**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **TAMMY EDWARDS,** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION NUMBER**<br>**2:07-cv-908-MHT** |
| **HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, and MIKE SWINDLE, individually,** | |
| **Defendants.** | |

<u>**EVIDENTIARY SUBMISSION IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT OF DEFENDANT HYUNDAI MOTOR MANUFACTURING
ALABAMA, LLC**</u>

COMES NOW Defendant Hyundai Motor Manufacturing Alabama, LLC (hereinafter "HMMA") and submits this Evidentiary Submission in Support of Its Motion for Summary Judgment.  HMMA relies upon the following evidence:[1]

Exhibit A     Deposition of Plaintiff Tammy Edwards and Exhibits 1-6, 8-28
(Deposition pages 25, 26, 49-52, 97-99, 307-12, 355-360, and Exhibits 4, 15 – 16, 18, 19 – 23, and 25-28 filed under seal)

---

[1] HMMA has filed a Motion to Seal portions of its Evidentiary Submission for the reasons set forth in that Motion.  HMMA is today separately filing a paper copy of the documents HMMA seeks to seal that are included in its Evidentiary Submission. Those documents are identified in the above listing, but are not included in this pleading. HMMA is also serving Plaintiff's counsel via hand delivery with a copy of the documents it seeks to have sealed. Information such as home addresses, telephone numbers, and the names of persons not pertinent to this litigation have been redacted from the attached documents in accordance with the E-Government Act of 2002 and Section II.I of the Administrative Procedures for the CM/ECF System for the United States District Court, Middle District of Alabama.

Exhibit B      Deposition of Defendant Mike Swindle and Exhibits 1 – 2, 6 – 10
(Exhibits 1, 7, and 10 filed under seal)

Exhibit C      Deposition of Stacye Jones and Exhibits 11-19
(Exhibits 14 – 19 filed under seal)

Exhibit D      Deposition of Tom Bondy and Exhibits 24, 27, and 28
(Exhibit 28 filed under seal)

Exhibit E      Deposition of Billy Kitchens and Exhibit 30

Exhibit F      Deposition of Amber Kelly and Exhibit 31

Exhibit G      Deposition of Wendy Warner and Exhibits 32 – 39, 41-44
(Exhibits 41 – 44 filed under seal)

Exhibit H      Deposition of Steve Culpepper and Exhibit 45

Exhibit I      Deposition of Kimberly Abrams

Exhibit J      Deposition of Michelle Nelson

**WHEREFORE**, HMMA respectfully requests that this Court grant its Motion for Summary Judgment, dismiss Edwards' claims with prejudice, and award HMMA its costs in defending against this action.

Respectfully submitted,

*/s/ Brian R. Bostick*
Timothy A. Palmer
J. Trent Scofield
Brian R. Bostick
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205)328-1900
Facsimile: (205)328-6000
brian.bostick@odnss.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 8[th] day of August, 2008, I electronically filed the foregoing Evidentiary Submission in Support of Motion for Summary Judgment of Defendant Hyundai Motor Manufacturing Alabama, LLC with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Kenneth D. Haynes
Alicia K. Haynes
Haynes & Haynes, P.C.
1600 Woodmere Drive
Birmingham, Alabama  35226

J. Tobias Dykes
Constangy, Brooks & Smith
One Federal Place
1819 Fifth Avenue North, Suite 900
Birmingham, Alabama  35203

_/s/ Brian R. Bostick_
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205)328-1900
Facsimile: (205)328-6000
brian.bostick@odnss.com

In The Matter Of:

**TAMMY EDWARDS**
v.
**HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, ET AL.**

**NO. 2:07-CV-908-MHT**

---

**TAMMY EDWARDS**
June 3, 2008

---



**TYLER EATON**

TYLER EATON MORGAN NICHOLS & PRITCHETT INC.

THE HIGHEST QUALITY IN COURT REPORTING

**Page 1**

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NO. 2:07-cv-908-MHT

TAMMY EDWARDS,
          Plaintiff,
vs.
HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC,
and MIKE SWINDLE, individually,
          Defendants.

DEPOSITION
OF
TAMMY EDWARDS
June 3, 2008

REPORTED BY:  Teresa Turquitt Davis
          Certified Court Reporter,
          Registered Professional
          Reporter and Notary Public

**Page 2**

1  S T I P U L A T I O N
2       IT IS STIPULATED AND AGREED,
3  by and between the parties, through their
4  respective counsel, that the deposition of
5  TAMMY EDWARDS may be taken before Teresa
6  Turquitt Davis, Commissioner, Certified
7  Court Reporter, Registered Professional
8  Reporter and Notary Public;
9       That the signature to and
10  reading of the deposition by the witness
11  is not waived, the deposition to have the
12  same force and effect as if full
13  compliance had been had with all laws and
14  rules of Court relating to the taking of
15  depositions;
16       That it shall not be necessary
17  for any objections to be made by counsel
18  to any questions, except as to form or
19  leading questions, and that counsel for
20  the parties may make objections and assign
21  grounds at the time of trial, or at the
22  time said deposition is offered in
23  evidence, or prior thereto.

**Page 3**

1       A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4       Ms. Alicia K. Haynes
5       Attorney at Law
6       Haynes & Haynes, P.C.
7       1600 Woodmere Drive
8       Birmingham, Alabama 35226
9
10  FOR THE DEFENDANT, HYUNDAI MOTOR
11  MANUFACTURING ALABAMA, LLC:
12       Mr. Brian R. Bostick
13       Attorney at Law
14       Ogletree, Deakins, Nash,
15          Smoak & Stewart, P.C.
16       One Federal Place, Suite 1000
17       1819 5th Avenue North
18       Birmingham, Alabama 35203
19
20
21
22
23

**Page 4**

1       A P P E A R A N C E S (Continuing)
2
3  FOR THE DEFENDANT, HYUNDAI MOTOR
4  MANUFACTURING ALABAMA, LLC:
5       Mr. Christopher N. Smith
6       Corporate Counsel
7       Hyundai Motor Manufacturing
8          Alabama, LLC
9       700 Hyundai Boulevard
10       Montgomery, Alabama 36105
11
12  FOR THE DEFENDANT, MIKE SWINDLE:
13       Mr. J. Tobias Dykes
14       Attorney at Law
15       Constangy, Brooks & Smith
16       1819 Fifth Avenue North
17       One Federal Place, Suite 900
18       Birmingham, Alabama 35203
19
20  OTHERS PRESENT:
21       Mike Swindle
22
23

1 (Pages 1 to 4)

Page 5

INDEX

INDEX OF EXAMINATION
Page:
EXAMINATION BY MR. BOSTICK        7
EXAMINATION BY MR. DYKES        366
REEXAMINATION BY MR. BOSTICK        379
REEXAMINATION BY MR. DYKES        385
REEXAMINATION BY MR. BOSTICK        387

INDEX OF EXHIBITS
Page:
Defendant's Exhibit 1        14
Defendant's Exhibit 2        27
Defendant's Exhibit 3        37
Defendant's Exhibit 4        39
Defendant's Exhibit 5        40
Defendant's Exhibit 6        41
Defendant's Exhibit 7        101
Defendant's Exhibit 8        104
Defendant's Exhibit 9        117
Defendant's Exhibit 10        132
Defendant's Exhibits 11-13        169

Page 6

INDEX OF EXHIBITS (Continuing)
Page:
Defendant's Exhibit 14        265
Defendant's Exhibit 15        299
Defendant's Exhibit 16        304
Defendant's Exhibit 17        306
Defendant's Exhibit 18        309
Defendant's Exhibit 19        310
Defendant's Exhibit 20        313
Defendant's Exhibit 21        314
Defendant's Exhibit 22        315
Defendant's Exhibit 23        324
Defendant's Exhibit 24        326
Defendant's Exhibit 25        326
Defendant's Exhibit 26        331
Defendant's Exhibit 27        331
Defendant's Exhibit 28        332

Page 7

I, Teresa Turquitt Davis, a Certified Court Reporter and Registered Professional Reporter of Birmingham, Alabama, and a Notary Public for the State of Alabama at Large, acting as Commissioner, certify that on this date, as provided by the Federal Rules of Civil Procedure of the United States District Court, and the foregoing stipulation of counsel, there came before me at One Federal Place, Suite 1000, Birmingham, Alabama, on June 3, 2008, commencing at 9:17 a.m., TAMMY EDWARDS, witness in the above cause, for oral examination, whereupon the following proceedings were had:

TAMMY EDWARDS,
being first duly sworn, was examined and testified as follows:

EXAMINATION BY MR. BOSTICK:
Q.    Good morning, Ms. Edwards.

Page 8

A.    Good morning.
Q.    My name is Brian Bostick and I'm an attorney for Hyundai Manufacturing Alabama, LLC.  I'm going to be asking you some questions today about your lawsuit against the company that you have pending.
I take it you have given a deposition in the past?
A.    I have.
Q.    How many depositions have you given?
A.    One.
Q.    Was that in one of your car wreck cases?
A.    No.
MS. HAYNES:  Object to the form.
Q.    What type of case was that in?
(Brief interruption.)
MR. BOSTICK:  We can go off the record.
(Off-the-record discussion had from 9:19 a.m. until 9:26 a.m.)

TAMMY EDWARDS Case 2:07-cv-00908-MHT-SRW    Document 23-2    Filed 08/08/2008    Page 4 of 51
HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, ET AL.

TAMMY EDWARDS
June 3, 2008

Page 9

1   Q.   I think, Ms. Edwards, you were
2   about to tell me what type of case it was
3   that you gave a deposition in.
4   A.   A mortgage company.
5   Q.   What did that case involve?
6   A.   They had quoted us an interest
7   rate of 6 percent for 15 years.  And then
8   when it got down to signing, it was 8.2 or
9   something like that for 30 years.
10  Q.   And is that the business that
11  you and your husband own, the restaurant?
12  A.   It was concerning that
13  business.
14  Q.   What is the name of that
15  restaurant?
16  A.   It was Court Side Cafe.  It's
17  no longer.
18  Q.   When did it go out of
19  business?
20  A.   April or May '04, '05 -- '05.
21  Q.   Was that just financial
22  reasons that it went out of business?
23  A.   Yeah.

Page 10

1   Q.   What was the resolution of
2   that lawsuit?
3   A.   Initially we was awarded
4   $410,000, but that was -- the state law
5   was different or something.  Anyway, we
6   ended up settling for 15 --
7   MS. HAYNES:  Hold on.  Is
8   there a confidentiality agreement on that?
9   THE WITNESS:  (Shakes head.)
10  MS. HAYNES:  Okay.  You can
11  tell him.
12  A.   We settled for 15.
13  Q.   Thousand?
14  A.   Yes.
15  Q.   What is your current address?
16  A.   ▮▮▮▮▮▮▮▮▮▮▮▮, Clanton,
17  Alabama 35045.
18  Q.   How long have you lived there?
19  A.   I have been at that address
20  for -- August will be five years.
21  Q.   Okay.  I guess in terms of
22  this deposition, generally the rules are
23  that I'll ask you a question and unless

Page 11

1   your attorney tells you not to answer, you
2   are to answer my question; is that fair?
3   A.   Uh-huh.
4   Q.   And if you don't understand
5   what my question is or you need it to be
6   clarified, you are free to ask that.  If
7   you need to take a break at any point, you
8   are free to do so.  But I would generally
9   ask that if I have a question that I have
10  asked you, that we finish out that
11  question before we take the break; is that
12  fair?
13  A.   Yes.
14  Q.   Did you testify in the trial
15  of that case as well as give a deposition?
16  A.   Yes.
17  Q.   Okay.  Are there any other
18  times other than those two where you have
19  given some kind of sworn testimony?
20  A.   No.
21  Q.   Okay.  Other than that
22  lawsuit, are there other lawsuits that you
23  have had involvement in other than the

Page 12

1   present one?
2   A.   The wreck that I had while I
3   was at Hyundai, we haven't settled or done
4   anything on that.
5   Q.   Who is being sued in that
6   case?
7   A.   Robert.  I don't even know his
8   last name, but it involves -- his
9   insurance company is AAA or USAA.
10  Q.   What court is that in?
11  A.   Autauga County.
12  Q.   Okay.  You haven't been
13  deposed in that case?
14  A.   No.
15  Q.   Has this Robert person been
16  deposed?
17  A.   Not that I know of.
18  Q.   Who is your attorney
19  representing you in that case?
20  A.   Fletcher Green.
21  Q.   Now, I noticed that you had
22  one wreck that was right about when you
23  got hired, and then there was another one

3 (Pages 9 to 12)

Toll Free 800.458.6031                    Tyler Eaton Morgan Nichols & Pritchett, Inc.

http://www.TylerEaton.com

Page 13

1  while you were out on leave.  Which one of
2  those two wrecks does that lawsuit relate
3  to?
4      A.    The first one.
5      Q.    Is there any lawsuit related
6  to the second wreck?
7      A.    Well, the guy, it was a
8  Mexican and he didn't have a license or
9  anything.  But the vehicle was insured, so
10  I don't know where that stands.  I mean
11  the same attorney is looking into it, but
12  we don't know where --
13     Q.    So you are currently married?
14     A.    Yes.
15     Q.    What is your husband's name?
16     A.    ████████
17     Q.    Where does he work?
18     A.    He hangs sheetrock.  He's
19  self-employed in Chilton County.
20     Q.    Has he worked for an entity at
21  some point prior in time?
22     A.    When we got married, he was
23  working at the Coca-Cola plant.  And after

Page 14

1  that, he worked with Allsouth.  And the
2  rest of the time, he's been self-employed.
3      Q.    Okay.  How long has it been
4  that he's been self-employed would you
5  estimate?
6      A.    September, I think, will be
7  21 years.
8          (Whereupon, Defendant's
9          Exhibit 1 was marked for
10          identification.)
11     Q.    I'll show you what I have
12  marked as Exhibit 1, and ask you if you
13  can identify that for me, please?
14     A.    Yes.
15     Q.    It looks like, if you will
16  notice, there is four pages.  Is this your
17  application to Hyundai?
18     A.    Yes, it is.
19     Q.    I just noticed that there are
20  two pages -- the second page is dated
21  10/26/05, and then the last page is dated
22  November 2, 2005.  And it looks like it
23  may be two separate applications.

Page 15

1          Do you remember why there were
2  two separate applications that you
3  completed?
4      A.    I have no idea.
5      Q.    Okay.  Was there anything that
6  you put in either of these applications
7  that as you sit here today under oath that
8  you would say is not true?
9      A.    No.  The computer class at
10  George C. Wallace, I didn't finish, but I
11  was taking it.  I took it.
12     Q.    Well, on one of these you said
13  you had a 3.6 at Isbella High School and
14  one you said you had a 3.4.  Which one of
15  those is correct?
16     A.    I have no idea.  I was just
17  guessing.
18     Q.    It says you got your job there
19  or that you had a sister, ████████
20  Was she currently working at HMMA at that
21  time?
22     A.    Yes.
23     Q.    What area was she working in?

Page 16

1      A.    She's in the engine
2  department.
3      Q.    Is that her name today?
4      A.    Davenport.
5      Q.    ████████████?
6      A.    Uh-huh.
7      Q.    Is she still working out at
8  Hyundai?
9      A.    Yes.
10     Q.    Do you know approximately when
11  her hire date was?
12     A.    July of '05, I believe.  I'm
13  almost certain that is it.
14     Q.    And how did you come to fill
15  out an application at Hyundai?
16     A.    A friend of mine was a team
17  leader and he had picked up an application
18  for me.
19     Q.    Who is that?
20     A.    Ricky Mimms.
21     Q.    Okay.  And did you fill the
22  application out at home?  Did you take it
23  out to the plant yourself or did you give

Page 17

1  it to him to take back?
2      A.    I gave it to him.
3      Q.    I guess it looks like at that
4  time you had part-time work at Clanton
5  Accounting?
6      A.    Yeah.
7      Q.    Were you performing any other
8  work other than the work at Clanton
9  Accounting?
10     A.    I was licensed to substitute
11  teach.
12     Q.    Were you substitute teaching
13  at the same time?
14     A.    Just if they needed me.
15     Q.    When did you first get
16  licensed to substitute teach?
17     A.    It was '94 or '95.  I'm not
18  sure.  It's been a long time.
19     Q.    Why did you decide to look for
20  a full-time job when you had been working
21  part-time?
22     A.    Benefits.
23     Q.    Okay.  Back at that time, who

Page 18

1  were you -- did you have health insurance
2  prior to the time you went to work for
3  Hyundai?
4      A.    I had Blue Cross and Blue
5  Shield, but it had went up and we couldn't
6  afford it.  We took it out with Alfa, so
7  we had to get rid of it.
8      Q.    Had y'all had that through
9  some employer at some point in time, the
10  Blue Cross Blue Shield?
11     A.    No.
12     Q.    Y'all just got that through
13  Alfa you said?
14     A.    Alfa.
15     Q.    So at the time you were
16  interviewing with Hyundai, you didn't have
17  any health insurance?
18     A.    No.
19     Q.    This is showing -- you know,
20  it says that you worked for the substitute
21  teaching for Chilton County Board of
22  Education from '94 up until later.
23          Are there any other jobs that

Page 19

1  you held from '94 up until you started
2  working at Hyundai other than those listed
3  on --
4      A.    I worked at Durbin --
5      Q.    -- the second page of this
6  application?
7      A.    I worked at Durbin Farms.
8      Q.    When did you work at Durbin
9  Farms?
10     A.    Well, I left Clanton
11  Accounting and went to Durbin Farms.  I
12  don't remember what month it was, but I
13  didn't stay there long.
14     Q.    Approximately what time frame
15  are we talking?
16     A.    That I stayed there?
17     Q.    No, just the time frame that
18  you worked there yearwise.
19     A.    I think it was '05.  But a
20  good friend of mine was the office manager
21  out there and I would go in and do things
22  and she would teach me the computer.  You
23  know, instead of getting paid, I would

Page 20

1  learn things on the computer.  So I had
2  been in there before, just not as an
3  employee.
4      Q.    Okay.  Was there a period of
5  time when you were an employee on their
6  payroll?
7      A.    Yeah, during tax season.
8      Q.    And what was your title then?
9      A.    All I did was helped do the
10  monthly statements for their businesses
11  while they done taxes.
12     Q.    Did you go through any kind of
13  training program there?
14     A.    Well, I mean other than her
15  training me, no.
16     Q.    I mean, do they have like an
17  orientation process?
18     A.    No.
19     Q.    Or anything like that they had
20  at Hyundai?
21     A.    No.
22     Q.    Did they have a handbook or
23  anything like that that they gave you?

5 (Pages 17 to 20)

Page 21

1  A.  No.
2  Q.  When you worked at the Chilton
3  County Board of Education, did they give
4  you any kind of training on their
5  policies?
6  A.  No.  They just do a
7  fingerprint and a background check and
8  stuff like that.
9  Q.  Did they have a handbook
10 there?
11 A.  No.
12 Q.  Okay.
13 A.  Not that I got.
14 Q.  Was there any particular
15 grades that you would substitute for?
16 A.  When I started out, I
17 substituted K through 6 mostly, which, I
18 mean, I done K through 12 the whole time.
19 And then I started doing the high school,
20 and I done janitorial or lunchroom.
21 Q.  When you started at Hyundai,
22 were you still doing substitute teaching?
23 A.  I was still qualified, but I

Page 22

1  wasn't.
2  Q.  Did you do any substitute
3  teacher work during the time you were out
4  on leave at Hyundai?
5  A.  No -- like now?
6  Q.  From the time you left --
7  A.  I left in August.
8  Q.  Of 2006, correct?
9  A.  Yes.
10 Q.  From August 2006 until the
11 present, have you done any substitute
12 teaching?
13 A.  Yes.
14 Q.  Did you do any substitute
15 teaching in between the time you went out
16 on medical leave at Hyundai and the time
17 you received notice that your employment
18 had ended?
19 A.  No.
20 Q.  Okay.  When was the first time
21 you did substitute teaching?
22 MS. HAYNES:  Ever or
23 since her --

Page 23

1  Q.  Since leaving Hyundai.
2  A.  I really couldn't -- it's been
3  this year.
4  Q.  2008?
5  A.  Yeah.
6  Q.  Have you had any other
7  employment since leaving Hyundai other
8  than the substitute teacher work?
9  A.  I worked 15 hours, I think, it
10 was last week.
11 Q.  Where was that?
12 A.  At Unistrut.
13 Q.  Spell that for me.
14 A.  U-N-I-S-T-R-U-T.
15 Q.  What type of employment is
16 that?
17 A.  His secretary was out for
18 vacation and I just answered the phone and
19 done a little cleaning or whatever.
20 Q.  Who is "he"?
21 A.  The owner.
22 Q.  If you don't know --
23 A.  I don't know his name.

Page 24

1  Q.  Where is Unistrut located?
2  A.  It's off Exit 264.
3  Q.  And was that temporary work
4  or --
5  A.  It was just basically him
6  letting me work because his secretary was
7  out and he knew I was in a financial bind.
8  Q.  Okay.  But so I'm clear, from
9  when you go out on medical leave in August
10 of 2006, you didn't have any employment of
11 any kind for the remainder of 2006,
12 correct?
13 A.  No.
14 Q.  And then all of 2007 you
15 didn't seek any employment anywhere, is
16 that correct?
17 A.  No.
18 Q.  And then 2008, only in 2008
19 have you sought these types of employment;
20 is that true?
21 A.  Yes.
22 Q.  Have you submitted any
23 applications for employment in 2008?

6 (Pages 21 to 24)

Pages 25 and 26 Filed Under Seal

Page 29

1  Q.    Okay.  And you had checked --
2  A.    Oh, yeah, it says in January.
3  I definitely had a call before that.
4  Q.    It says positions applying for
5  back on Exhibit 1 and you had checked
6  production or maintenance and wrote in the
7  word "janitorial."  Do you see that on the
8  front page on Exhibit 1?
9      MS. HAYNES:  I'm sorry, where?
10     MR. BOSTICK:  It's on
11 Exhibit 1, the first page.  Right here, it
12 says positions applying for (indicating).
13     A.    Oh, yeah.  Yeah, because I had
14 worked janitor at the school.
15     Q.    What about production, did you
16 have any prior production experience?
17     A.    No, other than just working.
18     Q.    I mean like --
19     A.    Being timed, you are talking
20 about?
21     Q.    Just any production facility
22 or any type of a corporation where you had
23 worked before.

Page 30

1  A.    I had worked for Southeastern
2  Anodizing.  It's been years.
3  Q.    What year did you graduate
4  from high school?
5  A.    '87.
6  Q.    And then run me through your
7  employment history up until you got to
8  Hyundai.
9  A.    Okay. Let's see.  '87, I
10 graduated; married '87.  Started work at a
11 lawyer, Speaks & Speaks, in Clanton.  I
12 started there, I believe, in August.  I
13 may have left in April to go -- I left
14 during peach season because I was raised
15 on a farm and my daddy didn't have much
16 help, and I actually made more money in
17 the field than I did in the lawyer's
18 office.
19     MS. HAYNES:  That is the way
20 those things work.
21     Q.    Where did you go after --
22     A.    When peach season was over, I
23 went to Blue Cross and Blue Shield.

Page 31

1  Q.    You worked at Blue Cross Blue
2  Shield?
3  A.    Yes.
4  Q.    What did you do for them?
5  A.    Data entry.
6  Q.    Where was that?
7  A.    In Riverchase.  I was in
8  Medicare Part B.
9  Q.    And then where did you go
10 after that?
11     A.    Back to the peach fields.
12     Q.    When roughly did you work at
13 Blue Cross Blue Shield?
14     A.    I started in November, I
15 believe, and it's been 19 or 20 years ago.
16 I quit around peach season again.  My
17 daughter was also in the hospital with
18 pneumonia, she was just ten months old.
19 But I quit right before peach season
20 again.
21     Then I stayed at home and had
22 two more kids and stayed with them.  And
23 then when my daughter started kindergarten

Page 32

1  in '94, the principal, which was the same
2  principal I had, asked me to apply for
3  substituting because I had been her office
4  aide for years.  So I applied '94 or '95.
5  But anyway, that is how I got into
6  subbing.
7  Q.    How often, I mean, '94/95 when
8  you were doing the substitute teaching,
9  give me your best estimate about how often
10 you are being called in to work.
11     A.    The first year or first couple
12 of years, I didn't do as much because I
13 had two smaller kids.  And then I worked a
14 pretty good bit basically, you know, maybe
15 once or twice a week.
16     Q.    So the busiest you would be
17 with that though with the substitute would
18 be once or twice a week though?
19     A.    Well, no, that wouldn't be the
20 busiest, just maybe an average.  Sometimes
21 it would be all week long and then
22 sometimes none.
23     Q.    Okay.  And then that is your

8 (Pages 29 to 32)

Page 33

1  substitute teaching. While you are doing
2  that, are there any other jobs that is
3  starting around '94 or '95, it sounds? I
4  know we had the accounting job that comes
5  a little bit later. Any other jobs that
6  you have in addition to the substitute
7  teaching from '94/95 forward?
8      A.   I worked at Wal-Mart until it
9  was peach season again.
10     Q.   What did you do for Wal-Mart?
11     A.   I worked in the bakery.
12     Q.   Give me the years that you
13 were there roughly.
14     A.   I wasn't there but -- I was
15 only there three months. I couldn't -- I
16 don't know what year it was.
17     Q.   So any other companies that
18 you worked for during this time period up
19 until when you start working at Hyundai?
20     A.   Just that Southeastern
21 Anodizing.
22     Q.   Did you go through orientation
23 and training at Blue Cross Blue Shield?

Page 34

1      A.   Yeah. We went through a
2  little bit.
3      Q.   And they do training on
4  diversity and they do the training on
5  sexual harassment and all that; you went
6  through that?
7      A.   No. I mean, I just went
8  through the training on my job.
9      Q.   It's your testimony you never
10 had any sexual harassment training at Blue
11 Cross?
12     A.   Not that I remember.
13     Q.   Is it possible that they had
14 it, you just don't recall it?
15     A.   It could be, but I don't think
16 so.
17     Q.   Okay. So your testimony is
18 you don't think Blue Cross was doing
19 training on sexual harassment when you
20 worked there?
21     MS. HAYNES:  Object to the
22 form.
23     A.   I don't remember it.

Page 35

1      Q.   What about Wal-Mart, did you
2  go through any training on sexual
3  harassment when you worked there?
4      A.   Yes.
5      Q.   What do you recall about that
6  training?
7      A.   It's basically a computer
8  test.
9      Q.   Who were you supposed to
10 report harassment to if it happened to you
11 at Wal-Mart?
12     A.   I believe it was a manager.
13     Q.   Did you ever make any
14 complaints of sexual harassment or
15 discrimination to anybody prior to the
16 time you worked at Hyundai?
17     A.   No.
18     Q.   Had you ever complained that
19 you had been discriminated against, not
20 just harassed, but discriminated --
21     A.   No.
22     Q.   -- against?
23     A.   No.

Page 36

1      MS. HAYNES:  Let him finish
2  his questions. You are talking over him.
3  It makes it hard for this lady.
4      Q.   But I guess at the time you
5  began working at Hyundai, at least from
6  your training at Wal-Mart, you knew sexual
7  harassment was illegal; right?
8      MS. HAYNES:  Object to the
9  form.
10     A.   I really never thought about
11 it, but, yeah.
12     Q.   And you knew from your
13 training at Wal-Mart that the general
14 process is to go complain to a manager if
15 you have a problem, right?
16     A.   I knew that is what Wal-Mart's
17 thing was.
18     Q.   Okay. And then you went
19 through orientation there at Hyundai as
20 well, didn't you?
21     A.   Uh-huh.
22     MS. HAYNES:  You will have to
23 answer out.

9 (Pages 33 to 36)

Page 37

1    A.   Yes.
2        (Whereupon, Defendant's
3    Exhibit 3 was marked for
4    identification.)
5    Q.   That is a document your
6 attorney provided to us. Do you recall
7 receiving this document when you were
8 going through your training out at Hyundai
9 in your first few weeks of employment?
10   A.   Yes.
11   Q.   Did you mark off these little
12 X's that are on this sheet, do you know?
13   A.   I believe so.
14   Q.   And so y'all had each of these
15 topics covered on the specific days?
16       MS. HAYNES:  The ones that are
17 X'd out or all of them?
18   A.   They were scheduled for those
19 days. I'm not positive that is what
20 happened.  That was the schedule.
21       MS. HAYNES:  Object to the
22 form of the question.
23   Q.   So the schedule you were

Page 38

1 provided said that on Friday,
2 January 20th, there was going to be sexual
3 harassment training by Chad Griffon?
4    A.   Uh-huh.
5    Q.   Do you know who Chad Griffon
6 is?
7    A.   No.
8    Q.   Do you know if he was in the
9 legal department there?
10   A.   I have no clue.
11   Q.   It sounds like you had a car
12 wreck during this week, right?
13   A.   I did -- no, I had the car
14 wreck on the 26th.
15   Q.   Why do you think it was the
16 26th that you had the car wreck on?
17   A.   Because I remember it.
18   Q.   Were you at work and did you
19 participate in training on the 19th and
20 20th?
21   A.   I did on the 19th, I believe,
22 but I don't think I did on the 20th.
23   Q.   Were you at work on the 20th?

Page 39

1    A.   I don't think so.  I missed a
2 Friday.
3    Q.   Why did you miss that Friday?
4    A.   I had went to the emergency
5 room because my -- we had a nurse -- there
6 was a nurse there and she was telling us
7 different things and my -- I had a real
8 bad headache and the sides of my neck
9 swelled up real bad and she told me I
10 needed to get to the hospital.  And I went
11 home and went to the emergency room and I
12 had -- I think they said my ears were
13 infected, but they said I had an allergic
14 reaction to something, and that is why I
15 was out.
16       (Whereupon, Defendant's
17    Exhibit 4 was marked for
18    identification.)
19   Q.   I have marked as Exhibit 4, it
20 looks like a medical record to Chilton
21 Medical Center Emergency Department dated
22 January 19th.  It looks like the time, if
23 I do my military time right is about 5:55.

Page 40

1 Is that consistent with your recollection
2 about when you went to the emergency room?
3    A.   Yes.
4    Q.   Did they hold you off work the
5 next day after you left the emergency
6 room?
7    A.   They recommended that I didn't
8 if I wasn't feeling better and the
9 swelling went down.
10   Q.   Do you know why there are no
11 checkmarks on any of the January 19th,
12 which is the Thursday dates, if you
13 attended those?
14       MS. HAYNES:  Are you talking
15 about Exhibit 3 now?
16       MR. BOSTICK:  Yes.
17   A.   Uh-uh, other than that was the
18 day that I was sick and I may have just
19 not marked them out.
20       (Whereupon, Defendant's
21    Exhibit 5 was marked for
22    identification.)
23   Q.   This was a team member

10 (Pages 37 to 40)

Page 41

1 handbook that was produced by your
2 attorney. Did you get a copy of the
3 handbook during your orientation?
4     A.    I believe so.
5     Q.    And did you read through it
6 during the orientation?
7     A.    No. I mean, we looked over
8 whatever they had, but I don't recall the
9 handbook.
10    Q.    Okay. But it sounds like --
11 I'll go ahead and mark week two.
12        (Whereupon, Defendant's
13        Exhibit 6 was marked for
14        identification.)
15    Q.    I think these were --
16 Exhibit 6, it looks like is the same type
17 of calendar for the orientation, but it
18 also -- it looks like -- is this some of
19 the additional materials, if you look
20 through the back? You have got to watch
21 out on us sneaky lawyers, we will try to
22 get you to admit it's a document you
23 haven't seen. But are these documents

Page 42

1 that were passed out to you during the
2 orientation as well?
3     A.    Yes, I would assume so.
4     Q.    Where was this orientation
5 taking place at the facility?
6     A.    At the training center.
7     Q.    Is there a big conference room
8 there?
9     A.    Yeah.
10    Q.    Who was in attendance with
11 you? Did you have any friends that
12 attended with you?
13    A.    My sister.
14    Q.    Who is your sister?
15    A.    ▬▬▬▬▬. We got hired the
16 same day.
17    Q.    Did she miss any time during
18 the two-week period?
19    A.    No.
20    Q.    Did you ever have any
21 conversations with her about what was
22 discussed in the sexual harassment
23 training on Friday?

Page 43

1     A.    I just asked her what did I
2 miss and she said mainly sexual
3 harassment.
4     Q.    Did she discuss what was said
5 about that?
6     A.    She said that the lady said
7 that I would have to take it. Whenever I
8 started work, I would just have to come
9 back and take it, that they would schedule
10 it.
11    Q.    It looks like there were
12 various different people from team
13 relations who spoke throughout the
14 orientation. Were there any specific
15 people from team relations that you met
16 during the orientation process?
17    A.    Patricia Adams is the main one
18 I remember because she was basically over
19 it, but I don't know if she is team
20 relations.
21    Q.    And, I guess, what was your
22 understanding from the orientation process
23 of what team relations' function is?

Page 44

1     A.    Basically, if you had a
2 problem to go to them, I guess.
3     Q.    They are a little bit
4 different concept than a lot of -- they
5 are not really a manager per se, they are
6 more like an advocate for the employee; is
7 that kind of your understanding from the
8 orientation process about what team
9 relations would be?
10        MS. HAYNES: Object to the
11 form.
12    A.    No. I assumed that they was
13 like management, you know.
14    Q.    But they were the specific
15 people that said if you have an issue with
16 something here in the plant or if you have
17 got a problem with your manager, team
18 relations is who you should talk to?
19        MS. HAYNES: Object to the
20 form.
21    A.    That is what I was told later.
22    Q.    That is what they were
23 communicating during orientation, too,

11 (Pages 41 to 44)

Page 45

1  wasn't it?
2      MS. HAYNES:  Object to the
3  form.
4      A.   That if we need them.
5      Q.   They are there?
6      A.   That they still work for
7  Hyundai.
8      Q.   And then you had, I guess --
9  who was the lady you said that was the
10  team relations person?  I asked you if you
11  knew anybody in orientation and you
12  mentioned someone's name.
13      A.   I'm not sure she's team
14  relations.  I'm just saying she was over
15  most of the -- Patricia Adams.  I never
16  seen her in our building.  I just seen her
17  at the training center.  I don't think
18  she's team relations.
19      Q.   And then when was the first
20  time that you met Stacye Jones?
21      A.   She come around one night
22  while we were -- I mean, checking each
23  station and just introduced herself.  I

Page 46

1  had been there maybe a couple of weeks or
2  so.
3      Q.   Do you know was she assigned
4  to your area?
5      A.   Yes.
6      Q.   Was there a team relations
7  person assigned to your department?
8      A.   Yeah.
9      Q.   And then who was there before
10  her?
11      A.   Her and Wil Ware.  I don't
12  remember which one was first.
13      Q.   Had you talked to Wil Ware
14  any?
15      A.   I had talked to him about
16  having to miss days for doctors'
17  appointments because I was worried about
18  missing days.
19      Q.   And you went to him with that
20  issue?
21      A.   Well, he stopped by my station
22  one night and I had been out, I think, the
23  day before or something and I asked him.

Page 47

1  Or I was going to have to be out and I
2  asked him how that was going to hurt
3  because the word on the floor was you
4  don't supposed to miss any the first six
5  months, no matter what.
6      Q.   What did he say?
7      A.   He just said as long as I had
8  a doctor's excuse, not to worry about it.
9      Q.   Obviously, we are going to
10  talk about the time you go to Stacye Jones
11  in late July or early August.  But prior
12  to that time, had you gone to her with any
13  complaints or issues?
14      A.   She had saw me in the bathroom
15  one night and my eyes was swelled up
16  from -- I had an allergic reaction to
17  something, I don't know what it was.  But
18  anyway, she had tried to talk to me about
19  going home.  And I also discussed my neck
20  with her because I was having trouble with
21  that, and she had suggested that I go to
22  short-term disability.
23      Q.   This is some point prior to --

Page 48

1      A.   Yeah.
2      MS. HAYNES:  You need to let
3  him finish his question.  You are still
4  answering too quick.
5      A.   Yeah.
6      Q.   That is prior to sometime in
7  August?
8      A.   Yes.
9      Q.   But so I am clear, did you
10  ever give Hyundai any doctors' notes with
11  medical limitations on your ability prior
12  to August of 2006?
13      A.   No.
14      Q.   It looks like, and we are
15  going to take a break real quickly here in
16  a second, but just to finish up, you have
17  told me your car wreck was the second week
18  of the orientation.  Did you think it was
19  January 26th?
20      A.   It is.
21      Q.   And looking at that, looking
22  back at Exhibit 6, did you miss that
23  second week, the Friday, the 27th, those

Pages 49-52 Filed Under Seal

Page 53

1    department when you came back from your
2    car wreck in January of '06 and had them
3    review your status?
4        A.    No.
5        Q.    Okay.
6        A.    I had talked to them.
7        Q.    You had talked to who?
8        A.    Medical. I mean, I did before
9    I left in August.
10       Q.    Now, I'm talking about in
11   January of 2006.
12       A.    No.
13       Q.    Did you go and have --
14       A.    No.
15       Q.    Obviously in August --
16       A.    Yeah.
17       Q.    -- they went in and they
18   reviewed your doctors' stuff and they tell
19   you this is what we think you can do and
20   this is what we think you can't do; right?
21       A.    Uh-huh.
22            MS. HAYNES: Object to the
23   form.

Page 54

1        Q.    Was there any process like
2    that back in January of 2006 when you came
3    back from the car wreck?
4        A.    Not that I can recall.
5        Q.    So other than you having a
6    conversation with Steve Culpepper where
7    you say your neck is sore from the wreck,
8    do you know of any communications between
9    your doctor and Hyundai about any
10   limitations placed on you in January
11   of 2006?
12       A.    In January?
13       Q.    Right.
14       A.    I mean, my doctor just told me
15   light duty, I mean, I knew --
16       Q.    And Steve Culpepper, he was
17   your group leader?
18       A.    Yes.
19       Q.    Was he your group leader
20   throughout the time --
21       A.    Yes.
22       Q.    -- that you worked there? Is
23   he the person you would go to if you

Page 55

1    wanted to get moved from one place to
2    another?
3            MS. HAYNES: Object to the
4    form.
5        A.    I --
6        Q.    He would be the person --
7        A.    Yeah, he would be the person
8    that would move you, but you wouldn't go
9    to him.
10       Q.    But he's the one directing
11   your assignments there?
12       A.    Yeah.
13            MR. BOSTICK: Why don't we
14   take a quick break and let everybody run
15   to the restroom, if they need to?
16            (Short break taken from 10:10
17   a.m. until 10:15 a.m.)
18       Q.    (BY MR. BOSTICK:) Ms.
19   Edwards, tell me about the first position
20   that you were assigned to there at
21   Hyundai. You said it was in fenders?
22       A.    Yes.
23       Q.    I guess you were a team member

Page 56

1    was your job title throughout the time
2    that you were there?
3        A.    Yes.
4        Q.    But then you might be assigned
5    to different areas?
6        A.    Yes.
7        Q.    What area is fenders within?
8    Is it within the body shop or is it within
9    a particular department?
10       A.    It's in the body shop, but it
11   was labeled as moving parts.
12       Q.    Okay. And then, I guess, help
13   me understand the body department. I know
14   you got to be familiar with that with your
15   CCR job. What are the various departments
16   that were reporting downtime to you later
17   when you were in the CCR job?
18       A.    The people that actually
19   contacted me or I contacted?
20       Q.    Well, I guess --
21       A.    Both?
22       Q.    Focus on just the CCR for a
23   second. You have, I assume, from point A

14 (Pages 53 to 56)

Toll Free 800.458.6031              Tyler Eaton Morgan Nichols & Pritchett, Inc.

                                                                    http://www.TylerEaton.com

TAMMY EDWARDS Case 2:08-cv-00908-MHT-SRW    Document 23-2    Filed 08/08/2008    Page 16 of 51
HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, ET AL.

TAMMY EDWARDS
June 3, 2008

Page 57

1 to point F in the assembly line that you
2 are responsible for saying there is
3 downtime on the line and here is what
4 happened?
5    A.    Okay, yes.
6    Q.    Tell me where it starts at A
7 and where it starts -- and where it ends
8 are the areas that would be reporting
9 downtime to you.
10    A.    Body build and BC-1.
11    Q.    Okay.
12    A.    But I would -- I mean,
13 something could break down somewhere else
14 like in fenders and that would still be in
15 my report, both the actual thing as to why
16 these two lines wasn't running.
17    Q.    So you were saying body build
18 is down, and there could be a specific
19 problem in body build that stopped the
20 process?
21    A.    Uh-huh.
22    Q.    But a fender could be coming
23 from moving parts and if you don't have a

Page 58

1 fender in body build, you have to stop the
2 line as well?
3    A.    Yeah, BC-1, yeah.
4    Q.    Did you have any reporting
5 responsibility for the moving parts
6 department?
7    A.    If it stopped the line.
8    Q.    Okay.  But I have seen in some
9 of the reports you would take pictures and
10 whatnot.  Would you get as detailed on a
11 downtime in the moving parts area as you
12 would in the BC-1 line?
13    MS. HAYNES:  What reports are
14 you talking about?
15    MR. BOSTICK:  The downtime
16 reports that she did as a CCR operator.
17    A.    I guess it would depend on how
18 serious or how long the downtime was.
19    Q.    So going back to your fenders
20 job, tell me what your job
21 responsibilities were in that position.
22    A.    I placed a fender on the
23 machine.  You just lay it down and then

Page 59

1 you mash a button and the clamps come down
2 on it and it welds it by itself.  You step
3 back and then it releases it and then you
4 just put it on a rack.
5    Q.    You pick the fender up and put
6 it on a rack?
7    A.    Uh-huh.
8    MS. HAYNES:  Is that a yes?
9    A.    Yes.
10    Q.    How much would you estimate
11 that fender weighed?
12    A.    Probably about three pounds.
13    Q.    Okay.  And were you working
14 first shift at that time?
15    A.    I was second shift.
16    Q.    Okay.  I don't necessarily
17 need to make this an exhibit, just let me
18 show you.  This looks like a change form
19 that says Tammy Edwards is assigned to
20 second shift effective 1/30/06.  I'm just
21 wondering were assigned to first shift --
22 does that refresh your recollection; were
23 you assigned to first shift for a month

Page 60

1 and then assigned to second shift later?
2    A.    No.  In the plant, they do
3 four months and then four months.
4    MS. HAYNES:  Are you marking
5 that as an exhibit?
6    MR. BOSTICK:  No.
7    MS. HAYNES:  Can we refer to
8 what you just showed her on the record?
9    MR. BOSTICK:  Document Bates
10 number D00044.
11    Q.    Okay.  So what were you
12 saying?
13    A.    That there --
14    MS. HAYNES:  Hold on.  What
15 was the question?
16    MR. BOSTICK:  I don't know.
17 You interrupted me.
18    MS. HAYNES:  Well, then read
19 it back.  But the record needs to be clear
20 when you are showing her a document.  It
21 either has to be marked or referred to as
22 a Bates number so the record is clear.
23    MR. BOSTICK:  There is a rule

15 (Pages 57 to 60)

Page 61

1  that says that?
2        MS. HAYNES:  Mine.
3        MR. BOSTICK:  Federal rules of
4  Haynes procedure.
5        MS. HAYNES:  That is right.
6        (Record read.)
7     A.    My beginning date was the
8  17th.  We trained for two weeks during the
9  day.  My starting date in the plant was
10  January the 30th and it was night shift.
11     Q.    I've got you.  So your first
12  assignment within the plant was second
13  shift working on fenders?
14     A.    Yes.
15     Q.    Okay.  How long did you work
16  in that position?
17     A.    I guess about a month or so.
18  I don't know the exact date.
19     Q.    And then you reported to Steve
20  Culpepper as your group leader, right?
21     A.    Well, at that time we reported
22  to Keith Ulrich.
23     Q.    What was his title?

Page 62

1     A.    His title was team leader.
2     Q.    Was Culpepper your group
3  leader?
4     A.    Yes.
5     Q.    The team leader, you give him
6  your time reports; is that what you do?
7     A.    Yeah.  And he's the one put me
8  on fenders because of my neck.
9     Q.    Who is, Keith?
10     A.    I mean, Steve assigned me to
11  his department.  And Steve and I both told
12  him about my car wreck, so he put me on
13  fenders.
14     Q.    Okay.  So tell me what you do
15  with your time sheets in terms of giving
16  them to the team leader.
17     A.    At that point we signed them
18  at the end of our shift and there was a
19  little rack up there and we updated it.
20     Q.    But would you give it to Keith
21  Ulrich, is that who --
22     A.    I would leave it in his
23  department or on his desk.

Page 63

1     Q.    Okay.  Other than that, would
2  you have any interaction with Keith Ulrich
3  on a day-to-day basis?
4     A.    Just if I needed -- if I was
5  going to tell him I had a doctor's
6  appointment or something like that.
7     Q.    And would he tell you then to
8  go talk to Steve Culpepper?
9     A.    Not -- he wouldn't -- he would
10  just tell me I would have to give him an
11  excuse, turn an excuse in.  But like if it
12  was on a Friday or something that was --
13  that he thought that we didn't need --
14  that somebody -- a bunch of people was
15  out, he would say you have to go talk to
16  Steve.
17     Q.    Okay.  So, I guess, were there
18  any times where you gave him the excuse
19  and he said go on home or would he say --
20  you've got this excuse, would he say well,
21  go clear it with Steve and then you can go
22  home?
23     A.    I didn't ever leave early.

Page 64

1     Q.    Okay.
2     A.    When I was under Keith, unless
3  it was early schedule.
4     Q.    Did Steve Culpepper ever do
5  any reviews of your performance?
6     A.    He just walked around and
7  inspected.  We didn't ever talk.
8     Q.    No formal, sit down with a
9  piece of paper type reviews though?
10     A.    No.
11     Q.    Same thing for Keith Ulrich?
12     A.    Yeah.
13     Q.    He didn't do any reviews?
14     A.    No.
15     Q.    Were you ever disciplined by
16  Mr. Ulrich?
17     A.    No.  He bragged on me.
18     Q.    Do you know whether or not
19  Mr. Ulrich would have had the authority to
20  discipline you, write you up?
21     A.    I believe he would.
22     Q.    I mean, what makes you think
23  that?

16 (Pages 61 to 64)

TAMMY EDWARDS v. 2:07-cv-00908-MHT-SRW    Document 23-2    Filed 08/08/2008    Page 18 of 51
HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, ET AL.

TAMMY EDWARDS
June 3, 2008

Page 65

1    A.    Because he was over me.
2    Q.    Well, I mean, do you know of
3 him ever issuing a reprimand to any team
4 members?
5    A.    No.
6    Q.    Okay.  Other than the fact
7 that he was the team leader, do you have
8 any basis to claim that he could have
9 disciplined you?
10    A.    Just knowing that he has said
11 yes and no to what we done.  He put us
12 where we was.
13    Q.    He could move around job tasks
14 and whatnot, right?
15    A.    Uh-huh.
16    Q.    But it sounds like you are
17 saying if there is a time when you might
18 need off work for a particular day or
19 something, that is something you would
20 clear with the group leader?
21    A.    No.  I went to Keith.
22    Q.    And Keith sometimes said you
23 need to go --

Page 66

1    A.    Sometimes he would -- yeah.
2    Q.    So obviously that suggests
3 that there is some things that had to go
4 above him, right?
5    A.    Yeah, some things.
6    Q.    What other things would he say
7 that is not something I can do, that is
8 something you need to talk to your group
9 leader about?
10    A.    Later when I got moved to CCR,
11 because Steve told me I wasn't going
12 anywhere, I didn't like it to begin with,
13 it was just -- I just didn't like it.  But
14 anyway, I asked could I go back to the
15 floor and Steve said no.  And because he
16 was over me then and he said no, he said
17 you are doing too good a job, and he said
18 you are not going nowhere.
19         And I worked on a Saturday and
20 I worked in the moving parts and it was a
21 real simple job where you just put little
22 parts on.  I mean, they didn't weigh
23 anything.  And you could stand up the

Page 67

1 whole time, which was better than sitting
2 down for me, and he said -- I went and
3 asked him, I said is there any way I can
4 do that job because that guy back there
5 said that he needed help, and he said no,
6 he said you are not going anywhere.  He
7 said you can do it on Saturdays, he said
8 but you are not going anywhere.
9    Q.    So there is a conversation you
10 are having with Culpepper at the time you
11 are doing the CCR job?
12    A.    CCR, yeah.
13    Q.    Was that job on the BC-1 line
14 that you were --
15    A.    No.
16    Q.    -- asking about?  What
17 department was it in?
18    A.    It was in moving parts.
19    Q.    Give me your best estimate as
20 to when you think that conversation took
21 place.
22    A.    I guess it was about a month
23 into me being CCR because I talked to him

Page 68

1 several times about it.
2    Q.    When did you start in the CCR
3 position?
4    A.    I believe it was March.
5    Q.    Okay.  Tell me about how you
6 came to be placed in the CCR position.
7    A.    I was on fenders and Keith
8 Ulrich come and got me, which was my team
9 leader.  He said you need to go with me,
10 and I said okay.  And I said where are we
11 going, and he said they want to see you.
12 And I said who is "they," and he said
13 Tom -- not Tom, but Harry and Steve.  And
14 I'm like what is wrong, did I do something
15 wrong.  And he is like no, no, no, you
16 didn't do nothing wrong and he was
17 laughing.  So he walked over there and
18 Steve said -- just pointed because we
19 didn't talk or nothing at that time much
20 or hardly any.
21         But anyway, so I went to sit
22 with Harry, which was the assistant
23 manager, and he said how are you liking

17 (Pages 65 to 68)

TAMMY EDWARDS
Case 2:07-cv-00908-MHT-SRW    Document 23-2    Filed 08/08/2008    Page 19 of 51
HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, ET AL.

TAMMY EDWARDS
June 3, 2008

Page 69

1  your job. And I said I like it just fine.
2  And he said how good are you on the
3  computer or typing and I said pretty good.
4  And I said I used to do about 70 or 80
5  words a minute, but I haven't typed in a
6  while. And he said well, would you like
7  to be on one now. And said what are you
8  talking about and he said I have got a job
9  available, and he said I need somebody to
10  keep up with the downtime with these
11  robots -- he said I stayed here all night,
12  and he said then all during the day the
13  Koreans are calling me because the reports
14  are not accurate.
15         And I said the reports, because
16  I didn't understand what he said. He said
17  the reports on the robots. He said every
18  time this line stops, he said I'm supposed
19  to tell them why it stopped. And he said
20  when they do a -- when I have a report
21  done, if they have a question, you know,
22  they should be able to look at it and say
23  oh, this is what happened, this robot

Page 70

1  broke, and he said that is not what is
2  happening right now. He said can you type
3  without typing all capital letters and I
4  said yeah, and he said okay. He said
5  well, I would like for you to do our
6  downtime. And I said okay, what do I need
7  to do different or when do I start or
8  whatever. And he said I'll be talking to
9  you, and he said just keep it between us
10  right now and I said okay.
11         So I got up and I went back to
12  my fenders. And then days later, Keith
13  come got me and was taking me to another
14  department or another part of his part and
15  he said come go with me, and I said okay.
16  And we walked over there and the machine
17  that we got to was broke down and they was
18  just sweeping around it, and I was like
19  what I am doing. He said well, I just
20  wanted to come over here so they would see
21  us come over here, he said but we are
22  fixing to go meet with your new boss.
23         And I said huh, and he said

Page 71

1  yeah. And I said so you won't be over me
2  still, and he said no, he said I won't be
3  over you, he said they are taking you away
4  from me, he said I sure hate to lose you.
5  So then we walked over to where Harry was.
6      Q.   What is Harry's last name?
7      A.   White.
8      Q.   What was his position?
9      A.   He was assistant manager.
10      Q.   Okay. So you went and spoke
11  to Harry?
12      A.   Me and -- Keith and me both
13  went.
14      Q.   What did Harry tell you?
15      A.   Harry said Tammy, he said this
16  is your new job right here, he said we are
17  going to go ahead and break you in on this
18  thing he said, but this is -- he
19  introduced Mike and he said this is the
20  king. And I said oh, okay. And he said
21  he's the king of the body build. And he
22  said you are going to love it over here,
23  he said don't worry, don't panic, he said

Page 72

1  all I want you to do is stand around and
2  watch how the robots work and this, that
3  and the other. He said we are going to
4  work you in.
5      Q.   Okay. So did somebody train
6  you to do the computer entry?
7      A.   When he took me over there
8  that night, Pam Stoddard, I didn't know at
9  that time that that was her job. I was
10  assuming that it was going to be a new
11  thing or, you know, two people doing it.
12  Anyway, she come up and she said what is
13  your job. And I said they said I would be
14  keeping up with downtime, I'm supposed to
15  be watching these robots and getting
16  familiar with it. And she said who said,
17  and I said Mr. Harry said. And she said
18  well, I want to know what is going on
19  because that is my job and she started
20  cussing and I was like well, I don't know
21  either, I said but you go tell -- which
22  Keith had said, you know, don't say
23  anything, but she asked me and that is all

Page 73

1  I could say.
2      But anyway, so that is what I
3  did. I told her that. She got mad. She
4  ended up --
5      Q.  She refused to train you
6  basically?
7      A.  Yeah, she refused to train me.
8  I had to go to the day shift for a
9  couple -- I think it was just one day. It
10 might have been two. But anyway, and let
11 the lady on the other shift train me
12 because Pam wasn't going to train me.
13     Q.  What was her name that was
14 on --
15     A.  Sherry McRae.
16     Q.  And so, you know, once you
17 were trained in doing the CCR job, are you
18 and Ms. McRae doing essentially the same
19 reports? You are on one shift and she is
20 for another shift though?
21     A.  Yes.
22     Q.  How long did it take you to
23 train with Ms. McRae before you started

Page 74

1  doing the job on your own?
2      A.  Oh, I only trained with her a
3  day or two. I think I might have stayed
4  two days, or it was one. I don't quite
5  remember.
6      Q.  Where did Pam Stoddard go
7  positionwise after you started full time
8  in the CCR?
9      A.  She remained on down there and
10 she would write down what was wrong on the
11 board downstairs and I would go get it off
12 the board.
13     Q.  But she had a job out in the
14 plant at that point, right?
15     A.  Yeah.
16     Q.  What was her position then?
17     A.  I mean, she was a team member.
18     Q.  Right. But like you were in
19 fenders?
20     A.  She was body build, I guess.
21     Q.  And so my understanding is if
22 there was some downtime in body build on
23 that shift, she is the person that is

Page 75

1  supposed to communicate with you about,
2  Pam was, about what the problem was; is
3  that right?
4      A.  If she was the one that wrote
5  it down or something. But sometimes, you
6  know, Melvin would write it down,
7  different people. And whoever wrote it
8  down is the one I would usually go to.
9      Q.  Melvin was in maintenance?
10     A.  No. He was in body build.
11     Q.  Was there somebody on the BC-1
12 line who was the person who would go write
13 it on the board or just say any type thing
14 is wrong with it?
15     A.  Amber Kelly.
16     Q.  So would Pam and Amber have
17 job responsibilities other than just
18 writing this on the board? I mean, would
19 they be doing a production job or
20 something like --
21     A.  I think Amber might like if
22 they was shorthanded, she would help on
23 the line and try to keep up with the board

Page 76

1  and Billy would help her.
2      Q.  So I take it there were no
3  discussions during this move to the CCR
4  about trying to get you a different job
5  because of your neck injury or anything
6  like that, were there?
7      A.  Steve just told me that it
8  would be a lot easier.
9      Q.  Well, I think you mentioned
10 this conversation with Steve. I thought I
11 heard you say that you went to him and
12 talked about doing -- where was the job
13 that you talked to him about going to when
14 you were in the CCR job?
15     A.  It was in moving parts.
16     Q.  And I thought I heard you say
17 you told him that if you were able to move
18 around instead of just sitting still, that
19 that would help your condition?
20     A.  Yes.
21     Q.  What specifically did you tell
22 him to that end?
23     A.  Do what?

19 (Pages 73 to 76)

Page 77

1  Q.  What did you tell him about
2  that? Did you tell him it was bothering
3  you to sit down for an extended period of
4  time?
5  A.  Well, they knew that. I even
6  brought a towel to work with me and put
7  behind my neck and I would walk around and
8  pull it just in the computer room, and
9  they told me I could walk around up there.
10  And Harry told me he didn't care what I
11  did as long as the report was done the
12  next morning, that was my only job.
13  Q.  So part of your job, as I
14  understand it, is entering information on
15  the computer, right?
16  A.  Uh-huh.
17  Q.  And then how often would you
18  have to go out into the plant to
19  investigate what the situation was?
20  A.  If anything happened with the
21  robot that was, you know, caused
22  significant downtime, they would want a
23  picture of it. And if the operator didn't

Page 78

1  have a camera -- some of them had
2  cameras -- and if they didn't have a
3  camera, I would have to go down there and
4  take a picture and talk with the person
5  who fixed it.
6  Q.  Were there departments that
7  could just call you and say here is the
8  problem on the phone, or were there some
9  that you couldn't communicate on the phone
10  with?
11  A.  The only ones that had a phone
12  was BC-1 and body build.
13  Q.  What areas would you need to
14  leave your desk in the computer room that
15  you were in to go investigate downtime?
16  A.  Any area that broke down.
17  Q.  I thought you were saying BC-1
18  and body build had phones. I assume if
19  body build --
20  A.  They do, but that don't mean
21  they used them.
22  Q.  Were there times that Pam
23  would call you and say body build is down

Page 79

1  and here is the problem and everything you
2  needed was contained in that call for your
3  report?
4  A.  Yeah, there were times, and
5  there were times it wasn't.
6  Q.  Okay. So it would depend on
7  what could be conveyed in the telephone
8  call?
9  A.  Yeah. A lot of times when I
10  would call down there they would say we
11  don't know what the problem is and I would
12  have to go find out myself.
13  Q.  But were there some areas that
14  just didn't have access to a phone to call
15  you at all?
16  A.  Yes.
17  Q.  What areas were those?
18  A.  The left and the sidelines,
19  the left and -- the moving parts, they had
20  radios, which all of them had radios that
21  they could tell me. But if they are
22  fixing the thing, they don't want to talk
23  then. And not to mention if I had to get

Page 80

1  a picture anyway, they would just tell me
2  face to face.
3  Q.  You mentioned Amber on the
4  BC-1 line. Who else, if anybody, would
5  you talk to on the BC-1 line that would
6  say here is the problem with the downtime?
7  A.  Billy Kitchens. And I can't
8  recall what the guy's name was. There was
9  a black guy that basically, you know, went
10  station to station and worked if somebody
11  had to go to the bathroom or whatever. I
12  forgot what his name was. He would tell
13  me if Amber and them didn't know.
14  Q.  Okay. Is that pretty much the
15  range of people on the BC-1 line you would
16  need to talk to to figure out what the
17  problem was?
18  A.  Yeah, like 90 percent of the
19  time.
20  Q.  The computer room where you
21  were based, was there anybody else that
22  worked in there with you?
23  A.  Richard Williams.

20 (Pages 77 to 80)

Page 81

1    THE WITNESS:  Can I stand up?
2    MS. HAYNES:  Sure.
3    A.    And Cory also.
4    Q.    What is Cory's last name?
5    A.    Cory, I don't remember.
6    Q.    Greggs?
7    A.    Yes, that is it.
8    Q.    Did you get along with both of
9    them?
10    A.    Uh-huh.
11    MS. HAYNES:  You have to
12    answer out.
13    A.    Yes.
14    Q.    So when you had your
15    information in your report, how would you
16    distribute the report when it was done?
17    Would you do that by e-mail?
18    A.    E-mail.
19    Q.    Did anybody have to look over
20    the report that you generated before you
21    could send it out at the end of the day?
22    A.    Steve would look over them
23    until he --

Page 82

1    Q.    Steve Culpepper?
2    A.    Yes.  Until he felt like I was
3    comfortable with what I was doing, not
4    only because he asked, but a lot of times
5    I asked him to look over it.
6    Q.    Would Tommy Bondy or any other
7    managers or Harry White review them?
8    A.    Harry White did.
9    Q.    But, I guess, was there any --
10    did you have to get their okay on a
11    day-to-day basis before e-mailing them
12    each day?
13    A.    If there was a certain problem
14    that I was unsure about or a picture that
15    I didn't -- I mean, a big picture of
16    something that was wrong, sometimes they
17    would -- the Koreans didn't want a picture
18    if somebody was standing on something that
19    might be dangerous; you know, they would
20    have to look at the pictures and make sure
21    everything was all right with that.
22    Q.    Did they ever discuss with you
23    that they felt that Steve or anybody else

Page 83

1    in management discussed with you that they
2    felt your descriptions of some of the
3    downtime issues were not as detailed as
4    they should have been?
5    A.    No.  They bragged on them.
6    Q.    Any conversation you had with
7    anybody in management where you talked
8    about doing things to improve the reports?
9    A.    No.  The first time I ever
10    spoke to Tom Bondy he said, Tammy, and I
11    said yes, and he said Tom Bondy, he said I
12    just want you to know the reports look
13    really good, and I said thank you.  That
14    was the first conversation I had had with
15    him.
16    Q.    So how would you have access
17    to the computer?  Did you have a password
18    to get on?
19    A.    I did.
20    Q.    Did you create your own
21    password?
22    A.    I did.
23    Q.    And so were there any days

Page 84

1    when you were out that -- I guess, when
2    you were out, who did the reports for you?
3    A.    Amber -- Steve or Amber.  I
4    had to leave my password.  I left it under
5    the computer.
6    Q.    Okay.  And had you trained
7    Amber to do the position?
8    A.    Yes.
9    Q.    How long did you take to train
10    her?
11    A.    It wasn't long because we
12    didn't get to train like all day.  It
13    would be certain times of the day she
14    would come up there and learn a little bit
15    here and a little bit there.
16    Q.    It looked like there was a
17    report that was called Amber report doc
18    that was in early June.  Is that
19    consistent with when you started training
20    her in your recollection?
21    A.    Probably.
22    Q.    Okay.  When you started
23    training her, was there a discussion about

21 (Pages 81 to 84)

Page 85

1 her eventually taking over the CCR
2 position?
3     A. No. The discussion what they
4 had agreed on was me do the upstairs for a
5 week and her do the downtime on the floor,
6 which was what she was already doing,
7 BC-1. She just walked around and found
8 out what was wrong and wrote it down on
9 her board and let me know or either I come
10 down there and read her board. And we
11 were going to alternate it each week.
12 That is what the plan was.
13     Q. So you would do Amber's job
14 out on the floor?
15     A. Uh-huh.
16     Q. And then she would do your job
17 in CCR?
18     MS. HAYNES: You have to
19 answer out.
20     A. Yes.
21     Q. And I guess what I am not
22 clear about with Amber's job is did she
23 have -- for example, you had a job with

Page 86

1 fenders where you had to do this and put
2 it --
3     A. Yes.
4     Q. Did she have a specific job
5 that would, you know, put a door on or
6 solder? I mean, what was she doing
7 specifically on the line at that time?
8     A. When I started CCR, Amber was
9 doing hinges on BC-1. And then to improve
10 the reports, they wanted to get them
11 better so they put somebody on the board
12 there because the team leader wasn't
13 having it correct. So they took her off
14 there and put her at the board and that
15 was her sole job was when they stopped, to
16 go find out what was wrong and make sure
17 that board was right.
18     Q. Weren't you saying that she
19 would fill in in other spots as well when
20 they needed that during that time?
21     A. Yes. I have seen her do it
22 twice.
23     Q. Okay. So if you were in that

Page 87

1 spot, you would have been doing that as
2 well?
3     A. No, because I wasn't familiar
4 with them. She was.
5     Q. Okay. I know you talked about
6 this conversation where you talked about
7 getting moved to moving parts with Steve
8 Culpepper. Was that in a point in time
9 before Amber was being trained or after?
10     A. Before.
11     Q. Is that conversation what led
12 to Amber being trained in that --
13     A. No. My doctor -- me being out
14 on doctors' excuses and stuff, they said
15 that it would be a good idea. I
16 recommended it to Rob and he said who
17 would you recommend, and I said Amber does
18 good down there, and he said okay.
19     Q. So I guess so I am clear, what
20 you are saying is that you were missing
21 time away from work, it was a discussion
22 of who can do this while I'm out?
23     A. Yes.

Page 88

1     Q. Do you know, was there ever
2 any discussion about Pam Stoddard doing it
3 while you were away from work?
4     A. She did do it, but she got
5 very upset about it and they didn't ask
6 her to no more.
7     Q. She was pretty upset that she
8 got --
9     A. Yes.
10     Q. -- moved out of that spot --
11     A. Yes.
12     Q. -- and you got moved in,
13 right?
14     A. Yes.
15     Q. What is her race?
16     A. She's black.
17     Q. And feel free to tell me, if
18 you need a break, just let me know.
19     A. I'm fine.
20     Q. So there is a discussion about
21 you asking to move to the moving parts
22 line. Did you ever have a discussion
23 while you were in the CCR position in this

22 (Pages 85 to 88)

TAMMY EDWARDS
HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, ET AL.

TAMMY EDWARDS
June 3, 2008

Page 89

1   June/July time frame about moving to any
2   other specific jobs?
3       A.   No.  I mentioned that I wanted
4   to go to the floor.  And one Saturday when
5   I was working, I mentioned I was wanting
6   to go back to the floor because at moving
7   parts I was in like just my own little
8   cubbyhole, it wasn't like a line, it was
9   quiet and you just done your job and it
10  wasn't strenuous or whatever.  And then
11  what I was doing now was just so much
12  commotion and just totally different than
13  what I was used to and I did ask -- I did
14  make mention that I wanted to go back to
15  the floor.  And I said it to Mike and that
16  was a Saturday.  Anyway, like an hour
17  later, he come and told me he said you are
18  coming to my line and I said huh.  He said
19  you are coming to my line, and I said how
20  do you know and he said I just called Tom
21  on the phone, and I said oh, okay.
22      Well, I wasn't wanting to go to
23  body build because, I mean, I didn't know

Page 90

1   how to do any of the jobs there other than
2   keep downtime and that still wouldn't help
3   me out any, so --
4       Q.   When did this conversation
5   take place with Mike?
6       A.   I have no idea.  I just know
7   that they discussed it and then when we
8   come back to work on Monday -- well, Harry
9   came in that Saturday and he come up and
10  he said so you are wanting to come to
11  Mike's line and I said huh.  And he said
12  are you going to work with Mike, and I
13  went "the floor"?  And he said no, are you
14  going to work on Mike's line?  He said do
15  you think you can handle it?  And I said
16  well, I don't think there is anything in
17  here I couldn't handle.  You know, as far
18  as mentally, I mean, I can learn any job.
19      And he said well, Mike is the
20  king and what Mike wants, Mike gets.  And
21  I knew that that wasn't what I was wanting
22  but I didn't want to be hateful about it.
23      And I went to Harry Monday when

Page 91

1   they was talking about it and I told him,
2   I said I'll just stay in the CCR room, and
3   he said are you sure and I said yeah.  I
4   said I'll be fine.  I said I'll just --
5   I'll stand up and sit down.  I said I have
6   gained -- I said I might gain a little bit
7   more weight, but I'll be all right.  I
8   just blowed it off as I'll just stay in
9   the CCR room.
10      Q.   Well, when you initiated the
11  discussion about going out on the floor,
12  had you told Mike or others there that
13  something to effect of well, my butt is
14  getting a little big, I want to get in a
15  job where I can move around or words to
16  that effect?
17      A.   Harry is the only person I
18  said anything.  I told him, I said I'll
19  stay up there.  And he said are you sure,
20  and I said yeah, I said I don't want to do
21  any -- I said that was nice of y'all to
22  give me that, I said I might gain a little
23  bit of weight, but I'll make it.

Page 92

1       Q.   So was wanting to get out and
2   move around more than you were in your
3   position, was that ever part of the reason
4   you wanted to move out of the CCR
5   position?
6       A.   The CCR position was -- it was
7   a good position, I learned a lot, but it
8   was just a different environment.
9       Keith Ulrich was just very
10  quiet, he was all Hyundai work, you know,
11  and I liked that.
12      And on the body build it was
13  just always MF this, MF that, cussing, men
14  and women talking about who is having an
15  affair with who; it's something that I
16  wasn't used to.  And you didn't want to
17  just say okay, I'm not going to be a part
18  of it.  You know, you didn't want to be
19  the bad one.  And it wasn't like you could
20  go to talk to anybody because it was
21  almost all of them doing it.
22      And I just felt like that I was
23  getting looked at like I was a part of it

23 (Pages 89 to 92)

TAMMY EDWARDS Case 2:08-cv-00908-MHT-SRW    Document 23-2    Filed 08/08/2008    Page 25 of 51
HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, ET AL.

TAMMY EDWARDS
June 3, 2008

Page 93

1  because of what people were saying and how
2  they were acting to me. And if you don't
3  say something back they think you are a
4  part of it and I didn't want to be a part
5  of it.
6      Q.    So this whole conversation
7  with Harry Chase and Steve Culpepper --
8      MS. HAYNES:  Harry Chase?
9      Object to the form.
10     A.    White?
11     Q.    Harry White, I'm sorry. Harry
12 White and Steve Culpepper about your
13 request to move back out on the floor is
14 at a point in time prior to the time you
15 go to Stacye Jones and make the complaint,
16 right?
17     A.    Yeah.
18     Q.    Give me your best estimate as
19 to when you think that request was made.
20     A.    Let's see. I started about
21 March. It was probably in May. I would
22 say around May.
23     Q.    Okay. And then sometime after

Page 94

1  that, Amber starts getting trained by you
2  on that position, the CCR position?
3      A.    It was a good while after
4  that. Because Sherry McRae had missed --
5  I don't know if it was a night -- I think
6  I was on days. Anyway, she had missed and
7  they were upset that day about the report
8  didn't get done and that is the day I told
9  Rob, which was the big senior manager, I
10 told him, I said well, we really need to
11 have somebody that can replace us. I said
12 I'm going to be out with doctors'
13 appointments, I said it wouldn't be a bad
14 idea to train somebody. And he said that
15 sounds good and he said who do you have in
16 mind, and I said Amber, I said she would
17 be good.
18     Q.    So when Ms. McRae was away
19 from work, do you know who would do the
20 reports on her shift when she was out?
21     A.    Chris, which was her group
22 leader, I think.
23     Q.    And then, I guess, but around

Page 95

1  that June/July time frame, Amber would be
2  able to do a report for you if you were
3  out?
4      A.    Steve actually done them until
5  like close to the end. But when that
6  conversation took place when we decided to
7  train somebody else, Sherry trained a girl
8  and she told me, she said just bring them
9  up here when the line is running good and
10 we are not real busy or either the
11 downtime, there is a lot of downtime she
12 said, don't keep them up here all day. So
13 I went by what she suggested.
14     Q.    Had you actually worked a week
15 out in the position Amber was in at some
16 point in time while you were at Hyundai?
17     MS. HAYNES:  Object to the
18 form.
19     Q.    Do you understand what I am
20 asking? You had said --
21     A.    I had performed the job.
22     Q.    You had said the plan was that
23 y'all would alternate weeks between you

Page 96

1  and Amber in the CCR job, right?
2      A.    Yes.
3      Q.    Did that ever go into effect,
4  and if so, when?
5      A.    The week that it was supposed
6  to go into effect was after my talk with
7  Stacye and they changed it.
8      Q.    Okay.
9      MS. HAYNES:  Do you need a
10 break?
11     MR. BOSTICK:  I think I'm to a
12 good stopping point. Why don't we take a
13 little restroom break real quick?
14     (Short break taken from 10:55
15 a.m. until 11:02 a.m.)
16     Q.    (BY MR. BOSTICK:)  I'm
17 thinking if we can push forward I can try
18 and maybe get through the whole -- your
19 complaint and when the investigation was
20 done and get to that point when you go out
21 on medical leave and we will probably take
22 a lunch break then and come back and
23 finish up with the rest of that stuff

24 (Pages 93 to 96)

Pages 97-99 Filed Under Seal

Page 101

1   Q.   Do you remember how you rated
2   him?
3   A.   No. I'm sure I did good.
4   Q.   You rated him as a good
5   manager or team leader?
6   A.   Yeah, he knew the job.
7   Q.   Do you recall approximately
8   when that was that you did that
9   evaluation?
10  A.   No.
11       (Whereupon, Defendant's
12       Exhibit 7 was marked for
13       identification.)
14  Q.   Does Exhibit 7 look like the
15  evaluation that you completed on
16  Mr. Swindle?
17  A.   (Reviewing document.)
18       MS. HAYNES: Is there anything
19  redacted off the top part of the page?
20       MR. BOSTICK: I don't think
21  so.
22       MS. HAYNES: Where it says
23  group leader, assistant manager, that was

Page 102

1   always blank?
2        MR. BOSTICK: I think so. If
3   we redact, we put a black marker on it.
4   Q.   Does this look like your
5   handwriting?
6   A.   All of it?
7   Q.   Is there something that looks
8   like your handwriting and something that
9   doesn't?
10  A.   Well, I wouldn't know some of
11  these -- I don't know some of these
12  people.
13  Q.   Okay. Like Ramsey Cowen --
14  who would you not know?
15  A.   Ramsey Cowen. Paul Dawson was
16  not on my shift. Dawn Magruder, I knew
17  her, she is a very hard worker. And
18  Carlos Wright, I had no -- I know him, but
19  I don't know what his job was. I seen him
20  in the plant.
21  Q.   I guess first and foremost, do
22  you know if this is something you
23  completed or not?

Page 103

1   A.   No.
2   Q.   It's not?
3   A.   Uh-uh.
4        MS. HAYNES: Say no.
5   A.   No.
6   Q.   Okay. Did you complete a form
7   similar to this though that you recall?
8   A.   I may have. I don't recall.
9   Q.   Okay. I mean, who would have
10  been the persons that you would have -- on
11  this list that you would have had enough
12  information about to make comments for?
13  A.   Dawn Magruder and Mike
14  Swindle.
15  Q.   Okay. But as best you can
16  recall, if you had done one on him, your
17  comments would have been that he was good
18  and very knowledgeable about the job of
19  Mike Swindle?
20       MS. HAYNES: Object to the
21  form.
22  A.   I would, yes, knowledgeable.
23  Q.   Okay.

Page 104

1        (Whereupon, Defendant's
2        Exhibit 8 was marked for
3        identification.)
4   Q.   I'll show you what I have
5   marked as Exhibit 8. This was a document
6   provided to us through your attorney. Do
7   you remember sending this e-mail to
8   Mr. Swindle?
9   A.   Yes.
10  Q.   Okay. Did you send him many
11  e-mails like this during the day, or how
12  often would you communicate to him by
13  e-mail?
14       MS. HAYNES: Object to the
15  form.
16  A.   Just like if people would send
17  me e-mails, you know, like this, I had a
18  list of people, and if I sent it, it would
19  just go to the same people, it wouldn't
20  just go to him. And then other people
21  also had my -- used my computer and they
22  would send e-mails.
23  Q.   I guess, did you just send

26 (Pages 101 to 104)

Page 105

1 this to him? It looks to me like this was
2 just you sent this to him and not anybody
3 else?
4    A.   No. I if I sent it to him, I
5 sent it to somebody else, too.
6    Q.   Your recollection is this
7 would have gone to other people as well?
8    A.   Uh-huh.
9        MS. HAYNES: You have to say
10 yes.
11    A.   Yes.
12    Q.   Okay. In your job as a CCR
13 operator, you would give Mr. Swindle your
14 time sheets, or how would that work?
15    A.   I would -- he would go in the
16 computer or either I would and put down
17 time.
18    Q.   But it sounds like was that
19 different for you than other team members
20 because you had access to the computer?
21    A.   Yes.
22    Q.   Explain that to me.
23    A.   I would do like the account of

Page 106

1 who is there and who is not, roll call, I
2 guess you could say. And I had access to
3 that and he would -- either he would call
4 me on Friday and say all right, what is
5 your hours or either have you updated it.
6    Q.   Okay.
7    A.   So we both did it.
8    Q.   Okay. So you could actually
9 enter your own hours into the system?
10    A.   Yes. If I wanted to, yeah.
11    Q.   Would you enter other people's
12 hours if they were absent?
13    A.   No. I just would let people
14 know -- the person that done the
15 attendance who was out.
16    Q.   Who was that person?
17    A.   Michelle Nelson normally done
18 it. And then they had me to go around and
19 do it. And I thought I was supposed to
20 report to some lady -- they told me to
21 report to this other lady, so I did. And
22 then Michelle sent me an e-mail and told
23 me that I needed to report to her.

Page 107

1    Q.   So other than dealing with
2 Mr. Swindle about time reports, were there
3 any other matters that you would have to
4 specifically deal with him on in your job
5 duties as a CCR operator?
6    A.   Just discussing downtime or
7 when I was going to be out since he was my
8 new team leader.
9    Q.   The time you were out. But, I
10 guess, in downtime in his area you talked
11 about Pam and Melvin being the two people
12 that you deal with. Would you then --
13 would Swindle be one of these people you
14 would go to if they were out?
15    A.   I mean, he would be one that I
16 would go to even if they were there if he
17 was the one standing by the problem.
18    Q.   But I guess Pam Stoddard was
19 your primary contact to deal with on that
20 in that area, right?
21    A.   Supposed to be, yes.
22    Q.   So did you get along with
23 Mr. Swindle --

Page 108

1    A.   I did.
2        MS. HAYNES: Object to the
3 form.
4    Q.   -- during the time you first
5 started working with him?
6    A.   I did. I didn't agree with
7 him, but I got along with him.
8    Q.   But, you know, did Mr. Swindle
9 ever come up to your computer room to
10 interact with you up there?
11    A.   Yes.
12    Q.   If he did, it was pretty rare
13 though, wasn't it?
14    A.   Yes.
15    Q.   So Mr. Swindle wasn't out
16 actively seeking to interact with you
17 during the time he was there at the plant
18 in terms of coming up to the computer
19 room, was he?
20        MS. HAYNES: Object to the
21 form. If you know what Mr. Swindle's
22 intent was.
23    A.   What now?

TAMMY EDWARDS 2:07-cv-00908-MHT-SRW   Document 23-2   Filed 08/08/2008   Page 29 of 51
HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, ET AL.

TAMMY EDWARDS
June 3, 2008

Page 109

1  Q.  How many times would you
2  estimate that Mr. Swindle came up to the
3  computer room during the time that you
4  were in the CCR position?
5  A.  Probably about fifteen is all.
6  Q.  And would he come up asking a
7  question about the downtime reports or
8  discussing downtime reports with that?
9  A.  No.
10  Q.  What would he discuss when he
11  would come up to the computer room to
12  talk?
13  A.  He would discuss his marital
14  problems and ask me questions about mine.
15  And mainly, his thing was that he didn't
16  understand how women -- any woman would
17  just sleep with one person, and that I
18  shouldn't believe my husband done it
19  either.
20  Q.  Is this a specific
21  conversation that you are recalling here?
22  A.  No.  That was discussed a lot
23  of times.

Page 110

1  Q.  Did you have Mr. Swindle's
2  number, telephone number in your cell
3  phone?
4  A.  I didn't have it as installed
5  like, but I did have his number.
6  Q.  If you wanted to pick up your
7  cell phone and call him, you could find it
8  within your phone to call him?
9  A.  If it was one of the last ones
10  on the thing is the only way.
11  Q.  How many times would you
12  estimate that you called him from your
13  cell phone?
14  A.  Probably three.
15  Q.  How many times would you
16  estimate that you called his cell phone
17  number from your work telephone?
18  A.  Probably several -- from the
19  CCR room?
20  Q.  Yes.
21  A.  Probably several.  Because if
22  he couldn't hear on the radio -- on body
23  build, you can't hear down there.  And if

Page 111

1  he didn't hear them calling him on the
2  radio, I would call his cell phone and say
3  they are calling you on the radio.
4  Q.  Did you call him to talk about
5  nonbusiness-related matters?
6  A.  Never.
7  Q.  Well, there was a period of
8  time where you would buy breakfast for
9  him, wasn't there?
10  MS. HAYNES:  Object to the
11  form.
12  A.  I went and got breakfast for
13  several people.
14  Q.  And he was one included,
15  wasn't he?
16  A.  Yes, he was.
17  Q.  Who else did you buy breakfast
18  for?
19  A.  Pam Stoddard, Richard Williams
20  and Jennifer Foster.
21  Q.  How many times would you
22  estimate you bought breakfast for
23  Mr. Swindle?

Page 112

1  A.  Oh, I couldn't tell you.
2  Several, whenever they asked.
3  Q.  Did he give you money for the
4  breakfast?
5  A.  Yes.
6  Q.  Or did you ever pay for his
7  with your own money?
8  A.  I paid for it one time and
9  then he paid me back.
10  Q.  Okay.  And did you pay for Ms.
11  Stoddard's breakfast any?
12  A.  Yeah, because she didn't have
13  change one day.
14  Q.  Well, would you call down to
15  him and say I'm going to get breakfast, do
16  you want something or something to that
17  effect?
18  A.  Not originally.  I don't know
19  how to say it.  If they knew I was going
20  to get breakfast, which I normally did
21  every morning, I would have to call them.
22  Because if I ever didn't call them, they
23  would say that I was being stuck up or

Page 113

1  whatever.
2      Q.    Who is "they"?
3      A.    Pam and Mike, just joking
4  around with me.
5      Q.    Did you and Mike ever talk
6  about you going to watch him race away
7  from work?
8      A.    Yes.
9      Q.    Tell me about that
10  conversation.
11     A.    He told me about him racing
12  and they -- several of them had
13  motorcycles. And said oh, I would love to
14  see that. I said my little boy -- I said
15  my youngest boy loves motorcycles, he is
16  motorcycle crazy. And he said why don't
17  you come watch us. And I said where is it
18  at, and he told me. And I said well, we
19  might just do that. And he said we, and I
20  said yeah. I said I'll have to ask Ralph.
21  And he said well, hell, if you are going
22  to bring Ralph, don't come.
23     Q.    Do you recall talking to

Page 114

1  Mr. Swindle at the family day event?
2      A.    I do.
3      Q.    Tell me what you remember
4  y'all discussing that day.
5      A.    It was just there wasn't any
6  tables. And when they come in, they come
7  in right beside us, and I said hey, I said
8  do you want us to save this table for you,
9  and he said yeah, if you don't mind. So I
10  waited on them to get their food and me
11  and my husband waited until they got a
12  table, and that was basically it.
13     Q.    Did you introduce Mr. Swindle
14  to your husband?
15     A.    Yes.
16     Q.    What did you say to your
17  husband? How did you introduce him?
18     A.    Just Mike, I guess.
19     Q.    I mean, did you say this is
20  somebody that works in my area or --
21     A.    This is my team leader.
22     Q.    Did you have any discussions
23  about he likes to race or anything like

Page 115

1  that?
2      A.    I don't recall.
3      Q.    Any small talk? Did you ever
4  tell Pam Stoddard that you thought Mike
5  looked similar to your husband?
6      A.    No.
7      Q.    Anything similar to that?
8      A.    No.
9      Q.    Did you ever tell Pam Stoddard
10  that you thought that Mike was attractive?
11     A.    No.
12     Q.    Did you ever call Billy
13  Kitchens from Mike's cell phone?
14     A.    I don't remember.
15     Q.    Was there a phone call that
16  you made where you pretended to be your
17  sister in the call to Billy Kitchens?
18     A.    From his phone?
19     Q.    From Mike Swindle's phone.
20     A.    I don't recall.
21     Q.    Do you recall Billy Kitchens
22  telling you that he thought your sister
23  was cute or something to that effect?

Page 116

1      A.    Billy never even saw my
2  sister. The people on the line that came
3  in training with us, they told him about
4  her and about how pretty she was or
5  whatever and how she was built. And Billy
6  kept telling me he was going to get her,
7  he was going to get her.
8      Q.    Did you ever make a call
9  pretending to be her to Billy just playing
10  her?
11     A.    I don't remember that.
12     Q.    This is a document Bates
13  numbered 1D01864. I'm not going to make
14  an exhibit of this, but it's a color --
15     MS. HAYNES:  What are the
16  numbers again?
17     MR. BOSTICK:  D01864.
18     A.    It's the day we got 600 --
19     MS. HAYNES:  There is no
20  question.
21     Q.    What is the date on the camera
22  printout?
23     MS. HAYNES:  I don't see a

29 (Pages 113 to 116)

Page 117

1  number on this document.
2      A.    It says 7/27.
3          MR. BOSTICK:  That is the
4  original.  The Bates number is on there.
5          MS. HAYNES:  I see down here.
6      Q.    It looks like July 27th, 2006?
7      A.    Yeah.
8      Q.    Are you in this picture?
9      A.    Yes.
10     Q.    I'll tell you what, let me go
11 ahead -- can I mark the color one?
12         (Whereupon, Defendant's
13         Exhibit 9 was marked for
14         identification.)
15     Q.    Can you circle for me where
16 you are in that picture?
17     A.    Have you got something to
18 write with?
19     Q.    (Counsel hands pen to
20 witness.)
21     A.    (Witness complies.)
22     Q.    Where is Mike Swindle in that
23 picture?

Page 118

1      A.    In the middle.
2      Q.    Can you circle him, too?
3      A.    (Witness complies.)
4          MS. HAYNES:  I'm sorry, I
5  didn't see where you circled.
6          THE WITNESS:  That is me and
7  this is him (indicating).
8      Q.    What was this photograph
9  memorializing?  What happened this day?
10     A.    We was the first shift to get
11 600.  That was a big goal for us.
12     Q.    To produce 600 --
13     A.    Units.
14     Q.    -- automobiles?
15     A.    Yes.
16     Q.    Did you give Mike Swindle a
17 hug that day as part of that celebration?
18     A.    No.  I patted him on the
19 shoulder.
20     Q.    Patted him on the shoulder.
21 Were there other times that you would
22 touch Mr. Swindle as you would walk by him
23 and just say hey and touch him on the

Page 119

1  shoulder or something to that effect?
2      A.    No.
3      Q.    Did you ever give him a hug?
4      A.    No.
5      Q.    Did you have any discussions
6  with Swindle about -- is it Roger
7  Cleckler -- that day?
8      A.    Yes.
9      Q.    Tell me about your
10 conversation with Swindle about Roger
11 Cleckler that day.
12     A.    I was walking -- our shift was
13 ending and the other shift was coming in.
14 And I had to wait.  You know, I was one of
15 the last ones on my shift to leave because
16 I had to wait until everything was tallied
17 up and stuff.  So I would go to the board
18 in BC-1 and then I would come down through
19 body build, which is connected or they are
20 close together.
21         And I was going down the aisle
22 and Mike seen me coming and he just
23 started bumping into me as I was walking.

Page 120

1  I was walking and I had my clipboard like
2  this (indicating).  And I always look
3  down, it's just a habit I have got.  And I
4  was just looking down and he kept just
5  bumping into me as we were walking, and I
6  said stop.  And I looked up and Roger
7  Cleckler was coming, which, I mean, I know
8  him, he's coached my kids in baseball.
9          Anyway, I said Mike, stop.  I
10 said people is going to think something.
11 He said I don't give an "F," and I said
12 don't talk like that.  I said he is a good
13 church-going man, I said don't be cussing.
14 Because Roger was walking this way.
15         And right when Roger got to us,
16 he said I don't give a fuck who he is or
17 where he goes.  And I just shook my head.
18 And I went to the end of the aisle and I
19 turned around and I went back because I
20 was going to say something to him.
21     Q.    To Roger?
22     A.    No, to Mike.  And he was
23 talking to two of the maintenance guys and

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                                                      http://www.TylerEaton.com

Page 121

1  I said I want to talk to you, and he said
2  blah, blah, blah, blah, blah like that,
3  and he just throwed his hand up. And
4  anyway, my shift ended.
5      Q.    And then Roger Cleckler, you
6  said he had coached your kids in --
7      A.    Baseball.
8      Q.    -- baseball? Did he go to
9  your church also?
10     A.    No.
11     Q.    Do you know anything about him
12  singing in a gospel group?
13     A.    (Witness nods head.)
14     Q.    What do you know about that?
15     A.    I just know he's in a gospel
16  group.
17     Q.    What is the name of the gospel
18  group?
19     A.    Fishers of Men, I believe.
20     Q.    Did you have a conversation
21  with Roger Cleckler after this incident?
22     A.    I did after like -- I think it
23  was September.

Page 122

1      Q.    Okay. Did you talk with him
2  at the ball field at some point?
3      A.    Yeah.
4      Q.    Tell me about that
5  conversation.
6      A.    He asked me how I was doing,
7  because he knew about my wreck. And I
8  said well, I said it's not just the wreck
9  the reason I'm not there. I said I'll go
10  ahead and tell you. I said since your
11  name was brought up in it, I said you
12  probably know something about it. And he
13  said what. And I said I was having
14  problems with my team leader, I said and
15  they are saying that you have called Ralph
16  because you saw something. And he said
17  what, and I said yeah. And he said Tammy,
18  he said you do not put up with that. He
19  said -- I said do you even know. And he
20  said who is it and I told him and he said
21  I don't guess I know him. And I said you
22  know the guy -- I said the first day I say
23  you at work and we were talking and we was

Page 123

1  talking about his son and he was asking me
2  about mine because they are the same age,
3  and we were talking and Mike come up while
4  we was talking and he said bye, Tammy, and
5  just done like that (indicating) and done
6  his shoulder like that, and I said bye.
7          Anyway, and I said that guy,
8  little short, and he said yeah. I said
9  well, anyway, I had some problems. And
10  after I had tried to talk with somebody
11  about it, I said they are pulling you into
12  it. And he said what are they talking
13  about. And I said just -- I don't know.
14  I said I don't know what all is said. I
15  said but anyway, I do know that they are
16  claiming that you called Ralph about
17  something.
18     Q.    Did you tape record that
19  conversation with Mr. Cleckler?
20     A.    No.
21     Q.    Okay.
22         MS. HAYNES: Did you mark the
23  picture as 9? Mine doesn't have a

Page 124

1  sticker.
2         MR. BOSTICK: Yes, I did.
3      Q.    Had you made any complaint
4  about Mr. Swindle at any point in time
5  prior to this July 27, 2006 incident that
6  you mentioned to me?
7         MS. HAYNES: Object to the
8  form.
9      A.    I had talked to some of my
10  coworkers, but they had all -- and Pam, I
11  had asked Pam to talk to him because she
12  was closer to him than anybody. And I had
13  also talked to Billy Kitchens.
14     Q.    Okay. Tell me about your
15  conversation with Pam.
16     A.    I just asked her would she ask
17  him to stop. And she said girl, if you
18  just act like it don't bother you, she
19  said he will stop. And I said that is
20  what he says and I said it's been going on
21  and I said he hasn't stopped yet. And she
22  said oh, don't worry about Mike, he's just
23  crazy. She said we just need to get him

31 (Pages 121 to 124)

Page 125

1  away from Jennifer and get him back with
2  his wife.  And I said well, that is what
3  I've been trying to do.  And I said he
4  said he was doing good because he had said
5  he had took his family to the lake and he
6  called me and told me about it.  He said
7  Tammy, you'll be proud of me, I took them
8  to the lake.  And I said yeah, I'm so
9  proud of you, and I've talked to him about
10 it.
11        And I've talked to Michelle
12 Nelson -- well, Sherry McRae has actually
13 talked to me first about him, and she is
14 on an opposite shift so I didn't know how
15 she would know anything anyway.  She said
16 you have got to watch him, he runs around
17 and he's a bad influence.  And I said oh,
18 really, and she said yeah.  I said well, I
19 sort of see some of it.  I said I heard he
20 was running around, but I don't know.  And
21 she said yeah, he is and I said I don't
22 know.
23        Anyway, and then Michelle

Page 126

1  Nelson told me when I talked to her about
2  it, she said it won't do no good to say
3  anything because all the management is
4  doing the same thing.  And I said well, I
5  pretty much figured that because he says
6  they are all drinking buddies and that he
7  couldn't get fired.  And she said yeah.
8        She said Tom is a really good
9  guy, she said but he has the same problem
10 they do.  So basically nobody to talk to.
11     Q.  So you and Michelle Nelson
12 were talking about -- whenever that
13 conversation took place, about going and
14 making a complaint against him, right?
15     A.  No.  She was just telling me
16 because he had been in the computer room
17 and she had come over there and she said
18 Tammy, she said you know Mike has got a
19 reputation and I said yeah, that is what
20 Sherry said.  And she said if any way
21 possible, she said you don't need to let
22 him be in here.  And I said well, I can't
23 stop him.  I said he don't hardly ever

Page 127

1  come up here, but -- I mean, he hardly
2  ever come up there.  And I said he's worse
3  on the floor than he is up here.
4        And she said what is he doing
5  and so I told her some of it, I said but I
6  don't want to start any trouble or nothing
7  I said because he said he would stop if I
8  just acted like it didn't bother me.  And
9  she said he won't ever stop.  She said
10 he's been that way ever since I've known
11 him.  She said everybody knows it.  She
12 said ain't nothing we can do about it
13 because management is the same way.  And I
14 said well, at least they don't talk like
15 he does, and she said well, they ain't no
16 different.
17     Q.  Tell me about your
18 conversation with Billy Kitchens.
19     A.  That was when I first got on
20 the CCR.
21     Q.  We think that was around
22 March, right?
23     A.  Yeah, like the end of March or

Page 128

1  maybe early April.
2     Q.  Okay.
3     A.  But anyway, Billy -- I mean,
4  Billy talked real dirty, too, but he
5  always said I'm sorry or whatever or tried
6  not to do it in front of me sometimes.
7        But Mike thought it was real
8  funny because I would get embarrassed and
9  stuff when he would do things, and he
10 would shake his private, grab it and do
11 like that (indicating) and the men would
12 laugh.  I mean, the more people was
13 around, the more he liked it.  And I kept
14 asking him to stop.  I said will you
15 please stop doing that.  And he said oh,
16 my God, he said what is it hurting, he
17 said I'm just playing with you.  And I
18 said yeah, but I don't like it, I said
19 please stop.  And he said all right, I'll
20 try.  Well, he didn't, he would still do
21 it every time I seen him.
22        And so I asked him, I said if
23 you don't stop, I'm going to have to quit

32 (Pages 125 to 128)

Page 129

1  even coming anywhere around you. And he
2  said what do you mean. And I said well,
3  people are going to think that I agree
4  with it if you keep doing that, and I said
5  please stop.
6          And anyway, I went on upstairs
7  to type some more. And when I went back
8  downstairs, I was going to go on the other
9  side of his line so I wouldn't -- because
10 I knew he was going to do it because he
11 thought it was funny, so I was going to go
12 to the other side. And when I looked up,
13 I seen him behind one of the vehicles and
14 he ducked down.
15         So when I seen him duck down,
16 there was another guy standing beside him,
17 I turned around and I went the long way
18 around, so I went all the way to BC-1.
19         When I got to BC-1, I was just
20 standing there writing down the downtime
21 and he come up right in my face and he
22 started cussing me out. And he said don't
23 you ever F'ing dodge me again. And I said

Page 130

1  what. He said I said don't you ever F'ing
2  dodge me again. He said if you don't want
3  me to talk to you, that is fine, I won't
4  never speak to you again.
5          I said Mike, all I did was ask
6  you to quit shaking. And he said I ain't
7  hurting you. And I said well, just quit
8  doing that, and he just turned around and
9  left. I mean, he was mad the rest of the
10 shift.
11         And the next morning when I
12 went to the board, Pam was laughing
13 because she knew that he was mad at me and
14 she was going tell her good morning, Mike,
15 ain't you going to tell her good morning
16 and they was laughing and I didn't say
17 anything, so I just kept writing.
18         And Billy had asked me the day
19 before what the deal was when Mike come up
20 cussing me, and I told him I said, he's
21 just such a pervert, I said I just can't
22 handle that, I said I'm not used to stuff
23 like that. And I said I have asked him to

Page 131

1  stop and he won't stop. And he said well,
2  you have just got to know Mike, he said
3  that is just Mike. He said he does shit
4  in front of my wife all the time, that is
5  why I don't bring my wife around him.
6          And I said well, I said I just
7  ain't used to it, I said I know all y'all
8  are, but I am not, I said, but I'm trying
9  to deal with it.
10         So anyway Mike come up to me
11 that morning after he was laughing at Pam
12 when I was at his board and he said let me
13 tell you something, he said don't you ever
14 F'ing go tell Billy nothing about me. And
15 I said what are you talking about. And he
16 said trying to get me in trouble, he said
17 Billy could try to get me in trouble if he
18 wanted to. And I said all I told him was
19 that you was a pervert, I didn't say go
20 report him or nothing. I said I just told
21 him -- he asked me what was wrong when he
22 seen him cussing me out, and I told him.
23         And he said -- I said Mike,

Page 132

1  listen, I don't want to fuss. I said all
2  I want to do is work. I said I ain't
3  trying to get you in trouble, I ain't
4  trying to get you fired, I just ask you
5  please don't do that no more, please just
6  don't talk like that and don't do that, I
7  said, because I want to be your friend.
8          And I even told him, I said I
9  think God put me here for you, I said,
10 because he was separated from his wife
11 when I first started, and I said your kids
12 need you. And he said okay, well, good,
13 and I said all right.
14    Q.   Do you need to take a break?
15    A.   (Witness shakes head.)
16    Q.   We can take a few minutes if
17 you want.
18         This conversation about not
19 saying anything to Billy Kitchens, did
20 that happen before or after this
21 July 27th?
22    A.   Before.
23         (Whereupon, Defendant's

33 (Pages 129 to 132)

Page 133

Exhibit 10 was marked for
identification.)

Q.    I'll show you what I am
marking Exhibit 10.  Can you tell me what
Exhibit 10 is, please?

A.    This is on Monday, the day I
talked to Michelle.  And Kim came up there
and told me that if I didn't talk to
Stacye, she was, and that I could get in
trouble for somebody else turning him in
instead of me because I was supposed to
turn him in.

Q.    In one of your tape-recorded
conversations, it sounds like you are
saying that there are three people that
told you that they would turn him in if
you didn't?

A.    Yes.

Q.    Do you remember saying that?

A.    Yes.

Q.    Who were the three people you
were talking about?

A.    Michelle, Kim and Amber.

Page 134

Q.    Okay.  So you told me earlier,
I had asked you about any conversations
that you had with anybody, and you told me
about this conversation with Michelle.
And I think you said that was her
saying --

A.    That wasn't this time.

Q.    That was an earlier time?

A.    Yes.

Q.    When do you think that
conversation took place?

A.    The first one?

Q.    Yes.

MS. HAYNES:  We are talking
about Michelle, right?

MR. BOSTICK:  Yes.

A.    I don't know.  I mean, just
sometime -- it was a good month before
this.

Q.    Okay.  Well, you started
working with Mr. Swindle in about late
March, early April?

A.    I think so.

Page 135

Q.    I mean, when is the first
time --

A.    No.  I think it was earlier
than March anyway --

Q.    You think it was earlier than
March?

A.    Yeah.

Q.    When is the first time that
you say something to Michelle Nelson,
Sherry McRae, Billy Kitchens or anybody
else where you are voicing that he is
doing something that you don't like?

A.    Billy Kitchens.

Q.    And when did that take place?

A.    Like a week -- I don't even
know if it was a week after I started on
his line.

Q.    Is that a conversation you
told me about a second ago?

A.    Yes.

Q.    After that conversation with
Billy Kitchens, when is the next time that
you have a conversation with somebody?

Page 136

A.    I talked to Sherry McRae when
I was on the day shift when she was going
to train me.  I actually may have talked
to her first.

Q.    Is that the conversation with
her you told me about?

A.    Yeah.

Q.    And when is the next
conversation you had with somebody?

A.    I talked to Pam several times
because -- asking her to talk to him.

Q.    And then when do you think
your conversation with Michelle Nelson
took place?

A.    The last one?

Q.    No, the first one.  You said
there was the first one and then you had
the one --

A.    Oh, it was probably -- go
ahead.

Q.    So I'm clear, it sounds like
you had a conversation with her earlier
on, right?

Tyler Eaton Morgan Nichols & Pritchett, Inc.
Toll Free 800.458.6031
http://www.TylerEaton.com

Page 137

1    A.   Uh-huh.
2    Q.   Yes or no?
3    A.   Yes.
4    Q.   And then you had a
5  conversation with her the same day that
6  you sent the July 31st e-mail?
7    A.   Yes.
8    Q.   When do you think your first
9  conversation with her took place?
10   A.   I would say sometime in June.
11   Q.   Okay.  Tell me about your
12 conversation with Michelle on July 31st.
13   A.   Michelle had sent me an e-mail
14 like we all send things out -- if somebody
15 sends it to us, they will send it out.
16 She had got a poem or some kind of thing
17 about a woman and the strength of a woman.
18       Anyway, I was sitting there and
19 I was reading the e-mail and it was
20 talking about how God made the woman on
21 the 8th day and how strong we are and how
22 they do the right thing and they don't let
23 things happen, blah, blah, blah.

Page 138

1        Well, while I was sitting
2  reading it, I started crying.  And so I
3  got up and I went to go to the bathroom.
4  And when I went out of my little room,
5  there is a -- the Koreans have a little
6  office right beside where I was.  And I
7  was going to go to the bathroom and
8  Michelle was coming toward me, and she
9  said hey, where is Amber.  And I said I
10 don't know.  And she seen me crying and
11 she said what is wrong, and I just went in
12 the Koreans' room because I didn't want
13 nobody to see me crying.  And I was just
14 crying real hard and she said what is
15 wrong, and I said that was just a really
16 good poem thing you sent me, I said it
17 just upset me, I said but I'll be all
18 right.  And she said no, she said you are
19 going to tell me what is wrong.  She said
20 that poem couldn't have upset you,
21 something is wrong.  She said are your
22 kids okay, and I said yeah, it's just
23 Mike.  I said I have tried to be his

Page 139

1  friend and I want to be his friend, I said
2  but I just can't be his friend, I said
3  because he won't stop doing all that dirty
4  stuff.  I said I have begged him and
5  begged him to quit doing that and he
6  won't.
7        And I said everybody laughs at
8  him, I said it's not like you can say
9  anything.  I said you have done told me
10 that the rest of them is the same way, and
11 I said I just don't know how to handle it.
12 I said I wish I could just go to another
13 department, even though I had it made
14 there.
15       But she said Tammy, she said
16 you cannot put up with it no more, she
17 said that is what is wrong with him,
18 nobody ever turns him in.  She said you
19 cannot put up with it no more.  She said
20 I'm going to talk to Kim.  And I said no,
21 I said don't tell anybody, I said I will
22 be fine, I said I just got upset with the
23 poem, I'll be fine.

Page 140

1        Well, I went to the bathroom
2  and I went on back to my computer and
3  Michelle -- Cory was there.  And then --
4  he was in the computer room with me.  And
5  he just said are you okay, and I said
6  yeah.  I didn't even tell him.  I said I'm
7  just having a bad day, I've got a lot on
8  my mind, and he said okay.
9    Q.   This is Cory saying this?
10   A.   Yeah.  And I was doing the
11 downtime and Kim Abrams said Tammy, and I
12 turned around and she was standing there
13 with Michelle.  And I said Michelle.  And
14 she said Tammy, she used to work somewhere
15 and she knows about this stuff.  And I
16 said I don't care, I said I don't want no
17 trouble.  She said Tammy, come in here.
18 So we went back in that little Koreans'
19 room and she said you tell me right now
20 what is going on and this, that and the
21 other and she said I'm going to tell you
22 what you are going to do.  And I said no,
23 I'm not going to do anything.  I said I

TAMMY EDWARDS
CASE 2:07-cv-00908-MHT-SRW    Document 23-2    Filed 08/08/2008    Page 37 of 51
HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, ET AL.

TAMMY EDWARDS
June 3, 2008

Page 141

1  have got to have my job.  And I said I'll
2  be all right, I said it's just a bad day.
3  And she said no, you are not, she said you
4  can go to Stacye or I'm going to.  And she
5  said it's going to be better if you go to
6  her, she said because if I go to her, you
7  can get in trouble, and she said I mean
8  it, too.  She said I'm tired of the way
9  Mike does, too.  She said he talks to me,
10  she said but I throw it back at him.
11      She said since I have cut up
12  with him myself, she said I can't say
13  anything.  She said but I do it just so he
14  will shut up.  And she said but I know you
15  don't do it, she said I have watched him
16  and she said I have seen him say things to
17  you and tell you about how everybody runs
18  around.  And I said well, everybody sees
19  him.  And she said you remember the other
20  day when he told you that everybody down
21  there run around and I told you I didn't,
22  I said yeah, I forgot about that, and she
23  said he's sitting there trying to tell you

Page 142

1  that it's okay.  I said yeah, I said that
2  wasn't that bad, you know, I just told him
3  no.  I said it's just the other stuff that
4  he does, I said but I'll be all right.
5  And she said well, I'm telling you that
6  you have got to lunch to report him or
7  either I'm going to.
8      So I went in there and they
9  watched me type Stacye and say I really
10  need to talk to you.  And she said all
11  right, she said you have done sent it, and
12  she knew then that I was going to talk to
13  Stacye.
14      So that afternoon Stacye called
15  me and said hey, I just got your e-mail,
16  she said do you want me to come over there
17  or you want to come over here.  But Cory
18  was in there with me, so I said I'll just
19  come to your desk.
20      So I went to her desk and I
21  asked her is there any way I can transfer
22  and she said why would you want to
23  transfer, what is going on.

Page 143

1      Well, I started crying and I
2  went to telling her and she said Tammy,
3  you can't transfer.  I said well, just put
4  me on another shift.  She said why would
5  you leave the CCR room, she said, you know
6  you have got it made.
7      And I said listen, I just can't
8  handle it and I told her about some of the
9  stuff that was going on and she said oh,
10  no, this don't happen.  I said listen,
11  Stacye, I consider you a friend, I said
12  you have been nice to me every time we
13  have talked, I said will you please just
14  do your best just to get me somewhere else
15  in the plant, I said because I don't want
16  this to get out, I mean, I said everybody
17  knows how Mike is and I just don't want to
18  be the one saying oh, poor little Tammy
19  can't handle it.  I said I just want to
20  get somewhere else.
21      And she said Tammy, no.  She
22  said my job is to fix the problem.  She
23  said I am not moving you away from any

Page 144

1  situation.  And I said I don't want
2  anything said, I said because my
3  husband -- you know, I said I have to go
4  home and tell him and I said he would be
5  worried every day, and she said yeah, your
6  job as a wife is to go home and tell him
7  and my job is to put a stop to it.
8      She said don't talk to anybody
9  today, she said I'm going to call my
10  management.  And she called her management
11  while she was sitting there and she said I
12  really need to come see you right now.
13  And she said I will talk to you about it
14  when I find out what to do from
15  management.
16      Q.  Okay.  So who did she call
17  when you were in the office?
18      A.  It was somebody in the other
19  building.
20      Q.  Was it a team relations person
21  as best you know?
22      A.  She said it was her
23  management.

36 (Pages 141 to 144)

Page 145

1    Q.   Did you speak to her again
2  that day, to Stacye?
3    A.   No.
4    Q.   And then it looks like the
5  notes, that you met with her the next day?
6    A.   Uh-huh.
7    Q.   Do you recall what time of day
8  you met with her?
9    A.   No.
10   Q.   Did you go home and tell your
11 husband about the stuff that night?
12   A.   Yeah.
13   Q.   Had you told him anything
14 about Mr. Swindle doing anything offensive
15 to you prior to July 31st?
16   A.   No.  I told him how he talks
17 and stuff.
18   Q.   You hadn't told him that
19 anything was directed at you by
20 Mr. Swindle prior to that time?
21        (Off-the-record discussion.)
22        (Short break taken from 11:47
23        a.m. to 11:53 a.m.)

Page 146

1    Q.   Back on the record, Ms.
2  Edwards.  Just so I am clear, was Stacye
3  Jones the first person in team relations
4  that you had spoken to about this
5  situation with Mr. Swindle?
6    A.   Yes.
7    Q.   And your first discussion with
8  her was on July 31st after you sent her an
9  e-mail?
10   A.   Yes.
11   Q.   And you mentioned earlier, I
12 asked you who all you had spoken to about
13 this prior to that time and you mentioned
14 Billy Kitchens.  And he's a team leader,
15 right?
16   A.   Yes.
17   Q.   And then you had also spoken
18 with Pam.  She's a team member, right?
19   A.   Yes.
20   Q.   And then Michelle, Sherry
21 McRae, those are both team members as
22 well?
23   A.   Yes, and Amber.

Page 147

1    Q.   Amber is a team member.  So
2  you hadn't spoken with Steve Culpepper
3  prior to this time, who was your group
4  leader, right?
5    A.   Steve saw a lot of it and he
6  was -- no.
7    Q.   You had not spoken to him
8  about this, made any complaint to him,
9  right?
10   A.   (Witness shakes head.)
11   Q.   And hadn't complained to Harry
12 about this either, right?
13   A.   No.
14   Q.   Prior to speaking with Stacye.
15 So just so I'm clear, have we talked about
16 everybody that you discussed this with at
17 Hyundai prior to you sitting down with
18 Stacye Jones on August 1st?
19   A.   I talked to Steve Culpepper
20 about another comment that was made and he
21 laughed at it, so I pretty much knew
22 what his reaction would be.
23   Q.   Tell me about this

Page 148

1  conversation with Steve Culpepper.
2    A.   Billy Kitchens kept telling me
3  my new job was going to be under his desk.
4  And Steve walked up and Steve said what is
5  going on, and I said tell him, Billy, tell
6  him what you said.  He started laughing.
7  And Steve said what did he say, and I said
8  he said my new job was going to be under
9  his desk.  And I looked at Steve and Steve
10 busted out laughing, and he said well, we
11 can't really authorize that, Billy.
12   Q.   Well, I mean was this some
13 type of complaint you were making to Steve
14 Culpepper?
15   A.   I was wanting his reaction to
16 see if he was going to be -- I thought he
17 was a little different, I didn't think he
18 was like that, but he didn't have the guts
19 to say anything.  He was over them, but he
20 didn't have any guts to discipline them,
21 you know.  He just laughed it off and said
22 oh, we can't really authorize that.
23   Q.   Is it your testimony you

Page 149

1  wanted Billy Kitchens to be reprimanded
2  over that comment?
3      A.   I was wanting him to say
4  Billy, you really shouldn't have said
5  that. I mean, I wasn't wanting anybody in
6  trouble, I was just wanting to address the
7  fact that the way they talk -- you know,
8  is there anybody that can say don't talk
9  like that, you know.
10     Q.   Well, what you wanted in your
11 mind, I guess, and what you said are two
12 different things.
13         MS. HAYNES:  Object to the
14 form.
15     Q.   What specifically did you say
16 to Steve Culpepper about the comment by
17 Billy Kitchens?
18         MS. HAYNES:  Object to the
19 form.
20     A.   All I said was Billy, tell him
21 what you said. And he laughed and I said
22 Steve, I said he says my new job is going
23 to be under his desk, and I said what

Page 150

1  about it. And he said well, we can't
2  really authorize that and just laughed, so
3  I just left it at that.
4      Q.   Any other conversations with
5  Steve Culpepper about Swindle or Kitchens
6  or anybody else saying anything you felt
7  was inappropriate prior to talking to
8  Stacye Jones on July 31st?
9      A.   I would make comments to Steve
10 about my downtime report about like if
11 something was down and he was wrong, he
12 would say well, who told you this, and I
13 said well, Pam said -- that is what Pam
14 had on the board or something like that,
15 he's like well, that is not what happened,
16 said something else happened, said you
17 might need to ask Mike.
18         And I said Steve, I said you
19 know how that goes. And he started
20 laughing and he said well, he'll tell you
21 what the problem is, he said he'll just
22 put a lot more into it and tell you some
23 stuff you don't want to hear. So, I mean,

Page 151

1  Steve was aware of it.
2      Q.   I mean do you know whether or
3  not he meant he might use an extra curse
4  word or something like that?
5          MS. HAYNES:  Object to the
6  form.
7      A.   Yes.
8      Q.   I mean, is it possible that is
9  what he is talking about as opposed to him
10 saying well, you are going to get sexually
11 harassed or make some sexual comments to
12 you or something like that?
13     A.   He knew --
14         MS. HAYNES:  Object to the
15 form. Is there a question? I didn't
16 understand a question in all that.
17         MR. BOSTICK:  She apparently
18 did, she was about to answer it.
19         MS. HAYNES:  Well, she is not
20 going to engage in any dialog with you.
21 She is going to answer your questions
22 only.
23         MR. BOSTICK:  Well, read it

Page 152

1  back and see what the question was.
2          (Record read.)
3      A.   He was pretty much saying you
4  know how Mike is, that is his way, he is
5  just -- he will still tell you what
6  happened, but he might put some more stuff
7  in there that you don't want to hear,
8  which means sexualwise, the "F" word, the
9  "MF" word, stuff like that.
10     Q.   That is how you took that?
11     A.   That is how I took it and that
12 is how he meant it.
13     Q.   You know that you can read his
14 mind?
15     A.   I did that day because, I
16 mean, he knows, everybody knows. The
17 whole line knows.
18     Q.   That he talks --
19     A.   That he cannot just come out
20 and give you an answer on anything.
21     Q.   Well, the truth is and your
22 testimony is that Mr. Swindle would talk
23 as sexually to you as to Pam as to anybody

38 (Pages 149 to 152)

Page 153

1  else in that area, isn't it?
2      A.    No.
3      Q.    You are saying that everybody
4  observed in your testimony him making
5  these comments, right?
6      A.    Uh-huh.
7      Q.    So, you know, Pam Stoddard is
8  able to observe that just as well as you,
9  right?
10     A.    Uh-huh.
11     Q.    Or, you know, any male
12  employees that are in that area, they were
13  able to observe that just like you,
14  weren't they?
15     A.    Yes.
16     Q.    And the majority of these
17  comments weren't even directed at you,
18  were they?
19     A.    Yes, they was.
20     Q.    So your testimony is that like
21  he didn't make sexual comments except when
22  you were in his area?
23     A.    He directed them to me because

Page 154

1  he said if I would just "F" him one time,
2  that I would go home and blow Ralph's head
3  off.
4      Q.    Did he ever make sexual
5  comments directed at anybody else other
6  than you that you saw?
7      A.    He talked about how he liked
8  having sex with other people, but he
9  didn't -- he said that him and Harry
10  didn't get along because Harry's wife
11  wanted him and stuff like that, and I was
12  a challenge to him because I had only been
13  with one person and he said he could
14  change that.
15     Q.    So my question is pretty
16  specific.  Did you ever see Mike
17  Swindle -- did you ever personally observe
18  him direct sexually derogatory comments at
19  anyone other than you?
20     A.    Yes.
21     Q.    Who?
22     A.    Amber Kelly.
23     Q.    Anybody other than Amber

Page 155

1  Kelly?
2      A.    He did to Kim, but they were
3  laughing -- they were both laughing and
4  joking.
5      Q.    Anybody other than Amber and
6  Kim?
7      A.    Jennifer, the one he was going
8  with.
9      Q.    Anybody else?
10     A.    Not that I can remember.
11  There was one lady that came in, but she
12  was from one of the suppliers.  And he was
13  looking at her and he made a face, and I
14  said what is that for, and he said that
15  girl that just walked by, I said I guess
16  you have been with her.  And he said oh,
17  no, he said I wouldn't touch her, he said
18  she F's niggers, and I said oh.  And he
19  said I don't go with that.  And I didn't
20  understand that because the girl he was
21  going with was black, so it was just a
22  comment he made.
23     Q.    What did you observe him say

Page 156

1  or do to Amber Kelly?
2      A.    Somebody had gave her a sucker
3  and we was standing at the stairs, and I
4  was already going up the stairs and she
5  said I don't want this.  And Mike walked
6  in the door and she said here, you want
7  this.  And he said no, but I've got
8  something you can suck on and he grabbed
9  his self and shook it at her.
10     Q.    Any other situations other
11  than that with Amber Kelly that you
12  observed?
13     A.    Other than him and her -- she
14  was telling him to quit looking at my butt
15  and quit doing this, and he grabbed me and
16  hugged me like and I was just standing
17  there.  She was like get your hands off
18  her and they got into a little argument,
19  and he said I ain't looking at you so
20  don't worry about it.
21     Q.    But specifically something
22  directed at Amber Kelly is what I'm asking
23  about?

Page 157

1      A.   No, because he said that she
2   was ghetto.
3      Q.   What did Amber Kelly say or do
4   in response to him making that comment
5   about the lollipop?
6      A.   She told me that she was going
7   to start recording them conversations,
8   that she was tired of the way they talked
9   to her.  And I was like how are you going
10  to do that, and she said I have got a
11  recorder on my phone.
12     Q.   What did she say to Mike
13  Swindle in response to him saying that?
14     A.   She just shook her head and
15  come on upstairs.
16     Q.   Did she laugh at it?
17     A.   No.
18     Q.   What did you see him say or do
19  to Kim?
20     A.   They were just cutting up that
21  day about Mike telling me that everybody
22  runs around.  And Kim has come up and said
23  Tammy, I don't run around.  She said Mike

Page 158

1   tells you everybody does it, but I don't
2   do it.  And he said oh, you know you would
3   "F" me or something like that, and they
4   just started laughing.  I mean, it was
5   like a joke.
6      Q.   So he and Kim were laughing
7   back and forth?
8      A.   Yeah.
9      Q.   Any other instances with Kim
10  other than that?
11     A.   No.
12     Q.   What about Jennifer?
13     A.   We were cleaning one day and
14  he said something sort of, you know, real
15  hateful.  And I was like why are you being
16  so hateful, I said you are not hateful to
17  Jennifer because me and her both was doing
18  it, whatever it was on that Saturday.  And
19  he was like well, she will cut me off if I
20  am hateful to her, said I can't be hateful
21  to her, it will ruin myself.
22     Q.   Was Jennifer there at the
23  time?

Page 159

1      A.   Yeah.  She hit him on the arm
2   like and they was laughing.
3      Q.   Any other instances with
4   Jennifer other than that one that you
5   observed?
6      A.   (Witness shakes head.)
7      Q.   So other than these
8   instances --
9           MS. HAYNES:  Did you answer
10  the question, I'm sorry?
11     A.   No.
12     Q.   The answer was no or you
13  didn't answer the question?
14     A.   No, I didn't see any other --
15  I don't recall any other.
16     Q.   I'm just trying to get us to a
17  point where we can take a break, and my
18  question is:  Other than Amber, Kim and
19  Jennifer, did you see him direct any kind
20  of sexual comments or behavior towards any
21  other women out at the plant other than
22  those three in these instances we have
23  just talked about?

Page 160

1      A.   He would tell me comments, but
2   as far as him taking them to the people to
3   their face, no.
4      Q.   We are going to talk when we
5   get back about all your interactions with
6   him, okay?
7      A.   Uh-huh.
8      Q.   What about Pam Stoddard, was
9   there any sexual banter back and forth
10  between the two of them?
11          MS. HAYNES:  Object to the
12  form.
13     A.   They talked about sex a lot
14  and how they had sex, but they didn't ever
15  act like they would be together.
16     Q.   I guess I have seen some of
17  those kind of conversations that are of a
18  sexual nature, but you never saw him say
19  or do anything to Pam Stoddard that she
20  appeared to find appropriate?
21     A.   No, because she was as bad as
22  he was.
23     Q.   Okay.

40 (Pages 157 to 160)

Page 161

1    MR. BOSTICK: Why don't we
2  take our break there? We can take our
3  lunch break.
4       MS. HAYNES: How long do you
5  want?
6       MR. BOSTICK: Let me finish
7  this up.
8       Q.   (BY MR. BOSTICK:) We were
9  talking about you had made mention about
10  him -- I guess, was Billy Kitchens around
11  when any of these instances were going on?
12       A.   Yeah.
13       Q.   Did you ever see Swindle
14  direct sexual comments -- make sexually
15  derogatory comments to Billy Kitchens or
16  to another man? When I say sexually
17  derogatory, I mean maybe he's making a
18  comment about --
19       A.   Someone else?
20       Q.   Or, you know, like -- I don't
21  know, not necessarily saying -- did you
22  ever see him make comments to men that you
23  felt were inappropriate?

Page 162

1       A.   Yes.
2       MS. HAYNES: Object to the
3  form.
4       Q.   Give me some examples of that.
5       A.   Like, for instance, one day
6  Billy was sitting on -- they had like
7  little break tables in the break room and
8  Mike was sitting at his little desk and
9  Mike was laid back and Billy was sitting
10  on top of the table and he had his head in
11  his hand like that (indicating), and I
12  said what is wrong and he looked up and he
13  said oh, I just didn't get me none last
14  night.
15       I said y'all just won't do, I
16  said that is all y'all talk about and I
17  shook my head. And Mike said you know
18  what your problem is, he said Ralph ain't
19  F'd you right, he said I'm just telling
20  you that is your problem.
21       And he took his chair and he
22  was going back and forth in it and he was
23  hollering, and anybody around could have

Page 163

1  heard him and he said you know what you
2  would say to me and I said no, I don't, I
3  don't want to know. He said you would say
4  "F" me, Mike; "F" me, Mike, do it harder,
5  and he said you would go home and blow
6  Ralph's F'ing head off. And Billy was
7  laughing. And he had his chair and he was
8  rolling across the floor like on it and he
9  was hollering "F" me, "F" me, "F" me.
10       Q.   I guess my question is a
11  little bit more specific is that that
12  sounds like a comment he is making to you
13  when Billy Kitchens was there.
14       My question is: Did you
15  observe Mike Swindle make any comments to
16  any men that you felt were sexually
17  inappropriate?
18       MS. HAYNES: To men, not in
19  front of men?
20       MR. BOSTICK: Right.
21       Q.   Did you ever hear something
22  like Billy Kitchens, oh, I would sleep
23  with your wife or something like that?

Page 164

1       A.   Yeah.
2       Q.   Tell me about that. A comment
3  he is directing to a man as opposed to a
4  woman that you felt were inappropriate?
5       A.   Him and Billy both talked that
6  way to each other about different women
7  they had been with and blah, blah, blah.
8  And he had told me some things, but not --
9  about Harry's wife, but that wasn't in
10  front of Harry.
11       Him and Billy talked about a
12  lot. But Billy wouldn't say -- he
13  wouldn't say it about me, he would just
14  talk about who he was going with.
15       Mike would always say me, about
16  me. And I even told him, I said would you
17  please stop, and Pam said oh, Tammy, hush,
18  he ain't hurting you, he don't want you,
19  and Mike said the hell you say. And he
20  told me, he said I'll drop Jennifer in a
21  minute if you will just give me the
22  go-ahead.
23       Q.   And I guess a second ago you

Page 165

1 made some mention about him saying this
2 where anybody could hear, talking about
3 Mike?
4 A.    Yeah.
5 Q.    And it sounds like on one of
6 your conversations you have where you
7 recorded it with Billy Kitchens, you tell
8 him that, you know, paraphrasing that the
9 stuff Billy Kitchens said to you was not
10 where everybody could hear, right?
11 A.    No.  Billy always apologized
12 and didn't address it to me.
13 Q.    Well, one of your big issues
14 with Mike Swindle and the things he said
15 to you was that other people could hear
16 what he was saying, wasn't it?
17 A.    Yeah, because he was
18 addressing it to me.
19 Q.    So other than the comments
20 with Billy Kitchens, can you think of any
21 other comments or actions you observed
22 that he directed towards men that you felt
23 were inappropriate?

Page 166

1 A.    He -- I had a picture.  I
2 always brought any updated pictures of my
3 family or kids or whatever, and I had a
4 picture of my daughter and her boyfriend
5 that I brought, and then I brought a
6 family portrait.  And he said -- this was
7 up in the computer room when he had come
8 and talked and sit down and was talking to
9 me.  And he said my, my, my, he said I had
10 better hush, he said I've got a daughter.
11 Because my daughter was 18 at the time --
12 well, she was 17 at the time and his was
13 fixing to turn 16, I think, he said.
14 But anyway, he said how long
15 has she been with that boy and I said
16 they've been together two or three --
17 going on three years, I think.  And he
18 said you can't tell me he ain't hitting
19 that.  And I said Mike, I said don't say
20 that about her.  He said well, I'm telling
21 you, he said you think people are crazy,
22 he said you are the one crazy.  He said
23 that is not normal just being with one

Page 167

1 person.  He said and if you think Ralph is
2 at work right now, he probably ain't at
3 work, he's probably getting him some.  And
4 I said no, Ralph don't do that.
5 And anyway, he said it and he
6 said Richard, tell her.  And Richard
7 turned around and he said yeah, there was
8 plenty of times I said I was at work when
9 I wasn't, he said but I got in trouble for
10 it.
11 And he had said things in front
12 of Toby Chance before about getting him
13 some, but he didn't go into details.
14 And on his aisle, he would say
15 out loud, you know, that he runs around to
16 have freaky sex, but he makes love to his
17 wife.
18 Q.    Any other instances you can
19 think of where he directed something at a
20 male employee that you observed?
21 A.    Other than him cussing them.
22 I mean, he's cussed them, but not talking
23 about sex.

Page 168

1 Q.    Who would you mean he would
2 cuss them?
3 A.    Like if something went down or
4 something or if they didn't fix something
5 quite as fast as he thought they should,
6 he would cuss and holler about that.  And
7 he would cuss the Koreans.  And he
8 hollered one day when I was walking down
9 his aisle and he was coming down the
10 little step things from up there fixing
11 something, he said hey, hey, and so I
12 stopped and he said I just cussed me some
13 Koreans out.  And I said Mike, I said you
14 do not need to do that, I said you are
15 going to get in trouble, I said -- because
16 he had done got in trouble for cussing on
17 the radio to Rob, another man.  And he
18 said I'm probably going to get wrote up
19 for that.  And I know he said they come
20 talked to him about it.
21 But anyway, he said I just
22 cussed me out some Koreans, and I said you
23 better quit, I said I'm telling you you

Page 169

1  are going to get in so much trouble. And
2  he said I don't care, he said I can't give
3  an "F," he said I've got Tom Bondy, he
4  said we are buddies, he said they ain't
5  going to fire me, he said ain't nobody
6  else can run this thing like I can.
7       Q.   Any other conversations
8  directed at male employees that we haven't
9  talked about?
10      A.   I'm sure there was, I mean,
11 but I don't recall them right now.
12      MR. BOSTICK:  Okay.  Well, why
13 don't we take our lunch break here?  Do
14 you want to come back at 1?
15      MS. HAYNES:  That is fine.
16      (Lunch break taken from 12:15
17 p.m. until 1:06 p.m.)
18      (Whereupon, Defendant's
19      Exhibits 11-13 were marked for
20      identification.)
21      Q.   (BY MR. BOSTICK:)  Ms.
22 Edwards, we just took our lunch break.
23 Before we get started back, is there any

Page 170

1  part of your testimony from earlier that
2  you would like to correct or amend before
3  we get started back?
4       A.   No.
5       Q.   Okay.  I have marked three
6  documents as Exhibits 11, 12 and 13.  I'll
7  just ask you first, have you ever seen
8  those documents before?  And as you are
9  looking through them, I see a signature
10 for Tammy Edwards at the end of each one.
11 Can you tell me if that is, in fact, your
12 signature on each document?
13      A.   Yes, that one is.
14      Q.   11, yes?
15      A.   11, yes; 12, yes; and 13.
16      Q.   Did you review these back in
17 August of 2006 before you signed them to
18 make sure you agreed with them when you
19 signed them?
20      A.   Me and Stacye went over them.
21      Q.   So were you allowed to make
22 any changes on any of these?
23      A.   I think on one of them there

Page 171

1  was a part that said we were very good
2  friends or something and I put good
3  friends.
4       Q.   Is that something you marked
5  out?  This is Exhibit 12, I think, we are
6  looking at.
7       A.   I don't know which one it is.
8  Yes.  I think she -- I'm the one said mark
9  it out.
10      Q.   Okay.  But there is the words
11 "trying to be," is that your writing or is
12 that Stacye's?
13      MS. HAYNES:  Which exhibit are
14 you speaking of?
15      MR. BOSTICK:  12.
16      A.   I think this is Stacye's.
17 That may be the other guy that was in
18 there.
19      Q.   Other than your signature at
20 the end of each document, is there any
21 handwriting on Exhibit 11, 12, or 13 that
22 is yours other than your signature and
23 dating at the end?

Page 172

1       A.   I don't recognize any, not
2  that I notice.
3       Q.   Okay.  And so the first one I
4  see is dated August 1 of '06.  I'm looking
5  at Exhibit 11 and it's got 1:42 p.m. and
6  3:25 p.m. written, do you know what those
7  times signify?
8       A.   I assume when she talked to
9  me.
10      MS. HAYNES:  Don't assume
11 anything.  Just answer to the best of your
12 knowledge.
13      Q.   The question would be:  Did
14 you meet with Stacye on the 1st just once
15 or twice?
16      A.   I don't remember.  I know I
17 met on the 1st.
18      Q.   Okay.  I mean, to me it's
19 either one of two things, my speculation,
20 but do you know if this means that y'all
21 starting meeting at 1:42 and ended at
22 3:25?  Would that be consistent with about
23 how long you talked to her on the 1st?

43 (Pages 169 to 172)

TAMMY EDWARDS 2:07-cv-00908-MHT-SRW   Document 23-2   Filed 08/08/2008   Page 45 of 51   TAMMY EDWARDS
HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, ET AL.

June 3, 2008

Page 173

1    A.    Possibly.  I can't say yes.
2    Q.    Where did you meet with her on
3 the 1st?
4    A.    There is a conference room
5 upstairs.
6    Q.    Okay.  How did you know that
7 you were going to meet with her that day?
8    A.    She came and got me.  She had
9 told me earlier that we was going to have
10 to meet.
11    Q.    On the 31st?
12    A.    Uh-huh.
13    MS. HAYNES:  Is that a yes?
14    A.    Yes.
15    Q.    On the 31st, she has told you
16 I have got to call my boss?
17    A.    (Witness nods head.)
18    Q.    From then until when she came
19 and got you on the 1st, did you have any
20 conversations with Stacye during that
21 time?
22    A.    No.
23    Q.    Okay.  What did Stacye tell

Page 174

1 you when she sat down with you on the 1st?
2    A.    She just told me the protocol
3 they had to do and how they would have to
4 handle it, and told me that it was a
5 matter that she would have to go with her
6 management because it was a pretty big
7 problem she had, and that I didn't need to
8 talk to anybody, and that if anybody
9 talked to me about it, not to, you know,
10 address it.
11    Q.    Okay.
12    A.    Until she was through
13 investigating.
14    Q.    That is during your
15 conversation with her on August 1st when
16 you were sitting down with her?
17    A.    Yeah.
18    Q.    What specifics did she give
19 you about the protocol that she had to
20 follow?
21    A.    She said that she had to --
22 she said she had a certain protocol to go
23 through, she had to talk to people and

Page 175

1 then get with her management.  And then
2 she told me later on when they never would
3 come up with what they were going to do
4 that she had never experienced a problem
5 like this, that the legal department was
6 handling it and she didn't know what was
7 taking so long.
8    Q.    I'm just talking about on --
9    A.    Oh, on the 1st, she just
10 basically told me they had a protocol to
11 go through and that she couldn't do
12 anything in one day, it would take a few
13 days, that she hoped it would be handled
14 by Friday.
15    Q.    Okay.  When you signed off on
16 Exhibit 11 at the bottom and your date is
17 August 3rd, but is this a summary of
18 y'all's conversation from August 1?
19    A.    Yes.
20    Q.    I guess I'll just ask you to
21 look through Exhibit 11 and tell me if
22 there is anything in there that as we sit
23 here today you now disagree with that

Page 176

1 description of what was discussed in
2 y'all's meeting on August 1?
3    MS. HAYNES:  You want her to
4 read Exhibit 11 and tell her if anything
5 is wrong or she doesn't agree with it?
6    MR. BOSTICK:  Yes, that now
7 she is saying this was not said during the
8 meeting.
9    A.    (Reviewing document.)
10    MR. BOSTICK:  My coffee tastes
11 terrible, I'm going to go refill it while
12 you look at that.
13    (Brief pause.)
14    A.    I mean, I agree with it.
15    Q.    This is an accurate summary of
16 what y'all discussed on August 1, you and
17 Stacye Jones?
18    A.    It don't have everything in
19 there, but what is in here is pretty
20 accurate.
21    Q.    Is there anything specifically
22 that you say y'all discussed that is not
23 included in here?

Page 177

1   A.   There was me telling her about
2 Mike humping the fence and about the time
3 he was telling me that I owed him because
4 he had put in some hours that I worked
5 when I was gone to the neck doctor.
6   Q.   Okay.
7   A.   I can't remember everything.
8 I mean, there is some things not in here.
9   Q.   Well, you know, are there any
10 other specific instances between you and
11 Mike that you told Stacye Jones about on
12 August 1 that are not referenced in this
13 document, Exhibit 11?
14        You said Mike humping the fence
15 and some comment about putting in some
16 hours for you while you were at the neck
17 doctor.
18   A.   And I told her about him
19 telling me that couldn't nobody do nothing
20 to him because he knew too much on Tom and
21 him and Tom was drinking buddies.
22   Q.   Well, see how there is
23 numbering at the bottom, see 241; do you

Page 178

1 see?·
2   A.   Yes.
3   Q.   Do you see it says about a
4 third of the way from the bottom, it says
5 sat "M" looking at my crotch, I told Mike
6 to stop and "M" said there wasn't anything
7 I could do to make him stop.
8        Was your response to him I can
9 slap the shit out of you?
10   A.   I did say that.
11   Q.   And he says that just turns me
12 on.
13   A.   Yeah.
14   Q.   Is that the same conversation
15 where he is saying something about him and
16 Tom being drinking buddies, or is that a
17 different conversation?
18   A.   Oh, that was a different
19 conversation.
20   Q.   When did the conversation take
21 place regarding he and Tom being drinking
22 buddies?
23   A.   Any time something come up

Page 179

1 that he like would get in trouble, if he
2 would do something that I would feel like
3 he could get in trouble and I would say
4 Mike, you don't need to do that, he would
5 say why, what are they going to do, they
6 ain't going to do an F'ing thing to me, so
7 it was on several occasions.  I couldn't
8 pinpoint them.
9   Q.   So other than the humping the
10 fence incident, the comment about putting
11 in some hours for you and his comment
12 about him and Tom Bondy being drinking
13 buddies, any other specific instances with
14 Mike Swindle that you told Ms. Jones that
15 are not in here?
16   A.   He asked me why it bothered me
17 so bad and I told him I just didn't like
18 it, that I wasn't like them and that I
19 didn't want people to think that I was
20 like them.  And he said oh, my God, I'm
21 not hurting you, he said everybody here
22 knows your F'ing Mother Teresa.
23   Q.   So he made some comment about

Page 180

1 Mother Teresa?
2   A.   Yeah.
3   Q.   I think we have talked about
4 some of these conversations, but I want to
5 go through the instances you mentioned and
6 kind of pin down who would have seen and
7 observed these things and when as best you
8 recall they happened.
9   A.   Okay.
10   Q.   You say that there was a
11 conversation at first that he asked if you
12 were married and your response was happily
13 married to your high school sweetheart?
14   A.   High school sweetheart.
15   Q.   And then he said he married
16 his sweetheart as well?
17   A.   Yes.
18   Q.   And then is that the same
19 conversation, it says progressed -- is it
20 the same conversation or at some point
21 later where he says have you ever been
22 with anybody else?
23   A.   That is the same conversation.

45 (Pages 177 to 180)

TAMMY EDWARDS v.
HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, ET AL.

TAMMY EDWARDS
June 3, 2008

Page 181

1    Q.   Did anybody witness that
2  conversation other than you and Swindle?
3    A.   There was people around, but
4  where we were standing, it's so loud, like
5  you probably wouldn't be able to hear what
6  I am saying to her.  So whether they heard
7  it or not, I can't say, but there were
8  people around.
9    Q.   Who would you say was around?
10   A.   At that point, Melvin Jones
11 should have been around and Eric.  I don't
12 know what his last name was.  That is
13 around where they were.
14   Q.   Is there anybody that you
15 would say this person definitely heard him
16 say that?
17   A.   I believe Pam was there, but
18 I'm not 100 percent positive.  I think she
19 was.
20   Q.   And then is it the same
21 conversation that he said you just haven't
22 been with the right one, if you had been
23 with me, you wouldn't go back to your

Page 182

1  husband?
2    A.   No.  That is a different
3  conversation.
4    Q.   Okay.  The first conversation
5  we just talking about, when is your
6  best estimate as to when that took place?
7    A.   That took place the first time
8  I was on his line.
9    Q.   And when did you have this
10 conversation about, you know, just hadn't
11 been with the right person?
12   A.   You ain't talking about the
13 desk episode?
14   Q.   You are telling me this is a
15 separate conversation, right?
16   A.   No.  I thought you was talking
17 about the desk episode.  That night.
18   Q.   That is all in one
19 conversation?
20   A.   Yeah, this is.
21   Q.   Okay.  What did he say to you
22 specifically about --
23   A.   Well, he first said I don't

Page 183

1  believe you, and I said okay.  And I just
2  didn't address anything because I was just
3  doing short answers.  And he said you know
4  what, he said the only other person that
5  has told me that is my wife, and he said
6  my wife says that she don't have no desire
7  to be with nobody, he said but I just
8  don't believe that.
9        But anyway, he said that his
10 wife acted the same way I did and that I
11 hadn't been with the right one and that he
12 didn't really know if he believed she had
13 either, just being with one person.
14   Q.   So was there any sexual
15 comment made by him to you about when he
16 says, you know, you hadn't been with the
17 right one or something, was there any
18 insinuation or comment being made about
19 him being the right one or anything like
20 that?
21   A.   Not in that discussion.
22   Q.   Okay.  Is that pretty much all
23 that was said between you and Swindle on

Page 184

1  that occasion?
2    A.   God, it's been so long ago.
3  Other than him say it -- when he did say
4  that about the right one, I think he did
5  say you haven't been with me because that
6  is when he ended up starting to shake his
7  self after he said that because he was
8  bragging on his size he said.
9    Q.   So you have this conversation.
10 And the next thing you have in here says
11 he cussed everything.  I guess you are
12 saying that he used "fuck" and
13 "motherfucker"?
14   A.   Yes.
15   Q.   And it says I would stand off
16 to the side and it says new to downtime.
17 Does that mean that you were new to that
18 position?
19   A.   Yes.
20   Q.   Then you are talking about an
21 incident where he grabbed his genitals?
22   A.   Several, yes.
23   Q.   And he says he asked you does

46 (Pages 181 to 184)

Page 185

1  it turn you on and your reply was no, I
2  wish you would stop?
3      A.   Yes.
4      Q.   And then Pam is saying oh,
5  damn, girl, it ain't hurting you?
6      A.   Yes.
7      Q.   Was anybody else present in
8  this conversation other than you, Mike and
9  Pam?
10      A.   No.
11      Q.   Was he saying anything to you
12  when he grabbed his genitals other than
13  does it turn you on?
14      A.   Well, a lot of times he
15  wouldn't say anything, he was just
16  laughing.  And whoever he was standing
17  around, he would punch them on the arm as
18  to say watch this and they would all
19  laugh, whoever was around him.
20      Q.   Who are some people that would
21  say that they saw him grab his genitals in
22  your presence?
23      A.   Probably none of them would

Page 186

1  admit to it.
2      Q.   Well, if they were telling the
3  truth.
4      A.   I know Toby Chance seen him do
5  it several times.  Billy Kitchens saw him
6  do it.  Farrard didn't see him do it, but
7  Farrard saw me dodging him because that is
8  why I was dodging him.  And Farrard asked
9  me later, he said Mike is a mess, ain't
10  he, and I said yeah, I guess you could say
11  that.  But he didn't see the actual thing,
12  but there was anybody on body build that
13  was in the middle aisle.
14      Q.   Did Pam ever see this?
15      A.   Yes.
16      Q.   And then you have this where
17  you say that you asked Mike what is it
18  with you and Pam, tell me about that
19  conversation with Mike.
20      A.   They were not like speaking or
21  something.  She was just in a real bad
22  mood and he said that Pam didn't like him
23  going with that Jennifer girl.  And I said

Page 187

1  oh, well, I don't want to get into none of
2  that.
3      Q.   And then looking to this
4  thing, Stacye asked you how often was he
5  shaking himself and was your response
6  whenever I came around?
7      A.   Just about any time I got in
8  his sight.  Or even if I didn't know he
9  was there -- I remember one time Pam
10  telling me to look because she knew that I
11  was like dodging him or it was getting on
12  my nerves and she thought it was funny,
13  too, and she said Tammy, look yonder, and
14  when I looked it was Mike doing that just
15  laughing.
16      Q.   I mean when you say he is
17  grabbing himself, I mean, is he grabbing
18  him in his genitals?
19      A.   He's grabbing his crotch going
20  up and down with it like and looking at
21  me.
22      Q.   Is he like simulating
23  masturbation, or how was he doing his

Page 188

1  hand?
2      A.   Just shaking it, simulating
3  that or do you want this or here it is or
4  whatever.
5      Q.   Tell me about this incident
6  where you say I'm going to start going
7  around the other way.
8      A.   It was when he was shaking his
9  self and I shook my head and I said Mike,
10  would you please stop doing that.  And we
11  was walking around the end of the aisle
12  and he said my God, he said it ain't
13  hurting you.  And I said yeah, but I don't
14  like it, I said just please stop because
15  I'm going to have to start dodging you and
16  I don't want us to be fussing.  And he
17  said oh, my God, he said that is crazy.
18  And he said I'll try, but he didn't.
19      Q.   Is this a separate
20  conversation where he says I won't speak
21  to you again?
22      A.   No, that is the same -- that
23  is when I dodged him and he come around

47 (Pages 185 to 188)

Page 189

1　there and he said you won't F'ing have to
2　worry about me speaking no more because it
3　embarrassed him because I dodged him. I
4　mean, and I had told him I was going to
5　have to start doing that if he didn't quit
6　doing it, but he thought it was funny, I
7　mean, like a game.
8　　　Q.　What was your response to Mike
9　when he said I just won't speak to you
10　anymore or whatever his words were?
11　　　A.　I just stood there. That is
12　when he had just about cussed me out.
13　　　Q.　Was there some point where you
14　came back to him and said are you and I
15　okay?
16　　　A.　Yeah, the next morning.
17　　　Q.　Tell me about that
18　conversation.
19　　　A.　I had worried about it all
20　night because I didn't know how I was
21　going to get out of the situation because
22　Harry and Steve and them was so proud, you
23　know, they thought they had done me this

Page 190

1　big favor, because it was a good job and I
2　was sitting in the computer room, but I
3　didn't want to act like -- I didn't want
4　them to think I wasn't appreciative, but I
5　didn't want to be in this situation
6　either. And I stayed up half the night
7　trying to figure out how we were going to
8　be able to get along.
9　　　So the next morning, I still
10　didn't say anything and I went to his
11　board and Pam was laughing and she said
12　ain't you going to say good morning, Mike,
13　ain't you going to talk to Tammy, ain't
14　Tammy your friend, just kept laughing.
15　And he just had like a sour look on his
16　face and he walked up right beside me and
17　said I'll tell you one thing, and I don't
18　know exactly how he said it, but he said
19　you don't tell -- you don't go tell Billy
20　any of my F'ing conversations with you no
21　more. And I said what did I tell Billy,
22　what are you talking about.
23　　　And he said Billy said

Page 191

1　something to me about what I was doing and
2　he said he's going to try -- if he wanted
3　to, he could try to get me in trouble with
4　Harry or somebody, and he said but I don't
5　appreciate it, he said if you have got
6　something to say about me, you say it to
7　me.
8　　　And I said Mike, listen, I said
9　I didn't sleep all night, I have been
10　worried about this stuff, all I want to do
11　is want to work. I said I asked you and
12　asked you to stop, didn't I, and he said
13　yeah. And I said you know good and well
14　that all I want to do is work and I don't
15　do stuff like that, I'm not used to how
16　y'all are.
17　　　And that is when I told him, I
18　said I feel like God has put me here for a
19　reason and I said I think you are the
20　reason. I said you need to get back with
21　your family, I mean, you need to be right
22　with your family and be a daddy and a
23　husband. And he eventually said -- I said

Page 192

1　are we okay, can I say that we are okay
2　and not feel bad and I can walk around you
3　now and not have to worry about it, and he
4　walked off and he took about four or five
5　steps and he turned around and he said
6　yeah, Tammy, he said we are okay, and I
7　said thank you.
8　　　Q.　So looking at the top of the
9　second page of Exhibit 11, you say Billy
10　asked her if she was miserable, "T," yes.
11　　　Now, what is that conversation,
12　because it says his next question to you
13　is want to go back to the line, Tammy, no;
14　you want to go to Mike's line; no, Mike is
15　a pervert. So obviously y'all are not
16　having a conversation about Mike making
17　you miserable, but what were you telling
18　Billy was making you miserable at that
19　point?
20　　　A.　Because Billy had done talked
21　to Mike. That is why Mike was mad because
22　I had told Billy that he was a pervert.
23　　　Q.　But what was necessitating

48 (Pages 189 to 192)

Page 193

1   y'all talking about moving out of the CCR?
2       A.   You mean Billy?
3       Q.   Billy asked her if she was
4   miserable and it says yes. Were you
5   saying you were miserable in the CCR job?
6       A.   Because when he had come up
7   and cussed me because I had dodged him, I
8   was real quiet because I wasn't used to it
9   and didn't know what I was going to do.
10  And Billy come up and asked me was I
11  miserable and I went to telling him about
12  what had happened and that I didn't know
13  how to deal with Mike and he just
14  explained to me that that is just how Mike
15  is.
16      Q.   If you are sitting here saying
17  that you are miserable because of this
18  interaction with Mike, why did he ask you
19  if you wanted to move to Mike's line?
20      A.   He was saying it funny, like
21  laughing about it sarcastically.
22      Q.   So this is not one of these
23  conversations that we talked about earlier

Page 194

1   about you wanting to get back out on the
2   floor from the CCR position?
3       A.   No. If I ever said anything
4   about going to the floor, I was talking
5   about moving parts because I never was on
6   BC-1 and I never was on body build before
7   that.
8       Q.   So you are saying you didn't
9   go to Billy and say I'm miserable, I want
10  to get out of the CCR job --
11      A.   No, I was taking downtime at
12  the board right where he had just cussed
13  me out like a few minutes before and Billy
14  come up and said you are miserable. Which
15  he also seen us talking, but he didn't say
16  anything and then I told him that is what
17  it was.
18      Q.   Then the rest of this is your
19  conversation with Mike, and I think you
20  told me about this earlier, he says don't
21  go tell Billy because I could get in
22  trouble basically?
23      A.   Yeah.

Page 195

1       Q.   And then y'all closed the
2   conversation out by saying are we okay and
3   he said we are okay?
4       A.   Yes.
5       Q.   When is your best recollection
6   about when this conversation with Billy
7   Kitchens and are we okay, when did that
8   conversation take place as best you
9   recall?
10      A.   I guess within a week or two
11  after I started on the line because he
12  started shaking himself and that is what
13  brought it all up.
14      Q.   Did there come some point in
15  time where he quit shaking himself after
16  you had this conversation?
17      A.   Yes.
18      Q.   So that action of him shaking
19  himself only lasted a couple of weeks?
20      A.   Yes.
21      Q.   Then you say he would talk
22  about having sex with women, pulling their
23  hair and how he does the freaky stuff.

Page 196

1   Who would have been around to hear this
2   conversation?
3       A.   Pam.
4       Q.   And there is a note outside,
5   it says Richard and MES overheard. Is
6   that talking about overheard this whole
7   conversation?
8       A.   No. That is when Richard
9   heard me asking Pam to ask him to stop.
10  And Pam said that if I acted like it
11  didn't bother me, and I said he said the
12  same thing but he's not stopping.
13      Q.   Okay. So it looks like we are
14  talking about two conversations here?
15      A.   Yeah.
16      Q.   One is Mike talking freaky
17  stuff on the side. Who would have heard
18  that conversation?
19      A.   Pam. That was down on the
20  floor.
21      Q.   And it looks like you and Pam
22  are having a conversation on the weekend?
23      A.   Upstairs.

49 (Pages 193 to 196)

Page 197

1  Q.   But see how there is that
2  little "on the weekend" and there is an
3  arrow drawn to it?
4  A.   Yeah.
5  Q.   Is that talking about this
6  conversation taking place on the weekend?
7  A.   I don't know when it took
8  place.  I mean, we worked on weekends so
9  it could have.
10  Q.   That is when you are saying
11  Richard overhead?
12  A.   Yeah.  Richard overhead me
13  telling Pam, asking her to talk to him
14  because Pam, they was like brother and
15  sister sort of.
16  Q.   Okay.  There is this next
17  sentence that talks about I bet you and
18  Ralph don't even have oral sex, and it
19  says "M" I don't use condoms, is that in
20  the same conversation?
21  A.   Yes, because he was talking
22  about he quit doing oral sex on other
23  women because he didn't know who all they

Page 198

1  had been with, that the only one he had done
2  oral sex with was his wife, but he would
3  me since I hadn't been with nobody but
4  Ralph.
5  Q.   It says in here, it says "I
6  would like your ass raw," were those the
7  words that he used?
8  A.   Yeah, and Pam was laughing.
9  Q.   So when do you think that
10  conversation took place?
11  A.   I don't remember.  There are
12  so many conversations that happened I
13  can't put a time line on it.
14  Q.   Well, it sounds like, you
15  know, the shaking stuff you said lasted a
16  two-week period.  Is this a comment that
17  took place during that time period?
18  A.   This was after.
19  Q.   Would anybody else have heard
20  this conversation other than you, Mike and
21  Pam?
22  A.   Amber said she heard it.
23  Q.   Where were y'all when this

Page 199

1  conversation took place?
2  A.   I believe we were on -- I have
3  done forgot the numbers of the stations.
4  It was at the end of the aisle, end of
5  body build near the office.
6  Q.   From what I have listened
7  to -- you took a tape recorder out to
8  Hyundai with you and recorded some
9  conversations, didn't you?
10  A.   Yes.
11  Q.   As best I can tell, it sounds
12  like one of the first conversations you
13  recorded is you and Stacye Jones probably
14  when y'all meet on August 3rd?
15  A.   Are you talking about the
16  first conversation that is on there?
17  Q.   Well, I guess, no, I'm sorry,
18  there is others.  But, I guess, do you
19  know a date of when was the first date you
20  started recording conversations?
21  A.   It probably would have been
22  around -- it probably would have been
23  around the 3rd, I'm not sure, but it's

Page 200

1  when Amber told me I needed to do
2  something, that Mike was getting a bunch
3  of people to lie for him and then
4  everybody quit talking to me, I mean, not
5  on the line, but the big people.
6  And I knew they were turning
7  because Steve Culpepper had come and asked
8  me to drop it.  He said will you please
9  drop it, and I said how can I drop it,
10  there is no way to drop it.  And I said so
11  are you saying you agree with what he's
12  done, and he said no, I'm just saying if
13  he apologizes and we make him stay away
14  from you, will you drop it and I said no.
15  Because they were turning and Amber told
16  me, she said I have got a recorder.  And I
17  said how am I going to record, and she
18  said I have got one on my phone.  And I
19  said well, I don't have a phone like that.
20  And she said you better take care of
21  yourself, she said because I'm telling you
22  he's getting people together.
23  Q.   So did you go buy a tape

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                                    http://www.TylerEaton.com

Page 201

1  recorder?
2      A.   Yeah.
3      Q.   What kind did you buy?
4      A.   I don't know.  Just a small
5  one.
6      Q.   And so then who all did you go
7  and tape record conversations with out in
8  the plant?
9      A.   Billy, Amber and Stacye.  That
10 was the only three.
11     Q.   Did you record any
12 conversation with Tom Bondy?
13     A.   No.
14     Q.   Did you tell any of the people
15 that you were tape recording their
16 conversations with them?
17     A.   No.
18     Q.   Why would you tape record
19 Amber when Amber is the one telling you to
20 tape record?
21     A.   Because she told me not to
22 trust nobody.  She said I'm telling you
23 right now, she said you take care of

Page 202

1  yourself.  She said you don't tell nobody
2  nothing, she said you do what you have got
3  to do she said because Tammy, I'm telling
4  you, you are going to end up being the one
5  out.  She said Farrard had told her some
6  stuff that Mike was saying and that he was
7  trying to get them to lie for him or
8  something.  I can't verify that was true.
9      Q.   Was that contention that you
10 had reported this because you were worried
11 your husband was going to find out?
12         MS. HAYNES:  Object to the
13 form.
14     A.   Do what now?
15     Q.   What was it that --
16     A.   My husband already knew it at
17 the time.
18         MS. HAYNES:  Listen to his
19 questions.
20     Q.   What was it that Mike was
21 supposedly saying that made you feel like
22 there was a conspiracy against you?
23         MS. HAYNES:  Object to the

Page 203

1  form.
2      A.   Amber said that Mike was
3  telling, trying to get them to say that
4  Roger Cleckler had saw me fondling Mike
5  and Roger had called my husband and my
6  husband made me report it.  And she told
7  me that in front of Michelle Nelson also.
8      Q.   Well, you had told Michelle
9  Nelson that you were concerned that a
10 friend of your husband's had seen y'all
11 hugging on the day of the 600 car --
12     A.   No.
13     Q.   That is not true?
14     A.   That is not true.
15     Q.   What did you tell Michelle
16 Nelson about the Roger Clecker incident?
17     A.   I told her that I didn't
18 realize how bad it was getting.  I said he
19 tells me that he will stop, I said but
20 he's getting worse.  I said there is a
21 friend of mine that works here and he even
22 hollered the "F" word right in front of
23 him.  I said when he sees me associating

Page 204

1  with somebody like that, I said that makes
2  me look bad, I said, and it shows me that
3  he don't care what he does, that, you
4  know, the sky is the limit and that
5  nothing is going to make him stop.  And I
6  said I don't know what to do to make him
7  stop.  And then that Saturday he told me
8  there was nothing I could do to make him
9  stop.
10     Q.   Did you tell Kim Abrams that
11 you were concerned that your husband was
12 going to find out from Roger Cleckler?
13     A.   No.
14     Q.   So if she said that, that just
15 wouldn't be true?
16     A.   No.  I said I was worried
17 about Roger thinking something, but I
18 wouldn't -- I did make the comment that
19 they had coached baseball together.  But I
20 didn't say I'm scared Roger -- because my
21 husband would know, I mean.  I'm not the
22 one that is down there lying.
23     Q.   Well, I guess, other than

Page 205

1 Swindle making this statement about you
2 being concerned about your husband, was
3 there something else that Swindle was
4 saying that led you to think that there
5 was something at work against you?
6    A.   No. Amber just told me, she
7 said girl -- she got me in the computer
8 room, she said girl, she said you just
9 don't what is going on. She said I have
10 done had two people -- she said one person
11 came to her and told her and one person
12 called her and said that they were getting
13 this thing together, which she had done
14 told me the day before that Farrard had
15 told her that Mike -- no, Farrard didn't
16 tell her this. She said Billy told her
17 that Mike had done called his wife and
18 told her that he might get fired. And
19 Billy said he will have a good excuse
20 before the day's up. And she told me in
21 the parking lot, she said I'm telling you
22 right now before I went home that day, she
23 said you better get somehow and record it.

Page 206

1 She said have you got a phone and I said
2 yeah, but it don't have a record. She
3 said well, mine has got a recorder, she
4 said I'm going to start recording them
5 myself she said because I'm tired of the
6 way they are doing.
7    Q.   Amber said that?
8    A.   Yes.
9    Q.   Do you know if Amber recorded
10 anybody's conversations?
11    A.   The way she said it, it's like
12 she had done done it, but I didn't get
13 into her personal business. She just said
14 Tammy, she said, girl, I am telling you,
15 she said you have got to take care of
16 yourself, she said they are going to get
17 you out of here. She said Mike has done
18 told them if he goes, they go, and she
19 said you better take up for yourself.
20    Q.   But in your initial
21 investigation interview with Stacye Jones
22 you were talking about the protocol she
23 said that she had told you about that she

Page 207

1 was going through, right?
2    A.   Well, she --
3    Q.   Did she tell you about the
4 protocol?
5    A.   She didn't explain that a
6 whole lot the first time. It was on the
7 3rd.
8    Q.   Well, she told you on the
9 first time she was going to investigate
10 it?
11    A.   Yes.
12    Q.   She told you she was going to
13 talk to other people, right?
14    A.   Yes.
15    Q.   She told you not to go talk to
16 anybody else about this?
17    A.   She said they are going to be
18 wanting to talk, she said do not talk to
19 them, yes, she did.
20    Q.   So you ignored those
21 instructions didn't you?
22    A.   I didn't ignore them.
23    Q.   Well, you went and talked to

Page 208

1 Billy and Amber at least and recorded your
2 conversations with them?
3    A.   If you listen to the tape, you
4 will see that Billy started the
5 conversation first, and Amber.
6    Q.   Who was asking who about the
7 stuff with Swindle during y'all's
8 conversations?
9    A.   On Billy's conversation, Billy
10 said they just got me. And I said who got
11 you, and he said Stacye, she got me before
12 she got you. And I said oh, really, and
13 he said yeah. That is when he asked did I
14 say anything about him and Mike was going
15 to take him out with him and that he was
16 sorry for everything and that Mike should
17 have been gone a long time ago.
18    Q.   That is what you say is on the
19 tape recording?
20    A.   Yeah, and a lot more.
21    Q.   What did you say back to him?
22    A.   He was apologizing for the
23 things that he had said to like being

52 (Pages 205 to 208)

Page 209

1  under the desk and stuff. And I said
2  Billy, it's not like -- this is not my
3  exact words, but this is what I basically
4  said, it's not like I was out to get
5  anybody, I just wanted y'all to stop. I
6  said I kept asking y'all to stop. I said
7  I didn't ask for this. And I said I am
8  not used to the way y'all talk, and I said
9  I don't want nobody mad at me and I said I
10  just can't handle it. And he said I know,
11  he said, Tammy, don't you feel like you
12  have done nothing wrong, he said you are
13  going to make this place a better place,
14  he said we shouldn't have done that.
15      Q.    Did you ever tell Stacye Jones
16  that you were recording these
17  conversations?
18      A.    No.
19      Q.    Did you ever give her a copy
20  of the tapes?
21      A.    No.
22      Q.    I mean, prior to the time that
23  you received your notice of termination in

Page 210

1  like July of 2007 or June of 2007, had you
2  let anybody at Hyundai know that you had
3  recorded those conversations?
4      A.    No.
5      Q.    Had you ever gone and recorded
6  any conversations with Mike Swindle?
7      A.    No.
8      Q.    Okay. Back to Exhibit 11, did
9  you say in response to Mike that one day
10  you are going to have a disease one day
11  and be in the nursing home?
12      A.    Yes.
13      Q.    And is this the next statement
14  about having a finger up your butt and Pam
15  saying you don't know what you are
16  missing, is that within the same
17  conversation as him talking about not
18  using condoms?
19      A.    I don't remember. I don't
20  know if it was the same conversation.
21  There was so many.
22      Q.    Well, you know, in just
23  looking at the note, the first sentence

Page 211

1  says I bet you Ralph don't even have oral
2  sex, and then the last in this is but I
3  don't have enough oral sex as much as I
4  used to, but you have been with one man, I
5  would lick your ass raw; is this all one
6  conversation that is being discussed?
7      A.    Yes.
8      Q.    And Pam you say would have
9  heard that?
10      A.    She had told me that before
11  though.
12      Q.    Pam had told you about --
13      A.    On different occasions that I
14  didn't know what I was missing.
15      Q.    By the specific acts
16  referenced here?
17      A.    Different acts, not just this
18  one.
19      Q.    What had Pam told you other
20  than have the finger up the butt comment?
21      A.    She was having a conversation.
22  Her and Mike was inside the gate, I guess,
23  you could say and they were doing

Page 212

1  something and she hollered and she said
2  Tammy, come here, come here because I was
3  getting the time down. And I was like
4  what, and she was like come in here, come
5  in here.
6          And so I walked inside the gate
7  and she said we are going to teach you how
8  to like sex. And I said what. And she
9  said -- and I said Pam, that is enough.
10  She said you don't know what you are
11  missing girl, she said we are going to
12  have you ready by night shift. She said
13  when night shift gets here, she said you
14  are going to be liking that stuff.
15      Q.    Who heard that conversation?
16      A.    It was just me and Mike and
17  her.
18      Q.    So going back to this comment
19  about lick your ass raw, that
20  conversation, when is your best estimate
21  as to when that took place?
22      A.    I have no idea because it was
23  just talk every day. I couldn't tell you

53 (Pages 209 to 212)

Page 213

1  when it was, just one of the many
2  conversations.
3      Q.   Do you think it was in that
4  two-week period when you first got in
5  there and he was grabbing himself still?
6      A.   Uh-uh, it wasn't that soon.
7      Q.   That is what I'm asking. What
8  is your best estimate as --
9      A.   After the two-week period is
10  all I can tell you.
11      Q.   So probably within two weeks
12  after that two-week period or was it a
13  month after?
14      A.   I would say longer than two
15  weeks, but I can't tell you a date.
16      Q.   But apparently some period two
17  weeks after, a lot of this stuff stopped
18  that you talked to him about, right?
19      A.   No.
20      Q.   Well, the touching himself
21  stopped, that definitely ended within two
22  weeks, right?
23      A.   It just went to something

Page 214

1  else.
2      Q.   What else ended within the two
3  weeks?
4      A.   He started with the tongue
5  thing and hanging on the fence, humping
6  the fence, two different fences.
7      Q.   Okay. I'm looking on the next
8  page, Bates number 241.
9      MS. HAYNES: I need a break
10  when you get to a good point.
11      MR. BOSTICK: How about get
12  through the rest of this one?
13      MS. HAYNES: That is fine,
14  just letting you know.
15      Q.   He's watching my crotch all
16  the time, he blocks the aisle. It says T.
17  Edwards, you better fucking stop; is that
18  what you told him?
19      A.   No.
20      Q.   What --
21      A.   Stacye asked me did I say that
22  to Mike because apparently that is what
23  she was told. I don't know. But anyway,

Page 215

1  I said if I said anything with an "F" it
2  was freaking. I said I ain't said the
3  F'ing word.
4      Q.   It looks like there might be a
5  line through the "F." Do you see that?
6      A.   Yeah, she marked it through
7  because I said I didn't say it.
8      Q.   Sometimes puts hands behind
9  his back and butts up against me. Is that
10  something you would have told her?
11      A.   Yeah. Yes.
12      Q.   Did he ever hug you?
13      A.   Yes.
14      Q.   Okay. Did you hug him back?
15      A.   No.
16      Q.   You said you touched him on
17  the shoulder a time or two?
18      MS. HAYNES: Object to the
19  form.
20      Q.   Are there specific instances
21  you remember when he hugged you?
22      A.   Just being Mike. One time
23  when Amber told him not to, he did it

Page 216

1  anyway.
2      Q.   How many times do you think he
3  hugged you during the time you were there?
4      A.   I have no idea.
5      MS. HAYNES: You don't have to
6  guess. Just give your best estimate.
7      A.   Probably around seven or eight
8  times.
9      Q.   And any of those times did
10  he -- well, first of all, did he ever
11  touch any of your private areas on your
12  body?
13      A.   No.
14      Q.   Other than these times he
15  hugged you or you mentioned him bumping up
16  against you, were there any other times
17  that he had some type of physical contact
18  with you?
19      A.   He pulled my ponytail I wear
20  in my hair a lot.
21      Q.   Other than pulling your
22  ponytail, bumping up against you or these
23  seven or eight times he hugged you --

54 (Pages 213 to 216)

Page 217

1    A.   I had got a new pair of pants
2  and he walked up and said somebody got a
3  new pair of pants and rubbed my leg with
4  the outside of his hand, but, I mean, it
5  was on the side of my leg.
6    Q.   Anything else? Any other
7  times other than that?
8    A.   Not that I recall.
9    Q.   These occasions, seven or
10 eight times where he hugged you, was one
11 of those when y'all were celebrating the
12 600 car day?
13   A.   No. I patted him on the
14 shoulder.
15   Q.   Was he being playful on these
16 times or was he making sexual comments
17 or --
18       MS. HAYNES: Object to the
19 form.
20   A.   He would hug me and tell me
21 that he would let go when I would hug him
22 back. And I would say well, I'm not
23 hugging you back, I said please just let

Page 218

1  go and he would eventually let go.
2    Q.   Well, other than -- I mean, I
3  guess, would he physically place his arms
4  around you where his hands would be in
5  your back?
6    A.   Yes.
7    Q.   At your back?
8    A.   No. It would either be on the
9  side or he would hug me toward the front
10 but he wouldn't hug me like up close, but
11 I would more on the arm because he ask me
12 could I feel how his chest was, how
13 muscular he was.
14   Q.   But his hands weren't touching
15 your breasts or anything like that when he
16 was hugging you?
17   A.   No.
18   Q.   Did you tell him this is
19 offensive to me or get away or anything
20 like that?
21   A.   I just would tell him to stop,
22 please stop and when are you going to
23 stop.

Page 219

1    Q.   It sounds like there were a
2  couple of things where you would say that
3  he would do something and you would say
4  well, I would just laugh at him. Is this
5  kind of one of these instances where he is
6  doing this and you are laughing and saying
7  stop, quit this kind of thing?
8    A.   No.
9    Q.   What are you saying your
10 response was?
11       MS. HAYNES: Response to what?
12       MR. BOSTICK: To him hugging
13 her.
14       MS. HAYNES: She already
15 testified to that.
16   A.   I already said that I would
17 just tell him to stop and not to do it.
18   Q.   Well, you said you weren't
19 laughing. Were you with a stern scowl on
20 your face?
21   A.   No, I just stood there. One
22 day I even said are you through, stop.
23 Because it was like a time thing. It was

Page 220

1  like he had to do it so long before he
2  quit.
3    Q.   How many times do you estimate
4  he would pull on your ponytail?
5    A.   A bunch of times. If I ever
6  walked by and didn't speak or if I didn't
7  see him and he would pop out or something,
8  he would just jerk it and say don't F'ing
9  walk by without speaking. It was a bunch.
10   Q.   Did any of the times he hugged
11 you or pulled on your ponytail, did it
12 aggravate your neck or bother you in any
13 way?
14   A.   I told him when he pulled my
15 ponytail that he hurt my neck and he said
16 I have done told you I can fix that neck.
17   Q.   I guess what you told him, did
18 it actually hurt your neck when he pulled
19 on your ponytail or did you just tell him
20 that?
21   A.   No, it did. And not only
22 that, I didn't want him doing it.
23   Q.   I understand that, but my

55 (Pages 217 to 220)

Page 221

1    question is --
2        A.   Yes.
3        Q.   Not what you told him, not
4    anything else, my question is:  Did his
5    pulling on your ponytail at any point in
6    time actually cause harm to your neck?
7        A.   It hurt at the time.
8        Q.   Okay.  Did you go to the
9    doctor?
10       A.   I was already seeing a doctor.
11       Q.   Did you go to medical?
12       A.   No.
13       Q.   Did it cause any kind of
14   injury?  I mean, you have got a lawsuit
15   over this, you realize, over him pulling
16   your ponytail.  I mean, I need to know.
17       MS. HAYNES:  Object to the
18   form.  It's not over pulling a ponytail.
19       MR. BOSTICK:  Well, there is
20   an assault claim in the complaint.  Are we
21   waiving any claim based on --
22       MS. HAYNES:  Are you
23   representing him or Hyundai?

Page 222

1        MR. BOSTICK:  I'm representing
2    Hyundai.
3        MS. HAYNES:  The assault claim
4    is not against Hyundai, is it?
5        MR. BOSTICK:  It's part of
6    this lawsuit.  Are you saying I don't have
7    a right to ask questions --
8        MS. HAYNES:  But the lawsuit
9    against Hyundai is not about pulling the
10   ponytail.  Rephrase your question.
11       MR. BOSTICK:  Are you waiving
12   claims in this --
13       MS. HAYNES:  No, I'm not.
14   Rephrase your question.
15       MR. BOSTICK:  I have a right
16   to ask about anything related to this
17   lawsuit, not just claims against my
18   client.
19       MR. DYKES:  The assault and
20   battery has defendants in it, so, I mean,
21   I --
22       MR. BOSTICK:  You have just
23   stated -- I assume you are stipulating

Page 223

1    that you have waived the assault claim
2    against Hyundai.
3        MS. HAYES:  Clarify your
4    question that it is not -- this case is
5    not about pulling a ponytail, okay?
6        MR. BOSTICK:  Okay.  So we are
7    not asserting any assault claim in this
8    case based on pulling a ponytail; is that
9    correct?
10       MS. HAYNES:  Don't diminish
11   her claims.
12       MR. BOSTICK:  I'm just trying
13   to clarify -- there was an assault claim
14   and any touching can serve as a -- I mean,
15   clarify for me please, counsel, what
16   touchings are serving as the basis for the
17   assault claim.
18       MS. HAYNES:  It's not my job,
19   Brian, to clarify for you.
20       MR. BOSTICK:  Okay.  Then let
21   me ask the questions.
22       MS. HAYNES:  Your questions
23   are to this witness, not me.

Page 224

1        MR. BOSTICK:  Okay.  Then
2    I'm --
3        MS. HAYNES:  Excuse me, Mr.
4    Bostick, don't talk over me.  Do not
5    diminish her claims --
6        MR. BOSTICK:  I'm not
7    diminishing, I'm trying to determine what
8    her --
9        MS. HAYNES:  -- by saying it's
10   about a ponytail pull.
11       MR. BOSTICK:  -- claims are.
12       MS. HAYNES:  And say it's
13   about ponytail pulling.
14       We will take a break now.
15       MR. BOSTICK:  Okay.  We will
16   take a break.
17       (Short break taken from 2:05
18   p.m. until 2:13 p.m.)
19       Q.   (BY MR. BOSTICK:)  We were
20   talking about Exhibit 11 and we had gotten
21   down to him bumping you on the side.  This
22   says Monday last week; do you see that?
23       A.   Yes.

Toll Free 800.458.6031                                              http://www.TylerEaton.com

Page 225

1    Q.    Is that when the bumping me on
2  the side, okay, and then it says "T" stop,
3  Roger knows me and he may think something
4  is going on; do you see that?
5    A.    Yeah, I see that.
6    Q.    Is this conversation referring
7  to the July 27th, 600 car day incident
8  that we talked about earlier?
9    A.    I don't know if that was the
10  same day or not.
11    Q.    Well, was the incident where
12  Roger Cleckler was coming towards y'all --
13    A.    Uh-huh.
14    Q.    -- you don't know if that was
15  on the 27th or not?
16    A.    No.
17    Q.    Was it somewhere around this
18  period of time, July 27th?
19    A.    It would be somewhere around
20  that date.
21    Q.    Okay. But anyway, so it looks
22  like here she has got written Monday, last
23  week, and it looks like referring to that

Page 226

1  incident. And it looks like -- I mean, is
2  that what you would have told Stacye is
3  that your comment was stop, Roger knows
4  me, he may think something is going on?
5    A.    I said stop before I ever saw
6  Roger.
7    Q.    But would you have told Stacye
8  that you had said Roger knows me, he may
9  think something is going on?
10    A.    I would have told Stacye what
11  I told Mike, which was here comes --
12  because Mike talks really ugly, and I said
13  here comes Roger, and I said I know him, I
14  said he has coached my son's baseball, I
15  said don't say anything out of the way, I
16  said I don't want him to think I approve
17  of anything.
18    Q.    And it says "M" I don't give
19  an "F" who he knows; did he say that?
20    A.    Yeah, or what he thinks.
21    Q.    Then it says Wednesday
22  afternoon, it says "T" to "B" you had a
23  rough day, question mark?

Page 227

1    A.    Yes.
2    Q.    What does that refer to?
3    A.    That is when I was referring
4  to Billy sitting on the break table.
5    Q.    And Billy says no, I just
6  didn't get any last night?
7    A.    Yes.
8    Q.    And then Mike says you know
9  what is wrong with her, she has never been
10  with -- I guess, tell me what Mike said in
11  response to Billy saying that.
12    A.    Basically what is on there.
13    MS. HAYNES: I think she has
14  already testified to that. She told you
15  about the break room incident.
16    Q.    It says you know what is wrong
17  with her, she has never been fucked, fuck
18  me, you motherfucker, fuck me?
19    A.    Yeah. See, Stacye don't have
20  everything I said, like parts, bits and
21  pieces. Yeah, and he was laughing the
22  whole time and then the chair had rollers
23  on it and he was like rolling toward the

Page 228

1  snack table that Billy was on.
2    Q.    Okay. Now, it has the little
3  reference of Wednesday afternoon. Is that
4  consistent with your recollection that
5  this is something that would happen pretty
6  close in time to when you went to Stacye?
7    A.    Yes.
8    Q.    Who would have observed this
9  other -- if anybody, other than you, Mike
10  and Billy Kitchens?
11    A.    It was in an area where there
12  is people that could see it. But with the
13  noise being like it is, I can't say that
14  they heard it. But Steve Culpepper, I
15  believe, was standing behind Mike's desk
16  on -- there is like a little column or
17  something there, and I think Steve was on
18  the other side of that, but I can't verify
19  that he heard.
20    Q.    And then she has got just the
21  word "Amber Kelly" listed. Do you know
22  why her name is put there or what that is
23  referring to?

57 (Pages 225 to 228)

Page 229

1    A.   No.

2    Q.   Would you have told Stacye

3 anything about Amber Kelly during that

4 August 1 meeting?

5    A.   Just Amber telling me I needed

6 to do something about it.

7    Q.   Okay. And then this next

8 statement every time I push him away, he

9 thinks it turns me on and tells me it

10 turns him on, my chest feels better than

11 Ralph's?

12    A.   That is what he said.

13    Q.   That is what Mike Swindle

14 said?

15    A.   Yes.

16    Q.   There is a little statement

17 outside here that says talks to Wade

18 Lassiter. Who is Wade Lassiter?

19    A.   He's one of the maintenance

20 men. He had witnessed Mike just doing his

21 normal thing. And he said -- he come up

22 to me at the BC-1 line and said I don't

23 think he will ever change, and I said I'm

Page 230

1 just glad all the men is not like that.

2 And he said no, believe me, all the men is

3 not like that.

4    Q.   And then this conversation

5 about the looking at the crotch and Mike

6 saying there wasn't anything I could do to

7 make him stop, did you say in response I

8 can slap the shit out of you; I think we

9 talked about that earlier?

10    A.   I did say that.

11    Q.   You said there was some

12 conversation that led you to go to Stacye

13 that was leading up to that relatively

14 close in time where he said, you know,

15 there is nothing you can do about that; is

16 this the conversation that you are talking

17 about then?

18    A.   Uh-huh.

19    MS. HAYNES: You will have to

20 answer out.

21    A.   Yes.

22    Q.   And then is this the same

23 conversation or separate where it says

Page 231

1 what do you want me to put down for time?

2    A.   It's the same day, different

3 conversation.

4    Q.   Was there anything said during

5 that conversation other than him saying

6 hey, did you hear me?

7    A.   I turned around and I said

8 what, and he said I said you could put

9 your pants down, and I said I heard you.

10    Q.   And then it says cursed Tommy

11 "R" on radio. Do you remember any

12 discussion about that?

13    A.   I had questioned Stacye about

14 why anybody would doubt the way he talks

15 because he cusses on the radio, he's the

16 only one that cussed on the radio and gets

17 away with it. And I brought up that --

18 his name because he had cussed him on the

19 radio.

20    Q.   What was this mention of Kim

21 Abrams and a comment about sleeping with

22 Mike?

23    A.   She told me that she -- on the

Page 232

1 day that we was in that little room and I

2 was upset and she said yeah, you are going

3 to turn him in she said because I have

4 heard him myself, she said everybody here

5 has seen how he does you and she said and

6 they are going to start thinking things

7 anyway. And she said Billy has already

8 got them thinking things. And I said

9 really, and she said yeah. And she said

10 that I have heard him when he was trying

11 to convince you to sleep with him, and I

12 said when because I didn't know what she

13 was talking about. And she said you know

14 the day we was cleaning and she said and

15 he was telling you that everybody sleeps

16 around and she said I come up and said I

17 don't, and he said even Kim does, and I

18 said no, I don't Tammy. I said oh, yeah.

19 She said I have heard how he talks to you.

20 She said the difference is I can't do -- I

21 said why don't y'all do something about it

22 then instead of telling me to since y'all

23 have all done it, and she said well, I

58 (Pages 229 to 232)

Page 233

1  have cut up with him back so I can't do
2  nothing, she said but you haven't, I have
3  watched you tell him to stop.
4      Q.   Then on the next page you've
5  got a statement that says Billy heard
6  "M" -- is this something that Mike said
7  that I'm not a boob man, I'm an ass man?
8      A.   Yeah.
9      Q.   Do you know roughly when that
10 conversation took place?
11     A.   They were talking about --
12 Billy and Mike both were talking about my
13 sister, which they hadn't seen, but the
14 people on the line had told Billy about
15 her. Billy was the one mainly talking
16 about my sister all the time. And she's
17 big up top and he said something about it
18 in front of me about him getting ahold to
19 her, and that is when Mike said I'm not a
20 boob man, I'm an ass man.
21     Q.   Okay. Anybody other than you
22 and Billy and Mike that would have heard
23 that conversation?

Page 234

1      A.   No, everybody else would have
2  been on the line.
3      Q.   And then you have got this
4  "P." Is this that conversation you were
5  talking about with Pam a second ago about
6  how you will get to where you like sex?
7      A.   Yeah.
8      Q.   It says last week, Mike have
9  you ever fingered yourself and you said
10 no.
11     A.   Yeah.
12     Q.   And he says I don't believe
13 you, every woman has done that, you and my
14 wife say that and you are both liars?
15     A.   Yes.
16     Q.   Anybody that would have heard
17 that conversation other than the two of
18 y'all?
19     A.   No.
20     Q.   Where would that conversation
21 take place?
22     A.   Body build. It's right beside
23 the downtime board.

Page 235

1      Q.   Then you have Billy apologized
2  to me about prior conversation. "T" there
3  was no sense in what happened at his desk
4  to Billy and, I guess, Billy I know. Tell
5  me about that conversation.
6      A.   Are you talking about after I
7  had turned him in?
8      Q.   Oh, no, this --
9      A.   Yeah, this happened after --
10 oh, yeah, of course, it did, that is
11 Stacye. Yeah, he apologized to me for
12 everything he had done and he said that he
13 had just come up from Stacye's, they had
14 gotten to him before they got to me. And
15 I asked him did he tell the truth and he
16 said yeah, I did. He said Mike is going
17 to take me out with him and I said why,
18 and he said because, he said did you tell
19 them anything about me. And I said well,
20 no, I said I have told them that you have
21 said things, but you apologized, but you
22 didn't basically refer to me. And I said
23 so you told the truth and he said yeah.

Page 236

1  And I said so you told about the desk deal
2  and he said what desk deal and then he
3  said oh, yeah, I remember, I sure do, they
4  asked me about that, I forgot, but now I
5  remember. He said Culpepper was standing
6  there, too.
7      Q.   So when you and Stacye talked
8  about that conversation with Billy, that
9  would have been sometime between
10 August 1st and August 3rd?
11     A.   And then I think it was
12 August 3rd. Are you talking about after I
13 asked Billy if he told the truth?
14     Q.   Yes.
15     A.   I think it was --
16     Q.   You went back and had a
17 conference with Stacye and told her you
18 had talked to Billy.
19     A.   Yes. And she told me that she
20 had to -- that just because she had talked
21 to Billy that didn't mean she couldn't
22 talk to them again and she had to remind
23 me not to talk to them and I told her that

59 (Pages 233 to 236)

Page 237

1  Billy had started the conversation.
2      Q.   And she said something about
3  preserving the integrity of the
4  investigation?
5      A.   Yes, you have got not to talk
6  to me. And I told her that I had to know,
7  that I felt by myself down there and I had
8  to know that somebody was telling the
9  truth. And she said that she completely
10 understood.
11     Q.   And the next line says, I
12 guess, this is where you talk about Mike
13 seeing your daughter and the boyfriend?
14     A.   Yeah.
15     Q.   And you say Mike said "you
16 know he's tearing that up"?
17     A.   Yeah.
18     Q.   That was up in the computer
19 room?
20     A.   Yeah.
21     Q.   Did anybody else hear that
22 conversation?
23     A.   Richard Williams.

Page 238

1          MS. HAYNES: Richard Williams?
2      A.   Uh-huh.
3      Q.   And then there is the
4  reference to call me fucking Mother
5  Teresa?
6      A.   He didn't do that upstairs.
7  That was downstairs.
8      Q.   That is a different
9  conversation?
10     A.   Yeah.
11     Q.   You told about that
12 conversation earlier. Is that pretty much
13 what had happened with that, with the
14 Mother Teresa comment?
15         MS. HAYNES: Object to the
16 form.
17     A.   I don't understand.
18     Q.   Did you testify about what
19 happened in the Mother Teresa comment
20 earlier?
21     A.   Yes. About him telling me
22 that wouldn't nobody think nothing about
23 me.

Page 239

1      Q.   Then it says Pam holding T's
2  arms back and telling "M" to kiss her?
3      A.   Yeah.
4      Q.   Tell me about what you were
5  telling Stacye there.
6      A.   She was asking me about. I
7  mean, I was telling her different things
8  that had happened and they are not in
9  order, but just as I thought about it I
10 was just telling her. And I was telling
11 her different things like Pam was holding
12 my arms back. She wasn't hurting me or
13 trying to hurt me, she was just being Pam
14 and telling me that I would be ready by
15 night shift after -- which he didn't kiss
16 me, but they were just acting.
17     Q.   Okay. You had mentioned, you
18 know, we initially started with I asked
19 you were there any things that you had
20 told Stacye that weren't in this and you
21 told me about Mike humping the fence?
22     A.   Yes.
23     Q.   Tell me about that incident.

Page 240

1      A.   He would get on the fence and
2  hike his leg up like and just go back and
3  forth on it. And he would say this is
4  what I would do to you and he would go
5  real slow and then he would go real, real
6  fast and say this is what Ralph does for
7  you.
8      Q.   Where physically is this going
9  on and what fence are we talking about?
10     A.   It went on at the end of body
11 build and beside the downtime board.
12     Q.   Would anybody have seen that?
13     A.   Yes.
14     Q.   Who would have seen that?
15     A.   Charles seen it. Melvin.
16     Q.   What is Charles' last name?
17     A.   I don't know. Charles.
18 Melvin, Eric, Pam, a guy named Joey. I
19 think his name is Joey. Anybody on that
20 line would have seen it because he was
21 hollering while he was on it, too.
22     Q.   When do you think that would
23 have took place?

60 (Pages 237 to 240)

Page 241

1    A.    I would -- I couldn't tell
2  you.
3    Q.    I mean, do you know if this
4  was within a couple of times of the time
5  you went to Stacye or before that?
6    A.    No, it was before that.
7    Q.    You also mentioned something
8  about putting some hours down for her
9  comment?
10    A.    Yeah.
11    Q.    Tell me about that
12  conversation.
13    A.    I had to have some injections
14  in my neck and I had asked if I could just
15  take like that afternoon and come back as
16  long as I had my nine hours and he said
17  yes. And on that Friday, which he
18  normally put my -- you know, he would put
19  my hours in.
20        And that Friday he called me
21  and he said I have done put your hours
22  down. And I said what did you put, and he
23  said I put three over. And I said Mike,

Page 242

1  don't do that, I said because I didn't
2  work. He said yeah, that is what I put
3  and he said you owe me now. And I said
4  no, and I said I didn't want to take any
5  time off, I got my days in, I didn't have
6  to take a time off, so that is all I was
7  worried about. And he said no, he said
8  you better not say anything, he said I
9  have done e-mailed it up there. He said
10  you will get me in trouble.
11    Q.    Okay.
12    A.    And he told Richard that I
13  owed him for it.
14    Q.    Let's look at Exhibit 12. How
15  many total times did you speak with Stacye
16  Jones from August 1, I guess, speak with
17  her in person from the first time you meet
18  with her on August 1 until you go out on
19  your medical leave?
20        MS. HAYNES: Object to the
21  form.
22    A.    I think three times upstairs
23  and twice downstairs. Actually, one time

Page 243

1  it really wasn't speaking, it was just
2  when they put me on the line. She come up
3  and said whose decision was it and then
4  she just went on.
5    Q.    This looks like Exhibit 12
6  has -- and Exhibit 13 also both have
7  8:57 a.m. on August 3rd. Do you know if
8  that is consistent with when you met again
9  with Stacye in your mind?
10    A.    I think so. I think this is
11  the Marty guy.
12    Q.    Marty Blaine?
13    A.    I don't know his last name.
14  But I think he was in there this time.
15    Q.    Okay. Well, let's look at
16  Exhibit 13 because it looks like whoever
17  wrote 13 probably wrote 11 as well.
18    A.    Yeah, that is Stacye.
19    Q.    Okay. Is this conversation on
20  August 3rd a conversation that you tape
21  recorded?
22    A.    No.
23    Q.    Okay. When did the

Page 244

1  conversation take place that you tape
2  recorded with Stacye Jones?
3    A.    The day that -- the next day
4  after Amber told me that they were coming
5  up with a different story and that Mike
6  was going to have people -- and I said how
7  can that happen and she said Tammy, I'm
8  just telling you, she said don't be
9  stupid, she said you better record it.
10        And then the next morning I had
11  the recorder and as soon as I got there
12  she told me what the two guys had said in
13  front of Michelle Nelson and I started
14  crying and I said who would believe that.
15  And I said I'm telling you right now, I
16  said this ain't happening to me. And
17  Michelle said thank you and she said it's
18  about time that you took up for yourself.
19    Q.    But you think that was after
20  this August 3rd meeting with Stacye and
21  then you went back to her a third time
22  then?
23    A.    No. The meeting that I had

61 (Pages 241 to 244)

Page 245

1  with her that wasn't recorded was, I
2  believe, was on the 2nd. I'm not sure.
3      Q.   And that is when she told you,
4  you know, let's preserve the integrity of
5  the investigation. You told her what you
6  talked to Billy about?
7      A.   I think so.
8          MS. HAYNES: Hold on. Did you
9  answer?
10     A.   Yes. I believe so.
11     Q.   Okay. Let's look at these
12  notes from Exhibit 13. It says without us
13  talking about it Billy has helped me a
14  lot, told me I was doing the right thing.
15  No one in Mike's area will speak to me,
16  always have spoken to me in past. Saw Pam
17  conversing with other team members, felt
18  it was about this situation. Is that
19  something that you told Stacye?
20     A.   Yes.
21     Q.   What had Billy done when you
22  say he had helped you a lot?
23     A.   He had -- when it all

Page 246

1  happened, he came to me. I was at the
2  board. And he said listen, he said if you
3  feel uncomfortable and you need me to go
4  with you anywhere, I will. And I said
5  why, I said I'm all right. Because at the
6  time I didn't think that everybody knew
7  and I didn't even know how he found out.
8  And I said I'm all right. And he said I
9  know what is going on. And I said oh, and
10  he said if you feel uncomfortable, he said
11  I'll walk you back and forth because I
12  have to go through Mike's station to get
13  to the thing. And I said no, I don't want
14  to get you in the middle of it and he said
15  I'm already in the middle of it, he said
16  because he's probably going to get me, he
17  said he knows so much. He said but you
18  don't worry about it, he said if I get
19  fired, he said I deserve to get fired.
20         And he told me, he said no
21  matter what happens -- and I said well,
22  I'm not trying to get you in trouble, I
23  wasn't trying to get nobody in trouble.

Page 247

1  He said I'm just telling you, he said I've
2  got a wife and we shouldn't have acted the
3  way we did. He said don't worry about us.
4      Q.   Did you basically tell Stacye
5  about that conversation with Billy?
6      A.   She didn't ask what he had
7  done. I just told her that he had
8  apologized for what he had said and he --
9      Q.   In your conversations with
10  Stacye, had you ever asked her to, you
11  know, investigate or look into the stuff
12  that Billy had done?
13     A.   No. I told her about it and
14  she asked me, she said what has Billy done
15  and I said well, he has apologized. And
16  she said well, Billy has to account for
17  what Billy does, she said whether he
18  apologized or not, she said I need to be
19  told what you are talking about. So I
20  told her about the desk situation, but I
21  said I'm not trying to get anybody in
22  trouble, she said but you have to tell me
23  this and she said it's my job.

Page 248

1      Q.   I mean, but I guess did you
2  make any differentiation between what you
3  were telling her about Mike Swindle versus
4  what you were telling her about Billy
5  Kitchens?
6      A.   What I told her about Billy
7  was that he was trying to do right. What
8  I told her about Mike was the true story
9  of what happened. It wasn't the fact that
10  I was trying to get him in trouble, it's
11  just that they wasn't going to label me as
12  no slut or nothing else like they were
13  trying to do because all I asked was to be
14  moved.
15     Q.   Did you ever ask her to take
16  any kind of disciplinary action against
17  Billy, ask Stacye that?
18     A.   I just asked her -- I just
19  asked her was he -- because Billy had
20  expressed to me that he felt like Mike was
21  going to take him out with him. And I
22  said Billy is worried about him being in
23  trouble and she said Billy has got to

62 (Pages 245 to 248)

Page 249

1    account for what Billy does. She says you
2    don't worry about Billy. She says he has
3    to account for his self.
4        Q.   Did you have any specific
5    discussions about -- when you said you
6    wanted to be moved, did you have a
7    specific place that you said I want to be
8    moved to this place or --
9        A.   I asked if I could just be
10   moved to another building like or either
11   another shift, and she said you had to be
12   there a year and they couldn't break the
13   rule thing. And she got real upset about
14   what was going on and she said oh, no, you
15   are not going nowhere.
16       Q.   Stacye got upset?
17       A.   Yeah.
18       Q.   So then it looks like she
19   asked you to describe your relationship
20   with Mike prior to the sexual situation.
21           Did you tell Stacye that you
22   had said you wanted y'all to be friends?
23       A.   Yeah.

Page 250

1        Q.   That you had brought Mike and
2    Jennifer breakfast?
3        A.   They would tell me what they
4    want. And I eventually started getting my
5    own breakfast at Hardee's because the
6    people I was getting for had done got too
7    many. And when I would go to the
8    cafeteria, it would take me too long to
9    get back. And the guy that was doing the
10   biscuits, Josh, I think his name was, he
11   had got to where he would say how many are
12   you getting for today, and it was getting
13   to be too much trouble.
14       Q.   It says even during sexual
15   situation, I would laugh and joke with
16   Mike because you don't embarrass Mike.
17   What were you telling Stacye to that end?
18       A.   Like when he was on the fence,
19   I laughed at him when he was on the fence
20   because he looked plumb stupid until he
21   started saying this is what I will do when
22   it was just on the fence, but -- and Pam
23   told me, she said you know if you act like

Page 251

1    it don't bother you, he will stop. But
2    when he would do stupid stuff like that, I
3    would laugh it off so he would stop.
4        Q.   Who is this Ronald that you
5    refer to in the next paragraph?
6            MS. HAYNES: Which exhibit?
7            MR. BOSTICK: 13.
8        A.   Is that about the biscuit?
9        Q.   Yes. And he says you ain't
10   getting that black motherfucker nothing?
11       A.   Yeah. I had went and got
12   biscuits and Mike -- Ronald, that guy, he
13   worked beside Jennifer, the one that Mike
14   supposedly was going with, and Mike didn't
15   like him because he had said something
16   about Jennifer's butt or something.
17           Anyway, he had asked for a
18   biscuit, too, so I got him one. And Mike
19   said oh, no, you are not giving that black
20   MF nothing. And Mike got it. And I don't
21   know if he ate it or whatever, but he even
22   gave me the money for it. I was supposed
23   to get the money from Ronald and Mike paid

Page 252

1    for it and he said you ain't giving that
2    black MF nothing. He said I don't like
3    him.
4        Q.   The last kind of full
5    paragraph there it says on the incident of
6    walking in the aisle Tammy did not use the
7    "F" word, has never used "F" words in
8    front of Mike. Is that referring back to
9    the incident we saw earlier where you said
10   might have used "freaking"?
11       A.   Yes.
12       Q.   And then it says next page
13   conversing with her spouse about wanting
14   to see Mike drag race, her little boy
15   loves racing; is that something you would
16   have told Stacye?
17       A.   Yes.
18       Q.   Had you told Stacye that you
19   said you were trying to be Mike's friend
20   and that he eventually quit rubbing
21   himself?
22       A.   Yes.
23       Q.   And then there is the

63 (Pages 249 to 252)

Page 253

1   reference to the fence comment. That is
2   the situation we have already talked
3   about, him humping the fence?
4       A.   I guess. I don't even see
5   what you are talking about.
6           (Reviewing document.)
7       Q.   Is that the incident we talked
8   about already, the humping the fence? You
9   say Melvin Jones may have seen this.
10      A.   Yes.
11      Q.   Is that talking about this
12  fence incident we have already talked
13  about?
14      A.   Yeah. It happened several
15  times.
16      Q.   Tell me what you told Stacye
17  about this, Mike put my name in his phone
18  to cover up Jennifer?
19      A.   She had done talked to Mike
20  and she said --
21      Q.   Stacye had talked to Mike?
22      A.   Yes. She was basically asking
23  me questions like he had told her

Page 254

1   something, she was wanting my story. And
2   she had talked to him and he had said that
3   he even had my number stored or something
4   like that. And I told her I said I have
5   called him like when it was too loud to
6   let him know that people are calling him
7   on the radio. And I was at 503 one
8   Saturday which is by the hinges and that
9   is on BC-1, and Billy come up to me and he
10  said I seen where you called Mike last
11  night. And I said what are you talking
12  about. He said where you called him up
13  last night. He said I was with him last
14  night when you called. They was at
15  Woodmere he said. And I said I didn't
16  call Mike. And he said Tammy, I seen your
17  name and I said you are lying through your
18  teeth.
19          Well, anyway, Mike was out that
20  week because he was having problems with
21  his wife and he called Billy and Billy was
22  standing there talking to him on the phone
23  and I said give me that phone. And I

Page 255

1   said, hey, I said how are you doing and I
2   said everything okay and he said yeah, I'm
3   doing fine. And I said why is Billy
4   sitting here telling me that I called you
5   last night. And he said oh, my God, that
6   is Jennifer. He said I have got your name
7   on Jennifer so my wife won't think
8   nothing.
9           And then when he come back to
10  work when he was up in the computer room
11  with me, after he was telling me about my
12  daughter and my husband was probably
13  cheating, too, I said oh, by the way, the
14  little deal about my name in your phone,
15  you need to get my name out of your phone.
16  And he started laughing and he said oh,
17  no, he said that is my escape goat, he
18  said my wife wouldn't think nothing about
19  me calling you because she knows we have
20  to talk. And Richard was sitting there
21  that whole time.
22      Q.   And Richard heard that?
23      A.   Richard Williams heard it,

Page 256

1   yes, and he thought it was funny.
2       Q.   Did anybody else hear that?
3       A.   No. Billy knew it and Richard
4   knew it.
5       Q.   It looks like she asked you
6   were you ever flattered by the attention
7   and do you feel that Mike may have felt
8   you were flirting and you said no, I
9   always laughed at him?
10          MS. HAYNES:  Object to the
11  form.
12      Q.   Two separate questions asked,
13  but do you remember that conversation with
14  Stacye?
15      A.   She was basically like
16  following up from his or somebody else
17  that she talked to, was I ever flattered.
18  And I said the reason I said laughed is
19  because I assumed if anybody thought I was
20  flattered that is what they saw is when I
21  laughed maybe like when he was hanging
22  himself on the fence. But if you are
23  asking me was I flattered, no.

64 (Pages 253 to 256)

Page 257

1      Q.    I guess my question is it
2  sounds like were there a lot of these
3  times where these incidents were going on
4  where you were physically laughing at
5  whatever he was doing?
6      A.    No, there wasn't a lot.  There
7  was a lot of times I did laugh at him for
8  other things that he would say, but it
9  wouldn't be pertaining to this.  He talked
10  about other stuff, too.
11      Q.    The sexual instances that we
12  have talked about, you know, the humping
13  the chair or humping the fence?
14      A.    No, none of that was funny.
15      Q.    Grabbing himself?
16      A.    No.
17      Q.    None of those that you would
18  have laughed at?
19      A.    No.
20      Q.    Then it says the next
21  paragraph approximately Monday of last
22  week, Roger saw Mike bumping into Tammy
23  and that goes down to, you know, Tammy

Page 258

1  already told Mike that Roger was a good
2  Christian man and Mike intentionally used
3  the "F" word.  Is that the conversation we
4  have already talked about with Roger
5  Cleckler?
6      A.    Yes.
7      Q.    And then did you tell Stacye
8  that when he had said something to you the
9  last Saturday about that there was nothing
10  she could do, that that was your breaking
11  point?
12      A.    Yeah because he told me the
13  whole time that he was going to stop if I
14  just acted like it didn't bother me, and
15  that was the first time he had told me
16  face to face, and he smiled when he said
17  it, he said no, I'm not going to stop and
18  there is nothing you can do about it and
19  folded his arms.
20      Q.    It looks to me like Exhibit 12
21  may be notes relating to the same meeting
22  on August 3rd?
23      A.    Yeah.

Page 259

1      Q.    I guess my last question is
2  just do you recall anything that was
3  discussed during your meeting with Stacye
4  on August 3rd that is not included in what
5  we have looked at with Exhibit 13?  And
6  feel free to look over Exhibit 12 if you
7  want to see if there is anything in there
8  different that refreshes your
9  recollection.
10          MS. HAYNES:  Do you know whose
11  notes are whose on 12 and 13?
12          THE WITNESS:  13 is Stacye's
13  and 12 is Marty's.
14          MS. HAYNES:  13 is whose
15  notes?
16          THE WITNESS:  Stacye's.
17          MS. HAYNES:  And 12 is whose
18  notes?
19          THE WITNESS:  Marty, I think,
20  is his name.
21      Q.    (BY MR. BOSTICK:)  And I know
22  I asked you about 11.  Is this your
23  signature at the bottom of 12 and 13 and

Page 260

1  your dating is August 3rd?
2      A.    Yes.
3      Q.    Is Exhibit 12 and 13 a correct
4  summary of what y'all talked about during
5  your meeting?
6      A.    I think there was some more
7  things we talked about because I don't see
8  some of the stuff in here.  We talked
9  about so much and she couldn't write as
10  fast as I was talking.  So other than me
11  telling her I had told her also again that
12  his comments about nobody couldn't do
13  nothing to him because of Tom.
14      Q.    Other than that comment, is
15  there anything specifically that you
16  recall y'all talked about that is not
17  mentioned in the notes?
18      A.    No, not that I recall.
19      Q.    So after August 3rd, what is
20  your next conversation with Stacye Jones?
21      A.    I believe it's when they put
22  me on the line.
23      Q.    Let me clarify this.  I assume

65 (Pages 257 to 260)

Page 261

1  that maybe you have looked at documents
2  since this lawsuit and whatnot. But just
3  going back and focusing on what you knew
4  back in August of 2006 and using it as a
5  point, the day you go out on leave, do you
6  know who Stacye Jones had spoken with as
7  part of that investigation other than
8  yourself?
9     A.   I know she has talked to
10 Billy.
11    Q.   You said that she had asked,
12 you know, we saw some of the comments
13 about --
14    A.   She talked to Mike.
15    Q.   There was some comments that
16 you had identified about did you tell your
17 husband about going to the drag racing or
18 whatnot. Did Stacye specifically say this
19 is stuff that Mike said, or how do you
20 know she spoke with Mike?
21    A.   The way I know it is because
22 Amber come and told me whenever Mike was
23 up there, and I said oh, really and she

Page 262

1  said yeah. And then I knew that he had
2  talked to her, but I didn't know what was
3  said. But anyway, when she said that
4  about the cell phone, I knew she had
5  talked to him because I knew he thought
6  that was funny. And then he tried to turn
7  it around like I was calling for something
8  else.
9     Q.   Okay. I don't need to make
10 this an exhibit, but this is a document
11 Bates numbered D01287, a doctor's note.
12 Does that refresh your collection, did you
13 go out and miss a portion of that
14 August 3rd to go to the doctor?
15    A.   I assume so.
16    Q.   Do you recall an incident
17 where you were on the phone on your cell
18 phone in the bathroom and Pam Stoddard was
19 in the bathroom with you?
20    A.   No. We had a different
21 bathroom.
22    Q.   Did you ever speak on a
23 telephone to someone while you were at the

Page 263

1  Hyundai plant and in Pam's presence where
2  you said you had filed the charges so you
3  wouldn't lose your marriage?
4     A.   No, that was never said.
5     Q.   Did you know what action was
6  taken against Mr. Swindle as a result of
7  this session?
8     A.   Yes.
9     Q.   What is your understanding of
10 what action was taken?
11    A.   That he had got two weeks'
12 suspension without pay and put on the
13 opposite shift.
14    Q.   Do you know whether or not he
15 was put on any type of probation?
16    A.   No.
17    Q.   Do you know whether he was
18 suspended with or without pay?
19    A.   Without.
20    Q.   How did you know that that
21 action was taken?
22    A.   Amber called me.
23    Q.   Did Stacye Jones ever tell you

Page 264

1  what the disciplinary action was?
2     A.   No. She said I could not find
3  out unless I came back to work.
4     Q.   Did she say that the action
5  taken was --
6     A.   No.
7     Q.   -- confidential?
8     A.   Oh, yes.
9     Q.   But she did tell you some
10 action had been taken?
11    A.   Yes. She said they have made
12 a decision, but I can't tell you what it
13 is.
14    Q.   Did she tell you that you
15 would not have to work on the same shift
16 with him anymore?
17    A.   No.
18    Q.   When did you first find out
19 that he wouldn't be on the same shift
20 anymore?
21    A.   Amber called me and told me
22 that is what his punishment was is two
23 weeks' suspension and he has to go to the

66 (Pages 261 to 264)

Page 265

1  opposite shift.
2      Q.    Did she say how she had heard
3  that?
4      A.    I think she said Billy told
5  her.
6      Q.    Did Stacye Jones give you any
7  kind of reassurances that the
8  investigation is being done and we have
9  taken some action to make sure this
10  doesn't happen again, anything to that
11  effect?
12      A.    No.
13            (Whereupon, Defendant's
14            Exhibit 14 was marked for
15            identification.)
16      Q.    Did you have any interaction
17  with Mike Swindle from --
18      A.    You want this in here?
19      Q.    I want you to look at 14 for
20  me right now, please.
21      A.    Okay.
22      Q.    Have you looked at this?
23      A.    Yeah, I remember it.

Page 266

1      Q.    Before I get on this, my
2  question before I lose my train of thought
3  like I so often do is:  Did you have any
4  interaction with Mike Swindle from
5  July 31st until the time you went out on
6  leave?
7      A.    No.  I saw him in the
8  lunchroom once.
9      Q.    Did you ever have any
10  conversations with him?
11      A.    No.
12      Q.    So from August 1, 2006 to the
13  present, is there any inappropriate sexual
14  conduct or any other type of conduct that
15  Mike Swindle has directed at you that you
16  say was inappropriate?
17      A.    No.
18      Q.    Okay.  This Exhibit 14 is
19  dated August 10th and it's a Thursday.  Do
20  you remember when you started working on
21  the BC-1 line?
22      A.    No.  It was around this date.
23  It was the first time Stacye had saw me on

Page 267

1  the line.
2      Q.    Okay.  Do you know if it was
3  before your August 3rd meeting with her?
4      A.    No.  It was after.
5      Q.    Okay.  So August 3rd was the
6  Thursday, August 10th was a Thursday.  Do
7  you have any estimate about when between
8  those two dates you were put on BC-1 line?
9      A.    It was -- I think it's this
10  week.  This being a Thursday, sometime
11  between Monday and Thursday.
12      Q.    How did you learn you were
13  going to the BC-1 line?
14      A.    I was upstairs in the CCR room
15  and I was still doing the downtime and
16  Billy called and said hey, said what are
17  you doing.  And I said -- no, Steve called
18  and I said getting this computer turned on
19  and ready and stuff.  And he said well,
20  come down here, Billy has got something
21  for you.  And I said okay.  He said I have
22  got a new job.
23            And I got down there and I went

Page 268

1  to Billy's station at the board and Billy
2  said come on.  And he went up on the line
3  and I had never been on the line, and he
4  said we are going to get you to do this
5  right here and he gave me a hammer to
6  start hammering on something that wasn't
7  sealed good on the hoods or the back part.
8  And I said what is this, why am I doing
9  this.  And he said well, Steve thought
10  that you feel better.  And I said oh,
11  really, and he said yeah, he said just
12  know I didn't have nothing to do with it.
13            And I said so why am I down
14  here doing this.  I said who is going to
15  do downtime and he said Amber is going to
16  go ahead and take over.  And I said well,
17  who is going to do yours, and he said
18  Amber is going to help me with it.  He
19  said just know I didn't have nothing to do
20  with it, I promise.
21      Q.    What did you mean when you
22  said who is going to do yours?  Amber
23  would be the one?

67 (Pages 265 to 268)

Page 269

1    A.   If Amber took my place, who
2  was going to take her place.  Because I
3  was supposed to be doing the downtime on
4  the board when she was upstairs.
5    Q.   Did you -- go ahead.
6    A.   And they all of a sudden cut
7  that job out they said.
8    Q.   Did you have any conversations
9  with Steve Culpepper about that job move?
10   A.   I asked him what -- why I was
11  there and whose decision and he said it
12  was Tom's decision.  And, I mean, he
13  immediately -- after he tried to get me to
14  drop it, he immediately quit speaking to
15  me.  I mean, he cut up with me all the
16  time and talked to me every time I seen
17  him and told me things to write down and
18  it just stopped.
19   Q.   Tell me about this
20  conversation you are talking about where
21  you say Steve told you to try and drop it.
22   A.   After Tom had sent for me and
23  I went upstairs and Steve went with me and

Page 270

1  Tom asked me what went on, and I started
2  crying.  And he said well, first of all,
3  Tammy, just let me tell you, he said Mike
4  was at my desk first thing this morning,
5  big crocodile tears, he said I know that
6  he's guilty of whatever, he said it was
7  all over his face.  He says he thinks I
8  can get him out of it and he said I told
9  him I couldn't help him.  And he said but
10  what all has he done.  And he said, first
11  of all, why didn't you tell me, and I said
12  well, he said you were his drinking buddy,
13  I said and y'all see how he acts.  He said
14  yeah, he said I have had maybe one drink
15  with that fool, and that is what he said.
16       And I said well, that ain't
17  what he says and he said I don't care what
18  he says.  He looked at Steve and he said
19  has he not had training, and he said have we
20  not trained him and give him chance after
21  chance after chance and Steve just shook
22  his head yes.
23       And anyway, so he asked me he

Page 271

1  said I need to know what he has done, so I
2  told him some of the things that was done
3  and I was crying and everything and he
4  said he's gone, he said I'm telling you
5  he's gone, he said you won't -- because I
6  told him, I said listen, I said it didn't
7  have to go anywhere, I just wanted to go
8  somewhere else.  And he said no, you
9  cannot go nowhere else, he said he's the
10  one that is going to be going, he said I'm
11  going to get rid of him.
12       And I went back downstairs and
13  about an hour and a half later it was time
14  for lunch so I went to go upstairs because
15  I just sit in the computer room for lunch
16  sometimes, and Steve was coming down the
17  stairs and he said Tammy and I said yeah,
18  and he said do you think there is anything
19  we can do where you just won't file this.
20  And I said Steve, I said you sat there and
21  heard everything, I said the whole plant
22  knows how he is and I said everybody is
23  trying to turn around and slander me and I

Page 272

1  said no way.  I said there is nobody going
2  to think that I done something wrong
3  because I didn't.  I said not only that, I
4  said I've told my husband about it and I
5  said my husband would be uncomfortable
6  with me working here and I would be
7  uncomfortable working here knowing that I
8  let him get away with it.  And he said
9  well, I'm not saying you have to, it was
10  just a suggestion.  And then after that
11  moment, it's just -- he just quit talking
12  to me.
13   Q.   So that conversation on the
14  steps that you just told me about, that
15  took place after you had talked to Stacye
16  Jones, at least on the 1st, right?
17   A.   Yes.
18   Q.   Had it taken place after
19  August 3rd?
20   A.   No.  It was before I signed
21  these because Stacye asked me why I talked
22  to him because they told Stacye that I had
23  come and told them, and she said Tammy, we

68 (Pages 269 to 272)

Page 273

1  told you you couldn't talk to anybody. I
2  said they sent for me and she said well,
3  that ain't what they said, and I said
4  yeah, they sent for me.
5       Q.    Did you talk with Culpepper
6  and Bondy at a point in time prior to
7  meeting with Stacye Jones on August 1?
8       A.    Yeah, that is when it was. On
9  August 1?
10      Q.    Yes.
11      A.    No, no.
12      Q.    That conversation was in
13  between your August 1 meeting and your
14  August 3rd meeting with her?
15      A.    Yes.
16      Q.    Okay.
17      A.    Stacye said I want you to know
18  this was not protocol and they had no
19  right to call you up here.
20      Q.    So did you have any
21  conversations with Tom Bondy about the
22  move to the BC-1 line?
23      A.    No.

Page 274

1       Q.    Had you had a conversation
2  with Tom Bondy prior to all this where you
3  told him you wanted to get back out in the
4  plant?
5       A.    Yes.
6       Q.    Okay. Had you told him
7  specifically where you wanted to go, or
8  tell me about that conversation with Tom
9  Bondy.
10      A.    The reports was some of what I
11  was getting, especially on the body build
12  was the wrong information. You know, all
13  I do is write down what they told me.
14  Then if I was having to go down there, it
15  would be something totally different. In
16  other words, some of them was writing down
17  something too so they wouldn't have to go
18  find out.
19           Well, that wasn't helping the
20  Koreans knowing how to fix things and I --
21  Tom and them, I had said something to them
22  about it and I told Tom that the reports
23  were no good and I said I would just as

Page 275

1  soon go back downstairs and go back to
2  fenders instead of writing stuff that I
3  don't know what is going on. I said they
4  are telling me stupid stuff and I said I
5  don't want to have a report with a bunch
6  of lies in it.
7           And the very next morning, he
8  had Amber and Pam back working. He took
9  both of them off the board and told me if
10 I -- he said you just stay in the CCR, he
11 said I'll get that fixed. And he put
12 Amber back on the line, she got mad and
13 left that day because they put her on the
14 worst thing, but they ended up putting her
15 back on the board because they needed her
16 and he took Pam off the board and she was
17 mad and they put Eric on there, so that
18 was his way to fix it.
19      Q.    But I guess my question was
20 did you go to Tom Bondy and say I want to
21 be moved to the moving parts area or the
22 body shop or did you give a -- what
23 specifically did you tell Tom Bondy about

Page 276

1  wanting to get out of the CCR position?
2       MS. HAYNES:  Object to the
3  form.
4       A.    That I didn't feel like some
5  of the reports, they wasn't doing right
6  downstairs. And if I was going to be
7  putting the wrong information in, I would
8  just as soon go back to where I was.
9       Q.    Okay. So you just told him --
10 I mean, did you say anything else about
11 where in particular you would like to be
12 transferred other than that you just
13 wanted out of that spot?
14      A.    No, he didn't ask. I just
15 said go back to where I was.
16      Q.    I mean, do you know as you sit
17 here today who all was involved in the
18 decision to move you to the BC-1 line?
19      A.    According to Billy, it was
20 Steve. And according to Steve, it was
21 Tom. Amber said that it was Tom.
22      Q.    Had you ever had any
23 conversations with Tom Bondy about this

69 (Pages 273 to 276)

Page 277

1  complaint against Swindle?
2      A.   Just that when he called me
3  upstairs.
4          MR. BOSTICK:  Why don't we
5  take a restroom break real quick?
6          (Short break taken from
7  3:08 p.m. until 3:20 p.m.)
8      Q.   (BY MR. BOSTICK:)  We are
9  looking at Exhibit 14, talking about your
10  e-mail to Stacye Jones.  Had you had a
11  conversation with Stacye Jones about the
12  BC-1 assignment prior to sending her this
13  e-mail?
14     A.   Yeah, that morning.
15     Q.   Okay.  What did y'all talk
16  about at that point?
17     A.   I was just working and she was
18  up behind me and she said Tammy and I
19  turned around and I said hey, and she said
20  who made this decision.  And I said Steve,
21  Tom, I don't know.  You didn't know about
22  it, and she said no, I was not informed.
23  And I said well, you know why I am here

Page 278

1  and she said we will talk about this some
2  more.  Because the person beside me
3  apparently was doing something with her
4  and he had something for him and she
5  handed it to him.  I don't know what it
6  was because he started saying have you got
7  my whatever.
8      Q.   So that is why she was in the
9  area was just to deal with that person?
10     A.   She was going around talking
11  to different team members.
12     Q.   What was your next
13  conversation with her after you sent the
14  e-mail?
15     A.   The next conversation was her
16  bringing me the book.  She didn't address
17  me being on the line or nothing.
18     Q.   Did she ever come back and
19  have any other conversations with you
20  about this being on the BC-1 line?
21     A.   No.
22     Q.   Did you have any conversations
23  with anybody else about being placed on

Page 279

1  the BC-1 line after you sent this e-mail
2  to Stacye Jones?
3      A.   Kim Abrams came up to me at
4  break and asked me what I was doing up
5  there, and I said you know why I am up
6  there.  And she said I'm telling you right
7  now, she said as soon as you get off work,
8  you better go see a lawyer, she said I'm
9  tired of this.  She said I feel bad
10  because I'm the one told you that you had
11  to tell and she said and I really felt
12  like they would protect you.  She said I
13  didn't think they would do this.
14     Q.   Was Swindle there in the
15  workplace at the time you went to the BC-1
16  line?
17     A.   Yes.
18     Q.   But you didn't have any
19  interaction with him during that time?
20     A.   Other than -- well, I went to
21  the tool room, and that is what Kim done
22  was the tool room, and I had to get some
23  more gloves.  And I was coming from the

Page 280

1  tool room and I looked up and he was
2  walking to the tool room and he was sort
3  of walking like at an angle, and I had to
4  stop so he wouldn't run into me.  He was
5  just looking straight ahead.  He was
6  walking real fast.  I mean, I could tell
7  he was mad.
8      Q.   Did you have any understanding
9  about whether or not the assignment you
10  were having on the BC-1 line would be a
11  permanent or a temporary assignment?
12     A.   Billy said that is where I
13  would be.
14     Q.   Well, it sounds like there are
15  several positions on the BC-1 line, right?
16     A.   Yes.
17         MS. HAYNES:  Object to the
18  form.
19     Q.   Did yours have a particular
20  name?
21     A.   It was just -- I don't know
22  what they called it.  It was -- they had a
23  gap -- they was having a problem with

70 (Pages 277 to 280)

Page 281

1    something and they was needing it beat in
2    in the back with tailgates, and I would
3    beat that in with the hammer. And then on
4    the car -- that was on the Sante Fe's.
5    And on cars, they gave me a rubber hammer
6    because the fenders was like tilted in or
7    something and we had to beat them out
8    like.
9        Q.    Was there some task you were
10   performing where you were knocking chips
11   off? I have seen --
12       A.    Oh, that is the like in the
13   door?
14       Q.    Uh-huh?
15       A.    You do that on the back.
16       Q.    Did you do that on the back?
17   And what I am talking about just so it's
18   clear for the record, there is a stick,
19   it's probably about 7 or 8 inches long.
20   Is that --
21       A.    Like a file?
22       Q.    It looks like a nail file for
23   your fingers but much bigger and then you

Page 282

1    take that and run it along to wipe off the
2    rough edges of the --
3        A.    The little weld splatter like.
4        Q.    Did you perform that task in
5    that position some?
6        A.    Yes.
7        Q.    So you mentioned that. And
8    then you mentioned something with a
9    hammer. I mean, were you performing more
10   than one task in this position?
11       A.    Yes.
12       Q.    Would you just do one task at
13   a time or were these all the tasks you
14   were doing in the position at the same
15   time?
16       A.    I would do whatever you
17   call it, the file thing. And on the Sante
18   Fe's, I would beat the end on the
19   tailgate. And then the Sonata's it's the
20   ones that had the problems with the
21   fenders.
22       Q.    Can separate cars come down
23   the line at the same time, separate

Page 283

1    models?
2        A.    It would be like the Santa Fe,
3    Sonata. You did one job and then the next
4    48 seconds, you did this one.
5        Q.    So when you are saying you did
6    these separate tasks, just so I am clear,
7    you are not saying you did the one task on
8    one vehicle for a week?
9        A.    No.
10       Q.    And then another task on
11   another vehicle for a week, these are
12   things you would do at the same time?
13       A.    Every 48 seconds, if the line
14   was running.
15       Q.    Did you move to any positions
16   at any point where you did tasks other
17   than those you have described for me?
18       A.    No. Afterwards you are
19   talking about?
20       Q.    I guess it looks like you were
21   in that position from somewhere between --
22       A.    From the time they put me on
23   the line until the time medical sent me

Page 284

1    home.
2        Q.    You were doing the same task
3    throughout that time?
4        A.    Yes.
5        Q.    And you said in here that
6    there was something in the task was
7    irritating your neck. I mean, could you
8    say what was the specific task that was
9    irritating your neck?
10       A.    The hammering. And on the
11   file thing, you have to use a lot of
12   pressure and, you know, put pressure
13   against it. So all three tasks that I was
14   doing, either three, they all three
15   irritated it and they knew it.
16       Q.    How much would you say the
17   hammer weighed?
18       A.    It wasn't a hammer like -- it
19   looked more like a -- I don't know. It
20   was all metal, steel or whatever.
21       Q.    Did it weigh more or less than
22   five pounds?
23       A.    I would assume less.

71 (Pages 281 to 284)

Page 285

1      Q.    And then how about the file,
2   how much do you think it would weigh?
3      A.    Oh, the file, it was real
4   light.  It was the job, the force you had
5   to put behind it.
6      Q.    Are there other jobs on that
7   line that would require lifting heavier
8   weights than what you were required to do
9   on the BC-1 line?
10      A.    I didn't do the rest of them,
11   so I don't know.  But to my knowledge,
12   they wouldn't have.
13      Q.    Do you know as you sit here
14   today, could you compare the physical
15   requirements of what you had to do in your
16   position to the physical requirements of
17   other positions on the BC-1 line?
18      A.    Some of them just had to pick
19   up hinges and their screw gun they used
20   was hanging from a line and they just had
21   to mash the button, do that.  Some of them
22   was putting doors on, but they had a
23   machine that had a suction that they

Page 286

1   plugged up and put it up to the door, and,
2   again, the screw gun is hanging from the
3   ceiling to screw it in.
4          There is one job that I know
5   would have been more difficult and it was
6   505, I think is what they call it.  It's
7   where they scrape the inside also and they
8   sand the inside of the doors and a lot of
9   pressure, that is the job everybody hates.
10      Q.    I guess my understanding that
11   is somewhere between like 13 and 15 jobs
12   on that line; is that right?
13      A.    Yes.
14      Q.    How many jobs would you say
15   were more strenuous than the position that
16   you were in?
17          MS. HAYNES:  The BC-1 job?
18          MR. BOSTICK:  Yes.
19          MS. HAYNES:  Not the CCR job.
20      A.    505 and 506.
21      Q.    Okay.  Are there any jobs that
22   you would say were less strenuous than the
23   one that you had on the BC-1 line?

Page 287

1      A.    The 503.  Even the doors, you
2   just -- the suction thing is putting it
3   in.
4      Q.    Are you saying those would be
5   less strenuous or they would be equally --
6      A.    I assume they would be less.
7      Q.    How many jobs would you say
8   would be about the equal strenuous level
9   as the one you had?
10      A.    I can't think of any.  I
11   didn't do them all, so I really couldn't
12   say.
13      Q.    Okay.  I don't know if I have
14   asked you for this before, I just want to
15   make sure.  You have told me about contact
16   directed at you by Mike Swindle and you
17   also told me about conduct by Billy
18   Kitchens.
19          Is there any other employee out
20   at Hyundai that you claim directed any
21   sexually harassing conduct at you other
22   than those two?
23      A.    There was a black guy that

Page 288

1   asked me did I run around and told me that
2   he could make me happy and blah, blah,
3   blah.  And I showed him a family portrait
4   and I told him I just didn't do that
5   stuff.  I said I would appreciate it if
6   you just wouldn't do that stuff.  And he
7   made the comment one more time.  And I was
8   supposed to go to each station and I
9   missed his station a couple of times, and
10   I had talked to Sherry McRae and I said is
11   everybody out here like that and she said
12   yeah.  And I don't know if she told Steve
13   or what, but that man was real nice to me
14   after that second time.  I didn't turn him
15   in or anything.  He never said nothing
16   else.  He actually told me he respected
17   me.
18      Q.    Do you know what his name was?
19      A.    I think -- I don't know.  I
20   think it was Jeffrey or I don't know.
21      Q.    Did you ever report him to
22   Stacye Jones or make any reports about him
23   for this act?

72 (Pages 285 to 288)

Page 289

1    A.   When I was telling Stacye
2  about what happened, I was telling her
3  that I didn't -- that I wasn't trying to
4  get nobody in trouble, but I just
5  wanted -- he wouldn't stop. And I said
6  I'm not a little girl or going to
7  tattle-tale or whatever, I said I can
8  overlook some things, I have overlooked
9  some things. She said what, like such as
10  and I said well, I mean there has been
11  other comments made by other people and I
12  overlooked that and you can't just
13  overlook this, it's too much and he won't
14  stop. And she said what other comments
15  and I said well, I would rather not say
16  and she said Tammy, you have to tell me
17  and I said well, I had a problem with this
18  guy, but I said I didn't know his name, I
19  said because he had come from the engine
20  shop and he stopped. I said every time he
21  sees me, he speaks, he's nice, he opens
22  the door, I said he's not mad at me or
23  nothing. I said so it's not like I can't

Page 290

1  look over things.
2    Q.   So I mean but you wouldn't
3  have ever identified him by name as to who
4  he was?
5    A.   I told her, she said I need to
6  know who it is and I said please don't go
7  say nothing to him and she said Tammy, she
8  said apparently we have a big problem
9  downstairs she said and we are going to
10  have to fix it. And I think it was
11  Jeffrey or Jeff, I don't know, but she
12  knew who I was talking about.
13    Q.   Other than Kitchens, Swindle
14  and this guy we think may be named
15  Jeffrey, anybody else that you claim
16  sexually harassed you there at Hyundai?
17    A.   No.
18    Q.   Okay. Do you recall going to
19  the clinic there at HMMA on August 16th?
20    A.   Yes.
21    Q.   Tell me about what happened
22  that day.
23    A.   I was on the line and I had

Page 291

1  took -- I had a bad night that night with
2  my neck and left shoulder hurting from
3  doing the hammering and stuff. And I had
4  took medicine on my way to work that
5  morning so by the time I got to work it
6  would be working and I would be all right.
7  And Billy kept saying Tammy, are you sick
8  because Billy just kept on talking to me
9  and trying to make sure everything was all
10  right and asking me questions. And I said
11  I don't feel too good and he said it's
12  bothering your neck, ain't it, and I said
13  you already know that. And he said well,
14  you look pale, and I said well, that is, I
15  think, from taking my medicine. And he
16  said what medicine and I said I took a
17  muscle relaxer and he said what was it and
18  I told him. And I said I also took one of
19  my pain pills and he said what was it and
20  I told him. And he said girl, he said
21  that ain't good and I said what do you
22  mean that ain't good, and he said you
23  can't take that and work on this line.

Page 292

1    And I said well, I didn't think
2  about, you know, every 48 seconds because
3  I wasn't used to doing it anyway until
4  that week. And he said if I wanted to --
5  if I told Steve or Stacye, he said if I
6  wanted to, you know, you could get in
7  trouble. And I said well, don't do me no
8  favors, I said believe me, I've got enough
9  enemies, I said I don't want no favors
10  from nobody. I said if you are supposed
11  to report me, you report me.
12    And I said if I need to go
13  home, I'll go home. I said I know medical
14  told me I could take them but so many
15  hours before my shift. And I said but I
16  can't do this and not take it and you know
17  that.
18    And he said well, what do you
19  want to do and I said don't ask me
20  nothing. I said I'm not asking you
21  nothing, I said you do what you are
22  supposed to do. If you are supposed to
23  call somebody, you call them.

73 (Pages 289 to 292)

Page 293

1    So he called Steve on the radio
2  and Steve said call Stacye, so he called
3  Stacye on her phone and Stacye said for me
4  to go to medical and see what the doctor
5  said.
6    So when I went to medical, that
7  doctor, he had a fit, he didn't even want
8  me to drive home. He said my pulse rate
9  was where I wasn't even supposed to be
10 working. And he said was they aware of
11 your work and I said yes. And he said why
12 are you on the line and I said well, that
13 is where they put me. And he said have
14 you been there the whole time, and I said
15 no. And he said and they knew about your
16 neck and I said yes. And he said did team
17 relations know and I said yes and he said
18 well, I will be talking to team relations.
19 He said I need to call somebody to come
20 get you and I said no, I will be fine.
21 And I asked him to let me go back to work
22 and he said no, he said you cannot go back
23 to work. He said if they knew about this,

Page 294

1  they knew better. And he said who is your
2  team relations person that you have talked
3  to and I told him Stacye and he said I
4  will be contacting her and I said please
5  don't, and he said that is my job.
6    And when I got back over there
7  to get my stuff out of my desk, Stacye was
8  at her desk and she waved at me and I went
9  over there to tell her, she said I already
10 know, I have done got in trouble and I
11 said for what. And she said the doctor
12 has done talked to me and I said I'm sorry
13 and she said well, it's all right.
14   Q.   And had you told the doctor
15 that you had taken a Flexeril that
16 morning?
17   A.   Yes.
18   Q.   And, I mean, what he was upset
19 about was you being out there working on
20 these medications?
21   MS. HAYNES:  Object to the
22 form.
23   A.   No. He was upset because they

Page 295

1  knew that my neck was hurt and they had me
2  out there.
3    Q.   Was this the first time that
4  you had gone to the clinic?
5    A.   No.
6    Q.   Okay. I mean, do you know
7  what the person's name was you spoke with
8  in the clinic?
9    MS. HAYNES:  Which occasion?
10   Q.   On the 18th.
11   A.   I don't know.
12   Q.   This is a doctor though, you
13 think?
14   A.   It was a guy. I think they
15 may call them practitioners. I don't know
16 if he was the doctor or practitioner or
17 whatever.
18   Q.   So did the guy in the clinic
19 say you can't be out working on the line
20 while you are on these medications?
21   A.   He said I couldn't be working
22 anywhere in the plant with my pulse rate
23 the way it was.

Page 296

1    Q.   Did he tell you to go see your
2  primary care physician?
3    A.   Yes. He said I had to get
4  released from a doctor. He wanted to see
5  papers from a doctor before I could come
6  back.
7    Q.   And so did they have any
8  conversation with you about short-term
9  disability or anything like that?
10   A.   Yeah. He asked me why did I
11 not apply for that and he asked me did I
12 have the paperwork and I said yes, I have
13 already got it. And he said you've
14 already got the paperwork and I said yes,
15 my teams relations lady has done
16 recommended it. And he said well, why
17 haven't you got on it and I said I just
18 can't afford to do it right now, and I
19 said I need to work.
20   Q.   Who is this team relations
21 person that had given you a short-term
22 disability packet?
23   A.   Stacye Jones. She didn't

74 (Pages 293 to 296)

Page 297

1 actually give it to me. She told me she
2 would give me one, but she ended up just
3 telling me where they was and I went and
4 got it myself.
5     Q.   When did that conversation
6 take place?
7     A.   That was probably a month
8 before all this happened.
9     Q.   Okay. How had that
10 conversation come up a month earlier with
11 Stacye Jones where she made that
12 suggestion to you?
13     A.   She had saw me in the CCR room
14 and I had the towel around my neck because
15 like I'm doing the CCR and there is a big
16 screen up here that I watch for the robots
17 to go down, the back of me is a bunch of
18 glass windows and her office is in there
19 and she could see in there. And she come
20 in there and she said Tammy, your neck is
21 still hurting you, and I said yes.
22         And she had told me about her
23 mother having back problems or something

Page 298

1 and she said you are just going to have to
2 take off. And I said well, the doctor
3 ain't said I've got to take off yet, I
4 said I can't afford to anyway. I said I'm
5 supposed to be seeing a new Dr. Katz, and
6 she says oh, no, he's awful. She just
7 seen me with that towel around my neck.
8     Q.   Did you look through the
9 short-term disability package at the time
10 that you went and got it?
11     A.   No.
12     Q.   Okay. So when did you first
13 learn that you could get paid leave for
14 short-term disability?
15     A.   I didn't know exactly at that
16 time that I could because you had to have
17 a doctor say you have got to be off at
18 this time, so it never was 100 percent of
19 me knowing that I could.
20     Q.   So I guess regardless of
21 whether or not you met the requirements
22 for it, when did you first know that if
23 you were approved for it, you would get

Page 299

1 paid leave as opposed to unpaid leave?
2     A.   We learned that in training.
3     Q.   Okay. Do you remember, who
4 gave you the short-term disability -- I'm
5 sorry. Did somebody give you a separate
6 packet around August 16th or did you just
7 have the old one you had been told to go
8 get by Stacye?
9     A.   I don't know. I think they
10 gave me another one. I'm not sure.
11         (Whereupon, Defendant's
12         Exhibit 15 was marked for
13         identification.)
14     A.   Did you have a question?
15     Q.   Not yet. Exhibit 15, is that
16 a fax that you sent to Dr. ?
17     A.   Poczatek.
18     Q.   It looks like it was sent on
19 August 18th of '06?
20     A.   Yes.
21     Q.   It says my job will not allow
22 me to take medication and work. Is that
23 something that was communicated by the

Page 300

1 doctor in the clinic at Hyundai?
2     A.   Yes.
3     Q.   And so they completed this
4 paperwork for your short-term disability
5 application?
6     A.   Yeah.
7     Q.   Look on the second page. It's
8 Bates numbered D01791. Is that something
9 that was given to you there at the clinic?
10     A.   Yes.
11     Q.   It says practitioner, it says
12 Michael Keene down at the bottom, do you
13 know if that is who you were dealing with
14 at the clinic?
15     A.   I don't know. I assume it
16 was.
17     Q.   And it says on the note, it
18 says return to medical after cleared by
19 MD?
20     A.   Yes.
21     Q.   Is that your understanding
22 that you were supposed to report back to
23 the clinic with whatever the doctor had

75 (Pages 297 to 300)

Page 301

1  advised you about when you got whatever
2  your restrictions were, if any?
3      A.   Yeah, and when I didn't have
4  to take the medication.
5      Q.   Okay.  The third page, D01792,
6  is that completed in your handwriting?
7      A.   Yes.
8      Q.   And then you checked off
9  personal medical on the form?
10     A.   Yes.
11     Q.   And I notice that you didn't
12  check FMLA.  Did you not check that
13  because of the little star that says you
14  have to work for 12 months at the time you
15  are going out?
16         MS. HAYNES:  Object to the
17  form.
18     A.   I was hoping I was going to
19  get to come back.  FMLA is like extended.
20  Stacye had said short-term disability.
21     Q.   Did you understand that you
22  weren't eligible for FMLA leave when you
23  went out on August 17th?

Page 302

1      A.   I found out later on.  I
2  wasn't really familiar with FMLA.
3      Q.   But you didn't mark the FMLA
4  box on this form, correct?
5      A.   No.
6      Q.   Did you read the statement
7  below your signature by the asterisk that
8  says a team member must have worked for
9  HMMA for 12 months or 52 weeks, need not
10  have been consecutive, and 1250 hours in
11  order to qualify to take family medical
12  leave?
13     A.   No, I didn't read it.
14     Q.   Look on page Bates number
15  D01795.  Did you read through this packet
16  of instructions when you received it?
17     A.   I basically just done what
18  Stacye instructed me to do.
19     Q.   I'm looking at the bottom of
20  1795, the next to the last paragraph, if
21  the team member is not eligible to apply
22  for STD or the request is not approved,
23  Hyundai's policies and procedures covering

Page 303

1  absences will be applied.  Did you talk
2  with anybody about that provision in
3  August?
4      A.   Stacye just said that -- when
5  I started short-term disability, if the
6  doctor didn't release me, it would just go
7  into long term.
8      Q.   I think there was one
9  conversation on there you had on there
10  where either Stacye or Jane Ramsey says as
11  long as you are applying for the leave for
12  your own, you are okay as far as your
13  absences; was that what your understanding
14  was when you went out in August?
15     A.   Yes.  And Stacye also said
16  until she got back with me, which she
17  never did.
18     Q.   And that is some conversation
19  down the road?
20     A.   Yeah.
21     Q.   Now, your application for
22  short-term disability benefits was
23  approved, right?

Page 304

1      A.   Yes.
2      Q.   And what was the benefit you
3  were receiving in terms of paymentwise
4  while you were on short-term disability?
5      A.   I believe it was 4 something
6  every week.  I don't remember an exact
7  amount.
8      Q.   Do you know if it's a
9  percentage of your income?
10     A.   I think 67 percent or
11  something is what they said.
12         (Whereupon, Defendant's
13         Exhibit 16 was marked for
14         identification.)
15     Q.   Can you tell me if the
16  handwriting on Exhibit 16 is your
17  handwriting?
18     A.   Yes.
19     Q.   Do you know what this form was
20  completed for?
21     A.   It says scheduled therapy.  He
22  had wanted me to go to therapy.
23     Q.   And so this problem list, are

76 (Pages 301 to 304)

# Pages 307-312 Filed Under Seal

Page 313

1   and no lifting.
2       Q.   Okay.  And so then you leave
3   the plant that day.  And, I guess, did you
4   have any -- is that the last time that you
5   actually physically showed up at the
6   plant?
7       A.   Yes.
8       Q.   Okay.  I think we talked about
9   this at the beginning of the deposition.
10  As you sit here today, your doctor hasn't
11  released you from medical restrictions
12  still as we sit here today?
13      A.   No.
14      Q.   Is that correct?
15      A.   That is correct.
16      Q.   Okay.
17          (Whereupon, Defendant's
18          Exhibit 20 was marked for
19          identification.)
20      Q.   Do you recall receiving
21  Exhibit 20?
22      A.   Yes.
23      Q.   Did you do anything in

Page 314

1   response to this letter?
2       A.   Yes.
3       Q.   Well, it looks like there was
4   another one that came after that.
5          (Whereupon, Defendant's
6          Exhibit 21 was marked for
7          identification.)
8       Q.   Have you seen Exhibit 21
9   before?
10      A.   Yes, I have seen both of them.
11      Q.   Okay.  This Exhibit 21 on the
12  second page, the bold information says if
13  this information is not received by
14  May 29, 2007 your plan will be closed and
15  we will assume you no longer wish to
16  pursue the long-term disability benefits
17  under the above group policy.
18          This is information that they
19  have said in initially requested in the
20  December 14th letter?
21      A.   Which I had sent them and at
22  that time Patrick Brundidge was over it
23  and Diane Crawford, I called and they

Page 315

1   connected me with her because Patrick was
2   no longer there.  And she said he had not
3   worked my file up, it had just been
4   sitting there.  And she said I'm sorry,
5   but I'm going to have to request it again.
6          (Whereupon, Defendant's
7          Exhibit 22 was marked for
8          identification.)
9       Q.   Is the information that he
10  requested something that you would have
11  sent him directly or something that your
12  attorney would have sent on your behalf?
13      A.   My attorney had a lot of my
14  records.  I don't know.
15      Q.   In terms of the response to
16  the request back in December though, do
17  you know?
18      A.   I don't remember which one.
19      Q.   And this is a fax.  Is this
20  your handwriting on the first page of
21  Exhibit 22?
22      A.   Yes.
23      Q.   Is this to your understanding

Page 316

1   the information you sent in response to
2   the April 24th and April 30th letters?
3       A.   Yes.
4          MR. BOSTICK:  Let's take a
5   quick break here.
6          (Short break taken from 4:04
7   p.m. to 4:16 p.m.)
8       Q.   (BY MR. BOSTICK:)  In the
9   conversation that you produced on the tape
10  recordings, did you tape record all your
11  conversations with people at the plant --
12      A.   No.
13      Q.   -- at the time you left?
14      A.   No.
15      Q.   How did you decide which
16  conversations you were going to record and
17  which ones you weren't?
18      A.   Like when I got my letter
19  about the long term was denied, I recorded
20  me and Stacye because I wanted to know
21  what steps to take.  Or if I couldn't get
22  them to call me back, I would record me
23  leaving them messages.

79 (Pages 313 to 316)

TAMMY EDWARDS v.
HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, ET AL.

Case 2:07-cv-00908-MHT-SRW    Document 23-3    Filed 08/08/2008    Page 29 of 47

TAMMY EDWARDS
June 3, 2008

Page 317

1    Q.   Well, how many conversations
2  do you estimate you had with Hyundai
3  employees during the time you were out on
4  leave that you didn't record?
5    A.   Just the ones that I didn't,
6  probably about 15.
7    Q.   Are there any conversations
8  that you recorded that you have since
9  deleted?
10   A.   No.
11   Q.   Are the conversations that are
12  on the tape, were they all done in
13  chronological order?
14   A.   Yes.
15   Q.   Okay.  So what I listened to
16  on the tape is going in time with when it
17  occurred?
18   A.   The day it happened.
19   Q.   It looked like there was a
20  conversation you had recorded where you
21  called Steve Culpepper right before your
22  short-term disability leave was about to
23  expire.  Do you recall that conversation?

Page 318

1    A.   Yes.
2    Q.   And, you know, you had your
3  conversation and then, I guess, was that
4  the last conversation you had with him
5  while you were out on leave?
6    A.   No.  I believe there was two
7  conversations on there with him.
8    Q.   Okay.
9    A.   Whatever is on the tape is the
10  last one I had.
11   Q.   When is your recollection as
12  to when you actually spoke to Steve
13  Culpepper while you were out on leave?
14   A.   One of them was when medical
15  sent me back.  When I come back, one of
16  them was that night I was out in the
17  parking lot.
18   Q.   Where were you out in the
19  parking lot?
20   A.   When medical sent me, I had to
21  call Steve.
22   Q.   Okay.  Are you talking about
23  the February 2007?

Page 319

1    A.   Yes, 2007.
2    Q.   Okay.  What did you and Steve
3  talk about that night?
4    A.   I just let him know that
5  medical said that I needed to call him and
6  he said okay.
7    Q.   Okay.
8    A.   Even though they had talked to
9  him, they said I still had to call him and
10  then Jane Ramsey told me I didn't.
11   Q.   That night on February 12th,
12  was there sometime you spoke to him while
13  you were out on leave prior to that time?
14   A.   I don't remember.  I talked to
15  him again, but I think it was afterwards.
16   Q.   Sometimes afterwards what?
17   A.   After February 12th.
18   Q.   Where in that time frame?
19   A.   I think it was when my
20  long-term was denied.  I don't know.  You
21  have to listen to the tape.  It's on
22  there.  I don't recall what day it was.
23   Q.   Do you know, it looks like

Page 320

1  from what I can tell, the recorded
2  conversation is after the short-term
3  disability is denied and after you go back
4  to the plant in February, it sounds from
5  there on like the calls are to people in
6  benefits?
7    A.   Finding out the next step.
8  And also, I talked to Steve and asked him
9  what -- did he know where I would be going
10  back so I could get the doctor to release
11  me.  Like if I was going back to CCR, I
12  could have been released.  I mean, the
13  doctor would have let me do that or the
14  downtown board.  But he said that the
15  downtime board was no longer a job and
16  that I would be going to 505 or 506, which
17  the doctor would not release me more.
18   Q.   What was the position that you
19  were in on the BC-1 line before you went
20  out on the leave?
21   A.   Hammering.
22   Q.   I mean did it have a number to
23  it, like 505?

Page 321

1    A.    It was at 506, but it wasn't
2  actually the 506 job.  It was like some
3  extra stuff they needed done.
4        MR. BOSTICK:  Let me go grab
5  my CDs and we might as well just listen to
6  these and figure out who is who.
7        (Brief pause from 4:22 p.m.
8  until 4:24 p.m.)
9        MS. HAYNES:  Let's make a note
10  on the record that we are listening and
11  where the time starts and ends.
12        MR. BOSTICK:  I'm not asking
13  any questions while I'm doing that.
14        MS. HAYNES:  I don't care.
15  You are doing it while my client is
16  sitting here so I'm considering it record
17  time.  You are asking her to do something.
18        MR. BOSTICK:  I'm not going to
19  be on this long.
20        (Off-the-record discussion.)
21        (Listening to tape recordings
22        from 4:25 p.m. to 4:34 p.m. )
23    Q.    (BY MR. BOSTICK:)  Ms.

Page 322

1  Edwards, we just listened to two excerpts
2  of your tape recordings that you
3  previously produced.  And were the
4  conversations that we heard conversations
5  between you and Steve Culpepper?
6    A.    Yes.
7    Q.    Okay.  The first conversation
8  on the tape, you made mention of a
9  conversation earlier where you were
10  outside the plant and called him the night
11  that you went out to the plant in February
12  of 2007.  Was that first tape-recorded
13  conversation we listened to that
14  conversation?
15    A.    It was either that night or
16  the next evening.
17    Q.    Okay.  And then the second
18  conversation that we listened to where you
19  are asking him about what position that
20  you would be placed on, was that
21  conversation in February of 2007 as well?
22    A.    I believe so.
23    Q.    Okay.  To your knowledge, can

Page 323

1  you testify under oath that you had a
2  conversation with Steve Culpepper after
3  these two tape-recorded conversations that
4  you have it from February of 2007?
5        MS. HAYNES:  Object to the
6  form.
7    A.    I don't recall.
8    Q.    Okay.  I guess, other than
9  Mr. Culpepper, did you have any
10  conversations with -- was Harry White, was
11  he still your assistant manager?
12    A.    Yeah.  When I was leaving, he
13  was still assistant manager, I think.  He
14  was in the process of getting promoted.
15    Q.    I mean, other than --
16  Culpepper was your group manager.  Was
17  there anybody in that line of command from
18  him to Harry White or another manager that
19  you made contact with while you were out
20  on medical leave separate and apart from
21  the people in benefits?
22    A.    When Steve told me to deal
23  with Jane, that is what I did.  And when

Page 324

1  Jane told me to deal with Stacye, that is
2  what I did.
3    Q.    So the answer to my question
4  is there weren't any other managers that
5  you dealt with other than people in
6  benefits that you were contacting during
7  the time you were out on leave?
8    A.    No.
9    Q.    Okay.
10        (Whereupon, Defendant's
11        Exhibit 23 was marked for
12        identification.)
13    Q.    Do you recall receiving
14  Exhibit 23?
15    A.    Yes.
16    Q.    I think you testified that you
17  called and spoke with Stacye Jones in
18  benefits after receiving this letter?
19    A.    Yes.
20    Q.    And that is one of the
21  conversations you recorded?
22    A.    Yes.
23    Q.    Were there any conversations

81 (Pages 321 to 324)

Page 325

1  you had with Stacye Jones after receiving
2  this letter that you didn't record?
3      A.   I may have.  I talked to her
4  several times.
5      Q.   After receiving the June 14th
6  letter?
7      A.   No.
8      Q.   You didn't ever physically go
9  to the plant at any point after June 14th
10  of 2007, correct?
11     A.   No.  My badge didn't work.
12     Q.   What are you saying about your
13  badge didn't work?
14     A.   To get in the plant, your
15  badge, you swipe a badge.
16     Q.   Did it work in February when
17  you went up there?
18     A.   It worked in December, but it
19  didn't work in February.
20     Q.   So how did you get in to go
21  see medical when you went up there in
22  February?
23     A.   When I swiped the badge, it

Page 326

1  didn't go in.  And the guard called the
2  main person, I don't know who it was, and
3  they said is that Tammy Edwards before she
4  even knew it, I guess they could read it,
5  and she said yes, it is and he said tell
6  her to go through the admin building.  So
7  I went back out in the parking lot and
8  walked to the admin building and there was
9  a cop or security guard like and he took
10  me to medical.
11     Q.   Okay.
12          (Whereupon, Defendant's
13          Exhibit 24 was marked for
14          identification.)
15     Q.   Do you recall receiving
16  Exhibit 24?
17     A.   Yes.
18     Q.   And then you made a call to
19  Wendy Warner at some point after receiving
20  this letter?
21     A.   I did.
22     Q.   Okay.
23          (Whereupon, Defendant's

Page 327

1          Exhibit 25 was marked for
2          identification.)
3      Q.   Was your receipt of Exhibit 24
4  your first notice that your employment
5  with Hyundai had ended?
6      A.   Oh, that my employment was
7  ended?
8      Q.   Yes.
9      A.   Yes.
10     Q.   Have you seen Exhibit 25
11  before?
12     A.   No.
13     Q.   You haven't seen it before?
14  Did you know that you were, through your
15  attorney, appealing the denial of the
16  long-term disability benefits?
17     A.   Yes.
18     Q.   Have you seen the document
19  Bates numbered 19D01996 before?
20     A.   No.
21     Q.   Okay.  And this is a statement
22  from Amy Bentley, MD.  And was she your
23  treating physician?

Page 328

1      A.   Yes.
2      Q.   Okay.  In this statement, she
3  says she has begged to go back to work,
4  but I do not see how she can do her
5  required duties because of pain with
6  lifting and turning.  She has always been
7  a worker and very stoic about her pain.
8  It has been very hard for her to be idle
9  while trying to heal this injury.  She is
10  obviously concerned about her long-term
11  job security.  I have encouraged her to
12  seek disability, but she refuses citing
13  her enjoyment of working.  Is that a
14  conversation that you recall having with
15  Dr. Bentley where she encouraged you to
16  seek disability?
17     A.   She encouraged me, but I
18  expressed to her that financially I wasn't
19  able.
20     Q.   I mean, when she was talking
21  about seeking disability, did she talk
22  about seeking Social Security disability?
23     A.   I never did get that far in

82 (Pages 325 to 328)

---

Page 329

1    the conversation.
2        Q.    Have you ever gone and applied
3    for Social Security disability benefits?
4        A.    No.
5        Q.    Okay.  Other than the
6    long-term disability benefits and the
7    short-term disability benefits from
8    Hyundai, have you sought any other kind of
9    disability payments from any other entity?
10       A.    No.
11       Q.    But was it Ms. Bentley's
12   statement to you back in May that she
13   didn't think you were physically ready to
14   be released back to work?
15           MS. HAYNES:  Object to the
16   form.
17       A.    Because I was working like
18   12 hours and she was talking about the
19   long hours and she didn't like that.
20       Q.    Are you still seeing
21   Dr. Bentley today?
22       A.    I'm under Diane Counce.
23   Dr. Bentley is my regular doctor.

---

Page 330

1        Q.    She hasn't released you back
2    to work still today?
3        A.    She asked me what my title was
4    and I told her what Steve said I would be
5    doing and she won't release me for that
6    job.  She said if I had my CCR, I could go
7    back and do that, but I couldn't do the
8    other.
9        Q.    Have you shown her a job
10   description for the CCR?
11       A.    No.  She asked me what it
12   involved.
13       Q.    Has she taken you off the
14   medications you have been prescribed?
15       A.    No.  She has changed some.
16       Q.    Are you on any of the
17   medications today that -- are you still on
18   Flexeril?
19       A.    No.
20       Q.    What?
21       A.    There is like seven different
22   medications, but I don't take them all
23   each day.  I take them at different times.

---

Page 331

1    Like if I am having a spasm, I will take
2    one kind or whatever.
3            (Whereupon, Defendant's
4            Exhibit 26 was marked for
5            identification.)
6        Q.    Have you seen Exhibit 26
7    before?
8        A.    Yes.
9        Q.    Is that consistent with your
10   recollection that your application for
11   long-term disability was denied November
12   of 2007?
13       A.    Yes.
14           (Whereupon, Defendant's
15           Exhibit 27 was marked for
16           identification.)
17       Q.    Have you seen Exhibit 27
18   before?
19       A.    Yeah, I think so.
20       Q.    And was that some type of
21   notice that they had conducted some type
22   of review and further denied your claim in
23   January of 2008?

---

Page 332

1        A.    Yes.
2        Q.    Is your claim with Standard
3    still pending or as far as is this kind of
4    the completion of --
5        A.    That is the last communication
6    I believe I've had.
7        Q.    So as far as there was no
8    appeal after this January 21, 2008 notice?
9        A.    No.
10           (Whereupon, Defendant's
11           Exhibit 28 was marked for
12           identification.)
13       Q.    I'll show you what I have
14   marked as Exhibit 28.  Do you recall --
15       A.    When I applied for
16   unemployment.
17       Q.    Do you recall applying for
18   unemployment compensation?
19       A.    Yes.
20       Q.    Did you have a hearing in
21   person before someone like an
22   administrative law judge is what they are
23   called?

83 (Pages 329 to 332)

Pages 301-331 Filed Under Seal

Page 333

1    A.    No.
2    Q.    Did you call in on the phone
3  and speak to someone?
4    A.    Yes.
5    Q.    And looking on the first page,
6  it says first call date 8/28/07 and then
7  it has an e-mail address at 5Edwards; is
8  that your e-mail address?
9    A.    Yes.
10   Q.    Look for me, if you would, on
11  the page Bates numbered D01301.
12   A.    (Witness complies.)
13   Q.    Do you see where halfway down
14  the page it says since the most recent
15  Sunday have you been mentally and
16  physically able to work, and the box no is
17  clicked and it says due to car accidents,
18  I am not able.  Is that what you told the
19  Department of Industrial Relations?
20   A.    That is part of it.
21   Q.    And then it says are you
22  available to accept full time work, and it
23  says no, same as above.  Is that what you

Page 334

1  told the Department of Industrial
2  Relations?
3    A.    Yes, because I couldn't do the
4  505 or 506.
5    Q.    Did you tell them anything at
6  the Department of Industrial Relations
7  about being able to do other types of jobs
8  other than one specific job at Hyundai?
9    A.    Yes.  I told him I was doing
10  my job until I got moved to the line.
11   Q.    Look on the page Bates
12  numbered D01308; do you see that?
13   A.    Uh-huh.
14   Q.    Did you tell them that the
15  reason for separation was quit due to
16  health reasons?
17   A.    I put I had a neck injury from
18  a car accident and I had a disagreement
19  with a coworker and I explained that, and
20  I was assigned to a different part of the
21  building which I could not perform without
22  taking the medication.
23   Q.    Well, I'm just looking.  Is

Page 335

1  this computer form something that you
2  filled out or something that someone else
3  filled out?
4    A.    I don't remember.  I know I
5  was on the computer with some of it and I
6  also talked to the lady on the phone, so I
7  don't know which was which.
8    Q.    Did you type in this where it
9  says title of person you advised you were
10  quitting, Stacye Jones, manager?
11   A.    No.
12   Q.    Did you type in what date did
13  you give notice of quitting and it says
14  8/16/2007?
15   A.    No.  I assume I was just
16  answering it.
17   Q.    Did you ever hear or were you
18  ever at any hearing of any sort before the
19  Industrial Relations Board where you heard
20  Stacye Jones testifying?
21   A.    No.
22   Q.    I'm not going to mark this as
23  an exhibit, but it's the plaintiff's

Page 336

1  second supplemental initial disclosures.
2    A.    Do I leave it right here?
3    Q.    I'm not going to mark it.  I
4  want to ask you about some of the names
5  that were listed as potential witnesses.
6       Do you see on page two of this,
7  just going through, these are the people
8  listed as potential witnesses.  There is
9  number twelve, Eric listed?
10   A.    Uh-huh.
11   Q.    What would this person Eric
12  possibly know?  Would he have observed a
13  particular incident?
14       MS. HAYNES:  And don't testify
15  to anything I have told you about any
16  witness.
17   Q.    And I just want to know about
18  your personal knowledge.  If you don't
19  know, you don't know.
20   A.    About what he would know?
21   Q.    Yeah.
22   A.    He was on body build line and
23  he witnessed the fence or should have.  I

84 (Pages 333 to 336)

Page 337

1  can't say that he was staring, but he's
2  witnessed the language.
3      Q.   Farrard, I know you have
4  mentioned that name a couple of times.  Is
5  he white or black?
6      A.   He's black.
7      Q.   Did he work on the BC-1 line?
8      A.   No.
9      Q.   Where did he work?
10     A.   Body build.
11     Q.   Would he know of anything
12 other than the stuff we have talked about
13 already?
14     A.   No, not that I know of.
15     Q.   Stephanie, last name unknown,
16 do you know -- give me a general
17 description of who that person is.
18     A.   She is one of the ladies that
19 was hired with me.  She was on BC-1 line.
20     Q.   T. C.?
21     A.   He was hired with me also.
22     Q.   Was he on the BC-1 line?
23     A.   Yes.

Page 338

1      Q.   Would he just have seen some
2  of the interaction between you and
3  Swindle?
4      A.   No.  He was one of the ones
5  that talked to me about being on the BC-1
6  line, wanting to know what I had done
7  wrong, and he knew that it was a
8  retaliation thing.
9      Q.   Is he a team member?
10     A.   Yes.
11     Q.   Did he have any involvement in
12 the decision to move you to the --
13     A.   No.
14     Q.   Did he have any personal
15 knowledge about that move?
16     A.   I didn't know how he knew, but
17 Amber had said they had threatened -- they
18 had either put him on a bad job or
19 threatened to put him on a bad job because
20 of something that had happened.  I don't
21 know.  They were going to try to get rid
22 of him.  I don't know, that was just
23 hearsay.

Page 339

1      Q.   Charles, last name unknown,
2  number 19, do you know who that is
3  referring?
4      A.   He's on body build.
5      Q.   What would he have knowledge
6  about?
7      A.   He also worked in the line by
8  the board where a lot of the stuff
9  happened.
10     Q.   How about Dura, number 20?
11     A.   He was on BC-2 and 3.  He
12 witnessed Steve telling me that I cannot
13 come out of the computer room because I
14 was doing too good of a job.
15     Q.   April Smith?
16     A.   She also when I made a comment
17 to Billy about the mouths around there,
18 she said does it bother you and I said
19 yeah, I'm just not used to it.  And she
20 said well, and I said are you and she said
21 yeah, because I talk worse than they do.
22     Q.   Is she a team member?
23     A.   She was a team leader at the

Page 340

1  time, but I don't think she is there now.
2      Q.   22, Latisha?
3      A.   She saw me in the bathroom and
4  asked me was I okay because she knew that
5  something was wrong.  And she said what
6  did they put you on the line for, and I
7  said I just had some problems.  And she
8  said well, you ain't got to tell me, she
9  said we have had problems here a lot, she
10 said but it ain't going to change.  She
11 said I knew you had problems with somebody
12 or you wouldn't be on the line.
13     Q.   Is she a team member?
14     A.   Member.
15     Q.   23, Karen?
16     A.   She's just a BC-1 person, team
17 member.
18     Q.   Okay.  What would she know, if
19 you know?
20         MS. HAYNES:  Is that something
21 I have told you?
22         THE WITNESS:  No, but I
23 don't --

85 (Pages 337 to 340)

Page 341

1      MS. HAYNES: Who is it?
2      THE WITNESS: It's Karen.
3      A.    It didn't involve me and Mike.
4      Q.    Was it something that would
5  come up at trial?
6      A.    It could.
7      MS. HAYNES: All right. Let
8  me talk to her and see what the --
9      (Short break from 4:58 p.m. to
10  5:03 p.m.)
11     Q.    I guess our question was on
12  number 23, Karen, and what knowledge she
13  might know.
14     A.    Billy had said -- and Billy
15  was over her that -- because any time they
16  got new ones, they flirted or figure out
17  who would run around and who wouldn't.
18  And when she come in, she was real pretty,
19  she is a black girl, she was real pretty.
20     Q.    You said she was a black girl?
21     A.    Yeah, she was real pretty.
22  And Billy was going to cut up with her and
23  he said that Tom told him that that one

Page 342

1  was his and he couldn't mess with her.
2  And then Amber told me that they were
3  seeing each other.
4      Q.    Amber told you that Karen
5  and --
6      A.    And Tom, the manager.
7      Q.    Tom Bondy?
8      A.    Yes.
9      Q.    Have you ever spoken to
10  Karen --
11     A.    Yes.
12     Q.    -- about any of this?
13     A.    No.
14     Q.    Has she ever corroborated any
15  of those?
16     A.    I didn't get intimate with
17  her.
18     Q.    What about Rob Katzenback?
19     A.    He's the senior manager or, I
20  guess, that is what you call it.
21     Q.    Did you have any personal
22  conversations with him about Swindle?
23     A.    No.

Page 343

1      Q.    Okay. I mean, did he
2  personally observe any of the stuff that
3  you say Swindle was doing?
4      A.    He just said -- no, he
5  observed me doing my job.
6      Q.    But, I mean, do you know if he
7  had any knowledge about stuff going on
8  between you and Swindle prior to you
9  making your complaints to Stacye Jones in
10  late July?
11     A.    No.
12     Q.    Jeffrey, is that the person we
13  talked about earlier that was the black
14  man who had made some kind of --
15     A.    No, that is a different one.
16     Q.    Who is this Jeffrey?
17     A.    I don't know what his last
18  name was. He was real nice.
19     Q.    How do you know that this
20  is -- it says sidelines. What would this
21  Jeffrey be talking about?
22     A.    Sidelines.
23     Q.    What would he know?

Page 344

1      A.    He says that Mike told him
2  that we had a thing going.
3      Q.    This Jeffrey?
4      A.    Yes.
5      Q.    He says that Mike told him
6  that you and Mike had a thing going?
7      A.    Yeah, that he was one of the
8  ones Amber said was supposed to -- he was
9  trying to convince -- Mike was trying to
10  convince. Amber said that Jeffrey and
11  another guy both said why is Tammy doing
12  this to Mike when Mike told us that they
13  had a thing going. He didn't tell me
14  that.
15     Q.    Who reported to you that he
16  said that?
17     A.    Amber.
18     Q.    Okay. Do you have any
19  firsthand knowledge that Mike Swindle told
20  someone that you and he were having a
21  consensual sexual relationship?
22     A.    No.
23     Q.    Other than this comment that

86 (Pages 341 to 344)

Page 345

1  you say Jeffrey said, is there any other
2  comment that you say you have heard about
3  Mike Swindle telling someone that y'all
4  were having a consensual sexual
5  relationship?
6       A.   Amber -- well, I'm not sure
7  she said consensual, she just said sex --
8  she just said a thing going is what she
9  told me, yeah, so take that as you want
10  to.  But Amber said Farrard also told her
11  the same thing -- no, Farrard is the one
12  that told her about him coming up with
13  excuses.
14         There was a guy in maintenance,
15  a white guy in moving parts that stayed in
16  moving parts, he told Amber that Mike had
17  told him the same thing.  I forgot what
18  his name was.
19       Q.   That Mike had said that y'all
20  had a thing going?
21       A.   Yeah.
22       Q.   Okay.
23       A.   And that my husband had found

Page 346

1  out about it and he was making me turn him
2  in.
3       Q.   What is Jeffrey's race that
4  supposedly heard this statement?
5       A.   He's black.
6       Q.   And is sidelines a department
7  that he would have worked in?
8       A.   Yeah, it's connected to body
9  build or close to body build.
10       Q.   Have you seen this person
11  Jeffrey before?
12       A.   No.
13       Q.   Do you even know what he looks
14  like?
15       A.   I mean, I worked with him.
16       Q.   If I was going to go look for
17  him, what would he look like?
18       A.   He's just black, probably six
19  foot, medium build.
20       Q.   Did he have any facial hair?
21       A.   I don't know.
22       Q.   But you never talked to
23  Jeffrey or whoever this other person is to

Page 347

1  confirm for yourself what Swindle had said
2  to them?
3       A.   No.
4       Q.   Okay.  This is just something
5  that Amber is reporting to you that she
6  has heard?
7       A.   Yes.
8       Q.   Who is Tony Robertson?
9       A.   He was on the other shift.
10       Q.   What would he know about this
11  situation?
12       A.   He just knows Mike's
13  personality and he's the one that Mike
14  cussed on the radio.
15       Q.   Are these the nurses in the
16  clinic that you would have dealt with?
17       A.   Yes.  One of them is the one
18  that when they escorted me in asked the
19  cop why he escorted me in.
20       Q.   Do you know which one that
21  was?
22       A.   No.
23       Q.   Were there any substantive

Page 348

1  conversations that you had with either of
2  these nurses other than what we have
3  talked about already on your visits to the
4  clinic?
5       A.   Yes.
6       Q.   What were those?
7       A.   The nurse asked me -- after
8  she asked the cop or security guard why he
9  escorted me in the back door, he said I'm
10  just doing what I am told, she said well,
11  you have never done that before.  And he
12  said, like I said, I'm just doing what I
13  was told.
14         And when I got in the room, she
15  said do you know what that was about.  And
16  it was the first night I had come back and
17  I was already a little nervous, but anyway
18  I knew when they escorted me in that it
19  was going to be bad.  And I was upset and
20  she said has something happened, and I
21  said yeah and I told her that I had turned
22  a team leader in.  And she said I knew
23  there was something like that.  She said

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                                    http://www.TylerEaton.com

TAMMY EDWARDS
HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, ET AL.

TAMMY EDWARDS
June 3, 2008

Page 349

1  we get women in here upset about stuff all
2  the time. She said come in here any time
3  you need us.
4      Q. Who is Wil Ware?
5      A. He's team relations.
6      Q. Okay. What would his
7  involvement have been -- I'm sorry,
8  scratch that. Was he the person that
9  Stacye Jones replaced?
10     A. He's the one they alternated
11 with.
12     Q. He was on the other shift from
13 her?
14     A. Uh-huh.
15     Q. Did he have any involvement in
16 your investigation?
17     A. He just knew that I had a neck
18 injury.
19     Q. Okay. Had you told him that
20 specifically?
21     A. Yes.
22     Q. When did that conversation
23 take place?

Page 350

1      A. That took place when I was in
2  fenders before I ever got the CCR.
3      Q. 37, Tracy who is listed as a
4  mechanic, do you know who that might be?
5      A. Yes. He come up to me and
6  told me not to -- he said I don't know
7  what is going on and I'm not asking you
8  what is going on, but I do know that there
9  is some men around here that don't know
10 how to act, but I want you to know my mama
11 raised me right and you can always talk to
12 me, and don't think that all men are like
13 Billy and Mike.
14     Q. Was this a team member?
15     A. He was a mechanic,
16 maintenance. He's an older man.
17     Q. Do you know of any other
18 employees who had taken leave for the
19 period of time that you had and gotten
20 their short-term disability and then
21 denied the long-term who were then allowed
22 to return to work?
23     A. No.

Page 351

1      Q. That is not a very good
2  question. Do you know of anybody who --
3  do you know any employees, first, who
4  exhausted their short-term disability and
5  then were allowed to return to work at
6  Hyundai?
7      A. I know one that was on FMLA.
8      Q. And then they came back to
9  work?
10     A. Yeah.
11     Q. Who was that person?
12     A. I believe her name was Sharon.
13 She was in moving parts.
14     Q. What was her leave related to,
15 do you know?
16     A. I didn't ask.
17     Q. Did you ever submit an
18 application for reemployment at Hyundai
19 after leaving or after you got the notice
20 from Wendy that you had been terminated?
21     A. There was jobs that I had
22 looked on their Web site and I believe
23 Alicia had talked to them.

Page 352

1      MS. HAYNES: Don't say
2  anything about who I have talked to.
3      Q. But did you yourself apply for
4  any open positions at Hyundai after you
5  went out on medical leave in August of
6  2006?
7      A. No.
8      Q. Okay. Have you filed for
9  bankruptcy in the last five years?
10     A. No.
11     Q. You haven't applied for Social
12 Security disability; is that right?
13     A. No.
14     Q. Do you have any children that
15 are over the age of 18?
16     A. I have a daughter that is 19.
17     Q. Does she live in Montgomery?
18     A. No.
19     Q. Where does she live?
20     A. She lives in Chilton County
21 with me, Clanton.
22     Q. One of your claims in this
23 case is for damages. And, I guess, one of

88 (Pages 349 to 352)

Pages 355-360 Filed Under Seal

Page 361

1   pain from the car wreck?
2       A.   I did some nights.  But when
3   all this took place, I still have
4   problems.
5       Q.   Did you have any marital
6   problems as a result of what happened at
7   Hyundai?
8       A.   My husband is -- he's not
9   upset with me or anything, but he's upset
10  with the situation.  And there was days
11  that after I got sent home that he would
12  call and say I'm on the way home, I just
13  can't work.  And he would just come home
14  and I don't understand it, I don't
15  understand it.  And we still -- I talk
16  about it now, if I can go back to work and
17  he's like well, how are we going to handle
18  that because he knows I'm a little
19  skittish about going back to work if, you
20  know, people don't know the truth, and
21  they don't know the truth.
22      Q.   Does he know that you have
23  filed this lawsuit?

Page 362

1       A.   My husband?
2       Q.   Yes.
3       A.   Yes.
4       Q.   Does he know you were coming
5   up here for a deposition today?
6       A.   Yes.
7       Q.   Did you ever use the "N" word
8   during the time you were working at
9   Hyundai?
10      A.   No.
11      Q.   Did you ever make a reference
12  to someone with the "N" word when you were
13  talking with Billy Kitchens?
14      A.   No, and I know what you are
15  talking about.  That was not said.
16      Q.   What do you mean by that?
17      A.   Amber called me and said that
18  Billy was telling her and some other
19  people -- this was after I left, that I
20  had called a black girl on a line that was
21  real smart mouth the "N" word, and I
22  didn't say that.  Actually, the black
23  people acted nicer and more decent than

Page 363

1   the white ones did, so I had no reason to.
2       But this one had a smart mouth
3   and me and her had words at a station on a
4   Saturday and she always blessed everybody
5   out.  And Amber said that she had got into
6   it with her and she said you can't let her
7   get the best of you and I said I'm not, I
8   said I'm quiet on some things, but I said
9   I'm not going to stand there and let her
10  talk to me like that.
11      And then I told Billy -- Billy
12  was her team leader and Billy was laughing
13  and he said so y'all got into it, he said
14  y'all ain't going to be fighting, and I
15  said I'm telling you right now I'm not one
16  to just start something, I said but she's
17  not going to run her mouth to me like she
18  does the rest of them.  And I never called
19  her the "N" word.
20      Q.   What was that lady's name?
21      A.   Tish.  It's not the one that I
22  have got on the witness thing.  It was
23  Tish something.

Page 364

1       Q.   What line did she work on?
2       A.   She was on Billy's BC-1.
3       Q.   When did this interaction take
4   place?
5       A.   It was one Saturday because I
6   was trying to work the hinge thing for
7   them and I had never worked it and I
8   jammed it or something and she was talking
9   about the line getting stopped.  As a
10  matter of fact, Billy said she was
11  full-blooded "N" word.  She fusses with
12  everybody he said.
13      Q.   Was there a point in time
14  where Billy Kitchens offered to let you
15  use his computer to do some of your work?
16      A.   Yes.
17      Q.   Tell me about how that came
18  about.
19      A.   I don't even recall, but I
20  don't think -- it was just one day, I
21  think.
22      Q.   Why did he offer that to you.
23      A.   I don't even remember.

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                                          http://www.TylerEaton.com

Page 365

1    Q.   Was it something, I mean, was
2  your neck bothering you or something about
3  not having to go up and down the stairs or
4  anything?
5    A.   I don't remember. I just
6  remember him offering it to me.
7    Q.   Was there anything sinister
8  about him offering you to use his
9  computer?
10    A.   No.
11    Q.   Was it a nice gesture he was
12  making to do that?
13    A.   Yes.
14    Q.   Do you know what training Mike
15  Swindle would have received on the sexual
16  harassment policies out at Hyundai?
17    A.   I have no idea.
18      MR. BOSTICK:  Toby, have you
19  got any questions?  I'm going to look
20  through my notes.
21      MR. DYKES:  I do.  I've got a
22  few.
23

Page 366

1  EXAMINATION BY MR. DYKES:
2    Q.   Ms. Edwards, my name is Toby
3  Dykes. I'm an attorney for Mike Swindle.
4  I was going to ask you a few questions
5  about your claims against him. Can you
6  hear me okay if we sit over here?
7    A.   I can.
8    Q.   I know you have already been
9  asked a bunch of questions today. I'm
10  going to try not to ask you anything that
11  you have already been asked. I can't
12  promise that I won't touch on something
13  that you have already talked about a
14  little bit, but I'll do my best to stay
15  away from things you have already talked
16  about.
17      Your attorney has produced
18  documents in response to discovery
19  requests that we sent out there. Have you
20  got any documents in your possession that
21  you believe support your claims against
22  Mike Swindle that you have not already
23  given to your attorney to be given to us?

Page 367

1    A.   No.
2    Q.   And we have listened to some
3  of the audiotapes that you made. Have you
4  taken any recordings of any conversations
5  that you had with Mike Swindle?
6    A.   No.
7    Q.   Have you got any videos of
8  anything that went on with Mike Swindle?
9    A.   No.
10    Q.   Any pictures of Mike Swindle?
11    A.   Just the one.
12    Q.   The one that we looked at
13  today that was Bates stamp number -- or, I
14  guess, it was not a Bates number, but that
15  was the July 27th, 2006 picture?
16    A.   Yeah, on that day.
17    Q.   You talked with Mr. Bostick
18  about the statements that you heard from
19  Amber and that you were alleging were the
20  slanderous statements that Mr. Swindle
21  made. How do you think you have been
22  damaged by what you are alleging Mike
23  Swindle said was slanderous?

Page 368

1    A.   Yeah.
2    Q.   How?
3    A.   How? Well, first of all, the
4  people that is down there, even the ones
5  that knew what happened, since I'm gone,
6  they think that I done something wrong.
7  When I got put on the line, they thought I
8  done something wrong or they knew that I
9  had went against the managers.
10      And my nephew contacted me and
11  he had been told by a really good friend,
12  somebody that has knew me all my life, but
13  they are a lot older than me, but that I
14  had tried to go with a man and he rejected
15  me so I turned him in, and that he had
16  been told that by somebody that worked
17  with Hyundai.
18      And that is in my county. I'm
19  in a totally different county. And I
20  don't even know who he would know that
21  could have told him that, so I don't know
22  what all has been said.
23    Q.   Well, you told Mr. Bostick

92 (Pages 365 to 368)

Page 369

1  about three different things, two
2  statements about you and Mike had
3  something going on?
4      A.   Yeah.
5      Q.   And then the one statement
6  with Farrard.  Those are the only three
7  comments that you are alleging that you
8  are aware of that Mr. Swindle made; is
9  that right?
10     A.   Yes.
11     Q.   Okay.  Any other way you think
12  those comments have damaged you?
13     A.   Just me.
14     Q.   Have they damaged you
15  monetarily in any way?
16     A.   They have changed people's
17  opinion of me and that damages me.  It
18  might not to you or somebody or it
19  probably wouldn't him, but it does to me.
20  And my husband, you know, I mean he's been
21  affected and my kids has been affected
22  drastically.
23     Q.   Tell me how.

Page 370

1      A.   Financially.
2      Q.   How?
3      A.   Financially, I lost my job
4  over it.  They would have accommodated me
5  if I wouldn't have turned him in.
6      Q.   I'm just asking about -- are
7  you saying you lost your job because Amber
8  told you that Mike had said something was
9  going on between the two of you and that
10  Farrard had made the comment about having
11  a thing?
12     A.   No.  I'm saying I lost it
13  because I did turn him in.
14     Q.   All right.  And that is not my
15  question.
16         My question is:  You have
17  claimed slander in this lawsuit against
18  Mr. Swindle.  And the statements that you
19  have said Mr. Swindle made were to Amber
20  Kelly or that you learned from Amber Kelly
21  that you and Mike had something going on
22  and that Farrard had said your husband was
23  making you do this.  And I just want to

Page 371

1  know about those statements, how those
2  statements have damaged you?
3      A.   I mean, they are not true and
4  it bothers me.  You know, I can't sleep
5  thinking somebody -- I don't want anybody
6  to think that I have messed around on my
7  husband, not one person.  I don't know if
8  it's 3,000 employees down there, if it
9  wasn't but two that thought it, I don't
10  like it.  I can't sleep.  I don't want it
11  said.  I want it to be told the truth.
12     Q.   Any other way that those
13  statements are claiming you are damaged?
14     A.   Just feeling that people look
15  at me different.  I just don't like it.  I
16  can't deal with it because he knows it's
17  not true.  He knew how proud I was of just
18  being with one person, and that means a
19  lot to me.
20     Q.   Any other way?
21     A.   Not that I can think of.
22     Q.   You have talked with
23  Mr. Bostick about the claims, the times

Page 372

1  that you indicated that Mr. Swindle had
2  touched you and you said there were seven
3  or so times that he hugged you and that he
4  pulled on your ponytail a lot, I think,
5  was what you had said?
6      A.   Yeah.
7      Q.   And that he rubbed your leg
8  with the outside of his hand --
9      A.   Uh-huh.
10     Q.   -- on one occasion about
11  talking about your pants?
12     A.   New pants, yes.
13     Q.   And focusing on the times that
14  you claim that he hugged you, do you think
15  he was trying to hurt you when he hugged
16  you?
17     A.   No, he was doing it because he
18  knew I didn't want to and just to show me
19  that he could and that he would anyway.
20     Q.   But you didn't think he was
21  trying to physically hurt you when he was
22  hugging you?
23     A.   No.

93 (Pages 369 to 372)

Page 373

1  Q.  When he would pull on your
2  ponytail, did you think he was trying to
3  physically hurt you or just trying to get
4  your attention?
5  A.  Yes, both.
6  Q.  Both, okay.  Did you ever go
7  see a doctor and tell them, you know, he
8  hurt my neck or my back by pulling on my
9  ponytail?
10  A.  No.
11  Q.  The time that you said that he
12  rubbed his hand -- rubbed your leg with
13  the outside of his hand, did you think he
14  was trying to hurt you on that occasion?
15  A.  No.
16  Q.  Any other times that you are
17  claiming Mr. Swindle touched you other
18  than what you have already talked about
19  there and with Mr. Bostick?
20  A.  No, not that I can remember.
21  Q.  Do you still have the same
22  cell phone that you had while you were
23  working at Hyundai?

Page 374

1  A.  Yes.
2  Q.  Who was the provider of that?
3  A.  Nextel.
4  Q.  What is that phone number?
5  A.  Well --
6  Q.  If you want to tell me off the
7  record so it's not on the record, I'm fine
8  with that.
9  A.  I used two different ones.
10  The one of them I don't have anymore is
11  389-5306 and 389-5313.
12  Q.  Which one do you not have
13  anymore?
14  A.  The 5306.
15  Q.  When did you file your lawsuit
16  against the mortgage company regarding the
17  mortgage issues?
18  A.  I don't remember.
19  Q.  The issues with the mortgage
20  company, had those happened before you
21  started working at Hyundai?
22  A.  Yes.
23  Q.  Did the mortgage problems

Page 375

1  cause you any emotional problems?
2  A.  Yes.
3  Q.  Did the mortgage issues cause
4  a strain on your marriage?
5  A.  It did while we was going
6  through it, but we got over it when I got
7  a job.
8  Q.  Was there any embarrassment
9  with what happened with the restaurant and
10  it closing?
11  A.  Yeah.
12  Q.  Were there concerns during
13  that time that you might lose your house?
14  A.  Not that I would lose it, but
15  I mean because I can't imagine losing it.
16  I had family members or something I would
17  have to do.  I mean, I didn't come out and
18  say I'm scared to lose my house.  It was
19  basically everything I was worried about.
20  Q.  With the car accident that you
21  filed a lawsuit over, have you had
22  emotional problems over the injuries and
23  what happened with the car accident?

Page 376

1  A.  I had like when I had bad
2  days, yeah, I would be emotional about it
3  or something or if I was in a lot of pain
4  on certain days or if I had to go to the
5  hospital that day.  It's not something I
6  thought about every day.
7  Q.  When is the last time you
8  talked with Amber Kelly?
9  A.  It was after she had her baby.
10  Q.  Do you know when that was?
11  A.  I don't.
12  Q.  Would you say it was this
13  year, 2007, 2006?
14  A.  I think it was 2007.
15  Q.  And I don't want to know
16  anything that your lawyer did or said, but
17  have you talked to Amber about testifying
18  in a case against Hyundai?
19  A.  Amber talked to me about it
20  before I had even seen a lawyer.
21  Q.  Okay.  What did she say?
22  A.  She said that -- she had
23  encouraged me to get a lawyer before I

94 (Pages 373 to 376)

Page 377

1  ever turned him in. She had talked to me
2  about it. She told me I was stupid and
3  that -- I said well, I don't want to lose
4  my job. And she said how are you going to
5  lose your job, and I said because like
6  Michelle said if all of them is doing it,
7  I'm going to be the one gone.
8        And Richard Williams overheard
9  us talking because we was in the computer
10 room and he said oh, no, he said you won't
11 neither, he said you won't be gone, he
12 will. And I said well, I would rather
13 just go somewhere else in the department,
14 this place is too big where I couldn't
15 just go somewhere else.
16       And Amber -- I said like
17 Michelle said they will all stick
18 together, and Amber said I bet I wouldn't,
19 she said my mama raised me to tell the
20 truth. She said I would be there.
21       Q.   In those conversations about
22 that, did you tell Amber that you wouldn't
23 have to work at Hyundai if she helped you

Page 378

1  out with the lawsuit?
2        A.   No.
3        Q.   Would you say Amber is lying
4  if she said that you had told her that?
5        A.   I say she either lied or
6  misunderstood me.
7        Q.   Did you ever tell Amber that
8  you had to pursue the litigation or your
9  husband would be upset with you?
10       A.   No.
11       Q.   Would you say Amber is lying
12 if she had said that you did?
13       A.   Yes. Because Amber kept
14 encouraging me to before I ever did, and
15 I've also got her on tape.
16       Q.   On the tape that you have
17 given us?
18       A.   Yes.
19       Q.   Any other recordings of Amber
20 that you haven't given us?
21       A.   Uh-uh.
22            MS. HAYNES:  No.
23       A.   No.

Page 379

1            MR. DYKES:  If you will give
2  me one minute, I think I am about done.
3            MR. BOSTICK:  I'll ask a
4  couple while you are doing that.
5            (Off-the-record discussion.)
6
7  REEXAMINATION BY MR. BOSTICK:
8        Q.   Do your sisters still work out
9  at Hyundai?
10       A.   Yes.
11       Q.   And tell me again what their
12 names are, just to make sure I've got
13 that?
14       A.   Lathea Davenport now. She's
15 in the engine shop. And April Mimms,
16 she's in GA.
17       Q.   Do you have a cousin that
18 works out there also or any other
19 relatives?
20       A.   Not that I can recall.
21       Q.   You were asked if you had said
22 something to Amber to the effect of that
23 she wouldn't have to work again out there

Page 380

1  if she testified in your favor, and you
2  said that she is either lying or there is
3  something she misunderstood. Is there a
4  specific comment that you made to her that
5  you are saying she misunderstood?
6        A.   Yes.
7        Q.   What is that specific comment
8  you told her?
9        A.   She said you are sitting here
10 worrying about not having a job and you
11 are sitting on a million dollar lawsuit,
12 and I said yeah, right. We had been
13 talking about lawyers because she was
14 needing a lawyer because she thinks that
15 her stepmother killed her daddy blah,
16 blah, blah, blah.
17            And when we was talking about
18 lawyers, she started talking to me about I
19 needed to get a lawyer and that is what
20 brought it all up. And I said a million
21 dollars, me and you neither one would have
22 to work, and we laughed. That was it.
23       Q.   Why would you make some

95 (Pages 377 to 380)

TAMMY EDWARDS v. ... -cv-00908-MHT-SRW    Document 23-3    Filed 08/08/2008    Page 45 of 17
HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, ET AL.

TAMMY EDWARDS
June 3, 2008

Page 381

1  reference to her participating in money
2  that you would get in this lawsuit?
3      A.  She was saying that she was
4  going to contact Oprah because she didn't
5  have the money to get a lawyer for her
6  because she thinks her daddy got killed,
7  and if that -- that was the last thing she
8  wanted to do and she had complained about
9  what they said to her.  And she had also
10  said that she was going to start taping
11  them and blah, blah, blah.  And she said
12  if I wasn't a single mama, I wouldn't be
13  here.  She said but you've got a husband
14  that can help you.  She said I ain't got
15  nobody to help me, she said I have to put
16  up with it.
17      Q.  When did that conversation
18  take place as best you can recall?
19      A.  About the lawyer was before I
20  turned -- before I talked to Stacye.
21      Q.  I'm talking about the million
22  dollars and neither of us would have to
23  work.

Page 382

1          MS. HAYNES:  Object to the
2  form.
3      A.  When we was talking about the
4  lawyers and she said a million dollars,
5  and I said million dollars, we wouldn't
6  need, you know, but I didn't say if you
7  testify.
8      Q.  I'm saying when did that
9  conversation take place.
10      A.  I think it was when we had
11  talked about the lawyers because we was in
12  the computer room.
13      Q.  So you are saying sometime
14  before you went to Stacye Jones?
15      A.  Yes.  And then she talked to
16  me downstairs about going to court.
17      Q.  Your termination was in July
18  of 2007.  Are there any HMMA employees
19  that you have spoken to since that time
20  other than what we have heard on the tape
21  recordings?
22      A.  Yes.
23      Q.  Who have you spoken to since

Page 383

1  that time?
2      A.  Ricky Mimms.  My sisters, of
3  course.
4      Q.  I guess any people at Hyundai,
5  employees that would have had any
6  involvement in the facts underlying this
7  lawsuit that you have spoken to from July
8  of '07 to the present?
9      A.  Oh, that would have knowledge?
10      Q.  Yes.
11      A.  Amber and Michelle and Kim
12  called, but I think it was before I was
13  terminated.
14      Q.  And do you have recordings of
15  those calls?
16      A.  I just recorded the fact that
17  they left a message for me to call them
18  back.
19      Q.  Other than Amber, Michelle and
20  Kim, anybody else that you have spoken to
21  since --
22      A.  Uh-uh.
23      Q.  You had mentioned Amber having

Page 384

1  a conversation with you where she said
2  something to the effect of making
3  reference to this audio recording?
4      A.  Uh-huh.
5      Q.  Is that the same conversation
6  where the discussion of the million
7  dollars took place?
8      A.  No.
9          MS. HAYNES:  Object to the
10  form.
11      A.  She talked to me about that in
12  the parking lot because she said that
13  Billy had been saying some things that he
14  shouldn't have said.  And I said well, now
15  you know how I feel.  And we was walking
16  out the gate and she said yeah, but
17  difference in me and you, she said I ain't
18  going to put up with it.  She said I might
19  be a single mom, she said but my mama
20  raised me better than that.  She said I
21  ain't going to put up with it.  She said
22  Billy has done told me one time that Tom
23  was ready for me, and she said I let him

Tyler Eaton Morgan Nichols & Pritchett, Inc.

Toll Free 800.458.6031                                      http://www.TylerEaton.com

Page 385

1  by with that one. She said I'm going to
2  start recording them.
3      Q.   So you are saying that
4  conversation is a different one from the
5  one where y'all discussed a million dollar
6  verdict or a million dollar lawsuit?
7          MS. HAYNES:  Object to the
8  form.
9      A.   Yeah.
10         MR. BOSTICK:  Have you got
11  anything more?
12         (Off-the-record discussion.)
13
14  REEXAMINATION BY MR. DYKES:
15     Q.   Ms. Edwards, just a couple of
16  more. I know you have told Brian about
17  your allegations against what Mike Swindle
18  did there at the facility. I just want to
19  make sure, is there anything that you have
20  not told Brian, Mr. Bostick, about today
21  that you are complaining that Mike Swindle
22  did to you while you worked at Hyundai?
23     A.   Just other than the

Page 386

1  humiliation and pulling my hair and stuff
2  like that?
3      Q.   Yeah. I just want to make
4  sure that you have talked today about all
5  of the complaints that you have got about
6  what you are alleging that Mike Swindle
7  did at Hyundai.
8      A.   I pretty much went over it
9  other than the fact that he's, like I
10  said, you know, he got to stay and I'm the
11  one out and that makes me look like the
12  bad guy and I can't handle it. I can't
13  deal with that.
14     Q.   In terms of conduct, what you
15  are alleging that he did and said, have
16  you talked about all those things today?
17         MS. HAYNES:  He wants to know
18  if you have left anything out.
19     A.   Not that I know of.
20         MR. DYKES:  That is all I've
21  got.
22         MR. BOSTICK:  One last
23  question, I think.

Page 387

1  REEXAMINATION BY MR. BOSTICK:
2      Q.   You talked earlier about a
3  conversation that you had with Tom Bondy
4  and Steve Culpepper on roughly August 2nd?
5      A.   I think so.
6      Q.   Is that the only conversation
7  that you had with those two together about
8  the Swindle matter?
9      A.   Yes.
10     Q.   There is not some conversation
11  you had with them in this time frame about
12  Swindle other than that one?
13     A.   No. I mean, I had talked with
14  Steve before.
15     Q.   I'm talking about the two
16  together.
17     A.   The two together, no.
18     Q.   And one last question: Your
19  job application said you worked for
20  Wal-Mart at some point and it referenced
21  an address in Rhode Island. Did you live
22  in Rhode Island for a period of time?
23     A.   No. I didn't work in Rhode

Page 388

1  Island.
2          MR. BOSTICK:  Okay. Thank you
3  for your time, Ms. Edwards.
4
5
6
7      FURTHER THE DEPONENT SAITH NOT
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

97 (Pages 385 to 388)

Page 389

DEPONENT'S CERTIFICATE

I, TAMMY EDWARDS, the witness herein, have read the transcript of my testimony taken before Teresa Turquitt Davis, on June 3, 2008, and the same is true and correct, to the best of my knowledge. Any corrections and/or additions, if any, are listed separately.

TAMMY EDWARDS
C/O Alicia K. Haynes
Haynes & Haynes, P.C.
1600 Woodmere Drive
Birmingham, Alabama 35226

Sworn to and subscribed before me, this the ____ day of ____ 2008, to certify which witness my hand and seal of office.

NOTARY PUBLIC

Page 390

CERTIFICATE

STATE OF ALABAMA)
JEFFERSON COUNTY)

I hereby certify that the above and foregoing deposition was taken down by me in stenotypy, and the questions and answers thereto were reduced to typewriting under my supervision, and that the foregoing represents a true and correct transcript of the deposition given by said witness upon said hearing.
I further certify that I am neither of counsel nor of kin to the parties to the action, nor am I in anywise interested in the result of said cause.

COMMISSIONER - NOTARY PUBLIC
ACCR LICENSE NO. 162

98 (Pages 389 to 390)

**RECEIVED**

(R)TW

| HYUNDAI<br>Hyundai Motor Manufacturing Alabama | Hourly Employment Application 2005 | HR-AL-HR-EMP-F-00021 |
|---|---|---|
| Rev Date: 9/1/04 | Owner: Employment | Revision Level: 00 |

Hyundai Motor Manufacturing Alabama, LLC ("HMMA") does not discriminate against any candidate or employee on the basis of sex, race, color, national origin, age, disability, religion, veteran status, or other legally protected classification.

The questions on this form are designed to assist you in your proper placement. Please be accurate in filling out this application. HMMA verifies work history, compensation, and educational information.

## EMPLOYMENT APPLICATION

| LAST NAME | FIRST NAME | MIDDLE NAME |
|---|---|---|
| Edwards | Tammy | Renae |

CURRENT ADDRESS (Number and Street)
████████

| CITY | STATE | ZIP | EMAIL |
|---|---|---|---|
| Clanton | AL | 35045 | aprilmimsb@aol.com |

| HOME PHONE | ALTERNATE PHONE NUMBER | SOCIAL SECURITY NUMBER | DRIVERS LICENSE NO/EXP DATE/STATE |
|---|---|---|---|
| ████ | ████ | ████ | ████ |

NOTIFY IN EMERGENCY:
NAME ████  ADDRESS ████  PHONE ████

ARE YOU UNDER 18 YEARS OF AGE?  ☐ YES  ☑ NO

WHAT CAUSED YOU TO SEEK EMPLOYMENT AT HMMA?  ☐ ADVERTISEMENT  ☑ REFERRAL  ☐ OTHER (Specify)

GIVE THE NAMES AND RELATIONSHIPS OF ANY RELATIVES WHO ARE WORKING OR APPLYING FOR WORK WITH HMMA (INFORMATION USED FOR PROPER PLACEMENT)  ████ - sister

HAVE YOU EVER BEEN CONVICTED OF A FELONY?  ☐ YES  ☑ NO  IF 'YES' PLEASE EXPLAIN
(A conviction may not necessarily disqualify you from the job applied for.)

ARE YOU ABLE TO PERFORM THE TASKS OF THE JOB YOU SEEK WITH OR WITHOUT ACCOMMODATION?  ☑ YES  ☐ NO

POSITION APPLYING FOR:  ☐ PRODUCTION  ☐ DIE MAINTENANCE  ☑ MAINTENANCE  Janitoral

HAVE YOU APPLIED PRIOR WITH HMMA?  ☐ YES  ☐ NO  DATE

## EDUCATION

| CIRCLE HIGHEST GRADE COMPLETED IN EACH SCHOOL GRADE CATEGORY | SCHOOL | LOCATION | MAJOR/DEGREE | DID YOU GRADUATE? | GRADE POINT AVERAGE |
|---|---|---|---|---|---|
| HIGH SCHOOL<br>9  10  11  (12) | Isabella High School | Maplesville, AL | Diploma | Yes | 3.4 |
| COLLEGE<br>1  2  3  4 | | | | | |
| GRADUATE SCHOOL<br>1  2  3  4 | | | | | |
| APPRENTICE, BUSINESS OR VOCATIONAL SCHOOL<br>1  2  3  4 | | | | | |
| OTHER TRAINING OR SKILLS (Special courses Military Training, if appropriate) | George C. Wallace Com. College | Clanton, AL | Computer class | Yes | A |

**EXHIBIT**
1

D- 00002  EDWARDS V HMMA

## PREVIOUS EMPLOYMENT

LIST ALL JOB AND ACTIVITIES INCLUDING FULL-TIME, PART-TIME EMPLOYMENT WHILE IN SCHOOL, AND SELF EMPLOYMENT. BEGIN WITH MOST RECENT.
DO NOT REFERENCE A RESUME. PLEASE LIST ALL PERIODS OF UNEMPLOYMENT IN SPACE AT BOTTOM OF PAGE

MAY WE CONTACT YOUR PRESENT EMPLOYER?
☑ YES  ☐ NO

| FROM MO. YR. | TO MO. YR. | EMPLOYER | PHONE # | REASON FOR LEAVING |
|---|---|---|---|---|
| 3/03 | Present | Clanton Accounting | 205-755-8576 | Still there / Need benefits |

STREET ADDRESS: 300 1st St. North
CITY: Clanton  STATE: AL  ZIP: 35045

| BASE RATE OF PAY START | FINAL |
|---|---|
| $5.50 | $6.50 |

YOUR TITLE AND JOB DUTIES: Data Entry, Filing, Faxing, balancing checking accounts

NAME AND TITLE OF SUPERVISOR: Kippy Underwood Accountant

Part time 3 days a week

---

| FROM MO. YR. | TO MO. YR. | EMPLOYER | PHONE # | REASON FOR LEAVING |
|---|---|---|---|---|
| 5/03 | Present | Chilton County Board of Education | 280 Lay Dam Road | Still there / need full time |

STREET ADDRESS: Lay Dam Road
CITY: Clanton  STATE: AL  ZIP: 35045

YOUR TITLE AND JOB DUTIES: Substitute Teaching, Janitor - Cleaning, running floor machines, lunchroom worker, PE Teacher

NAME AND TITLE OF SUPERVISOR: Tom Briar

---

| FROM MO. YR. | TO MO. YR. | EMPLOYER | PHONE # | REASON FOR LEAVING |
|---|---|---|---|---|
| 7/04 | 5/05 | Courtside Cafe | Closed | Closed - We lost alot of money + time |

STREET ADDRESS: 215 6th St. North
CITY: Clanton  STATE: AL  ZIP: 35045

| BASE RATE OF PAY START | FINAL |
|---|---|
| $0 | $0 |

YOUR TITLE AND JOB DUTIES: Owner - Cleaning, Cooking, washing dishes, taking care of all orders, running cash register, day to day operations

NAME AND TITLE OF SUPERVISOR: Self

---

| FROM MO. YR. | TO MO. YR. | EMPLOYER | PHONE # | REASON FOR LEAVING |
|---|---|---|---|---|
| 9/04 | 05/04 | Chilton County Board of Ed | | Opened a Restaurant |

STREET ADDRESS: Lay Dam Road
CITY: Clanton  STATE: AL  ZIP: 35045

YOUR TITLE AND JOB DUTIES: Substitute Teacher, Janitor, Lunchroom, PE Teacher

---

PERIODS OF UNEMPLOYMENT (List Dates and Explain Gaps)

## CERTIFICATION

Consistent with HMMA's objective of promoting safety and safeguarding its company assets, employees who lease and/or operate any Company-owned or provided vehicle (hereinafter "Vehicle"), including but not limited to those who are required to operate a Vehicle to perform their job functions, must meet, maintain, and follow all requirements, including driving eligibility requirements, in HMMA's Vehicle Services Policies and Procedures Manual or Hyundai Motor America's ("HMA") relevant policy manual. HMMA will periodically review the driving record of any employee who operates a Vehicle. If it is shown that an employee's driving record contains accidents and/or violations that exceed applicable standards, the employee will not be permitted to drive a Vehicle.

Your driving record will be reviewed through the appropriate state agency. If your job requires you to drive a Vehicle and you meet all other job-related requirements of the position, any job offer made to you will be contingent on the fact that your driving record conforms to applicable standards.

You agree to pay any lease charge by payroll deduction. Any money owed HMMA or HMA due to damage to a Vehicle or unpaid lease payment may be deducted from your pay check

I hereby certify that the entries on this form and any other statements made by me to HMMA are in connection with my application for employment true and correct. Any material omissions or misstatements are grounds for non-selection or termination.

I understand that if an offer of employment is made, it is contingent upon my submitting documentation of my legal right to work in the United States

I agree to submit to a physical examination and drug screen. I also authorize HMMA to request from my former employers, and any other source, any information which HMMA may lawfully seek in considering my application for employment, and I hereby release HMMA and such other employers or sources, from any liability whatsoever for requesting and/or providing such information
I UNDERSTAND THAT I WILL BE SUBJECT TO DISMISSAL IF ANYTHING IN THIS APPLICATION IS FOUND TO BE FALSE.

In consideration of my employment, I agree to conform to the rules and regulations of HMMA. I UNDERSTAND THAT MY EMPLOYMENT AND COMPENSATION IS AT WILL AND CAN BE TERMINATED WITHOUT CAUSE OR NOTICE AT ANY TIME AT THE OPTION OF MYSELF OR HMMA. I understand that no employee or representative of HMMA, other than the President has any authority to authorize an agreement for employment for any specified period of time or to make any agreement contrary to the foregoing.

Signature: Tammy Edwards
Date: 10-26-05

# HYUNDAI
Hyundai Motor Manufacturing Alabama

| | **Hourly Employment Application** | HR-AL-HR-EMP-F-00021 |
|---|---|---|
| Rev Date: 9/1/04 | Owner: Employment | Revision Level: 00 |

Hyundai Motor Manufacturing Alabama, LLC ("HMMA") does not discriminate against any candidate or employee on the basis of sex, race, color, national origin, age, disability, religion, veteran status, or other legally protected classification.

The questions on this form are designed to assist you in your proper placement. Please be accurate in filling out this application. HMMA verifies work history, compensation, and educational information.

## EMPLOYMENT APPLICATION

| LAST NAME | FIRST NAME | MIDDLE NAME |
|---|---|---|
| Edwards | Tammy | Renae |

**CURRENT ADDRESS (Number and Street)** ▉

| CITY | STATE | ZIP | EMAIL |
|---|---|---|---|
| Clanton | AL | 35045 | April mims6@ad.com |

| HOME PHONE | ALTERNATE PHONE NUMBER | SOCIAL SECURITY NUMBER | DRIVERS LICENSE NO/EXP DATE/STATE |
|---|---|---|---|
| ▉ | ▉ | ▉ | |

**NOTIFY IN EMERGENCY:** NAME ▉  ADDRESS ▉  PHONE ▉

ARE YOU UNDER 18 YEARS OF AGE?  ☐ YES  ☒ NO

WHAT CAUSED YOU TO SEEK EMPLOYMENT AT HMMA?  ☐ ADVERTISEMENT  ☒ REFERRAL  ☐ OTHER (Specify)

GIVE THE NAMES AND RELATIONSHIPS OF ANY RELATIVES WHO ARE WORKING OR APPLYING FOR WORK WITH HMMA (INFORMATION USED FOR PROPER PLACEMENT) ▉ - Sister

HAVE YOU EVER BEEN CONVICTED OF A FELONY?  ☐ YES  ☒ NO  IF 'YES' PLEASE EXPLAIN
(A conviction may not necessarily disqualify you from the job applied for.)

ARE YOU ABLE TO PERFORM THE TASKS OF THE JOB YOU SEEK WITH OR WITHOUT ACCOMMODATION?  ☒ YES  ☐ NO

POSITION APPLYING FOR:  ☒ PRODUCTION  ☐ DIE MAINTENANCE  ☒ MAINTENANCE

HAVE YOU APPLIED PRIOR WITH HMMA?  ☐ NO  ☐ YES  DATE

## EDUCATION

| CIRCLE HIGHEST GRADE COMPLETED IN EACH SCHOOL GRADE CATEGORY | SCHOOL | LOCATION | MAJOR/DEGREE | DID YOU GRADUATE? | GRADE POINT AVERAGE |
|---|---|---|---|---|---|
| HIGH SCHOOL 9 10 11 (12) | Isabella High | Maplesville, AL | | Yes | 3.6 |
| COLLEGE 1 2 3 4 | | | | | |
| GRADUATE SCHOOL 1 2 3 4 | | Weld | | | |
| APPRENTICE, BUSINESS OR VOCATIONAL SCHOOL 1 2 3 4 | | | | | |
| OTHER TRAINING OR SKILLS (Special courses, Military Training, if appropriate) | George C. Wallace | Clanton, AL | Computer Course | Certificate | A |

## PREVIOUS EMPLOYMENT

LIST ALL JOB AND ACTIVITIES INCLUDING FULL-TIME, PART-TIME EMPLOYMENT WHILE IN SCHOOL, AND SELF EMPLOYMENT BEGIN WITH MOST RECENT
DO NOT REFERENCE A RESUME. PLEASE LIST ALL PERIODS OF UNEMPLOYMENT IN SPACE AT BOTTOM OF PAGE

MAY WE CONTACT YOUR PRESENT EMPLOYER?
☐ YES  ☐ NO

**FROM** 5-05 **TO** Present
**EMPLOYER** Chilton Board of Education **PHONE #** 205-280-2770
**REASON FOR LEAVING** Still there (need full-time)
**STREET ADDRESS** Lay Dam Road — need benefits & better pay
**CITY** Clanton **STATE** AL **ZIP** 35045
**BASE RATE OF PAY START** $13 00/day **FINAL** $48 00/day
**YOUR TITLE AND JOB DUTIES** Cleaning bathrooms, classrooms - all janitorial duties, Lunchroom worker, substitute teacher, class discipline, P.E. Teacher, exercising, Office Worker, Preparing Lessons + test.
**NAME AND TITLE OF SUPERVISOR** Pam Bright Secretary

**FROM** 1989 **TO** 2004
**EMPLOYER** Chilton Board of Education **PHONE #** 205-280-2770
**REASON FOR LEAVING** Opened a restaurant
**STREET ADDRESS** Lay Dam Road
**CITY** Clanton AL **STATE** **ZIP** 35045
**BASE RATE OF PAY START** $3 00/day **FINAL** $13 00/day
**YOUR TITLE AND JOB DUTIES** Cleaning, teaching, helping students, P.E. Teacher, Janitor, Lunchroom worker, Office worker.
**NAME AND TITLE OF SUPERVISOR** Pam Bright Secretary

PERIODS OF UNEMPLOYMENT (List Dates and Explain Gaps)

## CERTIFICATION

Consistent with HMMA's objective of promoting safety and safeguarding its company assets, employees who lease and/or operate any Company-owned or provided vehicle (hereinafter "Vehicle"), including but not limited to those who are required to operate a Vehicle to perform their job functions, must meet, maintain, and follow all requirements, including driving eligibility requirements, in HMMA's Vehicle Services Policies and Procedures Manual or Hyundai Motor America's ("HMA") relevant policy manual. HMMA will periodically review the driving record of any employee who operates a Vehicle. If it is shown that an employee's driving record contains accidents and/or violations that exceed applicable standards, the employee will not be permitted to drive a Vehicle.

Your driving record will be reviewed through the appropriate state agency. If your job requires you to drive a Vehicle and you meet all other job-related requirements of the position, any job offer made to you will be contingent on the fact that your driving record conforms to applicable standards.

You agree to pay any lease charge by payroll deduction. Any money owed HMMA or HMA due to damage to a Vehicle or unpaid lease payment may be deducted from your pay check

I hereby certify that the entries on this form and any other statements made by me to HMMA are in connection with my application for employment true and correct Any material omissions or misstatements are grounds for non-selection or termination

I understand that if an offer of employment is made it is contingent upon my submitting documentation of my legal right to work in the United States

I agree to submit to a physical examination and drug screen. I also authorize HMMA to request from my former employers, and any other source, any information which HMMA may lawfully seek in considering my application for employment, and I hereby release HMMA and such other employers or sources from any liability whatsoever for requesting and/or providing such information
I UNDERSTAND THAT I WILL BE SUBJECT TO DISMISSAL IF ANYTHING IN THIS APPLICATION IS FOUND TO BE FALSE.

In consideration of my employment, I agree to conform to the rules and regulations of HMMA. I UNDERSTAND THAT MY EMPLOYMENT AND COMPENSATION IS AT WILL AND CAN BE TERMINATED WITHOUT CAUSE OR NOTICE AT ANY TIME AT THE OPTION OF MYSELF OR HMMA. I understand that no employee or representative of HMMA other than the President, has any authority to authorize an agreement for employment for any specified period of time or to make any agreement contrary to the foregoing

**Signature** Tammy Edwards    **Date** November 2, 2005



**HYUNDAI**
Motor Manufacturing Alabama, LLC
700 Halcyon Boulevard
Montgomery, Al 36105

Date: January 4, 2006

**Confidential**

**Edwards, Tammy**
Clanton, AL 35045

I am happy to confirm Hyundai Motor Manufacturing Alabama LLC's offer of employment to you as a Production Team Member. Your first day of employment will be **Tuesday, January 17, 2006 starting at 8:00 a.m.**

Your starting salary is $14.79/hr, with progression increases up to $22.20/hr within a two-year time frame. You will be in orientation for two weeks; orientation hours are 8:00 a.m. to 5:00 p.m. After orientation, work hours will be 6:30 a.m. to 3:15 p.m. These hours are subject to change to maintain efficient plant operations, up to and including rotating shifts.

In order to verify your employment eligibility, you <u>must</u> provide documentation to verify your identity and authorization to work in the United States. We prefer that you bring these documents on your first day; however, you do have three days to provide it. The documentation most commonly provided is a passport, or driver's license and birth certificate, or driver's license and social security card. Please review the enclosed form which lists all acceptable documents.

Please dress in business casual (no jeans or tee shirts); uniforms will be provided at a later date.

Please be aware that domestic and international travel may be required and is not guaranteed.

Neither our offer nor your acceptance creates a contract of employment. Employment at HMMA is offered on an at-will basis and can be terminated without cause or notice at anytime by either party. Please be advised all offers are subject to the successful completion of a physical, drug screen and background check.

Congratulations on your selection! We are looking forward to you joining us on **Tuesday, January 17, 2006. Please report to the HMMA Training Center at 900 Hyundai Boulevard in Montgomery, AL and check in with the receptionist by 8:00 a.m.**
Welcome to Hyundai!

*Wendy Warner*

Wendy Warner
Manager, Employment
sda

Signature _____ (Date) 1/17/06

Please sign this letter and bring it with you to orientation along with picture identification.

**EXHIBIT**
**2**

D- 00001  EDWARDS V HMMA

EXHIBIT
3
Exhibit

# New Team Member Orientation for the period of January 17 ~20, 2006

**Week One**

**40 Hour New Team Member Orientation (Week One)**

**Auditorium**

| | | | | |
|---|---|---|---|---|
| History of HMC/HMMA Kerri Christopher | Safety Overview Josh Wallace | Hyundai Spirit Patricia Adams | Sexual Harrasment Chad Griffon | |
| I-9 Forms Bethany Phillips | | | | |
| Benefits (401K) Melanie McCormick | Security and Workplace Violence Larry Pugh | Lock Out/Tag Out Awareness Adrienne Fontaine | | |
| Benefits Karla Sterling | HMMA Emergency Response Plan/Fire Extinguisher Training Frank Losoto | Vehicle Services David Colmans and Diane Cobb | Team Relations Representatives | |
| | | | Information Technology Mike Breen | |
| | Workmen's Compensation/EAP Penny Nicholl | Hearing Conservation Julie Wood | Overview of Common Core Program Connie Sator | |
| | | | Lunch | |
| Benefits (Continued) | Team Member Services McKee Southern, Affordable Eyewear, Wachovia Bank, MAX Fed Cr. Union, ID Badges, Safety Shoes, Benefits and Forms/ Questions/Answers | Bloodborne Pathogens Julie Wood | Policy and Procedures Team Relations | |
| Diversity Sheryl Rose | | Industrial Athlete and Wellness Julie Wood | | |
| Introduction of Senior Managers John Katson | | | | |
| HR Overview Greg Gimble | Ergonomic Principles and Body Mechanics Andy Gustafson Health South | Plant Tour for New Team Members | Policy and Procedures (Continued) | |
| Wachovia Bank Drew Brooks MAX Fed Credit Union Celeste Cook | | | | |
| Performance Management Nikol Butler | | | | |
| McKee Southern Fern Smith | | | | |
| | | Break | Break | |
| | | Adjourn | Adjourn | |



Exhibit 4 Filed Under Seal

# Team Member Handbook





**Hyundai Motor Manufacturing Alabama, LLC.**

1st Edition



EXHIBIT

5

Edwards v. Hyundai, et al.

0001

385-8000 - Front desk  8:00
8:00 Security

Vacation

## CONTENTS

HMMA History .................................................................. Page 1
HMMA Vision Statement ................................................... Page 1
HMMA Mission Statement ................................................. Page 1
HMMA's Team Values and Standards ................................. Page 1
   Safety
   Quality
   Team Diversity
   Efficiency
   Stewardship
Equal Employment Opportunity ........................................ Page 2
Unlawful Harassment ........................................................ Page 2
HMMA's Position on Unions .............................................. Page 3
Purpose of the Handbook .................................................. Page 3
Employment Statement ..................................................... Page 3
Team Member Records ...................................................... Page 4
Probation Period .............................................................. Page 4
Length of Service ............................................................. Page 5
Employment of Relatives .................................................. Page 6
Temporary Workers and Replacement Workers ................... Page 6
Team Member Orientation ................................................. Page 6
Hours of Work ................................................................. Page 6
Breaks/Communication Period .......................................... Page 7
   Break Periods
   Communication Period
Attendance ...................................................................... Pages 7-10
Work Week ...................................................................... Page 10
Overtime ......................................................................... Page 10
   Non-Exempt Team Members
   Exempt Team Members
Pay ................................................................................. Page 11
Payday ............................................................................ Page 11
Direct Deposit .................................................................. Page 11
Questions Regarding Pay .................................................. Page 11
"Call In" Pay .................................................................... Page 11
"Report In" Pay ................................................................ Page 11
Statement of Earnings ...................................................... Page 12
Garnishments .................................................................. Page 12
Benefits .......................................................................... Pages 12-20
   Attendance Incentive Program
   Family and Medical Act (FMLA)
   Holidays
   Vacation Non-Exempt/Exempt Team Members
   Scheduling Vacation
   Summer Shutdown
      Soliciting Volunteers
      Required Work
      Medical Leave

Edwards v. Hyundai, et al.

0002

Canceling Vacation
Personal Days
Scheduled Personal Days
Unscheduled Personal Days
Transfers
Unscheduled Vacation
Vacation Eligibility
Unused Vacation Time
Personal Leave
Bereavement Leave..........Page 20-22
Jury Duty..........Page 22
Military Leave..........Page 22
Team Wear..........Pages 22-24
Safety..........Page 24-25
Safety Committees
Safety Wear
Hard Hats and Bump Caps
Shoes
Safety Glasses
Personal Protective Equipment (PPE)
Housekeeping
Lock Out/Tag Out Procedures
Special Authorization Permits..........Page 26
Confined Space Entry Permits
Hot Work
Area Specific Safety Rules
Security..........Page 26-27
Foreign Trade Zone (FTZ)
Video Surveillance
HMMA Identification Badges (ID)
Parking/Traffic Control
Career Opportunity Program..........Page 27-28
Transfers..........Page 28-29
Solicitation, Distribution, and Postings..........Page 29-30
Team Member Work Conduct..........Page 30-31
Corrective Action..........Page 31-33
Discussion Planner
Informal Discussion
Formal Discussion
Commitment Discussion
Decision Leave
Termination
Serious Misconduct..........Page 34-35
Workplace Threats and Violence..........Page 35-36
Team Member Resolution Program and Procedure..........Pages 36-38
Step 1: Supervisory Level
Step 2: Resolution Request
Step 3: Resolution Appeal
Step 4: Resolution Final Appeal

ii

Team Member Review Board..........Page 38
Drugs, Alcohol and Weapons..........Page 38-40
For Cause Testing and Random Testing..........Page 40-41
Public Relations..........Page 41
Internal Communications..........Pages 42-44
Open-Door Policy
Bulletin Board
President's Roundtable
Group Leader/Manager One-on-Ones
Manager's Lunches
Team Advisor
Hyundai Communication System (HCS)
HMMA Closed Circuit Television System
HMMA Weekly News
Hyundai Insights
Five Minute Communication Meetings
Community Relations..........Page 44-45
Speeches
Tours
General Information..........Page 45-46
Electronic Devices
Camera/Video Camera
Cell Phones/Pagers
Audio Tape Recorders
HMMA Tools..........Page 46
Lockers..........Page 46-47
Cafeteria..........Page 47
Smoking..........Page 47
Telephone Calls..........Page 47

iii

## HMMA HISTORY

Hyundai Motor Company (HMC) was established in 1967. By 1974, HMC produced the Pony as their first independently designed and manufactured model.

In 1985 HMC established Hyundai Motor America (HMA) and launched the Excel which was the best selling import sub-compact in the US for three years. Eight years later Hyundai launched the Sonata II and started assembly of the Excel in Thailand.

Over the last 35 years Hyundai has established its place in a global marketplace. On April 2, 2002, Hyundai announced it had chosen Montgomery, Alabama to build its first U. S. manufacturing facility which will produce the next generation Sonata and Santa Fe.

## HMMA's VISION STATEMENT

Our Team provides value for your future

## HMMA's MISSON STATEMENT

To create exceptional automotive value for our customers by harmoniously blending safety, quality, and efficiency. With our diverse team, we will provide responsible stewardship to our community and environment while achieving stability and security now and for future generations.

## HMMA's TEAM VALUES

**SAFETY:** HMMA is committed to providing a safe working environment to preserve and enhance the health and personal safety of our Team Members. We will achieve this through the implementation of safety policies, safe work practices, a drug free workplace, and by daily commitment of all Team Members.

**QUALITY:** HMMA's commitment to Quality begins with its ability to achieve continuous improvement in its product by always listening to our customers. HMMA works with its suppliers to ensure high standards are continually maintained. All HMMA Team Members have an active role in maintaining and improving both the manufacturing process and quality.

**TEAM DIVERSITY:** HMMA's success depends on treating each Team Member with dignity and respect and utilizing our Team's diversity to its maximum potential. HMMA's definition of Team Diversity is accepting our differences and learning from each Team Member's unique perspective in order to achieve a new standard of excellence in society, at home and at work. We must all work as a Team, practicing integrity as we deal with our customers while listening and learning from one another, sharing in our successes, and helping one another succeed.

**EFFICIENCY:** In order to provide job stability and maintain profitability to HMMA we must all act effectively to minimize all aspects of waste.

1

Edwards v. Hyundai, et al.

0004

To achieve continuous growth and innovation, each Team Member has the responsibility to find more efficient ways to produce our products for our internal and external customers.

**STEWARDSHIP:** At HMMA we are committed to the stewardship of our environment and our community. Stewardship simply means managing responsibly. We are committed to conserving energy, recycling, aging responsibly, and eliminating elements that could cause harm to the environment. HMMA is also committed to being actively involved in our community in order that it may grow for the benefit of our Team Members and their families.

**EQUAL EMPLOYMENT OPPORTUNITY**

HMMA is committed to providing an environment that is free of unlawful discrimination and providing equal employment opportunities and promotional opportunities to all Team Members.

Equal employment opportunity means eliminating any practice of unlawful discrimination from employment - in recruitment, application, qualification, hiring, training and education, promotions, corrective action, layoffs, terminations, and all other conditions of employment.

HMMA makes all decisions with regard to employment without discriminating on the basis of race, color, religion, national origin, age, sex, disability, veteran status or any other unlawful basis. Additionally, HMMA will make reasonable accommodations for qualified job applicants and Team Members with disabilities, in accordance with the Americans with Disabilities Act.

HMMA's team relations manager has the appropriate authority and the responsibility to administer the EEO programs with regard to employment and promotional opportunities. Any Team Member who feels he/she has been discriminated against may express such concerns to his/her group leader/manager, the team relations representative, and/or the Human Resources Director. HMMA's team relations manager will be responsible for administering HMMA's EEO policy and insuring that any reported EEO violations are investigated promptly and handled according to all federal and state laws as well as HMMA's policies and procedures.

**UNLAWFUL HARASSMENT**

In order for all HMMA Team Members to enjoy a work environment free from all forms of unlawful discrimination, including sexual harassment, no Team Member - male or female - should be subject to unsolicited and unwelcome sexual advances or conduct, whether verbal, physical, explicit, or implied. This includes verbal innuendoes, suggestive comments, off-color jokes, gestures or physical contact. Such embarrassing, demeaning or intimidating behaviors interfere with a Team Member's work performance and may create a hostile, offensive work environment. It is also unlawful sexual harassment when submission to sexual

advances is a condition of getting or keeping one's job or when it influences personnel decisions. Furthermore, it is contrary to HMMA policy for any Team Member to be subjected to harassment in the workplace because of race, color, religion, national origin, age, physical or mental disability, veteran's status, or any other unlawful basis. Cases of such unlawful harassment should be reported to your group leader/manager, team relations representative, or the team relations manager.

**HMMA's POSITION ON UNIONS**

HMMA's team concept and creating a team environment is based on faith in each Team Member and recognizes our commitment to ensure a positive working environment. HMMA has developed its policies, wage structure and benefits plans with our Team Members' best interests in mind. Additionally, HMMA is committed to providing all Team Members with a safe place to work by utilizing state of the art equipment, technologies, as well as work practices to ensure safety.

By joining together as a team, we can accomplish our mutual goals assuring the success of Hyundai Motor Manufacturing Alabama, LLC and providing greater opportunities and job security for all Team Members and their families. Because of HMMA's commitment to every Team Member we do not believe that a third party such as a union is necessary at HMMA.

**PURPOSE OF THE HANDBOOK**

HMMA's handbook is intended as a summary of HMMA's policies and procedures. We ask each Team Member to read the handbook and familiarize themselves with HMMA's policies and procedures in order for you to understand HMMA's responsibilities to you and your responsibilities to HMMA.

This handbook is not a contract. We ask each Team Member to understand that in order for HMMA to remain competitive in a global market there may be times when changes are necessary. HMMA reserves the right to change policies and procedures when it becomes necessary, either in whole or in part, with or without notice. When it is determined that a policy or procedure needs to be changed, all Team Members will be notified by their manager and/or a video or other printed material to communicate such changes.

**EMPLOYMENT STATEMENT**

If Team Members have any questions concerning these policies and procedures they should ask their group leader/manager. If the Team Member is still unclear about the policies and procedures they should contact their team relations representative for clarification.

Every Team Member's employment with HMMA is a voluntary one and is subject to termination by you or HMMA at will, with or without cause, and with or without notice, at any time. Nothing in this

2

3

handbook or HMMA policies or procedures shall be interpreted to be in conflict with or to eliminate or modify in any way the employment-at-will status of HMMA Team Members.

This policy of employment-at-will may not be modified by any officer or Team Member and shall not be modified in any publication or document. The only exception to this policy is a written employment agreement approved at the discretion of the president or the board of directors, whichever is applicable.

This handbook or any policies or procedures are not contracts of employment.

## TEAM MEMBER RECORDS

Team Member records will be kept for information and business purposes only. Any of the following changes to your status must be reported to Human Resources:

- Name, address, or telephone number
- Marital Status
- Birth date, total number of dependents, their relationship to you
- Citizenship status
- Benefit - plan beneficiary designation
- Person(s) to be notified in case of emergency
- Formal education, courses completed, other training or professional skills acquired

Upon request, you may examine your own personnel file and indicate to Human Resources any information you think is inaccurate. Any Team Member wishing to view his/her personnel file must make a written request specifically stating what he/she wants to review and why they want to review the record on file. All personnel files are confidential information and can only be accessed by HMMA Team Members who have authorization. All personnel folders are located in Human Resources.

## PROBATION PERIOD

The probationary period is 90 calendar days. This probationary period is a time for evaluation, both by you and by HMMA. The probationary Team Member needs to evaluate HMMA's policies, procedures and overall working environment. The automotive industry is highly competitive. The work is fast-paced, physically demanding, high volume production which demands high standards of quality and safety. Learning to meet performance standards, working in a fast-paced manufacturing environment while meeting the guidelines which govern our conduct, and becoming acquainted with our team approach are also a part of the evaluation new Team Members need to make of HMMA.

HMMA needs to evaluate your progress during this period as well. Three performance evaluations are conducted during the probationary period.

4

These evaluations occur at the following intervals:

| 1 | 30 days |
| 2 | 60 days |
| 3 | 85 days |

If any new Team Member is off due to an approved leave of absence, the number of days absent will be added to the probation period.

Your overall progress is evaluated during the probation period. Strengths and weaknesses are discussed and helpful feedback regarding your development and progress is given during each of the aforementioned reviews.

In the event progress is less than acceptable or violations of standards of conduct occur, a probationary Team Member's employment may be terminated prior to the end of the 90 day period.

Before any new Team Member is terminated, a review of the facts and approvals by the department manager, team relations manager, director of human resources are required.

Once the probationary period is completed, the new Team Member becomes eligible for the following programs:

Equal Treatment Procedure
Peer Review Panel
Corrective Action Program
Attendance Incentive

## LENGTH OF SERVICE

HMMA considers "length of service" (LOS) as the period of continuous employment, starting from your date-of-hire and applies to all full-time Team Members. Length of service will be broken when a Team Member:

- resigns from employment (leaving the plant without proper authorization is considered voluntary resignation)
- is terminated from employment
- fails to return to work on the day following the end of a personal, medical, military, or other leave of absence, unless unusual conditions or circumstances exist that would prevent the Team Member from returning on the scheduled day
- retires
- fails to communicate with HMMA regarding an absence of three (3) consecutive days or longer (subject to the Family and Medical Leave Act and regulations)
- is not actively employed with HMMA for 12 consecutive months or length of service, whichever is the lesser.

A Team Member who voluntarily terminated his/her employment, and who is rehired, will not have any prior service restored. The date of rehire

5

Edwards v. Hyundai, et al.

0006

will become the new service date. Computation of service, for retirement purposes and the effect of breaks in service for retirement rights, however, will be determined in accordance with the Employee Retirement Income Security Act of 1974 (ERISA).

Transfer opportunities will be awarded based on LOS. In situations where more than one Team Member has the same LOS, HMMA will use the first letter of the Team Members last name as the tie breaker. If the Team Members last names begin with the same letter, then HMMA will use the second letter as the tie breaker and so on.

Position Advancement Opportunities will be based on qualifications. In situations where more than one Team Member has the same LOS, HMMA will use the first letter of the Team Members last name as the tie breaker. If the Team Members last names begin with the same letter, then HMMA will use the second letter as the tie breaker and so on.

## EMPLOYMENT OF RELATIVES

Relatives of Team Members may be employed at HMMA; however, they may not work or come under the direct supervision of another relative. Relatives are defined as those people who are related either by birth, adoption, or marriage.

The employment of relatives at certain levels of HMMA in positions where one might have influence over another will not be allowed.

## TEMPORARY WORKERS AND REPLACEMENT WORKERS

HMMA intends to utilize temporary and replacement workers to reduce temporary peaks of excess overtime, perform special projects, and fill vacancies while Team Members are on military leave, personal leave, or medical leave of absence. Use of temporary replacement workers also helps HMMA avoid potential layoffs.

## TEAM MEMBER ORIENTATION

HMMA will provide every Team Member with the training needed to understand HMMA's philosophies. Each Team Member will receive an orientation outlining HMMA team concepts, policies, benefits, and all other aspects related to their employment at HMMA.

## HOURS OF WORK

### Hours of Work

HMMA's normal work week for all production and administrative (non-exempt) Team Members consists of forty (40) hours per week based on an 8 hour work day five days per week. HMMA's normal work week for all administrative exempt Team Members consists of forty-five (45) per week based on an 8 hour work day and 5 hours of casual time per week. All production and maintenance Team Members will rotate shifts every 4 months. Production, maintenance, and administrative shift hours will

6

be as follows:

| SHIFT | SHIFT START TIME | SHIFT END TIME |
| --- | --- | --- |
| Production | | |
| 1st Shift | 6:30 a.m. | 3:15 p.m. |
| 2nd Shift | 5:15 p.m. | 2:00 a.m. |
| Maintenance | | |
| 1st Shift | 6:30 a.m. | 3:15 p.m. |
| 2nd Shift | 5:15 p.m. | 2:00 p.m. |
| 3rd Shift | 10:00 p.m. | 6:45 a.m. |
| Administration | | |
| 1st Shift | 8:00 a.m. | 4:45 p.m. |

There may be times when Team Members will be asked to work irregular hours due to production requirements. Any deviation in HMMA's weekly scheduled hours must be reviewed and approved by the payroll and benefits manager or his/her designee prior to any change in HMMA's normal work schedule. Any permanent adjustment to any HMMA Team Members regularly scheduled work hours must have approval by the director of Human Resources.

## BREAKS AND COMMUNICATION PERIODS

### Break Periods

HMMA provides all Team Members with two (2) ten (10) minute paid break periods per day. The first break period will be given in the first half of the Team Members shift; the second break period will be given in the second half of the Team Members shift. All Production Team Members will be provided specific time for each of the described breaks. Due to the nature of Maintenance Team Members responsibilities their breaks will be given at their convenience. In order to allow Administrative Team Members the ability to maintain the continuity of their responsibilities they may take their breaks at their convenience.

There will be times when HMMA schedules overtime. In these situations the Team Member will be given a 5 minute break for every hour of scheduled overtime. These breaks must be given at the end of the eighth hour of work.

### Communication Period

Each Team will have a five minute paid communication meeting at the beginning of each shift. This meeting is for the manager, group leader, or team leader to communicate important information to the team.

## ATTENDANCE

Regular attendance is the cornerstone for the success of HMMA. A Team Member's absenteeism can reduce the quality and effect of the overall efficiency of HMMA's operations, as well as cause hardship on fellow Team Members who report to work regularly. Regular attendance will

7

is every Team Member's responsibility, and every Team Member is expected to be on the job, on time, every scheduled workday.

The minimum acceptable standard of attendance is 98%.

Any scheduled workday missed is considered an absence. However, work time missed due to holidays, scheduled vacations, catastrophic event, jury duty, military duty, bereavement leave, short-term disability, work-related injury or illness, personal leave of absence and FMLA leave shall not be counted as an absence and are not cause for corrective action.

If a Team Member is absent due to a catastrophic event that results in a legally declared emergency which results in the closure of all major roads in the Team Member's county of residence, or if a Team Member must drive through such a county on the way to work, such absences will not count against the Team Member's attendance, nor be cause for corrective action. Final approval as to the declaration of a "Catastrophic Event" shall be made by the director of Human Resources.

Team Members who are not in their work area ready for work by their scheduled starting time will be counted as one-half day absent for calculating attendance only, excluding the following events:

A verifiable catastrophic event such as an accident causing road blockage of major highways, a major weather-related closure of roads, or other acts of God, which result in Team Members being tardy will be evaluated on a case by case basis. If it is determined by HMMA that there is a significant adverse impact on HMMA Team Members, the tardy shall not affect a Team Member's attendance record.

Team Members who leave prior to the end of their scheduled shift (including overtime hours) with their group leader's and/or manager's permission are considered to have left early. A leave early will be considered as one-half of absence for purposes of attendance calculation.

Any situation where a Team Member leaves the facility during scheduled work time (including overtime whether scheduled or voluntary) without their group leader, manager, senior manager, or any other member of management's authorization, the Team Member will be considered to have voluntarily resigned from his/her employment at HMMA.

Attendance will be calculated using a rolling calendar year using the following formula:

- Calculate the number of scheduled workdays. Scheduled workdays will include all excused scheduled workdays.
- Calculate the number of unexcused workdays.
- Subtract the number of unexcused workdays from the number of scheduled workdays and divide the remainder by the number of scheduled workdays to arrive at the Team Member's attendance percentage.

8

o Example:      237 Scheduled workdays
                 -5 unexcused workdays
                232/237 = 97.9%

When a Team Member's attendance falls below 98% at any time during the first year or subsequent years of employment during any rolling twelve-month period, corrective action will be considered. The rolling twelve-month period is a 365-day period.

Every Team Member is expected to notify his/her group leader and/or manager, in advance, of any known absence or future absence. When an absence is not known in advance, the Team Member must notify his/her group leader and/or manager 30 minutes prior to the start of the shift.

Failure to notify within 30 min. at start of the shift may result in corrective action up to and including termination.

Accumulative absences that result in a Team Member's attendance percentage falling below 98% may be cause for corrective action.

The following will be considered:

- Cause
- Frequency
- Patterns
- Failure to report
- Time pattern of reporting

A Team Member that does not communicate to his/her group leader and/or manager regarding his/her absence for a period of three (3) consecutive days or longer is considered to have voluntarily resigned his/her employment at HMMA.

HMMA will maintain appropriate attendance records. Any corrective action necessary is taken by the group leader and/or the manager. The appropriate team relations representative will be in attendance.

The corrective action process is intended to help Team Members correct any attendance problems. However, if the Team Member's attendance continues to be unacceptable, it could result in further corrective action up to and including termination.

When a Team Member's attendance percentage falls below the acceptable standard, corrective action may be considered. Corrective action is not automatic. Each Team Member's attendance record will be reviewed based on its own merit, and the circumstances in each case are considered. However, when corrective action is taken, the following steps must be followed:

1    Informal Discussion
2    Formal Discussion
3    Commitment Discussion

9

## 4    Decision Leave

The team relations representative will be consulted for guidance at each step of the aforementioned corrective action steps. The team relations representative will also attend each step as it occurs.

When corrective action is required beyond the four steps above, the Team Member's group leader and/or manager will contact the team relations manager and request a review of the Team Member's record for termination. No termination will take place unless the action is reviewed and approved by the team relations manager, section manager, and director of Human Resources.

## WORK WEEK

HMMA's work week begins at 12:01 a.m. Monday and ends on Sunday at 11:59 p.m.

## OVERTIME

### Non-exempt Team Members

Due to the nature of the automotive industry there will be times when we will be required to work overtime in order to meet our customer's needs. Overtime will be paid in one-tenth hour increments; any overtime worked will be paid during the normal pay cycle and included in the regular payroll check.

Overtime is calculated using the base rate of pay plus shift premium and team leader premium, if applicable. Overtime will be paid at 1.5 times the Team Member's regular rate of pay for any time worked in excess of eight hours during the normally scheduled work day as long as 40 hours of work has been achieved for that work week. Team Members will be paid at 1.5 times their regular rate of pay for time worked on Saturday or the sixth work day. Additionally, Team Members will be paid 2 times their regular rate of pay for time worked on Sunday or the seventh day of continuous work. Team Members who work on an approved HMMA holiday will be paid at 2 times their rate of pay. Vacation time will count as hours worked when calculating overtime.

### Exempt Team Members

Assistant managers and specialist Team Members wages are based on a 40 hour work week and 5 hours of casual overtime. Casual overtime is time that is worked without approval. Assistant managers and specialists will be paid at 1.5 times their calculated regular hourly rate for all pre-approved overtime.

In situations where the assistant manager and/or specialist Team Member is required to work because of scheduled production overtime they will be paid at 1.5 times their calculated hourly rate. Due to the fact that pro-duction overtime is scheduled and the assistant manager and/or specialist is required to work in order to support production needs the overtime will

10

be considered as pre-approved. Additionally, the casual overtime rule will not apply in this situation.

## PAY

HMMA reviews wages each year and makes appropriate changes to the wage scale based on several factors, such as: automotive industry, HMMA's performance, and the cost of living. Each Production and Maintenance Team Member will receive a base rate when joining the HMMA family and will receive a rate increase periodically over a 24 month period until they reach the top pay rate.

## PAYDAY

All Team Members will be paid on Tuesday on a biweekly basis.

## DIRECT DEPOSIT

All HMMA Team Members are required to use direct deposit. Each Team Member will receive an advice stub which will itemize pay and deductions in detail. Any questions regarding direct deposit should be directed to the Payroll and Benefits Department.

## QUESTIONS REGARDING PAY

If any Team Member has a question regarding pay, they are to contact their manager/assistant manager/group leader. The manager/assistant manager/group leader will notify the payroll department of any issues concerning pay and report back to the Team Member or arrange a meeting with the payroll department for the Team Member.

## "CALL IN" PAY

HMMA will pay for a minimum of four hours work at the regular straight time hourly rate for those Team Members who are called to work at a time other than their regularly scheduled work hours (before or after, but not continuous with their regularly scheduled shift). If there is at least four hours work available and the Team Members are given the option to work less hours, they will be paid only for the hours worked if they exercise the option to leave early.

## "REPORT IN" PAY

If the scheduled production is canceled due to any emergency, prior to the start of the shift and at least one hour of notification has been provided to the Team Members, no work will be available and no pay made to the Team Members.

If the scheduled production is canceled due to any emergency and less than one hour of notification is provided, Team Members will have the option of leaving and receiving pay only for the time worked or staying for a total of four hours. If the Team Member elects to remain at work, he or she must leave the plant at the end of this period.

11

If the notification of canceled production is made after four hours of work from the normal scheduled starting time of the shift that have been completed, Team Members will have the option of leaving and receiving pay only for the time worked or staying until the end of the regular shift. Team Members that have not been given their options and have been forced to leave will be paid for 8 hours.

Anytime a Team Member volunteers to go home early or is required to go home early, the Team Member may elect to use any available vacation time to make up for lost income. This time will always be excused and the lost time will not count against the Team Member's attendance.

## STATEMENT OF EARNINGS

Each Team Member will receive a yearly statement of earnings. The yearly statement of earnings is known as a W-2 Withholding Statement which provides the amount earned and the taxes that have been withheld. The W-2 will be issued in January each year for use in filing income tax forms.

## GARNISHMENTS

HMMA respects every Team Member's right to privacy with regard to personal and confidential information. However, HMMA may be required, by law, to withhold a portion of your pay if served with a court notice of a garnishment, wage assignment, wage deduction, or government levy. When situations such as this occur HMMA's payroll department will notify you of any pending action involving such matter that requires a wage withholding situation.

## BENEFITS

HMMA benefits are described in the Summary Description Plan.

## ATTENDANCE INCENTIVE PROGRAM

HMMA will pay a premium of $100.00 to non-exempt and exempt Team Member's up to assistant manager for perfect attendance for each 4-week period. All regular, full-time, non-exempt and exempt Team Members up to assistant manager are eligible to participate in the Attendance Incentive Program.

During the probationary period, a Team Member is not eligible to participate in the Attendance Incentive Program. A Team Member becomes eligible the first full 4-week attendance period following the end of his/her probation period.

The Team Member must maintain a perfect attendance record for a four (4) week attendance period to receive an attendance incentive. Perfect attendance is defined as no absences, including tardiness, early leave, lost time including scheduled overtime, or personal leaves.

12

The only exceptions to this policy are:

- HMMA observed holiday, unless the Team Member is scheduled to work on the holiday
- Scheduled Vacation
- Personal Days (HMMA may require documentation)
- Jury Duty
- Military Leave. Military leave shall be considered in accordance with applicable law.
- Bereavement Leave
- The balance of a shift lost due to an occupational illness/injury.
- Workers Compensation related doctor appointments. (When a Team Member misses part of a day due to a work-related injury/illness doctor appointment scheduled by the HMMA Medical Clinic.)
- Any work-related activities away from the plant
- Any medical leave, either work-related or non-work related that is determined to be FMLA
- Any leave that is determined to be FMLA

## FMLA

### General Provisions

It is the policy of HMMA to grant up to 12 weeks of family and medical leave during any 12 month period to eligible Team Members, in accordance with the Family and Medical Leave Act of 1993 (FMLA). The leave may be unpaid, paid, or a combination of unpaid and paid leave, depending on the circumstances of the leave and as specified in the policy.

A Team Member must have worked for HMMA for 12 months, or 52 weeks. In addition a Team Member must have worked at least 1250 hours during the 12 month period immediately before the date when the leave is requested to commence.

In order for the leave to qualify under the policy, the Team Member must be taking leave for one of the reasons listed:

- The birth of a child and in order to care for that child;
- The placement of a child for adoption or foster care, and to care for the newly placed child;
- The care of a spouse, child, or parent with a serious health condition; or
- The serious health condition of the Team Member.

HMMA may ask for certification of the serious health condition. The Team Member should try to respond to such a request within 15 days of the request provide a reasonable explanation for the delay. Failure to provide certification may result in a denial of continuation of leave. Medical certification may be provided by using the medical certification form. Request for medical certification must be made in writing as part of

13

HMMA's response to the Team Member's request for leave.

All Team Members requesting leave under the policy must provide verbal notice with an explanation of reason(s) for the needed leave to their immediate supervisor, who will advise the Benefits Department. If the leave is foreseeable, the Benefits Department may require the Team Member to provide a written request for leave and reason(s) for that leave. Failure of the Team Member to provide a written request for leave cannot be grounds to deny or delay the taking of FMLA leave.

HOLIDAYS

HMMA observes paid holidays each calendar year. HMMA will review the holiday schedule each year and communicate to all Team Members the holiday schedule for the coming year in November. All full time Team Members and team leaders are eligible for holiday pay, which includes shift premium if applicable. All full time Team Members will be eligible for holiday pay as of their first day of employment.

All Team members must work his/her last full scheduled workday before the holiday and the first full scheduled workday following the holiday in order to receive holiday pay.

All non-exempt Team Members and exempt Team Members up to assistant manager will be paid double time for hours worked on a designated HMMA holiday.

VACATION NON-EXEMPT/EXEMPT TEAM MEMBERS

HMMA realizes that vacation is an important benefit for all Team Members. HMMA's intention is to provide Team Members with a means to take a scheduled vacation without loss of pay. Vacation does not apply to holidays, bereavement leave, jury duty or military leave pay. The vacation allowance is granted for the calendar year only. Once it is used for the year, it is not renewed until January 1st of the next calendar year.

A Team Member's vacation eligibility is determined based on his/her length of service with HMMA and is to be used during the calendar year January 1st through December 31st. Any Team Member that has not worked hours for the year in which the vacation is scheduled will not be paid until at least one day has been worked in the qualifying year. Although Team Members must actually perform work in a new calendar year before qualifying for vacation, Team Members may use their vacation in January if it is connected with vacation or a holiday from the previous year. Five vacation days are reserved and must be used during HMMA's summer shutdown. However, a Team Member may use these days prior to shutdown for Family Medical Leave or if the Team Member is scheduled to work the vacation days that are reserved for the summer shutdown period. Anticipated unused shutdown vacation days may not be scheduled for dates before the actual shutdown occurs.

Starting the year of the Team Member's second anniversary, the Team

14

Member is eligible for vacation according to the following schedule. (The Team Member's vacation allowance is available as of January 1st each year)

- Less than one year will receive a prorated vacation based on the following
  - January – 10 days vacation
  - February – 9 days vacation
  - March – 8 days vacation
  - April – 7 days vacation
  - May – 6 days vacation
  - June – 5 days vacation
  - July – 4 days vacation
  - August – 3 days vacation
  - September – 2 days vacation
  - October – 1 days vacation
  - November & December – 0 days vacation

- Beginning January of the next year Team Members will receive:
  - 1st year – 10 days vacation
  - 2nd year – 11 days vacation
  - 3rd year – 12 days vacation
  - 4th year – 13 days vacation
  - 5th year – 14 days vacation
  - 6th year – 15 days vacation
  - 7th year – 16 days vacation
  - 8th year – 17 days vacation
  - 9th year – 18 days vacation
  - 10th year – 19 days vacation
  - 11th year – 20 days vacation
  - 12th year – 21 days vacation
  - 13th year – 22 days vacation
  - 14th year – 23 days vacation
  - 15th year – 25 days vacation

A Team Member's vacation pay is based on the Team Member's regular base pay at the time, but not more than eight (8) hours per day. Any vacation will include any shift differentials a Team Member is currently receiving. Vacation cannot be taken on Saturdays, Sundays, or holidays.

SCHEDULING VACATION

In order for HMMA to plan proper coverage for Team Member vacations, the scheduling period for the subsequent year's vacations will be during November and December as follows:

- Full week and single days of vacation for January and/or February must be scheduled between November 1 and

15

November 30 of the preceding year.
- Full weeks and single days of vacation for the remainder of the year - March through December - must be scheduled between December 1 and December 22 of the preceding year.
- Full weeks take precedence over single day vacation requests.
- Single days take precedence over 1/2 day vacation requests.
- When two (2) or more Team Members with the same length of service request the same dates for time off, the last letter of the Team Members' names will be used to determine who has first preference.

## SUMMER SHUTDOWN

HMMA reserves the right to schedule a plant shutdown each year. When a plant shutdown is planned, HMMA will inform Team Members of the planned shutdown by the end of December the prior year. HMMA reserves the right to require the Team Members to use up to 5 days of his or her vacation if needed during the shutdown period.

There may be occasions when it is necessary to schedule work during HMMA's summer shutdown period. When it is necessary to schedule work, each department will notify Team Members 30 days prior to the planned summer shutdown, which they will be required to work.

### Procedure

The manager and/or group leader will solicit volunteers and/or require Team Members to work during the shutdown period using the following criteria:

- Soliciting Volunteers:
  o Solicit volunteers based on length of service for shut down days that are not holidays. The Team Member volunteering with the longest length of service will be awarded the work. If two or more Team Members volunteer with the same length of service, the first letter of their last names will determine which Team Member is awarded the work.
  o If the voluntary work being offered is an HMMA holiday, the manager and/or group leader will use the overtime equalization chart to determine which Team Member will be awarded the overtime, as stated in the Equalization of Overtime Policy.
- Required Work:
  o When requiring Team Members to work on shutdown days that are not holidays, start from the bottom of the length of service list until the required manning is obtained.
  o All Team Members who volunteer or that are required to work during an HMMA shutdown that involves reserved vacation days will be eligible to reschedule

16

the vacation days.
- Skills Requirement
  o In overtime situations that require a specific skill and or qualifications to accomplish this job task, Skill will take precedence over length of service.
  o If more than one Team Member has the skill and qualifications, overtime equalization should be used as a determining factor and then length of service if applicable.

## Medical Leaves During Shutdown Periods

All Team Members that are on an approved medical leave, or personal leave during the shutdown period will be paid for any vacation reserved for the shutdown period, and will not be eligible to reschedule vacation days reserved for the shutdown period.

### Cancelling Vacation

Team Members who choose to cancel their scheduled vacation must notify their manager and/or group leader as soon as possible. Team Members may only cancel a scheduled vacation one time per scheduled year.

When a Team Member cancels a scheduled vacation week or day, he/she may reschedule the canceled vacation to any open block of available vacation time. The opportunity for the canceled week or day will be posted in a central area for the entire group or department, whichever is applicable, for 48 hours following the cancellation.

### Personal Days

All Team Members will be given three Personal Days each year. HMMA encourages its Team Members to schedule their Personal Days in advance if possible. However a Team Member may use Personal Days at their discretion for emergency situations or unforeseen circumstances (HMMA may require documentation) that prevent them from reporting to work, leaving early, or reporting late to work.

If a Team Member is already at work and needs to leave, the Team Member must contact his/her manager and/or group leader and get approval before leaving the plant. If the Team Member does not contact his/her manager and/or group leader or another member of management and leaves without proper authorization, he/she will be considered to have voluntarily resigned.

### Personal Day Limitations

- Personal Days were not developed to extend vacation periods or to be utilized in lieu of vacation

- Personal Days were not intended to be used to extend a holiday period, however if a verifiable unforeseen circumstance were to arise the Team Member would be

17

allowed to utilize a personal day to cover his/her absence.

- Can not be used during the New Hire 90 day probation period.

- If a Team Member uses a Personal Day on a Saturday or Sunday for a verifiable emergency he/she will not be eligible for compensation at a premium rate, but will be compensated at a straight time rate and may be required to provide documentation.

**Scheduled Personal Days**

- Must be scheduled in advance of the day taken (before close of previous shift).

- Must be approved in advance by immediate supervisor (may also be denied by immediate supervisor if manning not sufficient).

- Does not require documentation or explanation.

- Scheduled Personal Day will not effect attendance percentage.

- Scheduled Personal Day will remain eligible for attendance bonus.

- Scheduled Personal Day before a holiday will not disqualify holiday pay.

- Scheduled Personal Day before "scheduled Saturday/ Sunday" does not allow for missing Saturday/Sunday if scheduled.

- Scheduled Personal Day can be used on production Saturday/Sunday (or day that team member is scheduled to work).

- Scheduled Personal Day will be paid at straight time (regardless of day requested).

**Unscheduled Personal Days**

- Must only be used for emergency purposes.

- Emergency reason may be required to be documented.

- Documented emergency will still be eligible for attendance bonus.

- Un-documented emergency will disqualify for attendance bonus.

18

- Non-emergency use will disqualify for attendance bonus.

- Un-documented/non-emergency use before a holiday will disqualify holiday pay.

- Un-documented/non-emergency use will not count against attendance percentage.

- Un-documented/non-emergency use to cover tardy will disqualify attendance bonus.

- Utilizing to cover tardy will not count against attendance percentage.

- Unscheduled Personal Day can be used on production Saturday/Sunday (or day that team member is scheduled to work).

- Unscheduled Personal Day will be paid at straight time (regardless of day requested).

**Transfers**

If a Team Member transfers to a new Team, the Team Member will be required to reschedule his or her vacation.

**Unscheduled Vacation**

A Team Member's vacation allowance does not accumulate and must be taken in the calendar year in which it is earned. Team Members will be paid for any unscheduled vacation on the first pay period in February of the following year.

**Vacation Eligibility**

All regular, full time, exempt Team Members are eligible for vacation.

Vacation is earned by the Team Member each January. In order for the Team Member to be eligible for vacation he/she must have reported for work in the year of eligibility.

Requests for vacation days must be submitted to the supervisor one week in advance. The supervisor is required to approve or deny the request within 48 hours.

**Unused Vacation Time**

A Team Member will not be allowed to carry over unused vacation into the next year. Team Members that have vacation days remaining after the close of the calendar year (December) will be paid for any remaining vacation time by the first pay period in February.

Upon separation from employment with HMMA, the Team Member's vacation will be prorated and the Team Member will receive pay for any unused vacation during the year in which the termination occurs. If a

19

Team Member should die during the term of employment, pay for unused vacation will be paid in a lump sum to the Team Member's immediate beneficiary (as designated for retirement plan).

A Team Member's vacation pay is based on the Team Member's regular base pay at the time, but not more than eight (8) hours per day. Any vacation will include any shift differentials a Team Member is currently receiving. Vacation cannot be taken on Saturdays, Sundays, or holidays.

## Personal Leave

In an effort to recognize the need of Team Members who require time off in addition to personal days or vacation, HMMA may consider a personal leave of absence without pay for up to a maximum of thirty (30) days.

All regular permanent, full time Team Members employed by HMMA for a minimum of ninety (90) days are eligible to apply for an unpaid personal leave of absence. Departmental requirements will all be taken into consideration before a request is approved. Requests for unpaid personal leave may be denied or granted by HMMA. Approvals of the immediate supervisor, department director, and Director of Human Resources are required. All personal leaves are unpaid leaves.

An eligible Team Member should submit a request in writing to his/her immediate supervisor.

A Team Member is required to return from the unpaid personal leave on the originally scheduled return date. If the Team Member is unable to return, he/she must request in writing the extension of the leave.

If HMMA does not extend the leave, the Team Member must then return to work on the originally scheduled return date or be considered to have voluntarily resigned from his or her employment. Extensions of leave will be considered on a case-by-case basis.

## BEREAVEMENT LEAVE

The bereavement leave policy was developed to provide Team Members with a suitable period of time away from work, with pay, in order to properly attend to the arrangements required when a death in the Team Member's family occurs.

The Team Member's group leader or management Team Member should be immediately notified when such leave is needed.

A bereavement leave of absence, with pay, for a period not to exceed five workdays shall be granted to a Team Member when death occurs to the Team Member's:

• parent
• stepparent
• spouse

20

• child or stepchild

A bereavement leave of absence, with pay, for a period not to exceed three workdays shall be granted to a Team Member when death occurs to a member of a Team Member's family.
For the purpose of this policy, the Team Member's family shall be defined as follows:

• In the event of a miscarriage, if a death certificate is issued, then the above policy will apply
• Mother-In-Law/Father-In-Law
• Sister/Brother
• Grandparent/Grandchildren
• Stepsister/Stepbrother
• Grandparent-In-Law
• Half-sister/Half-brother
• Great Grandparents
• Son-In-Law/Daughter-In-Law

Exceptions may be made to the "Team Member's family" provisions if the deceased was a relative or foster parent and the Team Member resided with or was reared by the deceased.

In the event of the death of a Team Member's relative not mentioned above the Team Member will be excused, with pay, for up to one day (8 hours). This applies to the following family members only:

• Aunts
• Uncles
• First cousins
• Nephews
• Nieces
• Brother-In-Law and Sister-In-Law

When a Team Member is on vacation and a member of the Team Member's family dies, the time off will be considered as bereavement leave. Vacation time missed because of the death may be utilized at a later time. If an official HMMA holiday occurs during time considered as bereavement leave, the Team Member's bereavement will begin the day following the holiday. In addition, Saturdays, Sundays and holidays are not considered as bereavement. Any Team Member who is off on a Friday for an approved bereavement leave will not be expected to work on the Saturday or Sunday after the approved bereavement leave.

All bereavement leaves of more than one day must be taken on consecutive work days. (For example: Tuesday, Wednesday, Thursday, or Friday, Monday, Tuesday).

A Team Member who leaves during his or her shift due to the death of a family member that qualifies for bereavement leave will receive eight hours of total pay for that day. By leaving during the shift, the Team

21

Edwards v. Hyundai, et al.

0014

Member has started his/her bereavement leave and the partial day will count as a full day of the allowable bereavement leave.

HMMA may request documentation for verification to be retained with the leave of absence request.

## JURY DUTY

HMMA will provide income protection while a Team Member carries out his/her civic responsibility regarding jury duty.

Upon receipt of notification from the state or federal courts of an obligation to serve on a jury, the Team Member should notify his/her supervisor. The Team Member is required to provide copies of the jury subpoena or jury summons to his/her supervisor and to the Payroll Department.

Any Team Member appearing as a plaintiff, defendant, and/or witness in any legal proceeding, or for other appearances related to legal proceedings or court cases (e.g. deposition testimony), whether or not pursuant to a court-issued subpoena will not receive paid time off. Vacation, personal time, or unpaid time should be used for these instances.

## MILITARY LEAVE

Team Members who are inducted into the U.S. Armed Forces or who are reserve members of the U.S. Armed Forces or state militia groups will be granted leaves of absence for military service, training, or other obligations in compliance with state and federal laws. These Team Members may use accrued vacation leave but are not required to do so. At the conclusion of the leave, Team Members generally have the right to return to the same position they held prior to the leave or to a position with equivalent seniority, pay and benefits. HMMA will pay the difference between military pay and regular wages/salary for up to one month. Team Members are requested to notify their supervisor as soon as they are aware of the military obligation. Questions regarding HMMA military leave policy, applicable state and federal laws, and continuation of

sweatshirts not issued or purchased through the *Team Wear Collection* should not be worn over *Team Wear* during business hours.

The color choices at the present time are:

- pants/skirts in khaki, navy, grey, olive and black
- shirts in tan, white, blue & blue/white, herringbone, green, slate blue, denim, khaki, and black.

Team Members will also have choices of sweatshirts and sweaters which are also embroidered with the company logo.

Skirts may be hemmed to no more than 3 inches above the top of the knee.

All alterations will be done at Team Member expense. Safety issues and mutilation hazards for clothing should be kept in mind when altering clothes.

Team Wear is provided to Team Members once each 18 months. During orientation each Team Member will order his/her initial set of:

- 5 pants/skirts
- 5 tops
- 1 hat
- 1 belt

Every 18 months Team Members will receive a full replacement set of *Team Wear* due to wear and tear. Team Members will also have the option to purchase, at their own expense, pants/skirts in the same approved colors as those provided by HMMA.

Jeans (blue, black or any other color) are not considered appropriate for work at HMMA and are not to be worn during normal working hours. All items must conform to the Team Wear concept. Safety issues and protecting the finish of the vehicle should be taken into consideration when choosing Team Wear (100% cotton clothing is required in some areas and

Gift Shop. Team Members will bear the expense of tax and shipping for individual purchases.

Note: No pins, buttons, or other items may be worn on HMMA Team Wear unless it is issued by HMMA. Furthermore, only HMMA issued hats may be worn at HMMA. All HMMA head wear must be worn as issued and may not be altered. The only acceptable alteration is the addition of the Team Members name.

## SAFETY

HMMA's goal is to eliminate potential hazards before they become an accident. Every Team Member is responsible for safety not only for themselves but for others. We can all prevent incidents by avoiding unsafe acts, reporting unsafe acts and conditions and by learning and following the policies and procedures that have been developed to keep our facility safe.

### Safety Committees

HMMA's safety committees provide Team Members an opportunity to participate in safety improvements in their areas. The safety committees will conduct area audits, identify safety training needs and support safety awareness programs in the facility.

### Safety Wear

As part of HMMA's total Team Member safety program, special clothing and other apparel designated by department managers and the Safety/ Environmental Department must be worn by Team Members, when and where required, to help guarantee your personal safety.

### Hard Hats and Bump Caps

Hard hats (heavy-duty, impact-resistant hats) must be worn in work areas where there is danger of falling objects or hazardous conditions. Bump caps (lighter weight hats) may be required in some areas as an additional means of protection. Team Members are reminded to obey signs or directions in areas where such protective devices must be worn.

HMMA will issue all bump caps and hard hats. Only HMMA-issued hats may be worn. Additionally, safety caps may not be altered in any way. The only exception is the addition of the Team Members name.

### Shoes

HMMA safety-approved shoes are required in many areas of the plant and are necessary to safeguard your health. HMMA has established a specified dollar amount it will pay toward the purchase of safety shoes. Contact the safety department for the exact amount.

### Safety Glasses

All Team Members, vendors and visitors at HMMA are required to

24

wear OSHA-approved safety glasses in the production areas. Safety glasses are provided by HMMA and can be ordered through the Safety Department. Eye examination charges are not covered under this program. Safety glasses do not have to be worn when entering, exiting, or during breaks and lunch.

### Personal Protective Equipment (PPE)

When it is required, use of special safety equipment by Team Members shall be regarded as a condition of employment. Further information will be given to you during your training regarding equipment needed for your job. If you are not sure of the PPE required in your work area, please contact your group leader.

### Housekeeping

Good housekeeping habits allow all HMMA Team Members to be safe in their work areas as well as the ability to work more efficiently. Each Team Member is responsible for maintaining their work area. If we allow dust and dirt to accumulate or if we do not regularly maintain the work area safety hazards may occur. Team Member is responsible for disposing of trash both inside and out into the proper receptacle. Failure to adhere to the aforementioned is considered to be a performance issue and could result in corrective action.

### Lock-out/ Tag-out Procedures

The safety of all HMMA Team Members is a primary concern. In order to protect all Team Members from danger, we have established a Lock-out/Tag-out procedure to protect all those who enter machinery, work within machinery, or use machinery as part of their job duties at HMMA. Only authorized Team Members who have completed lock-out/tag-out training may work within machine guarding or enter machinery. Strict compliance with the lock-out/tag-out procedures and rules are required from all HMMA Team Members and contractors at all times.

HMMA will issue each trained and authorized Team Member a personal safety lock along with an identification tag. The Team Members lock and tag is required to be properly attached to the lock-out devices located on each piece of machineries control panel before entering. In situations where multiple persons must enter a piece of machinery requiring lock-out/tag-out, each person must attach his/her lock and tag to the lock-out device with a multi-lock hasp. All locks and tags must be removed before the equipment is restored.

Because of the differences in each machine or piece of equipment, the Team Member should learn the proper method of locking and tagging each piece of equipment they operate, repair or maintain. If a Team Member is unsure about the procedures for locking out the equipment, the Team Member must ask their manager and/or call the Safety Department for assistance.

25

## SPECIAL AUTHORIZATION PERMITS

Because of the varied types of work required, certain types of work require special authorization and/or training. Areas designated as confined space or certain welding operations require a permit prior to beginning work.

### Confined Space Entry Permits

When a location is designated a "confined space" it requires specialized training before a Team Member can work in the designated area. Confined spaces present characteristics of an atmosphere or have the potential for serious safety and/or health hazards.

Lack of oxygen or contamination of the air is possible in confined spaces. No Team Member or contractor is allowed to enter a "permit required" confined space unless they have received the proper training and the area has been adequately tested and a confined space entry permit has been issued. When training and/or a permit is needed contact the Safety Department to obtain training and/or a permit.

### Hot Work

There are areas within our facility that are susceptible to fire and explosions. Because of these dangers Team Members planning to do "hot work" in these areas must obtain a hot work permit before performing cutting, welding and/or spark producing work. Hot work being done on welding lines and in authorized maintenance areas does not require a hot work permit unless otherwise posted. All hot work permits must be obtained from the Safety Department.

### Area Specific Safety Rules

Individual areas within our facility will have area specific safety requirements. These include but are not limited to:

- Rules for the proper use of different kinds of tools and equipment
- Rules for performing different kinds of operations
- Proper techniques for lifting or performing other physical activity

Each department will be responsible for communicating the safety rules that apply to your particular job function. If a Team Member is unsure of the safety requirements for their work area they are to contact the manager for the department or the Safety Department.

## SECURITY

### Foreign Trade Zone (FTZ)

HMMA is designated as a FTZ under the Foreign Trade Zone Act of 1934.

26

The FTZ makes it possible for HMMA to receive parts from other countries without paying the required duty tax until the parts leave the FTZ as part of a completed vehicle. Operation of the FTZ is under the supervision of U.S. Customs Service and therefore HMMA is required to operate under stricter security than you may be accustomed.

### Video Surveillance

At HMMA the security of our Team Members as well as our product is important to us.

In order to ensure our Team Member's safety, protect our product, and maintain the FTZ zone, HMMA uses video surveillance throughout our facilities.

### HMMA Identification Badges

HMMA identification ("ID") badges are issued on the first day of employment. All HMMA Team Members are required to wear their ID badges, and have them visible when entering and exiting HMMA. Team Members do not have to have their badges visible when they are in their assigned work area. However, the Team Member must wear, and have their badge visible when traveling between HMMA facilities. Personal identification from your ID badge is an FTZ requirement. Security personnel may periodically inspect badges. All Team Members will be required to return his/her badge to security on their last day of employment. If any Team Member loses their identification badge, the Team Member is to notify Security immediately so that a new badge can be issued and activated.

### Parking/Traffic Control

The ability to park on HMMA premises is allowed during scheduled work times. At HMMA we have reserved parking spaces for visitors as well as for the disabled. Here at HMMA, all other Team Members have equal access to parking and parking spaces on a first come first serve basis. All Team Members are responsible for parking in the proper parking spaces and for respecting the visitors and disabled parking areas.

Additionally, HMMA has a posted speed limit as well as designated lanes which allow for smooth traffic flow in and out of the facility. All Team Members are required to follow all posted limits, as well as safe driving habits, to ensure the safety of all HMMA Team Members and visitors. Any Team Member found in violation of these rules is subject to corrective action up to and including termination.

## CAREER OPPORTUNITY PROGRAM

The purpose of the HMMA Career Opportunity Program (COP) is to encourage promotion from within HMMA and to ensure that all qualified Team Members have an equal opportunity for job advancement. This program is designed to provide an effective means of communication to Team Members of specific job vacancies within HMMA. This policy will

27

Edwards v. Hyundai, et al.

0017

be administered by the Employment Department.

It is the intent of HMMA to fill job vacancies from within the organization when Team Members with the skills and qualifications for the positions are available. In the event a posted position cannot be filled from within HMMA due to a lack of qualified Team Members external sources can and will be utilized to fill the position. Job advancement and transfers will be made without regard to race, color, religion, sex, age, national origin, veteran status, or disability.

This program will be used for exempt and non-exempt positions excluding the following: production Team Member, team leader, entry level support staff Team Member, management Team Member and above.

A manager may fill a vacancy internally within his/her section and within the same salary classification without posting the position by realigning a Team Member into the position. The position vacated will then be posted.

All full-time Team Members who have completed the probationary period at HMMA are eligible to apply for vacancies posted under this policy. In the interest of stability and continuity, a Team Member who accepts a twenty-four (24) months and will be prohibited from applying for another promotional opportunity during that twenty-four (24) month period.

A Team Member will be disqualified from consideration for any Career Opportunity Posting if he/she has active corrective actions at the Formal Relatives Policy may also prohibit a Team Member from being considered eligible for the posted position.

Vacancies to be filled by the Career Opportunity Program will be announced via closed circuit television and/or on the Career Opportunity Bulletin Boards. Vacancies will remain posted for five (5) working days following the first date of the announcement.

All Team Members who have filed a Career Opportunity Application but do not meet the minimum eligibility requirements will be notified in writing by the Employment Department. Candidates may be contacted for a screening interview to verify and/or clarify experience. Applicants not selected will be notified of their status, in writing, by the Employment Department.

A Team Member who has been awarded job advancement will be transferred within thirty (30) days of the selection decision. The Director of Human Resources must authorize any decision to delay the transfer.

## TRANSFERS

HMMA wants all of its Team Members to become multi-talented. In order to achieve this goal HMMA Team Members will have the ability to

request an assignment to another work area of their choice. Not only does this allow the Team Members to gain important job experience but it also helps HMMA to develop Team Members for other responsibilities.

Team Members with permanent medical restrictions, either off work or on a temporary work assignment, will be considered for placement, with or without accommodation, as required by the Americans with Disabilities Act. Placements of Team Members with permanent medical restrictions will take priority over transfer requests.

When a vacancy is declared, it shall be posted for department or group transfer, provided the position cannot be filled by a Team Member with permanent medical restrictions. This vacancy will be posted plant wide denoting the department and group. The requesting eligible Team Member with the longest length of HMMA service shall be placed in the open position. The job posting will be posted in designated areas of the facility for a period of three (3) working days, excluding weekends and holidays. All requests received by the end of the posting period shall be reviewed to determine which candidate has the longest length of service and is eligible for transfer.

The requesting Team Member must be a full-time, non-probationary Team Member with at least 12 months of HMMA service as of the date of the posting. The Team Member requesting transfer must not have transferred within the last twelve (24) months.

Any corrective action at the Commitment Discussion level or above will result in the denial of a Team Member's transfer request or promotional request. When two or more Team Members have identical length of service dates, the Team Member identification number will be used as the tie breaker. The Team Member with the lowest Team Member identification number will be awarded the transfer. Team Members will not be considered for any transfer that would result in conflict with the HMMA Employment of Relatives Policy.

To assure that adequate skill levels are maintained in each department, all transfer requests will be evaluated based on operational viability.

Any Team Member who submits and is awarded a transfer request must accept the transfer. The Team Member who receives a transfer shall be prohibited from another transfer for a period of twenty-four (24) calendar months. This period shall begin as of the actual date the award of transfer notification is given. A Team Member who transfers will be required to reschedule vacation time previously approved. A Team Member who transfers to a new department will assume high overtime hours on that team for overtime equalization purposes.

## SOLICITATION, DISTRIBUTION, & POSTINGS

HMMA prohibits the solicitation, distribution and posting of materials on or at HMMA property by any Team Member or non-HMMA Team Members, except as may be permitted by this policy. The sole excep-

28

29

tions to this policy are charitable and community activities supported by HMMA and HMMA-sponsored programs related to HMMA products and services.

Non-HMMA Team Members may not solicit Team Members or distribute literature of any kind on HMMA premises at any time. Team Members may only admit non-HMMA Team Members to work areas with HMMA approval or as part of a HMMA-sponsored program. These visits should not disrupt workflow. The HMMA Team Member must accompany the non-HMMA Team Member at all times. Former Team Members are not permitted onto HMMA property except for official company business. Team Members may not solicit other Team Members during work times, except in connection with a HMMA-approved or sponsored event. Team Members may not distribute literature of any kind during work times, or in any work area at any time, except in connection with a HMMA-sponsored event.

The posting of materials or electronic announcements are permitted with approval from the Director of Human Resources. All team communication boards located in team areas are intended for team related instruction and production-related materials only. Violations of this policy should be reported to the Director of Human Resources.

## TEAM MEMBER WORK CONDUCT

It is the policy of HMMA that Team Members maintain a working environment that encourages mutual respect, maintains fellow Team Members dignity, promotes civil and congenial relationships among Team Members and is free from all forms of harassment and violence.

Team Members are expected to conduct themselves in an appropriate manner as judged by a reasonable person at work, at all HMMA functions, and also in the community. Team Members have the right to conduct their work without disorderly or undue interference from other Team Members. HMMA prohibits Team Members from violating the rights of their co-workers.

HMMA encourages a congenial work environment of dignity and respect as well as professionalism. Therefore, HMMA prohibits Team Members from intentionally harming or threatening to harm other Team Members, clients, vendors, visitors or property belonging to any of these parties.

Team Members are responsible for maintaining their work area in a neat and professional manner.

Team Members are responsible for assuring the security of HMMA confidential/proprietary material in their possession and similarly maintaining the security of HMMA provided equipment. Team Members concerned for the security of their work area or equipment must inform their supervisor of such concerns.
HMMA reserves the right to search locked, unlocked and/or publicly

30

used HMMA property at any time without consent. HMMA may request a search of personal property at the worksite or locked HMMA property assigned to an individual if there is reasonable suspicion that evidence of illegal or prohibited activities resides therein. Refusal of such a request may result in corrective action up to and including termination.

## CORRECTIVE ACTION

The intent of corrective action is to provide a consistent way to address unacceptable attendance, performance, or conduct. Corrective action is designed to allow Team Members formal notice and the opportunity to correct any performance deviations from HMMA's acceptable standards.

The following corrective action, procedures will be taken by HMMA's management in order to address a Team Members' inability to meet HMMA's standards regarding attendance, performance, or conduct. Corrective action applies to exempt Team Members at the specialist level and below, non-exempt administrative Team Members and all production Team Members, including maintenance Team Members. A team relations representative will be available and must attend each phase of the corrective action procedure. The steps are as follows:

### Discussion Planner

Once it has come to the group leader and/or manager's attention that a Team Member's performance does not meet HMMA's performance standards, the group leader and/or manager will meet with the Team Member. This discussion is designed to gather facts about the performance issue and is to be a two-way conversation. The group leader and/or manager is to explore whether the performance issue is failure in the process, equipment, or with the Team Member.

- Equipment Problem. The group leader and/or manager will investigate and seek help in resolving any equipment problems.

- Process Problem. The group leader and/or manager will investigate and seek help in resolving any process problems.
- Team Member's Performance. Inform the Team Member of performance expectations and explain potential ramifications if the poor performance continues.

### Informal Discussion – Phase I

Phase I of corrective action is to address minor performance problems. The intent of Phase I is to bring the performance problem to the Team Member's attention through an Informal Discussion. The group leader and/or manager is responsible for conducting the Informal Discussion. The team relations representative will attend the Informal Discussion and serve as a witness. The Informal Discussion is an open discussion between the Team Member and the group leader and/or manager that identifies the nature of the problem and the possible solution.

31

Edwards v. Hyundai, et al.
0019

If the performance problem is corrected and no additional problems develop during the following twelve months, the documented Informal Discussion will be removed from the Team Member's file and will not be used for any future corrective action.

### Formal Discussion – Phase II

The Formal Discussion is the 2nd phase of corrective action and is to be used for more serious performance issues, or if a Team Member fails to correct an existing performance issue after receiving an Informal Discussion, or if it is decided that a Team Member's performance issue is serious enough that it warrants a higher phase of corrective action. The Team Member will be given a Formal Discussion letter. Attendees at the Formal Discussion phase are the group leader and/or a member of management, team relations representative and the Team Member. The group leader and/or production management Team Member will prepare a Formal Discussion document addressed to the Team Member summarizing the performance issue. If the performance issue is corrected and no additional performance issues arise during the following twelve (12) months, the Formal Discussion letter will be removed from the Team Member's file and will not be used for any future corrective action.

### Commitment Discussion – Phase III

The Commitment Discussion is the 3rd phase of corrective action. This phase will be used if a Team Member's performance continues to be unacceptable or the Team Member commits a serious action that requires a higher level of corrective action.

A Commitment Discussion is a formal meeting, which is conducted with the affected Team Member, his/her group leader and/or manager, team relations representative, the team relations manager, and the appropriate production management Team Member. The purpose of this phase of corrective action will be to determine what aspects of the Team Member's performance are unacceptable, why they are unacceptable, and the reasons behind the Team Member's performance problem. The Team Member will be required to write an action plan stating what actions he or she will take to resolve the performance problem. The Commitment Discussion letter and the Team Member's commitment letter will remain in the Team Member's personnel file for a period of 24 months. If the Team Member is able to correct the performance problem and no additional problems develop, the Commitment Discussion letter and the Team Member's action letter will be removed from the Team Member's personnel file and will not be used for any future corrective action.

### Decision Leave – Phase IV

The Decision Leave is the 4th phase of corrective action. This phase may be taken if the Team Member fails to correct the performance problem after the Commitment Discussion or if it is determined that the Team Member's performance is serious enough to warrant action beyond a

32

### Commitment Discussion.

The affected Team Member will meet with his/her group leader and/or manager, team relations representative, team relations manager and the appropriate production management Team Member for a formal meeting. The Team Member will be given the following day off with pay. The Team Member will be asked to use this time to make a final decision whether or not he/she wants to remain employed by HMMA.

If the Team Member decides to return to work and commit to correcting his/her performance, the day off will be excused with pay.

Information regarding a decision leave will remain in the Team Member's personnel file for a period of twenty-four (24) months. If the Team Member is able to correct the performance problem, and no additional performance problems develop, it will be removed from the Team Member's personnel file and will not be used for any future corrective action.

Corrective action will be administered sequentially with regard to all attendance performance situations. Specific performance-related issues regarding performance, quality, and conduct will be evaluated on a case-by-case basis, and corrective action may be applied based on the severity of the performance issue. Any Team Member whose employment is terminated by HMMA may be entitled to request a Peer Review Panel Hearing.

### Termination

HMMA and its Team Members have a mutual interest in maintaining job security and stability in our organization. Because of our mutual interest, HMMA and its management team hope that we never have to terminate a Team Member's employment. However, in situations where a Team Member refuses to respond to the steps in the "Corrective Action Program" outlined above, or if a Team Member's actions are such that HMMA feels his/her employment cannot be continued, the Team Member will be terminated. Every termination decision will be reviewed by the team relations manager, the Team Member's manager, and the Director of Human Resources to review all facts and information before a termination decision is made.

Notwithstanding anything to the contrary contained in this handbook, every Team Member's employment with HMMA is voluntary and is subject to termination by you or HMMA at will, with or without cause, and with or without notice, at any time. Nothing in this handbook or HMMA policies or procedures shall be interpreted to be in conflict with or to eliminate or modify in any way the employment-at-will status of HMMA.

### SERIOUS MISCONDUCT

33

Edwards v. Hyundai, et al.

HMMA requires a high degree of personal integrity from its Team Members. There are certain things a person can do that by nature are so serious that they place him/her outside of the "Corrective Action Policy." When a person commits one of those actions against HMMA and/or his/her fellow Team Members, he/she may be terminated from employment immediately.

In serious misconduct cases where it is determined that termination is not appropriate, the Team Member will receive a Letter of Conditional Employment which will remain in the Team Member's file for 36 months. Upon issuance of a letter of conditional employment, the affected Team Member, group leader, team relations representative, team relations manager and the appropriate management Team Member will have a formal meeting. Following this meeting, the Team Member will develop an action plan and make a written commitment to successfully implement that plan.

Listed below are some examples of activities that constitute serious misconduct at HMMA:

- Serious and/or excessive violations of HMMA's attendance program.
- Serious and/or excessive violations of HMMA's performance standards.
- Threatening or fighting on HMMA's premises, at HMMA sponsored functions, or while conducting business away from the plant.
- Disclosing, misusing or removing from the premises any HMMA or fellow Team Member's property unless authorized.
- Use, possession, sale, transfer of or being under the influence of illegal drugs, alcohol or any other intoxicating substance at any time on HMMA property. Gifts of alcohol and/or coolers containing alcohol are also prohibited at HMMA.
- Deliberate damage to HMMA property or the property of a fellow Team Member.
- Intentionally misrepresenting or falsifying any information concerning employment or any report on HMMA record.
- Engaging in any form of discrimination in the workplace, including racial or sexual harassment of a fellow Team Member or harassment by a person in a supervisory position of a Team Member under the supervisor's authority.
- Insubordination, including refusing to perform a work assignment or refusing to follow direction of HMMA security or safety personnel.
- Deliberately trying to conceal serious quality problems in HMMA products.
- Deliberately using unsafe work practices that might seriously jeopardize the health or safety of the Team Member or a fellow Team Member.

34

- Use, possession, sale or transfer of a weapon at any time on HMMA property.
- Engaging in illegal activities such as gambling or trafficking stolen goods.
- Deliberately violating HMMA's Solicitation and Distribution Policy.
- Deliberately spreading false or malicious rumors or slandering or libeling a fellow Team Member, HMMA or an HMMA product.
- Leaving the plant without proper authorization (note: this is also considered a voluntary resignation).
- Chronic violations of HMMA's Safety Rules or Procedures.
- Willful violations of HMMA's Lockout/Tag out, Confined Space Procedures or other situations where the violation places the Team Member or others in immediate danger.

The aforementioned list is not all inclusive.

## WORKPLACE THREATS AND VIOLENCE

This policy applies to any Team Member and/or person that make substantial threats, exhibits threatening behavior, or engages in violent acts on HMMA property or makes threats, exhibits threatening behavior, or engages in violent acts relating directly or indirectly to any work activities.

Threats, threatening behavior, or acts of violence against Team Members, vendors, contractors, visitors, or other individuals by anyone on HMMA property will not be tolerated (zero tolerance).

Threats, threatening behavior, or acts of violence against Team Members, vendors, contractors, visitors or other individuals relating directly or indirectly to work activities including phone calls, written materials, behavior at HMMA-sponsored activities will not be tolerated. Firearms, ammunitions, knives, bows or any other types of weapons are not permitted on HMMA property which includes the parking area(s).

In the event that violations of this policy are substantiated, HMMA will initiate a decisive and appropriate response. This response may include, but is not limited to: suspension or termination of any business relationship, reassignment of job duties, suspension or termination of employment, and/or seeking arrest and prosecution of the person or persons involved. Any violation of this policy will be considered serious misconduct. Any Team Member terminated pursuant to violations of this policy shall not be subject to the Team Member Review Board process.

Any Team Member that has knowledge of or witnesses threats, threatening behavior or an actual incident or violations of this policy is required to report the information to his/her immediate supervisor and/or the manager of security and/or his/her Team Member relations representative.

## TEAM MEMBER RESOLUTION PROGRAM AND

35

## PROCEDURE

In any organization there can be differences of opinion about working conditions, work rules and policies, and other work-related issues. To resolve these differences effectively, communication is essential. This program is designed to enhance communication by providing a formal process to resolve legitimate disputes. HMMA will provide a prompt, orderly means of receiving and responding to Team Members' concerns. This program and procedure is intended to supplement, rather than discourage or replace, informal discussions between supervisors and Team Members. A supervisor should make every reasonable effort to resolve Team Members' concerns outside the formal Team Member Resolution Procedure.

The Team Member Resolution Program and Procedure is available to all full-time Team Members who have successfully completed their probation period. The Team Member Resolution Program and Procedure is not available to individuals employed in a temporary status or to employees of any contracted services provided to HMMA. The initiation of the Team Member Resolution Procedure in good faith by Team Members shall not adversely affect their standing as Team Members.

The Team Member Resolution Program consists of four steps, which are outlined below.

Outside counsel will not be permitted to attend any of the meetings. However, appropriate witnesses may be permitted to attend with approval from the manager of team relations.

### Step 1: Supervisory Level

#### Team Member's Role

The Team Member should contact the team relations representative to coordinate a meeting in order for the Team Member to verbally present the concern to his/her supervisor within five (5) working days of the original cause for the appeal, or from the date the Team Member learned the cause for the appeal.

#### Supervisor's Role

The supervisor will meet with the Team Member and the team relations representative and respond verbally to the concerned Team Member within five (5) working days.

### Step 2: Resolution Request

#### Team Member's Role

36

If a Team Member does not agree with the supervisor's verbal response, he/she should contact a team relations representative for a Resolution Request Form. The team relations representative will give the Team Member the form and assist the Team Member in filing the form if necessary. The team relations representative will forward the Resolution Request form to the Team Member's section manager and coordinate within five (5) working days of receiving the answer to Step 1. The team relations representative will attend the meeting.

#### Section Manager's Role

The section manager will review and investigate the facts of the appeal with the assistance of the team relations representative. The department manager will then conduct the prearranged meeting with the Team Member and the team relations representative.

Regardless of the outcome of the meeting, the department manager will provide the Team Member with a written response, briefly outlining the decision. This response will be delivered to the Team Member no later than five (5) working days following the meeting.

### Step 3: Resolution Appeal

#### Team Member's Role

If a Team Member does not agree with the department manager's response, he/she should contact a team relations representative. The Team Member must make a written request stating he/she does not agree with the department manager's response and request to go to the next step. The team relations representative will forward the request to the team relations manager and coordinate a meeting within five (5) working days of receiving the answer to Step 2. The team relations representative will attend the meeting.

#### Manager of Team Relations Role

The team relations manager will review and investigate the facts of the appeal with the assistance of the team relations representative. The manager of team relations will then conduct the prearranged meeting with the Team Member and the team relations representative.

Regardless of the outcome of the meeting, the manager of team relations will provide the Team Member with a written response, briefly outlining the decision. This response will be delivered to the Team Member no later than five (5) working days following the meeting.

### Step 4: Resolution Final Appeal

The Resolution Final Appeal is the last step of the process. The committee's written response is the final decision and cannot be appealed. The committee cannot change or alter any approved policy.

37

Edwards v. Hyundai, et :

0022

Edwards v. Hyundai et

### Team Member's Role

If the Team Member is not satisfied with the decision of the team relations manager, he/she will give written notice, within five (5) working days of receipt of the Step 3 written response, to the team relations representative stating his/her wish to initiate the final step of the Resolution Appeal Process.

### Top Management's Role

The manager of team relations will coordinate and facilitate a meeting consisting of three of HMMA's top management within 10 days of the request. HMMA's top management representatives will meet with the Team Member and allow the Team Member to present his/her facts to the final appeal committee.

The committee may ask questions and/or speak to any witnesses as they feel may be necessary to reach a final decision. The Team Member filing will be notified of the committee's final decision in writing within 5 business days of the resolution meeting.

A Team Member may withdraw an appeal at any time. Once withdrawn, however, it may not be reinstituted. If the Team Member does not meet the time constraints outlined in this policy, Team Member Resolution request decisions will remain as defined by prior actions.

The procedure as outlined describes the normal course in which resolution requests are resolved. Team Members should note that the Team Relations Department is available to provide Team Member consultation on a problem and any other assistance at any time prior to or during the Team Member Resolution Procedure.

Team Members cannot file a Team Member Resolution Request against a policy they feel is unfair. However, a Team Member may file a Team Member Resolution Request regarding a policy that is not implemented properly.

### TEAM MEMBER REVIEW BOARD

The Team Member Review board is to allow those Team Members who feel they have been wrongfully terminated to request a review of that termination by a random selection of trained and qualified fellow Team Members. Any Team Member terminated for any reason except for violations of HMMA's policy on workplace threats and violence, drugs and alcohol, and the anti-harassment policy will have the right to appeal the termination to a Team Member Review Board.

### DRUGS, ALCOHOL AND WEAPONS PROHIBITED

HMMA is committed to maintaining a drug, alcohol and weapon free workplace for all Team Members in order to ensure the safety of all those working at our facility and at all HMMA sponsored events. The illegal

use, sale or possession of narcotics or illegal drugs, alcohol or controlled substances while on the job or on HMMA property (which includes parking areas) is prohibited and is a dischargeable offense. Any illegal substance will be turned over to the appropriate law enforcement agency and criminal prosecution may result. HMMA also considers off-the-job illegal drug use as proper cause for disciplinary action up to and including termination of employment.

Any Team Member convicted of driving under the influence which results in the suspension or revocation of his/her driving privileges and who, in the course of his/her job duties, is required to operate a motorized vehicle, including fork lifts, must notify the manager of the department. The suspension or revocation of a driver license will result in a job reassignment either temporarily or permanently. Any job reassignment will be to an open position only.

HMMA's business involves manufacturing, use of powered equipment, engineering, procurement, and project management. Therefore, the safety of our Team Members and facilities, as well as the safety of the general public and our ability to fulfill our obligations under the Drug-Free Work Place Act of 1988, are of paramount concern.

While HMMA has no intention of intruding into the private lives of its Team Members, HMMA does expect Team Members to report for work in a condition that allows them to perform their duties without jeopardizing their own safety or the safety of other Team Members. HMMA recognizes that Team Members' off-the-job, as well as on-the-job, involvement with drugs and/or alcohol can have an impact on the workplace and on our ability to accomplish our goal of a drug and alcohol-free work environment.

HMMA will take steps to prevent and discourage the use, possession, sale, or distribution of stated contraband at any time by any HMMA Team Members or contracted vendors. In accordance with this policy, periodic searches, random or annual urinalysis, drug screening or blood testing may be conducted. Such searches and testing will be performed by HMMA using qualified contracted agents or qualified management Team Members.

Any Team Member who is taking medication prescribed by a physician must be able to provide a record of the prescription, including the name of the medication, the prescribing physician's name, and any limitations of the prescription may place on the Team Member's ability to perform assigned duties. Furthermore, Team Members taking prescription or non-prescription medication are responsible for being aware of any potential prescription medication may have on their reactions, judgment, or ability to effect such drugs may have on their reactions, judgment, or ability to perform their duties, and if impairment is possible, to report such use to their group leader/manager or HMMA's medical clinic prior to reporting to work.

Any refusal by a Team Member to submit to a search or testing procedure may, however, constitute grounds for termination. The primary

39

38

purpose of this policy is to promote the safety and well-being of all Team Members. It would be inconsistent to promote a strong safety effort while allowing the use of drugs and alcohol or the possession of drugs, alcohol and/or weapons on HMMA property to undermine the safe and effective performance of Team Members on the job.

Each applicant for employment will be required, as a condition of employment, to undergo a urine drug screen/hair analysis. Applicants will be asked to read the policy and sign the post offer employment offer and Team Member consent to alcohol and drug screening. If an applicant tests positive and is determined to be in violation of this policy, applicant will be ineligible for employment.

## FOR CAUSE TESTING AND RANDOM TESTING

Each Team Member, as a condition of continued employment, is subject to medical or physical examination or tests, including urine drug screen and/or a drug screen using hair, at the determination of the responsible group leader, department manager and/or his/her designee, providing the following conditions are met:

- If the Team Member's group leader and/or manager has reasonable cause to suspect that the Team Member is in violation of this policy; or
- If the Team Member's job performance is deficient in a manner which suggests a possible violation of this policy; or
- If the position is designated as a safety sensitive and/or high risk occupation; or
- If the Team Member is selected at random for testing in order to monitor and ensure compliance by all Team Members with this policy. The random selection will be done centrally by HMMA's medical facility. Team Members will be asked to sign the Pre-Employment Offer and Team Member Consent to Alcohol and Drug Screening form.

If a Team Member tests positive for a random and/or for-cause testing and is determined to be in violation of this policy, the Team Member will be required to:

- attend a substance abuse program
- follow the attending physician and/or a qualified substance abuse counselor's guidance
- agree to random
- supply HMMA's testing over the next 12 months treatment and/or documentation that no further treatment is necessary
- agree to remain substance free as a condition of employment
- be responsible for any cost incurred that is not covered by HMMA's medical plan for treatment
- voluntarily resign if the Team Member subsequently tests

40

positive for any subsequent illegal or un-prescribed substance and or being under the influence of alcohol.

Any adulterated specimen will be viewed as falsification and will result in immediate termination.

Any Team Member requesting rehabilitation assistance will be referred to the Team Member Assistance Program (TMAP) provider for assessment and treatment recommendations. The TMAP provider will monitor the program and advise HMMA of the Team Member's progress. Should the program, the Team Member fail to maintain satisfactory progress or discontinue the Team Member will be subject to termination.

Any Team Member who refuses to submit to drug testing will be considered to be insubordinate and will be terminated. Additionally, if a Team Member refuses to submit to or cooperate with a post-accident blood or urine test, he/she may forfeit his/her right to recover workers' compensation benefits.

HMMA recognizes that drug abuse and/or dependency are medical/behavioral conditions that can be successfully treated. Team Members with drug problems are encouraged to request assistance from the Team Member Assistance Program. Participation in TMAP is totally voluntary and completely confidential; however, a request for assistance or participation in a TMAP does not excuse a Team Member from violation of this policy.

HMMA reserves the right to conduct unannounced searches of its property, vehicles, and facilities, including Team Member's vehicles, work areas, desks and lockers assigned to Team Members, at any time. No Team Member has the right to interfere with or object to such searches of HMMA property based on expectations of privacy or otherwise. HMMA reserves the right to search personal property belonging to its Team Members, such as, but not limited to, lunch boxes or bags, pocketbooks or briefcases if such property is brought onto HMMA premises or into HMMA vehicles.

All Team Members will be required to sign a statement acknowledging their understanding of and compliance with HMMA policy.

## PUBLIC RELATIONS

To ensure that all information given to the public and the media is consistent, beneficial and accurate, it is important that the Public Relations Department coordinates and controls all information going out externally. If you are contacted by the news media and asked for information about HMMA or if you are asked to comment on information about HMMA, you are to refer the interviewer to the Public Relations Department. You may not release any information about HMMA business or activities unless you have been specifically authorized by the Public Relations Department.

INTERNAL COMMUNICATIONS

41

Communication at HMMA is a key factor to our success. In order to maintain good communications, HMMA has established various avenues of communicating information to the Team Members. Additionally, and just as important, are the avenues that have been created to allow you, the Team Member, to communicate to HMMA. It is important to keep the avenues of communication open. By communicating we can all be successful. Even though we have many avenues for communication at HMMA all Team Members are encouraged to communicate with their group leaders and managers. Some of those methods are:

## Open-Door Policy

HMMA believes that each Team Members should have the ability to address problems as they arise personally. As with all companies, misunderstandings, differences of opinions and disagreements occur, if issues and concerns are not addressed in a timely manner those issues of concern can damage your relationships and affect all the parties involved. HMMA wants, and encourages all Team Members to openly communicate with one another to resolve misunderstandings, differences of opinion and disagreements. One way that we can resolve these issues is by having open communications with one another and the ability to discuss issues and concerns openly.

Unfortunately, there may be times when an agreement cannot be reached. In these situations HMMA wants every Team Member to know that through the Open-Door Policy they can address these issues in order to achieve a fair and practical solution.

Any member of the team relations department will assist you should a concern or issue were to arise.

Again, HMMA encourages all Team Members to discuss the situation in a respectful manner with the party involved. If a resolution is not reached, discuss the situation with the next level of management. The Open-Door Policy is meant to be used in a systematic fashion and may be pursued to the top levels of HMMA's management.

## Bulletin Board

HMMA has bulletin boards at all entrances and exits. These bulletin boards are for communicating work related information, information required by law, and job postings. Additionally, each team will have a bulletin board; these boards are for work related communications only. Team Members are prohibited from posting any information or notices directly on any bulletin board at HMMA.

## President's Roundtables

The President's Roundtables provide HMMA's Team Members an opportunity to meet and talk with HMMA's President as well as our Executive Vice Presidents. Team Members will be selected randomly on a bi-monthly basis and sent invitations to attend the meetings. Participation is voluntary; however each Team Member is encouraged to attend so that they can communicate directly with the President.

## Group Leader/Managers One-on-Ones

Each group leader/manager will meet with each Team Member twice a year. In a company the size of HMMA it is difficult at times for the two to get together and have a casual conversation. HMMA feels that developing these relationships is important and helps foster open communication. These meetings will be held away from the production work areas and are meant to be an opportunity for The Team Member and group leader/manager to have a 15 minute casual conversation.

## Manager Lunches

The managers lunches are another opportunity for a team to get together in a casual setting were the manager/assistant manager of the department meets with each team in their department every six months and provides lunch. Participation is voluntary. The purpose of these meetings is to continue to foster open communication and promote a team spirit as well a feeling of family within the department. The meeting is held during the normal lunch period and is unpaid time.

## Team Advisor

The Team Advisor is a bulletin that will be issued to the team to communicate important information to the teams. The Team Advisor will be issued on an as needed basis to each team leader so they can read the information during the Five Minute Communication meeting. Once the bulletin has been read it will be posted for a specified time in order to allow Team Members to read it at their leisure.

## Hyundai Communication System (HCS) 334-387-8008

HMMA has established the HCS in order to allow Team Members an opportunity to ask questions in the event their group leader, team relations representative or another member of management has been unable to answer your question or concern. This means of communication is done anonymously, by calling the HCS. The HCS does not record the extension or phone number from which the call came. HMMA encourages Team Members to talk with their managers first, but in the event you need to ask a question, make a comment, or voice a concern on a confidential basis, we also encourage you to call the HCS.

The HCS will be available 24 hours a day, seven days a week. Your call will be directed to the Director of Human Resources and or his designee.

42

43

The Director of Human Resources will review the question and/or comment and direct them to the most qualified person. If you leave your name and want a personal response, a meeting will be scheduled if you request one. Every effort will be made to make sure all replies are given within ten working days of receiving the call.

Anonymous calls will be posted with the answeres on the HCS boards for a period of five days. We also ask everyone to be patient. Some calls may contain complex issues that require more time in order to answer them accurately.

### HMMA Closed Circuit Television System (CCTV)

HMMA CCTV System is an internal video system that will be used to broadcast HMMA information to all Team Members daily.

### HMMA Weekly News

HMMA Weekly News is a weekly summary of company-related information. The HMMA Weekly News will be distributed every Monday on a weekly basis.

### HYUNDAI Insights

Hyundai Insights is a newsletter that will be sent to the Team Members home on a biweekly basis. This news letter will keep you and your family informed about what is going on at HMMA as well as what is going on at HMC and HMA.

### Five Minute Communication Meetings

Each team will have a five minute communication meeting at the start of each shift. The purpose of this meeting is to provide the Team Members with information pertaining to production, quality, or safety. These meetings may also be used to discuss sales, benefits, policy updates, or other pertinent information the team may need to know. All Team Members must be in their assigned meeting area ready for work at the start of their shift.

## COMMUNITY RELATIONS

### Speeches

HMMA receives many requests for speeches about our company from a variety of groups. If your organization is not-for-profit and would like a representative from HMMA to speak to a group, you or your organization needs to submit in writing the following information: All requests must be on the group's letterhead.

- Requested date of speech
- Time
- Location
- Name of Group

44

- Topic you would like covered
- Background information on the organization
- Person to contact with their phone number or email address

All requests must be turned in at least one month prior to the requested date for the speech and should be addressed to the manager of public relations.

### Tours

All family and public tours must be scheduled through the Public Relations Department.

## GENERAL INFORMATION

### Electronic Devices

HMMA has a responsibility to protect every Team Member as well as to protect HMMA assets. The automotive industry is a very competitive industry, and in order to protect its Team Members and proprietary information, HMMA must control what types of electronic devices are allowed in the workplace.

In order to ensure the health and safety of all Team Members, personal radios, televisions, tape recorders, and tape/CD/mp3 players are not permitted anywhere in the facility.

### Camera/Video Camera

In situations where a department uses a camera/video camera in order to conduct investigations, the department must have approval by the Security Department and must have a camera/video camera pass attached to the camera/video camera at all times. If a supplier has a need that requires the use of a camera/video camera in order to conduct an investigation or to assist in the function of their job duties, he/she must gain written approval from the responsible department. The written approval must be submitted to the Security Department for approval and verification from the responsible department. Once the Security Department has approved the use of a camera/video camera, Security personnel will issue a temporary camera/video camera pass. The camera/video camera pass must be attached to the camera/video camera.

Any camera/video camera without a camera/video camera pass will be confiscated, held in security and returned to the owner as they exit HMMA's premises, minus its film.

Personal camera/video cameras and camera/video phones are not permitted within the plant, nor will pictures be allowed during general tours. Business situations may require photos to be taken in the plant, but when these situations occur, only Team Members with an approved camera/video camera pass using a HMMA-owned camera/video camera will be

45

allowed to do so.

## Cell Phones/Pagers

HMMA reserves the right to issue cell phones and/or pagers for business reasons to those individuals that have been approved in order to conduct HMMA business matters.

Personal cell phones and pagers will be allowed in the facility. However, cell phones and pagers must be kept in the Team Member's locker or desk during work times. In addition, the devices must have the volume muted while being stored. Team Members may use their cell phones and/or pagers during breaks and lunch periods only, and the Team Member must be in a designated break area.

## Audio Tape Recorders

Audio tape recorders are prohibited on HMMA premises. In situations where an audio tape recorder is needed a request for approval must be submitted to and approved by the Director of Human Resources or his/her designee.

Any violation of the aforementioned could result in corrective action up to and including termination. Any violation by a non-HMMA Team Member could result in their being asked to leave the premises and the film, tape, disk, and/or any other type of device capable of storing audio or video information will be confiscated and/or memory erased.

## HMMA TOOLS

HMMA has supplied each Team Member with the tools as well as state of the art equipment needed to perform their daily job functions. Each Team Member is responsible for the care and upkeep, and inventory of tools and other equipment issued by HMMA. These tools and equipment are not to be removed from the appropriate HMMA work area. Personal tools must not be brought into HMMA.

Intentional damage to any HMMA tooling or equipment is subject to corrective action up to and including termination.

## LOCKERS

HMMA will provide each Team Member with a locker so that they may store personal items. However, these lockers should not be used to store money or valuables. HMMA will not be responsible for anything that is destroyed, lost or stolen from any locker.

Lockers will remain the property of HMMA at all times. HMMA maintains the right to inspect any locker and its contents at any time with or without notice if it is believed the locker(s) contain items contrary to HMMA policy. This includes but is not limited to items such as firearms, explosives, dangerous or lethal weapons, alcohol, illegal drugs, or missing HMMA property.

46

## CAFETERIA

HMMA provides two dining facilities for our Team Member's convenience. HMMA has designed each of our dining facilities so that you can experience a clean and pleasant area while dining. Prepared meals will be served daily. However if you choose to bring your own meal our dining facilities have ample seating for everyone. Team Members will also find vending machines located throughout the facility if you wish to purchase food or drink.

## SMOKING

In an effort to provide safe and comfortable work conditions, HMMA prohibits smoking and/or the use of smokeless tobacco products in all production facilities and administrative areas. Team Members who use tobacco products should respect all areas designated as "no smoking," limit their tobacco use to those areas where and when smoking is permitted (outside of the facility and only during breaks and dinner/lunch), and dispose of all smoking materials/smokeless tobacco products in proper containers.

Smoking or the use of smokeless tobacco is only permitted during non-work times. This is outlined as follows: one 10-minute paid rest period in the first half of the shift, one 10-minute paid rest period in the second half of the shift and during the unpaid lunch period. In case of overtime work, an additional 5-minute rest period for each full hour (60 minutes) of overtime can be taken. There are some jobs where there are no set scheduled break times, such as maintenance, administration, etc. It is understood that these Team Members still fall with the guidelines of taking only a 10-minute break in the first half of the shift, and a 10-minute break in the second half of the shift.

HMMA intends to consistently enforce the smoke free environment policy described in this document. Any HMMA Team Member violating this policy is subject to corrective action up to and including termination.

## TELEPHONE CALLS

All HMMA phones are for business purposes only. Team Members are not allowed to use HMMA phones for personal business. However, if an emergency situation should arise, the Team Member is to contact their group leader/manager and/or another member of management in order to use a HMMA phone.

All emergency phone calls into HMMA will be forwarded to the appropriate area. HMMA's Team Members and their families are very important and considered HMMA's extended family. Each Team Member should supply their family members with an emergency contact number for their work area, as well as the department they work in, the group leader/manager's name, and make sure their family knows that the contact information is for emergencies only.

47



40 Hour Common Core Training Program
Auditorium -- Conduct

**Week Two**

| | Friday, January 27, 2006 | | | |

**Communications Skills and Teams Training Learning Exercise**
Patricia Adams

**Communications Skills and Teams Training Learning Exercise (Cont'd)**

**Communications Skills and Teams Training Assessment**
Stinson Kennedy

**Communications Skills and Teams Training Assessment (Continued)**

Teams Training
Trust and Credibility
Dennis Jones

Teams Training
Trust and Credibility (Con't)

Teams Training
Team Risks
Dennis Jones

Teams Training
Team Risks (Con't)

EXHIBIT
6
tabbies®

Edwards v. Hyundai, et al.
0030

# Communications and Team Building Skills

## Table of Contents

| | Tab No. |
|---|---|
| Diversity Training | 1 |
| Communications Skills - Introduction to Communications | 2 |
| Teams – Introduction to Teams | 3 |
| Communications Skills -- Communicating Non-Defensively | 4 |
| Teams – Trust and Credibility | 5 |
| Communications Skills -- Dealing with Conflict | 6 |
| Teams – Team Risks | 7 |
| Teams – Stages of Team Development | 8 |

Edwards v. Hyundai, et al.
0031

# DIVERSITY TRAINING



Conducted By
**Training and Education Department**



# Hyundai Motor Manufacturing Alabama, LLC

Edwards v. Hyundai, et al.

0032

# Diversity Training

## Overview

**Introduction**

Managing diversity is a strategy for leveraging differences to gain a competitive advantage. Managing Diversity is creating a supportive work environment which enables all team memberss to contribute their full potential in pursuit of HMMA's business objectives. It will be achieved by *actively* valuing differences and fostering an environment where all individuals are treated with dignity and respect. Managing diversity is creating growth and outperforming the competition by *capitalizing* on the demographic changes in the marketplace. This will be achieved by understanding and satisfying the different needs and requirements of potential customers through innovative approaches, products and services.

**Contents**

This publication contains the following topics:

| Topic | See Page |
|---|---|
| Introduction | 1-2 |
| Myths About Diversity | 3-4 |
| What is Diversity? | 5 |
| Diversity "R" Us | 6 |
| Diversity Advantage | 7 |
| Impact of Diversity | 8 |
| The Respectful Workplace | 9 |
| M.E.E.T. on Common Ground | 10-12 |
| Summary | 13 |
| Reference Material | 14-15 |

**Objective**

To make participants more aware how our human differences may affect our customer relationships, our work relationships, and our personal relationships.

**Benefits**

All team members should gain an understanding of the importance of having a diverse work environment. Team members should realize that we all have uniquenesses (differences), but we are more similar than different.

*Continued on next page*

Edwards v. Hyundai, et al.

0033

# Overview, Continued

| | |
|---|---|
| **Course Objectives** | By the end of this workshop, participants will:<br>1. Be able to define the term diversity.<br>2. Be able to explain how our actions might impact others.<br>3. Be able to understand the importance of a respectful workplace.<br>4. Be able to explain the importance of diversity from a business perspective. |
| **Facilitator Expectations** | 1. One person speaks at a time. Streamline side conversations.<br>2. Everyone participates fully.<br>3. Keep an open mind.<br>4. Don't be afraid to share your own views.<br>5. Get out of your box and have fun. |
| **Class Expectations** | 1.<br>2.<br>3.<br>4.<br>5. |

Edwards v. Hyundai, et al.

0034

# Myths about Diversity

| | |
|---|---|
| **What Diversity Is Not?** | There is a lot of confusion about what diversity is and is not. Let's take a look at some of the myths. |
| **Myth No. 1** | **Diversity is a problem.** |
| *Fact No. 1* | It is not. It is an opportunity. |
| **Myth No. 2** | **Diversity is our Human Resources Department's responsibility.** |
| *Fact No. 2* | It is everyone's responsibility. Team members, supervisors and managers all play a significant role. |
| **Myth No. 3** | **Diversity is only about race and gender; minorities and women in the workplace.** |
| *Fact No. 3* | Diversity deals with the internal (our team members), and the external (our customers and suppliers). |
| **Myth No. 4** | **Diversity is about exclusivity.** |
| *Fact No. 4* | Diversity includes all of us. It is about creating a culture where everyone (each individual) can thrive and contribute to HMMA. It is about inclusivity. |
| **Myth No. 5** | Diversity is another version of Equal Employment/Affirmative Action. |

*Continued on next page*

Edwards v. Hyundai, et al.
0035

# Myths about Diversity, Continued

*Fact No. 5*     Diversity is about all team members and customers. Let's take a look at how the following two topics contrast.

| EEO/AA... | Diversity is... |
|---|---|
| Is a government initiative. | A voluntary and company driven initiative. |
| Legally driven. | Productivity driven |
| Quantitative | Qualitative |
| Problem focused | Opportunity focused |
| Assumes assimilation among participants | Assumes integration |
| Internally focused | Externally focused |
| Reactive | Proactive |

Edwards v. Hyundai, et al.

0036

# What is Diversity?

| | |
|---|---|
| **Definition** | Webster dictionary defines the term diversity as the state or fact of being different. |
| **HMMA's Definition** | Diversity is about *human differences*. It is about embracing our differences and acknowledging our similarities. |
| **Diversity Training** | Diversity training is about understanding how our *human differences* may affect our customer relationships, our work relationships, and our personal relationships. |

Edwards v. Hyundai, et al.

0037

# Diversity R Us

**Introductions**    We have a lot of similarities and uniqueness. This interactive exercise will allow everyone the opportunity to visualize how different and similar we are. You be the judge. The bottom line is that we want to get to know you and we only have a short period of time to do so.

**Instructions**    Let's have some fun! Travel over into the creative side of your mind. Use the following rules:

| Step | Action |
|------|--------|
| 1 | Using your flip chart sheet, place your name in the center of the page. |
| 2 | You must move or dance to the music while completing this exercise. |
| 3 | Write things that are important to you and qualities that contribute to your make up. You can include hobbies, interests, places you have traveled to or would like to go, family, where you are from, what you are going to be doing at HMMA, etc. |
| 4 | Draw 4 pictures of things that you would like to share with the group about yourself. Please be creative. Use as many colored markers as you can. |
| 5 | Write down or draw a picture of one risk you would like to take. |
| 6 | Write down or draw a picture of one thing that would just really surprise the group about yourself. |
| 7 | Be prepared to communicate to the group what you feel is your greatest strength or personal quality. |
| 8 | Be prepared to present this information to the group. |

**What did you Notice?**    Be prepared to discuss what was noticed (i.e. similarities and differences).

# Diversity Advantage

**Introduction**  Throughout our Diversity training, we will look at ourselves and how we view diversity, discuss the importance of a diverse workforce, and gain a better understanding of the impact of stereotypes, prejudices, and biases.

**Video**  Let's watch a 20-minute video, The Diversity Advantage: Food for Thought, which further explores the positive economic benefits of a diverse workforce.

**Group Discussion**  How might internal diversity help HMMA as it strives to reach its goals of being one of the Top Five auto manufacturers?

Edwards v. Hyundai, et al.

0039

HMMA TRAINING & EDUCATION

# The Impact of Diversity

| | |
|---|---|
| **Introduction** | It's all about impact. Our stereotypes, prejudices, perceptions, and biases mean absolutely nothing until they are acted upon. How we treat people is based upon our stereotypes, prejudices, perceptions, and biases. We must understand and come to realize how our actions affect others.<br><br>Let's take a look at each. |
| **Stereotype** | A stereotype is a simplified and standardized conception or image of individuals or groups shared by members of a group. |
| **Prejudice** | The term prejudice is defined as value judgments, whether positive or negative, that is assigned to groups of people based upon stereotypes and other preconceived notions about those people. |
| **Perception** | A perception is an insight. |
| **Bias** | Bias is defined as the prejudice that members of a particular group are fundamentally superior to members of other groups. |
| **Group Discussion** | In groups, list examples of stereotypes, prejudices, perceptions and biases. Be prepared to share your information with others. |

# The Respectful Workplace

**Introduction**   Our workplace should be a respectful workplace.  A respectful workplace begins with each of us, whereby we must do our part in promoting a respectful workplace.

**Respect**   We define *Respect* as consideration of self and others.  Respect includes: respect for the environment; respect for other people's privacy, their physical space and belongings; and respect for different viewpoints, philosophies, religion, gender, lifestyle, ethnic origin, physical ability, beliefs and personality.

**Workplace Respect**   Respect in the workplace is built on a foundation of three very important principles:  Equality, Accepting Differences, and Appreciating Diversity.

**Equality**   We must be willing to acknowledge that all persons have an equal right to work.  Each person should have an equal opportunity to make the best use of his or her abilities regardless of race, sex, religion, national origin, or any other characteristic.

**Accepting Differences**   Acknowledging Equality requires that we be able to accept differences between us.  We all work with people who are different from us.  They may look different, sound different, and even behave differently than us.  They may practice a different religion or come from a different cultural background than we do.  We must then realize that these differences do not prevent us from having an equal right to work.

**Appreciating Diversity**   The ability to Appreciate the Diversity that exists in our workplace is but another step of our foundation.  The variety of experiences, viewpoints, abilities, and ways of thinking to be found in today's workforce is an advantage for any organization.  Diversity adds depth and strength to the workplace.

**Summary**   On this foundation of Equality, Accepting our Differences, and Appreciating our Diversity, we can build the respectful workplace.  This can be a workplace where there is mutual respect for all employees.  This is not an impossible task----that is, if each of us are willing to do our part to promote respect in our workplace.

# M.E.E.T. on Common Ground

**Introduction**

A workplace where people want to come -- and STAY. HMMA and other organizations share this objective and it's at the core of many organizational initiatives. However, this simple objective can be difficult to achieve because it requires more than a policy, program, regulation or laws. It takes people; people with a common understanding, people with common skills, people with common goals. In other words, people who are willing and able to meet on common ground!

M.E.E.T. on Common Ground—Speaking Up for Respect in the Workplace training program will provide practical skills through exercises and several vignettes, that can be used to create a respectful and inclusive workplace.

**Contents**

This Section contains the following topics:

| Topic | See Page |
|---|---|
| Introduction | 10 |
| Training Objectives | 11 |
| The M.E.E.T. Model | 11 |
| Video Vignettes | 12 |

Edwards v. Hyundai, et al.
0042

# Overview

| | |
|---|---|
| **Introduction** | We are each unique individuals, with our own gifts, skills, concerns, and perspectives. This uniqueness is part of what makes us who we are as a person; although, in the workplace it can also be what sets us apart from our co-workers. |

So the question becomes how can we find common ground given all of our unique gifts, skills, concerns, and basic differences?

Believe it or not, it is possible to find ways to work together and be as productive as possible, if we keep in mind the one thing we all have in common—and that's the desire to be treated with respect.

At its core, respect has to do with establishing and maintaining effective working relationships.

**Training Objectives**

At the completion of this Section, participants should be able to:

- Explain the benefit of mutual respect in the workplace.

- Explain the importance of personal responsibility in promoting respect in the workplace.

- Use the four steps in the M.E.E.T. model to help promote a "mutual respect" working environment.

**The M.E.E.T. Model**

The M.E.E.T. Model is comprised of four steps that can be used to help promote a "mutual respect" working environment.

**M**—Make Time to Discuss
**E**—Explore Differences
**E**—Encourage Respect
**T**—Take Personal Responsibility

During the following vignettes, we will practice creating "I" messages to address each situation.

*Continued on next page*

Edwards v. Hyundai, et al.

0043

## M.E.E.T. on Common Ground, Continued

**Video Vignettes**    Six vignettes dealing with a variety of real world situations:
- "It's just an expression…"
- "It's just a joke…"
- "She's old news.  He's too green."
- "I didn't understand one word…"
- "I'll let that one slide…"
- "You should see her 'qualifications'…"

Develop your "I" statements.

# Summary

**In conclusion**   We have examined quite a bit of information about ourselves.  We have shared some of our similarities, as well as our uniquenesses.  We have discussed what diversity truly is and have come to realize that before we can understand the diversity of others, we must first understand our own diversity.

We all must take an active role in creating a respectful workplace.

First, we must examine our own behavior to maintain an environment free of intimidation and hostility.  We must control social interactions so they don't interfere with productivity.

Secondly, we must review our behavior and that of others within the organization for evidence of conduct that violates company policy.

## Exercise 1

### Reflecting on Respect and Diversity

Respect for, and responsiveness to, individual differences is critical to developing and maintaining effective relationships in the workplace. Our focus on workforce diversity should not lessen the importance of demonstrating respect for individual differences, such as personal styles, work habits, physical characteristics, and life circumstances.

It is also important to realize that many people have had experiences as members of groups which have fundamentally shaped their individual identities. For these people, separating their sense of individual identity from their sense of group membership may not be easy, as the two are closely connected.

In this exercise, you will have an opportunity to reflect on those things which you feel shape your own sense of identity -- who you are.

1. What three things about you most represent who you are?

   a.
   b.
   c.

2. What are the three things that others notice about you most often?

   a.
   b.
   c.

3. What may be the effect of the similarities and differences between your answers for questions 1 and 2?

# Personal Action Plan

**Introduction**

In the block below, write down some things you would like to stop doing. Then write down some things you would like to start doing. Next, write down some things that you would like to continue doing.

**Things I would like to stop doing...**

1. _____
2. _____

**Things I would like to start doing**

1. _____
2. _____

**Things I would like to continue doing**

1. _____
2. _____

**A new model**

This exercise is known as the Stop, Start, and Continue Model. Please make it a point to re-visit this model periodically to assess how you are doing. Feel free to update it as necessary.

Edwards v. Hyundai, et al.

0047

Edwards v. Hyundai, et al.

## Edwards Tammy R HMMA/Welding

**From:** Edwards Tammy R HMMA/Welding
**Sent:** Friday, May 12, 2006 10:47 AM
**To:** Swindle Michael W HMMA/Welding
**Subject:** FW: 20 Ways to Maintain A Healthy Level Of Insanity

**Subject:** FW: 20 Ways to Maintain A Healthy Level Of Insanity

*Tammy Edwards*
*CCR Operator Body/Weld*
*334-387-8375*
tedwards@hmmausa.com





EXHIBIT
8

# 20 Ways to Maintain A Healthy Level Of Insanity

1. At Lunch Time, Sit in Your Parked Car with Sunglasses on and point a Hair Dryer at Passing Cars. See If They Slow Down.

2. Page Yourself Over The Intercom.! Don't Disguise Your Voice.

3. Every Time Someone Asks You To Do Something, Ask If They Want Fries with that.

4. Put Your Garbage Can On Your Desk And Label It "In."

5. Put Decaf In The Coffee Maker For 3 Weeks. Once Everyone has Gotten Over Their Caffeine Addictions, Switch to Espresso.

6. In the Memo Field Of All Your Checks, Write "For Smuggling Diamonds"

Edwards v. Hyundai, et al.
0624

5/12/2006

7. Finish All Your sentences with "In Accordance With The Prophecy."

8. Don't use any punctuation

9. As Often As Possible, Skip Rather Than Walk.

10. Order a Diet Water whenever you go out to eat, with a serious Face.

11. Specify That Your Drive-through Order Is "To Go."

12. Sing Along At The Opera.

13. Go To A Poetry Recital And Ask Why The Poems Don't Rhyme

14. Put Mosquito Netting around Your Work Area and Play tropical Sounds All Day.

15. Five Days In Advance, Tell Your Friends You Can't Attend Their Party Because You're Not In The Mood.

16. Have Your Co-workers Address You By Your Wrestling Name, Rock Bottom.

17. When The Money Comes Out The ATM, Scream "I Won!, I Won!"

18. When Leaving The Zoo, Start Running Towards The Parking lot, Yelling "Run For Your Lives, They're Loose!!"

19. Tell Your Children Over Dinner. "Due To The Economy, We Are Going To Have To Let One Of You Go."

20. And The Final Way To Keep A Healthy Level Of Insanity.......

Send This E-mail To Someone To Make Them Smile.

Edwards v. Hyundai, et al.
0625



7/200

DEFENDANT'S
EXHIBIT
Edwards

## Edwards Tammy R HMMA/Welding

**From:** Edwards Tammy R HMMA/Welding
**Sent:** Monday, July 31, 2006 12:01 PM
**To:** Jones, Stacye M HMMA/HR

Stacye,

I really need to talk to you, today if anyway possible.

*Tammy Edwards*
*CCR Operator Body/Weld*
*334-387-8375*
tedwards@hmmausa.com





Edwards v. Hyundai, et al.
0609

7/31/2006

Tammy Edwards                    1:42 pm
8-1-06                           3:25 pm

Started right after I got on his line March 06 maybe

M asked if she was married? T- Happily, it's sweetheart-

M I did too

progressed to M- have you ever been w/ anybody else- T- No

You just hadn't been w/ right one, if you'd been w/ me you wouldn't

M as far as I know my wife hasn't either    go back to husband

tell us what you remember

he cussed, everything's F or MF, I would stand off to

the side (new to downtime) wasn't crazy about F + MF

1st thing I remember him shaking himself @ me

grabbed his genitals or rubbed them up or down M- Does

it turn you on? T- No I wish you would stop

Pam- Oh damn girl it ain't hurtin you

T asked M what is it w/ you & Pam, M- Pam doesn't

like Jennifer & wants to get her jealous T- I wish

you'd leave me out of that

How often shaking himself? whenever I came around him

(in front of Toby - Toby won't tell you)

T- I'm going to start going around the other way  M-

you better not "Fin" dodge me  You don't embarass him

or you'll get blessed out

M didn't stop, always went up BB, went down off-line

M talking to Fard, M ducked down, don't you ever fucking

dodge me again, matter of fact you don't have to worry

about me fucking speaking to you again (said to Tammy

at BCI)

EXHIBIT

11

D- 00239  EDWARDS V HMMA

Billy asked her if she was miserable - T- yes
B - want to go back to line - No, Tammy, You want to go to Mike's
line? T- No Mike's a pervert
M- Don't "F" go to Billy anymore or anybody about our
    business
T- What are you talking about
M- You didn't go tell Billy.
T- I told him you were a pervert
M- Billy could go tell Harry + he could tell his get in trouble
    I was hurt when you dodged me
T- How do you think I felt when you shake that @ me
M- Don't be talking about our discussions anymore
T- I just want to know we're OK
M- We're OK

M  talking about having sex w/ women, pulling their hair, I
    make love to my wife but do the freaky stuff on the side
    when they moved me upstairs, I thought things would get better
Richard in   about 3 weeks ago - going to floor a lot more
M ES over-   Pam told me if I would act like it didn't bother her M
heard        would stop   on weekend, M I bet you + Ralph don't even
                        have oral sex T M- I don't use condoms you gonna have a disease
    one day + be in the nursing home M- have you ever had a
    man's finger up your butt while having sex P- you don't
    know what you're missing M- doesn't have oral sex
    as much as he used to - but you've been w/ one man
    I'd lick your ass raw

D- 00240  EDWARDS V HMMA

he's watching my crotch all the time, he blocks the aisle

T- you'd better "F" stop    Sometimes puts hands behind
may have said freakin
his back & butts up against me

Mon- last wk. - M bumping me on the side T- stop, Roger knows me
M-                                                        & he may think something's going on
Wed morning, last wk, somebody's got some new pants- ran outside
of hand along outside of pant leg  T just shut up

M- I don't give an F who he knows

→ Wed afternoon- T to B you had a rough day? B- No, I just
didn't get any last night   M- you knew what's wrong
w/ her She's never been F   F me you MFer, F me
Ralph like Mike does  (M thrusting in a chair)


Amber Kelley


Everytime I push him away he thinks it turns me on &
tells me it turns him on   My chest feels better than Ralph's


talked    ← Sat- M ⊙ looking @ my crotch T- told Mike to stop &
to Wade
Laster     M said there wasn't anything T could do to make him
stop  T- I can slap the suit out of you  M- That just
turns me on

T- what do you want me to put down (for time)  M- those
pants   T pretended she didn't hear, M- Hey did you
hear me?


cursed Tommie R. on radio

Kim Abrams- Comment about sleeping w/ Mike


D- 00241  EDWARDS V HMMA

Billy heard M—

M— I'm not a boob man, I'm an ass man. You can leave your shirt on. I just want the bottom half

P— by the time she's goes to night shift, she'll be ready

last wk— M— have you ever fingered yourself, T—No M I don't believe you every woman's done that You + my wife say that + you're both liars

Billy apologized to me about prior conversations
to B— There was no sense in what happened @ his desk
B— I know

saw T's Screen saver — saw her daughter + her boyfriend
You know he's tearin' that up
called me "F" mother Teresa

Pam — holding T's arms back + telling M to kiss her

*Tammy Edwards*
8/3/06

Statement

**EXHIBIT**
tabbies
**12**

8-3-06

Tammie Edwards:                    8:57 AM — 10:00 AM

- Are you hearing anything on the Floor? Ans: No, but Billy has been very nice to me. Some TM's in Body-Build won't speak to me. Only one guy spoke to me.
- How is your husband, Ralph? Ans: We had a disagreement yesterday. My husband wants to know why Mike is still on the site.
- Describe your relationship w/ Mike before there were conversations of a sexual nature? Ans: We were ~~be~~ good Friends. I would even bring him breakfast, along w/ Jennifer. Mike may have paid for my breakfast only once. I was picking up breakfast for Mike, Richard, Pam, & Jennifer. Picking up breakfast for everyone became routine. Pam would initiate the idea of picking up breakfast for everyone.

*trying to* (margin note)

- Mike called a BM TM a "mother-Fucker" in reference to Tammie not buying the TM breakfast.
- Did anyone hear that besides you? Ans: No, we were standing alone next to the stairwell.
- When did the sexual harassment begin? Ans: Talks of a sexual nature occurred immediately.
- When were the sexual conversations directed towards you? Ans: It wasn't long @ all. It all started when he (Mike) was rubbing himself. Farrard (spelling) witnessed Mike rubbing himself.
- When did the sexual comments start to bother you? Ans: (Never answered question.) Was always bothered.

- Tammie stated that Mike put her name in his cell phone. Tammie's name is listed under Jennifer's number.
- Do you think that Mike misinterpreted your kindness as flirting? Ans: No, not at all!
- Mike asked Tammie, "What would it do to take you to cheat?"

_Tammie Edwards_

8/3/06

D- 00247  EDWARDS V HMMA

Tammy Edwards                                          8:57am
8-3-06

* Without us talking about it. Billy has helped me a lot- told me I
was doing the right thing, no one in Mike's area will speak to me
(always have spoken to me in the past) Saw Pam conversing w/ other
TMs - felt it was about this situation

Describe your relationship w/ Mike prior to sexual situation? I told him
I wanted us to be friends- I brought Mike & Jennifer's breakfast
(Mike would pay for hers + offer to pay for mine - I wouldn't let
him) pretty often   would go to cafeteria + pick up breakfast for
Pam, Mike, Jennifer, + Richard (got old + started getting her
breakfast @ Hardees) Pam would initiate breakfast a lot
+ call- Mike wants breakfast   to know if you're going to get
even during sexual situation- I would laugh + joke w/ Mike
because you don't embarass Mike.
last week- Mike called Tammy + asked if she would get Jennifer's
bacon + cheese biscuit - Tammy said I'll need to get Ronald
something. Mike said you ain't gettin that black MFer
nothing

foul language from Mike was immediate - sexual conversations
from the beginning (from Mike) the 1st thing Mike did was
rub himself + said you know you want it
≡ On the incident of walking in the aisle - Tammy did not
use the "F" word - has never used "F" word in front of Mike
did not ask why body build was down

EXHIBIT
13

admits conversing w/ her spouse about wanting to see Mike drag race - her little boy loves racing

Tammy would say I'm trying to be your friend but it's hard Mike eventually quit rubbing himself (humping) Mike would hang on to the fence and bump himself against the fence Melvin Jones may have seen this

Mike put my name in his phone to cover up for Jennifer calling has called Mike - work-related only (no more than 1 minute @ a time) Mike laughed + told Tammy he had her number stored

Were you ever flattered by the attention? No, I always laughed at him
Do you feel that Mike may have felt you were flirting? No, I laughed @ him
Mike would ask - what would it take for you to cheat

Approx. Monday of last week - Roger saw Mike bumping into Tammy, Mike said the "F" word + Tammy was worried that Roger heard that + would be offended (Roger is in a Gospel group) Tammy had already told Mike that Roger was a good christian man + Mike intentionally used the "F" word

confirms always being offended by comments not just recently when he told her last Saturday there was nothing she could do - that was her breaking point

Tammy Edwards
8/3/06

D- 00238  EDWARDS V HMMA

## Edwards Tammy R HMMA/Welding

**From:** Edwards Tammy R HMMA/Welding
**Sent:** Thursday, August 10, 2006 11:35 AM
**To:** Jones, Stacye M HMMA/HR
**Subject:** MY NEW JOB!!

Stacye,

I know you are busy so I decided I would email you about my new position. You stated this morning that you did not know they had put me on BC1. Well they told me it was so I would feel more comfortable, until things was over. I don't believe that and neither would anyone else if they were in my shoes. I am doing my job like I was instructed to do but it is irritating my neck worse. I don't understand what could be taking so long. It has been 1 week today since everything was over. I know you have no control over that but you said last Thursday it would be tomorrow maybe Monday and it should be over. I do appreciate your help and also you coming to talk to me on Tuesday afternoon. It really helps to talk, especially when you can't talk to anyone else. I forgot that other guys name, from Engine Team Relations. I only saw him twice but I didn't get to thank him for his help. Well I guess I better get back to "The Line", I wouldn't want them to have any reason to say anything. I appreciate your time, you ask me this morning my feelings so here they are. Let me know when you get another book, I don't mean to bug you about it. I just want to know what steps to take if anything ever happens again. I pray it won't.

*Tammy Edwards*
*CCR Operator Body/Weld*
*334-387-8375*
tedwards@hmmausa.com





DEFENDANT'S EXHIBIT

Edwards v. Hyundai, et al.

0608

8/10/2006

# Exhibits 15-16 Filed Under Seal



# HYUNDAI

Motor Manufacturing Alabama, LLC
700 Hyundai Boulevard
Montgomery, Al 36105



August 19, 2006

Dear Tammy,

You notified the Benefits Department of your need for a medical leave of absence. You have been employed with Hyundai since January 2006 and therefore are eligible to apply for Short-Term Disability. You stated your absence began on August 17th and will continue as determined by your doctor and our Medical Center.

Below is a list of forms included in the packet you picked up in medical.. Please complete as stated below:

 a.   <u>Leave of absence form</u> (**received**) Complete date, hire date, name, SS#, address, and department, complete your name, beginning and ending date (if known), sign and date. *Return to the Benefits Department.*

 b.   (ICM – must be completed by your treating physician when he states you may return to work *Bring this completed form with you to the Medical Center for your return to work evaluation.*

 c.   <u>Standard Insurance Company Forms</u>: (*fax these forms to Standard Insurance or return to the Benefits Department*)

  1)   Employee Statement (pg. 2 of 7) – team member must complete, sign and date
  2)   Attending Physician's Statement (pg. 4 of 7) – your treating physician needs to complete
  3)   Authorization to Obtain Information (pg. 6 of 7) – team member must complete the bottom of the form

When a Team Member must go out on a leave of absence, the Team Member is responsible for covering the first three (3) days of absence, using personal, vacation or unpaid time. After the first three (3) days of absence, the Team Member may apply for Short-Term Disability benefits You chose to take those three (3) days as excused unpaid. If your Short Term Disability is approved, those days will be excused, unpaid.

If approved, Short-Term Disability benefits are paid directly by The Standard Insurance Company (Hyundai's Short-Term Disability insurance carrier). Short-term disability covers 67% of the Team Member's base salary. Once the Team Member returns all required forms to The Standard Insurance Company, they will review and make a determination on the claim. Weekly checks for Short-Term Disability pay will be issued to the Team Member by The Standard Insurance Company, **not** by Hyundai. How to apply for Short-Term Disability benefits:

1.   The Benefits Department will complete the employer potion of the claim form.
2.   The Team Member will complete the employee portion of the claim form.
3.   The treating physician must fill out the physician portion of the form Any incomplete information will delay the processing of the claim and may delay payment of your benefits
4.   Complete the Authorization to Obtain Information Form.
5.   **Keep a copy of these completed forms for your records. You will need these documents in order to return to work.**
6.   Mail all completed forms to Standard Insurance, P.O. Box 2800, Portland, OR 97208-2800 or fax your completed forms to 1-800-378-6053. Please do not bring the completed forms to the Benefits Department.
7.   After all required forms and documentation are received by the Standard Insurance Company, it takes approximately one week to make a decision on the claim.

**EXHIBIT**
17

After being out of work due to a personal injury/illness you must make an appointment with the Medical Center for a fit-for-duty evaluation before you can return. **This exam must be conducted the day you are to return to work, prior to your shift starting.** Contact the Medical Center at (334) 387-8240. In order to return to work, the Medical Center requests a doctor's statement from your treating physician stating the following information:

- Specific dates of illness/injury
- Detailed diagnosis of illness/injury
- A medical release with the return to work date
- Details of any related restrictions and/or medications

If you are out for a period of more than two (2) weeks you must send a check to HMMA to keep your insurance in effect. The total amount due from you is: Life/Vol/Spouse/Child: $ 13.58

|  |  |
|---|---|
| Blue Cross : | $ 14.54 |
| Total Due: | $ 28.12 |

This check payable to HMMA needs to arrive on Friday before the regularly scheduled payday on the following Tuesday

If you have any questions, please do not hesitate to contact me or the Medical Leave Coordinator at (334) 387-8200.

Sincerely,


Penny Nicholls RN
Medical Specialist
(334) 387-8191
(334) 387-8162 fax

Note: Per HMMA's Medical Leave Policy, a Team Member cannot engage in gainful employment during any leave of absence without the prior written consent of the Director of Human Resources. A Team Member who accepts employment without prior written consent shall be considered to have voluntarily resigned from employment with HMMA as of the first day of work at the new employer.

D- 00114  EDWARDS V HMMA

# Exhibit 18 Filed Under Seal

# Exhibits 19-23 Filed Under Seal

July 11, 2007

Ms. Tammy Renae Edwards

Clanton, Alabama 35045

Dear Tammy:

The last day that you actually worked at HMMA was August 16, 2006. Soon thereafter, you applied for short-term disability ("STD") benefits and leave, which expired on February 11, 2007. You then applied for long-term disability ("LTD") benefits with the Standard Insurance Company ("Standard").

On June 8, 2007, HMMA learned that Standard had denied your LTD claim and that Standard had previously informed you of its determination.

Since the date that your LTD claim was denied, you have not reported to HMMA for work or even contacted your Group Leader or Manager regarding your absences, as is required by HMMA's Attendance Policy. As such, you are not on any form of approved leave and HMMA now considers you to have voluntarily resigned from your job at HMMA.

Information regarding your COBRA benefit will be sent to you by HMMA's Benefits Section.

I wish you the best in your future endeavors.

Sincerely,

Wendy Warner
Manager, Employment
Hyundai Motor Manufacturing Alabama, LLC

EXHIBIT
24

D- 00021  EDWARDS V HMMA

# Exhibits 25-28 Filed Under Seal

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF ALABAMA

3  NORTHERN DIVISION

4

5  TAMMY EDWARDS,

6  Plaintiff,

7  vs.

8  HYUNDAI MOTOR MANUFACTURING ALABAMA,

9  LLC, and MIKE SWINDLE, individually,

10  Defendants.

11

12  CIVIL ACTION NUMBER: 2:07-cv-908-MHT

13

14

15  DEPOSITION: MICHAEL WAYNE SWINDLE

16

17

18  S T I P U L A T I O N S

19  IT IS STIPULATED AND AGREED by

20  and between the parties through their

21  respective counsel that the deposition

22  of <u>MICHAEL WAYNE SWINDLE</u> may be taken

23  on June 10, 2008, before Sallie NeSmith

**Page 2**

1  Gunter, Certified Court Reporter of the

2  State of Alabama, ACCR License Number

3  37, Commissioner and Notary Public, at

4  the law offices of Haynes & Haynes,

5  1600 Woodmere Drive, Birmingham,

6  Alabama.

7  IT IS FURTHER STIPULATED AND

8  AGREED that the signature to and the

9  reading of the deposition by the

10  witness is waived, the deposition to

11  have the same force and effect as if

12  full compliance had been had with all

13  laws and rules of court relating to the

14  taking of depositions.

15  IT IS FURTHER STIPULATED AND

16  AGREED that it shall not be necessary

17  for any objections to be made by

18  counsel to any questions except as to

19  form or leading questions, and that

20  counsel for the parties may make

21  objections and assign grounds at the

22  time of trial or at the time said

23  deposition is offered in evidence or

**Page 3**

1  prior thereto.

**Page 4**

1  APPEARANCES

2  Appearing for the Plaintiff:

3  HAYNES & HAYNES, P.C.

4  By: Alicia K. Haynes, Esq.

5  1600 Woodmere Drive

6  Birmingham, Alabama 35226

7  Appearing for the Defendant Hyundai

8  Motor Manufacturing Alabama, LLC:

9  OGLETREE, DEAKINS, NASH, SMOAK

10  & STEWART, P.C.

11  By: Brian R. Bostick, Esq.

12  One Federal Place

13  Suite 1000

14  Birmingham, Alabama 35203

15  - and -

16  By: Christopher N. Smith, Esq.

17  Corporate Legal Counsel

18  Hyundai Motor Manufacturing

19  Alabama, LLC

20  700 Hyundai Boulevard

21  Montgomery, Alabama 36105

22

23

| | |
|---|---|
| 1 Appearing for the Defendant Michael | 1 Plaintiff's Exhibit 10 |
| 2 Wayne SWINDLE: | 2 HMMA Training Attendance Sheet......353 |
| 3 CONSTANGY, BROOKS & SMITH, LLC | 3 |
| 4 By: J. Tobias Dykes, Esq. | 4 |
| 5 One Federal Place | 5 |
| 6 Suite 900 | 6 |
| 7 Birmingham, Alabama 35203 | 7 |
| 8 Certified Court Reporter: | 8 |
| 9 Sallie NeSmith Gunter | 9 |
| 10 Videographer: Susan Pope | 10 |
| 11 Also Present: Tammy Edwards | 11 |
| 12 | 12 |
| 13 | 13 |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 5 | 7 |

| | |
|---|---|
| 1 I N D E X | 1 I, Sallie NeSmith Gunter, a |
| 2 | 2 Certified Court Reporter of the State |
| 3 Examination by Ms. Haynes............10 | 3 of Alabama, ACCR License Number 37, |
| 4 Examination by Mr. Bostick..........370 | 4 acting as Commissioner, certify that on |
| 5 Plaintiff's Exhibit 1 | 5 this date there came before me at the |
| 6 Michael Swindle Personnel File.......48 | 6 law offices of Haynes & Haynes, P.C., |
| 7 Plaintiff's Exhibit 2 | 7 1600 Woodmere Drive, Birmingham, |
| 8 Hyundai Team Member Handbook.........84 | 8 Alabama, on June 10, 2008, beginning at |
| 9 Plaintiff's Exhibit 3 | 9 or about 9:10 a.m., MICHAEL WAYNE |
| 10 Team Relations Memo 8/1/2006........138 | 10 SWINDLE, witness in the above cause, |
| 11 Plaintiff's Exhibit 4 | 11 for oral examination, whereupon, the |
| 12 Team Relations Memo 8/7/2006........140 | 12 following proceedings were had: |
| 13 Plaintiff's Exhibit 5 | 13 |
| 14 Team Relations Memo 8/1/2006........141 | 14 THE VIDEOGRAPHER: We now |
| 15 Plaintiff's Exhibit 6 | 15 commence the deposition in the matter |
| 16 Charge of Discrimination............142 | 16 of Tammy Edwards versus Hyundai Motor |
| 17 Plaintiff's Exhibit 7 | 17 Manufacturing Alabama, LLC, and Mike |
| 18 Memo 8/26/2006.....................142 | 18 Swindle individually, Civil Action |
| 19 Plaintiff's Exhibit 8 | 19 Number 2:07-cv-908-MHT, in the United |
| 20 HMMA Harassment Policy.............352 | 20 States District Court for the Middle |
| 21 Plaintiff's Exhibit 9 | 21 District of Alabama, Northern Division, |
| 22 HMMA Equal Employment Opportunity | 22 Susan Pope, videographer. Today is |
| 23 Policy.............................353 | 23 Tuesday, June 10th, 2008. The time is |
| 6 | 8 |

1  now 9:10 a.m.  The location is the
2  offices of the Haynes & Haynes, 1600
3  Woodmere Drive, Birmingham, Alabama.
4  The deponent is Mr. Mike Swindle.  The
5  deponent will be sworn and the
6  attorneys will then introduce
7  themselves.
8          THE COURT REPORTER:  Would you
9  gentlemen and lady like the usual
10 stipulations?
11       MR. BOSTICK:  That's fine.
12       MR. DYKES:  Fine.
13       MS. HAYNES:  That's fine with
14 me.
15          THE COURT REPORTER:  Would you
16 raise your right hand, please, Mr.
17 Swindle, to be sworn?
18
19       MICHAEL WAYNE SWINDLE,
20 being first duly sworn, was examined
21 and testified as follows:
22       MS. HAYNES:  Alicia Haynes for
23 the plaintiff, Tammy Edwards.

9

1          MR. DYKES:  Toby Dykes for the
2  defendant, Mike Swindle.
3          MR. BOSTICK:  Brian Bostick
4  for the defendant, Hyundai Motor
5  Manufacturing Alabama, LLC.
6          MS. HAYNES:  Do we need Mr.
7  Smith on the record since he's an
8  attorney?
9          MR. BOSTICK:  Chris Smith is
10 in-house counsel for the defendant.
11 EXAMINATION BY MS. HAYNES:
12     Q.    All right.  Mr. Swindle, if
13 you would, please state your full name
14 for the record, please, sir.
15     A.    **Michael Wayne Swindle.**
16     Q.    And have you ever given a
17 deposition before, Mr. Swindle?
18     A.    **No, ma'am.**
19     Q.    What is your address, please?
20     A.    ████████████████ **Lane,**
21 **Montgomery, Alabama.**
22     Q.    And how long have you lived at
23 that address?

10

1     A.    **Eight months.**
2     Q.    Who lives with you at that
3  address?
4     A.    **My wife, my daughter, and my**
5  **son.**
6     Q.    What is your wife's name,
7  please?
8     A.    ████████
9     Q.    Maiden name?
10    A.    ████████████████**L.**
11    Q.    Are your children over the age
12 of nineteen?
13    A.    **No, ma'am.**
14    Q.    What are their ages?
15    A.    **Eight and seventeen.**
16    Q.    Is your daughter the youngest
17 or the oldest?
18    A.    **The oldest.**
19    Q.    What is your date of birth?
20    A.    ████████████.
21    Q.    And where are you currently
22 employed?
23    A.    **Hyundai Motor Manufacturing.**

11

1     Q.    How long have you been
2  employed there?
3     A.    **Four and a half years.**
4     Q.    Where were you employed
5  previous?
6     A.    **Rheem Manufacturing.**
7          THE COURT REPORTER:  I'm
8  sorry?
9     A.    **Rheem.**
10    Q.    R-H-E-E-M?
11    A.    **Yes, ma'am.**
12    Q.    And how long were you employed
13 there?
14    A.    **Fourteen years.**
15    Q.    Prior to Rheem, where were you
16 employed?
17    A.    **City of Montgomery.**
18    Q.    How long were you employed
19 with the City of Montgomery?
20    A.    **Three years.**
21    Q.    Any employment prior to the
22 City of Montgomery --
23    A.    **Cas --**

12

| | |
|---|---|
| 1  Q.  Full-time employment? | 1  Q.  And what year did you leave |
| 2  A.  **Yeah, Castex.** | 2  school? |
| 3  Q.  Spell that, please, sir. | 3  A.  **Beginning of '87, '86 -- I** |
| 4  A.  **C-A-S-T-E-X.** | 4  **think it was '87.** |
| 5  Q.  T-X or -- | 5  Q.  But the end of your tenth- |
| 6  A.  **T-E -- T-E-X.** | 6  grade year? |
| 7  Q.  And how long were you employed | 7  A.  **Yes, ma'am.** |
| 8  with Castex? | 8  Q.  Had you already signed up for |
| 9  A.  **Maybe two years.** | 9  the military when you were in the tenth |
| 10  Q.  Any full-time employment prior | 10  grade? |
| 11  to that time? | 11  A.  **No, ma'am.** |
| 12  A.  **No, ma'am.  I was in the** | 12  Q.  Okay.  What did you do between |
| 13  **military, National Guard.** | 13  the tenth grade and signing up for |
| 14  Q.  How long were you in the | 14  National Guard? |
| 15  National Guard? | 15  A.  **Summer, it was no school.** |
| 16  A.  **Two and a half years.** | 16  Q.  Okay. |
| 17  Q.  What was your rank? | 17  A.  **I went in the military instead** |
| 18  A.  **E-2.** | 18  **of going back to school.** |
| 19  Q.  The whole time you were there? | 19  Q.  How old were you when you |
| 20  A.  **Yes, ma'am, well, E-1 and then** | 20  signed up for the -- |
| 21  **I moved to E-2.** | 21  A.  **Seventeen years old.** |
| 22  Q.  Were you discharged? | 22  Q.  And did you work in the |
| 23  A.  **Yes, ma'am.** | 23  National Guard and the City of |
| 13 | 15 |

| | |
|---|---|
| 1  Q.  Honorable? | 1  Montgomery at the same time? |
| 2  A.  **Yes, ma'am.** | 2  A.  **I wasn't full-time National** |
| 3  Q.  What year? | 3  **Guard.  It was only one weekend a** |
| 4  A.  **1990.** | 4  **month.** |
| 5  Q.  When did you start? | 5  Q.  Okay.  When did you work for |
| 6  A.  **In -- in the middle of '87.** | 6  Castex, was that while you were in |
| 7  Q.  Did you have any employment | 7  school? |
| 8  while you were in the National Guard, | 8  A.  **I might not have the dates.** |
| 9  any other employment? | 9  **It was all right there close together.** |
| 10  A.  **Just there, just City of** | 10  Q.  Okay.  What did you do for |
| 11  **Montgomery.** | 11  Castex? |
| 12  Q.  Did you graduate from high | 12  A.  **I was a carpet cleaner.** |
| 13  school? | 13  Q.  What type of company were |
| 14  A.  **No, ma'am.** | 14  they? |
| 15  Q.  Do you have a GED? | 15  A.  **Fire and water damage, carpet,** |
| 16  A.  **Yes, ma'am.** | 16  **painting.** |
| 17  Q.  What's the highest grade you | 17  Q.  Okay.  And why did you leave |
| 18  went in high school? | 18  Castex? |
| 19  A.  **Tenth.** | 19  A.  **For the City of Montgomery.** |
| 20  Q.  Did you finish the tenth? | 20  Q.  Better job? |
| 21  A.  **Yes.** | 21  A.  **Yes, ma'am.** |
| 22  Q.  You did? | 22  Q.  And what did you do for the |
| 23  A.  **Yes, ma'am.** | 23  City of Montgomery? |
| 14 | 16 |

| | |
|---|---|
| 1    **A.   Sanitation department.** | 1   health insurance? |
| 2    **Q.**   What was your job? | 2    **A.   No, I -- no.** |
| 3    **A.   Garbage collector.** | 3    **Q.**   Okay. What year did you go to |
| 4    **Q.**   The whole three years? | 4   work for Hyundai? |
| 5    **A.   Yes, ma'am.** | 5    **A.   '04.** |
| 6    **Q.**   And why did you leave City of | 6    **Q.**   Do you know what month in |
| 7   Montgomery? | 7   2004? |
| 8    **A.   Rheem, better job.** | 8    **A.   January 4th.** |
| 9    **Q.**   Okay. What did you do for | 9    **Q.**   And what was your first |
| 10   Rheem? | 10   position with Hyundai? |
| 11    **A.   I was a welder.** | 11    **A.   Team member.** |
| 12    **Q.**   Did you go to a trade school | 12    **Q.**   What was your first job? |
| 13   before going to Rheem? | 13    **A.   That was my first job, team** |
| 14    **A.   No, ma'am.** | 14   **member, it was --** |
| 15    **Q.**   Just on-the-job training? | 15    **Q.**   Doing what? |
| 16    **A.   Yes, ma'am.** | 16    **A.   Working with the robots.** |
| 17    **Q.**   Any certifications? | 17    **Q.**   What department? |
| 18    **A.   No, ma'am.** | 18    **A.   Body shop.** |
| 19    **Q.**   What was your first job at | 19    **Q.**   How did you learn about the |
| 20   Rheem? | 20   job at Hyundai? |
| 21    **A.   I was assembler.** | 21    **A.   I went to Fannick for robot** |
| 22    **Q.**   I'm sorry? | 22   **training, and other than that, it was** |
| 23    **A.   Assembler.** | 23   **on-the-job training.** |
| <div align="center">17</div> | <div align="center">19</div> |
| 1    **Q.**   And then moved to a welder? | 1    **Q.**   I'm sorry, my question was: |
| 2    **A.   Yes, ma'am.** | 2   How did you learn there was an option |
| 3    **Q.**   How long were you a welder for | 3   for a position at Hyundai? |
| 4   Rheem? | 4    **A.   I was -- I was put into that** |
| 5    **A.   My last four years.** | 5   **department when I started. I mean, I** |
| 6    **Q.**   And why did you leave Rheem? | 6   **didn't -- there was no bidding on that** |
| 7    **A.   To go to work at Hyundai.** | 7   **job.** |
| 8    **Q.**   Was that a better job? | 8    **Q.**   You were working at Rheem? |
| 9    **A.   Yes, ma'am.** | 9    **A.   Newspaper.** |
| 10    **Q.**   What was your last pay at | 10    **Q.**   Okay. Did you interview? |
| 11   Rheem? | 11    **A.   Yes, ma'am.** |
| 12    **A.   Fourteen ninety-one.** | 12    **Q.**   Who did you interview with? |
| 13    **Q.**   Fourteen ninety-one an hour? | 13    **A.   AIDT.** |
| 14    **A.   Yes, ma'am.** | 14    **Q.**   What does that stand for? |
| 15    **Q.**   Any bonuses or other benefits | 15    **A.   Alabama Industrial Training or** |
| 16   at Rheem? | 16   **something. I don't really know.** |
| 17    **A.   No, ma'am.** | 17    **Q.**   When is the first time you |
| 18    **Q.**   You didn't have insurance? | 18   interviewed with someone at Hyundai, if |
| 19    **A.   Yeah, I had insurance.** | 19   you ever did? |
| 20    **Q.**   Health insurance? | 20    **A.   I guess maybe July of '03, I** |
| 21    **A.   Yeah, BlueCross BlueShield.** | 21   **guess. I'm not really sure.** |
| 22    **Q.**   Any other employee benefits at | 22    **Q.**   Okay. Did you give notice at |
| 23   Rheem other than BlueCross BlueShield | 23   Rheem that you were going to work at |
| <div align="center">18</div> | <div align="center">20</div> |

1 Hyundai?
2     **A.**    **Yes, ma'am.**
3     **Q.**    Did you have to work out a
4 notice?
5     **A.**    **Yes, ma'am.**
6     **Q.**    How long a notice?
7     **A.**    **Two weeks.**
8     **Q.**    Did you go through any
9 training or orientation period before
10 moving into the position as team member
11 in the robot department -- I'm sorry,
12 it was body shop department working
13 with robots, did you go through any
14 training or orientation with Hyundai?
15     **A.**    **Only the AIDT classes, what**
16 **everybody goes through.**
17     **Q.**    Was that specific to Hyundai?
18     **A.**    **Yeah.**
19     **Q.**    It was?
20     **A.**    **Yes, ma'am.**
21     **Q.**    Were you trained on the
22 policies and procedures of Hyundai?
23     **A.**    **At that time, no.**

21

1     **Q.**    When did you have training?
2     **A.**    **After I started.**
3     **Q.**    When was that?
4     **A.**    **After January 4th.**
5     **Q.**    Were you working on the line
6 when you received the training?
7     **A.**    **No, ma'am.**
8     **Q.**    Before?
9     **A.**    **The plant wasn't even finished**
10 **when I started.**
11     **Q.**    Okay. Who was your supervisor
12 in January 2004?
13     **A.**    **Tom Bondy.**
14     **Q.**    What was his position?
15     **A.**    **He was manager.**
16     **Q.**    Manager of the body shop?
17     **A.**    **Yes, ma'am.**
18     **Q.**    Did you know Mr. Bondy
19 previous?
20     **A.**    **No, ma'am.**
21     **Q.**    Any other managers that you
22 reported to directly or indirectly?
23     **A.**    **Harry White, assistant**

22

1 manager.
2     **Q.**    Assistant manager of the body
3 shop?
4     **A.**    **Yes, ma'am.**
5     **Q.**    Is Mr. Bondy still manager of
6 the body shop?
7     **A.**    **Yes, ma'am.**
8     **Q.**    And is Mr. White still
9 assistant manager of the body shop?
10     **A.**    **No, ma'am.**
11     **Q.**    What position is he in?
12     **A.**    **He's the manager of -- he's an**
13 **engineer manager.**
14     **Q.**    Is he over a certain
15 department?
16     **A.**    **The engineers.**
17     **Q.**    Have you reported to anyone
18 else during the period of time you've
19 been at Hyundai other than Tom Bondy?
20     **A.**    **I had a senior manager, Rob**
21 **Katzenbach.**
22     **Q.**    When?
23     **A.**    **From the time I started 'til**

23

1 **maybe a year and a half ago when he got**
2 **moved.**
3     **Q.**    Where did he move to?
4     **A.**    **Paint shop.**
5     **Q.**    What was your next position
6 with Hyundai after team member in the
7 robot -- with robots in the body shop
8 department?
9     **A.**    **Team leader.**
10     **Q.**    Any other positions you've
11 held?
12     **A.**    **No, ma'am.**
13     **Q.**    What is your current position?
14     **A.**    **Team leader.**
15     **Q.**    How long have you been a team
16 leader?
17     **A.**    **Two and a half years, roughly.**
18     **Q.**    Do you know when you were
19 promoted?
20     **A.**    **No, ma'am.**
21     **Q.**    What is the difference in your
22 duties as a team member and a team
23 leader?

24

1      A.    Team member, I run the line,
2   and team leader, I make sure that the
3   line is being run, I make sure
4   everybody is doing what they're
5   supposed to be doing.
6      Q.    Do you manage employees?
7      A.    No, I -- I don't manage them.
8      Q.    Well, when you were a team
9   member in the body shop department
10  working with robots, who was your team
11  leader?
12     A.    Toby Chance.
13     Q.    And is Mr. Chance still a team
14  leader out there?
15     A.    No, ma'am.
16     Q.    What is his position?
17     A.    He's a weld engineer.
18     Q.    Is that a promotion for Mr.
19  Chance, going from team leader to weld
20  engineer?
21     A.    Yes.
22     Q.    As a weld engineer, what does
23  he do?

25

1      A.    No.
2      Q.    Who's over the engineers?
3      A.    Harry White, the manager.
4      Q.    Harry White you told me was
5   the assistant manager of the body shop?
6      A.    I said that he -- yeah, he was
7   assistant manager of the body shop when
8   I started, and he got a promotion to
9   manager over the engineers.
10     Q.    Okay.  So the engineers report
11  to a different supervisor?
12     A.    Different manager, yes, ma'am.
13     Q.    All right.  How many parts
14  loader -- parts loaders are there in
15  the body shop, how many employees?
16     A.    I have no idea right off how
17  many there is.
18     Q.    How many employees are in the
19  body shop?
20     A.    Roughly a hundred.
21     Q.    Is that on all shifts or one
22  shift?
23     A.    Just one shift.

27

1      A.    Controls the welds.
2      Q.    Can you be more specific?
3      A.    If we have cold welds on the
4   line, I tell Toby, and Toby makes the
5   proper adjustments.
6      Q.    What is a cold weld?
7      A.    A weld that's no good.
8      Q.    Is he actually doing the
9   welding?
10     A.    Robots do the welding.
11     Q.    Okay.  Is that like a quality
12  control or quality assurance-type
13  position as a weld engineer?
14     A.    No, he's not -- no.  We have a
15  quality department that does that.
16     Q.    What are the different
17  positions in the body shop?
18     A.    Parts loader, keeper, team
19  leader, group leader, assistant
20  manager, and manager and the engineers.
21     Q.    And is that the order, the
22  reporting order?  Are the engineers
23  over the managers?

26

1      Q.    Okay.  How many shifts does
2   Hyundai run in the --
3      A.    Two.
4      Q.    -- body shop?
5      A.    Two shifts.
6      Q.    What are the times?
7      A.    First shift is 6:30 to 3:15,
8   night shift is five -- 6:15 'til three
9   o'clock.
10     Q.    And what happens during the
11  break periods there from the 3:15 to
12  the 6:15 time period, is there
13  maintenance or is the plant just down?
14     A.    It depends on circumstances of
15  what's going on before break.  If my
16  line's down, we might have to run
17  through break.
18     Q.    But you're running a shift
19  from 6:30 a.m. to 3:15 p.m.?
20     A.    Yeah.
21     Q.    And the next shift does not
22  start 'til 6:15 p.m.?
23     A.    Oh, okay.  That is maintenance

28

1  **work.**

2    Q.  Okay.

3    A.  **Whatever needs to be done.**

4    Q.  All right.  On the machines or

5  the robots; is that correct?

6    A.  **Yes, ma'am.**

7    Q.  And the same thing happens

8  between the three a.m. shift and the

9  6:30 a.m.?

10    A.  **Yes.**

11    Q.  Are there any departments at

12  Hyundai that run three shifts?

13    A.  **Engine shop, I heard that the**

14  **engine shop runs three shifts.  I don't**

15  **know.  I don't work -- I haven't worked**

16  **over there.**

17    Q.  Okay.  What shifts have you

18  worked at Hyundai?

19    A.  **The day shift and the night**

20  **shift, I've rotated between both.**

21    Q.  What shift are you currently?

22    A.  **First shift.**

23    Q.  So you worked off yesterday at

29

---

1  3:15?

2    A.  **Yes, ma'am.**

3    Q.  Did you work yesterday?

4    A.  **Yes, ma'am.**

5    Q.  Five days a week?

6    A.  **Yes, ma'am.**

7    Q.  Any overtime?

8    A.  **Yes, ma'am.**

9    Q.  Every week do you work

10  overtime?

11    A.  **Roughly an hour a day.**

12    Q.  And what's the basis of

13  working overtime an hour a day?

14    A.  **Because I have to get there**

15  **and make sure the line's ready, and**

16  **then I stay over if we have to stay**

17  **over.**

18    Q.  As a team leader, are you

19  salaried or hourly?

20    A.  **Hourly.**

21    Q.  In the body shop, there are

22  approximately one hundred people; is

23  that right?

30

---

1    A.  **I would say.**

2    Q.  Okay.

3    A.  **Might be more, may be less.**

4    Q.  Okay.  Approximately?

5    A.  **Uh-huh.**

6    Q.  And how are those people

7  divided up between the positions that

8  you told me, parts loader, keeper, team

9  leaders, group leaders, and I assume

10  there is only one assistant manager and

11  only one manager; is that correct?

12    A.  **That's not correct.**

13    Q.  Okay.  How many assistant

14  managers are there?

15    A.  **Two assistant managers.**

16    Q.  How many managers?

17    A.  **One manager.**

18    Q.  Okay.

19    A.  **Over the body shop.**

20    Q.  Who are the assistant

21  managers?

22    A.  **Vince Gahafer.**

23      THE COURT REPORTER:  I'm

31

---

1  sorry?

2    A.  **Vince Gahafer.**

3      THE COURT REPORTER:  Do you

4  have any idea how to spell that?

5    A.  **G-A-H-A-F-E-R.**

6    Q.  And the other assistant

7  manager?

8    A.  **Michael O'Keefe.**

9    Q.  And were both of these

10  individuals assistant managers in 2006?

11    A.  **No.**

12    Q.  Who were the assistant

13  managers in 2006?

14    A.  **Harry White.**

15    Q.  Anyone else?

16    A.  **I don't remember, maybe Mike**

17  **Henry.  I don't remember.**

18    Q.  Was there only one assistant

19  manager in 2006?

20    A.  **I don't remember.**

21    Q.  Who's the current manager?

22    A.  **Current manager is Tom Bondy.**

23    Q.  And he was there in 2006?

32

1    A.    Yes, ma'am.
2    Q.    All right.  Who are the group
3  leaders currently?
4    A.    Chris Worley and Billy
5  Kitchens.
6    Q.    Mr. Kitchens was there in
7  2006, correct?
8    A.    Yes, ma'am.
9    Q.    Was Mr. Worley?
10    A.    Yes, ma'am.
11    Q.    Is Mr. Worley on the second
12  shift?
13    A.    Yes, ma'am.
14    Q.    And Mr. Kitchens is on the
15  first shift?
16    A.    Yes, ma'am.
17    Q.    How about the assistant
18  managers when it was Mr. White and
19  Mr. O'Keefe; is that correct?
20    A.    Mike O'Keefe just come to our
21  shop.
22    Q.    Okay.  And it was Mr. --
23    A.    Mr. White was the only

33

1    A.    Ten people.
2    Q.    Okay.  Just tell me first
3  shift.  You have you?
4    A.    Myself, Mylavanh Phomsavanh.
5    Q.    Okay.  Do you have any idea
6  how to --
7    A.    No, ma'am.
8    Q.    Say it again.
9    A.    Mylavanh Phomsavanh.
10    Q.    Okay.
11    A.    Keith Ulrich.
12    Q.    That's U-L-R-I-C-H?
13    A.    Yes, ma'am.
14    Q.    Okay.
15    A.    Richard Bush.
16    Q.    Is it like the president?
17    A.    Yes, ma'am.
18    Q.    Okay.
19    A.    Craig Hayes.
20    Q.    H-A-Y?
21    A.    H-A-Y-E-S, Hayes.
22    Q.    Any others?
23    A.    Did I give you five?

35

1  assistant manager at that time.
2    Q.    Did he work first or second
3  shift?
4    A.    He rotated sometimes.  He
5  wasn't -- it was only one manager, one
6  assistant manager.  Tom never worked
7  night shift.  Harry would work night
8  shift if there was a special project or
9  something that needed to be done.
10    Q.    All right.  Mr. Bondy was only
11  on first shift?
12    A.    Yes.
13    Q.    Is that correct?
14    A.    That's correct.
15    Q.    But Mr. Harry White, the
16  assistant manager, would work both
17  shifts?
18    A.    Yes.
19    Q.    Who are the current team
20  leaders besides yourself?
21    A.    Both shifts?
22    Q.    Yes, sir.  How many people are
23  we talking about?

34

1    Q.    You did.
2    A.    That's it.
3    Q.    Okay.  And that's all first
4  shift?
5    A.    Yes, ma'am.
6    Q.    Second shift team leaders,
7  please, sir?
8    A.    Tommy Robertson.
9    Q.    Robertson?
10    A.    Yes, ma'am.  Tommy Brown,
11  Jason Thornton, Jason Driggers, and
12  Terrance Battle.
13    Q.    Battle?
14    A.    B-A-T-T-L-E.
15    Q.    Okay.  These are all the
16  current team leaders; is that correct?
17    A.    Yes, ma'am.
18    Q.    Was there a change in 2006
19  that any of these were not in that same
20  position?
21    A.    Terrance Battle was not a team
22  leader at that time; he was a team
23  member.  Richard Bush was not a team

36

1   leader at that time; he was a team
2   member. And Jason Driggers was not a
3   team leader at that time; he was a team
4   member. I believe that's it.
5       Q.   Okay. Who did they replace,
6   Driggers, Battle, and Bush?
7       A.   Richard Bush replaced Dawn
8   Magruder.
9       Q.   Don?
10      A.   Dawn.
11      Q.   McGrigger?
12      A.   Magruder.
13      Q.   Okay. And Mr. Driggers
14  replaced whom?
15      A.   April Smith, and Terrance
16  Battle replaced Toby Chance.
17      Q.   Where did Ms. McGregor (sic)
18  move to, Ms. McGregor?
19      A.   Magruder?
20      Q.   Magruder, I'm sorry?
21      A.   She moved -- she's in moving
22  parts.
23      Q.   Is that still team leader?

                    37

1       A.   No, ma'am.
2       Q.   Is that a team --
3       A.   Member.
4       Q.   Why did she move from a team
5   leader back to a team member?
6       A.   I have no idea.
7       Q.   Didn't hear anything?
8       A.   Nope.
9       Q.   No scuttlebutt, no coffee pot
10  talk?
11      A.   Nope.
12      Q.   Okay. April Smith, why did
13  she -- where did she move?
14      A.   She no longer works with the
15  plant.
16      Q.   Was she fired?
17      A.   Yep. Yes.
18      Q.   Why?
19      A.   I have no clue. I do not
20  know.
21      Q.   No coffee pot talk?
22      A.   No, ma'am.
23      Q.   Okay. Toby Chance you told me

                    38

1   moved to an engineer?
2       A.   Yes, ma'am.
3       Q.   Currently are there any women
4   team leaders in the body shop on either
5   shift?
6       A.   No.
7       Q.   The keeper position in the
8   body shop, how many employees work in
9   that department?
10      A.   As a keeper?
11      Q.   Yes, sir.
12      A.   I couldn't give you an exact
13  number. I don't know. It's --
14      Q.   More than twenty-five, more
15  than thirty?
16      A.   I'd say more than twenty-five,
17  less than forty.
18      Q.   Do those people report
19  directly to you?
20      A.   No.
21      Q.   Do you manage them in any
22  fashion?
23      A.   No.

                    39

1       Q.   Who do you manage?
2       A.   People on my --
3           MR. DYKES: Object to the
4   form.
5       Q.   People where?
6       A.   Only the people that's under
7   me is the people that's on my line.
8       Q.   And what line are you working?
9       A.   Body build/body respot.
10      Q.   Are those parts loaders or
11  keepers?
12      A.   I have a parts loader, two
13  weld checkers.
14      Q.   Okay. Hold on. What is the
15  name of your line?
16      A.   Body build and body respot.
17      Q.   Body build and body respot?
18      A.   (Nodding.)
19      Q.   And what does that line do or
20  responsible for, what tasks?
21      A.   We put everything together,
22  put the sides to the floor and put a
23  roof on and put all the welds on it.

                    40

1    Q.    On a vehicle?

2    A.    **On a vehicle.**

3    Q.    A certain vehicle?

4    A.    **Both, NF and CM.**

5    Q.    Are you explain that?

6    A.    **Sonata and Santa Fe.**

7    Q.    Sonata is -- the initials

8    are -- what do you refer to it as?

9    A.    **Sonata's an NF.**

10    Q.    NF?

11    A.    **Yes.**

12    Q.    And the other vehicle?

13    A.    **Is a CM.**

14    Q.    And it's -- what did you tell

15    me is the real name of it?

16    A.    **Santa Fe.**

17    Q.    Santa Fe. All right. Going

18    back to your line, the body build and

19    the body respot, can you tell me what

20    that line does in detail?

21    A.    **Puts the floor to the sides,**

22    **welds the roof on, makes the welds, all**

23    **the welds that's on the body, and it**

41

1    **leaves me.**

2    Q.    And it leaves you?

3    A.    **Leaves my area.**

4    Q.    Okay. How long is each

5    vehicle in your area?

6    A.    **From one side of the line to**

7    **the next, twenty-five minutes.**

8    Q.    And how many people are on

9    your line?

10    A.    **I have nine people.**

11    Q.    And can you tell me the

12    positions or the titles those nine

13    people that work under you are given?

14    A.    **I have two weld checkers.**

15    Q.    Okay. Two weld checkers?

16    A.    **One parts loader, roof sub**

17    **operator.**

18    Q.    I'm sorry, I didn't hear that

19    at all.

20    A.    **A roof sub operator.**

21    Q.    You have one of those?

22    A.    **One.**

23    Q.    Okay.

42

1    A.    **And three keepers -- four**

2    **keepers.**

3    Q.    At the beginning of the line,

4    which individuals or positions are

5    there as the car progresses through you

6    line, or are they all there together?

7    A.    **It's only keepers on the**

8    **lines. My parts loader and my weld**

9    **checkers are on body respot.**

10    Q.    Okay. So it's two lines?

11    A.    **Two lines.**

12    Q.    All right. Tell me the duties

13    of a weld checker.

14    A.    **Do a drive check on every --**

15    **they have -- every time a car stops,**

16    **they have a different area they have to**

17    **do drive checks on.**

18    Q.    Drive, is that what you're

19    saying, drive?

20    A.    **Drive checks.**

21    Q.    Okay. What is that?

22    A.    **They use a chisel and a**

23    **hammer, hit the welds to see if they'll**

43

1    **break or not.**

2    Q.    Okay.

3    A.    **If any welds are cold, they**

4    **have to report it to me, and I report**

5    **it to Toby.**

6    Q.    And then that happens?

7    A.    **Toby fixes the welds.**

8    Q.    Okay. So is Toby Chance

9    assigned to your particular line?

10    A.    **The whole shop.**

11    Q.    Okay. There's only one

12    engineer?

13    A.    **Only one weld engineer.**

14    Q.    One weld engineer per that

15    body shop; is that correct?

16    A.    **Yes.**

17    Q.    All right. Parts loader, what

18    is that --

19    A.    **Only load parts.**

20    Q.    -- position?

21    A.    **Load parts at Station 322.**

22    Q.    And is that working with the

23    robot?

44

1    A.    **No.**
2    Q.    What is it doing?
3    A.    **Just loading parts.**
4    Q.    Well, explain what he does.
5    A.    **Gets the parts of out of a**
6    **bin, puts them on the jig and hits a**
7    **button, the robot picks it up and puts**
8    **it on the car.**
9    Q.    Okay.  Roof sub operator, what
10   does that position do?
11   A.    **He builds roofs for the Santa**
12   **Fe -- for the NF and the CMs.**
13   Q.    How does he build roofs, is he
14   just placing a fabricated roof on top
15   of the vehicle?
16   A.    **He runs the robots and -- and**
17   **loads parts.  That's an area all to**
18   **itself.  He loads parts, runs the**
19   **robots, and anything else that needs to**
20   **be done.**
21   Q.    Okay.  And the four keepers,
22   what are they doing?
23   A.    **One day they're a keeper, the**
                        45

1    **next day they rotate out with the other**
2    **people and drive check and load parts.**
3    Q.    As keepers, they're loading
4    parts?
5    A.    **Everybody is considered a**
6    **keeper on my line.  It's just I was**
7    **giving you the descriptions of the**
8    **jobs.**
9    Q.    I'm not understanding what a
10   keeper does when it's not rotating.
11   A.    **Makes sure the line's running,**
12   **they make sure the line's running,**
13   **clear any faults, change caps at lunch.**
14   Q.    Change caps at lunch?
15   A.    **On the welders.**
16   Q.    Okay.  Anything else?
17   A.    **Clean, they clean every day.**
18   Q.    Okay.  Anything else?
19   A.    **No.**
20   Q.    Okay.  The people who work for
21   you on the body build/body respot,
22   these nine people, have they worked for
23   you since 2006?
                        46

1    A.    **Some have, some haven't.**
2    Q.    In 2006, was this the line you
3    were responsible for?
4    A.    **Yes.**
5    Q.    Was this is the same job you
6    were responsible for?
7    A.    **Yes.**
8    Q.    And you went into that
9    position when?
10   A.    **When I made team leader.**
11   Q.    I'm sorry, what date was that
12   that you made team leader?
13   A.    **I don't know.**
14   Q.    You told me two and a half
15   years?
16   A.    **Roughly.  I don't know the**
17   **exact date when I made team leader.**
18   Q.    Do you remember the year?
19   A.    **No.**
20   Q.    Were you a team leader in
21   2006?
22   A.    **Yes.**
23   Q.    Were you a team leader in
                        47

1    2005?
2    A.    **I don't remember.  I don't --**
3    **I don't know.**
4    Q.    Have you ever seen your
5    personnel file?
6    A.    **Nope.**
7    Q.    Would there be a document that
8    would indicate when you would have
9    become a team leader?
10   A.    **I would imagine.**
11   Q.    I'm going to show you your
12   personnel file and see if you can flip
13   through the document -- I'm marking
14   this as Plaintiff's Exhibit 1.
15              (Plaintiff's Exhibit 1 was
16              marked for identification.
17              A copy is attached.)
18         MS. HAYNES:  And Brian, I'm
19   sorry, Jenny made three copies.  I
20   guess she forgot --
21         MR. BOSTICK:  That's okay.
22         MS. HAYNES:  At our first
23   break, I'll make sure she runs you
                        48

1  copies.
2      MR. BOSTICK:  That's all
3  right.  I can look on --
4      MS. HAYNES:  I guess she just
5  forgot.
6      MR. BOSTICK:  She normally
7  just makes three.
8      Q.  (BY MS. HAYNES) Yeah.  I saw
9  performance evaluations, and there's
10  some computer screens here that I can't
11  really read, and maybe it's indicated
12  on some of the SAP documents but --
13      MR. DYKES:  Look at Bates
14  stamp 463, that's probably --
15      Q.  Is that the document that --
16      A.  **I guess so.**
17      Q.  April 27th, 2006, has a
18  signature?
19      A.  **Yes, ma'am.**
20      Q.  And it says "Reason For
21  Action - Promotion"; is that correct?
22      A.  **Yes, ma'am.**
23      Q.  Does that refresh your

49

1      A.  **No, I did not.  The shifts**
2  **split, we had two shifts.**
3      Q.  Okay.
4      A.  **And I was team leader on one**
5  **shift, he was team leader on the other**
6  **shift.**
7      Q.  Okay.  Were you on first
8  shift?
9      A.  **We -- we rotated.**
10      Q.  How?
11      A.  **At that time, every four**
12  **months.**
13      Q.  So when you went into the
14  position in April of 2006, were you on
15  the night or day shift?
16      A.  **I don't remember what shift I**
17  **was on then.**
18      Q.  Can you tell that by looking
19  at Plaintiff's Exhibit 1, Bates Number
20  463, what shift you were working?
21      A.  **No.**
22      Q.  Is there a shift differential
23  paid for the second shift?

51

1  recollection when you went into that
2  position?
3      A.  **Yes, ma'am.**
4      Q.  Or became -- received the
5  promotion to team leader?
6      A.  **Uh-huh.**
7      Q.  Is that "yes"?
8      A.  **Yes.**
9      Q.  All right.  Prior to being a
10  team leader, where were you a team
11  member?
12      A.  **Body build/body respot.**
13      Q.  The same?
14      A.  **Same line.**
15      Q.  Okay.  Who was your team
16  leader?
17      A.  **Toby Chance.**
18      Q.  All right.  And when you
19  moved -- did you move into Toby
20  Chance's position as team leader?
21      A.  **No, I did not.**
22      Q.  Okay.  You went to another
23  line?

50

1      A.  **Yes.**
2      Q.  How much?
3      A.  **A dollar.**
4      Q.  Is there overtime also on both
5  shifts?
6      A.  **Yes, ma'am.**
7      Q.  Do you know if in April 2006
8  you were receiving the shift
9  differential?
10      A.  **I don't know, because this**
11  **dollar more an hour, that could be team**
12  **leader pay, 'cause the team leader**
13  **makes a dollar more an hour than**
14  **everybody else, but then you get a**
15  **dollar for working night shift.**
16      Q.  A dollar an hour?
17      A.  **Everybody does.**
18      Q.  Okay.  Who else worked --
19  well, let me strike that.  On the line
20  with you currently --
21      A.  **Who works there now?**
22      Q.  Well, how many men and how
23  many women work on that line with you,

52

1  body build/body respot?

2     A.   Two women.

3     Q.   Who are they?

4     A.   Sharon Newton and Dorothy

5  Bellamy.

6     Q.   How long have they been

7  employed with Hyundai?

8     A.   I don't know.

9     Q.   Were they on the line when you

10  went there as team --

11     A.   No.

12     Q.   -- leader?

13     A.   No.

14     Q.   Have they come to Hyundai

15  since -- well, strike that.  Have they

16  been employed -- or were they employed

17  in 2006?

18     A.   Sharon, yes; Dot, I don't

19  know.

20     Q.   Both were there in 2007?

21     A.   Yes.

22     Q.   Who else works in body

23  build/body respot on your line?

<center>53</center>

1     A.   Charles Harris and Jeffrey

2  Weeks, Holland Perryman, Kenneth

3  Phillips, Dan Koestler.

4     Q.   Is that K-E-S-S-L-E-R?

5     A.   K-O-E-S-T-L-E-R.

6     Q.   And have these individuals --

7     A.   One more.

8     Q.   I'm sorry?

9     A.   Joey Alford.

10     Q.   Can you spell that?  I know

11  the Joey, but the Alford?

12     A.   A-L-F-O-R-D.

13     Q.   And have all of these

14  individuals other than Ms. Bellamy

15  worked under you since 2006?

16     A.   No.

17     Q.   Who is new?

18     A.   Jeffrey Weeks, Dan Koestler,

19  Sharon, Dot, Holland, and Kenneth.

20     Q.   Almost a new line then; is

21  that correct?

22     A.   Yes.

23     Q.   Who is the last person that

<center>54</center>

1  came to work for you?

2     A.   Holland.

3     Q.   When did he come to work?

4     A.   Maybe January.

5     Q.   This year?

6     A.   Yes, ma'am.

7     Q.   Now, in your previous

8  position when you were a team member

9  and Mr. Chance was your -- did I say

10  that wrong, team member?  When you were

11  a team member and Mr. Chance was your

12  team leader, who all was on that line?

13     A.   Me, Pam Stoddard, Charles

14  Harris, Eric McKee.  That's all I

15  remember.  I don't know.

16     Q.   Just four of you?

17     A.   No.  There was probably more,

18  but I don't remember who all they were.

19     Q.   Okay.  And how long did the

20  four of you work together under Mr.

21  Chance as team members?

22     A.   That group there, I don't

23  know, maybe eight months.

<center>55</center>

1     Q.   Are you friends with Ms.

2  Stoddard?

3     A.   Yes.

4     Q.   And how long have the two of

5  you been friends?

6     A.   I've only known her since

7  we've worked out there.

8     Q.   Since 2004?

9     A.   She hasn't been there since

10  2004 I don't think.

11     Q.   Okay.  Do you know when she

12  came to work?

13     A.   No, ma'am.

14     Q.   Are you -- is she still out

15  there?

16     A.   Yes, ma'am.

17     Q.   Are y'all still friends?

18     A.   Yes, ma'am.

19     Q.   Do you do things away from

20  work?

21     A.   We have.

22     Q.   You go to her house, she comes

23  to your house?

<center>56</center>

1    A.    **Never been to her house.**
2    Q.    Has she been to your house?
3    A.    **Yes, she has.**
4    Q.    How often do the two of you
5    get together on social occasions
6    outside of work?
7    A.    **Since I've known her, maybe**
8    **three times.**
9    Q.    And what have been those three
10   times that you recall?
11   A.    **Her and Rob, her fiancé that**
12   **also works out there, has come to my**
13   **house.**
14   Q.    What is Rob's last name?
15   A.    **Johnson.**
16   Q.    Okay.  So she and Rob have
17   been to your house.  Do you know when
18   that was?
19   A.    **No, I don't.**
20   Q.    Was it in 2006?
21   A.    **I -- I don't remember when it**
22   **was.**
23   Q.    Okay.

57

1    A.    **But I know they have been**
2    **there.**
3    Q.    All right.  Any other
4    occasions?
5    A.    **I've seen --**
6    Q.    You told me three?
7    A.    **I've seen them out at clubs.**
8    Q.    Okay.  What club?
9    A.    **Woodmere.**
10   Q.    Where is that?
11   A.    **Montgomery.**
12   Q.    Okay.  What type club is that?
13   A.    **A tavern.**
14   Q.    Sports bar or bar?
15   A.    **Just a bar.**
16   Q.    Serve food?
17   A.    **Finger food.**
18   Q.    Where in Montgomery?
19   A.    **Woodmere Boulevard.**
20   Q.    Okay.  Where else have you
21   seen her out?
22   A.    **Nowhere.**
23   Q.    Well, you told me three

58

1    occasions --
2    A.    **Yeah.**
3    Q.    -- that y'all have been out
4    socially?
5    A.    **A couple of them at Woodmere,**
6    **and one time she -- her and Rob come to**
7    **my house.**
8    Q.    Okay.  When you've been to the
9    Woodmere club, have these been
10   prearranged occasions where y'all were
11   going to all meet out?
12   A.    **No.**
13   Q.    Okay.  Who else from Hyundai
14   do you meet out at clubs or bars?
15   A.    **I don't set up to meet nobody.**
16   **That's the only club in Montgomery, so**
17   **a lot of Hyundai people go there.**
18   Q.    Who else have you seen out
19   from Hyundai at Woodmere?
20   A.    **Do you want me to name**
21   **everybody?**
22   Q.    Yes, ma'am.
23   A.    **John Kallson, Tom Bondy,**

59

1    Harry --
2         THE COURT REPORTER:  I'm
3    sorry, John, what was that last name?
4    A.    **Kallson, Tom Bondy, Rob**
5    **Katzenbach, Toby, Billy, Pam.**
6    Q.    Hold on just a minute.  You'll
7    have to say first and last names,
8    please, sir.  Toby is Chance?
9    A.    **Toby Chance.**
10   Q.    Billy is Kitchens?
11   A.    **Billy Kitchens, Rob Johnson,**
12   **April Smith, Steve Culpepper, ninety**
13   **percent of the body shop.**
14   Q.    That would be your testimony,
15   ninety percent of the body shop you've
16   seen out at Woodmere Club?
17   A.    **I'm just making a guess, but a**
18   **lot.**
19   Q.    You've never seen Tammy
20   Edwards, have you?
21   A.    **No.**
22   Q.    How often do you go to
23   Woodmere?

60

| | |
|---|---|
| 1   A.   **Now, never.** | 1   Q.   Have you ever seen Stacye |
| 2   Q.   In 2006? | 2   Johnson at Woodmere? |
| 3   A.   **Often.** | 3   A.   **Who?** |
| 4   Q.   "Often" meaning four or five | 4   MS. HAYNES:  Is that her name, |
| 5   times a week? | 5   Stacye Johnson? |
| 6   A.   **No, meaning maybe once every** | 6   MR. BOSTICK:  Stacye Jones. |
| 7   **weekend.** | 7   Q.   Stacye Jones, I'm sorry? |
| 8   Q.   And why don't you go now, is | 8   A.   **Never.** |
| 9   it closed? | 9   Q.   Have you ever seen Robert |
| 10   A.   **No.  I just don't go.** | 10   Katzenbach -- Katzenbach? |
| 11   Q.   When did you stop going to | 11   A.   **I've seen him once.** |
| 12   Woodmere? | 12   Q.   Where? |
| 13   A.   **I mean, I still go, but I** | 13   A.   **Woodmere.** |
| 14   **don't go like I used to go.** | 14   Q.   When was that? |
| 15   Q.   How often do you go now? | 15   A.   **I have no idea when it was.** |
| 16   A.   **Once every two or three** | 16   Q.   Was it in 2006? |
| 17   **months.** | 17   A.   **I don't remember.** |
| 18   Q.   Do Tom Bondy and Toby Chance | 18   Q.   How about Rob Clevenger, have |
| 19   still go? | 19   you seen him -- |
| 20   A.   **I have no clue.** | 20   A.   **Never.** |
| 21   Q.   Have you seen them out? | 21   Q.   -- out clubbing? |
| 22   A.   **No, I haven't.** | 22   A.   **Never.** |
| 23   Q.   How about Billy Kitchens or | 23   Q.   How about Mr. Smith sitting |
| 61 | 63 |

| | |
|---|---|
| 1   Steve Culpepper, have you seen them out | 1   here at the table, have you seen him |
| 2   in, say, the last six months? | 2   out? |
| 3   A.   **No.** | 3   A.   **Never.** |
| 4   Q.   Do you still see Ms. Stoddard | 4   Q.   And did you ride in with him |
| 5   out; have you seen her out in the last | 5   today? |
| 6   six months at Woodmere? | 6   A.   **Yes, I did.** |
| 7   A.   **No, I haven't.  I haven't been** | 7   Q.   When did y'all meet, what time |
| 8   **out in the last six months.** | 8   did y'all meet this morning? |
| 9   Q.   Why is that? | 9   A.   **Six o'clock in Montgom -- in** |
| 10   A.   **Just haven't.** | 10   **Prattville.** |
| 11   Q.   Well, why would you go from | 11   Q.   Okay.  Did you come straight |
| 12   every -- going out every weekend to | 12   here? |
| 13   you're not going out? | 13   A.   **We ate breakfast.** |
| 14   A.   **No reason, just wanted a** | 14   Q.   Where did you eat breakfast? |
| 15   **change.** | 15   A.   **I don't remember the name of** |
| 16   Q.   Okay.  Are you going to | 16   **the place.** |
| 17   another club? | 17   Q.   Well, you don't remember if it |
| 18   A.   **No.  No, ma'am.** | 18   was Cracker Barrel or Hardee's? |
| 19   Q.   What are you doing now? | 19   A.   **It was an old Pizza Hut** |
| 20   A.   **Staying at home.** | 20   **building.** |
| 21   Q.   Okay.  Any reason you stopped | 21   Q.   Okay.  Have you ever seen |
| 22   clubbing? | 22   Mr. Ulrich out clubbing? |
| 23   A.   **No.** | 23   A.   **Never.** |
| 62 | 64 |

1    Q.   Harry White?
2    A.   Yes.
3    Q.   Did you see Mr. White out
4 clubbing in 2006?
5    A.   I don't remember.
6    Q.   When's the last time you saw
7 him out clubbing?
8    A.   Maybe sometimes last year.
9    Q.   Now, when you go clubbing, do
10 you take your wife?
11    A.   Sometimes.
12    Q.   Are you still seeing Jennifer
13 Foster?
14         MR. DYKES:  Object to the
15 form.
16         MS. HAYNES:  What's your
17 objection?
18         MR. DYKES:  I don't think
19 there is any testimony he's ever seen
20 her.
21    Q.   (BY MS. HAYNES) Okay.  Are you
22 still seeing Jennifer Foster?
23    A.   At work, I see her at work.

65

1    Q.   Are you still dating her?
2    A.   Never dated her.
3    Q.   What do you call it?
4    A.   Friendship.
5    Q.   Friends with benefits?
6    A.   What's the benefit?
7    Q.   I don't know.  What benefits
8 were you receiving from Jennifer
9 Foster?
10    A.   None.
11    Q.   Do you deny ever having a
12 dating or intimate relationship with
13 Jennifer Foster?
14    A.   Intimate that I've -- I've
15 kissed her.
16    Q.   Anything else?
17    A.   Nope.
18    Q.   Never had sex with her?
19    A.   Never.
20    Q.   Held hands with her?
21    A.   No.
22    Q.   Called her after work on your
23 telephone?

66

1    A.   Maybe.
2    Q.   How many times?
3    A.   I don't know.
4    Q.   What would be the occasion you
5 would call Jennifer Foster from your
6 telephone after work?
7    A.   To talk about work.
8    Q.   Does she work under you?
9    A.   No.
10    Q.   Does she work on the same
11 line?
12    A.   No.
13    Q.   Why would you have to call her
14 about work after hours?
15    A.   Because she has questions
16 about robots, and I answer them.
17    Q.   Is she still out at Hyundai?
18    A.   Yes.
19    Q.   Have you ever been clubbing
20 with Jennifer Foster?
21    A.   Yes.
22    Q.   How many times?
23    A.   I've seen her out at a club

67

1 twice.
2    Q.   Has she ever gone with you or
3 met you there?
4    A.   No.  She's been out there when
5 I've been out there.
6    Q.   Were you with your wife on
7 those occasions?
8    A.   No.
9    Q.   Has your wife been to
10 Woodmere?
11    A.   Yes.
12    Q.   How many times?
13    A.   Many.
14    Q.   Would your wife be with you
15 when you would see Jennifer Foster
16 clubbing?
17    A.   No.  She don't go with me that
18 much.
19    Q.   Your wife doesn't or Jennifer
20 doesn't?
21    A.   My wife doesn't.
22    Q.   Have you met Jennifer Foster
23 anywhere else other than Woodmere --

68

1    A.   No.
2    Q.   -- after hours?
3    A.   No.
4    Q.   Ever been out to eat with her?
5    A.   No.
6    Q.   Ever been to her house?
7    A.   No.
8    Q.   Has she ever been to your
9  house?
10    A.   No.
11    Q.   How long have the two of you
12  been friends?
13    A.   Three years?
14    Q.   You're asking me?
15    A.   No, I'm saying maybe three
16  years.
17    Q.   Okay.  Have you ever dated
18  anyone at work?
19    A.   No.
20    Q.   Ever had an intimate
21  relationship with anyone at work?
22    A.   No.
23    Q.   Prior to 2006, had you been

69

1    Q.   What exit?
2    A.   Hyundai Boulevard.  I don't
3  know what exit.
4    Q.   Okay.  So it's on the same
5  exit as the Hyundai plant?
6    A.   Yes, ma'am.
7    Q.   Just down the street some?
8    A.   Yes, ma'am.
9    Q.   Is that where the corporate
10  office is?
11    A.   I don't know where the
12  corporate office is.  I guess we would
13  be that.
14    Q.   Okay.  What else is at the
15  training center?
16    A.   Just the training center.
17  It's where new hires go before they
18  come to the plant.
19    Q.   Okay.  Do you know any names
20  of anyone who ever trained you on the
21  policies and procedures of Hyundai in
22  this time period of January to October
23  2004?

71

1  trained on the policies and procedures
2  of Hyundai, personnel policies and
3  procedures?
4    A.   Yeah.
5    Q.   Who trained you?
6    A.   Specific names, I don't know.
7    Q.   What department?
8    A.   It was when I first started.
9    Q.   When?  I know you started in
10  2004, but when did you get trained?
11    A.   In 2004.
12    Q.   January?
13    A.   January 'til October when we
14  went to the plant, we went through a
15  different class all the time.
16    Q.   How many classes did you
17  attend?
18    A.   Many.
19    Q.   And the training was there at
20  the plant?
21    A.   It was at the training center.
22    Q.   And where is that located?
23    A.   Down the road from the plant.

70

1    A.   Trained me on what now,
2  anything?
3    Q.   Policies and procedures of
4  Hyundai?
5    A.   Ah --
6    Q.   And I'm asking about personnel
7  policies and procedures?
8    A.   I remember Pat, she was a lady
9  at the training center, she gave us a
10  lot of classes.
11    Q.   Okay.  Anyone else you
12  remember?
13    A.   I don't remember.
14    Q.   Since January through October
15  2004, have you had any other training
16  at Hyundai?
17    A.   Team leader training.
18    Q.   When was that?
19    A.   I just took my team leader
20  training, I don't know, maybe a year
21  and a half ago.  I'm not sure.
22    Q.   Were you trained on any
23  personnel policies of Hyundai in that

72

1  team leader training?
2     **A.**  **OSHA.**
3     **Q.**  Anything else?
4     **A.**  **Safety.**
5     **Q.**  Anything else?
6     **A.**  **That's all I remember.**
7     **Q.**  Do you recall receiving any
8  training in any period about the
9  discrimination policies of Hyundai?
10     **A.**  **When I first started.**
11     **Q.**  In that January through
12  October 2004?
13     **A.**  **Uh-huh.**
14     **Q.**  Is that a "yes"?
15     **A.**  **Yes.**
16     **Q.**  What training did you receive?
17     **A.**  **We received all training that**
18  **everybody else received. I don't**
19  **remember every training I went through.**
20     **Q.**  I'm just asking about
21  harassment and discrimination.
22     **A.**  **Yeah, we went through that.**
23     **Q.**  Okay. What did you learn?

73

1     **A.**  **That we can't do it.**
2     **Q.**  Can't do what?
3     **A.**  **Any kind of harassment.**
4     **Q.**  What is your definition of
5  "harassment"?
6     **A.**  **Anything that bothers somebody**
7  **else.**
8     **Q.**  Anything else?
9     **A.**  **No.**
10     **Q.**  Okay. Do you consider
11  touching harassing?
12     **A.**  **It depends on the**
13  **circumstances.**
14     **Q.**  Okay. Do you consider saying
15  the word "fuck" harassing?
16     **A.**  **It might be to some people, I**
17  **don't know.**
18     **Q.**  Do you consider it? is my
19  question.
20     **A.**  **Me?**
21     **Q.**  Yes, sir.
22     **A.**  **I don't know. I mean, it**
23  **could be.**

74

1     **Q.**  Okay. What occasions could it
2  be?
3     **A.**  **If the other person didn't**
4  **like you saying it.**
5     **Q.**  Okay. Do you think it's fine
6  to say it in the workplace?
7     **A.**  **No.**
8     **Q.**  Have you done it?
9     **A.**  **I've done it.**
10     **Q.**  Did Hyundai train you that you
11  weren't supposed to say "fuck" in the
12  workplace?
13     **A.**  **They didn't say "fuck."**
14     **Q.**  What did they say?
15     **A.**  **Profanity.**
16     **Q.**  Is "fuck" profanity in your --
17     **A.**  **Yes, it is.**
18     **Q.**  Okay. Why would you say it?
19     **A.**  **Mad, aggravated.**
20     **Q.**  On what occasions would you
21  say it?
22     **A.**  **When something would go wrong**
23  **with the line, something was down.**

75

1     **Q.**  Have you ever said it in front
2  of a supervisor?
3     **A.**  **I don't remember.**
4     **Q.**  Okay. Have you ever said the
5  word "fuck" in front of Toby Chance?
6     **A.**  **I wouldn't doubt it.**
7     **Q.**  How about Billy Kitchens?
8     **A.**  **I wouldn't doubt I've said it**
9  **in front of him.**
10     **Q.**  How about Mr. Bondy?
11     **A.**  **Maybe.**
12     **Q.**  Maybe you have said it?
13     **A.**  **Maybe.**
14     **Q.**  How about Steve Culpepper,
15  probably?
16     **A.**  **Probably.**
17     **Q.**  Would you say that "fuck" in
18  2006 was part of your everyday
19  vocabulary?
20     **A.**  **If I say it, I only say it**
21  **around people who say it around me.**
22     **Q.**  Okay. And who would that be?
23     **A.**  **The people you just named.**

76

1    Q.    Okay.  You -- they say it and
2  you say it?
3      A.    **In the company of each other.**
4    Q.    Okay.  Do you say "fuck" at
5  home?
6      A.    **Not around my kids.**
7    Q.    Do you say it in front of your
8  wife?
9      A.    **Yes, I have.**
10    Q.    What occasions?
11      A.    **Depending on the**
12  **circumstances.  She's said it to me,**
13  **I've said it to her.**
14    Q.    Do you think because you say
15  it at home, it's okay to say the word
16  "fuck" at work?
17      A.    **Probably not.**
18    Q.    Have you ever said the word
19  "motherfucker"?
20      A.    **Yes.**
21    Q.    In front of the same people?
22      A.    **Yes.**
23    Q.    And they've said it in front

77

1  of you?
2      A.    **Only in the company of each**
3  **other.**
4    Q.    No other workers present?
5      A.    **Maybe if the other people are**
6  **around right there that you named off,**
7  **we might say -- yeah, we might say it**
8  **around each other.**
9    Q.    What would be the
10  circumstances just the four or five of
11  you would be together that other
12  workers would not be present?
13      A.    **Team leader meeting.**
14    Q.    And it's just the four or five
15  of you?
16      A.    **Team leaders.**
17    Q.    Okay.  Would there be managers
18  and assistant managers --
19      A.    **Yes.**
20    Q.    -- present as well?
21      A.    **You named off one, Tom Bondy.**
22    Q.    Sure.  Thank you for
23  correcting me on that.  And Mr. Bondy

78

1  would say it in team leader meetings?
2      A.    **I've heard him say it.**
3    Q.    Okay.  Has he said it out on
4  the line in the plant?
5      A.    **Around me.**
6    Q.    What would be the occasion
7  Mr. Bondy would say that, the word
8  "fuck" or "motherfucker"?
9      A.    **I mean, I couldn't give you no**
10  **specific times.**
11    Q.    Would it be just like everyday
12  vocabulary?
13      A.    **No, if something ain't going**
14  **right maybe.**
15    Q.    Is that how he would address
16  you?
17      A.    **No, he never addressed me as**
18  **that.**
19    Q.    Well, I'm just trying to think
20  of the context of the conversation
21  where you would say "motherfucker" and
22  it pertain to work.  Can you describe
23  that for me?

79

1      A.    **I mean, that would -- that**
2  **would be me and Tom or me and Toby, and**
3  **we'd be talking, "What the fuck is he**
4  **doing?"**
5    Q.    Okay.  That's a good example
6  of "fuck," I appreciate that.  Give me
7  an example of how you would use
8  "motherfucker."
9      A.    **"That motherfucker's crazy."**
10    Q.    Talking about whom?
11      A.    **Whoever it may be.**
12    Q.    Okay.  Have you ever used
13  those words to or about Tammy Edwards?
14      A.    **No.**
15    Q.    And you deny that you've ever
16  used those words to her?
17      A.    **Yes.**
18        MS. HAYNES:  Oh, I'm sorry,
19  did you give me a note earlier?
20        THE VIDEOGRAPHER:  (Nodding.)
21        MS. HAYNES:  Okay.  We'll take
22  a break.
23        THE VIDEOGRAPHER:  Off the

80

1 record, 10:09. We conclude tape one.
2 (Recess, commencing at
3 10:09 a.m. and concluding at
4 10:21 a.m.)
5 THE VIDEOGRAPHER: Back on the
6 record. We commence tape two of the
7 deposition. The time is 10:21.
8 Q. (BY MS. HAYNES) When we took
9 our break, we were talking about
10 training that you had received. Have
11 you been trained since 2004 other than
12 this team leader training on OSHA and
13 safety that you did about a year and a
14 half ago?
15 A. No.
16 Q. Have you been given any
17 policies and procedures on harassment
18 or discrimination in the workplace?
19 A. Not as I remember.
20 Q. Okay. Have you ever seen the
21 Hyundai policy on harassment and
22 discrimination?
23 A. I've seen the team member

81

1 book. It was in there, I read it.
2 Q. Anything else?
3 A. No.
4 Q. And you saw that in 2004?
5 A. Yes, ma'am.
6 Q. When you had the training in
7 2004, was there any role playing that
8 was provided to you or any of the other
9 members attending the same training
10 that you were?
11 A. Yeah, there was role playing.
12 Q. Were there situations given in
13 that training to describe for you what
14 was harassment and what was
15 discrimination?
16 A. No.
17 Q. Did you have to take any type
18 of test when you finished that
19 training?
20 A. I remember taking tests, but I
21 don't remember what all we took tests
22 on.
23 Q. Okay. You don't recall taking

82

1 a test on whether or not you had
2 listened and learned about the
3 discrimination or harassment policies
4 of Hyundai?
5 A. Maybe. I don't remember.
6 That's been a long time ago.
7 Q. Okay. And since this
8 situation with Ms. Edwards in 2006,
9 you've not been retrained on any
10 policies and procedures of Hyundai,
11 have you?
12 A. I don't believe so. I don't
13 know. Just the team leader training,
14 whatever was involved in that.
15 Q. Okay. Team leader training,
16 did you have anything on harassment or
17 discrimination?
18 A. Maybe. I -- I don't remember.
19 Q. You don't recall anything
20 about harassment or discrimination a
21 year and a half ago when you had team
22 leader training?
23 A. I imagine it was in there, but

83

1 do I remember it, no.
2 MS. HAYNES: Okay. And Brian,
3 I'm sorry, I forgot to tell Jenny to
4 make you copies.
5 MR. BOSTICK: That's okay.
6 (Plaintiff's Exhibit 2 was
7 marked for identification.
8 A copy is attached.)
9 Q. (BY MS. HAYNES) I'm going to
10 show you what I've marked as
11 Plaintiff's Exhibit 2. Is this the
12 team leader book -- Team Member
13 Handbook?
14 A. Yes, ma'am.
15 Q. As a team leader, do you have
16 another handbook?
17 A. No, ma'am.
18 Q. Is there such a thing as a
19 Team Leader Handbook?
20 A. Not to my knowledge.
21 Q. So this is all you've ever
22 received from Hyundai in the form of a
23 handbook?

84

1  A.  **Yes, ma'am.**
2  Q.  Okay.  Have you ever received
3  any separate policies or procedures
4  that had been revised, and they send
5  them to you in either e-mail format or
6  paper format?
7  A.  **No.**
8  Q.  Okay.  Ever seen any postings
9  in the workplace, maybe in the break
10  room, about discrimination policies of
11  Hyundai?
12  A.  **Yeah.**
13  Q.  Okay.  What have you seen?
14  A.  **What they were exactly, I**
15  **don't know, but yeah, I've seen them**
16  **posted.**
17  Q.  What have you seen?
18  A.  **Discrimination and harassment.**
19  Q.  Okay.  Is it a big poster,
20  little poster, a piece of paper?
21  A.  **Just a piece of paper this**
22  **size (indicating).**
23  Q.  Okay.  And what does it say?

85

1  A.  **I don't -- I don't know what**
2  **it said.**
3  Q.  Where have you seen it posted?
4  A.  **Team member areas, main board**
5  **when you walk in the door, and the big**
6  **discrimination thing is up on the door**
7  **about the pay.**
8  Q.  Anything else?
9  A.  **Not as I remember.**
10  Q.  In the last six months, have
11  you been trained in any fashion by team
12  relations?
13  A.  **No.**
14  Q.  Do you know anyone in team
15  relations?
16  A.  **Personally, no.**
17  Q.  Do you know anyone by name?
18  A.  **William Ware.**
19  Q.  Anyone else?
20  A.  **I don't know the new team**
21  **relations person we have, I don't know**
22  **her name.  All I know is her last**
23  **name's Modad.**

86

1  Q.  Last name is what?
2  A.  **Modad.  I don't know how to**
3  **pronounce her first name.**
4  Q.  Prior to 2006, and
5  specifically August of 2006 -- are you
6  with me?
7  A.  **Uh-huh, yes, ma'am.**
8  Q.  Had anyone ever complained
9  about you and your actions in the
10  workplace?
11  A.  **No, ma'am.**
12  Q.  Had anyone ever discussed with
13  you that you did not need to use
14  profanity in the workplace?
15  A.  **No, ma'am.**
16  Q.  Have you ever used the word
17  "bitch" in the workplace?
18  A.  **I'm sure I have.**
19  Q.  How about "fucking bitch"?
20  A.  **It's possible.**
21  Q.  What would be the occasions
22  that you would need to use the word
23  "bitch" in the workplace?

87

1  A.  **I don't know.**
2  Q.  Well, can you give me an
3  example of how you would use that?
4  A.  **"The bitch is crazy."  That**
5  **could be referring to man, woman,**
6  **whatever.**
7  Q.  Can you tell me any man you
8  refer to as a "bitch"?
9  A.  **The same ones that might refer**
10  **to me as one.**
11  Q.  Who would refer to you as a
12  "bitch"?
13  A.  **The ones that know that they**
14  **can jokingly say that to me and I won't**
15  **take offense to it.**
16  Q.  Who? is my question.
17  A.  **Specific names, I don't know.**
18  Q.  Who -- what male have you
19  referred to as a "bitch"?
20  A.  **In the workplace?**
21  Q.  Yes, sir.
22  A.  **I don't know.  It's a man**
23  **thing.  If -- if two men's talking,**

88

1  they going to say stuff to each other.
2      Q.    And --
3      A.    That don't mean that when
4  I'm -- if I'm standing around you I'm
5  going to say that to another man.
6      Q.    Well, and I'm trying to
7  ascertain who you called -- what male
8  you called in the workplace a "bitch."
9      A.    Charles Harris, because he
10 calls me one.
11     Q.    And why would Mr. Harris call
12 you a "bitch"?
13     A.    Because that's just a word
14 that he says.
15     Q.    Does he use the phrase "my
16 bitch"?
17     A.    He has.
18     Q.    And do you refer to him as "my
19 bitch" as well?
20     A.    No.
21     Q.    Do you have any type of sexual
22 relationship with Mr. Harris?
23     A.    No.

89

1      Q.    Well, why would he call you
2  "my bitch"?
3      A.    Well, "bitch" ain't no sexual
4  word to me.
5      Q.    Any other man referred to you
6  as "bitch" or "my bitch"?
7      A.    No, not as I remember.
8      Q.    Who is Mr. Harris?
9      A.    He works on my line.
10     Q.    He's an hourly worker?
11     A.    Yes.
12     Q.    What line?
13     A.    Body build/body respot.
14     Q.    He's been on your line for
15 some time?
16     A.    I can't give you the exact
17 dates, but he's been up there for a
18 while.
19     Q.    In the exhibit that I've given
20 you, have you ever read this front to
21 back, Plaintiff's Exhibit 2, the Team
22 Member Handbook?
23     A.    Every piece front to back, no,

90

1  I haven't.
2      Q.    Have you read the page 2?
3      A.    No.
4      Q.    You never read that?
5      A.    (No audible response.)
6      Q.    How about page 3?
7      A.    I might have looked through
8  all of it.
9      Q.    What pages do you recall
10 looking at that were of particular
11 interest to you at the time?
12     A.    I don't -- I don't remember.
13     Q.    You don't know?
14     A.    No, ma'am.
15     Q.    Okay.  Describe for me -- the
16 one we're looking at right now is a
17 paper copy that's on eight-and-a-half-
18 by-eleven paper but -- or is it
19 eight-and-a-half-by-ten -- eight-and-a-
20 half-by-eleven?
21          MR. DYKES:  It's eleven.
22     Q.    How was your handbook
23 fashioned, the format?

91

1      A.    Talking about this
2  (indicating)?
3      Q.    Yes, sir, Plaintiff's Exhibit
4  2.
5      A.    A little book.
6      Q.    Okay.  It's like folded in
7  half like this (indicating)?
8      A.    Smaller.
9      Q.    Smaller than that?
10     A.    Yeah.  It was a book, a little
11 small book.
12     Q.    Okay.  And where do you keep
13 yours or do you have one?
14     A.    I don't even have it anymore.
15     Q.    Okay.  When's the last time
16 you saw it?
17     A.    Way before I moved.
18     Q.    Way before you were a team
19 leader?
20     A.    No, before I moved houses and
21 a lot of my stuff got lost.
22     Q.    Okay.  Do you have it at work?
23     A.    No, I don't.

92

Q. When is the last time you saw one, a handbook?

A. **Some years ago.**

Q. Three, four years ago?

A. **Two or three years ago.**

Q. Okay. Do you have access to the handbook online on any Hyundai intranet?

A. **I believe so.**

Q. Okay. Have you ever gone online to access the handbook?

A. **Yes.**

Q. What occasions?

A. **To see what -- see what called for a serious misconduct.**

Q. Okay. And where did you look?

A. **On the -- I don't know what it's called. You've got to have a team password to get on it.**

Q. When did you look?

A. **Maybe two years, year and a half, almost two years ago.**

Q. Was it when the situation with

93

Ms. Edwards was going on?

A. **Yes.**

Q. Is that a "yes"?

A. **Yes, right after.**

Q. Who helped you look?

A. **I looked.**

Q. Okay. Who told you you could go online and look on that?

A. **I didn't know if I could or not. I just typed it in.**

Q. And did you find anything?

A. **Yeah.**

Q. What did you find?

A. **What calls for a serious misconduct.**

Q. Okay. And had someone told you that your behavior was serious misconduct or is this after you --

A. **This is after I come back off suspension.**

Q. Okay. And why would you be looking then, after suspension?

A. **I was just curious.**

94

Q. Any reason?

A. **No.**

Q. And what did you find or what did you learn?

A. **What calls for a serious misconduct?**

Q. Yes, sir.

A. **Severe quality issues and harassment, what I got charged with.**

Q. Anything else?

A. **No, I don't remember.**

Q. Okay. Do you know where serious misconduct is in the handbook?

A. **No.**

Q. Did you see the repercussions if you were found guilty of serious misconduct, what the company could do?

A. **Suspension, up to termination.**

Q. Anything else?

A. **No, that's all I remember.**

Q. Look for me on page -- well, it's Plaintiff's Exhibit 2, and it's going to be Bates Number 264. Are you

95

there?

A. **Yes, ma'am.**

Q. Well, you beat me there. Have you looked at this in the last six months?

A. **No, ma'am.**

Q. When's -- have you seen this exhibit at all in the last six months?

A. **No, ma'am.**

Q. Well, while we're at this juncture, let me ask you this: Have you reviewed any documents in the last six months in preparation to testify today?

A. **As far as this, no.**

Q. Any documents? is my question, sir.

A. **Yes.**

Q. What have you looked at?

A. **The investigation.**

Q. By Ms. Jones?

A. **Yes.**

Q. Anything else?

96

1    A.    **No.**
2    Q.    Did you have any handwritten
3    statement other than her typed notes
4    that you reviewed?
5    A.    **I don't understand.**
6    Q.    Did you make any notes,
7    personal notes yourself of what was
8    going on at the time?
9    A.    **No.**
10   Q.    Keep any diary or calendar?
11   A.    **No.**
12   Q.    So what you've used to refresh
13   your recollection is the notes Ms.
14   Jones took?
15   A.    **Yes.**
16   Q.    Did you read all the
17   statements that Ms. Jones took or just
18   yours?
19   A.    **Mine.**
20   Q.    Did you read Ms. Edwards'?
21   A.    **Yes.**
22   Q.    Anyone else's?
23   A.    **I read everybody's.**

97

1    met with Mr. Bostick?
2    A.    **No.**
3    Q.    You've just seen him in these
4    depositions?
5    A.    **Well, he was at -- at the**
6    **plant. I've seen him twice before**
7    **today.**
8    Q.    Okay. When was that?
9    A.    **At the deposition last week**
10   **when I -- and yesterday.**
11   Q.    What was the occasion you met
12   with him yesterday?
13   MR. DYKES:    Mike, you can
14   testify that you met with him, but what
15   was talked about, don't tell her.
16   She's not entitled to know that.
17   MS. HAYNES:    I'm entitled to
18   know what he talked to Mr. Bostick
19   about. That's not his lawyer; you're
20   his lawyer. There's no privilege.
21   MR. DYKES:    There's a joint
22   defense --
23   MR. BOSTICK:    There's a joint

99

1    Q.    And when did you do that?
2    A.    **When it all first started.**
3    Q.    When would that be?
4    A.    **Well, when I -- when I got my**
5    **attorney, whenever that was. I don't**
6    **remember when I --**
7    Q.    When you got your turn?
8    A.    **Attorney.**
9    MR. DYKES:    No, attorney.
10   Q.    Oh, attorney. Okay. Now, did
11   you hire Mr. Dykes or did the company
12   do that for you?
13   A.    **The company.**
14   Q.    You're not having to pay Mr.
15   Dykes anything?
16   A.    **No.**
17   MR. DYKES:    Object. Whether
18   or not he's paying the medical bills --
19   I mean, legal bills is not --
20   MS. HAYNES:    It is very
21   relevant. It goes to bias and
22   prejudice.
23   Q.    (BY MS. HAYNES) Have you ever

98

1    defense agreement in place, and it's
2    privileged.
3    MS. HAYNES:    Have you produced
4    it?
5    MR. BOSTICK:    Have you asked
6    for it?
7    MS. HAYNES:    No, but if you're
8    going to claim a privilege, you need to
9    produce it.
10   Q.    (BY MS. HAYNES) What agreement
11   have you signed?
12   A.    **Well, I don't know what you're**
13   **even talking about.**
14   Q.    Have you signed anything
15   employing either Mr. Dykes or Mr.
16   Bostick?
17   A.    **No.**
18   Q.    Is Mr. Bostick representing
19   you in any fashion?
20   MR. DYKES:    I mean, I --
21   Q.    Is Mr. Bostick representing
22   you? is my question.
23   A.    **I don't -- I don't who -- I**

100

1  don't know if he's representing Hyundai
2  or if he's representing me and Hyundai,
3  I don't know.
4      Q.   You're a little vague about
5  that?
6      A.   No, ma'am, I'm just telling
7  you.
8      Q.   Do you think you have two
9  lawyers?
10     A.   I know I have Toby as my
11  lawyer. I don't know what part it --
12  that the rest play in it.
13     Q.   When you met yesterday with
14  Mr. Bostick, was Mr. Dykes present?
15     A.   Yes, he was.
16     Q.   Who else?
17     A.   Just the three of us.
18     Q.   Mr. Smith wasn't present?
19     A.   No, he wasn't.
20     Q.   Where did the meeting take
21  place?
22     A.   At Hyundai.
23     Q.   How long did it last?

101

1      A.   Two hours.
2      Q.   Is that when you looked at
3  these documents?
4      A.   No.
5      Q.   That was before?
6      A.   Yes.
7      Q.   Did you look at any documents
8  yesterday?
9      A.   My statements only.
10     Q.   Yesterday?
11     A.   Yes.
12     Q.   Did you review -- in the last
13  six months, have you reviewed any
14  videotapes in preparation for a
15  deposition?
16     A.   Yes.
17     Q.   What have you reviewed?
18     A.   I don't know what the video
19  was, on a deposition.
20     Q.   When did you look at it?
21     A.   Yesterday.
22     Q.   Did you look at more than one?
23     A.   Just one.

102

1      Q.   Was that helpful?
2      A.   Not really.
3      Q.   Why? Why?
4      A.   Because watching a film's not
5  like sitting here getting drilled.
6      Q.   I'm sorry, do you feel like
7  I'm drilling you?
8      A.   Pretty much.
9      Q.   I apologize. I'm just asking
10  you questions, but if you feel like I'm
11  drilling you --
12     A.   No offense on it.
13     Q.   Okay. All right. Going back
14  to the agree -- I mean Plaintiff's
15  Exhibit 2, and one thing I want to just
16  make sure I'm clear on before I leave
17  that area, you've not signed anything
18  with Hyundai for Mr. Dykes to represent
19  you?
20     A.   No.
21     Q.   And you've not signed anything
22  with Hyundai that you have to testify a
23  certain way --

103

1      A.   No.
2      Q.   -- for them to pay for your
3  representation?
4      A.   No.
5      Q.   You are aware you're under
6  oath?
7      A.   I do (sic).
8      Q.   Okay. Prior to seeing the --
9  the statement that you gave Ms. Jones
10  as well as the other statements that
11  were given Ms. Jones, had you seen
12  those before in 2006?
13     A.   No.
14     Q.   Okay. You only saw those when
15  Hyundai hired Mr. Dykes for your
16  representation?
17         MR. DYKES:  Object to the
18  form.
19     A.   Yes.
20     Q.   Is that correct?
21     A.   Correct.
22     Q.   Okay. And did Mr. Dykes show
23  you those documents or Mr. Bostick?

104

1    A.    Toby did.
2    Q.    All right.  When you were
3    written up for serious misconduct, did
4    anyone tell you what area under the
5    policy you were being written up?
6    A.    No.
7    Q.    Did you question that?
8    A.    No.
9    Q.    Why not?
10   A.    I was glad to have my job.
11   Q.    Had you been told you were
12   going to be terminated?
13   A.    Nope.
14   Q.    Then why were you glad to have
15   your job.
16   A.    Because when -- usually when
17   stuff like this happens, you don't keep
18   your job.
19   Q.    And what is the basis of that
20   knowledge?
21   A.    I mean, I don't know.
22   Q.    Have you seen anyone else lose
23   their job?

105

1    A.    No.  I was just worried I was
2    going to lose my job.
3    Q.    Did anyone ever tell you there
4    was a possibility you could lose your
5    job?
6    A.    No.
7    Q.    How did you first learn that
8    Ms. Edwards had complained about you?
9    A.    Ferrard Alexander.
10   Q.    Ferrard?
11   A.    Alexander told me.
12   Q.    Okay.  What did he tell you?
13   A.    That Amber had told him that
14   Tammy has made sexual harassment
15   charges against me.
16   Q.    What is Mr. Alexander's
17   position?
18   A.    Now he is on a jig team.
19   Q.    What is that?
20   A.    They do dimensional work on
21   the vehicles.
22   Q.    They do dimensional work on
23   what?

106

1    A.    On the vehicle.
2    Q.    On the vehicle?
3    A.    On the car.
4    Q.    Okay.
5    A.    Door fits, trunk fits, hood
6    fits.
7    Q.    And Mr. Alexander just walks
8    up and tells you that Amber is it
9    Kelley?
10   A.    Amber Kelley.
11   Q.    Okay.  Is Ms. Kelley still out
12   there?
13   A.    Yes, she is.
14   Q.    Where is she now?
15   A.    CCR.
16   Q.    What does that stand for?
17   A.    I don't know.  They track
18   downtime.
19   Q.    Did Mr. Alexander tell you
20   what Ms. Kelley had told him in detail
21   other than Ms. Edwards had complained
22   about you?
23   A.    That's all he told me.

107

1    Q.    Okay.  Did he use the word
2    "sexual harassment"?
3    A.    He said she's trying to get me
4    for sexual harassment.
5    Q.    And what did you say to
6    Mr. Alexander?
7    A.    I didn't say nothing.
8    Q.    Okay.  What did you do after
9    you heard that from Mr. Alexander?
10   A.    Called my wife.
11   Q.    Okay.  Why did you do that,
12   what did you do that for?
13   A.    To tell her what was going on.
14   Q.    Did you know at that time what
15   was going on?
16   A.    No, but just off of that right
17   there, I was letting her know what was
18   going on.
19   Q.    Okay.  And then what is the
20   next thing you did?
21   A.    I went to Tom.
22   Q.    Is that Mr. Bondy?
23   A.    Yes, it is.

108

1    Q.   Okay.  And how soon did you go
2  to Tom Bondy after Mr. Alexander told
3  you that Ms. Edwards had complained
4  about you?
5    A.   That same day.
6    Q.   Was it within thirty minutes?
7    A.   No, probably not thirty
8  minutes, but it was in the same day.
9    Q.   Was it in the hour?
10   A.   A few hours.
11   Q.   Okay.  And what did you tell
12 Mr. Bondy?
13   A.   I told him that Tammy had
14 brought -- that I had heard that Tammy
15 was making charges on me for sexual
16 harassment, and I was worried that I
17 was fixing to lose my job.  I told him
18 I didn't know what to do.
19   Q.   What did Mr. Bondy say?
20   A.   He said there's nothing you
21 can do but sit back and wait and see
22 what team relations does.
23   Q.   Did Mr. Bondy have any

109

1  questions?
2    A.   No, he didn't.
3    Q.   Was anyone else present with
4  Mr. Bondy?
5    A.   No, it wasn't.
6    Q.   Okay.  What's the next thing
7  you did?
8    A.   I didn't do nothing.
9    Q.   Did you go and talk to anyone
10 else?
11   A.   No.
12   Q.   When is the first time team
13 relations talked to you?
14   A.   When they done my -- when they
15 took my statement.
16   Q.   Okay.  Did Mr. Bondy ever come
17 back and talk to you before team
18 relations?
19   A.   No.
20   Q.   Who did you talk to in team
21 relations?
22   A.   Stacye Jones.
23   Q.   Okay.  Anyone else?

110

1    A.   Somebody else was in there, I
2  don't remember who, maybe Lucas.
3    Q.   Lucas Cooner?
4    A.   Yeah.
5    Q.   Did you know Mr. Cooner
6  before?
7    A.   No, I didn't.
8    Q.   Did you know Ms. Jones before?
9    A.   No, I didn't.
10   Q.   Had you ever talked to team
11 relations before?
12   A.   As in -- no.  I mean, speaking
13 as they walk by.
14   Q.   Of being called in to team
15 relations, had you ever been called in
16 before?
17   A.   Yes.
18   Q.   On what occasion?
19   A.   Another team member had said
20 something about the Mexican clean-up
21 girls.
22   Q.   Who was that?
23   A.   The guy?

111

1    Q.   Yes, sir.
2    A.   Chad Spurlock.
3    Q.   Did you give a statement to
4  Ms. Jones then?
5    A.   It wasn't Ms. Jones.
6    Q.   Who was it?
7    A.   Rob Clevenger and William
8  Ware.
9    Q.   And when was this?
10   A.   I do not know.
11   Q.   Well, can you -- was it in
12 2006 when you went to -- before you
13 went to talk about Ms. Edwards?
14   A.   It was before then.
15   Q.   Okay.  Was it in 2006?
16   A.   It was before the -- this
17 incident, but I don't remember when.
18   Q.   Were you already a team
19 leader?
20   A.   Yes, I believe so.  I don't
21 really know.
22   Q.   Okay.  And what did you tell
23 Mr. Clevenger and Mr. Ware about the

112

1  incident with the team member?  Were
2  they harassing the clean-up crew?
3      A.  **I believe they overheard him**
4  **say that that's all the Mexicans are**
5  **good for is to clean up.**
6      Q.  Anything else?
7      A.  **No.**
8      Q.  Had you heard that?
9      A.  **Yeah, I did hear that.**
10     Q.  Did you tell Mr. Clevenger and
11 Mr. Ware that you had heard it?
12     A.  **Yes, I did tell them.**
13     Q.  And do you know the team
14 member who allegedly made those
15 statements?
16     A.  **That was who it was, Chad**
17 **Spurlock.**
18     Q.  I'm sorry, you did tell me
19 that.  Was Mr. Spurlock disciplined?
20     A.  **Yes, I believe he was.**
21     Q.  Do you know what discipline he
22 received?
23     A.  **I sure don't.**

113

1      Q.  Did he keep his job?
2      A.  **Yeah, but he's no longer with**
3  **us now.**
4      Q.  Do you know why he left?
5      A.  **No, I don't.**
6      Q.  Was he terminated?
7      A.  **I have no idea.**
8      Q.  Do you know if he was
9  suspended?
10     A.  **I have no clue.**
11     Q.  Do you know if he was fired or
12 left voluntarily?
13     A.  **I have no idea.  He didn't**
14 **work on my team.**
15     Q.  How many times did you have to
16 go to team relations about the incident
17 with Chad Spurlock?
18     A.  **One time.**
19     Q.  Okay.  Any other times
20 you've -- any other time you've had to
21 go to team relations and talk to
22 anyone?
23     A.  **Not as I remember, no.**

114

1      Q.  Since 2006, the incident with
2  Ms. Edwards, have you had to go back to
3  team relations?
4      A.  **No.**
5      Q.  How many times did you talk
6  with Ms. Jones?
7      A.  **During the investigation?**
8      Q.  Yes, sir.
9      A.  **Once.**
10     Q.  During the investigation, who
11 else did you talk with other than
12 Mr. Bondy and Ms. Jones and Mr. Cooner?
13     A.  **As far as team relations is**
14 **concerned, is that what you're saying?**
15     Q.  Anyone?
16     A.  **My wife.  I didn't talk with**
17 **nobody during the investigation.**
18 **After -- after everything was over,**
19 **people come talked to me about it.**
20     Q.  You never talked to Billy
21 Kitchens?
22     A.  **I listened to what Billy was**
23 **saying.**

115

1      Q.  Did you talk to Steve
2  Culpepper?
3      A.  **I listened to what Steve**
4  **Culpepper was saying.**
5      Q.  How about Mr. Bondy, did you
6  ever go back and talk to him?
7      A.  **No, I did not.**
8      Q.  Did you listen to what he was
9  saying?
10     A.  **He never talked to me about**
11 **the case.**
12     Q.  Anyone else while the
13 investigation was going on?
14     A.  **No.**
15     Q.  Okay.  What did you listen
16 that Billy Kitchens was telling you?
17     A.  **Whatever Amber told him.**
18     Q.  And that was?
19     A.  **Everything that was going on**
20 **in the office that Tammy was saying.**
21     Q.  Okay.  What did Mr. Kitchens
22 tell you? is my question.
23     A.  **I don't remember specifics of**

116

1  it.

2  **Q.**   Generally?

3  **A.   She was trying to get me for**

4  **sexual harassment, that I was cussing**

5  **around her.**

6  **Q.**   What else did Kitchens tell

7  you?

8  **A.   That's about it.**

9  **Q.**   He just said that Ms. Edwards

10  is trying to get you for sexual

11  harassment because you were cussing

12  around her?

13  **A.   Said she was trying to get me**

14  **for sexual harassment and that she**

15  **was -- that I was cussing around her.**

16  **Q.**   Anything else Mr. Kitchens

17  told you?

18  **A.   No.**

19  **Q.**   What did Mr. Culpepper tell

20  you?

21  **A.   He was telling me don't worry**

22  **about it, let team relations handle it.**

23  **Q.**   Had he had conversations with

<center>117</center>

1  Amber Kelley?

2  **A.   Probably so.**

3  **Q.**   Did he share those with you?

4  **A.   No.**

5  **Q.**   And why would you think that

6  Amber Kelley had a conversation with

7  Steve Culpepper?

8  **A.   Because Amber Kelley was**

9  **having a conversation with everybody on**

10  **the floor.**

11  **Q.**   Did you have a conversation

12  with Amber Kelley?

13  **A.   I didn't talk to Amber Kelley**

14  **then.**

15  **Q.**   Why not?

16  **A.   At that time, because she was**

17  **working with -- with Tammy.**

18  **Q.**   Had you talked with Amber

19  Kelley before?

20  **A.   Nope.**

21  **Q.**   Had Amber Kelley ever

22  complained to you about your mouth and

23  what you were saying --

<center>118</center>

1  **A.   No.**

2  **Q.**   -- in the workplace?

3  **A.   No.**

4  **Q.**   Has she since?

5  **A.   No.**

6  **Q.**   Have you had conversations

7  with Amber Kelley since July-August

8  2006?

9  **A.   Yes.**

10  **Q.**   And have you discussed Ms.

11  Edwards?

12  **A.   Yes.**

13  **Q.**   How many times?

14  **A.   I just started talking to**

15  **Amber maybe six months ago.**

16  **Q.**   Who initiated the

17  conversation?

18  **A.   She was having to do a board**

19  **in my team area, and I was at my desk,**

20  **and we just started talking.**

21  **Q.**   "She was having to do a

22  board," what does that mean?

23  **A.   A bulletin board.**

<center>119</center>

1  **Q.**   As in posting something or

2  decorating it?

3  **A.   Decorating, drawing lines on a**

4  **erase -- a dry-erase board.**

5  **Q.**   Okay.  What was she putting on

6  the dry-erase board?

7  **A.   It was for when cars come off**

8  **the line on BC3, the reason it was**

9  **coming off, was it going to be a long**

10  **delay or short delay, who took it off,**

11  **and the time it's estimated to go back**

12  **on.**

13  **Q.**   Okay.  All right.  What did

14  you and Ms. Kelley discuss six months

15  ago about Ms. Edwards?

16  **A.   Amber asked me if I've ever**

17  **said that I do not like black folks.**

18  **Q.**   Is Ms. Kelley African-

19  American?

20  **A.   Yes, she is.**

21  **Q.**   And that's how she started the

22  conversation?

23  **A.   She said she wanted to ask me**

<center>120</center>

1  something, and that's what she asked
2  me.
3      Q.    And what did you say?
4      A.    I said I have no reason not to
5  like black folks; I like everybody.
6      Q.    Okay.  And then what did she
7  say?
8      A.    She said that that's what
9  Tammy had told her.
10     Q.    And then what was the next
11 thing said by you or by her?
12     A.    She said that Tammy tried to
13 pay her to lie on me.
14     Q.    That was the next thing she
15 said?
16     A.    Yep.
17     Q.    Did she say how much Ms.
18 Edwards offered to pay her?
19     A.    She did not say.
20     Q.    Did she say she wasn't going
21 to lie for Tammy Edwards?
22     A.    She sure did.
23     Q.    Okay.  What did she say?

121

1      A.    She said she's not going to
2  lie for anybody.
3      Q.    Then what did she say?
4      A.    She said she asked Tammy did I
5  ever put my hands on her, and Tammy
6  told her no.
7      Q.    Anything else?
8      A.    No, not as I remember.
9      Q.    Did you ever put your hands on
10 Tammy Edwards?
11     A.    Hug to the side
12 (demonstrating).
13     Q.    Okay.  Any other part of your
14 body ever touch Tammy Edwards' --
15     A.    No.
16     Q.    -- body?
17     A.    No.
18     Q.    Did you ever pull her hair?
19     A.    I didn't pull her hair.  When
20 she walked by, I did her hair
21 (demonstrating), if you call that
22 pulling.
23     Q.    What are you saying?

122

1      A.    I just grabbed the back of her
2  hair, her ponytail, so if you call that
3  pulling, yeah, I did that.
4      Q.    Anything else?
5      A.    No.
6      Q.    How many times would you pull
7  her ponytail?
8      A.    I might have done it two or
9  three times.
10     Q.    Okay.  Any other part of your
11 body ever touch Tammy Edwards' body?
12     A.    Never.
13     Q.    What was the occasion you put
14 your arm around her shoulders as you
15 indicated?
16     A.    I don't -- I don't remember.
17 It was just a -- I mean, I don't
18 know -- remember what the occasion was.
19     Q.    Have you ever hugged her
20 either from the behind or in front?
21     A.    No.
22     Q.    You deny --
23     A.    I deny.

123

1      Q.    -- that you've ever done that?
2  All right.  Anything else Ms. Kelley
3  told you in that first conversation the
4  two of you had some six months ago?
5      A.    Not as I remember.
6      Q.    Have you discussed Ms. Edwards
7  since with Ms. Kelley?
8      A.    Yeah, the same stuff, the same
9  stuff I just got through telling you,
10 we've talked about it again.
11     Q.    About whether or not you liked
12 African-Americans, have y'all talked
13 about that since?
14     A.    No.  About the other, about
15 her -- about Tammy wanting to pay her.
16     Q.    Okay.  What else has she said
17 about Tammy Edwards wanting to pay her
18 to testify for her?
19     A.    She didn't say nothing else
20 about it.  I mean, I talk to Amber, but
21 it's not -- I don't talk about this no
22 more.
23     Q.    Okay.  Six months ago she said

124

1   Tammy tried to pay her to testify, and
2   she was not going to lie for anybody?
3      **A.**   **She said that Tammy would pay**
4   **her if she would lie, and she said that**
5   **she's not going to lie for anybody.**
6      **Q.**   Okay. Has she said anything
7   else in the last six months?
8      **A.**   **No.**
9      **Q.**   And then you said she, meaning
10   Ms. Kelley, asked if you had ever put
11   your hands on Ms. Edwards. Has she
12   talked about that in the last --
13      **A.**   **She didn't --**
14      **Q.**   -- six months?
15      **A.**   **She didn't ask if I've ever**
16   **put my hands on her.**
17      **Q.**   Okay. What -- what did you
18   tell me?
19      **A.**   **I told you that she asked**
20   **Tammy had I ever put my hands on her,**
21   **and she said no.**
22      **Q.**   Has she asked you that
23   question again?

<center>125</center>

1      **A.**   **No. She didn't ask me that.**
2   **That was a statement she was telling**
3   **me.**
4      **Q.**   And the two of you haven't
5   talked about that again since six
6   months ago?
7      **A.**   **Yeah, I told you we talked**
8   **about it again once the other time**
9   **but --**
10      **Q.**   When?
11      **A.**   **I don't remember, I don't**
12   **remember when.**
13      **Q.**   Okay. What was discussed the
14   next time the two of you talked about
15   Ms. Kelley asking Tammy Edwards if you
16   had ever put your hands on her?
17      **A.**   **She just every time -- when**
18   **she talked about it again, she said the**
19   **same thing, that Tammy told her that I**
20   **did not do that.**
21      **Q.**   Okay. Anything else?
22      **A.**   **No.**
23      **Q.**   Anything else you've talked to

<center>126</center>

1   Ms. Kelley about Tammy Edwards in the
2   last six months?
3      **A.**   **No.**
4      **Q.**   Did Ms. Kelley ever tell you
5   that she had encouraged Ms. Edwards to
6   complain about you?
7      **A.**   **That Amber had encouraged**
8   **Tammy?**
9      **Q.**   Yes.
10      **A.**   **No.**
11      **Q.**   When was your last
12   conversation with Ms. Kelley?
13      **A.**   **Yesterday evening when I was**
14   **leaving.**
15      **Q.**   Okay. What did the two of you
16   talk about?
17      **A.**   **I told her I wasn't going to**
18   **be at work today.**
19      **Q.**   Did you tell her why?
20      **A.**   **I told her I had some business**
21   **to handle.**
22      **Q.**   Did you tell her you were
23   coming to give a deposition in Tammy

<center>127</center>

1   Edwards' case?
2      **A.**   **I just told her I had business**
3   **to handle. I didn't tell her no more.**
4      **Q.**   Okay. My question, sir, was:
5   Did you tell Amber Kelley you were
6   coming to give a deposition in Tammy
7   Edwards' case?
8      **A.**   **No. But I figure she knows it**
9   **because she was talked to yesterday.**
10      **Q.**   And you're indicating by
11   Mr. Dykes and Mr. Bostick?
12      **A.**   **No, I did not tell her that.**
13   **I did not tell her I was coming up**
14   **here.**
15      **Q.**   Did Ms. Kelley share with you
16   that she had talked to Mr. Dykes and
17   Mr. Bostick yesterday?
18      **A.**   **Yes, she did.**
19      **Q.**   She did?
20      **A.**   **Yes.**
21      **Q.**   What did the two of you talk
22   about?
23      **A.**   **I didn't ask her no questions**

<center>128</center>

1 **about it.**
2     **Q.**   What did she talk to you
3 about?
4     **A.**   **She said that she talked to**
5 **the attorneys.**
6     **Q.**   Okay. Did she tell you what
7 she talked to the attorneys about?
8     **A.**   **No, she didn't.**
9     **Q.**   She just said, "I talked to
10 the attorneys yesterday"?
11     **A.**   **She told me that at the end of**
12 **the day yesterday and I was leaving.**
13     **Q.**   Okay. And did you say, "I did
14 too"?
15     **A.**   **No, I didn't.**
16     **Q.**   You didn't share that with
17 her?
18     **A.**   **No.**
19     **Q.**   Anybody else share that
20 information with you that they had
21 talked to the attorneys yesterday?
22     **A.**   **No.**
23     **Q.**   Just Ms. Kelley?
<div align="center">129</div>

1     **A.**   **That's it.**
2     **Q.**   Did you have to go and get
3 Ms. Kelley to talk to the attorneys
4 yesterday?
5     **A.**   **No, I didn't.**
6     **Q.**   Did you know she was going to
7 talk to Mr. Bostick --
8     MR. BOSTICK: Object.
9     **Q.**   -- and Mr. Dykes?
10     MR. DYKES: Object to the
11 form. I'm not going to -- I mean, if
12 he knows outside of anything that I
13 talked to him about, he can answer.
14 But if all he knows is what we talked
15 about, then no.
16     **Q.**   Did you see her going in?
17     **A.**   **Excuse me?**
18     **Q.**   Did you see Ms. Kelley going
19 in to talk to Mr. Dykes --
20     **A.**   **No, I did not.**
21     **Q.**   -- and Mr. Bostick? In the
22 last six months, who have you talked
23 with about Ms. Edwards other than your
<div align="center">130</div>

1 two attorneys and Ms. Kelley?
2     MR. DYKES: Object to the
3 form.
4     MR. BOSTICK: Object.
5     MS. HAYNES: I thought y'all
6 agreed that was the case, that he has
7 two attorneys? Didn't you tell me you
8 had a joint representation agreement?
9     MR. BOSTICK: Joint defense
10 agreement.
11     MS. HAYNES: I'm sorry, Mr.
12 Bostick?
13     MR. BOSTICK: Joint defense
14 agreement.
15     MS. HAYNES: Okay. Isn't that
16 the same thing?
17     MR. BOSTICK: You can answer
18 the question.
19     THE WITNESS: What was the
20 question?
21     MS. HAYNES: Can you repeat
22 the question for the witness?
23     (Whereupon, the last question
<div align="center">131</div>

1     was read back by the court
2 reporter.)
3     **A.**   **My wife.**
4     **Q.**   (BY MS. HAYNES) Anyone else?
5     **A.**   **No.**
6     **Q.**   You haven't talked to Billy
7 Kitchens about Ms. Edwards in the last
8 six months?
9     **A.**   **No.**
10     **Q.**   When was the last time you
11 talked to Steve Culpepper?
12     **A.**   **Maybe a month after he left.**
13     **Q.**   What was that occasion?
14     **A.**   **He got a new motorcycle.**
15     **Q.**   How did you know that?
16     **A.**   **He called me and told me.**
17 **That's what he was calling for.**
18     **Q.**   Okay. What kind did he get?
19     **A.**   **FJ-1200.**
20     **Q.**   Was that a result of any type
21 of severance he got from Hyundai that
22 he was able to buy that?
23     **A.**   **No, he sold one and got**
<div align="center">132</div>

1 another one.
2    Q.    Do you know what he sold?
3    A.    No, I do not.
4    Q.    Does he race?
5    A.    No, he doesn't.
6    Q.    Do you race?
7    A.    Occasionally.
8    Q.    Where do you race?
9    A.    Montgomery Drag Strip.
10   Q.    Motorcycles or cars?
11   A.    Motorcycles.
12   Q.    Who from the plant comes and
13 watches you race?
14   A.    There's people that come out
15 there to race. They don't come just to
16 watch me but --
17   Q.    My question was: Who from the
18 plant comes to watch you?
19   A.    Billy has been out there
20 before.
21   Q.    Mr. Kitchens?
22   A.    Yes. Pam Stoddard and Rob
23 Johnson has been out there, and Judd

133

1 Ballentine has been out there because
2 he races.
3    Q.    Okay. Has Ms. Foster watched
4 you race?
5    A.    Never.
6    Q.    Does Ms. Stoddard come and
7 watch you every time you race?
8    A.    No.
9    Q.    How many times has she watched
10 you race?
11   A.    Twice.
12   Q.    When is the last time you
13 raced?
14   A.    Two weeks ago.
15   Q.    Does Billy Kitchens race?
16   A.    No, he don't.
17   Q.    Has Mr. Bondy ever been to
18 watch you race?
19   A.    Tom has been to the drag
20 strip.
21   Q.    My question was: Has Mr.
22 Bondy come to watch you race?
23   A.    I've raced while Tom has been

134

1 at the drag strip; but did he come out
2 there to see me, I do not know the
3 answer to that.
4    Q.    How many times has Mr. Bondy
5 been to the drag strip --
6    A.    Once.
7    Q.    -- when you've raced?
8    A.    One time.
9    Q.    When was that?
10   A.    A month ago, month and a half
11 ago.
12   Q.    Who was he out there with?
13   A.    Vince Gahafer.
14   Q.    Anyone else?
15   A.    Vince's two boys.
16   Q.    Anyone else?
17   A.    No. Pam and Rob were there
18 that night.
19   Q.    When is the last time you
20 talked to Billy Kitchens about Tammy
21 Edwards?
22   A.    About her, it's been a while,
23 but he knew I was coming up here today.

135

1    Q.    How did he know that?
2    A.    Because he's my group leader.
3    Q.    Did you have to tell him you
4 were going to be gone for this?
5    A.    I had to tell him I was going
6 to be off for today. I told him I had
7 to come and give a deposition.
8    Q.    Did you have to go and clock
9 in this morning?
10   A.    No, I did not.
11   Q.    Are you getting paid for
12 today?
13   A.    Yes, I am.
14   Q.    Did you have to take vacation
15 or sick leave?
16   A.    No, I didn't.
17   Q.    Did you have to fill out any
18 paperwork?
19   A.    No, I haven't.
20   Q.    And the other day when you
21 were here for Tammy Edwards' deposition
22 at Mr. Bostick's office, were you paid
23 for that day?

136

1  A.  Yes, I was.
2  Q.  And that wasn't taken from
3  your vacation or personal time?
4  A.  No, it wasn't.
5  Q.  Were you paid overtime?
6  A.  No, I was not.
7  Q.  Last week did you get paid
8  overtime?
9  A.  Did I get paid some overtime?
10 Yes, I did.
11 Q.  How much?
12 A.  Maybe four hours.
13 Q.  What was that a result of?
14 A.  An hour a day for each day I
15 was at work.
16 Q.  Other than telling Mr.
17 Kitchens about this deposition, when is
18 the last time you and he talked about
19 Tammy Edwards?
20 A.  I don't know exact date.
21 Q.  Did you read Mr. Kitchens'
22 statement to Ms. Jones?
23 A.  Excuse me?
137

1  Q.  Did you read Mr. Kitchens'
2  statement to Ms. Jones?
3  A.  Yes, I did.
4  Q.  Did you agree with it?
5  A.  Some of it maybe; some of it I
6  did not.
7  Q.  What did you not agree with?
8  A.  The last statement that he
9  made in it.
10 Q.  That said what?
11 A.  That I was seeing Jennifer
12 Foster.
13 Q.  You didn't agree with that?
14 A.  No, I didn't.
15 Q.  Do you know why he would make
16 that comment?
17 A.  No, I do not.
18 Q.  Did you talk to him about it?
19 A.  No, I have not.
20    (Plaintiff's Exhibit 3 was
21    marked for identification.
22    A copy is attached.)
23 Q.  (BY MS. HAYNES) Plaintiff's
138

1  Exhibit 3, have you seen this document?
2  A.  Yes, I have.
3  Q.  It's numbered, for the record,
4  177 through 194, Edwards versus HMMA,
5  and then it has a D before those
6  numbers.  The pages are also numbered 1
7  through 18.  Have you seen any other
8  pages other than pages 1 through 18?
9  A.  Yeah.
10 Q.  What else have you seen?
11 A.  All of it.
12 Q.  I understand all of it.  But
13 are there any additional pages other
14 than 1 through 18 that you have seen
15 that's part of this investigation?
16 A.  I seen -- I've read the whole
17 investigation.
18 Q.  And is the whole investigation
19 other than 1 through 18 of Plaintiff's
20 3?
21 A.  This is it.
22 Q.  Okay.
23 A.  This is all of it.
139

1      MS. HAYNES:  And let me ask
2  y'all this.  It's marked
3  "confidential."  Is it -- do we have a
4  protective order that it has to be
5  under seal, do you recall?
6      MR. BOSTICK:  I'd have to go
7  back and look at the documents.  I
8  think so.
9      MS. HAYNES:  Okay.  I couldn't
10 remember.  It's highly confidential.
11     MR. BOSTICK:  Off the record.
12 Off the record.
13     THE VIDEOGRAPHER:  Off the
14 record, 11:14.
15     (Off-the-record discussion.)
16     THE VIDEOGRAPHER:  Back on the
17 record, 11:14.
18     (Plaintiff's Exhibit 4 was
19     marked for identification.
20     A copy is attached.)
21 Q.  (BY MS. HAYNES) Have you seen
22 Plaintiff's Exhibit 4, Bates Number
23 D-172 through 176?
140

1  A.  **Yes.**
2  Q.  And when did you first see it?
3  A.  **The same time I seen --**
4  MR. DYKES:  Three.
5  A.  **-- Number 3.**
6  (Plaintiff's Exhibit 5 was
7  marked for identification.
8  A copy is attached.)
9  Q.  (BY MS. HAYNES) Have you seen
10  Plaintiff's Exhibit 5?
11  A.  **It's the same thing.**
12  Q.  Well, that's not my question.
13  My question is:  Have you seen 5, which
14  is marked D-666 through 678?
15  A.  **Yes.**
16  Q.  When you saw Plaintiff's 5,
17  was it separate as I have it right now
18  or was it mixed in with the other
19  documents you've looked at?
20  A.  **It was all together.**
21  Q.  Okay.  Other than Plaintiff's
22  3, 4, and 5, have you seen any other
23  documents about the investigation?

141

1  A.  **Not to my knowledge.**
2  Q.  Okay.  Have you seen any other
3  statements other than those mentioned
4  in Plaintiff's Exhibits 3, 4, and 5?
5  A.  **Not to my knowledge.**
6  Q.  Have you ever seen Ms.
7  Edwards' charge of discrimination that
8  I'm marking as Plaintiff's Exhibit 6?
9  (Plaintiff's Exhibit 6 was
10  marked for identification.
11  A copy is attached.)
12  A.  **Yes, I have.**
13  Q.  (BY MS. HAYNES) Okay.  When
14  did you see it?
15  A.  **The same time I seen the rest.**
16  Q.  Okay.  Anything else that
17  you've seen?
18  A.  **Not to my knowledge, but if**
19  **you would show it to me, I could tell**
20  **you.**
21  (Plaintiff's Exhibit 7 was
22  marked for identification.
23  A copy is attached.)

142

1  Q.  (BY MS. HAYNES) Plaintiff's
2  Exhibit 7 -- well, I marked the wrong
3  one.  Have you seen that, Plaintiff's
4  7?
5  A.  **Yes, I have.**
6  Q.  Okay.  And when you saw 7 for
7  the first time, did it also have the
8  two attachments, Bates Numbers 250 and
9  251 attached?
10  A.  **No, it did not.**
11  Q.  Okay.  Is 250 and 251 the same
12  document?
13  A.  **Yes.**
14  Q.  Okay.  You've only written one
15  letter in this matter; is that correct?
16  A.  **Only one.**
17  Q.  Who assisted you in writing
18  that letter?
19  A.  **No one.**
20  Q.  Where did you type it?
21  A.  **At home.**
22  Q.  Anyone tell you what you
23  needed to type?

143

1  A.  **Not telling me what I needed**
2  **to type but tell me what -- how to word**
3  **some of it.**
4  Q.  Were you given a draft --
5  A.  **No, I was not.**
6  Q.  -- that you could copy?
7  A.  **No, I was not.**
8  Q.  Were you given an outline to
9  copy?
10  A.  **No, I was not.**
11  Q.  And when did you write this?
12  A.  **During the two weeks that I**
13  **was suspended.**
14  MS. HAYNES:  Okay.
15  THE VIDEOGRAPHER:  Off the
16  record, 11:19.  We conclude tape two of
17  the deposition.
18  (Recess, commencing at
19  11:19 a.m. and concluding at
20  11:38 a.m.)
21  THE VIDEOGRAPHER:  Back on the
22  record.  The time is now 11:38.  We
23  commence tape three of the deposition.

144

1  Q.  (BY MS. HAYNES) All right.
2  When we took a break, we had -- or
3  right before we took a break, we had
4  identified Plaintiff's 3, 4, 5, and 6
5  and 7, and you have reviewed these
6  documents previously; is that correct?
7    A.  **Yes, ma'am.**
8    Q.  Okay.  Did Mr. Kitchens tell
9  you that he had gone to talk to team
10  relations before you went to talk to
11  team relations?
12    A.  **During the first**
13  **investigation?**
14    Q.  Yes, sir.
15    A.  **Yes.**
16    Q.  Was there more than one
17  investigation?
18    A.  **I just meant this**
19  **investigation.**
20    Q.  Okay.  What did he tell you?
21    A.  **No details.**
22    Q.  He just said, "I went to talk
23  to team relations"?

145

1    A.  **Yeah.**
2    Q.  Did he tell you they asked
3  questions about you?
4    A.  **Yeah.  But we didn't -- I**
5  **mean, he said -- he said he had to go**
6  **talk to team relations about the**
7  **situation with me and Tammy, and that**
8  **was it, no details on nothing.**
9    Q.  Okay.  When he came back, he
10  didn't tell you anything?
11    A.  **No, he didn't.**
12    Q.  Were you and Mr. Kitchens
13  living together during this period of
14  time?
15    A.  **I don't know if it was at that**
16  **time.  I was only -- I only stayed at**
17  **his house for two months.**
18    Q.  Okay.  When was that?
19    A.  **I don't know the dates.**
20    Q.  Were you separated from your
21  wife?
22    A.  **Legally separated, no.  I was**
23  **just living at Billy's, and she was**

146

1  **living at home, and we seen each other**
2  **every day.**
3    Q.  Well, why were you staying
4  with Mr. Kitchen -- Kitchens?
5    A.  **Why?**
6    Q.  Yes, sir.
7    A.  **Because I wasn't staying at**
8  **home.  We was arguing.**
9    Q.  You and Mr. Kitchens --
10    A.  **No.**
11    Q.  -- or you and your wife?
12    A.  **Me and my wife.**
13    Q.  Okay.  And had you moved out?
14    A.  **I moved out.**
15    Q.  Did she ask you to leave?
16    A.  **No, she didn't.**
17    Q.  You just moved out?
18    A.  **I just moved out.**
19    Q.  All right.  And had you
20  already told Mr. Kitchens that you were
21  going to need a place to stay and
22  needed to stay with him?
23    A.  **Yeah.**

147

1    Q.  Okay.  So when you left the
2  home you shared with your wife, you
3  went right to Mr. Kitchens' place?
4    A.  **I might have stayed at my**
5  **parents' house a couple of days, but**
6  **yeah, eventually I went to Billy's.**
7    Q.  Okay.  And did he have a
8  house, an apartment?
9    A.  **He had a house.**
10    Q.  Did anyone live with him?
11    A.  **Jason Driggers.**
12    Q.  So it's a three-bedroom house?
13    A.  **Yes, ma'am.**
14    Q.  Okay.  And you had one
15  bedroom, Mr. Driggers had another, and
16  Mr. Kitchens?
17    A.  **That's right.**
18    Q.  Anyone else live in that
19  house?
20    A.  **No.**
21    Q.  And that was the setup for
22  about two months?
23    A.  **Maybe.**

148

1    Q.   Could have been longer?
2    A.   **Could have been shorter.**
3    Q.   Okay.  But you don't remember
4  the month --
5    A.   **No, I don't.**
6    Q.   -- that it was?
7    A.   **I know it was summertime**
8  **because it was hot.**
9    Q.   He didn't have air
10 conditioning?
11   A.   **Yeah, but it wasn't too good.**
12   Q.   Okay.  That's how you remember
13 it, huh?
14   A.   **Yeah.**
15   Q.   He probably was having the
16 same problem Mr. Bostick's having, air
17 conditioner problems.
18        All right.  And what was the
19 setup with -- how did you pay Mr.
20 Kitchens to stay at his house?
21   A.   **Two hundred dollars a month.**
22   Q.   Okay.  And do you know how
23 many times you gave him two hundred

149

1  dollars?
2    A.   **I only gave it to him once.**
3    Q.   Did you pay any other bills?
4    A.   **No.**
5    Q.   Did you ever have overnight
6  company while you were staying with
7  Mr. Kitchens?
8    A.   **No.**
9    Q.   Did you have female company
10 that came to visit you while you lived
11 with Mr. Kitchens?
12   A.   **My wife come and visited me.**
13   Q.   Okay.  Anyone else?
14   A.   **No.**
15   Q.   Any other female?
16   A.   **No.**
17   Q.   Ms. Foster didn't come?
18   A.   **No.**
19   Q.   Did Mr. Kitchens ever tell you
20 that he had told Ms. Jones and Mr.
21 Blame about Jennifer Foster and that
22 the two of you were having a
23 relationship?

150

1    A.   **No.**
2    Q.   Okay.  The first time you knew
3  that Mr. Kitchens had shared that
4  information was when you read this
5  document?
6    A.   **Yes, ma'am.**
7    Q.   Plaintiff's Exhibit 3?
8    A.   **Yes, ma'am.**
9    Q.   Okay.  Everything else but the
10 situation with Ms. Foster, which I
11 think is on the second page -- well,
12 I'm sorry, it's the third page of
13 Plaintiff's Exhibit 3, is everything
14 else except, what Mr. Kitchens related
15 to Ms. Jones and Mr. Blame?
16   A.   **No, I don't think of him as no**
17 **father figure.**
18   Q.   How old is he?
19   A.   **Forty-nine.**
20   Q.   And you're --
21   A.   **Thirty-nine.**
22   Q.   Okay.  Do you know why he
23 would say that?

151

1    A.   **I would guess 'cause I'm**
2  **younger than he is, and that might be**
3  **the way he looks at it.  I don't -- I**
4  **really don't know.**
5    Q.   Okay.  But you don't perceive
6  him as a father figure?
7    A.   **No, not at all.**
8    Q.   Have you ever had to borrow
9  money from him?
10   A.   **No, I have not.**
11   Q.   All right.  Anything else?
12   A.   **Not as far as I know.**
13   Q.   Okay.  Just the father figure
14 you do not agree with and the situation
15 that he said, "Mike is seeing a lady on
16 the floor" and names Jennifer Foster?
17   A.   **You're just talking about what**
18 **Billy said here, right?**
19   Q.   Yes, sir, just Billy Kitchens?
20   A.   **No, not as I -- I don't guess**
21 **so.**
22   Q.   When did Mr. Alexander -- now
23 that you see the dates on Plaintiff's

152

1 Exhibit 3, when did Mr. Alexander share
2 with you that he had heard Ms. Edwards
3 complain about you?
4       MR. BOSTICK:  Who is Mr.
5 Edwards?
6       THE WITNESS:  Ferrard.
7       MS. HAYNES:  Ferrard.
8       MR. BOSTICK:  Ferrard.  Okay.
9    A.   I don't remember what day
10 it -- it was the same day -- I mean, I
11 really don't know the date or the day.
12 I just know that Ferrard's the one that
13 told me.
14    Q.   (BY MS. HAYNES)  Okay.  And you
15 don't know if it was --
16    A.   And --
17    Q.   -- July 31st or August 1?
18    A.   No, ma'am, I do not.
19    Q.   Okay.  Did Mr. Kitchens tell
20 you beforehand that he was going to
21 talk to team relations?  I think we
22 established that.
23    A.   He told me that he was going

153

1 up there to talk to them.  He said he
2 got called to talk to team relations.
3    Q.   Okay.  And had you already
4 talked to Mr. Kitchens about what
5 Mr. Alexander had told you?
6    A.   No, I had not -- yes, I --
7 yes, I had.  Well, not in all that.  I
8 just heard -- I told him that I heard
9 Tammy was trying to get me in trouble,
10 and that was it.
11    Q.   Okay.  Who is Rhonda Wallace?
12    A.   Rhonda Wallace?
13    Q.   Yes, sir.
14    A.   I have no idea.
15    Q.   Okay.  She is mentioned on the
16 first page of Plaintiff's Exhibit 3,
17 where Mr. Kitchens is saying Rhonda
18 Wallace came to me again today, and he
19 sent her to Steve Culpepper?
20    A.   I have no idea who Rhonda
21 Wallace is.
22    Q.   Do you know anything about a
23 complaint with two suppliers involving

154

1 harassment?
2    A.   I had heard something about
3 it.
4    Q.   What did you hear?
5    A.   That one -- that a guy was
6 trying to talk to two of the suppliers.
7 I don't know who the guy was or who the
8 women were.  That might be one of the
9 women, I don't know.
10    Q.   Well, when you read
11 Plaintiff's Exhibit 3 before this
12 deposition, did you question anybody
13 about what's this going on with Rhonda
14 Wallace and Billy Kitchens?
15    A.   No.
16    Q.   Okay.  Billy Kitchens didn't
17 tell you about that --
18    A.   No.
19    Q.   -- that he'd talked to team
20 relations first about Rhonda Wallace?
21    A.   Nope.
22    Q.   All right.  Where Ms. Jones
23 writes, "It's ashamed" -- which is

155

1 sic -- "we put them in that,"
2 (referring to a complaint that two
3 suppliers have made regarding
4 harassment involving an HMMA TM)."  Do
5 you know what that's referring to?
6    A.   The TM, team member.
7    Q.   The suppliers, are those team
8 members as well?
9    A.   Suppliers are not team
10 members.
11    Q.   Who are they?
12    A.   Suppliers.  They check parts.
13    Q.   Vendors?
14    A.   Yeah, vendors.  They check
15 parts, they're parts that come in from
16 our suppliers, so we just call them the
17 suppliers.  They're the representatives
18 from whoever the part's coming to --
19    Q.   Okay.
20    A.   From.
21    Q.   Okay.  All right.  They're not
22 Hyundai employees?
23    A.   No, ma'am.

156

1    Q.   Okay.  All right.  After Ms.
2  Jones writes, "Have you heard details?"
3  and Mr. Kitchens tells her, "Tammy came
4  to me months ago," did Mr. Kitchens
5  ever tell you that Ms. Edwards had come
6  to him months ago complaining about
7  you?
8    A.   No, he did not.
9    Q.   And in 2006, specifically
10 August and September 2006, was Mr.
11 Kitchens your supervisor?
12   A.   No, he was not.
13   Q.   Whose supervisor was he?
14   A.   He wasn't.  He was a team
15 leader, just like I was.
16   Q.   Okay.  Was he a team -- team
17 leader over you?
18   A.   No, he was not.  We were
19 equal.
20   Q.   Was he a team leader over
21 Ms. Edwards?
22   A.   No, he was not.
23   Q.   Okay.  And team members and

157

1  team leaders are not equals, are they?
2    A.   Pay-wise, no.
3    Q.   Okay.  And work situation,
4  they're not equal?
5    A.   No.
6    Q.   Okay.  What's the difference
7  between a team member and team leader?
8    A.   A dollar.
9    Q.   A dollar an hour, but what's
10 your office situation?
11   A.   Office?
12   Q.   Yes.
13   A.   We don't --
14   Q.   Do you have an office?
15   A.   No, I don't.  I have a desk.
16 It's on the floor.
17   Q.   Okay.  Do you have a computer?
18   A.   Yes, I do.
19   Q.   Do you have a telephone?
20   A.   Yes, I do.  I don't think it's
21 working right now, but I have one.
22   Q.   Okay.  Team members don't have
23 a desk or --

158

1    A.   No, they don't.
2    Q.   -- a computer or a telephone,
3  do they?
4    A.   No, they don't.
5    Q.   Are you considered a
6  supervisor?
7    A.   No, I'm not.
8    Q.   All right.  So Mr. Kitchens
9  never said anything to you months ago
10 about Ms. Edwards?
11   A.   No, he did not.
12   Q.   All right.  Where Mr. Kitchens
13 tells Ms. Jones, "I told Mike to watch
14 his mouth and how he talks to ladies,"
15 that would be an incorrect statement?
16   A.   It sure would.
17   Q.   Okay.  He didn't -- he didn't
18 say anything to you about watching your
19 mouth and how you talk to the ladies?
20   A.   No, he did not.
21   Q.   All right.  In the next
22 sentence, did Mr. Kitchens tell you you
23 were a supervisor now?

159

1    A.   No, because I'm not a
2  supervisor, and he knows that.
3    Q.   All right.  So where he says,
4  "I told Mike he was a supervisor now,"
5  that's an incorrect statement again by
6  Mr. Kitchens?
7    A.   I'm not saying it's incorrect,
8  but I don't know why he would call me a
9  supervisor because a team leader's not
10 considered a supervisor.
11   Q.   Okay.  And then the next
12 sentence says, "Tammy did" -- "didn't
13 ask me to go to Mike."  You don't know
14 anything again about that?
15   A.   No, I do not.
16   Q.   All right.  So Mr. Kitchens
17 didn't say, "Ms. Edwards didn't tell me
18 to come to see you, but you need to
19 watch your mouth"?
20   A.   No, he did not.
21   Q.   All right.  The next sentence
22 where Mr. Kitchens said, "I told Mike
23 if he was talking ugly, he needed to

160

1  stop," that's incorrect?
2      **A.    That's incorrect.  He's never**
3  **told me that.**
4      Q.    All right.  And the next
5  sentence where it says, "Mike shrugged
6  it off, but I believe he listened to
7  me," that would also be incorrect?  Are
8  we on the same page?
9      **A.    I don't think so.**
10     Q.    I'm looking at Plaintiff's
11 Exhibit 3.
12     **A.    Uh-huh.**
13     Q.    Are you there?
14     **A.    Yeah.  What page?**
15     Q.    First page.  Let me see what
16 you're looking at.  Where we're --
17 right there, I'll put a little yellow
18 mark right there where I'm talking
19 about.  It says Billy's name and the
20 first sentence should be, "Tammy came
21 to me months ago."
22     **A.    Uh-huh, I got you.**
23     Q.    All right.  That's where we've
                        161

1  been.  Do we need to go back over that?
2      **A.    No, ma'am.**
3      Q.    All right.  You're with us
4  now, though, right?
5      **A.    Yes, ma'am.**
6      Q.    All right.  Where it says,
7  "Mike shrugged it off, but I believe he
8  listened to me" --
9      **A.    Uh-huh.**
10     Q.    -- that's an incorrect
11 statement?
12     **A.    Billy never come to me and**
13 **said anything.**
14     Q.    All right.  Go down to the
15 bottom of the page one of Plaintiff's
16 Exhibit 3, also Bates Number 177.
17     **A.    Uh-huh.**
18     Q.    And go up seven lines from the
19 bottom, and that should start off with
20 Stacye, where Ms. Jones is saying what
21 she said.
22     **A.    "Have you witnessed" --**
23     Q.    "Have you been in a
                        162

1  conversation with the three of you
2  where Mike used the F word?"
3      **A.    Uh-huh.**
4      Q.    Do you see where we are?
5      **A.    Yes, ma'am.**
6      Q.    Okay.  And Mr. Kitchens
7  answered, "That's a possibility."
8  Would you agree with that, that you,
9  Mr. Kitchens, and Ms. Edwards have been
10 in a conversation where you have said
11 the word "fuck"?
12     **A.    I would not agree on that.**
13     Q.    That's an incorrect statement
14 by him?
15     **A.    Yep.**
16     Q.    All right.  Right under that,
17 where Mr. Kitchens says, "That's a
18 possibility," Ms. Jones asks, "Have you
19 witnessed a situation where Mike was
20 seated in a chair and thrusting himself
21 forward in the presence of Tammy"?
22     **A.    Uh-huh.**
23     Q.    And Mr. Kitchens says, "I
                        163

1  don't remember."  Do you recall a
2  situation where you were in a chair
3  simulating a sexual act?
4      **A.    No, I don't.**
5      Q.    Do you deny that?
6      **A.    Yes, I do.**
7      Q.    You sat in Ms. Edwards'
8  deposition last week, correct?
9      **A.    Yes, I did.**
10     Q.    And you heard her describe
11 that situation?
12     **A.    Yes, I did.**
13     Q.    Okay.
14     **A.    I've heard it described many**
15 **times.**
16     Q.    Who described it to you?
17     **A.    Stacye Jones.**
18     Q.    Okay.  What did she say?
19     **A.    The same thing Tammy said.**
20     Q.    And Ms. Jones was -- described
21 that situation just like Ms. Edwards?
22     **A.    Pretty much.**
23     Q.    Any deviation?
                        164

1    A.   Well, when Stacye done it, she
2  was just jerking all around in the --
3  in the office up there.  I -- I mean, I
4  knew what she was doing.
5    Q.   All right.  Do you recall you
6  sitting in a desk chair or any kind of
7  chair where you were --
8    A.   No, I do not.
9    Q.   -- thrusting in the chair
10 simulating a sex act and yelling out
11 the F word?
12   A.   No, I do not.
13   Q.   You know what I mean when I
14 say "the F word," don't you?
15   A.   Yes, ma'am.
16   Q.   You deny that?
17   A.   I deny that.
18   Q.   Did you ever make the comment
19 to Ms. Edwards that she was not to go
20 to Billy Kitchens again to discuss your
21 fucking business?
22   A.   I do not.
23   Q.   You deny that?

165

1    A.   I deny it.
2    Q.   What was your relationship
3  with Ms. Edwards when she worked at
4  Hyundai?
5    A.   Co-worker.
6    Q.   Were you friends?
7    A.   I thought.
8    Q.   Acquaintances, how would you
9  describe the relationship?
10   A.   I thought we was friends, I
11 thought everything was good.
12   Q.   Okay.  Did you find her to be
13 a truthful person?
14   A.   On what we talked on.
15   Q.   Okay.  Anything you ever
16 talked about that you felt she was
17 untruthful?
18   A.   Not until this come up.
19   Q.   Okay.  But in the -- how long
20 had y'all worked together before this
21 came up?
22   A.   I don't know, four months,
23 five months.  I -- I really don't know.

166

1    Q.   What was her job?
2    A.   CCR operator.
3    Q.   And what is a CCR operator?
4    A.   She keeps up with the
5  downtime.
6    Q.   Did she do a good job in her
7  deposition explaining what her job
8  duties were?
9    A.   Yeah, pretty much.
10   Q.   Okay.  And what would be the
11 occasions that she would have to pass
12 through your department?
13   A.   Getting the downtime off the
14 board that was in my area and going to
15 the BC lines to get their downtime.
16   Q.   Okay.  Did you ever go
17 anywhere socially with Ms. Edwards away
18 from work?
19   A.   No.
20   Q.   And we've already established
21 you didn't see her out clubbing?
22   A.   No.
23   Q.   Okay.  Did she ever tell you

167

1  she was praying for you?
2    A.   No.
3    Q.   Did she ever counsel you about
4  getting back with your wife?
5    A.   Counsel me, no.
6    Q.   Okay.  How would you describe
7  those conversations?
8    A.   About like any woman would
9  say, you'd probably be best if you get
10 back with your wife.
11   Q.   Do you think most women would
12 say that?
13   A.   Yeah, pretty much.
14   Q.   Okay.  And why do you say
15 that?
16   A.   I -- I mean, I don't know.
17 That's just my thoughts.
18   Q.   Okay.  And most men would say
19 what, you don't need to get back with
20 your wife?
21   A.   Men don't talk about that.
22   Q.   Okay.
23   A.   I don't talk about that with

168

1  men.
2      Q.  All right.  What else would
3  Ms. Edwards talk with you about?
4      A.  **Kids, downtime, I mean, I**
5  **don't know, whatever the situation**
6  **might bring up.**
7      Q.  Okay.  What other than work
8  would she talk to you about where she
9  initiated the conversation?
10     A.  **Well, we talked about me**
11 **racing on a motorcycle.**
12     Q.  Okay.  What did she say?
13     A.  **Said that her and her husband**
14 **would like to come out -- was going to**
15 **come out there and watch me race.**
16     Q.  Okay.  Did she tell you why?
17     A.  **Why?**
18     Q.  (Nodding.)
19     A.  **No, I don't know.  I mean, I**
20 **guess they just wanted to come out**
21 **there like everybody does.**
22     Q.  Did she mention anything about
23 her child was interested in racing?

169

1      A.  **I mean, I don't remember.**
2  **Maybe so, I don't know.**
3      Q.  Anything else she would
4  initiate in having a conversation with
5  you that was outside talking
6  specifically about work or a work
7  situation?
8      A.  **Not as I remember.  I don't**
9  **know.**
10     Q.  Did she ever say anything
11 inappropriate to you?
12     A.  **Yeah.**
13     Q.  What?
14     A.  **When she asked me what am I**
15 **looking at, am I fucking stupid?**
16     Q.  Okay.  When did she say that?
17     A.  **The Friday before she went and**
18 **made these charges on me.**
19     Q.  And that would be --
20     A.  **I don't know the date.**
21     Q.  Sometime in July?
22     A.  **Yeah.**
23     Q.  And what were you doing when

170

1  she made that comment to you?
2      A.  **Walking down between the --**
3  **walking down between body build/respot,**
4  **on my phone.**
5      Q.  You were on your phone?
6      A.  **I was on my phone.**
7      Q.  Who were you talking to?
8      A.  **Rob Katzenbach.**
9      Q.  Okay.  Did he hear the
10 conversation?
11     A.  **No.**
12     Q.  Did anybody hear the
13 conversation?
14     A.  **No.**
15     Q.  Anybody ever told you they
16 heard Ms. Edwards say the F word to
17 you?
18     A.  **To me, no.**
19     Q.  Okay.  And tell me again what
20 you -- what she said to you.
21     A.  **I was walking by her going**
22 **down between the lines, I was on the**
23 **phone.  I looked over at her, and when**

171

1  **I got off the phone, she says, "Why are**
2  **you looking at me like that?  Are you**
3  **fucking stupid?"  I kept on walking,**
4  **because I don't like to be called**
5  **stupid.  The other didn't bother me.**
6  **She come up to me later, asked me what**
7  **was wrong with the line.  I told her I**
8  **might be too fucking stupid to answer**
9  **her question, she might need to go find**
10 **somebody else to ask.  And after that,**
11 **it was all downhill.**
12     Q.  Okay.  Do you think that was
13 the catalyst that --
14     A.  **I don't know.**
15     Q.  Okay.  And nobody heard that?
16     A.  **No.**
17     Q.  Okay.  Did anybody hear your
18 conversation where you said you might
19 be too fucking stupid to answer her
20 question?
21     A.  **I don't think so.**
22     Q.  Nobody else was around?
23     A.  **No.**

172

1    Q.    Where did that conversation
2  take place?
3    A.    **Both of them was at the same**
4  **place in between body build and respot.**
5    Q.    Right there on -- in the
6  middle of the plant, on the floor?
7    A.    **In the middle of my lines.**
8    Q.    Anything else she's ever said
9  inappropriate to you?
10    A.    **Not as I can recall.**
11    Q.    Did you ever report that to
12  anyone?
13    A.    **No.**
14    Q.    Did you tell Ms. Jones about
15  it?
16    A.    **No.**
17    Q.    Why not?
18    A.    **Oh, yes, I did tell Ms. Jones**
19  **about that.**
20    Q.    When?
21    A.    **During the conversation.**
22    Q.    Did you ever tell Mr. Bondy
23  about it?

173

1    A.    **No, I did not.**
2    Q.    Did you tell Mr. Kitchens
3  about it?
4    A.    **No, I did not.**
5    Q.    How about Mr. Culpepper?
6    A.    **No, I did not.**
7    Q.    Who was Ms. Edwards'
8  supervisor during that period of time?
9    A.    **Supervisor would -- that would**
10  **be group leader.**
11    Q.    Who would that have been?
12    A.    **Steve Culpepper.**
13    Q.    Okay.  So you didn't go and
14  tell Mr. Culpepper one of your team
15  members has --
16    A.    **No, I did not.**
17    Q.    -- violated policy or
18  anything?
19    A.    **No, I did not.**
20    Q.    Okay.  Anything else she said?
21    A.    **Not that I remember.**
22    Q.    Has she ever done anything
23  inappropriate to you?

174

1    A.    **Not that I can remember.**
2    Q.    Okay.  Has she ever sent you
3  a -- well, strike that.  Has she ever
4  told you a joke you thought was
5  inappropriate in the workplace?
6    A.    **Not as I remember, no.**
7    Q.    Have you ever heard her
8  telling a joke in the workplace?
9    A.    **No, I don't guess so.**
10    Q.    Have you heard her using the F
11  word at any other time in the workplace
12  other than the time you've shared with
13  us?
14    A.    **No, I haven't heard her.**
15    Q.    Pardon?
16    A.    **No, I have not heard her.**
17    Q.    Did she do a good job as a
18  CCR?
19    A.    **Yes.**
20    Q.    And did you have an
21  opportunity to observe her work as a
22  CCR?
23    A.    **I got the downtime reports.**

175

1    Q.    Okay.  Did she do a good job
2  with those?
3    A.    **Yeah, I guess so.**
4    Q.    Were they detailed?
5    A.    **Yeah.**
6    Q.    I mean, did you ever tell her
7  she wasn't doing a good job?
8    A.    **It wasn't my job to do that.**
9    Q.    Did you ever complain to
10  anyone about her job performance?
11    A.    **The downtime report really**
12  **don't reflect on me at all.**
13    Q.    Okay.  My question is, sir:
14  Had you ever complained to anyone about
15  her?
16    A.    **No, I did not.**
17    Q.    Okay.  And up until she
18  complained about you sexual harassing
19  her, had you ever made any complaint to
20  anyone about Tammy Edwards?
21    A.    **No, I had not.**
22    Q.    Had you heard anyone complain
23  about her?

176

1  A.  No.

2  Q.  On page 2 of Plaintiff's 3

3  that's continuing over from page 1,

4  where Ms. Jones asked, "Have you heard

5  any specifics regarding these incidents

6  I mentioned?" and Mr. Kitchens answered

7  basically what you've said on page 2 of

8  that exhibit, Ms. Jones then asks him,

9  "Who told you these things" and Mr.

10  Kitchens replied, "I don't want to say

11  names"?

12  A.  Uh-huh.

13  Q.  Have you heard anyone else

14  talking about these incidents that were

15  mentioned on the first page, for

16  instance, you sitting in a chair

17  thrusting yourself forward and saying

18  the F word to Ms. Edwards?

19  A.  Do I know who he's referring

20  to when he says, "I don't" --

21  Q.  That there were other -- he's

22  heard other people, but he doesn't want

23  to mention names?

177

1  A.  No, I have no clue who he's

2  talking about.

3  Q.  Okay.  Have you ever been in a

4  group setting with Mr. Bondy, Mr.

5  Culpepper, and Mr. Kitchens where they

6  were talking and laughing about this

7  incident with you in the chair?

8  A.  No, I have not.

9  Q.  All right.  Twelve -- the

10  twelfth line down on page 2 of

11  Plaintiff's 3, where it says "Billy:

12  Mike comes across brash," do you see

13  where I am, twelve lines down?

14  A.  Twelve names down?

15  Q.  Twelve lines.

16  A.  Okay.

17  Q.  Where it says "Stacye," and

18  she asks, "Can you think of anything

19  that can help us in our investigation"?

20  A.  Uh-huh.

21  Q.  And Billy says, "Mike comes

22  across brash.  The way Mike talks is

23  wrong.  I've been around him when he's

178

1  like that.  I haven't seen a situation

2  with the two of them (Tammy and Mike)."

3  Do you know what Mr. Kitchens is

4  referring to when he says that you come

5  across brash, and the way you talk is

6  wrong?

7  A.  No, I have no clue.

8  Q.  Is that a wrong statement by

9  him?

10  A.  I don't know what he's talking

11  about.

12  Q.  Have you ever talked -- other

13  than being around the supervisors and

14  managers you told me about that were

15  all men, have you ever talked about sex

16  in the workplace?

17  A.  No.

18  Q.  Have you ever talked about

19  sexual acts in the workplace?

20  A.  No.

21  Q.  Oral sex, anal sex?

22  A.  No.

23  Q.  Specifically, you deny that?

179

1  A.  I deny that.

2  Q.  Ms. Jones asks, "Have you seen

3  Mike do that with somebody else in the

4  plant," and Mr. Kitchens answers,

5  "You're dealing with someone who is

6  like a brother to me.  Yeah, I've seen

7  him do that stuff around other people."

8  Do you know what he's referring to

9  there?

10  A.  I have no clue.

11  Q.  Do you know what the word

12  "brash," B-R-A-S-H, means?

13  A.  Not really.  Harsh is what I

14  think.

15  Q.  Harsh?

16  A.  Yeah.

17  Q.  Okay.  All right.  The two

18  lines down where Billy says, "Yeah, I

19  understand the severity of the

20  situation.  I don't envy y'all.  I've

21  seen both sides.  Mike laughs and cuts

22  up but sometimes takes it to another

23  level," do you know what he's referring

180

1  to there?

2  **A.  No, I don't.**

3  Q.  Have you ever told jokes in

4  the workplace that would be demeaning

5  or degrading to women?

6  **A.  No.**

7  Q.  All right.  In the next

8  sentence down, Ms. Jones asks, "Can you

9  give me examples?" and Mr. Kitchens

10  says, "Talking bad, ugly, using the F

11  word. If Mike has never said that word

12  around TR, he knows not to say it

13  around anyone else." Do you know what

14  he's referring to there?

15  **A.  Using the F word.**

16  Q.  Okay.  And we've established

17  you have used that in the workplace?

18  **A.  I have used it.**

19  Q.  And you don't deny that?

20  **A.  I don't deny that.**

21  Q.  Did you use it yesterday when

22  you were at work?

23  **A.  I would imagine.**

181

1  Q.  Okay.

2  **A.  Around anybody, no; on the**

3  **phone, maybe.**

4  Q.  On the phone at work?

5  **A.  Maybe so.**

6  Q.  Is that what you're talking

7  about?  How about on the line?

8  **A.  No.**

9  Q.  You didn't use it yesterday on

10  the line?

11  **A.  No, I did not.  Since this, I**

12  **do not use profanity on the line.**

13  Q.  It hasn't happened since?

14  **A.  No, it has not.**

15  Q.  Okay.  All right.  A few lines

16  down, we have -- and I'm not counting

17  here, but I'll try and make a reference

18  here, where it says "Stacye" again, and

19  she says, "Has anyone told you besides

20  Tammy that Mike's language bothered

21  them," do you see where I am?

22  **A.  Yes, ma'am.**

23  Q.  Okay.  And Mr. Kitchens

182

1  answers, "Yeah," and Stacye says,

2  "Who?" and then the name Stephanie

3  Samuels is mentioned by Mr. Kitchens?

4  **A.  Uh-huh.**

5  Q.  Who is Stephanie Samuels?

6  **A.  Quality group leader.**

7  Q.  And what have you said to

8  Ms. Samuels?

9  **A.  Well, we argue on the rad --**

10  **when she was team leader, we used to**

11  **argue on the radio.**

12  Q.  What do you mean you'd argue

13  on the radio?

14  **A.  Because she was quality and I**

15  **was production, and we didn't get**

16  **along.  She wanted problems fixed right**

17  **then, and I had other things to do, and**

18  **then we'd argue about it on the radio.**

19  Q.  Would you use profanity in

20  talking with --

21  **A.  No, I would not.**

22  Q.  Did Mr. Kitchens ever say

23  Ms. Samuels had complained to him about

183

1  you?

2  **A.  No, because I never cussed at**

3  **Stephanie, not with the words that**

4  **you've been talking about.  I might say**

5  **"hell" or "damn."**

6  Q.  Okay.  What else have you said

7  to Ms. Sam --

8  **A.  Nothing.**

9  Q.  -- Ms. Samuels?  Did Ms.

10  Samuels ever tell you she didn't

11  approve of your language toward her?

12  **A.  No, she did not.**

13  Q.  Or directed toward her?

14  **A.  No, she did not.**

15  Q.  And reading Exhibit 3, is that

16  the first time you learned that Ms.

17  Samuels had ever complained to anyone

18  about you and your language?

19  **A.  Talking about the first time I**

20  **read this?**

21  Q.  Yes, sir.

22  **A.  Yes, ma'am.**

23  Q.  All right.  Then after

184

1  Stephanie Samuels, Ms. Jones asks,
2  "Have you and Mike spoken today
3  regarding this situation?" and Mr.
4  Kitchens says that "Mike got rumor of
5  it and came straight to me." Is that
6  correct?
7  **A.    I told you about that earlier.**
8  **Q.**   Okay.  Did you go to Mr.
9  Kitchens before you went to Mr. Bondy?
10  **A.    I don't remember.  I believe I**
11  **probably would have went to Tom first.**
12  **Q.**   And then the next line is --
13  when Ms. Jones asks, "Why did he come
14  to you?" and he answers, "I'm a father
15  figure," and you said you dispute that?
16  **A.    No, I don't look at him as a**
17  **father figure.**
18  **Q.**   Okay.  Why did you go to him
19  first?
20  **A.    I don't know if I went to him**
21  **first.**
22  **Q.**   Okay.  You're saying it could
23  have been Mr. Bondy and then Mr.

1  Kitchens?
2  **A.    Could have been.**
3  **Q.**   Okay.  And he states there,
4  "He would come to me or Tom," meaning
5  Bondy, "Tom as a friend." Are both
6  Mr. Bondy and Mr. Kitchens your
7  friends?
8  **A.    I would consider them to be a**
9  **friend.**
10  **Q.**   And then the next page on page
11  3 of Plaintiff's Exhibit 3, Mr.
12  Kitchens divulges the -- about your
13  seeing Jennifer Foster, who is a lady
14  on the floor, and you said that's just
15  not correct?
16  **A.    That's not correct.**
17  **Q.**   And is it true in the last
18  sentence that -- or the last two
19  sentences that Ms. Foster worked or
20  worked then for Keith Ulrich?
21  **A.    Yes, ma'am.**
22  **Q.**   Okay.  Had you discussed with
23  Pam Stoddard that Mr. Alexander had

1  told you that Tammy Edwards had
2  complained?
3  **A.    Pam was on my line.  She heard**
4  **it at the same time I did.**
5  **Q.**   Okay.  Okay.  Right under
6  where Mr. Kitchens stops talking, it
7  says Pam Stoddard had taken the day off
8  on August 1?
9  **A.    Uh-huh.**
10  **Q.**   Does that refresh your
11  recollection that you would have heard
12  on July 31st?
13  **A.    I -- I don't know.**
14  **Q.**   Well, you could not have heard
15  for the first time on August 1 if Ms.
16  Stoddard was gone?
17  **A.    I don't -- I don't know the**
18  **dates.  I told -- that's what I said**
19  **earlier.**
20  **Q.**   Did you and Ms. Stoddard
21  discuss that she was going to take a
22  day off so she wouldn't be called to
23  team relations to discuss this matter?

1  **A.    No, we did not.**
2  **Q.**   Did you and Ms. Stoddard talk
3  about what had been asked of you prior
4  to her going to team relations?
5  **A.    What do you mean by what was**
6  **asked of me?**
7  **Q.**   Yeah, what did Ms. Jones ask
8  of you?
9  **A.    I was the last person to go.**
10  **Q.**   Okay.  Did Ms. Stoddard
11  discuss with you what had been asked of
12  her?
13  **A.    No, she did not.**
14  **Q.**   Did Mr. Bondy and Mr. Kitchens
15  ever tell you they had met with Ms.
16  Edwards prior to her going to team
17  relations?
18  **A.    No.**
19  **Q.**   After you talked with Mr.
20  Bondy, did he call Ms. Edwards to his
21  office?
22  **A.    Not as I know.**
23  **Q.**   Under the interview with Tammy

1  Edwards on Plaintiff's Exhibit 3,
2  there's an asterisk --
3      A.    Uh-huh.
4      Q.    -- and it says, "I had gotten
5  word" -- and this is Ms. Jones'
6  writing -- "I had gotten word that
7  Tammy had met with management regarding
8  her allegations. When I mentioned this
9  to Tammy, she said management had
10  called her to meet with them." You
11  didn't know about that meeting?
12     A.    No, I did not.
13     Q.    Did anyone ever tell you that
14  they had had a meeting with Ms. Edwards
15  prior to her going to team relations?
16     A.    No, they did not.
17     Q.    Mr. Bondy never told you the
18  content of his conversation with Ms.
19  Edwards before you got to team
20  relations?
21     A.    I never knew that there was a
22  conversation with Ms. Edwards and Tom
23  Bondy.

189

1      Q.    Did you know there was a
2  meeting?
3      A.    No.
4      Q.    Did Mr. Bondy ever share with
5  you that he had learned either from
6  Ms. Edwards or anyone else prior to you
7  going in to meet with team relations?
8      A.    No.
9      Q.    How about Mr. Culpepper, did
10  he tell you that he had met with Ms.
11  Edwards before you went in and talked
12  to team relations?
13     A.    No, he didn't.
14     Q.    Reading -- and you've told me
15  you've already read what Ms. -- the
16  interview with Ms. Edwards, but
17  anything incorrect with what Ms.
18  Edwards told Ms. Jones?
19     A.    I'd have to sit here and read
20  every bit of it.
21     Q.    Sure, we can do that. Where
22  Stacye says, "When did this start?"
23  and Tammy Edwards states, "It started

190

1  right after I got on Mike's line --
2  around March 2006 maybe," do you agree
3  with that or disagree?
4      A.    Well, didn't nothing start,
5  no. Referring to something starting,
6  no, I don't agree with it.
7      Q.    Okay.
8      A.    But did she come to my line in
9  March 2006? Maybe.
10     Q.    Were you a team leader then?
11     A.    Yes, I was.
12     Q.    Okay. She states then, "Mike
13  asked if I was married and I told him I
14  was happily married to my high school
15  sweetheart"; is that true?
16     A.    Yes.
17     Q.    Not that your -- that she said
18  that, but did you ask her that?
19     A.    In conversation -- well, the
20  first sentence I asked her is did she
21  have kids. She said yeah, she had two.
22  I told her I had two. Then I said,
23  "Are you married?" and she said, "Yes,

191

1  I'm married to my high school
2  sweetheart." And I said, "I am too,
3  and in this day and age, that's a good
4  thing because you don't have to worry
5  about nothing." That's it.
6      Q.    That was the end of that
7  conversation?
8      A.    That was it.
9      Q.    And that's the first
10  conversation you had when she moved to
11  your line?
12     A.    That's it.
13     Q.    Okay. What's the second
14  conversation you --
15     A.    I have no clue.
16     Q.    Where she writes here -- this
17  is Ms. Jones writing -- that Ms.
18  Edwards stated, "It progressed to Mike
19  asking me if I had (quote) 'been' (end
20  quote) with anybody else." Did you ask
21  her that?
22     A.    No.
23     Q.    Did you make the statement

192

1 that as far as you knew, your wife had
2 not been with another man either?
3     **A.  No.  All I said is what was up**
4 **here, what I just told you.**
5     Q.  Okay.  You didn't say anything
6 else about the rest of that paragraph?
7     **A.  No, I did not.**
8     Q.  So you specifically deny that
9 you said that Ms. Edwards had just not
10 been with the right one, meaning the
11 right man?
12     **A.  I deny that.**
13     Q.  Do you deny that you told
14 Ms. Edwards that if she had been with
15 you, she wouldn't want to go back to
16 her husband?
17     **A.  Yes, I deny that.**
18     Q.  Then Ms. Jones tells Ms.
19 Edwards, "From the beginning tell us
20 what you remember," and Ms. Edwards
21 states, "Mike curses."  Do you admit
22 that?
23     **A.  Yes, I've already admitted**
193

1 **that.**
2     Q.  Okay.  That's -- we
3 established that earlier?
4     **A.  Yeah.**
5     Q.  Okay.  And she says,
6 "Everything is F or MF."  And do I need
7 to tell you what F and MF stands for?
8     **A.  No.**
9     Q.  You understand that question?
10     **A.  Yes, ma'am.**
11     Q.  All right.  And is that true?
12     **A.  Not -- everything is not.**
13     Q.  Do you say those words a lot
14 in the workplace or did you in 2006?
15     **A.  Not every word.  When I was --**
16 **when I was mad enough to say it and**
17 **something's going wrong with the line,**
18 **it was a good possibility.**
19     Q.  That it was every word?
20     **A.  As far as talking to you about**
21 **the weather outside, I didn't use them**
22 **words in that sentence.**
23     Q.  Okay.  Would you agree with
194

1 me, Mr. Swindle, you used them a lot in
2 2006?
3     **A.  Only if something was going**
4 **wrong with the line.**
5     Q.  Would that happen a lot,
6 something was wrong with the line?
7     **A.  Not a whole lot.**
8     Q.  How often in the day?
9     **A.  Once a day, twice a day.**
10     Q.  Okay.  And then Ms. Edwards
11 shares with Ms. Jones, "The first thing
12 I remember is him shaking himself at
13 me. He would grab his genitals or rub
14 them up and down."  Did you do that?
15     **A.  No, I did not.**
16     Q.  You deny that?
17     **A.  I deny that.**
18     Q.  You deny you've ever touched
19 yourself at the workplace in -- in a
20 suggestive manner?
21     **A.  Yes, I deny it.**
22     Q.  Okay.  Have you ever asked
23 Ms. Edwards or told Ms. Edwards that --
195

1 let me strike that and start again.
2 The next sentence, "Mike would ask me
3 if that turned me on," have you ever
4 made that statement to Ms. Edwards?
5     **A.  No, because I didn't do that.**
6     Q.  I'm just asking you, sir, if
7 you've made that statement?
8     **A.  No, I did not.**
9     Q.  Has Ms. Edwards ever told you
10 to stop?
11     **A.  No.**
12     Q.  Has she ever told you she
13 didn't like the words you used around
14 her?
15     **A.  No.**
16     Q.  Has she ever told you to stop
17 touching her?
18     **A.  I've never touched her.**
19     Q.  Has she ever told you to stop
20 shaking or rubbing yourself at her?
21     **A.  I never shaked or rubbed**
22 **myself at her.**
23     Q.  All right.  The next sentence
196

1  says, "Pam Stoddard would say, 'Oh,
2  damn, girl, it ain't hurting you.'"
3  Have you ever heard Pam Stoddard make
4  that comment?
5      A.  **No, I have not.**
6      Q.  Has Ms. Edwards ever asked
7  what is it with you and Pam?
8      A.  **Not to my knowledge.**
9      Q.  Have you ever told Ms. Edwards
10  that "Pam," meaning Ms. Stoddard,
11  "doesn't like Jennifer Foster and wants
12  to make Jennifer jealous"?
13      A.  **No.**
14      Q.  Is that true or untrue?
15      A.  **That's -- I -- I don't know**
16  **whether Pam likes Jennifer or not, but**
17  **I've never said that.**
18      Q.  Ms. Stoddard has never told
19  you she doesn't like Jennifer Foster?
20      A.  **No.**
21      Q.  Does Jennifer Foster like Pam
22  Stoddard?
23      A.  **I've never had a conversation**
197

1  **about liking Pam either.**
2      Q.  Are Pam Stoddard and Jennifer
3  Foster African-American?
4      A.  **Yes, they are.**
5      Q.  Did Ms. Edwards ever tell you
6  that she wished you would just leave
7  her out of all that?
8      A.  **No.**
9      Q.  All right.  Turning the page
10  to page 4 of Plaintiff's Exhibit 3, and
11  here we have bullet points.
12      A.  **Uh-huh.**
13      Q.  Okay.  The little dots is what
14  I'm referring to as bullet points, and
15  we have nine of those.  Do you see
16  where I'm talking about?
17      A.  **Yes, ma'am.**
18      Q.  Okay.  And instead of reading
19  sentence by sentence as we've been
20  doing, I'd like to go bullet point by
21  bullet point.
22      A.  **Yes, ma'am.**
23      Q.  Is that fine?
198

1      A.  **Yes, ma'am.**
2      Q.  Reading the first bullet
3  point, did you ever make that comment
4  to Ms. Edwards?  And I'm talking about
5  the comment, "Don't you ever fucking
6  dodge me again."
7      A.  **No, I did not.**
8      Q.  Okay.  Do you deny any of the
9  comments she relates to you in bullet
10  point one?
11      A.  **Do I deny all of them?**
12      Q.  The ones that she said relate
13  to you?
14      A.  **Yeah.**
15      Q.  You never said those?
16      A.  **No.**
17      Q.  Okay.  The second bullet
18  point, she quotes you as saying, "Don't
19  fucking go to Billy anymore or anybody
20  about our business."  Do you deny that?
21      A.  **Yes, I do.**
22      Q.  Did you say anything similar
23  to that?
199

1      A.  **No, I did not.**
2      Q.  Were you aware that Ms.
3  Edwards had complained to Billy
4  Kitchens that you were a pervert?
5      A.  **No, I was not aware of it.**
6      Q.  Okay.  Has anyone else told
7  you you're a pervert at work?
8      A.  **No.**
9      Q.  Was there a situation where
10  you were humping the fence --
11      A.  **No, I was not.**
12      Q.  -- in a sexually suggestive
13  manner?
14      A.  **No, I was not.**
15      Q.  Do you know what I'm referring
16  to?
17      A.  **Just from what I've read in**
18  **here.**
19      Q.  Okay.  And you deny that
20  happening?
21      A.  **I deny that.**
22      Q.  Mr. Swindle, the question I'm
23  going to ask is not meant to embarrass
200

1  you, but I need to know it.  Do you
2  have any mental or emotional
3  disabilities?
4      A.   **No, I do not.**
5      Q.   You've never had to be on any
6  type of medication?
7      A.   **No, I have not.**
8      Q.   Ever been treated for any type
9  of emotional or mental disability?
10     A.   **No, I have not.**
11     Q.   Have you been on any
12  medication in the last four years that
13  would cause you to act out in any type
14  of manner?
15     A.   **No, I have not.**
16     Q.   Any type of alcohol or drug
17  use in the last five years?
18     A.   **No, it has -- I have not.**
19     Q.   The third bullet point --
20  well, let's go back to the second
21  bullet point.  Did you ever tell Ms.
22  Edwards you were hurt when she tried
23  dodging you?

                    201

1      A.   **No.**
2      Q.   Was there ever a conversation
3  between you and Ms. Edwards where she
4  asked if the two of you were okay?
5      A.   **Not as I remember.**
6      Q.   Okay.  Was there a situation
7  where you were mad at her and she was
8  mad at you?
9      A.   **The only time I was mad at her**
10  **was when she called me "fucking**
11  **stupid."**
12     Q.   Okay.  And you were just
13  incensed because she called you
14  "stupid"?
15     A.   **Exactly.**
16     Q.   Okay.  Her calling you
17  "fucking" --
18     A.   **That didn't bother me.**
19     Q.   -- didn't bother you?
20     A.   **No.**
21     Q.   Okay.  All right.  In the
22  third bullet item, have you ever talked
23  with Ms. Edwards about having sex with

                    202

1  women and pulling their hair?
2      A.   **No.**
3      Q.   Why would you pull Ms.
4  Edwards' hair when she was in the
5  plant?
6      A.   **I didn't -- I didn't pull her**
7  **hair.  When she walked by, I done that**
8  **(demonstrating), and she turned around**
9  **to talk to me.  I mean, it wasn't like**
10  **I snatched the back of her head.**
11     Q.   Well, had she walked by you
12  without talking and you pulled her
13  ponytail and said, "Don't walk by me
14  without speaking"?
15     A.   **No.  I was busy.**
16     Q.   Then why did you pull her
17  ponytail?
18     A.   **I was busy, and I turned**
19  **around and seen her and just done that.**
20     Q.   Just reached out and tugged
21  it?
22     A.   **Just barely.**
23     Q.   Just barely touched her

                    203

1  ponytail?
2      A.   **Just barely, yeah.**
3      Q.   Why didn't you address her by
4  her name instead of pulling her hair?
5      A.   **I don't know.**
6      Q.   Any reason you chose to pull
7  her hair instead of talking to her?
8      A.   **No reason.**
9      Q.   Okay.  When you pulled her
10  hair, did you not say, "Don't walk by
11  me without talking"?
12     A.   **No, I did not.**
13     Q.   You just wanted to get her
14  attention by pulling her hair?
15     A.   **Exactly.**
16     Q.   Any other reason?
17     A.   **No.**
18     Q.   And you don't remember what
19  she said when you pulled her hair?
20     A.   **No, I don't.**
21     Q.   Still in the third bullet
22  item, did you ever make the comment
23  that you made love to your wife, but

                    204

1 you liked to do the freaky stuff on the
2 side?
3 A. No, I did not.
4 Q. Have you ever talked about
5 freaky sex?
6 A. I was in a -- a group
7 conversation that was talking about
8 that, and I was standing there present.
9 Q. Who was present?
10 A. It's in here.
11 Q. It's on down?
12 A. It's in here somewhere, the
13 whole group, the whole line.
14 Q. Can you show me where? I
15 haven't seen about you talking about
16 freaky sex with anybody?
17 A. No, no, no, I didn't say I was
18 talking about freaky sex. I said I was
19 in a group conversation where they was
20 talking about a different situation in
21 here --
22 Q. Okay.
23 A. -- that has to do with that.
205

1 A. A lady in the street but a
2 freak in the bed, it was the song. All
3 the details of the conversation, I do
4 not remember, but I remember that.
5 Q. Just the name of the song?
6 A. Yep.
7 Q. What's the name of that song?
8 A. I have no clue.
9 Q. Okay. And that led into
10 different people talking about freaky
11 sex?
12 A. No. That was the song that
13 they were talking about, and they were
14 talking about off of that one line
15 right there, a lady in the street but a
16 freak in the bed.
17 Q. Okay. And then did you follow
18 that up in the conversation that you
19 made love to your wife, but you had the
20 freaky sex --
21 A. I did not.
22 Q. -- on the side? You didn't
23 say anything about freaky sex?
207

1 Q. All right. Somebody else was
2 talking about freaky sex?
3 A. They was talking about a song.
4 Q. Okay. Who was that?
5 A. Everybody that was on the
6 line, everybody that was on my team was
7 standing in a circle and certain ones
8 was talking. Who was talking, I don't
9 remember, but there was a lot of folks
10 talking.
11 Q. Was Tammy Edwards in that --
12 A. She walked up into the
13 conversation.
14 Q. And what did she say?
15 A. She didn't say nothing, but
16 she didn't walk off either.
17 Q. She sat there and listened?
18 A. She sure did.
19 Q. Did she add anything to the
20 conversation?
21 A. I don't remember.
22 Q. What do you remember what she
23 walked up and listened to?
206

1 A. No, I did not.
2 Q. Somebody else said freaky
3 stuff?
4 A. It possibly could have
5 happened.
6 Q. Okay. And you don't remember
7 anybody talking about any specific sex
8 act --
9 A. No.
10 Q. -- in that conversation?
11 A. No, I don't.
12 Q. Did you and Ms. Edwards ever
13 discuss that if she would just act like
14 what you were saying to her didn't
15 bother you, you would stop?
16 A. No, because I wasn't saying
17 nothing to her.
18 Q. That's not my question. Did
19 you talk about that?
20 A. No.
21 Q. Okay. Do you have any
22 knowledge of Pam Stoddard telling
23 Ms. Edwards that if she would act like
208

1 it didn't bother you (sic) that you
2 would stop harassing her?
3    A.   No.
4    Q.   Bullet item -- and that was
5 bullet item four that we just talked
6 about, the Pam Stoddard comment.
7 Bullet item five, did you ever make a
8 comment to Ms. Edwards about her spouse
9 and her not having oral sex?
10    A.   No.
11    Q.   Okay.  Did Ms. Edwards talk to
12 you about she and her spouse having
13 oral sex?
14    A.   No.
15    Q.   Did you ever talk about you
16 and your wife having oral sex?
17    A.   No.
18    Q.   Next sentence, "Mike also said
19 he doesn't use condoms.  I told Mike he
20 was going to have a disease one day and
21 be in a nursing home."  Did the two of
22 you have that conversation, you and
23 Ms. Edwards?

209

1    Q.   Did you make the comment to
2 Ms. Edwards that you would, quote,
3 "lick her ass raw"?
4    A.   No, I did not.
5    Q.   Have you ever made that
6 comment at work?
7    A.   No, I have not.
8    Q.   All right.  Next bullet item
9 six -- give me a one-minute warning,
10 okay?  Next bullet item six, have you
11 ever looked at Ms. Edwards' crotch and
12 she told you to stop?
13    A.   No.
14    Q.   Has Ms. Edwards ever asked you
15 that Mr. Kitchens told me to ask you
16 what camel toes are?
17    A.   No, I don't remember ever --
18 him ever asking me that.
19    Q.   Well, did Ms. Edwards ask you
20 that?
21    A.   No.
22    Q.   You don't recall a
23 conversation where she said, "Mike,

211

1    A.   No.
2    Q.   All right.  The next sentence,
3 where she said, "Mike asked if I ever
4 had a man's finger up my butt while
5 having sex," did you discuss that with
6 her?
7    A.   No, I did not.
8    Q.   Did you ask her that question?
9    A.   No, I did not.
10    Q.   Have you ever made that
11 comment at work?
12    A.   No, I have not.
13    Q.   Was Ms. Stoddard standing
14 there and said that she didn't know
15 what she was missing?
16    A.   I would say no because I
17 didn't say that.
18    Q.   Okay.  All right.  The --
19 still in bullet item five, you've
20 already said you did not discuss oral
21 sex at work either with your wife or
22 with other women; is that correct?
23    A.   That's correct.

210

1 Billy told me I'm to come ask you about
2 what camel toes are"?
3    A.   No, I don't remember that.
4    Q.   Has Ms. Edwards told you she
5 would slap the shit out of you?
6    A.   Nope.
7    Q.   And then if she didn't make
8 that, you would -- make that comment,
9 you would not have said that just turns
10 you on?
11    A.   No, I wouldn't -- I didn't say
12 that.
13    Q.   Okay.  Have you ever tried to
14 block the aisle when she's been walking
15 by?
16    A.   No.
17    Q.   And in the last sentence of
18 bullet point six, "Sometimes Mike puts
19 his hand behind his back and butts up
20 against me," have you ever done that?
21    A.   No, I have not.
22    Q.   You've never thrust your
23 crotch into the person of Ms. Edwards?

212

1    A.    **No, I have not.**
2         MS. HAYNES:  Okay.  Take a
3    break.
4         THE VIDEOGRAPHER:  Off the
5    record, 12:35.  We conclude tape three
6    of the deposition.
7         (Recess, commencing at
8         12:35 p.m. and concluding at
9         1:49 p.m.)
10        THE VIDEOGRAPHER:  Back on the
11   record.  The time is now 1:49.  We
12   commence tape four of the deposition.
13        Q.    (BY MS. HAYNES) All right.
14   Prior to the lunch break, we were
15   talking about Plaintiff's Exhibit 3,
16   and let me ask you, since the lunch
17   break, have you had a time to reflect
18   on any of your answers and do you need
19   to change any answer?
20        A.    **No.**
21        Q.    Have you recalled anything
22   over the lunch break that you forgot to
23   tell me and you need to tell me?

1    A.    **I'm not on the same shift with**
2    **him any longer.**
3         Q.    Okay.  Which shift -- are you
4    on the same shift all the time now?
5         A.    **Now.**
6         Q.    Okay.  You don't rotate
7    shifts?
8         A.    **No -- yes, ma'am, I do rotate**
9    **shifts.**
10        Q.    Okay.  How long have you been
11   rotating shifts?
12        A.    **Since I got there, but I got**
13   **moved off of the shift I was on when**
14   **all this happened onto the other shift.**
15   **There's an A shift and a B shift.**
16        Q.    Okay.
17        A.    **I started on B shift.  When**
18   **all this happened, I got moved to A**
19   **shift, and then I got moved back to B**
20   **shift.**
21        Q.    When?
22        A.    **When Toby Chance moved to**
23   **engineer.**

1    A.    **No.**
2         Q.    Okay.  So up until now, all
3    your answers are true and correct and
4    accurate, to the best of your ability?
5         A.    **Yes, ma'am.**
6         Q.    Okay.  Let's continue with 3,
7    and I'll see if I can speed up this
8    process, but with regards to bullet
9    point seven, Plaintiff's Exhibit 3, do
10   you recall a situation where you and
11   Ms. Edwards discussed that you were
12   bumping into her in front of Roger
13   Clackler?
14        A.    **No, I do not.**
15        Q.    Do you know Roger Clackler?
16        A.    **I know who he is.**
17        Q.    How do you know him?
18        A.    **I was on the shift, the same**
19   **shift as him.**
20        Q.    What's his position at
21   Hyundai?
22        A.    **Keeper.**
23        Q.    Is he on your line?

1    Q.    What year was that?  How
2    long -- well, let me ask you this:  How
3    long did you stay on just A shift?
4         A.    **Just A shift, nine months,**
5    **roughly.**
6         Q.    Okay.  And were you
7    alternating shifts or always on A
8    shift?
9         A.    **I was -- I was always on A**
10   **shift, but that means I ro -- I mean,**
11   **this many months we'd do days, this**
12   **many months, we'd do nights.  Each**
13   **shift does the same.**
14        Q.    What's the difference between
15   A shift and B shift?
16        A.    **Just the people, no**
17   **difference.**
18        Q.    Okay.  Time is the same?
19        A.    **Time is the same.**
20        Q.    Okay.  So for nine months you
21   worked on A shift, which would have
22   meant different people?
23        A.    **Different people.  I was no**

1 longer on the shift that Tammy was on.
2    Q.   When you moved to --
3    A.   A shift.
4    Q.   -- A shift.  Now, you're back
5 on the same shift you started out with?
6    A.   Now I'm on -- yes, ma'am.
7    Q.   Was your job the same when you
8 were on A shift?
9    A.   Yes, ma'am.
10    Q.   Okay.  And since 2006, have
11 you had any raises with Hyundai?
12    A.   The normal twice-a-year raises
13 that everybody gets, cost of living.
14    Q.   In 2006, what was your rate of
15 pay, hourly rate?
16    A.   Twenty-three seventy
17 something.
18    Q.   An hour?
19    A.   Yes, ma'am.
20    Q.   Okay.  And what is it now?
21    A.   Twenty-four seventy something
22 or something like that.  I'm not -- I'm
23 not sure exact --

·217

1    Q.   Is that a "yes"?
2    A.   Yes, ma'am.  I'm not exact on
3 it.
4    Q.   In 2008, have you received any
5 raises?
6    A.   Just a cost of living.
7    Q.   And is that factored into the
8 24 dollars and 70-something cents
9 you're making now?
10    A.   Yes, ma'am.
11    Q.   When is the next raise
12 scheduled?
13    A.   October, I believe.
14    Q.   October 2008?
15    A.   We get two cost of livings a
16 year.
17    Q.   Okay.  And you just had one in
18 March?
19    A.   Or April.
20    Q.   All right.  Have you had any
21 conversations with Roger Clackler about
22 Tammy Edwards?
23    A.   Never.

219

1    Q.   Is that --
2    A.   -- what I make.
3    Q.   I'm sorry.  Is that with or
4 without the shift differential?
5    A.   That's without.  When we work
6 nights, you just add a dollar to that.
7    Q.   And you do that every four
8 months?
9    A.   Yes, ma'am -- no, no, no.
10 That's what we did when we first
11 started.  Now we do two months, then we
12 rotate.  We do two months days, two
13 months nights, two months days.  Then
14 we do three months nights, three months
15 days.
16    Q.   Okay.  For 2007, what did your
17 W-2 have on it that was your annual
18 salary or annual rate of pay with
19 Hyundai?
20    A.   Eighty-five, roughly somewhere
21 in there.
22    Q.   Eighty-five thousand?
23    A.   Yeah.

218

1    Q.   Has Roger Clackler said
2 anything to you about Tammy Edwards?
3    A.   Never.
4    Q.   Anything in bullet point
5 seven, did that -- did any of that take
6 place?
7    A.   I don't remember that, none of
8 that happening.
9    Q.   Okay.  Do you recall you and
10 Ms. Edwards discussing Mike -- I'm
11 sorry, Roger Clackler in any fashion?
12    A.   Yes.
13    Q.   What did the two of you
14 discuss?
15    A.   She told me she was going to
16 have to stop coming down every evening
17 laughing and joking with me because her
18 husband had a friend that worked on the
19 opposite shift, and if he seen us
20 laughing and joking, he would tell her
21 husband about that we was laughing and
22 joking, and he'd get mad.
23    Q.   And she told you who her

220

1  husband's friend was?
2      **A.  Yeah.**
3      Q.  She said Roger Clackler, and
4  did you say, "I don't give a fuck who
5  he knows"?
6      **A.  That wasn't the -- that wasn't**
7  **part of that conversation.**
8      Q.  Was it a part of any
9  conversation?
10     **A.  No, it was not.**
11     Q.  So Ms. Edwards approached you
12 and said she was going to have to stop
13 coming down and laughing and joking
14 with you?
15     **A.  Yes.**
16     Q.  What day did that take place?
17     **A.  I -- I don't know.**
18     Q.  Where were you when she told
19 you that?
20     **A.  Body build station 305,**
21 **propped up on the weld controller.**
22     Q.  You were propped up or she was
23 propped up?

<center>221</center>

1      **A.  Both.**
2      Q.  Both of you were propped up?
3      **A.  We were both like this**
4  **(demonstrating).**
5      Q.  Okay.  And who started the
6  conversation?
7      **A.  We was talking about something**
8  **else, I don't remember what it was.**
9      Q.  And Mr. Clackler worked the
10 same shift as Ms. Edwards?
11     **A.  Not at that -- no.**
12     Q.  What shift did he work?
13     **A.  He worked opposite shift of me**
14 **and Tammy.**
15     Q.  Okay.  So y'all were working
16 the day shift?
17     **A.  Yes.**
18     Q.  And Mr. Clackler was working
19 the night shift?
20     **A.  Exactly.**
21     Q.  How would the two of you even
22 see Mr. Clackler?
23     **A.  When he walked from the locker**

<center>222</center>

1  room to moving parts.
2      Q.  Well, I thought there was like
3  a three-hour window?
4      **A.  Not at that time, it wasn't.**
5      Q.  Okay.  What was the shift at
6  that time?
7      **A.  We ran until we ran what**
8  **numbers we had to run.  It was no**
9  **eight-hour shift.**
10     Q.  So he wasn't showing up at
11 6:15 p.m.?
12     **A.  He might have been showing up**
13 **at 5:30, but we was working 'til 5:30**
14 **or six o'clock every day.**
15     Q.  Okay.  So he would be moving
16 from the locker room to the production
17 line?
18     **A.  Yes.**
19     Q.  And what did you say when she
20 said I'm going to' have to come down
21 here and stop laughing and joking with
22 you because of my husband's friend?
23     **A.  I told her she was talking to**

<center>223</center>

1  me about downtime, there's nothing --
2  **there's nothing to worry about.**
3      Q.  And what did she say?
4      **A.  She didn't say nothing.**
5      Q.  Any other conversations the
6  two of you had about Roger Clackler?
7      **A.  No.**
8      Q.  All right.  Bullet point
9  eight, did you make a comment about her
10 pants?
11     **A.  I told her her pants looked**
12 **like blue jeans, because we were not**
13 **supposed to wear blue jeans in the**
14 **plant.**
15     Q.  And what did she say?
16     **A.  She asked me did I like them,**
17 **and I said I wouldn't let my wife wear**
18 **them to work because they're too tight.**
19     Q.  Were they too tight?
20     **A.  In my opinion.**
21     Q.  Her pants, Ms. Edwards' pants
22 were too tight?
23     **A.  I just said I would not let my**

<center>224</center>

1 wife wear them to work because they're
2 too tight.
3      Q.   And what did she say?
4      A.   She didn't say nothing.
5      Q.   Well, I thought there was a
6 conversation about them being blue
7 jeans?
8      A.   That was at the first of it.
9 I just told you the whole conversation.
10      Q.   Okay.  Tell me how the
11 conversation started then.
12      A.   I don't remember how it
13 started, but I noticed when she walked
14 up, she had on the pants, and somehow
15 the pants got brought up.  I told her
16 they looked like blue jeans.  She asked
17 me did I like them, and I said I
18 wouldn't let my wife wear them to work
19 because they're too tight.
20      Q.   Did you say anything about the
21 pants being new?
22      A.   I don't remember.
23      Q.   Did she ever answer your
                        225

1 question about they look like blue
2 jeans?
3      A.   She said they -- they wasn't
4 blue jeans.
5      Q.   Okay.  Anything else?
6      A.   That's all I remember.
7      Q.   And she made no comment when
8 you said you wouldn't let your wife
9 wear them to work?
10      A.   I don't remember that she did.
11      Q.   Does your wife work at
12 Hyundai?
13      A.   No, she does not.
14      Q.   Has she ever?
15      A.   No, she doesn't.
16      Q.   Does she work outside the
17 home?
18      A.   Does she do what?
19      Q.   Does she work outside the
20 home?
21      A.   Yes, she does.
22      Q.   Where?
23      A.   UPS.
                        226

1      Q.   And was she working at UPS in
2 2006?
3      A.   Yes, she was.
4      Q.   Does she wear blue jeans to
5 work?
6      A.   No, she don't.
7      Q.   Does she have a uniform?
8      A.   No, she don't.
9      Q.   What does she wear to work?
10      A.   Casual clothes, sort of like
11 what you're wearing.
12      Q.   Business suit?
13      A.   Yeah, except on Fridays, she
14 can wear just slacks and a shirt, never
15 jeans.
16      Q.   And did you think Ms. Edwards'
17 pants were inappropriate in the
18 workplace?
19      A.   I don't know.  I mean, I just
20 said I wouldn't let my wife wear them
21 to work.  To whether they're
22 inappropriate to her, that's up to her.
23 I mean, I can't say nothing about what
                        227

1 she wears to work.
2      Q.   But you mentioned there's a
3 dress code?
4      A.   Because I thought they were
5 blue jeans.
6      Q.   Okay.  Is there anything else
7 about the dress code other than you
8 can't wear blue jeans?
9      A.   You have to wear a uniform all
10 the time.
11      Q.   Anything else?
12      A.   Not as I know of.
13      Q.   What top did she have on?
14      A.   I don't remember, but I would
15 figure it would be a uniform top,
16 seeing that that's what we have to
17 wear.
18      Q.   So you wear a uniform top, but
19 bottoms you can wear anything but blue
20 jeans?
21      A.   Not anything but blue jeans.
22      Q.   Okay.
23      A.   They have to --
                        228

1    Q.    Pants?
2    A.    They have to be -- you can't
3    wear cargo pants with big, bulky
4    hanging-off pockets.
5    Q.    Okay.  Anything else?
6    A.    Not as I know of, no.
7    Q.    Does it say anything about
8    tight clothing?
9    A.    I don't know.
10   Q.    At any rate, you didn't report
11   her --
12   A.    No.
13   Q.    -- being out of dress code?
14   A.    No, I did not.
15   Q.    All right.  Bullet point nine,
16   did anything in bullet point nine
17   occur?
18   A.    Nope.
19   Q.    That conversation didn't take
20   place?
21   A.    No, it did not.
22   Q.    Did -- has Ms. Edwards ever
23   asked you if you had a rough day?

229

1    A.    She didn't ask me in this
2    paragraph, she asked Billy.
3    Q.    All right.  Have you ever
4    heard her ask Mr. Kitchens if he had a
5    rough day?
6    A.    No, I have not.
7    Q.    Okay.  And she's never asked
8    you that?
9    A.    No, not that I can recall.
10   Q.    Okay.  Did you ever hear
11   Mr. Kitchens make the comment that he
12   didn't get any last night?
13   A.    I do not remember that.
14   Q.    You don't remember it on this
15   occasion or you've never heard him make
16   that comment?
17   A.    I've never heard him make that
18   comment.
19   Q.    Okay.  And you never made the
20   comment, "You know what's wrong with
21   Tammy"?
22   A.    No, I did not.
23   Q.    Have you listened to any

230

1    video -- audio tapes in this case?
2    A.    No, I have not.
3    Q.    You haven't listened to any
4    tapes that Ms. Edwards recorded?
5    A.    No, I have not.
6    Q.    Been told about any of them
7    from any source other than your
8    lawyers?
9    A.    No, I have not.  The first I
10   heard of them or heard anything of them
11   was last Tuesday.
12   Q.    Okay.  Did you ever make any
13   recordings of anyone at work?
14   A.    No, I did not.
15   Q.    Do you know of anyone who has
16   said they've recorded Tammy Edwards?
17   A.    No, I do not.
18   Q.    In the plant, are there
19   videotapes, security videotapes to --
20   that are constantly recording?
21   A.    Only on the front door.
22   Q.    Okay.  No other place in the
23   plant?

231

1    A.    Unless it's watching the line
2    for downtime, but that's focusing only
3    on certain stations.
4    Q.    You're not aware of
5    videotapes --
6    A.    No, I'm not.
7    Q.    -- that can watch the workers
8    and somebody in security's sitting
9    there watching?
10   A.    No.
11   Q.    All right.  Turning to page 5,
12   there are nine bullet points there,
13   also part of 3, which continues with
14   Ms. Edwards talking to Ms. Jones.  Have
15   you reviewed those?
16   A.    Which part?
17   Q.    The bullet items, I think it's
18   nine.  Yeah, there's nine.  Have you
19   reviewed those?
20   A.    I have now.
21   Q.    Did you read them before
22   today?
23   A.    Yeah.

232

1    **Q.** Okay. Have you ever made a
2 comment that your chest would feel
3 better than Ms. Edwards' husband's
4 chest?
5    **A. No, I have not.**
6    **Q.** Have you ever discussed your
7 chest compared to anyone else's?
8    **A. No.**
9    **Q.** Do you recall making the
10 comment when Ms. Edwards asked you
11 about putting down her time what she
12 needed to do, you said, "Those pants"?
13    **A. Nope.**
14    **Q.** You deny making that comment?
15    **A. I deny making that comment.**
16    **Q.** Okay. Bullet item three, did
17 you make those comments that you were
18 not a boob man but an ass man?
19    **A. No, I have not.**
20    **Q.** Never said that in the
21 workplace?
22    **A. Nope.**
23    **Q.** Not even talking to the guys?

233

1    **A. Maybe to the -- no, not in
2 that sense, but we've talked about that
3 kind of stuff before.**
4    **Q.** What, who's a boob man and
5 who's an ass man?
6    **A. Not really who's a boob man
7 and who's an ass man.**
8    **Q.** What have you talked about
9 then?
10    **A. I mean, I don't know.**
11    **Q.** Well, if you've talked about
12 it in the workplace, I mean, surely,
13 it's in some con -- context. How?
14    **A. I mean, I've heard people talk
15 about all this stuff. I mean, boobs
16 and ass, I've just heard it talked
17 about it at work, and I've been
18 standing there in the conversation.**
19    **Q.** You've never voiced your
20 preference?
21    **A. No, I've never said if I'm an
22 ass man or a boob man.**
23    **Q.** You don't have a preference?

234

1    **A. No.**
2    **Q.** In the fourth bullet item, has
3 Pam encouraged you in any of your
4 comments -- well, let me strike that.
5 Have you ever heard Pam tell Ms.
6 Edwards that she would be ready by the
7 time she went to night shift?
8    **A. No.**
9    **Q.** Have you ever told Ms. Edwards
10 that if she did not give you sexual
11 favors, she would not be able to watch
12 her daughter cheer --
13    **A. No, I have not.**
14    **Q.** -- at ball games?
15    **A. I have not.**
16    **Q.** Have you ever talked about her
17 daughter being a cheerleader?
18    **A. She's told me that her
19 daughter was a cheerleader.**
20    **Q.** And you've never made the
21 comment that unless she participated,
22 she wouldn't get to play?
23    **A. No, I did not.**

235

1    **Q.** You wouldn't give her time
2 off?
3    **A. I'm not authorized to give her
4 time off.**
5    **Q.** In 2006, though, she was
6 working with your line as a CCR; is
7 that correct?
8    **A. That's correct.**
9    **Q.** And you were her direct
10 report?
11    MR. DYKES: Object to the
12 form.
13    **A. I was her team leader.**
14    **Q.** Were you her direct report?
15    **A. Team leader. I'm not
16 authorized to give time off.**
17    **Q.** Okay. But were you her direct
18 report?
19    **A. I guess you could say that. I
20 was the team leader.**
21    **Q.** Did you tell her what to do?
22    **A. No, I did not.**
23    **Q.** Okay. Who would direct her

236

1  work?
2      A.  She was a CCR.  I mean, I
3  don't know who told her what to do and
4  what not to do.
5      Q.  Okay.  But did she do work on
6  your line?
7      A.  No, she did not.
8      Q.  Whose line did she work on?
9      A.  Physical work, CCR operator.
10     Q.  Okay.  But did she have
11 responsibility on your line?
12     A.  As far as tracking downtime.
13     Q.  Anyone else's line did she
14 track?
15     A.  BC1.
16     Q.  Who was over that line?
17     A.  Billy was.
18     Q.  Billy Kitchens?
19     A.  Yes.
20     Q.  How did you learn she was
21 coming to the position of CCR, who told
22 you?
23     A.  When they brought her up there
                    237

1  and told me she was going to be doing
2  CCR.
3      Q.  Who told you that?
4      A.  I'm wanting to say it was
5  Keith or Harry.  I'm not really sure
6  which one car -- brought her up there.
7      Q.  And how did they introduce you
8  to --
9      A.  "This is Tammy Edwards, she's
10 going to be doing CCR."
11     Q.  And then how were you
12 introduced? is my question.
13     A.  How was I introduced?
14     Q.  (Nodding.)
15     A.  "This is Mike Swindle."
16     Q.  Were you referred to as "the
17 king"?
18     A.  I've never heard that.
19     Q.  Never heard anybody refer to
20 you as "the king"?
21     A.  I've never heard anybody refer
22 to me as "the king."
23     Q.  How about when you came back
                    238

1  from suspension, did anyone say, "The
2  king is back"?
3      A.  No.
4      Q.  All right.  Bullet item five,
5  has Ms. Stoddard ever held Ms. Edwards'
6  arms for you to kiss her?
7      A.  I've never seen her do it.
8      Q.  Have you ever tried to kiss
9  Ms. Edwards?
10     A.  No.
11     Q.  Bullet item six, did you make
12 those comments?
13     A.  No, I did not.
14     Q.  Bullet item seven, referring
15 to Ms. Edwards as "fucking Mother
16 Teresa," did you call her that?
17     A.  No, I did not.
18     Q.  Have you ever said that?
19     A.  No, I have not.
20     Q.  All right.  Bullet item eight
21 about a screen saver Ms. Edwards had
22 with a picture of her daughter and her
23 daughter's boyfriend, did you see the
                    239

1  screen saver?
2      A.  I don't know if I seen the
3  screen saver, but I've seen a picture
4  of her daughter before.
5      Q.  Where?
6      A.  She showed it to me.
7      Q.  Okay.  And did you make a
8  comment about her daughter?
9      A.  I said she had a pretty
10 daughter.  I have a daughter that's the
11 same age.
12     Q.  Did you make a comment about
13 the boyfriend --
14     A.  No.
15     Q.  -- and her daughter?
16     A.  I did not.
17     Q.  You did not say, "You know
18 he's tearing that up"?
19     A.  No, I didn't.
20     Q.  Have you ever apologized to
21 Ms. Edwards?
22     A.  No, I have not.
23     Q.  Has Billy Kitchens ever
                    240

1 apologized to Ms. Edwards?

2     **A.   It says right here he has.**

3     Q.   You don't know?

4     **A.   I do not know.**

5     Q.   Okay. Other than reading

6 that, you don't know?

7     **A.   I do not know.**

8     Q.   All right. In the -- there's

9 an asterisk under all of that, and it's

10 talking about a conversation with

11 welding manager Tom Bondy talking to

12 Ms. Jones. Do you have any knowledge

13 about Mr. Bondy's conversation with

14 Ms. Jones?

15     **A.   No, I do not.**

16     Q.   Did Mr. Bondy ever tell you

17 that someone in the workplace had told

18 him about this second-shift incident

19 with the two of you horsing around?

20     **A.   No, Tom never told me about**

21 **that.**

22     Q.   Okay. Have you ever heard

23 anything about Ms. Edwards' husband

241

1 Ms. Edwards was talking to on the

2 telephone?

3     **A.   No, I don't guess. I don't**

4 **know. I don't know what Pam thought.**

5     Q.   Did Pam tell you this?

6     **A.   I don't know if Pam told me**

7 **that, but that's just what -- I heard**

8 **it from somebody.**

9     Q.   Did you tell Ms. Stoddard to

10 go see Mr. Bondy about that?

11     **A.   No.**

12     Q.   Did Pam tell you she had gone

13 to see Mr. Bondy?

14     **A.   No, she didn't.**

15     Q.   You just don't know who told

16 you?

17     **A.   I don't remember who told me.**

18 **There was a lot of stuff going around**

19 **at the time.**

20     Q.   All right. Page 6, did you

21 read Ms. Stoddard's interview with TR

22 specialist Lucas Cooner?

23     **A.   I read it a while back.**

243

1 giving her an ultimatum to quit her job

2 or file charges against you?

3     **A.   Yes, I did.**

4     Q.   What did you hear?

5     **A.   That she was overheard in the**

6 **rest -- in the bathroom on the phone**

7 **and said that.**

8     Q.   Who overheard her in the

9 restroom?

10     **A.   Pam Stoddard.**

11     Q.   Pam Stoddard, your friend?

12     **A.   That's right.**

13     Q.   Said she overheard Ms. Edwards

14 in the bathroom on the telephone?

15     **A.   That's right.**

16     Q.   So she was only hearing one

17 side of the conversation?

18     **A.   That's right.**

19     Q.   And what did Ms. Stoddard tell

20 you she heard?

21     **A.   Just that, that if she didn't**

22 **do it, her husband would leave her.**

23     Q.   Did Ms. Stoddard know who

242

1     Q.   Look on page 7. All right.

2 Let me go back first to page 6, near

3 the bottom of the page, where Lucas

4 Cooner asks Ms. Stoddard why would

5 people keep putting her name in the pot

6 about she might have information, and

7 I'm paraphrasing.

8     **A.   Uh-huh.**

9     Q.   But I want to ask you about

10 what Ms. Stoddard said here.

11 "Everybody knows we're," and she's

12 talking about Mike and Pam --

13     **A.   Uh-huh.**

14     Q.   Mike being you, "are close."

15 Is that true?

16     **A.   Yeah, we're good friends.**

17     Q.   Okay. And then she continues,

18 "We work together. They see us

19 together a lot," correct?

20     **A.   Yeah.**

21     Q.   Is that true?

22     **A.   Because she was working on my**

23 **line at the time.**

244

1   Q.   Okay.  And then she says,
2   "About the person Mike is having an
3   affair with, that person and I have
4   straightened out our problems.  The
5   jealousy is not my concern."  Did you
6   read that?
7        A.   **I just read it when you did.**
8        Q.   You hadn't read it before?
9        A.   **I don't remember.  Probably**
10  **so.**
11       Q.   Why would your good friend Pam
12  Stoddard make the comment that you were
13  having an affair with someone if you
14  weren't?
15       A.   **I don't know.  I guess that's**
16  **a question for Pam.**
17       Q.   Okay.  Did you ever share with
18  her you were having an affair?
19       A.   **I wasn't having an affair.**
20       Q.   All right.  On the next page,
21  what I was getting ready to talk to you
22  was on 7.  Ms. Jones asks the question,
23  "Has Tammy ever said anything to you

245

1   Q.   **Talking to people, no.**
2        Q.   Well, did you ask her what she
3   was doing down there?
4        A.   **No, I did not.**
5        Q.   Was she causing problems?
6        A.   **No, she was not.**
7        Q.   Did you ever ask for her to be
8   moved?
9        A.   **No, I did not.**
10       Q.   Do you know why she was moved
11  from the CCR position?
12       A.   **No, I do not.**
13       Q.   Anyone talk to you about that?
14       A.   **No, they did not.**
15       Q.   Did you question why she was
16  moved after complaining about you to
17  the -- back on the line?
18       A.   **Nope.**
19       Q.   When she was moved back on the
20  line, where was she in relation to your
21  department?
22       A.   **She was on BC1.**
23       Q.   And how far is that from you?

247

1   about Mike saying anything to her?" and
2   Pam Stoddard answers, "No, I feel as if
3   something like this was happening, she
4   would distance herself from us.  She
5   comes downstairs looking for us."  Is
6   that true?
7        A.   **She would come down there on**
8   **the line every day.**
9        Q.   Ms. Edwards?
10       A.   **Yeah.**
11       Q.   Was that part of her job?
12       A.   **Well, yeah.  She would come**
13  **down there at other times when it**
14  **wasn't part of her job too.**
15       Q.   And would she look for you?
16       A.   **I don't know who she was**
17  **looking for.**
18       Q.   Well, did you ever see her go
19  talk to anyone?
20       A.   **She would talk to everybody on**
21  **the line, me included.**
22       Q.   Okay.  Was that part of her
23  job?

246

1        A.   **Inside the same shop.  It**
2   **depends on where I'm at on my line and**
3   **where she would be on BC1.**
4        Q.   Okay.  How close would the two
5   of you be?
6        A.   **Twenty-five yards up to a**
7   **hundred yards.**
8        Q.   And when she was in the office
9   at the CCR, where was she, how far was
10  she from you?
11       A.   **Could be the same distance,**
12  **depending on where I was standing on my**
13  **line.**
14       Q.   Were there occasions when you
15  would go to her office?
16       A.   **If she had something to ask me**
17  **about the downtime.**
18       Q.   Okay.  Any other times you'd
19  go to her office?
20       A.   **No.**
21       Q.   Who else was in that office?
22       A.   **Cory Griggs sometimes or -- I**
23  **don't know, I don't remember the other**

248

**Page 249**

1 guy's name. He did the same job Cory
2 Griggs does.
3 　　　Q.　All right. After she
4 complained, she was put back on the
5 line on the BC?
6 　　　A.　BC1.
7 　　　Q.　BC1. And what is that?
8 　　　A.　Where the moving parts is
9 hung.
10 　　　Q.　Okay. And what was her job?
11 　　　A.　I don't know. I didn't go
12 down there to see.
13 　　　Q.　Okay. Is your desk about 30
14 feet away?
15 　　　A.　I think it's probably more
16 than 30 feet away.
17 　　　Q.　Forty feet?
18 　　　A.　Maybe.
19 　　　Q.　Okay. You couldn't see what
20 she was doing?
21 　　　A.　No, I could not.
22 　　　Q.　Okay. And Mr. Culpepper
23 didn't tell you what he -- what she was

**Page 250**

1 doing?
2 　　　A.　I didn't ask Mr. Culpepper
3 what she was doing.
4 　　　Q.　No one told you?
5 　　　A.　Nope.
6 　　　Q.　Did Mr. Culpepper tell you why
7 he moved --
8 　　　A.　I didn't ask Culpepper why he
9 moved her.
10 　　　Q.　And no one told you?
11 　　　A.　Nope.
12 　　　Q.　All right. In the second
13 interview with Billy Kitchens, on page
14 7, Plaintiff's Exhibit 3, Mr. Kitchens
15 talks about the -- the chair incident.
16 Did Ms. Jones ever come back and ask
17 you about that?
18 　　　A.　No, she did not.
19 　　　Q.　Did you and Mr. Kitchens have
20 a conversation about it, that he
21 suddenly had some recollection --
22 　　　A.　No.
23 　　　Q.　-- about you being in the

**Page 251**

1 chair?
2 　　　A.　No, he did not.
3 　　　Q.　You still deny that you were
4 thrusting about in a chair?
5 　　　A.　Yes, I do.
6 　　　Q.　Saying, "Fuck me"?
7 　　　A.　Yes I do.
8 　　　Q.　You would agree with me that
9 that's not rational behavior for the
10 workplace, wouldn't you?
11 　　　A.　I would agree.
12 　　　Q.　You would agree with me that
13 it is, in fact, deviant behavior?
14 　　　A.　Yes, I would.
15 　　　Q.　You would also agree with me
16 that dry humping a fence is deviant
17 behavior, wouldn't you?
18 　　　A.　Yes, I would.
19 　　　Q.　Not appropriate for the
20 workplace?
21 　　　A.　No, it's not. That's why I
22 never done it.
23 　　　Q.　Have you ever seen anyone do

**Page 252**

1 it?
2 　　　A.　No, I haven't.
3 　　　Q.　All right. Then there's the
4 interview with Amber Kelley, and you've
5 read that one, it starts on 7 and goes
6 to page 8?
7 　　　A.　Yeah.
8 　　　Q.　In the first bullet item, it
9 has that you and Amber Kelley have had
10 conflict. What is that about?
11 　　　A.　I don't remember ever having a
12 conflict with her.
13 　　　Q.　Okay.
14 　　　A.　I never talked to her.
15 　　　Q.　All right. She says here that
16 you've cursed her twice when she
17 approached you about downtime. Is that
18 correct?
19 　　　A.　No, it's not.
20 　　　Q.　Never happened?
21 　　　A.　Nope.
22 　　　Q.　It says here as she approached
23 you, she asked you, "Why are you

1   staring at me?" Do you recall that
2   conversation?
3      A.   No.
4      Q.   And you didn't say, "I'm not,
5   I'm looking at something else"?
6      A.   **I did not.**
7      Q.   Okay. And do you recall
8   Ms. Kelley saying, "That's a married
9   woman, you shouldn't be looking at
10   her"?
11      A.   **No, I don't.**
12      Q.   Were you looking at Ms.
13   Edwards?
14      A.   **No, I was not.**
15      Q.   Do you deny saying, "I can
16   look at her any fucking way I want to,
17   right, Tammy"?
18      A.   **No, I d8id -- I did not say**
19   **that.**
20      Q.   Did you try to hug Tammy
21   Edwards in that conversation?
22      A.   **No, I did not. That**
23   **conversation never happened.**

<center>253</center>

1      Q.   Do you know why Ms. Kelley
2   would lie to team relations about you?
3      A.   **No, I do not.**
4      Q.   Do you have any -- any reason
5   the two of you don't get along or --
6      A.   **We do, we get along. We**
7   **didn't talk then; we talk now.**
8      Q.   Do you know why she would say,
9   "When you resist me, it turns me on"?
10     A.   **No, I don't.**
11     Q.   Do you know why she would tell
12   team relations, "You better quit
13   talking to me like that before I report
14   you," why Ms. Edwards would be saying
15   that to you?
16     A.   **No.**
17     Q.   Do you know why Amber Kelley
18   would lie to team relations about that
19   comment?
20     A.   **No.**
21     Q.   Is there a reason you had to
22   look over at your lawyer before you
23   answered that question?

<center>254</center>

1      A.   **No, it's not.**
2      Q.   I'm going to ask the question
3   again. Do you know of any reason why
4   Amber Kelley would lie to team
5   relations?
6      A.   **Maybe because it's the fact**
7   **that Tammy offered her -- that**
8   **everybody said Tammy offered her money**
9   **to lie on me.**
10     Q.   You think that's the reason
11   Amber Kelley's lying about you?
12     A.   **I don't know. That's my take**
13   **on it.**
14     Q.   Okay. Did you tell team
15   relations that, she's lying because
16   Tammy Edwards has offered her money?
17     A.   **I didn't know that at the time**
18   **the investigation was going on.**
19     Q.   Well, when did you learn that?
20     A.   **When Amber Kelley told me when**
21   **I've told when. It's all in your --**
22   **what you wrote down from earlier.**
23     Q.   Six months ago?

<center>255</center>

1      A.   **Something like that maybe.**
2      Q.   Well, have you ever gone and
3   talked to team relations again and
4   said, I've -- I've got this information
5   from Amber Kelley that she says Tammy
6   Edwards is going to pay her money?
7      A.   **No, I did not.**
8      Q.   And I think I've been frauded
9   here?
10     A.   **No, I did not.**
11     Q.   Why not?
12     A.   **I just didn't.**
13     Q.   Do you know why Billy Kitchens
14   would tell Amber Kelley that you were
15   coming up with stuff to cover yourself,
16   something about a friend of the family
17   seeing Tammy touching Mike?
18     A.   **I have no idea.**
19     Q.   Have you ever talked to
20   Michelle Nelson about Tammy Edwards?
21     A.   **No, I have not.**
22     Q.   How about Kim Abrams?
23     A.   **No, I have not.**

<center>256</center>

1     **Q.**   Have you ever had any type of
2 conflict with Michelle Nelson or Kim
3 Abrams?
4     **A.**   **No, I have not.**
5     **Q.**   Look on the page 9, where
6 Ms. Jones is asking Ms. Abrams, "Have
7 you heard Mike tell sexually explicit
8 jokes?" and Ms. Abrams says, "I don't
9 think so. He doesn't tell jokes, he is
10 a joke. I asked him one time if he
11 applied for team leader at the
12 beginning of the year. He said, 'No,
13 I'm not going to mess up what I have on
14 this shift.' I asked, 'What are you
15 going' -- 'what you got going on? You
16 mean Jennifer? Mike said, 'Yeah.'"
17 Did that conversation happen?
18     **A.**   **No, it did not.**
19     **Q.**   What position is Jenni -- I'm
20 sorry, what position is Kim Abrams in?
21     **A.**   **She's a tool room -- she works**
22 **in the tool room.**
23     **Q.**   Do you know why or know of any
           257

1 reason Ms. Abrams would lie about you?
2     **A.**   **No, I don't.**
3     **Q.**   Do you have any information
4 that Ms. Edwards has offered to pay her
5 too?
6     **A.**   **No, I do not.**
7     **Q.**   Have you asked her?
8     **A.**   **Asked who?**
9     **Q.**   Ms. Abrams.
10     **A.**   **I haven't asked Amber.**
11     **Q.**   My question --
12     **A.**   **No, I have not.**
13     **Q.**   Thank you. All right.
14 Stephanie Samuels, do you know Ms.
15 Samuels?
16     **A.**   **Yes, I do.**
17     **Q.**   Okay. I asked you about her
18 earlier, and you said you never cursed
19 around her; is that correct?
20     **A.**   **I said I said "hell" or**
21 **"damn."**
22     **Q.**   Ms. Jones asked, "Has he said
23 'BS' and the 'F' word?" and Ms. Samuels
           258

1 says, "Yeah, that's Mike." Would you
2 agree with that?
3     **A.**   **I agree that it says that. I**
4 **don't agree that I said that to her.**
5     **Q.**   Okay. Do you say it around
6 her?
7     **A.**   **No, I have not.**
8     **Q.**   What women have you said curse
9 words around that are not bothered by
10 that?
11     **A.**   **My wife.**
12     **Q.**   I'm sorry, let me rephrase my
13 question. What women in the workplace
14 have you said those words to that are
15 not bothered?
16     **A.**   **I try -- I don't say that**
17 **around nobody else, no women.**
18     **Q.**   In 2006, who were you saying
19 it around?
20     **A.**   **I don't recall saying that**
21 **around no women in 2006.**
22     **Q.**   Have you ever told sexually
23 explicit jokes in the workplace?
           259

1     **A.**   **No.**
2     **Q.**   All right. Page 10 is the
3 interview with Toby Chance. Did you
4 and Mr. Chance have a conversation
5 before he went to talk to team
6 relations?
7     **A.**   **No, we did not.**
8     **Q.**   Is he a friend of yours?
9     **A.**   **I consider him a friend.**
10     **Q.**   Okay. And Mr. Lucas is asking
11 some of these questions -- I'm sorry,
12 Mr. Cooner, and one of the questions
13 he's asked, "Does Mike use foul
14 language?" and Mr. Chance says, "Ass is
15 one of his favorites, not in a sexual
16 way and not towards anyone." Would you
17 agree with that?
18     **A.**   **I might have said "ass" around**
19 **Toby.**
20     **Q.**   Well, is saying the word "ass"
21 one of your favorites words to say?
22     **A.**   **No, it's not.**
23     **Q.**   Do you know why he would say
           260

1  that about you?
2     A.   **I don't know why he would say**
3  **that.**
4     Q.   Do you know why he would have
5  any reason to lie about you to team
6  relations?
7     A.   **No, I don't.**
8     Q.   Has Ms. Edwards offered him
9  any money?
10    A.   **I have no idea.**
11    Q.   You haven't asked him, since
12 he's your friend?
13    A.   **No, I haven't asked him.**
14    Q.   Y'all haven't had that
15 conversation?
16    A.   **No, we have not.**
17    Q.   All right. On page 11, the
18 top of the page, "Does Mike use the
19 word 'fuck?'" the question asked by
20 Mr. Lucas, and Mr. Chance answers, "No
21 more than anyone else, just in guy
22 talk," and we've established that would
23 be true, correct?

261

1     A.   **Yes, ma'am.**
2     Q.   And skipping two lines, "Does
3  Mike make comments about women?" and
4  Mr. Chance answered, "Between the guys,
5  yes." Is that true?
6     A.   **Maybe at a bar.**
7     Q.   Not at work?
8     A.   **Not at work.**
9     Q.   And Lucas Cooner asked, "Would
10 he say someone has a nice ass or nice
11 tits?" and Chance answered, "Not at
12 work, maybe at his house or out
13 drinking a beer." Would that be
14 correct?
15    A.   **Maybe.**
16    Q.   Well, do you -- maybe it's
17 correct, maybe it's not correct?
18    A.   **I might say that at home or**
19 **out drinking a beer.**
20    Q.   Okay. All right. Then Mr.
21 Cooner asked, "Why would someone be
22 making this up?" Do you see where I
23 am?

262

1     A.   **Yes.**
2     Q.   And Mr. Chance says, "I don't
3  know. I know Mike has a strong
4  friendship with Jennifer Foster. Mike
5  hasn't said anything about sex. I
6  think there's some jealousy out there."
7  Do you see that?
8     A.   **I see that.**
9     Q.   Would that be true?
10    A.   **That I have a strong**
11 **friendship with Jennifer Foster? It**
12 **would be true.**
13    Q.   Okay. And who would be the
14 ones that would be jealous about your
15 strong friendship, as you've defined
16 it, with Jennifer Foster?
17    A.   **I'm a white male, she's a**
18 **black female. We're in the South. Who**
19 **wouldn't? There's a lot of them that**
20 **would be.**
21    Q.   Who? was my question.
22    A.   **I don't know who.**
23    Q.   Well, was Tammy Edwards

263

1  jealous of your relationship with
2  Ms. Foster?
3     A.   **I have no idea.**
4     Q.   Did she ever tell you that?
5     A.   **I never asked her.**
6     Q.   Has Ms. Edwards ever led you
7  to believe she was in the least
8  interested in you?
9     A.   **I never asked her. I never**
10 **cared.**
11    Q.   That's not my question.
12    A.   **No, she has not.**
13    Q.   Okay. She's never done
14 anything to indicate to you she was
15 attracted to you in a physical or
16 emotional way?
17    A.   **No, she has not.**
18    Q.   All right. Next is the
19 interview with Tom Bondy. Do you see
20 where Mr. Bondy made the comment that
21 maybe you're not wired right?
22    A.   **Yeah.**
23    Q.   Has he ever made that comment

264

1 to you?
2    A.   No.
3    Q.   Since reading that, have you
4 gone and talked to him about what he
5 meant by maybe you're not wired right?
6    A.   **I haven't discussed anything**
7 **in here with anybody at work.  I don't**
8 **care what they said in here.**
9    Q.   Did you go and talk to Mr.
10 Bondy and ask him if you were going to
11 get fired?
12    A.   **I only talked with Tom one**
13 **time, and that was when I first heard**
14 **about the accusations that was being**
15 **made to me.**
16    Q.   Okay.  In the last sentence of
17 Bondy's interview, where Rob Clevenger
18 asked, "Did Mike disclose details?" Tom
19 Bondy stated, "No.  Mike was in denial
20 when he came to me in tears.  Mike
21 swore he didn't do anything to her and
22 asked if he would be fired."  Were you
23 in tears?

265

1    A.   **Yes, I was.**
2    Q.   Why?
3    A.   **I didn't want to lose my job**
4 **over lies?**
5    Q.   Over what?
6    A.   **Over lies.**
7    Q.   Can you tell me any reason why
8 all these people are lying about you?
9    A.   **I have no idea.**
10    Q.   All right.  Let's talk about
11 your interview.  How much, ten minutes?
12       Have you read your interview
13 with Ms. Jones?
14    A.   **I've read over it.**
15    Q.   Okay.  Anything that is not
16 accurate, what you told her and what
17 she asked?
18    A.   **I don't know.**
19    Q.   All right.  Did you tell her
20 you felt like you were fighting a
21 losing battle?
22    A.   **Yes, I did.**
23    Q.   Okay.  And did you share with

266

1 her that Amber and Kimberly and Tammy
2 were all talking on BC2?
3    A.   **Yes, I did.**
4    Q.   But you didn't know what they
5 were saying?
6    A.   **I sure did.**
7    Q.   All right.  And you mentioned
8 Charles Harris and Fard (sic) Alexander
9 here.  What did Charles Harris tell
10 you?
11    A.   **I don't remember at the time.**
12    Q.   You don't recall anything?
13    A.   **It says right here they are**
14 "telling them these things, but
15 they" -- "they're not sharing," so I
16 **don't know what they were saying.**
17    Q.   Who is telling Alexander and
18 Harris?
19    A.   **Amber.**
20    Q.   Anyone else?
21    A.   **Not as I remember.**
22    Q.   Okay.  Did Tammy Edwards go
23 and tell Alexander or Harris anything

267

1 about you?
2    A.   **Not to my knowledge.**
3    Q.   Okay.  No one has ever shared
4 that with you?
5    A.   **Not to my knowledge.**
6    Q.   Okay.  Has anyone ever shared
7 that Tammy Edwards was talking about
8 you in the workplace other than
9 Culpepper, Kitchens, and Bondy?
10    A.   **No, they have not.**
11    Q.   All right.  Second
12 paragraph -- well, I'm sorry, that's
13 not correct, third paragraph, it's
14 about breakfast.  Would Ms. Edwards get
15 you breakfast?
16    A.   **Yes, she would.**
17    Q.   Was that gratuitous on her
18 part or were you asking her to do it?
19    A.   **Both.**
20    Q.   Okay.  She was going to the
21 cafeteria?
22    A.   **Yes.**
23    Q.   Okay.  And did you also tell

268

1 her to get Jennifer Foster's breakfast
2 as well?
3    A.   **Maybe sometimes.**
4    Q.   Okay. And were you paying for
5 that?
6    A.   **I paid for different people's**
7 **all the time.**
8    Q.   Did you ever pay -- pay for
9 Ms. Edwards'?
10    A.   **There's a possibility, but I**
11 **don't know.**
12    Q.   Okay. All right. In the
13 fourth paragraph, you talk about the
14 conversation that happened on Friday,
15 July 28th, and that you had bought
16 doughnuts for the team, and this was
17 when you said the conversation with
18 Ms. Edwards took place where she called
19 you "fucking stupid." And you mention
20 there that you were on the cell phone
21 looking dazed. What would you have
22 been dazed about?
23    A.   **Because I was talking to Rob**

<center>269</center>

1 **Katzenbach about something on the line,**
2 **and I was doing like that.**
3    Q.   Okay. All right. Did Kim
4 Abrams on the second -- I'm sorry, page
5 13, did Kim Abrams tell you that she
6 had seen Ms. Edwards in the locker room
7 crying?
8    A.   **No, she did not.**
9    Q.   How do you know that?
10    A.   **Hearsay.**
11    Q.   Who told you?
12    A.   **I don't remember.**
13    Q.   Well, you told her, "Kim
14 Abrams was in the locker room with her
15 while she was crying. I haven't talked
16 to Tammy since then"?
17    A.   **That's right.**
18    Q.   And you don't know who told
19 you that Kim Abrams saw Ms. Edwards in
20 the locker room crying?
21    A.   **No, I do not.**
22    Q.   Was it Pam Stoddard?
23    A.   **I do not remember who it was.**

<center>270</center>

1    Q.   It would have to be a woman,
2 though, wouldn't it?
3    A.   **I would have to be a woman. I**
4 **would hope it was a woman.**
5    Q.   Okay. Can you tell me anyone
6 it would be other than Ms. Stoddard or
7 Ms. Foster?
8    A.   **Well, there's other women that**
9 **work out there, but I don't remember**
10 **which -- I don't know who it could have**
11 **been.**
12    Q.   All right. Then Mr. Clevenger
13 asks you about the conversations you
14 and Ms. Edwards would typically have,
15 and you'd talk about the drag strip,
16 which we've talked about, and pageants.
17 What kind of pageants were the two of
18 you talking about?
19    A.   **Her daughter was in pageants.**
20    Q.   Did your daughter do pageants
21 too?
22    A.   **No, she did not.**
23    Q.   Okay. Why would you and Ms.

<center>271</center>

1 Edwards be talking about pageants?
2    A.   **The same reason we'd talk**
3 **about drag strip, I guess.**
4    Q.   You had an interest in
5 pageants?
6    A.   **No. She didn't have an**
7 **interest in drag strips.**
8    Q.   What did she tell you about
9 pageants?
10    A.   **That her daughter was in them.**
11    Q.   Anything else?
12    A.   **No.**
13    Q.   All right. Ms. Jones asked
14 you about using the words F and MF, and
15 you answered, "Yes, but no more than
16 anyone else"; is that correct?
17    A.   **That's right.**
18    Q.   Is that a correct statement?
19    A.   **That's a correct statement.**
20    Q.   All right. Earlier we had
21 talked about her dodging you, and I
22 think you answered that that didn't
23 happen?

<center>272</center>

1    A.    I said I don't remember that
2  happening.
3    Q.    Okay.  Now that you look at
4  your statement, do you recall that you
5  shared with Ms. Jones that Ms. Edwards
6  was dodging you?
7    A.    That's what it says here.
8    Q.    My question, sir, is:  Do you
9  recall that you shared that with Ms.
10  Jones?
11    A.    Yes, it's right there
12  (indicating).  I do recall that.
13    Q.    All right.  Now that you're
14  reading that, what is your recollection
15  of Ms. Edwards' dodging you in the
16  workplace?
17    A.    What, do you want me to read
18  this off to you right here?
19    Q.    No, sir.  I want you to read
20  it and tell me now what you recollect,
21  having seen that.
22    A.    This was two years ago.  I
23  really don't remember none of this

273

1  stuff.
2    Q.    What's the basis of your
3  testimony today then if you don't
4  recall?
5    A.    I'm talking about any of this
6  stuff, any of -- I can't -- I can't
7  quote you word for word what I've wrote
8  on here -- what I said on here.
9    Q.    Well, you didn't write any of
10  this, Ms. Jones did, correct?
11    A.    Can we take a break?
12    Q.    No, sir, we're not taking a
13  break right now.
14        MR. DYKES:  We'll get to that.
15        THE WITNESS:  All right.
16        MR. DYKES:  We're about to.
17  How many minutes do we have left?
18        MS. HAYNES:  Repeat my
19  question, please.
20        (Requested portion of record
21        read by the court reporter.)
22    A.    That's right.  But it's
23  supposed to be me saying what she's

274

1  writing.
2    Q.    (BY MS. HAYNES)  okay.  And did
3  she read back to you what she wrote?
4    A.    No, she did not.
5    Q.    Okay.  Did you tell Ms. Jones
6  that Ms. Edwards was dodging you in the
7  workplace?
8    A.    I don't -- I didn't say she
9  was dodging me.  I said she walked down
10  the other side of body respot, and I
11  was in the middle of body respot.
12    Q.    All right.  And did you tell
13  Ms. Jones that you told Ms. Edwards,
14  "If you don't want to talk to me
15  anymore, I won't"?
16    A.    I probably said that.
17    Q.    Why did you say that to her?
18    A.    I have no idea why I said that
19  to her.
20    Q.    Well, did it make you mad that
21  she was dodging you?
22    A.    No, it did not.
23    Q.    Then why did you make the

275

1  comment?
2    A.    I don't know.  It didn't make
3  me mad.  I was just saying if you don't
4  want to talk to me no more, I won't
5  talk to you.
6    Q.    Did you ask her why she was
7  dodging you?
8    A.    No, I did not.
9    Q.    What do you recall about how
10  she would move about in the plant
11  trying to dodge you?
12    A.    I never noticed her moving
13  about in the plant to dodge me.
14    Q.    Well, why would you make the
15  comment then?
16    A.    Because I was -- she always
17  walked one certain way.  I was inside
18  body build and respot, and she walked
19  down on the other side of respot.
20    Q.    So she didn't have to pass by
21  you?
22    A.    That was the first time it had
23  ever happened.

276

1     **Q.** Okay. Do you remember what
2 day that happened?
3     **A. No, I do not.**
4     **Q.** You told her, "I do blow up
5 sometimes, but not at people"; is that
6 right?
7     **A. That's correct.**
8     **Q.** All right. Tell me about when
9 Ms. Jones asked you about Ms. Edwards
10 talking to Billy Kitchens about you
11 being a pervert.
12     **A. What --**
13     **Q.** What do you re -- when Ms.
14 Jones asked you about that, about Tammy
15 Edwards telling Billy Kitchens you were
16 a pervert and she didn't want to work
17 around you?
18     **A. I don't know whether Tammy**
19 **told Billy that or not.**
20     **Q.** Well, you explained, and it
21 says here, "Amber was going to do CCR,
22 and Tammy was going to BC1. I told
23 Tammy and Billy I wasn't going to lose

277

1 one of my workers. I offered to take
2 Tammy off my time sheet and give her to
3 Billy. Tammy said she wanted to stay
4 on my team"?
5     **A. Uh-huh.**
6     **Q.** Do you recall that?
7     **A. Yeah.**
8     **Q.** All right. How was that
9 answering the question about Ms.
10 Edwards telling Billy Kitchens you were
11 a pervert?
12     **A. I have no idea how that was --**
13 **I cannot answer that question. I don't**
14 **know.**
15     **Q.** All right. Did Ms. Jones tell
16 you that Tammy Edwards had asked to be
17 moved from your team?
18     **A. No, she did not.**
19     **Q.** Did Mr. Kitchens tell you that
20 Tammy Edwards asked to be moved from
21 your team?
22     **A. No, he did not.**
23     **Q.** All right. And the next thing

278

1 that she talks to you about is the
2 freaky sex comment, and I think we've
3 talked about that today, haven't we?
4     **A. Yes, we have.**
5     **Q.** Anything else you need to add
6 about that?
7     **A. No, there's not.**
8     **Q.** And I think the next comments
9 we've also talked about. The -- we
10 then have this question by Stacye
11 Jones, "Have you put your hands behind
12 your back and butted up against Tammy?"
13 and you said that you didn't touch her
14 at all, because she has problems with
15 her back and neck?
16     **A. Yeah.**
17     **Q.** You knew that she had neck
18 problems and back problems?
19     **A. To bump up behind her like**
20 **they're talking about right here, yeah.**
21     **Q.** What problems with her neck
22 and back did you know she had?
23     **A. All I know is she got in a car**

279

1 wreck.
2     **Q.** Did you ever see her with a
3 neck brace on?
4     **A. I've never seen her with her**
5 **neck brace on.**
6     **Q.** Okay. Did you know she had
7 neck and back problems when you were
8 pulling her ponytail?
9     **A. It wasn't like I was doing it**
10 **with the intent to hurt her. I didn't**
11 **pull her hair like that I told you, I**
12 **just done that (demonstrating).**
13     **Q.** Can you answer my question?
14     **A. Yes.**
15     **Q.** Yes, you did know she had neck
16 problems when you pulled her ponytail?
17     **A. Yes.**
18     MS. HAYNES: All right.
19     THE VIDEOGRAPHER: Off the
20 record. The time is now 2:48. We
21 conclude tape four of the deposition.
22     (Recess, commencing at
23     2:48 p.m. and concluding at

280

| | |
|---|---|
| 1       3:11 p.m.) | 1 of hers. |
| 2     THE VIDEOGRAPHER: Back on the | 2     Q.   How did you get her cell phone |
| 3 record. The time is 3:11. We commence | 3 number? |
| 4 tape five of the deposition. | 4     A.   **She called my phone off of** |
| 5     Q.   (BY MS. HAYNES) Let's move to | 5 **them.** |
| 6 page 15 of Plaintiff's Exhibit 3. Ms. | 6     Q.   And that was work-related? |
| 7 Jones asked you, continuing with your | 7     A.   **I don't remember what the** |
| 8 interview with her, about if you had | 8 **circumstances was.** |
| 9 mentioned any of the allegations to | 9     Q.   Well, other than work, why |
| 10 Billy Kitchens, and you had said, "Yes, | 10 would she have to call your -- |
| 11 on Monday," correct? | 11     A.   **I have no idea.** |
| 12     A.   **Yes.** | 12     Q.   How would she have gotten your |
| 13     Q.   Okay. That's incorrect, is it | 13 cell phone number? |
| 14 not, that you had mentioned it to Billy | 14     A.   **Because I'm a team leader. A** |
| 15 as soon as someone had told you about | 15 **lot of people, just about everybody has** |
| 16 it on that Friday? | 16 **my cell phone number.** |
| 17     A.   **That's not what I -- I said** | 17     Q.   Would there be any phone call |
| 18 **that I did say that something was going** | 18 from Ms. Edwards' phone, cell phone, to |
| 19 **on with me, I told you that and you** | 19 your cell phone, that would be longer |
| 20 **wrote it down. I don't remember what** | 20 than one minute? |
| 21 **day it was.** | 21     A.   **I don't remember.** |
| 22     Q.   You don't know if it was | 22     Q.   Okay. Did the two of you ever |
| 23 Monday or Friday? | 23 chitchat about anything else other than |
| 281 | 283 |
| 1     A.   **I know it wasn't Friday.** | 1 work? |
| 2     Q.   Okay. You followed that with | 2     A.   **Just the stuff that we've** |
| 3 several questions about Ms. Edwards. | 3 **talked about.** |
| 4     A.   **Uh-huh.** | 4     Q.   Did you ever think that you |
| 5     Q.   "If this is as bad as she | 5 and Ms. Edwards chitchatted, socialized |
| 6 says, why does she call me?" When does | 6 on the telephone? |
| 7 Ms. Edwards call you? | 7     A.   **No, not -- not really, no.** |
| 8     A.   **Never now. She called me and** | 8     Q.   Okay. What were your cell |
| 9 **asked me about breakfast.** | 9 phone numbers back in 2006? |
| 10     Q.   All right. Back in 2006, when | 10     A.   **What was my cell phone number?** |
| 11 would she call you? | 11 **The same thing it is now, 799-3840.** |
| 12     A.   **In the morning time.** | 12     Q.   799? |
| 13     Q.   About breakfast? | 13     A.   **3840.** |
| 14     A.   **Yeah.** | 14     Q.   And that's what prefix? |
| 15     Q.   Okay. Anything else? | 15     A.   **334.** |
| 16     A.   **Downtime, just whatever --** | 16     Q.   And that's the same cell phone |
| 17 **whatever.** | 17 you have right now? |
| 18     Q.   Did she ever call you when she | 18     A.   **Yes, same number.** |
| 19 was away from work? | 19     Q.   Who is your service with? |
| 20     A.   **No.** | 20     A.   **AllTell.** |
| 21     Q.   All right. Did she -- did you | 21     Q.   Who was it with in 2006? |
| 22 have her cell phone number? | 22     A.   **AllTell.** |
| 23     A.   **I had two cell phone numbers** | 23     Q.   Who pays for that cell phone |
| 282 | 284 |

1  number?

2      A.    I do.

3      Q.    So it's in your name, not

4  Hyundai's name?

5      A.    My name.

6      Q.    Have you ever got a copy of

7  your cell phone bill to give to anyone?

8      A.    No, I have not.

9      Q.    No one has asked you for a

10  copy of your cell phone bill?

11      A.    No, they have not.

12      Q.    Did you have Ms. Edwards' cell

13  phone programmed -- well, strike that.

14  Did you have Ms. Edwards' name

15  programmed into your cell phone under

16  Jennifer, what's her last name?

17          MS. EDWARDS:  Foster.

18      Q.    Foster?

19      A.    No, I did not.

20      Q.    You didn't have Ms. Edwards'

21  name and Jennifer Foster's phone

22  number?

23      A.    No, I did not.

285

1      Q.    Did you ever discuss with

2  Ms. Edwards that you had put her cell

3  phone number -- that you had used her

4  name on Ms. Foster's cell phone so your

5  wife would not find out you were

6  calling Jennifer Foster?

7      A.    No, I have not.

8      Q.    Not that you did that, but did

9  you tell --

10      A.    No, I did not.

11      Q.    -- Ms. Edwards that?  Did you

12  ever tell Mr. Kitchens that Tammy

13  Edwards was calling you?

14      A.    No, I did not.

15      Q.    Did you ever make that comment

16  in front of Richard Williams?

17      A.    No, I did not.

18      Q.    And I'm talking about the

19  comment that you put Tammy Edwards'

20  name on Jennifer Foster's phone number?

21      A.    I didn't make the comment at

22  all.

23      Q.    What was Jennifer Foster's

286

1  cell phone number in 2006?

2      A.    I have no idea.  I have no

3  idea what was in 2006.  She's changed

4  numbers many times.

5      Q.    Do you know what it is now?

6      A.    Yeah, I know what it is now.

7      Q.    What is it?

8      A.    451-4614.

9      Q.    334?

10      A.    334.

11      Q.    But you don't know what it was

12  in --

13      A.    No, I don't.

14      Q.    2006?  All right.  Another

15  question you had is, "Why do I have her

16  cell numbers in my phone?"  Did you

17  make that statement to Ms. Jones?

18      A.    Yes.

19      Q.    Okay.  And why did you tell

20  her that?

21      A.    Because I had Tammy's numbers

22  in my phone.  I still have one of her

23  numbers in my phone.

287

1      Q.    Why?

2      A.    Why do I have it now?

3      Q.    Yes.

4      A.    Because I just haven't erased

5  it.

6      Q.    Were you trying to convey to

7  Ms. Jones that you and Tammy Edwards

8  were having some kind of consensual

9  relationship?

10      A.    No, I was not.

11      Q.    Did you convey to Ms. Jones

12  that Ms. Edwards buys you breakfast?

13      A.    I didn't say she buys me

14  breakfast; I said she goes and gets

15  breakfast.

16      Q.    Okay.  She doesn't buy it?

17      A.    No.

18      Q.    She would just go and get you

19  breakfast?

20      A.    She might have bought, I might

21  have bought.  She went and got it.  She

22  probably went and got it a lot more

23  than anything else.

288

1    Q.   Okay.  And then you said, "Why
2  did she pat me on the back for making
3  600" and then "units" is in
4  parentheses.  Did Ms. Edwards pat you
5  on the back?
6    A.   **Yes, she did.**
7    Q.   Okay.  Did you try hugging you
8  or anything?
9    A.   **I don't remember.  She told me
10  I was a good team leader.**
11    Q.   And patted you on the back?
12    A.   **Yes.**
13    Q.   What's the big deal about
14  making 600 units, what does that mean?
15    A.   **That was an accomplish (sic)
16  that we was trying to get to, 600 units
17  in one day.**
18    Q.   That's 600 vehicles?
19    A.   **Six hundred vehicles off the
20  line in one day.**
21    Q.   Okay.  Is that a big goal?
22    A.   **It was then.**
23    Q.   Okay.  What's the goal now?

1    A.   **To run a hundred percent for
2  eight hours.**
3    Q.   Not measured in units anymore?
4    A.   **No.  We just try to get the
5  efficiency to a hundred percent.**
6    Q.   Okay.  You don't have a unit
7  number goal?
8    A.   **Yeah, whatever eight hours at
9  a hundred percent is.  I -- I don't
10  know what it is, depending on how we're
11  running.**
12    Q.   Okay.  But you don't still
13  have that goal --
14    A.   **No.**
15    Q.   -- of 600 units in a day?
16    A.   **No.**
17    Q.   Do you have 650 units in a
18  day?
19    A.   **We don't do that no more.**
20    Q.   Okay.  All right.  Then you
21  said, "At family day, my family was in
22  the cafeteria, and we saw her family.
23  Tammy said she would save us a seat."

1  Did she say that?
2    A.   **I said that.**
3    Q.   Is that true, that Ms.
4  Edwards --
5    A.   **That's true.**
6    Q.   -- said she would save you a
7  seat?
8    A.   **Yes, it is.**
9    Q.   For your family and her
10  family?
11    A.   **No.  The cafeteria was
12  crowded.  They were fixing to get up.
13  Me and my wife and my little boy walked
14  in.  She said she would hold the seat
15  for us while we went and got some --
16  got our food.**
17    Q.   Okay.  So she didn't sit down
18  and share a meal with you, she just
19  saved you a seat?
20    A.   **Exactly.  She intro -- we
21  intro -- she introduced me to her
22  husband, I introduced her to my wife,
23  and that was the most of it.**

1    Q.   Okay.  When was that?
2    A.   **Fam -- I don't know what
3  family day it was.  It had to be the
4  one in -- in this year right here.
5  I've only been to two.**
6    Q.   What month are they usually
7  held?
8    A.   **It was last month this year,
9  so somewhere -- it varies on the
10  months.**
11    Q.   Okay.  And she had all three
12  of her children there?
13    A.   **I'm not sure.**
14    Q.   Okay.  Did you meet her
15  daughter?
16    A.   **I might have seen her daughter
17  there.  I don't -- I don't remember if
18  I met her.**
19    Q.   Okay.  Had she ever told you
20  that she felt that God had sent her to
21  work in your department so she could
22  help you?
23    A.   **No.**

1  Q.   She never shared that with
2  you?
3  A.   **No.**
4  Q.   Did she ever share with you
5  that her husband was a youth minister?
6  A.   **They told me -- she told me**
7  **they went to church.**
8  Q.   She didn't share that with
9  you --
10  A.   **No.**
11  Q.   -- that he was a youth pastor?
12  A.   **No, she didn't.**
13  Q.   All right.  Let's talk about
14  the things here that are under an
15  asterisk on page 15.  "Mike made the
16  following complaints at the end of his
17  statement."  Did you complain to Ms.
18  Jones?
19  A.   **No, I didn't complain.  I just**
20  **told her that statement right there.**
21  Q.   Okay.  And you -- there's two
22  bullet points there.  The first bullet
23  point is, "Tammy told Kim (Abrams) and

293

1  point, you -- Ms. Jones writes,
2  "Kim" -- and I'm assuming this is what
3  you've told Ms. Jones?
4  A.   **That's right.**
5  Q.   "Kim has told everybody on the
6  other shift that I'm messing with black
7  girls from Body to Engine"?
8  A.   **Yep.**
9  Q.   "Kim says Michelle hates me·
10  because I'm a fucking whore"?
11  A.   **That's what Kim told me.**
12  Q.   Okay.  And did you tell Ms.
13  Jones that?
14  A.   **I sure did.**
15  Q.   And you said "fucking whore"?
16  A.   **I sure did, because that's**
17  **what Kim told me Michelle said.**
18  Q.   Okay.  Do you know why
19  Michelle would hate you?
20  A.   **I have no idea.**
21  Q.   And we may have already
22  established this, but what is the race
23  of Kim Abrams and Michelle Nelson?

295

1  Michelle (Nelson), and Kim told Tammy
2  if Tammy didn't go to TR," team
3  relations, "she (Kim), would (go to
4  TR)"; is that correct?
5  A.   **That's what I heard.**
6  Q.   All right.  Who told you that?
7  A.   **I believe -- I don't know,**
8  **Ferrard said he heard it through Amber.**
9  Q.   Anyone else say that?
10  A.   **No.**
11  Q.   Why did you think it was
12  important to tell Stacye Jones that?
13  A.   **I don't know.**
14  Q.   Do you know any reason Kim
15  Abrams and Michelle Nelson would have
16  any ill will toward you?
17  A.   **No, I do not.**
18  Q.   Do you think they coerced
19  Tammy Edwards to go and report you to
20  team relations?
21  A.   **I don't know if they did or**
22  **not.**
23  Q.   Okay.  And the next bullet

294

1  A.   **White.**
2  Q.   Both white?
3  A.   **Yes, ma'am.**
4  Q.   Okay.  And what information do
5  you have from whom, that Kim Abrams has
6  told anyone you're messing with black
7  girls?
8  A.   **It come off of the other --**
9  **other shift.**
10  Q.   Who told you?
11  A.   **Opposite shift of me.  I don't**
12  **remember who told me.**
13  Q.   And is that what you were
14  trying to convey to Ms. Jones, that it
15  all started because Michelle Nelson
16  hated you?
17  A.   **No.  I was just saying that**
18  **they're talking about me.  I didn't say**
19  **that she hated me.  I don't know if she**
20  **hated me or not.  I was just saying**
21  **what Kim said.**
22  Q.   Okay.  Did Ms. Jones say she
23  was going to do anything with that

296

1  information?

2     A.   No, she did not.

3     Q.   Okay.  Do you know why it's

4  important about Tammy Edwards

5  complaining about you, can you tell me

6  that?

7     A.   Do what?

8     Q.   Why is any of those two

9  complaints, why is that important to

10  the fact that Tammy Edwards complained

11  you were sexually harassing her?

12     A.   Because at the time,

13  everything I was hearing was Kim,

14  Michelle, and Tammy.

15     Q.   And you just think these three

16  women had it out for you?

17     A.   At the time I did.

18     Q.   Do you think the three women

19  had it out for you because you were

20  dating black women?

21     A.   I wasn't dating a black woman;

22  I was friends with a black woman.

23     Q.   Well, what was your -- what

297

1  were you trying to convey?

2     A.   That I think them three was --

3  just had something against me.  I

4  didn't know what it was, I really

5  didn't care, but I was just letting her

6  know.

7     Q.   Have you ever gone and talked

8  to Kim Abrams and Michelle Nelson about

9  why they were after you?

10     A.   I have not.

11     Q.   Did you have only the one

12  interview with Stacye Jones?

13     A.   Yes, ma'am.

14     Q.   Who initiated the discipline

15  or the write-up when you were written

16  up?

17     A.   Rob Katzenbach.

18     Q.   And what is his position?

19     A.   He was senior manager of body

20  shop.

21     Q.   And who else was present?

22     A.   Kesha, I believe.  Her name is

23  on which ever thing it is.  I don't

298

1  remember her last name, Kesha

2  something.

3     Q.   I couldn't read the writing.

4  It's Plaintiff's Exhibit 7.

5     A.   Kesha Morris.

6     Q.   What's her position?

7     A.   I have no idea.  She was a

8  team relations something, I guess team

9  relations management is what it says

10  there.

11     Q.   Okay.  And did you ever meet

12  with her other than in this meeting on

13  August 26th, '06?

14     A.   Never.

15     Q.   Was she in that meeting?

16     A.   Yes, ma'am.

17     Q.   Okay.  And who is the

18  management team member?

19     A.   That's Rob Katzenbach.

20     Q.   And you think it's Kesha

21  Morris?

22     A.   Morris.

23     Q.   All right.  Prior to this

299

1  meeting on August 26th, 2006, had you

2  heard anything about the investigation?

3     A.   No, ma'am.

4     Q.   This is the first time you

5  heard something?

6     A.   Besides the investigation

7  itself, that's the first time I knew

8  anything that was going to be -- happen

9  to me.

10     Q.   Okay.  Did -- were you called

11  in?

12     A.   I was at work.

13     Q.   All right.  You're at work,

14  you get a telephone call?

15     A.   I was at work, and I don't

16  remember how they come and got me, but

17  I had to go upstairs with Rob and

18  Kesha.

19     Q.   Did -- anyone from team

20  relations, were they there, that had

21  interviewed you?

22     A.   No.

23     Q.   Did you ask any questions?

300

1    A.    No.
2    Q.    Okay. What was told to you?
3    A.    That some form of
4  harassment -- I've been found with some
5  form of harassment, and they told me
6  what my discipline was.
7    Q.    And what did they tell you?
8    A.    I was going to get two weeks
9  suspension without pay, three -- three
10  years probation, and I'd be moved to
11  the opposite shift.
12    Q.    Where -- where were you when
13  this took place?
14    A.    In the -- one of the offices
15  in the body shop, in the weld shop.
16    Q.    Were you told after three
17  years it would be taken out of your
18  personnel file?
19    A.    No. I -- I don't know what
20  will happen to it in three years.
21    Q.    You understood you were on
22  probation for three years?
23    A.    I understood I was on

301

1  probation for three years.
2    Q.    Okay. Where in the letter,
3  Plaintiff's 7, does it say you're on
4  probation for seven -- three years?
5    A.    It don't say it in here.
6    Q.    Did anyone tell you that?
7    A.    Yes, it does, I'm sorry.
8  Well, it's for a period of 36 months,
9  that's three years. And until this
10  serious misconduct letter comes off of
11  me, I'll still be on probation.
12    Q.    That's what you understood?
13    A.    That's what I understood.
14    Q.    Okay. Were you suspended for
15  two weeks?
16    A.    Yes, ma'am.
17    Q.    Was it with or without pay?
18    A.    Without pay.
19    Q.    What did you do in those two
20  weeks?
21    A.    I went to Wind Creek with my
22  parents.
23    Q.    On Lake Martin?

302

1    A.    Lake Martin.
2    Q.    Anywhere else?
3    A.    Nowhere else.
4    Q.    Did your wife go with you?
5    A.    Yes, ma'am, my wife and my
6  boy.
7    Q.    Were you still separated from
8  your wife?
9    A.    No, ma'am.
10    Q.    Were you ever told when the
11  investigation concluded?
12    A.    Ma'am?
13    Q.    Were you ever told when the
14  investigation was concluded?
15    A.    No.
16    Q.    When you returned to work,
17  were you put on a shift opposite the
18  one you were currently assigned?
19    A.    Yes, ma'am.
20    Q.    Did you ever ask anyone why
21  that was?
22    A.    No, I did not.
23    Q.    Looking at Plaintiff's Exhibit

303

1  4, which has the date of August 7th,
2  2006, do you know why if the
3  investigation was concluded on August
4  7th, 2006, why you were not disciplined
5  for three more weeks?
6    A.    No, I do not know.
7    Q.    Did you already have
8  prearranged vacation plans for August
9  26th?
10    A.    No, I did not.
11    Q.    Did you have them for the
12  first of September?
13    A.    No, I did not.
14    Q.    Did anyone in team relations
15  ever sit down with you and discuss
16  their findings as a result of the
17  investigation?
18    A.    No, they did not.
19    Q.    Did you ever tell anyone that
20  you had gone to Hawaii while you were
21  being suspended?
22    A.    No, I did not.
23    Q.    Did you go to Hawaii?

304

1   A.  **No, I did not.**
2   Q.  Have you been?
3   A.  **Never.**
4   Q.  But you didn't tell anybody at
5   work that you -- that's what you did?
6   A.  **No.**
7   Q.  You deny that?
8   A.  **Deny going to Hawaii?**
9   Q.  No, deny that when you came
10  back off of suspension, you told people
11  you had gone to Hawaii?
12  A.  **Yeah, I deny that.**
13  Q.  Look for me at page 5 of
14  Plaintiff's Exhibit 4.  Did you ever
15  see the recommendation from human
16  resources -- or team relations, I'm
17  sorry?
18  A.  **I've never read this right**
19  **here.**
20  Q.  What is your understanding of
21  the discipline you received, the
22  serious misconduct letter, was that for
23  using profanity or harassing Tammy

305

1   to work.
2   Q.  Okay.  Did you ever cash in
3   your vacation pay?
4   A.  **No, I did not.**
5   Q.  Did you take vacation later on
6   in the year?
7   A.  **There's a possibility I could**
8   **have, but I don't remember.**
9   Q.  Okay.  And then in October,
10  did you get a cost-of-living raise?
11  A.  **Probably so.**
12  Q.  You weren't prohibited from
13  raises when you came back in September
14  2006?
15  A.  **I cannot get no promotion for**
16  **three years.**
17  Q.  Who told you that?
18  A.  **That's part of the serious**
19  **misconduct.**
20  Q.  But you weren't demoted
21  either, were you?
22  A.  **No, I was not.**
23  Q.  With regards to the

307

1   Edwards?
2   A.  **They told me some form of**
3   **harassment I have done.  Just what it**
4   **says right there, that's all I know.**
5   Q.  Okay.  When Mr. Katzenbach was
6   meeting with you, had you ever had any
7   meetings with him before?
8   A.  **No, I have not.**
9   Q.  Okay.  He's not one of those
10  that has been out clubbing with you?
11  A.  **I've never seen him at a club.**
12  Q.  Okay.  Did he tell you it was
13  not a real serious thing, just to go
14  out there and keep doing the good job
15  that you were doing?
16  A.  **No, I've never been told that.**
17  Q.  When you came back to work,
18  you did not lose any pay, did you?
19  A.  **My two weeks that I was**
20  **suspended, I lost that.**
21  Q.  When you came back to work,
22  did you lose any more pay?
23  A.  **No, not after I started back**

306

1   recommendation on page 5 of Plaintiff's
2   Exhibit 4, it talks about your use of
3   profanity.  Were you given any
4   additional discipline for violating the
5   use of profanity in the workplace?
6   A.  **No, ma'am.**
7   Q.  It says, "The use of profanity
8   and/or slurs of any kind is
9   unacceptable and will be addressed
10  accordingly through corrective action."
11  You didn't get that?
12  A.  **I got corrective action.**
13  Q.  You got the serious
14  misconduct?
15  A.  **That is corrective action.**
16  Q.  Okay.  The next paragraph
17  down, four, paragraph four under
18  "Recommendation" --
19  A.  **Uh-huh.**
20  Q.  -- "In regards to Mike's
21  harassing behavior, I make reference to
22  our Harassment Policy and our Serious
23  Misconduct Policy," and then in the

308

1  last sentence, it says that you will be
2  "given a Serious Misconduct Letter and
3  be removed from his TL status,"
4  correct?
5      A.   **Yes, it says that.**
6      Q.   Okay.  You were never removed
7  from your team leader status, were you?
8      A.   **No, ma'am, I was not.**
9      Q.   Did anyone discuss that with
10  you, about removing you at all from a
11  team leader status?
12      A.   **No, ma'am.**
13      Q.   Mr. Katzenbach didn't --
14      A.   **No, ma'am.**
15      Q.   -- talk about that?  Is this
16  the first time you were aware that team
17  relations recommended that you be
18  removed from a team leader?
19      A.   **It is.**
20      Q.   Okay.  And as I understand
21  your testimony, that has never happened
22  since you were promoted back in 2006?
23      A.   **That I haven't been demoted?**

309

1      Q.   Yes, sir, or removed from your
2  team leader status?
3      A.   **I've never been removed from**
4  **my team leader status.**
5      Q.   Look for me Plaintiff's
6  Exhibit 6.  This is the charge of
7  discrimination that Ms. Edwards filed
8  with the EEOC.  I think you had told me
9  you had seen that but only after you
10  got a lawyer; is that correct?
11      A.   **Yes, ma'am.**
12      Q.   No one ever asked you any
13  questions about that in September,
14  October, or November of 2006?
15      A.   **About this?**
16          MR. DYKES:  I object.
17      Q.   Yes, other than your lawyer?
18          MR. DYKES:  And anything you
19  were asked about by a lawyer in regards
20  to this, you're not -- don't answer
21  those questions, but anybody outside of
22  a lawyer --
23      Q.   Let me ask you this:  Were you

310

1  ever shown this exhibit, Plaintiff's
2  Exhibit 6, which is Ms. Edwards' charge
3  of discrimination with the EEOC, were
4  you ever shown that document in 2006?
5      A.   **No, ma'am.**
6      Q.   You have seen it since?
7      A.   **Yes, ma'am.**
8      Q.   Okay.  Look at page 2.  Have
9  you ever talked with Steve Culpepper or
10  Billy Kitchens about a situation that
11  took place where Mr. Kitchens told
12  Ms. Edwards what her new job duties
13  would be or her new job would be under
14  his desk?
15      A.   **No.**
16      Q.   Had you heard that before from
17  anyone other than reading it in this
18  document?
19      A.   **I had heard something about**
20  **it.**
21      Q.   What did you hear?
22      A.   **Just that, exactly what it**
23  **says right there.**

311

1      Q.   Who did you hear it from?
2      A.   **I don't remember, but I do**
3  **remember hearing it.**
4      Q.   In the second paragraph of
5  page 2, Ms. Edwards writes, "After
6  complaining of the harassment and in
7  direct retaliation for complaining, I
8  have been demoted and transferred away
9  from a better and more complex job to
10  the BC1 assembly line."  Is that -- is
11  that true, that she was transferred
12  from a better job back to the BC1 line?
13          MR. DYKES:  Object to the
14  form.
15          MR. BOSTICK:  Object to the
16  form.
17      A.   **I don't know what -- which job**
18  **would be better one job to the next, I**
19  **don't know.  But was she moved?  Yes.**
20      Q.   Well, do you think the CCR job
21  is better than being back on the
22  production or the assembly line --
23          MR. DYKES:  Object.

312

1  Q.  -- in the BC1 department?

2  MR. DYKES:  Object to the

3  form.

4  A.  **I've never done either one.  I**

5  **don't know.**

6  Q.  From looking, which job would

7  you prefer --

8  A.  **MR. DYKES:  Object to the**

9  **form.**

10  Q.  -- a job in the office with a

11  computer and a clipboard or being on

12  the line assembling cars?

13  MR. DYKES:  Object to the

14  form.

15  A.  **I'd rather be on the line.**

16  Q.  Why?

17  A.  **Because I'm not a sit-in-the-**

18  **office-behind-the-computer-type person.**

19  Q.  Okay.  When Ms. Edwards

20  started with Hyundai, was she on the

21  line?

22  A.  **Yes.**

23  Q.  Okay.  And was that a

313

1  promotion, going from the line in

2  Mr. Ulrich's department to the CCR job?

3  A.  **I don't think so, because a**

4  **promotion, you get a raise.**

5  Q.  You don't think she got a

6  raise?

7  A.  **I don't think so.  She was a**

8  **team member.**

9  Q.  Okay.  All team members paid

10  the same?

11  A.  **Yes, they do.**

12  Q.  Regardless of what department?

13  A.  **Yes.  The only thing that**

14  **changes the pay is the length of**

15  **service.**

16  Q.  As far as the ability to

17  promote within the company, would you

18  be more promotable from a CCR job or an

19  assembly line job?

20  MR. DYKES:  Object to the

21  form.

22  MR. BOSTICK:  Object to the

23  form.

314

1  MS. HAYNES:  What's your

2  objection?

3  MR. DYKES:  I don't think

4  Mike's the person to ask those

5  questions.  He doesn't have any

6  involvement in those decisions and

7  doesn't -- didn't have any control over

8  any promotions or anything to do with

9  that in regards to Ms. Edwards or

10  anybody else.

11  Q.  (BY MS. HAYNES) I'll rephrase.

12  What's your understanding, being out in

13  the plant now for four years and a team

14  leader, where would the best

15  opportunity for promotion come, from a

16  CCR position or an assembly line

17  position?

18  A.  **I don't know of a team leader**

19  **yet that's made team leader from being**

20  **in the CCR room.**

21  Q.  Okay.  What would be the next

22  available promotion from a CCR

23  position, what would you move to?

315

1  A.  **I have no clue.**

2  Q.  Who's the --

3  A.  **I don't --**

4  Q.  Who's the manager over the

5  CCRs, what would be the next step?

6  A.  **Well, you have no team -- you**

7  **have no team leader over CCR, you have**

8  **no group leader; all you have is an**

9  **assistant manager.  And you have to be**

10  **a team leader for two years, you have**

11  **to be a group leader for two years**

12  **before you can make assistant manager.**

13  Q.  So you're saying she couldn't

14  be an assistant manager in CCR without

15  being a team leader, then a group

16  leader?

17  A.  **Exactly.**

18  Q.  Which is what you would do on

19  an assembly line?

20  A.  **That's what you -- that's just**

21  **the way you do it in the whole plant.**

22  Q.  Okay.  Well, are there team

23  leaders in the CCR department?

316

1    A.    **CCR is only one person.**
2    Q.    On one shift?
3    A.    **Two shifts.**
4    Q.    One person per shift?
5    A.    **Yes, ma'am.**
6    Q.    Okay.  So you had -- that
7    period of time, you had Ms. Edwards on
8    one shift and then who was on the other
9    shift?
10   A.    **Sherry McRae, if I'm not**
11   **mistaken.  I'm not sure, but I think**
12   **Sherry McRae.**
13   Q.    Okay.  Who was in the position
14   before Ms. Edwards took the CCR
15   position?
16   A.    **Pam.**
17   Q.    Stoddard?
18   A.    **Yes.**
19   Q.    Do you know why she was moved
20   from the CCR position?
21   A.    **I have no idea.**
22   Q.    Where was she moved?
23   A.    **To my line.**

317

1    A.    **Steve Culpepper.**
2    Q.    Okay.  They moved Ms. Edwards
3    out of the position and put Ms. Kelley
4    in the position; is that your
5    testimony?
6    A.    **No.  I thought you was asking**
7    **how did Ms. Kelley get to go into --**
8    Q.    And that is my question.
9    A.    **You know, and I have no idea**
10   **how that come up.**
11   Q.    Okay.  When Ms. Edwards was
12   moved from the position, who went into
13   the position?
14   A.    **Amber Kelley did.**
15   Q.    Okay.  And you had nothing to
16   do with that?
17   A.    **I had nothing to do with it.**
18   Q.    And no one made a comment to
19   you why they had moved Ms. Edwards from
20   the CCR position back to the assembly
21   line?
22   A.    **No, they did not.**
23   Q.    Did you hear any comments from

319

1    Q.    So she went from the CCR
2    position to the --
3    A.    **Body --**
4    Q.    -- back to the assembly line?
5    A.    **Body build line.**
6    Q.    Okay.  What was her reaction
7    when she got moved?
8    A.    **I don't -- I don't know.  I**
9    **don't -- she never told me anything**
10   **about it.**
11   Q.    Well --
12   A.    **Whether she liked it or not,**
13   **she never told me.**
14   Q.    She didn't voice a complaint?
15   A.    **No.**
16   Q.    Okay.
17   A.    **Not to me.**
18   Q.    How did Ms. Kelley go into the
19   position?
20   A.    **All that took place with Billy**
21   **and Culpepper.  I had -- I had nothing**
22   **to do with it, so I don't know.**
23   Q.    Kitchens and --

318

1    employees wanting to know what Ms.
2    Edwards had done to be put back on the
3    line after being in the CCR position?
4    A.    **No.**
5    Q.    And I think we've already
6    established you had no complaints about
7    how she was performing her CCR job?
8    A.    **No, I didn't.**
9    Q.    Nor had you heard from anyone
10   that she had complaints?
11   A.    **No, I did not.**
12   Q.    Did anyone ever tell you that
13   she asked to be transferred back onto
14   the assembly line?
15   A.    **Tammy told me that she wanted**
16   **to come out of the CCR room.**
17   Q.    What did she say?
18   A.    **She would like to get out of**
19   **the CCR room and back on the line.**
20   Q.    She told you that?
21   A.    **She told me that.**
22   Q.    Did she say why she wanted out
23   of the CCR and back on the line?

320

1    A.    **Because she was gaining weight**
2    **in the CCR room.**
3    Q.    What did she say?
4    A.    **That her ass was getting big.**
5    Q.    And she wanted back on the
6    line?
7    A.    **Yes, ma'am.**
8    Q.    And what did you say?
9    A.    **I -- what could I say?  I**
10   **can't move her no how.  I didn't say**
11   **nothing.**
12   Q.    Did you go tell anyone that?
13   A.    **No.**
14   Q.    Did you hear her tell anyone
15   else that, "My ass is getting too big,
16   I want to be back on the assembly
17   line"?
18   A.    **I heard her tell no one.  I**
19   **just know she told me.**
20   Q.    Do you know what her job was
21   when she worked for Mr. Ulrich?
22   A.    **I figured she was in a**
23   **rotation back there doing something.  I**
                        321

1    **have no idea.**
2    Q.    Tell me what department that
3    was again.
4    A.    **Moving parts.**
5    Q.    Is that like being on the
6    assembly line?
7    A.    **Well, you're steadily working**
8    **all day, I mean, it's -- yeah.  I mean,**
9    **it's -- you just -- you don't have no**
10   **stand-around time, you're steadily**
11   **working.**
12   Q.    Well, tell me the difference
13   between that job that she had in
14   Ulrich's department and the job on the
15   BC1 --
16   A.    **No --**
17   Q.    -- line.
18   A.    **No difference.**
19   Q.    No difference?
20   A.    **You're just steadily working,**
21   **you're bending, you're moving, you're**
22   **twisting, you're just working.**
23   Q.    But in Ulrich's department,
                        322

1    you said she was working with parts,
2    but is she putting those parts on a
3    vehicle?
4    A.    **She was making the parts.**
5    Q.    Okay.
6    A.    **I don't -- I really don't know**
7    **what she was doing.  I just know what**
8    **they do in that area.**
9    Q.    And you don't know what she
10   was doing on the BC1 line?
11   A.    **No, ma'am, I do not.**
12   Q.    Do you know if she was moved
13   to the CCR job because she was having
14   trouble with her neck after her
15   automobile accident?
16   A.    **I have no clue.**
17   Q.    Ulrich didn't tell you that?
18   A.    **No, ma'am.**
19   Q.    The job on the BC1 assembly
20   line, was it a more physical job than
21   the CCR job?
22   A.    **I don't know what job she was**
23   **doing on the BC1 line.**
                        323

1    Q.    Well, would the B -- did you
2    know what she was doing in the CCR
3    department?
4    A.    **Yeah.**
5    Q.    And you heard her testimony
6    the other day, did you not?
7    A.    **Yeah.**
8    Q.    Where she told you what she
9    was doing when she was transferred back
10   to the BC1 line?
11   A.    **I believe -- I believe I was**
12   **paying attention, I'm not sure, yeah,**
13   **filing a burr off the back of the car**
14   **or something.  I don't --**
15   Q.    What would be more physically
16   demanding?
17   A.    **What, CCR or on the line?  On**
18   **the line.**
19   Q.    Why?
20   A.    **Because you're not sitting**
21   **behind a desk typing on a computer,**
22   **you're working.**
23   Q.    In the CCR position, that's
                        324

1  what she was doing, typing on a
2  computer?
3      A.  **Yeah, downtime, putting**
4  **downtime in the computer.**
5      Q.  How would she get the downtime
6  information to input in the computer,
7  how was she getting that information?
8      A.  **She'd call to the line or**
9  **somebody would call up there to her or**
10 **she'd come down there, just whichever**
11 **one.**
12     Q.  And then her job was to input
13 that information into the computer?
14     A.  **Exactly.**
15     Q.  And then create a report about
16 why the line was down, take pictures,
17 if necessary?
18     A.  **Well, we was supposed to --**
19 **the team members on the lines was**
20 **supposed to take the pictures.**
21     Q.  And then give that information
22 to her?
23     A.  **Yes, ma'am.**

325

1      Q.  Okay.  And input that all in
2  the same report?
3      A.  **Yes, ma'am.**
4      Q.  Did her job ever entail moving
5  outside the CCR office and behind the
6  computer?
7      A.  **I guess it could, depending on**
8  **the situation.**
9      Q.  How so?  How so?
10     A.  **If somebody gave wrong**
11 **information or she had to go to BC**
12 **lines to find out downtime or come to**
13 **my line, I mean, it just depends on the**
14 **situation.**
15     Q.  Did anyone ever tell you that
16 she wanted to be moved to another shift
17 so she didn't have to work with you?
18     A.  **Nope.**
19     Q.  That was never shared with you
20 by anyone?
21     A.  **Never shared with me.**
22     Q.  What did you hear was the
23 reason she was no longer on the BC1

326

1  line?
2      A.  **I didn't hear.  I didn't ask**
3  **questions.**
4      Q.  You didn't hear anything?
5      A.  **No, ma'am, I did not.**
6      Q.  No scuttlebutt, no coffee pot
7  talk?
8      A.  **I didn't -- didn't want to**
9  **know.**
10     Q.  Mr. Kitchens or Mr. Culpepper
11 didn't share that information with you?
12     A.  **Nope.**
13     Q.  And as you sit here today, you
14 have no knowledge about why Tammy
15 Edwards is no longer at Hyundai?
16     A.  **It's none of my concern why**
17 **she's not there.**
18     Q.  That's not my question.
19     A.  **I don't know why she's not**
20 **there.**
21     MS. HAYNES:  Can you repeat my
22 question?
23     (Requested portion of record

327

1  read by the court reporter.)
2      A.  **I do not.**
3      Q.  (BY MS. HAYNES) You understand
4  I didn't ask you about your concern?
5      A.  **Yes, ma'am.**
6      Q.  That I asked you what
7  knowledge you had?
8      A.  **Yes, ma'am.**
9      Q.  Okay.  And do you have any
10 knowledge why she's not?
11     A.  **No, I do not.**
12     Q.  Have you ever reviewed the
13 complaint that Ms. Edwards filed in
14 this case?
15     A.  **I -- I don't know.  Where --**
16 **where's the complaint's at?**
17     Q.  It looks like this.
18     A.  **Maybe.**
19     Q.  Did you look at the facts that
20 were -- statement of facts in that
21 complaint?
22     A.  **I don't know, I don't**
23 **remember.  I might have that, I might**

328

1 not; I don't know. I've got all this
2 stuff here. I don't know what I have.
3 I don't know.
4     MR. DYKES: If you saw the
5 complaint, would it --
6     THE WITNESS: Yeah, maybe.
7     MS. HAYNES: I don't have
8 another copy of it. How much more time
9 do we have on that tape?
10     THE VIDEOGRAPHER:
11 (Inaudible.)
12     Q. (BY MS. HAYNES) Okay. Let me
13 keep going. Did you ever make a
14 comment to Ms. Edwards stating, quote,
15 "Why do you think the black women want
16 to fuck me"?
17     A. **Never.**
18     Q. You deny making that?
19     A. **I deny making that.**
20     Q. Do you ever remember pushing
21 your body against Ms. Edwards' body
22 with your penis erect and making the
23 comment, "Tammy, can you tell me how

329

1 big I am"?
2     A. **Never happened.**
3     Q. You deny that?
4     A. **I deny that.**
5     Q. On the BC1 line, are you --
6 was Ms. Edwards required to use a
7 hammer on her shift?
8     A. **I have no idea. I wasn't the**
9 **team leader over -- over BC1 line.**
10     Q. Do you know who was?
11     A. **At the time, Billy Kitchens.**
12     Q. Were you still living with him
13 during that period of time?
14     A. **I have no clue.**
15     Q. You don't know when you moved
16 back home?
17     A. **No, I don't.**
18     Q. Was Kitchens over your area
19 and the BC1 line?
20     A. **No, he was not.**
21     Q. He was not over yours?
22     A. **No, ma'am.**
23     Q. Culpepper was?

330

1     A. **Yes, ma'am.**
2     Q. Have you ever told anyone that
3 you and Ms. Edwards were having a
4 consensual sexual relationship?
5     A. **Never.**
6     Q. Have you intimated that to
7 anyone?
8     A. **Never.**
9     Q. What you told Stacye Jones
10 about Ms. Abrams, Ms. Edwards, and
11 Michelle, what's her last name?
12     MS. EDWARDS: Nelson.
13     A. **Nelson.**
14     Q. -- Nelson, did you go and tell
15 anyone else that other than --
16     A. **No.**
17     Q. -- Ms. Jones?
18     A. **No, I did not.**
19     Q. After the investigation was
20 over and you had been suspended, when
21 you came back to the plant, did people
22 talk to you about what had happened?
23     A. **They asked me what had**

331

1 **happened, and I didn't talk about it.**
2     Q. You didn't?
3     A. **I did not talk about what**
4 **happened.**
5     Q. All right. You didn't share
6 your version of the story?
7     A. **No, I did not.**
8     Q. And you didn't tell anyone
9 that Tammy Edwards had been after you
10 and you rejected her?
11     A. **No, I did not.**
12     Q. You specifically deny that?
13     A. **I deny that.**
14     Q. So that never happened, did
15 it?
16     A. **That never happened.**
17     Q. Did you make the comment to
18 anyone that Ms. Edwards' husband had
19 found out about the two of you and was
20 mad and going to make her quit?
21     A. **No.**
22     Q. Did you ever tell anyone your
23 version of why Ms. Edwards was no

332

1 longer at Hyundai, that she had quit?

2     A.   I never said that I had a

3 version of why she wasn't at Hyundai.

4 I -- no, I never said that to anybody.

5     Q.   Do you think I asked you that?

6     A.   Okay. Could you repeat the

7 question then, please?

8     Q.   Sure.

9     (Requested portion of record

10     read by the court reporter.)

11     MR. DYKES: I think he

12 answered that question, Alicia.

13     A.   I didn't have a version, so I

14 didn't tell nobody nothing. I don't

15 know why she left from out there.

16     Q.   You never told anyone why you

17 thought she quit?

18     A.   No. My wife.

19     Q.   Okay. What did you tell your

20 wife about why Tammy Edwards quit?

21     A.   I didn't tell my wife why

22 Tammy Edwards quit. I told my wife

23 what -- what all had went on out there.

             333

1 I don't know if she quit. I don't know

2 what happened to Tammy. My wife is the

3 only person I talk to about this.

4     Q.   Do you know who Wendy Warner

5 is?

6     A.   No, I do not.

7     Q.   Ever heard that name before?

8     A.   I've heard the name at work,

9 but I don't know who she is.

10     Q.   Have you had any conversations

11 with Harry White about Ms. Edwards?

12     A.   No.

13     Q.   And has Mr. White told you

14 anything about Ms. Edwards?

15     A.   No, he has not.

16     Q.   Have you had any conversations

17 with Steve Culpepper about Tammy

18 Edwards?

19     A.   No, I have not.

20     Q.   Has Mr. Culpepper told you

21 anything about Tammy Edwards?

22     A.   No, he has not.

23     Q.   The same question with regards

             334

1 to Tom Bondy?

2     A.   No, ma'am.

3     Q.   You've told me everything you

4 and Mr. Bondy talked about?

5     A.   Yes, ma'am, I have.

6     Q.   And after the first time that

7 you went and told Mr. Bondy, you didn't

8 have any more conversations with him

9 about Tammy Edwards?

10     A.   No, I did not.

11     Q.   Nor he you?

12     A.   No, ma'am.

13     Q.   And we've talked about Amber

14 Kelley. Have you told me about all

15 conversations you've had with Amber

16 Kelley?

17     A.   Yes, ma'am, I have.

18     Q.   When is the last time you

19 talked about Tammy Edwards with Pam

20 Stoddard?

21     A.   I don't even know the last

22 time I've talked to her about it.

23     Q.   Well, did you tell her you

             335

1 were coming here for this deposition?

2     A.   No, I did not.

3     Q.   Has it been within the year?

4     A.   I don't remember. I would say

5 no.

6     Q.   Have you told me about all

7 conversations you had with Billy

8 Kitchens and had with you about

9 Tammy Edwards?

10     A.   Yes, ma'am.

11     Q.   Mr. Clevenger, other than the

12 investigation, did you have any

13 conversations with him about Tammy

14 Edwards?

15     A.   No, ma'am.

16     Q.   And you only had one

17 conversation with him then?

18     A.   Yes, ma'am.

19     Q.   Any telephone calls?

20     A.   No, ma'am?

21     Q.   Any e-mails?

22     A.   No, ma'am.

23     Q.   Did you have an e-mail

             336

1   account --
2       A.   Yes, ma'am, I did.
3       Q.   -- in 2006?
4       A.   Yes, ma'am.
5       Q.   What was your e-mail address?
6       A.   Michael Swindle.
7       Q.   At?
8       A.   HMMAUSA.com.
9       Q.   At HMAA?
10      A.   HMMAUSA.
11      Q.   Dot com?
12      A.   Yes, ma'am.
13      Q.   There's not a dot between
14  HMMAA.USA?
15      A.   No, HMM -- it's HMMAUSA.
16      Q.   Ms. Jones, have you had any
17  conversations with her other than
18  during the investigation, about Tammy
19  Edwards?
20      A.   No, ma'am.
21      Q.   The same question with regards
22  to Lucas Cooner?
23      A.   No, ma'am.

                    337

1       Q.   Is Mr. Cooner still at
2   Hyundai?
3       A.   No, ma'am.
4       Q.   And Ms. Jones is not at
5   Hyundai; is that correct?
6       A.   That's correct.
7       Q.   Mr. Katzenbach, is he still at
8   Hyundai?
9       A.   No, ma'am.
10      Q.   Do you know why he left?
11      A.   I have no idea why he left.
12      Q.   Do you know when he left?
13      A.   Within the year.  Maybe this
14  year, I'm not really sure.
15      Q.   Have you ever had any other
16  conversations with Mr. Katzenbach since
17  he issued you your serious misconduct
18  letter?
19      A.   No, ma'am.
20      Q.   That was your only time?
21      A.   Conversations just in general?
22      Q.   Yes, sir.
23      A.   I might have had a

                    338

1   conversation with him just about how
2   the line's running or something, but as
3   far as of Tammy, no, ma'am.
4       Q.   Do you know who Jane Ramsey
5   is?
6       A.   No, ma'am, I do not.
7       Q.   Do you know what she has to do
8   with this -- this case or this matter,
9   what information she might have?
10      A.   Jane Ramsey?
11      Q.   Yes, sir.
12      A.   I've never heard the name.
13      Q.   Did anyone ever discuss with
14  you Ms. Edwards' medical leave or
15  short-term- or long-term disability?
16      A.   No, ma'am.
17      Q.   In reviewing documents, have
18  you reviewed any documents with regards
19  to her long-term-, short-term
20  disability?
21      A.   No, ma'am, I have not.
22      Q.   Reviewed any medical records?
23      A.   No, ma'am, I have not.

                    339

1       Q.   Did you ever share with Ms.
2   Edwards that you had had a drug problem
3   in previous years?
4       A.   Yes, ma'am, I did.
5       Q.   Okay.  What did you share with
6   her about that?
7       A.   I was -- I went to rehab.
8       Q.   When was that?
9       A.   '90.
10      Q.   Who were you working for then?
11      A.   I was working for Rheem, but I
12  put myself through rehab.
13      Q.   And what was the rehab for?
14      A.   Cocaine.
15      Q.   Anything else?
16      A.   No, ma'am.
17      Q.   Have you been in rehab since
18  1990?
19      A.   No, ma'am, I have not.
20      Q.   With regards to Keith Ulrich,
21  have you had any conversations with
22  Mr. Ulrich about Tammy Edwards?
23      A.   No, ma'am, I have not.

                    340

1    Q.    And you don't recall any
2  conversations when he moved her to your
3  department?
4    A.    **No, ma'am.**
5    Q.    Marty Blame, do you -- have
6  you had any conversations with Marty
7  Blame?
8    A.    **No.  I know he's team**
9  **relations.**
10   Q.    Have you had any
11 conversations --
12   A.    **No, ma'am.**
13   Q.    -- with him about Tammy
14 Edwards?
15   A.    **No, ma'am, I have not.**
16   Q.    Have you had any conversations
17 with Michelle Nelson?
18   A.    **No, ma'am, I have not.**
19   Q.    Do the two of you talk at all?
20   A.    **No, ma'am, we do not.**
21   Q.    Is she still at Hyundai?
22   A.    **Yes, ma'am, she is.**
23   Q.    What shift does she work?

341

1    A.    **She's all the time day shift.**
2    Q.    The same shift with you?
3    A.    **Right now.  She stays on day**
4  **shift; she never rotates.**
5    Q.    What position is she in?
6    A.    **Admin assistant or something**
7  **maybe.**
8    Q.    For what department?
9    A.    **Body shop.**
10   Q.    Who does she report to?
11   A.    **I have -- I don't know.**
12   Q.    Any conversations you have had
13 with Kim Abrams?
14   A.    **No, ma'am.**
15   Q.    Have you ever discussed Tammy
16 Edwards with Kim Abrams?
17   A.    **No, ma'am, I have not.**
18   Q.    Have you ever discussed Tammy
19 Edwards with Michelle Nelson?
20   A.    **No, ma'am, I have not.**
21        THE VIDEOGRAPHER:  Off the
22 record.  The time is 4:08.  We conclude
23 tape five of the deposition.

342

1        (Recess, commencing at
2        4:06 p.m. and concluding at
3        4:34 p.m.)
4        THE VIDEOGRAPHER:  Back on the
5  record.  The time is now 4:34.  We
6  commence tape six of the deposition.
7    Q.    (BY MS. HAYNES) All right.  We
8  were talking about different people who
9  have been listed as possible witnesses.
10 I want to continue with that, Mr.
11 Swindle, and ask you if you've had any
12 conversations with Stephanie Samuels
13 about Tammy Edwards?
14   A.    **No, ma'am.**
15   Q.    Do you talk to Ms. Samuels at
16 all?
17   A.    **Yes, ma'am, I do.**
18   Q.    Is she still at Hyundai?
19   A.    **Yes, ma'am, she is.**
20   Q.    And what is her position at
21 Hyundai?
22   A.    **She's group leader over**
23 **quality.**

343

1    Q.    When was she promoted?
2    A.    **I don't know.**
3    Q.    And Ms. Samuels is the one
4  that told Ms. Jones that you had used
5  profanity toward her?
6    A.    **Yes, ma'am, that's what's in**
7  **the papers.**
8    Q.    Okay.  You deny that?
9    A.    **Yes, ma'am.**
10   Q.    A group leader would be a
11 higher position than a team leader,
12 correct?
13   A.    **Yes, ma'am.**
14   Q.    Is Ms. Samuels over you in any
15 fashion?
16   A.    **No, ma'am.**
17   Q.    Do you know who her direct
18 supervisor is --
19   A.    **Ah --**
20   Q.    -- now or in 2006?
21   A.    **No, ma'am, I do not.**
22   Q.    We've talked about Toby
23 Chance?

344

1    A.   **Yes, ma'am.**

2    Q.   He's a friend of yours?

3    A.   **Yes, ma'am.**

4    Q.   Have you had any conversations

5  with Mr. Chance --

6    A.   **No, ma'am.**

7    Q.   -- about Tammy Edwards?

8    A.   **No, ma'am.**

9    Q.   Ever?

10    A.   **No, ma'am, I have not.**

11    Q.   And has he made any comments

12  to you about Tammy Edwards?

13    A.   **No, ma'am, he has not.**

14    Q.   Roger Clackler, I think we

15  talked about, that you've not talked to

16  him about Ms. Edwards?

17    A.   **No, ma'am.**

18    Q.   Nor has he said anything to

19  you?

20    A.   **No, ma'am.**

21    Q.   Has anyone ever told you

22  anything Mr. Clackler stated about

23  Ms. Edwards?

<center>345</center>

1    A.   **No, ma'am.**

2    Q.   Do you know Patricia Adams?

3    A.   **Yes, ma'am.**

4    Q.   Who is she?

5    A.   **She's at the training center.**

6       THE COURT REPORTER: I'm

7  sorry, she's --

8    A.   **The training center.**

9    Q.   And how is it you know

10  Ms. Adams?

11    A.   **She was at the training center**

12  **when I arrived, first started.**

13    Q.   When you got your training?

14    A.   **Yeah. Yes, ma'am.**

15    Q.   Okay. And that was on sexual

16  harassment?

17    A.   **We had a lot of training. I**

18  **don't -- I don't remember what all the**

19  **training was.**

20    Q.   Do you have any knowledge as

21  you sit here today that it's against

22  the law to sexually harass anyone?

23    A.   **No, I don't have any knowledge**

<center>346</center>

1  of that.

2    Q.   You don't know one way or the

3  other?

4    A.   **No, ma'am, I do not.**

5    Q.   Did you ever take civics in

6  high school?

7    A.   **No, ma'am, I did not.**

8    Q.   Anyone ever told you it was

9  against the law to sexually harass

10  anyone in the workplace?

11    A.   **I might have heard that.**

12    Q.   But you don't know it to be

13  true?

14    A.   **Well, I figure it's true if**

15  **they told me that.**

16    Q.   When did they tell you that?

17    A.   **Through some training that**

18  **I've been through some time or another.**

19  **I don't remember when the training was,**

20  **but I've heard it.**

21    Q.   Have you ever talked to Ralph

22  Edwards?

23    A.   **No, ma'am, I have not.**

<center>347</center>

1    Q.   Other than meeting him at the

2  family picnic for Hyundai?

3    A.   **No, ma'am.**

4    Q.   Scott Gordy, do you know

5  Mr. Gordy?

6    A.   **Yeah, I know who he is.**

7    Q.   He's in payroll?

8    A.   **I don't know where he's at,**

9  **but I -- I know he works out there. I**

10  **don't know what department he works in.**

11    Q.   Have you ever had any

12  conversations with Mr. Gordy?

13    A.   **He's the one that called me**

14  **whenever I first started to work out**

15  **there and told me I had a job.**

16    Q.   Okay.

17    A.   **Other than that, no.**

18    Q.   Have not had any conversations

19  with him about Ms. Edwards?

20    A.   **No, ma'am.**

21    Q.   How about Mr. Griggs, do you

22  know Mr. Griggs?

23    A.   **Coy Griggs?**

<center>348</center>

1    Q.    Yes.
2    A.    **Yes, ma'am.**
3    Q.    Who is Mr. Griggs or what is
4    his position?
5    A.    **He's on EMS, MES, one of**
6    **those.**
7    Q.    What does that stand for?
8    A.    **I have no idea.**
9    Q.    What is --
10   A.    **He works on display panels, he**
11   **makes sure that the sequence numbers**
12   **are right.**
13   Q.    Is he an hourly worker or a
14   manager?
15   A.    **I would -- I don't know,**
16   **hourly.**
17   Q.    What does he know about your
18   interaction with Ms. Edwards?
19   A.    **I have no idea.**
20   Q.    Have you ever had any
21   conversations with him about Ms.
22   Edwards?
23   A.    **No, ma'am.**

349

1    Q.    Has he ever had any
2    conversations with you?
3    A.    **No, ma'am.**
4    Q.    Has he ever observed your
5    behavior in the workplace?
6    A.    **I've seen him at work.**
7    Q.    Has he ever talked to you
8    about your behavior in the workplace?
9    A.    **No, he has not.**
10   Q.    Have you ever used any
11   profanity around Mr. Griggs?
12   A.    **It's a possibility.**
13   Q.    Okay.  Who is Claudia Escobar?
14   A.    **Ergonomics.**
15   Q.    Have you talked to her about
16   Ms. Edwards or any of her claims?
17   A.    **No, ma'am.**
18   Q.    Have you ever talked to Mr.
19   Griggs about any of Ms. Edwards'
20   claims?
21   A.    **No, ma'am.**
22   Q.    Kesha Morris, we've talked
23   about, that she was one of the

350

1    individuals that signed your serious
2    misconduct letter; is that correct?
3    A.    **Yes, ma'am.**
4    Q.    Have you had any other
5    conversations with Ms. Morris since
6    that meeting back in August of 2006?
7    A.    **No, ma'am, I have not.**
8    Q.    And she's no longer at Hyundai
9    in Montgomery?
10   A.    **No, ma'am, she is not.**
11   Q.    Do you know when she left?
12   A.    **No, ma'am.**
13   Q.    All right.  Mr. Kimble, Greg
14   Kimble, do you know Mr. Kimble?
15   A.    **I don't know him.  I know who**
16   **he is.**
17   Q.    What position is he in?
18   A.    **I don't -- I do not know.**
19   Q.    Have you had any conversations
20   with him about Ms. Edwards or any of
21   her claims?
22   A.    **No, ma'am.**
23   Q.    Has he ever asked you any

351

1    questions about Ms. Edwards or any of
2    your claims?
3    A.    **No, ma'am.**
4    Q.    Anyone else I did not go over
5    with regards to that list that you have
6    talked to about Ms. Edwards other than
7    your wife?
8    A.    **No, ma'am.**
9    Q.    Do you know if you ever
10   evaluated Ms. Edwards or she evaluated
11   you?
12   A.    **I know I didn't never evaluate**
13   **her.  Whether she did me, I have no**
14   **knowledge of it.**
15   (Plaintiff's Exhibit 8 was
16   marked for identification.
17   A copy is attached.)
18   Q.    (BY MS. HAYNES) Plaintiff's
19   Exhibit 8, have you ever seen that
20   document or that statement?  Can you
21   answer my question or are you still
22   reading?
23   A.    **No, ma'am, I'm finished.  No,**

352

1 I haven't seen this.
2     (Plaintiff's Exhibit 9 was
3     marked for identification.
4     A copy is attached.)
5     Q.  (BY MS. HAYNES) Okay.
6 Plaintiff's Exhibit 9, have you ever
7 seen that document? Did I give it to
8 you, Toby?
9     MR. DYKES: Yeah.
10     A.  Not this -- not this document
11 here, but I have seen equal opportunity
12 employment -- opportunity thing.
13     Q.  Where was that?
14     A.  On the board up there by the
15 offices.
16     (Plaintiff's Exhibit 10 was
17     marked for identification.
18     A copy is attached.)
19     Q.  (BY MS. HAYNES) Plaintiff's
20 Exhibit 10, have you ever seen that
21 sign-in sheet?
22     A.  Probably so.
23     Q.  The second page purports to

353

1 have your signature on it.
2     A.  Yes, ma'am.
3     Q.  Is that your signature?
4     A.  Yes, ma'am, it is.
5     Q.  All right. Do you recall
6 receiving any type of training from
7 Hyundai in -- or on January 13th, 2004?
8     A.  Maybe so. I don't remember,
9 though, four-and-a-half years ago, but
10 evidently I was there.
11     Q.  The last two pages of this
12 exhibit, one of which is a sexual
13 harassment refresher training, which is
14 next to the last page, Bates Number
15 394, do you see your name on that
16 document?
17     A.  Which page is it, the first
18 page?
19     Q.  No, sir, it's next to the last
20 page, Bates number -- there's a number
21 at the bottom of the page that's 394.
22     A.  Okay.
23     Q.  No?

354

1     A.  No, I do not see my name on
2 here.
3     Q.  All right. Have you ever been
4 asked to take a refresher training on
5 sexual harassment?
6     A.  No, ma'am.
7     Q.  Okay. And I think we're clear
8 with that, the only training you've had
9 is right when you started in 2004?
10     A.  To my knowledge.
11     Q.  Okay. Have you ever been to
12 the lake with Tom Bondy?
13     A.  Yes, I have, I've been at the
14 lake at the same time as Tom Bondy.
15     Q.  Does he have a place at the
16 lake?
17     A.  No, ma'am, he does not.
18     Q.  Does he have a boat?
19     A.  Yes, ma'am, he does.
20     Q.  Is that also on Lake Martin?
21     A.  Yes, ma'am, it is.
22     Q.  Okay. Did you go to or go
23 with him to the meeting at his boat the

355

1 first of August to talk about Tammy
2 Edwards?
3     A.  No, I did not.
4     Q.  End of July, did the two of
5 you go to his boat?
6     A.  No, ma'am.
7     Q.  Did you tell anyone that you
8 and Tom had been out on his boat to
9 talk about Tammy Edwards?
10     A.  No, ma'am.
11     Q.  Have you ever heard Pam
12 Stoddard start a conversation with
13 Tammy Edwards using profanity?
14     A.  Have I ever heard Pam start a
15 conversation using profanity?
16     Q.  Yes, sir.
17     A.  No.
18     Q.  Have you ever heard her
19 talking dirty with Tammy Edwards?
20     A.  No.
21     Q.  Talk about sex?
22     A.  No, ma'am.
23     Q.  Did you ever ask Ms. Edwards

356

1  if you could get a hug now for making
2  600 units?
3  **A.  No, I did not.**
4  **Q.**  Did Ms. Stoddard ever tell you
5  that Ms. Edwards had talked to her to
6  talk to you about staying away from
7  her?
8  **A.  No, she didn't.**
9  **Q.**  Did Ms. Edwards ever use your
10  cell phone to make a call?
11  **A.  Yes, ma'am.**
12  **Q.**  When?
13  **A.  I don't know what exact date**
14  **it was.**
15  **Q.**  What was the occasion?
16  **A.  She called Billy Kitchens.**
17  **Q.**  And what was the reason for
18  calling Billy Kitchens?
19  **A.  She was acting like her**
20  **sister.**
21  **Q.**  Why?
22  **A.  I have no idea.  I didn't**
23  **listen to the conversation.**

357

1  **Q.**  You -- you don't have any
2  knowledge about the conversation?
3  **A.  She told me that she was going**
4  **to call Billy and mess with him.**
5  **Q.**  And you didn't hear the
6  conversation?
7  **A.  No, ma'am, I did not.**
8  **Q.**  Did Mr. Kitchens tell you
9  anything she said?
10  **A.  He said that she was just**
11  **picking at him, messing with him.**
12  **Q.**  Did he say what about?
13  **A.  No.  I didn't ask.**
14  **Q.**  Did you ever observe that
15  Billy Kitchens had harassed Tammy
16  Edwards?
17  MR. DYKES:  Object to the
18  form.
19  **A.  Not to my knowledge.**
20  **Q.**  After reading Plaintiff's
21  Exhibit 3 that we went over in detail
22  during your deposition, do you know of
23  any discipline that Billy Kitchens

358

1  received for any of his conduct or
2  behavior toward Ms. Edwards?
3  **A.  I have no knowledge of any.**
4  **Q.**  Do you think that's fair that
5  nothing happened to him and you got a
6  serious letter of misconduct?
7  MR. BOSTICK:  Object to the
8  form.
9  **A.  That's not my call to make.**
10  **Q.**  That's not my question.
11  **A.  Well, I don't know if it's**
12  **fair or not.**
13  **Q.**  Well, what's your opinion, do
14  you think it's fair or not?
15  **A.  I don't know what Billy did.**
16  **Q.**  After reading the document,
17  Plaintiff's 3?
18  **A.  I don't know if Billy did this**
19  **stuff or not, I mean, that's what I'm**
20  **saying.**
21  **Q.**  Well, if he had done it, do
22  you have an opinion whether it would
23  have been fair that he didn't get in

359

1  trouble and you did?
2  MR. DYKES:  Objection, Alicia.
3  He's answered the question.  He said
4  doesn't have an opinion one way or the
5  other.
6  **Q.**  Is that your testimony, you
7  don't have an opinion?
8  **A.  No, I don't have an opinion.**
9  **I don't know what he did and what he**
10  **didn't do.**
11  **Q.**  What's your Social Security
12  number?
13  **A.**  ████████████.
14  **Q.**  Are you known by any other
15  names other than Mike or Michael
16  Swindle?
17  **A.  No, ma'am.**
18  **Q.**  What's your middle initial?
19  **A.  W.**
20  **Q.**  That stands for what?
21  **A.  Wayne.**
22  **Q.**  Do you have any nicknames?
23  **A.  No, ma'am.**

360

1    Q.    Do you know where Steve
2   Culpepper lived?
3       A.    **No, ma'am.**
4       Q.    Do you know if he was fired?
5       A.    **That's what I heard.**
6       Q.    Was it over the incident with
7   April Smith?
8       A.    **I have no idea.**
9       Q.    Did they leave both at the
10  same time?
11      A.    **I don't remember if they left**
12  **at the same time.**
13      Q.    Have you ever used the P word?
14  Do you know what I'm talking about when
15  I say the P word, or do I need to say
16  that for you?
17      A.    **No, I believe I know what**
18  **you're talking about.**
19      Q.    Have you ever used that?
20      A.    **Not at work.**
21      Q.    Ever used it to describe Steve
22  Culpepper?
23      A.    **No, I have not.**
                    361

1   used to be located, does that line move
2   every 47 seconds?
3       A.    **It has to to keep up with the**
4   **BC line.**
5       Q.    How quickly does it move?
6       A.    **They have to build a part for**
7   **every car that's made, so it should be**
8   **47 seconds cycle time.**
9       Q.    Do you know that for a fact?
10      A.    **I don't know it for a fact.**
11      Q.    Do you have a group of men
12  that you refer to as your drinking
13  buddies there at Hyundai?
14      A.    **No.  I have guys that I drink**
15  **with.**
16      Q.    Who is that?
17      A.    **Billy and Toby.**
18      Q.    Billy Kitchens, Toby Chance?
19      A.    **Yes.**
20      Q.    How about Tom Bondy?
21      A.    **I -- I have dranked with him**
22  **before.**
23      Q.    Okay.  How often do y'all go
                    363

1       Q.    You deny using that word with
2   Ms. Edwards to describe Steve
3   Culpepper?
4       A.    **I do.**
5       Q.    Do you have any knowledge why
6   Chad Spurlock left the employment of
7   Hyundai?
8       A.    **No, ma'am, I do not know.**
9       Q.    On the BCI (sic) line, does
10  that line move every 48 seconds?
11      A.    **BC1 line.**
12      Q.    I'm sorry, BC1 line, does that
13  line move every 48 seconds?
14      A.    **Roughly.**
15      Q.    Well, what's your
16  understanding --
17      A.    **Forty --**
18      Q.    -- if everything's operating
19  correctly?
20      A.    **Forty-seven seconds.**
21      Q.    Forty-seven?
22      A.    **Yes, ma'am.**
23      Q.    Moving parts where Ms. Edwards
                    362

1   out and share a drink?
2       A.    **We don't go out together and**
3   **share a drink.  We might be at the same**
4   **place and have a drink.**
5       Q.    Do you drink there at work?
6       A.    **No.**
7       Q.    Where do you go?
8       A.    **Woodmere.**
9       Q.    And how often would the three
10  or four of you meet?
11      A.    **Once every couple of months we**
12  **might all run in there together, be**
13  **at -- there together at the same time.**
14      Q.    How about leaving after work
15  and going some place to have a drink?
16      A.    **No.**
17      Q.    You don't do that?
18      A.    **I do it, but not with Tom and**
19  **them.**
20      Q.    Okay.  Did you in 2006?
21      A.    **There's a possibility I could**
22  **have, but not leaving straight after**
23  **work and going anywhere.**
                    364

1    Q.    You'd meet at Woodmere later?

2    **A.    No.    We never met.    He would**

3    **just -- if he was going out there, he'd**

4    **say something, if we was going out**

5    **there, we'd say something, and**

6    **everybody would be out there at the**

7    **same time.**

8    Q.    Anybody else included in that

9    group other than the -- you, Chance,

10   Kitchens, Bondy?

11        MR. DYKES:    Object to the

12   form.

13        MS. HAYNES:    Did I name --

14        MR. DYKES:    He said -- you

15   threw Bondy in with Kitchens and

16   Chance, and I --

17   Q.    Kitchens and Chance was always

18   your buddies?

19   **A.    Me and Billy went to Woodmere**

20   **a lot.**

21   Q.    Okay.    And Chance?

22   **A.    He would come sometimes.**

23   Q.    All right.    And Mr. Bondy?

365

1    **A.    Rarely, but he would come.    He**

2    **would be out there when we was out**

3    **there.**

4    Q.    Okay.    What do you mean he

5    would be out there when y'all were out

6    there?

7    **A.    I mean -- meaning that I**

8    **didn't come by my house -- he didn't**

9    **come by my house and pick me up to go,**

10   **and I didn't go by his to pick him up**

11   **to go.    But if he was out there and I**

12   **was out there, we'd have a drink.**

13   Q.    All right.    Did y'all have a

14   certain day of the week that you all --

15   **A.    No.**

16   Q.    -- met?

17   **A.    No.**

18   Q.    It wasn't Friday after work?

19   **A.    No, no certain days.**

20   Q.    Just whenever?

21   **A.    Just whenever.**

22   Q.    Was it every two to three

23   times a week, was it that frequent?

366

1    **A.    No.**

2    Q.    Is it your testimony that it

3    was only once every two months that you

4    and Kitchens would go out drinking?

5    **A.    No, I'm not saying that once**

6    **every -- that me and Kitchens would go**

7    **out.**

8    Q.    How often would you and

9    Kitchens go out?

10   **A.    It has been every weekend**

11   **we've went out, every Friday night or**

12   **Saturday night.**

13   Q.    Okay.    And how often would

14   Chance join y'all?

15   **A.    Once every couple of months.**

16   Q.    The same with Bondy?

17   **A.    The same with Bondy.**

18   Q.    All right.    And how about

19   Culpepper, has he ever joined you?

20        MR. DYKES:    Alicia, we've done

21   all this.

22   **A.    No.**

23        MS. HAYNES:    I'm almost

367

1    through.

2         MR. DYKES:    Okay.    I mean, we

3    just --

4         MS. HAYNES:    I don't think we

5    got the frequency.

6         MR. DYKES:    I think we did.

7         MS. HAYNES:    Well, I'm sorry

8    if I've repeated myself.    It's been a

9    long day.

10        MR. DYKES:    I know.

11   **A.    Culpepper has been out with --**

12   **with me one time.**

13   Q.    (BY MS. HAYNES) Okay.    Did you

14   ever make the comment to Ms. Edwards

15   that you knew too much on Tom Bondy?

16   **A.    No, ma'am, never happened.**

17   Q.    Do you know anything on Tom

18   Bondy?

19   **A.    I don't know nothing on Tom**

20   **Bondy.**

21   Q.    Did you know about the

22   relationship between Mr. Culpepper and

23   April Smith before they got caught at

368

1 work?
2     A.    **Only rumors.**
3     Q.    Did you ever share that
4 information with Ms. Edwards?
5     A.    **It's a possibility.  I don't**
6 **know.**
7     Q.    I think I asked you this, but
8 I want to make sure.  Did Ms. Edwards
9 ever fill out an evaluation on you?
10     A.    **Not -- not to my knowledge.  I**
11 **don't know.  If she did, I don't know**
12 **nothing about it.**
13     Q.    Did you ever make the comment
14 to Ms. Edwards that, quote, "Ain't it
15 funny how people me and Billy don't
16 like get fired"?
17     A.    **I've never made that remark.**
18     Q.    You never told Ms. Edwards
19 that?
20     A.    **No, ma'am.**
21         MS. HAYNES:  All right.
22 That's all the questions I have.
23         MR. BOSTICK:  I might have a

369

1 few.  I need to take a five-minute
2 break.
3         THE VIDEOGRAPHER:  Off the
4 record, 4:59.
5         (Off-the-record discussion.)
6         (Recess, commencing at
7          4:59 p.m. and concluding at
8          5:07 p.m.)
9         THE VIDEOGRAPHER:  Back on the
10 record.  The time is now 5:07.
11 EXAMINATION BY MR. BOSTICK:
12     Q.    Mr. Swindle, I'm Brian
13 Bostick, attorney for Hyundai.  I just
14 had a couple of questions.
15         You had mentioned the name
16 Billy Kitchens.  What was his position
17 with HMMA at the time Ms. Edwards had
18 made her complaint in August of 2006?
19     A.    **Team leader.**
20     Q.    Did he at some point become
21 promoted to group leader position?
22     A.    **Yes, sir.**
23     Q.    When did that promotion take

370

1 place?
2     A.    **Somewhere towards the end of**
3 **'07.**
4         MR. BOSTICK:  That's all I
5 have.
6         MR. DYKES:  I don't have
7 anything.
8         MS. HAYNES:  Fine.  I don't
9 have anything.
10         THE VIDEOGRAPHER:  We now
11 conclude.  The time is 5:08.
12     THUS CONCLUDED THE DEPOSITION OF
13         MICHAEL WAYNE SWINDLE
14           AT 5:08 P.M.

371

1           C E R T I F I C A T E
2 STATE OF ALABAMA  )
3 JEFFERSON COUNTY  )
4     I hereby certify that the above
5 and foregoing proceeding was taken down
6 by me by stenographic means, and that
7 the questions and answers therein were
8 produced in transcript form by computer
9 aid under my supervision, and that the
10 foregoing represents, to the best of my
11 ability, a true and correct transcript
12 of the proceedings occurring on said
13 date at said time.
14     I further certify that I am
15 neither of counsel nor of kin to the
16 parties to the action; nor am I in
17 anywise interested in the result of
18 said cause.
19
20     _____
21     SALLIE NESMITH GUNTER
22     CERTIFIED COURT REPORTER
23     ACCR LICENSE #37

372

# Exhibit 1 Filed Under Seal

# Team Member Handbook





# HYUNDAI

Hyundai Motor Manufacturing Alabama, LLC.

1st Edition

Hyundai Motor Manufacturing Alabama, LLC.
700 Hyundai Boulevard
Montgomery, Alabama 36105

PLAINTIFF'S EXHIBIT



CONFIDENTIAL



## EQUAL EMPLOYMENT OPPORTUNITY

HMMA is committed to providing an environment that is free of unlawful discrimination and providing equal employment opportunities and promotional opportunities to all Team Members.

Equal employment opportunity means eliminating any practice of unlawful discrimination from employment - in recruitment, application, qualification, hiring, training and education, promotions, corrective action, layoffs, termination, and all other conditions of employment.

HMMA makes all decisions with regard to employment without discrimination on the basis of race, color, religion, national origin, age, sex, disability, veteran status or any other unlawful basis. Additionally, HMMA will make reasonable accommodations for qualified job applicants and Team Members with disabilities, in accordance with the Americans with Disabilities Act.

HMMA's team relations manager has the appropriate authority and the responsibility to administer the EEO programs with regard to employment and promotional opportunities. Any Team Member who feels he/she has been discriminated against may express such concerns to the Human Resources Director. HMMA's team relations manager will be responsible for administering HMMA's EEO policy and insuring that any reported EEO violations are investigated promptly and handled according to all federal and state laws as well as HMMA's policies and procedures.

## UNLAWFUL HARASSMENT

In order for all HMMA Team Members to enjoy a work environment free from all forms of unlawful discrimination, including sexual harassment, and unwelcome sexual advances or conduct, whether verbal, physical, explicit, or implicit. This includes verbal innuendoes, suggestive comments, off-color jokes, gestures or physical contact. Such embarrassing, demeaning or intimidating behaviors interfere with a Team Member's work performance and may create a hostile, offensive work environment. It is also unlawful sexual harassment when submission to sexual

2

D- 00258  EDWARDS V HMMA

handbook or HMMA policies or procedures shall be interpreted to be in conflict with or to eliminate or modify in any way the employment-at-will status of HMMA Team Members.

This policy of employment-at-will may not be modified by any officer or Team Member and shall not be modified in any publication or document. The only exception to this policy is a written employment agreement approved at the discretion of the president or the board of directors, whichever is applicable.

This handbook or any policies or procedures are not contracts of employment.

*Redacted*

advances is a condition of getting or keeping one's job or when it influences personnel decisions. Furthermore, it is contrary to HMMA policy for any Team Member to be subjected to harassment in the workplace because of race, color, religion, national origin, age, physical or mental disability, veteran's status, or any other unlawful basis. Cases of such unlawful harassment should be reported to your group leader/manager, team relations representative, or the team relations manager.

*Redacted*

**EMPLOYMENT STATEMENT**

Every Team Member's employment with HMMA is a voluntary one and is subject to termination by you or HMMA at will, with or without cause, and with or without notice, at any time. Nothing in this

3

D-00259 EDWARDS V HMMA

## ATTENDANCE

Regular attendance is the cornerstone for the success of HMMA. A Team Member's absenteeism can reduce the quality and effect of the overall efficiency of HMMA's operations, as well as cause hardship on fellow Team Members who report to work regularly. Regular attendance

7

is every Team Member's responsibility, and every Team Member is expected to be on the job, on time, every scheduled workday.

The minimum acceptable standard of attendance is 98%.

Any scheduled workday missed is considered an absence. However, work time missed due to holidays, scheduled vacation, catastrophic event, jury duty, military duty, bereavement leave, short-term disability, work-related injury or illness, personal leave of absence and FMLA leave shall not be counted as an absence and are not cause for corrective action.

If a Team Member is absent due to a catastrophic event that results in a legally declared emergency which results in the closure of all major roads in the Team Member's county of residence, or if a Team Member must drive through such a county on the way to work, such absences will not count against the Team Member's attendance for the purpose of calculating the acceptable standard of attendance, nor be cause for corrective action. Final approval as to the declaration of a "Catastrophic Event" shall be made by the director of Human Resources.

Team Members who are not on their work area ready for work by their scheduled starting time will be counted as one-half day absent for calculating attendance only, excluding the following events:

A verifiable catastrophic event such as an accident causing road blockage of major highways, a major weather-related closure of roads, or other acts of God which will result in Team Members being tardy will be evaluated on a case by case basis. If it is determined by HMMA that there is a significant adverse impact on HMMA Team Members, the tardy shall not affect a Team Member's attendance record.

Team Members who leave prior to the end of their scheduled shift (including overtime hours) with their group leader's and/or manager's permission are considered to have left early. A leave early will be considered as one-half day of absence for purposes of attendance calculation.

Any situation where a Team Member leaves the facility during scheduled work time (including overtime whether scheduled or voluntary) without their group leader, manager, senior manager, or any other member of management's authorization, the Team Member will be considered to have voluntarily resigned from his/her employment at HMMA.

Attendance will be calculated using a rolling calendar year using the following formula:

• Calculate the number of scheduled workdays. Scheduled workdays will include all excused scheduled workdays.
• Calculate the number of unexcused workdays.
• Subtract the number of unexcused workdays from the number of scheduled workdays and divide the remainder by the number of scheduled workdays to arrive at the Team Member's attendance percentage.

8

Redacted

D- 00260  EDWARDS V HMMA

o Example:

    237 Scheduled workdays
    <u>+ 5</u> unexcused workdays
    232/237 = 97.9%

When a Team Member's attendance falls below 98% at any time during the first year or subsequent years of employment during any rolling twelve- month period, corrective action will be considered. The rolling twelve-month period is a 365-day period.

Every Team Member is expected to notify his/her group leader and/or manager, in advance, of any known absence or future absence. When an absence is not known in advance, the Team Member must notify his/her group leader and/or manager 30 minutes prior to the start of the shift.

Failure to notify within 30 min. at start of the shift may result in corrective action up to and including termination.

Accumulative absences that result in a Team Member's attendance percentage falling below 98% may be cause for corrective action.

The following will be considered:

- Cause
- Frequency
- Patterns
- Failure to report
- Time pattern of reporting

A Team Member that does not communicate to his/her group leader and/ or manager regarding his/her absence for a period of three (3) consecutive days or longer is considered to have voluntarily resigned his/her employment at HMMA.

HMMA will maintain appropriate attendance records. Any corrective action necessary is taken by the group leader and/or the manager. The appropriate team relations representative will be in attendance.

The corrective action process is intended to help Team Members correct any attendance problems. However, if the Team Member's attendance continues to be unacceptable it could result in further corrective action up to and including termination.

When a Team Member's attendance percentage falls below the acceptable standard, corrective action may be considered. Corrective action is not automatic. Each Team Member's attendance record will be reviewed based on its own merit, and the circumstances in each case are considered. However, when corrective action is taken, the following steps must be followed:

1    Informal Discussion
2    Formal Discussion
3    Commitment Discussion

9

The team relations representative will be consulted for guidance at each step of the aforementioned corrective action steps. The team relations representative will also attend each step as it occurs.

When corrective action is required beyond the four steps above, the Team Member's group leader and/or manager will contact the team relations manager and request a review of the Team Member's record for termination. No termination will take place unless the action is reviewed and approved by the team relations manager, section manager, and director of Human Resources.

**WORK WEEK**

HMMA's work week begins at 12:01 a.m. Monday and ends on Sunday at 11:59 p.m.

**OVERTIME**

**Non-exempt Team Members**

Due to the nature of the automotive industry there will be times when we will be required to work overtime in order to meet our customer's needs. Overtime will be paid in one-tenth hour increments; any overtime worked will be paid during the normal pay cycle and included in the regular payroll check.

Overtime is calculated using the base rate of pay plus shift premium and team leader premium, if applicable. Overtime will be paid at 1.5 times the Team Member's regular rate of pay for any time worked in excess of eight hours during the normally scheduled work day as long as 40 hours of work has been achieved for that work week. Team Members will be paid at 1.5 times their regular rate of pay for time worked on Saturday or the sixth work day. Additionally, Team Members will be paid 2 times their regular rate of pay for time worked on Sunday or the seventh day of continuous work. Team Members who work on an approved HMMA holiday will be paid at 2 times their rate of pay. Vacation time will count as hours worked when calculating overtime.

**Exempt Team Members**

Assistant managers and specialist Team Members wages are based on a 40 hour work week and 5 hours of casual overtime. Casual overtime is time that is worked without approval. Assistant managers and specialists will be paid at 1.5 times their calculated regular hourly rate for all pre-approved overtime.

In situations where the assistant manager and/or specialist Team Member is required to work because of scheduled production overtime they will be paid at 1.5 times their calculated hourly rate. Due to the fact that production overtime is scheduled and the assistant manager and/or specialist is required to work in order to support production needs the overtime will be considered as pre-approved. Additionally, the casual overtime rule

10

D- 00261  EDWARDS V HMMA

- HMMA observed holiday, unless the Team Member is scheduled to work on the holiday
- Scheduled Vacation
- Personal Days (HMMA may require documentation)
- Jury Duty
- Military Leave. Military leave shall be considered in accordance with applicable law.
- Bereavement Leave
- The balance of a shift lost due to an occupational illness/injury.
- Workers Compensation related doctor appointments. (When a Team Member misses part of a day due to a work-related injury/illness doctor appointment scheduled by the HMMA Medical Clinic.)
- Any work-related activities away from the plant
- Any medical leave, either work-related or non-work related that is determined to be FMLA.
- Any leave that is determined to be FMLA

**FMLA**

**General Provisions**

It is the policy of HMMA to grant up to 12 weeks of family and medical leave during any 12 month period to eligible Team Members, in accordance with the Family and Medical Leave Act of 1993 (FMLA). The leave may be unpaid, paid, or a combination of unpaid and paid leave, depending on the circumstances of the leave and as specified in the policy.

A Team Member must have worked for HMMA for 12 months, or 52 weeks. In addition a Team Member must have worked at least 1250 hours during the 12 month period immediately before the date when the leave is requested to commence.

In order for the leave to qualify under the policy, the Team Member must be taking leave for one of the reasons listed:

- The birth of a child and in order to care for that child;
- The placement of a child for adoption or foster care, and to care for the newly placed child;
- The care of a spouse, child, or parent with a serious health condition; or
- The serious health condition of the Team Member.

HMMA may ask for certification of the serious health condition. The Team Member should try to respond to such a request within 15 days of the request or provide a reasonable explanation for the delay. Failure to provide certification may result in a denial of continuation of leave. Medical certification may be provided by using the medical certification form. Request for medical certification must be made in writing as part of

13

HMMA's response to the Team Member's request for leave.

All Team Members requesting leave under the policy must provide verbal notice with an explanation of reason(s) for the need leave to their immediate supervisor, who will advise the Benefits Department. If the leave is foreseeable, the Benefits Department may require the Team Member to provide a written request for leave and reason(s) for that leave. Failure of the Team Member to provide a written request for leave cannot be grounds to deny or delay the taking of FMLA leave.

Redacted

14

D- 00262  EDWARDS V HMMA

## CORRECTIVE ACTION

The intent of corrective action is to provide a consistent way to address unacceptable attendance, performance, or conduct. Corrective action is designed to allow Team Members formal notice and an opportunity to correct any performance deviations from HMMA's acceptable standards.

The following corrective action procedures will be taken by HMMA's management in order to address a Team Members' inability to meet HMMA's standards regarding attendance, performance, or conduct. Corrective action applies to exempt Team Members at the specialist level and below, non-exempt administrative Team Members and all production Team Members, including maintenance Team Members. A team relations representative will be available and must attend each phase of the corrective action procedure. The steps are as follows:

### Discussion Planner

Once it has come to the group leader and/or manager's attention that a Team Member's performance does not meet HMMA's performance standards, the group leader and/or manager will meet with the Team Member. This discussion is designed to gather facts about the performance issue and is to be a two-way conversation. The group leader and/or manager is to explore whether the performance issue is failure in the process, equipment, or with the Team Member.

- Equipment Problem. The group leader and/or manager will investigate and seek help in resolving any equipment problems.
- Process Problem. The group leader and/or manager will investigate and seek help in resolving any process problems.
- Team Member's Performance. Inform the Team Member of performance expectations and explain potential ramifications if the poor performance continues.

### Informal Discussion – Phase I

Phase I of corrective action is to address minor performance problems. The intent of Phase I is to bring the performance problem to the Team Member's attention through an Informal Discussion. The group leader and/or manager is responsible for conducting the Informal Discussion. The team relations representative will attend the Informal Discussion and serve as a witness. The Informal Discussion is an open discussion between the Team Member and the group leader and/or manager that identifies the nature of the problem and the possible solution.

31

identifies the nature of the problem and the possible solution.

If the performance problem is corrected and no additional problems develop during the following twelve months, the documented Informal Discussion will be removed from the Team Member's file and will not be used for any future corrective action.

### Formal Discussion – Phase II

The Formal Discussion is the 2nd phase of corrective action and is to be used for more serious performance issues, or if a Team Member fails to correct an existing performance issue after receiving an Informal Discussion, or if it is decided that a Team Member's performance issue is serious enough that it warrants a higher phase of corrective action. The Team Member will be given a Formal Discussion letter. Attendees at the Formal Discussion phase are the group leader and/or a member of management, team relations representative and the Team Member. The group leader and/or production management Team Member will prepare a Formal Discussion document addressed to the Team Member summarizing the performance issue. If the performance issue is corrected and no additional performance issues arise during the following twelve (12) months, the Formal Discussion letter will not be used for any future corrective action.

### Commitment Discussion – Phase III

The Commitment Discussion is the 3rd phase of corrective action. This phase will be used if a Team Member's performance continues to be unacceptable or the Team Member commits a serious action that requires a higher level of corrective action.

A Commitment Discussion is a formal meeting, which is conducted with the affected Team Member, his/her group leader and/or manager, team relations representative, the team relations manager, and the appropriate production management Team Member. The purpose of this phase of corrective action will be to determine what aspects of the Team Member's performance are unacceptable, why they are unacceptable, and the reasons behind the Team Member's performance problem. The Team Member will be required to write an action plan stating what actions he or she will take to resolve the performance problem.

The Commitment Discussion letter and the Team Member's commitment letter will remain in the Team Member's personnel file for a period of 24 months. If the Team Member is able to correct the performance problem and no additional problems develop, the Commitment Discussion letter and the Team Member's action letter will be removed from the Team Member's personnel file and will not be used for any future corrective action.

### Decision Leave – Phase IV

The Decision Leave is the 4th phase of corrective action. This phase may be taken if the Team Member fails to correct the performance problem

32

D- 00263  EDWARDS V HMMA

## Commitment Discussion.

The affected Team Member will meet with his/her group leader and/or manager, team relations representative, team relations manager and the appropriate production management Team Member for a formal meeting. The Team Member will be given the following day off with pay. The Team Member will be asked to use this time to make a final decision whether or not he/she wants to remain employed by HMMA.

If the Team Member decides to return to work and commits to correcting his/her performance, the day off will be excused with pay.

Information regarding a decision to take leave will remain in the Team Member's personnel file for a period of twenty-four (24) months. If the Team Member is able to correct the performance problem, and no additional performance problems develop, it will be removed from the Team Member's personnel file and will not be used for any future corrective action.

Corrective action will be administered sequentially with regard to all attendance performance situations. Specific performance-related issues regarding performance, quality, and conduct will be evaluated on a severity-by-case basis, and corrective action may be applied based on the severity of the performance issue. Any Team Member whose employment is terminated by HMMA may be entitled to request a Peer Review Panel Hearing.

## Termination

HMMA and its Team Members have a mutual interest in maintaining job security and stability in our organization. Because of our mutual interest, HMMA and its management team hope that we never have to terminate a Team Member's employment. However, in situations where a Team Member refuses to respond to the steps in the "Corrective Action Program" outlined above, or if a Team Member's actions are such that HMMA feels his/her employment cannot be continued, the Team Member may have his/her employment terminated. Every termination occasion will be reviewed by the team relations manager, the Team Member's manager, and the Director of Human Resources to review all facts and information before a termination decision is made.

Notwithstanding anything to the contrary contained in this handbook, every Team Member's employment with HMMA is voluntary and is subject to termination by you or HMMA at will, with or without cause, and with or without notice, at any time. Nothing in this handbook or HMMA policies or procedures shall be interpreted to be in conflict with or to eliminate or modify in any way the employment-at-will status of HMMA.

## SERIOUS MISCONDUCT

33

## SERIOUS MISCONDUCT

HMMA regards a high degree of personal integrity from its Team Members. There are certain things a person can do that by nature are so serious that they place him/her outside of the "Corrective Action Policy." When a person commits one of those actions against HMMA and/or his/her fellow Team Members, he/she may be terminated from employment immediately.

In serious misconduct cases where it is determined that termination is not appropriate, the Team Member will receive a Letter of Conditional Employment which will remain in the Team Member's file for 36 months. Upon issuance of a letter of conditional employment, the affected Team Member, group leader, team relations representative, team relations manager and the appropriate management Team Member will have a formal meeting. Following this meeting, the Team Member will develop an action plan and make a written commitment to successfully implement that plan.

Listed below are some examples of activities that constitute serious misconduct at HMMA:

- Serious and/or excessive violations of HMMA's attendance program.
- Serious and/or excessive violations of HMMA's performance standards.
- Threatening or fighting on HMMA's premises, at HMMA sponsored functions, or while conducting business away from the plant.
- Disclosing, misusing or removing from the premises any HMMA or fellow Team Member's property unless authorized.
- Use, possession, sale, transfer of or being under the influence of illegal drugs, alcohol or any other intoxicating substance at any time on HMMA property. Gifts of alcohol and/or employment cannot be solicited as prohibited at HMMA.
- Deliberate damage to HMMA property or the property of a fellow Team Member.
- Intentionally misrepresenting or falsifying any information concerning employment or any report on HMMA record.
- Engaging in any form of discrimination in the workplace, including racial or sexual harassment of a fellow Team Member or harassment of a person in a supervisory position of a Team Member under the supervisor's authority.
- Insubordination, including refusing to perform a work assignment or refusing to follow direction of HMMA security or safety personnel.
- Deliberately trying to conceal serious quality problems in HMMA products.
- Deliberately using unsafe work practices that might seriously

34

D- 00264  EDWARDS V HMMA

- Use, possession, sale or transfer of a weapon at any time on HMMA property.
- Engaging in illegal activities such as gambling or trafficking stolen goods.
- Deliberately violating HMMA's Solicitation and Distribution Policy.
- Deliberately spreading false or malicious rumors or slandering or libeling a fellow Team Member, HMMA or an HMMA product.
- Leaving the plant without proper authorization (note: this is also considered a voluntary resignation).
- Chronic violations of HMMA's Safety Rules or Procedures.
- Willful violations of HMMA's Lockout/Tag out, Confined Space Procedures or other situations where the violation places the Team Member or others in immediate danger.

The aforementioned list is not all inclusive.

35

36

CONFIDENTIAL

| **HYUNDAI** Hyundai Motor Manufacturing Alabama | FAMILY AND MEDICAL LEAVE POLICY | HR-AL-HR-TR-S-00013 |
|---|---|---|
| Revision Date: 11-Jan-08 | Owner: Assistant Manager, Team Relations | Revision Level: 02 |

## A. GENERAL PROVISIONS

It is the policy of HMMA to grant up to 12 weeks of family and medical leave during any 12-month period to eligible Team Members, in accordance with the Family and Medical Leave Act of 1993 (FMLA). The leave may be paid, unpaid, or a combination of paid and unpaid leave, depending on the circumstances of the leave and as specified in this policy.

## B. ELIGIBILITY

In order to qualify to take family or medical leave under this policy, the Team Member must meet all of the following conditions:

1) The Team Member must have worked for HMMA for 12 months, or 52 weeks. The twelve months, or 52 weeks, need not have been consecutive. For eligibility purposes, a Team Member will be considered to have been employed for an entire week even if the Team Member was on the payroll for only part of a week or if the Team Member is on leave during the week.

2) The Team Member must have worked at least 1250 hours during the twelve-month period immediately before the date when the leave is requested to commence. The principles established under the Fair Labor Standards Act (FLSA) determine the number of hours worked by a Team Member. The FLSA does not include time spent on paid or unpaid leave as hours worked. Consequently, these hours of leave should not be counted in determining the 1250 hours eligibility test for a Team Member under FMLA.

## C. TYPE OF LEAVE COVERED

In order to qualify as FMLA leave under this policy, the Team Member must be taking leave for one of the reasons listed below:

1) the birth of a child and in order to care for that child;

2) the placement of a child for adoption or foster care, and to care for the newly placed child;

3) the care of a spouse, child, or parent with a serious health condition; or

4) the serious health condition (described below) of the Team Member.

A Team Member may take leave because of a serious health condition that makes the Team Member unable to perform the functions of the Team Member's position.

A serious health condition is defined as a condition which requires inpatient care at a hospital, hospice, or residential medical care facility, including any period of incapacity or any subsequent treatment in connection with such inpatient care, or a condition which requires continuing care by a licensed health care provider.

This policy covers illnesses of a serious and long-term nature, resulting in recurring or lengthy absences. Generally, a chronic or long-term health condition which, if left untreated, would result in a period of incapacity of more than three days, would be considered a serious health condition.

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained
Page 1 of 5

CONFIDENTIAL                    D- 00266  EDWARDS V HMMA

| ![HYUNDAI logo] **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | FAMILY AND MEDICAL LEAVE POLICY | HR-AL-HR-TR-S-00013 |
|---|---|---|
| Revision Date: 11-Jan-08 | Owner: Assistant Manager, Team Relations | Revision Level: 02 |

Team Members with questions about what illnesses are covered under this FMLA policy or under the company's sick leave policy are encouraged to consult with the Human Resource Department.

HMMA may require a Team Member to provide a doctor's certification of the serious health condition. The certification process is outlined in section H.

If a Team Member takes paid sick leave for a condition that progresses into a serious health condition and the Team Member requests unpaid leave as provided under this policy, HMMA may designate all or some portion of related leave taken as leave under this policy, to the extent that the earlier leave meets the necessary qualifications.

An eligible Team Member can take up to 12 weeks of leave under this policy during any 12-month period. HMMA will measure the twelve-month period as a rolling 12-month period measured backward from the date a Team Member uses any leave under this policy. Each time a Team Member takes leave, HMMA will compute the amount of leave the Team Member has taken under this policy and subtract it from the 12 weeks of available leave, and the balance remaining is the amount the Team Member is entitled to take at that time.

5 ) If a husband and wife both work for HMMA and each wishes to take leave for the birth of a child, adoption or placement of a child in foster care, or to care for a parent (but not a parent "in-law") with a serious health condition, the husband and wife may only take a combined total of 12 weeks of leave.

### D. TEAM MEMBER STATUS & BENEFITS DURING LEAVE

While a Team Member is on leave, HMMA will continue the Team Member's health benefits during the leave period at the same level and under the same conditions as if the Team Member had continued to work.

If the Team Member chooses not to return to work for reasons other than a continued serious health condition of the Team Member or the Team Member's family member or a circumstance beyond the Team Member's control, HMMA will require the Team Member to reimburse HMMA the amount it paid for the Team Member's health insurance premium during the leave period.

Under current HMMA policy, the Team Member pays a portion of the health care premium. While on paid leave, HMMA will continue to make payroll deductions to collect the Team Member's share of the premium. While on unpaid leave, the Team Member must continue to make this payment, either in person or by mail. The payment must be received in the Accounting Department by the _____ day of each month. If the payment is more than 30 days late, the Team Member's health care coverage may be dropped for the duration of the leave. HMMA will provide 15 days notification prior to the Team Member's loss of coverage.

If the Team Member contributes to a life insurance or disability plan, HMMA will continue making payroll deductions while the Team Member is on paid leave. While the Team Member is on unpaid leave, the Team Member may request continuation of such benefit, and pay his or her portion of the premiums. If the Team Member does not continue these payments, HMMA may discontinue coverage during the leave.

### E. TEAM MEMBER STATUS AFTER LEAVE

CONFIDENTIAL    D- 00267  EDWARDS V HMMA

| ![HYUNDAI] Hyundai Motor Manufacturing Alabama | FAMILY AND MEDICAL LEAVE POLICY | HR-AL-HR-TR-S-00013 |
|---|---|---|
| Revision Date: 11-Jan-08 | Owner: Assistant Manager, Team Relations | Revision Level: 02 |

A Team Member who takes leave under this policy will be able to return to the same position or a position with equivalent status, pay, benefits and other employment terms. The position will be the same or one which is virtually identical in terms of pay, benefits, and working conditions.

HMMA may choose to exempt certain highly compensated Team Members from this requirement and not return them to the same or similar position.

## F. USE OF UNPAID AND PAID LEAVE

If the Team Member has earned paid leave, the Team Member must use paid leave first and take the remainder of the twelve weeks as unpaid leave. HMMA will notify the Team Member within two business days in writing or orally (to be confirmed in writing by no later than the Team Member's next regular payday), whether or not the leave will be designated as FMLA leave.

A Team Member who is taking leave because of the Team Member's own serious health condition or the serious health condition of a family member must use all paid vacation, personal or sick leave prior to being eligible for unpaid leave. Sick leave may be substituted for unpaid FMLA leave if the reason for the FMLA leave is covered by the established sick leave policy.

Disability leave for the birth of the child and for a Team Member's serious health condition will be designated as FMLA leave and will run concurrently with FMLA leave. For example, HMMA provides six weeks of pregnancy disability leave. The six weeks can be designated as FMLA leave and counted toward the Team Member's 12-week entitlement. The Team Member may then be required to substitute paid leave as appropriate before being eligible for unpaid leave for what remains of the 12-week entitlement.

A Team Member who is taking leave for the adoption or foster care of a child must use all paid time off (PTO), personal or family leave prior to being eligible for unpaid leave.

## G. Intermittent Leave or a Reduced Work Schedule

The Team Member may take FMLA leave in 12 consecutive weeks, may use the leave intermittently (take a day periodically when needed over the year), or, under certain circumstances, may use the leave to reduce the work week or work day, resulting in a reduced hour schedule. In all cases, the leave may not exceed a total of 12 work weeks over a 12-month period.

HMMA may temporarily transfer a Team Member to an available alternative position with equivalent pay and benefits if the alternative position would better accommodate the intermittent or reduced schedule for leave for the Team Member or Team Member's family member that is foreseeable and for planned medical treatment, including recovery from a serious health condition or to care for a child after birth, or placement for adoption or foster care.

For the birth, adoption or foster care of a child, HMMA and the Team Member must mutually agree to the schedule before the Team Member may take the leave intermittently or work a reduced hour schedule. Leave for birth, adoption, or foster care of a child must be taken within one year of the birth or placement of the child.

If the Team Member is taking leave for a serious health condition or because of the serious health condition of a family member, the Team Member should try to reach an agreement with HMMA before taking intermittent leave or working a reduced hour schedule. If this is not possible, then

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained
Page 3 of 5

CONFIDENTIAL

D- 00268  EDWARDS V HMMA

| ![Hyundai logo] HYUNDAI Hyundai Motor Manufacturing Alabama | FAMILY AND MEDICAL LEAVE POLICY | HR-AL-HR-TR-S-00013 |
|---|---|---|
| Revision Date: 11-Jan-08 | Owner: Assistant Manager, Team Relations | Revision Level: 02 |

the Team Member must prove that the use of the leave is medically necessary. HMMA may require certification of the medical necessity as discussed in Section H.

## H. CERTIFICATION OF THE SERIOUS HEALTH CONDITION

HMMA may ask for certification of the serious health condition. The Team Member should try to respond to such a request within 15 days of the request or provide a reasonable explanation for the delay. Failure to provide certification may result in a denial of continuation of leave. Medical certification may be provided by using the Medical Certification Form. Request for a medical certificate must be made in writing as part of HMMA's response to the Team Member's request for leave.

Certification of the serious health condition shall include: the date when the condition began, its expected duration, and a brief statement of treatment. For medical leave for the Team Member's own medical condition, the certification must also include a statement that the Team Member is unable to perform work of any kind or a statement that the Team Member is unable to perform the essential functions of the Team Member's position. For a family member who is seriously ill, the certification must include a statement that the patient, the family member, requires assistance and that the Team Member's presence would be beneficial or desirable.

If the Team Member plans to take intermittent leave or work a reduced schedule, the certification must also include dates and the duration of treatment, as well as a statement of medical necessity for taking intermittent leave or working a reduced schedule.

HMMA has the right to ask for a second opinion if it has reason to doubt the certification. HMMA will pay for the Team Member to get a certification from a second doctor, which HMMA will select. If necessary to resolve a conflict between the original certification and the second opinion, HMMA will require the opinion of a third doctor. HMMA and the Team Member will mutually select the third doctor, and HMMA will pay for the opinion. This third opinion will be considered final. The Team Member will be provisionally entitled to leave and benefits under the FMLA pending the second and/or third opinion.

## I. PROCEDURE FOR REQUESSTING LEAVE

All Team Members requesting leave under this policy must provide verbal notice with an explanation of the reason(s) for the needed leave to their immediate supervisor, who will advise the Benefits Department. If the leave is foreseeable, the Benefits Department may require the Team Member to provide a written request for leave and reasons(s) for that leave. Failure of the Team Member to provide a written request for leave cannot be grounds to deny or delay the taking of FMLA leave.

HMMA will provide individual notice of rights and obligations to each Team Member requesting leave within two business days or as soon as practicable. For Team Members on intermittent or recurring leave for the same incident, this notice will be provided every six months.

When a Team Member plans to take leave under this policy, the Team Member must give HMMA 30 days notice. If it is not possible to give 30 days notice, the Team Member must give as much notice as is practicable. A Team Member who is to undergo planned medical treatment is required to make a reasonable effort to schedule the treatment in order to minimize disruptions to HMMA's operations.

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained.
Page 4 of 5

CONFIDENTIAL

| HYUNDAI Hyundai Motor Manufacturing Alabama | FAMILY AND MEDICAL LEAVE POLICY | HR-AL-HR-TR-S-00013 |
|---|---|---|
| Revision Date: 11-Jan-08 | Owner: Assistant Manager, Team Relations | Revision Level: 02 |

If a Team Member fails to provide 30 days notice for foreseeable leave with no reasonable excuse for the delay, the leave request may be denied until at least 30 days from the date HMMA receives notice. While on leave, Team Members are requested to report periodically to HMMA regarding the status of the medical condition and their intent to return to work.

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained
Page 5 of 5

CONFIDENTIAL

D- 00270  EDWARDS V HMMA

| ![HYUNDAI] Hyundai Motor Manufacturing Alabama | CORRECTIVE ACTION POLICY | HR-AL-HR-TR-S-00007 |
|---|---|---|
| Revision Date: 22-June-07 | Owner: Assistant Manager, Team Relations | Revision Level: 01 |

## 1. PURPOSE

The intent of the Corrective Action Policy is to provide a consistent way to address unacceptable attendance, performance, or conduct. The Corrective Action Policy is a policy which is designed to allow Team Members formal notice and the opportunity to correct any performance deviations from HMMA's acceptable standards.

## 2. PROCEDURE

The following Corrective Action procedures will be taken by HMMA's management in order to address all Team Members' inability to meet HMMA's standards regarding attendance, performance, or conduct. This policy applies to exempt Team Members at the specialist level and below, non-exempt administrative Team Members, and all production team members, including maintenance team members. A team relations representative will be available and must attend each phase of the Corrective Action procedure. The steps are as follows:

### 2.1. Warning

2.1.1. Once it has come to the group leader and/or manager's attention that the Team Member's performance does not meet HMMA's performance standards, the group leader and/or manager will meet with the Team Member. This discussion is designed to gather facts about the performance issue and is to be a two-way conversation. The group leader and/or manager is to explore whether the performance issue is failure in the process, equipment, or with the Team Member.

- Equipment Problem. The group leader and/or manager will investigate and seek help in resolving any equipment problems.
- Process Problem. The group leader and/or manager will investigate and seek help in resolving any process problems.
- Team Member's Performance. Inform the Team Member of performance expectations and explain potential ramifications if the poor performance continues.

### 2.2. Informal Discussion

2.2.1. Phase 1 is to address minor performance problems. The intent of Phase 1 is to bring the performance problem to the Team Member's attention through an Informal Discussion. The group leader and/or manager is responsible for conducting the Informal Discussion. The team relations representative will attend the Informal Discussion and serve as a witness. The Informal Discussion is an open discussion

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained. Printed: 7/24/2007
Page 1 of 4

CONFIDENTIAL

D- 00271  EDWARDS V HMMA

| ![HYUNDAI] Hyundai Motor Manufacturing Alabama | CORRECTIVE ACTION POLICY | HR-AL-HR-TR-S-00007 |
|---|---|---|
| Revision Date: 22-June-07 | Owner: Assistant Manager, Team Relations | Revision Level: 01 |

between the Team Member and the group leader and/or manager that identifies the nature of the problem and the possible solution.

2.2.2. If the performance problem is corrected and no additional problems develop during the following twelve months, the documented Informal Discussion will be removed from the Team Member's file and will not be used for any future corrective action.

2.3. Formal Discussion

2.3.1. The Formal Discussion is the 2nd phase and is to be used for more serious performance issues, or if a Team Member fails to correct an existing performance issue after receiving an Informal Discussion, or if it is decided that a Team Member's performance issue is serious enough that it warrants a higher phase of Corrective Action. The Team Member will be given a Formal Discussion letter. Attendees at the Formal Discussion phase are the group leader and/or production management Team Member, team relations representative and the Team Member. The group leader and/or production management Team Member will prepare a Formal Discussion document addressed to the Team Member summarizing the performance issue. If the performance issue is corrected and no additional performance issues arise during the following twelve (12) months, the Formal Discussion letter will be removed from the Team Member's file and will not be used for any future corrective action.

2.4. Commitment Discussion

2.4.1. The Commitment Discussion is the 3rd phase of Corrective Action. This phase will be taken if a Team Member's performance continues to be unacceptable or the Team Member commits a serious action, which requires a higher level of Corrective Action.

2.4.2. A Commitment Discussion is a formal meeting, which is conducted with the affected Team Member; his/her group leader and/or manager, team relations representative, the team relations manager, and the appropriate production management Team Member. The purpose of this phase of Corrective Action will be to determine what aspects of the Team Member's performance are unacceptable, why they are unacceptable, and the reasons behind the Team Member's performance problem. The Team Member will be required to write an action plan stating what actions he or she will take to resolve the performance problem.

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained  Printed: 7/24/2007
Page 2 of 4

CONFIDENTIAL
D- 00272  EDWARDS V HMMA



|  **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | **CORRECTIVE ACTION POLICY** | HR-AL-HR-TR-S-00007 |
|---|---|---|
| Revision Date: 22-June-07 | Owner: Assistant Manager, Team Relations | Revision Level: 01 |

2.4.3. The Commitment Discussion letter and the Team Member's commitment letter will remain in the Team Member's personnel file for a period of 24 months. If the Team Member is able to correct the performance problem and no additional problems develop, the Commitment Discussion letter and the Team Member's action letter will be removed from the Team Member's personnel file and will not be used for any future corrective action.

## 2.5. Decision Leave

2.5.1. The Decision Leave is the 4[th] phase of Corrective Action. This phase may be taken if the Team Member fails to correct the performance problem after the Commitment Discussion or if it is determined that the Team Member's performance is serious enough to warrant action beyond a Commitment Discussion.

2.5.2. The affected Team Member will meet with his/her group leader and/or manager, team relations representative, manager team relations and the appropriate production management Team Member for a formal meeting. The Team Member will be given the following day off with pay. The Team Member will be asked to use this time to make a final decision whether or not he/she wants to remain employed by HMMA.

2.5.3. If the Team Member decides to return to work and commit to correcting his/her performance, the day off will be excused with pay.

2.5.4. Information regarding a Decision Leave will remain in the Team Member's personnel file for a period of twenty-four (24) months. If the Team Member is able to correct the performance problem, and no additional performance problems develop, it will be removed from the Team Member's personnel file and will not be used for any future corrective action.

2.5.5. Corrective Action will be administered sequentially with regard to all attendance performance situations. Specific performance-related issues regarding performance, quality, and conduct will be evaluated on a case-by-case basis, and Corrective Action may be applied based on the severity of the performance issue. Any Team Member whose employment is terminated by HMMA may be entitled to request a Peer Review Panel Hearing.

CONFIDENTIAL

D- 00273  EDWARDS V HMMA

| ⨀ **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | **CORRECTIVE ACTION POLICY** | HR-AL-HR-TR-S-00007 |
|---|---|---|
| Revision Date: 22-June-07 | Owner: Assistant Manager, Team Relations | Revision Level: 01 |

### 2.6. Termination

**2.6.1.** HMMA and its Team Members have a mutual interest in maintaining job security and stability in our organization. Because of our mutual interest, HMMA and its management team hope that we never have to terminate a Team Member's employment. However, in situations where a Team Member refuses to respond to the steps in the "Corrective Action Program" outlined above, or if a Team Member's actions are such that HMMA feels his/her employment cannot be continued, the Team Member will be terminated. Every termination decision will be reviewed by the manager, team relations, production management, and the director of human resources to review all facts and information before a termination decision is made

### 3. Note:

**3.1.** Before any formal Corrective Action is taken, the Team Member's group leader and/or manager will have met with the Team Member using the following procedures:

**3.1.1.** The group leader and/or manager will meet with the Team Member to discuss the performance issues in order to gain commitment from the Team Member regarding how he/she plans to correct his/her performance.

**3.1.2.** The group leader and/or manager is required to document the meeting.

CONFIDENTIAL

D- 00274  EDWARDS V HMMA

| HYUNDAI Hyundai Motor Manufacturing Alabama | HARASSMENT POLICY | HR-AL-HR-TR-S-00014 |
|---|---|---|
| Revision Date: 18-Jan-08 | Owner: Assistant Manager, Team Relations | Revision Level: 03 |

## Harassment

HMMA is committed to providing a work environment that is free of discrimination and unlawful harassment. Actions, words, jokes, or comments based on an individual's sex, race, ethnicity, age (40+), religion, or any other legally protected characteristic will not be tolerated. Discrimination and unlawful harassment (both overt and subtle) are forms of misconduct that demean another person and undermine the integrity of the employment relationship. This type of behavior is strictly prohibited. Any Team Member engaging in unlawful discrimination or harassment may be subject to disciplinary action, up to and including termination of employment.

## What is Harassment?

Harassment can take many forms. It may be, but is not limited to, words, signs, jokes, pranks, intimidation, physical contact, or violence. Harassment is not necessarily sexual in nature.

One form of illegal discrimination and harassment is sexual harassment. We may generally categorize "sexual harassment" as unwanted and unwelcome verbal, physical, or visual behavior or conduct that is either (1) sexual in nature or (2) directed at a person's gender where:

- Submission to the behavior may be perceived to be a term or condition of employment;

- Submission to or rejection of the behavior is used as the basis for making employment decisions such as promotions, transfers, annual evaluations, etc.; or

- Such conduct creates an intimidating, hostile, or offensive working environment or interferes with an individual's work performance.

Examples of sexual harassment include, but are not limited to, the following:

- Innuendoes, jokes, comments, slurs, invitations, or graphic commentary about an individual's body which are either sexual in nature or directed at a person's gender;

- Sexually suggestive or obscene objects, pictures, cartoons, posters, calendars, clothing, notes, letters, emails, or electronic media;

- Sexual gestures, leering, touching, assaulting, or impeding or blocking movements.

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained
Page 1 of 4

CONFIDENTIAL

D- 00275 EDWARDS V HMMA

| **HYUNDAI** Hyundai Motor Manufacturing Alabama | HARASSMENT POLICY | HR-AL-HR-TR-S-00014 |
|---|---|---|
| Revision Date: 18-Jan-08 | Owner: Assistant Manager, Team Relations | Revision Level: 03 |

1. **Responsibility**

As an HMMA Team Member, you are responsible for keeping our work environment free of harassment. Any Team Member who becomes aware of an incident of harassment, whether by witnessing the incident or being told of it, must report it to the Team Relations Manager or any member of management of HMMA with whom you feel comfortable. When HMMA becomes aware that harassment might exist, it will take prompt and appropriate action.

2. **Reporting Harassment**

If you feel that you have experienced harassment, you should take action immediately. If you are able, clearly explain to the person causing the harassment that you are uncomfortable with his or her behavior and request that the conduct cease immediately. If you are uncomfortable with that direct approach, report the incident immediately to the Team Relations Manager or any member of management of HMMA with whom you feel comfortable. HMMA will not retaliate against any Team Member who makes a good faith report of alleged harassment, even if the Team Member was in error.

3. **Investigation of Complaints of Harassment/Confidentiality**

All reports will be promptly investigated with due regard for the privacy of everyone involved. Due to the sensitive nature of complaints of sexual and other unlawful harassment, the Team Relations Department will investigate the complaints with particular care, and, to the extent possible, keep them confidential. Please be advised that anonymous claims usually cannot be investigated.

4. **Immediate and Appropriate Corrective Action**

Any Team Member found to have harassed a fellow Team Member or subordinate will be subject to severe disciplinary action or possible discharge. HMMA will also take any additional action necessary to correct the situation immediately.

5. **Consensual, Romantic or Sexual Relationships**

    5.1   HMMA strongly discourages romantic or sexual relationships between Team Members.

    5.2   HMMA prohibits romantic or sexual relationships between any HMMA member of management and any subordinate Team Member. Such a relationship may give rise to the perception by others that there is favoritism or bias in employment decisions affecting the Team Member. Moreover, given the uneven balance

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained
Page 2 of 4

CONFIDENTIAL

D- 00276  EDWARDS V HMMA

| Hyundai Motor Manufacturing Alabama | HARASSMENT POLICY | HR-AL-HR-TR-S-00014 |
|---|---|---|
| Revision Date: 18-Jan-08 | Owner: Assistant Manager, Team Relations | Revision Level: 03 |

of power within such relationships, consent by the Team Member is suspect and may be viewed by others or, at a later date, by the Team Member himself or herself as having been given as a result of coercion or intimidation. The atmosphere created by such appearances of bias, favoritism, intimidation, coercion or exploitation undermines the spirit of trust and mutual respect which is essential to a healthy work environment.

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained
Page 3 of 4

CONFIDENTIAL

D- 00277  EDWARDS V HMMA

| ⬡ **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | HARASSMENT POLICY | HR-AL-HR-TR-S-00014 |
|---|---|---|
| Revision Date: 18-Jan-08 | Owner: Assistant Manager, Team Relations | Revision Level: 03 |

I ACKNOWLEDGE RECEIPT OF THE HMMA ANTI-HARASSMENT POLICY AND COMPLAINT POLICY.

THIS POLICY IS PART OF THE COMPANY'S COMPLIANCE WITH FEDERAL AND STATE LAW PROHIBITING HARASSMENT. THE HARASSMENT POLICY CREATES NO CONTRACTUAL OBLIGATIONS ON THE PART OF HMMA OR ITS TEAM MEMBERS AND DOES NOT ALTER THE AT-WILL RELATIONSHIP BETWEEN HMMA AND ITS TEAM MEMBERS. YOU ARE FREE TO RESIGN AT ANY TIME, AND HMMA HAS THE SAME ABILITY TO TERMINATE THE EMPLOYMENT RELATIONSHIP. THE COMPANY RESERVES THE RIGHT TO REVISE THIS POLICY, WITHOUT NOTICE, TO RESPOND TO BUSINESS CONDITIONS AS THEY ARISE.

_____
Print Team Member Name

_____
Team Member Number

_____
Team Member's Signature

_____
Date

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained
Page 4 of 4

CONFIDENTIAL

D- 00278  EDWARDS V HMMA

| HYUNDAI Hyundai Motor Manufacturing Alabama | MEDICAL LEAVE POLICY | HR-AL-HR-TR-S-00022 |
|---|---|---|
| Revision Date: 18-Jan-08 | Owner: Assistant Manager, Team Relations | Revision Level: 02 |

## 1. PURPOSE

The purpose of this policy is to outline procedures that Team Members must follow when it is necessary for a Team Member to be placed on a work related or non-work related medical leave of absence.

## 2. POLICY

2.1. Team Members that are absent from work due to a non-occupational medical condition, must follow procedures outlined in this policy to qualify for a leave and receive short-term disability benefits. STD benefits will be provided based on HMMA's current plan.

2.2. HMMA will provide Worker's Compensation benefits in accordance with Alabama's Worker Compensation Laws and Regulations for Team Members who qualify for work related medical leave of absence due to an injury or illness arising out of their course and scope of employment with HMMA.

2.3. In the event questions arise regarding a non-occupational or work-related leave of absence or worker's compensation issues, the Team Member should contact the HMMA Safety manager.

## 3. PROCEDURE FOR WORK RELATED MEDICAL LEAVES

3.1. In order to be considered for a Worker's Compensation leave of absence, as stated in the Team Member Handbook, all injuries, regardless of how insignificant they seem, must be reported immediately to the Team Member's manager or another member of management

3.2. Medical care will be provided or directed by the HMMA Medical Clinic staff.

3.3. HMMA has modified and light duty job programs available to accommodate a Team Member that receives temporary medical restrictions due to a work-related injury or illness. If the HMMA Medical Clinic staff determines that a Team Member cannot return to his/her regular job assignment or perform a modified or light duty job, the HMMA Medical Clinic will place the Team Member off work.

3.4. All time off from work for work related injuries must be authorized by the HMMA Medical Clinic. Team Members off work without authorization will be charged with an absence.

## 4. RETURNING FROM A WORK RELATED MEDICAL LEAVE

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained
Page 1 of 3

CONFIDENTIAL

D- 00279  EDWARDS V HMMA

| **HYUNDAI** Hyundai Motor Manufacturing Alabama | MEDICAL LEAVE POLICY | HR-AL-HR-TR-S-00022 |
|---|---|---|
| Revision Date: 18-Jan-08 | Owner: Assistant Manager, Team Relations | Revision Level: 02 |

4.1. The HMMA Medical Clinic will determine when a Team Member is ready to return from a work related medical leave.

4.2. The HMMA Medical Clinic staff will assess each Team Member returning from a work related or non-work related medical leave of absence and determine if the Team Member needs to be placed in the HMMA Work Conditioning program.

5.  PROCEDURE FOR A NON-WORK RELATED MEDICAL LEAVE

5.1. In the event a Team Member is absent from work for a non-related injury or illness, he/she is required to do the following:

5.2. For an absence of one or two work days, Team Member must contact his/her manager each day no later than 60 minutes after the start of the shift.

5.2.1. Team Member must supply the following information:
5.2.2. The reason for the absence.
5.2.3. The expected length of absence.
5.2.4. Type of absence (unavoidable, unscheduled, unpaid)

5.3. If the absence will/does extend more than three days, the Team Member must contact the Medical Clinic on the third (3rd) day of absence. The Medical Clinic will inform him/her what documentation is necessary and will notify his/her Manager of the leave status.

5.4. For absences of more than three consecutive work days the Team Member must complete the proper forms to be eligible for Short Term Disability (STD) benefits. These forms can be obtained from the Medical Clinic.

6.  RETURNING FROM A NON-WORK RELATED MEDICAL LEAVE

6.1. Prior to returning to work from an absence of more than three days the Team Member must provide a doctor's statement to the HMMA Medical Clinic.. The Team Member that has been on an extended leave may be required to come in the shift prior to returning to work to ensure he/she has the proper paperwork and medical clearance to return to work. The doctor's statement may include the following information:

6.1.1. Specific dates on which the Team Member was unable to work due to illness or injury.

6.1.2. Detailed diagnosis of the illness or injury.

6.1.3. A medical release with the specific return date

6.1.4. Details of any related restrictions or medications.

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained
Page 2 of 3

CONFIDENTIAL

D- 00280  EDWARDS V HMMA

| HYUNDAI Hyundai Motor Manufacturing Alabama | MEDICAL LEAVE POLICY | HR-AL-HR-TR-S-00022 |
|---|---|---|
| Revision Date: 18-Jan-08 | Owner: Assistant Manager, Team Relations | Revision Level: 02 |

6.2. The HMMA Medical Clinic staff will assess each Team Member returning from a work related or non-work related medical leave and determine if the Team Member needs to be placed in the HMMA Work Conditioning ramp up program.

*NOTE: FAILURE TO FOLLOW PROCEDURES OUTLINED IN THIS POLICY CAN RESULT IN DELAY, SUSPENSION OR LOSS OF BENEFITS AND/OR AFFECT EMPLOYMENT STATUS.*

6.3. In the event there are inconsistencies with information provided, HMMA will conduct an appropriate investigation to determine benefit eligibility and if corrective action is necessary. Intentional misrepresentation of a medical condition and/or ability to work is a serious misconduct offense and can result in termination.

6.4. A Team Member cannot engage in gainful employment during any leave of absence without the prior written consent of the Director of Human Resources. A Team Member who accepts gainful employment without prior written consent shall be considered to have voluntarily resigned from employment with HMMA as of the first day of work at the new employer.

6.5. HMMA shall review each medical leave of absence to determine if the leave qualifies as FMLA leave. HMMA shall administer leaves that qualify for FMLA leave in accordance with law and HMMA's FMLA Leave Policy.

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained
Page 3 of 3

CONFIDENTIAL

D- 00281  EDWARDS V HMMA

| HYUNDAI | ATTENDANCE POLICY | HR-AL-HR-TR-S-00056 |
|---|---|---|
| Hyundai Motor Manufacturing Alabama | | |
| Revision Date: 21-Feb-06 | Owner: Assistant Manager, Team Relations | Revision Level: 02 |

## 1. PURPOSE

The intent of the Attendance Policy is to establish a consistent method to apply fair, equitable, and consistent administration of acceptable levels of attendance.

## 2. POLICY

Regular attendance is the cornerstone for the success of HMMA. A Team Member's absenteeism can reduce the quality and affect of the overall efficiency of HMMA operations, as well as causing a hardship on fellow Team Members who report to work regularly. Regular attendance is every Team Member's responsibility, and every Team Member is expected to be on the job, on time, every scheduled workday.

## 3. DEFINITIONS

Catastrophic Event: A legally declared emergency, which results in the closure of all roads.

Vacation: 10 scheduled paid vacation days per year (January-December).

Personal Days: 3 Personal Days per year (January –December) may be used at the Team Members' discretion.

## 4. GENERAL PROVISIONS

4.1. Acceptable Attendance:

4.1.1. The minimum acceptable standard of attendance is 98%.

4.2. Absence:

4.2.1. Any scheduled workday missed is considered an absence. However, work time missed due to holidays, scheduled vacations, catastrophic event, jury duty, military duty, bereavement leave, sick leave, work-related injury or illness, personal leave of absence and FMLA leave shall not be counted as an absence and are not cause for corrective action.

4.2.2. If a Team Member is absent due to a catastrophic event that results in:

4.2.2.1. A legally declared emergency which results in the closure of all roads in the Team Member's county of residence, or if a Team Member must drive through such a county on the way to work, such absences

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained. Printed: 3/1/2007
Page 1 of 4

CONFIDENTIAL

D- 00282  EDWARDS V HMMA

| ![Hyundai logo] HYUNDAI<br>Hyundai Motor Manufacturing Alabama | ATTENDANCE POLICY | HR-AL-HR-TR-S-00056 |
|---|---|---|
| Revision Date: 21-Feb-06 | Owner: Assistant Manager, Team Relations | Revision Level: 02 |

will <u>not</u> count against the Team Member's attendance, nor be cause for corrective action.

    4.2.2.2.   In order for a Team Member to retain eligibility for the attendance bonus, the Team Member must use a Personal Day for the day(s) of the absence.

      4.2.2.3.   Final approval as to the declaration of a "Catastrophic event" shall be made by the Director of Human Resources.

4.3. Tardiness: Team Members who are not in their work area ready for work by their scheduled starting time will be counted as one-half day absent for calculating attendance only, excluding the following events:

    4.3.1.  A verifiable catastrophic event such as an accident causing road blockage of major highways, a major weather-related closure of roads, or other acts of God which result in Team Members being tardy will be evaluated on a case by case basis. If it is determined by HMMA that there is a significant adverse impact on HMMA Team Members, the tardy shall not affect a Team Member's attendance record.

    4.3.2.  While Team Members need to be prudent in their use of Vacation days and Personal Days, the above reasons shall provide ample and fair opportunities for Team Members to maintain eligibility for attendance bonuses.

4.4. Leave Early: Team Members who leave prior to the end of their scheduled shift (including overtime hours) with their group leader's and/or manager's permission are considered to have left early. A Leave Early will be considered as one-half day of absence for purposes of attendance calculation.

    4.4.1.  Any situation where a Team Member leaves the facility during scheduled work time (includes overtime whether scheduled or voluntary) without their group leader, manager, senior manager, or any other member of management's authorization, the Team Member will be considered to have voluntarily resigned from his/her employment at HMMA.

    4.4.2.  Calculating Attendance: Attendance will be calculated using a rolling calendar year using the following formula.

      4.4.2.1.   Calculate the number of scheduled workdays. Scheduled workdays will include all excused scheduled workdays.
      4.4.2.2.   Calculate the number of unexcused workdays.
      4.4.2.3.   Subtract the number of unexcused workdays from the number of scheduled workdays and divide the remainder by the number of

CONFIDENTIAL

D- 00283 EDWARDS V HMMA

| ![HYUNDAI logo] **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | **ATTENDANCE POLICY** | HR-AL-HR-TR-S-00056 |
|---|---|---|
| Revision Date:  21-Feb-06 | Owner: Assistant Manager, Team Relations | Revision Level: 02 |

scheduled workdays to arrive at the Team Member's attendance percentage.

4.4.2.4.   Example:

237 Scheduled workdays
<u>- 5</u>  Unexcused workdays
232/237 = 97.9%

4.5. Excessive Absenteeism: When a Team Member's attendance falls below 98% at any time during the first year or subsequent years of employment during any rolling twelve- month period, corrective action will be considered.  The rolling twelve-month period is a 365-day period.

4.6. Evaluating Absenteeism: Every Team Member is expected to notify his/her group leader and/or manager in advance of any known absence or future absence.  When an absence is not known in advance, the Team Member must notify his/her group leader and/or manager 30 minutes prior to the start of the shift.

4.6.1. Accumulative absences that result in a Team Member's attendance percentage falling below 98% may be cause for corrective action.

4.6.1.1.   The following will be considered:

1. Cause
2. Frequency
3. Patterns
4. Failure to report
5. Time pattern of reporting

4.6.2. A Team Member that does not communicate to his/her group leader and/or manager regarding his/her absence for a period of three (3) consecutive days or longer is considered to have voluntarily resigned his/her employment at HMMA.

4.7. Record Keeping and Corrective Action: All Team Member Attendance records will be maintained by the group leader and/or manager. Any Corrective Action necessary is taken by the group leader and/or the manager.  The appropriate Team Relations Representative will be consulted for guidance.

4.7.1. The Corrective Action process is intended to help Team Members correct any attendance problems.  However, if the Team Member's attendance

Uncontrolled Document when printed ~ Reference Only
The controlled version of this document is electronically maintained  Printed: 3/1/2007
Page 3 of 4

CONFIDENTIAL

D- 00284  EDWARDS V HMMA

| HYUNDAI | ATTENDANCE POLICY | HR-AL-HR-TR-S-00056 |
|---|---|---|
| Hyundai Motor Manufacturing Alabama | | |
| Revision Date: 21-Feb-06 | Owner: Assistant Manager, Team Relations | Revision Level: 02 |

continues to be unacceptable it could result in further Corrective Action up to and including termination.

4.7.2. Corrective Action: When a Team Member's attendance percentage falls below the acceptable standard, corrective action may be considered. Corrective action is not automatic. Each Team Member's attendance record will be reviewed based on its own merit, and the circumstances in each case are considered. However, when Corrective Action is taken, the following steps must be followed:

1. Informal Discussion
2. Formal Discussion
3. Commitment Discussion
4. Decision Leave

4.7.3. *Note: The Team Relations Representative will be consulted for guidance at each step of the aforementioned Corrective Action Steps. The Team Relations Representative will also attend each step as it occurs.*

4.7.4. When Corrective Action is required beyond the above four steps, the Team Member's group leader and/or manager will contact the manager for team relations and request a review of the Team Member's record for termination. No termination will take place unless the action is reviewed and approved by the team relations manager, section manager, and Director of Human Resources.

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained. Printed: 3/1/2007
Page 4 of 4

CONFIDENTIAL

D- 00285  EDWARDS V HMMA

| **HYUNDAI** Hyundai Motor Manufacturing Alabama | **RESIGNATION POLICY** | HR-AL-HR-TR-S-00035 |
|---|---|---|
| Revision Date: 31-Jan-08 | Owner: Assistant Manager, Team Relations | Revision Level: 02 |

1. **Policy:**

   Although we hope your employment with HMMA will be a mutually rewarding experience we understand that varying circumstances do cause Team Members to voluntarily resign employment. Should this time come, you are asked to follow the guidelines below regarding notice and exit procedures.

2. **Procedures:**
   2.1. Team Members are encouraged to provide two weeks' notice to facilitate a smooth transition out of the organization.
   2.2. All resignations must be confirmed in writing. Team Members may wish to complete a "Team Member Resignation Form" provided by HMMA for this purpose or may submit other written notice including the reason for leaving and the effective date. Team Members who orally resign will receive a "Confirmation of Resignation" notice within 24 hours.
   2.3. If a Team Member provides more notice than requested, HMMA will evaluate and determine if the additional notice is necessary for effective business operations and will notify the employee using the "Confirmation of Resignation" form to confirm the final date of employment.
   2.4. If a Team Member provides less notice than requested, the employer may deem the individual to be ineligible for rehire depending upon the circumstances regarding the notice given.
   2.5. Management reserves the right to provide a Team Member with two weeks' pay in lieu of notice in situations where job or business needs warrant such action. Such a decision should not be perceived as reflecting negatively on the Team Member, since it may be due to a variety of reasons not known to the individual or other Team Members.
   2.6. Team Members who fail to report to work for three consecutive days without properly communicating to their group leader or manager the reasons for their absence will be viewed as voluntarily resigning their employment as of the 3rd day.
   2.7. Team Members that report for duty and then leave without the authorization will be considered as voluntarily resigning their employment.
   2.8. Team Members will not be allowed to rescind a resignation, whether given orally or in writing, once the resignation has been confirmed by HMMA.
   2.9. Team Members who resign in good standing under this policy and whose documented performance is above average under the organization's performance management system will be eligible for reemployment for a period of up to six months from last date of employment, with benefits tied to seniority reinstated in full. Former Team Members will be considered for open positions along with all other candidates. Former Team Members who apply for reemployment after 6 months will be treated as new employees for purposes of seniority-related benefits.

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained
Page 1 of 2

CONFIDENTIAL

D- 00286  EDWARDS V HMMA

| HYUNDAI<br>Hyundai Motor Manufacturing Alabama | RESIGNATION POLICY | HR-AL-HR-TR-S-00035 |
|---|---|---|
| Revision Date: 31-Jan-08 | Owner: Assistant Manager, Team Relations | Revision Level: 02 |

2.10. All departing Team Members, regardless of the circumstances surrounding their departure, will be reported to those with a need to know (i.e. payroll, front desk, IT and security in order to advise of the last day of actual work for HMMA).

2.11. Resigning Team Members will be schedule for an exit meeting with a member of the Team Relations Department to ensure that all tools and equipment are returned and to provide an opportunity to discuss any questions or concerns related to employment with HMMA. Team Members who fail to return any HMMA property including keys, credit cards, tools, uniforms, cellular phones, pagers and other equipment will be deemed ineligible for rehire and may be subject to legal proceedings on behalf of HMMA.

2.12. Departing Team Members will be asked to confirm their forwarding address to ensure that benefits and tax information are received in a timely manner. Final pay will be mailed to this address by the next payday unless state law or other procedures dictate otherwise. Accrued but unused vacation will be paid out consistent with the HMMA's vacation policy and state law requirements.

Uncontrolled Document when printed -- Reference Only
The controlled version of this document is electronically maintained
Page 2 of 2

CONFIDENTIAL

D- 00287  EDWARDS V HMMA

| HYUNDAI<br>Hyundai Motor Manufacturing Alabama<br>Revision Date:10/25/2005 | Modified Work Duty Policy<br>Owner: Safety | HR-AL-SF-S-00020<br>Revision Level: 01 |
| --- | --- | --- |

### 1. SCOPE:

All HMMA Team Members

### 2. PURPOSE:

2.1 To establish a process for eligibility and placement of Team Members who are suffering from a **temporary** occupational injury or illness to return to modified duty work assignments. The "modified duty assignment" is intended to:

- reduce number of days lost due to absences from injuries an illnesses,
- reduce worker's compensation insurance costs
- Develop a fair and consistent process for Team Members returning to work from Occupational injuries and illnesses.
- Prevent wage loss and to provide appropriate and productive work in preparation for the return of the Team Members to their normal job assignment.

### 3. POLICY STATEMENT:

3.1 Hyundai Motor Manufacturing Alabama, LLC is committed to cooperate and participate in a Return to Work program that is focused on early return to work to a productive temporary job that meets the medical restrictions of the Team Member and the production requirements of HMMA.

3.2 Temporary modified duty assignments will be no longer than thirty (30) calendar days Review of restrictions and tracking will be on-going by the Case Management Specialist.

    a.) If Team Member is capable of performing only one process, the modified duty will be limited to seven (7) calendar days.

    b.) If Team Member can perform two or more of their regular processes the modified duty may be thirty (30) calendar days.

3.3 Modified duty assignments provide temporary and productive work for a Team Member who has had an occupational injury or illness that resulted in temporary medical restrictions where their condition is expected to improve and return to their normal job assignment.

3.4 At the end of the (30) calendar day period or earlier the Team Member will:

    3.4.1 Return to their normal assigned work area or

    3.4.2 Placed off work on Worker's compensation if they have not reached maximum medical improvement

<center>1 of 5</center>

CONFIDENTIAL

| ![Hyundai logo] HYUNDAI<br>Hyundai Motor Manufacturing Alabama | Modified Work Duty Policy | HR-AL-SF-S-00020 |
|---|---|---|
| Revision Date:10/25/2005 | Owner: Safety | Revision Level: 01 |

3.5  All temporary modified duty assignments will be productive and no "make work" will be utilized for accommodation.

    3.5.1 Modified duty assignment will be within your normal job rotation or jobs you are trained to perform.

## 4. Eligibility for Entry and Exit from Modified Work program:

4.1  All Team Members who have medical restrictions resulting from an occupational injury or illness and are temporary in nature will be evaluated for the modified duty program.

4.2  Exit from the modified duty program will be:

    4.2.1 When Team Member is released for full duty by the Health Care  Provider or

    4.2.2 When Team Member's return to full duty supported by functional  capacity information.

    4.2.3 Maximum time frame for modified duty has expired. (30 calendar days)

    4.2.4 Unable to identify suitable and available work.

    4.2.5 Condition has become permanent and Team Member is at maximum medical improvement.

4.3  Refusal of a modified duty assignment by a Team Member will disqualify the individual from worker's compensation benefits and may result in corrective action.

## 5. Definitions:

5.1  **Regular Job** - Full job (processes) performed within the Team Member's scheduled rotation of job duties which the Team Member has been trained to perform.

5.2  **Modified Duty Work** - is productive work within your normal job rotation or jobs you are trained to perform.

5.3  **Normal Rotation Breakdown** - A Team Member is restricted from the performance of their normal job, including task rotations, because of medical restrictions. (I.e. regular job that requires four different tasks to be completed with the  team and the injured Team Member can only perform three of the four or may have decreased time on a specific job, etc.)

5.4  **Medically Restricted Team Member:** A Team Member suffering an occupational injury or illness resulting in written medical restrictions issued by an authorized Health Care provider limiting specific activities.

5.5  **Designated Supervisor:** Immediate supervisor to whom a medically restricted team member is assigned; i.e. Group Leader or Assistant Manager of the dept.

2  of  5

CONFIDENTIAL

D- 00289  EDWARDS V HMMA

| **HYUNDAI** | **Modified Work Duty Policy** | HR-AL-SF-S-00020 |
| Hyundai Motor Manufacturing Alabama | | |
| Revision Date:10/25/2005 | Owner: Safety | Revision Level: 01 |

## 6. PROCEDURE:

When a Team Member suffers an occupational injury/illness, the following process will be followed:

6.1 **Team Member Evaluation/Eligibility:** Team Members shall report all accidents and illnesses in a timely manner, and obtain the necessary treatment. After evaluation by authorized Health Care Provider and the Team Member is diagnosed with an occupational injury/illness that involves restrictions, modified duty/ return to work process will begin as soon as notifications of restrictions are received.

6.1.1 Productive work is available when an identified job meets the Team Member's restrictions and the Supervisor, Safety and Medical agree that the job offered can be performed safely with the medical restrictions provided and it meets a need for HMMA production.

6.1.2 Injured Team Members performing restricted work will be subject to periodic medical evaluations, at least every week if restrictions are provided by the Medical Center, and as deemed necessary when restrictions are provided by an off-site provider.

## 7. Team Member Assignments/Responsibilities:

7.1 A medically restricted Team Member whose restrictions meet the criteria for restricted Work will begin the RTW process. The seven (7) day period starts from date of restriction placement.

7.2 A medically restricted Team Member who can perform a portion of their regular job duties, but is unable to perform the normal job rotation is eligible for modified duty assignment. This modified duty work assignment is limited to 30 days in a rolling twelve (12) month period.

7.3 The designated Group Leader/Supervisor is responsible for Team Member's attendance record while on modified duty.

7.4 Paid Personal Time (PPT), jury duty, military leave, funeral leave, holidays are excluded from the definition of working days.

7.5 Safety Dept. Case Manager will track the restricted work assignments and notify the Assistant Area Manager and Team Member Relations Representative five (5) days before eligibility expires.

7.6 The Supervisor and Area Assistant Manager are responsible for identifying appropriate and productive work for the injured Team Member within their regular team. If no work is available within their regular work group, the Assistant Area Manager will work with the Safety Specialist and will attempt to identify productive work in another group and/or area. Shift change may occur in order to find productive work.

3 of 5

CONFIDENTIAL

D- 00290  EDWARDS V HMMA

| ⊕ HYUNDAI | Modified Work Duty Policy | HR-AL-SF-S-00020 |
|---|---|---|
| Hyundai Motor Manufacturing Alabama | | |
| Revision Date:10/25/2005 | Owner: Safety | Revision Level: 01 |

7.7 The Case Manager and Ergonomist will review the restrictions and will validate that the job requirements are within the medical restrictions. It is mandatory that the useful and productive work adheres to the medical restrictions identified.

7.8 Team Member's ability to work overtime will be determined on a case by case basis and will be based on medical guidance and production needs. Restricted duty may not always work production work hours.

7.9 Team Member's modified duty status will be re-evaluated when there is a change in medical restrictions as determined by the Health Care provider) and/or change in the availability of restricted work.

7.10 A Team Member may be provided a ramp-up period to acclimate to the work environment. Days worked during this ramp-up period will be recorded as modified duty.

7.11 If the Team Member is not able to return to their regular job and has completed the seven (7) days allowed restricted duty and is unable to return to full duty or has not reached maximum medical improvement, or if productive work is not available, the Team Member must report to Medical clinic for a medical exam.

7.12 On the seventh (7th) modified duty day of work, the medical clinic will examine the injured Team Member to determine their current medical status and:

7.12.1 If it is determined by the company health care provider that the injured Team Member is making satisfactory progress and it is estimated that they will return to their regular job within a reasonable amount of time, the injured Team Member may be able to continue on their restricted work assignment in combination with a ramp-up of their regular job assignment. This type of restriction will be issued by HMMA's physician.

7.12.2 If it is determined that the Team Member is unable to perform their normal job on a ramp-up schedule, the Team Member may be eligible for additional working days of restricted duty. Restricted duty may continue, if available and meets the "productive work" requirement and aligns with the business needs of HMMA.

7.12.3 If the injured Team Member is determined not to be medically suited for ramp-up and restricted duty is not available, the injured Team Member will be placed on worker's compensation temporary total to complete their recovery period.

7.13 Injured Team Members working under the Modified Duty Policy will receive their regular base rate of pay and benefits while working restricted duty.

4 of 5

CONFIDENTIAL

| **HYUNDAI** | **Modified Work Duty Policy** | HR-AL-SF-S-00020 |
|---|---|---|
| Hyundai Motor Manufacturing Alabama | | |
| Revision Date:10/25/2005 | Owner: Safety | Revision Level: 01 |

### 8. FORMS

8.1 HMMA Duty Disposition Form

### 9. Outputs

9.1 Team Members who are injured on the job will experience fewer days away from work and production will have productive work for injured Team Member

9.2 Reduce Worker's compensation cost and days away from work.

5 of 5

CONFIDENTIAL

| ![HYUNDAI logo] **HYUNDAI** Hyundai Motor Manufacturing Alabama | · SERIOUS MISCONDUCT POLICY | HR-AL-HR-TR-S-00037 |
|---|---|---|
| Revision Date: 31-Jan-08 | Owner: Assistant Manager, Team Relations | Revision Level: 02 |

### 1.0) PURPOSE

The intent of this policy is to define the steps that will be taken when it is believed that a Team Member has committed a Serious Misconduct violation.

### 2.0) POLICY

HMMA requires a high degree of personal integrity from its Team Members. There are certain things a person can do that by nature are so serious that they place him/her outside of the "Corrective Action Policy." When a person commits one of those actions against HMMA and/or his/her fellow Team Members, he/she may be terminated from employment.

### 3.0) GENERAL PROVISIONS

In Serious Misconduct cases where it is determined that termination is not appropriate, the Team Member will receive a Serious Misconduct Letter which will remain in the Team Member's file for 36 months. Upon issuance of a Serious Misconduct Letter, the affected Team Member, group leader, team member relations representative, manager-team member relations and the appropriate management team member will have a formal meeting. Following this meeting, the Team Member will develop an action plan and make a written commitment to successfully implement that plan. Listed below are some examples but is not an all-inclusive list of activities that constitute Serious Misconduct at HMMA:

- Serious and excessive violations of HMMA's attendance program.
- Serious and excessive violations of HMMA's performance standards.
- Threatening or fighting on HMMA's premises or while conducting business away from the plant.
- Disclosing, misusing or removing from the premises any HMMA or fellow Team Member's property unless authorized.
- Use, possession, sale, transfer of or being under the influence of illegal drugs, alcohol or any other intoxicating substance at any time on HMMA property. Gifts of alcohol and/or coolers containing alcohol are also prohibited at HMMA.
- Deliberate damage to HMMA property or the property of a fellow Team Member.
- Intentionally misrepresenting or falsifying any information concerning employment or any report or HMMA record.
- Engaging in any form of discrimination in the workplace, including racial or sexual harassment of a fellow Team Member or harassment by a person in a supervisory position of a Team Member under the supervisor's authority.

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained
Page 1 of 3

CONFIDENTIAL

D- 00293  EDWARDS V HMMA

| ![HYUNDAI logo] **HYUNDAI** Hyundai Motor Manufacturing Alabama | **SERIOUS MISCONDUCT POLICY** | HR-AL-HR-TR-S-00037 |
|---|---|---|
| Revision Date: 31-Jan-08 | Owner: Assistant Manager, Team Relations | Revision Level: 02 |

- Insubordination, including refusing to perform a work assignment or refusing to follow direction of HMMA Security or Safety personnel.
- Deliberately trying to conceal serious quality problems in HMMA products.
- Deliberately using unsafe work practices that might seriously jeopardize the health or safety of the Team Member or a fellow Team Member.
- Use, possession, sale or transfer of a weapon at any time on HMMA property.
- Engaging in illegal activities such as gambling or trafficking stolen goods.
- Deliberately violating HMMA's Solicitation and Distribution Policy.
- Deliberately spreading false or malicious rumors or slandering or libeling a fellow Team Member, HMMA or an HMMA product.
- Leaving the plant without proper authorization (note: this is also considered a voluntary resignation).
- Chronic violations of HMMA's Safety Rules or Procedures.
- Willful violations of HMMA's Lockout/Tagout, Confined Space Procedures or other situations where the violation places the Team Member or others in immediate danger.

**4.0)    PROCEDURES**

When the manager and/or the group leader determines that a Team Member has committed a Serious Misconduct violation, the following procedures are to be followed.

4.1) The group leader and the manager will contact the manager of team member relations to discuss the details of any alleged Serious Misconduct violation.

4.2.1) The manager of team member relations will coordinate all investigations.

4.2.2) The manager and/or group leader of the department will conduct an investigation regarding a Serious Misconduct violation with a member of the team member relations section in attendance.

4.2.3) After evaluation of the facts, the Team Member may be suspended pending further investigation or be allowed to continue to work until the investigation is concluded.

4.3) All the results from the investigation will be given to the manager of team member relations for review and comparison to HMMA's policy and past practice in similar situations.

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained
Page 2 of 3

CONFIDENTIAL                                        D- 00294  EDWARDS V HMMA

| 🚗 **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | **SERIOUS MISCONDUCT POLICY** | HR-AL-HR-TR-S-00037 |
|---|---|---|
| Revision Date: 31-Jan-08 | Owner: Assistant Manager, Team Relations | Revision Level: 02 |

4.4) The manager of team member relations will present the results of the investigation to the director of manufacturing, manager of employment.

4.5) If it is determined that the Team Member will be returned to work from suspension with less than a Serious Misconduct Letter, the Team Member will be paid for all missed time with no adverse impact.

4.6) If the decision is to give the Team Member a Serious Misconduct Letter:

> 4.6.1) The team member relations manager will set up a meeting with the Team Member's department manager and team member relations representative to inform the Team Member of the decision not to terminate his/her employment.

> 4.6.2) The Team Member's department manager will at that time present the Serious Misconduct Letter to the Team Member.

> 4.6.3) The Team Member is required to write a commitment letter by the end of his/her shift the following business day.

> 4.6.4) If the Team Member is returning from a suspension he/she will not be paid for any of the time during suspension. However, the Team Member will not lose any of his/her benefits during the time of the suspension.

> 4.6.5) The director of Human Resources must approve any exceptions to the Policy.

4.7) If the decision is to terminate

> 4.7.1) The manager of team member relations will set up a meeting with the manager of employment, department manager, team member relations representative and the Team Member in question.

> 4.7.2 ) The employment manager will notify the Team Member of his/her termination.

> 4.7.3) The terminated Team Member will then be escorted of the property by security.

Uncontrolled Document when printed – Reference Only
The controlled version of this document is electronically maintained
Page 3 of 3

CONFIDENTIAL

D- 00295  EDWARDS V HMMA

PLAINTIFF'S
EXHIBIT

6

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | 420-2006-05204 |
| ☒ EEOC | |
| and EEOC | |

State or local Agency, if any

| NAME(Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Tammy Edwards | (205) 755-6693 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 180 County Road 34 | Clanton, AL 35045 | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Hyundai Motor Manufacturing Alabama, LLC | over 15 | (334) 387-8000 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 700 Hyundai Boulevard | Montgomery, AL 36105 | Montgomery |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE EARLIES |
|---|---|
| ☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ AGE | March 2006 |
| ☒ RETALIATION  ☐ NATIONAL ORIGIN  ☐ DISABILITY  ☐ OTHER (Specify) | ☒ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began working at HMMA on or about January 17, 2006, as a team member. I started out assembling fenders under the supervision of Team Leader Keith Ulrich. After about one month, I was offered a more complex position within the company after meeting with Harry White (Assistant Plant Manager). I was responsible for monitoring automated assembly machines and for reporting all "down time" for the robots, the reason they were down and how it was corrected. I was immediately introduced to Mike Swindle, who at the time was not a Team Leader, he was just in charge of the Body Build Line. In our first conversation, Swindle asked me about my marital status and whether I had ever cheated on my husband. He began making vulgar, lewd and sexual gestures with his hands and tongue. Despite my clear requests to stop making sexual advance and sexual comments, he continued such conduct on virtually every shift, and every occasion I was in the vicinity of Swindle's manufacturing line. When Mike Swindle made Team Leader, I was put on his team. He simulated sexually explicit and invasive comments to me. Swindle also touched me against my will by hugging me frequently. On numerous occasions he would try and block me with his body while I was walking down his line. This statement is not inclusive, but merely illustrative. I complained verbally to Swindle and asked the sexual harassment to stop. Swindle informed me there was nothing I could do to make him stop.

On several occasions sexual harassment was witnessed by Steve Culpepper, Group Leader. Another Team Leader, Billy Kitchens, also sexually harassed me on the job (witnessed by Steve Culpepper on at least one occasion).

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct | SIGNATURE OF COMPLAINANT |
| | DEC 26 2006 |
| Date 9/20/06    Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day month and year) |

EEOC FORM 5 (10/94)

PAGE TWO

One Occasion, Kitchens told me in front of Steve, that my new job would be "under his desk." I looked at Steve and they both la and Steve said, "now Billy, you know I can't authorize that," or words to that effect.

Since complaining of harassment, the company has retaliated against me. Hyundai has retaliated against me by allowing its manager, Tom Bondy to subject me to an interrogation under the pretense that he along with Steve Culpepper were investigating my complaint of harassment. Instead, this interrogation was for the purpose of protecting Mike Swindle and/or Bill Kitchens rather than taking remedial action to stop harassment. After complaining of the harassment and in direct retaliation for complaining, I have been demoted and transferred away from a better and more complex job, to the BC1 assembly line  I had no deficiencies of any kind in my job performance and my performance could not have been the reason for my demotion. This undesirable reassignment to a much more physically demanding job was intended to cause me physical and emotional pair The company is aware that I am currently under the treatment of a neurologist for a neck injury and that I need to work in a less physically demanding position  Yet the company retaliated against me by forcing me to perform much more physically demand labor after complaining sexual harassment and a sexually hostile work environment.

I have been discriminated against based on my gender and I have been subjected to a sexually hostile work environment in violation of Title VII, 42 U.S C. § 2000e, et seq., I have also been retaliated against for making a complaint of violations of my federally protected rights.

INITIALS

RECEIVED

SEP 2 6 2006

# Exhibit 7 Filed Under Seal



**UNLAWFUL HARASSMENT**

In order for all HMMA Team Members to enjoy a work environment free from all forms of unlawful discrimination, including sexual harassment, no Team Member - male or female - should be subject to unsolicited and unwelcome sexual advances or conduct, whether verbal, physical, explicit, or implied  This includes verbal innuendoes, suggestive comments, off-color jokes, gestures or physical contact  Such embarrassing, demeaning or intimidating behaviors interfere with a Team Member's work performance and may create a hostile, offensive work environment  It is also unlawful sexual harassment when submission to sexual

2

advances is a condition of getting or keeping one's job or when it influences personnel decisions. Furthermore, it is contrary to HMMA policy for any Team Member to be subjected to harassment in the workplace because of race, color, religion, national origin, age, physical or mental disability, veteran's status, or any other unlawful basis  Cases of such unlawful harassment should be reported to your group leader/manager, team relations representative, or the team relations manager  -

3

D- 00363  EDWARDS V HMMA

## EQUAL EMPLOYMENT OPPORTUNITY

HMMA is committed to providing an environment that is free of unlawful discrimination and providing equal employment opportunities and promotional opportunities to all Team Members

Equal employment opportunity means eliminating any practice of unlawful discrimination from employment - in recruitment, application, qualification, hiring training and education, promotions, corrective action, layoffs terminations, and all other conditions of employment.

HMMA makes all decisions with regard to employment without discriminating on the basis of race, color, religion, national origin, age, sex, disability, veteran status or any other unlawful basis. Additionally, HMMA will make reasonable accommodations for qualified job applicants and Team Members with disabilities, in accordance with the Americans with Disabilities Act

HMMA's team relations manager has the appropriate authority and the responsibility to administer the EEO programs with regard to employment and promotional opportunities. Any Team Member who feels he/she has been discriminated against may express such concerns to his/her group leader/manager, the team relations representative, and/or the Human Resources Director. HMMA's team relations manager will be responsible for administering HMMA's EEO policy and insuring that any reported EEO violations are investigated promptly and handled according to all federal and state laws as well as HMMA's policies and procedures.

2



PLAINTIFF'S
EXHIBIT

D- 00355  EDWARDS V HMMA

# Exhibit 10 Filed Under Seal

**Page 1**

1  IN THE UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF ALABAMA

3  NORTHERN DIVISION

4

5  TAMMY EDWARDS,

6  Plaintiff,

7  vs.

8  HYUNDAI MOTOR MANUFACTURING ALABAMA,

9  LLC, and MIKE SWINDLE, individually,

10  Defendants.

11

12  CIVIL ACTION NUMBER:  2:07-cv-908-MHT

13

14

15  DEPOSITION:  STACYE M. JONES

16

17

18  S T I P U L A T I O N S

19  IT IS STIPULATED AND AGREED by

20  and between the parties through their

21  respective counsel that the deposition

22  of STACYE M. JONES may be taken on June

23  20, 2008, before Sallie NeSmith Gunter,

---

**Page 2**

1  Certified Court Reporter of the State

2  of Alabama, ACCR License Number 37,

3  Commissioner and Notary Public, at the

4  law offices of Haynes & Haynes, P.C.,

5  1600 Woodmere Drive, Birmingham,

6  Alabama.

7  IT IS FURTHER STIPULATED AND

8  AGREED that it shall not be necessary

9  for any objections to be made by

10  counsel to any questions except as to

11  form or leading questions, and that

12  counsel for the parties may make

13  objections and assign grounds at the

14  time of trial or at the time said

15  deposition is offered in evidence or

16  prior thereto.

17

18

19

20

21

22

23

---

**Page 3**

1  APPEARANCES

2  Appearing for the Plaintiff :

3  HAYNES & HAYNES, P.C.

4  By:  Alicia K. Haynes, Esq.

5  1600 Woodmere Drive

6  Birmingham, Alabama  35226

7  Appearing for the Defendant  Hyundai

8  Motor Manufacturing Alabama, LLC :

9  OGLETREE, DEAKINS, NASH, SMOAK

10  & STEWART, P.C.

11  By:  Brian R. Bostick, Esq.

12  One Federal Place

13  Suite 1000

14  Birmingham, Alabama  35203

15  - and -

16  By:  Christopher N. Smith, Esq.

17  Corporate Legal Counsel

18  Hyundai Motor Manufacturing

19  Alabama, LLC

20  700 Hyundai Boulevard

21  Montgomery, Alabama  36105

22

23

---

**Page 4**

1  Appearing for the Defendant Michael

2  Wayne SWINDLE :

3  CONSTANGY, BROOKS & SMITH, LLC

4  By:  J. Tobias Dykes, Esq.

5  By:  Tamula R. Yielding, Esq.

6  One Federal Place

7  Suite 900

8  Birmingham, Alabama  35203

9  Certified Court Reporter:

10  Sallie NeSmith Gunter

11  Also Present:  Tammy Edwards

12

13

14

15

16

17

18

19

20

21

22

23

I N D E X

1
2
3   Examination by Ms. Haynes............8
4   Examination by Mr. Bostick.........362
5   Plaintiff's Exhibit 11
6   Re-Notice of Deposition.............16
7   Plaintiff's Exhibit 12
8   Stacye Jones Résumé.................18
9   Plaintiff's Exhibit 13
10  Hyundai Web Pages -
11  HMMA Employment.....................51
12  Plaintiff's Exhibit 14
13  Handwritten Notes...................77
14  Plaintiff's Exhibit 15
15  E-Mail from Stacye Jones to Rob
16  Clevenger Dated 8/01/2006 and
17  Attachment Thereto.................154
18  Plaintiff's Exhibit 16
19  E-Mail from Stacye Jones to Rob
20  Clevenger Dated 8/07/2006 and
21  Attachment Thereto.................157
22  Plaintiff's Exhibit 17
23  E-Mail from STacye Jones to Rob

5

1   Clevenger Dated 8/07/2006 and
2   Attachment Thereto.................157
3   Plaintiff's Exhibit 18
4   Team Relations Memo from Greg Kimble to
5   Stacye Jones Dated 8/11/2006........177
6   Plaintiff's Exhibit 19
7   Memo From Stacye Jones to Kisha Morris
8   Dated 8/11/2006.....................195
9   Plaintiff's Exhibit 20
10  Memo From Stacye Jones to Melanie
11  McCormick, et al. Dated 8/21/2007...253
12  Plaintiff's Exhibit 21
13  Handwritten Notes Dated 8/7/06......277
14  Plaintiff's Exhibit 22
15  Team Meeting Minutes Dated
16  8/18/2006...........................292
17  Plaintiff's Exhibit 23
18  Department of Industrial Relations
19  Composite Documents.................306
20
21
22
23

6

1   I, Sallie NeSmith Gunter, a
2   Certified Court Reporter of the State
3   of Alabama, ACCR License Number 37,
4   acting as Commissioner, certify that on
5   this date there came before me at the
6   law offices of Haynes & Haynes, P.C.,
7   1600 Woodmere Drive, Birmingham,
8   Alabama, on June 20, 2008, beginning at
9   or about 9:23 a.m., STACYE M. JONES,
10  witness in the above cause, for oral
11  examination, whereupon, the following
12  proceedings were had:
13         THE COURT REPORTER:  Usual
14  stipulations, other than I understand
15  the witness wants to read and sign?
16         MR. BOSTICK:  Correct.
17         MR. DYKES:  Fine.
18         MS. HAYNES:  Yes, that's fine.
19         THE COURT REPORTER:  All
20  right.  Ms. Jones, would you raise your
21  right hand, please, ma'am, to be sworn?
22
23

7

1              STACYE M. JONES,
2   being first duly sworn, was examined
3   and testified as follows:
4   EXAMINATION BY MS. HAYNES:
5      Q.   All right.  Ms. Jones, would
6   you state your full name for the
7   record, please?
8      A.   **Stacye Maria Jones.  Stacye is**
9   **spelled S-T-A-C-Y-E, Maria, M-A-R-I-A,**
10  **Jones, J-O-N-E-S.**
11     Q.   And your address, please,
12  ma'am?
13     A.   **It is ▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮,**
14  **▮▮▮▮▮▮▮▮▮▮▮, Hoover, Alabama, 35244.**
15     Q.   Have you given a deposition
16  before?
17     A.   **I have.**
18     Q.   How many times?
19     A.   **Once.**
20     Q.   Was that deposition a result
21  of your employment or personal?
22     A.   **Employment.**
23     Q.   Were you working for Hyundai?

8

**Page 9**

1    A.    No.

2    Q.    Who were you working for when

3    you gave that deposition?

4    A.    **Russell Corporation.**

5    Q.    In Alexander City?

6    A.    **That is correct.**

7    Q.    How long did you work for

8    Russell?

9    A.    **Eight years.**

10    Q.    Are you from Alexander City?

11    A.    **Yes.**

12    Q.    What's your maiden name?

13    A.    **Tidwell, T-I-D-W-E-L-L.**

14    Q.    When did you leave Alexander

15    City?

16    A.    **Goodness, let's see, '97, '98.**

17    Q.    Did you go to high school

18    there at Benjamin Russell?

19    A.    **I did.**

20    Q.    Graduate?

21    A.    **Yes.**

22    Q.    Any education after that?

23    A.    **Yes.**

**Page 10**

1    Q.    Where?

2    A.    **Two years at Central Alabama**

3    **Community College, I graduated with an**

4    **associate's; two years at Auburn**

5    **University in Montgomery, I graduated**

6    **with a bachelor's in education.**

7         MR. BOSTICK:  Off the record.

8         (Off-the-record discussion.)

9    Q.    (BY MS. HAYNES) All right.

10    What was your first job after Auburn?

11    A.    **While I was attending Auburn,**

12    **I was working for Central Alabama**

13    **Community College, which did continue a**

14    **little bit, and then I went on board**

15    **with Russell Corporation.**

16    Q.    And what was your position

17    with Russell?

18    A.    **To begin with, I was a**

19    **switchboard operator.**

20    Q.    Okay.  And then you promoted

21    within?

22    A.    **I promoted to a workers'**

23    **compensation secretary and then was**

**Page 11**

1    promoted to employee relations manager.

2    Q.    Is that your last position

3    with Russell?

4    A.    **Yes.**

5    Q.    Okay.  And what was your next

6    position outside of Russell?

7    A.    **Let's see.  My next**

8    **position was -- do you know what --**

9    Q.    You brought your résumé,

10    great.

11         MR. BOSTICK:  She brought her

12    résumé with her pursuant to your

13    request.

14         MS. HAYNES:  If she brought

15    her résumé, that's great.

16    A.    **Do you still want me to answer**

17    **that question?**

18    Q.    Yes, ma'am.

19    A.    **After Russell, I went with**

20    **Louisiana Pacific.  I was an HR safety**

21    **manager.**

22    Q.    Where are they located?

23    A.    **Selma, Alabama.**

**Page 12**

1    Q.    And how long were you there?

2    A.    **I was only there for one**

3    **month.**

4    Q.    How.  Why so -- why so long?

5    A.    **Probably the best way to say**

6    **it is there was a situation that I**

7    **needed to take care of.**

8    Q.    Okay.  Work related?

9    A.    **No.**

10    Q.    Okay.  Personal.  And then

11    after Louisiana Pacific, where did you

12    go to work?

13    A.    **I began to contract through**

14    **Career Personnel with Hyundai.**

15    Q.    And what year was that,

16    please, ma'am?

17    A.    **That was 2004, October.**

18    Q.    But you were working through a

19    temp agency?

20    A.    **That's correct.**

21    Q.    And what was that name again?

22    A.    **Career Personnel in**

23    Montgomery.

1    Q.   And when did you go full time
2  with Hyundai?
3    A.   **In June of '05.**
4    Q.   And what was your first
5  position?
6    A.   **Team relations specialist.**
7    Q.   Who did you report to?
8    A.   **Audie, A-U-D-I-E, Swegman,**
9  **S-W-E-G-M-A-N.**
10    Q.   Is that a man or a woman?
11    A.   **It's a man.**
12    Q.   And what was Mr. Swegman's
13  title?
14    A.   **Manager of team relations.**
15    Q.   And did your supervisor ever
16  change or did it remain Mr. Swegman the
17  entire time?
18    A.   **My supervisor changed to Rob**
19  **Clevenger.**
20    Q.   Do you know when?
21    A.   **I don't.**
22    Q.   Okay.
23    A.   **Also I reported to Shawn**

13

1  **Flate.**
2    Q.   Shawn?
3    A.   **Shawn Flate, F-L-A-T-E. And**
4  **also I reported to Kisha Morris,**
5  **K-I-S-H-A M-O-R-R-I-S.**
6    Q.   At different times?
7    A.   **At different times, yes.**
8    Q.   Okay.  At any rate, when you
9  first went to Hyundai, you reported to
10  Mr. Swegman?
11    A.   **That's correct.**
12    Q.   And then that changed, and
13  Mr. Clevenger assumed that position?
14    A.   **That's correct.**
15    Q.   And was that manager of team
16  relations?
17    A.   **He was the assistant manager.**
18    Q.   Mr. Clevenger was?
19    A.   **That's correct.**
20    Q.   Did he ever hold the title of
21  manager?
22    A.   **No.**
23    Q.   And then did Mr. Clevenger

14

1  leave or promote from within?
2    A.   **Not that I'm aware of.**
3    Q.   What was the occasion you
4  reported to Mr. Flate?
5    A.   **He was the assistant manager.**
6    Q.   Did you report to Mr. Flate
7  the same time you reported to Mr.
8  Clevenger?
9    A.   **They work different shifts.**
10    Q.   Okay.  Got you.
11    A.   **And we work different shifts,**
12  **so we have reason to report to**
13  **different people.**
14    Q.   Got you.  And what was the
15  occasion that you reported to Ms.
16  Morris?
17    A.   **She became a new assistant**
18  **manager in team relations.**
19    Q.   Did she replace Mr. Flate or
20  Mr. Clevenger?
21    A.   **No, she did not.**
22    Q.   Was she on a different shift?
23    A.   **She was.**

15

1    Q.   Were they running three shifts
2  at that time?
3    A.   **They were not.**
4    Q.   What shift was Ms. Morris?
5    A.   **Shawn remained an assistant**
6  **manager, but his responsibilities**
7  **changed.  Kisha became the assistant**
8  **manager over the team reps.**
9    Q.   How many other team relations
10  specialists were there other than
11  yourself while you were there?
12    A.   **Let's see.  Nine or ten.**
13         (Plaintiff's Exhibit 11 was
14          marked for identification.
15          A copy is attached.)
16    Q.   (BY MS. HAYNES) Were they
17  divided between the different shifts?
18    A.   **Yes, and between the shops.**
19    Q.   Okay.  What was your
20  responsibility or assignment?
21    A.   **Welding, stamping,**
22  **maintenance, plant engineering and**
23  **maintenance.  I think that covers it.**

16

1    Q.    Welding, stamping, and
2  engineering?
3    A.    **Plant engineering and**
4  **maintenance.**
5    Q.    On what shift?
6    A.    **Both shifts, whichever shift I**
7  **was assigned.**
8    Q.    And did you work both shifts?
9    A.    **Yes.**
10   Q.    What were your normal hours?
11   A.    **If I was on first shift, I**
12  **would work 6:30 to five or 6:30 to**
13  **5:15.  If I was on second shift, I**
14  **would work 6:15 in the evening until**
15  **five o'clock in the morning.  If I**
16  **worked a split shift, I would work half**
17  **first shift half second shift.**
18   Q.    I'm going to show you what I'm
19  marking as Plaintiff's Exhibit 11, Toby,
20  which is your deposition notice.  Toby,
21  I'm sorry this is going to be a little
22  awkward.  And as part of this
23  deposition notice, I've asked that you

17

1  bring some documents, and you've told
2  me you have brought your résumé, which
3  is responsive to Request Number 1 of
4  Plaintiff's 11; is that correct?
5    A.    **That's correct.**
6    Q.    Okay.  When was the last time
7  your résumé was updated?
8    A.    **November of last year, so it**
9  **will not include my current employment,**
10  **and it also will not have my new**
11  **address on it.**
12       MS. HAYNES:  I'm going to mark
13  this as well.
14       (Plaintiff's Exhibit 12 was
15        marked for identification.
16        A copy is attached.)
17   Q.    (BY MS. HAYNES) Where are you
18  currently working?
19   A.    **Coca-Cola.**
20   Q.    And did you leave Hyundai and
21  start working at Coca-Cola?
22   A.    **Yes, ma'am.**
23   Q.    And when did you leave

18

1  Hyundai?
2    A.    **Let's see.  In December of '07**
3  **and started with Coca-Cola that next**
4  **week, December of '07.**
5    Q.    And what was the reason you
6  left Hyundai?
7    A.    **Better opportunity.**
8    Q.    How so?
9    A.    **I was an assistant manager**
10  **with Hyundai, and I'm a manager with**
11  **Coca-Cola.**
12   Q.    What is your title with
13  Coca-Cola?
14   A.    **Employee relations manager.**
15   Q.    Do you have any type of formal
16  training in human resources, human
17  resource management?
18   A.    **What's your definition of**
19  **"formal"?**
20   Q.    College.
21   A.    **No.**
22   Q.    Okay.  What training do you
23  have in human resources?

19

1    A.    **Just the day-to-day operations**
2  **training as well as multiple seminars**
3  **with legal firms that represented my**
4  **past companies, seminars that are not**
5  **presented by legal firms but presented**
6  **by outside companies that do training,**
7  **those types of things.**
8    Q.    Do you have any professional
9  designations currently?
10   A.    **No.**
11   Q.    Did your title change while
12  you worked at Hyundai --
13   A.    **Yes.**
14   Q.    -- from team relations
15  specialist?
16   A.    **It did.**
17   Q.    What was your --
18   A.    **Benefits assistant manager.**
19   Q.    And when did you assume that
20  title?
21   A.    **Let's see.  I have to look**
22  **back.**
23   Q.    I'm sorry?

20

1    A.    October of '06.

2    Q.    Was that a promotion for you?

3    A.    It was.

4    Q.    Who did you report to when you

5    were benefit assistant manager?

6    A.    Gianetta Turner.

7    Q.    I'm sorry?

8    A.    Gianetta, G-I-A-N-E-T-T-A,

9    Turner, T-U-R-N-E-R.

10    Q.    And what was Ms. Turner's

11    title?

12    A.    Manager of benefits and

13    compensation.

14    Q.    Did Ms. Turner report to Wendy

15    Warner?

16    A.    No, she reported to -- well,

17    no, Greg Kimble, who was the director

18    of HR.

19    Q.    The whole time you were there?

20    A.    The whole time -- did I report

21    to her the whole time, is that the

22    question?

23    Q.    No, was Mr. Kimble the

21

1    director of human resources the entire

2    time you were at Hyundai?

3    A.    Yes.

4    Q.    From October 2004 until

5    December 2007 did you have any other

6    titles other than the employee

7    relations special -- I'm sorry, team

8    relations specialist and benefits

9    assistant manager?

10    A.    I did.

11    Q.    What other titles?

12    A.    When I contracted with Hyundai

13    through Career Personnel, I was a

14    recruiter.

15    Q.    Okay. How long did you hold

16    that title?

17    A.    October '04 to June '05.

18    Q.    Any other titles?

19    A.    No.

20    Q.    Briefly tell me your job

21    duties as a recruiter.

22    A.    I was searching for candidates

23    to fill positions in production

22

1    management-type jobs. We also had

2    tech-support jobs and specialist jobs,

3    so more on the salaried side of

4    recruiting; and I worked directly with

5    the managers in those areas to help

6    them obtain good candidates to fill

7    their positions.

8    Q.    Okay. Well, let me ask you

9    this: Did you make hiring decisions as

10    a recruiter?

11    A.    I did not.

12    Q.    Just recommendations?

13    A.    That is correct.

14    Q.    Who made the hiring decisions?

15    A.    The hiring manager.

16    Q.    Who was that?

17    A.    It would have been the

18    production manager or whoever the job

19    was reporting to would make the

20    ultimate decision.

21    Q.    More than one person then?

22    A.    Could be, could be. Sometimes

23    it was just one person.

23

1    Q.    Do you recall interviewing

2    Mike Swindle?

3    A.    No.

4    Q.    Do you recall interviewing

5    Tammy Edwards?

6    A.    No.

7    Q.    Okay. After the recruiter

8    position in June 2005, you went to work

9    as the team relations specialist?

10    A.    That's correct.

11    Q.    What are those job duties?

12    A.    We were assigned to a shop,

13    and our main responsibility was to be

14    on the floor with the team members. We

15    would talk with them about any issues

16    they had, we would talk with them about

17    benefits. If they needed questions

18    answered about anything in conjunction

19    with the company, we would take their

20    questions and get their answers and

21    come back and report those answers to

22    them. Then some simple reporting, like

23    daily reporting of activities in the

24

1 shop. Let's see. We would make
2 recommendations to management on
3 corrective action, we would communicate
4 with management on the application of
5 policy and procedure.
6     Q.   Say that again.
7     A.   We would communicate with
8 management on application of policy and
9 procedure.
10     Q.   What does that mean?
11     A.   If a manager had a problem
12 with a team member, we would talk to
13 the manager about how best to proceed
14 with corrective action, if any was
15 needed.
16     Q.   Okay. Management is not
17 coming to you for interpretation of
18 policy and procedure?
19     A.   Management could come to me
20 for interpretation of policy and
21 procedure.
22     Q.   Did you do any training on
23 policy and procedure?

25

1 their jobs.
2     Q.   What area were you responsible
3 on the training?
4     A.   Just the policy.
5     Q.   Any certain policy or all the
6 policies?
7     A.   All the policies, just a brief
8 summary of the policies.
9     Q.   How long a training was that?
10     A.   I believe it was either an
11 hour or two hours.
12     Q.   Did you have a regular
13 schedule, training schedule?
14     A.   No, just whenever they called
15 on me. Sometimes they rotated the team
16 reps into that training, so when they
17 called on me, I would go over and do
18 the training.
19     Q.   Do you have any recollection
20 of training Mike Swindle?
21     A.   No.
22     Q.   Any recollection of training
23 Tammy Edwards?

27

1     A.   I did.
2     Q.   To management or team members?
3     A.   It was team members.
4     Q.   Did you do those as a
5 recruiter or as a team relations
6 specialist?
7     A.   Team relations specialist.
8     Q.   Okay. Any other job duties as
9 a team relations specialist?
10     A.   Let's see. Oh, I investigated
11 discrimination and harassment claims.
12     Q.   Anything else?
13     A.   Assisted in the process of
14 random drug screening and conducted
15 exit interviews.
16     Q.   What training did you conduct
17 for team members?
18     A.   There was a piece of new-hire
19 orientation, which was a two-week
20 program, where team relations would
21 come in and explain policy and
22 procedure to the new team members
23 before they went out onto the floor for

26

1     A.   No.
2     Q.   Did you train the entire time
3 you were a team relations specialist?
4     A.   No.
5     Q.   What period of time were you
6 training?
7     A.   Probably after I had been
8 there a while, but I wouldn't know the
9 exact date that I started the training.
10     Q.   Okay.
11     A.   But that would be in an effort
12 to get me up to speed with the
13 policies, and then they would let me
14 train so --
15     Q.   Did you cover discrimination
16 and harassment policies in your
17 training?
18     A.   I believe I did.
19     Q.   That was in the hour, hour-
20 and-a-half training?
21     A.   Right.
22     Q.   Okay. Describe the training
23 you provided on discrimination and

28

harassment.

    A.   **It would have been in relation to our handbook, so more or less if there's any feel that you have a person, be it a manager or another employee, discriminating against you or harassing you, that is something that you need to bring directly to team relations immediately so that team relations can investigate appropriately and the appropriate action can be taken.**

    Q.   Okay.  Anything else?

    A.   **(Nodding.)**

    Q.   Did you do --

    MR. BOSTICK:  You need to answer out loud.

    A.   **Oh, no.  No.  I'm sorry.**

    Q.   She can't take down a nod, and I was going on with my next question, because I understood.  I'm sorry.

    A.   **I am too.  I'll try to be better.**

<center>29</center>

    Q.   I will do the same.  Did you do any role-playing in the discrimination and harassment training?

    A.   **No.**

    Q.   Did you do scenarios to instruct what were examples of harassment or discrimination?

    A.   **I cannot remember exactly what was contained in that.  No, I did it by a -- I did it by a slide presentation, and I don't remember the contents of the slide presentation.**

    Q.   Was it a PowerPoint presentation?

    A.   **I believe it was.**

    Q.   Was that something that Hyundai put out or did you use someone else's?

    A.   **It was -- well, I don't know the answer to that question.  I don't know if they got it from somebody else or if they produced it internal.**

    Q.   Okay.  Did it have Hyundai

<center>30</center>

language in the slide presentation or was it generic?

    A.   **I don't remember that.**

    Q.   Okay.  Do you recall a slide presentation on the handbook, employee handbook of Hyundai?

    A.   **No.**

    Q.   Were you trained on the PowerPoint presentation and how to give that to employees?

    A.   **Yes.**

    Q.   Who trained you?

    A.   **I want to say it was Shawn Flate.**

    Q.   Prior to going to Hyundai, did you know it was illegal to discriminate in the workplace?

    A.   **Yes.**

    Q.   And you had learned that --

    A.   **Yes.**

    Q.   -- at Russell?

    A.   **Yes.**

    Q.   Or did you know it prior to

<center>31</center>

that time?

    A.   **I've pretty much known it all my life.**

    Q.   All right.  Would it surprise you that Mike Swindle did not know it was illegal to sexually harass someone in the workplace?

    MR. BOSTICK:  Object to the form.  You can answer.

    A.   **Oh, okay.  Would it -- can you repeat the question?**

    Q.   Sure.  Would it surprise you to know that Mike Swindle testified he did not know it was illegal to sexually harass in the workplace?

    MR. BOSTICK:  Object to the form.

    A.   **I don't know if it would surprise, so to speak, I mean --**

    Q.   Did you ever do any retraining of Mike Swindle after you conducted your investigation into Tammy Edwards' allegations?

<center>32</center>

1    A.  No.

2    Q.  Did you recommend that he be

3  retrained on the sexual-harassment

4  policies and procedures of Hyundai?

5    **A.**  **I pretty much remember the**

6  **recommendations that I made in my**

7  **investigation.  I don't believe that**

8  **was part of it.**

9    Q.  Okay.  Did you ever ask him

10  when you were investigating Tammy

11  Edwards' complaint if he knew it was

12  illegal to discriminate or harass?

13    A.  No.

14    Q.  You just assumed he knew?

15    MR. BOSTICK:  Object to the

16  form.

17    **A.**  **I don't know if I made an**

18  **assumption one way or the other.**

19    Q.  Okay.  After employees are

20  trained on discrimination and

21  harassment, was there any testing done

22  to see what their comprehension level

23  was?

33

1    A.  **Not to my knowledge.**

2    Q.  Was there any testing done on

3  any of the policies and procedures?

4    A.  **Not to my knowledge.**

5    Q.  Is there testing done at

6  Hyundai for any of the positions an

7  employee moves into?

8    **A.**  **Testing at some level, maybe**

9  **tech support, and that's just been**

10  **recent.  That was when I was in**

11  **benefits, but really didn't have -- I**

12  **didn't have a tie to that.  It was just**

13  **something that was part of our**

14  **department.**

15    Q.  Prior to employment, are they

16  tested, potential employees?

17    **A.**  **Prior to employment?**

18    Q.  And I need to rephrase that.

19  After a letter of -- an offer letter is

20  tendered, are they tested in any

21  fashion to see what job they're best

22  suited for?

23    **A.**  **I don't know the answer to**

34

1  that question.

2    Q.  Okay.  You didn't conduct any

3  testing of employees?

4    **A.**  **I did not.**

5    Q.  And you don't know of any

6  testing that was done other than the

7  tech support?

8    **A.**  **The testing that I would know**

9  **about would be computer testing.  It**

10  **wasn't something that I administered.**

11  **People who wanted a job with Hyundai**

12  **did a period of training prior to ever**

13  **coming on board with Hyundai, so I**

14  **don't know if you are asking is that**

15  **part of a test, or I guess I'm unclear.**

16    Q.  I'm asking if you're aware of

17  any testing done by either Hyundai or

18  another entity, third party, prior to

19  an employee being hired or after a

20  letter of offer is tendered to them,

21  any testing that's conducted?

22    **A.**  **Written testing, I don't know.**

23  **They did have to go through a six-week,**

35

1  I believe, training before they were

2  eligible to be considered for

3  employment with Hyundai.

4    Q.  Okay.

5    **A.**  **After -- the only thing I know**

6  **of was when they were hiring a person**

7  **in an administrative-type job, and they**

8  **would do a testing on computer skills.**

9    Q.  How are jobs posted and

10  advertised that are open and available?

11    **A.**  **When I was a recruiter, the**

12  **jobs that were available were -- if**

13  **they could not be filled internal, they**

14  **were posted on Monster or Career**

15  **Builder, whichever one we were**

16  **contracting with on that.  If they were**

17  **an internal job, they were posted on**

18  **the bulletin board for all the**

19  **employees to see.**

20    Q.  How about external postings?

21    **A.**  **External postings in what**

22  **regard?**

23    Q.  Is there a website?

36

1    A.    Yes. Yes.
2    Q.    Okay. Are jobs posted on the
3    website that's open to the public?
4    A.    Yes.
5    Q.    All right. Is there also --
6    A.    Please let me go back. I'm
7    not sure -- I know they were posted on
8    external, using external means, either
9    a Monster or Career Builder. I cannot
10   recall how they were posted on our
11   external website. I never actually
12   looked at them there.
13   Q.    How about internally, is there
14   an intranet where jobs are posted?
15   A.    An intranet? There was an
16   intranet. I'm not sure jobs were
17   posted out there.
18   Q.    Is there a preference given to
19   internal candidates over external
20   candidates for open positions?
21   A.    I wouldn't call it a
22   preference; I would call it a -- a way
23   of presenting those jobs to see if the

37

1    company had any qualified candidates.
2    So it's -- that would be the first
3    process, they would be posted to the
4    inside; and if there weren't qualified
5    candidates, they would be posted to the
6    outside.
7    Q.    After you moved from the
8    position of recruiter, who was making
9    not really hiring decisions but who was
10   interviewing potential candidates, what
11   would be the position?
12   A.    If it was the type of job I
13   was recruiting for, it would have been
14   Delechia McIntyre.
15   Q.    Title, please?
16   A.    Recruiter.
17   Q.    Okay. After you moved from the
18   recruiter position, there was still
19   a recruiter for Hyundai?
20   A.    Right. I was not the only
21   recruiter.
22   Q.    And that recruiter was not
23   employed with a third party like Career

38

1    Personnel that you --
2    A.    I believe she was employed
3    with a third party and then eventually
4    became permanent.
5    Q.    Is there a person or a title
6    or a position within Hyundai at the
7    time you left that was in charge of
8    recruiting, interviewing potential
9    candidates for employment?
10   A.    I guess Anthony Johnson would
11   have been tied to that and Scott Gordy.
12   Q.    Their titles and positions?
13   A.    Scott Gordy was, when I first
14   knew him, the assistant manager of
15   employment. Anthony Johnson was an
16   employment specialist, and he focused
17   more on the hiring of maintenance
18   and -- and people with specialized
19   skills.
20   Q.    But after June 2005, that was
21   no longer your responsibility?
22   A.    That's correct.
23   Q.    Okay. You no longer

39

1    interviewed candidates?
2    A.    No.
3    Q.    Or made recommendations for
4    promotions or positions?
5    A.    Sometimes in the -- if there
6    were internal applicants for internal
7    jobs, the ones that were posted, we
8    would give information as to whether or
9    not a person had corrective action, but
10   just the side of our job as a team rep.
11   So if they had corrective action or if
12   they had attendance issues or things of
13   that nature, we might submit that
14   information to be taken into
15   consideration on an internal promotion.
16   But that eventually was no more either;
17   they took it directly from the
18   personnel file.
19   Q.    Okay. If someone wants to
20   move from one department to another
21   department or move from one shift to
22   another shift within the same
23   department, what is the procedure?

40

1    A.   We -- I don't know what they
2    do now, but we did not have a -- a
3    transfer, so to speak, where a person
4    could just say, hey, I want to
5    transfer, and we would put that person
6    in another area.  They had to go
7    through the process of applying for any
8    of the jobs that were available; but
9    there was no request for transfer, so
10   to speak, at that time.
11       Q.   So if an employee who has been
12   there for three months sees a position
13   that they're interested in that's
14   posted, they post for that position?
15       A.   Right, they apply for that
16   position.
17       Q.   Do they fill out a new
18   application?
19       A.   They fill out a form of
20   interest in that new position.
21       Q.   And then what happens next?
22       A.   Then there's a specialist in
23   the employee -- in the employment

41

1    section of HR that takes those
2    applications and reviews them to see
3    who is qualified, who is not qualified,
4    and then interviews take place after
5    that, or they did at that time.
6        Q.   How are qualifications
7    determined?
8        A.   Generally by what a person
9    would write on their form, because
10   there was a place for them to list
11   those.  Probably a reflection too on
12   their application, their initial
13   application for employment with
14   Hyundai.  I would say that was -- that
15   would be it.
16       Q.   Were there any jobs that list
17   specific qualifications?
18       A.   Yes.
19       Q.   What jobs?
20       A.   I believe the jobs that went
21   up internal always had what the
22   qualifications were.  So it wasn't just
23   one specific job that would have a

42

1    description, it would be any job that
2    went up.
3        Q.   That would have minimum
4    qualifications?
5        A.   Uh-huh.
6        Q.   Is that a "yes"?
7        A.   Yes.
8        Q.   Are those physical
9    qualifications?
10       A.   I don't remember that
11   specifically.
12       Q.   Okay.  Do you know of any job
13   where an hourly team member would hold
14   that position that there was an
15   educational requirement?
16       A.   Any job where --
17       Q.   That's an hourly job?
18       A.   Any hourly job?
19       Q.   Was there an educational
20   requirement, you had to have more than
21   a high-school education?
22       A.   Our tech supports were hourly
23   paid, but I can't remember if they were

43

1    required to have education after
2    twelfth grade.  I cannot remember.
3        Q.   Okay.  Was there any lifting,
4    bending, stooping-type requirements for
5    any job?
6        A.   On the postings?
7        Q.   Yes, ma'am.
8        A.   I'm sorry, I don't remember
9    that either.
10       Q.   Okay.  If an individual wanted
11   to move from one shift to another
12   shift, what would be the procedure?
13       A.   That happened -- I'm not even
14   sure that happened period.  There would
15   be a request for it, but we didn't
16   transfer from one shift to the other.
17   It was just a -- that was just how it
18   was handled.
19       Q.   Okay.  What if I wanted to
20   move from one department to another
21   department, how would that be handled?
22       A.   The only way you could do that
23   would be to go through the internal

44

1  posting system because there were no
2  transfers or moving from one department
3  to the other.
4      Q.  You never moved one employee
5  from one department to another
6  department?
7      A.  Not when they were just
8  requesting to be moved.
9      Q.  Okay.  What would be the
10  procedure if they weren't requesting,
11  that one supervisor wants to move an
12  employee to another department or area?
13      A.  If the supervisor asked to do
14  it?
15      Q.  Yes.
16      A.  Oh, let me get clarification
17  too.  When you say "department," do you
18  mean within a plant, a department
19  within a plant?
20      Q.  Well, let me rephrase.  Ms.
21  Edwards was in an area that was the
22  moving tool belt; am I right?
23          MS. EDWARDS:  Moving parts.

45

1      A.  Yes.
2      Q.  Okay.  Would there have been a
3  separate supervisor for moving parts
4  than CCR?
5      A.  I'm trying to remember who the
6  supervisors were.  Give me a minute.
7  Our supervisors were called group
8  leaders.  There would have been --
9  there would have been several group
10  leaders in the shop, but one group
11  leader would have overseen moving parts
12  and CCR.  The group leaders also
13  rotated shifts, so it could depend.
14      Q.  All right.  Who did you have
15  under group leaders?
16      A.  Group leaders for CCR and
17  moving parts?
18      Q.  Well, I'm just trying to
19  establish positions there.  You have
20  the team members?
21      A.  Oh, okay, going up from a team
22  member?
23      Q.  Yes, ma'am.

47

1      Q.  Moving parts, and then moved
2  to the CCR position?
3      A.  Uh-huh.
4      Q.  How would that move take
5  place?
6      A.  Okay.  That was not a
7  department-to-department move.
8      Q.  How would you classify that?
9      A.  It was -- each person had
10  their team, and people within that team
11  could be moved to different jobs within
12  that team.  Yeah.
13      Q.  All right.  So moving parts
14  would be on the same team as the CCR?
15      A.  I believe the person who had
16  responsibility for that, that was all
17  together.
18      Q.  And so there's no procedure
19  that an employee has to fill out or ask
20  for?
21      A.  No.
22      Q.  Okay.  It's just a supervisor
23  making that decision?

46

1      A.  You would have a team member,
2  a team leader, a group leader, an
3  assistant manager, a manager, a senior
4  manager, and a director.
5      Q.  Okay.  And when Ms. Edwards
6  was a CCR -- am I saying that right?
7          MS. EDWARDS:  CCR.
8      Q.  Who would have been her team
9  leader, do you recall?
10      A.  Team leader?
11      Q.  Yes, ma'am.
12      A.  Let's see.  I'm trying to
13  think of who it was first because I
14  think before Mike, there was another
15  team lead.
16      Q.  Toby Chance, if you recall?
17      A.  I can't recall.  I'm sorry.
18      Q.  Okay.  At one point, it was
19  Mr. Swindle?
20      A.  Yes.
21      Q.  Okay.  And is the team leader
22  position a supervisor position --
23      A.  No.

48

1   Q.  -- as well?
2   A.  **No.**
3   Q.  What is it?
4   A.  **It's still a team member.**
5   Q.  Hourly?
6   A.  **Yes.**
7   Q.  What is the difference between
8  a team leader and a team member?
9   A.  **Team leader serves to kind of**
10  **direct the activity but not as a**
11  **supervisory entity.**
12   Q.  Who was the group leader over
13  Mr. Swindle, do you recall?
14   A.  **The group -- it would have**
15  **either been Chris Worley, which is**
16  **W-O-R-L-E-Y, or Steve Culpepper,**
17  **spelled just like it sounds.**
18   Q.  And over Mr. Culpepper would
19  have been whom?
20   A.  **Either Harry White or Tom**
21  **Bondy.**
22   Q.  Okay. And then over either
23  Mr. White or Mr. Bondy would have been

49

1  whom?
2   A.  **Rob Katzenbach, spelled**
3  **K-A-T-Z-E-N-B-A-C-H.**
4   Q.  Okay. And then above Mr.
5  Katzenbach?
6   A.  **It would have been somebody**
7  **from Korea, and I don't remember the**
8  **name.**
9   Q.  Physically located in Korea?
10   A.  **Oh, wait a minute, let me go**
11  **back. It would have been John Kalson.**
12  **Rob Katzenbach reported directly to**
13  **John Kalson, K-A-L-S-O-N. He was the**
14  **director of production.**
15   Q.  Okay. Was he physically
16  located in the Hyundai plant or in
17  Korea?
18   A.  **Yes, John Kalson was in the**
19  **Hyundai plant.**
20   Q.  And above Mr. Kalson?
21   A.  **That would have been the**
22  **Korean member.**
23   Q.  Was he physically located in

50

1  Korea or would he be physically located
2  in Montgomery?
3   A.  **I believe he was in**
4  **Montgomery.**
5   Q.  Okay. But you don't know a
6  name?
7   A.  **I can't remember his name. It**
8  **would have been the president at the**
9  **time.**
10   Q.  Any of the individuals, Mike
11  Swindle, Steve Culpepper, Tom Bondy,
12  Mr. Katzenbach, Mr. Kalson, would you
13  have conducted any training on
14  discrimination or harassment to any of
15  those individuals as part of your job
16  duties?
17   A.  **No.**
18     (Off-the-record discussion.)
19     (Recess.)
20     (Requested portion of record
21      read by the court reporter.)
22     (Plaintiff's Exhibit 13 was
23      marked for identification.

51

1     A copy is attached.)
2   Q.  (BY MS. HAYNES) Last week I
3  went online just to check the website
4  for Hyundai. Have you ever seen that,
5  just the screen?
6   A.  **No.**
7   Q.  Have you ever checked careers
8  at Hyundai?
9   A.  **No.**
10   Q.  Would you receive job
11  applications where it says, submit your
12  résumé to us online on Plaintiff's
13  Exhibit 13?
14   A.  **I believe we had a mailbox**
15  **designated for the résumés that came in**
16  **through here, so we had -- we checked**
17  **that mailbox.**
18   Q.  Okay. And then what happened
19  to them?
20   A.  **They would get a letter if we**
21  **were not interested. Or if we were**
22  **interested, we would contact and make**
23  **an appointment for a phone screening or**

52

1 an interview.

2      Q.   Where it says on Plaintiff's
3 13, "There are currently a total of 31
4 open jobs," from the time you were
5 there as a full-time employee, June
6 2005 until you left in December 2007,
7 were there always open positions at
8 Hyundai?

9      A.   **Once I was no longer a**
10 **recruiter, I really did not have access**
11 **to that information.  It wasn't**
12 **something that -- that I would have**
13 **known specifically.**

14     Q.   Did you ever know a period of
15 time at Hyundai that they weren't
16 hiring since you've been there since
17 June 2005?

18     A.   **No, I don't think.**

19     Q.   Did you keep up with any type
20 of statistics there in your position?

21     A.   **No.**

22     Q.   No?

23     A.   **No.**

53

1      Q.   Do you know what the turnover
2 rate is, by chance?

3      A.   **No.**

4      Q.   Ever heard?

5      A.   **I might have heard somebody**
6 **say two percent or 2.5 percent, but**
7 **that was early on.  I don't know that I**
8 **heard that figure later on when I was**
9 **in benefits.**

10     Q.   Okay.  You never went out to
11 trade schools or to high schools
12 recruiting for employees for Hyundai,
13 did you?

14     A.   **Not high schools.  It seems**
15 **like we participated in some career**
16 **fair-type events, and I remember one**
17 **specifically at a trade school, and I**
18 **want to say the other one was at a two-**
19 **year college.  There were two or three**
20 **times I went out on those types of**
21 **adventures.**

22     Q.   Were you doing that in 2007?

23     A.   **No.**

54

1      Q.   When was the last time you did
2 a trade show or career fair for
3 Hyundai?

4      A.   **I don't remember the exact**
5 **date, but it would have been between**
6 **October '04 and June of '05.**

7      Q.   You also told me in your
8 position as a team relations
9 specialist, other than training, you
10 also investigated discrimination and
11 harassment claims?

12     A.   **That's correct.**

13     Q.   How many did you investigate
14 while you were employed with Hyundai?

15     A.   **Maybe two or three.**

16     Q.   Had you investigated
17 harassment and discrimination claims
18 when you were working for Russell
19 Corporation?

20     A.   **Yes.**

21     Q.   How many?

22     A.   **Maybe between 25 and -- maybe**
23 **about 25, 20 to 25.**

55

1      Q.   Prior to becoming employed
2 with Hyundai, had you ever investigated
3 a sexual-harassment claim?

4      A.   **Yes.**

5      Q.   How many?

6      A.   **Maybe four or five.**

7      Q.   Of those four or five, had you
8 ever been the lead investigator?

9      A.   **Yes.**

10     Q.   How many?

11     A.   **All of those.  That was prior**
12 **to Hyundai?**

13     Q.   Yes, ma'am.

14     A.   **Okay.  Yes, all of those.**

15     Q.   Who taught you how to do an
16 investigation in a sexual-harassment
17 case?

18     A.   **Whatever company I worked for**
19 **would lay out the protocol for an**
20 **investigation.  Like with Russell, we**
21 **had a specific layout on paper what to**
22 **do, and then we actually had the**
23 **questions and everything prepared for**

56

1    us.  So either one of our senior
2    managers would sit down and go over
3    that protocol or our legal department
4    would go over that protocol.
5        Q.    Was there also a protocol at
6    Hyundai in conducting a sexual-
7    harassment investigation?
8        A.    There was.
9        Q.    Was there a separate protocol
10   for investigating discrimination
11   claims?
12       A.    I don't know if it was
13   necessarily a separate protocol.
14       Q.    Was it written?
15       A.    I remember having documents
16   from training sessions of what to do in
17   those cases.
18           MS. HAYNES:  Read back my
19   question, please.
20           (Whereupon, the last question
21           was read back by the court
22           reporter.)
23       Q.    (BY MS. HAYNES) Did Hyundai

57

1    provide you a written checklist in how
2    to conduct a sexual-harassment
3    investigation?
4        A.    The protocol was more or less
5    outlined within those training
6    documents.  I don't remember a
7    checklist.
8        Q.    Okay.  Who trained you at
9    Hyundai how to conduct a sexual-
10   harassment investigation?
11       A.    I believe it was a third-party
12   legal that came in.  We also had some
13   internal legal, but I don't think that
14   was investigation.
15       Q.    Okay.
16       A.    I think that was another
17   matter.
18       Q.    Do you recall what law firm
19   trained you on how to do a sexual-
20   harassment investigation?
21       A.    I don't.
22       Q.    Was it Mr. Bostick's firm,
23   Ogletree, Deakins?

58

1        A.    I don't remember.
2        Q.    Do you remember the name of
3    the trainer?
4        A.    No.
5        Q.    Did you do any role-playing in
6    that training session?
7        A.    No.
8        Q.    Do you know how long the
9    training session lasted?
10       A.    I want to say it was either
11   half a day or a whole day.
12       Q.    Was it on campus or off
13   campus?
14       A.    On campus.
15       Q.    Where did it take place, the
16   training?
17       A.    The training center.
18       Q.    Are there any corporate
19   offices at the training center?
20       A.    Corporate offices as in are
21   there any of our managers that reside
22   in the training center?
23       Q.    Yes.

59

1        A.    Yes.
2        Q.    What offices are there?
3        A.    The offices for the training
4    manager, training assistant manager.
5        Q.    Anyone else?
6        A.    Not that I know of that's
7    Hyundai.  I believe there's also some
8    AIDT people from the state over there.
9        Q.    Anyone else?
10       A.    (Nodding.)
11       Q.    Is that a no?
12       A.    Oh, no.  No.
13       Q.    When you conducted the
14   investigation into Tammy Edwards'
15   complaint, did you follow an outline or
16   checklist?
17       A.    I followed pretty much how we
18   had discussed to do it.  After the
19   complaint was made, I met with my --
20   let's see, it was then I guess my
21   assistant manager, and we discussed how
22   we wanted to investigate.
23       Q.    And who was that, your

60

1 assistant manager?

2     **A.   That would have been Rob**

3 **Clevenger. It could have been Rob**

4 **Clevenger or Shawn Flate. I can't**

5 **remember at the time who was in that**

6 **position. It also could have been**

7 **Kisha Morris.**

8     Q.   How did you first learn about

9 Ms. Edwards' complaint?

10     **A.   She came directly to my**

11 **cubicle one afternoon right before it**

12 **was time to go home.**

13     Q.   Did you have any communication

14 with her prior to that?

15     **A.   Communication about the**

16 **complaint?**

17     Q.   Her wanting to meet with you?

18 Did she send you an e-mail?

19     **A.   I believe she did send me an**

20 **e-mail at some point, but I don't know**

21 **if it was at that point that she wanted**

22 **to meet. But she did -- she came right**

23 **over to my desk, and she made the**

61

1 **complaint.**

2     Q.   Had you met with her before on

3 any occasion?

4     **A.   I had not formally met with**

5 **her. She and I knew each other in the**

6 **shop. One of our primary**

7 **responsibilities as team relations was**

8 **to get to know everybody in the shop**

9 **and to, you know, more or less**

10 **communicate very openly with them. So**

11 **I had talked to Tammy a lot in her job.**

12 **She and I had developed a rapport, so**

13 **to speak. She would -- we would talk**

14 **about family, we'd talk about, you**

15 **know, her daughter, her husband. You**

16 **know, we had what I would classify as**

17 **being good rapport.**

18     MR. BOSTICK: Let me put on

19 the record that we talked before the

20 deposition about she's being designated

21 on that subject of the findings of the

22 investigation into Ms. Edwards'

23 complaint as the 30(b)(6) rep for the

62

1 company, just want to put that on the

2 record.

3     MS. HAYNES: I'll need to get

4 that notice so we can identify what

5 areas. You don't have that with you,

6 by chance, do you?

7     MR. BOSTICK: I do. I can

8 tell you the specific numbers, yes.

9 Number 10.

10     MS. HAYNES: Item Number 10?

11     MR. BOSTICK: Item Number 10.

12     MS. HAYNES: Anything else?

13     MR. BOSTICK: Not for this

14 witness.

15     MS. HAYNES: Not for this

16 witness?

17     MR. BOSTICK: No.

18     Q.   (BY MS. HAYNES) Did you ever

19 have a chance to observe Ms. Edwards in

20 the workplace?

21     **A.   Yes.**

22     Q.   How many jobs did you observe?

23     **A.   Two.**

63

1     Q.   And what jobs were those?

2     **A.   One was the CCR, which would**

3 **have been right up next to -- well, not**

4 **next to but kind of diagonal to my**

5 **desk, a room, glassed-in room; and one**

6 **would have been I think it was Line 1,**

7 **it was either Line 1 or Line 2 moving**

8 **parts.**

9     Q.   Do you know of any complaints

10 about her work performance either in

11 moving parts or CCR?

12     **A.   No.**

13     Q.   No one ever voiced complaints

14 to you?

15     **A.   No, no complaints.**

16     Q.   Okay. Are you aware of any

17 concerns or issues prior to her coming

18 to speak with you about Mike Swindle?

19     MR. BOSTICK: Object to the

20 form.

21     MS. HAYNES: Compound, is that

22 what your objection is?

23     MR. BOSTICK: Concerns or

64

1    issues regarding performance or --
2        MS. HAYNES: Anything.
3        THE WITNESS: I'm sorry.
4        MS. HAYNES: Do you mind
5    repeating it?
6        (Whereupon, the last question
7        was read back by the court
8        reporter.)
9    A.    No complaints or anything.
10    But right around that same time, there
11    was another person being trained in
12    CCR, but now, I don't know what -- I
13    don't know why. I just noticed that
14    there were times when there was a
15    different person with Tammy in that
16    room, and they appeared to be training.
17    Q.    (BY MS. HAYNES) Who was that?
18    A.    I think it was Amber Kelley.
19    Q.    Okay.
20    A.    And I think her last name is
21    with an E-Y. I'm not sure.
22    Q.    Did you ever ask why Ms.
23    Edwards was training --

65

1    A.    No.
2    Q.    -- Amber Kelley?
3    A.    No.
4    Q.    Never?
5    A.    I don't remember having asked
6    her that.
7    Q.    Okay. Tell me your answer
8    again. You don't remember asking --
9    A.    I don't remember having asked
10    if she was training Amber.
11    Q.    Did you ask anyone ever --
12    A.    No.
13    Q.    -- is my question, why Amber
14    Kelley is training for the CCR
15    position?
16    A.    I don't remember.
17    Q.    Okay. Prior to Ms. Edwards
18    coming to you about Mike Swindle, had
19    you had anyone else complain to you
20    about Mike Swindle?
21    A.    No.
22    Q.    Had you observed Mike Swindle
23    in the workplace?

66

1    A.    Yes.
2    Q.    How many times?
3    A.    Probably daily.
4    Q.    Okay. Did you ever notice
5    anything that caused you concern?
6    A.    No.
7    Q.    And no one had expressed any
8    issues or concerns about Mr. Swindle --
9    A.    No.
10    Q.    -- prior to Ms. Edwards coming
11    to you?
12    A.    No.
13    Q.    Okay. Since Ms. Edwards
14    complained, did anyone come to you and
15    complain about Mike Swindle?
16    A.    During the course of the
17    investigation of the complaint, there
18    were a couple of names mentioned or
19    maybe one name mentioned that I had a
20    follow-up conversation with. But it
21    was not a -- it was not a harassment
22    complaint; it was more of a foul-mouth
23    complaint.

67

1    Q.    Okay. Had you ever witnessed
2    firsthand his foul mouth?
3    A.    No.
4    Q.    All right. You told me about
5    there was a follow-up conversation, but
6    that was not part of the actual
7    investigation of Ms. Edwards'
8    complaint?
9    A.    Well, it was -- it was lodged
10    within there, that's why I brought that
11    person in. Her name was Stephanie
12    Samuels. I found out about the
13    complaint through one of the other
14    people I was talking to, I believe it
15    was Billy Kitchens. And I brought her
16    in to see if she had knowledge of that,
17    first, because that was one of the
18    complaints primarily, and then, you
19    know, to ask her if she knew anything
20    else.
21    Q.    Had anyone else complained to
22    you before Ms. Edwards complained about
23    sexual harassment at Hyundai?

68

1    A.    I'm trying to remember the
2    order of investigations that I did.  I
3    cannot remember a timeline, and I can't
4    remember before or after, but I did
5    talk to another team member about
6    harassment.  It was in another shop,
7    and I was more or less assisting
8    another team rep.  We would normally
9    investigate together, but I can't
10   remember if that complaint was before
11   Tammy's or after.
12        Q.    Okay.  Was it a female that
13   complained?
14        A.    It was.
15        Q.    What was the complaint?
16        A.    Someone had made a comment
17   about -- and I want to say it was more
18   of a racial harassment, someone had
19   made a comment about they didn't feel
20   that white and blacks mixed.  That's --
21   it's similar, but that's not the exact
22   wording.
23        Q.    Who was that person?

69

1        A.    Juanita Romero.
2        Q.    Did any other females come and
3    complain to you about harassment or
4    discrimination?
5        A.    No.
6        Q.    Just Ms. Romero and Ms.
7    Edwards --
8        A.    Yes.
9        Q.    -- the entire time you were
10   there?
11        A.    I'm trying to think about my
12   other investigations.  I don't believe
13   so.
14        Q.    The follow-up that you had
15   with Ms. Samuels, was that an
16   investigation?
17              MR. BOSTICK:  Object to the
18   form.
19        Q.    Let me rephrase.  Did you make
20   your follow-up with Ms. Samuels a
21   separate investigation?
22        A.    No.
23        Q.    Are all your notes relative to

70

1    your conversations with Ms. Samuels
2    embodied in the investigation of Tammy
3    Edwards' complaint?
4        A.    Yes.
5        Q.    You have no separate notes?
6        A.    No.
7        Q.    Embodied in the investigation
8    of Tammy Edwards' complaint, there's a
9    statement made by Billy Kitchens about
10   an investigation involving a supplier
11   or vendor.  What was that about?
12        A.    To the best of my memory,
13   there had been a complaint from a
14   supplier about some form of harassment
15   there in the body shop, which is also
16   welding, but that was being taken care
17   of on a different -- a different level
18   because we had to communicate with the
19   supplier themselves so --
20        Q.    Was it sexual harassment?
21        A.    I want to say it was foul
22   mouth, more of a foul mouth, joking,
23   that type of thing is what I want to

71

1    say it was that --
2        Q.    Who was the person -- I'm
3    sorry, I didn't mean to interrupt.  Who
4    was the person using the foul mouth or
5    having the foul mouth?
6        A.    I cannot remember.
7        Q.    But it was in the body shop?
8        A.    It was in the body shop.
9        Q.    Was it in the welding
10   department?
11        A.    It was in the welding
12   department.
13        Q.    Was it Mike Swindle?
14        A.    It was not Mike, I do remember
15   that.
16        Q.    Was it Tom Bondy or Steve
17   Culpepper?
18        A.    No.
19        Q.    Did you have to talk to any of
20   those three individuals about the
21   situation with the supplier?
22        A.    No.  Actually, I had to talk
23   directly with the management and team

72

1 relations, whoever it was at that time,
2 and then they had to talk with the
3 management at the supplier, and then we
4 had to get that team of people
5 together.
6     Q.    Okay.  Would there be anyone
7 else other than yourself that would be
8 over team relations for that
9 department, the body shop?
10     A.    Yes.
11     Q.    Who else?
12     A.    I would have had a
13 counterpart.  At that time, it was Will
14 Ware, William Ware, W-A-R-E.
15     Q.    And did he work the opposite
16 shift that you did?
17     A.    He did.
18     Q.    And would he have worked with
19 Mike Swindle?
20     A.    He would have.
21     Q.    Okay.  On what occasions?
22     A.    Whatever occasion that shift
23 coincided.  Team relations was designed

73

1 to meet every employee, so each shift
2 would either by us rotating or the team
3 members rotating would come in contact
4 with both of the team reps.
5     Q.    Who else besides Mr. Ware in
6 team relations would have worked with
7 the body shop?
8     A.    Before -- before Will was in
9 that job, Shawn Flate was my
10 counterpart.
11     Q.    Okay.  Anyone else?
12     A.    I think that's all.
13     Q.    As part of your investigation
14 into Ms. Edwards' complaint, did you
15 talk to Will Ware or Shawn Flate about
16 any complaints they may have had about
17 Mike Swindle?
18     A.    I don't remember mentioning
19 that specifically to either one of
20 them.
21     Q.    Why not?
22     A.    And I'm trying to remember my
23 reasoning.  Well, Shawn, first of all,

74

1 would have known what I was
2 investigating because he eventually was
3 the assistant manager in team
4 relations, so he would have known the
5 background.  Will was on the opposite
6 shift, and when we conducted an
7 investigation, we were really not
8 supposed to discuss it with any other
9 team rep other than the one that was
10 our counterpart in order to maintain
11 confidentiality and in order for the
12 investigation to be as -- as good of an
13 investigation as it could be.
14     Q.    Would it not have been
15 important to you in your investigation
16 of Ms. Edwards' complaints if Mr. Ware
17 had previously investigated Mr.
18 Swindle?
19     A.    Would it have been important
20 to me?
21     Q.    Yes, ma'am.
22     A.    It may have.
23     Q.    Did you review Mr. Swindle's

75

1 personnel file during the investigation
2 of Ms. Edwards' complaint?
3     A.    No.
4     Q.    Why not?
5     A.    Team reps did not review
6 personnel files.  That was something
7 that was done above us.
8     Q.    Who would review personnel
9 files?
10     A.    The assistant manager or above
11 would review those.
12     Q.    That would be Mr. Clevenger?
13     A.    That would either be
14 Clevenger, Flate, or Morris.
15     Q.    Do you know of anything Mr.
16 Clevenger did separate and apart from
17 you in the investigation of Ms.
18 Edwards' complaint?
19     A.    Not specifically.
20     Q.    Do you know of any witness he
21 talked to?
22     A.    Now, he was involved in one of
23 the conversations that we had during

76

1 the investigation, with Tom Bondy, he
2 was in there with me.
3    Q.    But you were too?
4    A.    And I was in there, yes.
5    Q.    My question may have been
6 unclear.  Do you know of anything he
7 did separate and apart from you in the
8 investigation of Tammy Edwards'
9 complaint?
10    A.    No, I don't think so.
11         (Plaintiff's Exhibit 14 was
12           marked for identification.
13           A copy is attached.)
14    Q.    (BY MS. HAYNES) Okay.  There
15 are some handwritten notes I'm going to
16 mark as Plaintiff's 14.  And for the
17 record, it starts -- at the bottom of
18 the page, Ms. Jones, are some numbers.
19 This exhibit should be from D-00205
20 numbered consecutively through 247, so
21 make sure you have all those pages.  Do
22 you recognize this document?
23    A.    Yes.

                        77

1    Q.    And tell me what it is.
2    A.    It is my handwritten notes in
3 regards to the investigation.
4    Q.    And there are some other notes
5 in Plaintiff's Exhibit 14?
6    A.    Oh, yes.
7    Q.    Whose notes are those?
8    A.    I believe these are Marty
9 Blame, who is the -- who was the team
10 relations specialist in the engine
11 shop.  He was one of the people that
12 helped, and there might be some in here
13 from Lucas Cooner.  Yes, there are also
14 some from Lucas Cooner.
15    Q.    What was his title?
16    A.    Team relations specialist.  He
17 was assigned to general assembly.
18    Q.    And why did you involve Mr.
19 Blame and Mr. Cooner?
20    A.    We always were required to
21 have a second party present when we
22 were investigating.
23    Q.    Why is that?

                        78

1    A.    Well, generally, one would
2 take notes and one would ask questions,
3 but I always took notes a lot of times
4 too, even if I was primarily asking the
5 questions.
6    Q.    Okay.
7    A.    But just so that there would
8 be two parties who heard the
9 conversation.
10    Q.    All right.  Why did you
11 sometimes involve Mr. Blame and then
12 other times involve Mr. Cooner?
13    A.    Well, it would be according to
14 who was available.  I think Marty
15 started it with me, and then I think he
16 was out or he was unavailable at the
17 times that I had to get Lucas to step
18 in.
19    Q.    And both were team relations
20 specialists?
21    A.    That's correct.
22    Q.    Just like yourself?
23    A.    Yes.

                        79

1    Q.    Okay.  Why the engine shop and
2 why general assembly?
3    A.    No specific reason.  They were
4 available at the time, and a lot of
5 times the assistant manager would put
6 somebody with us.  So it wasn't
7 necessarily a choice, it was just who
8 was available at the time to help
9 cover.
10    Q.    Had either Mr. Blame or Mr.
11 Cooner ever worked with Mr. Swindle
12 before?
13    A.    I don't think so.
14    Q.    Did they know him?
15    A.    I don't think so.
16    Q.    Did you ask?
17    A.    Did I ask that question?  I
18 think I did.
19    Q.    In Plaintiff's 14, do you see
20 Mr. Clevenger's notes, handwritten
21 notes?
22    A.    What page?
23    Q.    I don't know, I'm just asking.

                        80

1  I don't know the writing of anyone.
2  You just told me Mr. Clevenger was
3  involved with Mr. Bondy?
4      A.  **Right.  But I would have made**
5  **those notes while he was asking the**
6  **questions.**
7      Q.  You didn't see Mr. Clevenger
8  making any notes?
9      A.  **I don't think so, and I only**
10  **see three different styles of**
11  **handwriting in here.**
12      Q.  Okay.
13      A.  **Mine, Lucas's, and Marty's.**
14  **Let me go right on through here,**
15  **though, just to make sure.  I think**
16  **that's -- that's correct.**
17      Q.  Is that your handwriting on
18  the first three pages?
19      A.  **Yes.**
20      Q.  And on the fourth page,
21  document Number 209, whose handwriting
22  is that, if you know?
23      A.  **Marty Blame.**

81

1      Q.  And can you tell me what is
2  Mr. Cooner's handwriting, which
3  document?
4      A.  **On 213, and there are some**
5  **other samples in here, 213, 214, 216,**
6  **220, 222.**
7      Q.  Okay.
8      A.  **Then 224, 225.  Then it goes**
9  **back to Marty on 236, Marty on 243 and**
10  **244, 245, 246, 247.**
11      Q.  On Plaintiff's Exhibit 14, the
12  first few pages is your interview with
13  Mr. Kitchens; is that correct?
14      A.  **That's correct.**
15      Q.  And the first page is dated
16  August 1, 2006?
17      A.  **Right.**
18      Q.  And there's a time of 2:35
19  p.m. to 1:16 p.m.  Can you tell me what
20  the time means there?
21      A.  **I think that's 12:35 to 1:16.**
22      Q.  There's a bad copy.  All
23  right.  So 12:35 to 1:16?

82

1      A.  **Yes.**
2      Q.  Is that the length of the
3  interview --
4      A.  **Yes.**
5      Q.  -- with Mr. Kitchens?
6      A.  **Yes.**
7      Q.  On document 207 as part of
8  Plaintiff's Exhibit 14, you had Mr.
9  Kitchens sign your notes?
10      A.  **Yes.**
11      Q.  And he dated that August 3rd,
12  2006.  Is there a reason it wasn't
13  dated and signed the same day?
14      A.  **I've never noticed that.  Let**
15  **me read through these.**
16      Q.  Do you want to read through
17  all of it?
18      A.  **No, just these -- this page,**
19  **because I wonder if maybe this is a**
20  **combination, because I had two, maybe**
21  **three interviews with Billy.  I don't**
22  **know why he would have dated it the**
23  **3rd.**

83

1      Q.  Was there a reason you had
2  some people sign your notes and other
3  people not?
4      A.  **Well, it was probably a matter**
5  **of whether or not I remembered to get**
6  **them to do it before they left the**
7  **room.**
8      Q.  Like document Number 213 and
9  214, your interview with Pam Stoddard
10  on August 2nd, 2006 --
11      A.  **Uh-huh.**
12      Q.  -- is there a reason you
13  didn't have Ms. Stoddard sign?
14      A.  **There is no specific reason.**
15      Q.  Is there any reason you didn't
16  put the time?
17      A.  **No, ma'am.**
18      Q.  Did you ever make any separate
19  notes during your investigation?
20      A.  **This was it.**
21      Q.  Okay.  Plaintiff's 14 are your
22  notes?
23      A.  **Yes.**

84

| | |
|---|---|
| 1    Q.   Did you make notations | 1    MS. HAYNES:  Read it back. |
| 2  anywhere else, DayTimer, computer, desk | 2    THE COURT REPORTER:  Question: |
| 3  calendar, or separate piece of paper | 3  "Did you question the truthfulness of |
| 4  about the demeanor of witnesses? | 4  any witness?" |
| 5    **A.   No.** | 5    **A.   Any questions that I would** |
| 6    Q.   Okay.  Do you have any | 6  **have asked would have been in the body** |
| 7  recollection of the demeanor of | 7  **of these notes.** |
| 8  witnesses? | 8    Q.   (BY MS. HAYNES) Okay.  In your |
| 9    MR. BOSTICK:  Object to the | 9  mind, was there an issue with the |
| 10  form. | 10  truthfulness with any witness you |
| 11    Q.   You can answer. | 11  interviewed? |
| 12    MR. BOSTICK:  You can answer. | 12    **A.   They were -- they were** |
| 13    **A.   Oh, okay.  Do I recollect on** | 13  **consistent with what they said.** |
| 14  **the witnesses?  They pretty much all of** | 14  **Like -- well, with Billy, I interviewed** |
| 15  **them came in --** | 15  **him three times, he was consistent** |
| 16    MR. BOSTICK:  She asked about | 16  **pretty much with what he said.  The** |
| 17  demeanor, not to interrupt.  Do you | 17  **other witnesses, I didn't -- I don't** |
| 18  have a present recollection of the | 18  **remember having a thought -- I don't** |
| 19  demeanor of the witnesses? | 19  **remember having a thought about whether** |
| 20    **A.   Right.  It was just an average** | 20  **or not they were being truthful.  My** |
| 21  **demeanor.** | 21  **main objective was just to gather the** |
| 22    Q.   Okay.  You didn't make notes | 22  **information and remain unbiased during** |
| 23  about who you thought was truthful or | 23  **the investigation.** |
| 85 | 87 |
| 1  who was being untruthful to you? | 1    Q.   Well, is not part of the |
| 2    **A.   No.** | 2  investigation to make some |
| 3    Q.   Do you have any recollection | 3  determination who is being truthful and |
| 4  of that? | 4  who is not? |
| 5    **A.   Any recollection of who was** | 5    **A.   After all the facts are** |
| 6  **truthful, who was not truthful?** | 6  **gathered, then outside of the team** |
| 7    Q.   Yes, ma'am. | 7  **relations specialists on up the food** |
| 8    **A.   No.** | 8  **chain is where those determinations** |
| 9    Q.   Did you question the | 9  **were made.** |
| 10  truthfulness of any witness? | 10    Q.   Okay.  And did you ever |
| 11    MR. BOSTICK:  Object to the | 11  express any opinions about any witness |
| 12  form. | 12  being truthful or untruthful to you |
| 13    Q.   You may answer. | 13  during the investigation to anyone at |
| 14    **A.   Okay.** | 14  Hyundai? |
| 15    Q.   He just puts an objection, | 15    **A.   Not that I recall.** |
| 16  that he doesn't like how I phrased my | 16    Q.   Okay.  Prior to making the |
| 17  question. | 17  recommendation, did you meet with |
| 18    **A.   I just want to make sure** | 18  anyone about those recommendations? |
| 19  **before I answer.** | 19    **A.   Let's see.  I would have met** |
| 20    MR. BOSTICK:  Unless I tell | 20  **with the assistant manager of team** |
| 21  you not to answer the question, answer | 21  **relations.** |
| 22  the question, if you understand it. | 22    Q.   Mr. Clevenger? |
| 23    **A.   Okay.  Please ask it again.** | 23    **A.   It could have been any of** |
| 86 | 88 |

```
 1   those three, Flate, Clevenger, or
 2   Morris. I'm trying to remember.  There
 3   was also a -- separate meeting in
 4   which I really didn't participate, I
 5   was just there, with I want to say Greg
 6   Kimble, legal counsel, Clevenger, me,
 7   and Wendy Warner. I think that's all.
 8       Q.   Was this during the
 9   investigation?
10       A.   This would have been after the
11   investigation.
12       Q.   Prior to your findings?
13       A.   Not prior to the findings,
14   prior -- well, as a discussion of these
15   notes, the typed notes, the final
16   investigation.
17       Q.   Prior to any discipline?
18       A.   Yes.
19       Q.   When was that?
20           MR. BOSTICK:  Object to the
21   form.
22       A.   I don't remember the date.
23       Q.   August 2006?
```
89

```
 1       A.   I'm trying to remember the
 2   timeline too.  This would have been --
 3   well, it probably was within that time
 4   frame. I don't remember specifically,
 5   though, the date.
 6       Q.   Had you already written a
 7   report prior to this meeting?
 8       A.   I don't remember that.
 9       Q.   Ms. Warner was in the meeting?
10       A.   Yes.
11       Q.   And what was her position
12   then?
13       A.   She was the HR manager.
14       Q.   Okay.  What was Mr. Kimble's
15   position?
16       A.   Director of HR.
17       Q.   And who was the legal counsel?
18           MR. BOSTICK:  Object to the
19   form.  I don't --
20           MS. HAYNES:  I'm entitled to
21   ask the question who it was in the
22   meeting.
23           MR. BOSTICK:  I don't think
```
90

```
 1   she said there was legal counsel there,
 2   did she?
 3           MS. HAYNES:  She did.
 4           MR. BOSTICK:  Okay.
 5       A.   Rick Neal.
 6       Q.   Pardon?
 7       A.   Rick Neal, N-E-A-L.
 8       Q.   Who is he?
 9       A.   He's general counsel.
10       Q.   In-house?
11       A.   Yes.
12       Q.   Anyone else?
13       A.   I think those are the ones I
14   listed.
15       Q.   Did you revise your findings
16   after this meeting?
17       A.   No.
18       Q.   Did you revise your report?
19       A.   No.
20       Q.   Had you written a report prior
21   to this meeting?
22       A.   I met --
23           MR. BOSTICK:  Have you got a
```
91

```
 1   copy of whatever report you're
 2   referring to?
 3           MS. HAYNES:  Well --
 4       A.   I still wouldn't know the date
 5   we had the meeting, that -- that's my
 6   thing, so --
 7       Q.   Plaintiff's 5 that has been
 8   previously marked, Plaintiff's 5, is
 9   that your report?
10       A.   This is my report.
11           MR. BOSTICK:  Look at the
12   whole thing before you answer the
13   question.
14       A.   Oh, I'm sorry, it's not the
15   complete report, because the -- Pam
16   Stoddard, I think she was -- at the
17   very end, she had made some kind of
18   comment that I put in.  Also I don't
19   see my findings, so this was just when
20   I finished up to this point before I
21   had the conversation with Pam Stoddard
22   at the end and before I had the --
23   written the -- or typed the -- the
```
92

1  findings.  They're not in here.
2      Q.   Okay.  Look for me at
3  Plaintiff's 3.
4      A.   Okay.
5      Q.   Can you tell me what
6  Plaintiff's Exhibit 3 is?
7      A.   Okay.  This is also not a
8  complete report because the final
9  report would have had my initial report
10  of what was reported and then right
11  behind it, it would have had the
12  findings line by line.  This is what
13  was said and this is what was found, so
14  this is still not the complete report.
15      Q.   My question is on Plaintiff's
16  3, what is that?
17      A.   It looks -- it looks like my
18  interviews by themselves.
19      Q.   Typed notes?
20      A.   Yes.
21      Q.   Okay.  Was there anything that
22  you did not include in your typed notes
23  from Plaintiff's 14 which were your

93

1  handwritten notes?
2      A.   No.
3      Q.   Did you incorporate any of
4  Mr. Blame, is it Blame and Cooner?
5      A.   Blame.
6      Q.   Mr. Blame and Mr. Cooner's
7  notes in your typewritten notes?
8      A.   Yes.
9      Q.   And how did you make a
10  determination which of their notes
11  would be included in your typewritten
12  notes and how you would deviate from
13  your own?
14      A.   Well, I'm sorry, let me go
15  back and clarify.  If they asked
16  questions within the context, it's
17  noted so here, so you'll see some
18  places where it says "Marty" instead of
19  my name asking a question, some places
20  where you see "Lucas" instead of my
21  name.
22      Q.   Okay.  When you were -- did
23  you type these notes?

94

1      A.   Yes.
2      Q.   Plaintiff's 3?
3      A.   Yes.
4      Q.   And did Mr. Blame or Mr.
5  Cooner sit there with you as you're
6  typing to --
7      A.   No.
8      Q.   You had the benefit of
9  their --
10      A.   I had their notes, right.
11          (Off-the-record discussion.)
12      Q.   (BY MS. HAYNES) Look for me,
13  please, ma'am, on Plaintiff's 14.
14  That's the handwritten notes?
15      A.   Oh, I'm sorry.
16      Q.   Yeah.  And on the second page,
17  Bates Number 206.
18      A.   Okay.
19      Q.   All right.  Mr. Kitchens is
20  saying something here about he
21  understood the severity, "I don't envy
22  y'all.  I've seen both sides.  Like a
23  shark, it smells blood - by the time

95

1  you get," and then it's just left off
2  there.  Do you know what he was saying
3  there?
4      A.   At the bottom of 206?
5      Q.   No, ma'am, in the middle of
6  206, where it says, "I understand the
7  severity" --
8      A.   Okay.  No.  He -- he stopped
9  at that point.
10      Q.   Okay.  Why did you not put
11  that in your notes, handwritten -- I
12  mean your typed notes in Plaintiff's 3?
13  I don't see that anywhere.
14      A.   I didn't understand what he
15  meant.  That's where the conversation
16  stopped so --
17      Q.   How did you make a
18  determination from your handwritten
19  notes to your typewritten notes what
20  would not be included?
21      A.   I would think that my
22  handwritten notes were translated into
23  my typewritten notes very -- very well.

96

1    Q.   Okay.  But if there was
2    something you did not understand from
3    your handwritten notes, you would not
4    include it?
5         MR. BOSTICK:  Object to the
6    form.
7    Q.   Is that correct?
8    A.   **I'm sorry, ask the question**
9    **again, please.**
10    Q.   If there was something you
11    didn't understand from your handwritten
12    notes, would you not include it?
13        MR. BOSTICK:  Same objection.
14    A.   **Not necessarily.**
15    Q.   Did you record your interviews
16    with these individuals?
17    A.   **No.**
18    Q.   Is there a reason why you did
19    not?
20    A.   **I wasn't -- it wasn't our**
21    **protocol to record.**
22    Q.   You just relied on your
23    handwritten notes and memory?

97

1    A.   **That's correct.**
2    Q.   Have you ever recorded
3    interviews?
4    A.   **No.**
5    Q.   Look for me at Plaintiff's 4.
6    Can you tell me what this is?
7    A.   **It's just part of the whole.**
8    **It's the initial summary and then the**
9    **conclusion line by line of each**
10    **complaint, but none of the interview**
11    **notes are with it.**
12    Q.   Okay.  Was the complete
13    investigation Exhibits 3, 4, and 5?
14        MR. BOSTICK:  Object to form.
15    Q.   Let me rephrase that.
16        MR. BOSTICK:  You mean her
17    complete typewritten?
18    Q.   Was your complete
19    investigation -- because with the
20    different exhibits I've shown you
21    today, you keep telling me that's not
22    the complete investigation.  I'm trying
23    to ascertain if you put Plaintiff's

98

1    Exhibits 3, 4, and 5 together, does
2    that represent your complete
3    investigation?
4         MR. BOSTICK:  Object to the
5    form.  With 14 as well, the handwritten
6    notes?
7         MS. HAYNES:  If that was part
8    of the investigation or the complete
9    packet, I guess.
10    A.   **It appears to be.**
11    Q.   Okay.  Did you also submit
12    your handwritten notes along with Mr.
13    Blame's and Mr. Cooner's --
14    A.   **Yes.**
15    Q.   -- as part of the
16    investigation?
17        MR. BOSTICK:  Object to the
18    form.
19    A.   **They are submitted in here**
20    **(indicating).**
21    Q.   Is that how you produced
22    everything to your manager?
23    A.   **That's correct.**

99

1    Q.   Is there anything else that
2    you produced?
3    A.   **Not that I can recall**
4    **specifically.**
5    Q.   Okay.  With regards to the
6    subject matter, sometimes you refer to
7    it as the EEO investigation and
8    sometimes EEO complaint.
9    A.   **Uh-huh.**
10    Q.   What did you mean by that?
11    A.   **That's how we were told to**
12    **title our investigations so --**
13    Q.   Either "investigation" or
14    "complaint"?
15    A.   **Yes.**
16    Q.   With "EEO"?
17    A.   **With "EEO" attached to it.**
18    Q.   And what does "EEO" mean?
19    A.   **To me it means equal**
20    **employment opportunity.**
21    Q.   Okay.  During your
22    investigation -- during the
23    investigation, was Ms. Edwards

100

1    truthful?

2        MR. BOSTICK:  Object to the

3    form.

4        A.  I was only there to collect

5    facts, not to make a determination as

6    to whether or not any of the people who

7    were being interviewed were truthful.

8    It was truly my job to stay completely

9    on the route of gathering the facts

10   from both sides.

11       Q.  How can you conduct an

12   investigation without making a

13   determination if someone is being

14   truthful to you?

15       A.  I've done it for 12 years.

16   One of -- one of my primary things that

17   I do -- and I think that all HR

18   professionals are the same way or I

19   hope they are -- is I don't make a

20   determination, especially in this case.

21   That determination had to come from the

22   people who received my notes after the

23   investigation.  So I was strictly their

101

1    fact-gatherer as a specialist.

2        Q.  No one asked your opinion,

3    well, did you think he was lying when

4    you asked him that question?

5        A.  No, because I didn't weigh in

6    on any of the final decisions.

7        Q.  And therefore, you didn't

8    observe body language or if someone was

9    able to look you in the eye when you

10   asked a telling question?

11       A.  All of the people that I

12   talked to did look me in the eye, I do

13   remember that.

14       Q.  How about body language?

15       A.  I don't remember any body

16   language.

17       Q.  Was that important to you,

18   them looking you in the eye?

19       A.  If -- them looking me in the

20   eye?

21       Q.  Yes, ma'am.

22       A.  No more important than

23   anything else, but I do remember eye

102

1    contact.

2        Q.  Okay.  Why is it you remember

3    that?

4        A.  It's just something -- it's

5    just one of my own personal things.  I

6    like to make sure I maintain eye

7    contact, and I tend to notice if people

8    don't maintain eye contact with me.

9        Q.  Okay.  But no one ever asked

10   you as part of your investigation did

11   you determine that someone was not

12   being truthful or was hedging from the

13   truth?

14       MR. BOSTICK:  Object to the

15   form.

16       A.  Uh-uh, no.

17       (Recess.)

18       MS. HAYNES:  Read my last

19   question.

20       (Whereupon, the last question

21        and answer were read back by

22        the court reporter.)

23       Q.  (BY MS. HAYNES) Since the

103

1    break, have you thought of something

2    you need to add or amend to any of your

3    answers?

4        THE WITNESS:  Can you read the

5    last question again?

6        (Whereupon, the last question

7         was read back by the court

8         reporter.)

9        Q.  (BY MS. HAYNES) Do you want to

10   change that answer?

11       A.  Well, I probably have a

12   better, more complete answer for that.

13       Q.  Okay.

14       A.  And that is, truthfulness

15   aside, there was -- and you can see in

16   my notes, there was some corroboration,

17   which leads somebody to believe that

18   there is some truthfulness there.

19       Q.  My question is:  Did you ever

20   make an opinion and share that opinion

21   that someone was being truthful or

22   untruthful to you during your

23   investigation?

104

1      MR. BOSTICK: Object to the
2  form.
3      A.   No.
4      Q.   We talked about when you were
5  talking to Mr. Kitchens, and I asked
6  you that about the -- the shark
7  comment, and how your notes just
8  trailed off.
9      A.   Uh-huh.
10     Q.   Is there any reason why you
11 didn't follow up and ask him what he
12 meant?
13     A.   No specific reason.
14     Q.   Okay.
15     A.   I do remember when we were
16 talking to all of the witnesses, there
17 were a lot of things said, and I tried
18 to get everything down that they said,
19 but I don't -- I don't remember any
20 specific reason I wouldn't have
21 followed up on that.
22     Q.   How did you come up with the
23 questions you would ask?

105

1      A.   I based most of them on
2  Tammy's complaint and just took it from
3  there.
4      Q.   Okay. How did you come up
5  with the order of witnesses?
6      A.   Let's see. I'm going to look
7  at what order I have them in.
8      (Off-the-record discussion.)
9      A.   I don't see any method to, you
10 know, which came first.
11     Q.   (BY MS. HAYNES) No one told
12 you how to interview anyone and what
13 order?
14     A.   No. Typically, though, after
15 I take the complaint, I'll interview
16 the witnesses that may or may not have
17 knowledge of it, and then I will wait
18 until last to interview the person
19 that's being complained about.
20     Q.   Okay. Look for me at
21 Plaintiff's 3, which is the typed notes
22 that you previously identified. On
23 page 1 near the bottom, you asked the

106

1  question, "Have you been in a
2  conversation with the three of you
3  where Mike used the F word?" and Billy
4  answered, "That's a possibility." Is
5  there a reason you didn't ask him
6  further --
7      A.   Where is that?
8      Q.   -- about what situation --
9      A.   Oh, okay. Here it is, I see.
10     Q.   It's seven lines up. Is there
11 a reason you didn't follow up with the
12 times that he had heard that?
13     A.   Well, I think my next question
14 was, "Have you witnessed the situation
15 where Mike was seated in a chair and
16 thrusting himself forward in the
17 presence of Tammy?" That was a lead
18 into that next question. So when he
19 said, "That's a possibility," I wanted
20 to go a little bit further into, you
21 know, is this the situation that that
22 happened in? That was a follow-up to
23 that.

107

1      Q.   Did you ever make the
2  determination that Mike Swindle had
3  used the F word frequently in the
4  workplace?
5      MR. BOSTICK: Object to the
6  form.
7      Q.   What are you referring to?
8      A.   I'm referring to Exhibit 4.
9      Q.   Uh-huh.
10     A.   Page 2, just that there was
11 corroboration that he used the F and
12 the MF word in the workplace.
13     Q.   And that's under Number 2 on
14 page 2 of Plaintiff's 4?
15     A.   That's correct.
16     Q.   Is that correct?
17     A.   That's correct.
18     Q.   And did you use just what Mike
19 Swindle told you or what Billy Kitchens
20 told you that there was a possibility?
21     A.   Since Mike confirmed it
22 himself, that was pretty much enough
23 corroboration for me. But I had heard

108

1 it from Billy, I had heard it -- I
2 can't remember who all I heard it from,
3 but since he corroborated that, that
4 was where I got it had been confirmed.
5     Q.    Okay. On the bottom of page
6 (sic) 3, the first page, you asked him
7 if he had heard any specifics regarding
8 the incidents you had mentioned?
9     A.    Which exhibit are we on now?
10    Q.    Exhibit 3.
11    A.    Back on 3. Okay.
12    Q.    Okay. And then Mr. Kitchens
13 answers basically what you've said, and
14 you asked, "Who told you these things?"
15 and he said, "I don't want to say
16 names." Did you tell him you were
17 conducting an investigation and it was
18 important in your investigation that
19 you know names?
20    A.    I did not ask him that
21 question.
22    Q.    Why not?
23    A.    Let's see. It seems that it

109

1 was more of a less of a question again,
2 because I asked him in the beginning
3 did he know of these things, and he
4 said he had -- he had just heard
5 things, and then he said, "I don't
6 really want," you know, dot-dot-dot, so
7 it's really just a re-questioning of
8 that.
9         Sometimes I did that within an
10 investigation, would ask the same
11 question maybe in a little bit
12 different way. And I think further
13 down, we did finally say, "Have you and
14 Mike spoken today regarding this
15 situation? and then he did say yes,
16 that he came straight to him. So
17 probably because I felt like later on I
18 got the information I needed about who
19 he had been talking to.
20    Q.    All right. Also on the second
21 page, you asked the question about ten
22 lines up from the bottom of the second
23 page, "Has anyone told you besides

110

1 Tammy that Mike's language bothered
2 them?" Do you see where I am?
3     A.    Uh-huh.
4     Q.    And Billy says, "Yeah," and
5 then you say, "Who?" and he says,
6 "Stephanie Samuels," he identifies
7 Stephanie Samuels as someone else who
8 has told him about Mike's language
9 bothering them, and then you go on to
10 your next question?
11    A.    Uh-huh.
12    Q.    Is that correct?
13    A.    That's correct.
14    Q.    Why didn't you ask him what
15 Stephanie Samuels had told him?
16    A.    Because I intended to call
17 Stephanie Samuels in and ask her myself
18 what she had heard.
19    Q.    Okay.
20    A.    Which on over in here is her
21 interview. Yeah, page 9 of Exhibit 3
22 is my interview with her, and I
23 really -- I approached that as have you

111

1 had any problems, and then that's when
2 she told me about it.
3     Q.    Well, Mr. Kitchens is a group
4 leader, correct?
5     A.    He was not at this time.
6     Q.    What position was he?
7     A.    He was a team leader.
8     Q.    Okay. And Stephanie Samuels,
9 what position was she?
10    A.    She was a team leader.
11    Q.    Also a team leader?
12    A.    Yes.
13    Q.    Okay. I don't understand why
14 if Stephanie Samuels is telling Billy
15 Kitchens that she has a problem with
16 Mike Swindle's mouth and what he is
17 saying to her that you didn't follow up
18 with, when did she say this, what did
19 she say, what was he saying?
20         MR. BOSTICK: Object to the
21 form.
22    Q.    Can you tell me why you did
23 not follow up?

112

1    MR. BOSTICK: Objection, asked
2 and answered.
3    A.    I'm sorry, am I supposed to
4 answer that?
5    Q.    Yes.
6    A.    Okay. Just because of what I
7 said before, I intended to meet with
8 her face to face to discuss the
9 situation. How better to get the
10 information than to get it directly
11 from the source.
12    Q.    Well, it would have made a
13 more complete investigation, would it
14 not, if you had asked him all the
15 specifics about what she said and then
16 follow up to see if she had anything
17 additional, correct?
18    MR. BOSTICK:  Object to the
19 form.
20    A.    I don't think so. I think
21 that my investigation interview with
22 her was what I needed to have.
23    Q.    All right. At the bottom of

113

1 your notes for Billy Kitchens, you have
2 an answer there, and it says "TR,"
3 which means team relations, right? I'm
4 on page 3.
5    A.    Okay.
6    Q.    "[Team relations] wanted to
7 interview welding team member Pam
8 Stoddard next, but Pam had taken a day
9 of vacation on August 1, 2006"; is that
10 correct?
11    A.    Yes.
12    Q.    Okay. How did you find out
13 she had taken a vacation day?
14    A.    I believe I had called to get
15 her off of the floor to come to meet
16 with me, and that's when I was told by
17 her group leader that she had a day
18 off.
19    Q.    Did you ever check any records
20 to see when she asked for that vacation
21 day?
22    A.    I did not.
23    Q.    Did you ever ascertain that it

114

1 was that morning?
2    A.    No.
3    Q.    All right. Your next
4 interview was with Ms. Edwards; is that
5 correct?
6    A.    Yes.
7    Q.    And you had already met with
8 her prior, the day before?
9    A.    On the 31st. Where is the
10 summary? Here it is. Yes, I had met
11 with her on July the 31st right about
12 time to go home, and she had given me
13 the complaint, and then I met with her
14 on August 1st.
15    Q.    Okay.
16    A.    Marty and I did.
17    Q.    And why did you have this
18 second meeting with her?
19    A.    She and I were the only ones
20 that were there when she was making
21 the -- the complaint. So I took the
22 complaint, but I wanted it as a matter
23 or as a part of our investigation for

115

1 her to repeat pretty much what she had
2 told me.
3    Q.    Okay. Why didn't you do that
4 first?
5    A.    Probably because I was going
6 to interview the witnesses first, try
7 to get all of them in first, but it
8 looks like -- well, I didn't
9 interview -- let's see. I don't know
10 that there was any reason I did it
11 second or that there was any reason I
12 wouldn't have done it first. Probably
13 some of it was based on availability of
14 the people -- let me lay this up
15 here -- not just by vacation, but
16 availability, so to speak, as of -- you
17 know, as in did they have other things
18 going on that they had to tend to at
19 that specific moment. But I don't
20 think there's any rhyme or reason to my
21 order, except for I did like to keep
22 the person who was being complained
23 about at the end.

116

1    Q.  Why is that?
2    A.  So I would have everything
3  that everybody said so that I could
4  introduce it at the time to the person
5  that had been complained about.
6    Q.  Okay.  Look for me on
7  Plaintiff's Exhibit 3, page 3, your
8  interview with Tammy Edwards, and
9  there's an asterisk there, where you
10  wrote, "I had gotten word that Tammy
11  had met with management regarding her
12  allegations."  How did you get word?
13    A.  I want to say Steve Culpepper
14  told me.  I can't remember for sure or
15  for certain, but I want to say Steve
16  told me.
17    Q.  Okay.  What did he tell you?
18    A.  Just that she had met with
19  Tom.
20    Q.  Mr. Culpepper just comes to
21  your office and says, oh, by the way?
22    A.  Oh, no.  It was probably when
23  I called to talk to her, because I

117

1  would call the group leader to send me
2  the people to talk to.  And I think he
3  might have said something like, well,
4  she's already talked to Tom, and I
5  said, well, that I need to talk to her
6  again.  But we wouldn't have had any
7  further conversation because team
8  relations was bound to confidentiality,
9  so I wouldn't have been discussing it
10  with Steve one way or the other.
11    Q.  Okay.  Did that concern you
12  that she, Ms. Edwards, had been called
13  in to meet with management?
14    A.  It had, because I was unaware
15  of the meeting.  But it didn't -- it
16  didn't cause any great shock or
17  anything, I just -- I would have wanted
18  to be involved in it if I had known
19  they were meeting.
20    Q.  Did you ever ascertain why
21  they met?
22    A.  On over into the interviews,
23  we met with Tom Bondy -- let me see if

118

1  I can find the page.  On page 11 of
2  Exhibit 3, down at the bottom is our
3  interview with Tom Bondy, and I don't
4  know that it says per se how they came
5  about meeting.  It just says that he
6  had heard Tammy was upset and he told
7  Steve to bring her up to the office,
8  and my notes say what happened from
9  there.
10    Q.  Did you ever ascertain from
11  Mr. Bondy that Mr. Swindle had gone to
12  him when he heard that Ms. Edwards had
13  complained or made an allegation of
14  sexual harassment, that he had gone
15  immediately to Tom Bondy?
16    A.  Let me see.  I don't know at
17  what point this happened, but Rob
18  Clevenger, the assistant manager in
19  team relations, was actually conducting
20  questioning in this meeting instead of
21  me, and Rob had asked, "Has Mike come
22  to you and discussed this?"  This is
23  page 12 of Exhibit 3 up at the top, and

119

1  Tom replies, "Yes, to ask if he was
2  going to be fired.  I told him it was
3  out of our hands," and then Rob said,
4  "Did Mike disclose details?" and Tom
5  said, "No."  And of course, we can read
6  the rest, "Mike was in denial when he
7  came to me in tears.  Mike swore he
8  didn't do anything to her and asked if
9  he would be fired."
10    But I don't know when that
11  took place, when that specific -- I
12  don't know when Mike went to Tom.
13    Q.  Well, would that concern you
14  that Mr. Swindle went to Mr. Bondy and
15  then Mr. Bondy calls in Tammy Edwards
16  to talk to him?
17    MR. BOSTICK:  Object to the
18  form.  It assumes facts not in evidence
19  is my -- I'm objecting to assuming
20  facts not in evidence.
21    A.  Do I need to answer?
22    Q.  Yes, ma'am.
23    A.  Okay.  Could you ask the

120

1  question again, please?
2         (Whereupon, the last question
3         was read back by the court
4         reporter.)
5         MR. BOSTICK:  Same objection.
6      A.   I don't -- I don't know when
7  Mike went to Tom, so I don't know the
8  specific timeline there.  Mike could
9  have gone to Tom after Tom's meeting
10 with Tammy, I don't know.  I don't know
11 the timeline there.
12     Q.   (BY MS. HAYNES) Was that not
13 important for you to find out?
14        MR. BOSTICK:  Object to the
15 form.
16     A.   Let me go back and see if I
17 can piece together some sort of
18 timeline.  I wouldn't say it was not
19 something that was not important to me,
20 but it's not something that I did.
21     Q.   I think my question is, would
22 it concern you?
23        MR. BOSTICK:  Object to the
                    121

1  form.
2      A.   Can we go back to the
3  question?
4      Q.   Let me just rephrase
5  everything.  And while we're at it,
6  just so maybe we won't have to stop and
7  repeat so much, Mr. Bostick and Mr.
8  Dykes can have objections to form, and
9  they're just putting something on the
10 record --
11     A.   Right.
12     Q.   -- preserving their objections
13 for later.  But unless they tell you
14 you don't answer, you can just continue
15 on.
16     A.   I understand, but it kind of
17 distracts me, and then I forget the
18 question.
19     Q.   Okay.
20     A.   I'm sorry.
21     Q.   Does it concern you, Ms.
22 Jones, that in the middle of you
23 conducting an investigation that under
                    122

1  the policies and procedures of Hyundai
2  you're supposed to do that someone
3  takes on that investigation for you
4  that's not supposed to?
5         MR. BOSTICK:  Object to the
6  form, assuming facts not in the record.
7      A.   I probably would best state it
8  this way, that it was important to me
9  that he come and get me as soon as he
10 heard anything about harassment.  So
11 that's how I would -- that's probably
12 how I would better phrase it.
13     Q.   Okay.  When you talked to Ms.
14 Edwards -- and let's go back on July
15 31st, when you talked to her, what was
16 her demeanor?
17     A.   On July 31st?
18     Q.   Yes, ma'am.
19     A.   She was crying, she was upset.
20     Q.   Okay.  When she talked to you
21 on August 1, after having just gotten
22 out of a meeting with Mr. Bondy and
23 Mr. Culpepper, what was her demeanor?
                    123

1      A.   She was crying and upset.
2      Q.   Okay.  Was she also upset that
3  she had been called into this meeting
4  with Mr. Bondy and had to go over the
5  whole situation about being sexually
6  harassed by Mr. Swindle?
7         MR. BOSTICK:  Object to the
8  form.  Object to assuming facts not in
9  the record.
10     A.   I don't remember her being
11 upset about the meeting per se because,
12 let's see, somewhere in the
13 investigation I believe that Tom was
14 indicating that he was, you know, very
15 interested in getting this resolved.
16 And I'm referring to -- let's see, I
17 don't know if that's all in there or
18 not.  Yeah, page 11 of Exhibit 3, where
19 Tom is answering the question, "Did you
20 have any firsthand knowledge of the
21 situation?" I believe even though Tammy
22 was crying and upset after that
23 meeting, I think it was more, you know,
                    124

1  based on what she was feeling. It
2  sounds to me as if -- and I wasn't
3  there, but it sounds to me as if Tom
4  was supportive during that meeting. He
5  made several statements that indicate
6  that.
7      Q.    When you met with him at 2:18
8  p.m. on August 2nd?
9      A.    Uh-huh.
10     Q.    Is that correct?
11     A.    Yes.
12     Q.    But he came to you early
13 morning on August 2nd --
14     A.    Right.
15     Q.    -- to tell you that he had had
16 second thoughts even before you
17 interviewed him, correct, page 5?
18         MR. BOSTICK: Object to the
19 form.
20     A.    He had, but their meeting was
21 on August 1st, I believe.
22     Q.    You found out about it on
23 August 1st and didn't call him or ask

125

1  him any questions until the afternoon
2  of August 2nd, correct?
3      A.    That's correct. That's
4  correct.
5      Q.    And prior to you interviewing
6  Mr. Bondy, he also came to you and said
7  that you need to know I initially
8  believed her, but I've got doubts now,
9  correct?
10         MR. BOSTICK: Object to the
11 form.
12     A.    That is what he said on page 5
13 of Exhibit 3, yes. I don't think he
14 said it exactly like that, though.
15     Q.    Well, what did you understand
16 from the conversation on the morning of
17 August 2nd, 2006?
18     A.    I don't think he said he had
19 doubts. He just said, you know, at
20 first he believed one thing and -- but
21 then he got to thinking about a
22 statement that Tammy had made while he
23 was talking to her about Mike horsing

126

1  around and somebody had told Tammy's
2  husband. So he didn't -- I don't think
3  he came right out and said he doubted
4  her, but he -- he said, you know, he
5  had thought more carefully about some
6  of the topics of their conversation
7  when they were meeting.
8      Q.    All right. Let's look at
9  that. That's on page 5. And you
10 write -- wrote, "Early on the morning
11 of August 2[nd], 2006, welding manager
12 Tom Bondy asked me if I could meet with
13 him privately for a moment." Is that
14 correct?
15     A.    Yes.
16     Q.    And that's how it happened?
17     A.    Yes.
18     Q.    He just comes to your office
19 and says, can I meet with you
20 privately?
21     A.    Well, we were -- we're in
22 cubicle -- well, we were in cubicles at
23 Hyundai, so you know, I could see him

127

1  from his cubicle, he could easily just
2  walk over and say, hey, do you have a
3  minute, can we meet privately for a
4  minute?
5      Q.    And where did you go?
6      A.    I think we went into one of
7  the conference rooms there in the weld
8  shop office.
9      Q.    And you wrote, "I agreed, and
10 he and I stepped into a conference
11 room." And then you continue, "Tom
12 said he got to thinking about what
13 Tammy said to him during his meeting
14 with her on August 1. Tom admitted
15 initially believing everything Tammy
16 told him and taking her side (because
17 he has a wife and two daughters)." Is
18 that what he said --
19     A.    Yes.
20     Q.    -- I believe her because I've
21 got a wife and two daughters?
22     A.    Uh-huh. Well, he -- he
23 initially believed what she told him

128

1  because he has a wife and two
2  daughters.
3      Q.  Does that not strike you odd,
4  I believe this woman who is complaining
5  about this man sexually harassing her
6  because I've got a wife and two
7  daughters?
8          MR. BOSTICK:  Object to the
9  form.
10     A.  It didn't strike me as odd
11  because he was probably thinking of it
12  from, you know, more of a personal
13  perspective.
14     Q.  Well, did you ask him what he
15  meant, as a manager of Hyundai, what do
16  you mean by that?
17         MR. BOSTICK:  Object to the
18  form.
19     A.  I didn't ask him, and it's
20  because of what you see later down here
21  in the bottom.  I didn't say anything
22  to him during the course of that
23  conversation.  I told him that I had

129

1  been silent the whole conversation
2  because I was not at liberty to discuss
3  the situation with him.  So more or
4  less I was just listening to what he
5  had to say.
6      Q.  Okay.  Why didn't you question
7  him right then?
8      A.  Because Rob Clevenger needed
9  to be available during his questioning
10  because he was a manager.
11     Q.  Okay.  But he makes the
12  statement here about something that
13  stood out in his mind.  "According to
14  Tom," and this is you writing, right?
15     A.  Uh-huh.
16     Q.  "According to Tom, Tammy told
17  him that a guy on second shift had seen
18  her and Mike horsing around and had
19  told Tammy's husband."  Did you ever
20  ask who the guy was on second shift?
21         MR. BOSTICK:  Object to the
22  form.
23     A.  Let's see if that's over here

130

1  on this other one, because I know the
2  name of the guy, but I cannot remember
3  who brought it up.  But no, I would not
4  have asked Tom any questions, just
5  because of the -- kind of the echelon
6  at Hyundai.  I was a specialist, so I
7  was not even -- I was not on his level
8  as far as management, so in order for
9  him to be questioned, I had to have a
10  member of my management present.
11     Q.  Well, look in your notes and
12  tell me at any time did you ever ask
13  who this guy was on second shift that
14  Bondy talked to that gave him this
15  information that you wrote in your
16  notes?
17         MR. BOSTICK:  Object to the
18  form.  That mischaracterizes -- you're
19  saying that Tom Bondy said this man
20  said that.  It clearly says he's saying
21  Tammy said that.
22     Q.  Okay.  Anywhere in your notes
23  do you follow up about anybody on

131

1  second shift, a guy that had seen Tammy
2  and Mike horsing around and had told
3  Tammy's husband?
4      A.  I would have to read my notes.
5  I believe the name is in here.
6      Q.  Okay.
7      A.  But I would have to -- I may
8  have to go back and read everything.
9  Okay.  The first mention, I think, of
10  Roger was when I had another interview
11  with Tammy, and that's when we
12  discussed Roger.  But Tammy felt like
13  it would offend Roger, that Roger was a
14  good Christian guy, and so she was
15  afraid that it would offend him for
16  Mike to be using the F word.
17     Q.  Where does the name Roger come
18  out, whose interview?
19     A.  Well, right now, the -- the
20  first time I've seen it, it is in an
21  August 3rd -- page 16, I'm sorry, page
22  16 of Exhibit 3, I'm in another
23  interview, the second interview with

132

1 Tammy, and we start -- I'm sorry, it's
2 page 17, closer to the bottom of the
3 page, where I say, "Let's discuss the
4 situation with Roger," and Tammy tells
5 me, "About Monday of last week, Mike
6 and I were walking together, and Mike
7 was bumping me. I saw Roger and told
8 Mike that Roger was a good Christian
9 man (in a gospel group), and "I feel
10 Mike used the F word intentionally,
11 because I told him Roger was a
12 Christian" and she was "afraid Roger
13 would be offended."
14    Q.  Be offended about what?
15    A.  The F word.
16    Q.  Okay. All right. Your
17 question, "Let's discuss the situation
18 with Roger" indicates that you had
19 already heard something about Roger.
20    A.  Well, and like I said before,
21 I'm not certain that's the first time
22 it came up, but I could remember right
23 off I did know that she and I talked

133

1 about that. I would need to look
2 through these other ones to see where
3 that might have come from.
4        Mike mentions it on page 15 in
5 his interview, page 15 of Exhibit 3,
6 but he doesn't say a specific name. He
7 just said, "One of Ralph's friends."
8    Q.  Did you ever know Roger's last
9 name?
10    A.  I want to say it was Cleckler.
11    Q.  Did you ever talk to Roger
12 Cleckler --
13    A.  No.
14    Q.  -- as part of the
15 investigation?
16    A.  No.
17    Q.  Why not? My question is, why
18 did you not talk to Roger Cleckler?
19    A.  Right, and I'm sorry, I'm
20 thinking for just a second. This was
21 later on in our investigation. I'm
22 thinking it was because Roger worked
23 the other shift, and I was trying to

134

1 keep the investigation more or less
2 contained. I mean, there were
3 already -- you know, the people that I
4 was interviewing were already telling
5 me that they had heard, and I was -- I
6 was trying to keep it contained. Also,
7 at that point, I didn't really know if
8 that was relevant or not. I mean,
9 he -- he had already said or Mike said
10 eventually in his testimony or his
11 statement that he used the F word, and
12 that's basically where Roger came into
13 the picture, other than what Tom had
14 said.
15    Q.  Well, Bondy makes the
16 allegation as does Kitchens as does
17 Swindle --
18    A.  Uh-huh.
19    Q.  -- that the only reason Tammy
20 Edwards was complaining is because
21 Cleckler went to her husband. Did you
22 not think that was important --
23        MR. BOSTICK:  Object to the

135

1 form.
2    Q.  -- for a just and fair
3 investigation that you talk to him and
4 see, did you go and talk to Tammy
5 Edwards' husband and is that her
6 motivation?
7        MR. BOSTICK:  Object to the
8 form.
9    A.  I didn't talk to Tammy's
10 husband.
11    Q.  I know you didn't talk to
12 Tammy's husband. Did you not think it
13 would be prudent in your investigation
14 to talk to Roger Cleckler to see if
15 that was Tammy Edwards' motivation to
16 even complain about Mike Swindle?
17    A.  At this point, I must not have
18 thought it was important to talk to
19 Roger.
20    Q.  Have you ever talked to Roger
21 Cleckler?
22    A.  Just on a team-rep-to-team-
23 member basis.

136

1    Q.    Have you ever questioned him
2    about any allegations with regards to
3    Tammy Edwards?
4    A.    No.
5    Q.    Can you tell me any reason
6    that you didn't?
7    A.    Only that what I've just said,
8    that I probably did not deem that to be
9    necessary at that time.
10    Q.    Okay.  Look for me on page 17,
11    when you're talking to Tammy, and she's
12    telling you about Mike Swindle hanging
13    on the fence and humping the fence, and
14    she says, "Melvin Jones may have seen
15    this."  Did you ever talk to Melvin
16    Jones?
17    A.    No.
18    Q.    Why not?
19    A.    Probably because of what I
20    said before, there were already so many
21    people involved in the investigation,
22    there was already a lot of talk about
23    the investigation.  Tammy, you know,

137

1    would come to me upset about all the
2    talk on the floor.  We were trying to
3    wrap it up as expeditiously as
4    possible, and she didn't know for a
5    fact that Melvin had seen it.  If I had
6    brought Melvin up and asked him the
7    question, then he would have known
8    details of the investigation, and he
9    may or may not have seen it, so I
10    didn't bring him up to talk to him.  I
11    just thought that would involve yet one
12    more person in the details of the
13    investigation.
14    Q.    Well, did you consider that a
15    serious allegation, that you've got a
16    team leader hanging on a fence and
17    humping it as if he's simulating a
18    sexual act in the workplace?
19    MR. BOSTICK:  Object to the
20    form.
21    MR. DYKES:  Object to the
22    form.
23    A.    I considered it serious, but I

138

1    believe I asked -- I want to say there
2    was another person that she said had
3    seen it that I had already interviewed,
4    I think Toby Chance maybe.
5    Q.    Why would you ask Toby Chance
6    that if that's not an individual that
7    Tammy Edwards said saw it?
8    MR. BOSTICK:  Object to the
9    form.
10    A.    Okay.  Tammy made mention on
11    page 4 of Exhibit 3 that there was
12    something in front of Toby Chance, so
13    that's why I brought him in.
14    Also I'd like to revisit our
15    conversation with Roger Cleckler,
16    because also on page 4 of Exhibit 3,
17    that's where Cleckler came into it.
18    That's how I knew Roger Cleckler's
19    name.  So Tammy confirmed -- well,
20    she -- let's see when I had the
21    conversation with Tom.  I believe that
22    was in -- Roger Cleckler came up in
23    Tammy's first interview on August 1st,

139

1    because they're bulleted here.
2    Q.    Sure.  So your testimony about
3    Roger Cleckler's name coming up towards
4    the end of your investigation as a
5    reason you didn't talk to him would be
6    untrue?
7    A.    Well, I said --
8    MR. BOSTICK:  Object to the
9    form.
10    A.    I said I wasn't positive that
11    I was telling you where it came up.  I
12    mean, I've had to read back through
13    here to -- to kind of get a grasp of
14    it.  But now that I'm seeing page 4 of
15    Exhibit 3, Roger specifically came up
16    in her -- in her complaint, and Toby's
17    name was specifically mentioned too.
18    That's why I met with Toby.  And she
19    may -- let's see.
20    Q.    Is there something you're
21    looking for to answer?
22    A.    No, I don't think so.  I'm
23    just -- I'm reading through here just

140

1  to make sure I have a better grasp of
2  the timeline.
3      Q.   You did finish your answer
4  then so I can go on to another
5  question?
6      A.   I think I'm -- I think I'm
7  finished with my answer.
8      Q.   My question specifically was
9  earlier when I was asking you about
10 Roger Cleckler and why you didn't
11 question him --
12     A.   Uh-huh.
13     Q.   -- did you not tell me that
14 his name came up later in the
15 investigation?
16     A.   Oh, I did, but when I was
17 telling you that, I said I'm not
18 certain at what point it came up.
19     Q.   Okay.
20     A.   Actually, I shouldn't have
21 done this, but I started towards the
22 back reviewing it.
23     Q.   Okay.

141

1      A.   Now that I've started
2  reviewing it from the front, it came up
3  early -- early on in the investigation.
4      Q.   When you're getting details
5  from Tammy Edwards --
6      A.   From Tammy, correct.
7      Q.   -- she mentions Roger Cleckler
8  and that -- and the bullet point is on
9  page 4 of Plaintiff's Exhibit 3, "Last
10 week, Mike was bumping me on the side
11 and I told him time to stop.  I saw
12 Roger Cleckler, a family friend,
13 walking towards us and thought Roger
14 might think something was going on
15 between Mike and me"?
16     A.   Uh-huh.
17     Q.   So she mentions Cleckler and
18 that when she saw Cleckler, this is
19 when Swindle was bumping her on her
20 side, correct?
21          MR. DYKES:  Object to the
22 form.
23     Q.   Is that correct?

142

1      A.   She says that, but she also
2  follows it up by saying that she
3  thought Roger might think something was
4  going on.  So there wasn't a blatant,
5  you know, I know he saw it, I know he
6  was offended, I know -- she just
7  thought he might have seen it.
8      Q.   Okay.  Look on page 3 of
9  Plaintiff's Exhibit 4, which is your
10 findings.  Number 10, where you have
11 the allegation, "Sometimes Mike puts
12 his hands behind his back and butts up
13 against me," and you wrote there that
14 "This allegation cannot be confirmed,"
15 correct?
16     A.   Correct.
17     Q.   All right.  And in her initial
18 statement to you, she tells you that
19 Mike is bumping up against her and
20 specifically recounts a situation with
21 Roger Cleckler.  Can you tell me with
22 that information why you did not talk
23 to Cleckler but made the determination

143

1  that her allegation could not be
2  confirmed?
3          MR. BOSTICK:  Object to the
4  form.
5      A.   Hold on just a second.  Let me
6  look at something.  Do you mind if I
7  take some of this out of here?
8      Q.   Sure, that's fine.  Do you
9  want some clips?
10     A.   Yeah, so I don't have to keep
11 flipping back and forth.
12     Q.   Do you need the question
13 repeated?
14     A.   No, I'm still just looking at
15 something.  I still go back to my
16 initial answer, you know, she thought
17 Roger saw it.  She was not certain that
18 he saw it.
19          MS. HAYNES:  All right.  The
20 court reporter needs a break.
21          (Off-the-record discussion.)
22          (Lunch recess.)
23          (Whereupon, the last question

144

1    was read back by the court
2    reporter.)
3    Q.    (BY MS. HAYNES) All right.
4 Let me ask you this: Since we've taken
5 a break, do you need to amend or append
6 any of your previous answers?
7        A.    Not that I can think of.
8        Q.    Okay. We were talking about
9 Roger Cleckler and Melvin Jones. You
10 never interviewed either one of those
11 individuals; is that correct?
12        A.    That's correct.
13        Q.    And can you tell me why you
14 would not have interviewed Melvin Jones
15 but Toby Chance when she indicated,
16 Ms. Edwards indicated that Toby Chance
17 was not -- would not be forthcoming?
18            MR. BOSTICK: Object to the
19 form.
20        Q.    And I'm referring to her
21 comments on page 4 of Plaintiff's
22 Exhibit 3.
23        A.    Where is the comment about

145

1 your notes are in Plaintiff's 14 with
2 regards to this second interview with
3 Ms. Edwards?
4        A.    It would have been one that
5 Marty was in on, the second interview
6 with Tammy Edwards on August 3rd begins
7 on 237 of Exhibit 14.
8        Q.    All right. Those notes are
9 237 and 238 for the second interview?
10            (Off-the-record discussion.)
11        A.    Yes, that appears to be the
12 same from these handwritten notes.
13        Q.    (BY MS. HAYNES) Was he in
14 there the entire time?
15        A.    Who?
16        Q.    Marty Blame?
17        A.    Oh, he would have been.
18        Q.    Okay. Can you tell me where
19 his notes are for that second
20 interview?
21        A.    We didn't both take notes
22 every time. Sometimes we both took
23 notes; sometimes we didn't.

147

1 Melvin? It's right in there too, I
2 think. That might be over here.
3 Because of the verbiage that she used,
4 page 17 of Exhibit 3, where she said
5 Melvin Jones may have seen this, and
6 then when I first interviewed her and
7 she was talking about Toby, she said
8 definitively, whenever I came around
9 him in front of Toby, but then she
10 added that. But she was definitive
11 about Toby, so that's why I wanted to
12 bring him in to interview him.
13        Q.    Because she said Melvin Jones
14 may have seen it, you didn't think you
15 needed to interview Mr. Jones?
16        A.    Because she was not certain
17 that it had taken place, I didn't
18 interview Melvin; but she was certain
19 that Toby had seen something, so I
20 interviewed Toby.
21        Q.    Okay. Any other reason?
22        A.    No.
23        Q.    Can you direct me to where

146

1        Q.    Well look for me on Bates
2 Numbers 246 and 247, Plaintiff's 14,
3 and tell me if that's Mr. Blame's
4 notes?
5        A.    It appears to be.
6        Q.    Okay. Do you see anything in
7 Mr. Blame's notes about Melvin Jones or
8 the fence-humping incident?
9        A.    I don't.
10        Q.    What was the reason both of
11 you would have Ms. Edwards sign your
12 notes?
13        A.    Probably for that very reason.
14 There might be something that I was
15 able to catch when writing that he
16 wasn't.
17        Q.    Were you reading the notes
18 back to the witnesses prior to getting
19 their signatures?
20        A.    No. After we took -- after we
21 asked the questions, then witnesses or
22 Tammy would take the notes, read over
23 them, and then they would sign.

148

1    Q.   Right then; is that correct?
2         MR. BOSTICK:  Object to the
3    form.
4    A.   Well, I'd have to look at
5    everybody's signature to see if it's on
6    the same date.  We've already looked at
7    Billy's, and for some reason his is
8    dated different.  But our usual format
9    was ask the questions, pass it to the
10   person who gave us the information,
11   they would read, and then they would
12   sign, and it would be that same date.
13        Q.   Did you ever ask anyone to
14   write a statement?
15        A.   I don't think I did.  I think
16   they were all my notes, Marty's notes,
17   and Lucas's notes.
18        Q.   Is it part of the Hyundai
19   protocol that individuals would in
20   their own handwriting make a statement
21   and sign it and date it?
22        A.   Not necessarily.  I mean, if a
23   complaint came in that way, it was

149

1    fine, but we didn't ask them to write
2    it down like that.
3         Q.   And you've never done it that
4    way?
5         MR. BOSTICK:  Object to the
6    form.
7         Q.   Have somebody write their own
8    statement and sign it?
9         A.   I have done in some jobs and
10   then in other jobs I haven't.
11        Q.   The question was unclear.
12   Have you ever done it in that format at
13   Hyundai?
14        A.   Oh, no.
15        Q.   It's always this way, that you
16   write --
17        A.   Always this way.
18        Q.   All right.  You write the
19   answer -- the question and the answer?
20        A.   Right.
21        Q.   Okay.
22        A.   Or maybe somebody that's in
23   with me will write the question and I

150

1    will write the answer.  We kind of
2    coordinate in order to get as -- as --
3    as much information as possible.  So it
4    could have been one writing the
5    question, one writing the answer, or it
6    could be me writing the question and
7    then writing the answer.  I always told
8    the person that I was talking to, hey,
9    you're going to have to give me a
10   minute because I've got -- I've got to
11   jot all this down so we got as much
12   information as possible.
13        Q.   All right.  With regards to
14   Mr. Swindle's interview, the 228
15   through 232 of Plaintiff's 14, are you
16   with me?
17        A.   I am.
18        MR. BOSTICK:  What are those
19   numbers again?
20        MS. HAYNES:  228 to 232.
21        MR. BOSTICK:  Okay.
22        Q.   (BY MS. HAYNES) Did you stop
23   the format of the question-answer with

151

1    Mr. Swindle?
2         A.   When he first came in --
3         Q.   Please, ma'am, answer that
4    question.  Did you stop that format?
5         A.   It does appear that I stopped
6    that format.  The reason I was going to
7    add something onto that is because I
8    had a very, you know -- or what I felt
9    was a very good list of what I wanted
10   to go by so --
11        Q.   Where is that list?
12        A.   Well, it was her -- it was her
13   allegations.
14        Q.   Okay.
15        A.   Which are part of Exhibit 3,
16   page 4, page 5, anything that she had
17   made in the summary statement, which
18   would be part of Exhibit 4, page 172 --
19   I'm sorry, Exhibit 4, page 1.
20        Q.   Did you already type that up?
21        A.   Now, this was the summary,
22   this was typed up in the very
23   beginning.  There is always a summary

152

1  statement of the complaint, so this was
2  typed up -- this was typed up at the
3  beginning. And then as things were
4  added to it, this became the top of the
5  document with everything in line behind
6  it, conclusions and things of that
7  nature.
8      Q.  And who did you send that to?
9      A.  Rob Clevenger.
10     Q.  Anyone else?
11     A.  No. It was his responsibility
12 to send it to legal.
13     Q.  Did you send your handwritten
14 notes to anyone prior to interviewing
15 Mr. Swindle?
16     A.  No.
17     Q.  Did you send the summary to
18 Mr. Clevenger before interviewing Mr.
19 Swindle?
20     A.  I sent -- as I was working on
21 it, Rob would ask me or Mr. Clevenger
22 would ask me where I was on the
23 investigation, and I might send him,

153

1  you know, what I had up to that date.
2      Q.  Uh-huh.
3      A.  But no, he did not see
4  handwritten notes.
5          (Plaintiff's Exhibit 15 was
6          marked for identification.
7          A copy is attached.)
8      Q.  (BY MS. HAYNES) Let me ask you
9  a question while we're at that point.
10 Plaintiff's Exhibit 15, please, ma'am,
11 this e-mail that you sent to Mr.
12 Clevenger, where it says "Subject: SMJ
13 EEO Summary Edwards 08.01.2006" --
14     A.  Uh-huh.
15     Q.  -- what is that that you sent
16 Mr. Clevenger on that date?
17     A.  That's just the summary,
18 because at that time, all we had at
19 7:22 a.m. on August 1st was the
20 complaint, so it's summarized here in
21 this document.
22     Q.  All right. And is that the
23 next page, which is -- let's see, the

154

1  first page is the document Number 665
2  and the next one is 666; is that
3  correct?
4      A.  That's correct.
5      Q.  And that's what you sent Mr.
6  Clevenger; is that correct?
7      A.  That is correct. I sent the
8  e-mail that's on 665 of Exhibit 15, and
9  it contained the attachment of 666 of
10 Exhibit 15.
11     Q.  All right. And then your next
12 e-mail is to Mr. Clevenger on August
13 3rd, 2006, at 5:25 p.m.; is that
14 correct?
15     A.  That's correct.
16     Q.  And had you interviewed
17 everyone at that point in time?
18     A.  I don't know if I may have
19 interviewed already and not been able
20 to notate it yet. I can't distinguish
21 from this, but my original -- or the
22 final report ended with comments by Pam
23 Stoddard, and this e-mail right here

155

1  does not contain those documents.
2      Q.  You're talking about your
3  e-mail Plaintiff's 15?
4      A.  My e-mail from August 3rd, the
5  one you wanted to know is that -- were
6  all the interviews complete on August
7  3rd, I believe -- this is not -- this
8  e-mail right here is not complete,
9  because I told Rob in the e-mail that I
10 estimate that I'm halfway finished, and
11 that probably meant with the typing of
12 it and that I'll start again first
13 thing in the morning. So there are
14 some things missing from this one that
15 are not in the -- the final right here
16 (indicating), which is Exhibit 3 of the
17 interviews.
18     Q.  Do you know why Mike Swindle's
19 interview is not in this e-mail that
20 you sent to Mr. Clevenger?
21     A.  Probably because I had not
22 typed it yet, but let me look.
23 Probably just because I had not typed

156

1  it yet.

2      Q.  Probably because what?

3      A.  **Probably because I had not**

4  **typed it yet.**

5      (Plaintiff's Exhibits 16 and

6      17 were marked for

7      identification.  Copies are

8      attached.)

9      Q.  (BY MS. HAYNES) Plaintiff's 16

10  is another e-mail to Mr. Clevenger

11  dated August 7th, 11:16 a.m.  Was that

12  the complete investigation?

13      A.  **Let me turn right here to this**

14  **one, or let me compare it right here to**

15  **this one.  No, that's still not**

16  **complete.  It doesn't contain the**

17  **interview with Pam Stoddard on August**

18  **7th, so I also probably had not added**

19  **that to it yet, because I sent this at**

20  **11:16 and she reported to me that --**

21  **that morning, and I know it was prior**

22  **to 11:16, but I had not added it yet.**

23      Q.  What time did Ms. Stoddard

1  come to you?

2      A.  **9:42.**

3      Q.  Why did you send the e-mail to

4  Mr. Clevenger after she came to you but

5  did not include that statement?

6      A.  **As a means of letting him know**

7  **where I was.  He wanted to know what my**

8  **progress was, and I said, well, I'll**

9  **send you what I have so far.**

10      Q.  Was he sending you those

11  inquiries by e-mail or telephone?

12      A.  **Telephone.**

13      Q.  Okay.  Were you communicating

14  with anyone else about your

15  investigation other than Mr. Clevenger?

16      A.  **No.  But if Shawn was on that**

17  **shift or Kisha had been on that shift,**

18  **I was probably communicating with them.**

19      Q.  In writing?

20      A.  **No, by phone.**

21      Q.  Okay.  Other than someone in

22  team relations, were you communicating

23  with anyone else?

1      A.  **No.**

2      Q.  Were you asked to provide any

3  type of memos to anyone else about how

4  the investigation was going?

5      A.  **No.**

6      Q.  How often was Mr. Clevenger

7  calling you?

8      A.  **Not very.  He knew that we**

9  **were busy doing this day in and day**

10  **out, so he would just check in.  He**

11  **wasn't -- he wasn't more or less**

12  **saying, you know, I need to know when**

13  **you've got this finished.  He was**

14  **saying, hey, what's your progress**

15  **report, what's the status? because he**

16  **knew we had several people to**

17  **interview.**

18      Q.  Is there a reason there is a

19  period of four days between your last

20  interview and you getting the typed

21  notes to him?

22      A.  **I would say because this**

23  **required a great deal of time to type,**

1  **and I had other responsibilities at**

2  **that same time, that would be why.**

3      Q.  You weren't off during this

4  period of time?

5      A.  **No.**

6      Q.  The plant wasn't closed?

7      A.  **No.**

8      Q.  The plant wasn't closed during

9  this period?

10      A.  **No, ma'am.  No.**

11      Q.  Other than the individuals

12  listed in your investigation and the

13  notes of that investigation to Mr.

14  Clevenger, were you communicating with

15  anyone else other than team relations

16  people?

17      A.  **No.**

18      Q.  At any time did anyone direct

19  you in your investigation what to

20  include and what to take out?

21      A.  **No.**

22      Q.  Did you ever convey to Ms.

23  Edwards that legal had taken the

1    investigation away from you?
2        A.    No.
3        Q.    Did Ms. Edwards ever ask why
4    is it taking so long?
5        A.    Yes.
6        Q.    And what did you say?
7        A.    I told her that we were having
8    to follow a certain -- a certain order.
9    We were going through each witness,
10    taking statements, and then it all had
11    to be compiled into one document.
12            MR. BOSTICK:  Alicia, can we
13    take a break right here?
14        (Off-the-record discussion.)
15        (Recess.)
16        (Whereupon, the last question
17            and answer were read back by
18            the court reporter.)
19        Q.    (BY MS. HAYNES)  All right.
20    Just to follow up, you never told Tammy
21    Edwards that the lawyers had taken it
22    from you and that this is the first
23    time that had ever happened to you?

161

1        A.    No.
2        Q.    Let me ask you a question with
3    regards to Plaintiff's Exhibit 14, your
4    handwritten notes.  Bates Number 230
5    here, this is part of your questions
6    with regards to Mike Swindle.  And can
7    you tell me why you deviated from your
8    previous practice of writing down the
9    question and the answer with Mr.
10    Swindle?
11            MR. BOSTICK:  Objection, asked
12    and answered.
13        A.    Just because I had a list of
14    the things that were alleged, and I
15    pretty much went by that list.
16        Q.    Did you show him the list?
17        A.    No.
18        Q.    So he didn't see a list and
19    just say, I deny have having a
20    conversation about oral sex and a
21    finger up her butt?
22        A.    No.  He didn't see -- he
23    didn't see what the allegations were.

162

1    I would ask, according to the
2    allegation, and he would answer, and I
3    took the answer, and I used that as my
4    template.
5        Q.    Okay.  Now, with regards to
6    the page I had directed you to, 230,
7    did you ask the question, "Have you
8    talked about having freaky sex with
9    other women"?
10        A.    Yes, because it's written here
11    at the top of the page.
12        Q.    Okay.  So you asked that
13    question, "Have you talked about having
14    freaky sex with other women"?
15        A.    Uh-huh.
16        Q.    And then is that how he
17    answered that question, what you've
18    written there?
19        A.    Yes.
20        Q.    And he starts talking about
21    Tammy Edwards?
22        A.    In -- in reference to "she,"
23    do you mean "She walked into that

163

1    conversation"?
2        Q.    Right.
3        A.    He meant Tammy.
4        Q.    Okay.
5        A.    Yes.
6        Q.    Did he hesitate when you asked
7    that question, "Have you talked about
8    having freaky sex with other women"?
9        A.    He didn't -- he didn't
10    hesitate.
11        Q.    He just started telling you
12    about a song?
13        A.    Yes.
14        Q.    And that Ms. Edwards had
15    walked up while the guys were talking
16    about this song?
17        A.    Right.
18        Q.    And where you write, "We were
19    bullshitting, all the guys were
20    agreeing," is that what he said to you,
21    "We were bullshitting"?
22        A.    Yes.
23        Q.    Okay.  And did you take issue

164

1  with his language while you were
2  talking with him?
3      A.   I believe he had already -- I
4  think we had already discussed his --
5  let me see if we had discussed his foul
6  language.
7      Q.   Page 2, Bates Number 229 of
8  Swindle's statement.
9      A.   Oh, okay, there it is.  He had
10  already admitted that -- that he did
11  curse on the floor.
12     Q.   And he said, "Yes, [I do
13  that], but no more than anyone else"?
14     A.   That's correct.
15     Q.   Did you ask who else does it?
16     A.   No, I didn't.  That was a
17  question in some earlier conversations,
18  I believe with Billy Kitchens -- let me
19  look at these notes.  I'm trying to
20  find where Billy said that there were
21  other people, and I don't know if it
22  was in his first, second, or third
23  interview.  But it had basically

165

1  already been summed up that that's what
2  was happening.
3      Q.   That what was happening, I'm
4  not following you?
5      A.   That there was foul language.
6      Q.   And did he talk foul when you
7  were interviewing him?
8      A.   He did say what is written
9  here in this document.  I tried to
10  write it very verbatim.  The comment by
11  Billy, page 16, Exhibit 3, kind of
12  close to the top, "Can you be more
13  specific about words and conversation
14  on the floor?  Would you say we have a
15  general problem with cursing and
16  talking about inappropriate things on
17  the floor?" and he said, "Yes, it's not
18  just on the floor.  I'm looking at
19  someone who does it," and he was
20  looking through the door at our
21  management group.
22     Q.   I don't see that about on page
23  16.

166

1      A.   Exhibit 3.
2      Q.   I'm there.
3      A.   Maybe I gave you the wrong
4  page number.  Let's see, page 16, one,
5  two, three, four, five -- about ten
6  lines down from the top, "Can you be
7  more specific about words and
8  conversation...?"
9      Q.   Okay.  And who was he looking
10  at?
11     A.   He was looking through the
12  door, which is -- right outside the
13  conference room door would have been
14  where our management sat, our upper
15  management.
16     Q.   And who was he looking at? is
17  my question.
18     A.   Now, he didn't -- he didn't
19  tell me who he was looking at.  He was
20  just looking out the door and motioning
21  that that's -- he was saying no more
22  than them.  I don't know who was
23  sitting outside of the room at that

167

1  time.
2      Q.   And why didn't you ask?
3      A.   Because I figured he was
4  talking about management.  That's all
5  that would have been sitting out there.
6      Q.   And you didn't think that was
7  important to know if it was Tom Bondy
8  or Steve Culpepper?
9      A.   I think he was referring to
10  management in general.  I don't think
11  he was referring to one specific
12  person.
13     Q.   How did you know who he was
14  referring to if you didn't ask; you're
15  just assuming?
16     A.   I'm just taking what he said,
17  and he looked out the door.  No, I
18  didn't ask any other questions past
19  that about specifics.
20     Q.   Look for me on page -- Exhibit
21  14, document Number 229 --
22     A.   Okay.
23     Q.   -- fourth line from the

168

1    bottom.

2        A.   Okay.

3        Q.   "Mike denies conversations

4    regarding Tammy telling Billy he was a

5    pervert. Amber was going to do CCR and

6    Tammy on BC1. Told Billy and Tammy I

7    wasn't going to lose one of my

8    workers."  What did you -- what was

9    that conversation about?

10        A.   I know the first part was

11    there had been some conversation about

12    whether or not he had overheard about

13    the conversation that Tammy had with

14    Billy about saying that Mike was a

15    pervert. The last part, I'm not

16    certain why that came up.  I'm not

17    certain what was meant there.

18        Q.   Did you ask, what do you mean

19    by that?

20        A.   I think I followed that up,

21    because on page 230, he had told me he

22    had offered to take Tammy off of his

23    time sheet and give her to Billy, and

169

1    Tammy said she wanted to stay on his

2    team, so that was the -- that was the

3    completion of that conversation right

4    there.

5        Q.   All right.  Swindle told Billy

6    Kitchens and Tammy Edwards he was not

7    going to lose one of his workers.  Who

8    was he referring to?

9        A.   Mike told Billy -- let's see.

10    Since I just wrote "Told," that's Mike,

11    Mike told Billy and Tammy he wasn't

12    going to lose one of his workers, that

13    he had "Offered to take Tammy off of

14    his time sheet" -- this continues on

15    page 230 of Exhibit 14 -- "and give her

16    to Billy, and Tammy said she wanted to

17    stay on his team."

18        Q.   How does that conversation or

19    that statement and the statement --

20    well, how does the statement on the

21    bottom of page 229 and the statement on

22    230 relate to one another?

23        A.   It sounds like job -- it

170

1    sounds like they're talking about

2    different jobs.

3        Q.   Okay.  Did you convey to

4    Mr. Swindle that Ms. Edwards wanted to

5    move from his --

6        A.   No.

7        Q.   -- department?

8        A.   No.

9        Q.   Did she ever ask you that?

10        A.   If she could move from his

11    department?

12        Q.   Yeah, can I just move, can I

13    transfer?

14        A.   Later on, I believe that was a

15    question of hers.

16        Q.   In the beginning, was it not a

17    question?

18        A.   I can't remember it being in

19    the very beginning, not when the

20    initial complaint was lodged.

21        Q.   She didn't ask you, can't you

22    just transfer me?

23        A.   I think it was later on after

171

1    we had done the investigation.

2        Q.   Okay.  Did you ever make the

3    comment, we don't transfer problems, we

4    deal with them?

5        A.   I don't know if I said it like

6    that.  I said that we don't transfer a

7    person from one place to the other,

8    because our transfer system was if

9    there's a job available, it would be

10    posted on the bulletin board, and that

11    really wouldn't be considered a

12    transfer. We didn't have a transfer

13    per se program.

14        Q.   Well, what is your

15    understanding of why Tammy Edwards

16    moved from the CCR position to the BC1

17    position?

18        A.   That she was -- and I had seen

19    this, she was training Amber Kelley to

20    be her replacement in CCR.

21        Q.   And that's why she got

22    transferred?

23        A.   Well, it wouldn't have really

172

1  been a transfer per se, because we were
2  still within that group.  Remember
3  earlier we were talking about -- we
4  were trying to get everything on the
5  transfer and the promotion and stuff
6  like that.  Within a certain group, you
7  can put a team member in a different
8  job, and it's not considered a
9  transfer; it's just kind of a
10 reassignment of duties because
11 everybody within a group is a team
12 member.  So it wasn't -- it wasn't a
13 transfer, so to speak.
14      Q.   Did you ever ask?
15      A.   About?
16           MR. BOSTICK:  Object to the
17 form.
18      Q.   Did you ever ask why she was
19 moved from CCR to BC1?
20      A.   I did.
21      Q.   Who did you ask?
22      A.   I believe I asked Tom Bondy.
23      Q.   Anyone else?

173

1      A.   I don't think I asked anybody
2  else.
3      Q.   What did Mr. Bondy tell you?
4      A.   Basically that Amber had been
5  training in CCR and that Tammy had
6  requested to move to the floor, and
7  that was about the end of our
8  conversation.
9      Q.   Was that the only conversation
10 you had?
11          MR. BOSTICK:  With Bondy about
12 this position?
13      Q.   Anyone?
14      A.   No.
15      Q.   Who else?
16      A.   I also mentioned it to Audie
17 Swegman, just to let him know that --
18 that the move had taken place.  I
19 wanted him to be aware of it.
20      Q.   Prior to the move taking
21 place, did you know about it?
22      A.   No.  But I knew there was
23 something because there was some

174

1  training going on.
2      Q.   My question is:  Prior to the
3  move, prior to Ms. Edwards being moved
4  to the BC1, had anyone told you they
5  were going to move her there?
6      A.   Not specifically.
7      Q.   Generally?
8      A.   Well, we all make -- we all
9  make assumptions as to what's going on.
10 And I had a bird's-eye view to that
11 room, and there were two people in
12 there where there's usually one, and
13 Amber was in there with Tammy.
14      Q.   Do you think I asked you what
15 your assumption was, is that the
16 question you think I asked?
17      A.   Well, I thought -- I thought
18 that answer was what you were -- what
19 you needed.  I thought that answer was
20 sufficient.
21      Q.   No, ma'am, that's not my
22 question.
23      A.   Okay.  Please reask the

175

1  question.
2           MS. HAYNES:  Sure.  Can you
3  read that question back for me?
4           THE COURT REPORTER:  Question:
5  "My question is:  Prior to the move,
6  prior to Ms. Edwards being moved to the
7  BC1, had anyone told you they were
8  going to move her there?"  Answer:
9  "Not specifically."  Question:
10 "Generally?"
11      A.   And I thought "generally"
12 meant, you know, what I might have
13 gathered from the situation, that's why
14 I answered that way.
15      Q.   (BY MS. HAYNES) I'm asking
16 generally had anyone discussed --
17      A.   No one had generally told me
18 that she was going to be moved,
19 generally, no one had told me that she
20 would be moved.
21      Q.   Generally, had it been
22 discussed that they were going to move
23 Tammy Edwards, after she complained --

176

1    A.    Not with me.

2    Q.    -- about Mike Swindle, to BC1?

3    A.    Not with me.

4    Q.    You're sure about that?

5    A.    Yes.

6         (Plaintiff's Exhibit 18 was

7          marked for identification.

8          A copy is attached.)

9    Q.    (BY MS. HAYNES) Plaintiff's

10   18, can you tell me what 18 is?

11   A.    It is a weekly report that we

12   provide.

13   Q.    And this is the weekly report

14   for August 7th through 11th?

15   A.    That's correct.

16   Q.    So Monday would have been the

17   7th; is that right?

18   A.    Right, and Tuesday would have

19   been the 8th.

20   Q.    Now, on the 7th, you were

21   still e-mailing Mr. Clevenger the

22   findings of your investigation; is that

23   correct?

177

1    A.    Yes, that's correct.

2    Q.    And the day after, is this you

3    telling Mr. Greg Kimble about the issue

4    on Tuesday?

5    A.    Yes.

6    Q.    And what were you telling

7    Mr. Kimble?

8    A.    Well, actually, let me -- let

9    me go back, please.  These notes were

10   sent directly to team relations.

11   They -- we had to address them to Mr.

12   Kimble, but they were sent directly to

13   our team relations folks.

14   Q.    One of which is your

15   supervisor?

16   A.    That's correct.

17   Q.    And that's Clevenger?

18   A.    Correct.

19   Q.    And then --

20   A.    Or that could have been Flate

21   or Morris, any of those three at that

22   time.

23   Q.    Who is Kim, Y. K. Kim?

178

1    A.    Y. K. Kim, I believe he was

2    working with team relations at that

3    time, but I don't remember what his

4    function was.

5    Q.    Okay.

6    A.    S. D. Park, he was definitely

7    working with team relations.  He had

8    come over from Korea to -- to work

9    specifically with that group.

10   Q.    Who is Kimble?

11   A.    Kimble is the director of HR.

12   Q.    Head man?

13   A.    Yes.

14   Q.    Okay.  And is this part of

15   your job duties that every week you

16   give him an update of what was going

17   on?

18   A.    I wouldn't technically give it

19   to him, but yes, it was part of my job

20   to send it to these folks right here in

21   team relations, and then they reported

22   directly to Kimble on that.

23   Q.    Who is the memo to?

179

1    A.    It's to Kimble, but that's how

2    we had to address it.

3    Q.    But you don't think he got it?

4    A.    Oh, yeah, I think he got it,

5    but probably not in this format,

6    because they reported to him separately

7    from this.

8    Q.    Who did?

9    A.    Rob, Shawn, Kisha, Audie,

10   S. D.

11   Q.    All right.  Tuesday, tell me

12   about the issue that you're -- and why

13   did you do it, issue and action, are

14   you supposed to do it in that format?

15   A.    Yes.  It was a format that we

16   used, and just so that I could kind of

17   show a follow-up is why I thought it

18   was a good thing.

19   Q.    Okay.

20   A.    And what did you want to know?

21   Q.    On Tuesday --

22   A.    Okay.

23   Q.    -- is that something that is

180

1  reported to you when you create it as
2  an issue?
3      A.  **Sometimes -- okay, that's a**
4  **good question. Sometimes the issues**
5  **will be from way back or whenever, and**
6  **I would take the issues from that time**
7  **period and transpose them onto the**
8  **report if I was still doing follow-up**
9  **on them in latter weeks. So this just**
10 **refers back to, you know, the initial**
11 **complaint, which was July 31st, which**
12 **would have been in another week, but I**
13 **think on this same one, I added that**
14 **the team member was reporting that**
15 **Steve wouldn't approve vacation or**
16 **personal time for her.**
17     Q.  Who was that team member?
18     A.  **So that was the new issue.**
19 **Tammy. I didn't put her name in here**
20 **because I tried to keep -- well, I**
21 **tried to keep names out of it, specific**
22 **names. Like on Monday, it says, "A**
23 **welding team member had made an EEO**

181

1  **complaint," but I didn't put her name**
2  **there.**
3      Q.  Is that --
4      A.  **That's pretty typical.**
5      Q.  Is that Ms. Edwards, though,
6  in Monday?
7      A.  **Yes.**
8      Q.  Where it says "Action" and
9  it's been obliterated, did you do that?
10     A.  **No.**
11     MR. BOSTICK: Those redactions
12 reference conversations with the legal
13 department, that and on the second
14 page.
15     MS. HAYNES: Well, you didn't
16 put that in your privilege log.
17     MR. BOSTICK: It's identified
18 on the privilege log. It's a produced
19 document, and clearly there are
20 redactions there.
21     MS. HAYNES: Well, document
22 195 and 196, you put "Team Relations
23 Memo," and you didn't put why it was

182

1  redacted as any kind of memo to legal,
2  and I think we've established there is
3  no one on here who is legal.
4      MR. BOSTICK: No. What I'm
5  saying, this was referencing our
6  redactions of conversations with legal.
7      MS. HAYNES: So you're telling
8  me you're not going to produce that
9  unredacted memo to me?
10     MR. BOSTICK: I'm certain the
11 privilege is referring to the content
12 of privileged conversations.
13     Q.  (BY MS. HAYNES) Is that what
14 you recall in your memo, that you were
15 referring to any kind of conversation
16 you had with legal?
17     A.  **Well, seeing as it was the**
18 **next week, like I said, I just -- I**
19 **took this, I transposed it from the**
20 **prior report to give an update, and**
21 **probably at this period of time that is**
22 **what I was doing.**
23     Q.  Well, do you remember me

183

1  asking you the question earlier about
2  who you were communicating with?
3      A.  **Yes.**
4      Q.  And you told me only Mr.
5  Clevenger?
6      A.  **At the time, at the time that**
7  **I was typing the report.**
8      Q.  Okay. And that was on the
9  7th, was it not?
10     A.  **Right.**
11     Q.  Okay. Monday, we've
12 established was the 7th?
13     A.  **That's correct.**
14     Q.  Okay. Do you need to change
15 your testimony?
16     A.  **I would not have been directly**
17 **speaking with legal, and I don't know**
18 **what this report says (indicating), I**
19 **don't. If somebody has got a copy of**
20 **it, that's fine but --**
21     Q.  Well, you're pointing to your
22 report, you don't know what your report
23 said?

184

1  A.  Well, not back from August
2  11th of 2006, I don't remember what
3  this specific action would be.  We did
4  these every week, and I always had a
5  very detailed report, so I wouldn't
6  remember exactly what was there.
7      Q.  But you weren't having
8  communications with legal?
9      A.  No.
10     Q.  And you were only giving your
11  reports straight to Mr. Clevenger?
12     A.  To Rob.
13     Q.  And nobody -- I think we
14  established and nobody was telling you what
15  to do with regards to your
16  investigation?
17     A.  That's correct.
18     Q.  Okay.  Are you telling me now
19  that on Monday there may have been some
20  action that involved legal, which would
21  have been the 7th of August?
22     A.  I don't know that, because
23  I -- I cannot recall what was in this

185

1  statement.
2      Q.  Well, what's your recollection
3  of who was directing you and your
4  activities and the investigation of
5  Tammy Edwards?
6      A.  It would have been any of the
7  assistant managers or any of the
8  managers in team relations.
9      Q.  No one in legal?
10     A.  No.
11     Q.  And you weren't having
12  conversations with legal?
13     A.  No.
14     Q.  Okay.  Was Mr. Clevenger
15  telling you anything that -- like, I've
16  been talking to legal and you need to
17  do such and such?
18     A.  I don't know that.  I'm just
19  trying to think what would have been
20  there.
21     Q.  So it's possible Mr.
22  Clevenger --
23     A.  It could have been an update

186

1  from Clevenger to me, it could have
2  been.
3      Q.  Saying that legal wanted you
4  to do the investigation a certain way?
5      A.  No, it would not have been
6  that.
7      Q.  Okay.  Also on Monday you've
8  got an issue about two supplier
9  employee females made a formal written
10  complaint of harassment against an HMMA
11  team member?
12     A.  Right.
13     Q.  And it says you were
14  interviewed as a witness.  What
15  knowledge did you have as a witness?
16     A.  I believe that I had conversed
17  with the supplier, and the supplier in
18  her written statement -- which is
19  something we had to have from them,
20  suppliers were handled differently -- I
21  believe in her statement she had said
22  something about she had seen me on the
23  floor, this is the supplier, she had

187

1  seen me on the floor, she knew I was
2  employee relations or team relations.
3  And so Gaby and Marty were trying to
4  figure out, you know, they were
5  investigating, like they would anybody
6  else, was there anything that I knew
7  directly, had I seen anything
8  firsthand.
9      Q.  All right.  And then you have
10  a bullet item here about "Legal is
11  currently reviewing this complaint"?
12     A.  Uh-huh.
13     Q.  Is that correct?
14     A.  Yes.
15     Q.  Okay.  Was this while you were
16  in -- trying to do an investigation?
17     A.  I was not doing an
18  investigation, Gaby and Marty were
19  doing the investigation.  But this type
20  of investigation right here is
21  completely different in that it was a
22  supplier, so there was a -- there was a
23  separate protocol for suppliers.

188

1    Q.    So legal would be involved in
2    that but not involved in Tammy Edwards?
3        A.    **Legal would be involved in**
4    **that.**
5        Q.    You're talking about the
6    supplier?
7        A.    Yes, the supplier.
8        Q.    Legal would not be involved in
9    Tammy Edwards' complaint?
10            MR. BOSTICK:  Object to the
11    form.
12        A.    **In the very end, yes.  But**
13    **legal was not involved in telling me**
14    **how to do the investigation or what to**
15    **say or how to act or anything like**
16    **that.  They weren't giving direction.**
17    **In the very final stages of -- before**
18    **we issued corrective action, legal**
19    **would have been involved but not at**
20    **this point, not with me directly.**
21        Q.    All right.  Going on to
22    Tuesday, the 8th, you write here that?
23    "The Welding TM" -- and you're

189

1    referring to Ms. Edwards, "who made an
2    EEO complaint last week, feels as if
3    [team members] and possibly management
4    are treating her differently."  What
5    did Ms. Edwards tell you?
6        A.    **That she felt like people were**
7    **treating her differently since she made**
8    **the allegation.**
9        Q.    And she told you this on the
10    Tuesday?
11        A.    **Tuesday, the 8th, yes.**
12        Q.    Okay.  And further, she said
13    or you write, "This [team member],"
14    meaning Ms. Edwards, "reported that the
15    GL," that's group leader?
16        A.    **That's correct.**
17        Q.    "Steve Culpepper would not
18    approve vacation/personal time for her
19    now where he would in the past."  Is
20    that what she told you?
21        A.    **Yes.**
22        Q.    And she told you also that on
23    Tuesday?

190

1        A.    **Yes.**
2        Q.    All right.  And then it has a
3    bullet item here, "Action."  Is this
4    what you did?
5        A.    **That's correct.**
6        Q.    And did you go immediately to
7    talk to Mr. Culpepper and Mr. Bondy?
8        A.    **I believe I did.**
9        Q.    Okay.  "I spoke with welding
10    manager Tom Bondy and GL," group
11    leader, "Steve Culpepper regarding
12    these allegations."  Now, did you start
13    a new investigation?
14        A.    **No.  I was following it up --**
15    **I was following up on her complaint, so**
16    **to speak.  So I went over just to ask**
17    **them about these specific things, well,**
18    **mainly about the vacation and personal**
19    **time.**
20        Q.    Well, did you recognize that
21    when she, meaning Ms. Edwards, came to
22    you, she was complaining?
23        A.    **Well, yes.**

191

1        Q.    And she's complaining of
2    retaliation?
3        A.    **It was --**
4            MR. BOSTICK:  Object to the
5    form.
6        A.    **It was what she perceived as a**
7    **retaliation.**
8        Q.    That's what counts, isn't it?
9            MR. BOSTICK:  Object to the
10    form.
11        Q.    Is it not?
12        A.    **Perception?**
13        Q.    It's what counts?
14        A.    **Yes.**
15        Q.    Okay.  And you understood she
16    was perceiving that she was being
17    retaliated against?
18        A.    **Yes.**
19        Q.    Okay.  Because she tells you
20    in the past that I didn't have a
21    problem getting my vacation and
22    personal time approved, now I do, and
23    I'm being treated differently by team

192

1    members and management, correct?

2        A.    That's what she says right

3    here, yes.

4        Q.    All right. Did you open a new

5    file and start an investigation?

6        A.    I did not.

7        Q.    Okay. Did you call Mr.

8    Culpepper -- or I mean Clevenger, Mr.

9    Clevenger here and tell him we've got a

10    problem?

11        A.    I did report to them that was

12    the feeling, that she was perceiving

13    that she was being retaliated against.

14        Q.    When you said "them," who is

15    them?

16        A.    Anybody in team relations, any

17    of the management in team relations,

18    which we've established it could be

19    anybody, any of the three AMs or Audie.

20        Q.    Did anyone tell you to

21    go talk to Mr. Bondy and Mr. Culpepper?

22        A.    No, I did that on my own.

23    After he told me, I wanted to know what

                    193

1    was going on, and that's why I broached

2    Tom and Steve.

3        Q.    I thought before when you

4    talked to Mr. Bondy, you had to have

5    someone, your manager there because of

6    the level he was on?

7        A.    Right. But that was -- he was

8    being questioned, he was being

9    questioned in relation to that. Now,

10    any -- like on just a typical day, he

11    was up in the office, he was like two

12    rows over from me, and he and I could

13    converse, you know, just openly. But

14    since he was being questioned in a

15    case, Rob had to be available to do

16    that.

17        Q.    Okay. And then what did they

18    tell you?

19        A.    Tom said -- just reading

20    directly from here, "Tom confirmed that

21    he intended to move this [team member]

22    from CCR to BC1. I advised him not to

23    do this due to legal ramifications and

                    194

1    perceived retaliation. Steve confirmed

2    that no request for vacation or

3    personal days had been submitted."

4        Q.    Okay. So this is different

5    than what you testified to, is it not,

6    that you had no previous knowledge?

7        A.    I did not have previous

8    knowledge.

9        Q.    Okay. She had not been moved

10    yet, had she?

11        A.    I don't remember what date she

12    was moved.

13        Q.    Okay.

14        A.    But I didn't have previous

15    knowledge. This would have been --

16    this would have been it. Now, there

17    was a -- there was a note from her, an

18    e-mail note, which I'm sure you have,

19    and I don't remember what it's dated.

20    I'd like to compare it to this.

21            (Plaintiff's Exhibit 19 was

22            marked for identification.

23            A copy is attached.)

                    195

1        Q.    (BY MS. HAYNES) Plaintiff's

2    Exhibit 19, there's two pages there.

3        A.    Yeah. On the 10th she sent me

4    on e-mail stating she was in her new

5    job. So Tuesday, the 8th of August

6    would have been the first time that I

7    had been made aware that there was an

8    intention to move anybody.

9        Q.    Okay. And my question is:

10    That's different than what you

11    testified to?

12        A.    No. Because what you asked me

13    before was did I have any knowledge of

14    it before this point, and the answer is

15    still no, this is when I was made aware

16    of it.

17        Q.    Okay. On the 8th?

18        A.    On the 8th.

19        Q.    Okay.

20        A.    This was the first mention of

21    it to me.

22        Q.    And that's Mr. Bondy telling

23    you he's getting ready to move her?

                    196

1    A.    Right.
2    Q.    And it's after you tell him
3    she's complaining about retaliation?
4    A.    I did tell -- well, I did tell
5    him that there was a complaint.  I
6    don't know if I specifically called it
7    retaliation.  But that's what he told
8    me afterwards, that there was that
9    intention.
10    Q.    Told you afterwards what,
11    afterwards from --
12    A.    He told me after I spoke with
13    him and Steve.  My action was I spoke
14    with them, and then Tom confirmed that
15    he intended to move.
16    Q.    Okay.
17    A.    So it happened just like this
18    is written right here.
19    Q.    What did he tell you, how did
20    he say it?
21    A.    That he had the intentions to
22    move Tammy from CCR to BC1.
23    Q.    Okay.  And then you say what?

197

1    A.    I told him that there could be
2    problems with that, legal
3    ramifications, perceived retaliation.
4    Q.    Why did you tell him that?
5    A.    Because that's what I needed
6    to tell a manager when they did
7    something like that.
8    Q.    What did he say?
9    A.    I can't remember exactly what
10    he said.  I'm not sure he said anything
11    to that.
12    Q.    But at any rate, you advised
13    him he did not need to make that move?
14    A.    Correct.
15    Q.    Okay.  And he did it anyway?
16    A.    He did it, but it was after a
17    conversation between me and Audie had
18    taken place.  I made sure Audie knew
19    what was going on, and then I believe
20    Audie or somebody higher talked to Tom,
21    and Tom told them -- and this was
22    finally settled through that -- that
23    Tammy had requested to move to the

198

1    floor, that she had been training
2    Amber.  So it was actually in the works
3    before this happened.
4    Q.    And who told you that?
5    A.    I want to say it was Audie,
6    because he was the one I -- he was the
7    one I took it to.  I want to say he
8    followed up with me directly on that.
9    Q.    And so before when I asked you
10    about Ms. Edwards asking in the
11    beginning if she could just transfer to
12    another position, you told me that was
13    later that she asked you that?
14    A.    It was not in the initial --
15    it was not initially when she made the
16    complaint.  It was not -- when she came
17    to my desk that afternoon to make the
18    complaint, she didn't immediately want
19    to transfer.  But she asked me later,
20    just kind of as a -- well, kind of as a
21    side note, you know, is it possible for
22    me to transfer?
23    Q.    Did she tell you where she

199

1    wanted to transfer to?
2    A.    The floor, but I don't think
3    she said anything specific about where.
4    Q.    Did she tell you why she
5    wanted to transfer?
6    A.    I'm sure she did, but I don't
7    remember exactly what she said.
8    Q.    In your conversation with
9    Bondy and Culpepper, when they're
10    saying this about they're going to move
11    her from CCR to BC1 and you advised you
12    better not do that, did anyone tell you
13    in that conversation, well, she really
14    wants to move, she's asked for this?
15    A.    I don't know that it was in
16    that conversation, I can't remember.
17    Q.    Okay.  And if they had told
18    you that, you would have written it
19    down, would you not?
20        MR. BOSTICK:  Object to the
21    form.
22    A.    Once they told me, I went
23    straight to Audie with it, so I don't

200

1 remember that being discussed.

2    Q.   Well, when you advised you

3 best not do that, that can be perceived

4 wrong, no one told you, oh, no, it's

5 fine, she really wants to do this?

6    A.   I'm trying to remember the

7 conversation.  I don't think there's

8 anything in there.  At that particular

9 time, I can't recall there being that

10 conversation.

11    Q.   All right.  And when

12 Plaintiff's 19 -- when Ms. Edwards sent

13 you this e-mail about her new job and

14 being in the new position, you didn't

15 e-mail her back and say, well, they

16 told me you wanted to be in this

17 position, that you wanted to move?

18        MR. BOSTICK:  Object to the

19 form.

20        THE WITNESS:  Can you read the

21 question again?

22        (Whereupon, the last question

23        was read back by the court

201

1 she sent this e-mail?

2    A.   Let's see.  Well, it says,

3 "You stated this morning that you did

4 not know they had put me on BC1."  It

5 does sound like we had a conversation

6 that morning of August 10th.  I'm

7 sorry, did I answer?

8    Q.   Yeah.  Do you have a

9 recollection of seeing her on the BC1

10 line?

11    A.   I did at some point see her on

12 the BC line, and it was two or three

13 times, maybe two, but I don't remember

14 exactly where that fell.

15    Q.   What was that conversation

16 when you saw her?

17    A.   I think we talked about her

18 neck and her back and what her

19 responsibilities had become on BC1, and

20 maybe I said that I did not know at

21 that time that they had put her on BC1.

22 But usually we would just talk

23 casually, we talked a lot about her

203

1        reporter.)

2    A.   No, I didn't e-mail her back.

3    Q.   (BY MS. HAYNES)  Okay.  And did

4 you know that at the time that she

5 e-mails you that I'm now on BC1, and

6 they told me it was so I would feel

7 more comfortable until things were

8 over?

9    A.   I knew it be --

10        MR. BOSTICK:  Object to the

11 form.

12    A.   I knew it because of her

13 e-mail.

14    Q.   You knew she was in the

15 position because of her e-mail?

16    A.   Well, because she said --

17 well, she says "My New Job" in the

18 subject, and then she mentions BC1 in

19 the body of the e-mail.

20    Q.   And is that how you found out

21 she was on BC1?

22    A.   Yes.

23    Q.   You didn't see her the morning

202

1 medical condition and stuff like that.

2    Q.   Did the two of you discuss

3 that Ms. Edwards was told she was going

4 to be moved to BC1 because it would

5 make her feel more comfortable while

6 the investigation was ongoing?

7    A.   I don't remember us conversing

8 about that.  She would have been in

9 close proximity to the other team

10 members.  I don't remember us getting

11 into a lot of detail about the

12 investigation, but he or she tells me

13 in the e-mail that management, I guess

14 when she says "they," I guess she's

15 meaning management, told her that they

16 wanted her to feel more comfortable

17 until things were over.  But I don't

18 think we discussed it on the line

19 because there were so many people

20 around.

21    Q.   Well, did you question, as a

22 human resource manager, how Ms. Edwards

23 would feel more comfortable being out

204

1 on a line instead of working as a CCR
2 in an office?
3          MR. BOSTICK: Object to the
4 form.
5     A.    Did I question it? Team
6 members had a preference for one or the
7 other. I mean, the floor was not
8 considered to be a bad place.
9 I'm sorry, am I not answering your
10 question?
11     Q.    Did you really think I asked
12 you that question?
13     A.    Well, ask it again, or repeat
14 the question.
15     Q.    Did you question --
16     A.    Did I question --
17     Q.    -- as a human resource
18 professional --
19     A.    Uh-huh.
20     Q.    -- that that was going to make
21 her feel more comfortable, being out on
22 the assembly line, manufacturing line
23 rather than in an office with a

205

1 line job, so I'm asking the human
2 resource professional --
3          MR. BOSTICK: And I've made my
4 objection.
5          MS. HAYNES: -- who you've
6 also designated as part of your
7 30(b)(6).
8     Q.    (BY MS. HAYNES) Does it make a
9 nice jury question, Ms. Jones? You
10 don't need to look at your lawyer, I'm
11 asking the question.
12     A.    Oh, I just need to make sure
13 it's okay for me to answer the
14 question.
15          MR. BOSTICK: If you can
16 answer.
17     Q.    Does it make a nice jury
18 question, what is the preferential job
19 here, the CCR clipboard job in an
20 office sitting on your behind all day
21 or slinging a hammer on an assembly
22 line?
23          MR. BOSTICK: Object. The

207

1 clipboard?
2          MR. BOSTICK: Object to the
3 form.
4     A.    Did I question it?
5          MR. BOSTICK: Apparently we
6 know which one Alicia would rather
7 have, but you can answer.
8     A.    I don't remember if I mentally
9 questioned it at that time or not.
10     Q.    Well, would you agree with me
11 it makes a nice jury question, what
12 would be the preferential job, a
13 clipboard job or slinging a hammer on
14 an assembly line?
15          MR. BOSTICK: Object to the
16 form, calls for a legal conclusion.
17          MS. HAYNES: No, I think it's
18 a fact question.
19          MR. BOSTICK: Whether it's a
20 jury question?
21          MS. HAYNES: You just made the
22 assumption that you would know what I
23 would pick, a clipboard job or assembly

206

1 question assumes facts not in evidence.
2     Q.    What job do you want to do?
3     A.    Well, the -- the CCR job and
4 the BC1 job were different, there's no
5 doubt about that.
6     Q.    That's not my question. My
7 question is --
8     A.    I'm getting -- I'm getting to
9 your question.
10          MR. BOSTICK: Let her answer
11 the question.
12     Q.    My question is: Which one
13 would you prefer, Ms. Jones?
14     A.    Personally, I would prefer
15 being out on the floor.
16     Q.    Really? Why?
17     A.    Because I like to be up and
18 around and moving around. And Tammy
19 had told me that she liked to be
20 mobile. She was an energetic person.
21 So I mean, I prefer to be on the floor,
22 because that's where all the people
23 are.

208

1    Q.   Well, how about if you have a
2  neck and back problem that's being
3  aggravated by being on the floor?
4    A.   **I do have a neck and back**
5  **problem.**
6    Q.   So would you still want to be
7  on the floor?
8    A.   **Absolutely.**
9    Q.   Okay. Would you also like to
10  be without a job because your --
11    A.   **I have been without a job**
12  **before.**
13    Q.   And do you prefer that?
14    A.   **I don't, but you know, it was**
15  **something that I had to -- I had to go**
16  **through a period of time without one.**
17    Q.   Without a job?
18    A.   **Yes, ma'am.**
19    Q.   Do you prefer that?
20    A.   **It wasn't the best of**
21  **circumstances.**
22        MR. BOSTICK:  Object to the
23  form.

209

1    A.   **But it wasn't the worst**
2  **circumstance I had ever in my life**
3  **either.**
4    Q.   Do you like having a paycheck?
5    A.   **I do.**
6    Q.   Do you like having insurance?
7    A.   **I do.**
8    Q.   Do you like being able to
9  provide for your family?
10    A.   **I do. I don't have a -- I**
11  **don't have children or a husband, but**
12  **yeah, if I had a family, I'd like to be**
13  **able to provide for them.**
14    Q.   Well, do you like to be able
15  to take care of yourself?
16    A.   **Sure.**
17    Q.   Being able to do what you want
18  to do when you want to do it with the
19  money that you make?
20    A.   **And life is not always like**
21  **that.**
22    Q.   Do you prefer that?
23    A.   **I prefer it, but it doesn't**

210

1  have to be that way.
2    Q.   Are you independently wealthy?
3    A.   **I'm not.**
4    Q.   If you needed a paycheck to
5  live, is it a preference of yours that
6  you would be -- rather have that
7  paycheck and be able to hold a job than
8  to not?
9    A.   **It depends on what kind of job**
10  **it is.**
11    Q.   Do you think it should be your
12  choice?
13        MR. BOSTICK:  Object to the
14  form.
15    A.   **Do I think it should be my**
16  **choice about what kind of job I have?**
17    Q.   Whether you have a paycheck or
18  not have a paycheck?
19    A.   **It -- it should be my choice**
20  **but --**
21    Q.   When she writes in her e-mail
22  to you, Plaintiff's 19, "I don't
23  believe that and neither would anyone

211

1  else if they were in my shoes," what do
2  you think she meant by that?
3        MR. BOSTICK:  Object to the
4  form.
5    A.   **Well, it -- I can't say**
6  **specifically what Tammy meant because I**
7  **can't read anybody's mind, but it**
8  **follows the statement, "Well, they told**
9  **me" -- "They told me it was so that I**
10  **would feel more comfortable until**
11  **things are over." So I would guess**
12  **that her next statement would mean she**
13  **didn't believe that, and that she**
14  **didn't believe anyone else would**
15  **believe it.**
16    Q.   Do you think she's complaining
17  of retaliation in this e-mail?
18    A.   **She could be.**
19    Q.   Well, what's your
20  understanding as a human resource
21  professional?
22    A.   **It -- it could be a complaint,**
23  **yes.**

212

1      Q.    On the 10th, in your report to
2   Mr. Kimble, director of human
3   resources, did you write about Ms.
4   Edwards sending you an e-mail?
5      A.    I did.
6      Q.    And you wrote that it
7   indirectly alluded to retaliation?
8      A.    Yes.
9      Q.    Is that your understanding?
10     A.    Yes.
11     Q.    Okay.  What action, if any,
12  did you take after you got this e-mail?
13     A.    That was right around the same
14  time I was talking to Audie about her
15  being moved.
16     Q.    Did you talk to anyone in
17  legal about it?
18     A.    No.
19         MR. BOSTICK:  Don't testify to
20  any -- you can answer if you did talk
21  to legal, but don't testify to any
22  communications from legal department
23  that were conveyed to you.

213

1         THE WITNESS:  Okay.
2         MS. HAYNES:  That was my
3   question, did she talk to anyone about
4   it.
5         MR. BOSTICK:  The question is
6   fine.
7         MS. HAYNES:  Did you have an
8   objection?
9         MR. BOSTICK:  Huh?
10        MS. HAYNES:  Did you have an
11  objection?
12        MR. BOSTICK:  No, I'm just
13  clarifying for the record.
14     Q.    (BY MS. HAYNES) You only
15  talked to Mr. Swegman?
16     A.    Audie.
17     Q.    That's the only person you
18  talked to?
19     A.    That's correct.
20     Q.    Do you know what you wrote
21  here on Thursday about your action?
22     A.    If I had to say, probably
23  something that Audie had told me in

214

1   relation with legal, but I don't know
2   what.
3      Q.    Do you have any recollection
4   as you sit here today that Mr. Swegman
5   said anything about legal?
6      A.    Oh, yeah.
7      Q.    All right.  But part of this
8   action would have dealt with you making
9   a telephone call to Mr. Swegman?
10     A.    The action wouldn't
11  necessarily be all of what I did.  The
12  action could be, okay, this is what is
13  being done in another avenue outside of
14  me.  The action was designed to make
15  sure that there was follow-up to every
16  issue.  So it may not have been direct
17  follow-up through me; it may have been
18  what I was hearing in conjunction with
19  what Audie was telling me.
20     Q.    Do you have a recollection of
21  what Mr. Swegman was telling you?
22     A.    On this date, I'm not sure it
23  was this date.  I do remember that he

215

1   came back to me, I don't know
2   specifically who I had discussed it
3   with, but he came back to me and said
4   that this was a move that was planned
5   prior to the allegation and that there
6   actually was already a person in
7   training for it, but I can't remember
8   if it was on this specific day.  I
9   can't remember if that's what the
10  verbiage is right here.
11     Q.    Well, if that was true, do you
12  know why she was not told that instead
13  of that it will make you feel more
14  comfortable while the investigation is
15  ongoing?
16        MR. BOSTICK:  Object to the
17  form.
18     A.    I don't know why she would
19  have been told that.
20     Q.    Did you question that?
21     A.    No.
22     Q.    Did you investigate?
23     A.    Investigate why she had been

216

1  moved?

2      Q.   Her complaint to you that she

3  was being retaliated?

4          MR. BOSTICK:  Object to the

5  form.

6      A.   My -- my involvement with it

7  was to take it directly to my manager.

8      Q.   And after you did that, did

9  you take any further action?

10     A.   I'm sure later on in the

11  investigative process there were other

12  things, but when he reported back to me

13  that it was a move that was made due to

14  what I just said, she was somebody

15  else training, she had requested to

16  move, things of that nature, after

17  that, no, I wouldn't have investigated

18  any further.  I wouldn't have looked

19  into it any further because that was my

20  manager telling me what had been done.

21     Q.   Why did you not convey that

22  back to Ms. Edwards?

23     A.   Let's see.  I'm trying to

217

1  think to -- when we conversed.  I know

2  she -- I want to say -- I want to say

3  she went on leave sometime around then

4  too.  That may have been why, I don't

5  know.  I can't remember exactly when

6  she went on leave.

7      Q.   Prior to her going out on

8  leave or even after she went out on

9  leave, did you ever convey or respond

10  to her e-mail, Plaintiff's Exhibit 19?

11     A.   No, I don't think so.

12     Q.   Okay.

13     A.   Now, she did say to let me

14  know when you can get another book.  I

15  think we talked back about the book,

16  but I don't know when that was.  I

17  believe I got her another book, so we

18  would have had another interaction

19  there.  I can't remember the context of

20  it.

21     Q.   How far was her office with

22  the CCR position from Mike Swindle?

23     A.   For the CCR, Mike would have

218

1  been downstairs, and she would have

2  been upstairs.

3      Q.   How far was she from Mr.

4  Swindle when she was on the BC1 line?

5      A.   Mike would have covered the

6  area right prior to the BC line, so he

7  could have been anywhere on that line.

8  She would have been in closer proximity

9  to him.

10     Q.   Did that concern you as a

11  human resource professional --

12         MR. BOSTICK:  Object to the

13  form.

14     Q.   -- that you've got a sexual-

15  harassment victim who is now being

16  placed in the direct proximity to her

17  harasser?

18         MR. BOSTICK:  Object to the

19  form.

20     A.   Well, one of the reasons that

21  we moved or I moved to mention all of

22  this to Audie was, you know, we wanted

23  to make sure that there wasn't -- there

219

1  wasn't a problem with that.  That's

2  what he -- or I don't know what

3  happened behind all the -- I don't know

4  what happened when Audie talked to me,

5  I don't know what he did next, but when

6  he came back and talked to me, you

7  know, that pretty -- that pretty much

8  closed off that -- that issue, that it

9  had been done correctly and that he

10  assessed that it had been done fairly.

11         MS. HAYNES:  Can you read my

12  question back?

13         (Whereupon, the last question

14          was read back by the court

15          reporter.)

16         MR. BOSTICK:  Can you read her

17  answer back, please?

18         (Whereupon, the last answer

19          was read back by the court

20          reporter.)

21     Q.   (BY MS. HAYNES) Did it concern

22  you that you were placing the victim

23  with the harasser?

220

1    MR. BOSTICK: Objection,
2  mischaracterizes facts in evidence.
3        THE WITNESS: Answer?
4        MR. BOSTICK: Yes.
5    A.    At that time, let's see, my
6  report had been given, and there
7  were -- there were things that were
8  corroborated and then there were things
9  that were not, so I couldn't fairly say
10  that Mike was a harasser. Not
11  everything had been corroborated, so it
12  would have been unfair for me to label
13  him that way.
14    Q.    What were your findings?
15    A.    Pardon?
16    Q.    What were your findings?
17    A.    I was just trying to find
18  those.
19    Q.    Plaintiff's 4, page 5.
20    A.    Oh, thank you. Plaintiff's 4
21  is right here. Okay. Let's start on
22  page 2.
23    Q.    Well, let me rephrase the

221

1  partial confirmation really means,
2  okay, there was a sense of something
3  that matched what somebody else said.
4  But in the end, it was unbecoming
5  behavior, so that's what the serious
6  misconduct letter was what was the
7  issue and a two-week suspension without
8  pay.
9    Q.    But you made the
10  recommendation, did you not, ma'am,
11  that he would be given a serious
12  misconduct letter and be removed from
13  his team leader status?
14    A.    Right, that was my
15  recommendation.
16    Q.    And you recommended that to
17  whom?
18    A.    That was to my group of folks
19  in team relations. But team relations
20  specialists were not managers, so it
21  wasn't anything that -- this
22  recommendation was not anything that
23  they had to take into consideration.

223

1  question. What was your
2  recommendation?
3    A.    I'm reading from the page,
4  "that Mike Swindle be given a serious
5  misconduct letter and be removed from
6  his [team leader] status."
7    Q.    Did that happen?
8    A.    He was given a serious
9  misconduct letter. He was not removed
10  from team leader status.
11    Q.    Why not?
12    A.    Because the evidence that we
13  found during the course and scope of
14  the investigation did not firmly prove
15  that he had done these things. That's
16  why I was going to go back to page 2
17  and start with the first point. There
18  were some partial -- well, it might be
19  summed up, though, here, let me look.
20        We have one confirmed
21  allegation, which was the foul mouth,
22  and then we had six incidences of
23  partial confirmation, which is --

222

1    Q.    Okay. Why did you recommend
2  that he be removed from his team leader
3  status?
4    A.    Because he had confirmed and
5  there was some partial confirmation
6  that he had displayed some behavior
7  unbecoming to a team member.
8    Q.    So he didn't need to be a team
9  leader?
10        MR. BOSTICK: Object to the
11  form.
12    A.    That was my recommendation.
13    Q.    Okay. Did you partner with
14  anyone to make that recommendation?
15    A.    No.
16    Q.    Who overrode you?
17        MR. BOSTICK: Object to the
18  form.
19    A.    Nobody overrode. It's just
20  that those types of decisions were made
21  in -- in with other people. Team
22  relations specialists were not
23  responsible for deeming what was proper

224

1 as far as corrective action. We were
2 only responsible for saying what we
3 thought or what -- what we might have
4 thought, but decisions were made
5 outside of us.
6     Q.   In the situation with the two
7 suppliers and the team member who was
8 harassing those two suppliers --
9     A.   Uh-huh.
10    Q.   -- what happened in that
11 situation?
12    A.   To the best of my memory, I
13 think we found out that the supplier
14 had been flirting with our team members
15 and showing herself to our team
16 members, and she was -- she was taken
17 off of that assignment because -- well,
18 she was still with the supplier, but
19 she was no longer assigned to Hyundai.
20    Q.   Was it two women or one?
21    A.   I want to say it was two. I
22 want to say it was two.
23    Q.   Were both of them taken off
                    225

1 the assignment?
2     A.   I think one of them might have
3 stayed.
4         (Off-the-record discussion.)
5     Q.   (BY MS. HAYNES) On this
6 recommendation, you wrote, "Tammy
7 Edwards account of Mike Swindle's
8 alleged harassment has not wavered"?
9     A.   Uh-huh.
10    Q.   What did you mean by that?
11    A.   That she consistently said the
12 same things throughout the
13 investigation.
14    Q.   Each and every time you talked
15 to her?
16    A.   She was consistent.
17    Q.   Was Swindle consistent?
18    A.   Swindle was consistent.
19    Q.   You only talked to him once,
20 though, correct?
21    A.   Let's see. Let me make sure.
22 Yes, we only talked to him once.
23    Q.   And he was consistent in that
                    226

1 he denied everything, correct?
2         MR. BOSTICK:  Object to the
3 form.
4     A.   Well, let me -- let me
5 rephrase. Let me go back and rephrase
6 what I've said. I think it would be
7 better explained if I said this about
8 Mike. When we would tell him something
9 that Tammy had said, and he was
10 answering the question, he would -- he
11 would recognize some of it and he would
12 say -- or he wouldn't say, but I'm
13 paraphrasing, I remember that, but
14 that's not how it happened. So he
15 admitted to some of the situations but
16 then told us that they happened a
17 different way.
18        So maybe consistency was not
19 the best way to say it. Maybe just
20 that, you know, he did admit, just like
21 with the foul language, that it
22 existed. Or in a situation where he
23 said, yeah, the conversation about
                    227

1 the -- the freak and the lady, the
2 song, he knew what that was, but he had
3 a different way -- a different way of
4 expressing it. He told it differently.
5 So it was basically one word against
6 another.
7     Q.   But you did have some
8 statements from Amber Kelley --
9     A.   Uh-huh.
10    Q.   -- that disputed Mr. Swindle's
11 denials, correct?
12    A.   Well, and I think those are
13 the ones that you'll find on my -- on
14 my summary of my findings, those are
15 the ones you're going to find where I
16 say like --
17    Q.   They're partially confirmed?
18    A.   Right.
19    Q.   How is something partially
20 confirmed?
21    A.   Well, like I was -- like I was
22 saying while ago, you know, when I say
23 a partial confirmation, I mean that
                    228

1 there were bits of the story that
2 seemed to be relayed by another person
3 but they weren't the whole story, they
4 weren't the whole story as it played
5 out as Tammy described it. But there
6 might be a piece of something that
7 Amber said that sounded familiar from
8 what something Tammy had said, and
9 that's kind of how I drew that is
10 it's -- it's believable, there is some
11 believable stuff there. So that's why
12 I would put it's partially confirmed,
13 because I didn't have a solid
14 foundation for it, but I kind of had
15 a -- a hint of it in other
16 conversations.
17     Q.    So the fact that Amber Kelley
18 said it happened and Ms. Edwards said
19 it happened but Mr. Swindle said it did
20 not happen, that would make it a
21 partial confirmation?
22     A.    Not necessarily, because in
23 some of my findings too, I would go

229

1 back to where I had asked Billy
2 Kitchens and Toby Chance and Mike about
3 things of that nature. So it wasn't
4 just derived just because -- if Tammy
5 or Amber were involved in it. There
6 were -- there were lots of places where
7 I go back and I reference what Billy
8 said and I reference maybe what Toby
9 said. So it wasn't just based on that.
10         MS. HAYNES:  Okay. Let's take
11 a break.
12         MR. BOSTICK:  Thank you.
13         (Recess.)
14         (Whereupon, the last question
15         was read back by the court
16         reporter.)
17     Q.    (BY MS. HAYNES) As part of
18 your investigation, did you ever talk
19 to Jennifer Foster?
20     A.    No.
21     Q.    Her name was mentioned several
22 times. Is there a reason you did not?
23     A.    It was mentioned not

230

1 necessarily in relation to this claim.
2     Q.    Were you ever told how Ms.
3 Edwards came to talk to you about her
4 complaints?
5     A.    Came that first day?
6     Q.    Yes, ma'am.
7     A.    I want to say that she had
8 told me she had talked with somebody in
9 the shop, I think it was Michelle
10 Nelson, who was the administrative
11 assistant in welding, and Michelle had
12 asked her to come see me or had told
13 her that she should tell me. I want to
14 say that's what she told me.
15     Q.    Did you ask Michelle about
16 that?
17     A.    I didn't, but I had a chance
18 to sit down with Michelle later in the
19 investigation, because there were
20 rumors that she was talking and
21 spreading the information in the
22 investigation. So I sat down with her
23 on, let's see, it was on August the

231

1 2nd, and because she had been mentioned
2 as having talked about the
3 investigation, we told her we had
4 reason to believe that she had
5 information regarding the
6 investigation; and we asked her if she
7 had firsthand knowledge of anything
8 relating to it, and she said no.
9     Q.    Now, you're looking at
10 Plaintiff's Exhibit 3?
11     A.    I'm at page 8, Exhibit 3, yes.
12     Q.    Okay. Now, when you called
13 her in to talk, Ms. Nelson, how long
14 did that meeting last?
15     A.    When I called Michelle?
16     Q.    Yes, ma'am.
17     A.    Not long.
18     Q.    Okay. She said only one
19 thing, no?
20     A.    She said only one thing when
21 we asked her if she had any firsthand
22 knowledge of anything related to our
23 investigation.

232

1    Q.    And she said no?

2    A.    **She said no.**

3    Q.    You didn't ask her any

4    questions?

5    A.    **No. Because after she said**

6    **she didn't have any firsthand**

7    **knowledge, I didn't want to open up**

8    **the -- the other information in here.**

9    **They had already told us that she was**

10   **talking about it. I didn't want her to**

11   **have specific details of it.**

12   Q.    You didn't ask her how she

13   came to know --

14   A.    **No.**

15   Q.    -- that there was a complaint?

16   A.    **No.**

17   Q.    But Ms. Edwards had conveyed

18   to you that Michelle Nelson had asked

19   her to come talk to you, and did she --

20   A.    **(Nodding.)**

21   Q.    You're shaking your head

22   "yes"? Is that a "yes"?

23   A.    **Yes.**

233

1    Q.    Okay.

2    A.    **Tammy had mentioned to me that**

3    **she had talked to Michelle, and**

4    **Michelle had advised her to come talk**

5    **to me.**

6    Q.    Okay. And did Ms. Edwards

7    convey to you that Michelle Nelson had

8    seen her upset and crying?

9    A.    **I don't know that she told me**

10   **that, but she told me that she had**

11   **talked with them, which I believed**

12   **meant that she had probably shared some**

13   **of the information with them about --**

14   **about what was going on.**

15   Q.    Okay.

16   A.    **But it would have been Tammy**

17   **talking to Michelle about it, so I**

18   **didn't see any reason to ask her any**

19   **more questions than that.**

20   Q.    When you're talking to

21   Michelle Nelson, did you tell her what

22   investigation you were conducting?

23   A.    **No, it doesn't look like I**

234

1    **specifically mentioned it.**

2    Q.    You just go in and say, I'm

3    conducting an investigation, do you

4    have any firsthand knowledge?

5    A.    **Correct.**

6    Q.    Would you agree with me you

7    needed to give her a little more

8    information for her to answer that

9    question?

10   A.    **I believe she knew why she was**

11   **being brought in.**

12   Q.    Is that because you put the

13   fear of God in her first?

14   MR. BOSTICK: Object to the

15   form.

16   A.    **No.**

17   Q.    Okay. But you started off by

18   saying that this is confidential and

19   you don't need to be discussing it with

20   anyone?

21   A.    **Right.**

22   Q.    Did you tell her that you had

23   also heard that she was running her

235

1    mouth?

2    A.    **Well, I told her what you see**

3    **here, that we had reason to believe**

4    **that she has information regarding the**

5    **investigation, which basically meant we**

6    **had heard that she had knowledge of the**

7    **investigation. And then that's when I**

8    **instructed her that she shouldn't be**

9    **sharing confidential information**

10   **outside of an investigation, and then I**

11   **specifically asked her if she had any**

12   **firsthand knowledge.**

13   Q.    Okay. But you did tell her

14   while you're making your speech to

15   her --

16   MR. BOSTICK: Object to the

17   form.

18   Q.    -- that if she was sharing

19   confidential information outside the

20   investigation, it could lead to

21   corrective action, up to and including

22   termination; is that correct?

23   A.    **Yes. I said, "Impeding an**

236

1    investigation by sharing confidential
2    information outside the investigation
3    can lead to corrective action up to and
4    including termination."
5        Q.   After that, she said she
6    didn't have any information?
7        A.   **She had no firsthand knowledge**
8    **of the investigation.**
9        Q.   Now, when you talked to Mr.
10   Swindle, you didn't tell him that, did
11   you, that if he was sharing
12   information, he could be subject to
13   termination?
14       A.   **That's what I meant on page 12**
15   **of Exhibit 3, when I said after the**
16   **confidentiality admonishment -- it was**
17   **very typical procedure every time a**
18   **person came in for us to basically**
19   **start our conversation off like that,**
20   **the witnesses, you know, we're**
21   **investigating a complaint made in the**
22   **shop, we ask you that this be treated**
23   **as confidential and not discuss it**

                    237

1    **outside of this room; if you feel you**
2    **need to discuss it, you need to come**
3    **and discuss it with me only and no one**
4    **else. So that's -- that's what the**
5    **confidentially -- confidentiality**
6    **admonishment is.**
7        Q.   And you're telling me that
8    even though it's not written down,
9    that's what you told Mr. Swindle?
10       A.   **Yes.**
11       Q.   Why would you write Ms.
12   Nelson's down verbatim like that and
13   not Mr. Swindle's?
14       A.   **Well, because she was being**
15   **brought in on the rumor that she was**
16   **spreading information, so I wanted to**
17   **make sure that it was stated out like**
18   **that.**
19       Q.   So why not discipline her, why
20   didn't you do that?
21       A.   **I could not corroborate what**
22   **she was doing. I couldn't corroborate**
23   **that she was the one spreading the**

                    238

1    information.
2        Q.   Okay. Now, when you talked to
3    Mr. Swindle, and I'm looking at
4    document Number 230 on Plaintiff's
5    14 -- I'm sorry, document Number 231,
6    the next page --
7        A.   **Okay.**
8        Q.   -- last paragraph, "Have you
9    approached people involved in this
10   investigation and told them what to
11   say?" why did you ask him that?
12       A.   **I believe in one of the**
13   **conversations that I had with Tammy**
14   **when she was very upset, she said --**
15   **I'm trying to remember exactly how she**
16   **said it. She believed that -- that**
17   **Mike was more or less invincible, she**
18   **believed that, you know, nobody could**
19   **touch him, nobody could fool with him,**
20   **and that, you know, he had told other**
21   **people that -- what to say or what to**
22   **do. So I did ask him that question.**
23            **I can't remember at what point**

                    239

1    **Tammy and I discussed that. There were**
2    **several times that we had discussions**
3    **that were more or less she was crying**
4    **and upset. They were not formal**
5    **investigative sessions, they would be**
6    **more of a -- I would go in and listen**
7    **to what she had to say and console her**
8    **more or less.**
9        Q.   She shared with you that Billy
10   Kitchens told her that Swindle was
11   coming up with a story to cover
12   himself, did she not?
13       A.   **Let me look back. Is that in**
14   **my notes, in my interview notes?**
15       Q.   Look at page 8.
16       A.   **Of Exhibit 3?**
17       Q.   Yes, ma'am, Amber Kelley
18   telling you, the third bullet item.
19       A.   **Okay.**
20       Q.   Is that why you --
21       A.   **Okay. That might have been --**
22   **let me see where his interview was in**
23   **conjunction, but that might have been**

                    240

1  why I asked him that question.

2    Q.    Have you looked at it?  Do you

3  think that's why you asked?

4    A.    Oh, yes, I thought I had

5  already asked.  I think that's why I

6  asked is because it was brought up in a

7  prior -- a prior discussion.

8    Q.    Did you ask -- follow up Ms.

9  Kelley's comment about what Mr.

10  Kitchens had told her by questioning

11  Mr. Kitchens again about that comment?

12    A.    Well, I was looking at his,

13  and I don't see it, but give me just a

14  minute.  I want to read all of them,

15  because I think we have three

16  interviews with him.  It doesn't appear

17  that I asked it directly.  My third

18  interview was some open-ended

19  questions -- well, I felt they were

20  open- ended, "Have you heard any

21  further conversation regarding this

22  investigation?"  I felt like he would

23  expound if he had.  "Have you discussed

241

1  this situation with Tammy or Mike?

2  Have you had any problems with

3  management asking questions?"  But I

4  don't think I asked that directly.

5    Q.    Well, when Ms. Kelley told you

6  that, that was on August 2nd; is that

7  correct?

8    A.    Yes, her interview was on

9  August 2nd.

10    Q.    Okay.  And she's telling you

11  that Billy Kitchens told her the day

12  before that Swindle was coming up with

13  an excuse?

14    A.    Uh-huh, I mean yes.

15    Q.    And relaying that someone had

16  seen he and Tammy Edwards horsing

17  around, paraphrasing, correct?

18    A.    Yes, because she says

19  "yesterday afternoon," which would have

20  been the day of August 1st.

21    Q.    Okay.  And that's the day you

22  started your investigation, correct?

23    A.    Correct.

242

1    Q.    Now, that morning is when Tom

2  Bondy came to you and told you the same

3  thing, correct?

4    A.    Let me look at the date we had

5  that conversation.

6    Q.    It's page 5, Plaintiff's 3.

7    A.    Okay.  It was on the morning

8  of August 2nd.

9    Q.    And he's telling you the same

10  thing?

11    A.    Not exactly the same thing.

12  He's just saying that he got to

13  thinking more about what Tammy told him

14  on August 1st and something stuck out

15  in his mind about something she had

16  said, a guy on second shift had seen

17  her and Mike horsing around and had

18  told Tammy's husband.

19    Q.    And that was the same thing

20  that Amber Kelley was telling you that

21  Billy Kitchens had told her?

22    A.    Not exactly the same thing.

23    Q.    Well, was it sufficiently

243

1  similar that like bells, sirens, and

2  whistles didn't go off in your head?

3      MR. BOSTICK:  Object to the

4  form.

5    A.    No, it wasn't exactly the same

6  on page 8 of Exhibit 3.  It just says,

7  "Billy told me Mike was coming up with

8  stuff to cover himself - something

9  about a friend of the family seeing

10  Tammy touching Mike.  The friend told

11  Tammy's husband, and now she's having

12  trouble."  It wasn't exactly.

13    Q.    What's different between what

14  Bondy told you and what Amber is

15  telling you about Billy Kitchens?

16    A.    Well, for one thing, Tom is

17  allegedly repeating what Tammy told

18  him.  Under Amber's statement, that's

19  something that Billy told her.  So in

20  my mind, you know, Tammy is delivering

21  the firsthand knowledge of it to Tom.

22  So what's different to me is it's

23  coming from -- the first one is coming

244

1 from -- directly from Tammy; the second
2 one is coming from Amber. And it just
3 didn't -- it didn't strike me as being
4 the exact same thing.
5     Q. Did you ever talk to Steve
6 Culpepper?
7     A. No.
8     Q. Why not?
9     A. He was not -- he was not
10 identified as a witness throughout all
11 the statements. I think that was --
12 that was the primary reason.
13     Q. He was the group leader of
14 Mike Swindle, though, correct?
15     A. Correct.
16     Q. Did you not think it prudent
17 to talk to his manager about his
18 actions, about Swindle's actions?
19     A. No, not in this case. We --
20 we always looked directly to people who
21 were identified as witnesses. If Steve
22 had been identified as a direct
23 witness, we would have interviewed him.

245

1 In the case that he wasn't, he was
2 not -- he was not one of those people
3 we spoke to.
4     Q. Mr. Culpepper was in with
5 Ms. Edwards when she went to talk to
6 Mr. Bondy, correct?
7     A. I don't know if he stayed or
8 not. I know that Tom -- or I had heard
9 that Tom had sent Steve to get her, but
10 I don't -- I don't factually know that
11 he was in that room.
12     Q. Did you ask?
13     A. I did not.
14     Q. Why? Why not?
15     A. I do not know why I didn't
16 ask.
17     Q. With regards to your notes on
18 Plaintiff's 14, document Number 228,
19 you do not have an end time for when
20 you talked to Mike Swindle. Do you
21 know how long you talked to him?
22     A. I don't. On some of the
23 interviews, I didn't record an end

246

1 time. I think on some of the
2 interviews I didn't record a time at
3 all. But when I remembered to, I would
4 record the start and the end.
5     Q. Steve Culpepper would have
6 been Tammy Edwards' group leader as
7 well, correct?
8     A. Steve Culpepper, yes.
9     Q. Did you think it prudent to
10 talk to Mr. Culpepper whether or not
11 Ms. Edwards had complained to him?
12     A. Well, because he was never
13 mentioned as a witness of anything that
14 happened, no.
15     Q. Did Ms. Edwards ever tell you
16 about a situation where Mr. Kitchens
17 said something improper to her in the
18 workplace, about where her job would
19 be?
20     A. Improper as to --
21     Q. Yeah.
22     A. I don't remember her telling
23 me that because I do remember her

247

1 telling me that she and Billy talked
2 and that he was -- he consoled her, so
3 to speak. That wasn't the exact word
4 that she used, but you know, that they
5 were buddies. But I don't -- unless
6 it's here in the notes, no, she did not
7 tell me that.
8     Q. She didn't convey a situation
9 where she had complained to Steve
10 Culpepper about Billy Kitchens telling
11 her that her new job was going to be
12 under his desk?
13     A. No.
14     Q. Today is the first time you've
15 heard about that?
16     A. Yes, I believe it is.
17     Q. Prior to the deposition, did
18 you review any documents?
19     A. This, which is exhibit --
20 well, it's the summary, the findings
21 and the interviews. That's what I
22 examined.
23     Q. Your investigation?

248

1    A.   Yes.

2    Q.   Anything else?

3    A.   No.

4    Q.   Did you look at Ms. Edwards'

5  deposition?

6    A.   No.

7    Q.   A summary of that deposition?

8    A.   No.

9    Q.   Did you look at a summary of

10  Mr. Swindle's deposition?

11    A.   No.

12    Q.   The videotape?

13    A.   No.

14    Q.   Have you listened to any audio

15  tapes?

16    A.   Yes.

17    Q.   Tell me about what you

18  listened to.

19    A.   I listened to two

20  conversations between Tammy and me.

21  One was, oh, gosh, -- one I can't

22  remember right off.  But the second one

23  was a longer conversation that we had

249

1  when I was in benefits as the assistant

2  manager there.  The first conversation,

3  I'm trying to remember, but I would

4  have to hear it to refresh my memory.

5  But there were two -- there were two

6  separate conversations that I heard.

7    Q.   Any other audio tapes you've

8  listened to?

9    A.   No.

10    Q.   And the conversation between

11  you and Ms. Edwards in benefits, did

12  that refresh your recollection of that

13  conversation?

14    A.   It did.

15    Q.   Prior to that, did you even

16  recall having the conversation with

17  Ms. Edwards?

18    A.   I did recall having a

19  conversation with her.

20    Q.   Okay.  What was the

21  conversation about when you were in

22  benefits?

23    A.   More or less it was she was

250

1  still out on leave.  I believe it

2  included talking about the denial of

3  her long-term disability claim.  She

4  also -- there were two specific things

5  that she asked for.  One was would she

6  be paid out her vacation.  The second

7  one was would she qualify for her

8  raises as they would have been given to

9  her when she came back to work.  When

10  you are a new team member, every six

11  months you qualified for an increase,

12  and she wanted to know since she had

13  been gone would she qualify for those

14  when she returned.

15    Q.   Was she asking you to come

16  back to work?

17    A.   She said she would like to be

18  back at work, but she wasn't asking me

19  to come back to work.  She was dealing

20  with the clinic, and at that time --

21  well, benefits really handled long-term

22  disability, if that's what you can call

23  it, but it was more or less a paper

251

1  thing.  So she had been dealing with

2  Jane Ramsey on her leave, she had been

3  dealing with the clinic, places like

4  that.

5    Q.   How do you know that?

6    A.   I think she had told me.

7    Q.   Did you ever have any

8  conversations with Jane Ramsey or the

9  clinic about Tammy Edwards?

10    A.   No.

11    Q.   How did you learn she was

12  going out on leave?

13    A.   I want to say she told me.

14    MR. BOSTICK:  "She," Tammy?

15    A.   "She," Tammy.  I'm sorry.

16    Q.   Okay.  And what did she tell

17  you?

18    A.   I believe it was something

19  along the lines of -- to do with the

20  accident that she had had.  She had

21  always told me along that she had

22  problems with her neck, and I believe

23  she told me that she was going out, you

252

1    know, in regards to that, to try to,
2    you know, make sure she could get that
3    where it needed to be again, medically
4    speaking.
5              (Plaintiff's Exhibit 20 was
6              marked for identification.
7              A copy is attached.)
8        Q.    (BY MS. HAYNES) Plaintiff's
9    Exhibit 20 is an e-mail from you to
10   Penny Nichols and Melanie McCormick
11   about Tammy Edwards, dated Monday,
12   August 20th, 2006.  Who is Melanie
13   McCormick and Penny Nichols?
14       A.    Penny Nichols was our -- I
15   don't know what her technical title
16   was, but she was a nurse that worked in
17   our safety department that kind of case
18   managed, but I don't know what her
19   specific title was.  Melanie McCormick
20   was a specialist in benefits.
21       Q.    Did you assume her title when
22   you went to benefits?
23       A.    No.  Melanie was a specialist;

253

1    I was assistant manager.
2        Q.    Whose position is higher?
3        A.    The assistant manager.
4        Q.    Okay.  Who was the assistant
5    manager in benefits before you as
6    assume the position?
7        A.    There wasn't one.
8        Q.    Okay.
9        A.    It was a new position.
10       Q.    All right.  When you sent this
11   e-mail on August 21st, were you still
12   in team relations or benefits?
13       A.    I would have been in team
14   relations because I didn't go into
15   benefits until I think October of that
16   year, yeah, October of '06.
17       Q.    Okay.  What was the purpose of
18   writing this e-mail?
19       A.    Let's see.  Well, I gave them
20   her phone number, so she might have
21   given that to me.  And then I also
22   wanted to know if her first three days
23   had been coded, because when you went

254

1    out on short-term disability, there was
2    a three-day wait period.  So in SAP,
3    those days had to be coded, and the
4    concern was if they're not coded,
5    people might not be paid properly, and
6    then a check would have to be requested
7    through one of our financial people.
8    So I wanted to make sure she had gotten
9    coded.
10       Q.    What does this mean, "She was
11   sent out to her personal physician last
12   week by the Medical Center"?
13       A.    It means due to some kind of
14   condition probably, the clinic there on
15   site, the Medical Center, deemed that
16   she was unable to do the job that she
17   was in, so they sent her out to be
18   evaluated by her personal physician.
19       Q.    Did she tell you that or did
20   someone in medical tell you that?
21       A.    You know, I'm thinking this --
22   I'm thinking this e-mail probably came
23   on the tail end of a conversation with

255

1    her, because I gave the -- I gave her
2    phone number and everything, so I'm
3    thinking I may have had this
4    conversation with her.  This is not
5    something I would normally do, but when
6    Tammy would call me, what I would try
7    to do is communicate the best I could
8    out to the people that needed to know.
9    But that -- this very well could have
10   been on the tail end of a conversation
11   with her.
12       Q.    Did she ask to be moved back
13   to the CCR position?
14       A.    Not that I recall.
15       Q.    Is the BC1 position a more
16   physically demanding position than the
17   CCR position?
18             MR. BOSTICK:  Object to the
19   form.
20       A.    The BC1 position is --
21   basically the people stand all day,
22   except for breaks and lunches.  And I
23   believe this is right, Tammy would take

256

1  a piece of metal, be it -- whatever it
2  was -- some of the tools were fashioned
3  by HMMA, so it might not have been a
4  hammer, it was some type of metal, and
5  the -- all the people up there would go
6  around the edges of the -- you know,
7  the preliminary car, so to speak, as it
8  was coming down the line.  Now, what
9  that was for, I'm not -- I'm not
10 completely sure.
11         But physical demand, she would
12 have to stand on her feet.  But
13 probably, you know, there was as much
14 of a mental demand in CCR as there was
15 a physical demand on that line.  I
16 would say they were -- they were pretty
17 much apples to apples.
18     Q.   You're comparing apples to
19 apples with a physical demand on the
20 BC1 line to a mental demand in the CCR
21 position; is that your testimony?
22     A.   Yes.
23     Q.   Okay.  My question was:  Is

257

1  the BC1 line a more physical demanding
2  job than the CCR job?
3      A.   I wouldn't call it necessarily
4  more.  It might be the same; it might
5  not be the same.  I mean, obviously, it
6  is different in the fact that you're
7  down on the floor instead of up in the
8  office.  But the physical demand I
9  would not say is any more because you
10 are standing, running around the edges
11 with a metal --
12        The CCR, you were sitting, but
13 you were doing reports and you had to
14 go up and down the stairs, back and
15 forth to the floor to get downtime
16 numbers and things of that nature, so
17 I'd say the physical was probably
18 equal.
19     Q.   What is your understanding of
20 why she was moved to the CCR position
21 from the moving tool -- moving parts,
22 I'm sorry?
23     A.   Why she was moved from moving

258

1  parts to CCR?
2      A.   Yes, ma'am.
3      A.   I don't know that I know that.
4      Q.   Did you ever ask?
5      A.   I don't think so.
6      Q.   Okay.  You have no
7  understanding as you sit here today why
8  she was moved from moving parts to CCR?
9      A.   I'm trying to think, but I --
10 I don't think so.  I don't think I know
11 anything about that move.
12     Q.   The first three days, is an
13 employee paid for those days if they're
14 out?
15     A.   They can -- or they could at
16 this time choose to take vacation/
17 personal.  They might have been able to
18 choose to take excused unpaid, I'm not
19 sure on that last one.  But that's how
20 the pay works, because the first three
21 days, since they're a waiting period,
22 that's vacation/personal, they can be
23 paid out like that.

259

1      Q.   And then after three days,
2  does it go to short-term disability?
3      A.   Yes.
4      Q.   For how long?
5      A.   Six months, and short term is
6  paid at 66 and two-thirds percent.
7      Q.   And then after that short-term
8  disability is exhausted, what happens?
9      A.   During process or during the
10 time that they're on short term,
11 generally about one month before short
12 term should end, there is communication
13 with the employee from the insurance
14 company.  If they foresee that person
15 being out -- you know, as referenced to
16 doctor notes, they foresee that person
17 is going to be out longer, they'll send
18 them some preliminary paperwork for
19 long-term disability, and then they
20 will start, you know, getting the
21 information together from their
22 doctors, there's a piece that they have
23 to fill out.  And then all that comes

260

1  in back to the insurance company and is
2  evaluated by them as to whether or not
3  they qualify for long term.
4        Q.    And if they don't qualify for
5  long term, what happens?
6        A.    They -- well, they're -- if
7  they don't qualify for long term,
8  they're basically considered on an
9  unapproved leave of absence with the
10  company, because they're no longer --
11  at that point, if you've been out six
12  months, you've exhausted your Family
13  Medical Leave, you've exhausted your
14  short-term disability, so you're --
15  you're out there not on an approved
16  leave. So that we would ask is that a
17  person come back to work, you know,
18  certainly with a note from a doctor
19  that said you don't have restrictions
20  in order to be placed back on the job.
21        Q.    Do you know -- at any time
22  after she went on leave, did Ms.
23  Edwards try to come back to work?

261

1        A.    I -- I wouldn't know that from
2  having dealt with her directly. I
3  believe I remember her telling me she
4  did, but she would have dealt -- if she
5  was coming back to work, she would have
6  had to come through our clinic because
7  she would have had to do a return-to-work
8  assessment. So they would be seeing
9  her more than I would have.
10        Q.    So she'd come back to the
11  facility and go straight to medical?
12        A.    Right. She had to be cleared
13  through them first.
14        Q.    Have you ever known anyone to
15  be escorted by security to medical?
16        A.    Yes. Everybody who comes in
17  the building that's been out on leave
18  has to be escorted by them to the
19  medical facility because their badge
20  doesn't work at that time or it's not
21  supposed to. It's supposed to be
22  deactivated when they go out on leave.
23        Q.    On short-term disability

262

1  leave?
2        A.    Yes.
3        Q.    And are they escorted through
4  the back door or another entrance?
5        A.    The only door that I know of
6  to the clinic would be -- well, okay,
7  let me go back. There are two
8  entrances to the clinic. There's a
9  door that comes in through the showroom
10  and goes through the back of the
11  clinic, and then there's a door that
12  comes directly through the lobby and
13  then you go outside just for a minute,
14  and there's a door directly to the
15  right where the clinic is. And I would
16  think that they would be escorting
17  through that door.
18        Q.    Through what door?
19        A.    Through the door through the
20  lobby. But it's entirely possible that
21  they could escort somebody else the
22  other way too if it's raining or
23  whatever.

263

1        Q.    What's your understanding of
2  how Ms. Edwards was escorted back?
3        A.    I don't have any knowledge of
4  that.
5        Q.    And while Ms. Edwards was on
6  short-term disability, did she call
7  you?
8        A.    I don't know when those calls
9  were made or when I received those
10  calls. I know the call that I heard
11  that was taped, that was actually after
12  she had gotten a letter about her
13  long-term disability so --
14        Q.    My question was: When she was
15  on short-term disability, did she call
16  you?
17        A.    Well, I was trying to recall
18  by prompting myself with that. She may
19  have called, I can't remember
20  precisely.
21        Q.    Did you make any notes?
22        A.    If she asked me questions or
23  specific questions, I would -- well,

264

1   actually, though, she asked me
2   questions sometimes I could go and get
3   the answer, because sometimes they were
4   relative to payroll.  So I'd just step
5   over to payroll, because they were
6   really close to benefits, and ask the
7   question and tell her on the phone.
8          So specifically, I might have
9   made a note, but now, I always keep,
10  you know, notes on -- if somebody is
11  asking me a question and I've got to
12  get back with them, I have to keep a
13  note on them or I'll forget it.
14     Q.    Where did you keep those
15  notes?
16     A.    Various places, not anywhere
17  specific.
18     Q.    Did you maintain a separate
19  file on Tammy Edwards at your desk?
20     A.    No.
21     Q.    On the computer?
22     A.    No.
23     Q.    How did you keep up with if

265

1   you needed to get back with her?
2      A.    I would usually have it on a
3   sticky note, something like that.
4      Q.    Okay.  So if she called and
5   someone else took the call, would it be
6   on a sticky note?
7      A.    Not necessarily, because we
8   all -- there were, let's see, four of
9   us in benefits, and we all had
10  different mannerisms of keeping notes
11  where people had called.  So they might
12  have done it differently than I did.
13     Q.    Did you get messages that
14  Ms. Edwards had called you while she
15  was on short-term disability?
16     A.    Any message?  Usually she
17  called me directly and left a voice
18  mail, she wanted to talk to me because
19  she had my number.
20     Q.    Would you call her back?
21     A.    Yes.
22     Q.    Do you know how many times the
23  two of you conversed over the telephone

266

1   while she was on short-term disability?
2      A.    While she was on short term,
3   probably not more than a couple of
4   times.
5      Q.    Okay.  Was there a procedure
6   that she had to call in so many times
7   during the week or on a monthly
8   basis --
9          MR. BOSTICK:  Object to the
10  form.
11     Q.    -- while she was on short-term
12  disability?
13     A.    That would have been something
14  that she would have been advised
15  through the safety/medical department.
16     Q.    Jane Ramsey?
17     A.    Yes.
18     Q.    Okay.  Were you aware of any
19  conversations with Wendy Warner and
20  Ms. Edwards?
21     A.    I don't think so.
22     Q.    Was anyone telling you they
23  were having conversations while she was

267

1   on short-term disability with Ms.
2   Edwards?
3      A.    No.
4      Q.    Did you participate in any
5   meetings about Ms. Edwards while she
6   was on short-term disability?
7      A.    While she was on short term?
8   I'm sure you have this.  When was the
9   corrective action given to Mike
10  Swindle?  I need the date on that in
11  order to be able to answer that
12  question.
13     Q.    Plaintiff's Exhibit 7.
14     A.    Exhibit 7.  That was 8/26.  So
15  she went out 8/21 or around 8/21.  What
16  was the question?  I'm sorry, I was
17  trying to draw a comparison.  What was
18  the question?
19          (Whereupon, the last question
20          was read back by the court
21          reporter.)
22     A.    I can't say for sure the date
23  of it, but I met with individuals in

268

1  conjunction with this disciplinary
2  action, and she -- she may have already
3  been out, because it looks like she
4  went out around August 21st, and the
5  corrective action was given August
6  26th. So I might have been in one
7  meeting, but it wasn't about her
8  short-term disability, it was about
9  this corrective action right here.
10  Q. (BY MS. HAYNES) Did I give you
11  Plaintiff's Exhibit 17? I think I
12  have. I just didn't show it to her.
13  Plaintiff's 17 is when you
14  finished your investigation on August
15  7th, 2006?
16  A. Uh-huh.
17  Q. Do you know why it took until
18  August 26th to issue any discipline to
19  Mike Swindle?
20  A. Because there was -- or there
21  were several people that had to weigh
22  in on the decision for corrective
23  action, and it wasn't always feasible

269

1  to get everybody together in one
2  location. Those people would have been
3  our legal -- now, only one person makes
4  the decision, but the people who were
5  in the room would be Greg Kimble;
6  general counsel, which would have been
7  Rick Neal; I would have been in that
8  room but not to weigh in, because I was
9  a specialist; and Wendy Warner. I
10  think that covers everybody. Could you
11  read back who it was?
12  Q. Kimble, Neal, Jones, and
13  Warner.
14  A. Rob Clevenger was in there.
15  Audie Swegman may have been in there.
16  Q. And what was the purpose of
17  the meeting or was it multiple
18  meetingS?
19  A. It was not multiple meetings;
20  it was just one meeting. And that's
21  typically how we decided how we wanted
22  to move forward -- well, how the
23  company wanted to move forward with

270

1  corrective action. So it was just a
2  meeting with those people involved, and
3  it was a discussion of what we wanted
4  to do in conjunction with the
5  corrective action towards Mike.
6  Q. Did you make any notes of that
7  meeting?
8  A. No.
9  Q. How long did the meeting last?
10  A. Those meetings were generally
11  maybe 30 or 45 minutes.
12  Q. Okay. And why did they
13  deviate from your recommendation?
14  A. They felt that there was not
15  enough corroboration to take him out of
16  his team leader status, but they came
17  back and said, you know, we still think
18  that there was some appropriateness
19  there, so we're going to suspend, we're
20  not going to pay him while he's out.
21  It was a two-week suspension. He got a
22  serious misconduct letter, which I
23  believe -- I can't remember for sure,

271

1  but I believe that alleviates his
2  possibilities of promotion for three
3  years. And I think that's all.
4  Q. Looking at 16, Plaintiff's 16
5  and Plaintiff's 17, the one I just gave
6  you --
7  A. Is 16 in here too? I'm not
8  sure I have 16. I need to go to the
9  restroom, I'm sorry. May I go, please?
10  MS. HAYNES: Sure.
11  (Off-the-record discussion.)
12  (Recess.)
13  Q. (BY MS. HAYNES) All right. I
14  was asking you about 16 and 17,
15  Exhibits 16 and 17. And on 16, you had
16  sent to Mr. Clevenger your
17  investigation at 11:16 a.m.?
18  A. Uh-huh.
19  Q. And that was after talking
20  with Pam Stoddard on August 7th at
21  9:42?
22  A. Right.
23  Q. All right. Why did you send

272

1    the one at 11:16 a.m. to him,
2    Plaintiff's Exhibit 16, without Ms.
3    Stoddard's statement?
4    **A.    Because I was probably trying**
5    **to let him know where we were, where I**
6    **was in finishing this up.**
7    Q.    Was he asking for immediate
8    reports?
9    **A.    Did we establish that the only**
10   **thing missing from 16 was the Pam**
11   **Stoddard information?**
12   Q.    That's correct.
13   **A.    Okay.  No, he wasn't**
14   **requesting them, but I'm -- I'm very**
15   **much in favor of, you know, trying to**
16   **do my job expeditiously, and I wanted**
17   **him to have what I had so far, even**
18   **though I had not added that on there.**
19   Q.    Well, it's just a short
20   paragraph?
21   **A.    Right.**
22   Q.    And she came in at 9:42 a.m.?
23   **A.    Right.**

<div align="center">273</div>

1    Q.    Why would you not go ahead and
2    type that up when two hours later you
3    do it?
4    **A.    There wouldn't be any specific**
5    **reason.**
6    Q.    Did you send him a draft over
7    of Ms. Stoddard's statement?
8    **A.    No.**
9    Q.    Is there any reason on
10   Plaintiff's 16 you did not indicate
11   that you had one other statement to
12   add?
13   **A.    No.  But probably before I**
14   **sent this over, he and I had a**
15   **telephone conversation and I told him,**
16   **hey, I'm going to send this over, but**
17   **I've got to add one more thing.**
18   Q.    Okay.  And you added that on
19   Plaintiff's 17?
20   **A.    Right.**
21   Q.    Okay.  Do you know why you
22   didn't put that on 16, Plaintiff's 16,
23   that you had talked with Pam Stoddard

<div align="center">274</div>

1    but it was not included?
2    **A.    Oh, why I didn't put it in the**
3    **body of my -- of 16 of my e-mail?**
4    Q.    Yes.
5    **A.    Is that the question?**
6    Q.    Yes, ma'am.
7    **A.    Okay.  The only thing I can**
8    **think of is that I had conveyed it to**
9    **him over the phone, because as you'll**
10   **notice on my second e-mail to him that**
11   **same day at 1:03, I said, "I only**
12   **revised the final page to conclude**
13   **Pam's conversation with me this**
14   **morning," which leads me to believe**
15   **that I did have a telephone with him**
16   **saying, hey, I've got to add one more**
17   **thing to it, you know, so you'll be**
18   **getting another revision other than --**
19   **you'll get another report other than**
20   **this one.**
21   Q.    And were your notes on Pam
22   Stoddard always ten lines?
23   **A.    Can you ask that question**

<div align="center">275</div>

1    **again?**
2    Q.    Were your notes always typed
3    as only ten lines?
4    **A.    No, because my initial**
5    **interview with Pam Stoddard was a page.**
6    **Let me look.**
7    Q.    I'm talking about the second
8    conversation.
9    **A.    Are you asking if anybody**
10   **revised my report?**
11   Q.    Yes, ma'am.
12   **A.    They did not.**
13   Q.    Did you revise it?
14   **A.    This was what I typed the**
15   **first time, and this is what was**
16   **presented.**
17   Q.    And you're referring to
18   Plaintiff's Exhibit 17, the last two
19   pages, where what she told you is on
20   ten lines?
21   **A.    That's correct.**
22   Q.    Okay.
23   **A.    Let me also look at my**

<div align="center">276</div>

1 handwritten notes right quick.

2     Q.   I don't believe they're in

3 Plaintiff's 14. I think they're

4 separate on Plaintiff's 21.

5         (Plaintiff's Exhibit 21 was

6        marked for identification.

7        A copy is attached.)

8        (Off-the-record discussion.)

9     Q.   (BY MS. HAYNES) Is 21 your

10 notes from your conversation with --

11     A.   Twenty-one is my notes from my

12 conversation, my final conversation

13 with Pam.

14     Q.   And she asked to meet with

15 you?

16     A.   She approached me, yes.

17     Q.   Okay. And what she told you

18 in that conversation is the same thing

19 that Mr. Bondy told you as well as what

20 Amber Kelley had told you about

21 Mr. Swindle trying to cover his tracks

22 with regards to a friend seeing he and

23 Ms. Edwards together, correct?

277

1     A.   Not really, because Pam said,

2 well, I have heard that one of Tammy's

3 friends on second shift saw her giving

4 Mike a hug. So she just -- that was

5 from another party. Now, she did say

6 that she heard in conversation in the

7 bathroom that she was the one that

8 heard it. But as far as the hug or

9 the -- the inappropriateness that the

10 other team member, Roger Cleckler, that

11 scenario, she told me she had heard it,

12 which to me meant somebody had randomly

13 told her.

14     Q.   Did you ask her who told her?

15     A.   I did not.

16     Q.   Why not?

17     A.   Because she said she had heard

18 it, which to me meant it was a rumor.

19     Q.   Okay. But if you don't ask

20 the question, you don't know that, do

21 you; that's an assumption on your part?

22     A.   I did not know it for a fact,

23 but I did go based off her statement

278

1 that I have heard it.

2     Q.   But if you're on a fact-

3 finding mission, if someone says, well,

4 I heard Tammy Edwards said this, would

5 not the next question be, who told you

6 that so that you can follow the trail?

7     A.   Not necessarily.

8     Q.   Why not necessarily?

9     A.   In -- in the way I

10 investigate, I differentiate or I try

11 to differentiate when a person is

12 delivering information that somebody

13 else said as opposed to I had this

14 conversation with Tammy, she told me

15 that Roger Cleckler had reported to her

16 husband. I -- I want to know from the

17 individual that they have firsthand

18 knowledge. In Pam's case, she didn't,

19 so I didn't -- I didn't pursue it.

20     Q.   Did you ask her when she heard

21 this telephone conversation?

22     A.   Let's see.

23     Q.   Looking at Plaintiff's 21?

279

1     A.   She said she had heard it on

2 Friday, which would have been August

3 4th, in the upstairs bathroom.

4     Q.   Where do you see "upstairs

5 bathroom"?

6     A.   Page 18 of Exhibit 17.

7     Q.   I'm looking at your

8 handwritten notes, Plaintiff's 21.

9     A.   Okay. "Tammy was on the phone

10 with someone in the bathroom." Well,

11 the upstairs bathroom was the bathroom

12 for the people who were upstairs so --

13     Q.   Okay. On your handwritten

14 notes, Exhibit 21 --

15     A.   This handwritten note, the

16 Exhibit 21?

17     Q.   Yes, ma'am.

18     A.   Okay.

19     Q.   Those are your notes?

20     A.   They are.

21     Q.   Okay. And this is Pam

22 Stoddard talking to you at 9:42 a.m. on

23 August 7th, 2006, correct?

280

1    A.    That's correct.

2    Q.    And she just approached you

3  and started talking?

4    A.    Yes.

5    Q.    And do you happen to have a --

6    A.    She approached me. I can't

7  remember where we were, though. We may

8  have gone into a conference room or we

9  may have -- I can't remember where we

10  had the conversation.

11    Q.    Okay. Did you write the notes

12  as she's talking or you went back to

13  your desk and made the notes?

14    A.    I believe I wrote the notes

15  while she was talking.

16    Q.    Okay. And she starts out by

17  telling you that people have approached

18  her about the investigation?

19    A.    Yes.

20    Q.    Okay. Now, did you ask who

21  had approached her about the

22  investigation?

23    A.    I did not.

281

1    Q.    Did you think that might be

2  important, that you might find out some

3  more information?

4    A.    No, because here again, the

5  same thing came to mind, you know,

6  people have come up to her. You know,

7  it did not -- it was not something I

8  wanted to pursue at that time.

9    Q.    Why not?

10    A.    Because it sounded to me as if

11  it was going to be the same scenario,

12  I've heard this. People have

13  approached me, that means other parties

14  were telling Pam things about the

15  investigation, and I knew who was

16  involved in the investigation, and I

17  knew the information. So if other

18  people were coming up to Pam, that part

19  of it did not -- it did not cause me to

20  want to explore any further.

21    Q.    Well, it had been important if

22  it was Michelle Nelson, wouldn't it,

23  because you had already told her that

282

1  she was going to be terminated she kept

2  running her mouth?

3        MR. BOSTICK: Object to the

4  form.

5    Q.    So why wouldn't you ask the

6  question, well, who's talking about it?

7    A.    Let's go back to your comment

8  about Michelle. If I had somebody

9  say that, which I didn't after we

10  admonished her, we would have gone back

11  to Michelle directly. We wouldn't have

12  asked Pam any more about what Michelle

13  said; we would have gone to Michelle

14  directly. What was the second part of

15  your question.

16    Q.    Well, I'm just trying to

17  figure out after you've admonished all

18  these people about not running their

19  mouth that you've got a witness coming

20  forward now telling you so many people,

21  and you write "many," "many people" --

22  and that's not on your notes of

23  Plaintiff's 21, but you write, "People

283

1  have approached Pam"?

2    A.    Uh-huh.

3    Q.    Why is that not important to

4  you?

5    A.    It's not that it's not

6  important to me that people have

7  approached. But like I said before, I

8  want firsthand knowledge, that's what

9  I'm looking for. If you have had the

10  conversation with Tammy or you have had

11  the conversation with Mike and it was

12  you having it, that's what I want to

13  know about; but I don't want to know

14  about random rumors that have come

15  flying through the plant.

16    Q.    Well, wasn't it important to

17  you after you had admonished all these

18  people not to run their mouth and that

19  was happening now, wasn't it

20  important --

21    A.    Well, our plant, I want to say

22  had -- we encompassed stamping and

23  welding. Probably together, we had

284

1  right around 220 or 230 people. There
2  was no way I could police. I mean,
3  after they had been given the
4  admonishment, there was no way I could
5  police that many people talking about
6  this situation.
7        Furthermore than that, I
8  myself never shared that information,
9  so it came from a specific source
10  involved in the investigation so --
11     Q.  So why did you sit there and
12  give them the spiel that you're going
13  to recommend termination if they run
14  their mouth if you're not going to
15  follow up with it?
16     A.  I did give them that spiel,
17  but she just said some people were
18  coming to her, and it sounded to me
19  like the rumor mill.
20     Q.  What if it had been a woman
21  coming to her and saying, you know, the
22  same thing happened to me that happened
23  to Tammy Edwards; you missed an

285

1  form.
2     Q.  And the hypothetical I'm
3  giving you is what if it was another
4  woman and the same thing had happened
5  to that woman that happened to Tammy
6  Edwards, that would have been important
7  to your investigation, wouldn't it?
8     A.  It would have been, but that's
9  not what was expressed. If there was a
10  specific person, she wouldn't have said
11  "many people." She would have said,
12  hey, so and so came to me on the floor
13  and this is what she told me.
14     Q.  Okay.
15     A.  Instead she chose to be
16  nonspecific.
17     Q.  All right. Let's move on,
18  Plaintiff's 21, the second sentence you
19  wrote here, "Day we got 600"?
20     A.  Uh-huh.
21     Q.  And then you draw an arrow
22  down. Why did you do that?
23     A.  Because that goes with we were

287

1  opportunity on that one then, didn't
2  you?
3        MR. BOSTICK:  Object to the
4  form.
5     A.  No, because that's not what
6  She told me.
7     Q.  You didn't follow up, so you
8  don't know, but it could have been a
9  good lead, had you followed up and that
10  was the testimony?
11        MR. BOSTICK:  Object to the
12  form.
13     Q.  Correct?
14     A.  The testimony from?
15     Q.  These people that you didn't
16  follow up with.
17     A.  I'm not sure I understand your
18  line of questioning.
19     Q.  You didn't follow up with the
20  next question that should have been
21  asked of Pam Stoddard, who has talked
22  to you?
23        MR. BOSTICK:  Object to the

286

1  hugging due to the excitement of that.
2  At Hyundai, when you made a goal, and
3  it was big in the weld shop, because
4  welding had a lot of issues producing
5  cars, and the day that we made 600 was
6  a really big day in the history of the
7  company.
8     Q.  I'm just asking why you drew a
9  line?
10     A.  Right, because that -- that
11  goes with "We were hugging due to
12  excitement."
13     Q.  Well, is she telling you this
14  about we got 600, and then she tells
15  you something about Friday and then she
16  says we were hugging? I don't see how
17  that relates in a sequential fashion
18  here.
19     A.  I'm not sure what the Friday
20  was, but she was saying we were all
21  hugging each other because we were so
22  excited about getting 600.
23     Q.  Why was that important?

288

1    A.    Let's see.  Okay.  Then I went
2    on down, I didn't draw -- friend of
3    second shift saw Tammy hug Mike.  The
4    hug was for making 600, according to
5    Pam, and told her husband.  That was
6    the importance of that.
7    Q.    Okay.  What is the importance
8    of "Friday - somewhere I didn't need to
9    be"?
10    A.    I don't know about that.
11    Q.    You don't know what that
12    meant?
13    A.    No.
14    Q.    Did you ask her?
15    A.    It's something that I wrote,
16    but no, I didn't go back and ask her
17    about that.
18    Q.    Was she conveying that she was
19    not supposed to be in the upstairs
20    bathroom but was?
21    A.    No.
22         MR. BOSTICK:  Object to the
23    form.

289

1    Q.    The only thing you make
2    mention of in your typed notes is on
3    Friday, and I'm referring to
4    Plaintiff's --
5    A.    Exhibit 17, page 18.
6    Q.    Correct, thank you.  "On
7    Friday, (August 4[th]), I was in the
8    upstairs bathroom, and Tammy was in
9    there on the phone with someone"?
10    A.    Uh-huh.
11    Q.    So you didn't make mention of
12    "Somewhere I didn't need to be."
13    A.    That's probably because I
14    never revisited that with Pam, so I
15    didn't include it in the notes because
16    I didn't know -- did not know what that
17    was.  But the crux of our conversation
18    is here.
19    Q.    Is there any reason you didn't
20    go back and ask Pam what she was
21    talking about?
22    A.    No specific reason.
23    Q.    Okay.  Would she have been in

290

1    the upstairs bathroom anyway?
2    A.    Yes.
3    Q.    Okay.
4    A.    I saw her in there on several
5    occasions when I would go to the
6    bathroom.
7    Q.    Is that the only ladies'
8    restroom there is?
9    A.    No.  There's also a ladies'
10    restroom downstairs right below the
11    office; there's a ladies' restroom to
12    the side of the BC lines; there's a
13    ladies' restroom in stamping.
14    Q.    Okay.
15    A.    And in the very back in
16    stamping maintenance.
17    Q.    How long did that conversation
18    with Pam Stoddard last?
19    A.    It was brief.  Maybe 15
20    minutes.
21    Q.    Did she say anything else
22    other than the ten lines that you have
23    on your handwritten notes, Plaintiff's

291

1    21?
2    A.    No.
3    Q.    And that lasted 15 minutes?
4    A.    Yeah.
5    Q.    Why?
6    A.    Well, because she -- I wrote
7    the meat of our conversation.  She was
8    probably talking about some other
9    things too.  She liked -- she liked to
10    talk.  Pam was -- Pam was funny.
11    Q.    Did you know she was good
12    friends with Mike Swindle?
13    A.    Pam -- I knew that they -- you
14    know, we worked together in the weld
15    shop.  I didn't know of many people
16    that weren't, you know, at least on a
17    friendly basis there in the shop.
18         (Plaintiff's Exhibit 22 was
19         marked for identification.
20         A copy is attached.)
21    Q.    (BY MS. HAYNES) Plaintiff's
22    Exhibit 22, can you tell me what
23    these -- or what this document is?

292

1    A.    It appears to be when our
2  shift met for a team relations meeting.
3  We had a staff meeting pretty
4  regularly, and I'm trying to
5  remember -- well, I know it, because of
6  the three p.m., but this was probably
7  our night staff meeting.  Emily was in
8  there from public relations to talk to
9  us about something, I think about the
10  commercial that Hyundai was going to
11  make, and you know, did we have any
12  suggestions for it.  But other than
13  that, I don't remember what the subject
14  of it was.  Well, it says down here,
15  let's see, "Subject:  Tammy Edwards:
16  On medical leave" is all it says.
17    Q.    My understanding is this is
18  like an HR team meeting?
19    A.    Yes, it's a staff meeting with
20  the team reps, and usually the AM, the
21  assistant manager in team relations.
22    Q.    Are they on like a certain day
23  of the week or is it every day?
293

1    A.    Usually -- I'm trying to
2  remember if it was generally Fridays.
3  I think it was Fridays at three p.m.
4    Q.    Both shifts attending?
5    A.    No.  The night shift would
6  usually have their own meeting, so we
7  must have been on day shift if it -- at
8  that time.
9    Q.    All right.  Who is Gaby?
10    A.    Gaby is the team relations
11  specialist for the paint shop.
12    Q.    Okay.  Her last name?
13    A.    Smith, and her real name is
14  Gabriella.
15    Q.    Lucas?
16    A.    Cooner.
17    Q.    Cooner.  We talked about him.
18  And Emily, last name?
19    A.    I can't remember Emily's last
20  name.  I was already trying to remember
21  it.  I can't remember it.
22    Q.    Okay.  And usually would Emily
23  be in the meetings?
294

1    A.    No.  As a matter of fact, on
2  this particular day, she was in there
3  for the first part of the meeting,
4  because it says "Emily PR" right there
5  in that line.  Like I said, she was
6  talking to us about some kind of
7  commercial or advertising spot that
8  they were going to do, and then she was
9  dismissed.
10    Q.    All right.  Do you know what
11  you were reporting on about Tammy
12  Edwards?
13    A.    Let's see.  This was on the
14  18th.  Probably just an update.  I sent
15  this on Monday, the 21st, so that was a
16  Friday, the 18th, so I was probably
17  just saying, hey, heads up, she's on
18  medical leave.
19    Q.    Do you know why this document
20  is redacted?
21    A.    I don't.
22    Q.    You weren't talking -- well,
23  let me ask you this:  Were any of these
295

1  individuals who were listed as
2  attendees in-house or external counsel
3  for Hyundai?
4    A.    They were not that I remember.
5    Q.    Did you talk about anything
6  legal?
7    A.    But we may have -- we may have
8  been talking about anything that legal
9  counsel had told us.  I would assume
10  that's why it's redacted.
11    Q.    If Tammy Edwards was on
12  medical leave, that was not a legal
13  situation, was it?
14    A.    Well, technically, when you go
15  out under short-term disability, you're
16  also considered to be running Family
17  Medical Leave concurrently.  So at
18  times, you know, there might be some
19  need for us to consult legal on Family
20  Medical Leave matters.
21    Q.    Had Ms. Edwards asked for
22  Family Medical Leave?
23    A.    It wasn't an ask-for type
296

1  situation. It would run concurrently.
2  So she was having short-term disability
3  run, her Family Medical Leave was
4  running as well; so it's probably
5  somebody in the medical department had
6  asked her for certification at some
7  point.
8      Q.  Do you know of any other team
9  meetings that you participated in where
10  Tammy Edwards was discussed?
11     A.  No. Team as in this team
12  right here with Gaby, Lucas?
13     Q.  Any team member, team meeting
14  that you participated was my question,
15  where Tammy Edwards was discussed?
16     A.  None other than the one I
17  mentioned just a few minutes ago where
18  the decision was being made on the
19  corrective action for Mike Swindle.
20     Q.  Look for me at Plaintiff's 6
21  that's in the binder. Did you receive
22  the charge of discrimination that Ms.
23  Edwards filed on September 20th, 2006?

297

1      A.  No.
2      Q.  Is this the first time you've
3  seen it?
4      A.  Yes.
5      Q.  You didn't conduct any type of
6  investigation after Hyundai received
7  the charge?
8      A.  No.
9      Q.  Were you interviewed in any
10  fashion?
11     A.  No.
12     Q.  Did you see the company's
13  response --
14     A.  No.
15     Q.  -- to the EEOC charge?
16     A.  No.
17     Q.  And you did not participate in
18  drafting that in any fashion?
19     A.  No.
20     Q.  Look for me the second page of
21  Plaintiff's Exhibit 7. Did I identify
22  the EEOC charge as Plaintiff's Exhibit
23  6 or 7?

298

1      A.  I think you said 6.
2          MR. BOSTICK: I think you said
3  6.
4      Q.  The second page of Plaintiff's
5  Exhibit 7, did you ever see this letter
6  that Mr. Swindle signed his name to?
7      A.  Yes.
8      Q.  Did you help him with that
9  letter?
10     A.  No.
11     Q.  Do you know who did?
12         MR. BOSTICK: Object to the
13  form.
14     A.  I don't know that anybody
15  helped him. He was supposed to write
16  the letter.
17     Q.  Do you know who typed it for
18  him?
19     A.  Do I know who typed it for
20  him?
21     Q.  Yes, ma'am.
22     A.  I don't know that anybody
23  typed it for him.

299

1      Q.  Do you know when you received
2  it?
3      A.  Probably upon his return from
4  his suspension, which was a period of
5  two weeks. He was suspended when this
6  was issued the 26th. So at the end of
7  those two weeks, he would have come
8  back in with this, the letter.
9      Q.  Was it ever discussed with you
10  present that prior to the issuing of
11  this discipline to Mr. Swindle on the
12  26th of August that Ms. Edwards was
13  already out on short-term disability
14  and would not be coming back?
15     A.  Was it discussed in a meeting?
16     Q.  No, ma'am. I just asked the
17  question very broadly, very generally.
18         THE WITNESS: Okay. Please
19  read the question again.
20         (Whereupon, the last question
21          was read back by the court
22          reporter.)
23         MR. BOSTICK: Object to the

300

1  form.
2       A.    It was -- let's see, Tammy and
3  I discussed it because I believe that's
4  why I generated this e-mail. I think
5  that answers it.
6       Q.    (BY MS. HAYNES) Anyone else?
7       A.    Now, you know, the fact that
8  she was out on short term may have been
9  discussed, but it wouldn't have ever
10 been discussed around she was never
11 coming back, because short-term
12 disability is exactly what it is,
13 short-term disability. I mean, we
14 would have expected -- we would have
15 expected her to come back to work, so
16 it wasn't -- it wasn't in that light.
17 It would have -- if I talked about it
18 to anybody else, it would have been
19 she's out on short term.
20      Q.    Okay. Did anyone in medical
21 discuss with you or you discuss with
22 anyone in medical about moving her to
23 another position to she could return to

301

1  work?
2       A.    No.
3       Q.    And I think I asked you this,
4  and if I did, I apologize. Did she ask
5  that in lieu of being placed on
6  short-term disability that she be
7  returned to her CCR position?
8       A.    No.
9       Q.    She never complained to you
10 that she could not do her CCR position
11 because of her neck or back problems?
12      MR. BOSTICK: Object to the
13 form.
14      A.    Well, in her e-mail that she
15 sent me when she was placed in that --
16 which is right there, I think she does
17 say, "I am doing my job like I was
18 instructed to do, but it is irritating
19 my neck worse."
20      MR. BOSTICK: And her question
21 was about the CCR position.
22      A.    Oh, the CCR. Did she complain
23 about having medical problems while she

302

1  was in CCR?
2       MS. HAYNES: Do you mind
3  repeating it?
4       THE WITNESS: Please.
5       MR. BOSTICK: I can
6  paraphrase. I think it was did she
7  tell you that she -- that her neck
8  injury prevented her from going back in
9  the CCR position, wasn't it?
10      THE COURT REPORTER: The
11 question was: "She never complained to
12 you that she could not do her CCR
13 position because of her neck or back
14 problems?"
15      A.    Not that I recall.
16      Q.    (BY MS. HAYNES) And in the
17 letter, you confirmed she did complain
18 that it was aggra -- being placed on
19 the BC1 line was aggravating?
20      A.    According to her e-mail, she
21 said, "I am doing my job like I was
22 instructed to do, but it is irritating
23 my neck worse."

303

1       Q.    Okay. And did you ever
2  understand from anyone that she was
3  having to take medication because of
4  her neck and back problems when she
5  went on the BC1 line?
6       MR. BOSTICK: Object to the
7  form.
8       A.    Not specifically related to
9  the BC1 line, but Tammy had told me for
10 a long time she had been on medication
11 prior to that time due to her accident.
12      Q.    And was showing up at work to
13 do the CCR job?
14      A.    That's correct.
15      Q.    Okay. She didn't tell you
16 that after she was placed on the BC1
17 line she had to start taking medication
18 to deal with those problems?
19      A.    Not specifically that it was
20 related to the BC1 line.
21      Q.    My question is: After she
22 went to the BC1 line, is that when she
23 told you she was having to take

304

1  medication?

2      A.   **No. She told me she was**

3  **having to take medication pretty much**

4  **after we met, because the first time we**

5  **met, I think we talked about her**

6  **medical issues as they related to her**

7  **automobile accident and how severe that**

8  **accident had been and what kind of**

9  **treatment she had been seeking for it,**

10  **you know, meds, therapy, things of that**

11  **nature.**

12      Q.   Is that with regards to --

13  when you say after you first met, when

14  she complained to you about Swindle

15  or --

16      A.   **No.**

17      Q.   -- before?

18      A.   **When she first started with**

19  **the company.**

20      Q.   Okay.

21      A.   **We would have met pretty**

22  **quickly after she got out of training.**

23      Q.   All right. Did she tell you

305

1  she had been to a doctor because of

2  what Swindle was doing to her?

3          MR. BOSTICK: Object to the

4  form.

5      A.   **I'm thinking. She may have**

6  **mentioned that she told her doctor that**

7  **she was having a lot of additional**

8  **stress at work due to that, that might**

9  **have been how the conversation went.**

10      Q.   She didn't share with you she

11  was having to take anything for sleep

12  or anxiety?

13      A.   **No. No.**

14          (Plaintiff's Exhibit 23 was

15              marked for identification.

16          A copy is attached.)

17      Q.   (BY MS. HAYNES) Plaintiff's

18  23, have you seen this document? My

19  question is: Have you seen the

20  document?

21      A.   **I'm looking at it.**

22          MS. HAYNES: Brian, do you

23  know why this would be marked a highly

306

1  confidential document when it's a

2  subpoenaed document from the Department

3  of Industrial Relations?

4          MR. BOSTICK: Uh-uh. It may

5  have just been in with the subpoena

6  documents that we were getting the

7  medical records at the same time.

8          MS. HAYNES: Okay.

9          MR. BOSTICK: We're not

10  perfect, we can stipulate to that.

11          MS. HAYNES: Well, you know,

12  highly confidential --

13          MR. BOSTICK: You know, off

14  the record.

15          (Off-the-record discussion.)

16          MR. BOSTICK: I will say on

17  the record I think that was an

18  oversight on our part to label it as

19  such, unless she submitted something to

20  them -- well, I do think this does

21  mention her -- I'm speculating on

22  Glenda, but if she talks in here about

23  her neck injury, maybe that's something

307

1  that maybe she thought out of caution,

2  since it mentions it, I'll stamp it

3  that.

4      A.   **I have only seen this part**

5  **right here (indicating).**

6      Q.   (BY MS. HAYNES) Tell me a

7  number, please, ma'am.

8      A.   **It is D-01312.**

9      Q.   You've seen only that page?

10      A.   **Yes.**

11      Q.   All right. Did you have a

12  conversation with anyone at the

13  Department of Industrial Relations?

14      A.   **I did not. I had a**

15  **conversation with I believe it was**

16  **Chris.**

17      Q.   Chris Smith?

18          MR. BOSTICK: Chris Smith?

19      A.   **Yes.**

20      Q.   Was it about Ms. Edwards'

21  unemployment?

22          THE WITNESS: Do want me to

23  answer that question?

308

1   MR. BOSTICK: You can describe
2   generally about the conversation but
3   not anything that you said to him or he
4   said to you.
5   A.   Okay.  Yes, it was about the
6   unemployment claim.
7   Q.   Okay.  But you -- well, let me
8   ask you this:  Look at pages 01310,
9   01311, and 1312 underneath the --
10   A.   I'm sorry, can I go back?  I
11   didn't see that part right there.
12   01311, I have seen that bottom part.
13   Q.   Okay.  How about the bottom
14   part of 01310?
15   A.   Let me look.  Oh, is that the
16   same thing?
17   Q.   Yes, ma'am.  Well, it's a
18   continuation.
19   A.   Okay.  Yes, those -- those
20   words right there where it says "ER
21   rebutt."
22   Q.   All right.  Look for me on
23   document 01310 --

309

1   A.   Okay.
2   Q.   -- of Plaintiff's Exhibit 23.
3   A.   Okay.
4   Q.   And we have established that
5   you did not speak with anyone at the
6   Department of Industrial Relations?
7   A.   That's correct.
8   Q.   Okay.  Did you provide anyone
9   any information wherein you said that
10   Ms. Edwards was on short-term
11   disability from August 16th, 2006,
12   until February 11th, 2007, due to a
13   non-work-related accident?
14   MR. BOSTICK:  Object to that
15   question if it's going to call for
16   conversations between her and in-house
17   counsel.
18   MS. HAYNES:  I'm just asking
19   if she has provided the information to
20   anyone.  I didn't ask if she provided
21   it to counsel.
22   A.   I don't remember if I provided
23   it.

310

1   Q.   Would that be a true statement
2   if you did provide it?
3   A.   With the dates that we've
4   looked at today, those would probably
5   be around the right dates.  We've
6   looked at an e-mail that I sent out to
7   Penny Nichols and Melanie McCormick on
8   August 21st.  It sounds like right
9   around the same dates.
10   Q.   Okay.
11   A.   I wouldn't know for sure
12   without looking at her short-term
13   disability forms.
14   Q.   All right.  On the same page,
15   D-01310, where it reads, "The claimant
16   failed to contact our office regarding
17   her absences, which is required by the
18   attendance policy," is that correct?
19   A.   Is it correct that that's part
20   of the policy?
21   Q.   No, ma'am, is that correct
22   that she, Ms. Edwards, did not contact
23   Hyundai regarding her absences?

311

1   A.   I didn't write this, so I'm
2   not positive.
3   Q.   I'm not asking about anything
4   about -- I'm just asking if that's a
5   correct or incorrect statement, that
6   she did not contact Hyundai?
7   MR. BOSTICK:  Answer it to the
8   extent of your personal knowledge.
9   A.   Okay.  I -- I don't know if
10   she contacted, personally speaking.
11   Q.   Okay.  The next sentence,
12   "Haven't heard from claimant at all,"
13   would be a correct statement, that
14   you, and I'm asking about you, Ms.
15   Jones, had not heard from Tammy Edwards
16   since August 16th, 2006?
17   A.   Now, let me ask this:  What
18   date was this?  This would have been
19   while I was in benefits, I think.
20   Having not written this, this would not
21   have been my statement, "Haven't heard
22   from claimant at all."  But I would not
23   be hearing from Tammy anyway.  I mean,

312

1 she would call me for general advice,
2 but Tammy had to be in touch with the
3 clinic and the medical side of things,
4 which we did not handle.
5 Q. Okay. But it would not be
6 true that you had not heard from her?
7 A. That's correct, and I did not
8 write that.
9 Q. Okay. You understand that on
10 the third page of that D-01312 of
11 Plaintiff's 23 that this is indicating
12 per you that this is correct?
13 A. Uh-huh. Is this down at the
14 bottom of the whole thing?
15 Q. Yes, ma'am.
16 MR. BOSTICK: Well, I mean, I
17 think it's -- I mean, who knows what
18 the guy is typing in, but it looks like
19 that is referring to this 9/10/07 10:47
20 conversation and not to this other
21 reference of 10:38.
22 Q. Well, let's go back up. On
23 D-01310, on September 10th, 2007, at
313

1 10:38 a.m., you did not have a
2 conversation with anyone at Industrial
3 Relations, did you?
4 A. No.
5 Q. And on September 10th, 2007,
6 at 10:47 a.m., about what, nine minutes
7 later, did you have a conversation with
8 anyone at Industrial Relations?
9 A. I believe I remember that I
10 did actually have that conversation.
11 Q. Who did you talk to?
12 A. I don't remember the name of
13 the person, but Chris came, Chris Smith
14 came to get me so that I could talk to
15 them over the phone.
16 Q. So you think you had both
17 those conversations?
18 A. No. The only part of the
19 conversation that was mine was the
20 9/10/07 at 10:47.
21 Q. Okay.
22 A. Where it says "ER rebutt."
23 (Off-the-record discussion.)
314

1 (Recess.)
2 Q. (BY MS. HAYNES) All right. We
3 were on before we took the break
4 Plaintiff's Exhibit 23. Now, did you
5 talk directly with the individual at
6 the Industrial Relations?
7 A. I did.
8 Q. And did he tell you what Tammy
9 Edwards had said?
10 A. He must have, according to how
11 my response is formulated.
12 Q. All right. And do you see on
13 document Number D-01310, did he tell
14 you what she said that's written there
15 on that document where it says,
16 "Claimant Statement" in the first box,
17 and then the second box, "Employer's
18 Statement"?
19 A. Let's see. I'm not positive
20 he told me all of that. He told me the
21 part about contacting her back in two
22 weeks, and the part about the medical
23 department would not allow her to work,
315

1 that she said I told her that.
2 Q. You didn't say anything about
3 the medical department?
4 A. To Tammy or to them?
5 Q. To Ms. Edwards?
6 A. In that conversation, I
7 believe probably we were talking about
8 her coming back to work, and my words
9 would have been that that would be a
10 decision left to the medical
11 department.
12 Q. Okay. Did she ask you what
13 she needed to do next in that
14 conversation?
15 A. I don't remember.
16 Q. All right. Well, what do you
17 remember about the conversation when
18 Tammy Edwards called you and said, I've
19 been denied long-term disability, what
20 do I do now?
21 A. I told her that --
22 MR. BOSTICK: Object to form.
23 Go ahead.
316

1     A.   I told her we were aware of
2   the denial. I'm not sure we had it in
3   writing, though, because we were with a
4   different insurance at that time, we
5   had gone from having Standard insurance
6   to Hartford insurance, and Standard
7   kind of fell off the map with us as far
8   as providing us information, so I'm not
9   sure I had that in writing, but I at
10   least had it on verbal from her
11   adjuster.
12          Tammy -- well, we talked
13   generally too. She was asking me about
14   my new job and stuff like that and
15   congratulating me on that. Then she
16   said, hey, I've got -- I've got a
17   question, I need to know if I'm going
18   to be paid out for my vacation, and
19   will I be eligible for the raises that
20   I would have ordinarily gotten had I
21   been working when I get back? And I
22   told her I don't know, I'd have to get
23   back with her on that. I did not give

317

1   her a time frame. I just said I would
2   need to get back to her. At first I
3   thought I would be able to ask the
4   vacation question to somebody in
5   payroll, because I think I went over to
6   payroll. There wasn't anybody over
7   there to say one way or the other.
8     Q.   Did you ever get back to her?
9     A.   I did not.
10     Q.   Why?
11     A.   Because after conversation
12   with Wendy Warner, the company had
13   decided to move on terminating her
14   employment, and so I knew that she
15   would be paid out her vacation if she
16   had any remaining, so I knew there
17   wasn't any reason for me to contact her
18   back on that. Also, that if her employment
19   was terminated, that meant that her
20   question about the raises did not
21   pertain either.
22     Q.   All right. Prior to being
23   denied long-term disability, had she

318

1   talked with you about coming back to
2   work?
3     A.   She may have, but just in
4   the -- in the case of I'd like to come
5   back to work. She knew that she had to
6   be in touch with medical. She knew I
7   was not medical.
8     Q.   Did you ever tell her you were
9   going to have to check with other
10   people and who you needed to talk to
11   was in Korea?
12          MR. BOSTICK:  Object to the
13   form.
14     A.   Not that I recall about the
15   Korea part.
16          Now, when we were having our
17   conversation, and she was asking about
18   the vacation payout and the raises and
19   stuff like that, I may have made a
20   statement along these lines. She may
21   have said, well, what from here? and I
22   might have said, well, there are other
23   people that are involved in making

319

1   these decisions other than myself, but
2   I'm not sure I made that statement
3   about Korea.
4     Q.   Okay. Did you ever understand
5   that she did not want to come back to
6   work?
7     A.   Did I ever think she didn't
8   want to come back to work?
9     Q.   Yes, ma'am.
10     A.   No. I thought she wanted to
11   come back to work.
12     Q.   Did you understand that I was
13   writing letters on her behalf trying to
14   get her back to work?
15     A.   No, I did not know you were
16   sending the company letters.
17     Q.   Okay. The conversation that
18   you're saying you had with the
19   Industrial Relations continues on
20   document number D-01311, and you said
21   you didn't tell her you'd call her back
22   in two weeks, that conversation never
23   took place?

320

1    A.    Right, I did not specify a
2    time frame. I told her in our
3    conversation that I would have to get
4    back to her on those -- on those couple
5    of things, but I didn't say that I'll
6    get back to you in two weeks.
7        Q.    Okay. All right. And "I did
8    speak with the claimant on the phone,
9    and the claimant wanted to know about
10   her VP," that would be vacation pay?
11       A.    Correct.
12       Q.    And did she talk about
13   anything else, not that you told the
14   Industrial Relations, other than
15   vacation pay?
16           MR. BOSTICK: Object to the
17   form.
18       A.    Actually, I told Industrial
19   Relations both of the things that she
20   wanted to know in that conversation,
21   and Industrial Relations did not record
22   it.
23       Q.    Okay.

321

1    A.    Told them she wanted to know
2    about her vacation pay and she wanted
3    to know would she be eligible for her
4    raises when she came back to work.
5        Q.    All right. Did you tell
6    Industrial Relations, "The claimant is
7    well aware that she would have to go
8    through our on-site medical facility to
9    return to work"?
10       A.    I did in response to -- I
11   think just a minute ago you were asking
12   me what did the Industrial Relations
13   rep tell me, I think that was in
14   response to did you tell her that the
15   medical department would not allow her
16   to work and that I would con -- I,
17   Stacye, could contact her back in two
18   weeks. That was a response to that,
19   that "The claimant is well aware that
20   she would have to go through our
21   on-site medical facility to return to
22   work."
23       Q.    Okay. And how is it you know

322

1    she's well aware of that?
2        A.    Because she had been trying to
3    come back to work, and that's who she
4    had been communicating with. She never
5    brought me a letter that said she was
6    restricted. I never saw that
7    information.
8        Q.    And how do you know she was
9    communicating with medical?
10       A.    I guess I just take it for
11   granted that she was because she never
12   came back to work, yet she was still
13   out on leave. They had her out on
14   leave.
15       Q.    But you made the statement,
16   which is your testimony that she was
17   communicating with medical, and I'm
18   trying to ascertain how you knew that.
19   Did Ms. Edwards tell you or did medical
20   tell you?
21       A.    Well, my response was maybe I
22   just took it for granted that she was
23   communicating, because she was still

323

1    out on leave. You can't be out on just
2    a random leave without communicating
3    with the medical clinic.
4        Q.    Okay. So you assumed?
5        A.    Yes.
6        Q.    Did you ever see any
7    short-term disability applications or
8    long-term disability applications?
9        A.    No. She would have gotten
10   those, and they would have gone
11   directly to Standard, and then long
12   term would have been the same way. She
13   would have filled out the forms and
14   submitted them directly to Standard.
15       Q.    And prior to Standard, who was
16   the insurance company?
17       A.    I don't know about prior to
18   Standard. After Standard was The
19   Hartford.
20       Q.    Okay. Who would send you
21   documents and communicate with you in
22   writing?
23       A.    The Standard should have been,

324

1 but it was something they were doing
2 because we had ended our business with
3 them. That was at the end of -- that
4 was at the end of '06 that we canceled
5 our contract with them or we went with
6 another business, we went with The
7 Hartford.
8    Q.   In 2007?
9    A.   In 2007, we were with The
10 Hartford, so in order for us to know
11 anything about the Standard and the
12 people who were still on insurance with
13 the Standard, we would contact Standard
14 over the phone.
15    Q.   Okay.  When Ms. Edwards
16 applied for long-term disability, was
17 that with Standard or Hartford?
18    A.   It would have been with
19 Standard, because if she had short-term
20 disability paid under Standard, it
21 would have moved right along to
22 Standard.
23    Q.   Okay.  On the document we're

                    325

1 discussing, D-01311, it says to see a
2 summary.  Did you provide a summary for
3 the Industrial Relations?
4    A.   No.
5    Q.   All right.  The next page,
6 D-01312, did you make those statements?
7    A.   Yes.
8    Q.   Is that true that Tammy
9 Edwards had not contacted you
10 concerning returning to work or not
11 contacted Hyundai?
12    A.   In order to return to work,
13 she had to be released by the medical
14 department, and that who she had to
15 contact.  I was not the medical
16 department.
17    Q.   The statement I'm asking you
18 about if you told Industrial Relations
19 is the sentence that says, "The
20 claimant has not contacted us
21 concerning returning to work."  Did you
22 make that statement to the Industrial
23 Relations board?

                    326

1    A.   I did make that statement.
2    Q.   Is that true?
3    A.   It is true.  She had not
4 contacted us equalling Hyundai,
5 equalling medical clinic.  Benefits was
6 not medical.
7    Q.   And that's what you're
8 meaning, she had not contacted medical
9 about returning --
10    A.   She had not contacted medical.
11    Q.   Okay.  Had she contacted you?
12    A.   She had, but I was not the
13 person she needed to go through to
14 return to work.
15    Q.   Did you ever tell her that?
16    A.   She -- yes, I did.
17    Q.   Okay.  You couldn't say what
18 she had told medical or anything of her
19 conversations since you were not privy
20 to that, though, could you?
21    A.   Ask one more time.
22    Q.   You didn't know what Tammy
23 Edwards had talked to medical about, do

                    327

1 you?
2    A.   No.
3    Q.   Then why would you tell the
4 Industrial Relations that she "has not
5 contacted us" when you don't know what
6 she had done?
7    A.   Because she was not back at
8 work, which meant she was still out on
9 leave.  So by process of elimination,
10 that meant she had not brought in her
11 release to return without restrictions.
12    Q.   Is that based on assumption
13 again?
14    A.   It's based on process of
15 elimination based on how the process
16 works.
17    Q.   Do you have any firsthand
18 knowledge that she never brought in a
19 release?
20    A.   No, I wouldn't, because she
21 would have brought it in to the medical
22 clinic.
23    Q.   Okay.  Why did you tell the

                    328

1 Industrial Relations, so Ms. Edwards
2 could not get her unemployment
3 benefits, that she had not contacted
4 Hyundai regarding returning to work?
5     MR. BOSTICK: Object to the
6 form.
7     A.   Still, by process of
8 elimination, she was not back at work.
9 In my mind, that equates to she has
10 never brought the proper release from
11 her doctor to get back to work. If she
12 had, she would have been back at work.
13     Q.   You were assuming?
14     A.   If that's what you want to
15 call it, but I don't call it that.
16     Q.   You had no firsthand
17 knowledge, correct?
18     A.   Correct.
19     Q.   Okay. Had you seen her back
20 at the plant?
21     A.   No.
22     Q.   Since she had left in August
23 of 2006, you had not seen her back at

329

1 the plant?
2     A.   Maybe once, maybe she came in
3 to pay her benefits, maybe twice. She
4 did come in to pay her benefits.
5     Q.   And she never had a
6 conversation with you that she had
7 tried coming back to work and medical
8 wouldn't let her?
9     A.   She may have said that in one
10 of her conversations with me.
11     Q.   Did she tell you why they
12 wouldn't let her come back to work?
13     A.   She might have said she was
14 still under restrictions by her
15 physician, but I -- I don't know. I
16 can't give you a specific date when she
17 would have said it or --
18     Q.   As benefits -- assistant
19 manager of benefits, did you handle
20 long-term- and short-term disability?
21     A.   I handled long term, not short
22 term.
23     Q.   And Jane Ramsey, what would

330

1 she have done?
2     A.   She would have done the short
3 term.
4     Q.   Did the two of you communicate
5 with short-term disability and
6 long-term disability?
7     A.   Sometimes. It just depended.
8 Usually the process was that the
9 insurance company was doing that with
10 the claimant outside of our knowledge.
11 Like I described before, if the
12 insurance company could kind of
13 foretell within the medical notes that
14 the claimant was going to be out longer
15 than the six months of short-term
16 disability, then they would start
17 working with the claimant a month, a
18 month and a half before the short term
19 would expire, and then the claimant
20 would be directly contacting them about
21 it, sending the paperwork and talking
22 with them on the phone, if necessary.
23     Q.   When did Jane Ramsey leave

331

1 Hyundai?
2     A.   Let's see. To the best of my
3 recollection, sometime in '07, sometime
4 around the first of '07, I think, maybe
5 in the first quarter.
6     Q.   Who assumed her position after
7 she left?
8     A.   I can't remember if Penny was
9 still there or not. Penny left as
10 well, and I can't remember who left
11 first. But then an assistant manager,
12 I don't know if that took place yet or
13 not, eventually someone was promoted
14 into an assistant manager of safety,
15 and that was their primary
16 responsibility, to oversee Family
17 Medical Leave, short-term disability,
18 to kind of case manage.
19     Q.   When Jane Ramsey left, did you
20 pick up the short-term disability for a
21 period of time?
22     A.   No. I did handle it for a
23 week while she was out on vacation,

332

1   yeah.

2       Q.   Did Ms. Edwards ever tell you

3   that Jane Ramsey had told her to deal

4   directly with you and not with her

5   anymore?

6       A.   No.

7       Q.   Okay.  But you would have been

8   the proper person for Ms. Edwards to

9   deal with as far as long-term

10  disability?

11      A.   Long term, but you know, I say

12  that loosely because long-term

13  disability was carried on by the

14  insurance party with the claimant

15  directly.  We were very rarely involved

16  in those situations other than to

17  receive a letter.

18      Q.   Had you discussed Ms. Edwards

19  taking short-term disability when she

20  was working the CCR job?

21      MR. BOSTICK:  Object to the

22  form.

23      A.   She may have when she first --

333

1   as I've stated before, when she first

2   started to work for Hyundai, and I

3   don't know when she came into the CCR

4   job, but she continuously within our

5   conversations would mention her -- her

6   neck problems, I mean, that was one of

7   our primary topics of conversation; and

8   I would ask her, you know, had she ever

9   considered, you know, that route.  That

10  was while I was still in team

11  relations.

12      Q.   Okay.  And what did she tell

13  you?

14      A.   I don't remember exactly what

15  she told me.  I'm trying but --

16      Q.   Did she tell you she needed

17  her job, she did not need to be on

18  disability?

19      A.   Well, it was -- it was

20  something similar to that, that she

21  needed -- she needed to work.

22      Q.   Once Ms. Edwards went to the

23  BC1 line, did you have any

334

1   conversations with Steve Culpepper

2   about the fact Ms. Edwards was on

3   medication and working on the line?

4       A.   No.

5       Q.   Did Mr. Culpepper ever call

6   you and leave a message that Tammy

7   Edwards was on medication and working

8   on the line?

9       A.   That very well may have

10  happened.

11      Q.   Did you ever tell Culpepper

12  that he needed to send Tammy Edwards to

13  medical?

14      A.   I'm trying to remember the

15  specific chain of events.  I don't

16  remember exactly.  I do know that when

17  it came to our attention that a person

18  was on meds, if they were meds that

19  might cause drowsiness or might put the

20  team member in jeopardy or might cause

21  an accident or something of that

22  nature, cause them to hurt themselves

23  or others, that was our protocol, we

335

1   would send them to medical.

2       Q.   Okay.

3       A.   So that -- that's possible.

4       Q.   What is your understanding of

5   how soon before a shift they can take

6   meds and still show up to work?

7       A.   It depended on the medication.

8       Q.   Did you ever convey that

9   information to any team member?

10      A.   About what length of time they

11  would need to take it prior to?

12      Q.   Yes, ma'am.

13      A.   I don't think so.

14      Q.   Okay.  What medications are

15  not allowed for a team member to take?

16      A.   Just the ones if you're -- if

17  you're having problems with drowsiness

18  or if you're not feeling well as a

19  result of taking the medications.

20  There's no set list of things that they

21  can't take, but we would let medical

22  evaluate that side of it.  That's why a

23  person would be sent to medical for

336

1    that kind of evaluation to take place.
2         Q.    So if it's a medication that's
3    not causing drowsiness, it's fine for
4    them to be at work?
5              MR. BOSTICK:  Object to the
6    form.
7         A.    Not -- not necessarily.
8         Q.    And I'm trying to find out
9    what medications are not approved.
10        A.    Like I mentioned, there's not
11   a list of approved and unapproved.
12   Once we found out a person was taking
13   meds, we would typically have them
14   evaluated by the medical clinic to make
15   sure that the meds that they were
16   taking were not interfering with work
17   or not going to cause them to be
18   subject to any type of accident.
19        Q.    Okay.  Can team members work
20   with restrictions that are not caused
21   from a workers' comp accident?
22        A.    No.
23        Q.    Have you ever accommodated
                      337

1    the clinic.
2         Q.    Did she ask if she could go
3    back to the CCR job instead of on the
4    line and be able to work?
5              MR. BOSTICK:  Object to the
6    form.
7         A.    I don't remember her asking to
8    go back to CCR.
9         Q.    Well, you told me at some
10   point she did, that she asked to be
11   transferred, and we talked about that
12   it wasn't in the beginning of your
13   investigation, it was later.  Do you
14   remember that?
15        A.    Yes, I do.
16        Q.    Okay.  What do you recall that
17   she asked about a transfer?
18        A.    She asked about a transfer as
19   in she wanted to get off that shift or
20   get another job within the company, but
21   it wasn't specific to CCR.
22        Q.    When did she ask?  If you
23   started your investigation on --
                      339

1    anyone?
2         A.    Not to my knowledge.
3         Q.    Under the ADA, Americans with
4    Disability Act, you've never
5    accommodated anyone at Hyundai?
6              MR. BOSTICK:  Object to the
7    form.
8         A.    Not to my knowledge.  I
9    wouldn't know if we were accommodating
10   under ADA.
11        Q.    Has an employee ever asked to
12   be accommodated?
13        A.    No.
14        Q.    Did Tammy Edwards ask to be
15   accommodated?
16             MR. BOSTICK:  Object to the
17   form.
18        A.    She -- she asked -- she wanted
19   to come back to work.  I don't know
20   that she asked to be accommodated.
21        Q.    Did she ask if --
22        A.    I would probably be in a
23   conversation that she would have had
                      338

1              MR. BOSTICK:  Object to the
2    form.
3         Q.    If she's complaining on July
4    31st and she goes out on medical, did
5    you tell me the 18th, August 18th --
6    16th, at what point in time in those 16
7    days did she ask?
8         A.    I -- I can't give you a date.
9    I just know it was not at the first of
10   our investigation.  She was not eager
11   to transfer in the first of the
12   investigation.
13        Q.    I think we established it's
14   August 10th she's put back on the line,
15   the BC1 line, is that correct, or is it
16   the --
17        A.    That's the day she sent me the
18   e-mail.  I don't know exactly what date
19   she went back on the BC1 line.
20        Q.    Well, look at 18, Plaintiff's
21   18.  I'll sorry, you don't have 18?
22        A.    This is it.  I'm sorry.
23        Q.    On 7/31, she complains?
                      340

1    A.    Uh-huh.

2    Q.    August 8th, Mr. Bondy

3    discusses putting her back on the line;

4    August 10th, she's back on the line;

5    and August 16, she's off on medical

6    leave.  At what point does she ask you

7    about a transfer?

8         MR. BOSTICK:  Object to the

9    form, asked and answered.

10        MS. HAYNES:  I don't think

11   it's -- it's been asked, I can

12   guarantee you that, several times.

13        MR. BOSTICK:  And her answer

14   was she didn't recall the date.

15   Q.    (BY MS. HAYNES) Let's see if

16   we can -- it wasn't July 31st?

17   A.    I really don't recall the

18   date.

19   Q.    And we have a period of seven

20   days there before she's put back on the

21   line.  Do you think in those -- that

22   seven-day window she asked to be moved?

23        MR. BOSTICK:  Same objection.

                341

1    A.    I can't help you with that.  I

2    cannot remember a date.

3    Q.    All right.  And you don't

4    recall Ms. Edwards asking you not to

5    investigate, just move her so she

6    didn't have to deal with Mike Swindle?

7         MR. BOSTICK:  Object to the

8    form.

9    A.    Do I not recall that she just

10   asked to move -- that she just asked me

11   to move her?

12   Q.    Correct.

13   A.    She asked about a transfer.

14   It was not a specific request of where

15   to transfer.  She asked me about

16   transferring, and I told her that

17   Hyundai did not just transfer team

18   members, that there had to be a

19   position open in order to do such a

20   thing.

21   Q.    Did she ask you that in lieu

22   of you conducting any investigation,

23   because she did not want to lose her

                342

1    job?

2         MR. BOSTICK:  Object to the

3    form.

4    A.    No.

5    Q.    You deny that?

6    A.    Yes.

7    Q.    Okay.  Do you know why she

8    would ask for a transfer if she's on

9    the BC1 line?

10        MR. BOSTICK:  Object to the

11   form.

12   A.    No, I would not know what

13   would be her thinking.  I -- I cannot

14   read her mind.

15   Q.    Okay.  You don't know when she

16   asked for the transfer, whether it's

17   when she's working on the BC1 line or

18   when she's still a CCR?

19        MR. BOSTICK:  Objection, asked

20   and answered.

21   A.    No.

22   Q.    Okay.  If her recollection is

23   better, would you rely on that?

                343

1         MR. BOSTICK:  Object to the

2    form.

3    A.    Would I rely on her

4    recollection?

5    Q.    Yes.

6    A.    I don't know.  I don't know

7    what you're asking me specifically.

8    Are you asking me to tell you if

9    whether or not she -- what she's told

10   you is accurate?

11   Q.    If she recalls that she asked

12   you not to investigate because she

13   needed her job, just to move her so she

14   did not have to deal with Mike Swindle,

15   would you dispute that?

16        MR. BOSTICK:  Object.  She has

17   answered that question twice now.

18   Q.    You couldn't dispute it, could

19   you because you --

20        MR. BOSTICK:  She's already

21   disputed it twice.

22   Q.    Let me get my answer, and I'll

23   move on.  You couldn't dispute it

                344

1 because you have no recollection,
2 correct?
3    A.   **No, on that I do recollect,**
4 **and I have already answered that**
5 **question. She did not tell me that.**
6    Q.   Not tell you, ask you?
7    A.   **She did not ask me.**
8    Q.   Okay. Why did you not put in
9 your notes anywhere that she asked for
10 a transfer?
11    A.   **Because that was after the**
12 **fact that the investigation had taken**
13 **place, and plus I told her there's no**
14 **transferring team members unless there**
15 **is a job opening.**
16    Q.   So finally we get a date, we
17 know it's after your investigation,
18 correct?
19    A.   **I don't know what date, but**
20 **after -- after the investigation, right**
21 **there towards the end. Like I said in**
22 **the very beginning, it was towards the**
23 **end of the investigation.**

345

1    Q.   Or it would be in your notes?
2    A.   **It may not be in my notes. If**
3 **that was something she called me**
4 **outside on her way into work and said**
5 **it, it may not be in my notes.**
6    Q.   Did you ever tell her to go
7 home and talk to her husband about what
8 had happened with Mike Swindle?
9    A.   **We may have had that**
10 **conversation because of how upset she**
11 **was, you know, just so I could kind of**
12 **console her through saying, you know,**
13 **maybe you want to discuss this with**
14 **your husband.**
15    Q.   Did she ask you to call and
16 talk to her husband?
17    A.   **I don't recall that.**
18    Q.   Do you recall making the
19 comment to her about Billy Kitchens,
20 that Billy Kitchens would just have to
21 live with his own actions?
22    A.   **In regards to what?**
23    Q.   The allegations that she had

346

1 made that Mr. Kitchens had said to her?
2    A.   **What did Mr. Kitchens say to**
3 **her?**
4    Q.   We've talked about this, about
5 under the desk, where her job would be
6 under the desk.
7    A.   **And I don't know anything**
8 **about that.**
9    Q.   So your answer would be you
10 would not have told her that, well,
11 Billy Kitchens would just have to live
12 with his own actions?
13    A.   **Because I don't know about**
14 **the -- the conversation that took place**
15 **between the two of them.**
16    Q.   Did she ever tell you that
17 Billy Kitchens had apologized to her
18 and she didn't want to do anything
19 about Billy Kitchens?
20    A.   **Now, that is in my notes, in**
21 **the investigation notes, but I'm not**
22 **sure it was in regards to that. But**
23 **those words, that he apologized to her,**

347

1 **I believe were in the context of she**
2 **asked him did he remember a certain**
3 **situation, the thrusting situation, and**
4 **he told us he did not. But then he and**
5 **Tammy had a discussion about it after**
6 **the fact, and I think he said, oh, I'm**
7 **sorry, I do remember having that**
8 **conversation, but he never said he**
9 **remembered the thrusting.**
10    Q.   You don't recall her saying
11 anything about Billy Kitchens and he
12 had apologized to her, and she didn't
13 want to do anything about him?
14    A.   **No.**
15    Q.   Did you ever have a
16 conversation with Ms. Edwards' medical
17 doctor?
18         MR. BOSTICK: Object to the
19 form.
20    A.   **No.**
21    Q.   Did you ever --
22    A.   **Oh, can I go back, page 7 of**
23 **Exhibit 16, second interview with Billy**

348

1  Kitchens? This was after I found out
2  that Billy and Tammy had been
3  conversing about the situation, I asked
4  him, "Did you recollect some
5  information?" and answered, "I
6  remembered us being together, but I
7  didn't remember the act. I did
8  apologize for anything that I might
9  have said in the conversation." That's
10  where the apology was mentioned.
11        I'm going to need a dinner
12  break, if we're going to continue much
13  more.
14        MS. HAYNES: I'm trying to
15  finish, I'm trying to finish. I had
16  one page of questions when I walked in
17  here this morning.
18        MR. BOSTICK: (Inaudible.)
19        THE COURT REPORTER: I'm
20  sorry, Brian, I --
21        MS. HAYNES: Well, you're not
22  going to blame this one on me. You can
23  take the blame, though, if you had your

349

1  witness prepared. I mean, it's pretty
2  elementary just to listen to my
3  questions and answer.
4        THE WITNESS: What is
5  elementary to one is not necessarily
6  elementary to another.
7        MS. HAYNES: I didn't ask a
8  question. I'm making a statement to
9  Mr. Bostick, not you.
10        Q.    (BY MS. HAYNES) Did you ever
11  make a comment to Ms. Edwards that you
12  got in a little trouble with her
13  doctor?
14        A.    No.
15        Q.    You don't know anything about
16  Ms. Edwards' medical doctor calling
17  because they were upset that she was
18  moved on the line, about her neck
19  problem?
20        A.    No.
21        Q.    Did you ever convey to Ms.
22  Edwards the results of the
23  investigation?

350

1        A.    Let's see. Did I -- what
2  would have normally happened, according
3  to our procedure --
4        Q.    All right. See, this is a
5  prime example of why we have been here
6  for eight hours.
7        MR. BOSTICK: Don't lecture
8  the witness.
9        MS. HAYNES: This is a prime
10  example.
11        MR. BOSTICK: You can ask her,
12  and answer the question. Just listen
13  to the question.
14        MS. HAYNES: I'm just making
15  my point.
16        MR. BOSTICK: Okay.
17        MS. HAYNES: Will you repeat
18  the question?
19        THE COURT REPORTER: Question:
20  "Did you ever convey to Ms. Edwards the
21  results of the investigation?"
22        Q.    (BY MS. HAYNES) Do you
23  understand that is a "yes" or "no"?

351

1        A.    I do understand that it's a
2  "yes" or "no."
3        Q.    Okay.
4        A.    But I want to have on record
5  what I'm about to say, if that's
6  acceptable.
7        MR. BOSTICK: You can answer
8  the question.
9        Q.    That's just why we're here. I
10  just want you to know, it's you, not
11  me, because I had one page of notes.
12  But go ahead, you are more than
13  welcome.
14        A.    Our normal procedure when we
15  investigate was to get back with both
16  sides, both parties. So Tammy went out
17  on leave, and I was not back in touch
18  with her on that investigation,
19  thinking that she would come back from
20  leave. That's when I would have
21  delivered a similar letter like this to
22  her (indicating). So no, it was never
23  communicated directly with me sitting

352

1    down with her and giving her the
2    letter.
3        Q.    And you're pointing to an
4    exhibit?
5        A.    I'm pointing to, let's see,
6    Exhibit 7, the letter that Mike Swindle
7    got. But it would not have been a
8    serious misconduct; it would have been
9    a wrap-up letter from the
10    investigation.
11        Q.    Did you ever type that letter
12    up?
13        A.    I don't remember if I did or
14    not.
15        Q.    Did Ms. Edwards ever contact
16    you about the investigation while she
17    was on short-term disability?
18        A.    The -- it may have popped up
19    in our conversation.
20        Q.    What did she say?
21        A.    She probably asked, you know,
22    what had happened.
23        Q.    What did you say?

353

1    work, we were going to sit down with a
2    letter and explain everything.
3        Q.    Does that letter exist?
4        A.    I don't know.
5        Q.    You never formulated it?
6        A.    I don't recall.
7        Q.    The letter that is Plaintiff's
8    Exhibit 7 to Mr. Swindle, did you type
9    that letter?
10        A.    I don't recall. It could have
11    been typed by Rob Clevenger or Shawn
12    Flate or Kisha Morris.
13        Q.    My question is, did you?
14        A.    I said I don't remember.
15        Q.    Okay. Look for me at
16    Plaintiff's Exhibit 2, please, and turn
17    to document D-00266. Are you familiar
18    with these policies?
19        A.    Yes.
20        Q.    And the format?
21        A.    Yes.
22        Q.    Where is it kept?
23        A.    In -- usually in the

355

1        A.    I think I told her that that
2    would be something we would discuss
3    when she got back to work.
4        Q.    Did you say that that will be
5    something we will discuss if you come
6    back to work?
7        A.    No.
8        Q.    Why not share it with her and
9    let her know what happened with regards
10    to her complaint?
11        A.    Because we were on the phone,
12    and that was a conversation that needed
13    to be had face to face.
14        Q.    Well, why didn't you tell her
15    that?
16        A.    I don't know.
17        Q.    Why not call her in and --
18    she's still an employee, is she not,
19    even on short-term disability?
20        A.    She was a team member, yes.
21        Q.    So why not ask her to come in
22    and share the results?
23        A.    Because when she got back to

354

1    department that owns the policy. In
2    this case, it says the owner is team
3    relations, but this policy is
4    administered through safety medical.
5        Q.    The revision date at the top
6    of the page, can you tell me what that
7    means?
8        A.    It would have been revised on
9    January the 11th, '08.
10        Q.    Okay. Was there in place
11    these same documents prior to January
12    11th, 2008?
13        A.    Yes. They just might not have
14    been written this way because
15    apparently there was a revision.
16        Q.    In 2006, were these documents
17    located on the computer, the intranet?
18        A.    Yes.
19        Q.    How did team members access
20    these policies?
21        A.    They could ask for copies of
22    them. We would run them off. As a
23    matter of fact, it was frequent that

356

1  team members on the floor would say,
2  hey, I want to see this policy, so I
3  would run a copy of it and take it off
4  and take it to them and mark it as a
5  copy.
6      Q.   The documents before this
7  purport to be a handbook?
8      A.   Uh-huh, yes.
9      Q.   How often were those provided
10 to team members?
11     A.   One was provided when they
12 started as a new hire.
13     Q.   Uh-huh.
14     A.   And then if they lost that
15 copy, I believe we allowed for one
16 replacement free of charge; then if
17 they lost that copy, that was a charge
18 on the next replacement.
19     Q.   In Plaintiff's 19, did Ms.
20 Edwards ask for another handbook?
21     A.   Is that the e-mail?
22     Q.   Yes, ma'am.
23     A.   Yes.

357

1  coming to team relations.
2      Q.   All right.  In the e-mail,
3  Plaintiff's 19, she ends the e-mail
4  with, "I appreciate your time.  You
5  asked me this morning my feelings, so
6  here they are."  Do you recall asking
7  her what her feelings were about being
8  back on the line?
9      A.   Well, now, I often asked her
10 about how she was feeling, because of
11 her medical condition due to the
12 automobile accident.  So I don't know
13 if that was in regards to that or
14 something else, but oftentimes I would
15 say, hey, how are you doing, how are
16 you feeling?
17     Q.   All right.  My question was:
18 Did you ask her that morning what her
19 feelings were with regard --
20     A.   Well, it says -- it says I
21 did.  I mean, that's what she says in
22 her e-mail, "You asked me this morning
23 my feelings, so here they are."

359

1      Q.   Did you ever provide her a
2  handbook?
3      A.   She says, "Let me know when
4  you get another book.  I don't mean to
5  bug you about it."  I believe I did,
6  because I believe she had to sign for a
7  replacement copy.  We kept a form for a
8  replacement copy.
9      Q.   Okay.  What was the discussion
10 about her not having a handbook?
11     A.   Maybe she had misplaced it
12 or -- I don't remember the exact
13 discussion.
14     Q.   Okay.  Was there any type of
15 discussion she had not followed the
16 policy, the Hyundai policy in reporting
17 Mike Swindle?
18     A.   Was there a discussion by me
19 with her --
20     Q.   Yes, ma'am.
21     A.   -- that she had not followed
22 the policy?  No, not that I recall,
23 because she followed the policy by

358

1          MR. BOSTICK:  She's just
2  asking your recollection about whether
3  you said that or not, not what she put
4  in the e-mail.
5      A.   Oh.  I probably did ask her
6  about how she was feeling.  That was a
7  common question.
8      Q.   Feeling, as in physical
9  feeling?
10     A.   Feeling as in physical
11 feeling.
12     Q.   Okay.  And is that what you
13 understand she was writing here, about
14 her physical feelings?
15     A.   I don't think she meant it the
16 same way here, no.
17     Q.   But that's how you meant it?
18     A.   Probably, because we talked a
19 lot about her medical condition.
20     Q.   But you have no recollection
21 of asking her, "How do you feel about
22 this move?" or something similar to
23 that?

360

1    A.    It -- it could have been about
2  anything.  If this was a day that I saw
3  her on BC1, I might have asked her how
4  she was feeling about being on BC1.
5  The majority of the time when I asked
6  her how she was feeling, it was in
7  regards to her medical condition.
8         MS. HAYNES:  All right.  Let
9  me have a short break with my client
10  and maybe I'm through.
11         MR. BOSTICK:  Okay.
12         (Recess.)
13    Q.    (BY MS. HAYNES) I had it
14  wrong.  The medical doctor there at
15  Hyundai, did he call you about Tammy?
16    A.    The medical doctor?  Somebody
17  in the clinic did call me, but I can't
18  remember exactly what the conversation
19  was.  I think it might have been --
20  that might have been when I knew that
21  she was going out, that he had put her
22  out of work to see her personal
23  physician.  That may have been why we

361

1  were discussing it.
2    Q.    Did the medical doctor there
3  at Hyundai discuss with you why Ms.
4  Edwards was placed back on the line if
5  she had a neck problem?
6    A.    Did he discuss that with me?
7  I think the extent of our discussion
8  was he was going to put her out of work
9  to see her personal physician until she
10  could come back to work without
11  restrictions.
12         MS. HAYNES:  Can you read it
13  one more time?
14         MR. BOSTICK:  So the answer is
15  no, right?
16         (Whereupon, the last question
17          was read back by the court
18          reporter.)
19    A.    No.
20         MS. HAYNES:  Thank you.
21  That's all the questions I have.
22  EXAMINATION BY MR. BOSTICK :
23    Q.    Briefly, Ms. Edwards went out

362

1  on medical leave on I believe we said
2  around August 16th of 2006, and you
3  were in team relations at that time,
4  right?
5    A.    That's right.
6    Q.    You hadn't taken your job over
7  in benefits --
8    A.    Right.
9    Q.    -- at that time?  So did you
10  have any involvement in a determination
11  of who she was eligible for FMLA at
12  that time or not?
13    A.    No, I would not have been
14  involved in the eligibility piece.
15    Q.    Did you know or do you know
16  back at the time whether she was
17  eligible at for FMLA?  You had made
18  some comments earlier about how FMLA
19  works.
20    A.    Well, now that I think back,
21  if she started -- I think she started
22  earlier that year, which would mean she
23  would not have been there a year yet,

363

1  which is one of the stipulations of
2  Family Medical Leave, that you're
3  employed for a year and work for 1,250
4  hours.  So I would have known that by
5  virtue of the fact I knew her date of
6  hire.
7         MR. BOSTICK:  No further
8  questions.
9         MS. HAYNES:  Good.  Have a
10  nice weekend.
11
12      THUS CONCLUDED THE DEPOSITION OF
13            STACYE JONES
14
15
16
17
18
19
20
21
22
23

364

```
 1            C E R T I F I C A T E
 2   STATE OF ALABAMA   )
 3   JEFFERSON COUNTY   )
 4        I hereby certify that the above
 5   and foregoing proceeding was taken down
 6   by me by stenographic means, and that
 7   the questions and answers therein were
 8   produced in transcript form by computer
 9   aid under my supervision, and that the
10   foregoing represents, to the best of my
11   ability, a true and correct transcript
12   of the proceedings occurring on said
13   date at said time.
14        I further certify that I am
15   neither of counsel nor of kin to the
16   parties to the action; nor am I in
17   anywise interested in the result of
18   said cause.
19
20        _____
21        SALLIE NESMITH GUNTER
22        CERTIFIED COURT REPORTER
23        ACCR LICENSE #37
                     365
```

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
### NORTHERN DIVISION

| | | |
|---|---|---|
| **TAMMY EDWARDS** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | **2:07-cv-00908-MHT** |
| **HYUNDAI MOTOR** | ) | |
| **MANUFACTURING ALABAMA,** | ) | |
| **LLC, and MIKE SWINDLE,** | ) | |
| **individually,** | ) | |
| | ) | |
| **Defendants.** | ) | |

# PLAINTIFF'S DEPOSITION EXHIBITS ORIGINALS

# FILE #1392

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

**PLAINTIFF'S EXHIBIT**

*11*

| | | |
|---|---|---|
| **TAMMY EDWARDS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:07-cv-908-MHT |
| **HYUNDAI MOTOR** | ) | |
| **MANUFACTURING ALABAMA, LLC,** | ) | |
| **and MIKE SWINDLE, individually,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### RE-NOTICE OF DEPOSITION

Please take notice that at the time, place and date indicated below, Plaintiff

will complete the testimony by deposition upon oral examination of that party

named below, pursuant to the Federal Rules of Civil Procedure 30(b) before a

Notary Public or other officer authorized by law to administer oaths by audio,

video and stenographic means. Such deposition conducted by audio, video and

stenographic means shall be taken for the purpose of discovery or for use as

evidence in this action, and will continue from time to time until completed, at

which time and place you are notified to appear and take such part in the

examination as shall be fit and proper.

DEPONENT:          STACYE JONES

DATE AND TIME:     To be determined

PLACE:             Haynes & Haynes, P.C.
                   1600 Woodmere Drive
                   Birmingham, Alabama 35226

**DEPONENT IS REQUESTED TO PRODUCE THE FOLLOWING**

**DOCUMENTS PURSUANT TO FEDERAL RULES OF CIVIL**

**PROCEDURE 30 & 34:**

1. Your current resume and your job description/title including duties for the last five years.

2. Any and all documents in your possession or control at any time which references Tammy Edwards.

3. Any and all e-mails authored by you or received by your which reference Tammy Edwards in any fashion.

4. Any and all agreements, electronic data, letters of understanding, or documents which reference your testimony in this matter including, but not limited to, how you are being compensated for your time and/or mileage/travel to testify.

5.     The deponent is requested to bring and permit Plaintiff to inspect and

to copy any and all documents or materials used at any time by the

deponent to prepare for the deposition.

Alicia K. Haynes
Attorney for Plaintiff

**OF COUNSEL:**

**HAYNES & HAYNES, P.C.**
1600 Woodmere Drive
Birmingham, Alabama 35226
Phone: (205) 879-0377
Fax: (205) 879-3572
E-mail: akhaynes@haynes-haynes.com
ASB-8327-E23A

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above and foregoing has been served
upon the following, by placing a copy of same in the U.S. Mail, properly
addressed and postage prepaid on this the ___10___ day of __June__, 2008.

J. Tobias Dykes
**CONSTANGY, BROOKS &**
**SMITH, LLC**
One Federal Place, Suite 900
1819 Fifth Avenue North
Birmingham, Alabama 35203

Brian R. Bostick
**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203

OF COUNSEL

**STACYE M. JONES**

Montgomery, Alabama 36116

PLAINTIFF'S EXHIBIT

/2

## SUMMARY

Experienced business generalist who communicates effectively in groups or on an individual basis, picks up new concepts quickly, and motivates people to do their best. Skilled in employee relations, worker's compensation, administration, and other business functions. Possesses very positive attitude, addresses problems immediately, and is both enthusiastic and proactive.

## PROFESSIONAL EXPERIENCE

**Hyundai Motor Manufacturing Alabama**
Montgomery, AL                                                                2005-Present

**Benefits Assistant Manager** (October 2006 – Present)
Manage 3 full-time exempt specialists and 1 full-time temporary employee. Review and prepare comparisons of benefits proposals. Report on company-wide leaves of absence using queries in SAP. Coordinate communications with team members regarding benefits. Conduct benefits training. Communicate with outside vendors regarding team member claims. Assist with implementation of Family Medical Leave administration by outside vendor. Review, revise, and develop policy and procedure. Ensure compliance with state and federal law and company policy.

**Team Relations Specialist** (June 2005 – October 2006)
Coordinated team relations functions for 175 team members in a union-free manufacturing environment. Investigated discrimination and harassment claims and made recommendations for necessary corrective action. Provided new-hire policy training. Assisted in the process of random drug screening. Communicated with all levels of production management in order to ensure consistent application of company policy and procedure. Conducted exit interviews.

**Career Personnel**
Montgomery, AL                                                                2004-2005

**Contract Recruiter for Hyundai** (October 2004 – June 2005)
Coordinated salaried recruiting (including sourcing, phone screening, interviewing, and making offers) from Administrative Assistant level up to Department Manager level for all areas of production and safety. Worked closely with Senior Management and outside recruiters to ensure all positions were filled by qualified candidates in a timely fashion. Reported weekly to management on all open requisitions. Represented Hyundai at multiple career fairs. Assisted with the collection of documentation and the completion of I-9's for new hires. Updated corporate job line.

**Louisiana Pacific**
Selma, AL                                                                    2004

**HR/Safety Manager** (April 2004 – May 2004)
Managed employee relations functions for 90 employees in a union-free manufacturing environment. Conducted new hire and temporary employee orientation. Administered first-aid. Conducted safety investigations. Maintained the OSHA log. Administered all random drug screening. Coached plant management in the implementation of both plant and company policy and procedure.

Susan M. Jones

(334) 598-8482

**Russell Corporation**                                                        1995 – 2003
Alexander City, AL

**Employee Relations Manager** (January 1998 – October 2003)
Managed employee relations functions for 1500 employees within four union-free manufacturing facilities. Reported monthly turnover and absenteeism. Addressed issues with employees regarding company benefits, safety, and company policies and procedures. Served on plant committees including recycling, safety, and ergonomic. Worked closely with plant management to ensure fair and consistent practices. Coordinated interviewing and hiring through both the company and temporary agency. Conducted new hire orientation.

- Worked closely with Corporate Office, Russell employees, the State of Alabama, employment agencies, and Williams, Roberts, Young (specialized training group) regarding the closing of the Slocomb and Columbia facilities. Delivered severance and benefit information in group and individual meetings for 500 employees.

- Reduced turnover at Coosa River facility from 46% to 20.8% by implementing evaluation process for all temporary employees.

- Improved safety incident rates through implementation of safety and training programs.

- Developed and delivered special supervisory training in the areas of documentation, drug screening, and employee relations.

- Promoted diversity through hiring practices, resolving conflict, and training programs.

**Worker's Compensation Secretary** (January 1996 – December 1997)
Worked directly with Manager of Worker's Compensation. Organized and maintained all legal, alternate duty, and med-only files for worker's compensation claimants. Reported annual worker's compensation costs and status of legal cases. Worked with the third party administrator to ensure proper payment of Temporary Partial Disability and/or Temporary Total Disability. Maintained information on assignments for employees with permanent medical restrictions.

**Human Resources Receptionist** (June 1995 – December 1995)
Answered, screened, and directed all incoming calls for corporate HR department. Prepared hourly, non-exempt, and exempt new hire information for pre and post orientation. Designed job manual for HR Receptionist position.


## EDUCATION

**Bachelor of Science**                                                        1992 – 1994
Auburn University at Montgomery, Montgomery, Alabama
Elementary Education, June 1994, 3.9 GPA, Summa cum Laude

  

PLAINTIFF'S
EXHIBIT

/3

## HMMA EMPLOYMENT

### Search Openings

Search our positions by selecting a Department below. Each job description
for applying and submitting your resume to us online. This is the fastest ar
way to be considered for any of our positions.

There are currently a total of **31** open jobs.

Department: | Diversity
Engine
Engine Support
Finance

Description Keywords: | ccr

**Search**



To fill out a general application form click here

### Previous Applicants

If you have previously applied to a position on our website, input your e-m
password below to login.

Email: |
Password: |

**Login**

If you do not remember your password click here

Home   |   Our Company   |   Community Relations   |   Jobs@HMMA   |   Manufacturing Plant   |   Media Center   |   Tours   |   Ve
Legal Disclaimer   |   Privacy Policy

# Exhibits 14-19 Filed Under Seal

1    IN THE UNITED STATES DISTRICT COURT

2         MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4

5    TAMMY EDWARDS,

6         Plaintiff,

7    vs.

8    HYUNDAI MOTOR MANUFACTURING ALABAMA,

9    LLC, and MIKE SWINDLE, individually,

10        Defendants.

11

12   CIVIL ACTION NUMBER:  2:07-cv-908-MHT

13

14

15       DEPOSITION:  THOMAS H. BONDY

16

17

18        S T I P U L A T I O N S

19       IT IS STIPULATED AND AGREED by

20   and between the parties through their

21   respective counsel that the deposition

22   of THOMAS H. BONDY may be taken on July

23   17, 2008, before Sallie NeSmith Gunter,

                    1

1    Certified Court Reporter of the State

2    of Alabama, ACCR License Number 37,

3    Commissioner and Notary Public, at the

4    Wingate Inn, 2060 Eastern Boulevard,

5    Montgomery, Alabama.

6        IT IS FURTHER STIPULATED AND

7    AGREED that it shall not be necessary

8    for any objections to be made by

9    counsel to any questions except as to

10   form or leading questions, and that

11   counsel for the parties may make

12   objections and assign grounds at the

13   time of trial or at the time said

14   deposition is offered in evidence or

15   prior thereto.

16

17

18

19

20

21

22

23

                    2

---

1              APPEARANCES

2    Appearing for the Plaintiff:

3        HAYNES & HAYNES, P.C.

4        By:  Alicia K. Haynes, Esq.

5        1600 Woodmere Drive

6        Birmingham, Alabama  35226

7    Appearing for the Defendant  Hyundai

8    Motor Manufacturing Alabama, LLC:

9        OGLETREE, DEAKINS, NASH, SMOAK

10          & STEWART, P.C.

11       By:  Brian R. Bostick, Esq.

12       One Federal Place

13       Suite 1000

14       Birmingham, Alabama  35203

15            - and -

16       By:  Christopher N. Smith, Esq.

17       Corporate Legal Counsel

18       Hyundai Motor Manufacturing

19          Alabama, LLC

20       700 Hyundai Boulevard

21       Montgomery, Alabama  36105

22

23

                    3

1    Appearing for the Defendant Michael

2    Wayne SWINDLE:

3        CONSTANGY, BROOKS & SMITH, LLC

4        By:  J. Tobias Dykes, Esq.

5        One Federal Place

6        Suite 900

7        Birmingham, Alabama  35203

8    Certified Court Reporter:

9    Sallie NeSmith Gunter

10   Also Present:  Tammy Edwards

11

12

13

14

15

16

17

18

19

20

21

22

23

                    4

1    I N D E X

3    Examination by Ms. Haynes.............7
4    Examination by Mr. Bostick..........141
5    Examination by Ms. Haynes...........144
6    Plaintiff's Exhibit 24
7    Résumé of Thomas H. Bondy.............9
8    Plaintiff's Exhibit 25
9    E-Mail With Attachment from Tammy
10   Edwards to Various Recipients Dated
11   08/09/2006..........................43
12   Plaintiff's Exhibit 26
13   HMMA Daily Productions Report........45
14   Plaintiff's Exhibit 27
15   Letter from Alicia Haynes to Tom Bondy
16   Dated 03/06/2007....................118
17   Plaintiff's Exhibit 28
18   Clinic Visit Notes..................119
19   Plaintiff's Exhibit 29
20   Re-Notice of Deposition.............131

5

1       I, Sallie NeSmith Gunter, a
2   Certified Court Reporter of the State
3   of Alabama, ACCR License Number 37,
4   acting as Commissioner, certify that on
5   this date there came before me at the
6   Wingate Inn, 2060 Eastern Boulevard,
7   Montgomery, Alabama, on July 17, 2008,
8   beginning at or about 9:18 a.m.,
9   THOMAS H. BONDY, witness in the above
10  cause, for oral examination, whereupon,
11  the following proceedings were had:
12       THE COURT REPORTER:  All
13  right.  Would you gentlemen and Ms.
14  Haynes, would y'all like the usual
15  stipulations?
16       MR. BOSTICK:  That's fine.
17       MS. HAYNES:  Yes, that's fine.
18       THE COURT REPORTER:  All
19  right.  Mr. Bondy, would you raise your
20  right hand, please, sir, to be sworn?

6

1            THOMAS H. BONDY,
2   being first duly sworn, was examined
3   and testified as follows:
4        MR. BOSTICK:  I think he'll
5   want to read and sign.
6   EXAMINATION BY MS. HAYNES:
7        Q.  All right.  Mr. Bondy, if you
8   would, please state your full name for
9   the record, please.
10       A.  Thomas H. Bondy, B-O-N-D-Y.
11       Q.  All right.  What does the H
12  stand for?
13       A.  Harry.
14       Q.  And your current address,
15  please, sir?
16       A.  8360 Chadburn Way.
17       Q.  Can you spell that?
18       A.  C-H-A-D-B-U-R-N, Way, W-A-Y.
19       Q.  Is that here in Montgomery?
20       A.  Yes, ma'am.
21       Q.  And the zip code, please, sir?
22       A.  36116.
23       Q.  Your date of birth?

7

1        A.  10/1/67.
2        Q.  '67?
3        A.  Yeah.
4        Q.  Have you ever given a
5   deposition before?
6        A.  Yeah, maybe ten, 12 years ago.
7        Q.  Okay.  Was it -- it wasn't for
8   Hyundai?
9        A.  No.
10       Q.  How long have you been
11  employed with Hyundai?
12       A.  Four and a half.
13       Q.  Four and a half years?
14       A.  Years, yeah.
15       Q.  Okay.  And Mr. Bostick just
16  slid across the table what purports to
17  be your résumé; is that correct?
18       A.  Yes.
19       Q.  Is that current through today?
20       A.  Yes, ma'am.
21       Q.  Okay.  When is the last time
22  you updated it?
23       A.  Maybe six months.

8

1    MS. HAYNES: Okay. We'll mark
2 that as Plaintiff's 24.
3         (Plaintiff's Exhibit 24 was
4         marked for identification.
5         A copy is attached.)
6    Q.   (BY MS. HAYNES) What's your
7 current position with Hyundai?
8    A.   **Production manager.**
9    Q.   And how long have you been in
10 that position?
11   A.   **Four and a half years.**
12   Q.   What are your job duties?
13   A.   **Entire weld shop operations.**
14   Q.   Which shift?
15   A.   **Day shift.**
16   Q.   Do you ever work the night
17 shift?
18   A.   **No.**
19   Q.   Who is your counterpart on the
20 night shift?
21   A.   **I have an AM that works on the**
22 **night shift. I have two AMs, night**
23 **shift and day shift, they rotate.**

9

1    Q.   Their names, please?
2    A.   **Now or then?**
3    Q.   Well, now, and then we'll go
4 back if it's changed any.
5    A.   **Mike O'Keefe is on nights,**
6 **O-K double E F-E. On day shift, it's**
7 **Vince Gahafer, G-A-H-A-F-E-R.**
8    Q.   And he's on the day shift?
9    A.   **Yes, ma'am.**
10   Q.   And when you say AM, that's
11 assistant manager?
12   A.   **Correct.**
13   Q.   Has it changed any in the four
14 and a half years that you've been
15 production manager of the weld shop?
16   A.   **Yes, ma'am.**
17   Q.   How?
18   A.   **I -- in 2006, it was Harry**
19 **White.**
20   Q.   In which position?
21   A.   **Assistant manager on both**
22 **shifts actually. I only had one.**
23   Q.   And how long was Mr. White

10

1 your assistant manager?
2    A.   **Two and a half years.**
3    Q.   And did Mr. White leave
4 Hyundai's employment?
5    A.   **No. We promoted him.**
6    Q.   What position is he in now?
7    A.   **He's the engineering manager.**
8    Q.   What position was Mr. O'Keefe
9 in prior to assistant manager?
10   A.   **I acquired him in late 2007.**
11 **He was an assistant manager in general**
12 **assembly.**
13   Q.   And when you say you "acquired
14 him," what do you mean?
15   A.   **He transferred to my**
16 **department. I had a vacant position.**
17   Q.   Who vacated the position
18 Mr. O'Keefe went into?
19   A.   **That was -- I think it was**
20 **Harry. When Harry left, I still had an**
21 **open spot.**
22   Q.   Was there a point in time that
23 Mr. White and Mr. Gahafer were both

11

1 assistant managers?
2    A.   **No, no, there was gaps.**
3    Q.   How did the one position
4 become two positions?
5    A.   **It was always supposed to be**
6 **two positions. We had -- we had a guy**
7 **quit in 2004, his name was Gerald**
8 **Dunagan, so it was Harry and Gerald**
9 **Dunagan originally, so I was -- I had**
10 **one for -- for a long time. I had**
11 **Harry White for a long time, and then I**
12 **had Vince by himself for a long time,**
13 **and now I'm fully staffed, which is**
14 **nice.**
15   Q.   Who are your direct reports
16 currently?
17   A.   **Mike O'Keefe, Vince Gahafer,**
18 **Billy Kitchens, Chris Worley.**
19   Q.   Anyone else?
20   A.   **No, ma'am.**
21   Q.   Has that changed in the last
22 four and a half years, your direct
23 reports?

12

1    A.    Well, Billy has only been a
2    group leader six months, a year, so
3    yeah.  We -- we didn't have group
4    leaders for a long time.
5    Q.    Mr. Kitchens and Mr. Worley
6    are both group leaders?
7    A.    Yes, ma'am.  Worley has been a
8    group leader for like two years, two
9    and a half years.
10    Q.    Who was in the position prior
11    to Mr. Kitchens?
12    A.    Steve Culpepper.
13    Q.    And was Mr. Culpepper in the
14    position when you started with Hyundai?
15    A.    We didn't have that position
16    filled, we didn't have anybody
17    qualified.
18    Q.    Was he the first group leader,
19    Mr. Culpepper?
20    A.    Worley was and then Culpepper.
21    Q.    Okay.  Any other group leaders
22    that have worked for you in the last
23    four and a half years other than

13

1    Kitchens, Culpepper, and Worley?
2    A.    No, ma'am.
3    Q.    Any other direct reports?
4    A.    No.
5    Q.    How many indirect reports do
6    you have?
7    A.    Two hundred fifty.
8    Q.    Is that all the hourly
9    workers?
10    A.    Yeah.
11    Q.    How many team leaders?
12    A.    Let's see.  There's ten.
13    Q.    Who are your current team
14    leaders?
15    A.    Let's see.  Tommy Brown, Tommy
16    Robertson, Mike Swindle, Terrance
17    Battle, Keith Ulrich, Craig Hay, Jason
18    Thornton, Jason Driggers, we'll call
19    him Yao, because I can't spell his real
20    name.  Who else?
21    Q.    That's nine.
22    A.    Richard Bush.  Yeah, there you
23    go.

14

1    Q.    Are the ten team leaders
2    divided between the two different
3    shifts?
4    A.    Yes, five per shift.
5    Q.    Okay.  Do they alternate
6    shifts or are they assigned one shift?
7    A.    They alternate every two to
8    three months.
9    Q.    All of them?
10    A.    Correct.
11    Q.    And has that always been the
12    case as long as you've had team
13    leaders?
14    A.    Correct.
15    Q.    What position is Mr. Swindle
16    currently working?
17    A.    He's team leader night shift.
18    Q.    And three months ago was he
19    team leader on day shift?
20    A.    Correct.
21    Q.    Is he assigned to a certain
22    line?
23    A.    Yeah, he's in charge of body

15

1    build/body respot.
2    Q.    And how long has he done that
3    position for you, if you know?
4    A.    Roughly two and a half years.
5    Q.    Have his job duties changed in
6    the last two and half years?
7    A.    No, ma'am.
8    Q.    Do you have any responsibility
9    in assigning raises or promotions for
10    the weld shop?
11    A.    Yes.
12    Q.    Okay.
13    A.    For my direct reports.
14    Q.    Okay.  What is that, do you
15    have any oversight above you or you can
16    recommend raises and promotions?
17    A.    I make the recommendations,
18    and then the HOD, head of department,
19    signs off.
20    Q.    Who is the head of department?
21    A.    Now or then?
22    Q.    Now.
23    A.    Ron Trautzsch, that's

16

1 T-R-A-U-T-Z-S-C-H. I struggle with it
2 every time. It's kind of like spelling
3 Yao.
4     Q. Prior to that person, who was
5 in that position?
6     A. Rob Katzenbach,
7 K-A-T-Z-E-N-B-A-C-H.
8     Q. Yeah, we've seen that one, but
9 we haven't seen the other one, Mr.
10 Trautzsch.
11     A. Okay.
12     Q. Katzenbach we can handle. All
13 right. So you can make a
14 recommendation, and then prior, Mr.
15 Katzenbach would approve your
16 recommendation for a raise or
17 promotion?
18     A. Right.
19     Q. Okay. In the last two and a
20 half years, have you --
21     A. Excuse me. The Korean
22 coordinators have to sign off as well.
23 The Korean coordinators, they sign off

17

1 as well.
2     Q. I'm still not understanding
3 that word.
4     MR. BOSTICK: Korean
5 coordinators.
6     A. Korean. That's the -- like my
7 American boss is the HOD, and then the
8 Korean HOD also has to sign off, so
9 there's two signatures.
10     MR. BOSTICK: Head of
11 department, HOD.
12     Q. In the last two and a half
13 years, have you sought a promotion or a
14 raise for Mr. Swindle?
15     A. No.
16     Q. Has he had raises in the last
17 two and half years?
18     A. No.
19     Q. Have any of your team leaders
20 had raises in the last two and a half
21 years?
22     A. Billy Kitchens.
23     Q. When he moved to group leader?

18

1     A. Correct.
2     Q. Anyone else?
3     A. No.
4     Q. Are raises -- other raises
5 awarded, cost-of-living raises, yearly
6 raises, are those given?
7     A. Yeah.
8     Q. By someone other than you?
9     A. No.
10     Q. Who?
11     A. No, I give them.
12     Q. In the last two and half
13 years, have you had a raise?
14     A. Yeah.
15     Q. Cost of living?
16     A. Correct.
17     Q. Okay. And has that been
18 across the board for all employees at
19 Hyundai?
20     A. Cost of living is for hourly
21 team members. Salary, we don't get
22 cost of living, we get our yearly merit
23 raises.

19

1     Q. What time of year is that?
2     A. That's in I want to say March.
3     Q. Is it only once a year?
4     A. Correct.
5     Q. And would Mr. Swindle have
6 received merit raises as a result of
7 being a salaried employee?
8     A. No.
9     Q. Is he salaried?
10     A. No, he's hourly.
11     Q. Would Mr. Kitchens be a
12 salaried employee?
13     A. Correct. We don't -- we have
14 a company that -- you -- like Swindle
15 or Kitchens will sign up to be a group
16 leader, that's a posted position, and a
17 third party runs an in-basket testing
18 program. We really -- from a promotion
19 standpoint, we -- our hands are really
20 out of it. The -- the company, you
21 know, either says you passed a test or
22 you didn't, and if you didn't pass the
23 test, I can't promote you. So it's

20

1  really based on how they do with the
2  test.
3      Q.   Okay.  So what you're telling
4  me, you had no say-so in Mr. Kitchens
5  being promoted?
6      A.   **Correct.**
7      Q.   Have you ever been trained on
8  the discrimination and harassment
9  policies of Hyundai?
10     A.   **Yes.**
11     Q.   When?
12     A.   **I want to say maybe a year**
13 **ago.  It's been a couple of times.**
14     Q.   Okay.  Do you remember the
15 first time?
16     A.   **Maybe 2004.**
17     Q.   And the second time was 2007?
18     A.   **Yeah.**
19     Q.   Do you know who trained you in
20 2004?
21     A.   **Just training center.  I don't**
22 **remember who.**
23     Q.   Okay.  How about in 2007?

21

1      A.   **The same.**
2      Q.   There at the training center?
3      A.   **Uh-huh.**
4      Q.   Is that a "yes"?
5      A.   **Yes.**
6      Q.   When you worked at Ford Motor
7  Company, did you also have training on
8  their discrimination and harassment
9  policies?
10     A.   **Yeah, that was yearly.**
11     Q.   Prior to coming to Hyundai,
12 would it be correct that you knew
13 discrimination and harassment in the
14 workplace was illegal?
15     A.   **Correct.**
16     Q.   Okay.  Have you ever been
17 trained that it's illegal to retaliate
18 against anyone in the workplace for
19 making a claim on harassment?
20     A.   **That's correct.**
21     Q.   How long have you known that?
22     A.   **Sixteen years.**
23     Q.   And when you say 16 years,

22

1  what is the basis?
2      A.   **It's based off of starting**
3  **with Ford Motor Company with training.**
4      Q.   Okay.  Has anyone at Hyundai
5  trained you on retaliation?
6      A.   **That's part of our harassment**
7  **training.**
8      Q.   Okay.  And were you trained on
9  retaliation in 2004?
10     A.   **Correct.**
11     Q.   Do you recall in August of
12 2006 having a conversation with Stacye
13 Jones about Tammy Edwards?
14     A.   **I know it was probably early**
15 **August.  Concerning what?  I mean, I**
16 **talk to team relations daily, so I**
17 **don't know what you're referring to.**
18     Q.   I'm referring to a
19 conversation you would have had with
20 Ms. Jones where she conveyed to you
21 there was a complaint from Ms. Edwards
22 that she was being treated differently
23 in the workplace?

23

1      A.   **No.**
2      Q.   You don't recall?
3      A.   **No.**
4      Q.   Do you recall in that
5  conversation -- well, you don't recall
6  the conversation so you wouldn't --
7      A.   **Yeah.**
8      Q.   Do you recall telling Ms.
9  Jones you were going to move Ms.
10 Edwards to the BC1 line?
11     A.   **Correct.**
12     Q.   Does that refresh your
13 recollection?
14     A.   **Yeah.  If that was the same --**
15 **if that was the same talk, yeah.**
16     Q.   Okay.  What do you recall
17 about that conversation?
18     A.   **She suggested that -- that**
19 **that could be viewed as retaliatory,**
20 **and I expressed to her that Tammy had**
21 **come to me and asked to be moved.  She**
22 **came to me and said that my husband**
23 **said my ass is getting too big, and I**

24

1   need to get back to the floor. So at
2   that point, I mean, she wasn't -- she
3   was struggling at the CCR position. We
4   already had Amber Kelley in place for a
5   back-up training, so when she asked to
6   be moved, it was -- you know, I was
7   accommodating.
8       Q.   When did she ask to be moved?
9       A.   I want to say early August.
10      Q.   And was this after you had
11  talked with her about her complaints
12  with regards to Mr. Swindle harassing
13  her?
14      A.   That was before, yeah.
15      Q.   What was before?
16      A.   She requested to move prior,
17  prior to any complaints.
18      Q.   Okay. And she came to you?
19      A.   Correct.
20      Q.   And said her ass was getting
21  too big?
22      A.   She said, my husband told me
23  my ass is getting too big so I need to

25

1   go back to the floor.
2       Q.   Okay. And what did you say?
3       A.   I said, well, we'll take a
4   look at it and we'll try to
5   accommodate.
6       Q.   And what positions did you
7   look to accommodate her?
8       A.   Well --
9            MR. BOSTICK: Object to the
10  form.
11      A.   -- her request --
12           MR. BOSTICK: Go ahead.
13      A.   She requested to work for
14  Billy Kitchens or Mike Swindle, so I
15  asked the group leader to look at those
16  areas for openings.
17      Q.   Who was the group leader you
18  asked to look for openings?
19      A.   Steve Culpepper.
20      Q.   And what did you tell Mr.
21  Culpepper?
22      A.   Just what -- that she had
23  requested to go to either Billy

26

1   Kitchens' or Mike Swindle's area and
2   that she wanted to be moved.
3       Q.   Okay. Have you routinely
4   moved people because they tell you
5   their ass is too big and they want to
6   be out on the floor?
7       A.   No, that was a first.
8       Q.   Yeah, I would think so.
9       A.   In 16 years.
10      Q.   Did you tell her that we don't
11  move people at Hyundai because their
12  husbands want them moved?
13      A.   No.
14           MR. BOSTICK: Object to the
15  form.
16      A.   No.
17      Q.   Why not?
18      A.   We try to accommodate. When
19  people are unhappy with their current
20  position, we do try to accommodate.
21      Q.   Did she tell you she was
22  unhappy?
23      A.   Yeah.

27

1       Q.   What did she tell you?
2       A.   She said she wanted to be
3   moved.
4       Q.   But she didn't tell you she
5   was unhappy, she just wanted to be
6   moved?
7       A.   Right.
8       Q.   Because her husband said --
9       A.   Right.
10      Q.   -- her ass was too big?
11      A.   Right.
12      Q.   I mean, she didn't say
13  anything else about wanting to be
14  moved?
15      A.   Just that she wanted to be
16  moved.
17      Q.   Okay. And you said sure?
18      A.   We'll try to accommodate.
19      Q.   Okay. Anything else in that
20  conversation?
21      A.   No.
22      Q.   And then your next
23  conversation was with Mr. Culpepper?

28

1    A.   Yeah, shortly after.

2    Q.   Did you tell Mr. Culpepper

3  that Ms. Edwards wants to be moved

4  because her husband said her ass is too

5  big?

6    A.   No, I left that portion out.

7    Q.   You just told Mr. Culpepper

8  what?

9    A.   That she requested to be

10  moved, and I asked him to try to

11  accommodate.

12    Q.   And what did he say?

13    A.   We'll look at it.

14    Q.   Okay.  And when -- did Mr.

15  Culpepper ever get back to you about a

16  position?

17    A.   He said he had an opening on

18  BC1.

19    Q.   When did he tell you that,

20  before or after she complained about

21  Mike Swindle?

22    A.   Well, this all transpired

23  weeks, weeks before.

29

1    Q.   Okay.

2    A.   Probably the next day I think

3  we ended up moving her.

4    Q.   Prior to Ms. Edwards

5  complaining about Mike Swindle --

6    A.   Correct.

7    Q.   -- you had moved her?

8    A.   Correct.

9    Q.   To what position?

10    A.   I don't know what position; it

11  was on BC1.

12    Q.   Do you know what job she was

13  doing?

14    A.   Huh?

15    Q.   Do you know what job she was

16  doing on BC1?

17    A.   I think she was doing a rework

18  operation.

19    Q.   What is a rework operation?

20    A.   Nonstandard work, just she

21  might have been knocking a burr off or

22  sanding a certain area, just an extra

23  operation.

30

1    Q.   Why would it be an extra

2  operation?

3    A.   Something that -- if a robot,

4  for example, misses a weld, we have

5  team members pick up the welds.  So if

6  there's a burr, a weld burr coming from

7  a robot, we'll have a team member knock

8  the burr off so --

9    Q.   Did you ever observe what job

10  she was doing?

11    A.   I don't remember.

12    Q.   Okay.  And it's your testimony

13  she was doing that before she told you

14  about Mike Swindle?

15    A.   Correct.

16    Q.   Okay.  Do you know how long

17  she was doing that job before she came

18  to you and talked to you about Mr.

19  Swindle?

20    A.   I want to say a couple of

21  weeks.

22    Q.   Okay.  And she had left the

23  CCR job, was no longer doing the CCR

31

1  job?

2    A.   Correct.

3    Q.   Okay.  Who started doing the

4  CCR job?

5    A.   Amber Kelley.

6    Q.   Okay.  Had Ms. Kelly been

7  doing that job before?

8    A.   She had been training with --

9  with Tammy.

10    Q.   Ms. Kelly?

11    A.   Probably about six weeks

12  maybe.

13    Q.   Did anyone else train Ms.

14  Kelly other than Ms. Edwards?

15    A.   Not that I'm aware of.

16    Q.   Okay.  Who else does that job,

17  the CCR job, other than Ms. Kelly?

18    A.   Pam Stoddard, she is -- she's

19  a back-up.  I don't know if she was --

20  I don't know if she was an operator at

21  that time, but she was -- I know she's

22  a back-up.

23    Q.   Who does the job now?

32

1    A.    **Amber Kelley and Sherry McRae.**
2    Q.    How long has Ms. McRae been
3    performing the job?
4    A.    **Maybe two years.**
5          MR. BOSTICK: Can I interject
6    something while I'm thinking about it?
7    Your 30(b)(6) Number 9 requested the
8    person the most knowledge about her job
9    performance, and I think we designated
10   Tom and also Steve Culpepper in regards
11   to whatever concerns were had with her
12   performance. If you get to that line
13   of questioning, I'm just letting you
14   know he'll testify on that point for
15   us.
16   Q.    Was Ms. McRae performing the
17   position at the same time Ms. Edwards
18   was?
19   A.    **No.**
20   Q.    Who did she replace?
21   A.    **I think Pamela.**
22   Q.    Pamela?
23   A.    **Right.**

33

1    Q.    Last name, please?
2    A.    **Stoddard.**
3    Q.    Okay.
4    A.    **I think Sherry McRae was the**
5    **opposite, I think it was Sherry and**
6    **Tammy.**
7    Q.    Okay. When was Ms. Stoddard
8    performing the job of CCR?
9    A.    **She was I'm going to say early**
10   **'06, 2006.**
11   Q.    And why did Ms. Stoddard cease
12   doing the CCR job?
13   A.    **She asked to be moved to the**
14   **floor, and that was -- we accommodated.**
15   Q.    Did she tell you why she
16   wanted to move to the floor?
17   A.    **No.**
18   Q.    She just said, I want to move?
19   A.    **Yeah.**
20   Q.    Yes?
21   A.    **Yes, sorry.**
22   Q.    And then you placed Ms. McRae
23   in the position?

34

1    A.    **I believe Tammy took Pam's**
2    **spot.**
3    Q.    And who was performing the CCR
4    job on the opposite shift?
5    A.    **That would be Sherry McRae.**
6    Q.    I thought Sherry McRae took
7    over the job from Pamela?
8    A.    **No, that was Tammy.**
9    Q.    Tammy took over the job
10   from --
11   A.    **For Pamela.**
12   Q.    Okay.
13   A.    **Sherry was Tammy's**
14   **counterpart.**
15   Q.    Did you have any conversations
16   with Ms. Edwards when she became the
17   CCR?
18   A.    **Not that I can recollect.**
19   Q.    Do you know why she was moved
20   to the position?
21   A.    **She -- Steve Culpepper said**
22   **that she was interested in the**
23   **position.**

35

1    Q.    Do you have to test for the
2    position?
3    A.    **No, no test. Some**
4    **qualifications were that -- I mean, you**
5    **needed some typing ability, you needed**
6    **some computer knowledge. So I mean,**
7    **pretty much at that level, I don't get**
8    **too much involved; if the group leader**
9    **recommends, you know, I usually grant**
10   **that.**
11   Q.    It's not like the position you
12   told me earlier that a third party gets
13   involved in testing and promoting the
14   person?
15   A.    **No, ma'am.**
16   Q.    So Mr. Culpepper recommended
17   Ms. Edwards for the CCR position, and
18   you approved that?
19   A.    **Yeah.**
20   Q.    And do you know when Ms.
21   Edwards moved to the CCR position at
22   Mr. Culpepper's recommendation?
23   A.    **I believe it was early '06.**

36

1    Q.    And after she was in the
2    position, did you have any
3    conversations with Ms. Edwards about
4    the type job she was doing?
5         MR. BOSTICK:  Object to the
6    form.  In the CCR position?
7         MS. HAYNES:  That was my
8    question.
9    A.    Yeah.  We -- we had several
10   short conversations, and they referred
11   to the lack of detail in the reports.
12   You know, I have to go to a high-level
13   downtime meeting every day, so I need
14   very detailed information.  The
15   downtime was -- was substandard.
16   Q.    How many meetings did you have
17   with her that her work was substandard?
18   A.    I don't recall, several.
19   Q.    And is that the belief you
20   had, that her work was substandard?
21   A.    Correct.
22   Q.    Okay.  Several as in --
23   A.    It wasn't a belief; it was

37

1    Q.    Anything else?
2    A.    No.
3    Q.    Okay.  After you talked to
4    her, did the reports get better?
5    A.    A little bit, they did for a
6    while.  I don't recall the amount of
7    time, but for a while they did -- they
8    did improve.
9    Q.    Did you ever put anything in
10   writing to her that you didn't like the
11   reports or she was doing a deficient
12   job?
13   A.    No, just verbal discussion.
14   Q.    Okay.  Is there any reason you
15   didn't put anything in writing to her?
16   A.    Didn't feel that it was
17   necessary.
18   Q.    Is that because she would
19   improve after you talked to her?
20   A.    She improved a little bit,
21   yeah.
22   Q.    Okay.  Did she ever give you
23   any feedback why the reports were

39

1    fact.
2    Q.    Okay.  How many conversations?
3    A.    Several.
4    Q.    More than ten, less than ten?
5    A.    Probably more, yeah.
6    Q.    More than 20?
7    A.    No.
8    Q.    So somewhere between ten and
9    20?
10   A.    Roughly.
11   Q.    Okay.  Anyone in those
12   meetings with you and Ms. Edwards?
13   A.    Rob Katzenbach.
14   Q.    Anyone else?
15   A.    Maybe Harry White.
16   Q.    Anyone else?
17   A.    That's it.
18   Q.    And your complaint was that
19   the reports lacked detail and the
20   downtime was substandard?
21   A.    Yeah, the -- the amount of
22   units built plus the downtime minutes
23   did not equal a full hour.

38

1    deficient?
2    A.    No.
3    Q.    Did she ever tell you she was
4    getting inaccurate information?
5    A.    No.
6    Q.    Where would she get her
7    information for her reports?
8    A.    From either maintenance or the
9    keepers on the floor.
10   Q.    Explain that procedure for me,
11   please.
12   A.    Any time there was any
13   downtime, she would go to the floor and
14   investigate either with maintenance or
15   the keeper to find out exactly what
16   happened and get details.
17   Q.    And then do what?
18   A.    Put it in the report.
19   Q.    Okay.  So how would the time
20   not equal?  If you had -- if someone
21   told you there are seven minutes that
22   the machine is down, I mean, how would
23   that differ?

40

1    A.    I don't understand the
2  question.
3    Q.    You told me her time -- the
4  times did not add up.
5    A.    The units lost, the downtime
6  plus the units that were actually built
7  that hour need to actually add -- add
8  up to a full hour of production.  The
9  basic arithmetic didn't add up.
10    Q.    Okay.  So on the line, you'd
11  have how many units were supposed to be
12  produced in an hour?
13    A.    Seventy-three.
14    Q.    Okay.  And then how would she
15  calculate units lost?
16    A.    You have -- based on a 47-
17  second cycle, that's how you base how
18  many units lost during a downtime.
19    Q.    So every 47 seconds, there's a
20  unit being produced?
21    A.    Correct.
22    Q.    Okay.  So if you're down three
23  minutes, how would you calculate,

41

1    A.    The keepers in charge of that
2  line.
3    Q.    Keepers.  Okay.  Who is the
4  keeper during the day shift, is it one
5  position or multiple?
6    A.    There is one per line.
7    Q.    So how many lines?
8    A.    Let's see.  It's roughly --
9  there's actually four areas, but
10  there's several lines.  There's roughly
11  ten lines.
12        (Off-the-record discussion.)
13        MS. HAYNES:  Okay.  Four
14  areas, ten lines.  We'll take a break
15  for Mr. Bostick.
16        (Off-the-record discussion.)
17        (Recess.)
18        (Plaintiff's Exhibit 25 was
19          marked for identification.
20          A copy is attached.)
21    Q.    (BY MS. HAYNES) Let me show
22  you what I'm marking as Plaintiff's
23  Exhibit 25.

43

1  divide 47 into three?
2    A.    Yeah.  Yeah.
3    Q.    And you come up with a
4  percentage of a vehicle?
5    A.    Right, and those never added
6  up.
7    Q.    Okay.  Who in maintenance
8  would be providing numbers?
9    A.    It depends on which area, I
10  mean, the maintenance person assigned
11  to that area.
12    Q.    Was there just a person
13  assigned to the area?
14    A.    No.  There's -- there are
15  several maintenance people on the
16  floor.
17    Q.    Okay.  And they would provide
18  information to Ms. Edwards?
19    A.    Correct.
20    Q.    Okay.  And who else, what
21  other position -- you told me and I
22  didn't write it down -- other than
23  maintenance?

42

1    A.    Okay.
2    Q.    I'm sorry, I don't have extra
3  copies of these.  Can you tell me what
4  that exhibit is?
5    A.    This looks like an old
6  downtime report.
7    Q.    Okay.  Has the format changed?
8    A.    Not much.  It's similar, yes.
9    Q.    Is there anything deficient on
10  that report that you can point out to
11  me?
12    A.    First item, "314 L1 pulled a
13  cap."
14    Q.    And what's deficient about
15  that?
16    A.    Well, nothing's deficient, as
17  far as the comment, but I need to know
18  why.
19    Q.    Okay.
20    A.    When I go to these high-level
21  meetings, I need to know why.  I need
22  to know why did the cap pull.
23    Q.    Is there not enough

44

1  information for you?
2      A.  Correct.
3      Q.  Okay.  Anything else?
4      A.  Let me -- "No Floors/Slow
5  cycle time."  Then "Action plan:  BB
6  waiting on floors," I -- I can't do
7  anything with that.  That's -- why were
8  we waiting on floors?
9      Q.  Okay.
10     A.  Why did we have slow cycle
11 time?
12         (Plaintiff's Exhibit 26 was
13          marked for identification.
14          A copy is attached.)
15     Q.  (BY MS. HAYNES) Anything else
16 you see?
17     A.  No, that's --
18     Q.  All right.  All right.
19 Plaintiff's Exhibit 26, can you tell me
20 what that document is?
21         MR. TOBIAS:  Plaintiff's
22 Exhibit 25, does it have a Bates stamp
23 number on it?

45

1         MS. HAYNES: Yes, D-932
2  through 935.
3      A.  Looks like a production
4  report.
5      Q.  I'm sorry?
6      A.  Production report.
7      Q.  And is this something Ms.
8  Edwards would be responsible for
9  completing each day?
10     A.  Correct.
11     Q.  Okay.  Can you tell me any
12 deficiencies on that report?
13     A.  Let me see here.  It says,
14 "[Left-hand] sides down due to Station
15 704 CM tables 2 and 3 locator pin is
16 not retracting."
17     Q.  That's a deficiency?
18     A.  I need additional information.
19     Q.  Okay.
20     A.  She was -- it's good up to
21 that point.  I need -- I need more
22 information.  I need to know a couple
23 more whys, and -- and -- and she would

46

1  be there.
2      Q.  Okay.  Anything else?
3      A.  "BB down due to part detect
4  sensor did not read empty skid," you
5  know, I need to know why didn't it
6  read.
7      Q.  Is that deficient?
8      A.  That's deficient.
9      Q.  Okay.  Anything else?
10     A.  "BB down to 311 L3 pulled
11 cap," you know, I need more
12 information.  I can't tell the
13 president that I was down because I
14 pulled a cap.
15     Q.  Okay.  Anything else?
16     A.  No.
17     Q.  Are you still looking?
18     A.  Do you want -- do you need
19 more?
20     Q.  Well, I'm just asking you
21 about that exhibit.
22     A.  I went to one page.  Do you
23 want me to look at all of them?

47

1      Q.  Please.
2      A.  Okay.
3      Q.  I mean, you're telling me that
4  her reporting was deficient, and I'm
5  just -- are these the type --
6      A.  Yeah.
7      Q.  -- deficiencies that she
8  had --
9      A.  Correct.
10     Q.  -- Ms. Edwards; is that
11 correct?
12     A.  Correct.  "CM carrier off
13 location on [the] third floor" I need
14 more information.
15     Q.  Okay.  Anything else?
16     A.  "Drop lifter at 302 under
17 traveled," I need more information.
18     Q.  Okay.
19     A.  "Drop lifter at Station 334
20 under traveled," I need more
21 information.
22     Q.  Anything else?
23         MR. BOSTICK:  Does this have

48

1 the e-mail, was this sent with an
2 e-mail?
3    MS. HAYNES: I don't know.
4    MR. BOSTICK: Most of these
5 were produced with the e-mail.
6    MS. HAYNES: I don't know.
7 I'll ask him, though.
8    MR. BOSTICK: Are you
9 representing this is one that Tammy
10 prepared or --
11    MS. HAYNES: I'm just asking
12 him about the report.
13    A. Here's -- here's -- here's an
14 example of units, the time and units
15 don't add up.
16    Q. May I see that? I don't have
17 an extra copy. I just want to see what
18 you're --
19    A. Do you want me to circle it?
20    Q. Yeah, that will be fine.
21    A. Sixty minutes in an hour,
22 target 75, actual units built is 41, 28
23 minutes of downtime. It doesn't add

49

1 up.
2    Q. Okay. And you marked -- you
3 circled that on Bates Number D-00925 on
4 Plaintiff's Exhibit 26, correct?
5    A. Correct.
6    Q. All right. Did Ms. McRae
7 always do her reports to your
8 satisfaction or did you have to review
9 those?
10    A. They -- they were really good
11 reports, yes.
12    Q. Okay. Ms. Stoddard's, did
13 you -- were her reports good?
14    A. Yeah, she had good reports.
15    Q. Okay. Ms. Kelley, did she --
16    A. Stoddard -- Stoddard needed
17 some coaching.
18    Q. Did you ever have meetings
19 with Ms. Stoddard that --
20    A. Yeah, we had a couple of
21 meetings. Her -- her -- her reports
22 were better than Tammy's but needed
23 some work, and she corrected that.

50

1    Q. Ms. Stoddard's reports were
2 better than Ms. Edwards' reports?
3    A. Correct.
4    Q. How about Ms. Kelley, how were
5 her reports?
6    A. Kelley's reports were very
7 good.
8    Q. They have always been very
9 good?
10    A. Correct.
11    Q. Okay. Have you ever had to
12 have coaching?
13    A. No.
14    Q. Never had to talk with her
15 about her reports?
16    A. No.
17    Q. Has anyone ever complained
18 about Ms. Stoddard's reports?
19    A. Not that I recall, no.
20    Q. Okay. Anyone ever complain
21 about Ms. McRae's reports?
22    A. No.
23    Q. Anyone complain about Ms.

51

1 Kelley's reports?
2    A. No.
3    Q. Anyone complain to you about
4 Ms. Edwards' reports?
5    A. Yes, several times.
6    Q. Who?
7    A. Myself and Rob Katzenbach.
8    Q. Okay. Anyone else?
9    A. M. H. Park.
10    Q. Who?
11    A. M. H. Park.
12    Q. Who is M. H. Park?
13    A. He's Korean coordinator.
14    Q. Where is he located?
15    A. Weld shop.
16    Q. What is his position?
17    A. He is the Korean HOD.
18    Q. Is Mr. Katzenbach still
19 employed with Hyundai?
20    A. No, ma'am.
21    Q. Where is he?
22    A. I -- I don't know.
23    Q. Has he left Hyundai?

52

1    A.    Yeah.

2    Q.    Not gone to another Hyundai

3 facility?

4    A.    No.

5    Q.    When did he leave?

6    A.    2007.

7    Q.    Do you know why?

8    A.    No.

9    Q.    What was Mr. Park's complaint

10 about Ms. Edwards' reports?

11    A.    The same complaints I had,

12 lack of detail.

13    Q.    The same with Mr. Katzenbach?

14    A.    Correct.  We all attended the

15 same meeting.

16    Q.    What other reports other than

17 the two different reports I've given

18 you would the CCR be responsible for at

19 that point in time?

20    A.    That's -- that's -- that's it.

21    Q.    Okay.  Did part of the CCR

22 position require them to be on the

23 floor as well as the office?

53

1    A.    No, that's work time.

2    Q.    All right.  So where it says

3 6:35 to 17:15?

4    A.    That's the amount of minutes

5 worked in that hour.

6    Q.    In the hour or the shift?

7    A.    The hour, 60 minutes in an

8 hour.

9    Q.    All right.  But is this one

10 shift on this page?

11    A.    Correct.  Correct.

12    Q.    Okay.  So the shift would have

13 started at 6:35?

14    A.    Yes.

15    Q.    And ended at 17:15?

16    A.    Yes.

17    Q.    And then the numbers down here

18 at the bottom, can you tell me what

19 this represents?

20    A.    Six ten is the amount of

21 minutes worked in that shift, target is

22 761 units, actual is 499, total

23 downtime 192.

55

1    A.    Yes.

2    Q.    Okay.  And how was their time

3 split?

4    A.    Based on -- based on downtime.

5 They had to go to the floor to collect

6 information.  At the end of the shift,

7 they would go to the floor to review

8 any downtime board information.

9    Q.    Were they required to be on

10 the floor any time a machine went down?

11    A.    Correct.

12    Q.    So is it constant machines are

13 going down?

14    A.    No.

15    Q.    How often?

16    A.    It's unpredictable.

17    Q.    Okay.  On this report that we

18 looked at, 26, would this last page

19 where you circled the time indicate the

20 total downtime?

21    A.    Excuse me?

22    Q.    Would this indicate the total

23 downtime in a shift?

54

1    Q.    Okay.  And why is it -- the

2 part where you've circled, why do you

3 say that's incorrect?

4    A.    Well, just basic math, without

5 a calculator, I can see it's not right.

6 You're supposed to get 75 jobs in an

7 hour.  We only had 28 minutes of

8 downtime.  If you base that off of 60

9 minutes per cycle, which we run 47

10 seconds per cycle, you would be at 69

11 jobs total.

12    Q.    Okay.

13    A.    With her downtime and our

14 actual units built, it's supposed to be

15 75.

16    Q.    This number, the actual

17 target?  I'm not following you.

18    A.    Actual units built plus the

19 downtime does not add up to 75 jobs.

20    Q.    Okay.  So you're saying these

21 two numbers --

22    A.    Yeah.

23    Q.    -- the 41 and the 28 should

56

1 add up to be 75?

2     A.  **To 75 jobs per hour. I mean,**

3 **you've got to look at the 40 -- you've**

4 **got to do a little bit of math with a**

5 **calculator at 47 seconds into the 28**

6 **minutes of downtime, right? So -- but**

7 **if you just -- if you just say 60**

8 **minutes is your cycle, which is over**

9 **cycle, which would be 28 jobs lost,**

10 **correct, it -- at 28 minutes of**

11 **downtime, if you add that to the units**

12 **netted that hour, 41, you're at 69.**

13 **Sixty-nine does not add up to 75.**

14     Q.  Okay. Like the first line,

15 where there's no downtime, you're

16 trying to get 69 units?

17     A.  **Correct. That was a wash.**

18     Q.  Okay. Is there a reason the

19 unit number would change from 69 in a

20 given hour?

21     A.  **Yeah, you've got breaks.**

22     Q.  Okay. And where you have the

23 target as 75, is that period longer

57

1 than the one hour?

2     A.  **No, 60 minutes -- 60**

3 **minutes -- there's only 60 minutes in**

4 **an hour, and your -- your production**

5 **is -- if you had zero downtime, you had**

6 **75 units in that hour. That's why at**

7 **the very top there's only 55 minutes of**

8 **work time, right?**

9     Q.  Okay. I see.

10     A.  **And we -- the target is 69, we**

11 **achieved 69, which was zero minutes of**

12 **downtime.**

13     Q.  So in a 55-minute work

14 period --

15     A.  **Correct.**

16     Q.  -- you would expect 69, and in

17 a 60-minute work period, you would

18 expect 75 as your target?

19     A.  **Correct.**

20     Q.  All right. I see now. And

21 the same would be true for a 50-minute

22 work period, you would expect 62 --

23     A.  **Correct.**

58

1     Q.  -- as your target?

2     A.  **Correct.**

3     Q.  And then the actual and your

4 downtime should add up to your target?

5     A.  **Exactly.**

6     Q.  Like this period right here,

7 what is that, 9:30 to 10:30, a 60-

8 minute period, with your target as 75,

9 should -- the 20 and the 44, is that

10 also deficient because that's not

11 adding up to 75?

12     A.  **Right.**

13     Q.  And that would be another

14 example?

15     A.  **Yeah. If you just based 60-**

16 **minute cycles at 44 minutes of**

17 **downtime, 44 plus 20 is 64. Sixty-four**

18 **is a long ways from 75, and I have to**

19 **explain that in high-level meetings.**

20     Q.  Look for me at this entry that

21 I have my pen on here, where you have

22 actual 60 and downtime nine, but you

23 would have exceeded, correct, your

59

1 goal?

2     A.  **I'm sorry?**

3     Q.  If that was correct?

4     A.  **May I see it?**

5     Q.  Sure.

6     A.  **Fifty minute -- that's a 50-**

7 **minute hour, 62 is your target, I can't**

8 **see.**

9     Q.  Is it actual 60, but then you

10 still had nine minutes downtime?

11     A.  **And then you've got 50, that's**

12 **another inaccuracy.**

13     Q.  And maybe I'm getting it wrong

14 too. Let me think. Is it nine units

15 that you're losing, not nine minutes?

16     A.  **Nine minutes.**

17     Q.  Nine minutes?

18     A.  **Nine minutes. But I'm**

19 **using -- I'm using 60-second cycles as**

20 **an example. It's really 47.**

21     Q.  Okay.

22     A.  **So it's even more of a**

23 **deficiency than what I'm explaining.**

60

1  **If you use 60-second cycles and you add**
2  **nine and 50, it's 59. The target is**
3  **62. And you know, I can't -- I get**
4  **killed with that information.**
5     Q.   Well, I'm just trying to
6  understand how these reports are
7  figured if you've got a vehicle every
8  47 seconds, but then the report is done
9  on minute increments.
10    A.   **No, I used minutes -- I don't**
11 **understand the question.**
12    Q.   For your downtime, is it in
13 minutes, but you're adding minutes to
14 vehicle numbers?
15    A.   **Yeah, you've got to convert,**
16 **you've got to convert, you know,**
17 **minutes into units.**
18    Q.   Okay. But you're still adding
19 minutes and units and getting your
20 target number?
21    A.   **I just used minutes as an**
22 **example.**
23    Q.   Well, but you're telling me

61

1  your minutes and your units should add
2  up to your target?
3     A.   **Right, right.**
4     Q.   Am I correct on that?
5     A.   **Correct.**
6     Q.   Okay.
7     A.   **Yeah.**
8     Q.   Now, you also told me that
9  when Ms. Edwards came to you and said
10 she wanted to move back on the line
11 because her husband said her ass was
12 too big that she asked to work for
13 Mr. Kitchens or Mr. Swindle?
14    A.   **Correct.**
15    Q.   Tell me about that
16 conversation.
17    A.   **It really wasn't any more than**
18 **what you just stated. She just told me**
19 **about her husband's request, she wanted**
20 **to go back to the line, and she**
21 **preferred to work for Billy Kitchens or**
22 **Mike Swindle, you know, reasons**
23 **unknown.**

62

1     Q.   That's all she said?
2     A.   **Correct.**
3     Q.   Okay. Did you talk to Mr.
4  Swindle about if she (sic) had an
5  opening?
6        MR. BOSTICK: Object to the
7  form.
8        MS. HAYNES: Did I say
9  something wrong, if he had an opening?
10       MR. BOSTICK: He.
11       MS. HAYNES: Did I say "she"?
12       MR. BOSTICK: Uh-huh.
13    Q.   (BY MS. HAYNES) If he had an
14 opening?
15    A.   **That was Culpepper's job.**
16 **He's -- you know, I told Culpepper the**
17 **talk that we had and then, you know,**
18 **where he placed her, it was up to him.**
19    Q.   Now, did you tell Stacye Jones
20 that Ms. Edwards had asked to be moved
21 back on the line under Mr. Kitchens or
22 Mr. Swindle?
23    A.   **I don't recall.**

63

1     Q.   Did Ms. Jones tell you that
2  Ms. Edwards was complaining about being
3  moved?
4     A.   **No.**
5     Q.   Did Ms. Jones tell you that
6  Ms. Edwards was complaining?
7     A.   **Did Ms. Jones --**
8        MR. BOSTICK: Object to the
9  form.
10    Q.   Did I ask the same question?
11 I want to make sure I'm clear that you
12 didn't say to Ms. Jones that Ms.
13 Edwards was complaining and Ms. Jones
14 did not tell you that Ms. Edwards was
15 complaining?
16       MR. BOSTICK: Object to the
17 form.
18    A.   **Correct, that's correct.**
19    Q.   You had no knowledge that
20 Ms. Edwards was --
21    A.   **No. I mean, she was just**
22 **informing me that that could be viewed**
23 **as retaliatory moving her. And I**

64

1  explained to her that she had asked to
2  be moved; I was accommodating, I wasn't
3  retaliating.
4       Q.   What did Ms. Jones tell you
5  about retaliation?
6       A.   Nothing.  I mean, just said it
7  could be viewed as retaliatory.
8       Q.   And after Ms. Jones had this
9  conversation that the move could be
10  viewed as retaliatory, did you go ahead
11  and make the move?
12       MR. BOSTICK:  Object to the
13  form.
14       Q.   Did you move Ms. Edwards?
15       A.   Correct.
16       Q.   After Ms. Jones told you the
17  move could be retaliatory, viewed as
18  retaliatory?
19       THE WITNESS:  Do I answer?
20       MR. BOSTICK:  I'm just stating
21  an objection.
22       THE WITNESS:  I don't know
23  what he was saying.

65

1  Stacye never told me that she was
2  complaining.  All Stacye stated was
3  what that could be viewed as, and I
4  explained to Stacye that she had
5  requested that move, and she said okay,
6  and that was the end of it.
7       Q.   But no other decision makers
8  in that move other than you and Mr.
9  Culpepper?
10       A.   Correct.
11       Q.   Okay.  And who was her
12  supervisor?
13       A.   Culpepper.
14       Q.   Who was the team leader?
15       A.   Billy Kitchens.
16       Q.   How far was Mr. Swindle's desk
17  from Ms. Edwards' work area?
18       MR. BOSTICK:  Object to the
19  form.  Are you talking about in the
20  position she was moved to?
21       Q.   After she was moved?
22       MR. BOSTICK:  To the BC1 line?
23       MS. HAYNES:  Correct.

67

1       MR. BOSTICK:  I'm just
2  objecting to the form of the question.
3       A.   Yes.
4       MR. BOSTICK:  Asking when did
5  the move take place take place in
6  relation to that conversation.
7       Q.   (BY MS. HAYNES) And just so
8  we're clear, after Ms. Jones told you
9  you moving Ms. Edwards could be viewed
10  as retaliation, you made the decision
11  to move her anyway?
12       MR. BOSTICK:  Object to the
13  form.
14       A.   We moved her.
15       Q.   Who is "we"?
16       A.   We moved her, Steve and I.
17       Q.   Steve Culpepper?
18       A.   Yeah.
19       Q.   And you?
20       A.   Correct.
21       Q.   Any other decision makers?
22       A.   And that was just based on
23  her -- her recommendation.  She --

66

1       A.   Probably 80 feet.
2       Q.   Could it be less?
3       A.   I don't know.  Roughly 80
4  feet.
5       Q.   Could Mr. Swindle see where
6  Ms. Edwards was working?
7       A.   No.
8       Q.   Why not?
9       A.   There's a structure in the
10  way.
11       Q.   Was it there then?
12       A.   Yeah.
13       Q.   How long has the structure
14  been there?
15       A.   2004.
16       Q.   What structure are you
17  referring to?
18       A.   Station 504, 505 on BC1.
19       Q.   I mean, are we talking a pole
20  that's a structure, a beam, what is the
21  structure?
22       A.   It's enclosed, the line is
23  enclosed there.

68

1    Q.   Why?

2    A.   **For -- because we do grinding**

3    **in that area.**

4    Q.   And this is the grinding of

5    welds?

6    A.   **Weld slag it's called.**

7    Q.   Okay.  Or the burrs?

8    A.   **Yeah.**

9    Q.   Okay.  What tools was she

10   required to use on that job?

11   A.   **I don't recall the exact**

12   **rework she was doing, so I can't**

13   **comment.**

14   Q.   Okay.  Did you ever have a

15   conversation with Ms. Edwards why you

16   were moving her?

17   A.   **No.  She had the conversation**

18   **with me; she requested to move.**

19   Q.   After you moved here, you

20   didn't have a conversation?

21   A.   **No.  No.**

22   Q.   Did you ever make any comment

23   about she would feel more comfortable

69

1    Culpepper would not approve vacation

2    personal time for her now where he

3    would in the past."  And then there's a

4    bullet point there and she has

5    "Action" -- this is Ms. Jones'

6    report -- "I spoke with welding manager

7    Tom Bondy and [group leader] Steve

8    Culpepper regarding these allegations.

9    Tom confirmed that he intended to move

10   this [team member] from CCR to BC1.  I

11   advised him not to do this due to legal

12   ramifications and perceived

13   retaliation.  Steve confirmed that no

14   requests for vacation/personal days had

15   been submitted."  Does that refresh

16   your recollection about that

17   conversation you had with Ms. Jones?

18   A.   **Yeah, that's -- that's what I**

19   **stated.**

20   Q.   Okay.  Do you have any reason

21   to dispute that it would have taken

22   place on August 8th?

23   A.   **I -- I don't have any reason.**

71

1    somewhere else?

2    A.   **No.**

3    Q.   Look for me in the book in

4    front of you on Plaintiff's 19, that

5    tab.  Have you seen that e-mail before?

6    A.   **I -- I don't recall this.**

7    Q.   You haven't seen it in

8    preparing for the depositions?

9    A.   **No, I don't recall this.  Do**

10   **you want me to read it?**

11   Q.   No, sir, that's fine if you

12   haven't seen it.  And look for me on

13   Plaintiff's 18, would be the one before

14   that one on the Tuesday note.  Do you

15   see where I am?

16        MR. BOSTICK:  Tuesday.

17   A.   **Tuesday.**

18   Q.   Where it says, "Issue:  The

19   welding [team member] who made an EEO

20   complaint last week feels as if [team

21   members] and possibly management are

22   treating her differently.  This [team

23   member] reported that the GL Steve

70

1    Q.   And on the next page under

2    Thursday, where Ms. Jones writes, "I

3    confirmed that the complainant in an

4    EEO investigation had been moved to a

5    different job (from CCR to the

6    production floor).  This [team member]

7    sent me an e-mail which indirectly

8    alluded to retaliation," and then rest

9    of it is obliterated.

10   A.   **Yeah, I don't --**

11   Q.   Does that refresh your

12   recollection that she was -- that Ms.

13   Edwards was moved on that Thursday,

14   which would have been August 10th?

15   A.   **Yeah.  I don't recall the**

16   **dates.  I just know it was about that**

17   **time.**

18   Q.   Okay.  Now, if you would,

19   please turn with me on Plaintiff's

20   Exhibit 3.

21   A.   **Okay.**

22   Q.   Have you seen this document

23   before?

72

1    A.   **No.**
2    Q.   Turn to page 11.
3         MR. BOSTICK:  Page 11.
4    Q.   At the bottom of the page it
5  says, "Interview With Tom Bondy."
6    A.   **Okay.**
7    Q.   Have you seen your interview
8  with Mr. Clevenger and Ms. Jones?
9    A.   **I've never seen this.**
10   Q.   Okay.  Do you have a
11 recollection of being interviewed by
12 Mr. Clevenger and Ms. Jones?
13   A.   **Yeah.  It might have been --**
14 **it might have been a day or two after**
15 **the complaint.**
16   Q.   Okay.  And do you have a
17 recollection that it took place on
18 August 2nd, 2006?
19   A.   **Correct.**
20   Q.   So your move of Ms. Edwards to
21 a different position would have taken
22 place after you were interviewed in the
23 investigation of her complaint?

73

1    A.   **Correct.**
2    Q.   Okay.  That's different than
3  your earlier testimony, is it not?
4    A.   **I don't remember.  I might**
5  **have slipped.  I don't know.  Yeah, it**
6  **was after.**
7    Q.   Anywhere in your interview
8  with Mr. Clevenger or Ms. Jones did you
9  indicate that Ms. Edwards had asked to
10 be moved to a different position
11 working under Mr. Swindle?
12   A.   **No.  That -- no.**
13   Q.   Why not?
14   A.   **Just -- are you talking about**
15 **this -- this discussion here on the**
16 **2nd?**
17   Q.   Yes, sir.
18   A.   **No.  That hadn't happened yet.**
19   Q.   What had not happened?
20   A.   **Her -- her request.**
21   Q.   Oh, she requested after the
22 meeting of August 2nd?
23   A.   **Correct.**

74

1         MR. BOSTICK:  Listen, she's
2  asking when did she -- you talked about
3  earlier the conversation with her about
4  moving to work with Swindle or
5  Kitchens; and she's asking you did you
6  talk about that during the August 2nd
7  conversation?
8    A.   **Wait, say that again.**
9         MS. HAYNES:  My question is:
10 Well, we'll let the court reporter read
11 it back.
12         (Whereupon, the last question
13          was read back by the court
14          reporter.)
15   Q.   (BY MS. HAYNES) She requested
16 or told you or asked you --
17   A.   **Okay.**
18   Q.   -- after your August 2nd
19 interview with Ms. Jones and Mr.
20 Clevenger that her husband wanted her
21 back on the line?
22   A.   **Correct.**
23   Q.   Okay.  Did you not find that a

75

1  little odd when you had reported to
2  Mr. Clevenger and Ms. Jones that the
3  only reason she was reporting being
4  harassed by Mr. Swindle was that her
5  husband wanted her or gave her an
6  ultimatum that she either --
7    A.   **During --**
8    Q.   Let me finish my question.
9  That she either file a complaint or
10 quit?
11   A.   **Yeah, that was -- that was the**
12 **information that she gave us.  The --**
13 **well, the first time we spoke before**
14 **this August 2nd meeting, which would**
15 **probably be the day before, that was**
16 **the information that she gave me.**
17   Q.   On August 1, she told you that
18 her husband had given her an ultimatum?
19   A.   **Correct.**
20   Q.   Okay.  And then a few days
21 later or maybe it's the next day she
22 tells you that her ass is too big, per
23 her husband, and she needs to go back

76

1   on the line?

2        A.    No, that was -- that was

3   after.

4        Q.    After what?

5        A.    I think when she came back. I

6   don't even recall exact dates, but

7   after she came back, I believe.

8        Q.    After she came back from what?

9        A.    It might have been a week, a

10  week later or so.

11       Q.    Well, we know you and Ms.

12  Jones have the conversation on August

13  8th, which is going to be six days

14  later after August 2nd.

15       A.    I don't know why, but June

16  seems like when she requested to be

17  moved. I don't remember what I have in

18  my statements, but it seems like June

19  is when she requested to be moved.

20       Q.    Okay. Why would you wait

21  until August to move her?

22       A.    Because we were training Amber

23  Kelley at that time. Amber wasn't

77

1   fully trained.

2        Q.    And Ms. Edwards was training

3   Amber Kelley?

4        A.    Correct.

5        Q.    No one else?

6        A.    Correct.

7        Q.    Okay. And evidently she did a

8   good job if you've never had any issues

9   with Amber Kelley's report, correct?

10       MR. BOSTICK:  Object to the

11  form.

12       A.    No. That's -- the training is

13  just basic functions of the job and,

14  you know, we would -- as far as telling

15  Amber what detail needed to be in the

16  report, that's -- that's up to us. And

17  I believe we -- we actually used

18  Tammy's reports as examples, you know,

19  this is why this is deficient.

20       Q.    Okay. So now you think Ms.

21  Edwards came to you in June about

22  moving to another department or another

23  job?

78

1        A.    June rings a bell.

2        Q.    Okay.

3        A.    And that's -- which is prior

4   to the -- to the incident.

5        Q.    Okay.

6        A.    She came to me about the

7   husband and whatever, wanting to be

8   moved, and she requested Billy and

9   Swindle. I don't know why, but that's

10  what she said.

11       Q.    So why would you move her

12  after she's complained about Swindle

13  harassing her?

14       MR. BOSTICK:  Object to the

15  form, asked and answered.

16       Q.    She asked you in June to move?

17       A.    Correct.

18       Q.    And you wait until after this

19  investigation starts?

20       A.    Well, you --

21       Q.    Let me finish my question,

22  please. So you wait until after this?

23       A.    Correct.

79

1        Q.    But knowing this has happened

2   in the meantime, the sexual-harassment

3   investigation, why would you move her

4   down there where he is?

5        MR. BOSTICK:  Same objection.

6        A.    It was moving her -- actually,

7   it was moving her away from where she

8   was. She was working under Mike

9   Swindle, so obviously, that

10  accommodation, moving her to a

11  different area, would -- would

12  obviously be best for both parties.

13       Q.    Okay. When she was in the CCR

14  office, where is that office located,

15  where was her work station?

16       A.    Upstairs in the office.

17       Q.    How far from Mike Swindle?

18       A.    That depends -- I mean, her --

19  the office and Mike Swindle's area are

20  real close, body build/body respot is

21  right underneath the office, so I -- I

22  can't guess how many feet.

23       Q.    Swindle's desk, are you with

80

1  me --
2  **A.    Correct.**
3  Q.  -- do you know where it is?
4  **A.    Yeah.**
5  Q.  I got to see it yesterday.
6  **A.    Right.**
7  Q.  Okay.  You would -- from
8  Swindle's desk to go to the office, the
9  CCR office --
10  **A.    Correct.**
11  Q.  -- he would get up, take a
12  left and go 50 yards?
13  **A.    Okay.**
14  Q.  Is that about right?
15  **A.    Roughly.**
16  Q.  Take another left, go up some
17  stairs?
18  **A.    Right.**
19  Q.  Two flights of stairs, go into
20  an air-conditioned office?
21  **A.    Correct.**
22  Q.  Make another left and another
23  left and go into her office?

81

1  BC1, you've already said she was 80
2  feet from him?
3  **A.    Yeah.**
4  Q.  Okay.  How is that in anyone's
5  best interests to move her from 300
6  feet away from him to 80 feet away from
7  him?
8  **A.    Well, it's -- it was**
9  **accommodating her request.  She -- she**
10  **would be reporting to a different team**
11  **leader.  Mike Swindle is at that desk**
12  **maybe twice a day for -- for maybe ten**
13  **minutes, I don't know, whatever he does**
14  **on the computer.  And then the rest of**
15  **the time he's all the way up by the**
16  **office, which is right -- you know,**
17  **right underneath the office where she**
18  **would have to pass through.**
19  Q.  Why is he under the office?
20  **A.    That's where -- that's where**
21  **his area is, right next to the offices.**
22  Q.  From the break room?
23  **A.    Yeah.**

83

1  **A.    Correct.**
2  Q.  Is that correct?
3  **A.    That's correct.  That's**
4  **correct.**
5  Q.  How many steps?
6  **A.    I don't know.**
7  Q.  Do you think a hundred yards?
8  **A.    Maybe.**
9  Q.  Three hundred feet?
10  **A.    Well, you're talking from**
11  **Swindle's desk.**
12  Q.  Yes, sir.
13  **A.    Swindle is not at his desk all**
14  **day.**
15  Q.  I understand that.  And my
16  question is from his desk?
17  **A.    Oh, from his desk, okay, yeah,**
18  **I agree.**
19  Q.  Okay.  From his desk to where
20  she would have been located in the CCR
21  office, approximately 300 feet?
22  **A.    I agree.**
23  Q.  Okay.  When she's moved to the

82

1  Q.  Back down to his desk?
2  **A.    Right.**
3  Q.  And then past his desk, whose
4  area is that?
5  **A.    Billy.**
6  Q.  And where is Kitchens' desk,
7  there by the Coke machine?
8  **A.    No, further down, maybe 40**
9  **feet past, 50 feet -- 50 feet past**
10  **that.**
11  Q.  Okay.
12  **A.    So she would actually be**
13  **reporting to a different team leader,**
14  **which is -- that break area wasn't even**
15  **in sight of Swindle's break area, you**
16  **couldn't see one to the other.**
17  Q.  Okay.  Were you aware at that
18  time that Swindle was living with
19  Kitchens?
20  **A.    No.**
21  Q.  Had you known that?
22  **A.    No.**
23  Q.  You never knew Swindle lived

84

1  with Kitchens?
2      A.   No, I don't follow where
3  people live.
4      Q.   Okay.  You're not personal
5  friends with Mr. Swindle?
6      A.   No.
7      Q.   Never done anything outside
8  the workplace with him?
9      A.   I've seen him at different
10  establishments in town, but that's --
11  we employ one percent of the
12  population, so I see a lot of team
13  members.
14      Q.   Have you ever sat at the same
15  table or the same bar and had a drink
16  with Mr. Swindle?
17      A.   Yeah, I'm sure we have.
18      Q.   How many times?
19      A.   Maybe four or five.
20      Q.   Okay.  At Woodmere Club?
21      A.   Yeah.
22      Q.   Okay.  Any other place?
23      A.   One time at The Pub down --

85

1  downtown.
2      Q.   Any other place?
3      A.   No, that's it.
4      Q.   Okay.  Has he ever been to
5  your house?
6      A.   No.
7      Q.   Has he been to your boat?
8      A.   No.
9      Q.   You've never invited him --
10      A.   No.
11      Q.   -- to your boat?
12      A.   No.
13      Q.   Do you have a boat?
14      A.   Yeah.
15      Q.   On Lake Martin?
16      A.   Correct.
17      Q.   Okay.  But you've never
18  invited him or Mr. Kitchens?
19      A.   No.  It's a family affair.
20      Q.   What do you mean, "It's a
21  family affair"?
22      A.   The weekends are for family.
23      Q.   Your family?

86

1      A.   Correct.
2      Q.   Okay.  Has anyone from Hyundai
3  ever been invited to your home?
4      A.   No, manage -- no one hourly.
5  We've had assistant managers, salaried
6  personnel has been invited, yeah.
7      Q.   Okay.  All right.  Look for me
8  still on page 11 where Mr. Clevenger
9  asked you if you had any firsthand
10  knowledge of the situation.
11          MR. BOSTICK:  What exhibit?
12      Q.   Page 11, Exhibit 3.  You were
13  asked if you had any firsthand
14  knowledge, and you said no?
15      A.   Right.
16      Q.   And then you followed that you
17  had heard Tammy was upset?
18      A.   Correct.
19      Q.   And told Culpepper to bring
20  her up here to your office; is that
21  correct?
22      A.   Yeah, in the body office.
23      Q.   All right.  Who told you she

87

1  was upset?
2      A.   Either Michelle Nelson or
3  Kimberly.  They're always together, so
4  I don't -- I can't remember which --
5  which one.
6      Q.   Kimberly who?
7      A.   Kimberly Abrams.
8      Q.   And why is it they're always
9  together?
10      A.   They're friends.
11      Q.   Do they work in the same area?
12      A.   Yeah.  They have to be
13  together.  One is the tool room
14  attendant, and she runs POs through the
15  tech specialist, which is Michelle.
16      Q.   Okay.  And what did they tell
17  you about Ms. Edwards being upset?
18      A.   No details, just Tammy was
19  upset.
20      Q.   And why was that of concern if
21  there were no details, just that Ms.
22  Edwards is upset?
23      A.   Any time there's a team member

88

1    that's upset, it's a concern so --

2    Q.   Had Mr. Swindle already told

3    you that Ms. Edwards had complained

4    about him?

5    A.   **No.**

6    Q.   You had no knowledge of that?

7    A.   **No, that was the first time I**

8    **heard of this.**

9    Q.   When Ms. Edwards comes to you?

10    MR. BOSTICK:  Object to the

11    form.

12    A.   **No, when either Michelle or**

13    **Kimberly came to me and said Tammy was**

14    **upset.**

15    Q.   But didn't tell you why she's

16    upset, just that --

17    A.   **Correct.**

18    Q.   -- Tammy Edwards is upset?

19    A.   **Yeah, that's right.**

20    Q.   Why would you call her to come

21    in to meet with you?

22    MR. BOSTICK:  Object, asked

23    and answered.

89

1    A.   **Yeah, I mean, I -- any time**

2    **there's a concern with a team member,**

3    **it needs to be addressed.**

4    Q.   Well, I'm sure you have team

5    members upset all the time at work,

6    don't you?

7    A.   **No.**

8    Q.   Okay.  So how did the

9    conversation start off?

10    A.   **She complained about Mike,**

11    **more verbal harassment, making sexual**

12    **comments. She included the details,**

13    **you know, at the -- towards the end. I**

14    **don't have a lot of details, but it was**

15    **very graphic and whatever. But at the**

16    **end, she concluded that, you know, her**

17    **husband was well -- you know, knows**

18    **about this and she needed to either**

19    **quit or file a lawsuit.**

20    Q.   Is that what she said, file a

21    lawsuit?

22    A.   **Or file a complaint or**

23    **something along those lines.**

90

1    Q.   Okay.  What did she tell you

2    about Mr. Swindle?

3    A.   **Just what I just told you.**

4    Q.   You didn't tell me anything.

5    A.   **I told you she made several**

6    **accusations of sexual, more or less**

7    **verbal harassment towards her over the**

8    **past few months and that she was upset**

9    **about it.**

10    Q.   Was she crying?

11    A.   **Yeah.**

12    Q.   How did the conversation start

13    off?

14    A.   **We just asked her what -- what**

15    **the problem was.**

16    Q.   And what did she say?

17    A.   **And she -- she informed us**

18    **about Mike's behavior towards her.**

19    Q.   Okay.  And did she go into

20    detail?

21    A.   **Yeah.**

22    Q.   Okay.  What was the detail she

23    provided you?

91

1    A.   **I don't have -- I don't**

2    **remember.**

3    Q.   You don't remember any of the

4    details?

5    A.   **No. It was pretty graphic,**

6    **though.**

7    Q.   Pretty graphic and you don't

8    remember any of it?

9    A.   **No. This is two years ago,**

10    **three years ago, I don't --**

11    Q.   Well, how is it you can't

12    remember the graphic details, but you

13    can remember she wanted to file a

14    lawsuit?

15    MR. BOSTICK:  Object to the

16    form.

17    A.   **That's what my memory recalls.**

18    Q.   Okay.  Anything else?

19    A.   **No, that's it.**

20    Q.   She didn't tell you that he

21    had been touching her?

22    A.   **No, she didn't say anything**

23    **about physical contact.**

92

1    Q.    Did she tell you she had been
2  humping a fence and simulating having
3  sex?
4    A.    No, I -- I didn't get any of
5  those details.
6    Q.    And did she say anything about
7  him making comments about "Fuck me"?
8    A.    That -- that was -- that could
9  have been in the conversation, yeah.
10    Q.    You don't think that would
11  stand out more in your memory about a
12  team leader telling a team member, "I
13  want you to fuck me" more than a
14  lawsuit?
15        MR. BOSTICK:  Object to the
16  form.
17    A.    Well, I'm just -- you know,
18  I'm just telling you what I recall.
19    Q.    But nothing about humping a
20  fence?
21    A.    No, I don't remember that.
22    Q.    Do you think you would have
23  recalled that?

93

1  conveyed to you?
2    A.    No, I don't remember details,
3  just that they were graphic.
4    Q.    All right.  Look on page 11
5  where you told Mr. Clevenger and Ms.
6  Jones and they're quoting you, "I
7  said," that's you, "maybe he's not
8  wired right."  Does that refresh your
9  recollection?
10    A.    Yeah, I could have said that.
11    Q.    Okay.  What did you mean by
12  that?
13    A.    Well, if this is -- obviously
14  if this took place, then he can't be
15  wired right.  If he actually did the
16  things that -- that Tammy explained,
17  then it's obvious that he's not wired
18  right.
19    Q.    Have you ever heard Swindle
20  use vulgar language in the workplace?
21    A.    You know, they don't -- you
22  know, when I come around, they put on
23  their best behavior, so I don't recall.

95

1    A.    I would think so.
2    Q.    Okay.  Did you make the
3  comment that maybe he's not wired
4  right?
5    A.    I don't know.  May have.
6    Q.    Okay.  Did you make a comment
7  that Swindle had been given chance
8  after chance after chance?
9    A.    No.
10    Q.    Did you talk about the
11  training that Swindle had received?
12    A.    Talk to who?
13    Q.    In the meeting you're having
14  with Ms. Edwards and Mr. Culpepper,
15  where she's telling you --
16    A.    I don't -- I don't recall
17  that.
18    Q.    You don't recall any of that?
19    A.    No.
20    Q.    In the interview notes, it's
21  written there that she "got graphic --
22  talking about actions and gestures."
23  Do you remember any gestures she

94

1  They don't curse in front of me.
2    Q.    Do you curse in front of them?
3    A.    No.
4    Q.    So if Swindle says that you've
5  used the word "fuck" and the word
6  "motherfucker" in the workplace, that
7  would be incorrect?
8    A.    Correct, yeah.
9    Q.    He would not be truthful with
10  that?
11    A.    Correct.
12    Q.    Have you read his deposition?
13    A.    No, I haven't seen any
14  depositions.
15    Q.    In the meeting you had with
16  Ms. Edwards and Mr. Culpepper, did she
17  ask you that she wanted to be moved?
18    A.    Can you repeat?
19    Q.    Yeah.  Did she ask that she
20  wanted to be moved away from Mr.
21  Swindle?
22    A.    In -- at what time?
23    Q.    In the meeting with Ms.

96

1  Edwards and Mr. Culpepper --
2      A.    No.
3      Q.    -- that you're having on --
4      A.    No, we didn't talk --
5      Q.    -- on August 1?
6      A.    No talk about moves were --
7  were mentioned.
8      Q.    Okay.  Did you tell her she
9  needed to speak to Ms. Jones?
10     A.    Yeah.
11     Q.    Did she tell --
12     A.    Team relations, I told her to
13 get with team relations.
14     Q.    Did she tell you she didn't
15 want to?
16     A.    I don't recall.
17     Q.    Did you make the comment that
18 she was not going anywhere, he was?
19     A.    No.
20     Q.    Okay.  Did Ms. Edwards tell
21 you that Mr. Swindle had told her that
22 the two of you were drinking buddies
23 and nothing was going to happen to him?

97

1  big crocodile tears that morning?
2      A.    He came to me either after --
3  it might have been the next day even,
4  but it was after the complaint,
5  obviously.  I don't know if it was the
6  same day or the next day, I can't
7  recall.
8      Q.    Did he come before you called
9  Ms. Edwards in?
10     A.    No.  No.
11     Q.    And what did he tell you when
12 he came in?
13     A.    He wanted to know if he was
14 going to be fired.
15     Q.    And what did you tell him?
16     A.    Said it's out of my hands,
17 it's in team relations' and legal's
18 hands.
19     Q.    Did you tell team relations
20 you believed Ms. Edwards?
21     A.    Did I tell -- yeah, I did.
22     Q.    Did you tell her that she had
23 your support?

99

1      A.    No.
2      Q.    Did Ms. Edwards tell you that
3  she had asked Mr. Swindle to stop on
4  more than one occasion and he kept
5  telling her he would, but it only got
6  worse?
7      A.    No, I don't recall that.
8      Q.    Did she tell you that he had
9  started doing things in front of
10 friends of theirs intentionally after
11 her asking him not to?
12     A.    I do recall that.
13     Q.    Okay.  What did she tell you
14 about that?
15     A.    Just what you just said, that
16 rings a bell.
17     Q.    Did she identify who?
18     A.    Who, I'm sorry?
19     Q.    Who he had done this in front
20 of?
21     A.    No, no, I don't --
22     Q.    Did you say anything that
23 Swindle had been in your office with

98

1      A.    Correct.
2      Q.    And then did you tell them
3  also that later that night you got to
4  thinking there were a couple of things
5  that didn't make sense to you?
6      A.    Correct.
7      Q.    Okay.  And what got you to
8  thinking that night after your
9  conversation with Ms. Edwards that
10 maybe she wasn't being truthful with
11 you?
12     A.    Well, I was recalling --
13 trying to recall the whole incident,
14 and the -- the one thing that stood out
15 was the -- the part that the husband
16 knew or found out from one of the other
17 team members that those two were close
18 or whatever and that she was being
19 forced to quit or file a complaint.
20     Q.    Why did that not make sense to
21 you?
22     A.    I just -- because I -- I never
23 seen or heard any issues with these --

100

1  with Mike and Tammy in the past.
2  It's -- you know, I just -- usually if
3  it's something that serious, you know,
4  I would have heard or somebody would
5  have came to me.
6      Q.   Had Stephanie Samuels ever
7  talked to you about Mike Swindle?
8      A.   No.
9      Q.   Had you heard she had
10  complained about Mike Swindle?
11      A.   No.
12      Q.   Me telling you is the first
13  time you've known about it?
14      A.   Correct.
15      Q.   If they were working on night
16  shift, you would not have had an
17  occasion to work with them, Ms. Edwards
18  and Mr. Swindle, correct?
19      A.   Correct.
20      Q.   So it's only every two to
21  three months that you were on the same
22  shift; is that correct?
23      A.   Right.

101

1      Q.   How much are you on the floor?
2      A.   Probably -- out of eight
3  hours, probably two hours, three hours.
4      Q.   Okay.  And from the CCR
5  office, where is your desk, not now but
6  then?
7      A.   Close.  I mean, maybe 20, 30
8  feet.
9      Q.   Could you see the CCR office
10  if you were sitting at your desk?
11      A.   Yes.
12      Q.   How?
13      A.   With my eyes.
14      Q.   You're in cubicles, are you
15  not?
16      A.   Right.
17      Q.   Okay.  And how high is the
18  cube?
19      A.   It's not -- they're not very
20  tall; they're short.
21      Q.   So if you're sitting at your
22  desk, you can see over --
23      A.   I can see CCR, yeah.

102

1      Q.   How high are those partitions?
2      A.   They're maybe 48 inches, but
3  you've got openings.  My opening faces
4  CCR.
5      Q.   Now?
6      A.   Correct.
7      Q.   Okay.  Then, in 2006, where
8  were you?
9      A.   In the same general area, I
10  mean, within feet.  We've only juggled
11  maybe once or twice, and I've always --
12  we've always been in the same area.
13      Q.   Okay.  After this conference
14  that you had with Ms. Edwards, did you
15  ever go back and talk with her again?
16      A.   No, that was the last -- no.
17      Q.   No one ever told you again
18  that she was upset in the workplace?
19      A.   No.
20      Q.   Except Ms. Jones, Ms. Jones
21  told you she was upset, didn't she?
22      MR. BOSTICK:  Object to the
23  form.

103

1      A.   No.
2      Q.   So if Ms. Jones came on August
3  the 8th and told you that Ms. Edwards
4  feels as if team members and possibly
5  management are treating her
6  differently --
7      MR. BOSTICK:  Object to
8  mischaracterizing his testimony from
9  earlier.
10      A.   No, I --
11      MR. BOSTICK:  He said she
12  didn't complain.
13      A.   Yeah.
14      Q.   Well, go back and look at
15  Plaintiff's 18 about your conversation
16  with Ms. Jones.
17      MR. BOSTICK:  Object to asked
18  and answered again.  He's already
19  testified she didn't say any -- Ms.
20  Jones didn't say anything about a
21  complaint.
22      A.   What are we looking at?
23      Q.   Tuesday, the 8th, which would

104

1  be --
2      A.   Okay.
3      Q.   -- the first page of
4  Plaintiff's 18.  And Ms. Jones says she
5  talked with you and Mr. Culpepper
6  regarding the allegations about Ms.
7  Edwards feeling as if team members and
8  management were treating her
9  differently?
10     A.   Yeah.  I -- I don't recall
11 her -- yeah, I don't recall that.
12     Q.   You don't recall Ms. Jones
13 telling you that?
14     A.   No.
15     Q.   If Ms. Jones had told you
16 that, would that have caused you
17 concern?
18          MR. BOSTICK:  Object to the
19 form.
20     Q.   Can you answer my question?
21     A.   I'm sorry, I was reading.
22 What -- what's the question?
23     Q.   Would it have caused you

105

1  concern had Ms. Jones told you?
2      A.   Yeah, of course.
3      Q.   Okay.  And you would have
4  called Ms. Edwards in to ask her if she
5  felt like management and team members
6  were treating her differently since she
7  complained?
8          MR. BOSTICK:  Object to the
9  form.
10     A.   I mean, based on -- on the
11 complaint -- you know, I don't remember
12 that complaint.
13     Q.   Would it have caused you as
14 much concern as Ms. Abrams or Ms.
15 Nelson coming to and saying Ms.
16 Edwards is upset in the workplace --
17          MR. BOSTICK:  Object to the
18 form.
19     Q.   -- and the reason you called
20 her in to start with?
21     A.   Correct.
22     Q.   But you don't think Ms. Jones
23 told you that?

106

1      A.   No.
2      Q.   All right.  On page 12, this
3  is following --
4          MR. BOSTICK:  Back on Exhibit
5  3?
6      Q.   I'm sorry, yes, Exhibit 3.
7  The bottom of page 11 and the beginning
8  of page 12 I'm going to ask you about
9  where you told Mr. Clevenger and Ms.
10 Jones that you had seen Swindle and
11 Ms. Edwards laughing.  Do you see that?
12     A.   On which day?
13     Q.   The bottom of the page 11.
14     A.   Okay.
15          MR. BOSTICK:  This is 12, look
16 at 11.
17     A.   Sorry.
18     Q.   Last sentence, "I've seen
19 these two laughing"?
20     A.   Correct.
21     Q.   Okay.  When had you seen
22 Swindle and Ms. Edwards laughing
23 together?

107

1      A.   Just on the floor, possibly
2  when -- when she was collecting
3  downtime, dates, I'm not sure.  I mean,
4  I -- you know, my -- my -- my thought
5  was they were friends.  I -- I didn't
6  know anything different.
7      Q.   Okay.  Next on page 12, you're
8  asked the question, "How would someone
9  on second shift see her and Mike
10 together?" and you answered, "Between
11 shifts"?
12     A.   Right.
13     Q.   Okay.  And that's a question
14 being asked of you when you told them,
15 "There's a gentleman on second shift on
16 moving lines"?
17     A.   Correct.
18     Q.   Okay.  How had you heard that
19 information about someone on second
20 shift?
21     A.   Tammy told me that on our
22 initial meeting.
23     Q.   Did she tell you who it was?

108

1    A.    She didn't say who.  She said
2    someone in moving lines had informed
3    her husband of her -- her and Mike's
4    relationship, whatever -- whatever that
5    means.
6        Q.    Where would the moving lines
7    department be from the weld shop where
8    Mike Swindle is located?
9        A.    They're kiddy-corner, across
10   the aisle and you're there.
11       Q.    If you're standing at Mike
12   Swindle's desk, where would moving
13   parts be?
14       A.    West about 50 feet.
15       Q.    I'm sorry, I said moving
16   parts, moving lines where this guy on
17   second shift was located?
18       A.    His desk and moving lines is
19   about 50 feet.
20       Q.    Moving lines is the same as
21   moving parts?
22       A.    Correct.
23       Q.    All right.  Back on page 12,
                        109

1        Q.    And what did you say?
2            MR. BOSTICK:  Object to the
3    form.
4        A.    As I stated earlier, it was in
5    team relations' and legal's hands.
6        Q.    Why did you say legal's hands?
7        A.    That's who handles harassment
8    cases.
9        Q.    How do you know that?
10       A.    That's standard protocol for
11   any complaint.
12       Q.    Had you participated in any
13   investigation of discrimination or
14   harassment at Hyundai before Ms.
15   Edwards' complaint?
16       A.    No.
17       Q.    Have you since?
18       A.    No.
19       Q.    Nothing involving Mr.
20   Culpepper?
21       A.    Culpepper?  That -- I didn't
22   participate.  I was -- that was legal
23   and team relations.
                        111

1    when team relations asked you, "Who
2    made you aware of the issue?" why did
3    you answer, "I don't know"?
4        A.    I couldn't remember
5    which it -- if it was Michelle or
6    Kimberly.
7        Q.    And that's why you said, "I
8    don't know"?
9        A.    Yeah, I didn't remember
10   which -- which one.
11       Q.    Why did you not tell them
12   either Michelle or Kim?
13       A.    I can't answer that.
14       Q.    When Mr. Swindle came to you
15   and asked if he was going to be fired,
16   what did he ask or say, what was in
17   that conversation?
18       A.    He said that he heard that
19   Tammy had filed a complaint against
20   him, and he wanted to know if he would
21   be terminated.
22       Q.    Anything else?
23       A.    No, that was it.
                        110

1        Q.    Is this the only time team
2    relations has ever talked to you and
3    employees in your workplace and
4    allegations of harassment, retaliation,
5    or discrimination?
6        A.    Correct.
7        Q.    Were you retrained on sexual
8    harassment after this investigation?
9        A.    I don't recall.  I think
10   probably -- probably in 2007, everybody
11   was trained plant-wide.
12       Q.    How long did the meeting with
13   Ms. Edwards last?
14       A.    Probably five minutes, five,
15   ten minutes.
16       Q.    Did she sit down during the
17   meeting?
18       A.    Yeah, everybody was sitting
19   down.
20           (Off-the-record discussion.)
21           MS. HAYNES:  Okay.  We'll take
22   a short break.
23           (Recess.)
                        112

1      (Whereupon, the last question
2          and answer were read back by
3          the court reporter.)
4      Q.    (BY MS. HAYNES) Have you had
5  conversations with anyone else other
6  than team relations about Ms. Edwards'
7  allegations of sexual harassment with
8  Mr. Swindle?
9      A.    No.
10      Q.    You've not discussed it with
11  Mr. Kitchens?
12      A.    No.  Billy may have come to
13  me, you know, worried about these
14  meetings, but I -- no, I --
15      Q.    What do you recall about
16  Mr. Kitchens coming to you?
17      A.    Just that he wanted to know
18  times or he was concerned about what
19  time and when these meetings were. He
20  wanted me to find out.
21      Q.    Okay. Anyone else?
22      A.    That was it.
23      Q.    Any more meetings with Mr.

113

1  Swindle --
2      A.    No.
3      Q.    -- where you discussed Ms.
4  Edwards?
5      A.    No, ma'am.
6      Q.    Any meetings with Ms. Nelson
7  or Ms. Abrams?
8      A.    No, ma'am.
9      Q.    How about Ms. Stoddard, any
10  meetings with Mrs. Stoddard?
11      A.    No, ma'am.
12      Q.    Did you ever discover that
13  Ms. Stoddard and Mr. Swindle were
14  having a relationship?
15          MR. BOSTICK:  Object to the
16  form.
17          MR. TOBIAS:  Object to the
18  form.
19      A.    No, ma'am.
20      Q.    Why did you say it like that,
21  like there was smile in your voice of
22  some sort?
23      A.    No, I can't recall that.

114

1      Q.    You find that unbelievable?
2      A.    Yeah.
3      Q.    Why?
4      A.    I don't know.  They seem like
5  opposites.
6      Q.    Anything else?
7      A.    You know, Mike is married, and
8  I don't know.  It seems -- seems almost
9  impossible.
10      Q.    Okay. Ms. Samuels, do you
11  know her, Stephanie Samuels?
12      A.    Yes.
13      Q.    But she's never talked to you
14  about Mr. Swindle?
15      A.    No.
16      Q.    Since Ms. Edwards complained,
17  has anyone else complained about Mr.
18  Swindle?
19      A.    No.
20      Q.    How did you learn that Ms.
21  Edwards was placed on medical leave?
22      A.    I think it was an e-mail
23  through -- through the group leader

115

1  once -- when she was coming back from
2  medical or when she was placed on
3  medical.
4      Q.    That she had been placed on
5  medical leave?
6      A.    I -- I didn't know anything
7  about her leave.
8      Q.    Okay.
9      A.    I didn't know why she was out.
10      Q.    You never knew that she had
11  been in an automobile accident?
12      A.    No, ma'am.
13      Q.    Or that she had problems with
14  her neck?
15      A.    No.
16      Q.    Had you known she had problems
17  with her neck, would you have placed
18  her on the job in the BC1 line?
19      A.    Yes.
20          MR. BOSTICK:  Object to the
21  form.
22      A.    Yes.  That was -- any reworks,
23  any rework job is usually a simple job.

116

1  Q.  Is it physical?

2  A.  **Well, anything is physical,**
3  **but it was light duty, put it that way.**

4  Q.  Okay.  So even with a neck
5  injury, you felt she could do the job?

6  MR. BOSTICK:  Object to the
7  form

8  A.  **I didn't know that she had a**
9  **neck injury or -- or that -- her**
10  **medical conditions at all.**

11  Q.  You never saw her with a neck
12  brace at work?

13  A.  **No, ma'am.**

14  Q.  Okay.  Did you ever have any
15  knowledge about her attempts to come
16  back to work?

17  A.  **That was sometime in '07?**

18  Q.  Correct.

19  A.  **I recall Steve sending me an**
20  **e-mail about her trying to come back to**
21  **work, and medical sent her home, I**
22  **guess.**

23  Q.  Okay.  What was your

117

1  conversation with Mr. Culpepper about
2  Ms. Edwards coming back to work?

3  A.  **That it was basically in**
4  **medical's hands.  They make that**
5  **decision; we don't make those**
6  **decisions.**

7  Q.  That was your conversation
8  with Mr. Culpepper?

9  A.  **Correct.**

10  Q.  Okay.  Mr. Culpepper didn't
11  tell you that Ms. Edwards could come
12  back to work with any type of
13  accommodation?

14  MR. BOSTICK:  Object to the
15  form.

16  A.  **We don't -- we don't handle**
17  **accommodations, I mean, that's strictly**
18  **up to medical to place those --**

19  Q.  Do you recall getting a letter
20  from me?

21  A.  **No.**

22  (Plaintiff's Exhibit 27 was
23  marked for identification.

118

1  A copy is attached.)

2  Q.  (BY MS. HAYNES)  Plaintiff's
3  27, have you seen that letter?  I'm
4  just asking if --

5  A.  **Yeah, if we -- I've seen -- I**
6  **believe I forwarded this to my legal**
7  **counsel.**

8  Q.  So you have seen it?

9  A.  **Correct.**

10  Q.  And do you know -- what is the
11  date of that letter, please, sir?

12  A.  **March 6th.**

13  Q.  Okay.  And do you think you
14  saw it on or about March 6th?

15  A.  **I couldn't tell you when I saw**
16  **this.**

17  (Plaintiff's Exhibit 28 was
18  marked for identification.
19  A copy is attached.)

20  Q.  (BY MS. HAYNES)  Plaintiff's
21  28, have you seen that document before,
22  Bates Number D-01866?

23  A.  **No, ma'am, I'm not -- I don't**

119

1  **get this information.**

2  Q.  Okay.  Do you know Lauren
3  Carter?

4  A.  **No, ma'am.**

5  Q.  Okay.  Did anyone ever ask you
6  if you could accommodate Ms. Edwards in
7  the workplace?

8  A.  **Not that I recall, no.**

9  Q.  Are there individuals in the
10  workplace that you've accommodated
11  their physical injuries?

12  MR. BOSTICK:  Object to the
13  form.

14  Q.  Or disabilities?

15  A.  **I -- that's -- that's up to**
16  **medical.**

17  Q.  Do you know of anyone who has
18  asked you for accommodation and are
19  working in a job right now because of a
20  disability or injury or a limitation
21  that's physical?

22  A.  **I can't recall anyone, no.**

23  Q.  Has medical ever asked you

120

1  about accommodating an injured worker?
2      A.   They will call based on -- and
3  ask whatever the restrictions might be,
4  do you have a job that will accommodate
5  restrictions, whatever they might be.
6  I can't recall what -- what her actual
7  restrictions were.
8      Q.   Can you tell me any team
9  member you've ever accommodated?
10         MR. BOSTICK:  Object to the
11  form.
12      A.   No.
13      Q.   Don't know of any?
14      A.   They -- no.  Usually the --
15  the restrictions are, you know,
16  occupational and they're out until
17  they're cleared.  When they're cleared,
18  they come back to work.  I mean, that's
19  how it works.  Usually when they come
20  back, it's without restrictions.
21      Q.   My question was:  Do you know
22  of anyone who has been accommodated?
23      A.   No.

121

1      Q.   And you've told me that unless
2  they're cleared, they don't come back?
3      A.   Correct.
4      Q.   And it's your recollection no
5  one asked you about accommodating Ms.
6  Edwards in the workplace?
7      A.   No.
8      Q.   Do you know of any team leader
9  you've accommodated based on a physical
10  restriction or limitation?
11      A.   No, ma'am.
12      Q.   What is the difference between
13  a team leader and a team member?
14      A.   Team leader is in charge of a
15  specific group.  They're still hourly,
16  but they're -- they're -- they're in
17  charge of maybe ten to 20 team members.
18      Q.   Okay.
19      A.   Basically, they just --
20  they're like reporters, they report
21  downtime, they help report downtime to
22  CCR, you know, vacations, you know,
23  they'll accept a request, and then they

122

1  go through group leaders.  So
2  they're -- they're in charge of ten to
3  20 team members.
4      Q.   And then how many team leaders
5  report to a group leader?
6      A.   Five per shift.
7      Q.   So for instance, Mr. Kitchens
8  right now has five team leaders
9  reporting to him?
10      A.   Correct.
11      Q.   And then five team leaders
12  each have 20 team members?
13      A.   Roughly ten to 20.  It varies
14  within the group.
15      Q.   Okay.  Are there any female
16  team leaders under you?
17      A.   Currently, no.
18      Q.   Any female group leaders?
19      A.   Currently, no.
20      Q.   How many of the team members
21  are female under you?
22      A.   I can't give you a number.
23      Q.   Do you know a percentage?

123

1      A.   No.
2      Q.   Have you ever terminated
3  anyone at Hyundai?
4      A.   Yes.
5      Q.   For what reasons?
6      A.   Reasons vary, attendance,
7  performance, that's -- that's basically
8  it, sleeping.
9      Q.   Sleeping on the job?
10      A.   (Nodding.)
11      Q.   Is that a "yes"?
12      A.   Yes.
13      Q.   What would be performance
14  issues?
15      A.   Not performing the
16  standardized work that is assigned to
17  that position.
18      Q.   Can you give me an example of
19  someone you've terminated for
20  performance?
21      A.   I can't remember his name;
22  he's in the moving lines.  He failed to
23  do his quality checks, and he was

124

1  terminated.

2    Q.  Okay.  Can you tell me what

3  would be a failure to do a quality

4  check, the process there that they

5  failed in?  I did not see the line

6  operating, so I don't know what a

7  quality check is.

8    A.  **Every hour keepers have to do**

9  **quality checks.  If they fail to do the**

10  **checks and defects get out of their**

11  **area, then they're subject to**

12  **discipline.**

13    Q.  That would not have anything

14  to do with reporting to a CCR or the

15  CCR doing their job?

16    A.  **No.**

17    Q.  Okay.  The CCR is only in

18  charge of reporting downtime and what

19  caused the downtime?

20    A.  **Correct.**

21    Q.  Anything else in the CCR job

22  responsibility?

23    A.  **No.**

                    125

1    Q.  Do you have a person that is

2  assigned to work the board that the CCR

3  reviews?  I think you told me earlier

4  keepers?

5    A.  **Yeah, it was keepers.  We**

6  **don't use the -- we really don't use**

7  **the board anymore, I mean, it's**

8  **typically just the CCR getting the**

9  **right information.**

10    Q.  Okay.  Who is responsible for

11  getting the information to the CCR?

12    A.  **She's responsible for going to**

13  **get the information from either**

14  **maintenance or the keeper.**

15    Q.  So it's not written on a board

16  anymore?

17    A.  **Not that I recall.  Maybe on**

18  **body build but not on -- not on BC1**

19  **where -- where Tammy last was, there's**

20  **no more board there.**

21    Q.  So Amber Kelley or Stephanie

22  McPhee, is that it?

23    A.  **McRae.**

                    126

1    Q.  Stephanie's last name?

2    A.  **Oh, Samuels.**

3    Q.  Stephanie that's -- who is

4  Sherry?

5    A.  **Sherry McRae.**

6    Q.  Sherry McRae.  If a machine

7  goes down, they just go down to the

8  floor and investigate that themselves?

9    A.  **Yeah.  Sometimes they can**

10  **get -- get ahold of each other through**

11  **telephone or -- yeah, basically they**

12  **use telephone or she goes out there,**

13  **either/or.**

14    Q.  Who would they telephone?

15    A.  **The team leader might**

16  **telephone the CCR and give them their**

17  **explanation.**

18    Q.  Okay.  How do you calculate

19  the time that the machine is down, who

20  is keeping up with that?

21    A.  **That's -- that's -- that's**

22  **based off of the -- the PLC has got run**

23  **times.  I mean, you can see on the --**

                    127

1  on the board the amount of downtime.

2  There is an electronic board that --

3    Q.  In the CCR office?

4    A.  **In the CCR office there's one,**

5  **there's also one on body build, and**

6  **they're throughout the shop.**

7    Q.  Is this the board, electronic

8  board that's kind of up high?

9    A.  **Yeah.**

10    Q.  And it has the different

11  numbers?

12    A.  **Correct.**

13    Q.  Okay.

14    A.  **Yeah.  When you go down there,**

15  **it might say 900 seconds and running**

16  **for a current breakdown.  So it gives**

17  **you that much information, and then**

18  **from there, you've got to get more**

19  **detailed information from either the**

20  **keeper, team leader, or the maintenance**

21  **personnel who was assigned to that**

22  **area.**

23    Q.  All right.  The keeper, that's

                    128

1  a job separate and apart from the CCR
2  job?
3      A.  **Correct.**
4      Q.  Who are the keepers?
5      A.  **Who are they?**
6      Q.  Names on your shift?
7      A.  **There's -- there's too many to**
8  **name. I might could give a couple.**
9  **There's probably 20 or 30 keepers per**
10  **shift.**
11      Q.  And what's the job description
12  of a keeper?
13      A.  **To perform quality checks and**
14  **just basic keeping the line running.**
15      Q.  And was this the job Ms.
16  Kelley, Amber Kelley was doing before
17  she became the CCR?
18      A.  **I don't recall. I don't think**
19  **so.**
20      Q.  Okay. You're not aware of any
21  job-share arrangement that Ms. Edwards
22  and Ms. Kelley had, that one was the
23  CCR for a period of time and the other

129

1  was the keeper, and then they would
2  switch?
3      A.  **I'm not aware of that.**
4      Q.  Okay. Do you recall a
5  conversation you had with Ms. Edwards
6  where she said she was getting bad
7  information that was affecting her
8  reports and she'd just as soon go back
9  on the line if her reports were not
10  going to be good?
11      A.  **I don't recall that.**
12      Q.  You don't recall that?
13      A.  **No.**
14      Q.  Anything like that?
15      A.  **No.**
16      Q.  Do you recall ever having a
17  conversation with Ms. Edwards where you
18  walked up and introduced yourself to
19  her and told her her reports were good?
20      A.  **No, I don't recall that.**
21      Q.  You deny having that
22  conversation?
23      A.  **Uh-uh.**

130

1      Q.  You do deny it? You're
2  shaking your head?
3      MR. BOSTICK:  You need to say
4  "no."
5      A.  **I said no.**
6      Q.  No, that conversation did not
7  happen?
8      A.  **Did not take place, yeah.**
9      MS. HAYNES:  All right. Let
10  me look over my notes, and I may be
11  through.
12      MR. BOSTICK:  Okay.
13      (Recess.)
14      (Plaintiff's Exhibit 29 was
15          marked for identification.
16          A copy is attached.)
17      Q.  (BY MS. HAYNES) In front of
18  you is the re-notice of the deposition
19  for the corporate representative of
20  Hyundai, and you have been identified
21  that you will testify to item 9, which
22  is "Knowledge of and most familiar with
23  the job performance of Tammy Edwards

131

1  for the last five years." Did you know
2  anything --
3      MR. BOSTICK:  Subject to our
4  objections.
5      Q.  Did you know anything about
6  the job she did in moving parts?
7      A.  **No, ma'am, I don't.**
8      Q.  Did you know anything about
9  her job performance when she was
10  working on the BC1 line?
11      A.  **No.**
12      Q.  The only thing you know about
13  is when she was in the position of CCR?
14      A.  **Right, because that -- go**
15  **ahead, sorry.**
16      Q.  Have you told me everything
17  you know about her performance as a
18  CCR?
19      A.  **Yeah. I'm -- you know, what**
20  **is important is everybody in that**
21  **position starting off makes some**
22  **mistakes, but it was, you know, not**
23  **responding to our coaching and**

132

1 counseling sessions, the repeated
2 mistakes is really what -- what we
3 focused on. I mean, it wasn't that we
4 coached and counseled her and then
5 mistakes disappeared. It was
6 repetition. So you know, even Amber or
7 Sherry I'm sure early on made mistakes
8 but corrected them through, you know,
9 our coaching and counseling.
10     Q.   I thought you told me Ms.
11 Edwards got better when you talked to
12 her?
13     A.   She did, but -- but she
14 still -- you know, mistakes were
15 repeating. I mean, there was a period
16 where performance improved, and then,
17 you know, it was back to substandard.
18     Q.   Okay. Did you ever get a
19 report and show her someone else's work
20 and that this is what you wanted her
21 reports to look like?
22     A.   That was more -- more activity
23 with Steven Culpepper than myself.

133

1 He -- Steve was the one that was
2 staying, you know, several hours
3 redoing her reports, not me. So you
4 know, I would tell Steve that this is
5 unacceptable, I need more information,
6 and then Steve would interact with
7 Tammy or whoever the CCR operator was.
8     Q.   How do you know that?
9     A.   That's his job.
10     Q.   How do you know Culpepper was
11 spending several hours correcting Ms.
12 Edwards' reports?
13     A.   I would see him.
14     Q.   Did he tell you or you'd just
15 see him?
16     A.   I'd see him redoing the
17 reports.
18     Q.   Okay. How would he redo her
19 reports?
20     A.   Add -- add the proper detail
21 that the report was missing.
22     Q.   Okay. How many times did you
23 see him doing that?

134

1     A.   I can't give you a number,
2 several.
3     Q.   When?
4     A.   I can't give you dates. You
5 know, while she was CCR operator,
6 that's all I know.
7     Q.   Before or after she complained
8 about Mr. Swindle?
9     A.   That was several months
10 before.
11     Q.   Okay. Did you ever hear from
12 Ms. Nelson or Ms. Abrams that if
13 Edwards did not complain about Mr.
14 Swindle, they were going to report him
15 to team relations?
16     A.   I don't recall that, no.
17     Q.   Do you know how Ms. Abrams or
18 Ms. Nelson learned that Ms. Edwards was
19 upset about Mr. Swindle?
20     A.   No.
21     Q.   Did you ever ask?
22     A.   No.
23     Q.   Anything else relative to

135

1 Ms. Edwards' job performance as a CCR
2 or have you told me everything you
3 know?
4     A.   Yes, ma'am.
5     Q.   Okay. Anything good she did
6 while she was a CCR?
7     A.   Well, I mean, there's always
8 good with the bad, I'm sure. But I --
9 I mentioned a period where her
10 performance did improve, that was
11 obviously good, but the -- the level of
12 detail that I needed going into a
13 meeting obviously didn't sustain
14 itself, it went back down.
15     Q.   Any issues with attendance
16 with Ms. Edwards?
17     A.   I -- I don't really deal with
18 the attendance on my level. It's a
19 group leader function.
20     Q.   Well, any time she didn't show
21 up to work, that was a complaint of
22 yours?
23     A.   No, I don't know about that.

136

1    Q.    Attitude, did she have a good
2    attitude?
3    A.    Yes.
4    Q.    Appear to get along well with
5    co-workers?
6    A.    Yes.
7    Q.    Any other issues you had about
8    your interaction with her?
9    A.    No.
10    Q.    No issues of insubordination?
11    A.    None.
12    Q.    Did you feel like she was
13    working hard trying to do a good job?
14    A.    I felt the effort was there.
15    From an effort standpoint, I thought --
16    yeah, I thought she was trying.
17    Q.    Did you feel she was receptive
18    to your coaching and counseling?
19    A.    Yeah.
20    Q.    Who put Ms. Kelley in Ms.
21    Edwards' place?
22        MR. BOSTICK:  Object to the
23    form.

137

1    A.    I believe a recommendation
2    came from Harry White.  She may have
3    inquired to Harry or Steve, but
4    ultimately Steve put -- he would put
5    her in that position, being the group
6    leader.
7    Q.    Did Ms. Edwards ever approach
8    you about individuals cross-training so
9    if anyone was absent, there would be
10    someone to do the job?
11    A.    No, that's not something they
12    would approach me on.
13    Q.    So you have no knowledge of
14    Ms. Edwards recommending that Ms.
15    Kelley cross-train for her position?
16    A.    No.  No.
17    Q.    Who is cross-trained for
18    Sherry McPhee's position?
19    A.    Sherry McRae?
20    Q.    I'm sorry, Sherry McRae?
21    A.    Currently?
22    Q.    Yes.
23    A.    Jamal, and I don't remember

138

1    his last name.
2    Q.    Okay.  Who is cross-trained
3    for Ms. Kelley's position currently?
4    A.    I still have -- I'm not sure
5    who's -- I'm not sure.
6    Q.    Well, you were about to say "I
7    still have" --
8    A.    I mean, Pamela is available I
9    guess for back-up, but I don't know
10    that anybody else is trained.  That
11    would be something that Steve could
12    answer.
13    Q.    Steve?
14    A.    Culpepper.
15    Q.    Is he still there?
16    A.    I mean, he knows what -- who
17    has been trained and who hasn't been
18    trained.
19    Q.    But Mr. Culpepper is no longer
20    at the workplace, is he?
21    A.    No, but he knows who has been
22    trained.
23    Q.    I'm asking you right now --

139

1    A.    Oh, right now?
2    Q.    -- who is cross-trained for
3    Ms. Kelley's position if Ms. Kelley is
4    not there?
5    A.    Just Jamal that I know of.
6    Q.    Is he first or second shift?
7    A.    Second shift.
8    Q.    That's Ms. McRae's position
9    currently, right?
10    A.    McRae is on days.
11    Q.    Okay.  And Ms. Kelley is on
12    evenings?
13    A.    Right.
14    Q.    So Jamal is cross-trained for
15    either first or second shift?
16    A.    Yeah.  It's the same position,
17    switch shifts.
18    Q.    So you only have one person
19    for the two positions?
20    A.    Currently that I know of.
21        MS. HAYNES:  Okay.  All right.
22    That's all the questions I have.
23

140

EXAMINATION BY MR. BOSTICK :

1    Q.   Just a couple of questions to
2 follow up on some questions asked my
3 Ms. Haynes. You mentioned Mr.
4 Culpepper having to revise some of
5 Ms. Edwards' reports, and earlier there
6 was a question about who had voiced
7 complaints to you about her performance
8 or these reports, and I guess is Mr.
9 Culpepper one of the people who would
10 have voiced some concerns to you about
11 her performance in that CCR job?
12    **A.   Correct. He was tired of**
13 **working so many hours.**
14    Q.   Okay. And then there was some
15 questions about the team leader
16 position, and I guess is that an hourly
17 or a salaried position?
18    **A.   Hourly.**
19    Q.   And then does a team leader
20 have the authority to discipline a team
21 member?
22    **A.   None.**

141

1    Q.   Do they have the authority to
2 reprimand or take any kind of
3 disciplinary action against them?
4    **A.   No.**
5    Q.   Do they have any involvement
6 in determining their pay?
7    **A.   No.**
8    Q.   You mentioned that they act as
9 a reporter. What do you mean by that?
10    **A.   They report downtime, they**
11 **report team members not performing**
12 **their -- their jobs up to par. They**
13 **basically just report.**
14    Q.   Okay. You talked about --
15 Ms. Haynes asked you about people that
16 had been terminated in your area. Do
17 you actually make termination decisions
18 or that something you recommend to HR?
19    MS. HAYNES: Object to the
20 form.
21    **A.   That's recommendations that we**
22 **make to HR.**
23    Q.   There were some questions

142

1 about pay being determined for hourly
2 employees. Do hourly employees receive
3 pay increases that are based on merit?
4    **A.   No, it's a cost-of-living**
5 **increase. It might even be quarterly.**
6 **It's -- it's plant-wide. It's a**
7 **company -- the company determines that.**
8    Q.   And then you mentioned some of
9 the different people in the position of
10 CCR, and Pam Stoddard was one. Did you
11 know -- did Culpepper come to you and
12 have any concerns about her
13 performance?
14    **A.   Yeah.**
15    Q.   Okay. Were they similar
16 issues to the type issues that he had
17 with Ms. Edwards?
18    MS. HAYNES: Object to the
19 form.
20    **A.   Yes. I mean, they all had**
21 **some problems in the beginning.**
22 **There's a -- there's, you know --**
23    (Off-the-record discussion.)

143

1    Q.   (BY MR. BOSTICK) When Ms.
2 Edwards was moved to the BC1 line,
3 would that have the result of
4 decreasing the likelihood that she
5 would have to interact with Mr. Swindle
6 as part of her job duties?
7    MS. HAYNES: Object to the
8 form.
9    **A.   Correct.**
10    MR. BOSTICK: That's all I've
11 got.
12 EXAMINATION BY MS. HAYNES :
13    Q.   Was that a consideration when
14 you moved her?
15    **A.   The only consideration I had**
16 **was that she asked to go somewhere**
17 **else, and that's -- typically, you**
18 **know, we try to accommodate, if at all**
19 **possible.**
20    Q.   Was it a consideration that
21 when you moved Ms. Edwards to the BC1
22 line that she would have less
23 interaction with Mr. Swindle?

144

1    A.   Correct.

2    Q.   And why did you factor that

3  into your consideration?

4    A.   Well, based on the situation.

5    Q.   Which was?

6    A.   Her -- based on her

7  allegations of Mike harassing her, we

8  obviously -- you know, getting her away

9  from Mike was obviously a good thing,

10  which, you know -- you know, since she

11  had requested to be moved. She

12  requested to move, though, prior to the

13  incident, she requested to -- to move

14  in June, so the Mike -- the Mike thing

15  wouldn't be part of that. It was based

16  off -- based off of her asking to be

17  moved. That's the main -- I mean, her

18  request was -- was I believe sometime

19  in June.

20    Q.   My question was about the

21  consideration of being moved from Mr.

22  Swindle and then I asked you why?

23    A.   The consideration -- say that

<center>145</center>

1  to be moved. So obviously, no.

2    Q.   So you're changing your

3  answer?

4    A.   Correct.

5    Q.   Okay. Why?

6    A.   Because that's the truth.

7    Q.   That's the what?

8    A.   That's the truth. I mean,

9  when employees come to me, that's when

10  we consider moving them. That's the

11  only thing that would spark her being

12  moved.

13    Q.   So the fact she complained

14  about Mr. Swindle was not an

15  intervening factor that made you change

16  your decision in any way?

17    A.   No. She requested that prior

18  to any incident.

19      MS. HAYNES: Okay. That's it.

20

21    THUS CONCLUDED THE DEPOSITION OF

22      THOMAS H. BONDY

23

<center>147</center>

1  again.

2    Q.   Was it a consideration of

3  yours to move her away from Mr.

4  Swindle?

5    A.   No, no. The consideration

6  only would be accommodating her

7  request.

8    Q.   Okay. Did you just answer

9  differently about two minutes ago?

10    A.   Maybe timeline-wise, I --

11    Q.   Maybe timeline-wise what?

12    A.   The -- the timeline is a

13  little bit -- it's a gray area for me,

14  as far as times.

15    Q.   I'm just asking your

16  consideration about moving her away

17  from Swindle, was that a consideration,

18  and I think you answered it and then

19  you kind of circled back around on the

20  same answer and --

21    A.   I -- the only thing that we --

22  no, because the only thing that we look

23  at is when an employee comes and asks

<center>146</center>

1      C E R T I F I C A T E

2  STATE OF ALABAMA  )

3  JEFFERSON COUNTY  )

4    I hereby certify that the above

5  and foregoing proceeding was taken down

6  by me by stenographic means, and that

7  the questions and answers therein were

8  produced in transcript form by computer

9  aid under my supervision, and that the

10  foregoing represents, to the best of my

11  ability, a true and correct transcript

12  of the proceedings occurring on said

13  date at said time.

14    I further certify that I am

15  neither of counsel nor of kin to the

16  parties to the action; nor am I in

17  anywise interested in the result of

18  said cause.

19

20    _____

21    SALLIE NESMITH GUNTER

22    CERTIFIED COURT REPORTER

23    ACCR LICENSE #37

<center>148</center>

# Thomas H. Bondy

8360 Chadburn Way  Montgomery, AL 36116
(334) 215-7025 Home   (334) 296-0073 Cell
(334) 387-8315 Work

## Profile

*Results-oriented and enthusiastic challenge seeker with a strong work ethic.  Effective
interpersonal, communication and team-building skills with the ability to build trust and rapport.
Excellent problem-solving and organizational skills.*

## Education

Olivet College, Olivet, Michigan
Bachelor of Arts Degree, May 1992
Major:  Business Administration    Minor:  Insurance

## Career Summary

- Production Management
- Human Resource Management

- Training & Motivation
- Quality Control

## Professional Experience



<u>HYUNDAI MOTOR MANUFACTURING OF ALABAMA, Montgomery, AL</u>
**Body Area Manager, Jan. 2004-Present**
- Helped design the entire Business Management System based on 16949 principles
- Responsible for complete body shop operations from the ground up
  - *Supervising equipment installation
  - *Training hourly team members the skills needed to produce a world-class car
- Supervise two assistant managers, four group leaders, ten engineers and 300 hourly employees
- Performed hands-on metal finish training for all new team members
- Attend daily quality reviews and assign Corrective Action Reports to respective parties
- Developed capable processes which are ergonomically designed for maximum output
- Trained interviewer:  Interviewed hundreds of potential hourly/salary team members
- Attended Fanuc Robotics Class, Basic Programming
- Completed a 35 day training camp on Lean Automation in Korea
- Implemented 5S program
- Trained hourly Team Members on Green Belt Six Sigma
- Played key role in TS16949 certification for HMMA, first OEM to achieve this certification
- HMMA was named 10[th] best plant in North America by J.D. Power in 2006, our first year of
  production
- Attended company sponsored union avoidance three day seminar in 2007
- Developed company wide reward and recognition program
- HMMA is the flagship for safety! 2007 fewest recordable injuries industry wide

<u>FORD MOTOR COMPANY, Brownstown Parts Redistribution Center, Brownstown, MI</u>
**Sheet metal Superintendent, Jan. 2003 – Jan. 2004**
- Increased LPMH (lines per man hour) by 12%
- Created a quality team which improved customer satisfaction by 33%
- Implemented a Kevlar glove program which reduced laceration rate by 86%

**Packaging Superintendent, 2002-2003**
- Increased LPMH 18% by maximizing production and holding people accountable
- Improved customer satisfaction 40% by reducing rejects and operating better than six sigma
  standards
- Eliminated six jobs and two classifications to maximize our proficiency and eliminate waste

FORD MOTOR COMPANY, Wixom Assembly Plant, Wixom, MI

**Manufacturing Planning Specialist, 1999-2002**
- Supervised twelve line foreman and 300 production/maintenance hourly workers
- Coordinated the launch of the new 2000 Town Car
- Responsible for meeting daily production schedules and department budgets
- Worked diligently at meeting quality standards on a daily basis
- Played a key role in the launching of the new Lincoln LS in 1999
- Devised a supervisor task analysis checklist to increase performance and accountability

**Production Supervisor, 1993-1999**
- Trained and supervised between 20-40 hourly employees, utilizing leadership abilities to maximize production
- Assumed the roles of the General Foreman and Body Area Manager during their absences
- Substituted as an acting MPS and Superintendent from February 1999 to November 2000
- Consistently met production schedules while maintaining quality control standards
- Experience in managing all areas of the Body Shop from manual welding to fit and finish
- Ensured that all safety standards were maintained
- Collaborated with other departments to improve quality control
- Trained new production supervisors
- Successfully retooled fixtures to reduce sheet metal defects as a member of the 1995 Continental Launch Team
- Member of the 1995 Lincoln Continental and 1998 Lincoln Town Car Launch Team
- Trained and certified in ISO9000 and in 14001 environmental standards

## REFERENCES

John Kalson
Plant Manager, HMMA
Hyundai Assembly Plant
Montgomery, AL
(334) 451-2677

Kurt Kavajecz
Plant Manager, Daimler Chrysler
Belvidere Assembly Plant
Belvidere, Illinois
(815) 547-2200 Work   (815) 389-2122 Home

Mike Skinner
Director, N.A. Parts Supply and Logistics
Ford Customer Service Division
mskinner@ford.com
(734) 523-3003 Office
(734) 674-7696

Mark Boldin
Plant Manager
St. Thomas Assembly Plant
Canada
8-782-5201
8-519-637-5201

03/06/2007  15:54    2058793572                HAYNES & HAYNES,P.C.                    PAGE  02

LAW OFFICES OF

# HAYNES & HAYNES, P.C.

ATTORNEYS AT LAW

ALICIA K. HAYNES, ATTORNEY                1600 WOODMERE DRIVE              TELEPHONE 205-879-0377
akhaynes@haynes-haynes.com                BIRMINGHAM, ALABAMA 35226        FACSIMILE 205-879-3572

KENNETH D. HAYNES, ATTORNEY                                                WEBSITE: www.haynes-haynes.com
kdhaynes@haynes-haynes.com

March 6, 2007

## VIA CERTIFIED MAIL RETURN RECEIPT
## REQUESTED AND VIA FACSIMILE - 334-387-8296

Mr. Tom Bondy
Mr. Steve Culpepper
Mr. Wil Ware, Human Resource Manager
Hyundai Motor Manufacturing, LLC
700 Hyundai Blvd.
Montgomery, AL  36105

RE:    Tammy Edwards

Dear Messrs. Bondy, Culpepper and Ware:

I represent Mrs. Edwards in her sexual harassment and retaliation case against Hyundai. Mrs. Edwards was recently released by her physician to return to work. On information and belief you have refused to return Mrs. Edwards to work stating there are no jobs available for her.

The purpose of this letter is to request that Mrs. Edwards be returned to work immediately. Further, your refusal to return Mrs. Edwards to work is evidence of illegal retaliation. All such retaliation should cases and desist immediately and Mrs. Edwards should resume her regular duties. Additionally, if my information is incorrect and Mrs Edwards has been terminated, please advise us at your earliest convenience.

Please forward this letter to your legal counsel if there are any questions.

Sincerely,

Alicia K. Haynes
FOR THE FIRM

AKH/jlc

CONFIDENTIAL

D- 00623  EDWARDS V HMMA

*PLAINTIFF'S EXHIBIT 27*

03/06/2007  15:54   2058793572              HAYNES & HAYNES, P.C.              PAGE  01

# HAYNES & HAYNES, P.C.
ATTORNEYS AT LAW
1600 WOODMERE DRIVE
BIRMINGHAM, ALABAMA 35226
TELEPHONE (205) 879-0377
FACSIMILE (205) 879-3572

## FAX TRANSMITTAL SHEET

DATE: _____3/6/07_____

TO: _____Mr. Wil Ware, Human Resources Manager___

NAME OF FIRM: ___Hyundai Motor Manufacturing, LLC___

FAX NO: _____334 - 387 - 8296_____

NO OF PAGES: ___2___ (INCLUDING THIS PAGE)

FROM: _____

MESSAGE: _____

**NOTICE:**   The information contained in this facsimile message is privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or use of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the address below via the U.S. Postal Service. Thank you.

IN THE EVENT THAT YOU HAVE PROBLEMS RECEIVING THIS TRANSMISSION, PLEASE CALL (205) 879-0377.

CONFIDENTIAL

D- 00622  EDWARDS V HMMA

# Exhibit 28 Filed Under Seal

1  IN THE UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF ALABAMA

3  NORTHERN DIVISION

4

5  TAMMY EDWARDS,

6      Plaintiff,

7  vs.

8  HYUNDAI MOTOR MANUFACTURING ALABAMA,

9  LLC, and MIKE SWINDLE, individually,

10     Defendants.

11

12  CIVIL ACTION NUMBER:  2:07-cv-908-MHT

13

14

15  DEPOSITION:  BILLY FRED KITCHENS, JR.

16

17

18      S T I P U L A T I O N S

19  IT IS STIPULATED AND AGREED by

20  and between the parties through their

21  respective counsel that the deposition

22  of BILLY FRED KITCHENS, JR. may be

23  taken on July 17, 2008, before Sallie

1

---

1  NeSmith Gunter, Certified Court

2  Reporter of the State of Alabama, ACCR

3  License Number 37, Commissioner and

4  Notary Public, at the Wingate Inn, 2060

5  Eastern Boulevard, Montgomery, Alabama.

6      IT IS FURTHER STIPULATED AND

7  AGREED that it shall not be necessary

8  for any objections to be made by

9  counsel to any questions except as to

10  form or leading questions, and that

11  counsel for the parties may make

12  objections and assign grounds at the

13  time of trial or at the time said

14  deposition is offered in evidence or

15  prior thereto.

16

17

18

19

20

21

22

23

2

---

1      APPEARANCES

2  Appearing for the Plaintiff :

3  HAYNES & HAYNES, P.C.

4  By:  Alicia K. Haynes, Esq.

5  1600 Woodmere Drive

6  Birmingham, Alabama  35226

7  Appearing for the Defendant  Hyundai

8  Motor Manufacturing Alabama, LLC :

9  OGLETREE, DEAKINS, NASH, SMOAK

10     & STEWART, P.C.

11  By:  Brian R. Bostick, Esq.

12  One Federal Place

13  Suite 1000

14  Birmingham, Alabama  35203

15      - and -

16  By:  Christopher N. Smith, Esq.

17  Corporate Legal Counsel

18  Hyundai Motor Manufacturing

19     Alabama, LLC

20  700 Hyundai Boulevard

21  Montgomery, Alabama  36105

22

23

3

---

1  Appearing for the Defendant Michael

2  Wayne SWINDLE :

3  CONSTANGY, BROOKS & SMITH, LLC

4  By:  J. Tobias Dykes, Esq.

5  One Federal Place

6  Suite 900

7  Birmingham, Alabama  35203

8  Certified Court Reporter:

9  Sallie NeSmith Gunter

10  Also Present:  Tammy Edwards

11

12

13

14

15

16

17

18

19

20

21

22

23

4

| | |
|---|---|
| 1 | I N D E X |
| 2 | |
| 3 | Examination by Ms. Haynes.............8 |
| 4 | Examination by Mr. Bostick...........91 |
| 5 | Examination by Ms. Haynes............92 |
| 6 | Examination by Mr. Bostick..........105 |
| 7 | Plaintiff's Exhibit 30 |
| 8 | Memos From Penny Nichols, RN.........89 |

5

---

1     BILLY FRED KITCHENS , JR.,

2 being first duly sworn, was examined

3 and testified as follows:

4 EXAMINATION BY MS. HAYNES :

5     **Q.** Mr. Kitchens, if you would,

6 state your full name for the record,

7 please, sir.

8     **A. Billy Fred Kitchens, Jr.**

9     **Q.** And what is your address,

10 please, sir?

11     **A. I actually have two addresses.**

12 **I live down here in Montgomery, it's**

13 ~~3021 Perry Hill Court~~; **and I live in**

14 **Auburn, my main home is in Auburn,** ~~2008~~

15 ~~Camelot Drive~~, **Auburn.**

16     **Q.** Why two homes?

17     **A. I'm 60 miles from work down**

18 **here, so I stay down here during the**

19 **week a lot, back and forth.**

20     **Q.** Okay. So I guess you didn't

21 appreciate my comments about the court

22 reporter's son moving to Tuscaloosa?

23     **A. It's just tough. It's tough.**

7

---

1     I, Sallie NeSmith Gunter, a

2 Certified Court Reporter of the State

3 of Alabama, ACCR License Number 37,

4 acting as Commissioner, certify that on

5 this date there came before me at the

6 Wingate Inn, 2060 Eastern Boulevard,

7 Montgomery, Alabama, on July 17, 2008,

8 beginning at or about 12:53 p.m.,

9 BILLY FRED KITCHENS , JR., witness in

10 the above cause, for oral examination,

11 whereupon, the following proceedings

12 were had:

13     THE COURT REPORTER: Would

14 y'all like the usual stipulations

15 again, except you want the witness to

16 read and sign?

17     MR. BOSTICK: Yes.

18     MS. HAYNES: That's fine.

19     THE COURT REPORTER: All

20 right. Would you raise your right

21 hand, please, sir, to be sworn?

22

23

6

---

1     **Q.** Okay. Are you married?

2     **A. Yes, ma'am.**

3     **Q.** Children?

4     **A. I have one son.**

5     **Q.** And is he in college yet?

6     **A. No, ma'am.**

7     **Q.** Okay. What is going to be

8 your choice of venue?

9     **A. I'm sorry?**

10     **Q.** Your choice of venue when he

11 goes to school? I'm playing with you,

12 you don't have to answer that.

13     **A. That's a whole 'nother story.**

14 **I mean, if I told it, I'd cry. I'm not**

15 **going to even get into that.**

16     **Q.** Oh, okay. What is your

17 current position with Hyundai?

18     **A. Group leader.**

19     **Q.** And how long have you been in

20 that position?

21     **A. Eight months now.**

22     **Q.** Is that a promotion for you

23 from your previous position?

8

---

1  A.  Yes, ma'am.

2  Q.  What was your position prior?

3  A.  Team leader.

4  Q.  And how long did you hold that

5  position?

6  A.  Three years, I think.

7  Q.  What is the difference in your

8  job duties between a team leader and a

9  group leader?

10  A.  Well, now being in a

11  management role, I handle all time,

12  keying in time, responsible for

13  delegating duties to all the team

14  leaders.  Team leader, you know, was

15  more hands on with the people on the

16  floor.  It was an hourly employee

17  really, just team leader, so I was

18  delegating jobs out to just the team

19  members then.

20  Q.  And what do you do now, as far

21  as delegation?

22  A.  Really just whatever is -- the

23  flavor of the day or whatever, I mean,

9

1  whatever is going on, I kind of --

2  everybody knows their duties as a team

3  leader, so I again, I just really

4  monitor what everybody does, make sure

5  that all the team leaders are doing

6  their jobs.

7  Q.  Who are the team leaders that

8  report to you currently?

9  A.  Let's see.  We've got Keith

10  Ulrich; this guy's name is Mylavanh

11  Phomsavanh, he's Laotian.  I want to

12  see you write that down now.  And Mike

13  Swindle and Richard Bush and Craig Hay.

14  Q.  What job does Ulrich do?  Am I

15  saying his name right?

16  A.  Ulrich.

17  Q.  Ulrich?

18  A.  He's a team leader.

19  Q.  Over what?

20  A.  Moving parts.

21  Q.  Moving parts.  Swindle?

22  A.  Team leader over body

23  build/body respot.

10

1  Q.  And I think he's referred to

2  as just Yao or Yea (phonetically)?

3  A.  Yao.

4  Q.  Yao.

5  MR. BOSTICK:  Phomsavanh or --

6  Q.  Yeah.  What is his position?

7  A.  Team leader over BC2 and BC3.

8  Q.  Mr. Bush, team leader over

9  what?

10  A.  Call it FSC, it's floor sides,

11  CRPB.

12  Q.  Floor sides?

13  A.  And CRPB.

14  Q.  What does that stand for?

15  A.  Cowl reinforcement, roof rail,

16  package tray is what that -- cowl, roof

17  rail -- CRP -- package tray, and back

18  panel.

19  Q.  Okay.  And Mr. Hay, he's team

20  leader over what?

21  A.  BC1.

22  Q.  And were you the team leader

23  over BC1 prior to Mr. Hay?

11

1  A.  Uh-huh, yes, ma'am.

2  Q.  And were you the team leader

3  over BC1 for three years?

4  A.  No.  I was at one time team

5  leader over body build and body respot.

6  Q.  How long?

7  A.  Maybe a year, year and a half.

8  I'm not really sure of the date.  I

9  know when I made team leader over BC1,

10  it was in January, so that would be --

11  it was about a year and a half and then

12  a year and a half on BC1.

13  Q.  Your home near Montgomery, is

14  that an apartment or a condominium?

15  A.  It's a -- patio home.

16  Q.  Has Mr. Swindle ever occupied

17  that residence with you?

18  A.  Yes.

19  Q.  For what period of time?

20  A.  It was I think around four or

21  three months he was there, and that

22  was -- as far as the time of the year,

23  I'm not sure.  It was during -- let's

12

**Page 13**

1    see, I think it was in '06 but -- I was
2    trying to remember whether it was cold
3    or hot or what. I'm not sure what time
4    of the year it was.
5        Q.    What was the reason he lived
6    with you two or three months?
7        A.    I don't know. He came to me
8    and said he wanted a place to stay, so
9    I mean, staying down here like I do,
10   the expense and all, I like to try to
11   keep somebody over there. It's a small
12   place, but having two people to split
13   the rent or whatever is -- is nice, you
14   know, so I said sure, come on.
15       Q.    Okay. Has anyone else from
16   Hyundai lived with you?
17       A.    Uh-huh.
18       Q.    Who?
19       MR. BOSTICK:  Say "yes" or
20   "no," please.
21       A.    Yes, it was Todd -- what was
22   his last name? Todd Webb, he stayed
23   there with me, and Jason Driggers

**Page 14**

1    stayed there.
2        Q.    Anyone else?
3        A.    That's all.
4        Q.    Did Mr. Swindle pay you rent
5    while he lived there?
6        A.    When I could get it out of
7    him, yeah. He --
8        Q.    Okay.
9        A.    I think he still owed me
10   money, though, if you want to know the
11   truth about it.
12       Q.    When I see him, I'll tell him
13   about that, okay?
14       A.    Okay.
15       Q.    I should have taken your
16   deposition first and I would have asked
17   him about it.
18       A.    It's about 280 bucks, if you
19   want to know the amount.
20       Q.    If he has checkbook, I'll let
21   you know and send that to you.
22       A.    All right.
23       MS. HAYNES:  Off the record.

**Page 15**

1        (Off-the-record discussion.)
2        Q.    (BY MS. HAYNES) When Mr.
3    Swindle lived with you, did you ever
4    see Jennifer Foster come visit him?
5        A.    No.
6        Q.    Do you have any knowledge of
7    the two of them having a relationship?
8        A.    A relationship? I know
9    they're friends, that's all I know.
10       Q.    You don't know that they
11   dated?
12       A.    No.
13       Q.    Or are more than friends?
14       A.    No.
15       Q.    Or I think the new term is
16   "friends with benefits"?
17       A.    Well, I'm not sure of that, I
18   don't --
19       Q.    But she never visited him --
20       A.    No.
21       Q.    -- at your residence?
22       A.    Not that I know of, not that
23   I'm aware of.

**Page 16**

1        Q.    Have you ever been out having
2    drinks with Mr. Swindle?
3        A.    Yes.
4        Q.    Would he have Ms. Foster with
5    him?
6        MR. BOSTICK:  Object to the
7    form.
8        A.    Most -- most of the time,
9    ████ was with him when I've been out.
10   It's been a long time. We haven't been
11   out lately but --
12       Q.    That's his wife?
13       A.    He had his wife with him.
14       Q.    Have you ever seen Ms. Foster
15   with him?
16       A.    At work, yeah. I mean,
17   they're around each other at work, but
18   other than --
19       Q.    Other than work, have you seen
20   them out together?
21       A.    No.
22       Q.    Not together at the drag race
23   or --

1    A.    No.

2    Q.    -- at Woodmere?

3    A.    No.

4    Q.    Has Mr. Swindle ever told you

5    that he had a relationship with Ms.

6    Foster?

7    A.    No.

8    Q.    When did you first meet Ms.

9    Edwards?

10    A.    Let's see.  I'm terrible with

11    dates.  I -- I can't --

12    Q.    What position was she in when

13    you first met her?

14    A.    The CCR.

15    Q.    Had she been in that position

16    for a period of time or was new to the

17    position?

18    A.    She was new then in the

19    position.

20    Q.    Did you have anything to do

21    with her being moved to that position?

22    A.    No.

23    Q.    Had you ever worked with her

17

1    in moving parts?

2    A.    No.

3    Q.    Did you know her when she

4    worked in moving parts?

5    A.    I never knew she was in moving

6    parts.  I never knew she was there

7    until she got the CCR job.

8    Q.    Thank you.  What was your

9    interaction with her as -- when she was

10    a CCR?

11    A.    She came down to BC1 and

12    reported the downtime off of an eraser

13    board we had down on the line and a lot

14    of times asked questions about the

15    downtime.

16    Q.    Are they still using that

17    erase board for downtime?

18    A.    No, no.

19    Q.    How was it used then, if you

20    know?

21    A.    It was like every hour was on

22    the board, and then you just -- really,

23    it was my responsibility if we were

18

1    down at any time, you know, during that

2    hour, I'd put the reason down, and then

3    we'd try to do a countermeasure at the

4    end of the shift or whatever, you know,

5    to --

6    Q.    How was the board organized?

7    I know you said that you had the times

8    on one side, which I guess was on this

9    side for you (indicating)?

10    A.    Yeah.  It was just like, you

11    know, each hour, and then it was a

12    space in between, and you write down --

13    I'm not sure, the board may still be

14    down there.

15    Q.    Would it have the time that

16    any machine went down?

17    A.    Yeah.

18    Q.    And whose responsibility was

19    that to keep up with that?

20    A.    My job at the time, team

21    leader, yeah.

22    Q.    For the BC1?

23    A.    Uh-huh, for BC1.

19

1    Q.    So if any one of the robots

2    went down on BC1, you would write down

3    the time it went down and the time it

4    came back up?

5    A.    Well, there is no robots on

6    BC1.

7    Q.    Okay.  What is there?

8    A.    But if any of the machinery,

9    yeah, if it was down, you'd write down

10    time it was down and then -- it was a

11    way of keeping up with it.  And she

12    would come down and write down the --

13    the time and record it on a report that

14    she did.

15    Q.    Okay.  Prior to Ms. Edwards

16    performing that job, who did the job?

17    A.    Oh, that job has been

18    through -- I know Paul Dawson did it

19    when we first started up, and let's

20    see, before -- I can't remember who did

21    it.  I know Paul did it, and then I

22    remember Tammy doing it.  I can tell

23    you the people after she did it.

20

1    Q.   Okay.  Who did it after Ms.
2  Edwards?
3    A.   I know Pam Stoddard has done
4  it, Amber Batie has done it, Jamal
5  Pollard does it, Richard Bush, Sherry
6  McRae.  Sherry is the one that was
7  doing it, that's the one that was doing
8  it I think before Tammy, one of the
9  ones.
10    Q.   Okay.
11    A.   And let's see who else has
12  done that.  A couple -- it's a guy on
13  the other shift, I know his nickname,
14  but I can't think of his real name.
15  Other than that, I -- the other shift,
16  there's a couple of people they use for
17  back-up, but that's all I know is the
18  ones I mentioned.
19    Q.   What shift do you work?
20    A.   Now I'm on nights, as you can
21  tell in my eyes.
22    Q.   I'm sorry, did you get any
23  sleep before you had to come here?

                    21

1    A.   Not much.
2    Q.   I'm sorry, I would have
3  rearranged that schedule.
4    A.   Well, I'm fine, I'm good.
5    Q.   Okay.  Have you worked days
6  before?
7    A.   Oh, yeah.  I just came off six
8  months on days.
9    Q.   Okay.  Back in 2006, do you
10  remember if you were days or nights,
11  which shift?
12    A.   I think we were doing two
13  months, two months, two months, three
14  months, three months, you know,
15  rotating.
16    Q.   Okay.
17    A.   I'm not sure of that.  I know
18  they changed it.  It was -- I'm not
19  sure of the rotation, but it was back
20  and forth we was rotating.
21    Q.   When Ms. Edwards was in the
22  CCR position, were the two of you
23  working the same shift?

                    22

1    A.   Yeah.
2    Q.   So you wouldn't have seen the
3  person that was working her position on
4  the other shift; is that correct?
5    A.   No, no, I wouldn't have seen
6  them, no.
7    Q.   Did you ever have any
8  complaints about Ms. Edwards in the CCR
9  position?
10    A.   No.
11    Q.   Did you ever review her
12  reports?
13    A.   At that time, that went to
14  management, so I never saw -- I may
15  have saw them in something we were
16  looking over maybe or -- but as far as
17  that report coming to me, it didn't at
18  that time, no.
19    Q.   Did anyone ever ask you
20  questions about any of her reports?
21    A.   No.
22    Q.   Okay.  Do you know of -- for
23  instance, Mr. Culpepper, did he ever

                    23

1  tell you that he was having to do redo
2  the reports and would ask you
3  information?
4    A.   No.
5    Q.   Mr. Bondy, did he ever
6  question you about any of the reports?
7    A.   No.
8    Q.   Have you ever been called to a
9  meeting where you had to -- before you
10  were a group leader where you had to
11  explain something on one of Ms.
12  Edwards' reports?
13    A.   I've been called to question
14  downtime, but I mean, I don't think it
15  was due to anything that was wrong on
16  the report.  I mean, you know, just it
17  was something on the report that I was
18  called to, you know, what's going on
19  here, why was this down?  But specifics
20  about her report, no, just, you know,
21  what was in the report.
22    Q.   Have you ever heard any
23  complaints about Ms. Edwards in the

                    24

1 workplace?

2     **A.**   **No.**

3     Q.   What was your relationship

4 with her while she was there?

5     MR. BOSTICK:  Object to the

6 form.

7     **A.**   **As I said before, I mean, she**

8 **was CCR.**

9     Q.   Did you get along with her?

10     **A.**   **Yeah.**

11     Q.   Any complaints about she

12 wasn't at work when she was supposed to

13 be, she was tardy?

14     **A.**   **No.**

15     Q.   Did she ever work for you?

16     **A.**   **Yeah.**

17     Q.   When?

18     **A.**   **Well, she would -- she worked**

19 **some on the weekends.  She would come**

20 **in and work on the weekends when they**

21 **were doing the TPM things, and after**

22 **she was moved from the CCR down to BC1,**

23 **she worked for me a short length of**

<center>25</center>

1 **time.  I'm not sure how long it was.**

2     Q.   On the weekends, what job did

3 she do when she was doing weekend work?

4     **A.**   **Oh, just we were -- TPM was**

5 **like cleaning up, you know, or whatever**

6 **was needed.**

7     Q.   Do you recall the time when

8 she was doing this cleanup work, was

9 this when she was also working as a

10 CCR?

11     **A.**   **I think so, yeah.**

12     Q.   Did you ever know she had been

13 hurt in an automobile accident?

14     **A.**   **Yeah.**

15     Q.   When did you know that?

16     **A.**   **She -- she told me about it.**

17 **It was back in '06.  I'm not sure the**

18 **month or --**

19     Q.   When she was a CCR?

20     **A.**   **Yeah.**

21     Q.   Okay.  Did you ever see her

22 with a neck brace on?

23     **A.**   **I don't think I saw her with a**

<center>26</center>

1 neck brace, no.

2     Q.   What did you know about her

3 injuries from the auto accident?

4     **A.**   **I just knew it was neck --**

5 **neck-related.**

6     Q.   And that's because she told

7 you?

8     **A.**   **Oh, yeah.**

9     Q.   Did she ever complain about

10 headaches or neck pain?

11     **A.**   **Yeah.**

12     Q.   Both or one?

13     **A.**   **I think it was headaches.**

14     Q.   Did she ever share with you

15 any medication she was on?

16     **A.**   **No.**

17     Q.   Did you ever know any

18 medication she was on?

19     **A.**   **No.**

20     Q.   How did you learn she was

21 being moved to the BC1 line?

22     **A.**   **I think Steve told me, Steve**

23 **Culpepper.**

<center>27</center>

1     Q.   What did he tell you?

2     **A.**   **He just said that Tammy is**

3 **coming down to work on BC1.**

4     Q.   Anything else?

5     **A.**   **No.**

6     Q.   Did he tell you what job she

7 would be doing?

8     **A.**   **No.**

9     Q.   Did you decide which job she

10 would be working on?

11     **A.**   **Yes.**

12     Q.   And how did you make that

13 decision?

14     **A.**   **Well, at the time we were --**

15 **we were doing containment on the CM,**

16 **which is the Santa Fe.  It's on the**

17 **rear opening of where the tailgate is,**

18 **and it was -- it's on the top of the**

19 **left-hand side, a lot of weld burrs,**

20 **and she had to just get the weld burrs**

21 **off the top of the -- it's a little**

22 **rounded-off area, a radius right here**

23 **that had weld splatter and weld burrs**

<center>28</center>

1  sticking out.  You'd take a small file
2  and knock the burrs off or file them
3  off or whatever, that's what she did.
4      Q.   Anything else?
5      A.   That's all I can remember.
6      Q.   The only tool she had to use
7  in doing that job was a file?
8      A.   It may have been a -- yeah, I
9  think it was just a file.
10     Q.   Did she also have to take a
11 hammer and round off that edge?
12     A.   She may have had to use a
13 hammer too.  I'm not sure.  I just
14 remember there were weld burrs that we
15 had to -- to -- to grind them off, file
16 them off or knock them off so --
17     Q.   And that was on the upper
18 right-hand corner of the --
19     A.   Left-hand corner.
20     Q.   Left-hand corner?
21     A.   Yeah.
22     Q.   Okay.  And what was the reason
23 she had to do the left and not the

29

1  right?
2      A.   Well, the right side was okay,
3  and then you hang the tailgate on, and
4  I think the burrs were causing damage
5  to the tailgate, the inner part of the
6  tailgate.
7      Q.   Was there a defect in one of
8  the machines completing the job and
9  that's why she had to do that
10 particular job?
11     A.   Well, it was -- I think it was
12 related to the weld schedule on one of
13 the robots, and it was a little hot so
14 it was pushing out the welds right
15 there, and -- but I think when they
16 made adjustments to the schedule, it
17 would cause it to be cold welds then,
18 so until they got it straightened out,
19 we had -- I don't know how long that
20 lasted, but we had to contain that on
21 BC1.
22     Q.   Do you know how long she did
23 that job?

30

1      A.   I -- I couldn't tell you.  I'm
2  not sure how long it was.
3      Q.   Was there another aspect of
4  that job that required her to lift
5  something on the car and use a rubber
6  mallet and knock it in?
7      A.   Not that I remember, no.
8      Q.   Is there a job like that on
9  the BC1 line?
10     A.   No, not now.
11     Q.   Where you had to use a rubber
12 mallet?
13     A.   No.
14     Q.   How long did that job last?
15     A.   I'm not sure.  I think it
16 was -- we did it for -- we were doing
17 it before she came down there, and then
18 probably a month, a week.
19     Q.   Who --
20     A.   I don't know.
21     Q.   I'm sorry.  Who did the job
22 before Ms. Edwards?
23     A.   I'm not sure.

31

1      Q.   You don't know a person?
2      A.   No.
3      Q.   Who did it after?
4      A.   I don't remember.  I don't --
5      Q.   Do you know why she went out
6  on medical leave?
7      A.   Why?
8      Q.   Yeah.
9      A.   I don't -- I gather it was her
10 neck.
11     Q.   Did you talk to anyone in
12 medical about her medical condition?
13     A.   No.
14     Q.   Did you talk to the doctor?
15     A.   No.
16     Q.   When you learned that she was
17 on medication, who did you go to?
18     A.   I didn't know she was on
19 medication.
20     Q.   Okay.  Did you ever have any
21 conversations with Steve Culpepper
22 about Ms. Edwards?
23     A.   In reference to?

32

1    Q.   Ms. Edwards?
2    A.   **I mean, just --**
3    Q.   Any time?
4    A.   **Not that I can recall.  I**
5  **don't --**
6    Q.   You don't recall any
7  conversation with --
8    A.   **I'm sure, but I don't remember**
9  **whether -- you know, it may have been**
10  **something about the downtime, this or**
11  **whatever.  I don't -- I don't know.**
12    Q.   Did you ever have any
13  conversations with Mr. Culpepper about
14  Ms. Edwards' health condition?
15    A.   **No.**
16    Q.   Did you ever have any
17  conversations with Mr. Culpepper about
18  Ms. Edwards' work product, whether it
19  was CCR or on the BC1 line?
20    A.   **Well, when he told me she was**
21  **coming to BC1.  Other than that, no.**
22    Q.   And the CCR position, did you
23  ever have any conversations with

33

1  Culpepper about that position?
2    A.   **No.**
3    Q.   Did you ever have any
4  conversations with Mr. Culpepper about
5  Ms. Edwards' complaints about Mr.
6  Swindle?
7    A.   **Say that again now.**
8    Q.   Did you ever any conversations
9  with Mr. Culpepper about Ms. Edwards'
10  complaints about Mr. Swindle?
11    A.   **No.  No.**
12    Q.   When did Ms. Edwards come to
13  you about Mr. Swindle, if ever?
14        MR. BOSTICK:  Object to the
15  form.
16    A.   **I don't remember the -- the**
17  **time.**
18    Q.   Do you remember the occasion?
19    A.   **No.**
20    Q.   Do you remember anything about
21  what she said?
22    A.   **I think she was referring to**
23  **his language at one time, and I said**

34

1  **that was just Mike being Mike, you**
2  **know.**
3    Q.   What do you recall about that
4  occasion, the conversation the two of
5  you had?
6    A.   **Just that.**
7    Q.   Okay.  Did you ever tell Mr.
8  Culpepper that Ms. Edwards had come to
9  you complaining --
10    A.   **No.**
11    Q.   -- about Mr. Swindle's
12  language?
13    A.   **No.**
14        MR. BOSTICK:  Let her finish
15  her question before you answer.
16    Q.   Did you ever any conversations
17  with Mike Swindle about Tammy Edwards?
18    A.   **No.**
19    Q.   Did you ever tell Mr. Swindle
20  that Ms. Edwards had come to you
21  complaining about his mouth or his
22  language?
23    A.   **I don't remember if I did or**

35

1  **not.  I don't think I did, no.**
2    Q.   Have you ever observed or
3  witnessed Mr. Swindle doing or saying
4  anything inappropriate to Ms. Edwards?
5    A.   **No.**
6    Q.   Have you heard him use the
7  word "fuck" in front of her?
8    A.   **I -- I can't remember, no, no.**
9    Q.   Have you ever heard him use
10  that word in the workplace?
11    A.   **Oh, yeah.**
12    Q.   Pardon?  Did you say "Oh,
13  yeah"?
14    A.   **Have I heard him say "fuck"**
15  **before?**
16    Q.   Yes.
17    A.   **Yes.**
18    Q.   How many times?
19    A.   **Oh, I don't know.**
20    Q.   Too numerous?
21    A.   **Yeah.**
22    Q.   How about the word "bitch,"
23  have you heard him say that in the

36

1  workplace?

2  **A.   In the workplace?**

3  Q.   Yes, sir.

4  **A.   I don't -- I don't remember if**

5  **he did.**

6  Q.   How about the word

7  "motherfucker," have you heard him use

8  that in the workplace?

9  **A.   Yeah.**

10  Q.   How was he using that?

11  **A.   Just in the middle of maybe**

12  **say something broke down and we were**

13  **getting angry and, you know -- you**

14  **know, say it.**

15  Q.   Okay.  Have you ever heard him

16  talk about his sex life in the

17  workplace?

18  **A.   No.**

19  Q.   Has he ever discussed that

20  with you?

21  **A.   No.**

22  Q.   Have you ever heard him talk

23  about that he enjoyed freaky sex?

                         37

1  **A.   No.**

2  Q.   Would you ever go to the CCR

3  room with Mr. Swindle or be present

4  when Mr. Swindle was there with Ms.

5  Edwards?

6  **A.   No.**

7  Q.   The three of you have never

8  been in that room together?

9  **A.   No.**

10  Q.   You never observed him in a

11  chair simulating having sex?

12  **A.   No.**

13  Q.   Have you heard him ask Ms.

14  Edwards anything relative to her

15  personal sex life?

16  **A.   No.**

17  Q.   Have you heard him make the

18  comment to Ms. Edwards that if she had

19  one night with him, she'd tell her

20  husband to leave?

21  **A.   No.**

22  Q.   Nothing like that?

23  **A.   No.**

                         38

1  Q.   Look for me at Plaintiff's

2  Exhibit 3, please, sir.  Let me ask you

3  this before we leave that area:  Have

4  you ever been at Mr. Swindle's desk

5  where Ms. Edwards was present?

6  **A.   I probably have, but I mean --**

7  **I mean, you're talking two years ago.**

8  **I -- yeah, I probably was, yeah.**

9  Q.   Have you ever heard Mr.

10  Swindle say anything inappropriate,

11  vulgar, or sexually offensive to Ms.

12  Edwards?

13  **A.   No.**

14  Q.   You've never heard Mr.

15  Swindle --

16  **A.   No.**

17  Q.   -- mention any type of sexual

18  act?

19  **A.   No.**

20  Q.   You need to before I -- before

21  you start saying "no" to my question,

22  you need to let me finish that

23  question.

                         39

1  **A.   Okay.**

2  Q.   Plaintiff's Exhibit 3, do you

3  recognize this interview that you had

4  with Stacye Jones?

5  **A.   Yes.**

6  Q.   Okay.  And do you remember

7  talking to Ms. Jones?

8  **A.   Uh-huh.**

9  Q.   Is that "yes"?

10  **A.   Yes, ma'am.**

11  Q.   Okay.  Did you tell Ms. Jones

12  that Tammy Edwards came to you months

13  ago?

14  **A.   Yes.**

15  Q.   And did you tell Ms. Jones

16  that you had told Mr. Swindle "to watch

17  his mouth and how he talks to the

18  ladies"?

19  **A.   Yeah.**

20  Q.   Okay.  Now, when you told

21  Ms. Jones that, were you being truthful

22  that you had, in fact, had a

23  conversation with Mr. Swindle?

                         40

1   A.   Yes.
2   Q.   Okay.  And in that
3   conversation, had you had anyone else
4   complain to you about Mike Swindle
5   other than Tammy Edwards?
6   A.   Yes.
7   Q.   Who?
8   A.   **Stephanie Samuels one time**
9   **mentioned his language.**
10  Q.   Anyone else?
11  A.   **No.**
12  Q.   Did anyone else mention his
13  behavior or his conduct?
14  A.   **No.**
15  Q.   Have you ever questioned that
16  maybe he's just not right with some
17  of -- how he acts in the workplace and
18  some of the things he says?
19  A.   **Say that again.**
20  Q.   Have you ever questioned maybe
21  he's just not right mentally?
22  A.   **Who, Mike?**
23  Q.   Yes.

                    41

1   mouth?
2   A.   **Right.**
3   Q.   Why didn't you go to him and
4   tell him about Ms. Samuels' complaint?
5   A.   **I don't know.  I just -- I**
6   **don't know.**
7   Q.   Okay.  Was Ms. Samuels'
8   complaint to you before or after Ms.
9   Edwards' complaint?
10  A.   **I'm not sure when it was.**
11  Q.   Were they about the same time?
12  A.   **Her -- Stephanie was probably**
13  **earlier.**
14  Q.   What was her position, Ms.
15  Samuels'?
16  A.   **Team leader.**
17  Q.   She was in the same position
18  you were?
19  A.   **Uh-huh.**
20  Q.   Is that a "yes"?
21  A.   **Yes, ma'am.**
22  Q.   She wasn't a group leader?
23  A.   **No.**

                    43

1   A.   **No.**
2   Q.   Do you think he's all there?
3   A.   **Yes.**
4        MR. BOSTICK:  Object to the
5   form.
6   Q.   Did you tell -- well, let me
7   ask you this:  When Ms. Samuels
8   complained to you, did you go and tell
9   Mr. Swindle?
10  A.   **No.**
11  Q.   Did you tell anyone in team
12  relations?
13  A.   **No.**
14  Q.   What was Ms. Samuels'
15  complaint?
16  A.   **Just him using "fuck," saying,**
17  **you know, just vulgar language.**
18  Q.   Did she tell you he had
19  touched her?
20  A.   **No.**
21  Q.   Pulled her hair?
22  A.   **No.**
23  Q.   She just didn't like his

                    42

1   Q.   Has she ever been a group
2   leader?
3   A.   **Yeah, she is now.**
4   Q.   In what department or section?
5   A.   **Quality control.**
6   Q.   Day shift?
7   A.   **She's with me now on nights.**
8   Q.   All right.  Ms. Jones asked
9   you toward the end of that interview on
10  the first page, "Have you witnessed a
11  situation where Mike was seated in a
12  chair and trusting himself forward in
13  the presence of Tammy?" and you
14  answered, "I don't remember."  Did you
15  ever go back to Ms. Jones and clarify
16  that you had seen that?
17  A.   **No.**
18  Q.   Okay.  Have you ever admitted
19  to Tammy Edwards that you did see it?
20  A.   **No.**
21  Q.   And you don't recall today
22  having seen that?
23  A.   **No.**

                    44

1    Q.    On the next page of your
2  interview, you discuss that "Mike comes
3  across brash," your words.  What did
4  you mean by that?
5    A.    Just his language.
6    Q.    Give me an example of when you
7  think he's brash.
8    A.    Just, you know, like I said,
9  when things get a little -- you know,
10  out there it's very stressful and when
11  it gets a little stressful, then, you
12  know, he talks ugly.
13    Q.    Talks ugly to women?
14    A.    No, just he talks ugly, I
15  mean, you know, just in general.
16    Q.    Does that violate Hyundai's
17  policies?
18         MR. BOSTICK:  Object to the
19  form.
20    A.    I'm not sure about -- I mean,
21  as far as -- does it violate their
22  policy?  No.
23    Q.    It doesn't?

                          45

1    Q.    Is it your belief today?
2    A.    Yes.
3    Q.    The way he talks in the
4  workplace is wrong?
5         MR. BOSTICK:  Object to the
6  form.
7    A.    Yeah.
8    Q.    Is it offensive?
9         MR. BOSTICK:  Object to the
10  form.
11    A.    I'm sorry?
12    Q.    Is it offensive?
13         MR. BOSTICK:  Are you talking
14  about the way he talks now in the
15  workplace or how he talked back in
16  2006?
17    Q.    Is the way he talks in the
18  workplace offensive?
19    A.    Yeah, in '06, yeah.
20    Q.    Is he still talking that way?
21    A.    No.
22    Q.    You haven't heard him say
23  anything?

                          47

1    A.    No.
2    Q.    Team leaders and team members
3  can talk vulgar in the workplace?
4    A.    No, no.
5    Q.    So what is it, it violates
6  their policies or it doesn't?
7    A.    I guess it violates their
8  policy.
9    Q.    Okay.  You follow that with
10  "The way Mike talks is wrong" --
11    A.    Yeah.
12    Q.    -- in your interview with
13  Ms. Jones.  Is that what you told her?
14    A.    (Nodding.)
15    Q.    You're shaking your head
16  "yes"?
17    A.    Yes.
18    Q.    And was that your belief then
19  in 2006 --
20    A.    Yes.
21    Q.    -- when you were interviewed I
22  think it was August of 2006?
23    A.    Yes.

                          46

1    A.    No.
2    Q.    Any curse words, any vulgar
3  words?
4    A.    No.
5    Q.    Since when?
6    A.    Since '06.
7    Q.    When in '06?
8    A.    August of '06.
9    Q.    You say in your interview that
10  Swindle is like a brother to you?
11    A.    Uh-huh.
12    Q.    Is that correct?
13    A.    Yeah.
14    Q.    Is he still like that?
15    A.    Yeah.
16    Q.    And then later on, you talk
17  about you're a father figure to him?
18    A.    Yeah.
19    Q.    Is that correct?
20    A.    Yeah.
21    Q.    Is that what you felt in 2006?
22    A.    I would say yeah.
23    Q.    Is that still how you feel

                          48

1  about him?
2      A.   Yeah.
3      Q.   Are y'all the same age?
4      A.   No.
5      Q.   Are you older than he is?
6      A.   I'm 25, I think he's -- no, I
7  think he's something, 37, 38.  I think
8  I'm ten years older than he is.  That's
9  right, he's 39, I'm 49.
10     Q.   Okay.  Why do you think you're
11 like a father figure for him?
12     A.   Well, he comes to me for
13 advice a lot of times, he --
14     Q.   Such as?
15     A.   Well, just in general, you
16 know, asks me family problems,
17 whatever, you know, he talks to me.
18     Q.   Anything else?
19     A.   No.
20     Q.   He just talks to you?
21     A.   Yeah.
22     Q.   Did you ever witness Ms.
23 Edwards trying to talk to him in the

49

1  did.
2      Q.   Anything else?
3      A.   That's all.
4      Q.   Have you ever talked ugly in
5  the workplace?
6      A.   Who, me?
7      Q.   Yes, sir.
8      A.   Yeah.
9      Q.   What have you said?
10     A.   I mean, I'm not -- I can't be
11 specific, I don't know.  I've
12 probably -- like I said, you know, it's
13 very, very stressful out there, and you
14 know, sometimes you let words fly that
15 you shouldn't, that you shouldn't say,
16 you know.
17     Q.   You can't remember anything
18 you said?
19     A.   No.
20     Q.   Have you said the word "fuck"
21 or "motherfucker"?
22     A.   I've probably said the word
23 "fuck."

51

1  workplace about family problems?
2      A.   No.
3      Q.   Did you ever witness her
4  telling him he needed to be in church
5  or he needed to go home to his wife and
6  be a good husband and daddy?
7      A.   No.
8      Q.   You never heard any of that?
9      A.   No.
10     Q.   Did you ever hear Ms. Edwards
11 talk ugly in the workplace?
12     A.   I'm sorry?
13     Q.   Ms. Edwards, did you ever hear
14 her talk ugly in the workplace?
15     A.   Oh, yeah.
16     Q.   What did you hear her say?
17     A.   Just -- you know, just curse
18 words.
19     Q.   I'm asking you what you heard
20 her say?
21     A.   "Shit," "damn."  I never heard
22 her say the F word I don't think.  I
23 can't remember, but I don't think I

50

1      Q.   Anything else?
2      A.   No.
3      Q.   How about "bitch"?
4      A.   I'm not -- I don't recall if I
5  have, I mean.
6      Q.   Have you ever told a joke or
7  made a comment that was demeaning or
8  offensive?
9      A.   No.
10     Q.   Did you ever make the comment
11 to Ms. Edwards that her job would be
12 under your desk?
13     A.   No.
14     Q.   You didn't say that?
15     A.   No.
16     Q.   Did you ever apologize to
17 Ms. Edwards for anything?
18     A.   Yeah.
19     Q.   What did you apologize for?
20     A.   My language.
21     Q.   What had you said on that
22 occasion?
23     A.   I just told her that, you

52

1 know, that if any time she was in
2 earshot of me talking ugly that I
3 wanted to apologize to her.
4     Q.   You were just doing it ahead
5 of time?
6         MR. BOSTICK:  Object to the
7 form.
8     A.   I'm sorry?
9     Q.   You were doing it ahead of
10 time, apologizing if she heard
11 something later or had you said
12 something and apologized for it?
13     A.   Well, I wasn't sure if she had
14 heard anything or not, so I just told
15 her I apologized for it if I had said
16 anything offensive around her.
17     Q.   But you don't recall a
18 conversation with Ms. Edwards about her
19 being under your desk?
20     A.   No.
21     Q.   And her asking Mr. Culpepper
22 and Mr. Culpepper said he couldn't
23 authorize that?

53

1     A.   No.
2     Q.   You don't have any
3 recollection of that?
4     A.   No.
5     Q.   Could it have happened and
6 just don't remember it?
7     A.   No.
8     Q.   You just deny that that would
9 have taken place?
10     A.   Right.
11     Q.   Do you know why Ms. Edwards
12 would say that you said that to her?
13     A.   No.
14     Q.   Did team relations ask you
15 about that comment?
16     A.   Not that I can recall.
17     Q.   Did you tell team relations
18 that Swindle was seeing Jennifer
19 Foster?
20     A.   Yeah.
21     Q.   Why did you tell them that?
22     A.   I think they asked me that.  I
23 mean, I don't think I just up and told

54

1 them that.  I think they asked me that,
2 was Mike and Jennifer friends or was he
3 seeing her, and I just said yeah.
4     Q.   What was the basis of your
5 knowledge that he was seeing her?
6     A.   Well, eating lunch together
7 and you know, seeing each other at
8 work.
9     Q.   Anything else?
10     A.   No, that's all.
11     Q.   Would they always eat lunch
12 together?
13     A.   Not always.
14     Q.   But you just felt from
15 watching them eat lunch together and in
16 the workplace that they were seeing
17 each other?
18         MR. BOSTICK:  Object to the
19 form.
20     A.   Yes.
21     Q.   What did you mean by that,
22 that they were seeing each other?
23     A.   I just told you, they saw each

55

1 other at work, they'd go to lunch.
2     Q.   Well, did you mean a dating
3 relationship that they were in?
4     A.   Well, no.
5     Q.   Well, look for me page 3 of
6 Plaintiff's Exhibit 3, the second line
7 Stacye Jones asked you, "Is there
8 anything else you would like to say?"
9 and then she says you answered, "Mike
10 is seeing a lady on the floor," and
11 then Ms. Jones says, "Who is it?" and
12 you answer, "Jennifer."  Do you recall
13 that conversation with Ms. Jones?
14     A.   Uh-huh.
15     Q.   Yes?
16     A.   Yes.
17     Q.   Okay.  Do you think she has it
18 wrong how it happened there?
19     A.   Yeah.
20     Q.   Okay.  You think she asked
21 you?
22     A.   Right.
23     Q.   Look for me at Plaintiff's

56

**Page 57**

1 Exhibit 14, and do you see your
2 signature on page 3, document D-207?
3 **A. Right.**
4 Q. Is that your signature?
5 **A. Uh-huh.**
6 Q. Is that a "yes"?
7 **A. Yes, ma'am.**
8 Q. Did you read it before you
9 signed it?
10 **A. Yes.**
11 Q. Okay. Did you change above
12 where she asked fourth line from the
13 bottom, "Anything else?" and she
14 writes, "Mike is seeing a lady on the
15 floor"?
16 **A. Did I change?**
17 Q. Yeah, did you change that?
18 **A. No.**
19 Q. Was that correct at the time?
20 **A. Yes.**
21 Q. Did you also tell her that you
22 were dodging Mr. Swindle that day?
23 **A. Yes.**

**Page 58**

1 Q. And why were you dodging him?
2 **A. Well, I think -- what did it**
3 **say? "I didn't want to be in this**
4 **room," because I didn't want to be**
5 **involved in the -- in this whole**
6 **matter.**
7 Q. Why not?
8 **A. Why not? I didn't want to be**
9 **involved in it. I mean, I didn't want**
10 **him coming to me talking to me about**
11 **anything and just stayed clear of him.**
12 Q. Was there a problem with just
13 meeting with team relations to tell
14 them the truth?
15 **A. No. That's what I did.**
16 Q. Okay. What was so painful
17 about that that you had to dodge Mr.
18 Swindle?
19 **A. I just -- I just didn't want**
20 **to be involved in it.**
21 Q. Because you felt it would
22 compromise your relationship with
23 Mr. Swindle?

**Page 59**

1 MR. BOSTICK: Object to the
2 form.
3 **A. No, no.**
4 Q. Do you have any reason to
5 believe that Ms. Edwards is not a
6 truthful person?
7 **A. No.**
8 Q. Have you ever found her to be
9 anything but truthful?
10 **A. No.**
11 Q. All right. Look for me at
12 page 7 of Plaintiff's Exhibit 3. This
13 is a -- I'm sorry, Plaintiff's Exhibit
14 3.
15 MR. BOSTICK: Back to the tab.
16 Q. And then page 7. The middle
17 of the page is your second interview
18 with Lucas Cooner and Stacye Jones. Do
19 you recall a second interview?
20 **A. Uh-huh.**
21 Q. Is that a "yes"?
22 **A. Yes, ma'am.**
23 Q. And Ms. Jones starts the

**Page 60**

1 conversation about a conversation you
2 had had previous with Ms. Edwards
3 yesterday. Do you recall that?
4 **A. Yes.**
5 Q. And you told her that you did
6 remember the three of you being
7 together but not that he was thrusting
8 in the chair?
9 **A. Right.**
10 Q. Okay. How is it you recall
11 that?
12 **A. She reminded me.**
13 Q. Ms. Edwards reminded you?
14 **A. Uh-huh.**
15 Q. Is that a "yes"?
16 **A. Yes.**
17 Q. Okay. And when Ms. Edwards
18 reminded you, that's what made you
19 recall that that, in fact, happened --
20 MR. BOSTICK: Object to the
21 form.
22 MR. DYKES: Object to the
23 form.

1    Q.    -- that the three of you were
2    together?
3    A.    **The three of us were standing,**
4    **I think we were all standing at his**
5    **desk.**
6    Q.    Do you remember the
7    conversation the three of you were
8    having?
9    A.    **No.**
10    Q.    You don't recall it being
11    about sex?
12    A.    **No.**
13    Q.    Did you ever tell Ms. Edwards
14    that before the day was up, Mike
15    Swindle would have a good excuse?
16    A.    **No.**
17    Q.    Did you tell Ms. Edwards that
18    Mr. Swindle had called his wife and
19    told her he might get fired?
20    A.    **No.**
21    Q.    Did you have any conversations
22    with Amber Kelley about Mr. Swindle?
23    A.    **No.**

61

1    wrong with Tammy is she's never been
2    fucked?
3    A.    **No.**
4    Q.    You've never been in his
5    presence and Ms. Edwards' presence
6    where he used the F word in front of
7    her?
8    A.    **No, not that I recall.**
9    Q.    Do you think you'd recall
10    that?
11    A.    **I probably would, yeah.**
12    Q.    Have you ever heard him say
13    that I'm not a boob man, I'm an ass
14    man?
15    A.    **No.**
16    Q.    Did you ever have a
17    conversation with Ms. Edwards about her
18    sister?
19    A.    **About her sister?**
20    Q.    Yes, sir.
21    A.    **Yeah.**
22    Q.    Tell me about that
23    conversation.

63

1    Q.    Have you ever seen Mr. Swindle
2    grab his genitals in front of Ms.
3    Edwards?
4    A.    **No.**
5    Q.    Have you ever seen him climb
6    the fence there at the BC1 line and
7    simulate a sexual act?
8    A.    **No.**
9    Q.    Have you ever seen him on the
10    fence?
11    A.    **On the fence?**
12    Q.    Yes.
13    A.    **No.**
14    Q.    Have you ever heard him say,
15    "Fuck me, Ralph, fuck me like Mike
16    does"?
17    A.    **No.**
18    Q.    How about on the body build
19    line, have you seen him do it on the
20    body build line?
21    A.    **No.**
22    Q.    Have you ever been in his
23    presence when he has told you what is

62

1    A.    **I remember her saying her**
2    **sister wanted to come to the body shop.**
3    Q.    For what?
4    A.    **To work.**
5    Q.    Anything else?
6    A.    **No.**
7    Q.    Did you ask her to get her
8    sister on the telephone --
9    A.    **No.**
10    Q.    -- that you wanted to talk to
11    her?
12    A.    **No.**
13    Q.    You didn't direct her to make
14    the telephone call?
15    A.    **No.**
16    Q.    Have you ever seen her sister?
17    A.    **No.**
18    Q.    Do you know her sister?
19    A.    **No.**
20    Q.    Did you have a situation last
21    year that involved Ms. Pam Stoddard
22    reporting you for sleeping on the job?
23    A.    **Do what?**

64

1    Q.   Did you have a situation last
2    year where Pam Stoddard reported that
3    you were sleeping on the job?
4    A.   Yes.
5    Q.   Tell me about that situation.
6    A.   We were -- we were working one
7    weekend, and I can't remember if it was
8    Saturday or Sunday, and we were taking
9    a break, she came down to the line, and
10   then later on, she said that we were
11   sleeping.
12   Q.   Was there an investigation?
13   A.   I was questioned by Tom, I
14   think, about it.
15   Q.   That you and Culpepper were
16   sleeping?
17   A.   Uh-huh.
18   Q.   Is that a "yes"?
19   A.   Yes, ma'am.
20   Q.   Did you report that both you
21   and Culpepper were sick during that
22   time?
23   A.   Right.

65

1    Q.   Both of you were sick at the
2    same time?
3    A.   Yeah.
4    Q.   And you had your head down on
5    the break room table?
6    A.   I think he did.  I was sitting
7    back in a chair like this, just rared
8    back like that (demonstrating).
9    Q.   Did you have to submit a
10   statement about that incident?
11   A.   I don't recall.  I don't think
12   I did.
13   Q.   What is your opinion of Pam
14   Stoddard?
15   A.   Pam?
16   MR. BOSTICK:  Object to the
17   form.
18   Q.   Yes, sir.
19   A.   She's a good worker, she is.
20   Anywhere you put her, she does a good
21   job.
22   Q.   Do you know why she would have
23   told an untruth about you sleeping on

66

1    the job?
2    A.   I probably was asleep, but it
3    was at break, we were taking a break.
4    Q.   Okay.  Was Mr. Culpepper
5    having a relationship with April Smith
6    during that time?
7    A.   I'm not sure.
8    Q.   Do you know why he left
9    employment with Hyundai?
10   A.   No.  Only rumors is what I
11   heard.
12   Q.   What have you heard?
13   A.   That he was fired.
14   Q.   He what?
15   A.   I heard rumors I said.
16   Q.   That he was fired?
17   A.   Right.  I don't know why,
18   though.
19   Q.   Did you ever tell Ms. Edwards
20   that you couldn't bring your wife
21   around Mr. Swindle because you didn't
22   like how he talked in front of her?
23   A.   I probably did, yeah.

67

1    Q.   Have you had your wife around
2    Mr. Swindle?
3    A.   Yes, she's been around him.
4    Q.   Did he talk ugly in front of
5    her?
6    A.   I don't think so.
7    Q.   Well, why did you tell Ms.
8    Edwards that, that you wouldn't bring
9    your wife around him anymore?
10   A.   Well, I mean, he -- like I
11   said, he's got a foul mouth, and I
12   didn't want him talking ugly around my
13   wife.
14   Q.   Well, can you make the
15   distinction for me why you wouldn't
16   want him talking like that in front of
17   your wife, but it was okay for him to
18   talk like that in the workplace?
19   MR. BOSTICK:  Object to the
20   form.
21   MR. DYKES:  Object to the
22   form.
23   A.   I don't -- I mean, he

68

**Page 69**

1 shouldn't talk that way anywhere. I
2 mean, you know, that's the way I stand
3 on that. I don't think -- but like I
4 said, you know, you -- things get out
5 there and get -- you get in the heat of
6 things going on, and sometimes words
7 fly. But in his case, sometimes he
8 talks that way in normal conversation,
9 you know.
10    Q.   When you had your wife out
11 there, was she at the workplace?
12    A.   My wife, no, no, it was -- I
13 think she's seen him maybe twice. He
14 came to my mother's funeral last year
15 and then one other time. He's probably
16 seen her twice in the five years I've
17 known him.
18    Q.   Well, I'm just trying to
19 ascertain why you would tell Ms.
20 Edwards that you didn't like how he
21 talked in front of your wife and you
22 wouldn't bring your wife around him
23 anymore, what was the basis of making

**Page 70**

1 that comment?
2    A.   Just like I said, his
3 language.
4    Q.   Okay. Well, can you tell me
5 why the women at work deserve less
6 respect than your wife?
7         MR. BOSTICK:  Object to the
8 form.
9    A.   They don't. They don't.
10    Q.   Well, could you not do
11 anything with his mouth at work?
12    A.   Not at that time. I mean, I
13 was the same as he was, hourly
14 employee.
15    Q.   Have you done anything since
16 he's -- since you've been his group
17 leader?
18    A.   He doesn't -- I haven't heard
19 him talk like that since I've been
20 group leader.
21    Q.   But you still don't bring your
22 wife around him?
23    A.   No, I don't bring my wife

**Page 71**

1 around him, I mean, I -- no.
2    Q.   Did you ever tell Ms. Edwards
3 that she had done the right thing by
4 turning Swindle in?
5    A.   I don't recall.
6    Q.   Did you tell her that if you
7 both got in trouble not to worry about
8 it because it would make Hyundai a
9 better place?
10    A.   I don't remember if I did or
11 not.
12    Q.   Did you ever talk with Ms.
13 Edwards about your marriage?
14    A.   I don't -- I don't know.
15    Q.   Did she ever give you advice
16 about your marriage?
17    A.   I don't remember.
18    Q.   That doesn't ring a bell you
19 at all?
20    A.   Uh-uh.
21    Q.   I'm sorry?
22    A.   No, ma'am.
23    Q.   Did Ms. Edwards tell you she

**Page 72**

1 just wanted to be moved away from Mr.
2 Swindle?
3    A.   I don't remember that if she
4 did.
5    Q.   Did she tell you she didn't
6 want to turn him in, she just wanted to
7 be moved?
8    A.   I don't remember if she did or
9 not.
10    Q.   Possible, you just don't
11 remember?
12    A.   I don't remember, no.
13    Q.   Did Ms. Edwards ever tell you
14 that her husband had found out and
15 given her an ultimatum?
16    A.   I heard that, but I don't know
17 if I heard it from her. I can't
18 remember. I've heard that before, but
19 I don't know if she told me, I can't
20 remember if she told me or somebody
21 else told me.
22    Q.   What did you hear?
23    A.   That -- I heard that her

**Page 73**

1  husband knew about Mike and that if she
2  didn't do something that he was going
3  to leave her.
4      Q.   But you don't know who you
5  heard it from?
6      A.   No, I don't remember.
7      Q.   Did you ever tell Ms. Kelley
8  that when Ms. Edwards came back to work
9  she would be doing the downtime board?
10     A.   No, I don't remember that if I
11  did.  When she came back to work from?
12     Q.   Medical leave?
13     A.   Being out on medical, she
14  would be doing the downtime board?
15     Q.   Yes.
16     A.   I may have.  I can't -- I
17  can't remember that.
18     Q.   Who does the downtime board
19  now?
20     A.   We don't do it that way
21  anymore as far as the board on BC1.
22  Everything is running so much smoother
23  now that everything is just radioed up

**Page 74**

1  to the CCR.
2      Q.   When Ms. Edwards was moved
3  down to the BC1 line under your
4  supervision, did you ever ask her if
5  her neck was bothering her?
6          MR. BOSTICK:  Object to the
7  form.
8      A.   I probably did.  I'm sure I
9  did, yeah.
10     Q.   What did she respond?
11     A.   I don't -- I don't recall.  I
12  don't remember.
13     Q.   Have you ever?
14     A.   Can I make something clear,
15  though?  I mean, I'm not -- at that
16  time now -- I'm a supervisor now, but
17  at that time, I was -- I was a team
18  leader, you know, so I wasn't really
19  a -- I was an hourly employee then.
20     Q.   You delegated duties, though?
21     A.   Right, right.
22     Q.   Okay.  And in the delegation
23  of duties, did you ask her, "Is your

**Page 75**

1  neck bothering you, Tammy"?
2      A.   Right, yeah, I did, I think I
3  did, yeah.
4      Q.   Why would you ask her that?
5      A.   Concern of her neck, I guess,
6  I mean, I just --
7      Q.   Is it because you knew that
8  job would bother her neck?
9      A.   No.  It may have been because
10  I was thinking to get her in an easy
11  job where it wouldn't bother her neck.
12     Q.   Well, did she answer you when
13  you asked her?
14     A.   I don't remember.  I mean, the
15  job she was in was very easy anyway
16  so --
17     Q.   Did you ever refer to Mike
18  Swindle as "the king"?
19     A.   Did I ever refer to him as
20  "the king?"
21     Q.   Yes.
22     A.   No.
23     Q.   Have you ever heard him

**Page 76**

1  referred to as that?
2      A.   No.  "The king"?
3      Q.   Yes.
4      A.   No.
5      Q.   Is Mr. Swindle still doing the
6  same job he was doing prior to Ms.
7  Edwards' complaints about him?
8      A.   Yes, ma'am.
9      Q.   Do you know of any punishment
10  he received?
11     A.   Do I know of any punishment?
12  Yeah, I know of -- from what I've
13  heard, rumors.  As far as official, I
14  don't know what.
15     Q.   What did he tell you?
16     A.   He didn't tell me.  I just
17  heard it on the floor that he was --
18  serious misconduct.
19     Q.   Anything else?
20     A.   No.  I'm not --
21     Q.   Did he miss any time from
22  work?
23     A.   He did, yeah.

1    Q.    How much?

2    A.    I'm not sure.  A couple of

3  weeks, I think.

4    Q.    Did he take vacation time and

5  get paid for it?

6    A.    Did he what?

7    Q.    Did he take vacation and get

8  paid for it?

9    A.    I don't -- I think he was

10  suspended without pay.

11    Q.    Did he come back to the same

12  job?

13    A.    Yeah.

14    Q.    Same hours?

15    A.    Yeah.

16    Q.    Have you always worked the

17  same shift as Mr. Swindle?

18    A.    No.  As a matter of fact, when

19  he was living with me, I think we were

20  on different shifts then.  He was on

21  the other shift from me.

22    Q.    You worked what shift then?

23    A.    One of -- it's just two

77

1  shifts, day or night.  I was on either

2  days or I was on nights and he was on

3  the other.

4    Q.    You're on night shift now and

5  he is as well?

6    A.    Yes.

7    Q.    Okay.  For the last two years,

8  have the two of you worked basically

9  the same shift?

10    A.    I think so, yeah -- no, no,

11  no, no, because they were on -- he

12  worked about three months here in the

13  last year that -- two or three months

14  that he was on the other shift from me,

15  but now we're on the same shift.

16    Q.    Was that the day shift he

17  worked --

18    A.    Yeah.

19    Q.    -- while you worked night

20  shift?

21    A.    No, he was on nights and I was

22  on days.  I've been on days for -- I

23  just went to nights in the last --

78

1  since July the 1st, and I had been on

2  days for like six months.

3    Q.    And then was he on nights for

4  six months or days?

5    A.    He was on -- he was on days --

6  I mean, he was on nights at one time

7  for two months while I was on -- when I

8  was on days.  Then they rotated back

9  and we went back together, rotated back

10  together in June -- July I think it

11  was.  No, we were on days together for

12  two months, and then we rotated

13  together to nights.  So it was two

14  months that he was on nights, let's

15  see, January and February, it would be

16  March and April that he was on nights

17  and I was on days.

18    Q.    Okay.

19    A.    This year.

20    Q.    2008?

21    A.    Yeah.

22    Q.    2007, did y'all work the same

23  schedule?

79

1    A.    I think we did, yeah.

2    Q.    How about 2006?

3    A.    I know we -- we were on the

4  opposite shifts at one time, but I

5  can't remember the dates.

6    Q.    Did Mr. Bondy ever have a

7  conversation with you that Ms. Edwards

8  was getting the wrong information for

9  her reports and to put Amber Kelley

10  back on the line?

11    MR. BOSTICK:  Object to the

12  form.

13    A.    I don't -- I don't remember it

14  if he did, no.

15    Q.    Did you ever put Amber Kelley

16  back on the line?

17    MR. BOSTICK:  Object to the

18  form.

19    A.    On the line?

20    Q.    Yes.

21    A.    You're referring to back on

22  BC1?

23    Q.    Yes.

80

1     A.    No.  I don't ever remember her
2  being back on BC1.
3     Q.    She was always doing the
4  downtime board?
5     A.    I think she's done it ever
6  since Tammy left.
7     Q.    Before that?
8     A.    Before that, I don't remember.
9     Q.    Do you remember a time that
10  Ms. Edwards was training Amber Kelley
11  for the CCR position?
12     A.    No.
13     Q.    Did you ever make the comment
14  to Ms. Edwards that Mike is going to
15  take you out with him?
16     A.    Say what, take you out?
17     Q.    Mike is going to take me out
18  with him?
19     A.    No.
20     Q.    Never made any type of comment
21  like that?
22     A.    No.
23     Q.    Did you ever make a comment

81

1     Q.    Yeah, have you ever known an
2  employee to be fired for putting on the
3  tailgate?
4     A.    No.
5     Q.    Have you ever known an
6  employee to be fired for saying they
7  went to a funeral and they didn't?
8     A.    Yeah, falsifying a document.
9     Q.    Have you ever heard of a
10  person being fired for being late?
11     A.    No.
12     Q.    Have you ever heard of a
13  person being fired for telling someone
14  they had a nice ass?
15     A.    No.
16     Q.    Have you ever heard of a
17  person being fired for slacking on the
18  job?
19     A.    No.
20        MR. BOSTICK:  Object to the
21  form.
22     Q.    Have you ever heard of a
23  person being fired for sleeping with a

83

1  that the entire plant was pretty much
2  like Swindle, and that what she had
3  done was right and it was going to
4  change the plant for the better?
5     A.    I don't recall if I did or
6  not, no.
7     Q.    Have you had any training on
8  sexual harassment?
9     A.    Yes.
10     Q.    Before or after Ms. Edwards'
11  complaint?
12     A.    Before.
13        MS. HAYNES:  Do you need a
14  break?
15        THE COURT REPORTER:  No, I'm
16  fine.
17     Q.    Are you fine?
18     A.    Sure.  Yeah, fine.
19     Q.    Have you known employees to be
20  fired for putting on the wrong
21  tailgate?
22     A.    Employee to be fired for
23  putting on --

82

1  co-worker?
2     A.    Only rumors I've heard --
3  well, no, no.
4     Q.    Have you hard of a person
5  being fired for starting rumors?
6     A.    No.
7     Q.    In your position as group
8  leader, do you make hiring and firing
9  decisions?
10     A.    No.
11     Q.    Have you ever recommended
12  someone be fired?
13     A.    No.
14     Q.    Do you know of anyone who is
15  being accommodated for either a work
16  injury or a personal injury at Hyundai?
17     A.    No.
18     Q.    Anyone working under you
19  that's being accommodated for an
20  injury?
21     A.    No.
22     Q.    Anyone who is being
23  accommodated for a disability?

84

1    A.    No.

2    Q.    Do you know anyone who is

3 working at Hyundai who is disabled?

4    A.    Just be specific, do you mean

5 out on short-term -- I mean, long-term

6 disability?

7    Q.    They're working, they're

8 working?

9    A.    They're working?

10    Q.    And they're disabled, have a

11 disability?

12    A.    Well, there's people out there

13 that are -- I mean, as a matter of

14 fact, a guy in maintenance that's

15 got -- his arm, something is wrong with

16 his arm, I mean, he's working, yeah.

17    Q.    Did Ms. Edwards ever express

18 to you that she wanted to go back to

19 work in fenders?

20    A.    I don't remember.

21    Q.    Has she ever told you she

22 wanted to work for you on the BC1 line?

23    A.    I've heard her say that

85

1 before, yeah.

2    Q.    What did she say?

3    A.    She wanted to come back to the

4 floor and work on BC1.

5    Q.    What did she tell you?

6    A.    That she'd like to come back

7 on the floor and work on BC1.

8    Q.    When did she tell you that?

9    A.    I don't -- I don't remember

10 the date.

11    Q.    What did you tell her?

12    A.    Sure.  I mean, but it wasn't

13 my -- you know, I didn't have the

14 authority to tell her she could come

15 back to my line.  But I mean, if she

16 wanted to come back, get it authorized,

17 yeah, she could come back to my line.

18    Q.    Did you have a conversation

19 with anyone about getting her to work

20 for you on BC1?

21    A.    No, not that I remember, no.

22    Q.    Did you ask her why she'd want

23 to leave the CCR job and work on the

86

1 BC1 line?

2    A.    No.

3    Q.    Did she ever tell you that her

4 husband wanted her back on the line

5 because her ass was getting too big?

6    A.    I remember her saying -- no, I

7 don't remember that.  I don't -- I've

8 heard that before, but I don't know

9 if -- I can't remember if she told me

10 specifically that.  I've heard that,

11 but I'm not going to say that she said

12 it if I can't remember it.

13    Q.    Prior to Ms. Edwards making

14 her complaint about Mr. Swindle, you

15 knew that discrimination and harassment

16 was illegal in the workplace, did you

17 not?

18    A.    Yes.

19    Q.    And did you know retaliation

20 in the workplace is illegal?

21    A.    Yes.

22    Q.    Do you recall a situation

23 where you told Vince Gahafer that

87

1 Culpepper was going through his and

2 Chris Worley's desk?

3    A.    No.

4    Q.    No?

5    A.    (Nodding.)

6    Q.    You have no recollection of

7 that?

8    A.    Say that again now.  Who was

9 the person, Vince?

10    Q.    Yes.

11    A.    Yeah.  Yeah, I told Vince

12 that, right, yeah.

13    Q.    All right.  What information

14 did you have that Culpepper was going

15 through their desks?

16    A.    Steve told me that he had went

17 up and looked in his desk for

18 something.

19    Q.    And found information on April

20 Smith?

21    A.    I'm not sure what it was.  I

22 thought it was information on him.

23    Q.    Did you participate in an

88

1 investigation into Mr. Culpepper?
2    **A.** **No.**
3    **Q.** What was the reason you told
4 Vince Gahafer what Culpepper had told
5 you?
6    **A.** **I think he asked me about**
7 **that, if I remember right, do you know**
8 **anything about Culpepper? And then I**
9 **just said, yeah, he told me he looked**
10 **in your desk for some paperwork.**
11    (Plaintiff's Exhibit 30 was
12    marked for identification.
13    A copy is attached.)
14    **Q.** (BY MS. HAYNES) I'm going to
15 mark this as a composite exhibit, 30,
16 which is three pages, D-00110, 107, and
17 100. Do you recognize those e-mails
18 that you received?
19    **A.** **Yeah, I remember getting these**
20 **e-mails.**
21    **Q.** Do you know why you would get
22 e-mails that Ms. Edwards was out on
23 medical leave or short-term disability?

89

1    **A.** **I was the team leader then, I**
2 **think, so she was working on my line,**
3 **so I would get the --**
4    **Q.** Did you get any other e-mails
5 about her medical leave?
6    **A.** **No.**
7    **Q.** Did you have conversations
8 with Mr. Culpepper about that?
9    **A.** **He may have told me that she**
10 **wouldn't -- if she was going to be here**
11 **or not; but other than that, no.**
12    **Q.** Did you and Culpepper have any
13 conversation about when Ms. Edwards
14 came back to work where she would go?
15    **A.** **No.**
16    **Q.** Where were you going to put
17 her when she came back to work?
18    **A.** **It wouldn't have been for me**
19 **to decide where she went. If she came**
20 **back to my line, yeah, I would have --**
21 **I don't know. I would -- it's**
22 **according to the situation, what was**
23 **going on, you know, on the line, where**

90

1    **Q.** I needed her or --
2    **Q.** What is the most someone picks
3 up on that line, the BC1 line?
4    MR. BOSTICK: Object to the
5 form.
6    **A.** **It -- it could be anywhere**
7 **from five pounds to I'd say 75 pounds,**
8 **doors, you know, you have to pick up**
9 **doors with bolts with them, so it would**
10 **be anywhere from five to 75, 80 pounds.**
11    **Q.** Anywhere from five pounds to
12 75 to 80?
13    **A.** **I'm just estimating, yeah.**
14    MS. HAYNES: All right. Let
15 me take a short break and we may be
16 through.
17    MR. BOSTICK: Can I follow up
18 on one before we take a break real
19 quick?
20    MS. HAYNES: Does it matter?
21 Go ahead.
22 EXAMINATION BY MR. BOSTICK:
23    **Q.** When you had talked earlier

91

1 about Ms. Edwards asked you about curse
2 words used -- I mean Ms. Haynes asked
3 you about curse words used by Ms.
4 Edwards, she had asked her about
5 using -- did she ever use "goddamn" in
6 your presence?
7    **A.** **Yeah, I think so.**
8    **Q.** Tell me about that incident.
9    **A.** **It was a time that -- and I**
10 **think it was -- I'm not sure of the**
11 **time, but she was -- had a disagreement**
12 **with one of the team members on the**
13 **line, one of the other girls, and she**
14 **told me that you better talk to that GD**
15 **nigger or I'm going to do something,**
16 **and I can't remember what she said.**
17    **Q.** Any other instances other than
18 that?
19    **A.** **No.**
20    MR. BOSTICK: That's all.
21 EXAMINATION BY MS. HAYNES:
22    **Q.** Did you discipline her for
23 that?

92

| 1 | A. Team leaders don't discipline. |
| 2 | Q. Did you turn her in? |
| 3 | A. No. |
| 4 | Q. Can you tell me how you can |
| 5 | recall that one comment by Ms. Edwards? |
| 6 | A. Because that -- the N word is |
| 7 | not used out there at all. I |
| 8 | probably -- I mean, that's -- I don't |
| 9 | know, that just stuck in my mind |
| 10 | because of the N word. |
| 11 | Q. So you can't remember Swindle |
| 12 | saying "fuck" or "bitch," but you can |
| 13 | remember the N word being said? |
| 14 | A. Yeah. |
| 15 | Q. Why? |
| 16 | A. I -- it just stuck in my |
| 17 | memory, I mean, somebody saying the N |
| 18 | word out there. I mean, that just |
| 19 | stuck in my memory, I don't know why. |
| 20 | Q. Why didn't you tell team |
| 21 | relations that when you had your two |
| 22 | interviews with them or was it three? |
| 23 | A. I don't know. |

93

| 1 | Mr. Swindle was sleeping around with |
| 2 | Jennifer Foster? |
| 3 | MR. BOSTICK: Object to the |
| 4 | form. |
| 5 | A. I didn't volunteer that. |
| 6 | Q. You just got asked about it? |
| 7 | MR. BOSTICK: Object to the |
| 8 | form. |
| 9 | MR. DYKES: Object to the |
| 10 | form. |
| 11 | A. Right. |
| 12 | Q. And you remembered then that |
| 13 | he was seeing Jennifer Foster? |
| 14 | A. Right. |
| 15 | Q. Okay. Were you seeing anyone |
| 16 | during that time? |
| 17 | A. Was I? |
| 18 | Q. Yes, sir. |
| 19 | A. Yeah, my wife. |
| 20 | Q. Other than your wife? |
| 21 | A. No, no. |
| 22 | Q. Okay. Was there ever a young |
| 23 | led you were flirting with, and you |

95

| 1 | Q. How many interviews did you |
| 2 | have with team relations? |
| 3 | A. Three. |
| 4 | Q. Three. Three interviews you |
| 5 | had with team relations and you don't |
| 6 | tell them that Ms. Edwards said GD and |
| 7 | the N word? |
| 8 | A. Well, I mean, they didn't ask |
| 9 | me anything about has she ever done |
| 10 | anything or anything like that, so I |
| 11 | just -- I didn't say anything. I |
| 12 | probably didn't remember it then, I |
| 13 | don't know. |
| 14 | Q. You didn't remember it then, |
| 15 | but you remember it now? |
| 16 | A. Yeah. |
| 17 | Q. Did someone refresh your |
| 18 | recollection that you needed to |
| 19 | remember that? |
| 20 | A. No, nobody refreshed me. |
| 21 | Q. Well, I just wonder why you |
| 22 | didn't volunteer that with team |
| 23 | relations when you volunteered that |

94

| 1 | were told that was Tom Bondy's, that |
| 2 | you couldn't flirt with her? |
| 3 | A. No. |
| 4 | Q. You don't recall that |
| 5 | situation? |
| 6 | A. No. |
| 7 | MS. HAYNES: Okay. We'll take |
| 8 | a break and -- |
| 9 | (Recess.) |
| 10 | (Whereupon, the last question |
| 11 | and answer were read back by |
| 12 | the court reporter.) |
| 13 | Q. (BY MS. HAYNES) Have you |
| 14 | reviewed any documents in this matter? |
| 15 | A. No. |
| 16 | Q. Have you reviewed any |
| 17 | depositions? |
| 18 | A. No. |
| 19 | Q. Any video or audio tapes? |
| 20 | A. No. |
| 21 | Q. Were you aware that Ms. |
| 22 | Edwards was recording some of your |
| 23 | conversations? |

96

1    A.   **I had heard that, yeah.**
2    Q.   Who did you hear from?
3    A.   **From Brian.**
4    Q.   Have you listened to any of
5  those tapes?
6    A.   **No.**
7    Q.   Have you been told what is on
8  any of the tapes?
9    A.   **Yeah.**
10    Q.   What have you been told?
11        MR. BOSTICK:  Don't talk about
12  anything talked about by counsel.
13    A.   **I really don't remember.**
14  **Let's see.  It was a conversation about**
15  **the chair, where we were standing by**
16  **his desk.**
17    Q.   And that you had recalled that
18  conversation during the tape?
19        MR. BOSTICK:  Object to the
20  form.
21    A.   **No, I didn't remember it.**
22    Q.   Okay.  Anything else?
23    A.   **That's all I remember now.**

97

1    A.   **No.**
2    Q.   And about Mr. Culpepper
3  condoning it?
4    A.   **No.**
5    Q.   And laughing about it?
6    A.   **No.**
7    Q.   You don't recall that
8  conversation at all between you and
9  Ms. Edwards?
10    A.   **No.**
11    Q.   Would you dispute that
12  happened?
13    A.   **Yeah.**
14    Q.   I'm going to let you listen to
15  this tape and you tell me if that's
16  your voice or not.
17        (Audio tape played.)
18    Q.   (BY MS. HAYNES) Is that your
19  voice?
20    A.   **Yeah, that's me.**
21    Q.   Is that Ms. Edwards' voice?
22    A.   **I guess, yeah.**
23    Q.   Does that refresh your

99

1    Q.   Do you recall anything on --
2  about the tape that you're asking Ms.
3  Edwards if she told team relations
4  about the conversation the two of you
5  had where her job would be under your
6  desk?
7    A.   **No.**
8    Q.   But you've not heard the
9  actual tape?
10    A.   **No.**
11    Q.   No?
12    A.   **No.**
13    Q.   If the tape had you recalling
14  that conversation, would you have any
15  reason to dispute?
16    A.   **Yeah.  I mean, I didn't say**
17  **it.**
18    Q.   You didn't say what?
19    A.   **About the desk, job under my**
20  **desk.**
21    Q.   Do you recall Ms. Edwards
22  having a conversation where she's
23  referring you to that comment?

98

1  recollection of a conversation you had
2  with Ms. Edwards?
3    A.   **Yeah.**
4    Q.   Does it change any of your
5  testimony?
6    A.   **I can't hear what I said on**
7  **there.  I mean, I remember us talking,**
8  **though, about it.**
9        MR. BOSTICK:  Alicia, just for
10  the record, is that a tape that has
11  been produced in this?
12        MS. HAYNES:  Sure, it has.
13        MR. BOSTICK:  Okay.
14        MS. HAYNES:  I think it's on a
15  DVD now.
16        MR. BOSTICK:  I just want to
17  make sure it is one that we've already
18  got.
19    Q.   (BY MS. HAYNES) Yeah.  Does it
20  change any of your sworn testimony?
21    A.   **No.**
22    Q.   On the tape, she's asking you
23  or telling you about the conversation

100

1    about you saying she had a job under
2    your desk and Culpepper laughing?
3        **A.    That's what she said, yeah.**
4        Q.    And did you hear yourself
5    saying, "Did you tell team relations
6    about that"?
7        **A.    I didn't hear that.**
8        Q.    Okay.  You still deny?
9        **A.    Yeah.**
10        Q.    You still deny the thrusting
11    incident in the chair?
12        **A.    Right.**
13        Q.    Even though you heard it on
14    this tape?
15        **A.    I didn't hear it on that tape.**
16    **It sounds like she's just sitting there**
17    **putting -- I mean, just going on trying**
18    **to get me to agree to stuff.  I mean,**
19    **you're talking -- we're talking about**
20    **after the fact she had taken somebody**
21    **to team relations over a sexual**
22    **harassment, and then I'm standing down**
23    **there and she's talking to me, I'm, you**

101

1    **know, walking on eggshells, I don't**
2    **know what she's going to do.  But I**
3    **don't think I agreed to anything she**
4    **said.**
5        Q.    Well, after this conversation,
6    you went back to team relations and
7    said --
8        **A.    That's right.**
9        Q.    -- said you had a
10    recollection, correct?
11        **A.    I did, of us standing at**
12    **Mike's desk, but I don't remember what**
13    **the conversation was, and I don't**
14    **remember seeing him thrusting himself**
15    **at her.**
16        Q.    Did you ask her if she told
17    team relations about --
18        **A.    I don't remember --**
19        Q.    -- under the desk?
20        MR. BOSTICK:  Let her finish
21    the question.
22        Q.    Pardon?
23        **A.    Go ahead.**

102

1        Q.    Is there a reason you feel
2    compelled to go ahead and answer
3    negative to my question before I get
4    the question out?
5        **A.    No.**
6        Q.    You're just going to deny
7    every question I ask?
8        MR. BOSTICK:  Object to the
9    form, argumentative.
10        **A.    I'm just going to be truthful.**
11        Q.    Okay.  After listening to the
12    tape, is it your testimony you just
13    agreed with everything Tammy Edwards is
14    saying?
15        **A.    No.**
16        Q.    You think she just made all
17    this up?
18        **A.    Obviously.**
19        Q.    You think she did?
20        **A.    Yeah.**
21        Q.    There's no truth to it?
22        **A.    Right.**
23        Q.    You do know there is a penalty

103

1    for perjury?
2        **A.    Right.**
3        Q.    Are you a religious person?
4        **A.    Oh, yes.**
5        Q.    Go to church?
6        **A.    When I can, if I'm not at**
7    **work.**
8        Q.    Okay.  Do you believe that
9    when you swear to tell the truth, it
10    does mean something?
11        **A.    Yes.**
12        Q.    Have you been promised
13    anything to alter your testimony today?
14        **A.    No.**
15        Q.    And it's your testimony as you
16    sit here today that Ms. Edwards has
17    made all this up?
18        **A.    I'm not saying she made it up,**
19    **but I don't think all of it is true.**
20        Q.    What do you think is not true?
21        **A.    I'd rather not go into what's**
22    **not true and what is true.**
23        Q.    Well --

104

1    A.   I don't think it's true that I

2 said she had -- the under-my-desk

3 thing, I don't think that's true.

4    Q.   What else is not true?

5    A.   The thrusting, I don't think

6 that's true, but then again, I don't

7 remember it so --

8    Q.   What else?

9    A.   That's all I can recall right

10 now.

11        MS. HAYNES:  I don't have any

12 more questions.

13 EXAMINATION BY MR. BOSTICK:

14    Q.   Just one question, Billy.

15 There was some questions about when you

16 and Swindle were on the same shift

17 versus the opposite shift.

18    A.   Uh-huh.

19    Q.   To clarify in my mind, he goes

20 out on suspension in August of 2006,

21 and then he comes back.  When he came

22 back from that suspension, did he come

23 back on the same shift as you or on a

105

1 I was on days for six months until we

2 just rotated in July.

3        MR. BOSTICK:  Okay.  I don't

4 have anything further.

5        MR. DYKES:  Can I talk to you

6 real quick.

7        MR. BOSTICK:  Yeah.

8        (Off-the-record discussion.)

9        MR. BOSTICK:  We're done.

10    THUS CONCLUDED THE DEPOSITION OF

11        BILLY FRED KITCHENS, JR.

12

13

14

15

16

17

18

19

20

21

22

23

107

1 different shift?

2    A.   He was opposite shift of me

3 then.

4    Q.   Okay.  And --

5    A.   I'm not sure how long that

6 lasted.  I believe it was at least a

7 year that he was on the other shift,

8 and then there was some maneuvering

9 around and -- with team leaders, and I

10 think he then came back to my shift

11 later on.  I'm not sure of the dates on

12 that.

13    Q.   And somewhere in this time,

14 you moved to group leader?

15    A.   Right.  I think that was in

16 October of last year, '07.

17    Q.   Okay.  And there was some

18 point where did you stay on days for a

19 longer period of time?

20    A.   Training, yeah, for -- when I

21 made group leader, I was on nights.  I

22 finished the year out on nights, and

23 then when I rotated to days in January,

106

1        C E R T I F I C A T E

2 STATE OF ALABAMA   )

3 JEFFERSON COUNTY   )

4    I hereby certify that the above

5 and foregoing proceeding was taken down

6 by me by stenographic means, and that

7 the questions and answers therein were

8 produced in transcript form by computer

9 aid under my supervision, and that the

10 foregoing represents, to the best of my

11 ability, a true and correct transcript

12 of the proceedings occurring on said

13 date at said time.

14    I further certify that I am

15 neither of counsel nor of kin to the

16 parties to the action; nor am I in

17 anywise interested in the result of

18 said cause.

19

20    _____

21        SALLIE NESMITH GUNTER

22      CERTIFIED COURT REPORTER

23        ACCR LICENSE #37

108

HI Guys,

Tammy Edwards has requested STD and she is expected to be out 2-3 weeks. I will let you all know when I receive medical documentation. Her absences should be excused and unpaid

Thanks,


Penny Nicholls, RN
Medical Specialist/Safety/General Affairs
Ph: 334-387-8191
Cell: 334-296-3650





PLAINTIFF'S
EXHIBIT
30

*Billy/Stephen,*

*Wanted to let you know that I have received medical documentation that Tammy will be out of work until Oct. 1, 2006.*


*Penny Nicholls, RN*
*Medical Specialist/Safety/General Affairs*
*Ph: 334-387-8191*
*Cell: 334-296-3650*

Stephen/Billy,

Wanted you all to know that Tammy will not be returning on Monday as expected. Her physician has extended her leave time to Jan. 2007. I will keep you posted as I receive information.

Thanks,

Penny Nicholls, RN
Medical Specialist/Safety/General Affairs
Ph: 334-387-8191
Cell: 334-296-3650

1      IN THE UNITED STATES DISTRICT COURT

2        MIDDLE DISTRICT OF ALABAMA

3          NORTHERN DIVISION

4

5   TAMMY EDWARDS,

6      Plaintiff,

7   vs.

8   HYUNDAI MOTOR MANUFACTURING ALABAMA,

9   LLC, and MIKE SWINDLE, individually,

10     Defendants.

11

12   CIVIL ACTION NUMBER:  2:07-cv-908-MHT

13

14

15     DEPOSITION:  AMBER KELLEY BATIE

16

17

18      S T I P U L A T I O N S

19     IT IS STIPULATED AND AGREED by

20   and between the parties through their

21   respective counsel that the deposition

22   of AMBER KELLEY BATIE may be taken on

23   July 17, 2008, before Sallie NeSmith

<center>1</center>

1   Gunter, Certified Court Reporter of the

2   State of Alabama, ACCR License Number

3   37, Commissioner and Notary Public, at

4   the Wingate Inn, 2060 Eastern

5   Boulevard, Montgomery, Alabama.

6     IT IS FURTHER STIPULATED AND

7   AGREED that it shall not be necessary

8   for any objections to be made by

9   counsel to any questions except as to

10   form or leading questions, and that

11   counsel for the parties may make

12   objections and assign grounds at the

13   time of trial or at the time said

14   deposition is offered in evidence or

15   prior thereto.

16

17

18

19

20

21

22

23

<center>2</center>

1           APPEARANCES

2   Appearing for the Plaintiff :

3     HAYNES & HAYNES, P.C.

4     By:  Alicia K. Haynes, Esq.

5     1600 Woodmere Drive

6     Birmingham, Alabama  35226

7   Appearing for the Defendant  Hyundai

8   Motor Manufacturing Alabama, LLC :

9     OGLETREE, DEAKINS, NASH, SMOAK

10      & STEWART, P.C.

11     By:  Brian R. Bostick, Esq.

12     One Federal Place

13     Suite 1000

14     Birmingham, Alabama  35203

15       - and -

16     By:  Christopher N. Smith, Esq.

17     Corporate Legal Counsel

18     Hyundai Motor Manufacturing

19      Alabama, LLC

20     700 Hyundai Boulevard

21     Montgomery, Alabama  36105

22

23

<center>3</center>

1   Appearing for the Defendant Michael

2   Wayne SWINDLE :

3     CONSTANGY, BROOKS & SMITH, LLC

4     By:  J. Tobias Dykes, Esq.

5     One Federal Place

6     Suite 900

7     Birmingham, Alabama  35203

8   Certified Court Reporter:

9   Sallie NeSmith Gunter

10   Also Present:  Tammy Edwards

11

12

13

14

15

16

17

18

19

20

21

22

23

<center>4</center>

I N D E X

3  Examination by Ms. Haynes.............7

4  Examination by Mr. Bostick...........82

5  Examination by Mr. Dykes.............82

6  Plaintiff's Exhibit 31

7  E-Mail from Tammy Edwards to Various

8  Recipients with Attachments Dated

9  08/09/2006...........................51

5

---

1       I, Sallie NeSmith Gunter, a

2   Certified Court Reporter of the State

3   of Alabama, ACCR License Number 37,

4   acting as Commissioner, certify that on

5   this date there came before me at the

6   Wingate Inn, 2060 Eastern Boulevard,

7   Montgomery, Alabama, on July 17, 2008,

8   beginning at or about 4:19 p.m.,

9   AMBER KELLEY BATIE , witness in the

10  above cause, for oral examination,

11  whereupon, the following proceedings

12  were had:

13      THE COURT REPORTER:  Usual

14  stipulations again, except you want the

15  witness to read and sign?

16      MR. BOSTICK:  Yeah, that's

17  fine.

18      MS. HAYNES:  That's fine.

19      THE COURT REPORTER:  All

20  right.  Would you raise your right

21  hand, please, ma'am, to be sworn?

22

23

6

---

1       AMBER KELLEY BATIE ,

2   being first duly sworn, was examined

3   and testified as follows:

4   EXAMINATION BY MS. HAYNES :

5       Q.   Will you state your full name

6   and your address, please?

7       A.   Amber Kelley Batie, ▓▓▓▓

8   ▓▓▓▓▓▓▓▓▓, that's ▓▓▓▓▓▓▓▓▓▓,

9   Crestview, Florida, 32536.

10      Q.   Say that one more time for me.

11      A.   32536.

12      Q.   How far a drive is that?

13      A.   It's two hours from

14  Montgomery.  I don't make it every day.

15      Q.   Do you stay locally --

16      A.   Yeah.

17      Q.   -- during the work time?

18      A.   Luverne, Alabama.

19      Q.   How far is that?

20      A.   About 45, 50 minutes.

21           (Off-the-record discussion.)

22      Q.   (BY MS. HAYNES) When did you

23  move to Crestview, Florida?

7

---

1       A.   Let's see.  May, end of May of

2   this year.

3       Q.   Okay.  So you haven't been

4   doing that commute long.  What is your

5   current position with Hyundai?

6       A.   CCR operator.

7       Q.   And how long have you been

8   employed with Hyundai?

9       A.   Since February 13th, '06.

10      Q.   What's the first job you had

11  with Hyundai?

12      A.   I worked on body complete 1.

13      Q.   Doing what?

14      A.   I installed door hinges, I

15  DA'd, I torqued bolts, put on doors,

16  put on fenders.

17      Q.   Okay.  What was the next job

18  you had?

19      A.   I did the downtime for body

20  complete 1.

21      Q.   And the next job you had?

22      A.   Communication control room,

23  CCR.

8

**Page 9**

1  Q.  And when did you start doing
2  the CCR job?
3  A.  It was around June, July, in
4  the summer.
5  Q.  How did you start doing that
6  job?
7  A.  I was doing BC1 downtime every
8  day -- and me and -- well, Tammy was
9  doing the whole shop downtime, and I,
10  you know, was giving her the
11  information.  And at one point, she had
12  wanted, you know, to rotate out on the
13  floor, like we'd rotate every two weeks
14  or so, I'd go up there and she would
15  come down to work on the floor and
16  then, you know, just rotate.  And also
17  she didn't have any back-up on our
18  shift, so I was trained to -- someone
19  needed to know how to do the position
20  so I was trained on that job.
21  Q.  Who approached you about doing
22  that job, the CCR job?
23  A.  Steven Culpepper.

**Page 10**

1  Q.  What did he tell you?
2  A.  He -- I can't remember exactly
3  what he told me, but I know I started
4  training for that job.
5  Q.  Did he say anything about
6  Ms. Edwards wasn't doing a good job and
7  he wanted you to do it?
8  A.  No, he did not say that when I
9  started my training.
10  Q.  Did he say it at any time?
11  A.  He did say that afterwards,
12  like as time went by.  Time frame-wise,
13  I cannot remember.
14  Q.  Was it after Ms. Edwards
15  complained about Mr. Swindle?
16  A.  No, it was not.
17  Q.  Before?
18  A.  Yes, it was before that.
19  Q.  What did he tell you?
20  A.  He told me her report -- she
21  didn't have enough detail in her
22  report, and basically he did say that
23  my report was better.

**Page 11**

1  Q.  Okay.  Did he say he was going
2  to move her at any point in time
3  because she wasn't doing a good job?
4  A.  No.
5  Q.  When did you learn she was
6  going to be moved?
7  A.  When did I learn she was going
8  to be moved?
9  Q.  To another position other than
10  CCR doing downtime?
11  A.  It would have been after the
12  complaint was filed.
13  Q.  And how did you learn?
14  A.  Well, they told me that I
15  would be -- Steven came to me and told
16  me that I would be CCR.  Steven
17  Culpepper told me that I would become
18  the CCR operator for full time.
19  Q.  And what did he tell you was
20  the reason?
21  A.  He did not give me a reason.
22  Q.  Did anyone else tell you that
23  you would be the full-time CCR operator

**Page 12**

1  other than Mr. Culpepper?
2  A.  No.  He was the only one that
3  came to me and told me that.
4  Q.  And it was after you were
5  interviewed by team relations as a
6  result of Ms. Edwards' complaint about
7  Mike Swindle?
8  A.  I do not know if it was after
9  that, after I was interviewed or not,
10  but I know it was after she filed her
11  complaint.
12  Q.  Okay.  When do you recall that
13  she filed her complaint about Mr.
14  Swindle?
15  A.  I would like to say it was
16  shortly after, maybe a week or so after
17  we reached the 600 point on our --
18  600-unit body input on our production
19  line.
20  Q.  And why do you recall that
21  date in particular?
22  A.  It seems like after that day
23  to me, Tammy, you know, started

1  complaining about -- to me about Mike
2  Swindle.
3      Q.    Okay.  Had she complained to
4  you before about Mr. Swindle?
5      A.    No, not before that date.
6      Q.    Okay.  What were her
7  complaints about Mr. Swindle?
8      A.    She told me that she was sick
9  of him, she was tired of how he talked
10 to her, and she was telling me that she
11 was tired of his behavior and basically
12 how he acted towards her.
13     Q.    Okay.  Did you ever witness
14 firsthand how Mr. Swindle was acting
15 towards Ms. Edwards or talking to Ms.
16 Edwards?
17     A.    Only witnessed one incident.
18     Q.    Okay.  What was that?
19     A.    And that was when me and Tammy
20 was walking back upstairs to the CCR
21 room, it was at the end of body build,
22 and he was coming in through the door,
23 and I asked him, "What are you looking

13

1      Q.    Okay.  Why did you make the
2  comment, "What are you looking at"?
3      A.    Because we always clashed, me
4  and Mike, we always had words each
5  other.  And he was staring at me, and
6  that's why I said that.
7      Q.    Okay.  He wasn't staring at
8  Ms. Edwards at that point in time?
9      A.    No, he was not.  He was
10 staring at me.
11     Q.    Was he staring at your face or
12 your body?
13     A.    He was staring at my face.
14     Q.    Was he smiling?
15     A.    No, I cannot remember if he
16 was smiling.
17     Q.    Why did you and Mr. Swindle
18 clash?
19     A.    Both of us are kind of feisty.
20 I have an attitude, and he gets smart,
21 would get smart with me at times, and I
22 would get smart, you know, right back
23 with him.

15

1  at?" like that, because he was staring
2  and he told me he wasn't, you know,
3  looking at me, that he was looking at
4  somebody else.  And then he went over
5  and put his arm around Tammy, and I was
6  like, you can't -- she's a married
7  woman, you can't be looking at her like
8  that.  And Tammy shrugged his arm off,
9  and he was like, she knows she likes
10 it.
11     Q.    What did Ms. Edwards say?
12     A.    She didn't say anything.  She
13 shrugged her shoulder off and walked
14 away from him.
15     Q.    Now, when you said he was
16 coming in the door, Mr. Swindle was
17 coming in the door?
18     A.    Yes, from outside.
19     Q.    Okay.
20     A.    At the end of body build line,
21 you know where you come in at.
22     Q.    Right.
23     A.    We was at the end right there.

14

1      Q.    Has he ever said or done
2  anything inappropriate to you or made
3  you feel uncomfortable?
4      A.    No.
5      Q.    Has he ever touched you?
6      A.    No.
7      Q.    Has he ever tried to touch
8  you?
9      A.    No.
10     Q.    Have you ever heard him
11 talking vulgar in the workplace or
12 using profanity?
13     A.    No, I have not heard him
14 talking vulgar, and yes, I have heard
15 him use profanity.
16     Q.    Okay.  What have you heard him
17 say?
18     A.    I cannot remember details, but
19 I have heard him cuss, use cuss words.
20     Q.    Did that make you feel
21 uncomfortable?
22     A.    No, it did not.
23     Q.    Did Ms. Edwards tell you it

16

1 made her feel uncomfortable the
2 language he was using?
3     A.   Yes.  Like I say, after we
4 reached that mark that day, she did
5 tell me that she did not like how he
6 was talking to her.
7     Q.   Did she give you any examples?
8     A.   I cannot remember.
9     Q.   And that's the only incident
10 that you observed then when he put his
11 arm around Ms. Edwards and she tried
12 shrugging it off?
13     A.   Yes, ma'am.
14     Q.   Did Ms. Edwards become upset?
15     A.   Yes, she was upset.
16     Q.   And how do you know that?
17     A.   Because by the way she walked,
18 stormed off, how she just shrugged it
19 off and walked away.
20     Q.   Did you talk to her about it
21 later?
22     A.   Yes.
23     Q.   What did you talk about?

17

1     Q.   Before she filed her complaint but
2 after that day.
3     Q.   After the --
4     A.   The 600-milestone date.
5     Q.   After he came in the door and
6 put his arm around her?
7     A.   Was it after?  I cannot
8 remember if it was after or if that
9 incident occurred before that day or
10 after.
11     Q.   Putting his arm around her,
12 you can't recall if that was --
13     A.   If we spoke to Billy that day,
14 I don't know if that incident was
15 before that day or after that day.
16     Q.   Okay.  Was that incident
17 before or after the 600 --
18     A.   It was afterwards.
19     Q.   -- milestone?
20     A.   It was afterwards.
21     Q.   That he put his arm around
22 her?
23     A.   Yes.

19

1     A.   She said she didn't like that,
2 she was tired and that she was going to
3 talk to the group leader to see if she
4 could get the group leader to speak
5 with Mike about how he reacted to her.
6     Q.   Who is the group leader?
7     A.   Steven Culpepper.
8     Q.   Okay.  Did Ms. Edwards ever
9 share with you that she had already
10 tried talking to Mr. Kitchens about
11 talking to Mr. Swindle?
12     A.   Yes.
13     Q.   What did she tell you?
14     A.   She -- I may -- I think I
15 remember that I was actually with her
16 when she approached Mr. Kitchens, and
17 he told her that he would, you know,
18 talk to Mike.
19     Q.   When was that, do you know,
20 that the two of you approached Mr.
21 Kitchens?
22     A.   This was -- it was after that
23 day.  I mean, this was before she --

18

1     Q.   Before the 600 milestone, do
2 you recall observing his profanity in
3 the workplace or his actions around
4 Ms. Edwards?
5     A.   No.
6     Q.   Had you ever seen him pull her
7 hair?
8     A.   No, I did not.
9     Q.   Have you ever seen him stand
10 in the aisle and put his hands on his
11 hips and not allow her to pass?
12     A.   No.
13     Q.   Okay.  Have you ever seen her
14 upset in the workplace before then?
15     A.   No, I do not remember her
16 being upset before then.
17     Q.   When the two of you were
18 together and you went to see Mr.
19 Kitchens, where was he at the time?
20     A.   BC1 line.
21     Q.   Okay.  And was the line
22 running?
23     A.   Yes.

20

1    Q.    And was -- do you recall what
2  she said to Mr. Kitchens, meaning Ms.
3  Edwards said to Mr. Kitchens?
4    A.    I do not recall the exact
5  words, but I do know that she asked him
6  to see if he could talk to Mike about,
7  you know, how he talked to her and
8  stuff.
9    Q.    Okay.  Did she give him any
10  examples?
11    A.    No.
12    Q.    Did you say anything during
13  the conversation?
14    A.    No.  I can't remember.
15    Q.    Okay.  Did you think Mr.
16  Kitchens was taking her complaint
17  seriously?
18    A.    I do not know.
19    Q.    Okay.  And all he said was
20  that I'll talk to Mike?
21    A.    Yes.
22    Q.    Okay.  Did he say anything
23  about, well, that's just how Mike is?

21

1    Q.    And why is that?
2    A.    Where I -- where I worked at
3  was on BC1, and Steve's desk was
4  outside BC1 line.
5    Q.    Had you told Ms. Edwards to
6  try talking to Mr. Kitchens about Mr.
7  Swindle?
8    A.    I may have given her that
9  advice.
10    Q.    Yeah.  Did you give her any
11  other advice about how to handle
12  Mr. Swindle?
13    A.    I know that I told her to keep
14  a record, keep her a notebook and log
15  any incidents that go on, you know, to
16  keep a record and --
17    Q.    Did you tell her to start
18  recording him?
19    A.    No, I did not.
20    Q.    Okay.  Did you tell her that
21  you had a tape recorder?
22    A.    No, I did not.
23    Q.    Okay.  Did she ever ask you

23

1    A.    I can't remember.
2    Q.    Do you recall if he laughed
3  when Ms. Edwards tried talking to him?
4    A.    I can't remember, no.
5    Q.    Okay.  Have you ever heard
6  Ms. Edwards tell Mr. Swindle to stop?
7    A.    No.
8    Q.    Have you ever heard Ms.
9  Edwards witness to Mr. Swindle?
10    A.    Witness?
11    Q.    Yeah, tell him he needs to be
12  in church, he needs to act a certain
13  way?
14    A.    No.
15    Q.    And be a good husband or
16  father?
17    A.    No.
18    Q.    Okay.
19    A.    I was never around Mike and
20  Tammy except for that one incident.
21  The majority of the time it was me,
22  Tammy, and Billy or me -- or Steve,
23  Billy, me, and Tammy.

22

1  about how to get a tape recorder?
2    A.    No, I do not remember that.
3    Q.    Okay.  Were you ever aware
4  that she was recording?
5    A.    No.
6    Q.    Okay.  Did you ever tell her
7  to go get a lawyer?
8    A.    No.
9    Q.    Okay.  Did she ever ask you to
10  be a witness and she'd pay you a
11  million dollars?
12    A.    No, she did not say it like
13  that.
14    Q.    What did she say?
15    A.    We were, you know, discussing,
16  you know, like how different companies,
17  automobile companies, how we learned in
18  our training that different automobile
19  companies had these sexual-harassment
20  lawsuits and how the victims were
21  rewarded (sic) large sums of money.
22  And you know, we -- she stated that,
23  you know, hey, we don't ever -- if I

24

**Page 25**

1　win a lawsuit, we don't have to worry
2　about this place again, and she was
3　like, I would give you money, you know,
4　for helping me out in this case and
5　testifying with me. And then she was
6　like, and I'll just give you money even
7　for just continuing to talk to me and
8　have lunch with me every day.
9　　Q.　And when did she say this?
10　　A.　We were in the CCR room. I
11　cannot remember the time frame. But
12　this was after she reported everything
13　to team relations.
14　　Q.　Did you ever tell her that she
15　was sitting on a million-dollar lawsuit
16　and wouldn't even report it?
17　　A.　No, I didn't say that.
18　　Q.　Did you say something like
19　that?
20　　A.　No.
21　　Q.　Y'all are sitting in CCR
22　together?
23　　A.　Yes.

25

**Page 26**

1　　Q.　Anyone else there?
2　　A.　Richard Williams may have been
3　there, because he was there all the
4　time -- they was not really allowed to
5　leave that room -- but I do not know if
6　he was present or not.
7　　Q.　And you're telling me y'all
8　had already had training or just had
9　training on sexual harassment?
10　　A.　No. I told you that when we
11　went through our training classes,
12　anyone that gets hired on, everyone has
13　to go through a two-week training
14　course before they are able to go to
15　the production floor. So one of those
16　classes that we have in that two weeks
17　training is on sexual harassment, and
18　they have slides and they show us --
19　they showed us different automobile
20　industries and, you know, the lawsuits
21　that they had against them and the
22　money that the company lost because of
23　these lawsuits.

26

**Page 27**

1　　Q.　And what was that -- was it a
2　film or a video or --
3　　A.　It's like a PowerPoint slide.
4　　Q.　PowerPoint. Okay. So it was
5　part of your sexual-harassment training
6　that you looked at a PowerPoint and in
7　that PowerPoint was different verdicts
8　that different companies had as a
9　result of sexual-harassment lawsuits?
10　　A.　It showed different companies
11　and the millions of dollars that they
12　paid out to different women and men for
13　sexual harassment.
14　　Q.　Okay. And why were y'all
15　talking about it on that day?
16　　A.　I do not remember how that
17　conversation got started.
18　　Q.　Do you know who started it?
19　　A.　No.
20　　Q.　But somehow it gets to
21　million-dollar verdicts?
22　　A.　Million-dollar verdicts?
23　　Q.　Or large verdicts, is that

27

**Page 28**

1　what it was? Was it just million-
2　dollar verdicts or just large verdicts?
3　　A.　Some of them were a million
4　dollars, millions of dollars.
5　　Q.　Okay. So you don't know who
6　started the conversation, but it's --
7　at that point, it's on verdicts and
8　recalling training; is that what you're
9　telling me?
10　　A.　Yes.
11　　Q.　Okay. And tell me again what
12　she said.
13　　A.　That we would not have to
14　worry about this place again, that we
15　won't have to ever worry about working
16　there again, and that she would, you
17　know, give me money to testify -- to
18　testify with her and that she would
19　just give me money anyway for
20　continuing to talk to her every day and
21　have lunch with her.
22　　Q.　And she said that she was
23　going to turn Swindle in so she would

28

1 have a lawsuit against him?

2    A. **No, she never said that.**

3    Q. Okay. What is the context of

4 y'all talking about it?

5    A. **I cannot remember how the**

6 **conversation came up, but she never**

7 **said anything about turning him in to**

8 **get any money.**

9    Q. Was this before or after she

10 turned him in?

11    A. **This was after -- this was**

12 **after team relations, she reported --**

13 **everything was reported to team**

14 **relations.**

15    Q. Was it after your interview

16 with team relations that the two of you

17 were having this conversation about

18 lawsuits?

19    A. **I cannot remember if it was**

20 **before or after.**

21    Q. Were y'all also talking about

22 the lottery, if you won the lottery

23 what you would do with the money?

<center>29</center>

1    A. **No.**

2    Q. You don't recall any of that

3 being in the conversation?

4    A. **No.**

5    Q. Okay. Had you been discussing

6 a lawsuit that you were looking into --

7    A. **No.**

8    Q. -- as a result of your father?

9    A. **A lawsuit as a result of my**

10 **father?**

11    Q. No, no, use of your father's

12 passing?

13    A. **No. I did have a conversation**

14 **with her, though, about, you know, my**

15 **father's passing, and it had nothing to**

16 **do with any money or anything.**

17    Q. Was it in the same

18 conversation, though?

19    A. **No.**

20    Q. What preceded the conversation

21 about the sex-harassment lawsuits, what

22 had y'all been talking about?

23    A. **I cannot remember how that --**

<center>30</center>

1 I do not remember.

2    Q. And when she said that about

3 she'd pay you to have lunch with her,

4 what did you say?

5    A. **She didn't say she would pay**

6 **me to have lunch with her.**

7    Q. What did she say?

8    A. **She said she would even give**

9 **me money because I continued to talk to**

10 **her every day and I continued to have**

11 **lunch with her every day.**

12    Q. Okay. Were you the only

13 person having lunch with her or talking

14 with her at that point?

15    A. **Yes.**

16    Q. Okay. And was this after she

17 had complained and no one would talk to

18 her?

19    A. **Yes.**

20    Q. Okay. And is that true, you

21 were the only person to talk to her

22 after she complained?

23    A. **Yes.**

<center>31</center>

1    Q. Okay. And you observed that?

2    A. **Yes.**

3    Q. Okay. What else did you

4 observe after she complained how she

5 was treated?

6    A. **I observed, you know, like I**

7 **said, different -- I do not -- I could**

8 **see like when we walked together, you**

9 **know, no one would speak, and I --**

10 **they -- individuals even stopped**

11 **speaking to me.**

12    Q. Because you associated with

13 her?

14    A. **Yes.**

15    MR. BOSTICK: Object to the

16 form.

17    Q. How were you treated because

18 you associated with Tammy?

19    MR. BOSTICK: Object to the

20 form.

21    A. **No one really talked to me**

22 **anymore like they used to.**

23    Q. And when you say "no one," who

<center>32</center>

1   are you talking about?

2      A.   **Different ones on the floor.**

3      Q.   Team members?

4      A.   **Yeah, team members.**

5      Q.   How about managers?

6      A.   **Management would continue to**

7   **talk to me because I would have to**

8   **communicate with them, you know, anyway**

9   **because of the job that I had.**

10      Q.   Did they treat you

11   differently, managers?

12      MR. BOSTICK:  Object to the

13   form.

14      A.   **I -- management, no.**

15      Q.   Did you see any managers

16   talking to Tammy after she complained?

17      A.   **I would see Billy Kitchens**

18   **talking to her.  I cannot remember**

19   **anyone else.**

20      Q.   Did you see Mr. Culpepper talk

21   to her?

22      A.   **No.**

23      Q.   Did you see Mr. Bondy talk to

<center>33</center>

1   her?

2      A.   **No, I did not.**

3      Q.   How did Mr. Swindle act after

4   she complained?

5      A.   **I mean, they -- I really do**

6   **not -- I don't think he said anything**

7   **to her.  I can't really answer that**

8   **because I wasn't around her.**

9      Q.   How did you get treated by

10   Mr. Swindle?

11      A.   **Me and him already didn't**

12   **speak so it --**

13      Q.   I guess he wasn't looking at

14   you either after that?

15      MR. BOSTICK:  Object to the

16   form.

17      A.   **I -- I mean, me and him, we**

18   **never did speak before, so I wouldn't**

19   **notice a difference afterwards.**

20      Q.   Did Ms. Edwards talk with you

21   about how she was being treated after

22   she complained?

23      A.   **Yes.**

<center>34</center>

1      Q.   Okay.  Did she share with you

2   about asking for vacation time and it

3   had been denied?

4      A.   **Yes.**

5      Q.   What did she say?

6      A.   **I just remember -- I do**

7   **remember her saying that she had needed**

8   **vacation off, I believe it was to**

9   **attend one of her children's functions**

10   **or game, and it was denied.**

11      Q.   Did she tell you who did that?

12      A.   **It is only one person that**

13   **approves and denies vacation so --**

14      Q.   Who is that?

15      A.   **That would be the group**

16   **leader.  He approves vacation or denies**

17   **vacation.**

18      Q.   Mr. Culpepper?

19      A.   **Yes.**

20      Q.   And it's in his sole

21   discretion?

22      A.   **They have to look at -- see**

23   **how many people are out.  We have a**

<center>35</center>

1   **five-percent rule, only six -- well,**

2   **five to six people can be out for**

3   **vacation, a certain amount in each**

4   **area; and if the calendar is full for**

5   **that day, then your vacation will be**

6   **denied.**

7      Q.   Have you ever had vacation

8   denied?

9      A.   **Yes, I have.**

10      Q.   After Ms. Edwards complained?

11      A.   **Before, after, now.**

12      Q.   Mr. Culpepper denies yours?

13      A.   **I've had him to deny my days**

14   **when he was there.**

15      Q.   Okay.  Did Mr. Culpepper ever

16   deny your vacation before Ms. Edwards

17   complained?

18      A.   **Yes, I've had vacation denied**

19   **before.**

20      Q.   What was the reason?

21      A.   **The five-percent rule, and I**

22   **remember I had -- he told me I could go**

23   **ask someone else if they would switch**

<center>36</center>

1    with me that already had that day off.
2        Q.    And did you do that?
3        A.    No.  I think I used a personal
4    day.
5        Q.    Okay.  So you can use a
6    personal day instead of vacation day,
7    and it's fine to be off?
8        A.    If you use a personal day,
9    it's a penalty.  If you -- you can
10    schedule personal days as well as you
11    schedule vacation days, but if you call
12    in and use a personal day, you -- it
13    hurts your attendance, but you do get
14    paid for that day.
15        Q.    And how many points do you
16    accrue before you are disciplined?
17        A.    We do not have a point system.
18        Q.    Okay.  Is it an occurrence
19    system?
20        A.    As long as you have the days
21    to be able to use to call in, you can
22    use them.
23        Q.    Well, how does it affect you

37

1    then if you're using personal?
2        A.    Because we were getting
3    incentives for our at -- for our
4    attendance if we had perfect
5    attendance.
6        Q.    What was the incentive?
7        A.    Like a hundred dollars a
8    month.
9        Q.    Per person, if you had perfect
10    attendance?
11        A.    Yes.
12        Q.    And don't use a vacation day,
13    don't use a personal day?
14        A.    If you use a vacation day, you
15    still have perfect attendance because
16    you have it scheduled.  If you schedule
17    a personal day and use it, you have
18    perfect attendance still because it was
19    scheduled.  If you call out -- call in,
20    you know, without getting anything
21    approved, then you would lose, you
22    know, your incentive.
23        Q.    So if Ms. Edwards asked for a

38

1    vacation day and that was granted,
2    she'd have perfect attendance, get her
3    hundred dollars a month, but if she had
4    to ask or took a personal day, that
5    affected it?
6        A.    Are you asking me if she would
7    take a personal day how -- if she would
8    call in or if she would schedule it?
9        Q.    If she would schedule it?
10        A.    No.  As long as it's
11    scheduled, you would still have perfect
12    attendance.
13        Q.    But if you call in, it would
14    count against you?
15        A.    Yes.
16        Q.    How many personal days do you
17    have a year?
18        A.    Three.
19        Q.    Did you ever -- after she
20    complained about Mr. Swindle, did you
21    ever see Mr. Culpepper ignore Ms.
22    Edwards?
23        A.    Ignore as in?

39

1        Q.    Not speak with her, not
2    acknowledge her?
3        A.    Yes, he did stop speaking with
4    her.
5        Q.    What did you observe?
6        A.    Usually, you know, he would
7    come up and, you know, speak, say,
8    hello, how are you today? or whatever,
9    but he stopped doing that.
10        Q.    Mr. Kitchens wasn't like that,
11    though?
12        A.    No.
13        Q.    Okay.  Did Mr. Culpepper still
14    speak to you?
15        A.    In reference to the downtime
16    report, yes.
17        Q.    Did he greet you like you said
18    he would usually do?
19        A.    Some days he would; some days
20    he would not.
21        Q.    And this is after Ms. Edwards
22    complained, he stopped doing that to
23    you, greeting you?

40

| | |
|---|---|
| 1    A.    Yes. | MR. BOSTICK: Object to the |
| 2    Q.    Or is it like shooting-the- | form. |
| 3    breeze-type conversation? | A.    I -- like I said, I really |
| 4    A.    Well, he would talk to me, you | didn't communicate with them like that |
| 5    know, like I said, because we had to -- | so -- |
| 6    they had to talk to me because of the | Q.    But you observed that's how |
| 7    downtime report, and that was it. | Ms. Edwards was treated? |
| 8    Q.    No -- nothing friendly? | MR. BOSTICK: Object to the |
| 9    A.    No. | form. |

41 / 43

Anything else?

1  A.  Yes.

2  Q.  You did tell me that, didn't

3  you?

4  A.  Yes.

5  Q.  What was the worst job out

6  there on that BC1 line, do you know?

7  A.  Let's see.  To me, physically,

8  the worst job would be the Station

9  Number 509, 510, the tailgates.

10  Q.  Was that where Ms. Edwards was

11  put after the CCR job?

12  A.  No.

13  Q.  Where was she put?

14  A.  At five -- let me see, 504 or

15  505.

16  Q.  What was your opinion of that

17  job?

18  A.  DA'ing is an easy job.  You

19  just get dirty.

20  Q.  What do you mean you get

21  dirty?

22  A.  From the weld splatter, your

23  DA weld splatter.

45

1  Q.  That does DA stand for?

2  A.  I don't know.

3  Q.  Okay.  So the splatters are

4  getting all over you?

5  A.  Yeah.

6  Q.  Or the filings?

7  A.  Yeah, the clippings, the dust,

8  it's dirt, dust and dirt.

9  Q.  Is that why it's kind of

10  enclosed so that it doesn't go

11  everywhere?

12  A.  Is it enclosed?  No, you're

13  not enclosed.

14  Q.  You're just out in the open?

15  A.  I mean, it's -- the only

16  station that is separate would be the

17  503, and everything else is like on

18  a -- up on a platform going down the

19  line.

20  Q.  After Ms. Edwards was moved to

21  the line, do you know how far she was

22  from Mr. Swindle's area?

23  A.  Body build is -- we have

46

1  another aisle that comes -- a break

2  area and then another aisle that comes

3  across, and then body build is on down.

4  Q.  How close was she to him?

5  A.  His station was on down.

6  You've got a big aisle right here, a

7  big aisle, another break area, and then

8  this is body build section on across

9  from this other aisle.  Behind this

10  break area is -- it was an empty space

11  then where the units came down, then

12  Station 503.  Enclosed up here on the

13  platform all the way down to the end of

14  the line would be 504 on down to this

15  other BC (indicating).

16  Q.  And the 504 job is the one you

17  say she was assigned to?

18  A.  She was at Station 504, 505,

19  in there.

20  Q.  Had you ever been put back on

21  the line once you were doing the

22  downtime board?

23  A.  Put back on the line as is in?

47

1  Q.  Working the BC1 after you had

2  been on the board for a while?

3  A.  For BC1, yes, I would have to

4  go work on the line, and sometimes I

5  would have to work on the line and do

6  downtime at the same time.  And that

7  was only when we were shorthanded or if

8  we had to carry parts to the line.

9  Q.  Did Ms. Edwards ask you if you

10  would be interested in learning the CCR

11  operator position and cross-training

12  for that job?

13  A.  Yes.

14  Q.  Okay.  And then did she go to

15  Rob Katzenbach and ask if you could

16  train for that job?

17  A.  I do not know who she went to.

18  I thought it was Steve Culpepper that

19  she had went to.

20  Q.  Okay.  So you understood she

21  asked if you could help with that job

22  and cross-train?

23  A.  Yes.

48

1    Q.    When you started doing that
2  job, no one told you you would be
3  replacing Ms. Edwards or doing that job
4  on a full-time basis?
5       A.    No, because what she had
6  wanted to do, she asked if -- she had
7  wanted to come down and work on the
8  floor some, so she went and asked, you
9  know, if -- I was already doing BC1
10 downtime, they were impressed with my
11 work, I was getting compliments on my
12 work from the Koreans and the
13 Americans.  So she went and asked if we
14 could -- actually if I could rotate out
15 with her.  And like I said, she
16 would -- I would go up there for two
17 weeks and work while she came on the
18 floor and worked, and then I would come
19 down and work on the floor, and she
20 would go up there for two weeks and
21 work.
22      Q.    And who was your team leader?
23      A.    My team leader was Billy

49

1  Kitchens.
2       Q.    Okay.  Did she tell you why
3  she wanted to do that?
4       A.    She had told me she had wanted
5  to come down on the floor, you know,
6  to, you know, work around -- it was
7  much funner, you know, working around
8  Billy and Mike.  And then too she had
9  told me that she was getting big, you
10 know, sitting up there at the CCR, and
11 that she needed to get down on the
12 floor.
13      Q.    Did she ever tell you she
14 didn't want to do the CCR job?
15      A.    No.
16      Q.    Did she do a good job as a CCR
17 operator?
18      A.    To me she did good.
19      Q.    Okay.  You didn't have any
20 complaints?
21      A.    No.
22      Q.    Did you ever see Pam
23 Stoddard's reports?

50

1       A.    No.
2       Q.    Let me let you look at this
3  report and tell me if that's yours, if
4  you recognize it.  And I'm showing you
5  Plaintiff's Exhibit 26.  Can you tell
6  me if that's your report?
7       A.    I would not say this is my
8  report.  I know how --
9            (Plaintiff's Exhibit 31 was
10            marked for identification.
11           A copy is attached.)
12      Q.    (BY MS. HAYNES) Look at
13 Plaintiff's 31 and see if that goes
14 with that exhibit.
15      A.    It looks like it was redone or
16 something, it's saying revised.
17      Q.    I'm sorry, what are you
18 saying?
19      A.    I'm saying it was -- it looks
20 like it was revised or something.  I
21 can't remember really.
22      Q.    Is 31 the attachment -- or is
23 31 the e-mail with the attachment that

51

1  is Plaintiff's Exhibit 26?
2       A.    The only thing I can say is
3  the dates are the same.  I don't know
4  if it was the original report that was
5  sent with this e-mail or not.  I can't
6  say that, but the dates are the same.
7       Q.    Would you use Ms. Edwards'
8  e-mail address when you were doing the
9  CCR job?
10      A.    I was using her e-mail
11 address.
12      Q.    Okay.  And on that date, tell
13 me the date of Plaintiff's 31, that
14 e-mail.
15      A.    August -- Wednesday, August
16 the 9th at 1:16 p.m.
17      Q.    And the report, which is
18 Plaintiff's Exhibit 26, what's the date
19 of that report?
20      A.    Tuesday, August the 8th.
21      Q.    So the same day?
22      A.    No.
23      Q.    The bottom of the page, August

52

the 8th, the attachment is the August

8th report?

A.  Oh, are you talking about is this the same date as this (indicating)?

Q.  Yes.

A.  Yes.  That's what I was telling you, it's the same date, it is the same date.

Q.  Do you have any recollection that on August 8th you were doing the CCR job and doing the report?

A.  I cannot remember.

Q.  Would you have forwarded anyone else's reports on that day?

A.  I cannot remember.

Q.  But you can't look at that report and say that's yours?

A.  My format on how I write it does not match, you know, what we usually do.

Q.  What is different?

A.  I was putting my times in

53

before I would list what happened, the problems.  I would put the time down.

Q.  Uh-huh.

A.  And instead of writing out 29 minutes, I would usually put it in parenthesis and I would write the number and then abbreviate minutes, so I -- that's why it's confusing to me.

Q.  Look at 25 and tell me if that's your report.

A.  This is more like my format right here.

Q.  Is it on the same day as the e-mail that was sent that's Plaintiff's 31?

A.  This was sent on the 9th, yeah, the same day this e-mail was sent.

MR. BOSTICK:  That's 31.

Q.  What other reports were you responsible for other than what is -- I'm sorry, other than -- 25 and 26, were those the two reports that you

54

were responsible for in 2006?

A.  And BC1, body complete line.

Q.  Is it embodied in either one of those reports?

A.  This is BC1 production report right here.  This is BC1 report right here, but on this report I was doing this one on Billy's computer at the end of BC line, and I would print it out and take it to Tammy during the shift so that she would stay caught up on it, and then I would take her a final copy at the end of the shift.

Q.  And is that your report attached to Plaintiff's 26?

A.  I really cannot say that because I did not turn in a final copy of this report.  She's responsible for turning in the final copy of this report.  But if I was giving her -- like I said, I was sending her the -- writing down each hour down there what was going on, print it out, take it up

55

there to her, and then, you know, she would put it on her report, if she was copying what I had wrote then, but I can't say if it's mine or not.

Q.  Okay.  Would she be doing the BC1 downtime report if you were doing the CCR job and she was doing downtime?

A.  I'm trying to think did she ever do BC1 downtime report.  I can't remember.

Q.  When you were job swapping, did she do the reporting that you would normally do on the floor while you did the jobs that she would normally do in the office?

A.  We never did get a chance to job swap; but in my training, I know that she would get the downtime downstairs for me from BC line.

Q.  Okay.  When did you start training for the job?

A.  It had to be around June or July.  I really can't remember.

56

1    Q.    Okay.  And did anyone up until
2  the time Ms. Edwards complained about
3  Mr. Swindle ever complain about the
4  arrangement?
5          MR. BOSTICK:  Object to the
6  form.
7    A.    **Repeat again.**
8    Q.    Up until she complained about
9  Mr. Swindle, did anyone complain about
10  the arrangement that the two of you
11  were working two weeks?
12    A.    **We never did get a chance to**
13  **follow through with that arrangement.**
14    Q.    Okay.  So you never came up
15  and worked the CCR job?
16    A.    **I never came up and worked the**
17  **CCR for two weeks and then went to the**
18  **floor and rotated with her.**
19    Q.    Okay.
20    A.    **I came up to work the CCR**
21  **whenever Ms. Edwards had appointments,**
22  **whenever she had to leave early, and I**
23  **worked during my training, I worked the**

57

1  CCR job.
2    Q.    And you worked alongside her?
3    A.    **During my training, yes.**
4    Q.    In August, what was the
5  arrangement in early August?
6    A.    **I cannot remember.**
7    Q.    If she was there working the
8  CCR job, were you also there or back on
9  the floor?
10    A.    **I was on the floor doing**
11  **downtime.**
12    Q.    Okay.  What would be the
13  reason you would send an e-mail
14  attaching a report?
15    A.    **I do not remember this e-mail,**
16  **and if I do send out an e-mail**
17  **attachment report, it is either**
18  **management has came to me and something**
19  **was incorrect in the report, either --**
20  **most likely, nine times out of ten, it**
21  **was a Korean who would come, Mr. Inwa,**
22  **and tell me something was wrong with**
23  **the report and ask me to resend it out,**

58

1  to correct information in the report
2  and then resend it out.
3    Q.    Does this e-mail, Plaintiff's
4  31, indicate that you amended these
5  three reports?
6          MR. BOSTICK:  Object to the
7  form.
8    A.    **I cannot remember if it**
9  **indicates that, and I do not even**
10  **remember if I amended those reports.**
11    Q.    You have no recollection?
12    A.    **No.**
13    Q.    Did you ever hear Steve
14  Culpepper tell Ms. Edwards that she
15  would never go back to work on the
16  line?
17    A.    **No.**
18    Q.    Do you recall -- do you know
19  an employee by the name of Dura?
20    A.    **Yes.**
21    Q.    Okay.  Where did Dura work?
22    A.    **On BC-2 or 3.**
23    Q.    Okay.  Is Dura a man or woman?

59

1    A.    **A male.**
2    Q.    Okay.  Did he challenge you
3  and Ms. Edwards to learn how to weld?
4    A.    **Yes.**
5    Q.    Okay.  Do you recall that?
6    A.    **Yes.**
7    Q.    And do you recall Ms. Edwards
8  said she was going to go down and take
9  Dura up on his challenge?
10    A.    **She did.**
11    Q.    And did she learn how to weld
12  or do that job for a little bit?
13    A.    **I think it was more like metal**
14  **finishing, I don't think it was**
15  **welding; but yes, she did.**
16    Q.    And were you present when she
17  told Mr. Culpepper that she had gone
18  down to do that job?
19          MR. BOSTICK:  Object to the
20  form.
21    A.    **I can't remember.  I know -- I**
22  **remember she did a good job, that she**
23  **did a good job, that he was impressed,**

60

1  but I do not remember any conversation
2  with Mr. Culpepper about that.
3      Q.   Okay.  Did Ms. Edwards ever
4  tell you that she was worried about
5  losing her job and did not want to
6  complain about Mr. Swindle?
7      A.   Yes, she did.
8      Q.   What did she tell you?
9      A.   She told me that she just
10 wished everything would go away, she
11 wished she would have never, you know,
12 said anything, but you know, she was at
13 a point where, you know, she couldn't
14 just turn away from it because her
15 husband was pressuring her at home to
16 push forward with it and stuff, and you
17 know, she told me that it was affecting
18 her marriage at home, so she, you know,
19 had to continue on with it.
20     Q.   This is after she complained?
21     A.   Yes.
22     Q.   Okay.  Do you know when she
23 told her husband?

61

1      Q.   Did you have any conversations
2  with Ms. Nelson and Ms. Abrams about
3  Ms. Edwards?
4      A.   No.
5      Q.   Did you have conversations
6  with them relative to Mr. Swindle?
7      A.   No.
8      Q.   Who is Chad Spurlock?
9      A.   Chad Spurlock?
10     Q.   Yes, ma'am, do you know who he
11 is?
12     A.   I don't know who that is.  I
13 can't remember who that is.
14     Q.   Did you ever call Ms. Edwards
15 and tell her to write that name down
16 because he had been fired for
17 discrimination?
18     A.   No, I don't remember that.
19     Q.   Okay.  Do you recall having
20 any telephone conversations with Ms.
21 Edwards since she left?
22     A.   Yes.
23     Q.   How many?

63

1      A.   No.
2      Q.   Did she ever tell you she just
3  wanted to be transferred and not
4  complain about Mr. Swindle?
5      A.   No, I do not remember that.
6      Q.   Okay.  But after she
7  complained, she told you she wished she
8  would have never done it?
9      A.   Yes.
10     Q.   Did she tell you what kind of
11 problems it was causing her in the
12 workplace?
13     A.   No.
14     Q.   Just the ones you've already
15 mentioned?
16     A.   Just those, yeah.
17     Q.   No one would talk to her?
18     A.   Different ones stopped
19 speaking.
20     Q.   Were you ever present with any
21 conversations between Michelle Nelson
22 and Kim Abrams and Ms. Edwards?
23     A.   No.

62

1      A.   I do not know how many it was,
2  but she called me often.
3      Q.   When is the last time y'all
4  talked?
5      A.   Probably my first day back
6  after maternity leave, and that was in
7  October, October.
8      Q.   Did you ever tell Ms. Edwards
9  Steve Culpepper was retaliating against
10 her for putting her back on the BC1
11 line?
12     A.   No, I did not say that.
13     Q.   Did you tell her it was wrong
14 for her to be put on the line?
15     A.   I told her that they could
16 have, you know, put her in a better
17 position because of her injury to her
18 neck for the job that she was doing.
19     Q.   And what did you mean by that?
20     A.   Well, her neck had swelled up
21 on her from a car accident that she was
22 in, and she had to hammer a part down,
23 and I think it was irritating -- the

64

1  hammering she was doing was irritating
2  her neck.
3      Q.    Did you actually see it swell
4  up?
5      A.    Yes, I did.
6      Q.    And is that when you made the
7  comment they could have put you on a
8  better job?
9      A.    Yeah.  And I even told her to
10  ask them to see if they could move her
11  somewhere else.
12      Q.    Did you ever offer Mr. Swindle
13  a lollipop or a sucker, a piece of
14  candy in the workplace?
15      A.    I may have.  I can't remember.
16      Q.    Do you ever recall him saying,
17  I have something you can suck on, and
18  grabbed his crotch, and you turned
19  around and walked away?
20      A.    I don't remember that.
21      Q.    Did you ever hear Mr. Swindle
22  brag about cussing out a Korean?
23      A.    Yes, I have heard him make

65

1  comments.
2      Q.    Okay.  What did he say?
3      A.    That he cussed them out
4  because he had did something to the
5  line that caused him to be down.  I
6  don't remember the exact words, but I
7  know the Korean was working inside his
8  line and caused him to have downtime,
9  and Mike had words with him, but I do
10  not remember what was said.
11      Q.    You don't recall him bragging
12  about what he said to the Korean?
13      A.    No.
14      Q.    Have you heard anyone discuss
15  why Ms. Edwards has not been allowed to
16  come back to work?
17      A.    No.
18      Q.    That's not been discussed in
19  your presence or you haven't heard
20  rumors why she's not been allowed to
21  come back after she was released by the
22  doctor?
23          MR. BOSTICK:  Object to the

66

1  form.
2      A.    No.
3      Q.    Have you heard anyone say
4  they're not going to accommodate her
5  because of her injury?
6      A.    No.
7      Q.    Who is cross-trained with you
8  to do the CCR position now?
9      A.    Jamal Pollard and Pamela
10  Stoddard.
11      Q.    Jamal, is that a man or a
12  woman?
13      A.    He's a male.
14      Q.    When was Mr. Pollard hired?
15      A.    I do not know his hire date.
16      Q.    Was he hired after Ms. Edwards
17  was -- went out on medical leave?
18      A.    Jamal was -- I had been out
19  because of complications during my
20  pregnancy, so I was not even there when
21  Mr. Pollard was trained.
22      Q.    Okay.
23      A.    And I really do not even know

67

1  who was doing my job while I was out,
2  if it was Pam or not.  Pam may have
3  filled in a couple of days.  It looked
4  like she did by the reports, but he was
5  trained while I was out, because I was
6  out of work the majority of my
7  pregnancy and after I had my baby.
8      Q.    Okay.  When were you out, if
9  you don't mind me asking?
10      A.    I was out March, the month --
11  couple of weeks in March, March the
12  16th I went out, and then I went out
13  again at the end of April, and I stayed
14  on out until October.
15      Q.    So from April to October,
16  2007?
17      A.    I went out again in April, and
18  I came back to work in June for a
19  couple of weeks, and then I went out
20  again.
21      Q.    And when was your baby born?
22      A.    August 21st, and she was
23  early.

68

1    Q.    I saw somewhere where you were
2  expecting twins.  Was it twins?
3    A.    **Yes, I was having**
4  **complications, and I ended up**
5  **miscarrying.**
6    Q.    I'm sorry.  So this is another
7  pregnancy?
8    A.    **No, it's the same one.**
9    Q.    Okay.  All right.  I'm sorry.
10  So you came back October --
11    A.    **Uh-huh.**
12    Q.    -- 2007?
13    A.    **October, yes.**
14    Q.    And at that point, Jamal
15  Pollard had been doing your job?
16    A.    **Yes.**
17    Q.    Okay.  And does he fill in for
18  you on occasion?
19    A.    **Yes.**
20    Q.    And then Ms. Stoddard fills in
21  occasionally?
22    A.    **Yes.**
23    Q.    And then on the other shift,

69

1  who does the job?
2    A.    **Sherry McRae.**
3    Q.    Did Mr. Culpepper ever come to
4  you and ask you if Ms. Edwards had
5  cussed you out in the lunchroom?
6    A.    **Yes.**
7    Q.    What did he say?
8    A.    **He had heard rumor, someone**
9  **had come back and said Tammy had cussed**
10  **me out in the lunchroom, and I told him**
11  **that did not happen, that was not true.**
12        MS. HAYNES:  Do you need a
13  break?
14        THE WITNESS:  I'm okay.
15        MS. HAYNES:  I'm sorry.  I
16  don't mind taking a break.
17        THE WITNESS:  Give me about
18  five minutes.
19        MS. HAYNES:  I'm sorry I went
20  into that.
21        (Off-the-record discussion.)
22        (Recess.)
23    Q.    (BY MS. HAYNES) All right.

70

1  Let's look at -- well, let me go back
2  and finish with Mr. Culpepper and the
3  lunchroom incident.  I was asking you
4  about that.  Tell me about Mr.
5  Culpepper coming up to you and asking
6  you about Tammy had cussed you out.
7    A.    **He said that somebody had told**
8  **him that me and Tammy had words in the**
9  **lunchroom and that she had cussed me**
10  **the lunchroom, and I told him that, you**
11  **know, that didn't happen and that**
12  **wasn't true.  And I asked him who told**
13  **him, and he refused to tell me, you**
14  **know, what the source had came from.**
15  **And I, you know, told Tammy, you know,**
16  **that -- what was said and everything,**
17  **the conversation between me and Mr.**
18  **Culpepper, I did tell her, you know,**
19  **that I told him, you know, that that**
20  **wasn't true.**
21    Q.    Is that correct?
22    A.    **Yes.**
23    Q.    She never cussed you out?

71

1    A.    **No, she did not.**
2    Q.    Okay.  Have you ever heard her
3  use cuss words at work?
4    A.    **I can't remember.  I -- she --**
5  **if Tammy cussed -- Tammy didn't talk --**
6  **that's not her character to cuss, I can**
7  **say that, it's not her character to**
8  **cuss.  Whether or not she used one, I**
9  **don't remember.**
10    Q.    Have you ever heard her say
11  anything racially derogatory?
12    A.    **No.**
13    Q.    Would that be her character,
14  to use derogatory words that have a
15  racial con --
16    A.    **She has never used that around**
17  **me.**
18    Q.    Has anybody ever told you
19  she's used that type language?
20    A.    **No.**
21    Q.    With the incident with Mr.
22  Culpepper in the lunchroom, asking you
23  if Ms. Edwards had cussed you out, was

72

1 this before she was moved from the BC1
2 line or after?
3    A.  I do not remember if it was
4 before, but this was after the
5 complaint, her complaint, but I don't
6 know when, if it took place before.
7    Q.  Okay.  Plaintiff's Exhibit 3,
8 page 7 and 8 has your notes when you
9 were being interviewed by team
10 relations, and it has three bullet
11 points on page 8 relative to you being
12 asked about what firsthand knowledge
13 you had.  Are these correct, what you
14 told team relations?
15    A.  The first one is.  The second
16 one, I cannot -- I don't remember that.
17 I do not recall that one.  This third
18 one, the first part is not true, I
19 don't remember that.  The second part,
20 I do remember the rumor going around
21 that Tammy's best friend's husband or
22 someone that they go to church with
23 seen her hugging Mike, and it got back

73

1    Q.  I need you to turn to page
2 217.  Do you recall when Ms. Jones was
3 asking you questions as well as Mr.
4 Cooner that they were taking notes?
5    A.  Uh-huh.
6    Q.  Have you seen these notes
7 before?
8    A.  No, I have not.  I've never
9 seen these notes before.
10    Q.  Okay.  All right.  You just
11 don't recall telling Ms. Jones or Mr.
12 Cooner that one to two months ago you
13 walked up on the tail end of a
14 conversation between --
15    A.  I don't remember the incident.
16    Q.  -- Mike, Pam, and Tammy?
17    A.  I do not recall the incident,
18 I don't remember the incident at all.
19    Q.  You don't remember the
20 incident, and you don't remember
21 telling Ms. Jones about that?
22    A.  No.
23    Q.  Okay.  Do you recall Ms.

75

1 to her husband, but I don't know where
2 that rumor came from.
3    Q.  You never heard Ms. Edwards
4 say that?
5    MR. BOSTICK:  Object to the
6 form.
7    A.  Did I ever hear her say --
8    Q.  That a friend of the family
9 saw Tammy touching Mike?
10    A.  Did she tell me that someone
11 saw her touch Mike?
12    Q.  Yes.
13    A.  No, she never told me that.
14    Q.  Okay.  Look for me -- keep
15 your hand there where we are, and turn
16 to Exhibit 14.
17    A.  (Indicating.)
18    Q.  Yes, ma'am, Exhibit 14, and
19 right there's okay.  And there are some
20 numbers on the bottom of the page, and
21 do you see in the right-hand corner?
22    MR. BOSTICK:  Right here, 206
23 (indicating).

74

1 Edwards saying anything about what Mike
2 Swindle was talking about performing
3 oral sex on her when she had only been
4 with one man?
5    MR. BOSTICK:  Object to the
6 form.
7    A.  I don't remember -- I don't
8 think she would even say anything to me
9 like that.
10    Q.  She wouldn't say anything to
11 you?
12    A.  I mean, you know, Tammy -- no,
13 no.
14    Q.  Okay.  The third bullet item,
15 did Mr. Billy Kitchens tell you that
16 Mr. Swindle was trying to come up with
17 stuff to cover himself?
18    A.  I do not remember him telling
19 me that, and honestly, I don't think
20 Billy would have told me that --
21    Q.  Okay.
22    A.  -- because of him and Mike's
23 relationship so I don't even --

76

**Page 77**

1     **Q.**   What was the relationship
2 between Kitchens and Swindle?
3     **A.**   **They were best friends, I mean**
4 **friends.**
5     **Q.**   Are they still best friends?
6     MR. BOSTICK: Object to the
7 form.
8     **A.**   **I do not know.**
9     **Q.**   You don't work around them
10 now?
11     **A.**   **I keep to myself pretty much.**
12 **I stay off the floor, I stay in CCR, I**
13 **eat lunch by myself pretty much. If I**
14 **do talk to someone, it's in another**
15 **section of the plant, like paint, I**
16 **talk to them, but I don't socialize any**
17 **more like I used to.**
18     **Q.**   Why?
19     **A.**   **Just personal problems that I**
20 **have, and I'm just -- I just like to**
21 **keep to myself.**
22     **Q.**   Okay. But back in 2006, you
23 had knowledge that Swindle and Kitchens

**Page 78**

1 were best friends?
2     MR. BOSTICK: Object to the
3 form.
4     **A.**   **I didn't have -- I would see**
5 **them talking all the time and I mean,**
6 **they were buddies, they would hang out**
7 **at work pretty much together, like me**
8 **and Tammy was hanging out pretty much**
9 **together.**
10     **Q.**   Okay. Did you ever know if
11 Ms. Stoddard was upset because she had
12 been replaced as the CCR by Tammy?
13     **A.**   **She never said anything to me.**
14     **Q.**   Ms. Stoddard didn't?
15     **A.**   **No.**
16     **Q.**   Okay. Would you say that
17 Tammy Edwards was a bit old-fashioned?
18     **A.**   **No.**
19     **Q.**   No?
20     **A.**   **No.**
21     **Q.**   Okay. Was she kind of set in
22 her ways?
23     **A.**   **No.**

**Page 79**

1     **Q.**   How would you describe her in
2 2006 in the workplace?
3     **A.**   **She was very friendly, and she**
4 **was a positive person, which is what**
5 **attracted me, you know, to her, because**
6 **she had a positive attitude and sort of**
7 **like an outgoing spirit. And she let**
8 **everyone know that her kids and her**
9 **family, you know, was her main concern,**
10 **her number one, because she was always**
11 **at their events, or you know, trying to**
12 **be there for them or giving them the**
13 **best, or either if she wasn't there,**
14 **she was trying to be involved with**
15 **their activities.**
16     **Q.**   Had you heard -- up until the
17 time she complained, had you ever heard
18 anyone refer to her or her work product
19 in a negative fashion?
20     **A.**   **Steve Culpepper, he would tell**
21 **me that her reports, they didn't have**
22 **enough details in them and/or they**
23 **didn't have enough information in them.**

**Page 80**

1     **Q.**   Would he show you examples?
2     **A.**   **No.**
3     **Q.**   Okay. Did he ever tell you
4 that he had talked to Tammy about her
5 reports?
6     **A.**   **No.**
7     **Q.**   Did you ever go to a club
8 called Woodmere?
9     **A.**   **Yes.**
10     **Q.**   Have you ever seen Mike
11 Swindle, Billy Kitchens, and Tom Bondy
12 together?
13     **A.**   **No.**
14     **Q.**   How about Swindle and
15 Culpepper together?
16     **A.**   **No.**
17     **Q.**   Have you ever seen Swindle
18 there?
19     **A.**   **I've seen Swindle there, and I**
20 **only went one time and he was there.**
21     **Q.**   Who was he with?
22     **A.**   **He was with his niece and**
23 **sister, it was his sister and his**

1  niece.
2      Q.   Do you think it's because that
3  you were friends with Ms. Edwards that
4  people don't talk to you now, don't
5  want to be around you?
6      A.   **They talk to me now.**
7      Q.   Now that she's gone?
8          MR. BOSTICK:  Object to the
9  form?
10      A.   **They started talking to me**
11  **even before she left.**
12      Q.   Did it improve for you after
13  she left?
14      A.   **I really can't say because**
15  **shortly thereafter, I was involved in a**
16  **car accident, and I was out for a bit.**
17      Q.   You were out?
18      A.   **Uh-huh.**
19      Q.   But you don't relate your
20  current situation about not socializing
21  with people as a result of anything
22  relating to Ms. Edwards?
23      A.   **No.**

81

1          MS. HAYNES:  That's all I
2  have.
3  EXAMINATION BY MR. BOSTICK:
4      Q.   Just so I'm clear, this whole
5  line of questioning about people not
6  talking to you, that was in the context
7  of you interacting with other team
8  members, correct?
9      A.   **Uh-huh.**
10          MR. BOSTICK:  That's all I
11  have.
12  EXAMINATION BY MR. DYKES:
13      Q.   I just have a couple.  Did
14  anybody ever tell you that Mike was
15  saying that he had a thing going with
16  Ms. Edwards?
17      A.   **No.**
18      Q.   Did you ever hear Mr. Swindle
19  say that he had a thing going with Ms.
20  Edwards?
21      A.   **No.**
22      Q.   Did you ever tell Ms. Edwards
23  that you had heard that Mike was saying

82

1  he had a thing going with her?
2      A.   **No.**
3          MR. DYKES:  I don't have
4  anything else.
5          MS. HAYNES:  That's all I
6  have.  Thank you.
7
8      THUS CONCLUDED THE DEPOSITION OF
9          AMBER KELLEY BATIE
10
11
12
13
14
15
16
17
18
19
20
21
22
23

83

1          C E R T I F I C A T E
2  STATE OF ALABAMA   )
3  JEFFERSON COUNTY   )
4      I hereby certify that the above
5  and foregoing proceeding was taken down
6  by me by stenographic means, and that
7  the questions and answers therein were
8  produced in transcript form by computer
9  aid under my supervision, and that the
10  foregoing represents, to the best of my
11  ability, a true and correct transcript
12  of the proceedings occurring on said
13  date at said time.
14      I further certify that I am
15  neither of counsel nor of kin to the
16  parties to the action; nor am I in
17  anywise interested in the result of
18  said cause.
19
20  _____
21      SALLIE NESMITH GUNTER
22      CERTIFIED COURT REPORTER
23      ACCR LICENSE #37

84

PLAINTIFF'S
EXHIBIT

31

| | |
|---|---|
| **From:** | Edwards Tammy R HMMA/Welding |
| **Sent:** | Wednesday, August 09, 2006 1:16 PM |
| **To:** | Worley, Christopher R HMMA/Welding; /o=Autos/ou=First Administrative Group/cn=Recipients/cn=treybutler; Abrams, Kimberly V HMMA/Welding; An Joon Goo HMMA/Welding; Applegate, John HMMA/Plant Engineering; Binasio, Peter J HMMA/Welding; Blackburn, David C HMMA/QC; Bondy, Thomas H HMMA/Welding; Brookshire, James A HMMA/Stamping; Brown, Tommy L HMMA/Welding; Certain, Thomas A HMMA/PC; Chance, Toby A HMMA/Welding; Coats, Bryan H HMMA/QC; Cox, Kevin HMMA/QC; Craig Stapely; Culpepper, Stephen R HMMA/Welding; Gahafer Vincent P HMMA/Welding; George, Eric S HMMA/PC; Gilkey-Shuford, Yvette A HMMA/QC; Gillahan, Donald L HMMA/Plant Engineering; Glass, Dennis J HMMA/QC; Glen, Art; Golden, Gusta AHMMA/Welding; Griggs, Corey R HMMA/MES; Gulden, Evan P HMMA/PC; Guy, Stephen F HMMA/QC; Hatch, John W HMMA/Production Control; HMC; Horton, Elizabeth W HMMA/PC; James Brookshire; Jung, Ku Yong HMMA/PC; Kalson, John HMMA/Production Sub_Div; Katzenbach, Robert T HMMA/Welding; Kim Inhwa HMMA/Welding; Kitchens, Billy F HMMA/Welding; Kongchan, Kahn T HMMA/QC; Kosgi, Ravi S HMMA/Welding; Lancaster, J Jackson HMMA/MES; Lee, Chang Woo HMMA/MES; Magruder, Dawn HMMA/Welding; McRae, Sheri H HMMA/Welding; Mouton, Patrick J HMMA/QC; Nelson, Michelle HMMA/Welding; Olding, Zachary E HMMA/Welding; Park, Joowook HMMA/Welding; Park, Myung Hyun HMMA/Welding; Phomsavanh, Mylavanh Y HMMA/Welding; Pinkney, Troy B HMMA/Plant Engineering; Robertson, Tommie J HMMA/Welding; Rohlman, Maurice J HMMA/Stamping; S. H. Jeon; Seung, Jo Jeon ; Smith, Scott A HMMA/Welding; Stapley, Craig E HMMA/Assembly; Stoddard, Pamela M HMMA/Welding; Swindle Michael W HMMA/Welding; Thomas, Kelly M HMMA/Welding; Thornton, Jason; Trull, Richard E HMMA/PC; Ulrich Keith A HMMA/Welding; Wegner, Bradley D HMMA/QC; White, Harry J HMMA/Welding; Williams, Keith K HMMA/QC; Williams, Richard A HMMA/MES |
| **Subject:** | August 8, 2006.ppt (Revised) |
| **Attachments:** | August 8, 2006.ppt |

This report had to be amended on the following slides:

> Body Shop Production Report (Item #3)
> BC#1 Production Report (Final totals)
> Build Line Production Report (Final hour and totals)

An error was found in the old report and had to be corrected.  I apologize for any inconvenience that may have been caused.

Thanks,

Amber Kelley

CONFIDENTIAL

## American Court Reporting
### toll-free (877) 320-1050

---

**Page 1**

```
IN THE UNITED STATES DISTRICT COURT        1
FOR THE MIDDLE DISTRICT OF ALABAMA         2
         NORTHERN DIVISION                 3
                                           4
CIVIL ACTION NUMBER                        5
2:07-CV-908MHT                             6
                                           7
TAMMY EDWARDS,                             8
     Plaintiff,                            9
vs.                                       10
HYUNDAI MOTOR                             11
MANUFACTURING ALABAMA, LLC,              12
and MIKE SWINDLE, individually,          13
     Defendants.                         14
                                         15
     DEPOSITION TESTIMONY OF:            16
          WENDY WARNER                   17
                                         18
July 18, 2008                            19
9:30 AM                                  20
                                         21
COURT REPORTER:                          22
KRISTEN DYKES THOMAS                     23
```

**Page 3**

```
 1  Certificate to the above office.  If you
 2  fail to do so, you automatically waive
 3  your right to make any corrections to
 4  your deposition.
 5
```

**Page 2**

```
 1            WENDY WARNER
 2  INSTRUCTIONS TO THE WITNESS
 3      Please read your deposition over
 4  carefully before you sign it.  You should
 5  make all your changes on the attached
 6  errata sheet.
 7      After making any changes which
 8  you have noted on the attached errata
 9  sheet, sign your name on the Deponent's
10  Certificate and date it.  You are signing
11  it subject to the changes you have made
12  on the errata sheet, which will be
13  attached to the deposition.
14      Return the attached errata sheet
15  and Deponent's Certificate to American
16  Court Reporting Service, Read & Sign
17  Department, P.O. Box 12765, Birmingham,
18  Alabama 35202.
19      According to the Rules of Civil
20  Procedure, you will have thirty (30) days
21  from the date you receive this deposition
22  in which to read it, sign it, and return
23  the errata sheet and Deponent's
```

**Page 4**

```
 1            ERRATA SHEET
 2  PAGE      LINE      EXPLANATION
 3  ----------------------------------------
 4  ----------------------------------------
 5  ----------------------------------------
 6  ----------------------------------------
 7  ----------------------------------------
 8  ----------------------------------------
 9  ----------------------------------------
10  ----------------------------------------
11  ----------------------------------------
12  ----------------------------------------
13  ----------------------------------------
14  ----------------------------------------
15  ----------------------------------------
16  ----------------------------------------
17  ----------------------------------------
18  ----------------------------------------
19  ----------------------------------------
20  ----------------------------------------
21  ----------------------------------------
22  ----------------------------------------
23  ----------------------------------------
```

1 (Pages 1 to 4)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 5

1  DEPONENT'S CERTIFICATE
2
3      I, WENDY WARNER, the witness
4  herein, have read the transcript of my
5  testimony and the same is true and
6  correct, to the best of my knowledge.
7  Any corrections and or additions, if any,
8  are listed separately.
9
10
11  _____
12  WENDY WARNER
13
14  _____
15  DATE
16
17      Sworn to and subscribed before
18  me, this the _____ day of
19  _____, 2008, to certify my hand
20  and seal of office.
21
22  _____
23  NOTARY PUBLIC

Page 6

1      S T I P U L A T I O N S
2      IT IS STIPULATED AND AGREED by
3  and between the parties through their
4  respective counsel that the deposition of
5  WENDY WARNER, may be taken before Kristen
6  Dykes Thomas, Court Reporter and Notary
7  Public, State at Large, at the Wingate
8  Inn, Montgomery, Alabama, on July 18,
9  2008, commencing at approximately
10  9:30 a.m.
11      IT IS FURTHER STIPULATED AND
12  AGREED that the signature to and the
13  reading of the deposition by the witness
14  is not waived, the deposition to have the
15  same force and effect as if full
16  compliance had been had with all laws and
17  rules of Court relating to the taking of
18  depositions.
19      IT IS FURTHER STIPULATED AND
20  AGREED that it shall not be necessary for
21  any objections to be made by counsel to
22  any questions, except as to form or
23  leading questions, and that counsel for

Page 7

1  the parties may make objections and
2  assign grounds at the time of trial or at
3  the time said deposition is offered in
4  evidence, or prior thereto.
5      In accordance with Rule 5(d) of
6  the Alabama Rules of Civil Procedure, as
7  amended, effective May 15, 1998, I,
8  Kristen Dykes Thomas, am hereby
9  delivering to Alicia K. Haynes the
10  original transcript of the oral testimony
11  taken July 18, 2008.
12      Please be advised that this is
13  the same and not retained by the Court
14  Reporter, nor filed with the Court.
15
16
17
18
19
20
21
22
23

Page 8

1          I N D E X
2
3  EXAMINATION BY:              PAGE NO.
4  Mrs. Haynes                    10
5  Mr. Bostick                   154
6  Certificate                   155
7
8      INDEX OF EXHIBITS
9  EXHIBITS                     PAGE NO.
10  PLAINTIFF'S 33                 47
11  PLAINTIFF'S 34 2004 policies    58
12  PLAINTIFF'S 35 resignation letter  72
13  PLAINTIFF'S 36                 77
14  PLAINTIFF'S 37 harassment policy   92
15  PLAINTIFF'S 38 discrimination charge 101
16  PLAINTIFF'S 39
17  PLAINTIFF'S 40                122
18  PLAINTIFF'S 41                131
19  PLAINTIFF'S 42                132
20  PLAINTIFF'S 43                132
21  PLAINTIFF'S 44 payroll        143
22
23

2  (Pages  5  to  8)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

---

Page 9

1    APPEARANCES
2  FOR THE PLAINTIFF:
3    Alicia K. Haynes
4    HAYNES & HAYNES, PC
5    1600 Woodmere Drive
6    Birmingham, Alabama 35226
7  FOR THE DEFENDANTS:
8    Brian R. Bostick
9    OGLETREE, DEAKINS, NASH, SMOAK &
10    STEWART, P.C. Suite 1000
11    1819 5th Avenue N
12    Birmingham, Alabama 35203
13    J. Tobias Dykes
14    CONTSTANGY, BROOKS & SMITH, LLC
15    One Federal Place, Suite 900
16    1819 Fifth Avenue North
17    Birmingham, Alabama 35203
18    Christopher N. Smith
19    Legal Corporate Counsel
20    Hyundai Motor Manufacturing
21    Alabama, LLC
22    700 Hyundai Boulevard
23    Montgomery, Alabama 36105

Page 10

1      I, Kristen Dykes Thomas, a Court
2  Reporter of Auburn, Alabama, and a Notary
3  Public for the State of Alabama at Large,
4  acting as Commissioner, certify that on
5  this date, pursuant to the Alabama Rules
6  of Civil Procedure, and the foregoing
7  stipulation of counsel, there came before
8  me at the Wingate Inn, Montgomery,
9  Alabama, commencing at approximately 9:30
10  a.m., on July 18, 2008, WENDY WARNER,
11  witness in the above cause, for oral
12  examination, whereupon the following
13  proceedings were had:
14
15      WENDY WARNER,
16  having been first duly sworn, was
17  examined and testified as follows:
18
19  EXAMINATION BY MRS. HAYNES:
20    Q.    State your full name for the
21  record, please.
22    A.    Wendy Susan Warner.
23    Q.    And your address?

Page 11

1    A.    9685 Bent Brook Drive here in
2  Montgomery, 36117.
3    Q.    And how long have you lived at
4  that address, Ms. Warner?
5    A.    Five years.
6    Q.    Are you currently employed
7  with Hyundai?
8    A.    I am.
9    Q.    And how long have you been
10  employed with Hyundai?
11    A.    Five years and six months.
12    Q.    And what's your current
13  position?
14    A.    Human Resources manager for
15  employment and benefits.
16    Q.    Who do you report to?
17    A.    Sharon Rose, the head of
18  department.
19    Q.    What's her title?
20    A.    Senior manager.
21    Q.    Senior manager for employment
22  and benefits?
23    A.    Senior manager for Human

Page 12

1  Resources.
2    Q.    And how long have you held the
3  title as HR manager for employment and
4  benefits?
5    A.    Two years.
6    Q.    What was your previous title
7  or position?
8    A.    Human Resources manager for
9  employment.
10    Q.    And was that a promotion for
11  you to move to your new title two years
12  ago?
13    A.    No. Lateral. Just additional
14  duties.
15    Q.    Okay. Did someone leave?
16    A.    Yes.
17    Q.    Who?
18    A.    Jannetta Turner. And they
19  consolidated and reorganized the
20  department.
21    Q.    Did anyone else leave other
22  than Ms. Turner --
23    A.    No.

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 13

1    Q.   -- at that time?
2    A.   No.
3    Q.   Was Ms. Turner in charge of
4    benefits at the time?
5    A.   Yes.
6    Q.   And that was a lateral move
7    for you?
8    A.   Correct.
9    Q.   Who does Ms. Rose report to,
10   if you know?
11   A.   BW Ryu.  And he's the vice
12   president for Human Resources and general
13   affairs.
14   Q.   Can you spell that last name?
15   A.   R-Y-U.
16   Q.   And is he located here in I
17   Montgomery?
18   A.   Yes, ma'am.
19   Q.   And I'm sorry.  Give me his
20   title again.  Vice president of --
21   A.   For Human Resources and
22   general affairs.
23   Q.   And do you know who Mr. Ryu

Page 14

1    reports to?
2    A.   The president.
3    Q.   His name?
4    A.   HI Kim.
5    Q.   Is he here in Montgomery or --
6    A.   Yes, ma'am.
7    Q.   -- Korea?
8    A.   In Montgomery.
9    Q.   Do you have any direct reports
10   under you?
11   A.   Yes.
12   Q.   Who?
13   A.   I have three assistant
14   managers: a salaried employment, Simon
15   Lee; hourly employment, James Kendrick;
16   benefits, Dana Davis.
17   Q.   How long has Mr. Lee been in
18   his position?
19        MR. BOSTICK:  I want to
20   clarify that this is a 30(b)(6)
21   deposition.  You are free to get some
22   background information on Ms. Warner, but
23   let's keep this limited on --

Page 15

1        MRS. HAYNES:  Well, my client
2    talked to different people in Human
3    Resources, and it wasn't any of these
4    people.
5        MR. BOSTICK:  Well, that
6    doesn't mean it's in the subject that
7    you've identified in the purpose of this
8    deposition.
9        MRS. HAYNES:  Are you going to
10   instruct her not to answer?
11       MR. BOSTICK:  I'm going to
12   give you a little bit of leeway to ask
13   her about background and her position
14   within the company.  But...
15       MRS. HAYNES:  I think I'm
16   entitled to ask that.
17       MR. BOSTICK:  In a 30(b)(6)?
18       MRS. HAYNES:  Yes, sir.  Who's
19   in this department.
20       MR. BOSTICK:  You can ask --
21   that's what I'm saying.  You got a little
22   bit of leeway on where she fits within
23   the organization and her background, but

Page 16

1    that's it.
2        MRS. HAYNES:  Well, that's all
3    I'm asking.
4        MR. BOSTICK:  Okay.  Go ahead.
5    I'm just clarifying -- and she'd like to
6    read and sign.  You didn't ask that
7    earlier, but she would like to do that as
8    well.
9        Q.   (BY MRS. HAYNES) How long has
10   Mr. Lee been one of your direct reports?
11   A.   He was promoted to assistant
12   manager in May of '07.  And I believe
13   he's been with us in a specialist
14   capacity since '05.
15   Q.   Who was in salaried benefits
16   reporting to you before Mr. Lee?
17   A.   Stacye Jones.
18   Q.   Okay.  Mr. Kendrick, how long
19   has he been reporting to you?
20   A.   In the assistant manager
21   capacity since May of '07, as a
22   specialist, since '05.
23   Q.   Who was in that position prior

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 17

1  to Mr. Kendrick?
2    A.  Scott Gordy.
3    Q.  Can you spell that last name?
4    A.  G-O-R-D-Y.
5    Q.  And how long has Mr. Davis
6  been reporting to you?
7    A.  Ms. Davis joined us in
8  February of this year.
9    Q.  '08?
10    A.  Uh-huh.
11    Q.  And who was in that position
12  prior to Ms. Davis?
13    Stayce Jones.
14    Q.  Have you ever given a
15  deposition before?
16    A.  Yes, ma'am.
17    Q.  How many occasions?
18    A.  With Hyundai or in my career?
19    Q.  Hyundai first.
20    A.  With Hyundai, let's see, I
21  believe five.
22    Q.  How many depositions have you
23  given in your career?

Page 18

1    A.  Probably fifteen.
2    Q.  Where were you before Hyundai?
3    A.  I was a Human Resources
4  consultant with Empower Solutions in
5  Atlanta, Georgia.
6    Q.  For how many years?
7    A.  One year.
8    Q.  And before that company?
9    A.  Pricewaterhouse Coopers.
10    Q.  How long were you there?
11    A.  Two and a half years.
12    Q.  Before Pricewaterhouse?
13    A.  Toyota Motor Manufacturing in
14  Georgetown, Kentucky.
15    Q.  And how long were you with
16  that facility?
17    A.  Seven years.
18    Q.  And before the Toyota facility
19  in Kentucky, where were you?
20    A.  Miami Valley Regional Transit
21  Authority in Dayton, Ohio.
22    Q.  How long?
23    A.  Two years.

Page 19

1    Q.  And before Miami Transit?
2    A.  Federated Department Stores.
3    Q.  In Chicago?
4    A.  Cincinnati.  Three years.
5    Q.  And before Federated?
6    A.  I was in the collegiate
7  environment with Eastern Kentucky
8  University and a small liberal arts
9  college in Lexington, Kentucky.
10    Q.  The name, please?
11    A.  Transylvania University.
12    Q.  Did you work the two
13  universities at the same time?
14    A.  No.
15    Q.  Separate?
16    A.  Separate, uh-huh.
17    Q.  Eastern —
18    A.  Eastern three years; Transy,
19  six years.
20    Q.  What did you do for
21  Transylvania University?
22    A.  Recruitment, development,
23  alumni affairs.

Page 20

1    Q.  Worked with collegians?
2    A.  Yes.
3    Q.  In what capacity?
4    A.  Recruitment, admissions.
5    Q.  Anything else?
6    A.  Huh-uh.
7    Q.  No?
8    A.  At Eastern I was in career
9  development and cooperative education and
10  placement and then taught classes to
11  undecided freshmen.
12    Q.  What made you leave the
13  collegiate setting and move to corporate?
14    A.  I wanted to get into Human
15  Resources.  That's what I -- my career
16  goal had been for quite some time.
17    Q.  Has there been a lapse of six
18  months or more between any entity you've
19  been employed with?
20    A.  No, ma'am.
21    Q.  Have you always gone from one
22  job to the next without any lapse?
23    A.  Yes.

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

1  Q. Have you ever been charged
2  with a responsibility of training on
3  discrimination or EEO matters at any
4  place?
5  A. As an employment training
6  manager at Federated Department Stores, I
7  was responsible for orientation.
8  Q. Any other place you trained on
9  EEO or discrimination?
10  A. ADA aspects at Toyota. And
11  then I was in charge of salaried team
12  relations at Toyota as well and did
13  review investigations from my team reps.
14  Q. Any other training?
15  A. Not that I can recall off the
16  top of my head in that particular area.
17  Q. You have not done any training
18  at Hyundai on discrimination?
19  A. No.
20  Q. AEA?
21  A. No. Team relations was that,
22  as well as legal.
23  Q. Do you have any responsibility

Page 22

1  over team relations?
2  A. No.
3  Q. Tell me about the five
4  depositions you've testified for Hyundai.
5  A. The first one was an
6  employment situation, someone that had
7  not been hired.
8  Q. When did you give that
9  deposition?
10  A. 2005.
11  Q. What's the name of the case?
12  A. Looney.
13  Q. L-O-O-N-E-Y?
14  A. Uh-huh.
15  Q. Versus --
16  A. Debra --
17  Q. -- Hyundai?
18  A. -- at HMMA.
19     Uh-huh.
20  Q. Debra Looney?
21  A. Uh-huh.
22  Q. Is that a yes?
23  A. Correct. Yes.

Page 23

1  Q. And what was the nature of
2  your testimony in Debra Looney versus
3  Hyundai?
4  A. Unemployment, recruitment,
5  discussion of the position.
6  Q. Did you testify to policies
7  and procedures of Hyundai?
8  A. Yes.
9  Q. Were you identified as the
10  corporate representative in that
11  deposition?
12  A. No.
13  Q. You were a fact witness?
14  A. Yes.
15  Q. Had you made the decision not
16  to hire this individual?
17  A. Did I make the decision not to
18  hire this individual?
19  Q. Or part of that decision not
20  to hire?
21  A. Yes.
22  Q. Do you know who the attorneys
23  were in that case?

Page 24

1  A. No.
2  Q. Okay. The next case you've
3  testified for Hyundai?
4  A. Yes. The Dees case.
5  Q. D-E-A --
6  A. D-E-E-S.
7  Q. When did you testify in that
8  case?
9  A. Maybe six months ago.
10  Q. Did you testify to policies
11  and procedures of Hyundai in that case?
12  A. Yes.
13  Q. Did you testify about
14  benefits?
15  A. No.
16  Q. What was the nature of your
17  testimony in Dees?
18  A. Unlawful termination.
19  Q. Were you a decision-maker?
20  A. Yes.
21  Q. What department did Dees work
22  in?
23  A. Stamping.

6 (Pages 21 to 24)

**American Court Reporting**
**July 30, 2008**

Page 25

1    Q.   What were the allegations?
2    A.   That the individual was
3 terminated not for just cause. He was
4 sleeping on the job.
5    Q.   Were you the sole
6 decision-maker in terminating Dees?
7    A.   No.
8    Q.   Who did you partner with?
9    A.   There is --
10    MR. BOSTICK: I'm going to
11 instruct -- you can ask if she's given
12 prior testimony. But that's --
13    MRS. HAYNES: She was a
14 decision-maker in the case.
15    MR. BOSTICK: Well, we're just
16 -- all we are getting is background
17 information here.
18    MRS. HAYNES: Are you
19 instructing her not to answer?
20    MR. BOSTICK: Yeah, because
21 it's not pertinent to background.
22    Q.   (BY MRS. HAYNES) Is stamping
23 department part of the welding

Page 26

1 department?
2    A.   No. Separate.
3    Q.   Is it part of the -- what
4 department is it in?
5    A.   It's one of the departments in
6 production.
7    Q.   Would you call that the
8 production department or production area?
9 How do y'all refer to it?
10    A.   Department or -- it's really a
11 division. Production is a division, and
12 then each area or shop is a department.
13 So stamping is a department; weld is a
14 department.
15    Q.   Who were the attorneys
16 involved in Dees versus Hyundai, if you
17 know?
18    A.   Vince Kilborn is the only
19 individual that I know.
20    Q.   Vince Kilborn?
21    A.   Uh-huh.
22    Q.   Is that a yes?
23    A.   Yes.

Page 27

1    Q.   What firm is Mr. Kilborn with?
2    A.   I'm sorry. I don't know.
3    MRS. HAYNES: Brian, is he
4 with y'all's firm?
5    MR. BOSTICK: No.
6    Q.   The next case you were
7 involved in providing testimony on behalf
8 of Hyundai?
9    A.   I testified two times with
10 Kilborn, so that's why I was including a
11 total of five. I was deposed more than
12 one time.
13    Q.   In the Dees case?
14    A.   Yes, ma'am.
15    Q.   What was the second time you
16 were deposed in that case?
17    A.   Seemed to be similar
18 information. I'm not certain what the
19 differentiation was, but I was requested
20 and deposed two times.
21    Q.   Did you appear as the
22 corporate representative of Hyundai?
23    A.   I think so, yes.

Page 28

1    Q.   And both of those times was by
2 deposition?
3    A.   Yes, ma'am.
4    Q.   Not by trial?
5    A.   Huh-uh -- no.
6    Q.   All right. The fourth time
7 you've been deposed?
8    A.   ADA case.
9    Q.   The name of the case?
10    A.   I'm sorry. I don't remember.
11    Q.   Do you know when you were
12 deposed?
13    A.   A year and a half ago.
14    Q.   2007?
15    A.   Sounds correct.
16    Q.   Can you remember who the
17 lawyers involved in that case were?
18    A.   I'm sorry. I don't.
19    Q.   What was the nature of your
20 testimony?
21    A.   Employment and selection.
22    Q.   Was it a termination or a
23 promotion?

**American Court Reporting**
**toll-free (877) 320-1050**

Page 29

1  A.  Applicant not hired.
2  Q.  Race or gender?
3  A.  ADA.
4  Q.  Do you remember the
5  disability?
6  A.  It was an individual that had
7  a situation with his hand that he was
8  involved in -- he was not able to utilize
9  his hand.
10  Q.  And the fifth case you've been
11  deposed in?
12  A.  That would be you.
13  Q.  Okay. Have you ever testified
14  in trial for Hyundai?
15  A.  Yes.
16  Q.  How many times?
17  A.  Once.
18  Q.  What was the name of the case?
19  A.  Debra Looney.
20  Q.  What was the nature of your
21  testimony for trial?
22  A.  It seemed to be the same as it
23  was for the deposition.

Page 30

1  Q.  Were you called as a witness
2  by the plaintiff or the defendant?
3  A.  I'm not certain.
4  Q.  Do you remember the lawyers
5  involved in that case?
6  A.  No, ma'am.
7  (Brief interruption)
8  Q.  Have you ever testified in any
9  other trials other than the Looney trial?
10  A.  No.
11  Q.  Not for Hyundai, but for any
12  employer?
13  A.  I have not testified except
14  for that case.
15  Q.  What policies and procedures
16  did you testify to in the Looney versus
17  Hyundai case?
18  A.  It was in regards to the
19  individual not being hired, so there
20  weren't any policies or procedures. It
21  was basically information in regards to
22  her skills and background and education
23  and then who was ultimately selected.

Page 31

1  Q.  In the Dees case, what
2  policies and procedures did you testify
3  to with Hyundai?
4  A.  Again, it was in regards to
5  the termination. So -- and the serious
6  misconduct policy.
7  Q.  Where is the serious
8  misconduct policy found?
9  A.  You're asking me? Are you
10  asking me?
11  Q.  (Nods)
12  A.  I'm sorry. I didn't know if
13  you were asking him or me.
14  It's in the handbook.
15  Q.  Employee handbook?
16  A.  Yes, ma'am.
17  Q.  Anywhere else?
18  A.  Not that I'm aware of.
19  Q.  Okay. Are there any policies
20  and procedures online?
21  A.  We have an MQ1 system
22  internally. It's not Internet, but
23  internally there is access.

Page 32

1  Q.  Is it easier for you to flip
2  through them separate like this?
3  A.  Yeah. That will be fine.
4  Q.  I'm going to show you what's
5  previously been marked as Plaintiff's
6  Exhibit 2, I believe, to Mr. Swindle's
7  deposition. And if you could tell me the
8  location of the serious misconduct policy
9  that was utilized in your testimony in
10  the Dees case.
11  A.  Number 34, page 34.
12  Q.  Okay. Which bullet item?
13  MR. BOSTICK: She's not going
14  to testify about substantive matters on
15  other litigation that's ongoing.
16  MRS. HAYNES: It's still
17  ongoing?
18  MR. BOSTICK: Yes.
19  MRS. HAYNES: I'm asking her
20  about the nature of her testimony as
21  corporate representative previously.
22  MR. BOSTICK: And she said she
23  testified about this policy.

8 (Pages 29 to 32)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 33

1      MRS. HAYNES: And I'm asking
2   which area.
3      MR. BOSTICK: Well, that's
4   getting into specific facts related to
5   the matter. I'm going to instruct her
6   not to answer.
7      MRS. HAYNES: I'm asking about
8   her testimony. I'm not asking about the
9   matter. And I've got a right to ask her
10   about her previous testimony as corporate
11   representative for Hyundai and her
12   interpretation of the policy.
13      MR. BOSTICK: What subject
14   matter is this dealing with here?
15      MRS. HAYNES: Policies and
16   procedures of Hyundai.
17      MR. BOSTICK: Tell me which
18   specific -- I mean, we are not going to
19   have this turn into just a free-for-all
20   deposition.
21      MRS. HAYNES: 8.
22      MR. BOSTICK: We've designated
23   her with regard to 8 as to the medical

Page 34

1   leave policy, the family medical leave
2   policy, the attendance policy, and the
3   resignation policy. She's prepared to
4   testify about those policies.
5      MRS. HAYNES: Tell me again.
6      MR. BOSTICK: The medical
7   leave policy --
8      MRS. HAYNES: FMLA?
9      MR. BOSTICK: FMLA policy.
10      MRS. HAYNES: Okay?
11      MR. BOSTICK: Attendance
12   policy, and the resignation policy.
13      MRS. HAYNES: I don't even see
14   attendance on here.
15      MR. BOSTICK: Well, you don't
16   have to ask her about attendance if you
17   don't want to.
18      MRS. HAYNES: Okay.
19   Who's with regards to the other policy --
20   termination policy? Is she going to
21   testify to the termination policy?
22      MR. BOSTICK: Those are the
23   policies we identified in our objection.

Page 35

1      MRS. HAYNES: Is she
2   identified as termination?
3      MR. BOSTICK: That's not one
4   that we identified. Mrs. Edwards wasn't
5   terminated under a progressive
6   disciplinary policy.
7      MRS. HAYNES: I don't have
8   that. I have termination policy. She
9   was terminated.
10      MR. BOSTICK: And she was
11   terminated under pursuant to the
12   attendance policy and the resignation
13   policy, which we've identified, and she's
14   prepared to identify about those two
15   policies.
16      MRS. HAYNES: So you're saying
17   she can testify to the resignation policy
18   where a termination will fall under? Is
19   that what you're telling me?
20      MR. BOSTICK: I'm saying that
21   the termination took place with regard to
22   her violation of the attendance policy
23   and the resignation policy and that

Page 36

1   Ms. Warner is prepared to testify as a
2   corporate representative about those two
3   policies. Are you wanting to ask
4   questions about the serious misconduct
5   policy?
6      MRS. HAYNES: Well, I was.
7   But if you're not going to let her, I
8   guess I'll send you another notice.
9      MR. BOSTICK: Well, I guess, I
10   mean, just --
11      MRS. HAYNES: That's fine.
12      MR. BOSTICK: -- for
13   efficiency --
14      MRS. HAYNES: No. That's
15   fine. I'll send you a notice.
16      MR. BOSTICK: I'm just saying
17   for efficiency purposes, I notified you
18   in March about the specific things she's
19   going to testify, and that's all she's
20   prepared to do.
21      MRS. HAYNES: Sure.
22      MR. BOSTICK: I don't -- I
23   mean, we can argue and fight about what

9 (Pages 33 to 36)

**American Court Reporting**
**July 30, 2008**

Page 37

1  -- but that's what she's prepared to
2  testify to today, and so I'm just telling
3  you that that's what I've identified and
4  that's what she's prepared. I don't
5  think it's fair to us to come at the last
6  minute and say I want you to testify
7  about these things that I haven't
8  communicated with you in six months to
9  our objections. That's all I'm stating.
10      MRS. HAYNES: I'll send you
11  another notice.
12      MR. BOSTICK: Okay.
13      Q.  (BY MRS. HAYNES) Is that the
14  only time you've testified about the
15  serious misconduct policy was in the Dees
16  case?
17      A.  Yes.
18      Q.  Have you ever trained on the
19  serious misconduct policy --
20      A.  Yes.
21      Q.  -- either personally or
22  trained other individuals?
23      A.  I have been trained on it,

Page 38

1  yes.
2      Q.  Have you trained other people?
3      A.  No.
4      Q.  Who trained you?
5      A.  Team relations management.
6      Q.  Any certain individual?
7      A.  A manager or assistant
8  managers.
9      Q.  Got a name?
10      A.  Audi Swagman (phonetic).
11      Q.  Anyone else?
12      A.  Rob Clevenger.
13      Q.  Anyone else?
14      A.  That's it.
15      Q.  When were you trained on
16  policies and procedures of Hyundai?
17      A.  2004.
18      Q.  How long was your training?
19      A.  Four hours.
20      Q.  Any other training since 2004
21  on policies and procedures of Hyundai?
22      A.  No.
23      MR. BOSTICK: I'm going to

Page 39

1  object to the form. Are you talking
2  about any and all policies?
3      MRS. HAYNES: Yes.
4      MR. BOSTICK: Or is there a
5  specific policy?
6      MRS. HAYNES: Any and all
7  policies.
8      A.  All policies, I have been
9  trained since that time; this particular
10  one, no.
11      Q.  What training have you
12  received since 2004 -- that would have
13  been when you were hired; is that
14  correct?
15      A.  I was hired in 2003.
16      Q.  Okay. You didn't receive
17  training in 2003?
18      A.  Start-up policies weren't
19  written yet.
20      Q.  After 2003 you received
21  training in 2004 on --
22      A.  Yes.
23      Q.  -- initial EEO policies?

Page 40

1      A.  The -- all the policies that
2  were in the team member handbook.
3      Q.  And after that what policies
4  were you trained on?
5      A.  Sexual harassment,
6  discrimination, EEO, diversity, FEMMA,
7  ADA --
8      Q.  I'm sorry?
9      A.  FEMMA, ADA.
10      Q.  FMLA?
11      A.  Uh-huh.
12      Q.  Anything else?
13      A.  That's all I recall.
14      Q.  Is that yearly training you
15  receive?
16      A.  We have training on a regular
17  basis from legal counsel, but I'm also a
18  member of professional organizations that
19  I have received outside training through.
20  Society Human Resource Management, I
21  just attended the national conference in
22  June.
23      Q.  Do you belong to one of the

10 (Pages 37 to 40)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 41

1  local organizations?
2      A.  Not local.  National.
3      Q.  Do you ever attend any -- like
4  the SHRM meetings?
5      A.  I have before, yes.
6      Q.  Do you attend any of their
7  seminars?
8      A.  The local here in Montgomery I
9  attended.  But I'm not a member.
10     Q.  Do you attend any continuing
11 education courses on a yearly basis?
12     A.  Yes.  Through SHRM.  I have
13 had classes through them.
14     Q.  Do you have any professional
15 designations?
16     A.  Not PHR or SPHR, but I'm a
17 certified trainer for interview
18 techniques.
19     Q.  When did you receive the SPHR
20 certification?
21     A.  I don't have the SPHR
22 certification.
23     Q.  Oh, I thought you did.

Page 42

1      A.  No.  I have certifications for
2  interviewing.
3      Q.  Okay.  What's the
4  certification for interviewing?
5      A.  It's Development Dimensions,
6  Incorporated.  It's our selection company
7  that trained us on behavioral-type
8  interview style.
9      Q.  When did you receive that
10 certification?
11     A.  2004.
12     Q.  Do you have any other
13 professional certifications or
14 designations?
15     A.  No.
16     Q.  Written any articles or
17 published any capacity?
18     A.  No.
19     Q.  Spoken at any seminars?
20     A.  I serve on several committees
21 throughout the Montgomery area on
22 education and work force development.
23     Q.  So you have spoken at

Page 43

1  seminars?
2      A.  I serve on advisory
3  committees.
4      Q.  Other than committee work, any
5  seminars or national organizations where
6  you've spoken?
7      A.  No.
8      Q.  Ever appeared as an expert
9  witness?
10     A.  No.
11     Q.  Provided any consulting work?
12     A.  No.  Only in the capacity that
13 I was a consultant.
14     Q.  You haven't co-wrote any
15 articles with anyone?
16     A.  No.
17     Q.  Do you have a degree?
18     A.  Yes.
19     Q.  From where?
20     A.  Eastern Kentucky University.
21     Q.  What year did you graduate?
22     A.  I have two degrees, an
23 undergraduate degree in psychology, a

Page 44

1  Bachelor of Science in 1977, and a
2  Master's of Arts Degree in counseling,
3  1981.
4      Q.  All from Eastern Kentucky?
5      A.  Yes.
6      Q.  Where is that located?
7      A.  Richmond, Kentucky.
8      Q.  Any other education after
9  Eastern Kentucky?
10     A.  Additional certifications
11 toward a counseling certificate and
12 secondary school certifications.
13     Q.  All from Eastern Kentucky?
14     A.  Uh-huh.
15     Q.  Is that a yes?
16     A.  Yes, yes.
17     Q.  Any case you've testified
18 either in trial or deposition about the
19 resignation policy of Hyundai?
20     A.  Not -- no.
21     Q.  What about the FMLA policy?
22     A.  No.
23     Q.  Attendance policy?

11  (Pages 41 to 44)

**American Court Reporting**
**July 30, 2008**

## American Court Reporting
## toll-free (877) 320-1050

Page 45

1  A.  No.
2  Q.  So this is your first case to
3  testify to those areas?
4  A.  Uh-huh -- yes.
5  Q.  Authored any affidavits on
6  those subjects on behalf of Hyundai?
7  MR. BOSTICK: Object to the
8  form.
9  A.  I'm not sure I understand.
10  I'm sorry.
11  Q.  Sworn testimony that's in
12  writing, affidavit testimony, written
13  declaration.
14  A.  I'm in consultation with
15  legal. They do ask for subject matter
16  expertise in particular situations. But
17  I'm not -- I'm sorry. I'm not clear
18  about what you're asking me.
19  MR. BOSTICK: She's asking you
20  for a sworn affidavit.
21  THE WITNESS: Sworn affidavit?
22  MR. BOSTICK: That would
23  probably be done in a summary judgment or

Page 46

1  something.
2  Q.  A declaration. Sometimes they
3  are affidavits, or sometimes they are
4  declarations. Where you've interpreted
5  policy on behalf of Hyundai Foods --
6  Hyundai Foods. I've got Tyson Foods on
7  my mind.
8  MR. BOSTICK: On these
9  specific policies.
10  A.  Have I -- I'm sorry. Could
11  you repeat the question?
12  Q.  Have you authored any
13  affidavit or declaration -- and when I
14  say authored, you've signed your name --
15  interpreting policy on behalf of Hyundai
16  in regards to attendance policy,
17  resignation policy, FMLA policy, or any
18  type of medical leave policy?
19  A.  I don't recall.
20  Q.  Where is the medical leave
21  policy located?
22  A.  In terms of?
23  Q.  Is it in Plaintiff's Exhibit 2

Page 47

1  that I've given you?
2  A.  (Witness reviews document)
3  I'm looking for the title
4  page, and I'm not seeing it. The family
5  medical leave policies is what you're
6  asking for?
7  Q.  Uh-huh. And that one has a
8  lot of redactions, and that may be -- let
9  me see if I can find a better policy for
10  you.
11  A.  I see it.
12  Q.  Let's just use this one. It
13  has the table of contents for you.
14  A.  Oh, thank you.
15  (WHEREUPON, Plaintiff's Number
16  33 was marked for identification.)
17  MR. BOSTICK: What exhibit
18  number is this?
19  MRS. HAYNES: 33.
20  A.  I have the medical leave
21  policy here. Is that what you're asking,
22  or are you wanting me to identify in the
23  handbook?

Page 48

1  Q.  I want you to tell me where it
2  is in the handbook.
3  A.  I see. Okay.
4  Q.  And if it's somewhere else --
5  well, let's do the handbook first, and
6  then we'll move on.
7  A.  Okay. I only see it listed
8  under summer shutdown under benefits.
9  Q.  And where under summer
10  shutdown is medical leave depicted?
11  A.  Medical leaves during shutdown
12  periods, page 17.
13  Q.  And what's your understanding
14  of that provision?
15  A.  All team members that are on
16  approved medical leave or personal leave
17  during the shutdown period will be paid
18  for any vacation reserved for the
19  shutdown period and will not be eligible
20  to reschedule vacation days reserved for
21  the shutdown period. So it's just
22  pertaining to information in regards to
23  summer shutdown, which we're shut down in

12  (Pages 45 to 48)

## American Court Reporting
## July 30, 2008

**American Court Reporting**
**toll-free (877) 320-1050**

Page 49

1   July.
2        Q.   The plant is shut down for
3   five days?
4        A.   Yes. And so you have to use
5   your vacation time to cover the shutdown.
6        Q.   For instance, in this year the
7   4th of July was on a Friday. How does
8   that work?
9        A.   One day is a holiday, and the
10  remaining days you have to use your
11  vacation days to cover for the shutdown.
12       Q.   So you take four vacation
13  days, and then you get your holiday pay?
14       A.   Yes.
15       Q.   Okay. Any other place in the
16  employee handbook is medical leave
17  defined?
18       A.   If it is, I don't see it. Not
19  in the contents. I can review each page,
20  but I do not see it in the content page.
21       Q.   Okay. Where did you find it
22  in Plaintiff's Exhibit 2?
23       A.   Is this Exhibit 2?

Page 50

1        Q.   Yes, ma'am. You told me you
2   had found it in some other pages that
3   were part of Exhibit 2.
4        A.   Uh-huh. This is the policy
5   that is in our internal system that is
6   accessed through what's called MQ1, but
7   all of our policies are in a database
8   within the company.
9        Q.   What is MQ1?
10       A.   Some type of system that we
11  store all of our policies. I'm not sure
12  what MQ stands for, but it is our
13  documentation database.
14       Q.   What policies are there that
15  hourly employees can access, if they can
16  at all?
17       A.   Any that have this header,
18  they can access --
19       Q.   The record is not going to --
20       A.   The document header that shows
21  the medical leave policy, and then there
22  is a number, HR -- Alabama HRTRSOOOO2.
23  Then those that have the appropriate

Page 51

1   header can be accessed and printed.
2        Q.   Okay. What page are you
3   referring to when you said the 02?
4        A.   The medical leave policy, the
5   front page.
6        Q.   And it says 02 --
7        A.   O -- yeah. 00022.
8        Q.   022?
9        A.   Yes, ma'am.
10       Q.   I've got you. Other
11  policies that can be accessed by hourly
12  team members will not always end in the
13  22?
14       A.   Right. It would just depend
15  on who created the document, and that's
16  the number when the document was created.
17  It's a tracking system.
18       Q.   This policy has a date of
19  January 18th, 2008. Was there a previous
20  policy?
21       A.   There would have been. A lot
22  of these policies, though, didn't have
23  the appropriate header on it. And so --

Page 52

1   in terms of the system, it required a new
2   header, so many of these are showing that
3   date. But it was cleaning this up so
4   that the header and the assignment of the
5   number was correct, so that's where a lot
6   of these have changed to January 18th.
7        Q.   What were the revisions from
8   2006 to 2008?
9        A.   Where would they be?
10       Q.   Do you know what they were?
11       A.   No, I don't.
12       Q.   Do you know if there were any?
13       A.   I don't.
14       Q.   Do you know if there were --
15  well, strike that.
16           Do you know if there was a
17  policy in 2007 on medical leave?
18       A.   Yes. There was.
19       Q.   Do you know the revisions from
20  2007 to 2008?
21       A.   I don't.
22       Q.   Was -- do you know
23  Mrs. Edwards was affected in any fashion

13 (Pages 49 to 52)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 53

1  by the revisions of the medical leave
2  policy?
3      A.  I don't know.
4      Q.  To answer that question, what
5  would you need?
6      A.  I would need to go back and
7  research what changes were made by team
8  relations and the other departments that
9  -- if they made any changes to the policy
10  or if it was just because of the header
11  situation.
12      Q.  Would she have been terminated
13  pursuant to the 2007 policy or the 2006
14  policy?
15      A.  My understanding is that she
16  was terminated for the attendance policy
17  in terms of not being able to contact
18  management or medical department.
19      Q.  Not contacting management or
20  medical --
21      A.  Supervisor, yes.
22      Q.  Did the medical leave policy
23  of 2006, 2007, or 2008 apply to

Page 54

1  Mrs. Edwards?
2      A.  I would have to research that
3  before I could answer it properly.
4      Q.  Why?
5      A.  Because as I said, I'm not
6  certain what the provisions were made in
7  2006 and 2007.
8      Q.  Where would the 2006 and 2007
9  medical leave policies be located?
10      A.  There should be a tracking
11  document within the MQ1, and team
12  relations would also have the older
13  policies.
14      Q.  Do you know if the 2006 or
15  2007 medical leave policies had a
16  non-work-related medical leave?
17      A.  I would have to research it
18  further on the changes that were made on
19  those two policies.
20      MRS. HAYNES:  Brian, do you
21  know -- and we can do this off the
22  record.
23      (Off-the-record discussion)

Page 55

1      MR. BOSTICK:  Let's take a
2  break and let's see if we can get
3  Chris on the phone and maybe we can
4  figure that out.
5          10:30 AM
6          (Short recess)
7          11:00 AM
8      MRS. HAYNES:  Back on,
9  Mr. Bostick?
10      MR. BOSTICK:  Yeah.
11      Q.  (BY MRS. HAYNES) Ms. Warner,
12  we've been off the record for about
13  thirty minutes.  And have you had a
14  chance to research the different policies
15  and how they have progressed?
16      A.  Yes.
17      Q.  And can you tell me that with
18  regards to attendance, FMLA, medical
19  leave, and resignation policies?
20      A.  As I stated earlier, there
21  have been no substantive changes to the
22  policies.  It was merely administrative,
23  in terms of the headers being changed

Page 56

1  through -- for our documentation system.
2      MRS. HAYNES:  Do you have the
3  2004 policies?
4      MR. BOSTICK:  Yeah.  Do you
5  want to make them an exhibit?
6      MRS. HAYNES:  Do you want to
7  do a composite?
8      MR. BOSTICK:  Yeah, that's
9  fine.
10      MRS. HAYNES:  I don't mind
11  doing them individually.  It's whatever
12  you prefer.
13      MR. BOSTICK:  I'm fine with
14  doing a composite if you want to save
15  some space.
16      MRS. HAYNES:  Just for
17  housekeeping, can you --
18      MR. BOSTICK:  Yeah.  One thing
19  -- those are -- they've got some markings
20  on it that just -- that we had to redact
21  out that were some of Chris's handwritten
22  notes on there.  But if you'll --
23      MRS. HAYNES:  Do you want to

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 57

1  substitute later?
2       MR. BOSTICK: If you --
3       MRS. HAYNES: I mean, is there
4  redactions to the --
5       MR. BOSTICK: No, nothing to
6  the substance of the policy, just where
7  he had some handwritten notes that you
8  can see.
9       MRS. HAYNES: Can you get me a
10 clean copy?
11      MR. BOSTICK: I don't know if
12 we have a clean copy. If we can find
13 one -- let me -- when we get back Monday,
14 I'll see if we can find a clean copy, and
15 I'll produce a Bates-numbered copy.
16      MRS. HAYNES: This almost
17 looks like a draft?
18      MR. BOSTICK: I think he just
19 had some notes on it.
20      MRS. HAYNES: I mean, I just
21 see some spelling errors.
22      MR. BOSTICK: Yeah. Let's go
23 off the record.

Page 58

1       (Off-the-record discussion)
2       (WHEREUPON, Plaintiff's
3  Exhibit Number 34 was marked for
4  identification.)
5       Q. I'm going to show you what's
6  been marked as Plaintiff's Exhibit 34.
7  Are these the 2004 policies?
8       A. Yes, ma'am.
9       Q. On the four areas that we've
10 previously identified; is that correct?
11      A. Medical leave, family medical
12 leave, attendance, and resignation
13 policy.
14      Q. Did you help draft any of
15 those policies?
16      A. Yes.
17      Q. Which policies?
18      A. All.
19      Q. Did you do that in 2003?
20      A. Yes.
21      Q. And were these 2004 policies
22 adopted?
23      A. Yes. From an approval

Page 59

1  standpoint, yes. But in terms of
2  formulating all of these policies, I did
3  serve on a committee and did provide
4  input.
5       Q. When were the first revisions
6  after 2004?
7       A. They were sporadic. As Brian
8  had mentioned, we were in the midst of
9  start-up, so it wasn't a methodical type
10 of meeting. It was as needed.
11      Q. How were the hourly employees
12 notified of these policies?
13      A. They were not --
14      Q. Plaintiff's 34?
15      A. Plaintiff's 34. How were they
16 notified?
17      Q. Uh-huh.
18      A. The --
19      Q. Let me strike that, and let me
20 ask you a better question.
21      A. Okay. Please.
22      Q. How were the policies embodied
23 in Plaintiff's Exhibit 34 disseminated to

Page 60

1  the hourly work force at Hyundai?
2       A. The hourly team members were
3  not hired until -- production until
4  January of '05. So '03 and '04 were
5  salary team members and maintenance team
6  members. But those were involved with
7  the team member handbook once that was
8  produced, and so that's how it was
9  communicated. We were not at the plant
10 site until '05.
11      Q. The medical leave policy,
12 though, is not embodied in the handbook;
13 is that correct?
14      A. Yes, that's correct.
15      Q. Is the attendance policy
16 that's in Plaintiff's 34 embodied in the
17 handbook, Plaintiff's Exhibit --
18      A. Yes.
19      Q. -- 33?
20      A. Page 7 through 10.
21      Q. And do the policies on
22 attendance that's located in Plaintiff's
23 Exhibit 34 follow verbatim in the

15 (Pages 57 to 60)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 61

1  handbook, which is Plaintiff's 33?
2      A.   They are highlighted.  It is
3  not the full policy.
4      Q.   Look for me on the attendance
5  policy 4.6.2.  And I'm looking on the
6  February 21st, 2006 policy.  We may have
7  to look and see if it's the same.
8      A.   Well, this is the '04 policy,
9  but I do have a 4.6.2.
10     Q.   Does it read a team member
11  that does not communicate to his, slash,
12  her group leader and, slash, or manager
13  regarding his, slash, her absence for a
14  period of three consecutive days or
15  longer is considered to have voluntarily
16  resigned his, slash, her employment at
17  HMMA?
18     A.   Yes.
19     Q.   Reads exactly like that?
20     A.   Yes.
21     Q.   Okay.  Can you tell me where
22  in the employee handbook that paragraph
23  is located?

Page 62

1      A.   Every team member is
2  expected to notify —
3      Q.   I'm sorry.  Just identify the
4  page and all of that.
5      A.   It's page 9.
6      Q.   Of Plaintiff's 33; is that
7  correct?
8      A.   Yes.
9      Q.   Okay.  And does it read
10  verbatim?
11     A.   Similar.  But no, not
12  verbatim.  4.6.2 says, a team member that
13  does not communicate to his/her group
14  leader and/or manager regarding his/her
15  absence for a period of three consecutive
16  days or longer is considered to have
17  voluntarily resigned his/her employment
18  at HMMA.
19          Every team member is expected
20  to notify his/her group leader and/or
21  manager in advance of any known absence
22  or future absences.  When an absence is
23  not known in advance, a team member must

Page 63

1  notify his/her group leader and/or
2  manager 30 minutes prior to start of the
3  shift.  Failure to notify within 30
4  minutes at the start of a shift may
5  result in corrective action up to and
6  including termination.
7      Q.   You've now read the same thing
8  twice?
9      A.   I read it twice?
10     Q.   Yes.  Didn't you?
11     A.   I read what was in the
12  attendance policy, and then I read what
13  was in the handbook.
14          MR. BOSTICK:  I think she's
15  asking you to compare this to this, the
16  same statement —
17          THE WITNESS:  Okay.
18     Q.   I'm just — are they the same?
19          MR. BOSTICK:  Look at — there
20  is — this —
21     Q.   That was my question.
22     A.   Okay.  Yes, it's the same.
23     Q.   And is that the provision that

Page 64

1  Hyundai terminated Mrs. Edwards'
2  employment?
3      A.   Yes.  Attendance as well as
4  the resignation policy.
5      Q.   Well, is this under the
6  attendance policy?
7          MR. BOSTICK:  Object to the
8  form.
9      Q.   Where would be the resignation
10  policy?
11     A.   In the handbook or here
12  (indicating)?
13     Q.   First, find it in the
14  handbook.
15     A.   I don't see it in the
16  handbook, the resignation policy.
17     Q.   Okay.  Is it in the policies
18  that were on the MQ1?
19     A.   Yes, ma'am.
20     Q.   And where is it?
21     A.   The number of the MQ1 number
22  is S00035 that members do have access to.
23     Q.   And I'm looking at a different

16 (Pages 61 to 64)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 65

1  resignation policy number. Look in
2  Plaintiff's Exhibit 2, not -- you're
3  looking at the 2004 policies?
4      A.  Yes, ma'am.
5      Q.  Okay. See if there is a
6  number.
7      A.  A newer one?
8      Q.  No. A number.
9      A.  A number.
10     Q.  Policy number.
11     A.  That was S100004.
12     Q.  Okay.
13         MR. BOSTICK: Is that the
14  attendance policy --
15         THE WITNESS: Resignation.
16  I'm sorry. S00035.
17     Q.  (BY MRS. HAYNES) All right.
18  Tell me what provision under resignation
19  policy S00035 that Hyundai terminated
20  Mrs. Edwards' employment.
21     A.  2.6, team members who fail to
22  report to work for three consecutive days
23  without properly communicating to their

Page 66

1  group leader or manager the reasons for
2  their absence will be viewed as
3  voluntarily resigning their employment as
4  of the third day.
5      Q.  What is -- what does Hyundai
6  consider properly communicating to their
7  group leader? How is that determined?
8      A.  They need to phone the group
9  leaders and either leave a message or
10  talk with them in person.
11     Q.  Does that apply to anyone who
12  is on medical leave?
13     A.  That applies to any situation.
14     Q.  My question is to medical
15  leave.
16     A.  Yes.
17     Q.  Whether you're on workers'
18  comp, FMLA, or personal medical, if
19  you're out --
20     A.  Yes.
21     Q.  -- you need to call in every
22  three days?
23     A.  Not every three days. But if

Page 67

1  you are not covered under an approved
2  leave, as well as contacting medical.
3      Q.  So you don't have to call in
4  every three days?
5      A.  No. Just if you are not
6  covered for some reason that you have
7  three days to do that. You do have to
8  call in -- and we're speaking just of
9  medical leave now, but you do have to
10  call in if you are not covered under an
11  approved leave.
12     Q.  What's considered an approved
13  leave?
14     A.  An approved leave would be
15  something that is approved through the
16  medical department, that it's a
17  substantiated by a doctor medical excuse,
18  short-term disability, FMLA, or long-term
19  disability.
20     Q.  Okay. Anything else?
21     A.  Not off the top of my head,
22  no.
23     Q.  Okay. Is the procedure

Page 68

1  different for team members who are out
2  for workers' comp injury or those who are
3  on FMLA or those on personal?
4         MR. BOSTICK: Object to the
5  form.
6      A.  I don't handle workers' comp.
7  Workers' comp is handled through our
8  safety department.
9      Q.  Okay. You have no knowledge,
10  then --
11     A.  No.
12     Q.  -- how the policy is applied?
13     A.  Not on workers' comp, I don't.
14     Q.  How about FMLA, personal
15  medical? Is it handled differently, the
16  policy?
17     A.  In terms of reporting?
18     Q.  Notice and reporting.
19     A.  They do still need to report
20  if they are not covered under an approved
21  leave.
22     Q.  How about individuals on
23  short-term or long-term disability? How

17  (Pages 65 to 68)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 69

1   is that policy applied?
2       A.   If they are covered under that
3   leave, then it's communicated to the
4   supervisor. And once they are not
5   covered by that leave or they are
6   notified that their request has been
7   denied by the carrier, it is their
8   responsibility to contact HMMA through
9   the medical clinic as well as a
10  supervisor.
11      Q.   Okay. What information did
12  Hyundai have that Mrs. Edwards had failed
13  to call in?
14      A.   There was no notification when
15  investigated by team relations through
16  the medical department or through
17  supervisor. Three days no-call, no-show.
18      Q.   From what date?
19      MR. BOSTICK: Is there
20  something you need to review?
21      THE WITNESS: Yeah. I need to
22  review the --
23      MR. BOSTICK: Termination

Page 70

1   letter?
2       THE WITNESS: Uh-huh.
3       MRS. HAYNES: I have the
4   termination letter, Plaintiff's Exhibit
5   35.
6       A.   On June 8th we were informed
7   by Standard that the LTD claim was
8   denied.
9       Q.   June 8th, 2007?
10      A.   Yes, ma'am.
11          And the letter was sent July
12  11th. So several weeks to comply with
13  the three-day no-call, no-show.
14      Q.   Do you know why Hyundai waited
15  from June 8th to July 11th to terminate?
16      A.   I would suspect to ensure that
17  we had investigated it properly and
18  thoroughly. As well as, shutdown week
19  would have been included, that we were
20  shut down typically from the 4th of July
21  week.
22      Q.   Is it your testimony that
23  Hyundai received no notice from June 8th

Page 71

1   until July 11th from Mrs. Edwards?
2       A.   Yes.
3       Q.   And you said she had -- that
4   Hyundai had received no information from
5   Mrs. Edwards from the medical department
6   or team relations?
7       MR. BOSTICK: Object to the
8   form.
9       A.   That Mrs. Edwards had not
10  contacted the medical department or the
11  group leader or supervisor.
12      Q.   And that was my question. Did
13  she have a choice there to contact
14  medical, team relations, or her group
15  leader?
16      A.   It would have been acceptable
17  to have contacted the group leader or the
18  medical clinic, but the preference would
19  be to have contacted both.
20      Q.   But my question is: Is there
21  a choice there, that the employee can
22  contact --
23      A.   Yes.

Page 72

1       Q.   -- either three?
2       A.   Two.
3       MR. BOSTICK: Object.
4       A.   Two. The group leader or the
5   medical clinic.
6       Q.   Okay. Did you mention awhile
7   ago team relations?
8       A.   No.
9       Q.   That's not an option, to
10  contact team relations?
11      A.   No.
12      (WHEREUPON, Plaintiff's
13  Exhibit Number 35 was marked for
14  identification.)
15      Q.   Plaintiff's Exhibit 35 is
16  authored by you; is that correct?
17      A.   The resignation letter, yes.
18      Q.   Is that 35?
19      A.   Yes.
20      Q.   What information did you have
21  to author the letter?
22      A.   In consultation with team
23  relations and legal, the information was

18  (Pages 69 to 72)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 73

1 reviewed and it was agreed upon by that
2 group to draft this letter and send it to
3 Mrs. Edwards.
4     Q.    Did you contact anyone in
5 medical or Mrs. Edwards' group leader to
6 see if they had heard from her?
7     A.    That would not have been my
8 role. But team relations did investigate
9 that.
10     Q.    Who would that be?
11     A.    My understanding would be Rob
12 Clevenger.
13     Q.    What's the basis of your
14 information?
15     A.    He was in the meeting with me
16 to discuss the situation.
17     Q.    And you learned in the meeting
18 that Mr. Clevenger had contacted the
19 group leader and medical?
20     A.    Mr. Clevenger typically is the
21 contact point for that information, yes.
22     Q.    Did Mr. Clevenger say that he
23 had contacted medical and the group

Page 74

1 leader and no one had heard from
2 Mrs. Edwards?
3     A.    That's my understanding, yes.
4     Q.    Did you have any other
5 information in that meeting that was
6 contrary to that?
7     A.    No.
8     Q.    When was the last you had
9 heard from Mrs. Edwards?
10     A.    I only recall hearing from
11 Mrs. Edwards after the letter was sent.
12     Q.    You had no prior contact?
13     A.    Not that I recall, no.
14     Q.    Who was in the meeting, the
15 termination meeting?
16     A.    Legal and --
17         MR. BOSTICK: Object to the
18 form. You can answer.
19     A.    Legal and consultation, team
20 relations, and myself.
21     Q.    I need names.
22     A.    Audi Swagman (phonetic) and
23 Rob Clevenger.

Page 75

1     Q.    Ms. Swagman -- is it Ms. --
2     A.    Mister.
3     Q.    -- or Mister?
4         Mr. Swagman was legal?
5     A.    Mr. Swagman is the team
6 relations manager. Mr. Clevenger is the
7 assistant team relations manager. And
8 then legal counsel.
9     Q.    Who is that?
10     A.    That would have been Rick
11 Neal, general counsel.
12     Q.    Anyone else?
13     A.    Chris Smith, corporate
14 counsel.
15     Q.    Anyone else at the meeting?
16     A.    That's all I recall.
17     Q.    Were any documents reviewed
18 during that meeting about Mrs. Edwards?
19     A.    Documents? Can you be more
20 specific?
21     Q.    No, ma'am. I don't know how
22 to define documents any further.
23     A.    The information was shared

Page 76

1 with me, and the decision was to
2 terminate. But I don't recall which
3 documents were reviewed at that time.
4     Q.    What documents did you review?
5     A.    The documents that I reviewed
6 were the attendance policy and the
7 resignation policy.
8     Q.    Anything else?
9     A.    That's all I recall.
10     Q.    Do you recall seeing
11 Plaintiff's Exhibit 27?
12     A.    (No response)
13     Q.    Can you answer my question?
14     A.    I'm sorry. What were you
15 asking me?
16         MRS. HAYNES: Can you repeat
17 the question?
18         (The question was read back by
19 the court reporter.)
20     A.    No, I do not.
21     Q.    Never seen it?
22     A.    No, ma'am.
23     Q.    Plaintiff's 28, have you seen

19 (Pages 73 to 76)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 77

1 that document?
2      A.   Only in consultation and
3 preparation for this case.
4      Q.   When did you see it for the
5 first time?
6      A.   Yesterday.
7      Q.   Have you seen Plaintiff's
8 Exhibit 30?
9      A.   I have not seen these
10 documents before.
11      (WHEREUPON, Plaintiff's
12 Exhibit Number 36 was marked for
13 identification.)
14      Q.   Okay.  Have you seen
15 Plaintiff's 36?
16      A.   I have not seen this document
17 before.
18      Q.   Okay.
19      MR. BOSTICK:  For
20 clarification, I guess you're enquiring
21 about subject 11, knowledge of reasons
22 why Plaintiff was terminated?
23      MRS. HAYNES:  That's kind of

Page 78

1 what we've been on for the last hour.
2      MR. BOSTICK:  Well, just
3 making sure.
4      MRS. HAYNES:  Have I gone
5 outside that in any fashion?
6      MR. BOSTICK:  No.
7      Q.   (BY MRS. HAYNES)  Do you know
8 who Lauren Carter is?
9      A.   I do not.
10      Q.   Have you ever seen the format
11 that's in Plaintiff's 28?
12      A.   Yes.  It looks like
13 documentation from clinic visits from the
14 database that medical uses.
15      Q.   Does Human Resources have
16 access to that database?
17      A.   No.
18      Q.   Relative to these notes, do
19 you -- well, let me ask you this:  Who is
20 your point of contact for medical
21 department currently?
22      A.   That would be Paul Dunbar.
23      Q.   How long has he been in that

Page 79

1 position?
2      A.   One year.
3      Q.   Prior to him, who was in that
4 position?
5      A.   Penny Nichols.
6      Q.   Plaintiff's Exhibit 30 has
7 Ms. Nichols' name on those documents?
8      A.   Yes.
9      Q.   So she was the --
10      A.   That's correct.
11      Q.   Do you know what her title
12 was?
13      A.   She was the registered nurse
14 and the safety specialist for the medical
15 clinic.
16      Q.   On Plaintiff's 36, the second
17 bullet point item, can you tell me what
18 that means?
19      A.   Is there a job we can place
20 her in if she has restrictions due to a
21 nonwork-related injury in her position.
22 Your question is?  I'm sorry.  I
23 didn't...

Page 80

1      Q.   What policy does that apply
2 to?
3      A.   There is a policy for modified
4 duty, but it would be related to only
5 injuries that occur on the work site,
6 occupational injuries.
7      Q.   What policy does that fall
8 under for work site job duties?
9      A.   It's a modified work duty
10 policy.
11      Q.   So does it fall under the
12 medical policy?
13      A.   I believe it's separate.
14      Q.   Look for me on the medical
15 leave policy 00022.
16      A.   Okay.
17      Q.   Are you familiar -- are you
18 there?
19      A.   Yeah.  3.3?
20      Q.   No, ma'am.  6.
21      A.   6.1?
22      Q.   Well, it starts with 6,
23 returning from a nonwork-related medical

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 81

1  leave. Are you familiar with that
2  policy?
3      A.   Yes.
4      Q.   And it's under the medical
5  leave policy?
6      A.   Yes.
7      Q.   Look under 6.2.
8      A.   The HMMA work conditioning
9  ramp-up program?
10     Q.   Yes. It starts out the HMMA
11 medical clinic staff?
12     A.   Uh-huh.
13     Q.   Is it a three-line policy that
14 you're looking at?
15     A.   Yes.
16     Q.   What is the conditioning
17 ramp-up program?
18     A.   Initially when we were
19 starting up before we were producing
20 vehicles, we did have a work conditioning
21 ramp-up program. I'm not familiar if
22 that is still existing at this time. But
23 when we were starting up with our team

Page 82

1  members and we were not in full
2  production, we did have a work
3  conditioning ramp-up program.
4      Q.   Under Plaintiff's Exhibit 2 --
5  you're looking at the policy of 2004.
6  Correct?
7      A.   Yes.
8      Q.   All right. In the policies
9  that are Plaintiff's Exhibit 2 on the
10 medical leave policy, I have a revision
11 date of January 18th, 2008.
12     MR. BOSTICK:  2 is the
13 handbook, I think.
14     MRS. HAYNES:  It's part of the
15 handbook, but it's under Plaintiff's
16 Exhibit 2.
17     MR. BOSTICK:  Okay. I've got
18 you. Go ahead.
19     A.   Work conditioning program.
20 But, again, I believe the revision date
21 was as a result of just the header. No
22 other information has changed yet,
23 whether that would have been regarding

Page 83

1  the conditioning program or grammatical
2  or typing errors.
3      Q.   I didn't have a question. But
4  my question would be:  Do you know of an
5  HMMA work conditioning program currently?
6      A.   No, I don't.
7      Q.   Has Hyundai ever used an HMMA
8  work conditioning program to return
9  employees to work?
10     A.   Not that I'm aware of.
11     Q.   Who would know that?
12     A.   The safety department.
13     Q.   Who's over the safety
14 department?
15     A.   Dennis Mickelson.
16     Q.   Is today the first day you
17 knew anything about a work conditioning
18 program in the policies and procedures of
19 Hyundai?
20     A.   As I said in regards to
21 start-up, I was aware of it, but not that
22 it was a continuing program.
23     Q.   And how were you aware of it

Page 84

1  at start-up? How was it used?
2      A.   Because I hired everyone in
3  terms of the orientation and the
4  training. I was involved in the
5  organization of the new hires.
6      Q.   Is there anything in the
7  family medical leave policy of Hyundai
8  about returning employees who have been
9  off on FMLA leave referring them to a
10 conditioning program?
11     A.   No.
12     Q.   Did Mrs. Edwards qualify for
13 FMLA leave?
14     A.   She did not. She had not
15 worked the amount of time required to be
16 eligible for FMLA.
17     Q.   And how did you ascertain
18 that?
19     A.   She began employment in
20 January of '06 and requested to go out on
21 leave in June. She would have needed to
22 work one year or 1,250 hours.
23     Q.   Did you ever look to see how

21 (Pages 81 to 84)

**American Court Reporting**
**July 30, 2008**

Page 85

1 many hours she had worked?
2     MR. BOSTICK: Object to the
3 form.
4     A.   I was not responsible for
5 determining if she was eligible for
6 family medical leave or not.
7     Q.   Whose responsibility is that
8 at Hyundai --
9     A.   That would have been --
10    Q.   -- in 2006?
11    A.   Penny Nichols.
12    Q.   Employees, how do they access
13 this MQ1 for policies?
14    A.   It's a database similar to an
15 Intranet-type of situation that they
16 would need access, and their group leader
17 or team leader would be able to access it
18 for them as well and print it.
19    Q.   Okay. That's the only way
20 that an hourly could access into one?
21    A.   Yes.
22    Q.   Is to go to the desk of the --
23    A.   Or the team rep would be able

Page 86

1 to do that as well for them.
2     Q.   Team who?
3     A.   Team relations, team
4 representatives. They are out on the
5 floor with the team members. That's
6 where they are located.
7     Q.   How about an employee who is
8 off work? How do they access?
9     A.   They could request the
10 information, and it could be sent to
11 them.
12    Q.   And is it sent -- well, first,
13 has Hyundai ever done that?
14    A.   I have not done it myself. I
15 would not say that it hasn't been done,
16 but I couldn't substantiate that it had
17 been done.
18    Q.   How are employees notified
19 there are additional policies and
20 procedures of Hyundai on MQ1 other than
21 those listed in the handbook?
22    A.   There would be information
23 sent to the team members via

Page 87

1 communication with the group leaders, and
2 they have five-minute meetings that they
3 would discuss with the team members that
4 there were new procedures or policies.
5 And we also post them when there is new
6 ones on our posting boards.
7     Q.   Did you post any of the
8 revisions that revised the header?
9     A.   Team relations would have to
10 answer that for you.
11    Q.   Okay. Do you know if
12 Mrs. Edwards ever asked for policies and
13 procedures while she was out on leave?
14    A.   I do not.
15    Q.   How are employees provided a
16 handbook?
17    A.   When they begin we have a
18 two-week orientation. And during
19 orientation the handbook is distributed
20 to each team member, and they sign an
21 acknowledgment form that they have
22 received that.
23    MR. BOSTICK: Can we take a

Page 88

1 quick restroom break, Alicia?
2     MRS. HAYNES: Uh-huh.
3         11:40 AM
4     (Short recess)
5         11:53 AM
6     Q.   Okay. Prior to the
7 termination of Mrs. Edwards, did you ever
8 talk to, say, Stacye Jones about
9 Mrs. Edwards?
10    A.   Not that I recall.
11    Q.   After the termination of
12 Mrs. Edwards, did you talk to Stacye
13 Jones about Mrs. Edwards?
14    A.   Yes.
15    Q.   What was that conversation
16 about?
17    A.   Mrs. Edwards contacted me
18 after she had received the letter and had
19 left a voice mail on my phone, and she
20 mentioned that she had spoken with Stacye
21 Jones. Stacye Jones reported to me at
22 that time, and I asked her what
23 conversations had she had with Tammy.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 89

1    Q.   And what did she tell you?
2    A.   She told me that Tammy had
3    called her in regards to confirmation of
4    her pay and benefits as to what she would
5    be receiving and in terms of what her
6    rate of pay would be.  But -- those were
7    the two comments that she made to me, but
8    I wanted that information clarified
9    before I called Tammy back.
10   Q.   Ms. Jones related to you only
11   that Mrs. Edwards called about her pay
12   and benefits, not about returning to
13   work?
14   A.   Yes, ma'am.
15   Q.   Okay.  Ms. Jones never
16   conveyed to you that Mrs. Edwards was
17   trying to get back to work?
18   A.   No, ma'am.
19   Q.   You have no knowledge as you
20   sit here today of Mrs. Edwards' effort to
21   get back to work?
22   A.   Not through Stayce Jones, no.
23   Q.   That's not my question.

Page 90

1    A.   I'm sorry.  Go ahead and
2    repeat it.
3    Q.   Sure.
4         MRS. HAYNES:  Can you repeat
5    the question for the record?
6         (The question was read back by
7    the court reporter.)
8    A.   I do not.
9    Q.   From any source?
10   A.   No, ma'am.
11   Q.   Do you know the name Tim
12   Palmer?
13   A.   I don't.
14        MRS. HAYNES:  Can she testify
15   about harassment policies?
16        MR. BOSTICK:  Yes.  Number 12,
17   harassment policy and --
18   Q.   Do you have a 2004 harassment
19   policy?
20   A.   Yes.
21   Q.   Is that embodied in
22   Plaintiff's Exhibit 34?
23   A.   Yes.

Page 91

1    Q.   And we want to make sure we --
2    I think we can do that just by the Bates
3    stamp at the top of the page.  Just make
4    sure we keep all the policies together
5    like they are.
6    A.   All right.
7    Q.   Let me show you -- can I see
8    that policy from 2004?
9    A.   Uh-huh.
10   Q.   At the bottom of the page of
11   the harassment policy dated November 4th,
12   2004, there is a notice which states
13   paper copies of this procedure should not
14   be used for decision-making purposes.
15   Only use the electronic at our HR, slash,
16   policies and forms, slash, policy and
17   procedure.  What does that stand for?
18   A.   At the time -- this was before
19   the MQI program, so we all had different
20   drives that the policies and procedures
21   were at.  So my take would be that was in
22   reference to ensuring that the most
23   recent policy was being utilized before

Page 92

1    we started with the new documentation
2    program.
3    Q.   How many harassment policies
4    have you seen at Hyundai?
5    A.   That would be the one, just
6    that one.
7    Q.   Just the 2004?
8    A.   I mean, I've seen with the
9    header changes, but no substantive
10   changes had been made.
11        (WHEREUPON, Plaintiff's
12   Exhibit Number 37 was marked for
13   identification.)
14   Q.   Have you ever seen 37?
15   A.   Harassment policy posting
16   training document.  This would be when
17   training is conducted, and this
18   information would have been given to
19   individuals that participated in the
20   training.
21   Q.   How is it different than the
22   policy?
23   A.   This would be a form, where

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 93

1 this would be the policy.
2    Q.   I'm sorry.  You'll have to
3 identify them for the record, please.
4    A.   Oh, I'm sorry.  37 would be a
5 form confirming attending training where
6 the policy is the official form.
7    Q.   Okay.  Look for me on
8 Plaintiff's Exhibit 2.
9        MR. BOSTICK:  The handbook?
10       MRS. HAYNES:  Yeah, the
11 handbook -- well, no, not the handbook.
12 Actually, the harassment policy which
13 follows the handbook.
14    Q.   Policy 14 dated January 18th,
15 2008.
16    A.   Okay.  And it's the harassment
17 policy that I'm looking for?
18    Q.   Yes, ma'am.
19       MR. BOSTICK:  That's what was
20 just sent over today.
21       MRS. HAYNES:  No.  I've had
22 this one.
23       MR. BOSTICK:  No.  She's

Page 94

1 looking for one.
2        MRS. HAYNES:  Oh.
3        MR. BOSTICK:  What's the Bates
4 number on it, Alicia?
5        MRS. HAYNES:  275.
6    Q.   Do you see Bates Number 275?
7    A.   This is harassment policy
8 January 18, 2008.
9    Q.   That's it.  275.  And just so
10 we're not going to get all these pages
11 mixed up, go ahead and paper clip what
12 came in today.
13    A.   All right.
14    Q.   Thank you.
15    A.   All right.  We are there.
16    Q.   Do you recognize Policy Number
17 14, which is Bates Number 275, 276, and
18 277 -- actually, 278?
19    A.   Yes.
20    Q.   How does this policy differ
21 from the 2004 policy?
22    A.   My understanding is this
23 policy only had the headers changed on

Page 95

1 it.  Everything else is the same.
2    Q.   Is the policy number the same
3 on the 2004 policy?
4    A.   Yes, ma'am, it is.
5    Q.   And is it a four-page
6 document?
7    A.   Four pages, yes.
8    Q.   And where is the harassment
9 policy listed in the employee handbook?
10    A.   Page 2 it is referenced.
11    Q.   And it's page 2 --
12    A.   Yes.
13    Q.   -- of Plaintiff's 33?
14    A.   Yes.
15    Q.   Is that Bates Number 0005 at
16 the bottom of the page?
17    A.   Yes.
18    Q.   The policy that's listed in
19 the employee handbook is entitled
20 unlawful harassment, and it's one
21 paragraph?
22    A.   Yes.  Normally, the handbook
23 is utilized as high-level, but, again,

Page 96

1 referenced that the policy can be
2 reviewed in totality on MQ1,
3    Q.   Is the reporting in the
4 employee handbook of harassment the same
5 as the Policy TRS 00014?
6    A.   It states in the handbook
7 cases of such unlawful harassment should
8 be reported to your group leader,
9 manager, team relations rep, or the team
10 relations manager.
11       In the policy it states, team
12 relation manager or any member of
13 management of HMMA with whom you feel
14 comfortable.
15    Q.   Do you know why there is a
16 difference?
17    A.   I do not.  It says group
18 leader, slash, manager, team relations
19 rep, or the team relations manager.  In
20 '04 there probably were not any team reps
21 hired yet, so the handbook would have
22 been a later revision.  But, again, with
23 start-up, there was a team relations

24  (Pages 93 to 96)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 97

1 manager hired very early on, so that
2 would be my take on why it was written
3 that way.
4    Q.   Looking at the harassment
5 policy, does it mention retaliation being
6 illegal?  The policy, not the handbook.
7    A.   The policy.  I'm sorry.  HMMA
8 will not retaliate against any team
9 member who makes a good faith report of
10 alleged harassment even if the team
11 member was in error.  Under number 2,
12 page 2.
13    Q.   Of Document Number 276; is
14 that where you are -- I'm sorry.  You
15 were looking at --
16    A.   Which would be the same,
17 just --
18    Q.   Okay.  Policy Number TRS00014?
19    A.   Yes, ma'am.
20    Q.   Can you tell me if there is
21 anything about retaliation in the
22 handbook?
23    A.   There is not.

Page 98

1    Q.   Do you know why not?
2    A.   Again, this is just high
3 level.  There is only --
4    Q.   The handbook is high level?
5    A.   There is only so much
6 information.  We can't put the whole
7 policy in there.  So if you notice on
8 most of these, the whole policy is not in
9 the handbook.
10    Q.   When you say high level for
11 the handbook, what are you referring to?
12    A.   It's information that's
13 included, but, again, we reference the
14 policy that the team member should review
15 as well.
16    Q.   Can you tell me where in the
17 handbook it tells the team members there
18 are policies that they can review?
19    A.   That would have been done in
20 training.
21    Q.   Other than training.  My
22 question is, in the handbook does it
23 inform a team member to go to another

Page 99

1 policy for more information?
2        THE WITNESS:  Did you print
3 the acknowledgment form?  I'm not seeing
4 the acknowledgment form.
5    A.   Under the purpose of a
6 handbook, when is this determined that a
7 policy or procedure --
8    Q.   Just refer me to a page,
9 please.
10    A.   Sure.  Page 3, 0005.
11    Q.   Yes, ma'am?
12    A.   Do you want me to read it?
13    Q.   No.  Just direct me to where
14 it is.
15    A.   It's under the purpose of the
16 handbook, second paragraph.
17    Q.   Yes, ma'am?  Where does it say
18 to go to another --
19    A.   When it is determined that a
20 policy or procedure needs to be changed,
21 all team members will be notified by
22 their manager and/or video or other
23 printed materials to communicate such

Page 100

1 changes.  If team members have any
2 questions concerning these policies and
3 procedures, they should ask their group
4 leader and manager.  If a team member is
5 still unclear about the policies and
6 procedures, they should contact their
7 team rep for clarification, and then they
8 would print the documents for them.
9    Q.   But it doesn't say anywhere in
10 the handbook, which I think was my
11 question, that there are other policies?
12    A.   I see what you're saying.
13    Q.   Is that correct, it doesn't
14 say?  That's my question.
15    A.   It does not say that.
16    Q.   Thank you.
17    A.   Yes.
18    Q.   When the decision was made to
19 terminate Mrs. Edwards in July 2007, were
20 you aware that she had filed a charge of
21 discrimination?
22    A.   I was not.
23    Q.   Have you seen the charge of

25  (Pages 97 to 100)

**American Court Reporting**
**July 30, 2008**

Page 101

1 discrimination Mrs. Edwards filed on
2 September 20th, 2006?
3        MRS. HAYNES:  And let me mark
4 that as 38.  I think they may have
5 already been marked, but this will save
6 us time.
7        (WHEREUPON, Plaintiff's
8 Exhibit Number 38 was marked for
9 identification.)
10       A.    I have not seen this before,
11 nor have I seen this before.
12       Q.    As part of your duties as HR
13 manager of employment and benefits, do
14 you receive charges of discrimination?
15       A.    I do not.
16       Q.    Whose job is that?
17       A.    Team relations.
18       Q.    Do you have any job
19 responsibilities, as far as investigating
20 charges?
21       A.    No.
22       Q.    That's team relations?
23       A.    Yes.

Page 102

1        Q.    Do you have any knowledge of
2 any investigation that was conducted in
3 to the charge of discrimination filed by
4 Mrs. Edwards?
5        A.    No.
6        Q.    Are you familiar with the
7 findings made by team relations?
8        MR. BOSTICK:  Are you
9 referring to -- that's what Stayce Jones
10 was designated for.  She's already
11 testified that.
12       MRS. HAYNES:  I'm just asking
13 a question.
14       A.    I'm not, no.
15       Q.    Okay.  Never seen it in a
16 report?
17       A.    No.
18       Q.    Do you know of any charges of
19 discrimination that have been filed in
20 the last five years, other than the ones
21 you've testified in?
22       MR. BOSTICK:  She has not been
23 prepared for that.  She can testify to

Page 103

1 her personal knowledge, but she's not
2 been prepared based on our objections.
3        MRS. HAYNES:  On privacy
4 concerns?
5        MR. BOSTICK:  On relevancy
6 concerns.
7        MRS. HAYNES:  Okay.
8        Q.    Do you have any personal
9 knowledge --
10       MR. BOSTICK:  As we stated in
11 here several objections -- you're talking
12 about number 10, I guess?
13       MRS. HAYNES:  Yes.  The
14 only objection I see is -- oh, I see.
15 You say it's overbroad, unduly
16 burdensome --
17       MR. BOSTICK:  Relevant.
18       MRS. HAYNES:  -- infringed on
19 the privacy.  Relevancy I don't see.
20       MR. BOSTICK:  The first
21 sentence.
22       MRS. HAYNES:  Oh, okay.
23       Q.    Do you have any firsthand

Page 104

1 knowledge of any charges of
2 discrimination in the last five years at
3 Hyundai?
4        A.    As it relates to
5 recommendation for termination.
6        MR. BOSTICK:  She said any
7 knowledge of charges of discrimination.
8        THE WITNESS:  Oh, charges.
9 No.
10       A.    Charges, no.  But if it is
11 recommended to terminate, I would have
12 been involved in the termination
13 committee meeting, but not any charges or
14 investigations.
15       Q.    Have you been involved in any
16 termination decisions where an individual
17 has already filed an EEOC charge?
18       A.    Not that I'm aware of, no.
19       Q.    Okay.  Prior to terminating
20 Mrs. Edwards, did you review her
21 personnel file?
22       A.    No.
23       Q.    Do you usually review

**American Court Reporting**
**toll-free (877) 320-1050**

Page 105

1  personnel files prior to termination
2  decisions?
3      A.   It would have been included,
4  normally, in the meeting if the person is
5  still on site.  If the person is not on
6  site, there typically are some different
7  nuances to the decision-making.
8      Q.   What's the termination
9  procedure?
10     A.   Termination procedure --
11         MR. BOSTICK:  Object to the
12  form.
13         MRS. HAYNES:  What's wrong
14  with that question?  That's about as
15  plain as you can get.
16         MR. BOSTICK:  Termination
17  procedure under what policy?
18         MRS. HAYNES:  Termination
19  procedure under Hyundai.
20         MR. BOSTICK:  Under the
21  resignation policy?
22         MRS. HAYNES:  Any policy.
23     Q.   How do you terminate an

Page 106

1  employee at Hyundai?
2          MR. BOSTICK:  I object.  Can
3  you testify to that, as to the
4  resignation in attendance policy?  That's
5  what we've designated you for.
6          THE WITNESS:  Yeah.
7          MR. BOSTICK:  Okay.
8          MRS. HAYNES:  I mean, if you
9  want to put somebody else up that's got
10  more knowledge about the termination
11  policy.  I mean, I've got it written
12  down.
13         MR. BOSTICK:  I don't think
14  we've produced a termination policy.
15         MRS. HAYNES:  No.  But that's
16  my query.
17         MR. BOSTICK:  We're going by
18  -- procedure for termination under one of
19  the policies we've identified, she can
20  testify to that.  If you want to limit it
21  to the policies we're dealing with, you
22  can answer the question about termination
23  under those policies.

Page 107

1      Q.   (BY MRS. HAYNES) Let's look
2  at the medical and the attendance
3  policies.
4      A.   Okay.
5          MRS. HAYNES:  Is that okay,
6  Brian?
7          MR. BOSTICK:  If you break it
8  up into not a compound question.
9      Q.   Okay.  Under the medical leave
10  policy, is there a termination provision?
11         MR. BOSTICK:  Look at the
12  policy she's talking about.
13         MRS. HAYNES:  You know, we
14  only had four policies that you're
15  letting her testify to.  It just seems to
16  me she'd already be schooled so we are
17  not having to refer back.
18     A.   Could you please repeat the
19  question?
20     Q.   Is there a termination
21  provision under the medical leave policy
22  for termination?
23     A.   6.3, in the event there are

Page 108

1  inconsistencies with information
2  provided, HMMA will conduct an
3  appropriate investigation to determine
4  benefit eligibility and if corrective
5  action is necessary.  Intentional
6  misrepresentation of a medical condition
7  or the ability to work is a serious
8  misconduct offense and can result in
9  termination.
10     Q.   Okay.  Did you do any of that
11  prior to terminating Mrs. Edwards?
12     A.   Team relations did.  And that
13  information was shared in consultation
14  with legal, and that information was
15  provided to me.
16     Q.   Okay.  What information?
17     A.   The investigation information
18  in terms of them being eligible, the
19  period of time that the LTD claim was
20  notified, and that Mrs. Edwards had not
21  contacted the group leader or medical
22  within the three days; no-call, no-show.
23     Q.   That's a report?

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 109

1    A.    That's an investigation.
2    Q.    I understand an investigation.
3    Was it reduced to a report?
4    A.    No.
5    Q.    Or was it verbal to you?
6    A.    It was verbal to me. But I do
7    believe there was investigation records
8    to that effect.
9    Q.    Relative to the Medical Leave
10    Policy 6.3?
11    A.    Yes.
12    Q.    And when you say you believe
13    there was an investigation, did you see
14    it?
15    A.    It was communicated to me. I
16    did not see the information in writing.
17    It was communicated.
18    Q.    Who communicated it?
19    A.    Team relations.
20    Q.    Name?
21    A.    Rob Clevenger.
22    Q.    What was communicated to you,
23    what information?

Page 110

1    A.    That the individual had not
2    contacted medical or contacted their
3    supervisor after their LTD was not
4    approved.
5    Q.    Was there anything about
6    misrepresenting or inconsistencies in any
7    information?
8    A.    In regards to the individual
9    not following contacting and following
10    the procedure, yes, that is an
11    inconsistency.
12    Q.    Was that embodied in the
13    report?
14    A.    Yes. Verbally to me.
15    Q.    All right. Under the
16    attendance policy -- is there a
17    termination policy provision under the
18    attendance policy, 4.7.2?
19    MR. BOSTICK: Are you talking
20    about in addition to the resignation
21    4.6.3 we've already talked about?
22    MRS. HAYNES: No. 6 would be
23    under another policy. Would it not? I'm

Page 111

1    under attendance.
2    A.    It's under procedures under
3    2.6 for the decision that was made. But
4    in regards to your specific question,
5    4.7.4, when corrective action is required
6    beyond the above four steps, the team
7    member, group leader, and/or manager will
8    contact the manager for team relations,
9    request a review of the team members
10    record for termination. No termination
11    will take place unless the action is
12    reviewed and approved by the team
13    relations manager, section manager, and
14    director of Human Resources.
15    Q.    What did you just read,
16    4.7.4?
17    A.    Yes, ma'am.
18    Q.    All right. And then prior to
19    that you referred me to 2.6?
20    A.    Yes.
21    Q.    Okay. Where is 2.6, under --
22    A.    Oh, I'm sorry. It's under
23    resignation policy. I apologize.

Page 112

1    Q.    Okay. We're just under
2    attendance right now.
3    A.    Yeah. I'm sorry.
4    Q.    I mean, that is what you told
5    me she was --
6    A.    Yes, ma'am.
7    Q.    -- terminated under, right,
8    attendance and resignation?
9    A.    Resignation, yes, ma'am.
10    Q.    Under 4.7.2 of the attendance
11    policy, were any of those steps
12    implemented prior to proceeding to 4.7.4?
13    A.    This pertains to a different
14    scenario of someone that is in regards to
15    corrective action when they are still on
16    site and their percentage falls below the
17    accepted Standard. So it's a different
18    condition versus the situation of someone
19    who is not on site.
20    Q.    Where does it say that?
21    A.    I'm just telling you the
22    interpretation of the policy. It doesn't
23    say that there, but that is the correct

28  (Pages 109 to 112)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 113

1  utilization of this policy.
2      Q.  Did you ever go and look as it
3  indicates about a team members attendance
4  record, that that would be reviewed?
5      A.  Not in Mrs. Edwards' case,
6  because it wasn't relevant, but certainly
7  in cases that we have terminated team
8  members for falling below that
9  percentage.
10     Q.  Can you tell me why 4.7.2 and
11  4.7.4 did not apply to Mrs. Edwards'
12  situation?
13     A.  She was not on site.  She was
14  not working on site.  This is pertaining
15  to someone that has sporadic attendance
16  issues while they're coming to work.  But
17  she was not working on site at the time.
18     Q.  Can you tell me anywhere in
19  the policy on attendance it says this
20  only applies to on-site employees and not
21  all team members?
22         MR. BOSTICK:  Object to the
23  form.  And that is specially for these

Page 114

1  two provisions?
2         MRS. HAYNES:  Yes.
3      A.  I do not see it in the policy.
4      Q.  Okay.  Look for me under the
5  resignation policy.  Can you tell me if
6  there is a termination provision under
7  that policy?
8      A.  Resignation is voluntary, so
9  there wouldn't have been a termination
10  clause in there.
11     Q.  Is there -- so the answer to
12  my question is no?
13     A.  That would be correct.
14     Q.  Okay.  Under the resignation
15  policy, is it also the policy of Hyundai
16  that exit interviews will be completed?
17     A.  When they are on site, yes.
18     Q.  So resigning employees who are
19  not on site are not asked to do an exit
20  interview?
21     A.  No.
22     Q.  Have you ever asked an
23  employee who has already been -- well,

Page 115

1  has already resigned and left to do an
2  exit interview?
3      A.  Not that I'm aware, no.
4      Q.  Do -- well, strike that.
5         Does Hyundai ever conduct exit
6  interviews?
7      A.  Yes.  On team members that are
8  on site, we do conduct exit interviews.
9      Q.  What does the resignation
10  policy say about eligibility for rehire?
11     A.  2.9, team member who resign in
12  good standing under this policy and whose
13  documented performance is above-average
14  under the organizations, performance
15  management system will be eligible for
16  reemployment for a period of up to six
17  months from last date of employment with
18  benefits tied to seniority reinstated in
19  full.
20     Q.  Was Mrs. Edwards eligible for
21  rehire?
22     A.  Mrs. Edwards would have been
23  able to reapply for opportunities that

Page 116

1  she is qualified for.
2      Q.  Can you answer the question I
3  asked?
4         MR. BOSTICK:  She did answer
5  the question.
6      Q.  She is eligible for rehire?
7      A.  She is eligible to apply for
8  open positions that she is qualified for.
9      Q.  All right.  In your
10  conversation with her, did she ask?
11     A.  I don't recall if she asked me
12  or not.
13     Q.  In that conversation did you
14  tell her she was eligible for rehire and
15  could apply?
16     A.  I don't recall.
17     Q.  All right.  Let's see if we
18  can make short some of these things.
19         All right.  You've been
20  identified as having knowledge of her pay
21  and benefits and the value, pretty much
22  know her pay.  Do you know the value of
23  her benefits or incentives of Hyundai in

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 117

1  2006 and 2007?
2      A.   I can specifically tell you
3  how much the company paid versus what the
4  team member pays, but I don't know the
5  total value.
6      Q.   Hyundai never advertised to
7  the team members the value or the
8  percentage of their benefits?
9      A.   No, ma'am.
10     Q.   Okay.  What benefits would
11 Mrs. Edwards have had in 2006?
12     A.   She would have had medical,
13 dental, vision, and pharmacy coverage
14 through Blue Cross/Blue Shield.  The
15 company pays 95 percent of the premium,
16 and the team member pays 5 percent.
17     Q.   And what was the premium in
18 2006?
19     A.   I would have to investigate
20 that for you.  I don't recall.
21     Q.   Is that still the same?
22     A.   It's higher now.
23     Q.   The premium is higher --

Page 118

1      A.   Yes.
2      Q.   -- or the percentage is
3  higher?
4      A.   The premium is higher.  The
5  percentage is the same.
6      Q.   Do you know what it is now,
7  the premium per employee?
8      A.   It's $700 a month.  And the
9  team member pays 5 percent of that, which
10 is $16 every two weeks, and the company
11 pays the remainder.
12     Q.   Are employees eligible for a
13 family plan?  Can they purchase that?
14     A.   Yes.  It's the same amount.
15 Single is $8 dollars; family is the $16.
16     Q.   Did Mrs. Edwards have single
17 or family?
18     A.   I do not know.  I would have
19 to investigate that.
20     Q.   So single coverage, the
21 employee is paying $8 every two weeks?
22     A.   That's right.  And family
23 coverage is 16.

Page 119

1      Q.   But the premium is the same,
2  seven hundred?
3      A.   Seven hundred dollars, yes, a
4  month is what is the total premium.
5  Hyundai pays 95 percent of that seven
6  hundred dollars.
7      Q.   My question is:  Is family and
8  single still seven hundred dollars?
9      A.   Single is less than family.
10 It's about six twenty.
11     MRS. HAYNES:  Did you have
12 family or single?
13     MRS. EDWARDS:  I had family.
14     Q.   (BY MRS. HAYNES)  Seven
15 hundred, then, is the family premium?
16     A.   Yes, ma'am.
17     Q.   And is the dental, vision, and
18 pharmacy all included in that same
19 premium?
20     A.   That's correct.
21     Q.   Okay.  What else is part of
22 the benefits?
23     A.   Life insurance two times their

Page 120

1  salary -- and they have the option to
2  purchase more -- short-term and
3  long-term --
4      Q.   Just a minute.
5      A.   Oh, I'm sorry.  Go ahead.
6      Q.   What does the -- how does the
7  company pay for the life insurance?
8      A.   It's calculated by age.  And I
9  would have to get the totals for you.  I
10 don't know.  Each individual is different
11 depending on their age.
12     Q.   How hard is that to get Brian?
13     MR. BOSTICK:  I'm sorry.  What
14 were you asking for?
15     MRS. HAYNES:  She can't
16 testify to what the company paid for the
17 life insurance.
18     MR. BOSTICK:  At that time for
19 her?
20     A.   Do you have that one page that
21 has the --
22     Q.   I have a --
23     MR. BOSTICK:  Let's go off the

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 121

1  record for just a second.
2  (Off-the-record discussion)
3  12:30 PM
4  (Short recess)
5  12:43 PM
6  MRS. HAYNES:  Back on the
7  record.
8  Q.   (BY MRS. HAYNES) Do you know,
9  Ms. Warner, if there are records that
10 determine what portion the company pays
11 for life insurance for each employee?
12 A.   No.
13 Q.   Have no knowledge?
14 A.   No.
15 Q.   Mr. Bostick has shown me a
16 document --
17 MRS. HAYNES:  Brian, can we
18 mark that?
19 MR. BOSTICK:  I have no
20 problem with that.
21 Q.   Did you prepare that document?
22 MRS. HAYNES:  We'll mark that
23 as Plaintiff's 40.

Page 122

1  A.   I did not prepare the
2  document, but I am familiar with the
3  form.
4  (WHEREUPON, Plaintiff's
5  Exhibit Number 40 was marked for
6  identification.)
7  Q.   Plaintiff's Exhibit 40, can
8  you tell me what that document
9  represents?
10 A.   This represents the payment
11 that the team member makes when they are
12 out on leave, and this is the employee
13 contribution.
14 Q.   All right.  Did the company
15 pay any portion for the child insurance
16 or the child life insurance or the spouse
17 life insurance?
18 A.   Only two times the voluntary
19 life insurance.  The rest of it would
20 have been employee paid.
21 Q.   I understand the company pays
22 a portion of the life insurance of the
23 employee, and we don't know that amount

Page 123

1  today.  But my question is very specific:
2  Does the company pay any portion of the
3  child or spouse life insurance?
4  A.   No.
5  Q.   You were telling me after
6  life insurance there is long-term
7  disability and short-term disability.
8  A.   Yes.  A hundred percent that
9  the company pays.
10 Q.   Do you know the amount?
11 A.   I do not.
12 Q.   And do you know the amount the
13 company pays for short-term disability?
14 MR. BOSTICK:  Are you asking
15 if the employee is out, what percentage
16 of their salary they would receive, or
17 are you talking about --
18 MRS. HAYNES:  The insurance,
19 the value of the insurance.
20 A.   Well, it's done by heads.
21 It's done by the total number of the
22 population.  And that is how it's paid
23 for through the insurance company, so

Page 124

1  it's based on employee population, is how
2  we negotiate the contracts on life and
3  disability.
4  Q.   The company pays 100 percent
5  of long-term and short-term disability?
6  A.   Yes.
7  Q.   If an employee is on long-term
8  or short-term disability, does the
9  company pay any other benefits to the
10 employee?
11 A.   A short term employee
12 disability would be 60 percent of their
13 pay for six months.
14 Q.   I know that's what the
15 insurance is paid.  But is the company --
16 A.   No.
17 Q.   -- paying anything?
18 A.   Except the health insurance.
19 They are still paying the 95 percent.
20 But on the disability, no, nothing else.
21 Q.   Do they accrue vacation times
22 while they are on short-term or long-term
23 disability?

31 (Pages 121 to 124)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 125

1  A.  Yes.
2  Q.  Do they accrue holidays?
3  A.  I'd have to check. I don't
4  know that for certain. I do know
5  vacation is accrued.
6  Q.  Personal days?
7  A.  I don't think so. Just
8  vacation.
9  Q.  Do you know a policy that
10  provides any of this information?
11  A.  I do not.
12  Q.  Do you know anything about
13  incentives on the production line that
14  employees are eligible for?
15  A.  I don't.
16  Q.  Do you know about attendance
17  incentive?
18  A.  I don't.
19  Q.  Any other benefits?
20  A.  The 401(k). The company
21  contributes 60 percent of the first 3
22  percent.
23  Q.  Sixty percent?

Page 126

1  A.  Uh-huh. Of the first 3
2  percent.
3  Q.  Tell me how that is figured.
4  A.  When a team member decides to
5  contribute to their 401(k), the
6  calculation is matched by the employer of
7  60 percent of the first 3 percent of
8  their pay.
9  Q.  An employee can put away 3
10  percent of their salary?
11  A.  They can voluntarily
12  contribute up to 15 percent. But what
13  the company will match will be only the
14  first 3 percent.
15  Q.  But only 60 percent of the
16  first 3 percent?
17  A.  Yes, ma'am.
18  Q.  All right. Any other
19  benefits?
20  A.  That's all that I'm aware of.
21  Q.  No accidental death,
22  Ms. Warner?
23  A.  Oh, there is AD&D, yes. I'm

Page 127

1  sorry. You're right. That's part of the
2  life insurance, AD&D.
3  Q.  Is it separate than the life?
4  A.  It's with the same carrier.
5  But I do know it -- it is company paid,
6  but, again, it's based on total employee
7  population in terms of the cost.
8  MRS. HAYNES: Is there any
9  issue about the authenticity of any of
10  these health plans, like the benefit
11  plan for -- this is the accidental death
12  and dismemberment.
13  MR. BOSTICK: I don't think if
14  you --
15  MRS. HAYNES: And I don't know
16  that I'll --
17  MR. BOSTICK: If we want to go
18  on the record with Bates, let me and
19  Chris look at them, and we can probably
20  agree to that. I'm not that
21  disingenuous.
22  Q.  Do you know if any of these
23  policies have the amount the company pays

Page 128

1  for the benefits?
2  A.  I don't. I believe these are
3  summary plan descriptions. They are not
4  policies; they're summary plan
5  descriptions.
6  MRS. HAYNES: I mean, I just
7  hate to go through --
8  MR. BOSTICK: Do you just want
9  to do it by Bates number, rather than --
10  why don't we go off the record and we can
11  figure out what we've got.
12  Q.  (BY MRS. HAYNES) Let me ask
13  you, are you going to be able to say this
14  is the Blue Cross/Blue Shield healthcare
15  plan?
16  A.  Yes.
17  Q.  Do you know about the MetLife?
18  A.  Yes. Our benefits have
19  changed, but at the time those were the
20  carriers.
21  Q.  Okay. Short-term, long-term?
22  A.  Yes.
23  MRS. HAYNES: Can we just have

32 (Pages 125 to 128)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 129

1   a stipulation? Y'all look at those and
2   see if we can --
3           MR. BOSTICK: Yeah. Is there
4   one on the bottom that you --
5           THE WITNESS: Short-term and
6   long-term.
7           MRS. HAYNES: And, you know, I
8   had two. And I couldn't tell if Standard
9   had sent this, perhaps, to my client.
10  But there were different -- or they were
11  formatted different. Look at that and
12  see if -- they were all Standard and all
13  -- both short-term, but the format was
14  different.
15      Q.  Did you ever receive anything
16  from the Standard about Mrs. Edwards?
17      A.  Not personally, no.
18      Q.  Did anyone ever report to you
19  that the Standard had found that
20  Mrs. Edwards could return to work in
21  February 2007?
22      A.  No.
23      Q.  Did you know that?

Page 130

1       A.  During the meeting in
2   regards --
3           MR. BOSTICK: Just answer the
4   question.
5       A.  No, I did not.
6       Q.  Okay. Do you know why she was
7   not returned to work in February of 2007?
8       A.  No, ma'am.
9       Q.  Have no knowledge?
10      A.  No, I don't.
11      Q.  Do you have any knowledge of
12  Mrs. Edwards' efforts to return to work
13  in February of 2007?
14      A.  No.
15      Q.  Do you have anything to do
16  with the long-term or short-term
17  disability in your position?
18      A.  I administer the contracts.
19  But the day-to-day activity of working
20  with the carrier, working with the team
21  members, or with medical is in safety and
22  medical department.
23      Q.  Now do you do benefits as part

Page 131

1   of your job?
2       A.  I administer the contracts
3   only.
4       Q.  When did you assume benefits
5   from Ms. Jones?
6           MR. BOSTICK: Object to the
7   form.
8       A.  I did not receive them from
9   Ms. Jones.
10      Q.  I understand. After
11  Ms. Jones left, when did you start doing
12  her duties?
13          MR. BOSTICK: Object to the
14  form.
15      A.  I did not do her duties. She
16  reported to me.
17      Q.  When did you assume benefits?
18      A.  In April of '07.
19          (WHEREUPON, Plaintiff's
20  Exhibit Number 41 was marked for
21  identification.)
22      Q.  Plaintiff's 41, have you seen
23  that document?

Page 132

1       A.  No, I have not.
2           (WHEREUPON, Plaintiff's
3   Exhibit Number 42 was marked for
4   identification.)
5       Q.  42, did you receive that
6   document? Have you received it or
7   reviewed it?
8           MR. BOSTICK: Are we talking
9   about all of these documents in Exhibit
10  1, the different correspondence?
11          MRS. HAYNES: Exhibit 41.
12          MR. BOSTICK: Oh, you said 41?
13  Okay. Just make sure you haven't seen
14  any of that.
15          THE WITNESS: No.
16      A.  I have not.
17          (WHEREUPON, Plaintiff's
18  Exhibit Number 43 was marked for
19  identification.)
20      Q.  Plaintiff's 43, have you seen
21  that document?
22      A.  No, I have not.
23      Q.  As part of your job duties in

33 (Pages 129 to 132)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 133

1  benefits currently, do you receive
2  information from short-term or long-term
3  disability about any team member?
4      A.  No, ma'am.
5          MR. BOSTICK:  Object to the
6  form.
7      Q.  Do you have any knowledge
8  about any document that's been redacted
9  in this litigation, a reason for any
10  redaction?
11      A.  No, ma'am.
12          MRS. HAYNES:  Brian, is the
13  insurance information in the rule 26, or
14  are they self-insured?
15          MR. BOSTICK:  No, they're not.
16  There is a declarations page and --
17  through AIG.
18      Q.  (BY MRS. HAYNES)  Do you have
19  any knowledge about any insurance policy?
20      A.  In regards to?
21      Q.  The employers liability
22  practices?
23      A.  In preparation for the trial,

Page 134

1  yes.  And the --
2      Q.  This trial?
3          MR. BOSTICK:  Deposition.
4      A.  For the deposition.  I'm
5  sorry.
6          Preparation for the
7  deposition.
8      Q.  Okay.  What knowledge do you
9  have?
10      A.  It was shared with me, and I
11  do know that the annual fee of the cost
12  of the insurance is paid through my
13  budget.
14      Q.  Annual fee?
15      A.  There is a cost for the --
16      Q.  The premium?
17      A.  The premium, yes.
18      Q.  Do you know if Hyundai puts
19  their financial statements on any
20  website?
21      A.  I don't know.
22      Q.  Are they a stock company?
23      A.  I don't believe so, no.

Page 135

1      Q.  Privately held?
2      A.  LLC.
3      Q.  You don't own any stock in the
4  company?
5      A.  No.
6      Q.  What's the parent corporation?
7      A.  Hyundai Motor Corporation.
8      Q.  Is that public or private?
9      A.  I know it's family owned.
10      Q.  Do you know of any audits that
11  have been conducted by the office of the
12  Federal Contract Compliance Department or
13  the Department of Industrial Relations or
14  the Equal Employment Opportunity
15  Commission?
16          MR. BOSTICK:  Which number are
17  you looking at?
18          MRS. HAYNES:  16.
19          MR. BOSTICK:  We objected to
20  that.
21          MRS. HAYNES:  Are you going to
22  instruct her not to answer if she knows
23  of any audits?

Page 136

1          MR. BOSTICK:  Well, this
2  doesn't ask anything about any audits, so
3  it's not even within the subject.
4          MRS. HAYNES:  Well, I think
5  it's embodied --
6          MR. BOSTICK:  It talks about
7  indicating race of the defendants' work
8  force.  This is not a race discrimination
9  claim.  But to save time, I think we're
10  not -- we don't have OFCCP.
11      Q.  They are not a government
12  contractor?
13      A.  No.
14      Q.  Never have been?
15      A.  No.
16      Q.  Isn't that interesting?  Are
17  you aware of any audits by EEOC or
18  Industrial Relations?
19      A.  No.
20          MR. BOSTICK:  Object to that.
21      Q.  It's not embodied in your job
22  description?
23      A.  No.

34  (Pages 133 to 136)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 137

1    Q.   Who would handle that?
2    A.   Legal would be involved in
3  that.
4    Q.   With regards to number 15 of
5  Plaintiff's 32, you've been designated --
6       MRS. HAYNES:  I assume it's
7  her for number 15?
8       MR. BOSTICK:  Are you talking
9  about whether a replacement was hired for
10  the plaintiff's prior position?
11       MRS. HAYNES:  That's correct.
12       MR. BOSTICK:  Let's go off the
13  record.
14    (Off-the-record discussion)
15    Q.   (BY MRS. HAYNES)  All right.
16  Let me ask you the question, was anyone
17  hired to replace Mrs. Edwards on the BC1
18  line?
19    A.   Not that I'm aware of.  We
20  don't hire one for one for production.
21  We hire only based on head count, so we
22  would -- if there was an opening in weld,
23  we would have hired a production team

Page 138

1  member for weld and then they would have
2  determined where they needed that person.
3    Q.   When she was terminated, was a
4  vacancy created?
5    A.   I don't know that for a fact.
6  I would have to investigate that.
7    Q.   All right.  What's the head
8  count for the production, or is it
9  separated like that?
10    A.   It's -- we have a staffing
11  plan of a total of 3100 people.  And 2800
12  are hourly, and the remainder are
13  salaried, as well as temporaries.
14    Q.   What's the purpose for
15  temporaries?
16    A.   Temporaries are filling in a
17  variety of positions, and there is a Temp
18  To Perm program within the production
19  areas.  We are not hiring externally.  We
20  are only hiring Temp To Perm at this
21  point on production sites.
22    Q.   When did you stop hiring
23  externally for production?

Page 139

1    A.   We started the production Temp
2  To Perm program in January of '06.
3    Q.   Is there an agency you deal
4  with for temporary employees?
5    A.   Aerotek, yes.  And a small
6  percentage, Career Personnel.
7    Q.   What is Aerotek?
8    A.   It's a temporary agency that
9  provides temporaries to us for
10  production.
11    Q.   Do you have a contract with
12  them?
13    A.   Yes.
14    Q.   So no production position
15  would be posted on any external site?
16    A.   That's correct.
17    Q.   And how do you let Aerotek
18  know that you need temporary employees in
19  production?
20    A.   My assistant manager for
21  hourly employment would be in contact
22  with Aerotek when there is a request made
23  by the department.  And we confirm that

Page 140

1  there is eligible head count to allow an
2  additional temporary.
3    Q.   And how long does a temporary
4  employee work before they're considered
5  permanent or offered permanent
6  employment?
7    A.   It varies depending on the
8  needs of the company.
9    Q.   Is there not a procedure in
10  place?
11    A.   Not at this time.
12    Q.   Does Aerotek only provide
13  temporary employees to Hyundai?
14    A.   No.
15    Q.   They are a career
16  service that's --
17    A.   Yes.  Throughout the United
18  States.
19    Q.   And what was the other
20  company, Career --
21    A.   Career Personnel.
22    Q.   And do you have a contract --
23  does Hyundai have a contract with Career

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 141

1 Personnel?
2    A.   Yes.
3    Q.   Is there a certain percentage
4 you -- of employees you receive from
5 Career Personnel and different from
6 Aerotek?
7    A.   It's based on the type of
8 position that we're looking for.  But
9 Aerotek has 98 percent of the hourly
10 temporaries.  But salaried and clerical,
11 we use a local company, which is Career
12 Personnel.
13    Q.   Salary and technical
14 administrative?
15    A.   Yeah.
16       MR. BOSTICK:  Technical or
17 clerical?
18    A.   It's salaried in clerical.
19 It's not technical.
20    Q.   Okay.  Sorry.  I thought I
21 heard you say technical.
22    A.   That's okay.
23    Q.   What jobs are posted on the

Page 142

1 external website of Hyundai?
2    A.   Salaried exempt and salaried
3 nonexempt.  There are technical
4 maintenance positions on there as well.
5    Q.   Any other agency or third
6 party that Hyundai contracts with or
7 advertises with for temporary or
8 permanent employees?
9    A.   For permanent employees we do
10 use a variety of recruiters throughout
11 the United States.  For temporary,
12 Aerotek, Career Personnel, and Manpower
13 are the ones that we utilize.
14    Q.   Manpower where, in Montgomery?
15    A.   Here locally, uh-huh.
16    Q.   Are you familiar with the
17 payroll history of Mrs. Edwards, what her
18 rate of pay was at the time?
19    A.   I believe I did see it in
20 preparation for this deposition.
21       MR. BOSTICK:  I've got it
22 somewhere, Alicia.
23    Q.   While he's looking for that,

Page 143

1 let me ask you this:  What happens to
2 vacation and personal days if you don't
3 use them at the end of the year?
4    A.   Vacation days you're paid out;
5 personal days you lose.
6       MRS. HAYNES:  I thought I -- I
7 asked at the beginning of the deposition,
8 and you said you didn't have any
9 documents?
10       MR. BOSTICK:  You asked me if
11 I had the deposition notices.
12       MRS. HAYNES:  No.  I said, do
13 you have any documents?  And you said,
14 we've already produced everything.
15       MR. BOSTICK:  Yeah.  That's a
16 document we produced earlier.
17       MRS. HAYNES:  I don't remember
18 seeing this one, but I'll take your word
19 for it.
20       (WHEREUPON, Plaintiff's
21 Exhibit Number 44 was marked for
22 identification.)
23    Q.   (BY MRS. HAYNES)  Can you tell

Page 144

1 me, what is Plaintiff's 44?
2    A.   This is a document from
3 payroll showing the pay for Mrs. Edwards.
4    Q.   Did you put that together?
5    A.   No, ma'am.
6    Q.   Okay.  Was she working
7 overtime -- well, let me re-ask that.
8       Was she eligible for overtime?
9    A.   Yes.
10    Q.   Okay.  And was that one and a
11 half times her rate of pay?
12    A.   Yes.
13    Q.   In 2006 what was her hourly
14 rate?
15    A.   I would need to investigate
16 that.  I don't know.
17    Q.   All right.
18    A.   I could calculate it here, but
19 I don't know.
20    Q.   That's fine.  On that exhibit
21 is there any other pay she received other
22 than salary -- I'm sorry -- other than
23 her hourly rate and overtime?

36 (Pages 141 to 144)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 145

1    A.    That appears to be the only
2  entries, is what you've described.
3    Q.    Is there any indication of
4  total hours she has worked -- or did
5  work?
6    A.    No. This just shows what was
7  paid in terms of the hours that she
8  worked.
9        MR. BOSTICK: But you could --
10    A.    -- calculate the total. But I
11  don't see the total on here. These are
12  wage types, and then these are the number
13  of hours, but -- for each designation,
14  but it doesn't show the total number of
15  hours worked.
16    Q.    What are the codes for the
17  wage types?
18    A.    They are SAP codes. They are
19  indicators of regular working time,
20  overtime, or double-time. So it
21  calculates the system in the payroll.
22    Q.    Does it indicate any change in
23  department or job?

Page 146

1    A.    No. It has employee number.
2  It has the ID number, but it doesn't
3  indicate where she works. That's
4  typically a call center, and I don't see
5  it on here.
6    Q.    Would there be a change moving
7  from one department to another in
8  production?
9    A.    Yes. In terms of tracking the
10  head count, they would have needed to
11  have submitted a change form indicating
12  that a position -- as long as it was a
13  permanent move. If it was a temporary
14  move, it would not be mandatory.
15    Q.    Who completes the change form?
16    A.    The group leader and then
17  approved by the assistant manager and
18  section manager.
19    Q.    So for each move within
20  production that Mrs. Edwards would make
21  there would be a charge form --
22    A.    If it was a permanent move.
23  If it was a temporary move or within her

Page 147

1  group, no. It would have had to have
2  been a permanent move.
3    Q.    Have you reviewed any change
4  forms on Mrs. Edwards?
5    A.    No, I have not.
6    Q.    All right. Did you bring the
7  team relation section files for Bondy,
8  Swindle, Culpepper, and Kitchens?
9        MR. BOSTICK: Whatever the
10  documents were, we've identified it as
11  being produced previously.
12        MRS. HAYNES: So where you say
13  here that you're going to make available
14  at the 30(b)(6) deposition, that's
15  incorrect?
16        MR. BOSTICK: I think we --
17  from this response we produced these.
18  Yeah. That's incorrect. We've produced
19  these already, whatever we've identified
20  in here.
21    Q.    Are there separate personnel
22  files and team relation files for each
23  employee?

Page 148

1    A.    Yes.
2    Q.    How many different files are
3  there?
4    A.    There is a personnel file;
5  there is a benefit file, and there is a
6  team relations file.
7    Q.    What would be contained in a
8  team relation file?
9    A.    I can't testify to that
10  because it's not under my jurisdiction.
11    Q.    Okay. Do you know what would
12  be in a personnel file?
13    A.    Sure.
14    Q.    What?
15    A.    The offer letter, the
16  background check, the tax forms,
17  confidentiality agreement, acknowledgment
18  form for the team member handbook.
19    Q.    Anything else?
20    A.    That's pretty much it.
21    Q.    Any disciplinarian actions?
22    A.    Serious misconduct is in
23  there.

37 (Pages 145 to 148)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 149

1  Q.  Under personnel?
2  A.  Uh-huh.  But anything else is
3  in team relations.
4  Q.  Like work performance issues,
5  would those be under personnel or team
6  relations?
7  A.  Team relations.
8  Q.  A benefit file, what would be
9  contained there?
10  A.  Beneficiary forms, requests
11  for change in beneficiary forms, initial
12  sign-ups for benefits.
13  Q.  Anything else?
14  A.  Military leave documents.
15  That would be it.
16  Q.  How about evaluations?  Where
17  are those located?
18  A.  Salary performance evaluations
19  are separate; hourly, we don't do
20  evaluations on hourly team members.
21  Q.  Was there something in the
22  handbook about evaluations?
23  A.  I think about the probationary

Page 150

1  — I'm not sure.
2  Q.  I know I've seen evaluations
3  somewhere.
4  A.  (Witness reviews documents)
5  Q.  Did you find anything?
6  A.  Not regarding evaluations but
7  probation period on page 4.
8  Q.  Page 4 of the handbook?
9  A.  Yes.
10  Q.  Page 4?
11  A.  Yes.
12  Q.  And that would be Bates Number
13  0006?
14  A.  Yes.
15  Q.  And what does it say about
16  evaluations?
17  A.  Evaluations for team members
18  occur at 30, 60, and 85 for new team
19  members.  Their overall progress is
20  evaluated.
21  Q.  Where are those records kept?
22  A.  Initially team relations kept
23  them, but I -- they have been moved to

Page 151

1  our area in the latter part of 2006.
2  Q.  Okay.  And after that there
3  were no evaluations?
4  A.  There were evaluations.  But
5  they were kept by team relations.  They
6  have been moved to our area after the
7  plant was started up, but we don't have
8  normal performance management programs
9  for hourly team members after the 90-day
10  probationary period.  Just salary team
11  members are her merit-based.
12  Q.  How about team leaders?  Do --
13  A.  They are still hourly.
14  Q.  Okay.  Group leaders?
15  A.  They are salaried.
16  Q.  Are they evaluated?
17  A.  Yes.
18  Q.  How often?
19  A.  Beginning of the year, mid
20  year, and year end.  Year end is the
21  score that counts.
22  Q.  What's the fiscal year?  Is
23  that how they're --

Page 152

1  A.  January to December.
2  Q.  Okay.  So they are evaluated
3  in January?
4  A.  For the beginning of the year
5  to begin the goals and objectives and
6  then mid year score and a year-end score.
7  Q.  And where are those kept?
8  A.  Those are kept in a separate
9  file in Human Resources.
10  Q.  Are they used for bonuses?
11  A.  Merit increase time, only for
12  merit base.  Bonus is not calculated by
13  the merit, by the performance management
14  score.
15  Q.  Are bonuses rewarded?
16  A.  They don't call them bonuses.
17  But we have received a payout at
18  Christmastime that was called a gift or
19  an achievement award or an honorarium,
20  but not a guaranteed annual bonus.
21  Q.  Is that only to salaried?
22  A.  All team members.
23  Q.  How much has the Christmas

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 153

1  payout been for the last two years?
2      A.    It varies by classification.
3  It started out, I believe, at 250 and
4  it's continued to move up.
5      Q.    In 2006 do you know what the
6  Christmas payout was?
7      A.    I would have to check. I
8  don't recall specifically.
9      Q.    What was it this last year?
10     A.    For production members, again,
11 I'd have to check. I do not know.
12     Q.    Any other payouts during the
13 year other than the Christmas payout?
14     A.    Not that I'm aware of, no.
15     Q.    Is that what it's called,
16 Christmas?
17     A.    It's called something
18 different each year. I think this year
19 it was called achievement award.
20     Q.    Do you know if it was over
21 $500?
22     A.    I don't know for production
23 team members.

Page 154

1      Q.    What would you have to look at
2  to ascertain that information?
3      A.    Compensation would have had
4  the breakdowns on that.
5      Q.    All right.
6          MRS. HAYNES: That's all the
7  questions I have.
8          MR. BOSTICK: I just had one
9  follow-up.
10 EXAMINATION BY MR. BOSTICK:
11     Q.    You had mentioned earlier the
12 meeting with Clevenger, and you mentioned
13 there being a -- making a report. Was
14 that an oral or written report?
15     A.    That was an oral report that
16 he communicated to me.
17     Q.    Okay. To your knowledge, does
18 he have -- or was there a written report
19 in that meeting?
20     A.    Not that was communicated to
21 me, no.
22     Q.    Okay.
23         MR. BOSTICK: That's all I've

Page 155

1  got.
2              1:25 PM
3          FURTHER THE DEPONENT SAITH NOT
4          C E R T I F I C A T E
5  STATE OF ALABAMA )
6  COUNTY OF LEE   )
7              I hereby certify that the
8  above and foregoing deposition was taken
9  down by me in stenotype, and the
10 questions and answers thereto were
11 transcribed by means of computer-aided
12 transcription, and that the foregoing
13 represents a true and correct transcript
14 of the deposition given by said witness
15 upon said hearing. I further certify
16 that I am neither of counsel nor of kin
17 to the parties to the action, nor am I in
18 anywise interested in the result of said
19 cause.
20 KRISTEN DYKES THOMAS
21 CERTIFIED COURT REPORTER #257
22 My Commission expires
23 June 25, 2012

**American Court Reporting**
**July 30, 2008**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| TAMMY EDWARDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:07-cv-908-MHT |
| HYUNDAI MOTOR | ) | |
| MANUFACTURING ALABAMA, LLC, | ) | |
| and MIKE SWINDLE, individually, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S EXHIBIT**

32

---

## RE-NOTICE OF DEPOSITION

---

Please take notice that at the time, place and date indicated below, Plaintiff,

Tammy Edwards, will complete the testimony by deposition upon oral

examination of that party named below, pursuant to Rule 30(b)(5) and (6) of the

Federal Rules of Civil Procedure before a Notary Public or other officer

authorized by law to administer oaths by audio, video and stenographic means.

Such deposition conducted by audio, video and stenographic means shall be taken

for the purpose of discovery or for use as evidence in this action, and will continue

from time to time until completed, at which time and place you are notified to

appear and take such part in the examination as shall be fit and proper.

DATE AND TIME:    Friday, July 18th, 2008, 9:00 a.m., immediately following the deposition of Steve Culpepper

PLACE:    HAYNES & HAYNES, P.C.
1600 Woodmere Drive
Birmingham, AL 35226

DEPONENT:    The person designated by the defendant as having the most knowledge concerning the following matters:

1. Knowledge of and most familiar with electronically stored information containing personnel data on persons employed at Hyundai Motor Manufacturing Alabama, LLC at any time between January 1, 2005, and the present, including, but not limited to, name, social security number, gender, date of hire, date of promotion, date of termination, job transfer, rates of pay, participation in any employment benefit plans, evaluations, performance ratings, job title, job function, line assignment, shift assignment, discipline, job qualifications (including, but not limited to, education level, job history, and experience), and skills testing (including, but not limited to, tests administered, test results, and validation efforts).

2. Knowledge of and most familiar with electronically stored information regarding Defendant's policies and decisions relating to selection, rating, and retention of employees of Hyundai during the period of January 1, 2005, to the present.

3. Knowledge of and most familiar with electronically stored information reflecting the profits and losses of Hyundai from January 1, 2005, to the present.

4. Knowledge of and most familiar with every electronic mail or message system used from January 1, 2005, to the present.

5. For all information described in paragraphs 1-4 above:

    a.    The names of files containing such information;

    b.    The name, model number, operating system, configuration and location of any computer(s) used to process the information;

c. The name and version of the software programs that are used to access or analyze the information or to produce reports;

d. If the filenames, computers, or software described above changed between January 1, 2005, and the present, the date on which Defendants began using such hardware or software and the date such use was discontinued;

e. The media on which the information is stored (e.g., tape, hard disk, floppy diskette, or CD-ROM);

f. The record retention, backup, destruction, modification, or control policies, practices, or procedures relating to such information from January 1, 2005, to the present;

g. The name, social security number, title, department, business address and telephone number of any person who is or who has been responsible for maintaining and updating the procedure for collecting the information and verifying its accuracy;

h. If such information is stored in database records,

    i. The number of record types and their names,

    ii. The approximate number or records of each type,

    iii. How and when the records of each type are generated,

    iv. The name and description of each field in the record,

    v. The file documentation, including file layouts and field formats for all record types,

    vi. All codes associated with each field, e.g., termination codes, race codes, department codes,

    vii. The edit routines used to flab and/or modify invalid codes.

    viii. Whether the record type contains information on all employees, and if not, the categories of employees that have been excluded and/or included,

    ix. The name, social security number, title, department, business address and telephone number of the person(s) having custody of or responsibility for maintaining and/or processing each of the record types identified.

    x. The titles and descriptions of all reports or analyses generated from each record type identified, including the following information:

        (a) the name, title and business address of person(s) having custody of the report, and

        (b) the purpose and use of the report;

      i.     If any electronic information is maintained under contractual or other arrangements with someone not an employee of Defendant;

          i.     The name and address of each such person and his/her/its relationship with Defendant,

          ii.    The inclusive dates of such contract or arrangement, and

          iii.   The precise purpose and nature of services provided under each such contract or arrangement.

6.    Knowledge of and most familiar with Plaintiff's pay and benefits and the value thereof and any and all other employee incentives for the last five (5) years, including knowledge of payroll checks and the legend used on each check for coding purposes.

7.    Knowledge of and most familiar with the positions and job duties held by Tammy Edwards with defendant, including the pay, benefits, evaluations, and investigation of any and all complaints for the last five (5) years.

8.    Knowledge of and most familiar with all employment policies of defendant, specifically, but not limited to, defendant's leave policy, FMLA policy, progressive discipline policy, termination policy, hire policy, pay and benefit policies, and sick and disability policy.

9.    Knowledge of and most familiar with the job performance of Tammy Edwards for the last five (5) years.

10.   Knowledge of and most familiar with Plaintiff's complaints of discrimination for the five (5) years, as well as any other employee's complaint of discrimination.

11.   Knowledge of and most familiar with all reasons why Plaintiff was terminated.

12.   Knowledge of and most familiar with Defendant's policies and procedures to prohibit discrimination in the work place for the last five (5) years.

13.   Knowledge of and most familiar with defendant's document retention policy.

14. Knowledge of and most familiar with what documents have been destroyed or misplaced to avoid disclosure during this litigation.

15. Knowledge of and most familiar with Defendant's hiring and firing procedures, including the job posting or advertisement for Plaintiff's previous position, the list of applicants which indicate the name, age and gender of all applicants, interviews of applicants and each hiring of Plaintiff's replacement.

16. Knowledge of and most familiar with statistics and/or reports which indicate that equal opportunity information commonly found on an EEO-1 form or on any other form to the Department of Industrial Relations, Office of Federal Contract Compliance Programs ("OFCCP") and/or those documents which most specifically indicates the race of defendant's workforce for the last five (5) years.

17. Knowledge of all payroll records, benefits, prizes and awards of Plaintiff and her replacement.

18. Knowledge of and most familiar with Defendant's net worth, gross and net profits, financial statements, income tax returns, bank statements and deposit records, general ledgers, and any and all documents reflecting the defendant's gross income, net income and expenditures for the last five (5) years.

19. Knowledge of and most familiar with any and all insurance policies that have been invoked or put on notice or that are providing any type of coverage as a result of any or all of plaintiff's claims referenced in her complaint.

20. Knowledge of and most familiar with training materials used in training and/or counseling all employees on employment discrimination in the workplace, seminars or meetings held in which employment discrimination was a topic and/or classes held discussing employment discrimination for the last five (5) years.

Deponent is requested to produce all documents requested in the attached Schedule "A".

Prompt written notification to the undersigned is requested, providing the name, address, telephone number, position and job title of the person(s) designated and the matters on which the person(s) will testify.

The deponent is requested to bring and permit Plaintiff, Tammy Edwards, to inspect and to copy any and all documents used by the deponent to prepare for the deposition.

_____
Alicia K. Haynes
Attorney for Plaintiff

**OF COUNSEL:**

**HAYNES & HAYNES, P.C.**
1600 Woodmere Drive
Birmingham, Alabama 35226
Phone: (205) 879-0377
Fax: (205) 879-3572
E-mail: akhaynes@haynes-haynes.com
ASB-8327-E23A

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above and foregoing has been served upon the following, by placing a copy of same in the U.S. Mail, properly addressed and postage prepaid on this the ____8____ day of ___July___ , 2008.

J. Tobias Dykes
**CONSTANGY, BROOKS & SMITH, LLC**
One Federal Place, Suite 900
1819 Fifth Avenue North
Birmingham, Alabama 35203

Brian R. Bostick
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203

_____
OF COUNSEL

# "SCHEDULE A"

Defendant's representative, as identified pursuant to Plaintiff's 30(b)(6) deposition notice, is requested to provide the following documents at the time of deposition:

1.  The complete personnel files of Tammy Edwards, Tom Bondy, Mike Swindle, Steve Culpepper and Billy Kitchens for the last five years.

2.  A copy of the harassment and discrimination manual given to all workforce for the last five years.

3.  A copy of all personnel and EEOC policies, including, but not limited to, defendant's leave policy, FMLA policy, progressive discipline policy, term policy, hire policy, pay and benefit policies, and sick and disability policy for the last five years.

4.  A copy of the corporate directive on dealing with documentation of incidents/disciplinary matters.

5.  A list of all hiring and firing decisions of Steve Culpepper and Billy Kitchens for the last five years.

6.  The defendant's document retention policy for the last five years.

7.  All complaints and/or grievances, written or verbal, wherein any form of discrimination, unfair treatment, or harassment has been mentioned or alleged for the last five years.

8.  All documents that reflect the gender makeup of the entire workforce at Hyundai in Alabama and throughout the United States by region for the last five years.

9.  The FMLA policy of defendant for the last five years.

10. All form EEO-1's completed or compiled by defendant for the last five years.

11. All affirmative action data maintained by defendant and produced to any governmental agency for the last five years.

12. All audits of the OFCCP for the last five years and the recommendations/ summaries and reviews.

13. All audits or investigations conducted by the Department of Labor for the last five years.

14. All audits or investigations conducted by the EEOC for the last five years.

15. All documentation depicting all employee benefits of defendant, the value of the benefit to the employee, actual costs paid by the defendant for each stated benefit, and the value the company has placed on all said benefits for the last five years.

16. All annual reports, financial statements, profit and loss statements, and tax returns of Hyundai and any other subsidiary for the last five years.

17. Defendant's hiring and firing procedures for the last five years.

18. All policies of insurance that have been in place by defendant that cover employment discrimination and negligence matters, as well as employer's practice liability insurance for the last five years.

19. All complaints of discrimination and pay inequities for the last five (5) years.

20. The complete file regarding the investigation into the complaints of discrimination and any EEOC charge of discrimination filed by Plaintiff, Tammy Edwards, including any and all notes, witness statement, and statements of investigators.

21. All advertisements for the last five years for the positions previously held by the Plaintiff.

# Team Member Handbook

PLAINTIFF'S
EXHIBIT

33





Hyundai Motor Manufacturing Alabama, LLC.

1st Edition

_wards v. Hyundai, et al.

0001

387-8000- front desk 8100
8100 Security

Vacation

# CONTENTS

HMMA History ........................................................... Page 1
HMMA Vision Statement ......................................... Page 1
HMMA Mission Statement ....................................... Page 1
HMMA's Team Values and Standards ..................... Page 1
   Safety
   Quality
   Team Diversity
   Efficiency
   Stewardship
Equal Employment Opportunity ............................... Page 2
Unlawful Harassment ................................................ Page 2
HMMA's Position on Unions ................................... Page 3
Purpose of the Handbook .......................................... Page 3
Employment Statement ............................................. Page 3
Team Member Records .............................................. Page 4
Probation Period ....................................................... Page 4
Length of Service ...................................................... Page 5
Employment of Relatives .......................................... Page 6
Temporary Workers and Replacement Workers ...... Page 6
Team Member Orientation ........................................ Page 6
Hours of Work ........................................................... Page 6
Breaks/Communication Period ................................. Page 7
   Break Periods
   Communication Period
Attendance ........................................................ Pages 7-10
Work Week ................................................................ Page 10
Overtime .................................................................... Page 10
   Non-Exempt Team Members
   Exempt Team Members
Pay .............................................................................. Page 11
Payday ........................................................................ Page 11
Direct Deposit ........................................................... Page 11
Questions Regarding Pay .......................................... Page 11
"Call In" Pay .............................................................. Page 11
"Report In" Pay ......................................................... Page 12
Statement of Earnings ............................................... Page 12
Garnishments ............................................................ Page 12
Benefits .............................................................. Pages 12-20
   Attendance Incentive Program
   Family and Medical Act (FMLA)
   Holidays
   Vacation Non-Exempt/Exempt Team Members
   Scheduling Vacation
   Summer Shutdown
      Soliciting Volunteers
      Required Work
      Medical Leave

i

Edwards v. Hyundai, et al.

0002

Team Member Review Board..............................................Page 38
Drugs, Alcohol and Weapons...........................................Page 38-40
For Cause Testing and Random Testing.............................Page 40-41
Public Relations.............................................................Page 41
Internal Communications.................................................Pages 42-44
Open-Door Policy
    Bulletin Board
    President's Roundtable
    Group Leader/Manager One-on-Ones
    Manager's Lunches
    Team Advisor
    Hyundai Communication System (HCS)
    HMMA Closed Circuit Television System
    HMMA Weekly News
    Hyundai Insights
    Five Minute Communication Meetings
Community Relations.......................................................Page 44-45
    Speeches
    Tours
General Information.........................................................Page 45-46
    Electronic Devices
        Camera/Video Camera
        Cell Phones/Pagers
        Audio Tape Recorders
HMMA Tools.................................................................Page 46
Lockers........................................................................Page 46-47
Cafeteria......................................................................Page 47
Smoking.......................................................................Page 47
Telephone Calls.............................................................Page 47

iii

Canceling Vacation
Personal Days
Scheduled Personal Days
Unscheduled Personal Days
Transfers
Unscheduled Vacation
Vacation Eligibility
Unused Vacation Time
Personal Leave.............................................................Page 20-22
Bereavement Leave........................................................Page 22
Jury Duty.....................................................................Page 22
Military Leave...............................................................Pages 22-24
Team Wear...................................................................Page 24-25
Safety.........................................................................Page 25
    Safety Committees
    Safety Wear
    Hard Hats and Bump Caps
    Shoes
    Safety Glasses
    Personal Protective Equipment (PPE)
    Housekeeping
    Lock Out/Tag Out Procedures.......................................Page 26
Special Authorization Permits
Confined Space Entry Permits
    Hot Work
    Area Specific Safety Rules...........................................Page 26-27
Security......................................................................Page 27
    Foreign Trade Zone (FTZ)
    Video Surveillance
    HMMA Identification Badges (ID)
    Parking/Traffic Control
Career Opportunity Program............................................Page 27-28
Transfers....................................................................Page 28-29
Solicitation, Distribution, and Postings..............................Page 29-30
Team Member Work Conduct...........................................Page 30-31
Corrective Action..........................................................Page 31-33
Discussion Planner
    Informal Discussion
    Formal Discussion
    Commitment Discussion
    Decision Leave
    Termination
Serious Misconduct.......................................................Page 34-35
Workplace Threats and Violence.......................................Page 35-36
Team Member Resolution Program and Procedure.................Pages 36-38
    Step 1: Supervisory Level
    Step 2: Resolution Request
    Step 3: Resolution Appeal
    Step 4: Resolution Final Appeal

ii

Edwards v. Hyundai, et al.

0003

## HMMA HISTORY

Hyundai Motor Company (HMC) was established in 1967. By 1974, HMC produced the Pony as their first independently designed and manufactured model.

In 1985 HMC established Hyundai Motor America (HMA) and launched the Excel which was the best selling import sub-compact in the US for three years. Eight years later Hyundai launched the Sonata II and started assembly of the Excel in Thailand.

Over the last 35 years Hyundai has established its place in a global marketplace. On April 2, 2002, Hyundai announced it had chosen Montgomery, Alabama to build its first U. S. manufacturing facility which will produce the next generation Sonata and Santa Fe.

## HMMA's VISION STATEMENT

Our Team provides value for your future

## HMMA's MISSION STATEMENT

To create exceptional automotive value for our customers by harmoniously blending safety, quality, and efficiency. With our diverse team, we will provide responsible stewardship to our community and environment while achieving stability and security now and for future generations.

## HMMA's TEAM VALUES

**SAFETY:** HMMA is committed to providing a safe working environment to preserve and enhance the health and personal safety of our Team Members. We will achieve this through the implementation of safety policies, safe work practices, a drug free workplace, and by daily commitment of all Team Members.

**QUALITY:** HMMA's commitment to Quality begins with its ability to achieve continuous improvement in the product by always listening to our customers. HMMA works with its suppliers to ensure high standards are continually maintained. All HMMA Team Members have an active role in maintaining and improving both the manufacturing process and quality.

**TEAM DIVERSITY:** HMMA's success depends on treating each Team Member with dignity and respect and utilizing our Team's diversity to its maximum potential. HMMA's definition of Team Diversity is accepting our differences and learning from each Team Member's unique perspective in order to achieve a new standard of excellence in society, at home and at work. We must all work as a Team, practicing integrity as we deal with our customers while listening and learning from one another, sharing in our successes, and helping one another succeed.

**EFFICIENCY:** In order to provide job stability and maintain profitability to HMMA we must all act effectively to minimize all aspects of waste.

1

To achieve continuous growth and innovation, each Team Member has the responsibility to find more efficient ways to produce our products for our internal and external customers.

STEWARDSHIP: At HMMA, we are committed to the stewardship of our environment and our community. Stewardship simply means managing responsibly. We are committed to conserving energy, recycling, and eliminating elements that could cause harm to the environment. HMMA is also committed to being actively involved in our community in order that it may grow for the benefit of our Team Members and their families.

## EQUAL EMPLOYMENT OPPORTUNITY

HMMA is committed to providing an environment that is free of unlawful discrimination and providing equal employment opportunities and promotional opportunities to all Team Members.

Equal employment opportunity means eliminating any practice of unlawful discrimination from employment - in recruitment, application, qualification, hiring, training and education, promotions, corrective action, layoffs, terminations, and all other conditions of employment.

HMMA makes all decisions with regard to employment without discriminating on the basis of race, color, religion, national origin, age, sex, disability, veteran status or any other unlawful basis. Additionally, HMMA will make reasonable accommodations for qualified job applicants and Team Members with disabilities, in accordance with the Americans with Disabilities Act.

HMMA's team relations manager has the appropriate authority and the responsibility to administer the EEO programs with regard to employment and promotional opportunities. Any Team Member who feels he/she has been discriminated against may express such concerns to his/her group leader/manager, the team relations representative, and/or the Human Resources Director. HMMA's team relations manager will be responsible for administering HMMA's EEO policy and insuring that any reported EEO violations are investigated promptly and handled according to all federal and state laws as well as HMMA's policies and procedures.

## UNLAWFUL HARASSMENT

In order for all HMMA Team Members to enjoy a work environment free from all forms of unlawful discrimination, including sexual harassment, no Team Member - male or female - should be subject to unsolicited and unwelcome sexual advances or conduct, whether verbal, physical, explicit, or implied. This includes verbal innuendoes, suggestive comments, off-color jokes, gestures or physical contact. Such embarrassing, demeaning or intimidating behaviors interfere with a Team Member's work performance and may create a hostile, offensive work environment. It is also unlawful sexual harassment when submission to sexual

2

advances is a condition of getting or keeping one's job or when it influences personnel decisions. Furthermore, it is contrary to HMMA policy for any Team Member to be subjected to harassment in the workplace because of race, color, religion, national origin, age, physical or mental disability, veteran's status, or any other unlawful basis. Cases of such unlawful harassment should be reported to your group leader/manager, team relations representative, or the team relations manager.

## HMMA's POSITION ON UNIONS

HMMA's team concept and creating a team environment is based on faith in each Team Member and recognizes our commitment to ensure a positive working environment. HMMA has developed its policies, wage structure and benefits plans with our Team Members' best interests in mind. Additionally, HMMA is committed to providing all Team Members with a safe place to work by utilizing state of the art equipment, technologies, as well as work practices to ensure safety.

By joining together as a team, we can accomplish our mutual goals assuring the success of Hyundai Motor Manufacturing Alabama, LLC and providing greater opportunities and job security for all Team Members and their families. Because of HMMA's commitment to every Team Member we do not believe that a third party such as a union is necessary at HMMA.

## PURPOSE OF THE HANDBOOK

HMMA's handbook is intended as a summary of HMMA's policies and procedures. We ask each Team Member to read the handbook and familiarize themselves with HMMA's policies and procedures in order for you to understand HMMA's responsibilities to you and your responsibilities to HMMA.

This handbook is not a contract. We ask each Team Member to understand that in order for HMMA to remain competitive in a global market there may be times when changes are necessary. HMMA reserves the right to change policies and procedures when it becomes necessary, either in whole or in part, with or without notice. When it is determined that a policy or procedure needs to be changed, all Team Members will be notified by their manager and/or a video or other printed material to communicate such changes.

If Team Members have any questions concerning these policies and procedures they should ask their group leader/manager. If the Team Member is still unclear about the policies and procedures they should contact their team relations representative for clarification.

## EMPLOYMENT STATEMENT

Every Team Member's employment with HMMA is voluntary one and is subject to termination by you or HMMA at will, with or without cause, and with or without notice, at any time. Nothing in this

3

Edwards v. Hyundai, et al.

0005

handbook or HMMA policies or procedures shall be interpreted to be in conflict with or to eliminate or modify in any way the employment-at-will status of HMMA Team Members.

This policy of employment-at-will may not be modified by any officer or Team Member and shall not be modified in any publication or document. The only exception to this policy is a written employment agreement approved at the discretion of the president or the board of directors, whichever is applicable.

This handbook or any policies or procedures are not contracts of employment.

## TEAM MEMBER RECORDS

Team Member records will be kept for information and business purposes only. Any of the following changes to your status must be reported to Human Resources:

- Name, address, or telephone number
- Marital Status
- Birth date, total number of dependents, their relationship to you
- Citizenship status
- Benefit - plan beneficiary designation
- Person(s) to be notified in case of emergency
- Formal education, courses completed, other training or professional skills acquired

Upon request, you may examine your own personnel file and indicate to Human Resources any information you think is inaccurate. Any Team Member wishing to view his/her personnel file must make a written request specifically stating what he/she wants to review and why they want to review the record on file. All personnel files are confidential information and can only be accessed by HMMA Team Members who have authorization. All personnel folders are located in Human Resources.

## PROBATION PERIOD

The probationary period is 90 calendar days. This probationary period is a time for evaluation, both by you and by HMMA. The probationary Team Member needs to evaluate HMMA's policies, procedures and overall working environment. The automotive industry is highly competitive, fast-paced, physically demanding, high volume production which demands high standards of quality and safety. Learning to meet performance standards, working in a fast-paced manufacturing environment while meeting the guidelines which govern our conduct, and becoming acquainted with our team approach are also a part of the evaluation new Team Members need to make of HMMA.

HMMA needs to evaluate your progress during this period as well. Three performance evaluations are conducted during the probationary period.

These evaluations occur at the following intervals:

| | |
|---|---|
| 1 | 30 days |
| 2 | 60 days |
| 3 | 85 days |

If any new Team Member is off due to an approved leave of absence, the number of days absent will be added to the probation period.

Your overall progress is evaluated during the probation period. Strengths and weaknesses are discussed and helpful feedback regarding your development and progress is given during each of the aforementioned reviews.

In the event progress is less than acceptable or violations of standards of conduct occur, a probationary Team Member's employment may be terminated prior to the end of the 90 day period.

Before any new Team Member is terminated, a review of the facts and approvals by the department manager, team relations manager, director of human resources are required.

Once the probationary period is completed, the new Team Member becomes eligible for the following programs:

Equal Treatment Procedure
Peer Review Panel
Corrective Action Program
Attendance Incentive

## LENGTH OF SERVICE

HMMA considers "length of service" (LOS) is the period of continuous employment, starting from your date-of-hire and applies to all full-time Team Members. Length of service will be broken when a Team Member:

- resigns from employment (leaving the plant without proper authorization is considered voluntary resignation)
- is terminated from employment
- fails to return to work on the day following the end of a personal, medical, military, or other leave of absence, unless unusual conditions or circumstances exist that would prevent the Team Member from returning on the scheduled day
- retires
- fails to communicate with HMMA regarding an absence of three (3) consecutive days or longer (subject to the Family and Medical Leave Act and regulations)
- is not actively employed with HMMA for 12 consecutive months or length of service, whichever is the lesser.

A Team Member who voluntarily terminated his/her employment, and who is retired, will not have any prior service restored. The date of rehire

5

4

Edwards v. Hyundai, et al.

0006

will become the new service date. Computation of service, for retirement purposes and the effect of breaks in service for retirement rights, however, will be determined in accordance with the Employee Retirement Income Security Act of 1974 (ERISA).

Transfer opportunities will be awarded based on LOS. In situations where more than one Team Member has the same LOS, HMMA will use the first letter of the Team Members last name as the tie breaker. If the Team Members last names begin with the same letter, then HMMA will use the second letter as the tie breaker and so on.

Position Advancement Opportunities will be based on qualifications. In situations where more than one Team Member has the same LOS, HMMA will use the first letter of the Team Members last name as the tie breaker. If the Team Members last names begin with the same letter, then HMMA will use the second letter as the tie breaker and so on.

## EMPLOYMENT OF RELATIVES

Relatives of Team Members may be employed at HMMA; however, they may not work or come under the direct supervision of another relative. Relatives are defined as those people who are related either by birth, adoption, or marriage.

The employment of relatives at certain levels of HMMA in positions where one might have influence over another will not be allowed.

## TEMPORARY WORKERS AND REPLACEMENT WORKERS

HMMA intends to utilize temporary and replacement workers to reduce temporary peaks of excess overtime, perform special projects, and fill vacancies while Team Members are on military leave, personal leave, or medical leave of absence. Use of temporary replacement workers also helps HMMA avoid potential layoffs.

## TEAM MEMBER ORIENTATION

HMMA will provide every Team Member with the training needed to understand HMMA's philosophies. Each Team Member will receive an orientation outlining HMMA team concepts, policies, benefits, and all other aspects related to their employment at HMMA.

## HOURS OF WORK

### Hours of Work

HMMA's normal work week for all production and administrative (non-exempt) Team Members consists of forty (40) hours per week based on an 8 hour work day five days per week. HMMA's normal work week for all administrative exempt Team Members consists of forty-five (45) per week based on an 8 hour work day and 5 hours of casual time per week. All production and maintenance Team Members will rotate shifts every 4 months. Production, maintenance, and administrative shift hours will

6

be as follows:

| SHIFT | SHIFT START TIME | SHIFT END TIME |
| --- | --- | --- |
| Production | | |
| 1st Shift | 6:30 a.m. | 3:15 p.m. |
| 2nd Shift | 5:15 p.m. | 2:00 a.m. |
| Maintenance | | |
| 1st Shift | 6:30 a.m. | 3:15 p.m. |
| 2nd Shift | 5:15 p.m. | 2:00 a.m. |
| 3rd Shift | 10:00 p.m. | 6:45 a.m. |
| Administration | | |
| 1st Shift | 8:00 a.m. | 4:45 p.m. |

There may be times when Team Members will be asked to work irregular hours due to production requirements. Any deviation in HMMA's weekly scheduled hours must be reviewed and approved by the payroll and benefits manager or his/her designee prior to any change in HMMA's normal work schedule. Any permanent adjustment to any HMMA Team Members regularly scheduled work hours must have approval by the director of Human Resources.

## BREAKS AND COMMUNICATION PERIODS

### Break Periods

HMMA provides all Team Members with two (2) ten (10) minute paid break periods per day. The first break period will be given in the first half of the Team Members shift; the second break period will be given in the second half of the Team Members shift. All Production Team Members will be provided specific time for each of the described breaks. Due to the nature of Maintenance Team Members responsibilities their breaks will be given at their convenience. In order to allow Administrative Team Members the ability to maintain the continuity of their responsibilities they may take their breaks at their convenience.

There will be times when HMMA schedules overtime. In these situations the Team Member will be given a 5 minute break for every hour of scheduled overtime. These breaks must be given at the end of the eighth hour of work.

### Communication Period

Each Team will have a five minute paid communication meeting at the beginning of each shift. This meeting is for the manager, group letter, or team leader to communicate important information to the team.

## ATTENDANCE

Regular attendance is the cornerstone for the success of HMMA. A Team Member's absenteeism can reduce the quality and effect of the overall efficiency of HMMA's operations, as well as cause hardship on fellow Team Members who report to work regularly. Regular attendance

7

is every Team Member's responsibility, and every Team Member is expected to be on the job, on time, every scheduled workday.

The minimum acceptable standard of attendance is 98%.

Any scheduled workday missed is considered an absence. However, work time missed due to holidays, scheduled vacations, catastrophic event, jury duty, military duty, bereavement leave, short-term disability, work-related injury or illness, personal leave of absence and FMLA leave shall not be counted as an absence and are not cause for corrective action.

If a Team Member is absent due to a catastrophic event that results in a legally declared emergency which results in the closure of all major roads in the Team Member's county of residence, or if a Team Member must drive through such a county on the way to work, such absences will not count against the Team Member's attendance for the purpose of calculating the acceptable standard of attendance, nor be cause for corrective action. Final approval as to the declaration of a "Catastrophic Event" shall be made by the director of Human Resources.

Team Members who are not in their work area ready for work by their scheduled starting time will be counted as one-half day absent for calculating attendance only, excluding the following events:

A verifiable catastrophic event such as an accident causing road blockage of major highways, a major weather-related closure of roads, or other acts of God which will result in Team Members being tardy will be evaluated on a case by case basis. If it is determined by HMMA that there is a significant adverse impact on HMMA Team Members, the tardy will not affect a Team Member's attendance record.

Team Members who leave prior to the end of their scheduled shift (including overtime hours) with their group leader's and/or manager's permission are considered to have left early. A leave early will be considered as one-half day of absence for purposes of attendance calculation.

Any situation where a Team Member leaves the facility during scheduled work time (including overtime whether scheduled or voluntary) without their group leader, manager, senior manager, or any other member of management's authorization, the Team Member will be considered to have voluntarily resigned from his/her employment at HMMA.

Attendance will be calculated using a rolling calendar year using the following formula:

- Calculate the number of scheduled workdays. Scheduled workdays will include all excused scheduled workdays.
- Calculate the number of unexcused workdays.
- Subtract the number of unexcused workdays from the number of scheduled workdays and divide the remainder by the number of scheduled workdays to arrive at the Team Member's attendance percentage.

8

o  Example:        237 Scheduled workdays
                   <u>- 5</u>  unexcused workdays
                   232/237 = 97.9%

When a Team Member's attendance falls below 98% at any time during the first year or subsequent years of employment during any rolling twelve- month period, corrective action will be considered.  The rolling twelve-month period is a 365-day period.

Every Team Member is expected to notify his/her group leader and/or manager, in advance, of any known absence or future absence.  When an absence is not known in advance, the Team Member must notify his/her group leader and/or manager 30 minutes prior to the start of the shift.

Failure to notify within 30 min. at start of the shift may result in corrective action up to and including termination.

Accumulative absences that result in a Team Member's attendance percentage falling below 98% may be cause for corrective action.

The following will be considered:

- Cause
- Frequency
- Patterns
- Failure to report
- Time pattern of reporting

A Team Member that does not communicate to his/her group leader and/or manager regarding his/her absence for a period of three (3) consecutive days or longer is considered to have voluntarily resigned his/her employment at HMMA.

HMMA will maintain appropriate attendance records.  Any corrective action necessary is taken by the group leader and/or the manager.  The appropriate team relations representative will be in attendance.

The corrective action process is intended to help Team Members correct any attendance problems.  However, if the Team Member's attendance continues to be unacceptable it could result in further corrective action up to and including termination.

When a Team Member's attendance percentage falls below the acceptable standard, corrective action may be considered. Corrective action is not automatic. Each Team Member's attendance record will be reviewed based on its own merit, and the circumstances in each case are considered. However, when corrective action is taken, the following steps must be followed:

1        Informal Discussion
2        Formal Discussion
3        Commitment Discussion

9

Edwards v. Hyundai, et al.

0008

4    Decision Leave

The team relations representative will be consulted for guidance at each step of the aforementioned corrective action steps. The team relations representative will also attend each step as it occurs.

When corrective action is required beyond the four steps above, the Team Member's group leader and/or manager will contact the team relations manager and request a review of the Team Member's record for termination. No termination will take place unless the action is reviewed and approved by the team relations manager, section manager, and director of Human Resources.

## WORK WEEK

HMMA's work week begins at 12:01 a.m. Monday and ends at 11:59 p.m.

## OVERTIME

### Non-exempt Team Members

Due to the nature of the automotive industry there will be times when we will be required to work overtime in order to meet our customer's needs. Overtime will be paid in one-tenth hour increments; any overtime worked will be paid during the normal pay cycle and included in the regular payroll check.

Overtime is calculated using the base rate of pay plus shift premium and team leader premium, if applicable. Overtime will be paid at 1.5 times the Team Member's regular rate of pay for any time worked in excess of eight hours during the normally scheduled work day as long as 40 hours of work has been achieved for that work week. Team Members will be paid at 1.5 times their regular rate of pay for time worked on Saturday or the sixth work day. Additionally, Team Members will be paid 2 times their regular rate of pay for time worked on Sunday or the seventh day of continuous work. Team Members who work on an approved HMMA holiday will be paid at 2 times their rate of pay. Vacation time will count as hours worked when calculating overtime.

### Exempt Team Members

Assistant managers and specialist Team Members wages are based on a 40 hour work week and 5 hours of casual overtime. Casual overtime is time that is worked without approval. Assistant managers and specialists will be paid at 1.5 times their calculated regular hourly rate for all pre-approved overtime.

In situations where the assistant manager and/or specialist Team Member is required to work because of scheduled production overtime they will be paid at 1.5 times their calculated hourly rate. Due to the fact that production overtime is scheduled and the assistant manager and/or specialist is required to work in order to support production needs the overtime will

10

be considered as pre-approved. Additionally, the casual overtime rule will not apply in this situation.

## PAY

HMMA reviews wages each year and makes appropriates changes to the wage scale based on several factors, such as: automotive industry, HMMA's performance, and the cost of living. Each Production and Maintenance Team Member will receive a base rate when joining the HMMA family and will receive a rate increase periodically over a 24 month period until they reach the top pay rate.

## PAYDAY

All Team Members will be paid on Tuesday on a biweekly basis.

## DIRECT DEPOSIT

All HMMA Team Members are required to use direct deposit. Each Team Member will receive an advice stub which will itemize pay and deductions in detail. Any questions regarding direct deposit should be directed to the Payroll and Benefits Department.

## QUESTIONS REGARDING PAY

If any Team Member has a question regarding pay, they are to contact their manager/assistant manager/group leader. The manager/assistant manager/group leader will notify the payroll department of any issues concerning pay and report back to the Team Member or arrange a meeting with the payroll department for the Team Member.

## "CALL IN" PAY

HMMA will pay for a minimum of four hours work at the regular straight time hourly rate for those Team Members who are called to work at a time other that their regularly scheduled work hours (before or after, but not continuous with their regularly scheduled shift). If there is at least four hours work available and the Team Members are given the option to work less hours, they will be paid only for the hours worked if they exercise the option to leave early.

## "REPORT IN" PAY

If the scheduled production is canceled due to any emergency, prior to the start of the shift and at least one hour of notification has been provided to the Team Members, no work will be available and no pay made to the Team Members.

If the scheduled production is canceled due to any emergency and less than one hour of notification is provided, Team Members will have the option of leaving and receiving pay only for the time worked or staying for a total of four hours. If the Team Member elects to remain at work, he or she must leave the plant at the end of this period.

11

If the notification of canceled production is made after four hours of work from the normal scheduled starting time of the shift have been completed, Team Members will have the option of leaving and receiving pay only for the time worked or staying until the end of the regular shift. Team Members that have not been given their options and have been forced to leave will be paid for 8 hours.

Anytime a Team Member volunteers to go home early or is required to go home early, the Team Member may elect to use any available vacation time to make up for lost income. This time will always be excused and the lost time will not count against the Team Member's attendance.

## STATEMENT OF EARNINGS

Each Team Member will receive a yearly statement of earnings. The yearly statement of earnings is known as a W-2 Withholding Statement which provides the amount earned and the taxes that have been withheld. The W-2 will be issued in January each year for use in filing income tax forms.

## GARNISHEMENTS

HMMA respects every Team Member's right to privacy with regard to personal and confidential information. However, HMMA may be required, by law, to withhold a portion of your pay if served with a court notice of a garnishment, wage assignment, wage deduction, or government levy. When situations such as this occur HMMA's payroll department will notify you of any pending action involving such matter that requires a wage withholding situation.

## BENEFITS

HMMA benefits are described in the Summary Description Plan.

## ATTENDANCE INCENTIVE PROGRAM

HMMA will pay a premium of $100.00 to non-exempt and exempt Team Member's up to assistant manager for perfect attendance for each 4-week period. All regular, full-time, non-exempt and exempt Team Members up to assistant manager are eligible to participate in the Attendance Incentive Program.

During the probationary period, a Team Member is not eligible to participate in the Attendance Incentive Program. A Team Member becomes eligible the first full 4-week attendance period following the end of his/her probation period.

The Team Member must maintain a perfect attendance record for a four (4) week attendance period to receive an attendance incentive. Perfect attendance is defined as no absences, including tardiness, early leave, lost time including scheduled overtime, or personal leaves.

The only exceptions to this policy are:

- HMMA observed holiday, unless the Team Member is scheduled to work on the holiday
- Scheduled Vacation
- Personal Days (HMMA may require documentation)
- Jury Duty
- Military Leave. Military leave shall be considered in accordance with applicable law.
- Bereavement Leave
- The balance of a shift lost due to an occupational illness/injury. (When a Team Member misses part of a day due to a work-related injury/illness doctor appointment scheduled by the HMMA Medical Clinic.)
- Any work-related activities away from the plant
- Any medical leave, either work-related or non-work related that is determined to be FMLA
- Any leave that is determined to be FMLA

## FMLA

### General Provisions

It is the policy of HMMA to grant up to 12 weeks of family and medical leave during any 12 month period to eligible Team Members, in accordance with the Family and Medical Leave Act of 1993 (FMLA). The leave may be unpaid, paid, or a combination of unpaid and paid leave, depending on the circumstances of the leave and as specified in the policy.

A Team Member must have worked for HMMA for 12 months, or 52 weeks. In addition a Team Member must have worked at least 1250 hours during the 12 month period immediately before the date when the leave is requested to commence.

In order for the leave to qualify under the policy, the Team Member must be taking leave for one of the reasons listed:

- The birth of a child and in order to care for that child;
- The placement of a child for adoption or foster care, and to care for the newly placed child;
- The care of a spouse, child, or parent with a serious health condition; or
- The serious health condition of the Team Member.

HMMA may ask for certification of the serious health condition. The Team Member should try to respond to such a request within 15 days of the request or provide a reasonable explanation for the delay. Failure to provide certification may result in a denial of continuation of leave. Medical certification may be provided by using the medical certification form. Request for medical certification must be made in writing as part of

HMMA's response to the Team Member's request for leave.

All Team Members requesting leave under the policy must provide verbal notice with an explanation of reason(s) for the needed leave to their immediate supervisor, who will advise the Benefits Department. If the leave is foreseeable, the Benefits Department may require the Team Member to provide a written request for leave and reason(s) for that leave. Failure of the Team Member to provide a written request for leave cannot be grounds to deny or delay the taking of FMLA leave.

HOLIDAYS

HMMA observes paid holidays each calendar year. HMMA will review the holiday schedule each year and communicate to all Team Members the holiday schedule for the coming year in November. All full time Team Members and team leaders are eligible for holiday pay, which includes shift premium if applicable. All full time Team Members will be eligible for holiday pay as of their first first day of employment.

All Team members must work his/her last full scheduled workday before the holiday and the first full scheduled workday following the holiday in order to receive holiday pay.

All non-exempt Team Members and exempt Team Members up to assistant manager will be paid double time for hours worked on a designated HMMA holiday.

VACATION NON-EXEMPT/EXEMPT TEAM MEMBERS

HMMA realizes that vacation is an important benefit for all Team Members. HMMA's intention is to provide Team Members with a means to take a scheduled vacation without loss of pay. Vacation does not apply to holidays, bereavement leave, jury duty or military leave pay. The vacation allowance is granted for the calendar year only. Once it is used for the year, it is not renewed until January 1st of the next calendar year.

A Team Member's vacation eligibility is determined based on his/her length of service with HMMA and is to be used during the calendar year January 1st through December 31st. Any Team Member that has not worked hours for the year in which the vacation is scheduled will not be paid until at least one day has been worked in the qualifying year. Although Team Members must actually perform work in a new calendar year before qualifying for vacation, Team Members may use their vacation in January if it is connected with vacation or a holiday from the previous year. Five vacation days are reserved and must be used during HMMA's summer shutdown. However, a Team Member may use these days prior to shutdown for Family Medical Leave or if the Team Member is scheduled to work the vacation days that are reserved for the summer shutdown period. Anticipated unused shutdown vacation days may not be scheduled for dates before the actual shutdown occurs.

Starting the year of the Team Member's second anniversary, the Team

14

Member is eligible for vacation according to the following schedule. (The Team Member's vacation allowance is available as of January 1st each year)

Team Members with:

- Less than one year will receive a prorated vacation based on the following
  - o January – 10 days vacation
  - o February – 9 days vacation
  - o March – 8 days vacation
  - o April – 7 days vacation
  - o May – 6 days vacation
  - o June – 5 days vacation
  - o July – 4 days vacation
  - o August – 3 days vacation
  - o September – 2 days vacation
  - o October – 1 days vacation
  - o November & December – 0 days vacation

- Beginning January of the next year Team Members will receive:
  - o 1st year – 10 days vacation
  - o 2nd year – 11 days vacation
  - o 3rd year – 12 days vacation
  - o 4th year – 13 days vacation
  - o 5th year – 14 days vacation
  - o 6th year – 15 days vacation
  - o 7th year – 16 days vacation
  - o 8th year – 17 days vacation
  - o 9th year – 18 days vacation
  - o 10th year – 19 days vacation
  - o 11th year – 20 days vacation
  - o 12th year – 21 days vacation
  - o 13th year – 22 days vacation
  - o 14th year – 23 days vacation
  - o 15th year – 25 days vacation

A Team Member's vacation pay is based on the Team Member's regular base pay at the time, but not more than eight (8) hours per day. Any vacation will include any shift differentials a Team Member is currently receiving. Vacation cannot be taken on Saturdays, Sundays, or holidays.

SCHEDULING VACATION

In order for HMMA to plan proper coverage for Team Member vacations, the scheduling period for the subsequent year's vacations will be during November and December as follows:

• Full week and single days of vacation for January and/or February must be scheduled between November 1 and

15

November 30 of the preceding year.

- Full weeks and single days of vacation for the remainder of the year - March through December - must be scheduled between December 1 and December 22 of the preceding year.
- Full weeks take precedence over single day vacation requests.
- Single days take precedence over 1/2 day vacation requests.
- When two (2) or more Team Members with the same length of service request the same dates for time off, the last letter of the Team Members' names will be used to determine who has first preference.

## SUMMER SHUTDOWN

HMMA reserves the right to schedule a plant shutdown each year. When a plant shutdown is planned, HMMA will inform Team Members of the planned shutdown by the end of December the prior year. HMMA reserves the right to require the Team Members to use up to 5 days of his or her vacation if needed during the shutdown period.

There may be occasions when it is necessary to schedule work during HMMA's summer shutdown period. When it is necessary to schedule work, HMMA will notify Team Members 30 days prior to the planned summer shutdown, which they will be required to work.

### Procedure

The manager and/or group leader will solicit volunteers and/or require Team Members to work during the shutdown period using the following criteria:

- **Soliciting Volunteers:**
  o Solicit volunteers based on length of service for shut down days that are not holidays. The Team Member volunteering with the longest length of service will be awarded the work. If two or more Team Members volunteer with the same length of service, the first letter of their last names will determine which Team Member is awarded the work.
  o If the voluntary work being offered is an HMMA holiday, the manager and/or group leader will use the overtime equalization chart to determine which Team Member will be awarded the overtime, as stated in the Equalization of Overtime Policy.
- **Required Work:**
  o When requiring Team Members to work on shutdown days that are not holidays, start from the bottom of the length of service list until the required manning is obtained.
  o All Team Members who volunteer or that are required to work during an HMMA shutdown that involves reserved vacation days will be eligible to reschedule

16

the vacation days.

- **Skills Requirement**
  o In overtime situations that require a specific skill and or qualifications to accomplish this job task, Skill will take precedence over single length of service.
  o If more than one Team Member has the skill and qualifications, overtime equalization should be used as a determining factor and then length of service if applicable.

## Medical Leaves During Shutdown Periods

All Team Members that are on an approved medical leave, or personal leave during the shutdown period will be paid for any vacation reserved for the shutdown period, and will not be eligible to reschedule vacation days reserved for the shutdown period.

### Cancelling Vacation

Team Members who choose to cancel their scheduled vacation must notify their manager and/or group leader as soon as possible. Team Members may only cancel a scheduled vacation one time per scheduled year.

When a Team Member cancels a scheduled vacation week or day, he/she may reschedule the canceled vacation to any open block of available vacation time. The opportunity for the canceled week or day will be posted in a central area for the entire group or department, whichever is applicable, for 48 hours following the cancellation.

### Personal Days

All Team Members will be given three Personal Days each year. HMMA encourages its Team Members to schedule their Personal Days in advance if possible. However a Team Member may use Personal Days at their discretion for emergency situations or unforeseen circumstances (HMMA may require documentation) that prevent them from reporting to work, leaving early, or reporting late to work.

If a Team Member is already at work and needs to leave, the Team Member must contact his/her manager and/or group leader and get approval before leaving the plant. If the Team Member does not contact his/her manager and/or group leader or another member of management and leaves without proper authorization, he/she will be considered to have voluntarily resigned.

### Personal Day Limitations

- Personal Days were not developed to extend vacation periods or to be utilized in lieu of vacation
- Personal Days were not intended to be used to extend a holiday period, however if a verifiable unforeseen circumstance were to arise the Team Member would be

17

- allowed to utilize a personal day to cover his/her absence.

- Can not be used during the New Hire 90 day probation period.

- If a Team Member uses a Personal Day on a Saturday or Sunday for a verifiable emergency he/she will not be eligible for compensation at a premium rate, but will be compensated at a straight time rate and may be required to provide documentation.

**Scheduled Personal Days**

- Must be scheduled in advance of the day taken (before close of previous shift).

- Must be approved in advance by immediate supervisor (may also be denied by immediate supervisor if manning not sufficient).

- Does not require documentation or explanation.

- Scheduled Personal Day will not effect attendance percentage.

- Scheduled Personal Day will remain eligible for attendance bonus.

- Scheduled Personal Day before a holiday will not disqualify holiday pay.

- Scheduled Personal Day before "scheduled Saturday/Sunday" does not allow for missing Saturday/Sunday if scheduled.

- Scheduled Personal Day can be used on production Saturday/Sunday (or day that team member is scheduled to work).

- Scheduled Personal Day will be paid at straight time (regardless of day requested).

**Unscheduled Personal Days**

- Must only be used for emergency purposes.

- Emergency reason may be required to be documented.

- Documented emergency will still be eligible for attendance bonus.

- Un-documented emergency will disqualify for attendance bonus.

18

---

- Non-emergency use will disqualify for attendance bonus.

- Un-documented/non-emergency use before a holiday will disqualify holiday pay.

- Un-documented/non-emergency use will not count against attendance percentage.

- Un-documented/non-emergency use to cover tardy will disqualify attendance bonus.

- Utilizing to cover tardy will not count against attendance percentage.

- Unscheduled Personal Day can be used on production Saturday/Sunday (or day that team member is scheduled to work).

- Unscheduled Personal Day will be paid at straight time (regardless of day requested).

**Transfers**

If a Team Member transfers to a new Team, the Team Member will be required to reschedule his or her vacation.

**Unscheduled Vacation**

A Team Member's vacation allowance does not accumulate and must be taken in the calendar year in which it is earned. Team Members will be paid for any unscheduled vacation on the first pay period in February of the following year.

**Vacation Eligibility**

All regular, full time, exempt Team Members are eligible for vacation.

Vacation is earned by the Team Member each January. In order for the Team Member to be eligible for vacation he/she must have reported for work in the year of eligibility.

Requests for vacation days must be submitted to the supervisor one week in advance. The supervisor is required to approve or deny the request within 48 hours.

**Unused Vacation Time**

A Team Member will not be allowed to carry over unused vacation into the next year. Team Members that have vacation days remaining after the close of the calendar year (December) will be paid for any remaining vacation time by the first pay period in February.

Upon separation from employment with HMMA, the Team Member's vacation will be prorated and the Team Member will receive pay for any unused vacation during the year in which the termination occurs. If a

19

Team Member should die during the term of employment, pay for unused vacation will be paid in a lump sum to the Team Member's beneficiary (as designated for retirement plan).

A Team Member's vacation pay is based on the Team Member's regular base pay at the time, but not more than eight (8) hours per day. Any vacation will include any shift differentials a Team Member is currently receiving. Vacation cannot be taken on Saturdays, Sundays, or holidays.

### Personal Leave

In an effort to recognize the need of Team Members who require time off in addition to personal days or vacation, HMMA may consider a personal leave of absence without pay for up to a maximum of thirty (30) days.

All regular permanent, full time Team Members employed by HMMA for a minimum of ninety (90) days are eligible to apply for an unpaid personal leave of absence. Departmental requirements will all be taken into consideration before a request is approved. Requests for unpaid personal leave may be denied or granted by HMMA. Approvals of the immediate supervisor, department director, and Director of Human Resources are required. All personal leaves are unpaid leaves.

An eligible Team Member should submit a request in writing to his/her immediate supervisor.

A Team Member is required to return from the unpaid personal leave on the originally scheduled return date. If the Team Member is unable to return, he/she must request in writing the extension of the leave.

If HMMA does not extend the leave, the Team Member must then return to work on the originally scheduled return date or be considered to have voluntarily resigned from his or her employment. Extensions of leave will be considered on a case-by-case basis.

### BEREAVEMENT LEAVE

The bereavement leave policy was developed to provide Team Members with a suitable period of time away from work, with pay, in order to properly attend to the arrangements required when a death in the Team Member's family occurs.

The Team Member's group leader or management Team Member should be immediately notified when such leave is needed.

A bereavement leave of absence, with pay, for a period not to exceed five workdays shall be granted to a Team Member when death occurs to the Team Member's:

• parent
• stepparent
• spouse

20

• child or stepchild

A bereavement leave of absence, with pay, for a period not to exceed three workdays shall be granted to a Team Member when death occurs to a member of a Team Member's family.

For the purpose of this policy, the Team Member's family shall be defined as follows:

• In the event of a miscarriage, if a death certificate is issued, then the above policy will apply
• Mother-In-Law/Father-In-Law
• Sister/Brother
• Grandparent/Grandchildren
• Stepsister/Stepbrother
• Grandparent-In-Law
• Half-sister/Half-brother
• Great Grandparents
• Son-In-Law/Daughter-In-Law

Exceptions may be made to the "Team Member's family" provisions if the deceased was a relative or foster parent and the Team Member resided with or was reared by the deceased.

In the event of the death of a Team Member's relative not mentioned above the Team Member will be excused, with pay, for up to one day (8 hours). This applies to the following family members only:

• Aunts
• Uncles
• First cousins
• Nephews
• Nieces
• Brother-In-Law and Sister-In-Law

When a Team Member is on vacation and a member of the Team Member's family dies, the time off will be considered as bereavement leave. Vacation time missed because of the death may be utilized at a later time. If an official HMMA holiday occurs during time considered as bereavement leave, the Team Member's bereavement will begin the day following the holiday. In addition, Saturdays, Sundays and holidays are not considered as bereavement. Any Team Member who is off on a Friday for an approved bereavement leave will not be expected to work on the Saturday or Sunday after the approved bereavement leave.

All bereavement leaves of more than one day must be taken on consecutive work days. (For example: Tuesday, Wednesday, Thursday, or Friday, Monday, Tuesday).

A Team Member who leaves during his or her shift due to the death of a family member that qualifies for bereavement leave will receive eight hours of total pay for that day. By leaving during the shift, the Team

21

sweatshirts not issued or purchased through the *Team Wear Collection* should not be worn over *Team Wear* during business hours.

The color choices at the present time are:

- pants/skirts in khaki, navy, grey, olive and black
- shirts in tan, white, blue & blue/white, herringbone, green, slate blue, denim, khaki, and black.

Team Members will also have choices of sweatshirts and sweaters which are also embroidered with the company logo.

Skirts may be hemmed to no more than 3 inches above the top of the knee.

All alterations will be done at Team Member expense. Safety issues and mutilation hazards for clothing should be kept in mind when altering clothes.

Team Wear is provided to Team Members once each 18 months. During orientation each Team Member will order his/her initial set of:

- 5 pants/skirts
- 5 tops
- 1 hat
- 1 belt

Every 18 months Team Members will receive a full replacement set of *Team Wear* due to wear and tear. Team Members will also have the option to purchase, at their own expense, pants/skirts in the same approved colors as those provided by HMMA.

Jeans (blue, black or any other color) are not considered appropriate for work at HMMA and are not to be worn during normal working hours. All items must conform to the Team Wear concept. Safety issues and protecting the finish of the vehicle should be taken into consideration when choosing *Team Wear* (100% cotton clothing is required in some areas and ~~loose clothing is not allowed in production line~~).

---

Member has started his/her bereavement leave and the partial day will count as a full day of the allowable bereavement leave.

HMMA may request documentation for verification to be retained with the leave of absence request.

**JURY DUTY**

HMMA will provide income protection while a Team Member carries out his/her civic responsibility regarding jury duty.

Upon receipt of notification from the state or federal courts of an obligation to serve on a jury, the Team Member should notify his/her supervisor. The Team Member is required to provide copies of the jury subpoena or jury summons to his/her supervisor and to the Payroll Department.

Any Team Member appearing as a plaintiff, defendant, and/or witness in any legal proceeding, or for other appearances related to legal proceedings or court cases (e.g. deposition testimony), whether or not pursuant to a court-issued subpoena will not receive paid time off. Vacation, personal time, or unpaid time should be used for these instances.

**MILITARY LEAVE**

Team Members who are inducted into the U.S. Armed Forces or who are reserve members of the U.S. Armed Forces or state militia groups will be granted leaves of absence for military service, training, or other obligations in compliance with state and federal laws. These Team Members may use accrued vacation leave but are not required to do so. At the conclusion of the leave, Team Members generally have the right to return to the same position they held prior to the leave or to a position with equivalent seniority, pay and benefits. HMMA will pay the difference between military pay and regular wages/salary for up to one month. Team Members are requested to notify their supervisor as soon as they are aware of the military obligation. Questions regarding HMMA military leave policy, applicable state and federal laws, and continuation of ~~benefits should be directed to~~

Gift Shop. Team Members will bear the expense of tax and shipping for individual purchases.

Note: No pins, buttons, or other items may be worn on HMMA Team Wear unless it is issued by HMMA. Furthermore, only HMMA issued hats may be worn at HMMA. All HMMA head wear must be worn as issued and may not be altered. The only acceptable alteration is the addition of the Team Members name.

## SAFETY

HMMA's goal is to eliminate potential hazards before they become an accident. Every Team Member is responsible for safety not only for themselves but for others. We can all prevent incidents by avoiding unsafe acts, reporting unsafe acts and conditions and by learning and following the policies and procedures that have been developed to keep our facility safe.

### Safety Committees

HMMA's safety committees provide Team Members an opportunity to participate in safety improvements in their areas. The safety committees will conduct area audits, identify safety training needs and support safety awareness programs in the facility.

### Safety Wear

As part of HMMA's total Team Member safety program, special clothing and other apparel designated by department managers and the Safety/ Environmental Department must be worn by Team Members, when and where required, to help guarantee your personal safety.

### Hard Hats and Bump Caps

Hard hats (heavy-duty, impact-resistant hats) must be worn in work areas where there is danger of falling objects or hazardous conditions. Bump caps (lighter weight hats) may be required in some areas as an additional means of protection. Team Members are reminded to obey signs or directions in areas where such protective devices must be worn.

HMMA will issue all bump caps and hard hats. Only HMMA-issued hats may be worn. Additionally, safety caps may not be altered in any way. The only exception is the addition of the Team Members name.

### Shoes

HMMA safety-approved shoes are required in many areas of the plant and are necessary to safeguard your health. HMMA has established a specified dollar amount it will pay toward the purchase of safety shoes. Contact the safety department for the exact amount.

### Safety Glasses

All Team Members, vendors and visitors at HMMA are required to

24

wear OSHA-approved safety glasses in the production areas. Safety glasses are provided by HMMA and can be ordered through the Safety Department. Eye examination charges are not covered under this program. Safety glasses do not have to be worn when entering, exiting, or during breaks and lunch.

### Personal Protective Equipment (PPE)

When it is required, use of special safety equipment by Team Members shall be regarded as a condition of employment. Further information will be given to you during your training regarding equipment needed for your job. If you are not sure of the PPE required in your work area, please contact your group leader.

### Housekeeping

Good housekeeping habits allow all HMMA Team Members to be safe in their work areas as well as the ability to work more efficiently. Each Team Member is responsible for maintaining their work area. If we allow dust and dirt to accumulate or if we do not regularly maintain the work area safety hazards may occur. Team Member is responsible for disposing of trash both inside and out into the proper receptacle. Failure to adhere to the aforementioned is considered to be a performance issue and could result in corrective action.

### Lock-out/Tag-out Procedures

The safety of all HMMA Team Members is a primary concern. In order to protect all Team Members from danger, we have established a Lock-out/Tag-out procedure to protect all those who enter machinery, work within machinery, or use machinery as part of their job duties at HMMA. Only authorized Team Members who have completed lock-out/tag-out training may work within machine guarding or enter machinery. Strict compliance with the lock-out/tag-out procedures and rules are required from all HMMA Team Members and contractors at all times.

HMMA will issue each trained and authorized Team Member a personal safety lock along with an identification tag. The Team Members lock and tag is required to be properly attached to the lock-out devices located on each piece of machineries control panel before entering. In situations where multiple persons must enter a piece of machinery requiring lock-out/tag-out, each person must attach his/her lock and tag to the lock-out device with a multi-lock hasp. All locks and tags must be removed before the equipment is restarted.

Because of the differences in each machine or piece of equipment, the Team Member should learn the proper method of locking and tagging each piece of equipment they operate, repair or maintain. If a Team Member is unsure about the procedures for locking out the equipment, the Team Member must ask their manager and/or call the Safety Department for assistance.

25

## SPECIAL AUTHORIZATION PERMITS

Because of the varied types of work required, certain types of work require special authorization and/or training. Areas designated as confined space or certain welding operations require a permit prior to beginning work.

### Confined Space Entry Permits

When a location is designated a "confined space" it requires specialized training before a Team Member can work in the designated area. Confined spaces present characteristics of an atmosphere or have the potential for serious safety and/or health hazards.

Lack of oxygen or contamination of the air is possible in confined spaces. No Team Member or contractor is allowed to enter a "permit required" confined space unless they have received the proper training and the area has been adequately tested and a confined space entry permit has been issued. When training and/or a permit is needed contact the Safety Department to obtain training and/or a permit.

### Hot Work

There are areas within our facility that are susceptible to fire and explosions. Because of these dangers Team Members planning to do "hot work" in these areas must obtain a hot work permit before performing cutting, welding and/or spark producing work. Hot work being done on welding lines and in authorized maintenance areas does not require a hot work permit unless otherwise posted. All hot work permits must be obtained from the Safety Department.

### Area Specific Safety Rules

Individual areas within our facility will have area specific safety requirements. These include but are not limited to:

- Rules for the proper use of different kinds of tools and equipment
- Rules for performing different kinds of operations
- Proper techniques for lifting or performing other physical activity

Each department will be responsible for communicating the safety rules that apply to your particular job function. If a Team Member is unsure of the safety requirements for their work area they are to contact the manager for the department or the Safety Department.

## SECURITY

### Foreign Trade Zone (FTZ)

HMMA is designated as a FTZ under the Foreign Trade Zone Act of 1934.

26

The FTZ makes it possible for HMMA to receive parts from other countries without paying the required duty tax until the parts leave the FTZ as part of a completed vehicle. Operation of the FTZ is under the supervision of U.S. Customs Service and therefore HMMA is required to operate under stricter security than you may be accustomed.

### Video Surveillance

At HMMA the security of our Team Members as well as our product is important to us.

In order to ensure our Team Member's safety, protect our product, and maintain the FTZ zone, HMMA uses video surveillance throughout our facilities.

### HMMA Identification Badges

HMMA identification ("ID") badges are issued on the first day of employment. All HMMA Team Members are required to wear their ID badges, and have them visible when entering and exiting HMMA. Team Members do not have to have their badges visible when they are in their assigned work area. However, the Team Member must wear, and have their badge visible when traveling between HMMA facilities. Personal identification from your ID badge is an FTZ requirement. Security personnel may periodically inspect badges. All Team Members will be required to return his/her badge to security on their last day of employment. If any Team Member loses their identification badge, the Team Member is to notify Security immediately so that a new badge can be issued and activated.

### Parking/Traffic Control

The ability to park on HMMA premises is allowed during scheduled work times. At HMMA we have reserved parking spaces for visitors as well as for the disabled. Here at HMMA, all other Team Members have equal access to parking and parking spaces on a first come first serve basis. All Team Members are responsible for parking in the proper parking spaces and for respecting the visitors and disabled parking areas.

Additionally, HMMA has a posted speed limit as well as designated lanes which allow for smooth traffic flow in and out of the facility. All Team Members are required to follow all posted limits, as well as safe driving habits, to ensure the safety of all HMMA Team Members and visitors. Any Team Member found in violation of these rules is subject to corrective action up to and including termination.

## CAREER OPPORTUNITY PROGRAM

The purpose of the HMMA Career Opportunity Program (COP) is to encourage promotion from within HMMA and to ensure that all qualified Team Members have an equal opportunity for job advancement. This program is designed to provide an effective means of communication to Team Members of specific job vacancies within HMMA. This policy will

27

Edwards v. Hyundai, et al.

0017

be administered by the Employment Department.

It is the intent of HMMA to fill job vacancies from within the organization when Team Members with the skills and qualifications for the positions are available. In the event a posted position cannot be filled from within HMMA due to a lack of qualified Team Members external sources can and will be utilized to fill the position. Job advancement and transfers will be made without regard to race, color, religion, sex, age, national origin, veteran status, or disability.

This program will be used for exempt and non-exempt positions excluding the following: production Team Member, team leader, entry level support staff Team Member, management Team Member and above.

A manager may fill a vacancy internally within his/her section and within the same salary classification without posting the position by realigning a Team Member into the position. The position vacated will then be posted.

All full-time Team Members who have completed the probationary period at HMMA are eligible to apply for vacancies posted under this policy. In the interest of stability and continuity, a Team Member who accepts a promotion will be expected to remain in the new position for a period of twenty-four (24) months and will be prohibited from applying for a promotional opportunity during that twenty-four (24) month period.

A Team Member will be disqualified from consideration for any Career Opportunity Posting if he/she has active corrective actions at the Formal Discussion level or above. Any conflict with the Employment of Relatives Policy may also prohibit a Team Member from being considered eligible for the posted position.

Vacancies to be filled by the Career Opportunity Program will be announced via closed circuit television and/or on the Career Opportunity Bulletin Boards. Vacancies will remain posted for five (5) working days following the first date of the announcement.

All Team Members who have filed a Career Opportunity Application but do not meet the minimum eligibility requirements will be notified in writing by the Employment Department. Candidates may be notified for a screening interview to verify and/or clarify experience. Applicants not selected will be notified of their status, in writing, by the Employment Department.

A Team Member who has been awarded job advancement will be transferred within thirty (30) days of the selection decision. The Director of Human Resources must authorize/deny decision to delay the transfer.

### TRANSFERS

HMMA wants all of its Team Members to become multi-talented. In order to achieve this goal HMMA Team Members will have the ability to

request an assignment to another work area of their choice. Not only does this allow the Team Members to gain important job experience but it also helps HMMA to develop Team Members for other responsibilities.

Team Members with permanent medical restrictions, either off work or on a temporary work assignment, will be considered for placement, with or without accommodation, as required by the Americans with Disabilities Act. Placements of Team Members with permanent medical restrictions will take priority over transfer requests.

When a vacancy is declared, it shall be posted for department or group transfer, provided the position cannot be filled by a Team Member with permanent medical restrictions. This vacancy will be posted plant wide denoting the department and group. The requesting eligible Team Member with the longest length of HMMA service shall be placed in the open position. The job posting will be posted in designated areas of the facility for a period of three (3) working days, excluding weekends and holidays. All requests received by the end of the posting period shall be reviewed to determine which candidate has the longest length of service and is eligible for transfer.

The requesting Team Member must be a full-time, non-probationary Team Member with at least 12 months of HMMA service as of the date of the posting. The Team Member requesting transfer must not have transferred within the last twelve (24) months.

Any corrective action at the Commitment Discussion level or above will result in the denial of a Team Member's transfer request or promotional request. When two or more Team Members have identical length of service dates, the Team Member identification number will be used as the tie breaker. The Team Member with the lowest Team Member identification number will be awarded the transfer. Team Members will not be considered for any transfer that would result in conflict with the HMMA Employment of Relatives Policy.

To assure that adequate skill levels are maintained in each department, all transfer requests will be evaluated based on operational viability.

Any Team Member who submits and is awarded a transfer request must accept the transfer. The Team Member who receives a transfer shall be prohibited from another transfer for a period of twenty-four (24) calendar months. This period shall begin as of the actual date the award of transfer notification is given. A Team Member who transfers will be required to reschedule vacation time previously approved. A Team Member who transfers to a new department will assume high overtime hours on that team for overtime equalization purposes.

### SOLICITATION, DISTRIBUTION, & POSTINGS

HMMA prohibits the solicitation, distribution and posting of materials on or at HMMA property by any Team Member or non-HMMA Team Members, except as may be permitted by this policy. The sole excep-

28

29

tions to this policy are charitable and community activities supported by HMMA and HMMA-sponsored programs related to HMMA products and services.

Non-HMMA Team Members may not solicit Team Members or distribute literature of any kind on HMMA premises at any time. Team Members may only admit non-HMMA Team Members to work areas with HMMA approval or as part of a HMMA-sponsored program. These visits should not disrupt workflow. The HMMA Team Member must accompany the non-HMMA Team Member at all times. Former Team Members are not permitted onto HMMA property except for official company business. Team Members may not solicit other Team Members during work times, except in connection with a HMMA-approved or sponsored event. Team Members may not distribute literature of any kind during work times, or in any work area at any time, except in connection with a HMMA-sponsored event

The posting of materials or electronic announcements are permitted with approval from the Director of Human Resources. All team communication boards located in team areas are intended for team related instruction and production-related materials only. Violations of this policy should be reported to the Director of Human Resources.

## TEAM MEMBER WORK CONDUCT

It is the policy of HMMA that Team Members maintain a working environment that encourages mutual respect, maintains fellow Team Members dignity, promotes civil and congenial relationships among Team Members and is free from all forms of harassment and violence.

Team Members are expected to conduct themselves in an appropriate manner as judged by a reasonable person at work, at all HMMA functions, and also in the community. Team Members have the right to conduct their work without disorderly or undue interference from other Team Members. HMMA prohibits Team Members from violating the rights of their co-workers.

HMMA encourages a congenial work environment of dignity and respect as well as professionalism. Therefore, HMMA prohibits Team Members from intentionally harming or threatening to harm other Team Members, clients, vendors, visitors or property belonging to any of these parties.

Team Members are responsible for maintaining their work area in a neat and professional manner.

Team Members are responsible for assuring the security of HMMA confidential/proprietary material in their possession and similarly maintaining the security of HMMA provided equipment. Team Members concerned for the security of their work area or equipment must inform their supervisor of such concerns.
HMMA reserves the right to search locked, unlocked and/or publicly

used HMMA property at any time without consent. HMMA may request a search of personal property at the worksite or locked HMMA property assigned to an individual if there is reasonable suspicion that evidence of illegal or prohibited activities resides therein. Refusal of such a request may result in corrective action up to and including termination.

## CORRECTIVE ACTION

The intent of corrective action is to provide a consistent way to address unacceptable attendance, performance, or conduct. Corrective action is designed to allow Team Members formal notice and the opportunity to correct any performance deviations from HMMA's acceptable standards.

The following corrective action procedures will be taken by HMMA's management in order to address a Team Members' inability to meet HMMA's standards regarding attendance, performance, or conduct. Corrective action applies to exempt Team Members at the specialist level and below, non-exempt administrative Team Members and all production Team Members, including maintenance Team Members. A team relations representative will be available and must attend each phase of the corrective action procedure. The steps are as follows:

### Discussion Planner

Once it has come to the group leader and/or manager's attention that a Team Member's performance does not meet HMMA's performance standards, the group leader and/or manager will meet with the Team Member. This discussion is designed to gather facts about the performance issue and is to be a two-way conversation. The group leader and/or manager is to explore whether the performance issue is failure in the process, equipment, or with the Team Member.

- Equipment Problem. The group leader and/or manager will investigate and seek help in resolving any equipment problems.
- Process Problem. The group leader and/or manager will investigate and seek help in resolving any process problems.
- Team Member's Performance. Inform the Team Member of performance expectations and explain potential ramifications if the poor performance continues.

### Informal Discussion – Phase I

Phase I of corrective action is to address minor performance problems. The intent of Phase I is to bring the performance problem to the Team Member's attention through an Informal Discussion. The group leader and/or manager is responsible for conducting the Informal Discussion. The team relations representative will attend the Informal Discussion and serve as a witness. The Informal Discussion is an open discussion between the Team Member and the group leader and/or manager that identifies the nature of the problem and the possible solution.

30

31

If the performance problem is corrected and no additional problems develop during the following twelve months, the documented Informal Discussion will be removed from the Team Member's file and will not be used for any future corrective action.

## Formal Discussion – Phase II

The Formal Discussion is the 2nd phase of corrective action and is to be used for more serious performance issues, or if a Team Member fails to correct an existing performance issue after receiving an Informal Discussion, or if it is decided that a Team Member's performance issue is serious enough that it warrants a higher phase of corrective action. The Team Member will be given a Formal Discussion letter. Attendees at the Formal Discussion phase are the group leader and/or a member of management, team relations representative and the Team Member. The group leader and/or production management Team Member will prepare a Formal Discussion document addressed to the Team Member summarizing the performance issue. If the performance issue is corrected and no additional performance issues arise during the following twelve (12) months, the Formal Discussion letter will be removed from the Team Member's file and will not be used for any future corrective action.

## Commitment Discussion – Phase III

The Commitment Discussion is the 3rd phase of corrective action. This phase will be used if a Team Member's performance continues to be unacceptable or the Team Member commits a serious action that requires a higher level of corrective action.

A Commitment Discussion is a formal meeting, which is conducted with the affected Team Member, his/her group leader and/or manager, team relations representative, the team relations manager, and the appropriate production management Team Member. The purpose of this phase of corrective action will be to determine what aspects of the Team Member's performance are unacceptable, why they are unacceptable, and the reasons behind the Team Member's performance problem. The Team Member will be required to write an action plan stating what actions he or she will take to resolve the performance problem. The Commitment Discussion letter and the Team Member's commitment letter will remain in the Team Member's personnel file for a period of 24 months. If the Team Member is able to correct the performance problem and no additional problems develop, the Commitment Discussion letter and the Team Member's action letter will be removed from the Team Member's personnel file and will not be used for any future corrective action.

## Decision Leave – Phase IV

The Decision Leave is the 4th phase of corrective action. This phase may be taken if the Team Member fails to correct the performance problem after the Commitment Discussion or if it is determined that the Team Member's performance is serious enough to warrant action beyond a

32

### Commitment Discussion.

The affected Team Member will meet with his/her group leader and/or manager, team relations representative, team relations manager and the appropriate production management Team Member for a formal meeting. The Team Member will be given the following day off with pay. The Team Member will be asked to use this time to make a final decision whether or not he/she wants to remain employed by HMMA.

If the Team Member decides to return to work and commit to correcting his/her performance, the day off will be excused with pay.

Information regarding a decision leave will remain in the Team Member's personnel file for a period of twenty-four (24) months. If the Team Member is able to correct the performance problem, and no additional performance problems develop, it will be removed from the Team Member's personnel file and will not be used for any future corrective action.

Corrective action will be administered sequentially with regard to all attendance performance situations. Specific performance-related issues regarding performance, quality, and conduct will be evaluated on a case-by-case basis, and corrective action may be applied based on the severity of the performance issue. Any Team Member whose employment is terminated by HMMA may be entitled to request a Peer Review Panel Hearing.

## Termination

HMMA and its Team Members have a mutual interest in maintaining job security and stability in our organization. Because of our mutual interest, HMMA and its management team hope that we never have to terminate a Team Member's employment. However, in situations where a Team Member refuses to respond to the steps in the "Corrective Action Program" outlined above, or if a Team Member's actions are such that HMMA feels his/her employment cannot be continued, the Team Member will be terminated. Every termination decision will be reviewed by the team relations manager, the Team Member's manager, and the Director of Human Resources to review all facts and information before a termination decision is made.

Notwithstanding anything to the contrary contained in this handbook, every Team Member's employment with HMMA is voluntary and is subject to termination by you or HMMA at will, with or without cause, and with or without notice, at any time. Nothing in this handbook or HMMA policies or procedures shall be interpreted to be in conflict with or to eliminate or modify in any way the employment-at-will status of HMMA.

## SERIOUS MISCONDUCT

33

Edwards v. Hyundai, et al.

0020

HMMA requires a high degree of personal integrity from its Team Members. There are certain things a person can do that by nature are so serious that they place him/her outside of the "Corrective Action Policy." When a person commits one of those actions against HMMA and/or his/her fellow Team Members, he/she may be terminated from employment immediately.

In serious misconduct cases where it is determined that termination is not appropriate, the Team Member will receive a Letter of Conditional Employment which will remain in the Team Member's file for 36 months. Upon issuance of a letter of conditional employment, the affected Team Member, group leader, team relations representative, team relations manager and the appropriate management Team Member will have a formal meeting. Following this meeting, the Team Member will develop an action plan and make a written commitment to successfully implement that plan.

Listed below are some examples of activities that constitute serious misconduct at HMMA:

- Serious and/or excessive violations of HMMA's attendance program.

- Serious and/or excessive violations of HMMA's performance standards.

- Threatening or fighting on HMMA's premises, at HMMA sponsored functions, or while conducting business away from the plant.

- Disclosing, misusing or removing from the premises any HMMA or fellow Team Member's property unless authorized.

- Use, possession, sale, transfer of or being under the influence of illegal drugs, alcohol or any other intoxicating substance at any time on HMMA property. Gifts of alcohol and/or coolers containing alcohol are also prohibited at HMMA.

- Deliberate damage to HMMA property or the property of a fellow Team Member.

- Intentionally misrepresenting or falsifying any information concerning employment or any report or HMMA record.

- Engaging in any form of discrimination in the workplace, including racial or sexual harassment of a fellow Team Member or harassment by a person in a supervisory position of a Team Member under the supervisor's authority.

- Insubordination, including refusing work assignment or refusing to follow direction of HMMA security or safety personnel.

- Deliberately trying to conceal serious quality problems in HMMA products.

- Deliberately using unsafe work practices that might seriously jeopardize the health or safety of the Team Member or a fellow Team Member.

34

- Use, possession, sale or transfer of a weapon at any time on HMMA property.

- Engaging in illegal activities such as gambling or trafficking stolen goods.

- Deliberately violating HMMA's Solicitation and Distribution Policy.

- Deliberately spreading false or malicious rumors or slandering or libeling a fellow Team Member, HMMA or an HMMA product.

- Leaving the plant without proper authorization (note: this is also considered a voluntary resignation).

- Chronic violations of HMMA's Safety Rules or Procedures.

- Willful violations of HMMA's Lockout/Tag out, Confined Space Procedures or other situations where the violation places the Team Member or others in immediate danger.

The aforementioned list is not all inclusive.

## WORKPLACE THREATS AND VIOLENCE

This policy applies to any Team Member and/or person that make substantial threats, exhibits threatening behavior, or engages in violent acts on HMMA property or makes threats, exhibits threatening behavior, or engages in violent acts relating directly or indirectly to any work activities.

Threats, threatening behavior, or acts of violence against Team Members, vendors, contractors, visitors, or other individuals by anyone on HMMA property will not be tolerated (zero tolerance).

Threats, threatening behavior, or acts of violence against Team Members, vendors, contractors, visitors or other individuals relating directly or indirectly to work activities including phone calls, written materials, behavior at HMMA-sponsored activities will not be tolerated. Firearms, ammunitions, knives, bows or any other types of weapons are not permitted on HMMA property which includes the parking area(s).

In the event that violations of this policy are substantiated, HMMA will initiate a decisive and appropriate response. This response may include, but is not limited to: suspension or termination of any business relationship, reassignment of job duties, suspension or termination of employment, and/or seeking arrest and prosecution of the person or persons involved. Any violation of this policy will be considered serious misconduct. Any Team Member terminated pursuant to violations of this policy shall not be subject to the Team Member Review Board process.

Any Team Member that has knowledge of or witnesses threats, threatening behavior or an actual incident or violations of this policy is required to report the information to his/her immediate supervisor and/or the manager of security and/or his/her Team Member relations representative.

## TEAM MEMBER RESOLUTION PROGRAM AND

35

## PROCEDURE

In any organization there can be differences of opinion about working conditions, work rules and policies, and other work-related issues. To resolve these differences effectively, communication is essential. This program is designed to enhance communication by providing a formal process to resolve legitimate disputes. HMMA will provide a prompt, orderly means of receiving and responding to Team Members' concerns. This program and procedure is intended to supplement, rather than discourage or replace, informal discussions between supervisors and Team Members. A supervisor should make every reasonable effort to resolve Team Members' concerns outside the formal Team Member Resolution Procedure.

The Team Member Resolution Program and Procedure is available to all full-time Team Members who have successfully completed their probation period. The Team Member Resolution Program and Procedure is not available to individuals employed in a temporary status or to employees of any contracted services provided to HMMA. The initiation of the Team Member Resolution Procedure in good faith by Team Members shall not adversely affect their standing as Team Members.

The Team Member Resolution Program consists of four steps, which are outlined below.

Outside counsel will not be permitted to attend any of the meetings. However, appropriate witnesses may be permitted to attend with approval from the manager of team relations.

### Step 1: Supervisory Level

**Team Member's Role**

The Team Member should contact the team relations representative to coordinate a meeting in order for the Team Member to verbally present the concern to his/her supervisor within five (5) working days of the original cause for the appeal, or from the date the Team Member learned the cause for the appeal.

**Supervisor's Role**

The supervisor will meet with the Team Member and the team relations representative and respond verbally to the concerned Team Member within five (5) working days.

### Step 2: Resolution Request

**Team Member's Role**

36

If a Team Member does not agree with the supervisor's verbal response, he/she should contact a team relations representative for a Resolution Request Form. The team relations representative will give the Team Member the form and assist the Team Member in filing the form if necessary. The team relations representative will forward the Resolution Request form to the Team Member's section manager and coordinate within five (5) working days of receiving the answer to Step 1. The team relations representative will attend the meeting.

**Section Manager's Role**

The section manager will review and investigate the facts of the appeal with the assistance of the team relations representative. The department manager will then conduct the prearranged meeting with the Team Member and the team relations representative.

Regardless of the outcome of the meeting, the department manager will provide the Team Member with a written response, briefly outlining the decision. This response will be delivered to the Team Member no later than five (5) working days following the meeting.

### Step 3: Resolution Appeal

**Team Member's Role**

If a Team Member does not agree with the department manager's response, he/she should contact a team relations representative. The Team Member must make a written request stating he/she does not agree with the department manager's response and request to go to the next step. The team relations representative will forward the request to the team relations manager and coordinate a meeting within five (5) working days of receiving the answer to Step 2. The team relations representative will attend the meeting.

**Manager of Team Relations Role**

The team relations manager will review and investigate the facts of the appeal with the assistance of the team relations representative. The manager of team relations will then conduct the prearranged meeting with the Team Member and the team relations representative.

Regardless of the outcome of the meeting, the manager of team relations will provide the Team Member with a written response, briefly outlining the decision. This response will be delivered to the Team Member no later than five (5) working days following the meeting.

### Step 4: Resolution Final Appeal

The Resolution Final Appeal is the last step of the process. The committee's written response is the final decision and cannot be appealed. The committee cannot change or alter any approved policy.

37

Edwards v. Hyundai, et al.

0022

Edwards v. Hyundai, et al.

**Team Member's Role**

If the Team Member is not satisfied with the decision of the team relations manager, he/she will give written notice, within five (5) working days of receipt of the Step 3 written response, to the team relations representative stating his/her wish to initiate the final step of the Resolution Appeal Process.

**Top Management's Role**

The manager of team relations will coordinate and facilitate a meeting consisting of three of HMMA's top management within 10 days of the request. HMMA's top management representatives will meet with the Team Member and allow the Team Member to present his/her facts to the final appeal committee.

The committee may ask questions and/or speak to any witnesses as they feel may be necessary to reach a final decision. The Team Member filing will be notified of the committee's final decision in writing within 5 business days of the resolution meeting.

A Team Member may withdraw an appeal at any time. Once withdrawn, however, it may not be reinstated. If the Team Member does not meet the time constraints outlined in this policy, Team Member Resolution request decisions will remain as defined by prior actions.

The procedure as outlined describes the normal course in which resolution requests are resolved. Team Members should note that the Team Relations Department is available to provide Team Member consultation on a problem and any other assistance at any time prior to or during the Team Member Resolution Procedure.

Team Members cannot file a Team Member Resolution Request against a policy they feel is unfair. However, a Team Member may file a Team Member Resolution Request regarding a policy that is not implemented properly.

**TEAM MEMBER REVIEW BOARD**

The Team Member Review board is to allow those Team Members who feel they have been wrongfully terminated to request a review of that termination by a random selection of trained and qualified fellow Team Members. Any Team Member terminated for any reason except for violations of HMMA's policy on workplace threats and violence, drugs and alcohol, and the anti-harassment policy will have the right to appeal the termination to a Team Member Review Board.

**DRUGS, ALCOHOL AND WEAPONS PROHIBITED**

HMMA is committed to maintaining a drug, alcohol and weapon free workplace for all Team Members in order to ensure the safety of all those working at our facility and at all HMMA sponsored events. The illegal

38

use, sale or possession of narcotics or illegal drugs, alcohol or controlled substances while on the job or on HMMA property (which includes parking areas) is prohibited and is a dischargeable offense. Any illegal substance will be turned over to the appropriate law enforcement agency and criminal prosecution may result. HMMA also considers off-the-job illegal drug use as proper cause for disciplinary action up to and including termination of employment.

Any Team Member convicted of driving under the influence which results in the suspension or revocation of his/her driving privileges and who, in the course of his/her job duties, is required to operate a motorized vehicle, including fork lifts, must notify the manager of the department. The suspension or revocation of a driver license will result in a job reassignment either temporarily or permanently. Any job reassignment will be to an open position only.

HMMA's business involves manufacturing, use of powered equipment, engineering, procurement, and project management. Therefore, the safety of our Team Members and facilities, as well as the safety of the general public and our ability to fulfill our obligations under the Drug-Free Work Place Act of 1988, are of paramount concern.

While HMMA has no intention of intruding into the private lives of its Team Members, HMMA does expect Team Members to report for work in a condition that allows them to perform their duties without jeopardizing their own safety or the safety of other Team Members. HMMA recognizes that Team Members' off-the-job, as well as on-the-job, involvement with drugs and/or alcohol can have an impact on the workplace and on our ability to accomplish our goal of a drug and alcohol-free work environment.

HMMA will take steps to prevent and discourage the use, possession, sale, or distribution of stated contraband at any time by any HMMA Team Members or contracted vendors. In accordance with this policy, periodic searches, random or annual urinalysis, drug screening or blood testing may be conducted. Such searches and testing will be performed by HMMA using qualified contracted agents or qualified management Team Members.

Any Team Member who is taking medication prescribed by a physician must be able to provide a record of the prescription, including the name of the medication, the prescribing physician's name, and any limitations the prescription may place on the Team Member's ability to perform assigned duties. Furthermore, Team Members taking prescription or non-prescription medication are responsible for being aware of any potential effect such drugs may have on their reactions, judgment, or ability to perform their duties, and if impairment is possible, to report such use to their group leader/manager or HMMA's medical clinic prior to reporting to work.

Any refusal by a Team Member to submit to a search or testing procedure may, however, constitute grounds for termination. The primary

39

Edwards v. Hyundai, et al.

0023

purpose of this policy is to promote the safety and well-being of all Team Members. It would be inconsistent to promote a strong safety effort while allowing the use of drugs and alcohol or the possession of drugs, alcohol and/or weapons on HMMA property to undermine the safe and effective performance of Team Members on the job.

Each applicant for employment will be required, as a condition of employment, to undergo a urine drug screen/hair analysis. Applicants will be asked to read the policy and sign the post offer employment offer and Team Member consent to alcohol and drug screening. If an applicant tests positive and is determined to be in violation of this policy, applicant will be ineligible for employment.

## FOR CAUSE TESTING AND RANDOM TESTING

Each Team Member, as a condition of continued employment, is subject to medical or physical examination or tests, including urine drug screen and/or a drug screen using hair, at the determination of the responsible group leader, department manager and concurrence of the HMMA team relations manager and/or his/her designee, providing the following conditions are met:

- If the Team Member's group leader and/or manager has reasonable cause to suspect that the Team Member is in violation of this policy; or
- If the Team Member's job performance is deficient in a manner which suggest a possible violation of this policy; or
- If the position is designated as a safety sensitive and/or high risk occupation; or
- If the Team Member is selected at random for testing in order to monitor and ensure compliance by all Team Members with this policy. The random selection will be done centrally by HMMA's medical facility. Team Members will be asked to sign the Pre-Employment Offer and Team Member Consent to Alcohol and Drug Screening form.

If a Team Member tests positive for a random and/or for-cause testing and is determined to be in violation of this policy, the Team Member will be required to:

- attend a substance abuse program
- follow the attending physician and/or a qualified substance abuse counselor's guidance
- agree to random
- supply HMMA's testing over the next 12 months treatment and/or documentation with documentation of treatment and/or documentation that no further treatment is necessary
- agree to remain substance free as a condition of employment
- be responsible for any cost incurred that is not covered by HMMA's medical plan for treatment
- voluntarily resign if the Team Member subsequently tests

40

positive for any subsequent illegal or un-prescribed substance and or being under the influence of alcohol.

Any adulterated specimen will be viewed as falsification and will result in immediate termination.

Any Team Member requesting rehabilitation assistance will be referred to the Team Member Assistance Program (TMAP) provider for assessment and treatment recommendations. The TMAP provider will monitor the Team Member and/or advise HMMA of the Team Member's progress. Should the Team Member fail to maintain satisfactory progress or discontinue the program, the Team Member will be subject to termination.

Any Team Member who refuses to submit to drug testing will be considered to be insubordinate and will be terminated. Additionally, if a Team Member refuses to submit to or cooperate with a post-accident blood or urine test, he/she may forfeit his/her right to recover workers' compensation benefits.

HMMA recognizes that drug abuse and/or dependency are medical/behavioral conditions that can be successfully treated. Team Members with drug problems are encouraged to request assistance from the Team Member Assistance Program. Participation in TMAP is totally voluntary and completely confidential; however, a request for assistance or participation in a TMAP does not excuse a Team Member from violation of this policy.

HMMA reserves the right to conduct unannounced searches of its property, vehicles, and facilities, including Team Member's vehicles, work areas, desks and lockers assigned to Team Members, at any time. No Team Member has the right to interfere with or object to such searches of reserves the right to search personal property or otherwise. HMMA Members, such as, but not limited to, lunch boxes or bags, pocketbooks or briefcases if such property is brought onto HMMA premises or into HMMA vehicles.

All Team Members will be required to sign a statement acknowledging their understanding of and compliance with HMMA policy.

## PUBLIC RELATIONS

To ensure that all information given to the public and the media is consistent, beneficial and accurate, it is important that the the Public Relations Department coordinates and controls all information going out externally. If you are contacted by the news media and asked for information about HMMA or if you are asked to comment about HMMA, you are to refer the interviewer to the Public Relations Department. You may not release any information about HMMA business or activities unless you have been specifically authorized by the Public Relations Department.
INTERNAL COMMUNICATIONS

41

Communication at HMMA is a key factor to our success. In order to maintain good communications, HMMA has established various avenues of communicating information to the Team Members. Additionally, and just as important, are the avenues that have been created to allow you, the Team Member, to communicate to HMMA. It is important to keep the avenues of communication open. By communicating we can all be successful. Even though we have many avenues for communication at HMMA all Team Members are encouraged to communicate with their group leaders and managers. Some of those methods are:

## Open-Door Policy

HMMA believes that each Team Member should have the ability to address problems as they arise personally. As with all companies, issues and concerns, differences of opinions and disagreements occur. If of concern are not addressed in a timely manner those issues involved. HMMA wants, and encourages all Team Members to openly communicate with one another to resolve misunderstandings, differences of opinion and disagreements. One way that we can resolve these issues is by having open communications with one another and the ability to discuss issues and concerns openly.

Unfortunately, there may be times when an agreement cannot be reached. In these situations HMMA wants every Team Member to know that through the Open-Door Policy they can address these issues in order to achieve a fair and practical solution.

Any member of the team relations department will assist you should a concern or issue were to arise.

Again, HMMA encourages all Team Members to discuss the situation in a respectful manner with the party involved. If a resolution is not reached, discuss the situation with the next level of management. The Open-Door Policy is meant to be used in a systematic fashion and may be pursued to the top levels of HMMA's management.

## Bulletin Board

HMMA has bulletin boards at all entrances and exits. These bulletin boards are for communicating work related information, information required by law, and job postings. Additionally, each team will have a bulletin board; these boards are for work related communications only. Team Members are prohibited from posting any information or notices directly on any bulletin board at HMMA.

## President's Roundtables

The President's Roundtable provide HMMA's Team Member an opportunity to meet and talk with HMMA's President as well as our Executive Vice Presidents. Team Members will be selected randomly on a bi-monthly basis and sent invitations to attend the meetings. Participation is voluntary; however each Team Member is encouraged to attend so that they can communicate directly with the President.

## Group Leader/Managers One-on-Ones

Each group leader/manager will meet with each Team Member twice a year. In a company the size of HMMA it is difficult at times for the two to get together and have a casual conversation. HMMA feels that develop-ing these relationships is important and helps foster open communication. These meetings will be held away from the production work areas and are meant to be an opportunity for The Team Member and group leader/man-ager to have a 15 minute casual conversation.

## Manager Lunches

The managers lunches are another opportunity for a team to get together in a casual setting were the manager/assistant manager of the department meets with each team in their department every six months and provides lunch. Participation is voluntary. The purpose of these meetings is to continue to foster open communication, and promote a team spirit as well a feeling of family within the department. The meeting is held during the normal lunch period and is unpaid time.

## Team Advisor

The Team Advisor is a bulletin that will be issued to the team to com-municate important information to the teams. The Team Advisor will be issued on an as needed basis to each team leader so they can read the information during the Five Minute Communication meeting. Once the bulletin has been read it will be posted for a specified time in order to allow Team Members to read it at their leisure.

## Hyundai Communication System (HCS) 334-387-8008

HMMA has established the HCS in order to allow Team Members an opportunity to ask questions in the event their group leader, team rela-tions representative or another member of management has been unable to answer your question or concern. This means of communication is done anonymously, by calling the HCS. The HCS does not record the extension or phone number from which the call came. HMMA encour-ages Team Members to talk with their managers first, but in the event you need to ask a question, make a comment, or voice a concern on a confidential basis, we also encourage you to call the HCS.

The HCS will be available 24 hours a day, seven days a week. Your call will be directed to the Director of Human Resources and or his designee.

42

43

The Director of Human Resources will review the question and/or comment and direct them to the most qualified person. If you leave your name and want a personal response, a meeting will be scheduled if you request one. Every effort will be made to make sure all replies are given within ten working days of receiving the call.

Anonymous calls will be posted with the answers on the HCS boards for a period of five days. We also ask everyone to be patient. Some calls may contain complex issues that require more time in order to answer them accurately.

## HMMA Closed Circuit Television System (CCTV)

HMMA CCTV System is an internal video system that will be used to broadcast HMMA information to all Team Members daily.

## HMMA Weekly News

HMMA Weekly News is a weekly summary of company-related information. The HMMA Weekly News will be distributed every Monday on a weekly basis.

## HYUNDAI Insights

Hyundai Insights is a newsletter that will be sent to the Team Members home on a bi-weekly basis. This news letter will keep you and your family informed about what is going on at HMMA as well as what is going on at HMC and HMMA.

## Five Minute Communication Meetings

Each team will have a five minute communication meeting at the start of each shift. The purpose of this meeting is to provide the Team Members with information pertaining to production, quality, or safety. These meetings may also be used to discuss sales, benefits, policy updates, or other pertinent information the team may need to know. All Team Members must be in their assigned meeting area ready for work at the start of their shift.

## COMMUNITY RELATIONS

### Speeches

HMMA receives many requests for speeches about our company from a variety of groups. If your organization is not-for-profit and would like a representative from HMMA to speak to a group, you or your organization needs to submit in writing the following information: All requests must be on the group's letterhead.

- Requested date of speech
- Time
- Location
- Name of Group

44

- Topic you would like covered
- Background information on the organization
- Person to contact with their phone number or email address

All requests must be turned in at least one month prior to the requested date for the speech and should be addressed to the manager of public relations.

### Tours

All family and public tours must be scheduled through the Public Relations Department.

## GENERAL INFORMATION

### Electronic Devices

HMMA has a responsibility to protect every Team Member as well as to protect HMMA assets. The automotive industry is a very competitive industry, and in order to protect its Team Members and proprietary information, HMMA must control what types of electronic devices are allowed in the workplace.

In order to ensure the health and safety of all Team Members, personal radios, televisions, tape recorders, and tape/CD/mp3 players are not permitted anywhere in the facility.

### Camera/Video Camera

In situations where a department uses a camera/video camera in order to conduct investigations, the department must have approval by the Security Department and must have a camera/video camera pass attached to the camera/video camera at all times. If a supplier has a need that requires the use of a camera/video camera in order to conduct an investigation or to assist in the function of their job duties, he/she must gain written approval from the responsible department. The written approval must be submitted to the Security Department for approval and verification from the responsible department. Once the Security Department has approved the use of a camera/video camera, Security personnel will issue a temporary camera/video camera pass. The camera/video camera pass must be attached to the camera/video camera.

Any camera/video camera without a camera/video camera pass will be confiscated, held in security and returned to the owner as they exit HMMA's premises, minus its film.

Personal camera/video cameras and camera/video phones are not permitted within the plant, nor will pictures be allowed during general tours. Business situations may require photos to be taken in the plant, but when these situations occur, only Team Members with an approved camera/video camera pass using a HMMA-owned camera/video camera will be

45

allowed to do so.

## Cell Phones/Pagers

HMMA reserves the right to issue cell phones and/or pagers for business reasons to those individuals that have been approved in order to conduct HMMA business matters.

Personal cell phones and pagers will be allowed in the facility. However, cell phones and pagers must be kept in the Team Member's locker or desk during work times. In addition, the devices must have the volume muted while being stored. Team Members may use their cell phones and/or pagers during breaks and lunch periods only, and the Team Member must be in a designated break area.

## Audio Tape Recorders

Audio tape recorders are prohibited on HMMA premises. In situations where an audio tape recorder is needed a request for approval must be submitted to and approved by the Director of Human Resources or his/her designee.

Any violation of the aforementioned could result in corrective action up to and including termination. Any violation by a non-HMMA Team Member could result in their being asked to leave the premises and the Team Member is responsible for the care and upkeep, and inventory of film, tape, disk, and/or any other type of device capable of storing audio or video information will be confiscated and/or memory erased.

## HMMA TOOLS

HMMA has supplied each Team Member with the tools as well as state of the art equipment needed to perform their daily job functions. Each Team Member is responsible for the care and upkeep, and inventory of tools and other equipment issued by HMMA. These tools and equipment are not to be removed from the appropriate HMMA work area. Personal tools must not be brought into HMMA.

Intentional damage to any HMMA tooling or equipment is subject to corrective action up to and including termination.

## LOCKERS

HMMA will provide each Team Member with a locker so that they may store personal items. However, these lockers should not be used to store money or valuables. HMMA will not be responsible for anything that is destroyed, lost or stolen from any locker.

Lockers will remain the property of HMMA at all times. HMMA maintains the right to inspect any locker and its contents at any time with or without notice if it is believed the locker (s) contain items contrary to HMMA policy. This includes but is not limited to items such as firearms, explosives, dangerous or lethal weapons, alcohol, illegal drugs, or missing HMMA property.

46

## CAFETERIA

HMMA provides two dining facilities for our Team Member's convenience. HMMA has designed each of our dining facilities so that you can experience a clean and pleasant area while dining. Prepared meals will be served daily. However if you choose to bring your own meal our dining facilities have ample seating for everyone. Team Members will also find vending machines located throughout the facility if you wish to purchase food or drink.

## SMOKING

In an effort to provide safe and comfortable work conditions, HMMA prohibits smoking and/or the use of smokeless tobacco products in all production facilities and administrative areas. Team Members who use tobacco products should respect all areas designated as "no smoking," limit their tobacco use to those areas where and when smoking is permitted (outside of the facility and only during breaks and dinner/lunch), and dispose of all smoking materials/smokeless tobacco products in proper containers.

Smoking or the use of smokeless tobacco is only permitted during non-work times. This is outlined as follows: one 10-minute paid rest period in the first half of the shift, one 10-minute paid rest period in the second half of the shift and during the unpaid lunch period. In case of overtime work, an additional 5-minute rest period for each full hour (60 minutes) of overtime can be taken. There are some jobs where there are no set scheduled break times, such as maintenance, administration, etc. It is understood that these Team Members still fall with the guidelines of taking only a 10-minute break in the first half of the shift, and a 10-minute break in the second half of the shift.

HMMA intends to consistently enforce the smoke free environment policy described in this document. Any HMMA Team Member violating this policy is subject to corrective action up to and including termination.

## TELEPHONE CALLS

All HMMA phones are for business purposes only. Team Members are not allowed to use HMMA phones for personal business. However, if an emergency situation should arise, the Team Member is to contact their group leader/manager and/or another member of management in order to use a HMMA phone.

All emergency phone calls into HMMA will be forwarded to the appropriate area. HMMA's Team Members and their families are very important and considered HMMA's extended family. Each Team Member should supply their family members with an emergency contact number for their work area, as well as the department they work in, the group leader/manager's name, and make sure their family knows that the contact information is for emergencies only.

47

| ![HYUNDAI] HYUNDAI<br>Hyundai Motor Manufacturing Alabama | Medical Leave Policy | HR-AL-HR-TR-S-00022 |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

## 1. PURPOSE

The purpose of this policy is to outline procedures that Team Members must follow when it is necessary for a Team Member to be placed on a work related or non-work related medical leave of absence.

## 2. POLICY

2.1. Team Members that are absent from work due to a non-occupational medical condition, must follow procedures outlined in this policy to qualify for a leave and receive short-term disability benefits.  STD benefits will be provided based on HMMA's current plan.

2.2. HMMA will provide Worker's Compensation benefits in accordance with Alabama's Worker Compensation Laws and Regulations for Team Members who qualify for work related medical leave of absence due to an injury or illness arising out of their course and scope of employment with HMMA.

2.3. In the event questions arise regarding a non-occupational or work-related leave of absence or worker's compensation issues, the Team Member should contact the HMMA Safety manager.

## 3. PROCEDURE FOR WORK RELATED MEDICAL LEAVES

3.1. In order to be considered for a Worker's Compensation leave of absence, as stated in the Team Member Handbook, all injuries, regardless of how insignificant they seem, must be reported immediately to the Team Member's manager or another member of management

3.2. Medical care will be provided or directed by the HMMA Medical Clinic staff.

3.3. HMMA has modified and light duty job programs available to accommodate a Team Member that receives temporary medical restrictions due to a work-related injury or illness.  If the HMMA Medical Clinic staff determines that a Team Member can not return to his/her regular job assignment or perform a modified or light duty job, the HMMA Medical Clinic will place the Team Member off work.

NOTICE: Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

1

PLAINTIFF'S EXHIBIT

34

| ![Hyundai logo] HYUNDAI<br>Hyundai Motor Manufacturing Alabama | Medical Leave Policy | HR-AL-HR-TR-S-00022 |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

3.4. All time off from work for work related injuries must be authorized by the HMMA Medical Clinic.  Team Members off work without authorization will be charged with an absence.

4. RETURNING FROM A WORK RELATED MEDICAL LEAVE

4.1. The HMMA Medical Clinic will determine when a Team Member is ready to return from a work related medical leave.

4.2. The HMMA Medical Clinic staff will assess each Team Member returning from a work related or non-work related medical leave of absence and determine if the Team Member needs to be placed in the HMMA Work Conditioning program.

5. PROCEDURE FOR A NON-WORK RELATED MEDICAL LEAVE

5.1. In the event a Team Member is absent from work for a non-related injury or illness, he/she is required to do the following:

5.2. For an absence of one or two work days, Team Member must contact his/her manager each day no later than 60 minutes after the start of the shift.

5.2.1.  Team Member must supply the following information:
5.2.2.  The reason for the absence.
5.2.3.  The expected length of absence.
5.2.4.  Type of absence (unavoidable, unscheduled, unpaid)

5.3. If the absence will/does extend more than three days, the Team Member must contact the Medical Clinic on the third (3rd) day of absence.  The Medical Clinic will inform him/her what documentation is necessary and will notify his/her Manager of the leave status.

5.4. For absences of more than three consecutive work days the Team Member must complete the proper forms to be eligible for Short Term Disability (STD) benefits.  These forms can be obtained from the Medical Clinic.

6. RETURNING FROM A NON-WORK RELATED MEDICAL LEAVE
6.1. Prior to returning to work from an absence of more than three days the Team Member must provide a doctor's statement to the HMMA Medical Clinic.  The Team Member that has been on an extended leave may be required to come in

NOTICE: Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

2

| ![HYUNDAI logo] HYUNDAI Hyundai Motor Manufacturing Alabama | Medical Leave Policy | HR-AL-HR-TR-S-00022 |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

the shift prior to returning to work to ensure he/she has the proper paperwork and medical clearance to return to work.  The doctor's statement may include the following information:

6.1.1.  Specific dates on which the Team Member was unable to work due to illness or injury.

6.1.2.  Detailed diagnosis of the illness or injury.

6.1.3.  A medical release with the specific return date

6.1.4.  Details of any related restrictions or medications.

6.2. The HMMA Medical Clinic staff will assess each Team Member returning from a work related or non-work related medical leave and determine if the Team Member needs to be placed in the HMMA Work Conditioning ramp up program.

*NOTE: FAILURE TO FOLLOW PROCEDURES OUTLINED IN THIS POLICY CAN RESULT IN DELAY, SUSPENSION OR LOSS OF BENEFITS AND/OR AFFECT EMPLOYMENT STATUS.*

6.3. In the event there are inconsistencies with information provided, HMMA will conduct an appropriate investigation to determine benefit eligibility and if corrective action is necessary.  Intentional misrepresentation of a medical condition and/or ability to work is a serious misconduct offense and can result in termination.

6.4. A Team Member cannot engage in gainful employment during any leave of absence without the prior written consent of the Director of Human Resources.  A Team Member who accepts gainful employment without prior written consent shall be considered to have voluntarily resigned from employment with HMMA as of the first day of work at the new employer.

6.5. HMMA shall review each medical leave of absence to determine if the leave qualifies as FMLA leave.  HMMA shall administer leaves that qualify for FMLA leave in accordance with law and HMMA's FMLA Leave Policy.

*NOTICE:* Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

| **HYUNDAI** Hyundai Motor Manufacturing Alabama | **Family Medical Leave Policy** | HR-AL-HR-TR-S-00013 |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

## A. GENERAL PROVISIONS

It is the policy of HMMA to grant up to 12 weeks of family and medical leave during any 12-month period to eligible Team Members, in accordance with the Family and Medical Leave Act of 1993 (FMLA). The leave may be paid, unpaid, or a combination of paid and unpaid leave, depending on the circumstances of the leave and as specified in this policy.

## B. ELIGIBILITY

In order to qualify to take family or medical leave under this policy, the Team Member must meet all of the following conditions:

1) The Team Member must have worked for HMMA for 12 months, or 52 weeks. The twelve months, or 52 weeks, need not have been consecutive. For eligibility purposes, a Team Member will be considered to have been employed for an entire week even if the Team Member was on the payroll for only part of a week or if the Team Member is on leave during the week.

2) The Team Member must have worked at least 1250 hours during the twelve-month period immediately before the date when the leave is requested to commence. The principles established under the Fair Labor Standards Act (FLSA) determine the number of hours worked by a Team Member. The FLSA does not include time spent on paid or unpaid leave as hours worked. Consequently, these hours of leave should not be counted in determining the 1250 hours eligibility test for a Team Member under FMLA.

## C. TYPE OF LEAVE COVERED

In order to qualify as FMLA leave under this policy, the Team Member must be taking leave for one of the reasons listed below:

1) the birth of a child and in order to care for that child;

2) the placement of a child for adoption or foster care, and to care for the newly placed child;

3) the care of a spouse, child, or parent with a serious health condition; or

4) the serious health condition (described below) of the Team Member.

A Team Member may take leave because of a serious health condition that makes the Team Member unable to perform the functions of the Team Member's position.

A serious health condition is defined as a condition which requires inpatient care at a hospital, hospice, or residential medical care facility, including any period of incapacity or any subsequent

*NOTICE:* Paper copies of this Procedure should NOT be used for decision making purposes. Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

| **HYUNDAI**  Hyundai Motor Manufacturing Alabama | **Family Medical Leave Policy** | HR-AL-HR-TR-S-00013 |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

treatment in connection with such inpatient care, or a condition which requires continuing care by a licensed health care provider.

This policy covers illnesses of a serious and long-term nature, resulting in recurring or lengthy absences. Generally, a chronic or long-term health condition which, if left untreated, would result in a period of incapacity of more than three days, would be considered a serious health condition.

Team Members with questions about what illnesses are covered under this FMLA policy or under the company's sick leave policy are encouraged to consult with the Human Resource Department.

HMMA may require a Team Member to provide a doctor's certification of the serious health condition.  The certification process is outlined in section H.

If a Team Member takes paid sick leave for a condition that progresses into a serious health condition and the Team Member requests unpaid leave as provided under this policy, HMMA may designate all or some portion of related leave taken as leave under this policy, to the extent that the earlier leave meets the necessary qualifications.

An eligible Team Member can take up to 12 weeks of leave under this policy during any 12-month period. HMMA will measure the twelve-month period as a rolling 12-month period measured backward from the date a Team Member uses any leave under this policy.  Each time a Team Member takes leave, HMMA will compute the amount of leave the Team Member has taken under this policy and subtract it from the 12 weeks of available leave, and the balance remaining is the amount the Team Member is entitled to take at that time.

5 ) If a husband and wife both work for HMMA and each wishes to take leave for the birth of a child, adoption or placement of a child in foster care, or to care for a parent (but not a parent "in-law") with a serious health condition, the husband and wife may only take a combined total of 12 weeks of leave.

## D. TEAM MEMBER STATUS & BENEFITS DURING LEAVE

While a Team Member is on leave, HMMA will continue the Team Member's health benefits during the leave period at the same level and under the same conditions as if the Team Member had continued to work.

If the Team Member chooses not to return to work for reasons other than a continued serious health condition of the Team Member or the Team Member's family member or a circumstance beyond the Team Member's control, HMMA will require the Team Member to reimburse HMMA the amount it paid for the Team Member's health insurance premium during the leave period.

Under current HMMA policy, the Team Member pays a portion of the health care premium.  While on paid leave, HMMA will continue to make payroll deductions to collect the Team Member's share of the premium. While on unpaid leave, the Team Member must continue to make this payment, either in person or by mail.  The payment must be received in the Accounting

*NOTICE:* Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

2

| ⬡ **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | **Family Medical Leave Policy** | **HR-AL-HR-TR-S-00013** |
|---|---|---|
| Revision Date: 4-Nov-04 | Owner: Team Relations | Revision Level: 01 |

Department by the _____ day of each month. If the payment is more than 30 days late, the Team Member's health care coverage may be dropped for the duration of the leave. HMMA will provide 15 days notification prior to the Team Member's loss of coverage.

If the Team Member contributes to a life insurance or disability plan, HMMA will continue making payroll deductions while the Team Member is on paid leave. While the Team Member is on unpaid leave, the Team Member may request continuation of such benefit, and pay his or her portion of the premiums. If the Team Member does not continue these payments, HMMA may discontinue coverage during the leave.

## E. TEAM MEMBER STATUS AFTER LEAVE

A Team Member who takes leave under this policy will be able to return to the same position or a position with equivalent status, pay, benefits and other employment terms. The position will be the same or one which is virtually identical in terms of pay, benefits, and working conditions.

HMMA may choose to exempt certain highly compensated Team Members from this requirement and not return them to the same or similar position.

## F. USE OF UNPAID AND UNPAID LEAVE

If the Team Member has earned paid leave, the Team Member must use paid leave first and take the remainder of the twelve weeks as unpaid leave. HMMA will notify the Team Member within two business days in writing or orally (to be confirmed in writing by no later than the Team Member's next regular payday), whether or not the leave will be designated as FMLA leave.

A Team Member who is taking leave because of the Team Member's own serious health condition or the serious health condition of a family member must use all paid vacation, personal or sick leave prior to being eligible for unpaid leave. Sick leave may be substituted for unpaid FMLA leave if the reason for the FMLA leave is covered by the established sick leave policy.

Disability leave for the birth of the child and for a Team Member's serious health condition will be designated as FMLA leave and will run concurrently with FMLA leave. For example, HMMA provides six weeks of pregnancy disability leave. The six weeks can be designated as FMLA leave and counted toward the Team Member's 12-week entitlement. The Team Member may then be required to substitute paid leave as appropriate before being eligible for unpaid leave for what remains of the 12-week entitlement.

A Team Member who is taking leave for the adoption or foster care of a child must use all paid time off (PTO), personal or family leave prior to being eligible for unpaid leave.

## G. Intermittent Leave or a Reduced Work Schedule

The Team Member may take FMLA leave in 12 consecutive weeks, may use the leave intermittently (take a day periodically when needed over the year), or, under certain circumstances, may use the leave to reduce the work week or work day, resulting in a reduced

*NOTICE: Paper copies of this Procedure should NOT be used for decision making purposes. Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure*

| HYUNDAI                                 | **Family Medical Leave Policy** | HR-AL-HR-TR-S-00013 |
|-----------------------------------------|----------------------------------|---------------------|
| Hyundai Motor Manufacturing Alabama     |                                  |                     |
| Revision Date:  4-Nov-04                | Owner: Team Relations            | Revision Level:  01 |

hour schedule. In all cases, the leave may not exceed a total of 12 work weeks over a 12-month period.

HMMA may temporarily transfer a Team Member to an available alternative position with equivalent pay and benefits if the alternative position would better accommodate the intermittent or reduced schedule for leave for the Team Member or Team Member's family member that is foreseeable and for planned medical treatment, including recovery from a serious health condition or to care for a child after birth, or placement for adoption or foster care.

For the birth, adoption or foster care of a child, HMMA and the Team Member must mutually agree to the schedule before the Team Member may take the leave intermittently or work a reduced hour schedule. Leave for birth, adoption, or foster care of a child must be taken within one year of the birth or placement of the child.

If the Team Member is taking leave for a serious health condition or because of the serious health condition of a family member, the Team Member should try to reach an agreement with HMMA before taking intermittent leave or working a reduced hour schedule. If this is not possible, then the Team Member must prove that the use of the leave is medically necessary. HMMA may require certification of the medical necessity as discussed in Section H.

## H. CERTIFICATION OF THE SERIOUS HEALTH CONDITION

HMMA may ask for certification of the serious health condition. The Team Member should try to respond to such a request within 15 days of the request or provide a reasonable explanation for the delay. Failure to provide certification may result in a denial of continuation of leave. Medical certification may be provided by using the Medical Certification Form. Request for a medical certificate must be made in writing as part of HMMA's response to the Team Member's request for leave.

Certification of the serious health condition shall include: the date when the condition began, its expected duration, and a brief statement of treatment. For medical leave for the Team Member's own medical condition, the certification must also include a statement that the Team Member is unable to perform work of any kind or a statement that the Team Member is unable to perform the essential functions of the Team Member's position. For a family member who is seriously ill, the certification must include a statement that the patient, the family member, requires assistance and that the Team Member's presence would be beneficial or desirable.

If the Team Member plans to take intermittent leave or work a reduced schedule, the certification must also include dates and the duration of treatment, as well as a statement of medical necessity for taking intermittent leave or working a reduced schedule.

HMMA has the right to ask for a second opinion if it has reason to doubt the certification. HMMA will pay for the Team Member to get a certification from a second doctor, which HMMA will select. If necessary to resolve a conflict between the original certification and the second opinion, HMMA will require the opinion of a third doctor. HMMA and the Team Member will mutually select the third doctor, and HMMA will pay for the opinion. This third opinion will be considered final. The

*NOTICE: Paper copies of this Procedure should NOT be used for decision making purposes. Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure*

| **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | **Family Medical Leave Policy** | **HR-AL-HR-TR-<br>S-00013** |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

Team Member will be provisionally entitled to leave and benefits under the FMLA pending the second and/or third opinion.

## I. PROCEDURE FOR REQUESSTING LEAVE

All Team Members requesting leave under this policy must provide verbal notice with an explanation of the reason(s) for the needed leave to their immediate supervisor, who will advise the Benefits Department. If the leave is foreseeable, the Benefits Department may require the Team Member to provide a written request for leave and reasons(s) for that leave. Failure of the Team Member to provide a written request for leave cannot be grounds to deny or delay the taking of FMLA leave.

HMMA will provide individual notice of rights and obligations to each Team Member requesting leave within two business days or as soon as practicable.  For Team Members on intermittent or recurring leave for the same incident, this notice will be provided every six months.

When a Team Member plans to take leave under this policy, the Team Member must give HMMA 30 days notice.  If it is not possible to give 30 days notice, the Team Member must give as much notice as is practicable.  A Team Member who is to undergo planned medical treatment is required to make a reasonable effort to schedule the treatment in order to minimize disruptions to HMMA's operations.

If a Team Member fails to provide 30 days notice for foreseeable leave with no reasonable excuse for the delay, the leave request may be denied until at least 30 days from the date HMMA receives notice.  While on leave, Team Members are requested to report periodically to HMMA regarding the status of the medical condition and their intent to return to work.

*NOTICE:*  Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

| ⬡ HYUNDAI<br>Hyundai Motor Manufacturing Alabama | **Attendance Policy** | HR-AL-HR-TR-<br>S-00004 |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

## 1.  PURPOSE

The intent of the Attendance Policy is to establish a consistent method to apply fair, equitable, and consistent administration of acceptable levels of attendance.

## 2.  POLICY

Regular attendance is the cornerstone for the success of HMMA.   A Team Member's absenteeism can reduce the quality and affect of the overall efficiency of HMMA operations, as well as causing a hardship on fellow Team Members who report to work regularly.  Regular attendance is every Team Member's responsibility, and every Team Member is expected to be on the job, on time, every scheduled workday.

## 3.  DEFINITIONS

Catastrophic Event:  A legally declared emergency, which results in the closure of all roads.

Vacation: 10 scheduled paid vacation days per year (January-December).

Personal Days: 3 Personal Days per year (January –December) may be used at the Team Members' discretion.

## 4.  GENERAL PROVISIONS

4.1. Acceptable Attendance:

4.1.1. The minimum acceptable standard of attendance is 98%.

4.2. Absence:

4.2.1. Any scheduled workday missed is considered an absence.  However, work time missed due to holidays, scheduled vacations, catastrophic event, jury duty, military duty, bereavement leave, sick leave, work-related injury or illness, personal leave of absence and FMLA leave shall not be counted as an absence and are not cause for corrective action.

4.2.2. If a Team Member is absent due to a catastrophic event that results in:

*NOTICE:* Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

1

| ⓗ HYUNDAI<br>Hyundai Motor Manufacturing Alabama | Attendance Policy | HR-AL-HR-TR-S-00004 |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

    **4.2.2.1.**   A legally declared emergency which results in the closure of all roads in the Team Member's county of residence, or if a Team Member must drive through such a county on the way to work, such absences will <u>not</u> count against the Team Member's attendance, nor be cause for corrective action.

    **4.2.2.2.**   In order for a Team Member to retain eligibility for the attendance bonus, the Team Member must use a Personal Day for the day(s) of the absence.

    **4.2.2.3.**   Final approval as to the declaration of a "Catastrophic event" shall be made by the Director of Human Resources.

**4.3.** Tardiness:  Team Members who are not in their work area ready for work by their scheduled starting time will be counted as one-half day absent for calculating attendance only, excluding the following events:

    **4.3.1.**  A verifiable catastrophic event such as an accident causing road blockage of major highways, a major weather-related closure of roads, or other acts of God which result in Team Members being tardy will be evaluated on a case by case basis.  If it is determined by HMMA that there is a significant adverse impact on HMMA Team Members, the tardy shall not affect a Team Member's attendance record.

    **4.3.2.**  While Team Members need to be prudent in their use of Vacation days and Personal Days, the above reasons shall provide ample and fair opportunities for Team Members to maintain eligibility for attendance bonuses.

**4.4.** Leave Early:  Team Members who leave prior to the end of their scheduled shift (including overtime hours) with their group leader's and/or manager's permission are considered to have left early.  A Leave Early will be considered as one-half day of absence for purposes of attendance calculation.

    **4.4.1.**  Any situation where a Team Member leaves the facility during scheduled work time (includes overtime whether scheduled or voluntary) without their group leader, manager, senior manager, or any other member of management's authorization, the Team Member will be considered to have voluntarily resigned from his/her employment at HMMA.

**_NOTICE:_** Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

| ⬡ **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | **Attendance Policy** | **HR-AL-HR-TR-S-00004** |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

4.4.2.  Calculating Attendance: Attendance will be calculated using a rolling calendar year using the following formula.

    4.4.2.1.  Calculate the number of scheduled workdays.  Scheduled workdays will include all excused scheduled workdays.

    4.4.2.2.  Calculate the number of unexcused workdays.

    4.4.2.3.  Subtract the number of unexcused workdays from the number of scheduled workdays and divide the remainder by the number of scheduled workdays to arrive at the Team Member's attendance percentage.

    4.4.2.4.  Example:

        237 Scheduled workdays
        - 5  Unexcused workdays
        232/237 = 97.9%

4.5. Excessive Absenteeism: When a Team Member's attendance falls below 98% at any time during the first year or subsequent years of employment during any rolling twelve- month period, corrective action will be considered.  The rolling twelve-month period is a 365-day period.

4.6. Evaluating Absenteeism: Every Team Member is expected to notify his/her group leader and/or manager in advance of any known absence or future absence.  When an absence is not known in advance, the Team Member must notify his/her group leader and/or manager 30 minutes prior to the start of the shift or no more than 60 minutes after the start of his/ her shift.

    4.6.1.  Accumulative absences that result in a Team Member's attendance percentage falling below 98% may be cause for corrective action.

        4.6.1.1.  The following will be considered:

            1.  Cause
            2.  Frequency
            3.  Patterns
            4.  Failure to report
            5.  Time pattern of reporting

*NOTICE:* Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

| ⟨Ⓗ⟩ **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | **Attendance Policy** | **HR-AL-HR-TR-S-00004** |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

4.6.2.  A Team Member that does not communicate to his/her group leader and/or manager regarding his/her absence for a period of three (3) consecutive days or longer is considered to have voluntarily resigned his/her employment at HMMA.

4.7. Record Keeping and Corrective Action: All Team Member Attendance records will be maintained by the group leader and/or manager. Any Corrective Action necessary is taken by the group leader and/or the manager.  The appropriate Team Relations Representative will be consulted for guidance.

4.7.1.  The Corrective Action process is intended to help Team Members correct any attendance problems.  However, if the Team Member's attendance continues to be unacceptable it could result in further Corrective Action up to and including termination.

4.7.2.  Corrective Action: When a Team Member's attendance percentage falls below the acceptable standard, corrective action may be considered. Corrective action is not automatic.  Each Team Member's attendance record will be reviewed based on its own merit, and the circumstances in each case are considered.  However, when Corrective Action is taken, the following steps must be followed:

1.  Informal Discussion
2.  Formal Discussion
3.  Commitment Discussion
4.  Decision Leave

4.7.3.  *Note: The Team Relations Representative will be consulted for guidance at each step of the aforementioned Corrective Action Steps.  The Team Relations Representative will also attend each step as it occurs.*

4.7.4.  When Corrective Action is required beyond the above four steps, the Team Member's group leader and/or manager will contact the manager for team relations and request a review of the Team Member's record for termination.  No termination will take place unless the action is reviewed and approved by the team relations manager, section manager, and Director of Human Resources.

*NOTICE:* Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at
R:HR Dept/Policies and forms/Policy & Procedure

4

| ⬡ **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | **Resignation Policy** | **HR-AL-HR-TR-S-00035** |
|---|---|---|
| Revision Date: 4-Nov-04 | Owner: Team Relations | Revision Level: 01 |

of up to six months from last date of employment, with benefits tied to seniority reinstated in full. Former Team Members will be considered for open positions along with all other candidates. Former Team Members who apply for reemployment after 6 months will be treated as new employees for purposes of seniority-related benefits.

2.10. All departing Team Members, regardless of the circumstances surrounding their departure, will be reported to those with a need to know (i.e. payroll, front desk, IT and security in order to advise of the last day of actual work for HMMA).

2.11. Resigning Team Members will be schedule for an exit meeting with a member of the Team Relations Department to ensure that all tools and equipment are returned and to provide an opportunity to discuss any questions or concerns related to employment with HMMA. Team Members who fail to return any HMMA property including keys, credit cards, tools, uniforms, cellular phones, pagers and other equipment will be deemed ineligible for rehire and may be subject to legal proceedings on behalf of HMMA.

2.12. Departing Team Members will be asked to confirm their forwarding address to ensure that benefits and tax information are received in a timely manner. Final pay will be mailed to this address by the next payday unless state law or other procedures dictate otherwise. Accrued but unused vacation will be paid out consistent with the HMMA's vacation policy and state law requirements.

*NOTICE:* Paper copies of this Procedure should NOT be used for decision making purposes. Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

2

| ⨀ **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | **Harassment Policy** | HR-AL-HR-TR-S-00014 |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

## Harassment

HMMA is committed to providing a work environment that is free of discrimination and unlawful harassment.  Actions, words, jokes, or comments based on an individual's sex, race, ethnicity, age (40+), religion, or any other legally protected characteristic will not be tolerated.  Discrimination and unlawful harassment (both overt and subtle) are forms of misconduct that demean another person and undermine the integrity of the employment relationship.  This type of behavior is strictly prohibited.  Any Team Member engaging in unlawful discrimination or harassment may be subject to disciplinary action, up to and including termination of employment.

## What is Harassment?

Harassment can take many forms.  It may be, but is not limited to, words, signs, jokes, pranks, intimidation, physical contact, or violence.  Harassment is not necessarily sexual in nature.

One form of illegal discrimination and harassment is sexual harassment.  We may generally categorize "sexual harassment" as unwanted and unwelcome verbal, physical, or visual behavior or conduct that is either (1) sexual in nature or (2) directed at a person's gender where:

- Submission to the behavior may be perceived to be a term or condition of employment;

- Submission to or rejection of the behavior is used as the basis for making employment decisions such as promotions, transfers, annual evaluations, etc.; or

- Such conduct creates an intimidating, hostile, or offensive working environment or interferes with an individual's work performance.

Examples of sexual harassment include, but are not limited to, the following:

- Innuendoes, jokes, comments, slurs, invitations, or graphic commentary about an individual's body which are either sexual in nature or directed at a person's gender;

*NOTICE:*  Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

1

- Sexually suggestive or obscene objects, pictures, cartoons, posters, calendars, clothing, notes, letters, emails, or electronic media;

- Sexual gestures, leering, touching, assaulting, or impeding or blocking movements.

1.    Responsibility

As an HMMA Team Member, you are responsible for keeping our work environment free of harassment. Any Team Member who becomes aware of an incident of harassment, whether by witnessing the incident or being told of it, must report it to the Team Relations Manager or any member of management of HMMA with whom you feel comfortable. When HMMA becomes aware that harassment might exist, it will take prompt and appropriate action.

2.    Reporting Harassment

If you feel that you have experienced harassment, you should take action immediately. If you are able, clearly explain to the person causing the harassment that you are uncomfortable with his or her behavior and request that the conduct cease immediately. If you are uncomfortable with that direct approach, report the incident immediately to the Team Relations Manager or any member of management of HMMA with whom you feel comfortable. HMMA will not retaliate against any Team Member who makes a good faith report of alleged harassment, even if the Team Member was in error.

3.    Investigation of Complaints of Harassment/Confidentiality

All reports will be promptly investigated with due regard for the privacy of everyone involved. Due to the sensitive nature of complaints of sexual and other unlawful harassment, the Team Relations Department will investigate the complaints with particular care, and, to the extent possible, keep them confidential. Please be advised that anonymous claims usually cannot be investigated.

4.    Immediate and Appropriate Corrective Action

Any Team Member found to have harassed a fellow Team Member or subordinate will be subject to severe disciplinary action or possible discharge. HMMA will also take any additional action necessary to correct the situation immediately.

5.    Consensual, Romantic or Sexual Relationships

5.1    HMMA strongly discourages romantic or sexual relationships between Team Members.

5.2    HMMA prohibits romantic or sexual relationships between any HMMA member of management and any subordinate Team Member. Such a relationship may give rise to the perception by others that there is favoritism or bias in employment decisions affecting the Team Member. Moreover, given the uneven balance of power within such relationships, consent by the Team Member is suspect and may be viewed by others or, at a later date, by the Team Member himself or herself as having been given as a result of coercion or intimidation. The atmosphere created by such appearances of bias, favoritism, intimidation, coercion or exploitation undermines the spirit of trust and mutual respect which is essential to a healthy work environment.

I ACKNOWLEDGE RECEIPT OF THE HMMA ANTI-HARASSMENT POLICY AND COMPLAINT POLICY.

THIS POLICY IS PART OF THE COMPANY'S COMPLIANCE WITH FEDERAL AND STATE LAW PROHIBITING HARASSMENT. THE HARASSMENT POLICY CREATES NO CONTRACTUAL OBLIGATIONS ON THE PART OF HMMA OR ITS TEAM MEMBERS AND DOES NOT ALTER THE AT-WILL RELATIONSHIP BETWEEN HMMA AND ITS TEAM MEMBERS. YOU ARE FREE TO RESIGN AT ANY TIME, AND HMMA HAS THE SAME ABILITY TO TERMINATE THE EMPLOYMENT RELATIONSHIP. THE COMPANY RESERVES THE RIGHT TO REVISE THIS POLICY, WITHOUT NOTICE, TO RESPOND TO BUSINESS CONDITIONS AS THEY ARISE.

_____        _____
[Team Member's Signature]              [Date]

| ⓗ **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | **Resignation Policy** | **HR-AL-HR-TR-S-00035** |
|---|---|---|
| Revision Date:   4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

## 1. Policy:

Although we hope your employment with HMMA will be a mutually rewarding experience we understand that varying circumstances do cause Team Members to voluntarily resign employment. Should this time come, you are asked to follow the guidelines below regarding notice and exit procedures.

## 2. Procedures:

2.1. Team Members are encouraged to provide two weeks' notice to facilitate a smooth transition out of the organization.

2.2. All resignations must be confirmed in writing. Team Members may wish to complete a "Team Member Resignation Form" provided by HMMA for this purpose or may submit other written notice including the reason for leaving and the effective date. Team Members who orally resign will receive a "Confirmation of Resignation" notice within 24 hours.

2.3. If a Team Member provides more notice than requested, HMMA will evaluate whether the additional notice is necessary for effective business operations and will notify the employee using the "Confirmation of Resignation" form to confirm the final date of employment.

2.4. If a Team Member provides less notice than requested, the employer may deem the individual to be ineligible for rehire depending upon the circumstances regarding the notice given.

2.5. Management reserves the right to provide a Team Member with two weeks' pay in lieu of notice in situations where job or business needs warrant such action. Such a decision should not be perceived as reflecting negatively on the Team Member, since it may be due to a variety of reasons not known to the individual or other Team Members.

2.6. Team Members who fail to report to work for three consecutive days without properly communicating to their group leader or manager the reasons for their absence will be viewed as voluntarily resigning their employment as of the 3rd day.

2.7. Team Members that report for duty and then leave without the authorization will be considered as voluntarily resigning their employment.

2.8. Team Members will not be allowed to rescind a resignation, whether given orally or in writing, once the resignation has been confirmed by HMMA.   ---

2.9. Team Members who resign in good standing under this policy and whose documented performance is above average under the organization's performance management system will be eligible for reemployment for a period

*NOTICE:* Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

| **HYUNDAI** Hyundai Motor Manufacturing Alabama | **Resignation Policy** | **HR-AL-HR-TR-S-00035** |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level: 01 |

of up to six months from last date of employment, with benefits tied to seniority reinstated in full. Former Team Members will be considered for open positions along with all other candidates. Former Team Members who apply for reemployment after 6 months will be treated as new employees for purposes of seniority-related benefits.

2.10. All departing Team Members, regardless of the circumstances surrounding their departure, will be reported to those with a need to know (i.e. payroll, front desk, IT and security in order to advise of the last day of actual work for HMMA).

2.11. Resigning Team Members will be schedule for an exit meeting with a member of the Team Relations Department to ensure that all tools and equipment are returned and to provide an opportunity to discuss any questions or concerns related to employment with HMMA. Team Members who fail to return any HMMA property including keys, credit cards, tools, uniforms, cellular phones, pagers and other equipment will be deemed ineligible for rehire and may be subject to legal proceedings on behalf of HMMA.

2.12. Departing Team Members will be asked to confirm their forwarding address to ensure that benefits and tax information are received in a timely manner. Final pay will be mailed to this address by the next payday unless state law or other procedures dictate otherwise. Accrued but unused vacation will be paid out consistent with the HMMA's vacation policy and state law requirements.

NOTICE: Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

2

| ⬡ **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | **Attendance Policy** | HR-AL-HR-TR-S-00004 |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

## 1.  PURPOSE

The intent of the Attendance Policy is to establish a consistent method to apply fair, equitable, and consistent administration of acceptable levels of attendance.

## 2.  POLICY

Regular attendance is the cornerstone for the success of HMMA.   A Team Member's absenteeism can reduce the quality and affect of the overall efficiency of HMMA operations, as well as causing a hardship on fellow Team Members who report to work regularly.  Regular attendance is every Team Member's responsibility, and every Team Member is expected to be on the job, on time, every scheduled workday.

## 3.  DEFINITIONS

Catastrophic Event:  A legally declared emergency, which results in the closure of all roads.

Vacation: 10 scheduled paid vacation days per year (January-December).

Personal Days: 3 Personal Days per year (January –December) may be used at the Team Members' discretion.

## 4.  GENERAL PROVISIONS

4.1. Acceptable Attendance:

    4.1.1.  The minimum acceptable standard of attendance is 98%.

4.2. Absence:

    4.2.1.  Any scheduled workday missed is considered an absence.  However, work time missed due to holidays, scheduled vacations, catastrophic event, jury duty, military duty, bereavement leave, sick leave, work-related injury or illness, personal leave of absence and FMLA leave shall not be counted as an absence and are not cause for corrective action.

    4.2.2.  If a Team Member is absent due to a catastrophic event that results in:

*NOTICE:* Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

D- 01905  EDWARDS V HMMA

| ![Hyundai] HYUNDAI<br>Hyundai Motor Manufacturing Alabama | Attendance Policy | HR-AL-HR-TR-S-00004 |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

4.2.2.1.    A legally declared emergency which results in the closure of all roads in the Team Member's county of residence, or if a Team Member must drive through such a county on the way to work, such absences will not count against the Team Member's attendance, nor be cause for corrective action.

4.2.2.2.    In order for a Team Member to retain eligibility for the attendance bonus, the Team Member must use a Personal Day for the day(s) of the absence.

4.2.2.3.    Final approval as to the declaration of a "Catastrophic event" shall be made by the Director of Human Resources.

4.3. Tardiness:  Team Members who are not in their work area ready for work by their scheduled starting time will be counted as one-half day absent for calculating attendance only, excluding the following events:

4.3.1.  A verifiable catastrophic event such as an accident causing road blockage of major highways, a major weather-related closure of roads, or other acts of God which result in Team Members being tardy will be evaluated on a case by case basis.  If it is determined by HMMA that there is a significant adverse impact on HMMA Team Members, the tardy shall not affect a Team Member's attendance record.

4.3.2.  While Team Members need to be prudent in their use of Vacation days and Personal Days, the above reasons shall provide ample and fair opportunities for Team Members to maintain eligibility for attendance bonuses.

4.4. Leave Early:  Team Members who leave prior to the end of their scheduled shift (including overtime hours) with their group leader's and/or manager's permission are considered to have left early.  A Leave Early will be considered as one-half day of absence for purposes of attendance calculation.

4.4.1.  Any situation where a Team Member leaves the facility during scheduled work time (includes overtime whether scheduled or voluntary) without their group leader, manager, senior manager, or any other member of management's authorization, the Team Member will be considered to have voluntarily resigned from his/her employment at HMMA.

*NOTICE:* Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

2

D- 01906  EDWARDS V HMMA

| HYUNDAI<br>Hyundai Motor Manufacturing Alabama | Attendance Policy | HR-AL-HR-TR-S-00004 |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

4.4.2. Calculating Attendance: Attendance will be calculated using a rolling calendar year using the following formula.

    4.4.2.1.   Calculate the number of scheduled workdays.  Scheduled workdays will include all excused scheduled workdays.

    4.4.2.2.   Calculate the number of unexcused workdays.

    4.4.2.3.   Subtract the number of unexcused workdays from the number of scheduled workdays and divide the remainder by the number of scheduled workdays to arrive at the Team Member's attendance percentage.

    4.4.2.4.   Example:

            237 Scheduled workdays
           - 5   Unexcused workdays
           232/237 = 97.9%

4.5. Excessive Absenteeism: When a Team Member's attendance falls below 98% at any time during the first year or subsequent years of employment during any rolling twelve- month period, corrective action will be considered.  The rolling twelve-month period is a 365-day period.

4.6. Evaluating Absenteeism: Every Team Member is expected to notify his/her group leader and/or manager in advance of any known absence or future absence.  When an absence is not known in advance, the Team Member must notify his/her group leader and/or manager 30 minutes prior to the start of the shift or no more than 60 minutes after the start of his/ her shift.

    4.6.1.  Accumulative absences that result in a Team Member's attendance percentage falling below 98% may be cause for corrective action.

        4.6.1.1.   The following will be considered:

            1. Cause
            2. Frequency
            3. Patterns
            4. Failure to report
            5. Time pattern of reporting

*NOTICE:* Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

D- 01907  EDWARDS V HMMA

| ![Hyundai Logo] HYUNDAI<br>Hyundai Motor Manufacturing Alabama | Attendance Policy | HR-AL-HR-TR-S-00004 |
|---|---|---|
| Revision Date: 4-Nov-04 | Owner: Team Relations | Revision Level: 01 |

4.6.2. A Team Member that does not communicate to his/her group leader and/or manager regarding his/her absence for a period of three (3) consecutive days or longer is considered to have voluntarily resigned his/her employment at HMMA.

4.7. Record Keeping and Corrective Action: All Team Member Attendance records will be maintained by the group leader and/or manager. Any Corrective Action necessary is taken by the group leader and/or the manager. The appropriate Team Relations Representative will be consulted for guidance.

4.7.1. The Corrective Action process is intended to help Team Members correct any attendance problems. However, if the Team Member's attendance continues to be unacceptable it could result in further Corrective Action up to and including termination.

4.7.2. Corrective Action: When a Team Member's attendance percentage falls below the acceptable standard, corrective action may be considered. Corrective action is not automatic. Each Team Member's attendance record will be reviewed based on its own merit, and the circumstances in each case are considered. However, when Corrective Action is taken, the following steps must be followed:

1. Informal Discussion
2. Formal Discussion
3. Commitment Discussion
4. Decision Leave

4.7.3. *Note: The Team Relations Representative will be consulted for guidance at each step of the aforementioned Corrective Action Steps. The Team Relations Representative will also attend each step as it occurs.*

4.7.4. When Corrective Action is required beyond the above four steps, the Team Member's group leader and/or manager will contact the manager for team relations and request a review of the Team Member's record for termination. No termination will take place unless the action is reviewed and approved by the team relations manager, section manager, and Director of Human Resources.

---

*NOTICE:* Paper copies of this Procedure should NOT be used for decision making purposes. Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

4

D- 01908  EDWARDS V HMMA

| ![HYUNDAI logo] HYUNDAI<br>Hyundai Motor Manufacturing Alabama | Family Medical Leave Policy | HR-AL-HR-TR-S-00013 |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

## A. GENERAL PROVISIONS

It is the policy of HMMA to grant up to 12 weeks of family and medical leave during any 12-month period to eligible Team Members, in accordance with the Family and Medical Leave Act of 1993 (FMLA).  The leave may be paid, unpaid, or a combination of paid and unpaid leave, depending on the circumstances of the leave and as specified in this policy.

## B. ELIGIBILITY

In order to qualify to take family or medical leave under this policy, the Team Member must meet all of the following conditions:

1) The Team Member must have worked for HMMA for 12 months, or 52 weeks.  The twelve months, or 52 weeks, need not have been consecutive.  For eligibility purposes, a Team Member will be considered to have been employed for an entire week even if the Team Member was on the payroll for only part of a week or if the Team Member is on leave during the week.

2) The Team Member must have worked at least 1250 hours during the twelve-month period immediately before the date when the leave is requested to commence.  The principles established under the Fair Labor Standards Act (FLSA) determine the number of hours worked by a Team Member.  The FLSA does not include time spent on paid or unpaid leave as hours worked.  Consequently, these hours of leave should not be counted in determining the 1250 hours eligibility test for a Team Member under FMLA.

## C. TYPE OF LEAVE COVERED

In order to qualify as FMLA leave under this policy, the Team Member must be taking leave for one of the reasons listed below:

1) the birth of a child and in order to care for that child;

2) the placement of a child for adoption or foster care, and to care for the newly placed child;

3) the care of a spouse, child, or parent with a serious health condition; or

4) the serious health condition (described below) of the Team Member.

A Team Member may take leave because of a serious health condition that makes the Team Member unable to perform the functions of the Team Member's position.

A serious health condition is defined as a condition which requires inpatient care at a hospital, hospice, or residential medical care facility, including any period of incapacity or any subsequent

_NOTICE:_ Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

1

D- 01909  EDWARDS V HMMA

| ⊛ HYUNDAI<br>Hyundai Motor Manufacturing Alabama | Family Medical Leave Policy | HR-AL-HR-TR-<br>S-00013 |
|---|---|---|
| Revision Date: 4-Nov-04 | Owner: Team Relations | Revision Level: 01 |

treatment in connection with such inpatient care, or a condition which requires continuing care by a licensed health care provider.

This policy covers illnesses of a serious and long-term nature, resulting in recurring or lengthy absences. Generally, a chronic or long-term health condition which, if left untreated, would result in a period of incapacity of more than three days, would be considered a serious health condition.

Team Members with questions about what illnesses are covered under this FMLA policy or under the company's sick leave policy are encouraged to consult with the Human Resource Department.

HMMA may require a Team Member to provide a doctor's certification of the serious health condition. The certification process is outlined in section H.

If a Team Member takes paid sick leave for a condition that progresses into a serious health condition and the Team Member requests unpaid leave as provided under this policy, HMMA may designate all or some portion of related leave taken as leave under this policy, to the extent that the earlier leave meets the necessary qualifications.

An eligible Team Member can take up to 12 weeks of leave under this policy during any 12-month period. HMMA will measure the twelve-month period as a rolling 12-month period measured backward from the date a Team Member uses any leave under this policy. Each time a Team Member takes leave, HMMA will compute the amount of leave the Team Member has taken under this policy and subtract it from the 12 weeks of available leave, and the balance remaining is the amount the Team Member is entitled to take at that time.

5 ) If a husband and wife both work for HMMA and each wishes to take leave for the birth of a child, adoption or placement of a child in foster care, or to care for a parent (but not a parent "in-law") with a serious health condition, the husband and wife may only take a combined total of 12 weeks of leave.

## D. TEAM MEMBER STATUS & BENEFITS DURING LEAVE

While a Team Member is on leave, HMMA will continue the Team Member's health benefits during the leave period at the same level and under the same conditions as if the Team Member had continued to work.

If the Team Member chooses not to return to work for reasons other than a continued serious health condition of the Team Member or the Team Member's family member or a circumstance beyond the Team Member's control, HMMA will require the Team Member to reimburse HMMA the amount it paid for the Team Member's health insurance premium during the leave period.

Under current HMMA policy, the Team Member pays a portion of the health care premium. While on paid leave, HMMA will continue to make payroll deductions to collect the Team Member's share of the premium. While on unpaid leave, the Team Member must continue to make this payment, either in person or by mail. The payment must be received in the Accounting

*NOTICE:* Paper copies of this Procedure should NOT be used for decision making purposes. Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

D- 01910  EDWARDS V HMMA

| (Hyundai logo) HYUNDAI<br>Hyundai Motor Manufacturing Alabama | Family Medical Leave Policy | HR-AL-HR-TR-S-00013 |
|---|---|---|
| Revision Date:　4-Nov-04 | Owner: Team Relations | Revision Level: 01 |

Department by the _____ day of each month. If the payment is more than 30 days late, the Team Member's health care coverage may be dropped for the duration of the leave. HMMA will provide 15 days notification prior to the Team Member's loss of coverage.

If the Team Member contributes to a life insurance or disability plan, HMMA will continue making payroll deductions while the Team Member is on paid leave. While the Team Member is on unpaid leave, the Team Member may request continuation of such benefit, and pay his or her portion of the premiums. If the Team Member does not continue these payments, HMMA may discontinue coverage during the leave.

## E. TEAM MEMBER STATUS AFTER LEAVE

A Team Member who takes leave under this policy will be able to return to the same position or a position with equivalent status, pay, benefits and other employment terms. The position will be the same or one which is virtually identical in terms of pay, benefits, and working conditions.

HMMA may choose to exempt certain highly compensated Team Members from this requirement and not return them to the same or similar position.

## F. USE OF UNPAID AND UNPAID LEAVE

If the Team Member has earned paid leave, the Team Member must use paid leave first and take the remainder of the twelve weeks as unpaid leave. HMMA will notify the Team Member within two business days in writing or orally (to be confirmed in writing by no later than the Team Member's next regular payday), whether or not the leave will be designated as FMLA leave.

A Team Member who is taking leave because of the Team Member's own serious health condition or the serious health condition of a family member must use all paid vacation, personal or sick leave prior to being eligible for unpaid leave. Sick leave may be substituted for unpaid FMLA leave if the reason for the FMLA leave is covered by the established sick leave policy.

Disability leave for the birth of the child and for a Team Member's serious health condition will be designated as FMLA leave and will run concurrently with FMLA leave. For example, HMMA provides six weeks of pregnancy disability leave. The six weeks can be designated as FMLA leave and counted toward the Team Member's 12-week entitlement. The Team Member may then be required to substitute paid leave as appropriate before being eligible for unpaid leave for what remains of the 12-week entitlement.

A Team Member who is taking leave for the adoption or foster care of a child must use all paid time off (PTO), personal or family leave prior to being eligible for unpaid leave.

## G. Intermittent Leave or a Reduced Work Schedule

The Team Member may take FMLA leave in 12 consecutive weeks, may use the leave intermittently (take a day periodically when needed over the year), or, under certain circumstances, may use the leave to reduce the work week or work day, resulting in a reduced

*NOTICE:* Paper copies of this Procedure should NOT be used for decision making purposes. Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

D- 01911　EDWARDS V HMMA

| ![HYUNDAI logo] HYUNDAI<br>Hyundai Motor Manufacturing Alabama | Family Medical Leave Policy | HR-AL-HR-TR-S-00013 |
|---|---|---|
| Revision Date: 4-Nov-04 | Owner: Team Relations | Revision Level: 01 |

hour schedule. In all cases, the leave may not exceed a total of 12 work weeks over a 12-month period.

HMMA may temporarily transfer a Team Member to an available alternative position with equivalent pay and benefits if the alternative position would better accommodate the intermittent or reduced schedule for leave for the Team Member or Team Member's family member that is foreseeable and for planned medical treatment, including recovery from a serious health condition or to care for a child after birth, or placement for adoption or foster care.

For the birth, adoption or foster care of a child, HMMA and the Team Member must mutually agree to the schedule before the Team Member may take the leave intermittently or work a reduced hour schedule. Leave for birth, adoption, or foster care of a child must be taken within one year of the birth or placement of the child.

If the Team Member is taking leave for a serious health condition or because of the serious health condition of a family member, the Team Member should try to reach an agreement with HMMA before taking intermittent leave or working a reduced hour schedule. If this is not possible, then the Team Member must prove that the use of the leave is medically necessary. HMMA may require certification of the medical necessity as discussed in Section H.

## H. CERTIFICATION OF THE SERIOUS HEALTH CONDITION

HMMA may ask for certification of the serious health condition. The Team Member should try to respond to such a request within 15 days of the request or provide a reasonable explanation for the delay. Failure to provide certification may result in a denial of continuation of leave. Medical certification may be provided by using the Medical Certification Form. Request for a medical certificate must be made in writing as part of HMMA's response to the Team Member's request for leave.

Certification of the serious health condition shall include: the date when the condition began, its expected duration, and a brief statement of treatment. For medical leave for the Team Member's own medical condition, the certification must also include a statement that the Team Member is unable to perform work of any kind or a statement that the Team Member is unable to perform the essential functions of the Team Member's position. For a family member who is seriously ill, the certification must include a statement that the patient, the family member, requires assistance and that the Team Member's presence would be beneficial or desirable.

If the Team Member plans to take intermittent leave or work a reduced schedule, the certification must also include dates and the duration of treatment, as well as a statement of medical necessity for taking intermittent leave or working a reduced schedule.

HMMA has the right to ask for a second opinion if it has reason to doubt the certification. HMMA will pay for the Team Member to get a certification from a second doctor, which HMMA will select. If necessary to resolve a conflict between the original certification and the second opinion, HMMA will require the opinion of a third doctor. HMMA and the Team Member will mutually select the third doctor, and HMMA will pay for the opinion. This third opinion will be considered final. The

_NOTICE:_ Paper copies of this Procedure should NOT be used for decision making purposes. Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

4

D- 01912  EDWARDS V HMMA

| ⊚ **HYUNDAI**<br>Hyundai Motor Manufacturing Alabama | **Family Medical Leave Policy** | **HR-AL-HR-TR-S-00013** |
|---|---|---|
| Revision Date: 4-Nov-04 | Owner: Team Relations | Revision Level: 01 |

Team Member will be provisionally entitled to leave and benefits under the FMLA pending the second and/or third opinion.

## I. PROCEDURE FOR REQUESSTING LEAVE

All Team Members requesting leave under this policy must provide verbal notice with an explanation of the reason(s) for the needed leave to their immediate supervisor, who will advise the Benefits Department. If the leave is foreseeable, the Benefits Department may require the Team Member to provide a written request for leave and reasons(s) for that leave. Failure of the Team Member to provide a written request for leave cannot be grounds to deny or delay the taking of FMLA leave.

HMMA will provide individual notice of rights and obligations to each Team Member requesting leave within two business days or as soon as practicable. For Team Members on intermittent or recurring leave for the same incident, this notice will be provided every six months.

When a Team Member plans to take leave under this policy, the Team Member must give HMMA 30 days notice. If it is not possible to give 30 days notice, the Team Member must give as much notice as is practicable. A Team Member who is to undergo planned medical treatment is required to make a reasonable effort to schedule the treatment in order to minimize disruptions to HMMA's operations.

If a Team Member fails to provide 30 days notice for foreseeable leave with no reasonable excuse for the delay, the leave request may be denied until at least 30 days from the date HMMA receives notice. While on leave, Team Members are requested to report periodically to HMMA regarding the status of the medical condition and their intent to return to work.

*NOTICE:* Paper copies of this Procedure should NOT be used for decision making purposes. Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

D- 01913  EDWARDS V HMMA

| ⬡ **HYUNDAI** Hyundai Motor Manufacturing Alabama | **Harassment Policy** | HR-AL-HR-TR-S-00014 |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

### Harassment

HMMA is committed to providing a work environment that is free of discrimination and unlawful harassment.  Actions, words, jokes, or comments based on an individual's sex, race, ethnicity, age (40+), religion, or any other legally protected characteristic will not be tolerated.  Discrimination and unlawful harassment (both overt and subtle) are forms of misconduct that demean another person and undermine the integrity of the employment relationship.  This type of behavior is strictly prohibited.  Any Team Member engaging in unlawful discrimination or harassment may be subject to disciplinary action, up to and including termination of employment.

### What is Harassment?

Harassment can take many forms.  It may be, but is not limited to, words, signs, jokes, pranks, intimidation, physical contact, or violence.  Harassment is not necessarily sexual in nature.

One form of illegal discrimination and harassment is sexual harassment.  We may generally categorize "sexual harassment" as unwanted and unwelcome verbal, physical, or visual behavior or conduct that is either (1) sexual in nature or (2) directed at a person's gender where:

- Submission to the behavior may be perceived to be a term or condition of employment;

- Submission to or rejection of the behavior is used as the basis for making employment decisions such as promotions, transfers, annual evaluations, etc.; or

- Such conduct creates an intimidating, hostile, or offensive working environment or interferes with an individual's work performance.

Examples of sexual harassment include, but are not limited to, the following:

- Innuendoes, jokes, comments, slurs, invitations, or graphic commentary about an individual's body which are either sexual in nature or directed at a person's gender;

*NOTICE:*  Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

1

D- 01914 EDWARDS V HMMA

- Sexually suggestive or obscene objects, pictures, cartoons, posters, calendars, clothing, notes, letters, emails, or electronic media;

- Sexual gestures, leering, touching, assaulting, or impeding or blocking movements.

## 1. Responsibility

As an HMMA Team Member, you are responsible for keeping our work environment free of harassment. Any Team Member who becomes aware of an incident of harassment, whether by witnessing the incident or being told of it, must report it to the Team Relations Manager or any member of management of HMMA with whom you feel comfortable. When HMMA becomes aware that harassment might exist, it will take prompt and appropriate action.

## 2. Reporting Harassment

If you feel that you have experienced harassment, you should take action immediately. If you are able, clearly explain to the person causing the harassment that you are uncomfortable with his or her behavior and request that the conduct cease immediately. If you are uncomfortable with that direct approach, report the incident immediately to the Team Relations Manager or any member of management of HMMA with whom you feel comfortable. HMMA will not retaliate against any Team Member who makes a good faith report of alleged harassment, even if the Team Member was in error.

## 3. Investigation of Complaints of Harassment/Confidentiality

All reports will be promptly investigated with due regard for the privacy of everyone involved. Due to the sensitive nature of complaints of sexual and other unlawful harassment, the Team Relations Department will investigate the complaints with particular care, and, to the extent possible, keep them confidential. Please be advised that anonymous claims usually cannot be investigated.

## 4. Immediate and Appropriate Corrective Action

Any Team Member found to have harassed a fellow Team Member or subordinate will be subject to severe disciplinary action or possible discharge. HMMA will also take any additional action necessary to correct the situation immediately.

5.    Consensual, Romantic or Sexual Relationships

5.1    HMMA strongly discourages romantic or sexual relationships between Team Members.

5.2    HMMA prohibits romantic or sexual relationships between any HMMA member of management and any subordinate Team Member. Such a relationship may give rise to the perception by others that there is favoritism or bias in employment decisions affecting the Team Member. Moreover, given the uneven balance of power within such relationships, consent by the Team Member is suspect and may be viewed by others or, at a later date, by the Team Member himself or herself as having been given as a result of coercion or intimidation. The atmosphere created by such appearances of bias, favoritism, intimidation, coercion or exploitation undermines the spirit of trust and mutual respect which is essential to a healthy work environment.

I ACKNOWLEDGE RECEIPT OF THE HMMA ANTI-HARASSMENT POLICY AND COMPLAINT POLICY.

THIS POLICY IS PART OF THE COMPANY'S COMPLIANCE WITH FEDERAL AND STATE LAW PROHIBITING HARASSMENT. THE HARASSMENT POLICY CREATES NO CONTRACTUAL OBLIGATIONS ON THE PART OF HMMA OR ITS TEAM MEMBERS AND DOES NOT ALTER THE AT-WILL RELATIONSHIP BETWEEN HMMA AND ITS TEAM MEMBERS. YOU ARE FREE TO RESIGN AT ANY TIME, AND HMMA HAS THE SAME ABILITY TO TERMINATE THE EMPLOYMENT RELATIONSHIP. THE COMPANY RESERVES THE RIGHT TO REVISE THIS POLICY, WITHOUT NOTICE, TO RESPOND TO BUSINESS CONDITIONS AS THEY ARISE.

_____          _____
[Team Member's Signature]                    [Date]

D- 01917  EDWARDS V HMMA

| HYUNDAI | Medical Leave Policy | HR-AL-HR-TR-S-00022 |
|---|---|---|
| Hyundai Motor Manufacturing Alabama | | |
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

## 1.  PURPOSE

The purpose of this policy is to outline procedures that Team Members must follow when it is necessary for a Team Member to be placed on a work related or non-work related medical leave of absence.

## 2.  POLICY

2.1. Team Members that are absent from work due to a non-occupational medical condition, must follow procedures outlined in this policy to qualify for a leave and receive short-term disability benefits.  STD benefits will be provided based on HMMA's current plan.

2.2. HMMA will provide Worker's Compensation benefits in accordance with Alabama's Worker Compensation Laws and Regulations for Team Members who qualify for work related medical leave of absence due to an injury or illness arising out of their course and scope of employment with HMMA.

2.3. In the event questions arise regarding a non-occupational or work-related leave of absence or worker's compensation issues, the Team Member should contact the HMMA Safety manager.

## 3.  PROCEDURE FOR WORK RELATED MEDICAL LEAVES

3.1. In order to be considered for a Worker's Compensation leave of absence, as stated in the Team Member Handbook, all injuries, regardless of how insignificant they seem, must be reported immediately to the Team Member's manager or another member of management

3.2. Medical care will be provided or directed by the HMMA Medical Clinic staff.

3.3. HMMA has modified and light duty job programs available to accommodate a Team Member that receives temporary medical restrictions due to a work-related injury or illness.  If the HMMA Medical Clinic staff determines that a Team Member can not return to his/her regular job assignment or perform a modified or light duty job, the HMMA Medical Clinic will place the Team Member off work.

NOTICE:  Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

1

D- 01918  EDWARDS V HMMA

| ⬡ **HYUNDAI**  Hyundai Motor Manufacturing Alabama | **Medical Leave Policy** | HR-AL-HR-TR-S-00022 |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

3.4. All time off from work for work related injuries must be authorized by the HMMA Medical Clinic.  Team Members off work without authorization will be charged with an absence.

## 4.  RETURNING FROM A WORK RELATED MEDICAL LEAVE

4.1. The HMMA Medical Clinic will determine when a Team Member is ready to return from a work related medical leave.

4.2. The HMMA Medical Clinic staff will assess each Team Member returning from a work related or non-work related medical leave of absence and determine if the Team Member needs to be placed in the HMMA Work Conditioning program.

## 5.  PROCEDURE FOR A NON-WORK RELATED MEDICAL LEAVE

5.1. In the event a Team Member is absent from work for a non-related injury or illness, he/she is required to do the following:

5.2. For an absence of one or two work days, Team Member must contact his/her manager each day no later than 60 minutes after the start of the shift.

5.2.1.  Team Member must supply the following information:
5.2.2.  The reason for the absence.
5.2.3.  The expected length of absence.
5.2.4.  Type of absence (unavoidable, unscheduled, unpaid)

5.3. If the absence will/does extend more than three days, the Team Member must contact the Medical Clinic on the third (3rd) day of absence.  The Medical Clinic will inform him/her what documentation is necessary and will notify his/her Manager of the leave status.

5.4. For absences of more than three consecutive work days the Team Member must complete the proper forms to be eligible for Short Term Disability (STD) benefits.  These forms can be obtained from the Medical Clinic.

## 6.  RETURNING FROM A NON-WORK RELATED MEDICAL LEAVE

6.1. Prior to returning to work from an absence of more than three days the Team Member must provide a doctor's statement to the HMMA Medical Clinic.. The Team Member that has been on an extended leave may be required to come in

**NOTICE:** Paper copies of this Procedure should NOT be used for decision making purposes.  Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

2

D- 01919  EDWARDS V HMMA

| HYUNDAI | Medical Leave Policy | HR-AL-HR-TR-S-00022 |
|---|---|---|
| Hyundai Motor Manufacturing Alabama | | |
| Revision Date: 4-Nov-04 | Owner: Team Relations | Revision Level: 01 |

the shift prior to returning to work to ensure he/she has the proper paperwork and medical clearance to return to work. The doctor's statement may include the following information:

6.1.1. Specific dates on which the Team Member was unable to work due to illness or injury.

6.1.2. Detailed diagnosis of the illness or injury.

6.1.3. A medical release with the specific return date

6.1.4. Details of any related restrictions or medications.

6.2. The HMMA Medical Clinic staff will assess each Team Member returning from a work related or non-work related medical leave and determine if the Team Member needs to be placed in the HMMA Work Conditioning ramp up program.

*NOTE: FAILURE TO FOLLOW PROCEDURES OUTLINED IN THIS POLICY CAN RESULT IN DELAY, SUSPENSION OR LOSS OF BENEFITS AND/OR AFFECT EMPLOYMENT STATUS.*

6.3. In the event there are inconsistencies with information provided, HMMA will conduct an appropriate investigation to determine benefit eligibility and if corrective action is necessary. Intentional misrepresentation of a medical condition and/or ability to work is a serious misconduct offense and can result in termination.

6.4. A Team Member cannot engage in gainful employment during any leave of absence without the prior written consent of the Director of Human Resources. A Team Member who accepts gainful employment without prior written consent shall be considered to have voluntarily resigned from employment with HMMA as of the first day of work at the new employer.

6.5. HMMA shall review each medical leave of absence to determine if the leave qualifies as FMLA leave. HMMA shall administer leaves that qualify for FMLA leave in accordance with law and HMMA's FMLA Leave Policy.

*NOTICE:* Paper copies of this Procedure should NOT be used for decision making purposes. Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

3

D- 01920  EDWARDS V HMMA

| ⬡ HYUNDAI<br>Hyundai Motor Manufacturing Alabama | **Resignation Policy** | HR-AL-HR-TR-<br>S-00035 |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level:  01 |

1. **Policy:**

   Although we hope your employment with HMMA will be a mutually rewarding experience we understand that varying circumstances do cause Team Members to voluntarily resign employment. Should this time come, you are asked to follow the guidelines below regarding notice and exit procedures.

2. **Procedures:**
   2.1. Team Members are encouraged to provide two weeks' notice to facilitate a smooth transition out of the organization.
   2.2. All resignations must be confirmed in writing. Team Members may wish to complete a "Team Member Resignation Form" provided by HMMA for this purpose or may submit other written notice including the reason for leaving and the effective date. Team Members who orally resign will receive a "Confirmation of Resignation" notice within 24 hours.
   2.3. If a Team Member provides more notice than requested, HMMA will evaluate whether the additional notice is necessary for effective business operations and will notify the employee using the "Confirmation of Resignation" form to confirm the final date of employment.
   2.4. If a Team Member provides less notice than requested, the employer may deem the individual to be ineligible for rehire depending upon the circumstances regarding the notice given.
   2.5. Management reserves the right to provide a Team Member with two weeks' pay in lieu of notice in situations where job or business needs warrant such action. Such a decision should not be perceived as reflecting negatively on the Team Member, since it may be due to a variety of reasons not known to the individual or other Team Members.
   2.6. Team Members who fail to report to work for three consecutive days without properly communicating to their group leader or manager the reasons for their absence will be viewed as voluntarily resigning their employment as of the 3rd day.
   2.7. Team Members that report for duty and then leave without the authorization will be considered as voluntarily resigning their employment.
   2.8. Team Members will not be allowed to rescind a resignation, whether given orally or in writing, once the resignation has been confirmed by HMMA.
   2.9. Team Members who resign in good standing under this policy and whose documented performance is above average under the organization's performance management system will be eligible for reemployment for a period

*NOTICE: Paper copies of this Procedure should NOT be used for decision making purposes. Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure*

D- 01921  EDWARDS V HMMA

| ⬡ HYUNDAI<br>Hyundai Motor Manufacturing Alabama | **Resignation Policy** | HR-AL-HR-TR-<br>S-00035 |
|---|---|---|
| Revision Date:  4-Nov-04 | Owner: Team Relations | Revision Level: 01 |

of up to six months from last date of employment, with benefits tied to seniority reinstated in full. Former Team Members will be considered for open positions along with all other candidates. Former Team Members who apply for reemployment after 6 months will be treated as new employees for purposes of seniority-related benefits.

2.10. All departing Team Members, regardless of the circumstances surrounding their departure, will be reported to those with a need to know (i.e. payroll, front desk, IT and security in order to advise of the last day of actual work for HMMA).

2.11.    Resigning Team Members will be schedule for an exit meeting with a member of the Team Relations Department to ensure that all tools and equipment are returned and to provide an opportunity to discuss any questions or concerns related to employment with HMMA. Team Members who fail to return any HMMA property including keys, credit cards, tools, uniforms, cellular phones, pagers and other equipment will be deemed ineligible for rehire and may be subject to legal proceedings on behalf of HMMA.

2.12.    Departing Team Members will be asked to confirm their forwarding address to ensure that benefits and tax information are received in a timely manner. Final pay will be mailed to this address by the next payday unless state law or other procedures dictate otherwise. Accrued but unused vacation will be paid out consistent with the HMMA's vacation policy and state law requirements.

*NOTICE:* Paper copies of this Procedure should NOT be used for decision making purposes. Only use the electronic copy at R:HR Dept/Policies and forms/Policy & Procedure

2

D- 01922  EDWARDS V HMMA



July 11, 2007

Ms. Tammy Renae Edwards
180 County Road 34
Clanton, Alabama 35045

Dear Tammy:

The last day that you actually worked at HMMA was August 16, 2006. Soon thereafter, you applied for short-term disability ("STD") benefits and leave, which expired on February 11, 2007. You then applied for long-term disability ("LTD") benefits with the Standard Insurance Company ("Standard").

On June 8, 2007, HMMA learned that Standard had denied your LTD claim and that Standard had previously informed you of its determination.

Since the date that your LTD claim was denied, you have not reported to HMMA for work or even contacted your Group Leader or Manager regarding your absences, as is required by HMMA's Attendance Policy. As such, you are not on any form of approved leave and HMMA now considers you to have voluntarily resigned from your job at HMMA.

Information regarding your COBRA benefit will be sent to you by HMMA's Benefits Section.

I wish you the best in your future endeavors.

Sincerely,

Wendy Warner
Manager, Employment
Hyundai Motor Manufacturing Alabama, LLC

**From:** Culpepper, Stephen R HMMA/Welding
**Sent:** Monday, February 12, 2007 11:41 PM
**To:** Bondy, Thomas H HMMA/Welding
**Cc:** Gahafer, Vincent P HMMA/Welding
**Subject:** Tammy Edwards

PLAINTIFF'S
EXHIBIT
36

Tom,

The last bit of information I received regarding Tammy Edward's return to work was she was supposed to report for duty on Wednesday, February 7th. Neither Vince nor I have received any information from her or anyone at HMMA stating something different.

Tonight, I inquired about her return to work with our Medical staff. They confirmed to me that she did come to Medical this afternoon, but she had stated to the doctor that her Doctor's excuse was incorrect. Supposedly, her doctor's excuse cleared her to return to full duty, but she informed our Medical staff that she had medical restrictions. Medical sent her home to obtain a doctor's excuse stating her restrictions before clearing her to go back to work.

I have several questions:
- Does her missed days (starting Wednesday of last week) classify as "no-call, no-show"?
- Is there a job we can place her in if she has restrictions (due to a non-work related injury) from her physician?

I know this is a sensitive subject, please advise.

Best regards,

*Stephen Culpepper*
*Group Leader, Body shop*
*Hyundai Motor Manufacturing Alabama, L.L.C.*
*700 Hyundai Blvd*
*Montgomery, AL 36105*
*sculpepper@hmmausa.com*
*Cell Number 334-296-5535*

CONFIDENTIAL

| ![HYUNDAI] Hyundai Motor Manufacturing Alabama | Harassment Policy Posting Training Document | HR-AL-HR-TR-S-00058 |
|---|---|---|
| Revision Date: 03/09/06 | Owner: Team Relations | Revision Level: 00 |

## HMMA's Position on Harassment

HMMA is committed to providing a work environment that is free of discrimination and unlawful harassment. Actions, words, jokes, or comments based on an individual's sex, race, ethnicity, age, religion, or any other legally protected characteristic will not be tolerated. Discrimination and unlawful harassment are forms of misconduct that demean another person. This type of behavior is strictly prohibited. Any Team Member engaging in unlawful discrimination or harassment may be subject to disciplinary action, up to and including termination of employment.

## What is Harassment?

Harassment can take many forms. It may be, but is not limited to, words, signs, jokes, pranks, intimidation, physical contact, or violence. Harassment is not necessarily sexual in nature.

One form of illegal discrimination and harassment is sexual harassment. We may generally categorize "sexual harassment" as unwanted and unwelcome verbal, physical, or visual behavior or conduct that is either (1) sexual in nature or (2) directed at a person's gender.

Such conduct creates an intimidating, hostile, or offensive working environment or interferes with an individual's work performance.

Examples of sexual harassment include, but are not limited to, the following:

- Innuendoes, jokes, comments, slurs, invitations, or graphic commentary about an individual's body which are either sexual in nature or directed at a person's gender;

- Sexually suggestive or obscene objects, pictures, cartoons, posters, calendars, clothing, notes, letters, emails, or electronic media;

Any Team Member, who becomes aware of an incident of harassment, whether by witnessing the incident or being told of it, must report it to the Team Relations Manager or any member of management of HMMA with whom you feel comfortable.

If you feel that you have experienced harassment, you should take action immediately. If you are able, clearly explain to the person causing the harassment that you are uncomfortable with his or her behavior and request that the conduct cease immediately. If you are uncomfortable with that direct approach, report the incident immediately to the Team Relations Manager or any member of management of HMMA with whom you feel comfortable.

HMMA does not tolerate harassment of its Team Members, nor does it tolerate retaliation or reprisals against any Team Member who makes a complaint of harassment or participates in the investigation of such a complaint.

**PLAINTIFF'S EXHIBIT**

*37*

Team: _____ G/L or A/M: _____ Date Trained: _____

**EXHIBIT**

**38**

# CHARGE OF DISCRIMINATION

| | | CHARGE NUMBER |
|---|---|---|

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this m.

| | FEPA |
|---|---|
| x | EEOC |

420-2006-05204

and EEOC

State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Tammy Edwards | (205) 755-6693 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 180 County Road 34 | Clanton, AL 35045 | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Hyundai Motor Manufacturing Alabama, LLC | over 15 | (334) 387-8000 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 700 Hyundai Boulevard | Montgomery, AL 36105 | Montgomery |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PLACE EARLIES |
|---|---|
| [ ] RACE  [ ] COLOR  [X] SEX  [ ] RELIGION  [ ] AGE | March 2006 |
| [X] RETALIATION  [ ] NATIONAL ORIGIN  [ ] DISABILITY  [ ] OTHER (Specify) | [X] CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I began working at HMMA on or about January 17, 2006, as a team member. I started out assembling fenders under the supervision of Team Leader Keith Ulrich. After about one month, I was offered a more complex position within the company after meeting with Harry White (Assistant Plant Manager). I was responsible for monitoring automated assembly machines and for reporting all "down time" for the robots, the reason they were down and how it was corrected. I was immediately introduced to Mike Swindle, who at the time was not a Team Leader, he was just in charge of the Body Build Line. In our first conversation, Swindle asked me about my marital status and whether I had ever cheated on my husband. He began making vulgar, lewd and sexual gestures with his hands and tongue. Despite my clear requests to stop making sexual advance and sexual comments, he continued such conduct on virtually every shift, and every occasion I was in the vicinity of Swindle's manufacturing line. When Mike Swindle made Team Leader, I was put on his team. He simulated sexually explicit and invasive comments to me. Swindle also touched me against my will by hugging me frequently. On numerous occasions he would try and block me with his body while I was walking down his line. This statement is not inclusive, but merely illustrative. I complained verbally to Swindle and asked the sexual harassment to stop. Swindle informed me there was nothing I could do to make him stop.

On several occasions sexual harassment was witnessed by Steve Culpepper, Group Leader. Another Team Leader, Billy Kitchens, also sexually harassed me on the job (witnessed by Steve Culpepper on at least one occasion).

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to t knowledge, information and belief. |

| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT    SEP 2 6 2006 |
|---|---|
| Date 9/20/06    Tammy Edwards    Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |

D- 00320  EDWARDS V HMMA

PAGE TWO

. Occasion, Kitchens told me in front of Steve, that my new job would be "under his desk." I looked at Steve and they both la and Steve said, "now Billy, you know I can't authorize that," or words to that effect.

Since complaining of harassment, the company has retaliated against me. Hyundai has retaliated against me by allowing its manager, Tom Bondy to subject me to an interrogation under the pretense that he along with Steve Culpepper were investigating my complaint of harassment. Instead, this interrogation was for the purpose of protecting Mike Swindle and/or Bill Kitchens rather than taking remedial action to stop harassment. After complaining of the harassment and in direct retaliation for complaining, I have been demoted and transferred away from a better and more complex job, to the BC1 assembly line. I had no deficiencies of any kind in my job performance and my performance could not have been the reason for my demotion. This undesirable reassignment to a much more physically demanding job was intended to cause me physical and emotional pair The company is aware that I am currently under the treatment of a neurologist for a neck injury and that I need to work in a less physically demanding position. Yet the company retaliated against me by forcing me to perform much more physically demand labor after complaining sexual harassment and a sexually hostile work environment.

I have been discriminated against based on my gender and I have been subjected to a sexually hostile work environment in violation of Title VII, 42 U.S.C. § 2000e, et seq., I have also been retaliated against for making a complaint of violations of my federally protected rights.

INITIALS

RECEIVED

SEP 2 6 2006

Edwards v. Hyundai, et al.

Revised: 01/08/2008

# SUMMARY OF BENEFITS FOR
## HYUNDAI MOTOR MANUF...TURING ALABAMA, LLC

Hyundai Motor Manufacturing Alabama, LLC provides each eligible employee full-time (working at least 40 hours per week), active employee Basic Group Term Life, AD&D, Long Term Disability and in most cases Short Term Disability insurance. These benefits are provided to you at no cost. No action is needed by you in order to receive these benefits. You are enrolled for these coverages on the first day of employment.

Our company is also making it possible to add more protection to your life insurance plan through payroll deduction. Supplemental Insurance is voluntary group life insurance that is simple to apply for and provides you with many important benefits to help secure your family's future.

| Coverage | Benefit Amount | Carrier |
|---|---|---|
| Basic Life Insurance | • Hyundai provides an amount equal to **2 times** your annual earnings (rounded to the nearest $1,000 of benefit) to a Maximum of $500,000 | MetLife |
| Accidental Death and Dismemberment Benefit | • An amount equal to the Basic Life Insurance amount | MetLife |
| Employee Supplemental Life Insurance | • Coverage amounts in increments of $10,000<br>• Maximum benefit amount is the lesser of 5 times Basic Annual Earnings or $500,000<br>• All full-time employees working 30 hours or more per week are eligible<br><br>**Guaranteed Issue**<br>• Amounts up to $200,000 do not require a Statement of Health<br>Amounts over $200,000 require a completed Statement of Health, subject to medical review $160,000. | MetLife |
| Spouse Supplemental Life Insurance | • Coverage amounts in increments of $5,000<br>• Maximum benefit amount is the lesser of one-half of 5 times Basic Annual Earnings or $250,000<br>• All full-time employees working 30 hours or more per week are eligible<br><br>**Guaranteed Issue**<br>• Amounts up to $50,000 do not require a Statement of Health<br>• Amounts over $50,000 require a completed Statement of Health, subject to medical review $80,000; | MetLife |
| Child(ren) Supplemental Life Insurance | • Coverage amount is equal to $10,000<br>• Coverage ends at 19 years old, or 25 years old if a full-time student<br>• All full-time employees working 30 hours or more per week are eligible $10,000.- | MetLife |
| Long Term Disability | **Benefits**<br>• 60% of your covered monthly earnings, with a maximum monthly benefit of $10,000.00<br>• 2 year own occupation<br>• You may be eligible to receive benefits once you have been continuously disabled for a period of 180 days.<br>You will receive benefits if you are disabled due to a covered injury or sickness. | Standard |
| Short Term Disability | **Benefits**<br>• 67% of your covered weekly earnings, with a maximum weekly benefit of $1,000.00<br>• 2 year own occupation<br>• You may be eligible to receive benefits once you have been continuously disabled for a period of at least three days.<br>You will receive benefits if you are disabled due to a covered injury or sickness. 39 | Standard |

PLAINTIFF'S EXHIBIT

*The information shown above is only a brief outline of coverage. Please refer to your employee booklet for further details, coverage provisions and coverage limitations and exclusion.*

Exhibits 41-44 Filed Under Seal

**American Court Reporting**
**toll-free (877) 320-1050**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

CIVIL ACTION NUMBER
2:07-CV-908MHT

TAMMY EDWARDS,

    Plaintiffs,

vs.

HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC,
and MIKE SWINDLE, individually,

    Defendants.

DEPOSITION TESTIMONY OF:
STEVE CULPEPPER

July 18, 2008
2:20 PM

COURT REPORTER:
KRISTEN DYKES THOMAS

Page 3

1  Certificate to the above office. If you
2  fail to do so, you automatically waive
3  your right to make any corrections to
4  your deposition.

Page 2

1  SCOTT PULPEPPER
2  INSTRUCTIONS TO THE WITNESS
3      Please read your deposition over
4  carefully before you sign it. You should
5  make all your changes on the attached
6  errata sheet.
7      After making any changes which
8  you have noted on the attached errata
9  sheet, sign your name on the Deponent's
10  Certificate and date it. You are signing
11  it subject to the changes you have made
12  on the errata sheet, which will be
13  attached to the deposition.
14      Return the attached errata sheet
15  and Deponent's Certificate to American
16  Court Reporting Service, Read & Sign
17  Department, P.O. Box 12765, Birmingham,
18  Alabama 35202.
19      According to the Rules of Civil
20  Procedure, you will have thirty (30) days
21  from the date you receive this deposition
22  in which to read it, sign it, and return
23  the errata sheet and Deponent's

Page 4

ERRATA SHEET
PAGE     LINE     EXPLANATION
1  ------------------------------------------
2  ------------------------------------------
3  ------------------------------------------
4  ------------------------------------------
5  ------------------------------------------
6  ------------------------------------------
7  ------------------------------------------
8  ------------------------------------------
9  ------------------------------------------
10  ------------------------------------------
11  ------------------------------------------
12  ------------------------------------------
13  ------------------------------------------
14  ------------------------------------------
15  ------------------------------------------
16  ------------------------------------------
17  ------------------------------------------
18  ------------------------------------------
19  ------------------------------------------
20  ------------------------------------------
21  ------------------------------------------
22  ------------------------------------------
23  ------------------------------------------

1 (Pages 1 to 4)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 5

1     DEPONENT'S CERTIFICATE
2
3     I, SCOTT PULPEPPER, the witness
4 herein, have read the transcript of my
5 testimony and the same is true and
6 correct, to the best of my knowledge.
7 Any corrections and or additions, if any,
8 are listed separately.
9
10
11     _____
12     SCOTT PULPEPPER
13
14     _____
15     DATE
16
17     Sworn to and subscribed before
18 me, this the _____ day of
19 _____, 2008, to certify my hand
20 and seal of office.
21
22     _____
23     NOTARY PUBLIC

Page 6

1     S T I P U L A T I O N S
2     IT IS STIPULATED AND AGREED by
3 and between the parties through their
4 respective counsel that the deposition of
5 SCOTT PULPEPPER, may be taken before
6 Kristen Dykes Thomas, Court Reporter and
7 Notary Public, State at Large, at the
8 Wingate Inn, Montgomery, Alabama, on July
9 18, 2008, commencing at approximately
10 2:20 p.m.
11     IT IS FURTHER STIPULATED AND
12 AGREED that the signature to and the
13 reading of the deposition by the witness
14 is not waived, the deposition to have the
15 same force and effect as if full
16 compliance had been had with all laws and
17 rules of Court relating to the taking of
18 depositions.
19     IT IS FURTHER STIPULATED AND
20 AGREED that it shall not be necessary for
21 any objections to be made by counsel to
22 any questions, except as to form or
23 leading questions, and that counsel for

Page 7

1 the parties may make objections and
2 assign grounds at the time of trial or at
3 the time said deposition is offered in
4 evidence, or prior thereto.
5     In accordance with Rule 5(d) of
6 the Alabama Rules of Civil Procedure, as
7 amended, effective May 15, 1998, I,
8 Kristen Dykes Thomas, am hereby
9 delivering to Alicia Haynes the original
10 transcript of the oral testimony taken
11 July 18, 2008.
12     Please be advised that this is
13 the same and not retained by the Court
14 Reporter, nor filed with the Court.
15
16
17
18
19
20
21
22
23

Page 8

1     I N D E X
2
3 EXAMINATION BY:      PAGE NO.
4 Mrs. Haynes      11
5 Mr. Bostick      163
6 Certificate      168
7
8     INDEX OF EXHIBITS
9 EXHIBITS      PAGE NO.
10 PLAINTIFF'S 45   resume'      23
11 PLAINTIFF'S 46   report      59
12 PLAINTIFF'S 47   report      49
13 PLAINTIFF'S 48   report      60
14 PLAINTIFF'S 49   report      60
15 PLAINTIFF'S 50   report      62
16 PLAINTIFF'S 51   report      64
17 PLAINTIFF'S 52   e-mail      84
18 PLAINTIFF'S 53   e-mail      87
19 PLAINTIFF'S 54   statements      88
20 PLAINTIFF'S 55   time sheets      93
21 PLAINTIFF'S 56   vacation request      124
22
23

2 (Pages 5 to 8)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 9

1    A P P E A R A N C E S
2    FOR THE PLAINTIFF:
3       Alicia K. Haynes
4       HAYNES & HAYNES, PC
5       1600 Woodmere Drive
6       Birmingham, Alabama 35226
7    FOR THE DEFENDANTS:
8       Brian R. Bostick
9       OGLETREE, DEAKINS, NASH, SMOAK &
10      STEWART, P.C. Suite 1000
11      1819 5th Avenue N
12      Birmingham, Alabama 35203
13      J. Tobias Dykes
14      CONSTANGY, BROOKS & SMITH, LLC
15      One Federal Place, Suite 99
16      1819 Fifth Avenue North
17      Birmingham, Alabama 35203
18      Christopher N. Smith
19      Legal Corporate Counsel
20      Hyundai Motor Manufacturing
21      Alabama, LLC
22      700 Hyundai Boulevard
23      Montgomery, Alabama 36105

Page 10

1       I, Kristen Dykes Thomas, a Court
2    Reporter of Auburn, Alabama, and a Notary
3    Public for the State of Alabama at Large,
4    acting as Commissioner, certify that on
5    this date, pursuant to the Alabama Rules
6    of Civil Procedure, and the foregoing
7    stipulation of counsel, there came before
8    me at the Wingate Inn, Montgomery,
9    Alabama, commencing at approximately 2:20
10   p.m, on July 18, 2008, SCOTT PULPEPPER,
11   witness in the above cause, for oral
12   examination, whereupon the following
13   proceedings were had:
14
15       SCOTT PULPEPPER,
16   having been first duly sworn, was
17   examined and testified as follows:
18
19       COURT REPORTER:  Usual
20   stipulations?
21       MR. BOSTICK:  You've got the
22   option, if you would like, to read and
23   review the deposition after it's done for

Page 11

1    typos, that type of thing.  Do you want
2    to have that option to do that?  And then
3    you have 30 days to see if there is
4    something --
5       THE WITNESS:  Okay.
6       MR. BOSTICK:  We'll read and
7    sign.
8
9    EXAMINATION BY MRS. HAYNES:
10      Q.   Will you state your full name
11   for the record, please.
12      A.   Steven Richard Culpepper.
13      Q.   And what's your address?
14      A.   My current address is ▨▨▨
15   ▨▨▨▨▨▨, Wetumpka, Alabama.
16      Q.   How long have you lived at
17   that address?
18      A.   About three months.
19      Q.   Who lives there with you?
20      A.   My wife and my stepdaughter.
21      Q.   What's your wife's name?
22      A.   ▨▨▨▨▨▨▨ Culpepper.
23      Q.   How long have you and

Page 12

1    Mrs. Culpepper been married?
2       A.   Just over six months.
3    December 29th.
4       Q.   Is your stepdaughter over the
5    age of 19?
6       A.   No.
7       Q.   Do you have any other
8    children?
9       A.   I have a son, 14.
10      Q.   Where are you currently
11   employed?
12      A.   Kelly Aerospace.
13      Q.   What do you do there?
14      A.   I am the machine shop
15   supervisor.
16      Q.   How long have you been
17   employed there?
18      A.   Since November of last year.
19      Q.   2007?
20      A.   Yes.
21      Q.   Where were you employed
22   previous?
23      A.   Hyundai Motor Manufacturing of

3  (Pages 9 to 12)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 13

1  Alabama.
2      Q.   When did you leave Hyundai?
3      A.   September of '07.
4      Q.   How long were you employed
5  with Hyundai?
6      A.   Four and a half years, I
7  think.
8      Q.   What was your last position
9  with Hyundai?
10     A.   Group leader of the welding
11 department.
12     Q.   How long did you hold that
13 position?
14     A.   Almost two years.
15     Q.   Prior to group leader in the
16 welding department, what was your
17 position with Hyundai?
18     A.   Team leader of Body Complete
19 2.
20     Q.   Is Body Complete 2 also called
21 BC2?
22     A.   Yes, BC2.
23     Q.   Have you ever worked BC1?

Page 14

1      A.   Occasionally.
2      Q.   As a team leader or a group
3  leader?
4      A.   Both.
5      Q.   As a group leader in the
6  welding department, who are the team
7  leaders under you?
8      A.   My team leaders on my shift
9  were Toby Chance, Mike Swindle, Billy
10 Kitchens, Dawn McGrugor (phonetic), and
11 Mylavanh Phomsavanh.
12     Q.   Can you spell that?
13     A.   M-Y-L-A-V-A-N-H,
14 P-H-O-M-S-A-V-A-N-H.  That's why we
15 called him Yow (phonetic).
16     Q.   You called him what?
17     A.   Yow.  That was his given
18 nickname.
19     Q.   Prior to being a team leader
20 in Body -- is it Body Comp?
21     A.   Body Complete 2.
22     Q.   Body Complete 2.  Okay.
23         -- what was your position with

Page 15

1  Hyundai?
2      A.   Production team member.
3      Q.   And how long were you a
4  production team member before you moved
5  to a team leader position?
6      A.   I think it was a year, maybe a
7  little over a year.
8      Q.   For team member?
9      A.   I was a team member
10 approximately one year, a team leader
11 approximately one year, maybe longer.
12     Q.   What's the difference between
13 a team leader and a team member?
14     A.   Team leader kind of oversees
15 the day-to-day duties of a small given
16 team or a small area delegated small
17 assignments, keep up with time sheets,
18 report problems, more of a go-to contact
19 person as an intermediator between
20 production team member and group leader.
21 But they are not a member of management.
22     Q.   Is it more money to be a team
23 leader than a team member?

Page 16

1      A.   Slightly.
2      Q.   How much?
3      A.   It's one dollar an hour more.
4      Q.   So if everyone else was being
5  paid fourteen dollars, you're paid
6  fifteen dollars an hour?
7      A.   That's correct.
8      Q.   What's the difference between
9  a team leader and a group leader?
10     A.   A group leader is a member of
11 management and is directly responsible
12 for the team leaders and all the team
13 members of that department as far as
14 delegation of assignments, attendance,
15 disciplinary problems.  It's general
16 management, shop floor supervisor.
17     Q.   Okay.  When did you become a
18 group leader?  What year?
19     A.   If I remember correctly, it
20 was November 2005.
21     Q.   And what's the difference in
22 pay, if you know, between a team leader
23 and a group leader?

4 (Pages 13 to 16)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 17

1  A.  I'm not sure, because group
2  leader is a salaried position.  I can
3  tell you what my difference in pay was,
4  but that was calculated on a given
5  overtime.
6  Q.  Okay.  What's the difference?
7  A.  My difference was probably an
8  extra dollar an hour, maybe two dollars
9  an hour more on the average.
10  Q.  Where was your office located
11  as a group leader?
12  A.  Upstairs with all the rest of
13  the salaried team members.
14  Q.  What's your educational
15  background?
16  A.  I have an associate's degree
17  in business management from Ashworth
18  College.
19  Q.  Where is Ashworth?
20  A.  It is a school in Norcross,
21  Georgia.  I completed it long-distance
22  education.
23  Q.  Correspondence?

Page 18

1  A.  Yes.  And I have a few
2  certificates such as body repair,
3  technology, finance with body training,
4  but no other certifications.
5  Q.  Okay.  What high school did
6  you go to?
7  A.  I attended Stanhope Elmore
8  High School until 1994 or '95.  I dropped
9  out my senior year and got a GED.
10  Q.  Where is Stanhope?
11  A.  In Millbrook.
12  Q.  Why did you leave Hyundai?
13  A.  I was terminated for serious
14  misconduct.
15  Q.  What did you do?
16  A.  I made copies of proprietary
17  information.
18  Q.  What type of information did
19  you copy?
20  A.  Personnel files.
21  Q.  Of whom?
22  A.  April Michelle Smith.
23  Q.  Is that your now wife?

Page 19

1  A.  Yes.
2  Q.  Anything else?
3  A.  No.
4  Q.  Were you married at the time
5  you were making copies of Ms. Smith's
6  personnel file?
7  A.  No.
8  Q.  She was not your wife?
9  A.  No.
10  Q.  Did you have another wife?
11  A.  No.  We were divorced.
12  Q.  When were you divorced?
13  A.  March 2007.
14  Q.  Anything else you were copying
15  other than Ms. Smith's personnel file?
16  A.  No.
17  Q.  And why were you copying
18  Ms. Smith's personnel files?
19  A.  I thought there were some
20  discrepancies in some things, such as
21  disciplinary actions, and I was curious
22  for myself.  I eventually -- well, not
23  eventually.  The same day I destroyed

Page 20

1  those copies.  I never took them off the
2  property.
3  Q.  Did you ascertain if there
4  were actually discrepancies in
5  disciplinary actions directed to
6  Ms. Smith?
7  A.  No, I did not.
8  Q.  What was causing you concern?
9  A.  I felt maybe there was some
10  maybe partiality on the part of the
11  assistant manager, Vince Gayhaper
12  (phonetic), but I was never able to prove
13  or disprove that.  Like I said, I
14  destroyed that information and I had to
15  remain impartial to it because of my
16  position.
17  Q.  Was Mr. Gayhaper a group
18  leader as well?
19  A.  He was assistant manager.
20  Q.  Did you report to him?
21  A.  I did.
22  Q.  Was Mr. Gayhaper's desk in the
23  same work area as yours?

5 (Pages 17 to 20)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 21

1  A.  Yes.
2  Q.  Did he work a different shift?
3  A.  Sometimes.  Vince mainly
4  stayed on night shift, and I rotated.
5  Q.  How was it discovered that you
6  had gone in his desk and removed her
7  file -- or copied her file?
8  A.  I was told I was caught on
9  videotape, caught by security cameras.
10  If that's true or not, I don't know.
11  Q.  Was there an investigation?
12  A.  There was.
13  Q.  How long did the investigation
14  last?
15  A.  I'm not sure.  Maybe two
16  weeks.
17  Q.  Was Ms. Smith fired too?
18  A.  She was fired prior to that.
19  Q.  For what?
20  A.  For falsifying documents.
21  Q.  What was the allegation that
22  she had falsified?
23  A.  Allegedly she had falsified

Page 22

1  her time records for herself.
2  Q.  How does -- well, strike that.
3  Is it not an electronic
4  system?
5  A.  No.
6  Q.  How does one keep their time
7  at Hyundai?
8  A.  Typically, the team members
9  have a sign-in and out book that they log
10  their time in on, and the team leader
11  verifies that.  Then it is submitted it
12  to the group leader, which is then input
13  electronically.
14  Q.  Who was her team leader?
15  A.  She was the team leader.
16  Q.  Oh, she was the team leader?
17  A.  Yes.
18  Q.  And Mr. Gayhaper was her group
19  leader?
20  A.  Was her assistant manager.
21  Christopher Worley (phonetic) was her
22  group leader.
23  Q.  I've got you.  Was she

Page 23

1  terminated before or after you?
2  A.  Before.
3  Q.  Pardon?
4  A.  Before.
5  Q.  How much before?
6  A.  I don't remember.  Maybe a
7  month.
8  Q.  You have brought your resume'
9  today, and I appreciate that.
10  A.  Uh-huh.
11  Q.  Any other documents you've
12  brought?
13  A.  Other than what's in my
14  wallet, you know, driver's license and a
15  few dollars, no, ma'am.
16  (WHEREUPON, Plaintiff's
17  Exhibit Number 45 was marked for
18  identification.)
19  Q.  45, is that your resume',
20  Plaintiff's 45?
21  A.  It is.
22  Q.  Did -- when was the last time
23  that was updated?

Page 24

1  A.  Probably September or October
2  of 2007.
3  Q.  Okay.  When you went to --
4  A.  When I went to work with Kelly
5  Aerospace -- or just before I went to
6  work at Kelly Aerospace.
7  Q.  Okay.  So Kelly Aerospace is
8  not on this document?
9  A.  No, ma'am.
10  MR. BOSTICK:  Alicia, before I
11  forget, we are going to make him, in
12  addition to Bondy on 9, about concerns
13  with Plaintiff's job performance.  And I
14  think he can testify on 15 on whether
15  there was a replacement on that specific
16  job on BC1.
17  Q.  (BY MRS. HAYNES)  Is there a
18  reason you put here that you were still
19  employed with Hyundai at the time of
20  October, November of 2007 when you did
21  this resume'?
22  A.  No, ma'am.  And, actually,
23  someone had pointed that out to me.  A

6 (Pages 21 to 24)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 25

1  potential employer had pointed that out
2  to me, and I never went back and
3  corrected it. It was error and oversight
4  on my part.
5      Q. Okay. Did you ask Mr. Bondy,
6  Mr. King, and Mr. Kitchens to be
7  references for you?
8      A. I did.
9      Q. When was the last time you
10  talked to Mr. Bondy?
11      A. It's been a long time. Right
12  after I left Hyundai he had called once,
13  maybe twice just to check up on me, see
14  how I was doing, if I had found
15  employment. But not since. And I
16  haven't heard from Mr. King or
17  Mr. Kitchens since.
18      Q. Since --
19      A. Since I left Hyundai.
20      Q. Okay. Mr. Bondy you had one
21  contact with since you left Hyundai?
22      A. Yes.
23      Q. And that was in 2007?

Page 26

1      A. Yes.
2      Q. Have you been in contact with
3  anyone at Hyundai since you left?
4      A. I run into them in Wal-Mart
5  and the grocery store every once in a
6  while, but nothing formal or scheduled or
7  planned.
8      Q. Okay. Have you had anything
9  other than a five-minute conversation
10  with anyone from Hyundai since you left?
11      A. No.
12      Q. How about Mr. Smith? Have you
13  talked to Mr. Smith?
14      A. (No response)
15      Q. Chris Smith down there.
16      A. Oh, I've met him briefly.
17      Q. Today?
18      A. Today.
19      Q. Have you had telephone
20  conversations with Mr. Smith before
21  today?
22      A. No.
23      Q. When did you meet Mr. Bostick?

Page 27

1      A. I met Mr. Bostick the same
2  time I met Mr. Dykes, maybe two, three
3  weeks ago right before our first planned
4  deposition.
5      Q. How long did that meeting take
6  place?
7      A. Not long, maybe 30 minutes.
8      Q. Where did the three of you
9  meet?
10      A. At a McDonalds.
11      Q. Who else was present?
12      A. No one.
13      Q. And did you have lunch with
14  them today?
15      A. Uh-huh.
16      Q. Is that a yes?
17      A. Yes, ma'am.
18      Q. Was that at the Chick-Fil-A?
19      A. Yes, ma'am.
20      Q. Who bought your lunch?
21      A. I did.
22      Q. Has anyone promised you
23  anything with regards to your testimony

Page 28

1  today?
2      A. No.
3      Q. Are you being paid for your
4  time?
5      A. No.
6      Q. How did you get off work
7  today?
8      A. Because I'm in a salary
9  position, I have some leeway in my work
10  schedule. I had requested this day off,
11  so I actually left work at one o'clock.
12  I didn't take the whole day off. I just
13  left at one o'clock.
14      Q. Okay. No one other than --
15  what did you tell me your new place is,
16  Aerospace --
17      A. Kelly Aerospace.
18      Q. --Kelly Aerospace paying --
19      A. That's correct.
20      Q. -- any compensation for today?
21      A. No.
22      Q. How many other meetings have
23  you had with Mr. Dykes or Mr. Bostick

7 (Pages 25 to 28)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 29

1  since the meeting two weeks ago and
2  today?
3      A.  None.
4      Q.  Have you reviewed any
5  documents, depositions?
6      A.  No.
7      Q.  Have you reviewed any
8  audiotapes or videotapes?
9      A.  No.
10     Q.  Were there videotapes out in
11  the plant area?
12     A.  Videotapes?
13     Q.  Yeah.  Security cameras.
14     A.  Oh, there is -- yeah, there is
15  security cameras throughout the plant.
16  Their exact locations, I'm not sure.
17     Q.  Did you know there were
18  security cameras in the office?
19     A.  I did not.
20     Q.  And you never saw a tape?
21     A.  No.
22     Q.  They just told you they had a
23  tape?

Page 30

1      A.  Yes.
2      Q.  How do you know there are
3  security cameras out in the plant?
4      A.  Oh, I had been told by members
5  of HR and members of the security force
6  in casual conversations.  It was never
7  just a direct question or direct answer.
8  It was just something that was just kind
9  of brought up in casual conversation in
10  the past.
11     Q.  Do you know if any videotapes
12  were -- from the security cameras were
13  reviewed as part of the investigation
14  into Mrs. Edwards' complaints about
15  Mr. Swindle?
16     A.  I do not know.
17     Q.  Do you know if there is
18  security cameras that would film that
19  aisle where he was located and where she
20  would walk?
21     A.  I do not know.  Like I said,
22  I'm not certain of any camera locations.
23     Q.  Other than you were told by

Page 31

1  Human Resources?
2      A.  Yes.
3      Q.  Do you have any reason not to
4  believe that's true?
5      A.  No.
6      Q.  What was the reason Human
7  Resources was telling you there were
8  security cameras throughout the plant?
9          MR. BOSTICK:  Object to the
10  form.
11     A.  Again, I don't remember who it
12  was, but it was just through casual
13  conversation.  I think it may have been
14  someone from team relations.  I can't
15  remember.  I mean, it's been so long.
16     Q.  You can't recall why someone
17  in team relations or Human Resources was
18  telling you about security cameras?
19     A.  No, ma'am.
20     Q.  Do you know if it related to
21  Mr. Swindle?
22     A.  No.  It did not.  I don't
23  think it related to any disciplinary

Page 32

1  problem or specific incident.  It was
2  just something that was brought up.
3      Q.  How long did you supervise
4  Mr. Swindle before you left Hyundai?
5      A.  Well, probably one year.  When
6  I first became group leader, he was on
7  the opposite shift that I was on.  Then I
8  was traded places with the other group
9  leader, and then Swindle came under my
10  supervision.  So maybe one year.
11     Q.  2006?
12     A.  I think it was the end of
13  2006, beginning of 2007.
14     Q.  Okay.  Did you know
15  Mr. Swindle before then, before he
16  started working directly under your
17  supervision?
18     A.  He and I hired in at Hyundai
19  at the same time.
20     Q.  Did you become friends?
21     A.  We became friendly coworkers.
22  We were on friendly terms, but we didn't
23  see each other outside of work or spend a

8 (Pages 29 to 32)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 33

1  great deal of time with each other.
2      Q.    You've never see him outside
3  of work?
4      A.    Once.
5      Q.    What was that occasion?
6      A.    Right after I got divorced he
7  and several other coworkers took me out
8  for a drink. That was March or April of
9  2007.
10     Q.    Where did y'all go?
11     A.    Woodmere Tavern.
12     Q.    Who else went with you?
13     A.    There was me, Mike Swindle,
14 Billy Kitchens, April, Adam -- I can't
15 remember his last name. There were so
16 many people there from Hyundai. There is
17 a lot of people from Hyundai that
18 socialize there. There were some people
19 from the engine department. I can't
20 remember all of their names.
21     Q.    When did you meet
22 Mrs. Edwards?
23     A.    When she hired in, she was a

Page 34

1  direct report to me.
2      Q.    In what department, what job?
3      A.    She was placed primarily -- or
4  initially as a production team member in
5  the moving parts area. If I remember
6  right, she started off building fenders.
7      Q.    Do you recall the occasion
8  that you did meet her for the first time?
9      A.    I think so. I typically do a
10 small orientation with the new hires. If
11 I remember right, that was -- the first
12 time I met her was in the conference room
13 upstairs in the welding department during
14 a brief orientation.
15     Q.    Had she already been trained
16 through the training department at that
17 point in time?
18     A.    Yes. She had already went
19 through her two-week training
20 orientation.
21     Q.    Did she work at any other part
22 of the plant before being assigned to
23 your area?

Page 35

1      A.    Not to my knowledge.
2      Q.    Okay. Were other people
3  brought in at the same time she was to
4  work for you?
5      A.    Yes.
6      Q.    Okay. Do you remember her
7  saying anything in that meeting?
8      A.    No, nothing particular, other
9  than I remember she told me she was
10 formerly a substitute schoolteacher. I
11 like to ask everybody their background,
12 just to try to get to know them a little
13 better, and place them in a position that
14 might be suitable for them.
15     Q.    Okay. Did she tell you
16 anything about her neck injury and having
17 an auto accident?
18     A.    At that time, no.
19     Q.    When did you hear about that?
20     A.    I don't remember the exact
21 date. It was -- it was sometime after
22 she became CCR operator.
23     Q.    Was Mr. Ulrich (phonetic) a

Page 36

1  team leader under you?
2      A.    Yes, he was. I'm sorry. I
3  left him out.
4      Q.    But you don't recall in that
5  first introductory meeting with
6  Mrs. Edwards telling you that she had
7  been in a wreck recently and was having
8  trouble with her neck and you telling her
9  you would move her to -- put her in
10 moving parts down on the line?
11     A.    No, I don't recall that.
12     Q.    Could it have happened and you
13 just don't recall today?
14     A.    I suppose it's possible. I
15 just don't recall it.
16     Q.    Do you recall how long she
17 worked in moving parts before she was
18 moved to the CCR position?
19     A.    I don't recall. It may have
20 been two months. That's a best guess.
21     Q.    Okay. Do you recall meeting
22 with her where you and Mr. White, Harry
23 White talked to her?

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 37

1    A.   Yes, I do.  Yes.  We asked her
2  some questions pertaining to the CCR job.
3    Q.   Okay.  And why were you
4  interested in moving her from moving
5  parts to the CCR job?
6    A.   At that time the current CCR
7  operator Pamela Stoddart (phonetic) was
8  being moved back into an equipment
9  operator position due to her previous
10  experience with it, and there was a need
11  for another CCR operator.  And I had
12  recalled that Tammy had once been a
13  substitute schoolteacher, and I thought
14  some of those skills may apply to the CCR
15  job, since it primarily entailed making
16  reports.
17    Q.   Okay.  How had she been
18  performing in moving parts?
19    A.   Average, I suppose.
20    Q.   Did you have any complaints?
21    A.   No.
22    Q.   Can you describe the moving
23  parts job for me that Mrs. Edwards was

Page 38

1  performing?
2    A.   If I recall correctly, you
3  load a fender into an automated jig; you
4  load some subsequent components along
5  with that, such as reinforcement; and you
6  hit a button and it rolls it together.
7    Q.   Okay.  What was the heaviest
8  thing she lifted at moving parts?
9    A.   Heaviest thing?
10    Q.   Yes, sir.
11    A.   On the fender job, the
12  heaviest thing was a fender.  And it was
13  probably 10, 15 pounds.  There is other
14  jobs in the moving parts area that are
15  quite heavier.
16    Q.   Did she ever complain to you
17  that she was having difficulty performing
18  the moving parts job?
19    A.   Not that I recall.
20    Q.   Were you the decision-maker to
21  move Mrs. Edwards from moving parts to
22  the CCR position?
23    A.   It was a joint decision

Page 39

1  between Harry White and myself.
2    Q.   And did you move Pam Stoddart
3  because she was not doing a good job as a
4  CCR operator?
5    A.   No.  The purpose of moving Pam
6  was due to a need of equipment operator.
7  At that time we were adding more
8  equipment operators on what they called a
9  split schedule, split shift.  So there
10  was an early shift and a late shift for
11  equipment, and there was -- so basically,
12  it doubled the equipment tender workload.
13    Q.   Where on the line did you
14  place Ms. Stoddart?
15    A.   I can't remember if it was
16  body build line or the CRPV line.
17    Q.   Did Ms. Stoddart express any
18  opposition when you were moving her from
19  the CCR position?
20    A.   Not that I recall.
21    Q.   Do you recall anyone else
22  performing this CCR position other than
23  Ms. Stoddart prior to the replacement of

Page 40

1  Mrs. Edwards?
2    A.   Back in the very, very
3  beginning, Paul Dawson took the position.
4  He was moved to equipment tender as well.
5  And, of course, on the opposite shift,
6  there is Sheri (phonetic) McCray
7  (phonetic).
8    Q.   Who trained Mrs. Edwards to do
9  the CCR job?
10    A.   That was joint between Pam
11  Stoddart and myself.
12    Q.   Okay.  And what training did
13  you provide Mrs. Edwards?
14    A.   As I recall mainly what to
15  look for as far as breakdowns, how to
16  report breakdowns, the counter measures
17  of the breakdowns, and the terminology
18  that was used on the floor.  Pam provided
19  most of the training.
20    Q.   Okay.  Did you tell or
21  instruct Mrs. Edwards how you wanted to
22  reports done?
23    A.   I did.  On a continuous basis,

10  (Pages 37 to 40)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 41

1  it was part of my job to coach and
2  counsel her. There were mistakes made on
3  the report frequently, and I had to
4  review those mistakes with her and show
5  her what we needed to improve.
6      Q.  Okay. Did you ever have her
7  redo any reports?
8      A.  Yes.
9      Q.  Okay. On what occasions? Do
10 you know?
11     A.  I couldn't tell you.
12     Q.  How many times?
13     A.  It was quite a few.
14     Q.  More than ten? Less than ten?
15     A.  I'd say probably more than
16 ten.
17     Q.  Did her reports get better?
18     A.  There was a period of time
19 when they did get better. And then it
20 seemed to curtail again. I mean,
21 everybody struggles with that position to
22 begin with, and there was plenty of
23 patience provided on our part as far as

Page 42

1  training and counseling and making sure
2  she was given the proper time and
3  training. And at that point, things
4  seemed like they were starting to
5  improve, and I don't know why, but they
6  kind of curtailed off again.
7      Q.  When?
8      A.  If I had to --
9      Q.  I don't want you guessing. I
10 want you to give me your best estimate.
11     A.  My best estimate was somewhere
12 around the May time frame of 2006, I
13 think it was.
14     Q.  That her reports were not
15 good?
16     A.  Yes. I was spending lots of
17 excessive hours myself after
18 Mrs. Edwards had already left for the end
19 of the shift where I had to go back and
20 make corrections and improve the report
21 because the initial report after it was
22 reviewed by management was not
23 satisfactory. And I would have to go

Page 43

1  back and edit it and revise it.
2      Q.  Did you save changes to those
3  reports?
4      A.  No, ma'am, I did not.
5      Q.  Then how would you revise
6  them?
7      A.  It was done in a Power Point
8  format, so I would just go in
9  electronically, edit what needed to be
10 edited, and correct what needed to be
11 corrected, and save it under the same
12 file name, and send it out electronically
13 and print hard copies.
14     Q.  You overwrote her form?
15     A.  At times, yes.
16     Q.  Okay. And then you printed
17 out those revised forms?
18     A.  Yes, ma'am.
19     Q.  Or revised reports, rather?
20     A.  Yes, ma'am.
21     Q.  And then did you e-mail those?
22     A.  Yes, ma'am.
23     Q.  To the same people she

Page 44

1  e-mailed her reports to?
2      A.  Yes, ma'am. There was a
3  distribution list.
4      Q.  How many reports do you think
5  you revised and e-mailed that you
6  overrode her reports?
7      A.  I couldn't say. There were
8  lots of corrections made, some of which
9  she was present for. I don't know a
10 definite answer.
11     Q.  Anyone else's reports did you
12 have to revise, override?
13     A.  No, ma'am. She was the only
14 one working for me at that time, as far
15 as CCR operator goes.
16     Q.  Okay. Did you do those
17 revisions at her desk or...
18     A.  Usually, yes. She would leave
19 her computer logged in because she'd say,
20 Steve, it's late; I'm tired; I need to go
21 home; we've been here 12 hours. And I
22 couldn't force her to stay past 10 hours,
23 and I wasn't going to ask her, so I would

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 45

1 finish up the report after she had left
2 and e-mail it under her name.
3     Q.    Okay.  And would you e-mail
4 the reports using her name?
5     A.    Sometimes, yes.  There was a
6 few times where I did it under my name.
7 If the computer was already logged off, I
8 would go into the network drive, access
9 it, and correct it as needed.
10     Q.    Okay.  So those e-mails would
11 still be in existence where you corrected
12 her reports?
13     A.    As far as I know.
14     Q.    Okay.  What was your e-mail
15 address?
16     A.    Sculpepper@hmmausa.com.
17     Q.    Give me that again.
18 Sculpepper@ --
19     A.    -- hmmausa.com.
20         MR. BOSTICK:  Can we take a
21 quick restroom break?
22         MRS. HAYNES:  We just started.
23 Can you just run and get right

Page 46

1 back?
2         MR. BOSTICK:  Yeah, I can, if
3 nobody else has to go.
4         THE WITNESS:  I'd like to go,
5 too, please.
6             2:55 PM
7         (Short recess)
8             2:57 PM
9     Q.    (BY MRS. HAYNES)  And you
10 think you were correcting reports in May?
11     A.    I believe so, yes, ma'am.
12     Q.    Here is one from May 31st.
13 Have you looked at any of these reports
14 since you left Hyundai?
15     A.    No, I have not.
16     Q.    Do you recognize this
17 production report?
18     A.    Yes, ma'am.  I recognize the
19 format.
20     Q.    Is this one you did?
21     A.    I couldn't tell you.
22     Q.    Do you recognize it as a
23 report that Mrs. Edwards did?

Page 47

1     A.    I'm not sure.  I couldn't tell
2 you who wrote this report just looking at
3 the first page.
4     Q.    Okay.  Look at page number
5 363.
6     A.    363.  Okay.
7     Q.    Looking at those times, does
8 that refresh your recollection if you or
9 Mrs. Edwards would be doing this report?
10     A.    Yes.  I believe it was her
11 report.  It's not mine.
12     Q.    And what makes you so certain
13 about that?
14     A.    The grammatical errors.
15     Q.    Okay.  And what page are you
16 referring to grammatical errors?
17     A.    Page 363.
18     Q.    Okay.  Which number?
19     A.    Line item 930 to 1030, the
20 only chemical bracket broke and fell
21 snatching the motor cable out.  I
22 wouldn't have used terminology such as
23 that.  Koreans don't understand what

Page 48

1 snatching is.
2     Q.    Okay.  What would you have
3 said?
4     A.    I believe I'd have probably
5 phrased it as something as such the only
6 cable bracket broke motor cable was
7 pulled out.  I wouldn't have used the
8 word snatching.
9     Q.    Okay?
10     A.    The next line down, team
11 leader stimulated the digital input.
12 Being a robot programmer, I know it's
13 team leader simulated the digital input.
14     Q.    Okay.  Anything else?
15     A.    I haven't finished reading the
16 rest of the page.
17         I don't see any other obvious
18 discrepancies.
19     Q.    Any problems with the work
20 time target actual and downtime?  I mean,
21 what were you actually having to correct,
22 her grammatical errors?
23     A.    The grammatical reports such

12  (Pages 45 to 48)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 49

1  as that.
2      Q.  Okay.  That's what you're
3  referring to?
4      A.  Right, items such as that.
5  But not just grammatical errors, but
6  errors such as what really occurred
7  there, because sometimes -- as you can
8  see, there is pictures on some of these
9  slides.  Sometimes the picture didn't
10  match the description, or it was
11  something that didn't make sense.
12      Q.  Okay.  Can you provide me an
13  example in any of these pictures?
14      A.  Out of these pictures, no,
15  ma'am.  These look accurate as to the
16  best of my knowledge.
17      Q.  Pardon?
18      A.  These pictures look accurate
19  as best of my knowledge.
20          (WHEREUPON, Plaintiff's
21  Exhibit Number 47 was marked for
22  identification.)
23      Q.  Okay.  Plaintiff's 47, was

Page 50

1  this the typical type report you would
2  receive from Mrs. Edwards?
3      A.  Actually, no, ma'am.  This is
4  actually one of the better ones.
5      Q.  How did this report compare to
6  Pam Stoddart's reports?
7      A.  I would say Pam's were better.
8  They were more accurate with the
9  terminology and a depicting of what
10  actually happened.
11      Q.  How so?
12      A.  Well, because Pam had previous
13  operator experience, she could obviously
14  tell if -- she could go up and look at a
15  situation and look at the parts being
16  repaired or not repaired, and she knew
17  the terminology a little bit better.  But
18  more so she would paint a better picture
19  of what the root cause problem was of
20  what occurred to correct it.  There was
21  more at stake than just recording how
22  much downtime there was.  We needed to
23  know exactly detailed information of what

Page 51

1  went wrong, who fixed it, and how we are
2  going to keep it from happening again.
3      Q.  Okay.  Did you ever have to
4  work on any of Ms. McCray's reports?
5      A.  Not that I recall.  She worked
6  on the opposite shift.
7      Q.  On Plaintiff's 47 on the --
8  page 6 -- I'm sorry -- 364 and 366 -- I'm
9  sorry -- 364 and 365, do you know what
10  those begin times reference?
11      A.  If I'm correct, maybe begin
12  times reference a lined fault in the body
13  build line.
14      Q.  And duration means what?
15      A.  How long that fault existed
16  before it was reset or returned to a
17  normal condition.
18      Q.  And does the CCR person input
19  those times?
20      A.  I don't think so.  I think the
21  computer automatically tallies those
22  times.
23      Q.  On this report; is that

Page 52

1  correct?
2      A.  Yes, ma'am.
3      Q.  The format is that the time is
4  already there; the computer knows when
5  it's gone down and how long it's been
6  down?
7      A.  Yes, ma'am, if I remember
8  correct.
9      Q.  And does the computer also
10  configure the text, the area, summary,
11  and the detail?
12      A.  I think the only areas that
13  are input by the CCR operator are the
14  comment and action plan.
15      Q.  Okay.  How about on the page
16  before on page 363, the downtime, is that
17  input by the CCR operator, or does the
18  computer configure those?
19      A.  No.  That's input manually.
20      Q.  Okay.  And do you take the
21  downtime from any numbers -- let me
22  rephrase.
23          Do you take the downtime

13  (Pages 49 to 52)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 53

1  that's located on 363 and put -- or is
2  that ascertained from 364 or 365?
3  　　A.　That's a yes and no answer.
4  The pages 364 and 365 are more of a
5  reference, because not all downtime
6  represented line faults. There were
7  times that the condition was normal and
8  the computer would not recognize that as
9  a downtime. At that point it's the
10  responsibility of the team leaders and
11  the CCR operator to report that downtime.
12  　　Q.　Well, like this report-- and
13  we're still on Plaintiff's 47. But
14  looking at the report on 363, we see the
15  time period 6:35 to 7:30.
16  　　A.　Uh-huh.
17  　　Q.　And has downtime of five --
18  that's five minutes or five units?
19  　　A.　Five minutes.
20  　　Q.　Okay. So if you go over to
21  364 and 365 and go down to -- you find
22  that time 6:30, which actually doesn't
23  start until page 365, is there a way you

Page 54

1  can add up those times to get the five
2  minutes? Is that how that's figured?
3  　　A.　I am not sure on that. Again,
4  me personally, I never put a lot of stock
5  into this report because it's all
6  computer-driven, and it didn't always
7  catch every fault, because sometimes
8  there was a line stopped without a
9  downtime being recorded by the computer
10  (indicating).
11  　　Q.　And you're pointing to pages
12  364 and 365?
13  　　A.　Yes, ma'am. What they call
14  the EMOS report, I think it is.
15  　　Q.　I'm sorry. The what?
16  　　A.　I think it's called an EMOS
17  report, E-M-O-S.
18  　　Q.　All right. So you didn't put
19  a lot of stock into that?
20  　　A.　No, ma'am.
21  　　Q.　All right. Did anyone ever
22  criticize you or Mrs. Edwards for the DT
23  analysis report?

Page 55

1  　　A.　Not to my recollection. It
2  was all criticized on the Power Point
3  presentation.
4  　　Q.　And that's the production
5  report?
6  　　A.　Yes, ma'am.
7  　　Q.　And that's located on 363?
8  　　A.　363 and 4. It's all generated
9  as one report.
10  　　Q.　Okay. So from 354 to 363 --
11  　　A.　Yes, ma'am.
12  　　Q.　-- is what you considered the
13  Power Point?
14  　　A.　Yes, ma'am.
15  　　Q.　All right. Looking at the
16  first page -- well, let's see. There is
17  nothing on the first page, 354, that she
18  would have to input, Mrs. Edwards.
19  Correct?
20  　　A.　No, ma'am. That was just a
21  title page. The only thing she would
22  change on it is the date.
23  　　Q.　Okay. The -- let me ask you

Page 56

1  this: As of May -- do you recall when
2  you put her into the position of CCR?
3  　　A.　It was wintertime, but I
4  couldn't tell you exactly when. If it
5  was before Christmas or after Christmas,
6  I'm not sure.
7  　　Q.　The second page 355, looking
8  at that, can you tell me any
9  deficiencies, concerns you had?
10  　　A.　Nothing obvious.
11  　　Q.　Okay. The next page 356, are
12  there any issues, criticisms?
13  　　A.　Only one. And it's just a
14  minor criticism. On item C, cause and
15  counter measure, maintenance had to
16  repair, that would have been highly
17  criticized for not giving details, how
18  did they repair, what did they repair.
19  That would have been criticized.
20  　　Q.　Okay. Anything else?
21  　　A.　Nothing obvious that I see
22  right there.
23  　　Q.　Okay. Pages 357 through 362

14 (Pages 53 to 56)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 57

1  are pictures and descriptions. Any
2  criticisms?
3      A.  Actually, yes. The Koreans
4  would have criticized the detailed
5  description. We know it was a damaged
6  SOP from the 700 L-1 drop, but the
7  question would have been asked, why did
8  it drop. Those were the kind of
9  questions I was routinely hit with on a
10  daily basis.
11     Q.  Well, were you supposed to put
12  why on the picture and descriptions?
13     A.  Yes, ma'am. Detailed
14  descriptions, not just -- what I'm
15  looking at is damaged SOP from 700 L-1
16  drop because whatever the reason was.
17     Q.  Okay. Anything else?
18     A.  On that page, no, ma'am.
19     Page 359 the question would
20  have been asked what caused the LEONI
21  mounting brackets to be sheered off. Was
22  it a robot crash? Did a part fall?
23  Those are the kind of questions the

Page 58

1  Koreans wanted answered and upper
2  management wanted answered. They don't
3  just sheer off.
4      Q.  Okay. Anything else?
5      A.  Page 360, two pallets of
6  quarter lowers off location in ASRS; this
7  happened back to back. That is not a bad
8  description, but they would have asked
9  for what caused the pallets to be off
10  location. Was it production control
11  error, or was it an ASRS error?
12     Q.  Okay. Anything else?
13     A.  Minor criticism on 361,
14  suction cup came off; maintenance had to
15  put back on. Upper management would have
16  preferred it to be worded as such:
17  Maintenance prepared or replaced suction
18  cup on, was it an NF hanger or a CM
19  hanger?
20     Q.  Okay. Anything else?
21     A.  No, ma'am.
22     Q.  Okay. And the picture, like
23  on 362 where she writes the BPR pedestal

Page 59

1  sealer O-ring fell causing sealer to
2  leak, is that one fine?
3      A.  I think that one is pretty
4  much self-explanatory. The O-ring fell,
5  that was the root cause of -- it's -- it
6  would have been nice, though, to have put
7  in there maintenance replaced O-ring or
8  made repairs. But that's the only
9  criticism I would have with that.
10     (WHEREUPON, Plaintiff's
11  Exhibit Number 46 was marked for
12  identification.)
13     Q.  Let me show you what I'm
14  marking as Plaintiff's 46, which is one
15  of Ms. McCray's reports.
16     A.  Okay.
17     Q.  And look at the last couple of
18  pages back where she's got a couple of
19  pictures and descriptions. Any
20  deficiencies with her pictures and
21  descriptions?
22     A.  Page number 793, there is no
23  mention of what was done to correct the

Page 60

1  condition, just station was damaged and
2  cable track caught on the part.
3      Q.  Is that deficient?
4      A.  I would say, yes, ma'am.
5      (WHEREUPON, Plaintiff's
6  Exhibit Number 48 was marked for
7  identification)
8      Q.  Plaintiff's 48, can you look
9  at that report and -- now, is this the
10  same as the DT analysis report?
11     A.  Yes, ma'am, that's DT
12  analysis.
13     Q.  Can you tell me if there is
14  anything deficient in this report?
15     A.  Not that I can tell with the
16  limited information. This -- the EMOS
17  report was always used as a -- was never
18  a stand-alone report. It was more
19  something to support the Power Point
20  presentation. And I can't tell if there
21  is any deficiencies in this or not.
22     (WHEREUPON, Plaintiff's
23  Exhibit Number 49 was marked for

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 61

1  identification.)
2      Q.   Plaintiff's 49, is there
3  anything deficient in that report?
4      A.   I see a lot of empty spaces in
5  the action plan column. I'm sure that
6  would have been questioned. Some of the
7  items are -- there is an action plan
8  listed, but it looks like most are empty
9  or blank.
10     Q.   Action plan is located where?
11     A.   The last column.
12     Q.   Is this the same
13  computer-generated form that you told me
14  before?
15     A.   It looks like it is, just in a
16  different printed format.
17     Q.   Can I see 48?
18     A.   Yes, ma'am.
19     Q.   Well, 48 is the one you told
20  me was okay, didn't you?
21     A.   I never finished looking at
22  it.
23     Q.   Okay. It has the blank action

Page 62

1  plan?
2      A.   Yes. I'm sure the blanks
3  would have been questioned.
4      Q.   Okay. That's 48 or 49?
5      A.   This one is 48.
6      Q.   And 49 you're saying the same
7  thing, the action plan?
8      A.   Yes, ma'am. There seemed to
9  be about half of the -- half of the
10  columns seem to be empty, roughly half.
11     (WHEREUPON, Plaintiff's
12  Exhibit Number 50 was marked for
13  identification)
14     Q.   Plaintiff's 50, can you tell
15  me any deficiencies in that report?
16     A.   There is a few blanks on the
17  action plans.
18     Q.   Anything else?
19     A.   Not sure yet.
20     Q.   Any deficiencies?
21     A.   Not so far. Nothing that I
22  see that management would complain about.
23     Q.   Do you know who did that

Page 63

1  report?
2      A.   No, ma'am.
3      Q.   Can you tell if you had to fix
4  it?
5      A.   No, ma'am, I couldn't tell.
6  Just off the top of my head, I would say
7  I have not put my hands on this report.
8  I see some of the lines not fitting into
9  the Power Point tables correctly, and I
10  believe I would have corrected that if I
11  had seen this report.
12     Q.   Would you get any e-mails or
13  any type of written documentation
14  criticizing any of Mrs. Edwards' reports?
15     A.   No, ma'am. It was all first
16  thing in the morning from senior
17  management and the Korean management. I
18  never had this -- not that I recall. I
19  never had an e-mail or anything that
20  said, you must do better or -- but every
21  morning Rob Katzenbach, Tom Bondy, Harry
22  White, the Korean management, MH Park, NY
23  Kim, Jubilon (phonetic), they would

Page 64

1  criticize it every morning.
2      Q.   All reports?
3      A.   No, ma'am. Not all reports,
4  not all reports.
5      (WHEREUPON, Plaintiff's
6  Exhibit Number 51 was marked for
7  identification.)
8      Q.   Okay. I'll show you what's
9  been marked as 51. Those at the bottom
10  of the first page of 51, BD601 and
11  BC1597, does that mean anything to you?
12     A.   It looks like body build
13  numbers and body complete output numbers,
14  if I had to assume.
15     Q.   All right. I've got some
16  numbers highlighted there. Do you see
17  where I'm referring you to on that
18  exhibit, Plaintiff's 51?
19     A.   Yes, ma'am.
20     Q.   Do you know how those numbers
21  would get out of sequence?
22     A.   No, ma'am.
23     Q.   Okay. Those are numbers that

16 (Pages 61 to 64)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 65

1  the computer automatically syncs.
2  Correct?
3      A.   To my knowledge, yes, ma'am.
4      Q.   Okay.  The only way they'd get
5  it of sync is if someone is tampering
6  with the document?
7      A.   No, ma'am.  We've had repeated
8  issues where CMOS would go down or the
9  network would have problems and -- I
10 forget the name of the department, the IT
11 department.
12      -- and they would have to make
13 corrections.
14      Q.   So the computer would show
15 different times on the same report?
16      A.   Sometimes, yes, ma'am.
17 Sometimes it would shut down altogether
18 and there was no CMOS report or EMOS
19 report.
20      Q.   So what are you referring to
21 as an EMOS?
22      A.   This report.
23      Q.   Plaintiff's 51?

Page 66

1      A.   Yes, ma'am.
2      Q.   Okay.  Other than going down,
3  do you know why the numbers would be
4  skewed?
5      A.   No, ma'am.
6      Q.   Did you ever change numbers?
7      A.   No, ma'am.
8      Q.   All right.  And did anyone
9  ever complain about the times on the
10 report?
11      A.   Not to my knowledge.
12      Q.   Okay.  Would that affect the
13 calculation of downtime?
14      A.   On the EMOS report, it would
15 affect the calculation of downtime.
16      Q.   Okay.  Which would affect
17 other areas of the report?
18      A.   If the rest of the report was
19 dependant on the EMOS, yes, it would.  If
20 the report was dependant on the downtime
21 dry erase boards and the team leaders,
22 then it shouldn't have any effect.
23      Q.   Okay.  Anything else that

Page 67

1  causes you concern with that report,
2  Plaintiff's 51?
3      A.   Just a few blanks in the
4  action plans side.  That's really the
5  only thing I would see anything with it.
6      Q.   Okay.  Did you ever put
7  anything in writing to Mrs. Edwards that
8  her reports were deficient?
9      A.   No, ma'am, I don't think I
10 did.
11      Q.   When you left Hyundai, did you
12 have any documents in your possession,
13 whether hard copy or electronic,
14 regarding Tammy Edwards or her work
15 product?
16      A.   No.
17      Q.   Did you ever tell Mrs. Edwards
18 that she was doing a good job with her
19 reports?
20      A.   Well, on a continuous basis,
21 part of my job is to encourage and coach
22 and uplift.  And during these coaching
23 sessions, I would point out the things

Page 68

1  that she was doing well.  Of course, you
2  know, I would point out the areas that
3  needed improvement as well.  I guess
4  maybe I was trying to play too much
5  Mr. Nice Guy, but I did show her all of
6  the deficiencies, as well as give her
7  praise for the items that were well.
8      Q.   Okay.  What did you think she
9  was doing a good job with?
10      A.   I would say mostly effort and
11 attitude.
12      Q.   What do you mean by effort and
13 attitude?
14      A.   I'd say she was trying.  She
15 was trying to make a good report -- I
16 felt like she was trying to make a good
17 report.  There were items that we
18 continually worked, such as technical
19 terms and how to approach maintenance and
20 get good detailed information.
21      Q.   Did you ever complain to
22 Mrs. Edwards about Ms. Stoddart's
23 reports?

17 (Pages 65 to 68)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 69

1    A.    Not that I recall.
2    Q.    Okay. Did you ever say she
3  was typing in all upper case and was not
4  giving enough information?
5    A.    I do remember saying that she
6  was typing in all upper case and the
7  Koreans did not like that.
8    Q.    Okay. Did you say she spent
9  too much time on the floor?
10    A.    I don't recall.
11    Q.    Okay. Do you recall telling
12  Mrs. Edwards that Ms. Stoddart's reports
13  were deficient with regard to not enough
14  information?
15    A.    I may have. I don't recall
16  for sure. I may have.
17    Q.    Okay. Did you send
18  Mrs. Edwards to train for the CCR
19  position with Sheri McCray because Pam
20  Stoddart would not train her?
21    A.    I remember sending
22  Mrs. Edwards to train with Sheri McCray,
23  not because Pam wouldn't train her, but

Page 70

1  because Sheri was more efficient, a
2  little more experienced with the report.
3  I felt like she would get more valuable
4  training.
5    Q.    Did you ever tell Mrs. Edwards
6  that she worried too much about her
7  reports?
8    A.    Not that I recall.
9    Q.    Did Mrs. Edwards ever complain
10  to you that she was getting incorrect
11  information from the floor?
12    A.    I don't remember. If she did,
13  I'm sure I would have addressed it with
14  those individuals.
15    Q.    Okay. Did you, for a period
16  of time, put Amber Kelly back on the line
17  because she was not doing a good job with
18  the downtime boards?
19    A.    Not that I recall.
20    Q.    You don't ever recall putting
21  Amber Kelly back on the line?
22    A.    Not that I recall, no ma'am.
23  I mean, I'm not saying it didn't happen.

Page 71

1  I'm just -- I don't remember.
2    Q.    Okay. Was she in charge of
3  the downtime boards?
4    A.    For a period of time, she was.
5    Q.    Okay. And how is that
6  important to the CCR position?
7    A.    There was a small period of
8  time we had a Korean senior president who
9  requested these boards have certain
10  information, and he wanted the CCR report
11  to reflect the dry erase boards. So
12  obviously, when it is wrong, the other is
13  going to be wrong.
14    Q.    Did you at any time question
15  Mrs. Edwards about her reports that she
16  was doing in the CCR position?
17    A.    What do you mean?
18    Q.    Just question her about any of
19  the entries she had made.
20    A.    Sure. Every day.
21    Q.    Okay. And did she give you
22  satisfactory answers?
23    A.    Sometimes. Sometimes I would

Page 72

1  have to call the maintenance team leader
2  or my team leader to get more detailed
3  accurate information.
4    Q.    And who would you have to
5  call?
6    A.    Do you mean specifically or...
7    Q.    Yes, sir.
8    A.    If it was a maintenance issue,
9  I would have called Judd -- I can't
10  remember his last name. I would have
11  called maintenance team leader Judd, or I
12  would have called the respectum team
13  leader of the area that I had a question
14  about.
15    Q.    Did you ever tell Mrs. Edwards
16  you would talk to the keepers about some
17  of the information she was receiving from
18  the floor?
19    A.    I may have. I made it a point
20  to counsel everyone, not just CCR
21  operator.
22    Q.    What was your opinion of
23  Mrs. Edwards as a worker in your

18 (Pages 69 to 72)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 73

1  department?
2      A.   I had no problems with her.
3  She -- other than correcting deficiencies
4  on the reports, she and I got along well.
5  I thought her attendance was
6  satisfactory.  Her job performance
7  overall up until the point where the
8  reports started curtailing was
9  satisfactory.  I did notice an attitude
10  change in her about the same time the
11  performance of her reports went down.
12  What caused that, I don't know.
13      Q.   And when you say attitude
14  change, what do you mean?
15      A.   She started to become a little
16  more sarcastic and -- I don't know what
17  the right word is.  She just didn't seem
18  as happy as she used to be.
19      Q.   When was this?
20      A.   I would say in the springtime
21  time frame of 2006.
22      Q.   After she was moved to the CCR
23  position?

Page 74

1      A.   Uh-huh.
2      Q.   Is that a yes?
3      A.   Yes, ma'am.
4      Q.   Did she ever complain to you
5  about Mike Swindle?
6      A.   No, ma'am.
7      Q.   Ever?
8      A.   No, ma'am.
9      Q.   Okay.  Did you ever observe
10  Mr. Swindle in the workplace?
11      A.   Sure.
12      Q.   Did you ever see or hear
13  anything inappropriate from him?
14      A.   The only inappropriate thing
15  I've heard from Mike was his use of
16  profanity.
17      Q.   How often did he use
18  profanity?
19      A.   I would say as much as anybody
20  else on the shop floor.  I mean, it was
21  just kind of common place language in the
22  factory.
23      Q.   Did you ever hear Mrs. Edwards

Page 75

1  use profanity?
2      A.   Yes, ma'am.
3      Q.   What have you heard her say?
4      A.   I've heard her say most all
5  profane language.  If you would like me
6  to be specific, I've heard her say ass,
7  bitch, fuck, pussy, nigger.
8      Q.   Ass, bitch, pussy, nigger?
9      A.   I've heard her say fuck and
10  shit.
11      Q.   Okay.  Anything else?
12      A.   Not that I recall.
13      Q.   Okay.  What have you heard
14  Mr. Swindle say?
15      A.   I know I've heard him say all
16  of those words except nigger.  I've never
17  heard him say nigger.
18      Q.   Okay.  What have you said?
19      A.   I'm sure I've said all of the
20  same words except for nigger.
21      Q.   Okay.  How about Mr. Kitchens?
22      A.   I would say the same.
23      Q.   Same as you or same as --

Page 76

1      A.   Same as me.
2      Q.   How about Mr. Bondy?
3      A.   I would say the same, same as
4  me.
5      Q.   Did you ever counsel or
6  discipline Mrs. Edwards for saying any of
7  these words?
8      A.   No, I did not.
9      Q.   Why not?
10      A.   By policy I should have, and
11  that's a fault on my part.  But it was
12  common place where every team member in
13  the shop -- it's just kind of factory
14  life, and as long as no one is
15  complaining about the language being used
16  by other team members, there is no real
17  reason, in my eyes, to go discipline them
18  or counsel them on it.
19      Q.   Where was she when she said
20  these words that you said she said?
21      MR. BOSTICK:  Object to the
22  form.
23      A.   I don't remember every place.

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 77

1  I remember there was a couple of
2  occasions she was down on the BC1 line
3  talking with me and Billy Kitchens, a
4  couple of times in the CCR operator
5  office.
6      Q.   How did she use the word ass
7  when you heard her?
8      A.   I distinctly remember her
9  saying her husband told her her ass was
10  getting too big.
11      Q.   Okay.  Any other times?
12      A.   I can't remember exact
13  terminology.  I think she made a comment
14  to the effect that she was tired of
15  sitting on her ass all the time.
16      Q.   Okay.  Anything else?
17      A.   Not that I can recall.
18      Q.   How did she use the word
19  bitch?
20      A.   I have heard her use that word
21  at reference to Amber and Pam.
22      Q.   Amber Kelly and --
23      A.   Amber Kelly and Pam Stoddart.

Page 78

1      Q.   How did she use that?  Was
2  this in a conversation with you?
3      A.   I don't recall if it was with
4  me directly or if I was just nearby.
5      Q.   Well, who was she talking to?
6      A.   I believe Billy.
7      Q.   Mr. Kitchens?
8      A.   Yes.
9      Q.   Okay.  What did you hear her
10  say?
11      A.   Something to the effect of
12  that bitch or that bitch is trying to
13  cause me problems or something like that.
14      Q.   Referring to Ms. Kelly or
15  Ms. Stoddart?
16      A.   Both.
17      Q.   Okay.  Any other time you've
18  heard her use the word bitch?
19      A.   Not that I can recall.
20      Q.   Okay.  Pussy, how did she use
21  that word?
22      A.   The day that she approached me
23  and Tom Bondy, she said one of the things

Page 79

1  Mike had told her was that he wanted to
2  lick her pussy.  But I haven't heard her
3  use it in any type of on-the-floor use.
4      Q.   So when she was complaining to
5  you and Mr. Bondy about the sexual
6  harassment of Mr. Swindle she used that
7  word?
8      A.   Yes, ma'am.
9      Q.   Was she upset when she used
10  that word?
11      A.   I'm sure she was.
12      Q.   Well, what do you recall?
13      A.   That she was upset during that
14  conversation.
15      Q.   Was she crying?
16      A.   I think she was.
17      Q.   Okay.  Any other time you've
18  heard her use the word pussy?
19      A.   Not that I recall.
20      Q.   Okay.  When have you heard her
21  use the word nigger?
22      A.   I heard her use the phrase
23  fucking nigger on BC1.  I don't recall

Page 80

1  exactly how the conversation went, but I
2  do recall being somewhat offended by it.
3  But I didn't say anything because I try
4  to just -- to each his own.
5      Q.   Okay.  Were you present when
6  she said it?
7      A.   I overheard her tell Billy
8  Kitchens.  I wasn't in the direct
9  conversation.
10      Q.   Where were you?
11      A.   I was standing behind station
12  503, maybe 5, 6, 7 feet away.  I don't
13  know.  They were painting something at
14  station 503.  They were painting some
15  guardrails.
16      Q.   Okay.  And where was she and
17  Mr. Kitchens?
18      A.   They were working in close
19  proximity at station 503 painting.
20      Q.   And how far from you?
21      A.   Maybe 6 feet, 5, 6 feet.  I
22  think I was just walking up when I heard
23  it.

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 81

1  Q.  Walking up to them or --
2  A.  Yes, ma'am, just walking up to
3  them.
4  Q.  Did you tell them, I heard --
5  A.  No, ma'am, I did not.
6  Q.  Why not?
7  A.  Again, I try not to get into
8  private conversations and to each his
9  own. Now, if Billy had made a complaint,
10 I would have addressed it. Or if someone
11 else had made a complaint, I would have
12 addressed it. But since I had heard no
13 complaint, I just -- I let it be.
14 Q.  Any other time you've heard
15 her use that word?
16 A.  Not that I remember.
17 Q.  Okay. How about the word
18 fuck? When did she use that?
19 A.  She used it in a conversation
20 with me and Tom Bondy?
21 Q.  When she was complaining about
22 Mr. Swindle?
23 A.  Yes.

Page 82

1  Q.  Did you consider that she was
2  using that word or relaying what had been
3  told to her?
4  A.  She said it was what was told
5  to her. She didn't use it in any type of
6  anger or a direct comment. She said she
7  was repeating what was told to her by
8  Mike.
9  Q.  The word shit, when did you
10 hear her say that?
11 A.  I've heard her say that just
12 out of exclamation or frustration on
13 several occasions. I mean, everybody
14 says it without thinking. It was just
15 common place -- oh, shit; I messed up.
16 Or, you know...
17 Q.  Where was she when you heard
18 it?
19 A.  I've heard her say it on the
20 floor around body build, around BC1, and
21 in the CCR office.
22 Q.  Anyone else present?
23 A.  I don't remember.

Page 83

1  Q.  Any other words that you've
2  heard her say?
3  A.  Not that I remember.
4  Q.  Have you ever heard her talk
5  about her sex life at work?
6  A.  Not that I recall, no.
7  Q.  Have you heard Mr. Swindle
8  talk about his sex life at work?
9  A.  Not that I recall.
10 Q.  How loud is the plant?
11 A.  When it's at full operation,
12 it's pretty loud.
13 Q.  Was it loud that day that you
14 walked up and heard Mrs. Edwards and
15 Mr. Kitchens talking?
16 A.  No. There was no production
17 that day. It was a Sunday.
18 Q.  It was what?
19 A.  It was a Sunday.
20 Q.  Do you know what she was upset
21 about?
22 A.  No, ma'am, I don't. The
23 conversation changed when I walked up.

Page 84

1  Q.  You didn't ask what was wrong?
2  A.  No, ma'am. Because they were
3  both smiling and giggling.
4  Q.  Who was giggling?
5  A.  Both Tammy and Billy, Billy
6  Kitchens.
7  Q.  Did they stop that when you
8  walked up?
9  A.  Yes, ma'am. The tone of the
10 conversation became work-related at that
11 point because I had inquired about an
12 update on the progress.
13 Q.  Give me just a minute. I'm
14 looking for a document.
15    MR. BOSTICK: I'm going to run
16 to the restroom while you're doing that,
17 Alicia.
18        4:35 PM
19       (Short recess)
20        4:47 PM
21    (WHEREUPON, Plaintiff's
22 Exhibit Number 52 was marked for
23 identification.)

21  (Pages 81 to 84)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 85

1    Q.   (BY MRS. HAYNES) Plaintiff's
2   52. Have you ever seen Plaintiff's 52?
3    A.   I have.
4    Q.   Okay.  What was that
5   regarding, Plaintiff's 52?
6    A.   That is an e-mail I composed
7   and generated in response to some
8   information I received about a rumor that
9   had been circulating in the shop that --
10  on a particular Sunday -- as a matter of
11  fact, the one time that I went out
12  drinking with Mike and Billy that we
13  mentioned earlier, this was the morning
14  after.  Billy and I were both sick that
15  morning.
16   Q.   Hungover or sick?
17   A.   Sick sick.  I mean, virus
18  sick.  Sick for several days.  And at
19  break time on a scheduled break, we had
20  took a break at the table and propped our
21  heads up.  And I believe at that time
22  Pamela and several others walked down
23  there to say they finished with their

Page 86

1   duties for the day -- and this was a
2   Sunday -- and they were ready to go home,
3   which I gave them permission to leave for
4   the day.
5       At this point something -- a
6   rumor began circulating in the shop that
7   me and Billy were caught sleeping down
8   there and April was leaning over on top
9   of me and kissing me.  But April was
10  actually sitting at another table.  It
11  wasn't even the vicinity.  I had composed
12  this e-mail because it had become quite
13  damaging to me, because it -- you know
14  how rumors are.  They spread like
15  wildfire.  So it became damaging to me.
16  And I generated this e-mail to Tom that
17  if something became of it, I wanted it to
18  be known what the truth was.
19   Q.   Okay.  So that's why you sent
20  that?
21   A.   Yes, ma'am.  It was simply in
22  defense, and I wanted to get the record
23  straight what really happened.

Page 87

1    Q.   Okay.  Were you disciplined in
2   any fashion?
3    A.   No.
4    Q.   There was an investigation,
5   though; is that correct?
6    A.   Yes.
7    Q.   All right.  Is that -- was
8   that part of the investigation?
9    A.   I'm sure this was.
10   Q.   Okay.  Was Billy Kitchens
11  disciplined in any fashion?
12   A.   Not to my knowledge.
13   Q.   Was Ms. Stoddart?
14   A.   Not to my knowledge.
15   Q.   Okay.
16   A.   I'm not always made aware of
17  other people's discipline.
18       (WHEREUPON, Plaintiff's
19  Exhibit Number 53 was marked for
20  identification)
21   Q.   In that e-mail, Plaintiff's
22  53, did you indicate that you felt she
23  was an untruthful person?

Page 88

1       MR. BOSTICK:  Object to the
2   form.
3    A.   I would not classify her as an
4   untrue person.  But I felt like if she
5   was the one spreading this, then,
6   obviously, that was a lie.  I wouldn't
7   classify her as an untruthful person,
8   though.
9    Q.   Okay.  Did you indicate in
10  that e-mail to Mr. Bondy that she was a
11  troublemaker?
12   A.   I think I did.
13       (Witness reviews e-mail)
14       Yes, I did.  Looking back at
15  it, I did indicate to Tom that she had
16  been known to start several rumors in the
17  shop.  And her motive for that, I don't
18  know.
19   Q.   Is that your opinion of her,
20  that she's a -- likes to starts rumors?
21   A.   That would be my personal
22  opinion, yes, that she likes to start
23  rumors or gossip.

22  (Pages 85 to 88)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 89

1    (WHEREUPON, Plaintiff's
2  Exhibit Number 54 was marked for
3  identification.)
4    Q.  Okay.  Look for me,
5  Plaintiff's Exhibit 54, and tell me if
6  that was -- or if these statements are
7  also as part of an investigation about
8  you and Mr. Kitchens sleeping on the job
9  and, I guess, the additional allegation
10  of you and Ms. Smith kissing.
11    MR. BOSTICK:  Object to not
12  laying a foundation as to whether or not
13  he's even seen the investigation file
14  before.
15    MRS. HAYNES:  Well, his
16  statement is on the bottom.
17    A.  I have not seen these pages
18  before.
19    Q.  Okay.  Well, look --
20    MR. BOSTICK:  Look through the
21  whole thing and tell her what you've seen
22  before.
23    THE WITNESS:  Okay.

Page 90

1    Q.  That's fine.  Look to the last
2  page and just tell me if that's your
3  statement and you signed it.
4    MR. BOSTICK:  The last page?
5    MRS. HAYNES:  I saw his name
6  somewhere.
7    A.  There is no statement from me
8  in here.
9    Q.  Okay.  I'm sorry.  Do you know
10  if you wrote a statement?
11    A.  I can't remember.  I remember
12  composing the e-mail.  I don't remember
13  writing a statement on a notepad.
14    (WHEREUPON, Plaintiff's
15  Exhibit Number 53 was marked for
16  identification)
17    Q.  All right.  Look for me on
18  Plaintiff's Exhibit 53 and tell me if
19  you've seen that document.
20    A.  (Witness reviews document)
21    MR. BOSTICK:  Her question is
22  have you seen this document before.  Look
23  through the whole thing.

Page 91

1    A.  (Witness reviews document)
2    No, I have not.
3    Q.  You have not seen that?
4    A.  No, I have not.
5    Q.  Okay.  Did you feel like you
6  were being investigated in retaliation
7  for any actions or conduct in the
8  workplace?
9    A.  I mean, I had broke policy.  I
10  knew I had broke policy.  I felt it was a
11  completely legitimate exercise.
12    Q.  What was a legitimate
13  exercise?
14    A.  The conduction of the
15  investigation and the findings against
16  me.  I mean, it's black and white.  I was
17  wrong.
18    Q.  And you're not eligible for
19  rehire?
20    A.  To my knowledge, no, ma'am,
21  I'm not.
22    Q.  With regards to the
23  investigation or your e-mail to Mr. Bondy

Page 92

1  about the sleeping on the job, did you
2  feel that was in retaliation?
3    A.  I had heard that Pam was mad
4  at me in retaliation for something that
5  she perceived me to do.  What that was, I
6  don't know.  Again, that's just hearsay.
7    Q.  Well, you wrote that it was a
8  personal attack from Pam directed as
9  retaliation because her --
10    MR. BOSTICK:  Are we back on
11  Exhibit 53?
12    MRS. HAYNES:  Yeah.
13    Q.  -- because her good friend
14  Ronald Mitchell had been terminated?
15    A.  That's what I had been told.
16  Yes, ma'am.
17    Q.  Did you terminate Mitchell?
18    A.  No, ma'am, I did not.  I have
19  no control over who is terminated.
20    Q.  Was there ever any type of
21  investigation about time sheets that
22  you're aware of?
23    MR. BOSTICK:  Object to the

**American Court Reporting**
**July 30, 2008**

# American Court Reporting
## toll-free (877) 320-1050

Page 93

1   form.
2       A.   The only investigation that
3   I'm aware of was the investigation on
4   April's time sheets.
5       Q.   There were some time sheets
6   that had been produced in this case, and
7   they have your name on them.  Do you know
8   if they relate in any fashion to time you
9   had to work over because of any errors
10  you were correcting for Mrs. Edwards?
11      A.   I don't know without seeing
12  them.
13          (WHEREUPON, Plaintiff's
14  Exhibit Number 55 was marked for
15  identification.)
16      Q.   Okay.  Plaintiff's 55, do you
17  know why those were in your personnel
18  file?
19      A.   No, ma'am.  These would have
20  no bearing on my time making any repairs
21  to the production report.  They seem to
22  be time sheets from the BC2 line from the
23  period of January to June.

Page 94

1       Q.   Okay.  Was there ever an
2   allegation that you -- something about
3   time sheets that you're aware of?
4       A.   Not that I'm aware of, no.
5       Q.   Or your time?
6       A.   No, ma'am, not that I'm aware
7   of.
8       Q.   Okay.  Do you know why those
9   would be in your personnel file?
10      A.   I have no idea.
11      Q.   To your knowledge, they do not
12  relate in any fashion to Mrs. Edwards?
13      A.   To my knowledge, they do not.
14      Q.   Do you ever recall receiving
15  this letter from me, Plaintiff's Exhibit
16  27?
17      A.   I think I do recall receiving
18  this letter.
19      Q.   Okay.  What did you do with it
20  when you received it?
21      A.   I brought it to the attorneys
22  at Hyundai.  And they told me --
23          MR. BOSTICK:  Don't discuss

Page 95

1   anything they said to you.
2           THE WITNESS:  Okay.
3       Q.   Did you give it to anyone else
4   other than Hyundai's legal counsel?
5       A.   No.
6       Q.   Is this -- do you know what
7   day you received that letter from me?
8       A.   I don't remember that exact
9   date, no, ma'am.
10      Q.   Before receiving the letter,
11  Plaintiff's Exhibit 27 from my office,
12  were you aware that Tammy Edwards had
13  filed a charge of discrimination against
14  Hyundai?
15      A.   No, ma'am.
16      Q.   Have you ever seen or reviewed
17  Plaintiff's Exhibit 38?
18      A.   I don't believe I have.
19      Q.   Did you participate in the
20  investigation of Mrs. Edwards' complaint
21  about Mr. Swindle with team relations?
22      A.   No, ma'am.
23      Q.   Okay.  You were never

Page 96

1   interviewed?
2       A.   Not in the beginning, no.  It
3   was sometime after before I was
4   interviewed.
5       Q.   About Mrs. Edwards?
6       A.   Yes, ma'am.
7       Q.   Okay.  Who interviewed you?
8       A.   The lady's name was Gabriella,
9   and I can't remember the gentleman's
10  name.  They were both on team relations.
11      Q.   What were you asked?
12      A.   If I had ever seen Mike touch
13  her inappropriately, use profanity around
14  her, or make offensive comments to her.
15  I can't remember everything.
16      Q.   Okay.  What did you answer?
17      A.   No, I had not seen Mike touch
18  her inappropriately; no, I had not heard
19  Mike make offensive comments directed
20  her; and yes, I had heard Mike use
21  profanity.
22      Q.   Okay.  Anything else?
23      A.   I can't remember anything

## American Court Reporting
### July 30, 2008

**American Court Reporting**
**toll-free (877) 320-1050**

Page 97

1 else.
2    Q.   Did you sign the statement?
3 Did they ask you to sign a statement?
4    A.   I can't remember.
5    Q.   Do you know if it was in
6 August of 2006 that you were interviewed?
7    A.   I don't remember what month it
8 was.
9    Q.   Do you know if it was before
10 or after you put Mrs. Edwards back on the
11 line and out of the CCR position that you
12 were interviewed by team relations?
13    A.   It was after, I think.
14    Q.   Had she already left on
15 medical leave?
16    A.   I think she had.
17    Q.   Do you know how long she had
18 been out on medical leave when you gave a
19 statement to team relations?
20    A.   No, ma'am.
21         MR. BOSTICK:  Object to the
22 form.
23    Q.   (BY MRS. HAYNES)  And tell me

Page 98

1 who you gave a statement to.  Gabriella?
2    A.   I think her name was
3 Gabriella.  I can't remember her last
4 name.  And I don't remember the
5 gentleman's name.  I know he was team
6 relations for the engine shop, but I
7 can't remember his name.
8    Q.   Anyone else in the room with
9 the three of you?
10    A.   No, ma'am.
11    Q.   Do you know if it was Rob
12 Clevenger?
13    A.   No.
14    Q.   Lucas Cooner (phonetic)?
15    A.   No.
16    Q.   Marty Blane (phonetic)?
17    A.   Marty.
18    Q.   Marty Blane?
19    A.   I think it was Marty.
20    Q.   Did you know of anyone else
21 going to talk to team relations other
22 than you at that time?
23    A.   No, ma'am.

Page 99

1    Q.   Do you know if you went to
2 team relations to be interviewed before
3 or after Mr. Swindle was suspended?
4    A.   I think it was after.
5    Q.   How did you learn Mr. Swindle
6 was suspended?
7    A.   I was told by my manager, Tom
8 Bondy, that Mike Swindle was charged with
9 a serious misconduct and was serving a
10 two-week suspension.
11    Q.   When he came back from
12 suspension, was he still on your shift?
13    A.   Yes.
14    Q.   Okay.  What shift were y'all
15 working?
16    A.   I don't remember if it was day
17 shift or night shift at the time.  Like I
18 said, we rotate.
19    Q.   Okay.  Were you told anything
20 else about Swindle and his suspension or
21 the terms of his disciplinary action?
22    A.   The only thing I was told was
23 it was conduct unbecoming.

Page 100

1    Q.   Okay.  Were you told how to
2 treat him or what assignments he could
3 work and could not work?
4    A.   Not that I recall, no.
5    Q.   Did you ever make any notes of
6 your meeting with Mrs. Edwards and
7 Mr. Bondy?
8    A.   Not that I recall.
9    Q.   Okay.  What do you recall
10 about that meeting?
11    A.   The day in question she
12 approached me and said she needed to talk
13 with me and Tom upstairs privately.  We
14 went into the conference room, and she
15 began making allegations that Mike was
16 sexually harassing her.  She made
17 allegations that Mike had walked up
18 behind her and grabbed her butt, and she
19 said Mike had told her that he wanted to
20 lick her pussy.  And she was just
21 generally distraught and upset about it.
22         At that point Tom and I had
23 asked her if she would like to get team

25  (Pages  97 to 100)

**American Court Reporting**
**July 30, 2008**

Page 101

1  relations involved so we could begin an
2  investigation. She said she had already
3  talked with team relations and got them
4  involved at that point. She said she
5  didn't have a choice but to talk to team
6  relations because her husband had gave
7  her an ultimatum to either file charges
8  or get a divorce.
9      Q.  Anything else?
10     A.  She had made mention that her
11  husband's friend, Mr. Clecker (phonetic)
12  on the opposite shift had told her
13  husband that something was going on with
14  her and Mike.
15     Q.  That she told you that Clecker
16  said he told --
17     A.  Clecker told her husband that
18  something was going on between Tammy and
19  Mike.
20     Q.  Okay. What else?
21     A.  That's all I can remember
22  really.
23     Q.  And it's your testimony that

Page 102

1  she came to you and told you she needed
2  to talk to you and Mr. Bondy?
3      A.  Yeah. I think I was walking
4  by and she said I need to speak with you
5  and Tom upstairs. And I think Tom was
6  already made aware that she wanted to
7  speak with us, but I can't remember for
8  sure.
9      Q.  Okay. You did not go and get
10  Mrs. Edwards and tell her that Mr. Bondy
11  wanted to talk to her?
12     A.  I may have. I may have said,
13  let me go see if Tom's available, then
14  sure he was, and then I asked Tammy to
15  join us. I may have.
16     Q.  Could it also have been that
17  Mr. Bondy requested that you go get
18  Mrs. Edwards, that he wanted to talk to
19  her?
20     A.  No, no. I remember Tammy
21  requesting the meeting of me. She said,
22  I'd like to speak with you and Tom, and I
23  went and made sure Tom had time to speak

Page 103

1  with us and there was no one in the
2  conference room. And then Tom said,
3  yeah, I'm available; let's bring her up
4  here and talk to her.
5      Q.  Look for me at Exhibit 3, page
6  11, which is team relations interview
7  with Tom Bondy. Have you ever seen
8  that --
9      A.  No, ma'am.
10     Q.  -- document?
11     A.  No, ma'am.
12     Q.  Okay. Read that where it says
13  interview with Tom Bondy.
14     A.  Uh-huh.
15     Q.  It starts on page 11 and ends
16  on page 12.
17     A.  (Witness reads document)
18     Q.  Just those two pages, just
19  Mr. Bondy's interview.
20     A.  Oh, okay. That's the first
21  one?
22     Q.  Well, I wanted you to read it
23  first.

Page 104

1      A.  Yes, ma'am.
2      Q.  Does that refresh your
3  recollection that Mr. Bondy asked you to
4  go and get Mrs. Edwards and bring her to
5  his office?
6      A.  Sort of. Like I said, that
7  was after I went and talked to him that
8  Tammy requested a meeting with us. And
9  he said, okay; go get Tammy and bring her
10  up here. Yeah, he did ask me to get her
11  after I went upstairs and requested the
12  meeting -- or after Tammy requested a
13  meeting I should say.
14     Q.  So Mr. Bondy -- where team
15  relations asked him who asked for the
16  meeting and Mr. Bondy said, I did, that's
17  not correct?
18     A.  Not to my recollection. I may
19  be incorrect, but not to my recollection.
20     Q.  Okay. Your recollection is
21  that Mrs. Edwards flagged you down and
22  says, I want to meet with you and
23  Mr. Bondy?

26 (Pages 101 to 104)

**American Court Reporting**
**toll-free (877) 320-1050**

Page 105

1    A.   Yes, ma'am.
2    Q.   Okay.  And she told you then
3  she'd already been to team relations?
4    A.   Yes, ma'am.
5    Q.   Okay.  Had you talked to
6  Mr. Swindle before the meeting with
7  Mr. Bondy?
8    A.   No.
9    Q.   You didn't know that
10  Mr. Swindle had gone to Mr. Bondy and
11  discussed that Mrs. Edwards had already
12  been to team relations and complained
13  about sexual harassment?
14    A.   No, ma'am.
15    MR. BOSTICK:  Object to the
16  form.
17    A.   I had no information of
18  anything like that.
19    Q.   Okay.  This was the first time
20  you knew of anything, when Mrs. Edwards
21  tells you in that meeting with Mr. Bondy?
22    A.   That's correct.
23    Q.   Okay.  You did not know she

Page 106

1  had already been to team relations?
2    A.   That's correct.
3    Q.   After the meeting with
4  Mrs. Edwards and Mr. Bondy, did you have
5  another meeting with Mr. Bondy or stay
6  after Mrs. Edwards left and discuss
7  Mrs. Edwards?
8    A.   We didn't discuss
9  Mrs. Edwards directly.  We discussed
10  making sure team relations was involved,
11  and we were discussing making sure there
12  were no rumor or shoptalk out on the
13  floor regarding the situation.  We kept
14  it objective at that point.
15    Q.   What did you do after she left
16  the room?
17    A.   I don't remember.
18    Q.   Have no recall?
19    A.   No, ma'am.  I don't remember
20  exactly what I did.
21    Q.   Did you call team relations?
22    A.   Yes, ma'am, I believe I did.
23  I don't remember who I talked to.  I

Page 107

1  think it was Stacye Jones.
2    Q.   Okay.  What did you tell her?
3    A.   I remember telling Stacye that
4  Tammy would like to make a complaint on a
5  pretty serious charge.  And Stacye
6  replied she was already aware of the
7  situation.
8    Q.   Did Ms. Jones ask you why you
9  and Mr. Bondy were meeting with
10  Mrs. Edwards?
11    A.   That, I don't remember.  I
12  don't remember if she asked that question
13  or not.
14    Q.   In the meeting with
15  Mrs. Edwards and Mr. Bondy, did Mr. Bondy
16  make any comments about Mr. Swindle?
17    A.   I think he said something to
18  the effect of what's wrong with him; I
19  don't know why he would do something like
20  that.
21    Q.   Did he say anything about he
22  wasn't wired right?
23    A.   I don't remember if he said

Page 108

1  that or not.  I know it's in his
2  statement, but I don't remember if he
3  said that or not.
4    Q.   Did you hear Mr. Bondy say,
5  Mike is gone; he had had chance after
6  chance after chance?
7    A.   No, ma'am, I don't remember
8  him saying that.
9    Q.   Okay.  Did he say anything
10  about he's had training and continues to
11  screw up?
12    A.   I remember he said Mike has
13  had training in sexual harassment and he
14  knows better.
15    Q.   Okay.  And did you admit that
16  he had had training on sexual harassment?
17    A.   Yes, ma'am.  We all had
18  training on sexual harassment.
19    Q.   Okay.  And you knew it was
20  illegal to sexually harass someone in the
21  workplace?
22    A.   Yes, ma'am.
23    Q.   Did you know at this point in

27 (Pages 105 to 108)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 109

1  time, 2006?
2      A.  Yes, ma'am, I knew it was
3  illegal.
4      Q.  Okay.  Did you also know it
5  was illegal to retaliate?
6      A.  Yes, ma'am.
7      Q.  How did you know that?
8      A.  Through training.
9      Q.  When?
10     A.  I don't remember the dates.
11 It was part of my management training.
12 It was also part of my school curriculum
13 when I obtained my Associate's Degree.
14     Q.  What class did you take that
15 you learned it was illegal to retaliate
16 against someone?
17     A.  Business law.
18     Q.  Okay.  How long of a course
19 was that?
20     A.  I don't remember.  It was a
21 three-credit course.  I don't remember
22 how long exactly it was.
23     Q.  Did you take that course prior

Page 110

1  to 2006?
2      A.  I don't think so.
3      Q.  I think your --
4      A.  Well, yes, ma'am, I did.  Yes,
5  ma'am, I did.
6      Q.  Okay.  So prior to 2006 you
7  had had a business law course?
8      A.  Yes, ma'am.  In the year of
9  2006, yes, ma'am.
10     Q.  Prior to this situation where
11 Mrs. Edwards complained about
12 Mr. Swindle, had you taken that course in
13 business law and knew it was illegal to
14 retaliate?
15     A.  To the best of my knowledge,
16 yes, ma'am.
17     Q.  What grade did you make in
18 that course?
19     A.  It was either in the 80 or 90
20 percentile.  I don't remember exactly.
21     Q.  It's not given a letter grade?
22     A.  A or B.
23     Q.  After the meeting with

Page 111

1  Mr. Bondy and Mrs. Edwards, did you
2  approach Mrs. Edwards again?
3      A.  I don't remember.  I probably
4  did.  I mean, CCR and group leader work
5  pretty close together, and you're in
6  continuous contact throughout the day.
7      Q.  Did you approach her again
8  about her complaint about Mr. Swindle?
9      A.  No, ma'am, I don't think I
10 did.
11     Q.  Okay.  Do you recall
12 approaching Mrs. Edwards within an hour
13 or so and asking her not to sign the
14 complaint against Mr. Swindle?
15     A.  No, ma'am.
16     Q.  Did you tell her that you
17 could get Mr. Swindle to apologize if she
18 would just let it go?
19     A.  No, ma'am.
20     Q.  You don't recall that at all?
21     A.  No, ma'am.
22     Q.  That just didn't happen or you
23 don't recall it?

Page 112

1      A.  I don't think it happened.
2      Q.  It could have happened,
3  though?
4      A.  No, ma'am.
5      Q.  No, you don't think so?
6      MR. BOSTICK:  Objection.
7  Asked and answered.
8      Q.  After that did you refuse to
9  talk with Mrs. Edwards?
10     A.  No.
11     Q.  Do you know why Amber Kelly
12 would testify contrary to that, that you
13 refused to talk or deal at all with
14 Mrs. Edwards?
15     MR. BOSTICK:  Object to the
16 form.
17     A.  No, ma'am, I have no idea why
18 Amber would testify to that.
19     Q.  You've never felt she was
20 retaliating against you in any fashion,
21 have you?
22     MR. BOSTICK:  Who is she?
23     MRS. HAYNES:  Amber Kelly.

28  (Pages 109 to 112)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 113

1    A.   No, ma'am.
2    Q.   Were you ever present where
3  Mrs. Edwards complained to you about a
4  statement that Billy Kitchens made to her
5  about her job would be under his desk?
6    A.   No, ma'am.
7    Q.   You don't recall that at all?
8    A.   No, ma'am.
9    Q.   You don't recall saying,
10  Billy, we can't authorize that?
11    A.   No, ma'am.
12    Q.   It just didn't happen?
13    A.   No, ma'am.
14    Q.   Didn't?
15    A.   No, ma'am, it did not happen.
16    Q.   Okay.  Tell me about why you
17  put Mrs. Edwards from the CCR position to
18  the BC1 line?
19    A.   Two reasons: First, she
20  requested that she go back down to the
21  floor line -- well, I'm sorry.  Not the
22  floor line, but on the floor working on
23  the line.  And because of the quality of

Page 114

1  reports weren't improving to the level we
2  had hoped, we decided it was time for a
3  change.  And that decision was made maybe
4  two months before all this transpired
5  with the complaint.
6    Q.   Have you read that somewhere?
7    A.   No, ma'am.
8        MR. BOSTICK:  Object to the
9  form.
10    Q.   That is almost identical to
11  how Tom Bondy testified yesterday, almost
12  verbatim.  Do you know that?
13    A.   That's because it's truth.
14    Q.   That is?
15    A.   Yes, ma'am.
16    Q.   Do you know why he would say
17  two reasons and give two reasons just
18  like you gave two reasons?
19    A.   Other than it being the truth,
20  no, ma'am.  I haven't spoken with Tom.
21    Q.   Haven't read anything that
22  that was your script for today?
23    A.   No, ma'am.  There is no

Page 115

1  script.
2    Q.   When did Mrs. Edwards ask to
3  be moved back to the line?
4    A.   I don't remember the date per
5  se --
6    Q.   But sometime in June?
7    A.   I think it was in the May,
8  June time frame.  I'm not sure.
9    Q.   That's what Mr. Bondy said
10  yesterday, too.  Why didn't you move her
11  back in May or --
12        MR. BOSTICK:  That's what
13  Mrs. Edwards testified, too, also.  Isn't
14  it?  I mean, are we going to talk about
15  what she said in conflict with that, too,
16  or are we just going to comment on --
17        MRS. HAYNES:  I just think
18  it's very odd that his testimony is
19  verbatim how Bondy's is.  But that's
20  regardless.
21    Q.   (BY MRS. HAYNES)  Why didn't
22  you move her in May, June?
23    A.   I needed time to train a

Page 116

1  replacement.
2    Q.   Okay.  How long did that take?
3    A.   I think it was about six
4  weeks.
5    Q.   You didn't leave Pam Stoddart
6  in a position six weeks when you moved
7  Mrs. Edwards to that position.  Did you?
8    A.   No, ma'am.  I think her time
9  period was a little shorter, maybe three
10  or four weeks.  But there was an
11  immediate need to get her back on the
12  floor as an equipment operator.
13    Q.   Okay.  What did Mrs. Edwards
14  tell you was the reason she needed to go
15  back on the line?
16    A.   She gave me a couple of
17  reasons.  She said, number one, her
18  husband told her her ass was getting too
19  big, and she said she wanted to be down
20  on the floor working on either body build
21  with Mike or on BC1 with Billy because
22  they have all the fun.
23    Q.   Do you know what?  That's the

29 (Pages 113 to 116)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 117

1  same thing Mr. Bondy said yesterday.
2      MR. BOSTICK: I object to that.
3      MRS. HAYNES: Okay.
4      Q.  (BY MRS. HAYNES) Do you think
5  that's coincidental as well?
6      A.  Yes, ma'am, I do.  It's the
7  truth.
8      Q.  Okay.  It's just coincidental
9  that the reasons are the same.  Did you
10  tell Mr. Bondy that, that that's why
11  Mrs. Edwards wanted to be moved,
12  because --
13      A.  Yes, ma'am.
14      Q.  -- her ass was too big and she
15  wanted --
16      A.  No, ma'am.
17      Q.  -- to be with Kitchens and
18  Swindle?
19      A.  No, ma'am.  I told Mr. Bondy
20  that she had requested being moved
21  because she felt like her ass was getting
22  too big, that she wanted to work on the
23  line, and she was getting bored in the

Page 118

1  CCR office.  And we agreed after
2  reviewing the performance of the reports
3  that we would make a change.  Amber had
4  been training as a backup at that point,
5  and she was the most logical choice at
6  the time.
7      Q.  Who suggested that Ms. Kelly
8  be trained for that position?
9      A.  I think it was Harry White.
10      Q.  It wasn't Mrs. Edwards?
11      A.  I remember it being Harry
12  White.
13      Q.  Okay.  What did Mr. White say?
14      A.  In previous conversations he
15  thought her to be a very intelligent
16  person and capable of doing the job.  And
17  in the conversations I had had with her,
18  I got the same perception of her.  She
19  seemed to be somewhat educated,
20  well-spoken, and I felt like she was
21  deserving of it.
22      Q.  Okay.  Do you routinely move
23  people who want to be moved back on the

Page 119

1  line because their ass is too big?
2      A.  No, ma'am, I do not.
3      Q.  Or that their husband says
4  their ass is too big?
5      A.  No, ma'am, I do not.
6      Q.  Okay.  Have you ever done that
7  before?
8      A.  I had never had anyone make
9  that statement to me before.
10      Q.  Okay.  Did you tell
11  Mrs. Edwards we don't move people because
12  their husbands want them moved?
13      A.  I don't think I put it in that
14  terminology.  I believe I said we don't
15  move people to other positions just
16  because they don't like the job anymore
17  and was moved on an as-needed basis.
18      Q.  Okay.  When did you identify
19  the position that she would be moved
20  into?
21      A.  I knew she would be moved to
22  BC1.  There wasn't a specific station on
23  BC1 when the decision was made, but I

Page 120

1  knew there were openings on BC1
2  available.
3      Q.  Was she an extra person?
4      A.  No, ma'am.  At the time when
5  she did finally move into that position,
6  she had started to complain about her
7  neck, and I took that into consideration
8  and tried to put her on a light, easy job
9  so she could get acclimated to working on
10  the floor again.  I didn't want to just
11  have her a culture shock where she's been
12  in the office not using her body very
13  much and then going to a strenuous
14  position.  That and the fact she had told
15  me her neck was bothering her, I put her
16  into what we call a containment position
17  to catch a quality defect for our
18  customer.  It was never the intention to
19  leave her in such a position.  She would
20  have been trained in four different
21  stations as everyone else is.
22      Q.  So that was a temporary
23  position?

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 121

1    A.  Yes, ma'am.
2    Q.  You did not have to fill out
3  any forms that she was being moved into
4  that position?
5    A.  No, ma'am.
6    Q.  Who was in the position on the
7  BC1 line prior to her?
8    A.  The containment job?
9    Q.  Yes, sir.
10   A.  A temporary employee.  I don't
11 know their name.
12   Q.  Where did you move them?
13   A.  I believe they were
14 terminated.
15   Q.  But you don't know for sure?
16   A.  It's been so long.  I can't
17 remember.
18   Q.  Did you hire someone else for
19 Ms. Kelly's position?
20   A.  No, ma'am.
21   Q.  If you moved Ms. Kelly from
22 the floor to the CCR position, who took
23 her job?

Page 122

1    A.  A temporary employee.  It was
2  on BC1 as well, her position.  She was
3  leaving.
4    Q.  Why didn't you put
5  Mrs. Edwards in the position that was
6  being vacated by Ms. Kelly?
7    A.  Again, I didn't want to just
8  throw her into a strenuous position after
9  being in the office for so long.  I felt
10 that it would have been detrimental to
11 her well-being.
12   Q.  What was Ms. Kelly's job?
13   A.  Station 503 door hinge
14 install, if I remember correctly.
15   Q.  What does that position do,
16 the 503?  Describe it for me, please.
17   A.  The operator installs door
18 hinges onto a jig; it pushes a button --
19 I'm sorry.  They push a button; the jig
20 goes into the car, and they attach the
21 hinges using air guns and fasteners.
22 Then the jig releases from the car and
23 moves back into position, and then you

Page 123

1  load the next part.
2    Q.  Do you recall Ms. Jones coming
3  to you and telling you that Mrs. Edwards
4  perceived she was being treated
5  differently since complaining?
6    A.  I think I remember Stayce
7  mentioning that to me.  And I don't
8  remember my exact response.
9    Q.  Did Ms. Jones tell you that
10 Mrs. Edwards had reported that you had
11 not approved her vacation or personal
12 time as you had in the past?
13   A.  I do remember that.  Tammy had
14 requested a vacation day and I denied it
15 because the schedule was already full and
16 there was a 5 percent rule.  I was
17 catching a lot of pressure from my
18 management group not to exceed the 5
19 percent rule, which I believe was five
20 team members scheduled off at the time.
21 And that was made very clear to me not to
22 exceed that rule.
23   Q.  Had Mrs. Edwards asked you to

Page 124

1  be off and you denied it?
2    A.  Not that I recall.
3    Q.  Okay.  Do you have a vacation
4  request form?
5    A.  Yes, ma'am.
6    Q.  And what is it?
7    A.  It was a request form filled
8  out by the team members specifying a day
9  and how many hours they would like for
10 vacation.  It is then approved or
11 disapproved by the group leader or a
12 higher member of management.
13   Q.  Okay.  Before Mrs. Edwards
14 complained, had you ever asked her to
15 fill out a vacation request form?
16   A.  I had.  And it had not been
17 done, but I gave her the vacation anyway.
18   Q.  After she complained, did you
19 tell her she would be filling out a form?
20   MR. BOSTICK:  Object to the
21 form.
22   A.  I don't remember.
23   MRS. HAYNES:  This has not

31 (Pages 121 to 124)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 125

1   been produced. She just found this
2   document.
3       (WHEREUPON, Plaintiff's
4   Exhibit Number 56 was marked for
5   identification.)
6       Q.  Plaintiff's 56, do you
7   recognize that?
8       MR. BOSTICK: Can we take a
9   break and look at this?
10      MRS. HAYNES: Sure.
11          5:18 PM
12      (Short recess)
13          5:25 PM
14      Q.  (BY MRS. HAYNES) We just
15  broke for you to look at 56. Have you
16  seen it now?
17      A.  Yes, ma'am. The vacation
18  request.
19      Q.  And is that the first time
20  that Mrs. Edwards ever had to submit a
21  vacation request to you that you signed
22  and approved?
23      A.  That, I can't remember if it

Page 127

1       A.  It wasn't required to turn it
2   in to anyone.
3       Q.  Okay. You just kept it?
4       A.  Yes, ma'am.
5       Q.  And did you ever throw them
6   out?
7       A.  I don't remember. I may have
8   thrown them out at the end of the year.
9   Say 2006 may have went out at the
10  beginning of 2007. That's possible. I
11  don't really remember.
12      Q.  Did anyone ever ask you for
13  documents on Mrs. Edwards, if you had
14  anything?
15      A.  I think so. I gave them
16  everything that she had -- or everything
17  I had in her personnel file and whatever
18  documentation I can find.
19      Q.  You had a separate personnel
20  file on Mrs. Edwards?
21      A.  I had a separate personnel
22  file on everyone.
23      Q.  Okay. What was in

Page 126

1   was the first time.
2       Q.  If there were others, would
3   they be in her personnel file?
4       A.  No, ma'am. Vacation requests
5   were kept separate. Not in the personnel
6   files, but in a binder with all other
7   vacation requests. I kept all original
8   documents in a three-ring binder and made
9   a copy for the team member and gave them
10  a copy.
11      Q.  Okay. So you would have kept
12  the original?
13      A.  Yes, ma'am. And they were all
14  left at Hyundai when I left Hyundai.
15      Q.  Okay. In what type of binder?
16      A.  A large three-ring binder
17  similar to this one.
18      Q.  Okay. How was it labeled?
19      A.  I don't remember if it was
20  labeled. I just kept it in a binder on
21  the top of my desk.
22      Q.  Okay. And did you turn those
23  in to anyone?

Page 128

1   Mrs. Edwards' personnel file that you
2   maintained?
3       A.  Medical papers -- not so much
4   papers, but anytime she went to visit
5   medical, they would print out a
6   disposition of either return to work or
7   can accommodate restrictions. Anything
8   pertinent that would have been to her
9   disciplinary, I would have been put in
10  there. Doctor's excuses I may have put
11  in there.
12      Q.  Would you have coaching and
13  counseling notes?
14      A.  No. I failed on that part
15  with everyone. I didn't keep coaching
16  and counseling notes in their personnel
17  files?
18      Q.  Did you have any disciplinary
19  forms on Mrs. Edwards?
20      A.  Not to my recollection, no,
21  ma'am.
22      Q.  Okay. Do you remember
23  anything negative that you had in a

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 129

1  personnel file on Mrs. Edwards?
2      A.  No, ma'am.
3      Q.  Likewise, if there were other
4  vacation request forms, the original
5  would be in your possession had she
6  signed them previous to August 11th?
7      A.  They would have been in the
8  binder whether they were approved or
9  disapproved.  I kept the originals.
10     Q.  Okay.  Do you recall a meeting
11  with Ms. Jones, Tom Bondy, and yourself
12  where you convey that you were going to
13  move Mrs. Edwards to the BC1 line?
14     A.  I vaguely remember it.
15     Q.  Okay.  Did she advise you not
16  to do that, use the legal ramifications
17  and perceived retaliation?
18     A.  I believe she mentioned that
19  it was a possibility of it.  I don't
20  remember her advising us not to do it.
21     Q.  And you did it anyway?
22     A.  Yes, ma'am.  We felt it was a
23  legal move since she had -- this was

Page 130

1  already planned and in place long before
2  the complaint was made.
3      Q.  Okay.  Did you tell
4  Mrs. Edwards why you were moving her?
5      A.  I don't remember what I told
6  her when I moved her.
7      Q.  Okay.  And you think it's just
8  coincidental that you moved her six days
9  after she complained about Mr. Swindle?
10     A.  Yes, ma'am.  It was already
11  planned and ordained to move her.
12     Q.  Had you and Mrs. Edwards
13  discussed positions on the line that she
14  would be moved?
15     A.  I don't remember if we
16  discussed any specific position.
17     Q.  Okay.  Did you ever talk to
18  her while she was on the line?
19     A.  Yes, ma'am.
20     Q.  Okay.  What conversations did
21  you have?
22     A.  I don't think it was so much
23  conversation as it was how are you, you

Page 131

1  know, casual greeting and meeting.  I
2  tended to do that with everyone, just
3  come by and say good morning or how are
4  you.  I don't remember having any lengthy
5  substantial conversations with her at
6  that point.
7      Q.  Did you ask her how her neck
8  was?
9      A.  I may have.  I don't remember.
10     Q.  Did you ask her if she was
11  taking any medication?
12     A.  I may have.  I don't remember.
13     Q.  Did you send her to medical?
14     A.  If she was taking medication,
15  I'm sure I did.
16     Q.  Okay.  Do you recall that?
17     A.  I don't remember.  I do know
18  it was a policy of mine if I was made
19  aware of a team member taking a
20  medication such as a painkiller or
21  narcotic, I would send them to medical
22  for an evaluation, because I didn't want
23  them being hurt in production.

Page 132

1      Q.  Okay.  Did you go and ask
2  Mrs. Edwards if she was taking pain
3  medication?
4      A.  Again, I don't remember.
5      Q.  Have no knowledge?
6      A.  I don't remember.
7      Q.  Did Ms. Jones ever come back
8  and visit with you after she found out
9  that you had moved Mrs. Edwards to the
10  BC1 line?
11     A.  I don't remember that either.
12     Q.  Did she have a conversation
13  with you?
14     A.  I don't remember.
15     Q.  Okay.  Do you recall a
16  conversation about vacation or personal
17  days with Ms. Jones relative to
18  Mrs. Edwards?
19     A.  No, ma'am.
20     Q.  Do you receive -- do you
21  recall receiving e-mails from Penny
22  Nichols about Tammy Edwards, Plaintiff's
23  Exhibit 30?

33  (Pages 129 to 132)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 133

1    A.   I think so.  Stating she
2  applied for FMLA or short-term
3  disability.
4    Q.   Okay.  How did you learn that
5  she was out on short-term disability or
6  medical leave?
7    A.   Through this e-mail from Penny
8  Nichols.
9    Q.   Okay.  Is that the only way
10  you knew?
11    A.   Yes, ma'am.
12    Q.   Did you receive any other
13  e-mails other than these three e-mails
14  from Ms. Nichols?
15    A.   I may have.  I can't say.
16    Q.   The last e-mail looks like it
17  was sent on September 29th, 2006
18  advising you that Mrs. Edwards' physician
19  had extended her leave time to January
20  2007; is that correct?
21    A.   It appears so.
22    Q.   On February 12th, 2007, did
23  you send an e-mail to Mr. Bondy?

Page 134

1    A.   It appears so.
2    Q.   Okay.  And that's dated
3  Monday, February 12th, 2007 at
4  11:41 p.m.?
5    A.   Yes, ma'am.  That's what it
6  appears.
7    Q.   Was that your shift at that
8  point in time?
9    A.   Yes, ma'am.  It looks like I
10  was working night shift at that point.
11    Q.   Okay.  Why did you copy
12  Mr. Gayhaper?
13    A.   He was my direct report, my
14  assistant manager.  I typically copy him
15  on most of my correspondence.
16    Q.   Had Mr. Bondy asked you
17  anything about Mrs. Edwards?
18    A.   Not that I recall.
19    Q.   Okay.  You start the e-mail
20  off, Plaintiff's Exhibit 36 by stating,
21  Tom, the last bit of information I
22  received regarding Tammy Edwards' return
23  to work was where she was supposed to

Page 135

1  report for duty on Wednesday, February
2  7th.  Does that indicate that Mr. Bondy
3  had asked you about it, her returning to
4  work?
5    A.   I don't think it does.  I
6  think I was just beginning my
7  correspondence at this point.
8    Q.   Okay.  Do you know where you
9  got the date that she was supposed to
10  return to work February 7th?
11    A.   I'm sure medical gave it to
12  me.
13    Q.   Well, if the last e-mail I
14  have just has January 2007 and it doesn't
15  have a date February 7th, do you know
16  where you got that date?
17    MR. BOSTICK:  Object to the
18  form.
19    A.   No, ma'am.
20    Q.   Who would you have talked to
21  in medical?
22    A.   Most likely Penny Nichols.
23  Sometimes it wasn't always an e-mail; it

Page 136

1  was a phone call.
2    Q.   Okay.  And why were you
3  calling Ms. Nichols about Mrs. Edwards?
4    MR. BOSTICK:  Object to the
5  form.
6    A.   Usually, she calls me, not the
7  other way around.
8    Q.   All right.  In the second
9  paragraph, it does state that you
10  enquired.  Correct?
11    A.   Yes, ma'am.
12    Q.   All right.  And why did you
13  call?
14    A.   Because, as I say right here
15  on my second sentence, that she came to
16  medical this afternoon -- I had heard
17  that she was at the plant and came to
18  medical.  And I had not seen her or
19  spoken to her, so I called medical to
20  ascertain her condition -- not condition,
21  but her status.  Because at that point I
22  was receiving no information whether she
23  was still on short-term disability, FMLA,

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 137

1  or long-term disability, and it made a
2  difference in the way I recorded her time
3  in the time sheets.
4      Q.  Okay.  The questions you had
5  for Mr. Bondy, did he ever send you an
6  answer via e-mail?
7      A.  I don't recall receiving one
8  via e-mail or if it was face-to-face.  I
9  don't recall an answer.
10     Q.  Okay.  But you asked him
11  whether or not she would be a no-call,
12  no-show --
13     A.  Yes, ma'am.
14     Q.  -- from what you consider were
15  the missed days?
16     A.  Yes, ma'am.
17     Q.  Did he answer you on that?
18     A.  I don't think he did.  I don't
19  remember him answering that.
20     Q.  Did you ask that question of
21  anyone else?
22     A.  No, I don't think I did.  I
23  think once I didn't receive a written

Page 138

1  statement saying he was going to be a
2  no-call, no-show or short-term, I just
3  went ahead and classified it as
4  short-term disability.  I had no other
5  knowledge at that point.
6      Q.  Okay.  Did you talk to anyone
7  about implementing disciplinary action
8  and writing her up for that?
9      A.  No, ma'am.
10     Q.  Have you ever written anyone
11  up for no-show, no-call?
12     A.  Not that I recall.
13     Q.  No one at Hyundai ever wrote
14  up for no-call, no-show?
15     A.  It's possible.  But I don't
16  remember.
17     Q.  Okay.  The question you asked
18  of Mr. Bondy:  Is there a job we can
19  place her in if she has restrictions due
20  to a non-work-related injury from her
21  physician, did Mr. Bondy ever answer that
22  question?
23     A.  I don't remember.

Page 139

1      Q.  Did you ever ask anyone else
2  that question?
3      A.  I don't remember that either.
4      Q.  Okay.  In the last sentence of
5  your e-mail you write, I know this is a
6  sensitive subject; please advise.  What
7  was sensitive?
8      A.  Sensitive because I knew Tammy
9  felt like she was being treated unfairly
10  due to a phone call she gave me.  And I
11  didn't want to convey the wrong message.
12     Q.  Okay.  What phone call?
13     A.  She had called me in the
14  morning.  I believe it was after she
15  visited medical.
16     Q.  In February '07?
17     A.  Yes, ma'am.
18     Q.  Okay.  What did the two of you
19  talk about?
20     A.  She said that she was still
21  out on disability and medical had advised
22  her she needed to touch base with me from
23  time to time and let me know her status,

Page 140

1  whether she was still filing short-term,
2  long-term, or FMLA.  And she wanted to
3  know why I didn't let her come to work.
4  I explained that I had no job to
5  accommodate her restrictions.
6      Q.  Anything else?
7      A.  I believe she went into some
8  comments about she felt that she was
9  being treated unfairly and Mike was
10  guilty and some things of that nature.  I
11  don't remember the exact words used and
12  what was said.
13     Q.  Okay.  Anything else?
14     A.  I can't remember.
15     Q.  Do you remember anything else
16  you told her?
17     A.  I can't remember, ma'am.
18     Q.  Did you send a letter to
19  Mr. Bondy telling him that you had heard
20  from Mrs. Edwards?
21     A.  I'm sorry?
22     Q.  Did you send him a follow-up
23  e-mail that you had heard from

35 (Pages 137 to 140)

**American Court Reporting**
**July 30, 2008**

Page 141

1  Mrs. Edwards?
2      A.  That, I don't remember.
3      Q.  Did she call you before the
4  12th or after the 12th of February as
5  indicated in this e-mail of Plaintiff's
6  36?
7      A.  I can't remember that either.
8  I can't remember the date she called me.
9      Q.  Okay.  If she had called you
10  before the 12th, would you have not have
11  included that in your e-mail, that you
12  had heard from her?
13      A.  Probably not.
14      Q.  Why not?
15      A.  Because I knew there was an
16  investigation pending at that point as
17  far as her and Mike.
18      Q.  That was still pending in
19  February of 2007?
20      A.  Well, as far as I knew, it was
21  pending.  I never heard the outcome.
22      Q.  Okay.  Following your e-mail
23  on February 12th, 2007, did you talk with

Page 142

1  anyone in medical about whether or not
2  you could accommodate Mrs. Edwards?
3      A.  That, I don't remember.  I
4  can't say.
5      Q.  Did anyone contact you?
6      A.  If she had visited medical,
7  I'm sure they would have contacted me.
8      Q.  Do you know Lauren Carter?
9      A.  The name sounds familiar.
10      Q.  Look for me at Plaintiff's
11  Exhibit 28.
12      A.  (Witness reviews document)
13      Q.  Why did you tell Ms. Carter
14  that Mrs. Edwards could not be
15  accommodated?
16      A.  As I recall, her restrictions
17  were no extended standing, sitting, or
18  lifting.  And I had no job to place her
19  in that met those requirements.
20      Q.  Where did you receive those
21  requirements?
22      A.  From Lauren.  She called me
23  and said her restrictions are no

Page 143

1  extending, standing, sitting, or lifting.
2      Q.  Okay.
3      A.  Can you accommodate?  And I
4  replied, no, I don't have a job that
5  accommodates those.
6      Q.  Do you see that anywhere in
7  the medical notes, where they called you
8  and conveyed that?
9      A.  Yes, ma'am.  I see it here.
10      Q.  That's Mrs. Edwards'
11  conversation with nursing.  But did -- or
12  medical.  Did medical ever convey that to
13  you?
14      A.  Yes, ma'am.
15      Q.  When?
16      A.  When they called.
17      Q.  On the 12th?
18      A.  I assume it was the 12th.  I'm
19  not sure what day it was.
20      Q.  Okay.  That's when you called.
21  Right?
22      A.  No, ma'am.  They called me.
23      Q.  Medical called you on the

Page 144

1  12th?
2      A.  If they called -- if I talked
3  to medical, they called me.
4      Q.  Well, in the second paragraph,
5  does it not say, tonight I enquired about
6  her return to work with our medical
7  staff?
8      A.  Yes, ma'am, it does.  It's
9  possible that I was in medical on another
10  unrelated item.
11      Q.  Do you recall that?
12      A.  It's possible.  I had to visit
13  medical from time to time to take care of
14  injured team members or maybe go get
15  somebody some aspirin for a headache.
16      Q.  Okay.  Did they also convey to
17  you that she is having some coworker
18  issues that have her very upset?
19      A.  No.  She didn't say that.
20      Q.  Okay.  Do you see that in the
21  notes?
22      A.  Yes, ma'am, I saw that.  But
23  that was not conveyed to me.

**American Court Reporting**
**toll-free (877) 320-1050**

Page 145

1    Q.    Only about the restrictions?
2    A.    Yes, ma'am.
3    Q.    How would you classify the
4    work there in the welding department?
5    Heavy, medium, or light work?
6         MR. BOSTICK:  Object to the
7    form.
8    A.    I'd say most of it is medium
9    to heavy.
10   Q.    What's the -- what would you
11   classify as a medium job?
12   A.    A medium job I would classify
13   as an equipment tender.
14   Q.    Pardon?
15   A.    An equipment tender.  And
16   their job entails maintaining the robots,
17   taking out weld caps, correcting
18   programs, things of that nature.
19   Q.    Okay.  How often are the
20   breaks?
21   A.    I don't remember.  It's been
22   so long.  I think they are a couple of
23   hours a piece -- a couple of hours apart.

Page 146

1    I don't remember exactly.
2    Q.    But you just left in
3    September.  Didn't you?
4    A.    Yes, ma'am.
5    Q.    But you don't remember?
6    A.    No, ma'am.  I'm supervisor of
7    a machine shop, and I've got a whole new
8    schedule that I have to maintain and keep
9    up with.  I kind of put away the old and
10   reflect on the new.
11   Q.    Okay.  You don't know what the
12   schedule -- you don't recall the
13   schedule?
14   A.    No, ma'am.
15   Q.    Okay.  What would be the
16   heaviest lifting job in the welding
17   department?
18   A.    The heaviest lifting job would
19   probably require lifting somewhere in the
20   area of thirty pounds.  And that's
21   carrying moving parts, such as trunks,
22   doors, hoods.
23   Q.    Thirty pounds is the heaviest?

Page 147

1    A.    I think thirty -- on a normal
2    standard thirty pounds would probably be
3    the heaviest.  There are occasions when
4    team members might have to make repairs
5    or something out of the ordinary that
6    would require a little more lifting.  But
7    on a normal standard, I'd say probably
8    thirty pounds is probably the heaviest,
9    just off the top of my head.
10   Q.    What's the lightest job?
11   A.    I don't know.  Maybe lifting
12   five pounds.
13   Q.    What job would that be?
14   A.    That would be a cross between
15   either tool room attendant or CCR
16   operator.
17   Q.    Would the CCR operator job
18   require no lifting, standing, or sitting
19   for extended periods?
20   A.    It would require sitting for
21   extending periods.
22   Q.    How long?
23   A.    Between breaks usually.

Page 148

1    Several hours at a time sometimes.
2    Q.    Several hours being two hours?
3    A.    Two.  Two to three hours at a
4    time sometimes, yes, ma'am.  CCR
5    operator's job entails watching the
6    production board there in the office and
7    maintaining or monitoring downtime, line
8    production.
9    Q.    Did Mrs. Edwards ever tell you
10   that she had gone to the line to perform
11   some welding for an employee named Dara
12   (phonetic)?
13   A.    I don't recall that.
14   Q.    Okay.  Did you ever tell
15   Mrs. Edwards you were not going to put
16   her on the line?
17   A.    I don't recall that either.
18   Q.    Did Mrs. Edwards ever ask you
19   to move her from Mike Swindle?
20   A.    After the complaint was made.
21   The -- it wasn't so much she reported --
22   or she reported to Mike Swindle, but her
23   time was kept up on Mike's time sheet,

37 (Pages 145 to 148)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 149

1 because CCR directly reported to group
2 leader. And she had requested that she
3 be taken off of Mike's time sheet because
4 she didn't have to go into Mike's area
5 and record her time.
6    Q. When you put her on the BC1,
7 how far was that from Mr. Swindle's work
8 area, his desk?
9    A. It was maybe thirty feet, I
10 would say, from his desk. Probably two
11 or three hundred feet away from his
12 general work area.
13    Q. When she was in the CCR room,
14 how far was she from Mr. Swindle?
15    MR. BOSTICK: Object to the
16 form.
17    A. Pretty far.
18    Q. Did Mrs. Edwards ever express
19 a desire to go back to Mr. Ulrich's team?
20    A. I don't remember.
21    Q. Do you ever recall telling her
22 she was not going anywhere? I don't
23    A. I don't remember. I don't

Page 150

1 recall saying that.
2    Q. What's Amber Kelly's race?
3    A. What's her race?
4    Q. Yes, sir.
5    A. She's African-American, I
6 guess.
7    Q. Did she ever complain to you
8 about Mrs. Edwards?
9    A. Not that I recall.
10    Q. Did you ever see the two of
11 them together?
12    A. Other than on her training
13 period, I don't recall them ever being
14 real friendly.
15    Q. Did you ever see them eating
16 lunch together, taking a break together?
17    A. Not that I recall.
18    Q. How were you aware of her neck
19 problems?
20    A. She had made me aware -- I
21 want to say it was during the end of her
22 term as CCR -- not so much term, but
23 somewhere in the time frame of April or

Page 151

1 May of 2006.
2    Q. Did she complain to you about
3 any problems she was having at work with
4 regard to her neck?
5    A. I remember her saying that her
6 neck hurt when she sat down for long
7 periods of time.
8    Q. Okay. Did you ever see her
9 neck swollen?
10    A. I think I saw her neck swollen
11 one time. And it was very early in the
12 morning, and I had told her to go on home
13 -- that she had stayed past her ten hour
14 shift was over, to go on home.
15    Q. Any point in time she was not
16 able to work a full shift because of her
17 neck problems?
18    A. I can't remember if she left
19 early for her neck problems or missed any
20 time from it.
21    Q. Was it your decision to put
22 her back on the -- well, strike that.
23    Was it your decision to put

Page 152

1 her on the BC1 line?
2    A. I had part in it. It was a
3 mutual decision between me, Tom Bondy,
4 and Harry White. We decided as a
5 management group that there was an
6 opening on BC1 and she had requested to
7 go there, so we saw no problem with it.
8    Q. She requested to go to BC1?
9    A. Yes, ma'am.
10    Q. Did she also request to go to
11 fenders?
12    A. I don't recall.
13    Q. Did she request to be moved
14 from any area where Mr. Swindle was?
15    A. That, I don't recall.
16    Q. Do you know why you would put
17 her near Mr. Swindle's area after she
18 just complained about him sexually
19 harassing her?
20    MR. BOSTICK: Object to the
21 form.
22    A. I didn't feel like she was
23 near Mr. Swindle's area. I mean, she was

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 153

1  on a job on BC1, and Mike was on the
2  other end on body build.
3      Q.   Were there other areas you
4  could have put her that she would not see
5  or interact with him?
6      A.   I don't think there were at
7  the moment. I was filling a job opening.
8      Q.   How was the job opening
9  created?
10     A.   Well, as I said before, there
11 was a containment job on BC1, and the
12 temporary employee that was doing it had
13 been let go, and I needed a replacement.
14 I felt it was a good place for her to
15 start out.
16     Q.   Any other temporary employees
17 working in that department?
18     A.   I don't recall. I'm sure
19 there were.
20     Q.   How many in all did you have?
21     A.   At one point there was
22 probably 20. I don't know how many there
23 were at that time.

Page 154

1      Q.   Is there any reason you
2  wouldn't move a temporary employee to
3  accommodate a full-time employee?
4      A.   Well, the jobs the temporary
5  employees were performing at the time
6  were pretty heavy jobs, very strenuous
7  jobs. In light of her well-being, I
8  didn't feel like it would be a good idea
9  to put her in something that she might
10 get hurt on.
11     Q.   Is there any reason you didn't
12 keep her in the CCR job?
13     MR. BOSTICK: Object to the
14 form. Asked and answered.
15     A.   Job performance and personal
16 request to be moved.
17     Q.   Did you ever hear Mrs. Edwards
18 tell Billy Kitchens or Mike Swindle that
19 they should not talk like that?
20     A.   I don't, no, ma'am.
21     Q.   Did Ms. Smith ever -- your
22 current wife, did she ever work around
23 Mr. Swindle?

Page 155

1      A.   Yes, ma'am. She worked for
2  Mike as a team member at one point.
3      Q.   Did she ever complain to you
4  about how Mr. Swindle talked to her?
5      A.   No, never.
6      Q.   Did she ever tell you he had a
7  foul mouth?
8      A.   No.
9      Q.   Did she ever tell you he used
10 profanity?
11     A.   Not as a direct comment. But
12 everyone knew that Mike used profanity.
13 So did I, so did April, so did Tammy.
14     Q.   Did you ever tell Mrs. Edwards
15 that she would feel more comfortable
16 working on the BC1 line?
17     A.   That, I don't recall.
18     Q.   Did you ever tell Mr. Kitchens
19 why you moved Mrs. Edwards to his
20 department?
21     A.   I don't recall if I did or
22 didn't.
23     Q.   All right.

Page 156

1      MRS. HAYNES: Let me look at
2  my notes. I may be through.
3      5:40 PM
4      (Short recess)
5      5:43 PM
6      Q.   What documents have you
7  reviewed in preparing for your
8  deposition?
9      A.   My resume'.
10     Q.   That's it?
11     A.   Yes, ma'am.
12     Q.   Do you know if there is a list
13 of temporary employees that would have
14 been terminated in the welding department
15 in July or August of 2006?
16     A.   I do not know, ma'am.
17     Q.   Did you keep up with temporary
18 employees that were in your department?
19     A.   Barely. I signed their time
20 sheets. They reported mostly to Aerotek.
21     Q.   Okay. On the time sheets that
22 we've previously looked at, is there an
23 indication for temporary employees?

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 157

1    A.   No, ma'am.  That was a
2  separate payroll.
3    Q.   Who kept up with it?
4    A.   I would submit those to
5  Aerotek.  I forget who my contact was.
6  You would have to call Aerotek.
7    Q.   You don't recall who your
8  contact was?
9    A.   No, ma'am, I can't remember
10  his name.
11    Q.   Where are they located?
12    A.   There was a man and a lady
13  that worked there on site in the Hyundai
14  office administration building.  And I
15  can't remember their names.
16    Q.   That's where the Aerotek
17  office is?
18    A.   They had a satellite office
19  there in the Adven (phonetic) building.
20    Q.   Is that who you dealt with?
21    A.   Yes, ma'am.
22    Q.   When you left in September
23  '07, was that still where the satellite

Page 158

1  office of Aerotek was, in the Hyundai
2  office?
3    A.   Yes, ma'am.  I don't know if
4  it's still there or not.
5    Q.   But when you left.
6    A.   When I left, yeah, there was
7  still a satellite office there.
8    Q.   Were you aware that
9  Mrs. Edwards was recording your
10  conversation?
11    A.   No, ma'am.
12    Q.   You haven't been told that?
13    A.   No, ma'am.
14    Q.   Okay.  I'm going to play a
15  tape.  I want to ask you if that's your
16  voice on that tape.
17    A.   Okay.
18        (WHEREUPON, a tape was played
19  in the deposition)
20    Q.   Is that your voice?
21    A.   Yes, ma'am.
22    Q.   Does that refresh your
23  recollection about any of your

Page 159

1  conversation?
2    A.   I remember the conversation.
3    Q.   Okay.  Who is Janine?
4    A.   I believe she was over
5  benefits for the Adven Department.  I
6  don't remember for sure.
7    Q.   Okay.  Did you have any
8  conversations with Janine about
9  Mrs. Edwards?
10    A.   Not that I recall.
11    Q.   Okay.  Why did you suggest to
12  Mrs. Edwards that she needed to apply for
13  FMLA?
14    A.   Well, I didn't --
15        MR. BOSTICK:  Object to the
16  form.
17    A.   I didn't know at that point
18  what her options were.  I didn't know the
19  full extent of all the details.
20    Q.   Okay.  On the tape you had
21  told her that she was going to BC1; is
22  that correct?
23    A.   Uh-huh.

Page 160

1    Q.   Is that a yes?
2    A.   Yes, ma'am.
3    Q.   Okay.  When did you identify
4  that that would be her job when she came
5  back?
6    A.   I don't recall.
7    Q.   Was there an opening there?
8    A.   I'm sure there was.
9    Q.   Why are you sure?
10    A.   I wouldn't have placed her on
11  BC1 unless there was an opening there.
12    Q.   Are they always openings
13  there?
14    A.   It tends to flux on BC1 more
15  than any other team.
16    Q.   Why is that?
17    A.   Temporary employees.
18    Q.   There are more temporary
19  employees in that area?
20    A.   That.  And moving parts.
21    Q.   And why are there more
22  temporary employees on BC1 and moving
23  parts?

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 161

1    A.    Generally because those jobs
2  are learned easier.  And when I have
3  temporary employees coming in and out
4  like a revolving door, they can pick up
5  and learn those jobs faster than you
6  could, say, a metal finish job or
7  something in repair.
8    Q.    Is repair in weld?
9    A.    Uh-huh.
10   Q.    Is that a yes?
11   A.    Yes, ma'am.
12   Q.    Is that the BC1 job that
13 Mrs. Edwards was working on, the repair
14 job?
15   A.    No, ma'am.
16   Q.    That wasn't a repair job?
17   A.    That was a customer complaint
18 containment job.  When I refer to repair,
19 I meant body repair, repairing heavily
20 damaged cars, dents, and broken welds.
21   Q.    Do you know why Mrs. Edwards
22 would have been told that she was going
23 to do the downtime board job by other

Page 162

1  employees when she came back to work?
2    A.    No, ma'am.  That position was
3  temporary and had already been resolved
4  at that point.  And that was -- like I
5  said in my earlier testimony, that was a
6  temporary thing due to a senior Korean
7  president, and that job went away.
8    Q.    Is the downtime board kept --
9  or was it being kept when you left there
10 in September '07?
11   A.    It was being maintained by the
12 team leaders, not by a specified person
13 who just goes around from board to board.
14   Q.    Okay.  And does the CCR person
15 still come down to get the numbers off
16 the board?
17   A.    Generally, maybe once or twice
18 a shift they'll come down and look at the
19 board and make sure everything is in line
20 with the report.
21   Q.    Is there still a keeper job,
22 or was there when you left?
23   A.    That's the equipment tender

Page 163

1  job that's also known as keeper.
2    Q.    And do they have anything to
3  do with the board?
4    A.    Occasionally, if the team
5  leader is not in the area when the
6  downtime occurs, keepers will take it
7  upon themselves to write down the details
8  of the downtime.
9    Q.    Is that part of their job
10 duties, to keep up with downtime?
11   A.    I don't think it was a
12 specified job duty for it, no ma'am.
13   Q.    Okay.  All right.  Well, let
14 me ask you this:  After hearing the tape,
15 does that refresh your recollection about
16 your's and Mr. Bondy's conversation and
17 the chance after chance --
18   A.    I don't recall hearing Tom say
19 that.
20   Q.    Okay.
21      MRS. HAYNES:  All right.
22 That's all I have.  Thank you.
23      MR. BOSTICK:  I may have a

Page 164

1  couple.  I need to talk with Steve just
2  for a brief second.
3      (Short recess)
4  EXAMINATION BY MR. BOSTICK:
5    Q.    Earlier you looked at document
6  56, this vacation request.  Is that your
7  initials on the form?
8    A.    Yes.  Those are my initials
9  where I approved both days that were
10 requested.
11   Q.    Okay.  And so is it your --
12 does that seem consistent with your
13 recollection of this being around August
14 11th?  I mean, do you have any reason to
15 dispute that's when it was submitted?
16   A.    I have no reason to dispute
17 it.
18   Q.    Okay.  You had talked about
19 Mr. Swindle being suspended.  When he
20 came back from suspension, the two weeks
21 suspension in August, did he come back on
22 the same shift as you or on a different
23 shift?

41 (Pages 161 to 164)

**American Court Reporting**
**July 30, 2008**

**American Court Reporting**
**toll-free (877) 320-1050**

Page 165

1  A.  I think he actually reported
2  to Chris Worley at that time, and he was
3  replaced by Tommy Robertson.
4  Q.  Explain that -- does that mean
5  he came back to --
6  A.  He came back on the opposite
7  shift from me.  And Tommy Robertson
8  changed shifts from Chris Worley's shift
9  to my shift.
10  Q.  What was Chris Worley's
11  position?
12  A.  Group leader.
13  Q.  On the opposite shift?
14  A.  Yes.
15  Q.  The telephone conversation we
16  just -- recording we just listened to, do
17  you know when approximately that
18  conversation took place?
19  A.  I don't remember the day.  I
20  remember it was very early in the
21  morning, somewhere around 6:30, 7:00.
22  First shift was just beginning, and I had
23  already stayed past my welcome on second

Page 166

1  shift.
2  Q.  In terms of a calendar,
3  though, do you know -- and we've looked
4  at Exhibit 28, and you mentioned some
5  call around in there.  Is that the call
6  you think that you may have been
7  referring to earlier?
8  A.  The day in February, yeah, I
9  think it was somewhere in that time
10  frame.  But I don't remember exactly what
11  day it was.
12  Q.  But it was sometime around
13  that e-mail that you sent --
14  A.  Yeah, it was sometime around
15  the e-mail that was sent to Tom Bondy.
16  Q.  Did you have any
17  communications with Mrs. Edwards at any
18  point from that point forward?
19  A.  No.
20  Q.  And when you referred her --
21  it sounded to me on the thing she said
22  her short-term disability had run out.
23  And I guess when you directed her to

Page 167

1  benefits, was that for the purpose of her
2  clarifying what other type of leads might
3  be available?
4  A.  Absolutely.  I wanted her
5  rights to be protected and whatever
6  resource was available to her.
7  Q.  But you don't have any
8  participation in determining --
9  A.  None.
10  Q.  -- what leads are available
11  or --
12  A.  No.
13  Q.  Okay.
14  MR. BOSTICK:  That's all I've
15  got.
16  A.  I can't approve short-term,
17  long-term, or FMLA.
18  Q.  Okay.
19  MRS. HAYNES:  I don't have
20  anything else.
21  6:00 PM
22
23  FURTHER THE DEPONENT SAITH NOT

Page 168

1  C E R T I F I C A T E
2
3  STATE OF ALABAMA )
4  COUNTY OF LEE    )
5
6  I hereby certify that the
7  above and foregoing deposition was taken
8  down by me in stenotype, and the
9  questions and answers thereto were
10  transcribed by means of computer-aided
11  transcription, and that the foregoing
12  represents a true and correct transcript
13  of the deposition given by said witness
14  upon said hearing.  I further certify
15  that I am neither of counsel nor of kin
16  to the parties to the action, nor am I in
17  anywise interested in the result of said
18  cause.
19  KRISTEN DYKES THOMAS
20  CERTIFIED COURT REPORTER #257
21  My Commission expires
22  June 25, 2012
23

42 (Pages 165 to 168)

**American Court Reporting**
**July 30, 2008**

~~605~~ ████████████, Prattville, AL 36067    ███████████ ████████████    ████████@████████████

# Stephen R. Culpepper

**Objective**    To find new challenges as a manager within an organization who strives to grow globally.

**Experience**    January 2004- Present        Hyundai Motor Manufacturing of        Montgomery, AL
                                            Alabama

### Group Leader of Welding Department

- Completed a 35 day Training Camp on Lean Automation in Korea
- Helped HMMA achieve 10th Best Plant award by J.D. Power in 2006 during first year of production
- Was instrumental in implementing Business Management system into Welding Department
- Played key role in TS 16949 certification for HMMA, the first OEM in North America to achieve this certification
- Responsible for Body Shop operations on daily basis and supervised 125 Team Members
- Attended FANUC Robotics class, Spot-tool Operation
- Appointed Robotics Trainer
- Attended Metal Finish and Body Repair at Trenholm Tech College
- Appointed Metal Finish Trainer and Body Complete Team Leader
- Helped develop the processes and SWIS for all stations on Body Complete lines
- Authored and implemented the Standard Repair Guide for Heavy Body Repairs
- Attended daily quality reviews and assigned Corrective Action Reports to appropriate parties
- Trained, coached, and mentored Team Leaders and Team Members to produce a world class vehicle
- Played a key role in the model launch of the Hyundai Sonata and Santa Fe
- Improved Quality and First Time Through ratio from 89% to 96% by implementing strict standards and tracking the results through daily reports and weekly trend charts

May 2000-January        Thermasys Corporation        Montgomery, AL
2004

### Mill Team Leader

- Supervised daily mill operations of aluminum tube mills
- Responsible for tooling set-up, machine operations, and quality audits
- Responsible for training team members to set up machines, trouble shoot problems, and record quality checks using SPC and DataMyte systems

1997-2000        Continental Eagle Corporation        Prattville, AL

### Metal Fabricator

- Responsible for tool and die set up
- Maintained tooling inventory and scheduled maintenance of tooling
- Interpreted blue prints and lay out of materials accordingly

**PLAINTIFF'S EXHIBIT**

*45*

1    IN THE UNITED STATES DISTRICT COURT

2    MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4

5    TAMMY EDWARDS,

6       Plaintiff,

7    vs.

8    HYUNDAI MOTOR MANUFACTURING ALABAMA,

9    LLC, and MIKE SWINDLE, individually,

10      Defendants.

11

12    CIVIL ACTION NUMBER:  2:07-cv-908-MHT

13

14

15    DEPOSITION:  KIMBERLY ABRAMS

16

17

18    S T I P U L A T I O N S

19    IT IS STIPULATED AND AGREED by

20  and between the parties through their

21  respective counsel that the deposition

22  of KIMBERLY ABRAMS  may be taken on July

23  17, 2008, before Sallie NeSmith Gunter,

1

---

1  Certified Court Reporter of the State

2  of Alabama, ACCR License Number 37,

3  Commissioner and Notary Public, at the

4  Wingate Inn, 2060 Eastern Boulevard,

5  Montgomery, Alabama.

6    IT IS FURTHER STIPULATED AND

7  AGREED that it shall not be necessary

8  for any objections to be made by

9  counsel to any questions except as to

10  form or leading questions, and that

11  counsel for the parties may make

12  objections and assign grounds at the

13  time of trial or at the time said

14  deposition is offered in evidence or

15  prior thereto.

16

17

18

19

20

21

22

23

2

---

1    APPEARANCES

2  Appearing for the Plaintiff :

3    HAYNES & HAYNES, P.C.

4    By:  Alicia K. Haynes, Esq.

5    1600 Woodmere Drive

6    Birmingham, Alabama  35226

7  Appearing for the Defendant  Hyundai

8  Motor Manufacturing Alabama, LLC :

9    OGLETREE, DEAKINS, NASH, SMOAK

10      & STEWART, P.C.

11    By:  Brian R. Bostick, Esq.

12    One Federal Place

13    Suite 1000

14    Birmingham, Alabama  35203

15    - and -

16    By:  Christopher N. Smith, Esq.

17    Corporate Legal Counsel

18    Hyundai Motor Manufacturing

19      Alabama, LLC

20    700 Hyundai Boulevard

21    Montgomery, Alabama  36105

22

23

3

---

1  Appearing for the Defendant Michael

2  Wayne SWINDLE :

3    CONSTANGY, BROOKS & SMITH, LLC

4    By:  J. Tobias Dykes, Esq.

5    One Federal Place

6    Suite 900

7    Birmingham, Alabama  35203

8  Certified Court Reporter:

9  Sallie NeSmith Gunter

10  Also Present:  Tammy Edwards

11

12

13

14

15

16

17

18

19

20

21

22

23

4

## Page 5

I N D E X

Examination by Ms. Haynes.............7

5

## Page 6

1     I, Sallie NeSmith Gunter, a
2  Certified Court Reporter of the State
3  of Alabama, ACCR License Number 37,
4  acting as Commissioner, certify that on
5  this date there came before me at the
6  Wingate Inn, 2060 Eastern Boulevard,
7  Montgomery, Alabama, on July 17, 2008,
8  beginning at or about 2:57 p.m.,
9  KIMBERLY ABRAMS, witness in the above
10 cause, for oral examination, whereupon,
11 the following proceedings were had:
12        THE COURT REPORTER:  Usual
13 stipulations again, except you want the
14 witness to read and sign?
15        MR. BOSTICK:  Yeah, that's
16 fine.
17        MS. HAYNES:  That's fine.
18        THE COURT REPORTER:  All
19 right.  Ms. Abrams, would you raise
20 your right hand, please, ma'am, to be
21 sworn?

6

## Page 7

1              KIMBERLY ABRAMS,
2  being first duly sworn, was examined
3  and testified as follows:
4  EXAMINATION BY MS. HAYNES :
5     Q.   Okay.  Ms. Abrams, if you
6  would, state your full name for the
7  record and your address, please.
8     A.   **Kimberly Vernon Abrams,** ▮▮▮▮
9  ▮▮▮▮▮▮▮▮, **Rockford, Alabama, 36153.**
10    Q.   How long have you been
11 employed with Hyundai?
12    A.   **Four and a half years.**
13    Q.   What is your position?
14    A.   **I'm a tool room attendant.**
15    Q.   And have you had that position
16 with the entire time you've worked for
17 Hyundai?
18    A.   **No, ma'am.  I was hired as a**
19 **production worker and worked on the**
20 **line for about eight months and then**
21 **went to tool room.**
22    Q.   Was that a promotion for you?
23    A.   **No.**

7

## Page 8

1     Q.   Better job?
2     A.   **Just a better job.**
3     Q.   Okay.  Why is that?
4     A.   **Well, I'm not on the line.**
5  **I'm actually -- you know, I issue**
6  **supplies, do all the ordering, a lot of**
7  **computer work.**
8     Q.   Have you ever been a CCR?
9     A.   **No, ma'am.**
10    Q.   Do you know anything about the
11 job?
12    A.   **No, ma'am.**
13    Q.   Haven't seen reports?
14    A.   **I see reports, but I don't**
15 **know -- you know, I do see the report,**
16 **I pull up the production report to get**
17 **the quantity of cars we do daily for my**
18 **reports.**
19    Q.   Do you ever reviewed reports
20 done by Tammy Edwards?
21    A.   **I've saw them in the past when**
22 **she was there to get the production**
23 **amount off of them, yes.**

8

1    Q.    Did you have any issues with
2  her reports?
3    A.    **No.**
4    Q.    Any complaints?
5    A.    **No.**
6    Q.    Any complaints about her doing
7  her job as a CCR?
8    A.    **No.**
9    Q.    How did you first learn that
10  Ms. Edwards was being harassed by Mr.
11  Swindle?
12        MR. BOSTICK:  Object to the
13  form.
14        MR. DYKES:  Object to the
15  form.
16        MS. HAYNES:  You may answer.
17    A.    **Michelle Nelson called me and**
18  **asked me to come upstairs and talk to**
19  **Tammy.**
20    Q.    And that's the first time you
21  learned?
22    A.    **Yes, ma'am.**
23    Q.    Had you seen anything in the

<center>9</center>

1    A.    Uh-huh, e-mails, telephone.
2    Q.    And how long have you known
3  Ms. Nelson?
4    A.    **Three years.  I think she**
5  **started about a year after me.  I did**
6  **not know her before then.**
7    Q.    All right.  Tell me what
8  happened after you got this telephone
9  call from Ms. Nelson.
10    A.    **I went upstairs, and Tammy and**
11  **Michelle were in a conference room, and**
12  **I went in and sat down and talked to**
13  **Tammy.**
14    Q.    Okay.  Tell me about that
15  conversation, or how it started until
16  the end.
17    A.    **Tammy was upset and crying and**
18  **said she was being harassed by Mike**
19  **Swindle.  I can't remember the entire**
20  **conversation.  The things that do stand**
21  **out is she told me that he'd grabbed**
22  **her by the hair at one point and she**
23  **had asked him not to touch her hair.**

<center>11</center>

1  workplace --
2    A.    **No.**
3    Q.    -- prior to that time?
4        MR. BOSTICK:  Let her finish
5  her question before you answer.
6        THE WITNESS:  Okay.
7    Q.    Okay.  And Michelle Nelson,
8  what position was she in at the time?
9    A.    **Administrative assistant.**
10    Q.    Did the two of you work
11  together?
12    A.    **Yes, ma'am.**
13    Q.    How so?
14    A.    **We -- she gives me information**
15  **for my job.  And I also furnish her**
16  **information for her job, so we work**
17  **closely on the job.**
18    Q.    By telephone or your offices
19  are side by side?
20    A.    **No, ma'am.  My office is**
21  **downstairs, hers is upstairs so --**
22    Q.    You're just communicating by
23  e-mail?

<center>10</center>

1  Then she had -- told me a comment that
2  he had made, which this is what she
3  told me, that he would eat her raw.
4  And she told me that a stamping team
5  member had walked by and overheard
6  something between her and Mike, and she
7  was worried that her husband was going
8  to find out about it, and she was
9  scared.
10    Q.    Anything else?
11    A.    **I can't recall everything said**
12  **because it's been a long time.  That is**
13  **all I do know for certain.**
14    Q.    What did you say during this
15  conversation?
16    A.    **I let Tammy know that she**
17  **could go and talk to team relations and**
18  **that if someone was harassing her or**
19  **bothering her on her job, that was what**
20  **she needed to do was talk to team**
21  **relations.**
22    Q.    What did she say?
23    A.    **I can't remember.**

<center>12</center>

1    Q.   Generally, you don't recall?

2    A.   I know one of her concerns was
3    about having to talk to a male about
4    it, but we had a female team relations
5    at the time, so that's what -- Stacye
6    Jones, so I told her, you know, she
7    wouldn't have to talk to a man, she
8    could talk to a woman.

9    Q.   Did she tell you why she was
10   uncomfortable talking to a man?

11   A.   No.

12   Q.   Okay.  Anything else you said
13   other than talk to team relations?

14   A.   Not that I can remember.

15   Q.   Okay.  Do you recall Ms.
16   Nelson saying anything during this
17   conversation?

18   A.   I'm sure Michelle was saying
19   stuff, but I can't remember what it
20   was.  I mean, it's been a long time.

21   Q.   What happened after this
22   conversation?

23   A.   I went back downstairs to the

13

1    tool room and went back to work.

2    Q.   And did you have any other
3    conversations with Ms. Edwards about
4    Mike Swindle?

5    A.   I'm sure that Tammy came in
6    and talked to me at other times, but I
7    cannot recall what was said or not
8    said.

9    Q.   Okay.  Did you have any
10   conversations with Ms. Nelson about the
11   situation?

12   A.   No.

13   Q.   Did you go and talk to team
14   relations?

15   A.   Only when they called me in
16   and they asked me questions.

17   Q.   All right.  What was asked and
18   said during that meeting?

19   A.   I really can't remember.  I
20   mean, they asked about the -- what, you
21   know, Tammy had told me, and if I had
22   ever seen or heard anything between
23   Mike and Tammy, and I can't remember

14

1    everything they asked.

2    Q.   Have you ever heard Swindle
3    use profanity in the workplace?

4    A.   Yes.

5    Q.   What have you heard?

6    A.   Just normal curse words when,
7    you know --

8    Q.   Is there such thing as normal
9    curse words?

10   A.   I don't know.  I mean, I have
11   heard him use the F word, I've heard
12   him say "damn" and you know, stuff like
13   that, because we did work together
14   before I went to the tool room.

15   Q.   Okay.  Did you find his
16   language offensive?

17   A.   No, ma'am.

18   Q.   Has he ever told offensive
19   jokes to you or sexually explicit jokes
20   to you?

21   A.   No, ma'am.

22   Q.   Has he ever asked about your
23   sex life?

15

1    A.   No.

2    Q.   Has he ever commented
3    graphically about women?

4    A.   Yes.

5    Q.   Such as, can you give me an
6    example?

7    A.   Just somebody being hot or
8    their ass being hot, not specifically
9    to somebody but, you know, if someone
10   walked by.

11   Q.   Has he ever talked about his
12   own personal sex life with you?

13   A.   No.

14   Q.   Has he ever told you or shared
15   with you people he's dated or wants to
16   date in the workplace?

17   A.   Yes.

18   Q.   What has he told you?

19   A.   The only comment was when we
20   were talking about a job that was
21   coming open, and he said he would not
22   sign up for it because he didn't want
23   to mess up what he had going on that

16

shift.

Q.   And did you ask him to explain?

A.   I did ask him what he was talking about, and he said a girl's name.

Q.   Was that Jennifer?

A.   Uh-huh.

Q.   Is that "yes"?

A.   Yes, I'm sorry.  But other than that, there was nothing else said.

Q.   Okay.  Had you ever observed Mr. Swindle and Ms. Foster together?

A.   No, but I work opposite shift than them.  I had worked some on the same shift, but I'm very secluded on my job.

Q.   But you knew what he was talking about when he said he didn't want to mess up what he had on that shift?

MR. BOSTICK:  Object to the form.

17

A.   He said Jennifer.

Q.   Okay.

A.   But that's all I knew.

Q.   Had you heard rumors about he and Ms. Foster?

A.   No, ma'am.

Q.   Anything else he's discussed about his own personal sex life?

A.   No, ma'am.

Q.   Did he mention anything in graphic terms with regards to Jennifer Foster?

A.   No, ma'am.

Q.   Has ever discussed at that time or since Tammy Edwards with you?

A.   No, ma'am.

Q.   Had you seen things in the past that you felt he should have been written up for or investigated?

MR. BOSTICK:  Object to the form.

A.   I don't -- I don't know any.

Q.   Did you ever discuss any of

18

that with Tammy Edwards, that you had seen things that he should have been written up for and had not been?

A.   I don't recall.

Q.   Did you ever make the comment that he had gotten away with a lot of stuff because he was good at his job?

A.   Not that I remember.

Q.   Have you heard him say things out of the way to Ms. Edwards?

A.   No, ma'am.

Q.   Do you recall having a conversation with Ms. Edwards where she said Mr. Swindle said it was okay to sleep around, that everyone does it?

A.   I don't recall that.

Q.   Okay.  Do you still work around Mr. Swindle?

A.   No, ma'am.  We're on opposite shifts.

Q.   Do you encounter him at all?

A.   No, ma'am.

Q.   When you found out that Ms.

19

Edwards had been moved from the CCR position to the BC-1 line, what was your response?

MR. BOSTICK:  Object to the form.

A.   I didn't have a response.

Q.   You didn't talk to her at all about it?

A.   Tammy talked to me about people mistreating her on the BC line when she went there, I remember that conversation with her.

Q.   Well, were you surprised when she was moved from CCR to the BC1 line?

MR. BOSTICK:  Object to the form.

A.   No.

Q.   You didn't ask her, who did this to you?

A.   Not that I remember.

Q.   Okay.  Did you make a comment to her that she needed to get a lawyer?

A.   Not that I remember.

20

1    Q.   Okay.  What did she tell you
2  about people mistreating her on the
3  line?
4       A.   That black girls on the line
5  were ignoring her or not -- if she
6  asked a question, wouldn't answer, that
7  she was being mistreated.
8       Q.   Did she say anything else?
9       A.   That's all I recall --
10       Q.   When did you have --
11       A.   -- of the conversation.
12       Q.   I'm sorry, I didn't mean to
13  interrupt.  When did you have that
14  conversation with her?
15       A.   It was after she went to the
16  BC line, but I'm not sure the time
17  frame.
18       Q.   Did you know she had a neck
19  injury?
20       A.   Yes, ma'am.
21       Q.   Okay.  How did you know that?
22       A.   She had told me that she was
23  involved in a wreck when she was in

21

1    Q.   Do you know who Amber Kelley
2  is?
3       A.   I know who Amber is, but she's
4  also on the opposite shift from me.  I
5  haven't spoken with her.
6       Q.   Did you ever observe Ms.
7  Edwards doing anything inappropriate in
8  the workplace?
9       A.   No, ma'am.
10       Q.   Or talking inappropriate?
11       A.   No, ma'am.
12       Q.   Have you ever heard her curse
13  or talk dirty?
14       A.   No, ma'am.
15       Q.   You didn't see Mr. Swindle
16  pull Ms. Edwards' hair?
17       A.   No, ma'am.
18       Q.   And when you and Ms. Nelson
19  are talking with her, this was in a
20  room there in the office?
21       A.   Conference room.
22       Q.   Conference room.  How long did
23  that meeting take place?

23

1  training, but she didn't want to miss
2  out on the Hyundai job, so she, you
3  know, went ahead and went to the
4  training.
5       Q.   Did you ever see her in the
6  workplace with a neck brace on?
7       A.   I cannot remember.
8       Q.   Did you ever tell Ms. Edwards
9  that she was being retaliated against
10  and so were you?
11            MR. BOSTICK:  Object to the
12  form.
13       A.   No, ma'am.
14       Q.   Okay.  Did you tell her
15  anything about that Swindle was not
16  even talking to you anymore and the
17  rest of the employees were acting funny
18  towards you?
19       A.   I don't remember a
20  conversation with Tammy about that.
21       Q.   Have you had any conversations
22  with Amber Kelley about Ms. Edwards?
23       A.   No, ma'am.

22

1       A.   I can't remember.
2       Q.   Was it longer than 30 minutes
3  or less than 30 minutes?
4       A.   I really can't remember.
5       Q.   Did you or Ms. Nelson tell
6  Ms. Edwards that she had to go to team
7  relations and report Mr. Swindle?
8       A.   No, ma'am.
9       Q.   When you say she was upset,
10  can you tell me -- well, describe her
11  demeanor.
12       A.   She was crying.
13       Q.   Did she tell you what had made
14  her start crying?
15       A.   I don't remember.
16       Q.   Do you recall anything about a
17  poem that had been sent to her?
18       A.   A poem?  No, ma'am.
19       Q.   Do you know Stephanie Samuels?
20       A.   Yes, ma'am.
21       Q.   Did you know Ms. Samuels had
22  complained about Mr. Swindle?
23       A.   No, ma'am.

24

1    Q.    This is the first you've heard
2  about it?
3    A.    **Yes, ma'am.**
4    Q.    Have you ever heard of anyone
5  else complaining about Mr. Swindle?
6    A.    **No, ma'am.**
7    Q.    Have you ever had any
8  complaints about him?
9    A.    **No, ma'am.**
10    Q.    How about Ms. Nelson, did she
11  share with you or in that conversation
12  her personal experience with Mr.
13  Swindle?
14    A.    **No, ma'am.**
15    Q.    Do you know if she's ever been
16  touched or talked to inappropriately by
17  Mr. Swindle?
18    A.    **No, ma'am.**
19    Q.    Ms. Nelson?
20    A.    **No, ma'am.**
21    Q.    Has anyone else talked to you
22  about how Swindle has treated them in
23  the workplace?

<center>25</center>

1    A.    **No, ma'am.**
2    Q.    And you don't recall you or
3  Ms. Nelson telling Ms. Edwards if she
4  did not go to team relations, you
5  would?
6    A.    **No, ma'am.**
7    Q.    Did you ever tell Ms. Edwards
8  that Swindle had done you the same way
9  but that you had cut up with him back,
10  so you couldn't turn him in?
11    A.    **No, ma'am.**
12    Q.    Would that be true, that the
13  two of you have cut up together, you
14  and Mr. Swindle?
15    A.    **Yes, ma'am.**
16    Q.    To what degree?
17    A.    **Joking, just normal cutting
18  up, nothing sexual, no.**
19    Q.    Did any of his joking ever
20  offend you, but you just laughed it
21  off?
22    A.    **No, ma'am.**
23    Q.    You've never been offended by

<center>26</center>

1  his actions?
2    A.    **No, ma'am.**
3    Q.    Have you ever seen him grab
4  his genitals through his clothing?
5    A.    **No, ma'am.**
6    Q.    Have you ever seen him hump a
7  fence --
8    A.    **No, ma'am.**
9    Q.    -- simulating a sexual act?
10    A.    **No, ma'am.**
11    Q.    Have you ever worked on the
12  BC1 line?
13    A.    **Yes, ma'am.**
14    Q.    Okay.  For what period of
15  time?
16    A.    **I had to fill in when someone
17  was not there, and I would come in --
18  would be asked to come in early, 30
19  minutes early to help with
20  pre-production, and that was a period
21  for probably four or five months.**
22    Q.    What job did you do?
23    A.    **Putting on bolts into the door**

<center>27</center>

1  hinges.
2    Q.    What was the heaviest thing
3  you had to lift?
4    A.    **The gun, which weighs six
5  pounds.**
6    Q.    Did you see the job that Ms.
7  Edwards was doing when she was on the
8  BC1 line?
9    A.    **I can't remember what she was
10  doing.**
11    Q.    It had to do with knocking
12  weld burrs off with a file and using a
13  hammer to bend a curve in the metal on
14  the doors.
15    A.    **No, ma'am.**
16    Q.    You didn't see her doing that
17  job?
18    A.    **No, ma'am.**
19    Q.    Do you have any knowledge of
20  that job?
21    A.    **Yes, ma'am.**
22    Q.    Have you done that job before?
23    A.    **No, ma'am.**

<center>28</center>

**29**

1  Q.  Who have you seen do that job?

2  A.  **I couldn't tell you names, but**

3  **I mean, I go on the line, so I see all**

4  **the jobs.  I know what you're talking**

5  **about, but I couldn't tell you any**

6  **names of anybody that has done it.**

7  Q.  What is entailed in that job

8  that you've seen?

9  A.  **You take a file and run it**

10  **around the door frame, and then if**

11  **there's anything there that doesn't**

12  **come up, you have to hit it with a file**

13  **to get it out.**

14  Q.  Have you seen them use a

15  hammer, a metal hammer on that?

16  A.  **Most of time they just do the**

17  **file and a DA sander.**

18  Q.  What is a DA sander?

19  A.  **It's a tool, it's a gun, an**

20  **air -- held in your palm and it sands,**

21  **and you run it around the door frame.**

22  Q.  Okay.

23  A.  **Weighs about two pounds.**

**30**

1  Q.  Okay.  Did you see anyone

2  using a rubber mallet or a hammer on

3  that job?

4  A.  **No, ma'am.**

5  Q.  Would you rather work on the

6  BC1 line or the tool room?

7  A.  **The tool room.**

8  Q.  And the reason?

9  A.  **I like the job in the tool**

10  **room.**

11  Q.  Why?

12  A.  **It has a lot of -- it's**

13  **different every day, it's not the same,**

14  **a lot of different things go on, and I**

15  **like that.**

16  Q.  Anything else?

17  A.  **No.**

18  Q.  Is it more physically

19  demanding on the line?

20  A.  **No.  I do a lot of heavy**

21  **lifting, moving, stacking stuff on**

22  **shelves, so no, ma'am, it's not.**

23  Q.  Is the line timed?

**31**

1  A.  **Uh-huh.**

2  Q.  Is that a "yes"?

3  A.  **Yes, ma'am.  I'm sorry.**

4  Q.  The tool room job wouldn't

5  have the pressure of being timed, would

6  it?

7  A.  **No, ma'am.**

8  Q.  Okay.  And would the same be

9  true with the CCR job, that it's not a

10  timed job?

11  A.  **Yes, ma'am.**

12  Q.  Like the line is?

13  A.  **Yes, ma'am.**

14  Q.  Do you have an opinion whether

15  the CCR job is more physically

16  demanding than the BC1 line?

17  A.  **No, ma'am.**

18  Q.  You don't have an opinion?

19  A.  **I don't have an opinion.**

20  Q.  You've never had to do that

21  job?

22  A.  **Right.**

23  Q.  When you were talking to

**32**

1  Ms. Edwards when Ms. Nelson called you

2  up, did you have any doubt that Ms.

3  Edwards was being truthful about what

4  had happened to her?

5  A.  **No, ma'am.**

6  Q.  Was it your opinion she was

7  being truthful?

8  A.  **Yes, ma'am.**

9  Q.  Has that opinion changed?

10  A.  **No, ma'am.**

11  Q.  Do you recall anything else

12  she said other than he -- Mr. Swindle

13  had told her he would eat her raw and

14  had grabbed her by the hair?

15  A.  **No, ma'am.**

16  Q.  There was more that she said,

17  you just can't remember?

18  A.  **Yes, ma'am, I just don't**

19  **remember.**

20  Q.  Okay.  Was it pretty graphic

21  what she was telling you that he had

22  said or done to her?

23  A.  **I don't remember.**

1    Q.   Did you make any notes?
2    A.   **No, ma'am.**
3    Q.   What did you hear was the
4    reason Ms. Edwards was no longer in the
5    workplace?
6         MR. BOSTICK:  Object to the
7    form.
8    A.   **I don't understand what you're**
9    **asking.**
10   Q.   How did you learn she was no
11   longer there?
12   A.   **I don't know how I learned**
13   **because I believe I was off on leave**
14   **when -- but I don't remember.  I don't**
15   **know.**
16   Q.   You think you weren't working
17   when she went out?
18   A.   **I'm not sure.  I don't**
19   **remember.  I don't remember when she**
20   **went out.**
21   Q.   Have you heard why she's not
22   been returned to work after being
23   released by her doctor to return to

33

1    work?
2    A.   **No, ma'am.**
3         MR. BOSTICK:  Object to the
4    form.
5    A.   **No, ma'am.**
6    Q.   Have you ever known team
7    members to be accommodated by any --
8    because of any injury they've had with
9    regards to a job or a position?
10   A.   **No, ma'am.**
11   Q.   When you were out on leave,
12   was that -- and I hate to be personal,
13   but were you returned to the same job?
14   Was that a medical leave?
15   A.   **Yes, ma'am.**
16   Q.   And I'm not going to get
17   personal, I'm just trying to see if you
18   were returned to the same type job, and
19   I don't want you telling me anything
20   about your medical leave, let's just
21   get that if it was a medical leave.
22   Let's do it this way.  Have you known
23   anyone to be injured as a result of not

34

1    a job injury, and that was
2    accommodated?
3    A.   **No, ma'am.**
4    Q.   Have you ever known anyone to
5    be hired that had a disability?
6    A.   **No, ma'am.**
7    Q.   Okay.  Are there jobs there
8    that what you would call light-duty
9    jobs?
10   A.   **Not to my knowledge.**
11   Q.   Like in your job, what is the
12   heaviest you pick up?
13   A.   **Probably 45-pound boxes.**
14   Q.   Okay.  What is the lightest, a
15   piece of paper?
16   A.   **Uh-huh.**
17   Q.   Is that "yes"?
18   A.   **Yes, ma'am.**
19   Q.   Are there jobs on the line
20   like that as well?
21   A.   **I don't understand.**
22   Q.   What is the lightest job
23   you've done on the line?

35

1    A.   **Me personally?**
2    Q.   Yes, ma'am.
3    A.   **I would have to say on the BC**
4    **line.**
5    Q.   Have you ever done fenders?
6    A.   **Yes, ma'am.**
7    Q.   Is that --
8    A.   **That's part of BC line.**
9    Q.   Oh, it is?
10   A.   **Yes, ma'am.**
11   Q.   Were you aware that Ms.
12   Edwards did the fender job before she
13   was moved to the CCR job?
14   A.   **No, ma'am.**
15   Q.   But you've done fenders?
16   A.   **Yes, ma'am.**
17   Q.   Is that a lighter job?
18        MR. BOSTICK:  Object to the
19   form.
20   A.   **Than?**
21   Q.   I don't know, working in the
22   tool room?
23   A.   **I don't know.**

36

1    Q.    What part do you do in the
2    tool room?
3    A.    **I do everything the tool room.**
4    Q.    I'm sorry, I misstated.  What
5    job did you do in the fenders?
6    A.    **I ran the fender jigs.**
7    Q.    Can you be a little more
8    explicit?  I did go and look at that
9    job yesterday, but I didn't see it
10   running.
11   A.    **Okay.  I loaded the parts into**
12   **the jig that the robot welds on.**
13   Q.    Okay.  Is that like a three-
14   step process?
15   A.    **I don't -- I don't understand**
16   **what you're asking.**
17   Q.    To load the robot, tell me the
18   process.
19   A.    **You pick up a fender, lay it**
20   **in the jig, you pick up two parts, put**
21   **them in the jig, hit a button and it**
22   **closes, and then it welds.**
23   Q.    Is that timed?
                        37

1    A.    **Yes, ma'am.**
2    Q.    Forty-seven seconds?
3    A.    **I think so.  I haven't worked**
4    **on the line in a long time.**
5    Q.    Okay.  How about moving parts,
6    did you ever work in moving parts?
7    A.    **Yes, ma'am.**
8    Q.    Is that a less strenuous job
9    than BC1?
10   A.    **I don't know.**
11   Q.    And why couldn't you -- it's
12   not timed, is it, moving parts?
13   A.    **Yes, ma'am.**
14   Q.    Every 47 seconds?
15   A.    **Yes, ma'am.**
16   Q.    So you're telling me all jobs
17   out there are timed every 47 seconds?
18        MR. BOSTICK:  Object to the
19   form.
20   A.    **I don't understand.**
21   Q.    Are there any jobs that are
22   not timed every 47 seconds?
23   A.    **I don't understand what you**
                        38

1    see mean by timed every 47 seconds.
2    Q.    That the line is moving or --
3    A.    **Okay.  The moving line does**
4    **not actually move, but the jigs and the**
5    **robots move every time a job is done,**
6    **so I'm assuming it's 47 seconds, but I**
7    **may not know.**
8         MS. HAYNES:  All right.  Let
9    me look at my notes, and I'm almost
10   through.
11        (Off-the-record discussion.)
12        (Recess.)
13   Q.    (BY MS. HAYNES) All right.
14   Just a couple to clean up.  Since Ms.
15   Edwards has been gone from Hyundai,
16   have you ever called her at home?
17   A.    **No, ma'am.**
18   Q.    Has she called you?
19   A.    **Yes, ma'am.**
20   Q.    Have y'all talked on the
21   telephone?
22   A.    **Yes, ma'am.**
23   Q.    Have you ever -- well, tell me
                        39

1    about that conversation.
2    A.    **I can't tell you anything**
3    **about it.  I don't remember, but I do**
4    **know Tammy has called me I think twice.**
5    Q.    Did y'all talk on both
6    occasions?
7    A.    **Yes, ma'am.**
8    Q.    Were the conversations
9    friendly?
10   A.    **Yes, ma'am.**
11   Q.    Okay.  And you don't recall
12   anything that was said in those
13   conversations?
14   A.    **I recall Tammy asking me if I**
15   **would talk to her lawyer, and I told**
16   **her if her lawyer called me, I would**
17   **talk to I said him -- her, but I do**
18   **remember that.  Other than that, I**
19   **don't remember anything.**
20   Q.    Okay.  And we've never talked?
21   A.    **No, ma'am.**
22   Q.    Okay.  Did you ever apologize
23   to Tammy for telling her to turn
                        40

1  Swindle in?

2      A.  **Not that I recall.**

3      Q.  Okay.  Did you ever tell her,

4  I'm sorry I ever told you to turn him

5  in because of how they've done you now?

6      A.  **Not that I recall.**

7      Q.  Okay.  You don't recall

8  anything like that?

9      A.  **No, ma'am.  It's been a long**

10  **time.**

11      Q.  Were you upset about how Ms.

12  Edwards was done after she turned Mr.

13  Swindle in?

14          MR. BOSTICK:  Object to the

15  form.

16      A.  **I don't know.  I don't --**

17      Q.  You don't know?

18      A.  **Uh-uh, no, ma'am.**

19          MS. HAYNES:  Okay.  That's all

20  I have.

21          THE WITNESS:  Okay.

22      THUS CONCLUDED THE DEPOSITION OF

23              KIMBERLY ABRAMS

41

1          C E R T I F I C A T E

2  STATE OF ALABAMA    )

3  JEFFERSON COUNTY    )

4      I hereby certify that the above

5  and foregoing proceeding was taken down

6  by me by stenographic means, and that

7  the questions and answers therein were

8  produced in transcript form by computer

9  aid under my supervision, and that the

10  foregoing represents, to the best of my

11  ability, a true and correct transcript

12  of the proceedings occurring on said

13  date at said time.

14      I further certify that I am

15  neither of counsel nor of kin to the

16  parties to the action; nor am I in

17  anywise interested in the result of

18  said cause.

19

20      _____

21          SALLIE NESMITH GUNTER

22      CERTIFIED COURT REPORTER

23          ACCR LICENSE #37

42

1  IN THE UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF ALABAMA

3  NORTHERN DIVISION

4

5  TAMMY EDWARDS,

6      Plaintiff,

7  vs.

8  HYUNDAI MOTOR MANUFACTURING ALABAMA,

9  LLC, and MIKE SWINDLE, individually,

10      Defendants.

11

12  CIVIL ACTION NUMBER:  2:07-cv-908-MHT

13

14

15      DEPOSITION:  MICHELLE NELSON

16

17

18      S T I P U L A T I O N S

19      IT IS STIPULATED AND AGREED by

20  and between the parties through their

21  respective counsel that the deposition

22  of MICHELLE NELSON may be taken on July

23  17, 2008, before Sallie NeSmith Gunter,

1

1  Certified Court Reporter of the State

2  of Alabama, ACCR License Number 37,

3  Commissioner and Notary Public, at the

4  Wingate Inn, 2060 Eastern Boulevard,

5  Montgomery, Alabama.

6      IT IS FURTHER STIPULATED AND

7  AGREED that it shall not be necessary

8  for any objections to be made by

9  counsel to any questions except as to

10  form or leading questions, and that

11  counsel for the parties may make

12  objections and assign grounds at the

13  time of trial or at the time said

14  deposition is offered in evidence or

15  prior thereto.

16

17

18

19

20

21

22

23

2

1      APPEARANCES

2  Appearing for the Plaintiff :

3      HAYNES & HAYNES, P.C.

4      By:  Alicia K. Haynes, Esq.

5      1600 Woodmere Drive

6      Birmingham, Alabama  35226

7  Appearing for the Defendant  Hyundai

8  Motor Manufacturing Alabama, LLC :

9      OGLETREE, DEAKINS, NASH, SMOAK

10      & STEWART, P.C.

11      By:  Brian R. Bostick, Esq.

12      One Federal Place

13      Suite 1000

14      Birmingham, Alabama  35203

15      - and -

16      By:  Christopher N. Smith, Esq.

17      Corporate Legal Counsel

18      Hyundai Motor Manufacturing

19      Alabama, LLC

20      700 Hyundai Boulevard

21      Montgomery, Alabama  36105

22

23

3

1  Appearing for the Defendant Michael

2  Wayne SWINDLE :

3      CONSTANGY, BROOKS & SMITH, LLC

4      By:  J. Tobias Dykes, Esq.

5      One Federal Place

6      Suite 900

7      Birmingham, Alabama  35203

8  Certified Court Reporter:

9  Sallie NeSmith Gunter

10  Also Present:  Tammy Edwards

11

12

13

14

15

16

17

18

19

20

21

22

23

4

**Page 5**

I N D E X

Examination by Ms. Haynes.............7
Examination by Mr. Bostick..........

**Page 6**

1  I, Sallie NeSmith Gunter, a
2  Certified Court Reporter of the State
3  of Alabama, ACCR License Number 37,
4  acting as Commissioner, certify that on
5  this date there came before me at the
6  Wingate Inn, 2060 Eastern Boulevard,
7  Montgomery, Alabama, on July 17, 2008,
8  beginning at or about 3:39 p.m.,
9  MICHELLE NELSON, witness in the above
10  cause, for oral examination, whereupon,
11  the following proceedings were had:
12      THE COURT REPORTER: Usual
13  stipulations again, except you want the
14  witness to read and sign?
15      MR. BOSTICK: Yeah, that's
16  fine.
17      MS. HAYNES: That's fine.
18      THE COURT REPORTER: All
19  right. Would you raise your right
20  hand, please, ma'am, to be sworn?

**Page 7**

1  MICHELLE NELSON,
2  being first duly sworn, was examined
3  and testified as follows:
4  EXAMINATION BY MS. HAYNES:
5      Q. All right. Ms. Nelson, would
6  you state your full name for the
7  record, please, and your address?
8      A. Michelle Nelson, ████████
9  ██████, Montgomery, Alabama, 36107.
10      Q. Harmon Way?
11      A. Street.
12      Q. Street?
13      A. Uh-huh.
14      Q. What is your current position
15  with Hyundai?
16      A. I'm a tech support in the
17  welding department.
18      Q. What do you do?
19      A. I -- everything. I run the
20  department. I -- let's see. I do
21  payroll, I pay our bills, I order
22  things for our department, and that's
23  the main responsibilities. I won't go

**Page 8**

1  into all the little things that my
2  college degree may not be any use for.
3      Q. Who do you report to?
4      A. To Harry White.
5      Q. And how long have you reported
6  to Mr. White?
7      A. Two years.
8      Q. Prior to Mr. White, who did
9  you report to?
10      A. Rob Katzenbach.
11      Q. And have you always been in
12  tech support in the welding department?
13      A. Yeah. I began as
14  administrative assistant, but my
15  position was reclassified to a tech
16  support.
17      Q. When was it reclassified?
18      A. I believe approximately a year
19  and a half ago.
20      Q. But the duties did not change?
21      A. No, the duties did not change.
22      Q. Do you have an office?
23      A. No, I have a cubicle. It's

1  lovely.
2      Q.    Where is your cubicle?
3      A.    It's located -- it's the
4  second one as you enter in the door to
5  the left.
6      Q.    On the front row?
7      A.    Uh-huh.
8      Q.    Okay.  Who are your cube
9  mates?
10      A.    Who are they now?
11      Q.    Yes.
12      A.    In front of me is a team
13  relations, one of our representatives
14  who is now on night shift, Marty Blame.
15  To the left of him is Nabela Modad, who
16  is another team relations
17  representative.  They're very new to
18  our department, pretty new.  To the
19  left of me is Michael O'Keefe, who is
20  assistant manager in welding, and then
21  to -- behind me is Billy Kitchens, who
22  is a group leader.
23      Q.    Okay.  Have you always been

                        9

1  located --
2      A.    Yes.
3      Q.    -- in the same --
4      A.    No, not always.  We rearranged
5  our office I believe the Christmas
6  before last shutdown, and so I was on
7  the other side of the room, on the last
8  row, second cubicle on the left.
9      Q.    In 2006, you were on the last
10  row coming in the door?
11      A.    That's correct.
12      Q.    From that cubicle, could you
13  see the CCR room?
14      A.    Yes, I could see it.
15      Q.    Okay.  Did you know Ms.
16  Edwards prior to her being moved to the
17  CCR position?
18      A.    Not really.
19      Q.    Had not worked with her in any
20  capacity?
21      A.    No.
22      Q.    How would you describe the --
23  your interaction once she was a CCR?

                        10

1      A.    I would say we would talk in
2  passing, hi, how are you, kind of
3  thing.  I knew her a little bit.  I
4  knew that she was a mom, and I don't
5  know, just kind of, you know -- I
6  wouldn't say -- well, almost
7  acquaintance-level relations, yeah,
8  colleague relations, yeah.
9      Q.    Did you ever have occasion to
10  review any of her work?
11      A.    No.
12      Q.    Any of the reports?
13      A.    No.
14      Q.    Ever have anyone complain to
15  you about the reports?
16      A.    No.
17      Q.    Ever have anyone brag to you
18  about her reports?
19      A.    No.
20      Q.    Anyone ever express any
21  deficiencies about Ms. Edwards' work or
22  work product?
23      A.    No, I don't recall any.

                        11

1      Q.    Okay.  Did you ever work with
2  Mr. Bondy?
3      A.    Yes.
4      Q.    What is your interaction with
5  Mr. Bondy?
6      A.    He is a manager in our
7  department on the production side.
8  Really my interaction with him is very,
9  very little.  He's within the office
10  area, but as far as I don't answer to
11  him or anything like that.  I -- my --
12  I fall under the processing side, which
13  includes engineers and people that are
14  indirect.  He's a production, which is
15  direct.
16      Q.    Okay.  When did you learn that
17  Ms. Edwards was having issues in the
18  workplace?
19      A.    The day I sent her an e-mail.
20      Q.    Okay.  And what e-mail did you
21  send her?
22      A.    It was an e-mail about I
23  had -- she was on the list with some

                        12

1  other women that I assume it was a
2  chick thing, and it was about loving
3  yourself and being a strong woman and,
4  you know, knowing who you are kind of
5  thing, you know, just self-love kind of
6  thing, encouragement, and so, you know,
7  I had sent that out.
8     Q.  And what happened?
9     A.  She came up to me and thanked
10  me for sending it to her, and then she
11  burst into tears. And I asked -- I
12  said, that's okay, I'm glad to send it
13  to you, I'm glad you liked it. And --
14  but when she started crying, I was
15  like, are you okay? And she said,
16  yeah, I'm okay. And then I looked at
17  her, and said -- I mean, this is not
18  just something that happens in the
19  office. I said, are you sure you're
20  okay? And she's like no.
21      And we were in the middle of
22  this huge area, and so I said, why
23  don't we go into that room over there,

13

1  why don't we come into this room? So
2  we went into what was then a little
3  Korean engineer room, and that's when
4  she told me that she had been -- had
5  been sexually harassed by Mike Swindle.
6     Q.  What did she say?
7     A.  We sat down, and she was
8  crying and she found it hard to get the
9  words out, but she said that she --
10  that Mike had been saying things to her
11  and touching her inappropriately, and
12  you know, she was obviously really
13  upset by it and that someone had
14  seen -- a friend of her husband's had
15  seen them when Mike was touching her,
16  and she was afraid of what her husband
17  might do if he found out.
18     Q.  Did she tell you if he had
19  even told her husband?
20     A.  No, she hadn't told her
21  husband, she said she hadn't.
22     Q.  She didn't say anything about
23  that my husband says I've got to turn

14

1  him in or --
2     A.  No, uh-uh.
3     Q.  That wasn't said?
4     A.  No.
5     Q.  All right. What else
6  happened?
7     A.  I am not accustomed to this
8  type of environment, production. My
9  background is white collar, so I didn't
10  feel -- I mean, sometimes a corporation
11  can present an avenue, but in reality,
12  you don't know if that's a good avenue
13  to follow. Okay. So I felt -- I knew
14  that we had team relations reps, and I
15  said, you know, maybe you ought to talk
16  to a team relations representative,
17  because we have a woman who you could
18  talk to, and if you're not comfortable
19  talking to a man, you can talk to
20  Stacye, who was our representative at
21  the time. And you know, she's like, I
22  don't know, I don't know if that will
23  get me in trouble, you know.

15

1      And I said, well, you know,
2  why don't we call Kim in and get Kim's
3  opinion on it? She's been in
4  production for a long time, and you
5  know, she knows this world more than I
6  do, a lot better than I do. And you
7  know, Kim is -- I have a lot of respect
8  for her, she's a very down-to-earth
9  woman. And you know, I knew that
10  whatever we talked about would be
11  confidential and that she could trust
12  her, you know. And so she said, okay,
13  let's -- you know, let's get Kim.
14      So Kim came up, and she was
15  talking -- you know, we talked more
16  about what was going on, what had been
17  going on. So we both recommended that
18  she go to team relations. Kim felt
19  like it was a good choice.
20     Q.  Why is that?
21     A.  Because she obviously felt she
22  was being harassed, and that's an
23  avenue that we know from -- we're told

16

1  in orientation we have.

2  Q.  Did Ms. Edwards say anything

3  about Mr. Swindle said that he would

4  not get in trouble because he knew Tom

5  Bondy?

6  A.  **Yes.**

7  Q.  What did she say about that?

8  A.  **That was about it.**

9  Q.  Did she say anything about --

10  A.  **She said that they wouldn't**

11  **believe her.  If it was his word versus**

12  **her word, he would win.**

13  Q.  And she shared that with you?

14  A.  **Uh-huh.**

15  Q.  Is that a "yes"?

16  A.  **Yes, she did.  I'm sorry, yes,**

17  **she did.**

18  Q.  Okay.  Anything else you

19  recall that she shared with you about

20  why she was hesitant to go to team

21  relations?

22  A.  **No.**

23  Q.  Did she tell you she had

17

1  complained to anyone else?

2  A.  **No.**

3  Q.  Did she mention that she had

4  told Billy Kitchens?

5  A.  **No.**

6  Q.  Okay.  Had you observed Mr.

7  Swindle acting inappropriate or

8  speaking inappropriate --

9  A.  **No.**

10  Q.  -- yourself?

11  A.  **No.**

12  Q.  Had you ever had any other

13  people complain to you?

14  A.  **No.**

15  Q.  Heard any complaints in the

16  workplace --

17  A.  **No.**

18  Q.  -- about Swindle?

19  A.  **Uh-uh.  I'm pretty remote, you**

20  **know, I'm up in the office that's**

21  **literally upstairs from the floor, so**

22  **no.**

23  Q.  Okay.  Did either you or Ms.

18

1  Abrams make the comment that if Ms.

2  Edwards didn't go to team relations,

3  you would go to team relations on her

4  behalf?

5  A.  **No.**

6  Q.  Did you offer to go with her

7  to team relations?

8  A.  **I don't recall if we did or**

9  **not.  I don't know.  No, because I**

10  **remember the day after she went or**

11  **maybe the day of that she did talk to**

12  **Stacye, she told me then that she had.**

13  **I mean, I was so sensitive to the**

14  **fact -- that's why I asked her before I**

15  **even brought Kim up, because this is**

16  **extremely personal, and so I didn't --**

17  **I was very -- you know, very sensitive**

18  **to what was going on.**

19  Q.  Okay.

20  A.  **And wanted her to stay in**

21  **control of it, you know.**

22  Q.  Did Ms. Edwards share with you

23  that she was afraid she would lose her

19

1  job?

2  A.  **Yes.**

3  Q.  What did she tell you about

4  that?

5  A.  **That she was afraid because of**

6  **her relationship -- I mean, the**

7  **relationship of Mr. Bondy and Mike,**

8  **that she might, you know -- well, I**

9  **don't know if it was that she would**

10  **lose her job, just afraid of what might**

11  **happen.  I don't believe there was any**

12  **mention of I'm afraid I'll lose my job.**

13  **It was more of I'm just afraid in**

14  **general, you know.**

15  Q.  Okay.

16  A.  **The big concern for me that**

17  **day seemed to be she was afraid of what**

18  **her husband would think.**

19  Q.  What did you tell her about

20  that?

21  A.  **I couldn't tell her anything.**

22  **I don't know her husband.**

23  Q.  Did either you or Ms. Abrams

20

1   tell her to go home and tell her
2   husband about what was going on?
3       A.   Uh-uh.
4           MR. BOSTICK:  Say "yes" or
5   "no," please.
6       A.   Oh, I'm sorry, no.
7       Q.   Do you recall any of the
8   graphic details she was sharing with
9   you about what Swindle had done to her?
10      A.   Unfortunately, yes.
11      Q.   What do you recall?
12      A.   The one that stands out in my
13  mind the most is that she said that he
14  asked her if -- this is kind of
15  embarrassing -- he asked her if she and
16  her husband had oral sex, and she said,
17  Mike, you're not supposed to ask me
18  that.  And he said -- he said, well, I
19  would eat you out so good that you
20  would never go back to your husband.
21      Q.   Okay.  Anything else you
22  recall?  And apologize if I'm
23  embarrassing you.

                    21

1       A.   No, that's pretty much it.
2   That's what I recall.
3       Q.   All right.  Any touching that
4   she related to you?
5       A.   Uh-huh, yeah.
6       Q.   What?
7       A.   Just that he had touched her,
8   yeah.  We didn't go into graphic
9   detail, but that he was touching her.
10      Q.   Did you have any doubt in your
11  mind that she was not telling the
12  truth --
13          MR. BOSTICK:  Object to the
14  form.
15      Q.   -- when she told you?
16      A.   I don't think I had an opinion
17  about it.  I didn't have enough
18  information, you know.  My concern was
19  more for her to access what was
20  available at work if this, you know,
21  was happening.
22      Q.   Did you ever have an opinion
23  whether or not she was telling you the

                    22

1   truth?
2       A.   I don't have any personal
3   knowledge of the situation.
4       Q.   Did she ever tell you in that
5   conversation that she just wanted to be
6   moved, that she did not want to turn
7   him in?
8       A.   I don't recall that being
9   said.
10      Q.   That she'd rather just
11  transfer and not get him in trouble?
12      A.   I don't recall that being
13  said.
14      Q.   Okay.  What happened after
15  that?
16      A.   After where?
17      Q.   After this conversation, what
18  is your next conversation with anyone
19  about the matter?
20      A.   I don't know that there was a
21  conversation.
22      Q.   Another conversation or you
23  don't count this as a conversation?

                    23

1       A.   No, with her.
2       Q.   Yes.
3       A.   That was definitely a
4   conversation, yes.
5       Q.   Okay.  Did she come to you or
6   you go to her after this?
7       A.   She told me after she had
8   talked to Stacye that she had talked to
9   Stacye, and she was glad she talked to
10  Stacye.
11      Q.   Okay.  And did you hear from
12  Ms. Edwards any more after that about
13  the situation?
14      A.   Yes.
15      Q.   When?
16      A.   I don't know, I mean,
17  afterwards.  I don't know.
18      Q.   Okay.  What did she tell you
19  the next time you talked?
20      A.   You know, it's been two years,
21  I don't remember, to be honest you.
22  The once incident in the beginning
23  stands out in my mind very clearly, but

                    24

1 other conversations not so much.

2     Q.  Okay.  Do you recall having a

3 meeting with team relations?

4     A.  **Yes.**

5     Q.  Okay.  And what took place in

6 that conversation?

7     A.  **Very little, because I have**

8 **hearsay.  You know, I mean, I talked**

9 **with -- told them what Tammy talked**

10 **with me about.  That was it.**

11     Q.  Did they ask you any

12 questions?

13     A.  **Not really, except I think**

14 **maybe if I had ever seen anything.  I**

15 **don't know.  It's been a long time**

16 **again, it's been quite a while.**

17     Q.  Eight and 9, do you recall if

18 that -- it starts on page 8 and goes to

19 9.  Does that --

20     A.  **I'm just 8.**

21     Q.  You're just 8.

22     A.  **I said, "No."**

23     Q.  I'm sorry, I was getting you

            25

---

1 confused with Ms. Abrams there.

2     A.  **That's okay.**

3     Q.  You're just 8?

4     A.  **Uh-huh.**

5     Q.  Okay.

6     A.  **And that sounds about right.**

7     Q.  You just said, "No"?

8     A.  **Yeah.**

9     Q.  You didn't tell them what

10 all --

11     A.  **All I said was I have hear --**

12 **I mean, I remember clearly saying**

13 **anything I have is hearsay, I haven't**

14 **seen anything.**

15     Q.  And that was it?

16     A.  **Uh-huh.**

17     Q.  You didn't tell Stacye what

18 Ms. Edwards had told you?

19     A.  **No, uh-uh.**

20     Q.  And she didn't ask?

21     A.  **No.**

22     Q.  Did she say why she was

23 reading the whole thing about an

            26

---

1 investigation is confidential?

2     MR. BOSTICK:  Object to the

3 form.

4     Q.  Do you see where it said,

5 "Impeding an investigation by sharing

6 confidential information can lead to

7 corrective action"?

8     A.  **Uh-huh.**

9     Q.  Did she read you that or say

10 that to you?

11     A.  **I think she said that.**

12     Q.  Did she tell you what she was

13 investigating?

14     A.  **I don't remember.  I believe**

15 **so.**

16     Q.  You were never asked about why

17 or when Ms. Edwards came to your office

18 or how any of this started?

19     A.  **No.**

20     Q.  Did you say -- well, let me

21 see.  But you do remember saying

22 everything you knew was hearsay?

23     A.  **Yes, ma'am.**

            27

---

1     Q.  She didn't ask you to sign a

2 statement or a form?

3     A.  **No.**

4     Q.  So I guess your meeting with

5 team relations was pretty short, huh?

6     A.  **Very short.**

7     Q.  And that was the extent of it?

8     A.  **Uh-huh.**

9     Q.  In and out?

10     A.  **Exactly, yes.**

11     Q.  Did you ever have any

12 conversation with Swindle after Ms.

13 Edwards talked to you?

14     A.  **No.**

15     Q.  Did you have a conversation

16 with anyone after that, other than

17 Ms. Edwards, in team relations?

18     MR. BOSTICK:  Object to the

19 form.

20     A.  **I don't recall.**

21     Q.  How about Tom Bondy?

22     A.  **Kim at the time was there.**

23     Q.  Did you have conversation with

            28

1  Tom Bondy?

2      A.  Yes.

3      Q.  Tell me about that

4  conversation.

5      A.  **Let me think.  I think I just**

6  **told him that he needed to talk to**

7  **Tammy.**

8      Q.  You told --

9      A.  **Tom Bondy.**

10     Q.  -- Mr. Bondy?

11     A.  **Uh-huh.**

12     Q.  Did you tell him Ms. Edwards

13  was upset?

14     A.  **Yeah, uh-huh.**

15     Q.  Did you know what she was

16  upset about?

17     A.  **No.**

18     Q.  You just went to him and said

19  that Ms. Edwards is upset or Tammy is

20  upset, you need to talk to her?

21     A.  **Yeah.  He's very protective of**

22  **his team members, and to see her so**

23  **upset, it was upsetting for me, and**

29

1  **he -- you know, I've seen him go to bat**

2  **for team members, so I knew that if**

3  **something was going on, he'd go to bat.**

4      Q.  And did you relay that to

5  Ms. Edwards?

6      A.  **Uh-huh.**

7      Q.  Is that a "yes"?

8      A.  **Yes, it is.  That's a yes.**

9      Q.  Did Ms. Edwards talk with you

10  after she had been to see Mr. Bondy?

11     A.  **I don't remember.**

12     Q.  Did you ever make a comment to

13  her that Mr. Swindle was just a bad

14  influence?

15     A.  **I don't remember saying that.**

16     Q.  Did you tell her anything

17  about him having a reputation there at

18  the plant?

19     A.  **I can't remember if I said**

20  **that or not.**

21     Q.  Did the two of you ever

22  discuss that it was a difficult

23  situation to --

30

1      A.  Yes.

2      Q.  -- complain in?

3      A.  Uh-huh.

4      MR. BOSTICK:  Let her finish

5  her question.

6      A.  Go ahead.

7      Q.  What was that conversation

8  about?

9      A.  **We've talked about it's**

10  **difficult for any woman to make a**

11  **complaint because, you know, it's a**

12  **man's world.**

13     Q.  Did you discuss that some of

14  the manage -- other management acted

15  just like Swindle did?

16     MR. BOSTICK:  Object to the

17  form.

18     A.  **I don't think so.  I don't --**

19     Q.  Do you recall making any kind

20  of comment about there wasn't a whole

21  lot you could do with it -- do about

22  it, that it was kind of sad?

23     MR. BOSTICK:  Object to the

31

1  form.

2      Q.  Do you recall anything like

3  that?

4      A.  **I don't remember that.  That's**

5  **not my -- I don't think that's in my**

6  **character.  I don't know.  I don't**

7  **remember that, saying that.**

8      Q.  Did you learn that Ms. Edwards

9  was moved to the line after she

10  complained?

11     A.  **That she was moved to the**

12  **line?**

13     Q.  BC1 line?

14     A.  **I'm sorry, would you repeat**

15  **that question?**

16     Q.  Yeah.  Did you learn that Ms.

17  Edwards was moved from her CCR position

18  to the BC1 line?

19     A.  **I know that she was moved,**

20  **yes.**

21     Q.  How did you learn that she was

22  moved?

23     A.  **I'm sure somebody told me.  I**

32

1  don't know who.
2      Q.   Did you ever go see her on the
3  line?
4      A.   No.
5      Q.   Did you see her in the break
6  room or anywhere else and talk to her?
7      A.   No.  Again, I'm pretty remote.
8      Q.   Did you ever hear Ms. Abrams
9  say she was sorry for encouraging
10  Tammy to complain?
11      A.   No.
12      Q.   Did you hear anyone say that?
13      A.   No.
14      Q.   Did you know that Ms. Edwards
15  had a neck problem?
16      A.   Yes.
17      Q.   And how did you know that?
18      A.   She told me.
19      Q.   Had you ever seen her in the
20  bathroom having problems because of her
21  neck?
22      A.   I don't recall that.
23      Q.   Okay.  Had you ever heard Ms.

33

1  Edwards curse or talk ugly in the
2  workplace --
3      A.   Not that I recall.
4      Q.   -- other than what had been
5  related to her by Swindle?
6      A.   No.  Again, we didn't have a
7  lot of interaction.
8      Q.   Did you ever comment to Ms.
9  Edwards how good her reports were?
10      A.   No.  They didn't -- I didn't
11  see them.
12          MS. HAYNES:  I think that's
13  all I've got.  Thank you, Ms. Nelson.
14          THE WITNESS:  Thank you.
15      THUS CONCLUDED THE DEPOSITION OF
16              MICHELLE NELSON
17
18
19
20
21
22
23

34

1          C E R T I F I C A T E
2  STATE OF ALABAMA   )
3  JEFFERSON COUNTY   )
4      I hereby certify that the above
5  and foregoing proceeding was taken down
6  by me by stenographic means, and that
7  the questions and answers therein were
8  produced in transcript form by computer
9  aid under my supervision, and that the
10  foregoing represents, to the best of my
11  ability, a true and correct transcript
12  of the proceedings occurring on said
13  date at said time.
14      I further certify that I am
15  neither of counsel nor of kin to the
16  parties to the action; nor am I in
17  anywise interested in the result of
18  said cause.
19
20      _____
21          SALLIE NESMITH GUNTER
22      CERTIFIED COURT REPORTER
23          ACCR LICENSE #37

35