IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| **TAMMY EDWARDS,** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION NUMBER** |
| | **2:07-cv-908-MHT** |
| **HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC, and MIKE SWINDLE,** individually, | |
| **Defendants.** | |

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF
DEFENDANT HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC**

Timothy A. Palmer
J. Trent Scofield
Brian R. Bostick
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205)328-1900
Facsimile: (205)328-6000
brian.bostick@odnss.com

## TABLE OF CONTENTS

I.   INTRODUCTION AND ARGUMENT SUMMARY ...............................................1

II.  STATEMENT OF UNDISPUTED FACTS ........................................................5

    A.   Edwards' Employment with HMMA.............................................................5

    B.   Edwards Is Assigned to the CCR Position.....................................................7

    C.   Edwards Requests to be Moved to the Production Floor..............................9

    D.   Edwards Meets Co-Worker Mike Swindle ..................................................11

    E.   The Weld Shop Celebration for Producing 600 Automobiles ......................12

    F.   Edwards Supposed "Interrogation" by the Production Manager ..................12

    G.   Edwards Makes a Complaint of Harassment to Team Relations...................13

    H.   HMMA Immediately Investigates Edwards' Complaint ..............................14

    I.   HMMA Takes Prompt Remedial Measures and Disciplines Swindle...........23

    J.   Edwards Ignores HMMA's Request to Keep the Investigation Confidential

       and Impartial ...........................................................................................23

    K.   Edwards Did Not Complain About Team Leader Billy Kitchens ................24

    L.   Edwards Is Assigned to the BC1 Line .........................................................24

    M.   Edwards Goes on Medical Leave ................................................................26

    N.   Edwards' Short-Term Disability Benefits Expire.........................................28

    O.   Edwards' Long-Term Disability Benefits Claim is Denied..........................29

    P.   Edwards Is Considered to Have Resigned Her Employment After Not

       Promptly Returning to the Plaint When Her Approved Paid Leave Expired 29

    Q.   Edwards' Allegation of Slander by Swindle.................................................31

III. ARGUMENT.....................................................................................................32

i

A.    Edwards' Hostile Work Environment Claim Must Be Dismissed.................32

    1.    Conduct Not Directed at Edwards Because of Her Sex Is Not Counted ...........................................................................................32

    2.    The Alleged Harassment Was Not Sufficiently Severe or Pervasive to Create an Actionable "Hostile Work Environment".....................33

    3.    HMMA Is Not Liable for Any Alleged Harassment Because It Took Immediate and Appropriate Corrective Action ........................38

    4.    To the Extent Edwards Claims That Swindle Was a Supervisor, HMMA Still Prevails Under the <u>Faragher</u> Defense ..........................41

        a.    HMMA Exercised Reasonable Care to Prevent and Correct Promptly Any Harassing Behavior ........................................42

        b.    Edwards Unreasonably Failed to Take Advantage of HMMA's Preventative And Corrective Opportunities ..........44

B.    Edwards' FMLA Claim Must Fail.................................................................44

C.    The Evidentiary Framework for Plaintiff's Sex Discrimination and Retaliation Claims.......................................................................................46

D.    Edwards' Retaliation Claims Must Fail........................................................47

    1.    Edwards Cannot Prove Her Retaliatory Transfer Claim...................48

        a.    The Acceptance of Edwards' Request to Move to the Production Floor Is Not "Adverse".......................................48

        b.    The Reassignment Is Not a Materially Adverse Employment Action ..............................................................49

          c.     There Is No Causal Connection Between  Edwards' Complaint and Her Reassignment .........................................51

          d.     HMMA Has Legitimate, Non-Retaliatory Reasons for the Reassignment ........................................................53

      2.     Edwards Cannot Prove Her "Interrogation" Claim ..........................54

      3.     Edwards Cannot Prove Her Retaliatory Discharge Claim.................55

      4.     Edwards' Failure to Rehire Claim Also Must Fail ...........................58

   E.     Edwards' Sex Discrimination Claim Also Fails ............................................59

   F.     Edwards' Claim for Assault and Battery Must Fail.......................................61

   G.     Edwards' Claim for Slander Must Fail .........................................................62

   H.     HMMA Is Due Summary Judgment Upon Edwards' Outrage Claim ...........65

   I.     Even if Edwards Has Presented Evidence Establishing That Swindle Engaged in Conduct Amounting to the Torts of Outrage, Assault and Battery or Slander, She Has Failed to Establish That HMMA Is Liable for His Conduct .................................................................................................69

   J.     Edwards' Negligence Claim Fails as a Matter of Law ..................................72

      1.     Edwards' Negligent Supervision Claim Fails Because Edwards Has Failed to Prove the Occurrence of Any Underlying Tort ...........72

      2.     Edwards' Negligence Claim Also Fails on the Merits.......................73

IV.   CONCLUSION.......................................................................................................76

## I.     INTRODUCTION AND ARGUMENT SUMMARY

Plaintiff, Tammy Edwards, is a former employee of defendant Hyundai Motor Manufacturing Alabama, LLC ("HMMA").  She was hired in January of 2006 to work as a Team Member and was assigned to work in the Weld Shop.  She contends that she was sexually harassed by her co-worker – co-defendant – Mike Swindle from approximately March of 2006 until July of 2006.  Despite knowing that she could present any problems or concerns to HMMA's Team Relations Department or to HMMA management, Edwards waited until July 31, 2006 (almost four months from when the harassment allegedly began) to complain.   Nonetheless, HMMA immediately conducted an investigation, and took prompt corrective action. Edwards admits that she has not had any other complaints about Swindle since making her complaint.

Edwards was initially assigned to a Team Member position on the production floor, but moved to a Communication Control Room ("CCR") position in March of 2006, where she would report production line downtime issues on an Excel spreadsheet for management on a daily basis.  In June of 2006, Edwards requested to move out of the CCR position and back to the production floor.  HMMA soon thereafter began training another Team Member to perform the tasks of the CCR position.  Edwards was moved to the production floor in August of 2006 based upon her request and management's determination that her performance in the CCR position was substandard.

Edwards made her complaint of harassment against Mike Swindle on July 31, 2006.  HMMA conducted a thorough investigation and interviewed Edwards (twice), Swindle and co-workers to determine what allegations could be confirmed.  HMMA determined that Swindle had used profanity in the workplace and had engaged in

unprofessional and inappropriate behavior in violation of its Harassment Policy. Therefore, Swindle was transferred to another shift away from Edwards, was issued a serious misconduct letter (which prevents him from being eligible for promotion for two years) and was issued a two-week suspension without pay. Edwards admits that she never had any further issues with Swindle after making her complaint.

On August 16, 2006, Edwards reported to Team Relations that she felt nauseous and that she had taken a muscle relaxer prior to reporting for work. She was sent to the HMMA medical clinic. For the first time, she advised the medical staff that she was having problems with her neck (related to a car accident that she had away from work in January of 2006) and she was sent to her personal physician to determine what, if any, medical restrictions she had. Edwards did not return to the plant. Instead, she applied for and received paid medical leave.

Edwards was advised to report to the medical clinic with information on her medical condition when her approved leave expired. Edwards received short-term disability benefits until February of 2007, but continued on approved leave thereafter because she continued to seek long-term disability benefits. Edwards' approved leave expired when HMMA learned on June 8, 2007, that her application for long-term disability benefits was denied. Edwards failed to report to the medical clinic and failed to advise her supervisors of her status. Therefore, HMMA notified Edwards by letter dated July 11, 2007, that she was considered to have voluntarily resigned her employment by not taking the steps to contact either the medical clinic or her supervisors pursuant to HMMA's attendance and resignation policies.

Edwards alleges in her Complaint that she was sexually harassed by her co-worker, defendant Mike Swindle, and retaliated against in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").  She claims that she was retaliated against, because she was reassigned to another position within the Weld Shop, subjected to an "interrogation" by her managers during the sexual harassment investigation, and "was terminated and not rehired into her previous position or any position…."  (Complaint, ¶¶ 50-51).  She alleges that she was wrongfully denied FMLA leave, and that she was discharged because of her sex.  She  also asserts state law claims for negligent hiring, training, supervision and retention for the actions of Swindle.  Finally, she asserts claims for intentional infliction of emotional distress, assault and battery, and slander.[1]

All of Edwards' claims against HMMA must be dismissed.  The conduct about which she complains is not sufficiently severe or pervasive to constitute a hostile work environment claim. Further, it is undisputed that, although Edwards waited several months to make any report of misconduct by Swindle, once she did, HMMA immediately conducted an investigation and took prompt remedial measures by moving Swindle to an opposite shift and imposing severe disciplinary punishment against him.  Edwards admits that HMMA's actions remedied her complaint and that she has had no further problems with Swindle since the day she complained.

Edwards' FMLA claim against HMMA also must fail.  Edwards went out on medical leave in August of 2006, and had not worked the required one-year period to be eligible for FMLA leave at that time.  The determination of eligibility is made when the

---

[1] Edwards also asserts a state law claim for invasion of privacy, but only against Defendant Swindle. (Complaint, ¶¶ 67-70).

request for leave is made.  The mere fact that Edwards crossed the one-year threshold while out on leave does not mean that her leave was then covered by the FMLA.

Edwards now seeks to argue that it was retaliatory that she was moved from her CCR position to a position on the production floor, but she admits that she had told at least three of her supervisors that she wanted to be moved to a position back on the production floor several weeks <u>before</u> she made her complaint of harassment. Therefore, she cannot show a causal connection between the two actions.  Further, it is not an "adverse" employment action to transfer an employee pursuant to their request, and a move from one production Team Member position to another cannot be considered a "materially adverse" employment action as is required under Burlington Northern & Santa Fe R.R. v. White, 548 U.S. 53 (2006).  Finally, Edwards cannot dispute the reasons for the move:  (1) she had requested to move to the floor; and (2) her supervisors felt that her performance was lacking because her reports that she prepared in the CCR position were deficient in that they lacked sufficient detail.  Edwards' suggestion that she was subjected to an "interrogation" must fail because their conversation comes nowhere near approaching the materiality standard under Burlington Northern, and she cannot dispute the reasons for the meeting.

Edwards also cannot prove that she was discharged because of her sex or in retaliation for her harassment complaint.  She has failed to prove that she was treated differently than any male employees. She also has failed to prove a causal connection between her complaint and her discharge, which occurred almost a year later. It is undisputed that Edwards did not contact the medical clinic or her supervisors when her long-term disability application was denied.  Edwards had clearly been informed to report

4

to the medical clinic when a change in her leave circumstances had taken place. She obviously knew to do this when she reported to the medical clinic when her short-term disability benefits expired a few months earlier. Further, her claim that she was never rehired must fail because it is undisputed that she never applied for any positions with HMMA after her termination.

Edwards' state law claims against HMMA also fail on the merits. She has not proven that Swindle's actions constituted assault and battery, invasion of privacy, slander or outrage. Further, her state law claims against HMMA fail because there is no evidence that HMMA ratified or approved Swindle's actions. Finally, she has no evidence that HMMA was negligent in its handling of this situation. For all of these reasons, HMMA is entitled to judgment as a matter of law on all claims.

## II.    STATEMENT OF UNDISPUTED FACTS[2]

### A.    Edwards' Employment with HMMA

Edwards applied for employment at HMMA in October of 2005. (Edwards Depo., at 14:8-15:4, Ex. 1). In her application, Edwards requested a position in either production or maintenance. (Edwards Depo., at 29:4-17, Ex. 1). Edwards began her employment with HMMA on January 17, 2006. (Edwards Depo., at 28:2-4, Ex. 2). Immediately thereafter, Edwards attended a two-week orientation for newly-hired Team Members.[3] (Edwards Depo., at 37:2-38:22, Exs. 2-6). During orientation, HMMA's Team Relations Department discussed HMMA's Anti-Harassment Policy, and HMMA's Legal Department presented a two-hour presentation on HMMA's Anti-Harassment Policy.

---

[2] For purposes of this motion and brief only, HMMA accepts the facts viewed in the light most favorable to Edwards as required under Fed. R. Civ. P. 56.

[3] In keeping with its team concept, HMMA refers to hourly employees as "Team Members."

(Edwards Depo., at 38:1-12, Ex. 3). Edwards was absent the day of this presentation because she was sick from an allergic reaction. (Edwards Depo., at 39:18-40:19).

Nonetheless, as part of the orientation, Edwards received the HMMA Team Member handbook, which contains HMMA's Anti-Harassment Policy.[4] (Edwards Depo., at 40:20-41:9, Ex. 5). The Anti-Harassment Policy clearly prohibits sexual harassment, requires Team Members to report sexual harassment, and it sets forth alternative avenues of reporting harassment (*e.g.,* a Team Member may report alleged harassment to his/her Group Leader, Manager, Team Relations Representative, or Manager of the Team Relations Department). (Id.). Further, Edwards' sister (April Mimms), who also attended the new hire orientation, told Edwards about the sexual harassment training. (Edwards Depo., at 42:4-43:10). Edwards understood from orientation that she should report any problems or concerns she had in the workplace to Team Relations: "if you had a problem to go to them." (Edwards Depo., at 43:11-44:21). It is also undisputed that Mike Swindle, the alleged harasser, had been trained on HMMA's Anti-Harassment Policy. (Swindle Depo., at 69:23-70:21, 81:20-82:11).

Edwards also missed two days of the second week of new hire orientation due to a car accident. (Edwards Depo., at 48:16-49:5, Ex. 6). Edwards claims that she had neck pain from the accident, but did not report the injury to HMMA's medical clinic and did not have any medical restrictions imposed by her physician. (Edwards Depo., at 49:6-50:20, 52:23-54:4).

After new-hire orientation, HMMA assigned Edwards to a production job on the Moving Lines Team in the Weld Shop. (Edwards Depo., at 55:18-56:11, 58:19-59:15,

---

[4] HMMA policies are also available on the HMMA intranet. (Warner Depo., at 31:19-23, 85:12-86:11).

61:11-18). The Weld Shop consisted of Moving Lines, Body Build Line, Body Complete 1, and Body Complete 2. While on the Moving Lines Team, she initially assembled fenders (weighing approximately three pounds per fender) on the automobiles in the Weld Shop. (Edwards Depo., at 58:19-59:12). She does not contend that this job on the production floor bothered her neck. (Edwards Depo., at 48:9-13, 66:19-67:2).

Edwards reported to Group Leader Steve Culpepper throughout the time she worked at HMMA. (Edwards Depo., at 54:16-21). Group Leader is the position above Team Leader and is considered a supervisory position. (Culpepper Depo., at 16:8-16)(Jones Depo., at 48:21-25). Team Leaders are also assigned to the different lines. (Bondy Depo., at 122:12-17). A Team Leader is an hourly, non-exempt, non-management employee who provides general guidance to Team Members on his/her team. (Edwards Depo., at 65:2-15)(Jones Depo., at 49:7-11)(Bondy Depo., at 141:16-142:13)(Kitchens Depo., at 74:14-19). The Team Leader also collects timesheets from Team Members on his team. (Culpepper Depo., at 15:12-21). However, importantly, a Team Leader is not a "supervisor" and has no authority to promote, discipline or terminate Team Members. (Jones Depo., at 48:21-49:11)(Bondy Depo., at 141:5-142:13)(Culpepper Depo., at 15:12-21).

B.    **Edwards Is Assigned to the CCR Position**

In March of 2006, Edwards was reassigned to work as a CCR Operator in the Weld Shop. (Edwards Depo., at 68:2-4). Edwards was still classified as a "Team Member," and her hourly rate of pay, benefits, and opportunity for overtime remained the same. (Warner Depo., at 146:19-147:5, Ex. 44). Even though she conducted most of her work in the Weld Shop office, Edwards was re-classified as a member of the Body Build

Team A for employee roster (*i.e.* "head count") and budgetary purposes only. (Edwards Depo., at 62:5-7, 76:9-15)(Swindle Depo., at 236:5-238:10).

Assistant Manager Harry White and Group Leader Steve Culpepper made the decision to place Edwards in the CCR position. (Edwards Depo., at 68:5-72:4)(Culpepper Depo., at 38:20-39:1). Team Member Pam Stoddard was previously performing the CCR position prior to Edwards and was moved out of the position, according to Edwards, because she had performance problems. (Edwards Depo., at 72:5-73:4). Stoddard had been reassigned back into a position on the production floor. (Edwards Depo., at 74:6-20).

As an CCR Operator, Edwards was required to input information in a standard Excel spreadsheet template showing the causes of production down-time and the counter-measures to the causes of the down-time in the Weld Shop as reported by Team Members in the area where the issue occurred. (Edwards Depo., at 56:22-58:18, 77:13-78:5)(Culpepper Depo., at 50:12-51:2, 52:12-19). She would then provide this spreadsheet to management on a daily basis. (Id.). Edwards would often have to walk extensively through the plant to gather the information from Team Members on the production lines to be included in the report. (Edwards Depo., at 77:17-78:5).

Steve Culpepper, Harry White, and Tom Bondy all had issues with the lack of detail that Edwards provided on her downtime reports. (Culpepper Depo., at 40:20-44:12)(Bondy Depo., at 37:1-39:2). Specifically, Edwards often did not provide the details of the causes of the production down-time and the proposed counter-measures, which required Weld Shop management to frequently correct/complete these reports. (Culpepper Depo., at 48:19-51:2)(Bondy Depo., at 38:18-23)(Kelly Depo., at 79:20-23).

8

Culpepper testified that he would often have to stay late at the end of his shift to revise the reports before sending them out to management. (Culpepper Depo., at 42:11-44:15).

## C.    Edwards Requests to be Moved to the Production Floor

A few months after working as an CCR operator (approximately May or June of 2006), Edwards told Culpepper (her immediate supervisor), that she wanted him to reassign her back to a job on the production floor. (Edwards Depo., at 66:6-67:12, 87:5-23)(Culpepper Depo., at 113:16-114:5). Edwards also told White (Culpepper's immediate supervisor), that she wanted to move to a position on the production floor. (Edwards Depo., at 93:6-22). Edwards admits that she discussed with Culpepper and White that "I was going to go back to the floor" as early as May of 2006. (Edwards Depo., at 89:20-93:22)(Culpepper Depo., at 115:2-8); see also, Kelly Depo., at 50:4-12 ("[Edwards] had told [Kelly] that [Edwards] wanted to come down on the floor . . . it was much funner [sic], you know, working around Billy [Kitchens] and Mike [Swindle] . . . [Edwards] had told [Kelly] that [Edwards] was getting big . . . sitting up there at the CCR").

Edwards said that she did not like the CCR position because there was "so much commotion" in the position.  (Edwards Depo., at 89:3-13).  Further, she claimed that her neck was sometimes bothered in the CCR position and that a position on the production floor was better for her neck:  in a position on the floor "you could stand up the whole time, which was better than sitting down for me …" (Edwards Depo., at 66:10-67:8). Edwards admits that she had informed Culpepper that it bothered her neck in the CCR position when she had to sit for a long period of time at the computer. (Edwards Depo., at 76:2-77:12).

Edwards admits that prior to her sexual harassment complaint, she had also told Production Manager Tom Bondy that she wanted to return to the floor of the plant. (Edwards Depo., at 274:1-5)(Bondy Depo., at 77:20-78:6).  Edwards said she told Bondy that she was having difficulty putting correct information in reports based on what was being provided to her and that she would rather go to a position on the floor. (Edwards Depo., at 274:6-276:15).

In June 2006, after Edwards had made known this desire to move to the production floor, Harry White made the decision that Team Member Amber Kelly would be trained to work as CCR Operator.  (Edwards Depo., at 84:6-21)(Culpepper Depo., at 118:1-21)(Kelly Depo., at 56:20-23). Kelly had previously worked various jobs on the Body Complete 1A Team, including investigating and recording production down-time information for that Team. (Edwards Depo., at 86:4-17)(Kelly Depo., at 48:3-8).  Kelly started her training in June of 2006, two months <u>before</u> any complaint by Edwards. (Kelly Depo., at 56:22).  Kelly had been told by Culpepper <u>before</u> any complaint by Edwards that Edwards "didn't have enough detail in her report, and … that my report was better." (Kelly Depo., at 10:14-23).

Because of Edwards's performance problems as CCR Operator, Edwards's well-known desire to leave the CCR Operator job, and Kelly's ability to perform the CCR Operator position (and replace Edwards), Culpepper, White, and Bondy decided in early June 2006 to reassign Kelly as CCR Operator and to reassign Edwards to the production floor.  (Bondy Depo., at 77:15-77:6, 151:21-152:7)(Culpepper Depo., at 113:16-114:5, 115:2-116:4).  Edwards admits that she was aware that she was going to be working on the production floor <u>before</u> she made any complaint of harassment. (Edwards Depo., at

96:1-7). Edwards' personal preference was to have a "job share" arrangement where she and Amber Kelly would alternate weeks between the CCR position and Kelly's position on the floor. (Edwards Depo., at 84:22-85:20). There is no evidence that HMMA allows for any such "job share" arrangements. (Bondy Depo., at 129:20-130:3).

D.    **Edwards Meets Co-Worker Mike Swindle**

Shortly after being reassigned to CCR Operator, Edwards first met Mike Swindle, who was a Production Team Member on Body Build Team A. (Edwards Depo., at 100:4-12). On April 24, 2006, Swindle became a Team Leader on the Body Build Team A. (Swindle Depo., at 49:8-50:14, Ex. 1, #D-00463). As set forth previously, Team Leader is a non-supervisory position. Because Swindle worked on the floor and Edwards worked in the office in the Weld Shop, they had limited interaction. (Edwards Depo., at 107:22-108:14). However, Edwards would sometimes come to Swindle's line to determine downtime issues. (Id.). Edwards also would provide Swindle with her timesheets during the time she worked in the CCR position. (Edwards Depo., at 105:12-17). Edwards admits that it was a rare occasion when Swindle would come to the computer room where she worked to interact with her. (Edwards Depo., at 108:8-14).

Edwards considered Swindle to be a friend. (Edwards Depo., at 107:22-108:7). Edwards bought Swindle breakfast on numerous occasions, sent him a humorous e-mail, told him she wanted to see him race his motorcycle on the weekends, and she introduced her husband to him at a HMMA event for Team Member families. (Edwards Depo., at 104:1-105:5, 111:7-114:21, Ex. 8). Edwards claims she was trying to encourage Swindle to be a good father and husband. (Edwards Depo., at 124:9-125:10).

11

**E.    The Weld Shop Celebration for Producing 600 Automobiles**

On July 27, 2006, the Weld Shop celebrated its milestone achievement of producing 600 vehicle bodies in one shift. (Edwards Depo., at 116:12-117:7). Edwards says she patted Swindle on the shoulder as part of the celebration that day. (Edwards Depo., at 118:8-19). Edwards says that their shift was ending and another shift was entering the Weld Shop, a friend of her husband's, Roger Cleckler, was coming through the plant to start his shift. (Edwards Depo., at 119:9-120:8). Edwards says that Swindle started bumping his hip against her as they were walking. (Edwards Depo., at 119:21-120:8). Edwards asked Swindle to stop because Cleckler knows Edwards and he may think something is going on and because Cleckler was a church-going man. (Edwards Depo., at 120:9-14, 225:1-226:17). Edwards says she told Swindle not to do anything in front of Clecker because "I don't want him to think I approve of anything." (Edwards Depo., at 226:16-17). As Cleckler approached, Edwards claims Swindle said "I don't give a fuck who he is or where he goes." (Edwards Depo., at 120:15-20, 226:10-17).

**F.    Edwards Supposed "Interrogation" by the Production Manager**

Edwards spoke to two female co-workers (Michelle Nelson and Kimberly Abrams) before making her complaint to Stacye Jones. (Edwards Depo., at 137:13-142:13). Both encouraged Edwards to report the matter to the Team Relations Department. (Edwards Depo., at 140:10-141:10)(Nelson Depo., at 15:7-16:19)(Abrams Depo., at 11:7-12:21).[5] Later that day, Nelson told Bondy that Edwards was upset and

_____

[5] Team Relations works with Team Members with any employment issues they have, provides training to Team Members and new hires on policies and procedures, makes recommendations to management on corrective action, communicates with management on the application and interpretation of policies and procedures, and investigates claims of discrimination and harassment. (Jones Depo., at 24:7-27:11).

that he needed to speak to Edwards. (Nelson Depo., at 29:2-30:3)(Bondy Depo., at 87:23-88:19).   She did not tell Bondy why Edwards was upset. (Nelson Depo., at 29:12-30:3)(Bondy Depo., at 88:16-19).   Although Edwards now characterizes the meeting as an "interrogation," she testified merely that she told Bondy of Swindle's alleged conduct and Bondy responded that this behavior was unacceptable, called Swindle a "fool," and suggested that Swindle should be terminated.  (Edwards Depo., at 269:22-271:11).

**G.     Edwards Makes a Complaint of Harassment to Team Relations**

On July 31, 2006, Edwards sent an e-mail to Team Relations Representative Stacye Jones asking to speak with her.  (Edwards Depo., at 142:8-19, Ex. 10).   Edwards had previously gone to Team Relations (and Stacye Jones specifically) with work issues, but not to make any complaints of discrimination or harassment.   (Edwards Depo., at 45:19-47:8, 146:1-10).   Edwards considered Jones to be a friend and said that Jones had been helpful in all of their prior dealings. (Edwards Depo., at 143:7-20). Stacye Jones was the first person in HMMA Management or Team Relations that Edwards had spoken to about Swindle's alleged misconduct. (Edwards Depo., at 146:1-147:13).   There had been no prior complaints of harassing behavior against Swindle at HMMA. (Jones Depo., at 66:17-67:12).

Jones called Edwards in response to the e-mail and they met that afternoon. (Edwards Depo., at 142:14-23)(Jones Depo., at 61:8-62:17).   Edwards specifically complained that Swindle had made inappropriate comments and gestures to her at work. (Edwards Depo., at 143:1-20).  Jones told Edwards that she would speak to her manager in Team Relations and begin an investigation immediately.  (Edwards Depo., at 143:21-144:23). Jones told Edwards not to speak to anyone that day and that Jones would contact

her manager in Team Relations. (Edwards Depo., at 144:8-23). Edwards expressed concern about her husband finding out about the situation and Jones responded "your job as a wife is to go home and tell him and my job is to put a stop to it." (Edwards Depo., at 144:1-7).

Edwards was concerned that others might think she approved of Swindle's alleged behavior. (Edwards Depo., at 164:23-165:18). She told Jones that she was not trying to get Swindle in trouble, but "they wasn't going to label me as no slut or nothing else." (Edwards Depo., at 248:1-14). Edwards claims that the "final straw" that led to her complaint occurred the preceding Saturday because Swindle had told her that he was not going to stop and that there was nothing she could do about it and folded his arms.[6] (Edwards Depo., at 258:7-19). Other employees interviewed as part of the investigation informed Jones that Edwards had told them that she was making her complaint because she was concerned over her husband's friend (*i.e.,* Roger Cleckler) having witnessed the incident on July 27, 2006. (Jones Depo., at 130:16-133:10)(Abrams Depo., at 11:17-12:9)(Nelson Depo., at 14:6-17)(Bondy Depo., at 108:13-109:5).

## H.    HMMA Immediately Investigates Edwards' Complaint

Jones began the investigation the next day (August 1) and met with Edwards to obtain a full account of the alleged misconduct. (Edwards Depo., at 172:3-173:22, Ex. 11) (Jones Depo., at 123:13-124:1). Jones took detailed notes of what they discussed and Edwards was allowed to review the notes, revise them, and sign her name to them. (Edwards Depo., at 170:5-171:18, Ex. 11-13). Jones explained the protocol of the investigation to Edwards and instructed her to keep the matter confidential. (Edwards

---

[6] Swindle denies making any such comment. (Swindle Depo., at 196:9-22).

Depo., at 173:23-174:17). Jones told Edwards that she would conduct the investigation, interview witnesses, and then provide her report to her manager in Team Relations. (Edwards Depo., at 174:18-175:14).

As part of the investigation, the Team Relations Department interviewed nine Team Members, including Edwards (twice). (Jones Depo., at 77:14-79:23, Ex. 14). Edwards alleged that Swindle had committed the following inappropriate behavior:[7]

1.   Mike asked me if I had "been" with anybody else. Mike said I just had not been with the right one. If I had been with him, I wouldn't want to go back to my husband.

Edwards said that Swindle would discuss his marital problems with her and state that he did not understand how a man could sleep with just one person and that she should not believe her husband had done so either. (Edwards Depo., at 109:1-23). Swindle denied asking Edwards if she had been with anybody else; denied telling Edwards that she had not been with the right one; and denied telling Edwards that she would not want to go back to her husband if she had been with him. (Swindle Depo., at 192:16-23, 193:1-17)(Jones Depo., Ex. 17, #D-00715). Jones concluded that this allegation was partially confirmed. (Jones Depo., at 222:12-23, Ex. 16, #D-00681).

2.   Mike curses. Everything is "F" or MF."

Edwards claimed that there were several times that Swindle would use profanity, but that it was not sexual in nature. (Edwards Depo., at 167:18-169:11). Swindle admitted that he used profanity in the workplace, but says he has stopped doing so since Edwards made her complaint against him. (Swindle Depo., at 182:9-14; 193:18-

---

[7] The listing of the allegations investigated by Jones is included in her August 7, 2006, Team Relations Memorandum. (Jones Depo., Ex. 16).

194:1)(Jones Depo., Ex. 17, #D-00715).   Jones concluded that this accusation was confirmed. (Jones Depo., at 108:1-109:4, 222:12-23, Ex. 16, #D-00681).

      3.    The first thing I remember is him shaking himself at me.   He would grab his genitals or rub them up and down.  Mike would ask me if that turned me on. I would say no and tell him I wished he would stop.

Edwards said that the incidents where Swindle was grabbing himself took place within two weeks after she started working in the CCR position. (Edwards Depo., at 128:18-128:21, 195:5-13).  Edwards said that Swindle's shaking himself only lasted for a couple of weeks and then he stopped. (Edwards Depo., at 195:14-20).  Swindle denied making any such gestures and no witness confirmed Edwards' allegation.  (Swindle Depo., at 195:10-196:1-22)(Jones Depo., Ex. 17).  Edwards claimed that co-worker Toby Chance could confirm this allegation, but he did not.  (Jones Depo., at 146:6-12, Ex. 17, #D-00712-713).   Therefore, Jones could not confirm this allegation.  (Jones Depo., at 222:12-23, Ex. 16, #D-00681).

      4.    Mike said, "Don't you ever fucking dodge me again.  Matter of fact, you don't have to worry about me fucking speaking to you again."  You don't embarrass Mike, or you'll get blessed out.

Edwards claimed that she attempted to go on a separate route through the plant other than passing by Swindle's work area and that Swindle said "don't you ever f-ing dodge me again."  (Edwards Depo., at 129:6-23). Edwards said Swindle said: "if you don't want me to talk to you, that is fine, I won't never speak to you again."  (Edwards Depo., at 130:1-4).  Swindle claimed that he merely said he would not speak to her anymore if that was what she wanted.  (Jones Depo., Ex. 17, #D-00715)(Swindle Depo.,

at 275:20-276:23).  Jones concluded this allegation was only partially confirmed.  (Jones Depo., at 222:12-23, Ex. 16, #D-00681).

5.    Mike told me, "Don't fucking go to Billy anymore or anybody about our business." I asked Mike what he was talking about and told Mike I told Billy he (Mike) was a pervert.  Mike said Billy could go tell Harry (White), and he (Mike) could get in trouble.

Swindle denied making any such statement.  (Swindle Depo., at 199:17-21). Edwards said that she told Billy Kitchens that Swindle was a pervert and that "I'm just not used to stuff like that."  (Edwards Depo., at 130:18-131:9). Kitchens said Edwards complained only about his use of profanity, and that Kitchens had told Swindle to watch his mouth. (Kitchens Depo., at 34:22-35:2, 40:11-41:1). Jones could not confirm this allegation.  (Jones Depo., at 222:12-23, Ex. 16, #d-00681).

6.    Mike was talking about having sex with women and pulling their hair.  He said he made love to his wife, but he does the freaky stuff on the side.

Edwards claimed that she heard Swindle say that he runs around on the side to have his freaky sex, but makes love to his wife. (Edwards Depo., at 167:11-17, 195:21-23, Ex. 11, #D-00240).  Edwards said Pam Stoddard heard the conversation.  (Edwards Depo., at 196:1-3).  Stoddard denied hearing the conversation during the investigation. (Jones depo., Ex. 17, #D-00707-709). Swindle denied making this statement. (Swindle Depo., at 204:21-208:20). Swindle testified that he was in a group conversation with some co-workers and the co-workers were talking about a song "A lady in the street, but a freak in bed."  (Swindle Depo., at 205:4-208:20). Swindle denied making any comments about making love to his wife and doing freaky stuff on the side. (Swindle

17

Depo., at 204:21-205:3) (Jones Depo., Ex. 17, #D00715). Jones concluded that the allegation could only be partially confirmed. (Jones Depo., at 222:12-23, Ex. 16, #D-00682).

> 7.    Pam told me if I would act like it didn't bother me Mike would stop.

Pam Stoddard denied observing any inappropriate behavior by Swindle during the investigation. (Jones Depo., at Ex. 17, #D-00707-709). Jones could not confirm this allegation. (Jones Depo., at 222:12-23, Ex. 16, #D00682).

> 8.    Mike said he bet Ralph (my spouse) and I don't even have oral sex. Mike asked if I ever had a man's finger up my butt while having sex.  Pam said I didn't know what I was missing.  Mike said he'd lick my ass raw.

Edwards said this conversation took place at the end of the Body Build Line near the office. (Edwards Depo., at 198:23-199:5).  Edwards claimed that Pam Stoddard and Amber Kelly heard Swindle make the statement that "I would lick your ass raw." (Edwards Depo., at 198:5-22). Edwards also claimed on one occasion that Swindle asked if she had ever had a finger up her butt and Pam Stoddard said you don't know what you're missing. (Edwards Depo., at 210:13-21).  Swindle denied making any of these statements. (Swindle Depo., at 210:2-211:13). Stoddard and Kelly both denied hearing any of these comments during the investigation. (Kelly Depo., at 16:1-15, 75:10-76:9)(Jones Depo., Ex. 17, #D-00707-709).  Jones could not confirm this allegation. (Jones Depo., at 222:12-23, Ex. 16, #D-00682).

> 9.    Mike watches my crotch all the time.  One time, when Mike was looking at my crotch, I told him to stop.  Mike said there wasn't anything I could do to

make him stop. I told him I could slap the shit out of him. Mike said that just turned him on.

Edwards said that Amber Kelly witnessed this incident and told Swindle not to look at Edwards. (Edwards Depo., at 156:10-20). Kelly denied that Swindle was looking at Edwards and said that Swindle was staring Kelly in the face because they had previously clashed with each other. (Kelly Depo., at 15:7-23). Swindle denied looking at Edward's crotch; denied that Edwards said she could "slap the shit" out of him; and denied saying that turns him on. (Swindle Depo., at 211:8-212:12)(Jones Depo., Ex. 17, #D-00716. Jones concluded that this allegation was only partially confirmed. (Jones Depo., at 222:12-23, Ex. 16, #D-00682).

        10.    Sometimes Mike puts his hands behind his back and butts up against me.

Edwards said that Swindle would sometimes put his hands behind her back and bump up against her. (Edwards Depo., at 215:8-216:20). She testified that he hugged her approximately 7 or 8 times. (Edwards Depo., at 215:12-216:8). He never touched any private areas on her body. (Edwards Depo., at 216:9-13). Edwards testified that he pulled her ponytail on several occasions, but that it never bothered her neck or aggravated her condition. (Edwards Depo., at 216:14-20, 220:3-22). Swindle denied putting his hand behind his back and butting up against Edwards. (Swindle Depo., at 212:17-213:1)(Jones Depo., Ex. 17, #D-00715). Swindle also denied hugging Edwards. (Swindle Depo., at 123:19-23). Edwards admitted that Swindle was not trying to hurt her when he hugged her. (Edwards Depo., at 372:13-23). She admitted Swindle was not trying to hurt her when he was pulling her ponytail, but was just trying to get her attention. (Edwards

Depo., at 373:1-20). Jones could not confirm this allegation. (Jones Depo., at 222:12-23, Ex. 16, #D-00682).

      11.     Mike ran the outside of his hand along the outside of my pant leg.

Edwards said that she had a new pair of pants, and Swindle rubbed her leg with the outside of his hand on the side of her leg. (Edwards Depo., at 217:1-5, 372:7-23). Swindle denied touching Edwards and said that he commented to Edwards that her pants looked like blue jeans and that she was not supposed to wear jeans to work. (Swindle Depo., at 224:8-14). Then, Edwards asked if Swindle liked the pants, and he said that he would not let his wife wear them to work because they were too tight. (Swindle Depo., at 224:8-18). Jones could not confirm this incident. (Jones Depo., at 222:12-23, Ex. 16, #D-00682).

      12.     I asked Billy if he had a rough day, and Billy told me he didn't "get any last night." Mike said, "You know what's wrong (with Tammy)? She's never been fucked. Mike began to thrust his body in his chair while saying, "Fuck me you mother fucker – fuck me, Ralph, like Mike does."

Edwards claimed that Billy Kitchens witnessed this incident. (Edwards Depo., at 162:5-163:9, 227:3-228:7). Swindle denied that this incident occurred. (Swindle Depo., at 165:1-17). Kitchens said he remembered a conversation in which Swindle may have been saying something of a sexual nature, but could not remember specifics and did not see Swindle thrusting in the chair. (Jones Depo., Ex. 17, #D-00703, 718)(Kitchens Depo., at 102:11-15). Jones could only partially confirm this incident. (Jones Depo., at 222:12-23, Ex. 16, #D-00612-613).

13.    Every time I push Mike away, he thinks it turns me on and tells me it turns him on. He says his chest feels better than Ralph's chest.

Edwards claimed that Amber Kelly witnessed this incident.  Kelly told Jones of one incident in which Swindle tried to hug Edwards from the side and she pushed him away and Swindle said "when you resist me, it turns me on." (Kelly Depo., at 73:15, Ex. 3, at 7-8).  Swindle denied this statement. (Swindle Depo., at 233:1-8)(Jones Depo., Ex. 17, #D-00716).  Jones found this allegation partially confirmed.  (Jones Depo., at 222:12-23, Ex. 16, #D-00613).

14.    When I asked Mike what to "put down" for my time, Mike said, "Those pants."

Edwards said that she asked Swindle on one occasion what she should put down for her time on her time record and Swindle responded "those pants."  (Edwards Depo., at 230:22-231:9).  Swindle denied making this comment.  (Swindle Depo., at 233:9-15)(Jones Depo., Ex. 17, #D-00716).   Jones could not confirm this allegation. (Jones Depo., at 222:12-23, Ex. 16, #D-00683).

15.    Billy heard Mike say he was not a boob man, but he (Mike) was an ass man.  Mike told me I could leave my shirt on – he just wanted the bottom half.

Edwards said that Swindle said that he was a "not a boob man, but an ass man" on one occasion.  (Edwards Depo., at 233:4-20).  She said that Billy Kitchens would have heard that conversation. (Edwards Depo., at 233:21-234:2).  Swindle denied making the comment. (Swindle Depo., at 233:16-23).   Kitchens denied ever hearing the comment. (Jones Depo., Ex. 17, #D-00718)(Kitchens Depo., at 63:12-15). Jones concluded this allegation could not be confirmed.  (Jones Depo., at 222:12-23, Ex. 16, #D-00683).

16.    Pam encouraged Mike and even told him that "I would be ready by the time I went to night shift."

Edwards claimed that Pam Stoddard said something to the effect of we are going to teach you to like sex and have you ready by the night shift. (Edwards Depo., at 211:19-212:17).  Swindle and Stoddard both denied that this incident occurred.  (Swindle Depo., at 235:2-8)(Jones Depo., Ex. 17, #D-00708). Jones could not confirm this allegation. (Jones Depo., at 222:12-23, Ex. 16, #D-00683).

17.    Pam has held my arms back and told Mike to kiss me.

Both Swindle and Stoddard denied that this incident occurred. (Swindle Depo., at 239:4-13)(Jones Depo., Ex. 17, #D-00707-709).  Jones could not confirm this allegation. (Jones Depo., at 222:12-23, Ex. 16, #D-00683).

18.    Mike asked me if I fingered myself.

Edwards claimed that Swindle asked her if she had ever fingered herself and she said no and he said that his wife had said the same thing and that they both were liars. (Edwards Depo., at 234:8-19).  Swindle denied that this incident occurred. (Swindle Depo., at 239:11-13, Ex. 3)(Jones Depo., at Ex. 17, #D-00716).  Jones could not confirm this allegation. (Jones Depo., at 222:12-23, Ex. 16, #D-00683).

19.    Mike called me fucking Mother Teresa.

Swindle denied making this comment.  (Swindle Depo., at 239:14-19).  This allegation could not be confirmed by Jones. (Jones Depo., at 222:12-23, Ex. 16, #D-00683).

I.      **HMMA Takes Prompt Remedial Measures and Disciplines Swindle**

After completing the investigation, the Team Relations Department concluded that Swindle had used inappropriate language in front of Edwards. (Jones Depo., at 222:3-224:7).  Although many of the allegations could not be confirmed, Jones also concluded that Swindle engaged in inappropriate behavior in violation of HMMA's Harassment Policy, and recommended that disciplinary action be taken. (Jones Depo., at 222:12-223:8, Ex. 17, #D-00684).  HMMA suspended Swindle from work without pay (for two weeks) and reassigned Swindle to work on the second shift, which is the shift opposite of Edwards's shift, so as to prevent Edwards and Swindle from having to interact. (Edwards Depo., at 263:5-265:5) (Jones Depo., at 269:17-272:31)(Swindle Depo., Ex. 1, #D-00480).  Swindle also was issued a serious misconduct letter, which is placed in his personnel file and prevents him from seeking a promotion for two years. (Id.). Swindle was also required to write a commitment letter explaining what steps he would take to ensure these issues did not recur. (Id.).  Edwards admits that from the time she spoke to Stacye Jones on July 31, 2006, she never had any further interaction with Swindle and he has never engaged in any further inappropriate behavior. (Edwards Depo., at 266:1-17).

J.      **Edwards Ignores HMMA's Request to Keep the Investigation Confidential and Impartial**

Edwards acknowledges that she was instructed by Stacye Jones not to speak to any witnesses during the investigation, but instead of following this directive, she spoke to Billy Kitchens and Amber Kelly and secretly tape recorded conversations with both of them. (Edwards Depo., at 199:6-10, 200:23-202:8, 206:20-208:5). Edwards also secretly recorded her conversation with Jones. (Edwards Depo., at 209:15-210:4).  It is a violation

of HMMA policy to have any type of audio or video recorder in the plant. (Edwards Depo., Ex. 5, at 45-46). Edwards never informed Stacye Jones that she was recording conversations. (Edwards Depo., at 209:15-18). She never provided Jones or anyone at HMMA with a copy of the tapes as part of the investigation. (Edwards Depo., at 209:19-21). Edwards had not let anyone at HMMA know that she had recorded conversations with anyone prior to filing this lawsuit. (Edwards Depo., at 209:22-210:4).

**K.    Edwards Did Not Complain About Team Leader Billy Kitchens**

In her lawsuit, Edwards now claims that she was also harassed by Team Leader Billy Kitchens. (Complaint, ¶ 20). Edwards admits that she was not offended by Kitchens' alleged behavior. (Edwards Depo., at 148:2-150:3, 235:1-237:10, 247:4-248:14). During the investigation, Edwards told the Team Relations Department that Kitchens had been very helpful to her during the investigation. (Edwards Depo., at 244:19-245:20). Specifically, Edwards said "without us talking about [the details of the sexual harassment investigation], Billy [Kitchens] has helped me a lot. He told me I was doing the right thing." (Edwards Depo., at 245:11-247:23). Nonetheless, Edwards only complains about one action by Kitchens; Kitchens allegedly told Edwards that "my new job was going to be under his desk" and that Culpepper allegedly laughed and said "we can't really authorize that, Billy." (Edwards Depo., at 147:14-148:11). Kitchens and Culpepper both denied that this incident occurred. (Kitchens Depo., at 53:17-20)(Culpepper Depo., at 113:2-15).

**L.    Edwards Is Assigned to the BC1 Line**

Per Edwards' request to move back to the production floor, Edwards was reassigned to work on the Body Complete 1A Team on August 10, 2006. (Culpepper

Depo., at 113:16-114:5)(Bondy Depo., at 144:15-19)(Jones Depo., Ex. 19). On the Body Complete 1A Team, Edwards inspected vehicles to ensure that there were no gaps in the tail gates and she corrected gaps that she found by tapping the tail gates with a light hammer. (Edwards Depo., at 281:14-284:4). She estimates that the hammer weighed less than five pounds.  (Edwards Depo., at 284:16-23). Edwards also had a metal file that was a little bigger than her finger that she would run along the edges of the car to smooth off rough edges. (Edwards Depo., at 281:16-282:3).  Also, Edwards's job was considered an "easy job" and one of the least physically demanding jobs on the Body Complete 1A Team.  (Culpepper Depo., at 120:8)(Edwards Depo., at 285:13-286:20)(Kelly Depo., at 45:14-18)(Kitchens Depo., at 75-11).  Edwards claims that her work in this position caused an irritation of her neck. (Edwards Depo., at 284:5-23).[8]  However, Edwards had not previously provided any medical restriction regarding her condition to the medical clinic. (Edwards Depo., at 48:9-13, 52:23-53:16).

Edwards sent an e-mail to Stacye Jones making vague complaints about her assignment to the BC1 line on August 10, 2006.  (Edwards Depo., at 277:8-278:7, Ex. 14).  Jones looked into the move and determined that Edwards was legitimately moved to the production floor and that the steps had been in place to make such a move since Edwards made her request to move to the floor months before making her complaint against Swindle, which was consistent with her prior observation that Kelly was being

---

[8] Edwards completed a form on August 18, 2006, again stating that her primary discomfort with her neck was sitting for long periods of time. (Edwards Depo., at 304:12-305:23, Ex. 16).  She also stated on the form that standing for long periods or walking for long periods were not problems for her condition at that time. (Edwards Depo., at 305). This was consistent with her conversations with her Group Leader that a position on the floor would be better for her neck than the CCR job.  (Edwards Depo., at 66:10-67:8).

trained well in advance of Edwards' complaint. (Jones Depo., at 173:18-175:13, 196:3-199:3).

**M.    Edwards Goes on Medical Leave**

After working on the Body Complete 1A Team for just three days, Edwards told the Team Relations Department on August 16, 2008, that she was experiencing nausea because she had taken Flexeril, a prescription muscle relaxer prior to starting her shift. (Edwards Depo., at 290:19-293:17). Consequently, the Team Relations Department requested that Edwards immediately go to HMMA's on-site medical clinic.[9] (Edwards Depo., at 293:1-5).

Edwards reported to HMMA's on-site medical clinic for the first time that she had suffered injuries from an automobile accident in January 2006 and that her physician had been encouraging her to stop working so that her neck would completely heal. (Edwards Depo., at 295:6-296:6). In response, the on-site medical facility told Edwards that she could not work while taking muscle relaxers and that she should obtain a statement from her personal physician with a description of her medical restrictions. (Edwards Depo., at 97:4-99:12, 295:18-296:6, 299:11-300:20, Ex. 15).

On August 17, 2006, Edwards applied for short-term disability benefits through Standard Insurance Company ("The Standard"), HMMA's short-term disability carrier. (Edwards Depo., at 300:7-301:10, Ex. 15, Doc. Bates no. D-01792). The Standard granted her short-term disability leave and made arrangements to pay her sixty-six percent (66%) of her income. (Edwards Depo., at 303:21-304:11). Edwards did not

---

[9] For safety considerations, HMMA requires that Team Members taking any prescription medications that could cause impairment to report such use to HMMA's on-site medical clinic. (Edwards Depo., Ex. 5, at 39).

request FMLA leave on the leave of absence application that she completed. (Edwards Depo., at  301:5-302:5, Ex. 15, #D-01792).  Edwards was advised on the form that to request FMLA leave "a Team Member must have worked for HMMA for 12 months or 52 weeks (need not have been consecutive) and 1250 hours in order to qualify to take family or medical leave." (Edwards Depo., at 301:21:302:18, Ex. 15, #D01795). Edwards was not eligible for FMLA leave because she had only worked for HMMA for seven months.  (Edwards Depo., Ex. 17, #D-00113).

Edwards was clearly instructed that she should report back to the medical clinic when she was released by her doctor or when her approved leave expired. (Edwards Depo., at 300:3-301:4, Ex. 15, #D-01791).  Edwards was also advised in the paperwork that "if a HMMA [Team Member] is out of work for more than four days with a personal injury or illness, they must receive a fit for duty evaluation at the HMMA medical clinic before returning to work."   (Edwards Depo., at 306:1-307:4, Ex. 15, #D-01794). Edwards understood that as long as she was receiving short-term disability benefits or was applying for long-term disability benefits, she would be considered on an approved leave. (Edwards Depo., at 303:4-7).

By letter dated August 19, 2006, Edwards was provided with correspondence relating to her short-term disability benefits. (Edwards Depo., at 306:1-307:4, Ex. 17). Edwards was specifically informed in the correspondence as follows:

> After being out of work for personal injury/illness, you must make an appointment with the medical center for a fit-for-duty evaluation before you can return.  **This exam must be conducted the day you are to return to work, prior to your shift starting.  Contact the medical center at (334) 387-8240.**  In order to return to work, the medical center requests a doctor's statement from your treating physician stating the following information:
>
> Specific dates of illness/injury

27

Detailed diagnosis of illness/injury

A medical release with the return to work date

Details of any related restrictions and/or medications.

(Edwards Depo., at 306:16-307:4, Ex. 17). Edwards admits that she had been verbally given the same instructions by the medical center as well. (Edwards Depo., at 307:2-4).

On September 26, 2006, approximately one month after going on her medical leave, Edwards filed a Charge of Discrimination with the EEOC, asserting claims of sexual harassment and retaliation. (Swindle Depo., Ex. 6)

**N.    Edwards' Short-Term Disability Benefits Expire**

Edwards was notified by The Standard that her short-term disability benefits would expire on February 11, 2007. (Edwards Depo., at 311:15-23). Although Edwards' short-term disability benefits expired, her short-term disability benefits application had been converted to an application for long-term disability benefits at the time. (Edwards Depo., at 309:7-310:4, Ex. 19). Edwards returned to the plant on February 12, 2007, but did not have any information from her physician about her medical condition or her restrictions. (Edwards Depo., at 311:15-312:3). Edwards was instructed to return to the medical clinic the next day with the necessary paperwork from her physician. (Edwards Depo., at 312:4-7).

When Edwards returned the next day to HMMA's medical clinic, she reported with medical restrictions of no prolonged standing, or sitting, and no lifting. (Edwards Depo., at 311:15-313:1, Ex. 19) (Culpepper Depo., at 142:16-19). The medical clinic advised that she would continue on her medical leave because there were no available jobs that she could perform with her medical restrictions. (Edwards Depo., at 312:12-

313:1) (Culpepper Depo., at 142:20-143:22). Edwards never returned to the plant after February 13, 2007. (Edwards Depo., at 313:2-13).

**O.    Edwards' Long-Term Disability Benefits Claim is Denied**

While Edwards was on medical leave, the Standard was attempting to investigate whether long-term disability benefits were available or whether Edwards' injury resulted from a pre-existing condition. (Edwards Depo., at 313:17-314:2, Ex. 20). On December 14, 2006, the Standard requested information from Edwards to investigate the claim, but as of April 30, 2007, Edwards still had not provided the requested information. (Edwards Depo., at 314:5-316:3, Ex. 20-21).

Edwards was notified by letter dated June 14, 2007, that her application for long-term disability benefits was denied.  (Edwards Depo., at 325:10-15, Ex. 23). Edwards was verbally informed of the decision by The Standard on June 11, 2007. (Edwards Depo., at 332:10-19, Ex. 28, #D-01311).  Edwards did not return to the plant after receiving the denial letter. (Edwards Depo., at 324:13:325:11). She did not report to the medical clinic as she had been instructed both in writing and orally to do. (Edwards Depo., at 325:8-326:10, Ex. 24).  Further, she never contacted Steve Culpepper, Harry White or any other manager in her line of supervision after the Standard had denied her long-term disability application.  (Edwards Depo., at 323:1-324:8).

**P.    Edwards Is Considered to Have Resigned Her Employment After Not Promptly Returning to the Plaint When Her Approved Paid Leave Expired**

When the Standard denied Edwards' long-term disability application, she was no longer on an approved leave. (Warner Depo., at 68:19-69:10).  HMMA's Attendance Policy provides:

> A Team Member that does not communicate to his/her group leader and/or manager regarding his/her absence for a period of three (3) consecutive days or longer is considered to have voluntarily resigned his/her employment at HMMA.

(Warner Depo., at 68:19-69:10, Ex. 33, at 9)(Edwards Depo., Ex. 5, at 9).[10] It is undisputed that Wendy Warner, the Manager of HMMA's Employment Department, made the decision that Edwards had voluntarily resigned her employment at HMMA. (Warner Depo., at 72:15-17, Ex. 35). Warner had no knowledge that Edwards had filed a sexual harassment complaint against Swindle or an EEOC charge against HMMA. (Warner Depo., at 100:18-101:11).

Warner notified Edwards by letter dated July 11, 2007, that she was considered to have voluntarily resigned her employment according to the HMMA Attendance Policy and Resignation Policy because she had not reported back to the HMMA medical clinic and had not had contact with her group leader or manager since the denial of her disability application. (Edwards Depo., at 326:15-17, Ex. 24).[11] Presumably, Edwards did not return to the medical clinic because she knew she would not be able to return to work. (Edwards Depo., at 25:3-10, 313:8-13).

Edwards claims that she has been retaliated against because she has not been rehired by HMMA. (Complaint, ¶ 51). Edwards admits that she never submitted an

---

[10] HMMA's Resignation Policy has a similar provision. (Warner Depo., Ex. 34, #D-01921).

[11] Edwards will likely argue that she should not have been terminated because she made a telephone call to Stacye Jones, who was then assigned to the Benefits Department, regarding the denial of her disability application. (Edwards Depo., at 316:18-23). But the Attendance Policy clearly states that she should have contacted her managers. (Edwards Depo., Ex. 5, at 9). Further, she admits that she was aware that return-to-work issues were handled by the medical clinic and that she was to report to the medical clinic when her approved leave expired. (Edwards Depo., at 303:4-7, 306:16-307:4, Ex. 17). The Benefits Department deals only with short-term and long-term disability applications and has no involvement whatsoever in return-to-work or approved leave issues. (Jones Depo., at 250:20-252:4).

application for re-employment at HMMA after she was terminated. (Edwards Depo., at 351:17-352:7). She knows that there is a website where available positions are posted. (Edwards Depo., at 351:21-23). Edwards' attorney sent a letter to several Weld Shop managers dated March 6, 2007, incorrectly claiming that Edwards had been previously released by her physician to return to work, but failed to mention that Edwards was released <u>with</u> medical restrictions that prevented her from working (no prolonged standing, sitting, or lifting). (Edwards Depo., at 312:20-313:13).

Edwards had her attorney appeal the denial of her long-term disability application after being informed of her termination. (Edwards Depo., at 327:10-17, Ex. 25). The appeal was ultimately denied in January of 2008. (Edwards Depo., at 331:3-332:9, Exs. 26, 27). Edwards applied for unemployment compensation benefits and represented that she was unable to work: "due to car accidents I am not able." (Edwards Depo., at 3332:10-334:22, Ex. 28, #D-01391). She also answered "no" to the question "are you available to accept full-time work." <u>Id</u>. Edwards still as of the time of her deposition had not been medically released to return to work without restrictions. (Edwards Depo., at 25:3-10, 313:8-13). Edwards continues to have limitations on the amount of lifting, standing, and sitting. (Edwards Depo., at 25:11-26:17).

**Q.    Edwards' Allegation of Slander by Swindle**

Edwards claims that she was slandered by Swindle because Amber Kelly allegedly heard that Swindle had said "we had a thing going" to an unidentified co-worker. (Edwards Depo., at 344:1-17). Edwards claims that only Amber Kelly heard this statement. (Edwards Depo., at 344:15-17). Edwards has no first-hand knowledge of Swindle ever telling anyone that they were having a sexual relationship. (Edwards Depo.,

at 34418-22). Amber Kelly denied under oath ever hearing anyone say that Edwards and Swindle were having a consensual sexual relationship or words to that effect. (Kelly Depo., at 82:13-83:2).

### III.    ARGUMENT

**A.    Edwards' Hostile Work Environment Claim Must Be Dismissed**

To establish a claim of "hostile work environment" sexual harassment, a plaintiff-employee must allege and eventually prove five elements: (1) that the employee belongs to a protected group; (2) that the employee was subjected to unwelcome harassment; (3) that the harassment was based on the employee's sex; (4) that the harassment affected a "term, condition, or privilege" of employment; and (5) that the employer knew or should have known of the harassment and failed to intervene. See Henson v. City of Dundee, 682 F.2d 897, 903-05 (11th Cir. 1982). The incidents about which Edwards complains were not sufficiently severe or pervasive to affect Edwards' terms and conditions of employment.  Nonetheless, once notified of the incidents, HMMA made a prompt response to Edwards' complaint and therefore HMMA is entitled to summary judgment.

**1.    Conduct Not Directed at Edwards Because of Her Sex Is Not Counted**

It should be first noted that several of Edwards' complaints about Swindle had nothing to do with her sex and therefore are not considered in determining whether there was severe or pervasive conduct.  See Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000) (writing that acts complained of "must be of a sexual or gender-related nature . . . before they are considered in determining whether the severe or pervasive requirement is met").  The mere fact that an employee uses profanity, including the "f" word does not implicate Title VII, and a hostile work environment claim cannot be based

on conduct directed at persons of both sexes, regardless of the severity of the conduct. See Baldwin v. Blue Cross/Blue Shield of Alabama, 480 F.3d 1287, 1301 (11th Cir. 2007) ("Title VII does not prohibit profanity alone, however profane. It does not prohibit harassment alone, however severe and pervasive."), cert. denied, 128 S. Ct. 499 (2007). Edwards contends that Swindle and a female employee (Pam Stoddard) were discussing graphic sexual subjects. While this conduct might be inappropriate, there is no evidence that it was directed at Edwards because she is a woman. See Henson, 682 F.2d at 904; see also Richmond-Hopes v. City of Cleveland, 1998 WL 808222, *4 (6th Cir. 1998)(unpublished)(where plaintiff's supervisor had "called her a 'bitch,' grabbed his crotch, made a gesture near his crotch mimicking masturbation, and said 'Stroke me, stroke me,'" but had also made the same offensive gestures to male employees, the evidence did not support a finding that the supervisor's response had been "because of" the plaintiff's sex.).

2. **The Alleged Harassment Was Not Sufficiently Severe or Pervasive to Create an Actionable "Hostile Work Environment"**

To give rise to a hostile work environment claim under Title VII, the harassment must be sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment. This "is the element that tests the mettle of most . . . harassment claims." Gupta v. Florida Board of Regents, 212 F.3d 571, 583 (11th Cir. 2000), cert. denied, 531 U.S. 1076 (2001). To be actionable, the environment must be one that a reasonable person would find hostile and abusive. See Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999), cert. denied, 529 U.S. 1068 (2000).[12]

---

[12] Where, as here, the plaintiff does not complain about the harassment to the company for an extended period of time, there is also an issue as to whether she subjectively

The applicable analytical framework in hostile work environment claims is well-established in this circuit.  In <u>Gupta v. Florida Bd. of Regents</u>, 212 F. 3d 571, 582 (11th Cir. 2000), the Eleventh Circuit discussed the following caveats as to the severity standard:

> The fourth element–that the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment"–is the element that tests the mettle of most sexual harassment claims.  Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere "general civility code."  <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283-84, 141 L. Ed. 2d 662 (1998). This requirement is regarded "as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace–such as male-on-male horseplay or intersexual flirtation–for discriminatory 'conditions of employment.'" <u>Oncale v. Sundowner Offshore Services</u>, Inc., 523 U.S. 75, 81, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201 (1998).

The Supreme Court  has directed courts to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.  <u>Faragher</u>, 524 U.S. at 787-88.

Measured by the <u>Mendoza</u> criteria, the conduct complained of in this case does not pass muster.  Edwards does not contend that Swindle ever touched her private parts. (Edwards Depo., at 216:9-13).  <u>See</u> <u>Harvill v. Westward Commc'ns, L.L.C.</u>, 433 F.3d 428, 436 (5th Cir. 2005)("Undoubtedly, the deliberate and unwanted touching of [a plaintiff's] intimate body parts can constitute severe sexual harassment").  Further,

---

perceived her work environment to be hostile at the time she was allegedly harassed. The harassment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998).

Edwards claims that Swindle only grabbed his crotch area for a period of a few weeks and this had stopped several months before she made her complaint.  (Edwards Depo., at 216:9-13).   Edwards identifies only the following conduct by Swindle that could be argued was directed at her because of her sex:  (1) grabbing his crotch area over a period of two weeks more than four months before she complained; (2) saying if she had been with him she would not want to go back to her husband; (3) asking her if she had ever had a man's finger up her butt on one occasion; (4) staring at her crotch; (4) putting his hands behind his back and butting up against her on a few occasions; (5) touching the outside of her pants leg once; (6) claiming she had "never been fucked" while thrusting his body into a chair; (7) telling her it turns him on when she pushes him away; (8) telling her he is an "ass man;" (9) responding to her question what do you want me to "put down" for my time with the answer "your pants;" and (10) asking her if she ever fingered herself.

The Eleventh Circuit has made clear that "[m]ere 'sex talk,' without more, does not rise to the level of objectively severe and pervasive harassment."  Howard v. City of Robertsdale, 168 Fed. Appx. 883, 889-90 (11th Cir. 2006); See, e.g., Adusumilli v. City of Chicago, 164 F.3d 353, 357 (7th Cir. 1998) (holding the plaintiff failed to make out a prima facie case of sexual harassment where her coworkers teased her and made sexual jokes aimed at her), cert. denied, 528 U.S. 988 (1999); Black v. Zaring Homes, Inc., 104 F.3d 822, 823-24 (6th Cir. 1997) (holding male employee's comments and jokes in female plaintiff's presence were not sufficiently severe or pervasive to constitute an objectively hostile work environment), cert. denied, 522 U.S. 865 (1997).

While the above listing (if true) certainly involves inappropriate behavior, Edwards has failed to present evidence required to support a sexual harassment claim of "extensive, long lasting, unredressed and uninhibited sexual threats that permeated plaintiff's work environment." Gupta, 212 F. 3d at 586 (quoting Indest v. Freeman Decorating, Inc., 164 F. 3d 258, 264 (5th Cir. 1999)). Further, there is no evidence that Edwards was affected in any way in the performance of her job.

A review of the facts in the following cases reveal that summary judgment has been granted under the "severe and pervasive" standard even where much more egregious conduct was undisputed to have occurred. Mendoza, 195 F.3d at 1247-48 (conduct not sufficiently severe or pervasive where harasser allegedly said to plaintiff "I'm getting fired up;"rubbed his hip against plaintiff's hip while touching her shoulder and smiling, made sniffing sounds on two occasions while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and harasser's "constant" following and staring at Mendoza in a "very obvious fashion"); Shepherd v. Comptroller of Public Accounts of Texas, 168 F.3d 871, 872-75 (5th Cir.1999) (holding that several incidents over a two-year period, including comment "your elbows are the same color as your nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support hostile-environment claim), cert. denied, 528 U.S. 963 (1999); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir.1998) (holding that statement that plaintiff had the "sleekest ass" in the office plus single incident of "deliberately" touching plaintiff's "breasts with some papers that he was holding in his hand" were insufficient to alter the terms or conditions of the plaintiff's employment); Adusumilli, 164 F.3d at 357 (holding

36

actions insufficient to support hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1365-66 (10th Cir.1997) (holding five "sexually-oriented, offensive" statements over sixteen months insufficient to show hostile environment, even though one of the harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can"); Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753-54 (4th Cir.1996) (holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding, and stared at him in the bathroom" insufficient to establish violation of Title VII), cert. denied, 519 U.S. 818 (1996); Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir.1995) (holding insufficiently severe or pervasive to support a hostile-environment claim nine instances of offensive behavior over seven months including repeated references to plaintiff as a "tilly" and a "pretty girl" and one instance of simulated masturbation); Weiss v. Coca-Cola Bottling Co. of Chicago, 990 F.2d 333, 337 (7th Cir.1993) (holding plaintiff's claims--supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blonde, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once at a bar and  twice at work--were not sufficient for actionable sexual harassment).

37

Edwards does not contend that Swindle's conduct affected her job performance, she complains only about a handful of incidents occurring over a period of several months, and she did not testify to any threatening conduct. While certainly inappropriate, the alleged conduct at issue does not rise to the level to establish an unlawful hostile work environment under Title VII.[13]

### 3.    HMMA Is Not Liable for Any Alleged Harassment Because It Took Immediate and Appropriate Corrective Action

Even if Edwards could show that the conduct at issue was sufficiently severe or pervasive, HMMA is still entitled to summary judgment because it is undisputed that HMMA management immediately resolved the situation. When the alleged harassment is committed by a co-worker, a Title VII plaintiff must show that the employer either knew (actual notice) or should have known (constructive notice) of the harassment and failed to take immediate and appropriate corrective action. Watson v. Blue Circle, Inc., 324 F.3d 1252, 1259 (11th Cir. 2003).

Actual notice is established by proof that management knew of the harassment. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1278 (11th Cir. 2002). When an employer has a clear and published policy that outlines the procedures an employee must follow to report suspected harassment and the complaining employee follows those procedures, actual notice is established. Breda v. Wolf Camera & Video, 222 F.3d 886, 889 (11th Cir. 2000); Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1364 (11th Cir. 1999). Constructive notice, on the other hand, is established when the harassment was so

---

[13] Edwards' belated allegations against Billy Kichens also fail because his alleged single comment of "my new job was going to be under his desk" is not sufficiently severe or pervasive, and Plaintiff admitted that she had no problems with Kitchens after her complaint and the resulting investigation. (Edwards Depo., at 147:14-148:11, 244:19-245:20).

severe and pervasive that management reasonably should have known of it. <u>Miller</u>, 277 F.3d at 1278. There is no evidence to warrant constructive notice in this case. Edwards had never complained before, and HMMA had not previously received any complaints of harassment against Swindle. Further, there is no evidence that HMMA management had been made aware of Edwards' concern prior to her complaint on July 31, 2006. Once notified of Edwards' complaint, HMMA responded immediately.

There is no set or bright-line test for determining when an employer has discharged its Title VII obligations in responding to an employee complaint. <u>Madray v. Publix Supermarkets, Inc.</u>, 208 F.3d 1290, 1298 (11th Cir. 2000) ("We recognize that the wide variety of employment settings make it difficult to establish a uniform test for determining whether an employer's anti-harassment policy complaint procedures demonstrate the employer's reasonable care in preventing sexual harassment."), <u>cert. denied</u>, 531 U.S. 926 (2000). Nonetheless, where there are no complaints of further inappropriate behavior by the alleged harasser after the remedial action is taken, the Court should hold that the employer's response was sufficient as a matter of law. <u>See Steele v. Offshore Shipbuilding, Inc.</u>, 867 F.2d 1311, 1316 (11th Cir. 1989)(noting it to be of "special importance" that the "harassment ended after the remedial action"); <u>Walton v. Johnson & Johnson Services, Inc.</u>, 347 F.3d 1272, 1288 (11th Cir. 2003) ("where the substantive measures taken by the employer are sufficient to address the harassing behavior, complaints about the process under which those measures are adopted ring hollow"), <u>cert. denied</u>, 541 U.S. 959 (2004).

The Eleventh Circuit has noted that counseling sessions or warnings can serve as appropriate remedial measures where the allegations of sexual harassment have been

substantiated.  Baldwin v. Blue Cross/Blue Shield, 480 F.3d 1287 (11th Cir. 2007)("We have held that warnings and counseling of the harasser are enough where the allegations are substantiated"); See also Fleming v. Boeing Co., 120 F.3d 242, 246-47 (11th Cir. 1997) (talking to the harasser and telling the complainant to report any further problems was, as an initial measure, enough to constitute "immediate and appropriate corrective action"); Id. at 247-48 (giving the harasser a verbal warning and transferring the complainant to a different work group in the same facility also constituted "immediate and appropriate corrective action"); accord Gawley v. Ind. Univ., 276 F.3d 301, 306-07, 311-12 (7th Cir. 2001) (issuance of "counseling memorandum" to the harasser was sufficient); Intlekofer v. Turnage, 973 F.2d 773, 779-80 (9th Cir. 1992)(noting that counseling may be a sufficient remedy "as a first resort").

It is undisputed that HMMA took stern disciplinary action against Swindle. HMMA suspended Swindle from work without pay (for two weeks) and reassigned Swindle to work on the second shift, which is the shift opposite of Edwards's shift, so as to prevent Edwards and Swindle from having to interact. (Edwards Depo., at 263:5-265:5) (Jones Depo., at 269:17-272:31)(Swindle Depo., Ex. 1, #D-00480).  Swindle also was issued a serious misconduct letter, which is placed in his personnel file and prevents him from seeking a promotion for two years. (Id.).

This disciplinary action is clearly sufficient where, as here, the allegations of inappropriate behavior could only be partially substantiated.  Baldwin, 480 F.3d at 1306 ("Because warning the harasser and counseling him ordinarily is enough where the employer is able to substantiate the allegations, it certainly follows that the same remedy is enough where it is not able to do so.").  That Edwards may now contend that the

company should have done more is immaterial.  Farley v. American Cast Iron Pipe Co.,

115 F.3d 1548, 1555 (11th Cir. 1997)("Although [plaintiff] remains unsatisfied with

[defendant's] resolution of her complaint, we have never stated – nor does [plaintiff]

propose that we have ever held - - that a complainant in a discrimination action has a

right to the remedy of her choice."). Baldwin, 480 F.3d at 1306 ("the complainant does

not get to choose the remedy").

### 4.    To the Extent Edwards Claims That Swindle Was a Supervisor, HMMA Still Prevails Under the Faragher Defense

It is undisputed that Swindle, as a Team Leader, did not have the authority to hire,

fire, promote or reassign significantly different duties, and therefore, was not a

supervisor.  (Jones Depo., at 48:21-49:11 (Bondy Depo., at 141:5-142:13)(Culpepper

Depo., at 15:12-21); See  Pa. State Police v. Suders, 542 U.S. 129, 144 (2004) (quotation

omitted)(tangible employment action requires "a significant change in [Merritt's]

employment status," by a supervisor with the authority "to make economic decisions

affecting other employees.").  As one court has noted under almost identical facts:

> [T]o be considered a supervisor, the alleged harasser must have had the
> power (not necessarily exercised) to take tangible employment action
> against the victim, such as the authority to hire, fire, promote, or reassign
> to significantly different duties. The fact that an alleged harasser may have
> been a "team leader" with the authority "to assign employees to particular
> tasks will not be enough to make that person a supervisor.

Merritt v. Albemarle Corp., 496 F.3d 880, 883 (8th Cir. 2007) (citations and internal

quotations omitted.  As a Team Leader, Swindle was an hourly employee without

authority to hire, fire, or discipline and therefore was not a supervisor as a matter of law.

(Edwards Depo., at 65:2-15)(Jones Depo., at 49:7-11)(Bondy Depo., at 141:16-

142:13)(Kitchens Depo., at 74:14-19);  See also Weyers v. Lear Operations Corp., 359

F.3d 1049, 1057 (8th Cir. 2004)(holding that the fact that the alleged harasser may have

been a team leader who was responsible for ensuring that an assembly line ran according to schedule and assigned tasks on the line was not enough to make that person a supervisor). Nonetheless, Edwards may seek to argue that Swindle was a supervisor for purposes of Title VII liability.

Under Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), an employer is not liable for the hostile environment created by one of its supervisors if the employer proves: (1) that it exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) that the plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities provided by the employer to avoid harm or otherwise failed to avoid harm. Ellerth, 118 S.Ct. at 2270. The Faragher defense only comes into play when it is a supervisor who is allegedly harassing the employee. Faragher, 524 U.S. at 807, 118 S. Ct. at 2292-93; see also Burlington Indus., 524 U.S. at 765, 118 S. Ct. at 2270. See Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1363-64 (11th Cir. 1999). Because Swindle was not a supervisor, the Faragher defense is inapplicable.

### a.    HMMA Exercised Reasonable Care to Prevent and Correct Promptly Any Harassing Behavior

Even if Swindle could be considered a supervisor, HMMA is still entitled to summary judgment under the Faragher defense. Edwards does not contend that Swindle took any tangible employment action against her and he had no authority to do so. An employer may demonstrate reasonable care to prevent sexual harassment by showing the development of "an effective and comprehensive anti-sexual harassment policy," which is "thoroughly disseminated," and to which the employer "demonstrate[s] a commitment to adhering." Farley v. American Cast Iron Pipe Co., 115 F.3d 1548, 1554 (11th Cir. 1997).

In Madray v. Publix Supermarkets, Inc., 208 F.3d 1290 (11th Cir. 2000), cert. denied, 531 U.S. 926 (2000), this Court defined the evidence an employer must submit at summary judgment to prove that it has taken reasonable care to prevent and correct promptly any harassing conduct. The employer meets the initial burden under this affirmative defense by presenting evidence that it has promulgated and disseminated an effective anti-harassment policy. The employer must also prove that its complaint procedure provides "multiple avenues" for lodging a harassment complaint to ensure the employee has avenues of complaint other than to a manager who is involved in the offensive conduct. Madray, 208 F.3d at 1298-99. It is undisputed that: (1) HMMA has comprehensive policies prohibiting discrimination and harassment that allow for multiple avenues of complaint; (2) that those policies are widely disseminated in the Team Member Handbook and on HMMA's Intranet, and through comprehensive training provided by HMMA's legal department, and (3) that the Team Relations Department actively investigates complaints and enforces the policies. (Jones Depo., at 28:15-29:12)(Edwards Depo., Ex. 5, at 2-3).

An employer may demonstrate reasonable care to correct harassment by taking substantive measures to stop the harassment and ensure that there is no reoccurrence. See Walton v. Johnson & Johnson Servs., 347 F.3d 1272, 1288 (11th Cir. 2003). Here, HMMA has presented undisputed evidence that it immediately conducted an investigation into Edwards' complaint, took prompt remedial measures, and the harassment ceased from the point Edwards made her complaint.

43

### b.    Edwards Unreasonably Failed to Take Advantage of HMMA's Preventative And Corrective Opportunities

An employer's showing that the plaintiff unreasonably failed to follow the employer's complaint procedures will often be sufficient to prove that the employee failed to fulfill her obligation of taking reasonable care to avoid the harm, thereby establishing the second element of the Faragher-Ellerth defense. Faragher, 524 U.S. at 807-08, 118 S.Ct. at 2293. As the Eleventh Circuit held in Baldwin v. Blue Cross/Blue Shield, 480 F.3d 1287 (11th Cir. 2007): "Baldwin waited too long to complain. Her complaint came three months and two weeks after the first proposition incident and three months and one week after the second one. That is anything but prompt, early, or soon." See also Walton v. Johnson & Johnson Services, Inc., 347 F.3d at 1289-91 (holding that employee's three-month delay in reporting her supervisor's repeated acts of sexual harassment, including a rape, was sufficient to demonstrate second prong of Ellerth/Faragher defense). As in Walton and Baldwin, Edwards' delay of four months in reporting the alleged harassment was unreasonable as a matter of law. Therefore, HMMA is entitled to prevail on the Farahgher defense to the extent it is applicable.

## B.    Edwards' FMLA Claim Must Fail

The FMLA, as relevant to this case, gives an eligible employee with a sufficiently serious medical condition the right to up to 12 weeks of unpaid leave within a 12-month period. 29 U.S.C. §§ 2612(a)(1)(D), 2612(c)-(d). An employee who takes FMLA leave generally has the right, upon returning from leave, to be reinstated to the position that he occupied when he went on leave or to an equivalent position. 29 U.S.C. § 2614(a)(1). Employees become eligible for FMLA leave only after twelve months of employment. 29 U.S.C. § 2611(2)(A)(i).

44

According to the FMLA regulations, the determination of whether an employee is eligible for the protections of the FMLA must be made "as of the date leave commences." 29 C.F.R. § 825.110(d)(emphasis added). This Court has previously addressed this issue and has held that the determination of eligibility is made at the time the leave commences. Walker v. Elmore County Bd. Of Educ., 223 F. Supp. 2d 1255, 1257-58 (M.D. Ala. 2002)(observing that an employee who sought FMLA leave to begin before her 12-month anniversary was not entitled to that leave, even though she remained on her employer's payroll for just over 12 months), aff'd on other grounds, 379 F. 3d 1249 (11th Cir. 2004).

Numerous other courts have also made this determination that eligibility is determined at the commencement of the leave. See Butler v. Owens-Brockway Plastic Prods., 199 F.3d 314, 316 (6th Cir. 1999) (determination of whether employee has worked for employer at least 1250 hours in past twelve months must be made as of date leave commences.); Duckworth v. Pratt & Whitney, 152 F.3d 1, 8 (1st Cir. 1998) (employee must be eligible at time of leave, rather than at time of adverse action).

Several district courts also have squarely rejected the argument that an employee who begins a period of leave before 12 months of employment and then crosses the 12-month threshold for FMLA eligibility while still on leave should be considered eligible under the FMLA. See Flannery v. Nextgen healthcare Info. Sys. Inc., No. 05-6007, 2006 U.S. Dist. LEXIS 55738, 2006 WL 2338408, at *3 (E.D. Pa. Aug. 10, 2006) (rejecting employee's contention that "he became eligible on … his one-year anniversary date, while on leave" because § 825.110(d) "is clear: the 12-month work requirement triggers 'as of' the day the leave commences, not while on leave"); Willemssen v. Conveyor Co.,

359 F. Supp. 2d 813, 818 (N.D. Iowa 2005)(holding that because the employee "was not an 'eligible employee' on the date her leave commenced, she was not entitled to eligibility period"); Sewall v. Chicago Transit Auth, No. 99-C-8372, 2001 U.S. Dist. LEXIS 330, 2001 WL 40802, at *5-6 (N.D. Ill. Jan. 16, 2001) (rejecting employee's argument that the court should "pick a date in the middle of his absence to determine the beginning of his FMLA leave").

It is undisputed that Edwards' employment by HMMA began in January 2006 and that her leave began in August of 2006.  (Edwards Depo., at 28:2-4, 351:17-352:7, Ex. 2). She was not eligible for FMLA leave at that time because she had only worked for HMMA for seven months. (Edwards Depo., at 301:21-302:5). Edwards remained on the medical leave until she was terminated in July of 2007. The mere fact that Edwards later crossed the one-year threshold while on leave is irrelevant, and HMMA is entitled to judgment as a matter of law on Edwards' FMLA claim.

**C.    The Evidentiary Framework for Plaintiff's Sex Discrimination and Retaliation Claims**

Edwards does not have any direct evidence of sex discrimination or retaliation. Therefore, she must prove her claims through the circumstantial evidentiary model created in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, the Plaintiff must prove a prima facie case of sex discrimination or retaliation. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Armstrong v. Flowers Hosp., Inc., 33 F.3d 1308, 1314 (11th Cir. 1994); Weaver v. Casa Gallardo, 922 F.2d 1515, 1524 (11th Cir. 1991).

After the Plaintiff proves a prima facie case of discrimination or retaliation, the Defendant need only to produce evidence that there is a legitimate, non-discriminatory

(or non-retaliatory) reason for the challenged employment action. See McDonnell Douglas Corp., 411 U.S. at 802; Chapman v. AI Transport, 229 F.3d 1012, 1024-25 (11th Cir. 2000); Armstrong, 33 F.3d at 1313-14. The presumption of discrimination/retaliation is then rebutted and the employer is entitled to summary judgment unless the Plaintiff proffers evidence sufficient to create a genuine issue of material fact that discrimination/retaliation was actually the reason for the challenged action. See Chapman, 229 F.3d at 1024-25. If the employer offers more than one reason for the stated employment action, then the Plaintiff must dispute each stated reason to survive summary judgment. See Chapman, 229 F.3d at 1025 (noting that plaintiff must rebut each of the employer's proffered reasons for its challenged action) (emphasis added) (citing Combs v. Plantation Patterns, 106 F.3d 1519, 1529 (11th Cir. 1997), cert. denied, 522 U.S. 1045 (1998)).

**D.    Edwards' Retaliation Claims Must Fail**

Edwards' claims that she was retaliated against because she was moved from her CCR position to a position on the production floor, subject to an "interrogation" by Culpepper and Bondy on the day that she made her initial complaint, and (3) was discharged and not rehired by HMMA. To establish a prima facie case of retaliation, Edwards must show: (1) she engaged in statutorily protected expression; (2) she suffered a materially adverse employment action; and (3) the adverse action was causally related to the protected expression. See, e.g., Weaver v. Casa Gallardo, 922 F.2d 1515, 1524 (11th Cir. 1991). Edwards cannot establish the second or third required elements of her prima facie case.

1.    **Edwards Cannot Prove Her Retaliatory Transfer Claim**

a.    **The Acceptance of Edwards' Request to Move to the Production Floor Is Not "Adverse"**

Edwards admits that she told three different supervisors (Bondy, Culpepper, and White) that she wanted to move out of the CCR position and to the production floor. (Edwards Depo., at 66:6-67:12, 87:5-23, 93:6-22, 274:1-276:15). The Eleventh Circuit holds that when a transfer is effectuated upon the plaintiff's request, it cannot be said to be adverse. See Doe v. Dekalb County School Dist., 145 F.3d 1441, 1454 (11th Cir. 1998)(voluntary transfer is not adverse as a matter of law). In Doe, the Eleventh Circuit relied upon the Fourth Circuit's holding in Hooper v. State of Maryland, 1995 U.S. App. LEXIS 373 (4th Cir. 1995), wherein the Court held that even though racial animus might have played a factor in the acceptance of a transfer request, the Court still found "that does not amount to a material fact because acceptance of a voluntary request to transfer is not an adverse employment action." Id., at *13-14. In Hooper, the Court found dispositive that "Hooper admitted that he requested a transfer." Id.

The same result is required here. Edwards admitted that she requested to move to the production floor in May or June of 2006. (Edwards Depo., at 66:6-67:12, 87:5-23, 87). This request had nothing to do with Swindle or any complaint (which she would not make for another two months). Edwards admitted in her deposition that she wanted to move to the production floor to be in a position where she did not have to sit for extended periods and where there was not "so much commotion" as there was in the CCR position. (Edwards Depo., at 89:3-13, 66:10-67:8). Just as in Hooper, Edwards cannot now create a material issue of fact by belatedly claiming that HMMA's acceptance of her request for a move to the production floor was adverse to her.

b.      **The Reassignment Is Not a Materially Adverse Employment Action**

Under the U.S. Supreme Court's decision in <u>Burlington Northern & Santa Fe Ry. v. White</u>, 548 U.S. 53 (2006), a plaintiff must now "show that a reasonable employee would have found the challenged [retaliatory] action materially adverse" such that the action "might well have dissuaded a reasonable worker from" engaging in the statutorily protected activity. <u>Id</u>. at 68, 126 S. Ct. at 2415 ("To be sure, reassignment of job duties is not automatically actionable."). The Supreme Court uses "material adversity" to separate significant from trivial harms." <u>Id</u>., 548 U.S. at 68.

Several courts have held since <u>Burlington</u> that a move from one job to another will not meet the threshold of a "materially adverse" action. <u>See</u> <u>Higgins v. Gonzales</u>, 481 F.3d 578, 590-91 (8th Cir. 2007)(where there was no evidence that the new position resulted in reduced pay, prestige, or more difficult tasks, "the normal inconveniences associated with any transfer, such as establishing one's professional connections in a new community, are [not] sufficient, without more, to demonstrate a significant change in working conditions."); <u>Sabzevari v. The Reliable Life Ins. Co</u>., 264 Fed. Appx. 392, 396 (5th Cir. Jan. 31, 2008)(unpublished)(Sabzevari presented no evidence that a transfer from the assistant manager position in Beaumont to the assistant manager position in Austin was anything but a lateral transfer in terms of pay, promotional opportunities, working conditions, and other objective factors. Therefore, denial of the lateral transfer from Beaumont to Austin is not a materially adverse employment action, and cannot support Sabzevari's retaliation claim."); <u>McGowan v. City of Eufala</u>, 472 F.3d 736, 743 (10th Cir. 2006)(denied move from day shift to night shift was not materially adverse where: "the shifts offered no differences in pay and benefits, nor was the night shift more

arduous. Although claiming it to be a better assignment, her stated desire for change was purely for personal reasons"); Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 918 (8th Cir. 2007) (employee's reassignment from office to open office cubicle was not actionable harm even though "new work space may not have been as desirable").

Although no ruling has issued since Burlington, the Eleventh Circuit has consistently held that a move from one position to another to be considered adverse, it must involve "lesser pay, responsibilities, or prestige . . ." Doe v. Dekalb County School Dist., 145 F.3d 1441, 1452 (11th Cir. 1998); Hinson v. Clinch County Bd. Of Educ., 231 F.3d 821, 829 (11th Cir. 2000). The Eleventh Circuit also has made clear that minor changes in assignments, particularly "ephemeral" ones, do not constitute adverse job actions. Gupta, 212 F.3d at 587-89 (refusal to give professor desired work assignments, at desired hours and locations, did not constitute an adverse employment action), cert. denied, 531 U.S. 1076 (2001); see also, Allen v. United States Postmaster Gen., 158 Fed. Appx. 240, 244, 2005 WL 3340136 (11th Cir. Dec. 9, 2005)(unpublished)("Allen can only complain of a change in shift and having to drive farther to work, which are not adverse employment actions."); Benefield v. Fulton Co., 130 Fed. Appx. 308, 313-14 (11th Cir. 2005)(unpublished)("Because Benefield failed to show that the transfer resulted in a change in her rank or compensation, her transfer also did not constitute an adverse employment action.").

Edwards will undoubtedly argue now that she personally would have preferred to have the CCR position to working on the production floor. This is contrary to what she admits she told her supervisors at the time (Edwards Depo., at 66:10-67:8), but is nonetheless irrelevant to determining whether the move was materially adverse.

Policastro v. Northwest Airlines, Inc., 297 F.3d 535, 539 (6th Cir. 2002)("[A]n employee's subjective impressions as to the desirability of one position over another are not relevant."); Cf., Burlington Northern, 125 S. Ct. at 2417 (noting in the context of a Title VII retaliation claim that "[w]hether a particular reassignment is materially adverse depends on the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position considering all the circumstances.")(internal punctuation and citation omitted)); See also Flaherty v. Gas Research Inst., 31 F.3d 451, 457 (7th Cir. 1994) (personal perception that a job assignment was "personally humiliating is insufficient, absent other evidence, to establish a materially adverse employment action.").

This Court should apply the same analysis as that applied by the Eighth Circuit and the Fifth Circuit, and hold that a move does not constitute a materially adverse employment action upon which a retaliation claim can be based where there is no evidence of diminished pay, prestige, or responsibility. Here, Edwards was merely requesting a move from one Team Member position to another and such a move should not be considered a cognizable adverse employment action under Title VII's retaliation provisions.

### c. There Is No Causal Connection Between Edwards' Complaint and Her Reassignment

This is not a situation where a plaintiff makes a complaint of discrimination and is then, only after the complaint, abruptly moved to another position. It is undisputed that Edwards had requested a move to the production floor and that the process had begun to effectuate that move months before Edwards made any complaint. (Edwards Depo., at 93:11-94:17). Edwards admits that she had told three different supervisors that she

wanted to move to the production floor months <u>before</u> making her complaint. (Edwards Depo., at 93:6-22). It is undisputed that Kelly had been chosen to train in the CCR position two months before her complaint. (Edwards Depo., at 86:6-21)(Kelly Depo., at 48:9-23, 57:20-58:3). The Eleventh Circuit has noted the distinction between a situation where the alleged retaliation begins soon after the complaint, as opposed to where the actions were ongoing both before and after the complaint. <u>See</u> <u>Griffin v. GTE Florida, Inc.</u>, 182 F.3d 1279, (11th Cir. 1999)(no causal connection found where plaintiff claimed that he was harassed in retaliation for making complaint where plaintiff claimed harassment was occurring both before and after complaint); <u>Graham v. Gonzalez</u>, 157 Fed. Appx. 139 (11th Cir. Nov. 29, 2005)(plaintiff failed to show causal connection between the "ultimate withdrawal of her conditional employment offer" and her filing of an EEOC Complaint where the FBI had previously made essentially the same decision before she made her complaint). There can be no inference or retaliatory motive where an employer sets about a course of action long before the protected activity occurs. <u>See</u> <u>Morgan v. Hilti</u>, 108 F.3d 1319, 1324 (10th Cir. 1997) (plaintiff's argument that his termination was retaliatory was rejected because the court noted that the termination decision "simply completed the . . . process already set in motion" before the specific incidents of protected activity occurred). Edwards admits that she requested the move long before making a complaint, (Edwards Depo., at 93:6-22), and her placement on the floor merely completed the process set in motion two months earlier. These undisputed facts destroy any causal connection between the challenged transfer and her complaint.

**d.    HMMA Has Legitimate, Non-Retaliatory Reasons for the Reassignment**

Finally, Edwards cannot dispute HMMA's reasons for her transfer.  Edwards was moved because she had requested it and because her managers felt her reports in the CCR job were substandard. (Culpepper Depo., at 113:16-114:5, 115:2-116:4)(Bondy Depo., at 77:15-77:6, 151:21-152:7).   Edwards must produce evidence to dispute both of these reasons to survive summary judgment.  See Chapman, 229 F.3d at 1025.  Edwards admits that she requested a transfer and therefore she cannot dispute this fact.  See Dillard v. Weber & Assoc., 1999 U.S. Dist. LEXIS 641 (Jan. 22, 1999)(unpublished)(plaintiff could not show reason for transfer was pretextual where "[s]he admits she requested the transfer…").   Further, HMMA's managers were entitled to rely upon what Edwards told them at the time.  In Jones v. Gerwens, 874 F.2d 1534 (11th Cir.1989). the Eleventh Circuit noted that "an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation" and that an "admission of misconduct provides sufficient foundation for an employer's good faith belief that an employee has engaged in misconduct." See id. at 1540.  The Jones cases stands for the simple proposition that an employer is entitled to rely in good faith upon what its employees tell them. The same analysis is warranted here.  Edwards has admitted that she requested a move to the production floor and her managers were entitled to rely on that request.   There is no evidence that HMMA's managers were doing anything other than acting in good faith when they moved her to the floor.  See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (explaining that "if the employer fired an employee because it honestly believed that the employee had violated a company policy,  even if it was mistaken in such belief, the discharge is not

'because of race'").  Therefore, Edwards cannot dispute this first stated reason for her move.

Edwards also cannot challenge that her supervisors were not satisfied with her performance in the CCR position by merely claiming that her performance was exceptional.  See Abbes v. Embraer Servs., 195 Fed. Appx. 898, 901 (11th Cir. 2006)(plaintiff's testimony that his "performance was perfect" was not sufficient to dispute that his "supervisors believed in the validity of their criticisms of him"). Edwards does not create an issue of fact by merely injecting her opinion that she did a good job.  Edwards is not allowed to "substitute [her] business judgment for that of the employer." Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000)(en banc).[14] For each of the foregoing reasons, Edwards' retaliatory reassignment claim must fail.

### 2.    Edwards Cannot Prove Her "Interrogation" Claim

Edwards cannot prove that the supposed "interrogation" by Bondy and Culpepper was retaliatory.  No disciplinary action was taken against Edwards, and Edwards says Bondy was supportive in his comments to her.  (Edwards Depo., at 140:10-141:10). Bondy testified, and Michelle Nelson confirmed, that he asked to speak to Edwards because Nelson had said Edwards was upset for some unspecified reason and requested that Bondy speak to her.  (Bondy Depo., at 87:23-88:19) (Nelson Depo., at 29:2-30:3). This cannot be said to be a materially adverse action. This conversation was, at most, a "minor annoyance" that the Supreme Court has made clear still is not covered under Title

---

[14] Edwards will likely argue that this reason is pretextual because she was never issued disciplinary warnings regarding her performance.  Culpepper testified to having to constantly redo Edwards' reports, and it does not create an issue of fact that Culpepper would try to deal with Edwards in a positive fashion instead of a negative one. (Culpepper Depo., at 67:20-68:20).

VII's retaliation provision. <u>Burlington Northern</u>, 548 U.S. at 68. Finally, Edwards cannot dispute that Bondy spoke with her based upon his good faith belief that she was upset based upon the request of her co-worker.

### 3.    Edwards Cannot Prove Her Retaliatory Discharge Claim

Edwards cannot prove a causal connection between her complaint and her termination because there is no evidence that the person who discharged her, Wendy Warner of HMMA's Employment Department, was aware that Edwards had filed the internal complaint against Mike Swindle or an EEOC Charge when she made the decision to terminate Edwards' employment.  (Warner Depo., at 102:1-104:22). <u>Raney v. Vinson Guard Serv., Inc.</u>, 120 F.3d 1192, 1197 (11th Cir. 1997)("In a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression. . . .").   Absent some evidence that Warner was aware of any complaints by Edwards, her retaliation claim must be dismissed. <u>See</u>, <u>e.g.</u>, <u>Brungart v. BellSouth Telecommunications, Inc.</u>, 231 F.3d 791, 799 (11th Cir. 2000)("A decision maker cannot have been motivated to retaliate by something unknown to him."), <u>cert. denied</u>, 532 U.S. 1937 (2001).   Where, as here, the decisionmaker has testified under oath that she was not aware of the plaintiff's complaints, knowledge cannot be imputed to her.  <u>Brochu v. City of Riviera Beach</u>, 304 F.3d 1144, 1156 (11th Cir. 2002) (reasoning that "neither a court nor a jury may impute knowledge to a decision-maker who has sworn he had no actual knowledge").

In addition, almost a year had passed between Edwards' complaint on July 31, 2006, and her termination on July 11, 2007, which further suggests no causal connection. <u>See</u> <u>Clark County School Dist. v. Breeden</u>, 532 U.S. 268, 273 (2001)("The cases that

accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close." . . . See e.g., Richmond v. Oneok, Inc., 120 F.3d 205, 209 (10th Cir. 1997)(3-month period insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174-1175 (7th Cir. 1992)(4-month period insufficient.").

Further, Edwards cannot dispute HMMA's legitimate non-discriminatory reasons for her termination.  Edwards does not dispute that she was informed when she went on leave that she should report to the medical clinic when her leave expired.  (Edwards Depo., at 300:3-301:4, Ex. 15, #D-01791).  She was also informed that she should keep her supervisors aware of her status while away from leave. (Edwards Depo., Ex. 5, at 9). Edwards admits that she did neither of these things.  (Edwards Depo., at 323:1-324:8, 325:8-326:10, Ex. 24).  Edwards cannot now claim that she was unaware that she should have reported to the medical clinic when she had been informed orally and in writing to do so.  (Edwards Depo., at 300:3-301:4, 306:1-307:4, Ex. 15, #D-01791, 01794).  It is undisputed that had Edwards reported back to work as she was supposed to do, that she would not have been medically released to return to work.  (Edwards Depo., at 25:3-26:17, 313:8-13).

HMMA has the right to designate whom Team Members must report to for return-to-work issues and that Edwards may have contacted HMMA's benefits department did not meet her obligation. See e.g., Farley v. American Cast Iron Pipe, 115 F.3d 1548, 1554 (11th Cir.1997)("it is incumbent upon the employees to utilize the procedural mechanisms established by the company specifically to address problems and

grievances."); see also Young v. Bayer Corp., 123 F.3d 672, 674 (7th Cir.1997) (noting that when an employer has identified and appointed a recipient for sexual harassment complaints, "complainants can be expected to utilize it").

Finally, Edwards is estopped from contending now that she could have reported back to work given that she continued to report that she was unable to work because she was seeking disability benefits well into 2008. See Talavera v. School Bd. of Palm Beach County, 129 F.3d 1214 (11th Cir.1997)(plaintiff was estopped from denying the truth of any statements made in her disability application). It is undisputed that had Edwards reported back to work as she was supposed to do, that she would not have been medically released to return to work. (Edwards Depo., at 25:3-26:17, 313:8-13). Edwards cannot show that she suffered any damage if HMMA mistakenly considered her to have abandoned her job because the undisputed evidence shows that she was not able to return to work at the conclusion of her leave. (Edwards Depo., at 25:3-10, 313:8-13). Courts have upheld an employer's right to terminate an employee who exhausts all available leave and still is unable to return to work. Further, it is undisputed that Edwards was deemed to have voluntarily resigned pursuant to the clear language of HMMA's Attendance and Resignation Policies.

In Covucci v. Service Merchandise Co., No. 98-3823 2004 WL 2367970 (6th Cir. Oct. 20, 2004), the Sixth Circuit Court of Appeals rejected the plaintiff's claim of discrimination and upheld the application of a Leave of Absence policy that required that an employee be discharged when available leave was exhausted:

> Covucci failed to demonstrate that Service Merchandise's proffered nondiscriminatory reason for terminating him was pretextual. The leave-of-absence policy does not distinguish between handicapped and nonhandicapped individuals. Instead, it imposes a uniform approach

>in that it provides for the termination of any employee who does not return
>to work at the end of an authorized leave period or whose absence due to
>illness, injury or military service exceeds one year.  Nor has Covucci
>presented any evidence that Service Merchandise applied its policy
>unfairly or inconsistently.  Because Covucci has failed to raise any
>genuine issue of material fact as to the legitimacy of Service
>Merchandise's reason for terminating him, he cannot succeed in his
>statutory discrimination claim.

Covucci, 2004 WL 2367970, at *6-7; See also Cone v. Longmont United Hospital

Assoc., 14 F.3d 526, 528 (10th Cir. 1994) (affirming grant of summary judgment for

employer and holding that plaintiff could not challenge reason offered by defendant for

discharge where plaintiff was discharged for failing to return to work after exhausting

approved leave of absence; Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1046

(6th Cir. 1998)(same).  Because Edwards failed to return to work and because she was

unable to return to work at the end of her approved leave, her discharge claim must fail.

### 4.    Edwards' Failure to Rehire Claim Also Must Fail

An employer's failure to rehire an employee is "undoubtedly an adverse

employment action" where the employee *reapplied* for the position after termination. See

Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130, 1135, 1141 (5th Cir.

Unit A Sept. 1981), cert. denied, 455 U.S. 1000 (1982).  If the employer uses formal

procedures to announce positions and identify candidates, the plaintiff cannot make out a

prima facie case unless he shows that he applied for the position. See Vessels v. Atlanta

Indep. Sch. Sys., 408 F.3d 763, 768 (11th Cir. 2005).  Furthermore, under such

circumstances, "[a] general interest in being rehired without submitting an application" is

insufficient to satisfy the application requirement. Smith v. J. Smith Lanier & Co., 352

F.3d 1342, 1345 (11th Cir. 2003) (applying application requirement to age discrimination

claim).  Because Edwards never formally applied for a position at HMMA through its

application procedures after her termination, she cannot establish a prima facie case of retaliation. See Jones v. Ala. Power Co., 2008 U.S. App. LEXIS 13709 (11th Cir. June 23, 2008) (unpublished) ("because it is undisputed that Jones did not reapply for any positions with Alabama Power after his termination, Jones cannot show that he suffered a materially adverse employment action and thus cannot make out his prima facie case"). Again, Edwards is also estopped from now claiming that she was ready and able to return to work during this time when she was representing that she was disabled in her request for long-term disability benefits.

**E.     Edwards' Sex Discrimination Claim Also Fails**

Edwards also contends that her discharge and the alleged failure to rehire were motivated by sex discrimination. Edwards cannot establish a prima facie case for her sex-based discharge claims.  To establish a prima facie case of sex discrimination, Edwards must show that: (1) she was a member of a protected class; (2) she was qualified for her job; (3) she suffered an adverse employment action; and (4) her employer treated similarly situated employees, who were not members of the protected class, more favorably. Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 842-43 (11th Cir. 2000). Edwards has failed to show that she was qualified to return to her job at the time she was discharged.  Further, she has failed to point to any male employees who were treated differently under similar circumstances.

To establish a prima facie case, Edwards must come forward with evidence that she was treated differently than others outside the protected class. See Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999)(affirming grant of summary judgment for employer and noting that employee could not establish a prima facie case because he

failed to point to any persons outside the protected class who were treated more favorably

than her). Edwards has failed in this regard. The Eleventh Circuit has stated the

following about comparator evidence:

> In determining whether employees are similarly situated for
> purposes of establishing a prima facie case, it is necessary
> to consider whether the employees are involved in or
> accused of the same or similar conduct and are disciplined
> in different ways. The most important factors in the
> disciplinary context are the nature of the offenses
> committed and the nature of the punishments imposed. We
> require that the quantity and quality of the comparator's
> misconduct be nearly identical to prevent courts from
> second-guessing employers' reasonable decisions and
> confusing apples with oranges. Exact correlation is neither
> likely nor necessary, but the cases must be fair congeners.
> In other words, apples should be compared to apples.

Mannica v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999)(citations and quotations

omitted)(emphasis added).  Edwards has failed to point to any male employees who did

not report back to work at the end of an expired leave who were not terminated.  Further,

as with regard to her retaliation claim, she has failed to dispute the reasons for her

termination.

It should also be noted that the decision to discharge was made by Wendy

Warner, who also is female.  There is no evidence that Warner would want to

discriminate against persons of her own protected class.  Elrod v. Sears, Roebuck & Co.,

939 F.2d 1466, 1471 (11th Cir. 1991)  (persons within same protected class as plaintiff

are more likely to be the victims of discrimination than its perpetrators).

Finally, plaintiff has failed to show that she was treated any differently than male

employees with regard to her failure to rehire claim and she cannot dispute that HMMA

has not considered her for rehire because she has not gone through its formal application procedures.  For these reasons, plaintiff's claim of sex discrimination must be dismissed.

**F.     Edwards' Claim for Assault and Battery Must Fail**

Under Alabama law, an assault is "'an intentional, unlawful offer to touch the person of another <u>in a rude or angry manner</u> under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented.'"  <u>Wright v. Wright</u>, 654 So. 2d 542, 544 (Ala. 1995) (emphasis added).  In <u>Surrency v. Harbison</u>, 489 So. 2d 1097, 1103 (Ala. 1986)(emphasis added), the Alabama Supreme Court defined a battery as follows:

> "'A successful assault becomes a battery.  A battery consists in an injury actually done to the person of another in an <u>angry or revengeful or rude or insolent manner</u>, as by spitting in the face, or in any way touching him in anger, or violently jostling him out of the way, or in doing any intentional violence to the person of another.  The wrong here consists, not in the touching, so much as in the manner or spirit in which it is done, and the question of bodily pain is important only as affecting the damages.  Thus, to lay hands on another in a hostile manner is a battery, although no damage follows; but to touch another, merely to attract his attention, is no battery and not unlawful.'"

Edwards bases her assault and battery claims upon several innocuous touchings by Swindle (bumping against her, pulling her pony tail, hugging her, and brushing the outside of her leg). Edwards admits that Swindle never touched her in any inappropriate places. (Edwards Depo., at 216:9-13).  Importantly, Edwards testified that Swindle never touched her in a rude or angry manner. (Edwards Depo., at 372:13-373:20).  Because these incidents of touching were not done in any angry manner toward Edwards, these claims must be dismissed.  <u>See</u> <u>Reed v. Wal-Mart Stores, Inc.</u>, 2000 U.S. Dist. LEXIS 7788 (M.D. Ala. May 3, 2000)(dismissing assault and battery claim where "Napoleon

was never touched by Mitch Pettis or any Wal-Mart employee in a hostile, angry or rude manner as required to constitute an assault and battery").

**G.      Edwards' Claim for Slander Must Fail**

Edwards alleged that she was slandered by Swindle because Amber Kelly told her that she allegedly heard that Swindle had said "we had a thing going" to an unidentified co-worker.  (Edwards Depo., at 344:1-17).  Edwards has no first hand knowledge of Swindle ever telling anyone that they were having a sexual relationship.  (Edwards Depo., at 344:18-22).  Moreover, Amber Kelly denied under oath that she heard anyone say that Edwards and Swindle were having a consensual relationship or words to that effect.  (Kelly Depo., at 82:13-83:2).  Edwards' slander claim fails because she cannot prove a prima facie case and because her anecdotal testimony regarding the supposed comments is inadmissible.

In Alabama, both slander and libel are considered a species of defamation and to establish a prima facie case of defamation, plaintiff must establish that: (1) the defendant was at least negligent; (2) in publishing; (3) a false and defamatory statement; (4) concerning the plaintiff; and (5) which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod).  Ex parte Crawford Broadcasting, 904 So. 2d 221, 225 (Ala. 2004). Slander per se is actionable if it imputes to the plaintiff an indictable offense involving infamy or moral turpitude.  Anderton v. Gentry, 577 So. 2d 1261, 1263 (Ala. 1991). Damages are implied when there is slander per se.  Id.  Slander per quod "is a communication to a third person of a defamatory statement subjecting the plaintiff to disgrace, ridicule, odium, or contempt although not imputing the commission of a crime

involving infamy or moral turpitude." Id. Slander per quod requires the plaintiff to plead and prove special damages. Id. Special damages are "'the material harms that are the intended result or natural consequence of the slanderous statement, and the general rule is that they are limited to material loss capable of being measured by money.'" Casey v. McConnell, 975 So. 2d 384, 390 (Ala. Civ. App. 2007) (quoting Butler v. Town of Argo, 871 So. 2d 1, 18 (Ala. 2003)).

In Anderton v. Gentry, 577 So. 2d 1261 (Ala. 1991), Gentry, the president of a bank, told various customers and others that Anderton, an employee of the bank, had approved loans for certain people in exchange for sexual favors. Anderton denied the allegations and sued Gentry, alleging slander. Anderton specifically argued that Gentry's statements about him constituted slander per se because, he argued, the statements charged him with adultery and with soliciting prostitution. This Court, however, noted that Gentry's statements about Anderton did not describe the actions defined as adultery in § 13A-13-2, Ala. Code 1975, or as prostitution in § 13A-12-110, Ala. Code 1975. Thus, because Gentry's statements did not suggest a crime of infamy or moral turpitude, the court held that the statements could, at most, support a claim of slander per quod.

As in Anderton, the alleged statement that Edwards and Swindle "had a thing going" does not amount to an indictable offense of infamy or moral turpitude. See Ala. Code § 13A-13-2(a) (explaining that a person commits adultery when "he engages in sexual intercourse with another person who is not his spouse and lives in cohabitation with that other person when he or that other person is married"). Therefore, Edwards' slander claim is slander per quod and requires proof of special damages.

63

Edwards cannot prove a prima facie case of slander per quod. First, there is no evidence of any negligent conduct by Swindle. Further, Amber Kelly denies hearing Swindle make any alleged comments regarding him having "a thing going" with Edwards. Edwards' anecdotal testimony regarding this supposed incident is not admissible evidence, particularly given that Amber Kelly denied under oath that it ever occurred. See Bogle v. Orange County Bd. of County Com'rs, 162 F.3d 653, 659 (11th Cir. 1998)(rejecting plaintiff's "anecdotal testimony" about alleged comparators where "witnesses who testified regarding these other incidents had no personal knowledge"); Pritchard v. Southern Company Services, 92 F.3d 1130, 1135 (11th Cir. 1996)(rejecting plaintiff's testimony, which constituted inadmissible hearsay, that was "based on the statements of unknown co-workers" ), cert. denied, 520 U.S. 1274 (1997). Therefore, plaintiff cannot prove any of the alleged statements were published.

In addition, Edwards has not pled special damages and has not offered testimony of special damages. In her deposition, Edwards testified that the damage caused by the alleged statements was that "they are not true and it bothers me." (Edwards Depo., at 371:3-6). Edwards further testified that "she don't want anybody to think that I have messed around on my husband, not one person." (Edwards Depo., at 371:3-11). Finally, Edwards testified that people "look at her different" and that Swindle "knew how proud she was just being with one person, and that means a lot to me." (Edwards Depo., at 371:12-19). As such, Edwards fails to show special damages, much less any monetary loss, caused by Swindle's alleged statements. Therefore, Edwards cannot prove a prima facie case of slander, and her claim is due to be dismissed.

**H.    HMMA Is Due Summary Judgment Upon Edwards' Outrage Claim[15]**

In order to hold HMMA liable for the allegedly wrongful acts of Swindle, however, Edwards must first establish that Swindle's acts indeed constituted the tort of outrage. It is elemental that if Swindle's conduct did not arise to the level necessary to support a claim of outrage, HMMA cannot be held liable for his conduct. Potts v. BE&K Const. Co., 604 So. 2d 398, 400 (Ala. 1992); see also, Alabama Great Southern R. Co. v. Ensley Transfer and Supply Co., 100 So. 342, 345, 211 Ala. 298, 301 (1924). In the instant case, Edwards has failed to present evidence sufficient to establish that Swindle's conduct rose to the level of tortious outrage.

The determination of whether acts are sufficiently objectionable to support a cause of action for outrage may be made by trial courts as a matter of law. Logan v. Sears, Roebuck & Co., 466 So. 2d 121, 123 (Ala. 1985) (citing, American Road Service Co. v. Inmon, 394 So. 2d 361, 365 (Ala. 1981)). To overcome summary judgment on an outrage claim, a plaintiff must present evidence establishing "that the defendant's conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it." Thomas v. BSE Indus. Contractors, Inc., 624 So. 2d 1041, 1043 (Ala. 1993) (citing, Inmon, 394 So. 2d 361). The Alabama Supreme Court defines "extreme and outrageous conduct" as "conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." Inmon, 394 So. 2d at 365. The plaintiff's burden in proving outrage is "heavy,"

---

[15] Edwards' claim is referenced as intentional infliction of emotional distress. In Alabama, the torts of outrage, outrageous conduct, and intentional infliction of emotional distress are the same cause of action. See Stewart v. Matthews Indus., Inc., 644 So. 2d 915, 918 (Ala. 1994).

Surrency v. Harbison, 489 So. 2d 1097, 1105 (Ala. 1986), and recovery of damages "is limited 'to the most reprehensible situations.'"  State Farm Ins. Co. v. Morris, 612 So. 2d 440, 443 (Ala. 1993) (citation omitted); see also, Thomas, 624 So. 2d at 1044.

The tort of outrage does not allow recovery for "'mere insults, indignities, threats, annoyances, petty oppressions or other trivialities.'"  Inmon, 394 So. 2d at 364-65 (citation omitted).  "While Inmon ... recognize[d] a cause of action in Alabama based solely upon insulting language, it did not create a cause of action which arises from every insult."  Logan, 466 So. 2d at 122.  The Logan Court went on to explain this rationale:

> Our manners, and with them our law, have not yet progressed to the point where we are able to afford a remedy in the form of tort damages for all intended mental disturbance. ... There is no occasion for the law to intervene with balm for wounded feelings in every case where a flood of billingsgate is loosed in an argument over a back fence.  The plaintiff must necessarily be expected and required to be hardened to a certain amount of rough language, and to acts that are definitely inconsiderate and unkind. There is still in this country at least, such a thing as liberty to express an unflattering opinion of another, however wounding it may be to his feeling; and in the interest not only of freedom of speech but also of avoidance of other more dangerous conduct, it is still very desirable that some safety valve be left through which irascible tempers may blow off relatively harmless steam. ... Accordingly, it is generally held that there can be no recovery for mere profanity, obscenity, or abuse, without circumstances of aggravation, or for insults, indignities or threats which are considered to amount to nothing more than mere annoyances.

Id. at 124, quoting, W. Prosser, Law of Torts, 54-55 (4th ed. 1971) (emphasis added); see also, Surrency, 489 So. 2d at 1105-06.

In regard to insulting language, the Alabama Supreme Court has held that conduct such as referring to a homosexual as "queer as a three dollar bill," and cursing co-workers does not arise to conduct sufficient to establish a claim of outrage.  See Logan, 466 So. 2d at 122-24 (homosexual comment); Surrency, 489 So. 2d at 1099-1100, 1105-06 (co-worker cursing).  In McIsaac v. WZEW-FM Corp., 495 So. 2d 649, 650-51 (Ala. 1986),

the Court held that evidence that an owner and president of a radio station asked a female employee to have an affair with him, tried to kiss her, asked her to dinner, gave her suggestive looks, made suggestive innuendos and suggestive touches, and fired her when she refused his advances, did not arise to the level of extreme and outrageous conduct necessary to support a claim of outrage, and instead amounted to "'mere insults, indignities, threats [or] annoyances,' for which the law will not hold one liable in tort." (citation omitted).    The Court thus affirmed the grant of summary judgment in defendant's favor upon plaintiff's outrage claim. Id. at 651.

In the instant case, Edwards bases her outrage claim solely upon the actions of Mike Swindle.  Edwards has failed to present evidence sufficient to support her claim. Specifically, she has failed to establish that Swindle's conduct was extreme and outrageous or caused emotional distress so severe that no reasonable person could be expected to endure it.  At most, Edwards' evidence of Swindle's conduct amounts to mere insults, indignities, threats, annoyances, petty oppressions or other trivialities for which no recovery is available under the theory of outrage.  While Swindle's alleged comments may have been vulgar, they do not arise to the level of outrage.

Edwards will probably try to reference the Alabama Supreme Court's decision in Busby v. Truswal Systems Corp., 551 So. 2d 322 (1989), for the broad proposition that evidence of sexual harassment can support a claim of outrage.  A consideration of Busby, however, reveals that it is easily distinguishable from the instant case, because the severity and enormity of the evidence of sexual harassment in Busby is light years away from the meager evidence Edwards here presents.

In <u>Busby</u>, the female plaintiffs sought to hold their employer vicariously liable for the outrageous acts of their supervisor, Deaton, and presented evidence that their supervisor invited them to swim nude with him; asked them if he could put his hands in their pockets; told them that he would put a stick in their machines so they could masturbate while working; told them he could have sex as fast as the operating machines; told the plaintiffs he wanted them to stop wearing bras and wanted them to come to work wearing less clothing; told one that if she had not stayed up all night having sex she could do her work properly; told one that if he had thirty minutes with her, he could get her pregnant; acted as if he was about to pinch their breasts with pliers and his hands; told one he would send her across the street to some men because she was always sexually aroused; asked one to accompany him to the rest room and hold his penis while he urinated; told one that her nipples were as large as another employee's entire breast; followed one to the bathroom and told her he was going to help her; followed one around one night; said that a table in his office had been damaged when one of the plaintiffs and a co-employee had sex on it; openly stared at their sexual anatomy; put his arm around them, stroked their necks and grabbed their arms; and made other lewd remarks and gestures. 551 So. 2d at 323-24. The Court concluded that this mountain of evidence of sexually harassing acts presented a jury question as to whether Deaton engaged in conduct sufficient to support a claim of outrage, but it still affirmed the grant of summary judgment to the defendant company, because the plaintiffs failed to establish that it was liable for Deaton's conduct. <u>Id</u>. at 324-328. The Court thus determined that if the plaintiffs could have demonstrated that the company was liable for Deaton's conduct, a

jury question would have been created regarding whether the conduct amounted to the tort of outrage.

There can be little doubt, however, that <u>Busby</u>'s holding was limited to the severe and egregious facts there presented.  While Swindle's alleged behavior may be inappropriate, such egregious facts do not exist in the instant case which could create a jury question regarding whether the actions of Swindle amounted to the tort of outrage. As a result, the Alabama Supreme Court's holding in <u>Busby</u> does not avail Edwards here. Edwards has simply failed to present evidence sufficient to support her claim of outrage and, as a result, HMMA is entitled to summary judgment thereupon.  <u>See</u>, <u>Potts</u>, 604 So. 2d at 400.  Even if Edwards has produced evidence sufficient to establish a claim of outrage, however, summary judgment is still proper for HMMA, because like the <u>Busby</u> plaintiffs, Edwards has failed to establish that HMMA can be held liable for the conduct of Swindle.

**I.    Even if Edwards Has Presented Evidence Establishing That Swindle Engaged in Conduct Amounting to the Torts of Outrage, Assault and Battery or Slander, She Has Failed to Establish That HMMA Is Liable for His Conduct**

The Alabama Supreme Court has clearly stated that establishing vicarious or respondeat superior liability against a company for the sexually harassing, outrageous conduct of its employees is extremely rare:

> The tort of outrage provides a remedy for 'extreme and outrageous conduct,' ... and so should not be the basis for vicarious or respondeat superior liability except <u>in the most compelling circumstances</u>. ... The tort of outrage carries punitive damages, which should not ordinarily be imposed against an employer for the personal sexual transgressions of its employees.

<u>Busby</u>, 551 So. 2d at 327-328 (emphasis added).  "For [an employer] to become liable for [the] intentional torts of its agent, the plaintiff[] must offer evidence that [1] the

agent's wrongful acts were in the line and scope of his employment; or [2] that the acts were in further-ance of the business of [the employer]; or [3] that [the employer] participated in, authorized, or ratified the wrongful acts.'"   Potts, 604 So. 2d at 400, quoting, Joyner v. AAA Cooper Transp., 477 So. 2d 364, 365 (Ala. 1985); see also, Busby, 551 So. 2d at 326.  The Alabama legislature also addressed this issue at § 6-11-27(a) of the Alabama Code (1975):

> A principal, employer, or other master shall not be liable for punitive damages for intentional wrongful conduct or conduct involving malice based upon acts or omissions of an agent, employee, or servant of said principal, employer, or master unless the principal, employer, or master either: (i) knew or should have known of the unfitness of the agent, employee, or servant, and instructed him with a disregard of the rights or safety of others; or (ii) authorized the wrongful conduct; or (iii) ratified the wrongful conduct; or unless the acts of the agent, servant or employee were calculated to or did benefit the principal, employer or other master, except where the plaintiff knowingly participated with the agent, servant, or employee to commit fraud or wrongful conduct with full knowledge of the import of his act.

The Alabama Supreme Court has held that sexually harassing conduct is "aimed purely" at satisfying the offending employee's own desires, not the employer's, and is thus outside the line and scope of the employee's employment, and not performed in furtherance of the employer's business.   Busby, 551 So. 2d at 327-28.   Edwards, therefore, must prove that HMMA ratified Swindle's conduct. In order to prove ratification, Edwards must show that HMMA either expressly adopted the offending employees' behavior or that it implicitly approved of it.   Potts, 604 So. 2d at 400. Edwards can offer no evidence showing that HMMA expressly adopted Swindle's conduct, thus she must attempt to show that HMMA implicitly approved of it.

The Alabama Supreme Court has held that to establish implicit ratification of sexually harassing, outrageous conduct, "in addition to proving the underlying tortious

conduct of an offending employee, a complaining employee must show that the employer (1) had actual knowledge of the tortious conduct of the offending employee and that the tortious conduct was directed at and visited upon the complaining employee; (2) that based upon this knowledge, the employer knew, or should have known, that such conduct constituted sexual harassment and/or a continuing tort; and (3) that the employer failed to take 'adequate' steps to remedy the situation." Id. To be "adequate," the steps taken by the employer to remedy the situation must be reasonably calculated to stop the harassment. Id. at 401. Finally, "if the undisputed evidence shows that the employer, as soon as it is practical to do so after learning of the conduct, took steps to stop the tortious conduct and the tortious conduct stopped, the steps taken by the employer were adequate, as a matter of law." Id.

Edwards has failed to prove that HMMA implicitly ratified the complained of conduct. First, to hold HMMA liable for Swindle's acts under a ratification theory, Edwards must establish that Swindle's acts amounted to tortious behavior. Because, as demonstrated above, she has failed to establish that Swindle committed any tortuous acts, her ratification theory fails and HMMA is thus entitled to summary judgment. Potts, 604 So. 2d at 400. Further, the steps HMMA took to address Edwards' complaint of sexual harassment were adequate and effective in stopping the conduct of which she complained.

It is undisputed that HMMA did not take any actions to ratify any alleged harassing behavior. When Edwards informed Stacye Jones that she had been sexually harassed, Jones immediately began an investigation of her complaint. It is undisputed that once Edwards finally made her complaint, HMMA conducted a thorough investigation

and resolved her complaint. She never had any further problems with Swindle. When an employer responds to an employee complaint and takes steps to resolve the issue, the employer cannot be said to have ratified the alleged discriminatory conduct.  <u>East Ala. Behavioral Medicine, P.C. v. Chancey</u>, 883 So. 2d 162, 170 (Ala. 2003)("An employer cannot be said to have ratified an employee's conduct when the employer, upon learning of an employee's conduct, which was not in the scope of the employee's employment, gives instructions calculated to prevent a recurrence.");  <u>Joyner v. AAA Cooper Transp.</u>, 477 So. 2d 364, 365 (after an employee's homosexual advances to another employee were reported to the employer, the employer conducted an investigation and informed the offending employee that if another complaint of this nature came to the employee's attention the offending employee would be laid off and a full-scale investigation conducted). Because the steps that HMMA took were effective in stopping the conduct complained of, HMMA's steps taken were adequate as a matter of law, and thus HMMA has not ratified Swindle's conduct.  <u>Id</u>. at 401.  For these reasons, Edwards' intentional tort claims must be dismissed.

**J.      Edwards' Negligence Claim Fails as a Matter of Law**

> **1.      Edwards' Negligent Supervision Claim Fails Because Edwards Has Failed to Prove the Occurrence of Any Underlying Tort**

Under Alabama law, negligent supervision is a legal theory by which a claim of sexual harassment may be brought. "It is well settled that Alabama does not recognize an independent cause of action for sexual harassment. Instead, claims of sexual harassment are maintained under common-law tort theories such as assault and battery, invasion of privacy, negligent training and supervision, and outrage." <u>Stevenson v. Precision Standard, Inc.</u>, 762 So. 2d 820, 825 n.6 (Ala. 1999)(citations omitted).  To support a

negligence claim, however, the plaintiff must prove the commission of an underlying tort. See Taylor v. Stevenson, 820 So. 2d 810, 812 (Ala. 2001)(in addressing Stevenson's malpractice claim against her attorneys Taylor and Smith, the "Court reasoned, in essence, that Pemco [the employer] could not be independently guilty of negligence or wantonness in training or supervising Windsor [the offending employee] in the absence of some tort committed by him against Stevenson."); see also University Federal Credit Union v. Grayson, 878 So. 2d 280, 291 (Ala. 2003)(citations omitted)(finding that a plaintiff must establish an underlying common-law tort in order to prevail in a claim for negligent supervision).

In Stevenson, the Supreme Court of Alabama explained that the employer "cannot be held liable for authorizing or ratifying conduct that, according to the jury, did not occur. Accordingly, a verdict against [the employer] based on a finding of negligent training and supervision would be inconsistent with a verdict exonerating [the employee]." 762 So. 2d at 825; see Jackson v. Cintas Corp., 391 F. Supp. 2d 1075, 1100-1101 (M.D.Ala. 2005)("Further, the 'incompetency' of the offending employee in a negligent supervision claim must be based on an injury resulting from a tort which is recognized under Alabama common law."). Because Edwards has failed to show that she was subjected to any conduct that constitutes a common law tort claim, her negligence claim must be dismissed.

### 2.    Edwards' Negligence Claim Also Fails on the Merits

To prove negligence, Edwards must show (1) a duty; (2) breach of the duty; (3) proximate cause; and (4) injury arising therefrom.  Keel v. Banach, 624 So. 2d 1022, 1026 (Ala. 1993).  "The common law prescribed such a duty upon the employer, owing

to the fellow servants of the incompetent servant, and provided an action at law against the employer for injuries to a servant caused by the incompetence of such fellow servant as a proximate consequence of the negligence of the employer in retaining him with knowledge of his incompetency and the danger incident to his retention." McDuff v. Kurn, 172 So. 886, 887 (Ala. 1937) (citing Jenkins v. Mann, 220 Ala. 661, 127 So. 230). In explaining the basis for negligent supervision claims, the Alabama Supreme Court stated:

> In the master and servant relationship, the master is held responsible for his servant's incompetency when notice or knowledge, either actual or presumed, of such unfitness has been brought to him. Liability depends upon its being established by affirmative proof that such incompetency was actually known by the master or that, had he exercised due and proper diligence, he would have learned that which would charge him in the law with such knowledge. It is incumbent on the party charging negligence to show it by proper evidence.

Gardner v. State Farm Mutual Auto. Ins. Co., 842 So. 2d 1, 9-10 (Ala. Civ. App. 2002)(citing Armstrong Bus. Servs. v. AmSouth Bank, 817 So.2d 665 (Ala. 2001)). The Gardner Court quotes the Armstrong Court for the proposition that a plaintiff may successfully pursue a negligent supervision claim by "showing specific acts of incompetency and bringing them home to the knowledge of the master, or by showing them to be of such nature, character, and frequency that the master, in exercise of due care, must have had them brought to his notice." Id. Thus, a plaintiff must prove either actual or constructive knowledge of the employee's misconduct. Edwards cannot make such a showing here.

Edwards claims that HMMA was negligent in the hiring of Swindle, but has offered no evidence that HMMA was aware of any concerns with Swindle's behavior prior to her complaint. The same is true for Edwards' negligent training and supervision

claims.  Zielke v. AmSouth Bank, N.A., 703 So. 2d 354, 358 n.1 (Ala. Civ. App. 1996) (noting that there is no discernible distinction between claims of negligent training and claims of negligent supervision).

Edwards has no evidence to support the proposition that HMMA should have had constructive notice that Swindle had engaged in any potentially unlawful behavior prior to Edwards' July 31, 2006, complaint.  It is undisputed that both Swindle and Edwards were aware of HMMA's anti-harassment policies and that discriminatory conduct was not allowed in the workplace. (Edwards' Depo., Ex. 5, at 2-3)(Swindle Depo., Ex. 2, at 2-3). Swindle had clearly been informed that discriminatory conduct is not permitted in HMMA's workplace, and Edwards was clearly informed that she had avenues of complaint available to her.  (Edwards Depo., at 45:19-47:8, 146:1-10)(Swindle Depo., at 73:7-74:3).    HMMA clearly fulfilled any duty owed to Edwards to prohibit discrimination and to properly train and supervise its employees on its anti-discrimination policies.  Despite her awareness of HMMA's complaint mechanism, Edwards failed to complain for several months. (Edwards Depo., at 142:8-19, Ex. 10).  There is nothing in the record to indicate that Swindle's alleged conduct permeated the HMMA facility to impute constructive knowledge to HMMA.  Further, Edwards cannot prove that Swindle was negligently retained by HMMA.  It is undisputed that there have been no further complaints against Swindle after Edwards' complaint. (Edward Depo., at 266:1-17).

Edwards also cannot prove negligence under a theory of actual notice.  A negligence claim cannot survive summary judgment when an employer immediately conducts an investigation into an allegation of harassment and the harassing conducts ceases.  Cf. Patterson v. Augat Wiring Sys., Inc., 944 F. Supp. 1509, 1529 (M.D. Ala.

1996) (allowing negligent supervision claim to go to the jury because when plaintiff's complaints about the harassing supervisor finally led to an investigation by the employer, no effective remedial action was taken, and the harassment and retaliation continued and escalated). While "the manner in which a sexual-harassment complaint is handled when sexual harassment has, in fact, occurred can form the basis for a claim for negligent or wanton supervision," Stevenson, 762 So. 2d at 825, the Supreme Court of Alabama has found such a claim actionable only when the sexual harassment did not stop or ceased only temporarily in spite of the employer's purported corrective action. See Machen v. Childersburg Bancorporation, Inc., 761 So. 2d 981, 987 (Ala. 1999); Big B, Inc. v. Cottingham, 634 So. 2d 999, 1003-04 (Ala. 1993).   It is undisputed that HMMA immediately investigated Edwards' claim and that any alleged inappropriate conduct stopped. (Edwards Depo., at 143:21-144:23). Therefore, summary judgment is warranted on Edwards' negligence claim.

## IV.     CONCLUSION

For all the foregoing reasons, HMMA is entitled to summary judgment on all of Edwards' claims.   HMMA respectfully requests that this Court grant its Motion for Summary Judgment, dismiss this case with prejudice, and award HMMA its costs and attorneys' fees in defending against this case.

Respectfully submitted,

/s/ Brian R. Bostick
TIMOTHY A. PALMER (PAL009)
J. TRENT SCOFIELD (SCO024)
BRIAN R. BOSTICK (BOS015)
Ogletree, Deakins, Nash,
  Smoak & Stewart, P.C.
One Federal Place, Suite 1000
1819 Fifth Avenue North

Birmingham, AL 35203
(205) 328-1900
brian.bostick@odnss.com
Attorneys for Defendants
Hyundai Motor Manufacturing Alabama,
LLC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 8th day of August, 2008, I electronically filed the foregoing Defendant's Brief in Support of Its Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Kenneth D. Haynes
> Alicia K. Haynes
> Haynes & Haynes, P.C.
> 1600 Woodmere Drive
> Birmingham, Alabama  35226

> J. Tobias Dykes
> Constangy, Brooks & Smith
> One Federal Place
> 1819 Fifth Avenue North, Suite 900
> Birmingham, Alabama  35203

/s/ Brian R. Bostick
OGLETREE, DEAKINS, NASH,
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205)328-1900
Facsimile: (205)328-6000
brian.bostick@odnss.com

6544431.1