## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| TAMMY EDWARDS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | **2:07-cv-908-MHT** |
| HYUNDAI MOTOR | ) | |
| MANUFACTURING ALABAMA, LLC, | ) | |
| and MIKE SWINDLE, individually, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANT, MIKE SWINDLE'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT

---

COMES NOW, the Plaintiff, Tammy Edwards, by and through her attorney of record, and submits this response in opposition to Defendant, Mike Swindle's Motion for Partial Summary Judgment. Material issues of fact are in dispute which preclude summary judgment as to any of Plaintiff's claims.

Pursuant to this Court's order, Plaintiff provides the following response in opposition to Defendant, Mike Swindle's Motion for Summary Judgment. Plaintiff incorporates herein her response and evidence submitted in opposition to HMMA's motion for summary judgment. As grounds therefore, Plaintiff shows unto this Honorable Court the following:

## I.    PLAINTIFF'S INTRODUCTION AND SUMMARY OF THE ARGUMENT

### 1.    Introduction

This is an egregious sexual harassment case involving Plaintiff's direct supervisor that culminated into further illegality when Hyundai transferred the Plaintiff six days after her formal complaint of sexual harassment from her computer desk job to a job slinging a hammer on the automotive production line. Hyundai, with prior knowledge that Plaintiff suffered from neck pain and swelling, not only moved her to the physically demanding and dirty job, but moved her closer to her supervisor harasser under the guise that the move would make her feel more comfortable[1] while the sexual harassment investigation was ongoing. The move was made contrary to the clear warning[2] Hyundai's Human Resource office provided to Plaintiff's supervisor not to reassign her due to issues of retaliation and amid Plaintiff's complaint of retaliation.

Within a week of her transfer, Plaintiff was sent to the medical department by the same supervisors who placed her in the physically demanding job when Plaintiff conveyed she was taking medication for her neck pain to help her

---

[1]  PX19.

[2]  PX18.

2

physically make it through her 12 hour shift.  Plaintiff was placed on involuntary

medical leave and despite her repeated and ongoing efforts to return to work,

Hyundai has not only refused to reinstate Plaintiff, but has terminated her during

the pendency of this litigation.

This entire scenario began with the actions of one man, Mike Swindle, the

Plaintiff's team leader who from his first introductory conversation forward

portrayed an unusual and even perverted obsession with sex.  In their initial

conversation, Swindle asked Tammy Edwards, the Plaintiff, if she was married and

if she ever cheated on her husband.  Thereafter, Swindle, with an unfettered

license, began making vulgar,[3] lewd,[4] and sexual[5] comments, overtures and even

---

[3] Swindle asked Edwards if she had ever had a man's finger up her butt while having sex.  (PX3, D00180).

[4] While asking Edwards if she and her husband ever had oral sex, Swindle boasted that since she had only been with one man, he would lick her ass raw.  (PX3, D00180).

[5] When Edwards asked Swindle how many hours she should put down for her time, Swindle replied she could put her pants down.  (PX3, D00180).

3

sexual gestures and simulations with his hands,[6] tongue,[7] and body[8] which caused even his manager to comment "maybe he is not wired right."[9]

Despite Plaintiff's clear and repeated requests to Swindle to stop targeting her for his inappropriate sexual advances[10] and comments,[11] Swindle continued his harassment, even boldly asserting that unless Plaintiff complied, she would not see her daughter cheer at a single football game and boasting it would do her no good to complain because no one ran the plant like he did and he was untouchable

---

[6] Swindle would hug the Plaintiff and ask if she could feel how big he was and say "Can you feel how big I am? Why do you think all the black women want to fuck me?" (Pl.'s Aff., ¶15; see also, Doc. 1, ¶ 15). Swindle would also grab his genitals through his pants and shake them at Edwards or rub them up and down. (PX3, D00179).

[7] Swindle would stare at Plaintiff in a lewd manner looking at her genital area and licking his lips. When Plaintiff threatened to slap Swindle, Swindle laughed and said that would turn him on. (PX3, D00180).

[8] Swindle told Edwards that her problem was she had never been fucked. Swindle then began to thrust his body in his chair while saying, "Fuck me your mother fucker—fuck me, Ralph, like Mike does." (PX3, D00180). Swindle would also "hump" a chain link divider within the plant taunting Edwards this is how he would "fuck" her. Edwards described this humping as Swindle on the fence with his leg hiked up going back and forth and he would go real slow and then speed up real fast and then he would holler out. Edwards depo., p. 240:1-23

[9] PX3, D00187.

[10] Amber Kelly reported that Swindle tried to hug Edwards and when Edwards shrugged him away, he said, "When you resist me, it turns me on." (PX3, D00184).

[11] Swindle referred to Edwards as "Fucking Mother Theresa." (PX3, D00184).

4

because he and Bondy (the manager) were drinking buddies.  In fact, when

Plaintiff complained to another Team Leader for help, Swindle became angry and

told her "Don't fucking go to Billy anymore or anybody about our business."

When Edwards would attempt to circumvent Swindle in trying to complete her

work, he would sneak up behind her, forcibly jerk her head back by grabbing her

hair and warn Edwards, "Don't you fucking dodge me again."[12]

## II.    STATEMENT OF FACTS[13]

### A.    Plaintiff's Initial Employment with HMMA Prior to Being Transferred to Swindle's Supervision and His Sexual Harassment

Edwards began employment with Hyundai on January 17, 2006.  (DX2).

After accepting the employment offer, Edwards attended orientation, but was not

trained on Hyundai's anti-harassment and discrimination policies nor did she

receive a handbook.  (DX2-DX6; Edwards depo., p. 38:18-22 - 40:10-19; 41:7-9;

43:1-20).

Defendant provided that Plaintiff received a handbook, was trained on the

policies and further, Edwards' sister, informed, her about the sexual harassment

---

[12]  Edwards depo., p. 129:19 - 130:10; 220:3-16.

[13]  Swindle states in his brief that he accepts Plaintiff's version of the facts for purposes of his motion for summary judgment and brief.  (Def.'s Brief, p. 4, FN2). Plaintiff also relies on her statement of facts and legal arguments in her opposition to Defendant, Hyundai's, motion for summary judgment.

training she missed.  (Def.'s Brief, p. 6).  This position is incorrect  as Edwards

clearly testified she did not receive the handbook and her sister merely informed

Edwards that training would be rescheduled for her, which never happened.[14]

(Edwards depo., p. 41:7-9 - 43:1-10).

   Edwards' initial assignment was in the body shop in the fender department

working with moving parts.[15]  (Edwards depo., p. 56:7-11).  Edwards was absent

from work January 26 and 27 due to an automobile accident.  (Edwards depo., p.

48:14-23 - 49:1-5).  Upon her return to work, Edwards provided the training center

her medical excuse and also provided an excuse and return to work slip to team

relations who told Edwards that she would not be allowed to work with the neck

brace she was currently wearing and if she wore it inside the plant, she would be

sent home.  Edwards stated she would just take it off.  (Edwards depo., p. 49:9 -

50:12).

   On her first night back to work after the automobile accident, Edwards told

her Group Leader, Steve Culpepper about the accident and that her doctor had

---

[14] See also PX19 where Edwards requests a handbook when she complained to Jones of retaliation so she would know what to do if she is ever sexually harassed again.

[15] The Hyundai plant works a rotational schedule. Edwards was initially assigned to the second shift for four months and then rotated to the first shift for another four months.  (Edwards depo., p. 59:20-64).

6

requested she be on light duty because of problems with her neck.  Culpepper

accommodated Edwards request[16] and placed her in fenders, a light duty job.[17]

(Edwards depo., p. 52:6-14; 54:21; 55:18-22).

Initially after her accident, Plaintiff's doctor prescribed medications of

Lortabs and muscle relaxers.  (Edwards depo., p. 97:8-23).  Edwards reported to

the Hyundai medical office that she was taking the medications and was told she

would have to take the medications at home when off work and that the

medications could not be taken so many hours before work.  (Edwards depo., p.

99:8-22; 349:17 - 350:2).  The Hyundai physician also confirmed that Edwards had

apprised her team leader of the situation.  (Edwards depo., p. 99:21-22).

Edwards worked in fenders for approximately one month reporting to Keith

Ulrich, Team Leader, and Steve Culpepper, Group Leader.  (Edwards depo., p.

61:17 - 62:4).  The Team Leader[18] had the authority to discipline, make work

---

[16]  Culpepper was made aware of Plaintiff's neck problems in April or May
2006.  (Culpepper depo., p. 150:18 - 151:7).

[17]  In this department, Edwards would place an automobile fender weighing
approximately three pounds on a machine, press a button to clamp the fender which
was then welded, also by the machine, with Edwards picking up the finished product
and placing it on a rack.  (Edwards depo., p. 58:19 - 59:12).

[18]  In 2006, Swindle was a team leader in Body Build and Body Respot.  There
are 10 team leaders (5 per shift, i.e, Swindle, Ulrich, Kitchens), 2 group leaders (one
per shift, i.e., Culpepper), an assistant manager (Harry White), and a manager (Tom

7

assignments, change job tasks and is also whom Edwards provided her timesheets and informed if she needed to be off work for a doctor's appointment. (Edwards depo., p. 62:20 - 63:16; 65:6-21). Further, a team leader oversees the day to day duties of a small team or area keeping up with the time sheets of those employees, reporting problems or going to as a contact intermediator between production team member and group leader. (Culpepper depo., p. 15). Team Leaders sit at a desk on the front line of the production area with a computer and telephone which is not the same for the hourly team members. The group leaders are located in an office remote from the production line. (Swindle depo., pp. 158-159; Culpepper depo., p. 17:10-13). Team leaders are paid $1.00 more than the hourly workers and are not considered equals with team members. (Culpepper depo., p. 16; Swindle depo., pp. 157-158).

### B. Edwards is Reassigned to the CCR Position Where Swindle is Introduced to her as "The King" and the Sexual Harassment Begins

Team leader, Ulrich recommended Edwards for a promotion to the CCR position which involved working from a computer station in an office setting that was on the second floor away from the production line. This position involved keeping up with the downtime when the robots malfunctioned. (Edwards depo., p.

_____

Bondy). (Swindle depo., pp. 30-36).

68:7 - 70:10).  Edwards replaced Pam Stoddard  who was placed back on the

production floor to record the downtime on a wet board when a robot went down.

This position required recording the causation of the malfunction, how repaired

and how long the robot was down.  It was from this board or person that Edwards

would receive the required information for her downtime reports.  (Edwards depo.,

p. 74:9-12).

    While Edwards' office was located upstairs in the computer room away from

the production floor, on occasions it would be necessary for Edwards to walk

downstairs to the production floor to investigate or obtain additional information

needed for her report as well as take pictures to attach to her downtime report.  The

finished report was then disseminated to the managers and owners of Hyundai.

Edwards trained for two days with Sherry McRae who worked the opposite shift

performing the same job.  (Edwards depo., p. 72:7 - 73:4; 73:15 - 74:5; 74:9-12;

78:13-21; 79:9-12; 79:18 - 80:2).

    Long periods of sitting aggravated Edwards neck while performing the CCR

job and Edwards asked and obtained permission from Culpepper and Harry White

to walk around in the computer room as needed.  This request was approved as

long as her report was complete by the next morning.  Edwards even brought a

towel to work with her to put behind her neck and would walk around pulling the

9

towel to relieve her neck pain.  Compiling the report with attached pictures was Edwards only job.  (Edwards depo., p. 75:5 - 77:12).

In her new position, Edwards was introduced to Mike Swindle by Harry White, assistant manager, as "The King" of the body build.  (Edwards depo., p. 71:15-21; 100:6-8).  Months later when Edwards would ask if she could be  moved away from Swindle and back to her previous job in fenders, White would tell Edwards that whatever Swindle wants, he gets.   (Edwards depo., p. 90:19-22).

### C.    Edwards' Sexual Harassment by "the King" Becomes Severe and Unbearable as Swindle Brags he is Untouchable Because he is Drinking Buddies with his Manager Tom Bondy

As her new team leader, Edwards reported to Swindle the downtime in his area.  (Edwards depo., p. 107:67-8).  After Edwards starting reporting to Swindle, he would come to the computer room and discuss his marital problems, as well as inquire of Edwards about her marriage.  From the initial conversation Swindle inquired if Edwards was married and if she ever ran around on her husband.  When Edwards remarked she was happily married to her high school sweetheart, Swindle said she was lying and said she had not been with the right person.  Swindle asked what it would take for Edwards to cheat on her husband.  (PX3, D00193).

Swindle told Edwards that if she would just fuck him one time that she would go home and blow Ralph's (her husband) head off.  (Edwards depo., p.

153:20 - 154:3; Abrams depo., p. 15). Swindle said he did not understand how women could sleep with just one person and that men slept with multiple partners and that Edwards should not believe her husband was monogamous either. Swindle told Edwards to call her husband on his cell phone. When Edwards complied and her husband did not answer, Swindle laughed and said it was because her husband was with another woman. (Edwards Aff., ¶ 16; Edwards depo., p. 109:13-19).

Swindle would harass Edwards by grabbing his genitals and shaking them at Edwards when other men would be around to laugh. On other occasions, Swindle would grab his penis through his pants and stroke it up and down. (PX3, D00179). Edwards described that the more people around, the more Swindle liked harassing her even though she kept asking him to stop. (Edwards depo., p. 128:7-15). Even though Edwards asked Swindle numerous times to stop, he would still grab his crotch and shake his genitals at her every time she saw him. (Edwards depo., p. 120:15-21).

The harassment by Swindle became so bad that Edwards started avoiding Swindle and walking the long way around his work area, but Swindle, undeterred, would appear and cuss Edwards out and tell her not to "fucking dodge" him again. Swindle would grab Plaintiff by the hair when she would try to dodge him and tell

her "don't fucking walk by me without speaking." Edwards again asked Swindle to stop shaking his genitals and he replied that he was not hurting her and there was nothing she could do to stop him. (Edwards depo., p. 129:19 - 130:10).

Billy Kitchens, Team Leader, asked Edwards why Swindle was cussing her and Edwards replied that he was such a pervert she could not handle him acting like he did. Kitchens replied that was just Swindle and he understood that he would not bring his wife around Swindle because of how he acted towards women. (Edwards depo., p. 130:18 - 131:5; 146:11-15; Kitchens depo., p. 71). Kitchens confirmed that Swindle comes across brash and the way he talks is wrong. (PX3, p. 2). Kitchens also admitted that Stephanie Samuels, Quality Group Leader, had complained that Swindle's language bothered her and that Swindle was disrespectful to women. (PX3, p. 9-10; Kitchens depo., pp. 34, 42-43; PX3, pp. 2, 9).

Kitchens asked Edwards if she was miserable and she told him that she was. He asked if she wanted to go back on the line and she said, "No." He then asked sarcastically if she wanted to go to Swindle's line and she said, "No," and told Kitchens that Swindle was a pervert. (Edwards depo., p. 193:6-21).

After Edwards complained to Kitchens, Swindle approached Edwards and told her "Don't fucking go to Billy (Kitchens) anymore or anybody about our

business." Edwards replied she did not know what he was talking about.  Swindle said that Edwards was trying to get him in trouble.  (PX3, D00180).

Swindle would graphically describe women in the workplace  (Abrams depo., p. 16) and use profanity when he would talk to Edwards about these women. Everything Swindle said was using the word, "fuck" or "mother fucker."[19]  (PX30, D00179).  Swindle even admitted during his deposition that he used the words "bitch" and "fucking bitch" in the workplace, but testified that "well, bitch" ain't no sexual word to me.  (Swindle depo., p. 87:16-20; 90:3-4).

Swindle asked Edwards if she had ever had a man's finger up her butt during sex.  (PX3, p. 4).  Swindle discussed performing oral sex on Edwards and told her "he would lick her ass raw."  Swindle referred to  Edwards as "fucking Mother Theresa."  (Edwards depo., p. 179:16-22; 211:1-6).  Swindle rubbed Edwards leg through her pants and remarked that plaintiff had on new pants, looked "damn good" and if she were his wife he would not have let her out of the house. (Edwards Aff., ¶ 17).  Swindle, seeing a picture of Plaintiff's minor daughter on her desk, remarked that she knew Plaintiff's daughter's boyfriend was "tearing that up."  (PX3, D00181).

---

[19]  On several occasions, the sexual harassment of Plaintiff was witnessed by Steve Culpepper, Group Leader.  Another Team Leader, Billy Kitchens, also sexually harassed Plaintiff on the job, and this harassment was also witnessed by Culpepper.

13

Swindle would discuss different women he had been with sexually in the workplace and those that he would not pursue with Edwards. (Edwards depo., p. 155:16-20). Edwards also observed Swindle sexually harassing other females in front of her and Edwards would tell him to stop. Swindle remarked to Amber Kelley when she was walking down the aisle with a sucker in her mouth that he had something she could suck on and grabbed his genitals and shook it at her. (Edwards depo., p. 156:2-9). Swindle then told Kelley she was "ghetto" and said "you just want to fuck me." (Edwards depo., p. 157:1-2).

Swindle made similar comments to Jennifer, another female coworker in front of Edwards. (Edwards depo., p. 158:13-21). Swindle also discussed sexual situations with Pam Stoddard in front of Edwards when Swindle and Stoddard discussed the various ways they had had sex with different people. (Edwards depo., p. 160:13-15). Team member, Kelley, walked up on the end of this conversation between Edwards, Swindle and Stoddard and heard Edwards complain, you better quit talking to me like that before I report you. Stoddard threatened, "No one is going to fuck with Mike." Kelley inquired of Edwards what they were talking about and Edwards reported that Swindle was talking about

14

performing oral sex on her since she had only been with one man.  (PX3,[20] p. 8 - D00184).

Swindle would hug Edwards against her will and press his body against hers asking if she could feel his erect penis, "Tammy, can you tell how big I am?" "Why do you think the black women want to fuck me?"  (Edwards Aff., ¶ 15).  On one occasion Kelley told Swindle to stop looking at Edwards' butt and in reply Swindle grabbed Edwards and hugged her even though Kelley and Edwards protested that Swindle was to get his hands off Edwards.  (Edwards depo., p. 156:13-20).

Swindle admitted he not only hugged Edwards but grabbed the back of Edwards' hair pulling her toward him and knew when he jerked her head back that Edwards had neck problems.  (Swindle depo., p. 122:9-12; 123:1-5, 280).

Swindle would tell Edwards that if she did not have with him, she would not see Haley, Plaintiff's daughter, cheer at any football games this year.  Swindle would tell Edwards that if she did not kiss or hug him, she could not pass down the

---

[20]  Plaintiff admits this is an accurate summary, but is not everything that Plaintiff discussed with Team Relations that Swindle had done and specifically told Team Relations that Swindle had altered her hours.  Swindle added the hours back in and told Edwards that she owed him.  (Edwards depo., p. 176:14 - 177:6-21).

aisle. Swindle approached Plaintiff and told her to kiss him so "everyone will think you are fucking me."

Several times Plaintiff would try to do her job by walking the long way around instead of near Swindle's area. He would forcibly jerk Plaintiff's head by grabbing her ponytail and holding her against her will and tell her, "Don't fucking walk by me without speaking." (PX3, D00179-D00181; Edwards depo., p. 129:19 - 130:10).

On another occasion, Plaintiff's arms were held behind her back by female team member, Stoddard, a close friend of Swindles so Swindle could kiss Edwards. Stoddard told Swindle to "get her." Swindle informed Plaintiff there was nothing she could do that would make him stop. (Edwards depo., p. 204:1-9). Plaintiff pushed Swindle away from her after he made the comment that nothing could stop him and Swindle laughed and remarked that he liked it when she got rough. Swindle stared at Plaintiff in a lewd manner looking at her genital area and licking his lips. When Plaintiff threatened to slap Swindle, Swindle laughed and said that would turn him on. (PX3, D00179-D00181).

On another occasion, Edwards asked Billy Kitchens if he had had a rough day to which Kitchens replied that he had because he, "didn't get any last night." Swindle, who was listening to the conversation then remarked that he knew what

was wrong with Edwards, she had never been fucked," to which Swindle began to thrust his body wildly in a chair while saying, "fuck me you mother fucker -- fuck me Ralph like Mike does."  (PX3, p. 4; Edwards depo., p. 162:5 - 163:9; 227:3 - 228:19).

During the investigation, Kelley reported that she had told Swindle not to make suggestive looks at Edwards, "That's a married woman, you shouldn't be looking at her."  Swindle replied, "I can look at her any fucking way I want to, right, Tammy."  Edwards replied, "No."  Swindle then hugged Edwards and when Edwards tried to shrug him away Swindle replied, "when you resist me, it turns me on." Additionally, Swindle hugged Plaintiff seven or eight times, would purposely bump against her with his hands behind his back.  (Edwards depo., p. 216:2-23; 217:1-5; 220:3-22).

Swindle would not only hug Edwards, but would ask Edwards if she could feel how muscular his chest was and that his chest was bigger than her husband's. (Edwards depo., p. 218:8-13).  Edwards described the hugs having to last for a period of time with Edwards having to stand there and then ask Swindle if he was through so she could move.  (Edwards depo., p. 219:21 - 220:2).

Swindle told Edwards that he was an ass man, not a boob man and she could leave her shirt on, he just wanted her bottom half.  Swindle asked Edwards if she

17

fingered herself.  (PX3, D00181).  Swindle bragged to Edwards about having sex with different women and pulling their hair.  He said he made love to his wife, but he liked to have freaky sex on the side.  Swindle would ask Edwards if she and her husband had oral sex, would brag about having sex with other people and would tell Edwards that he did not use condoms when he had sex.  Swindle stated that he did not get along with Harry White because White's wife wanted him.  (PX3, p. 4; Edwards depo., p. 154:4-14; 195:18 - 198:4).

Edwards would go to the cafeteria to get her breakfast and if she did not ask Swindle if she could bring his breakfast back for him, then he would talk about her in a negative fashion.  When Swindle would ask Edwards to go to the cafeteria and bring back breakfast for he and Jennifer Foster, the female coworker he was having an affair with.[21]  When Edwards remarked that she would need to get Ronald Mitchell breakfast as well, Swindle replied, "You ain't getting that black mother fucker nothing."  (PX3, p. 17; Edwards depo., p. 112:1-23; 251:11 - 252:3).  Swindle invited Edwards to watch him race his motorcycle and when Edwards replied "we might do that," Swindle told Edwards if she was bringing her husband, don't come.  (Edwards depo., p. 113:5-22).

---

[21] Swindle is married.  (Swindle depo., p. 11).

18

On another occasion, Edwards was walking down the aisle with her clipboard when Swindle approached and started bumping her with his body as she was walking.  Edwards asked Swindle to stop and when she looked up, she saw team member, Cleckler, also her children's baseball coach and a friend from church.  Edwards asked Swindle to stop harassing her and explained that people would think something, to which Swindle replied that he did not give a "fuck."  Edwards asked Swindle not to talk like that in front of Mr. Cleckler explaining that he is a good church-going man and would be offended.  Swindle replied in front of Cleckler, "I don't give a fuck who he is or where he goes."  (Edwards depo., p. 119:21 - 120:20).

Kim Abrams reported that Swindle would make comments about women's body parts and looks at women in a sexual way.  Abrams further complained that Swindle has a foul mouth and that she had inquired of him if he was going to apply for the team leader position at the beginning of the year to which he replied he was not going to mess up what he had on that shift because he was having a relationship with one of his team members.  (Abrams depo., pp. 16-17).  Hyundai did nothing about this complaint.

On July 31, 2006, Edwards became upset and was crying over the fact Swindle would not stop his harassment even though she had begged him to quit.

(Edwards depo., p. 138:1 - 139:14).  Michelle Nelson and Kim Abrams saw how

upset Edwards was and told her that she needed to send Stacye Jones, in team

relations, an e-mail to report Swindle.  (Edwards depo., p. 139:15 - 142:13).

Edwards inquired of Jones if she could just be moved to another area away

from Swindle, Jones replied that Edwards would not be transferred but the problem

would be fixed.  (Edwards depo., p. 142:14 - 144:15).  Six days later, Edwards was

transferred and within a week later, Edwards was escorted off Hyundai's plant and

her name tag blocked for future access.  Swindle was still at his desk.

### D.    There are No Prior Complaints about Edwards Performance in the CCR position Until She Complains About Swindle and Brings This Lawsuit

Initially Edwards would ask Steve Culpepper to look over her reports until

she was comfortable in her new position.  (Edwards depo., p. 81:19 - 82:5).  No

one in management ever discussed with Edwards that there were problems with her

reports, in fact, they bragged how well her reports were.  (Edwards depo., p. 82:22

- 83:15).  Tom Bondy, manager, made a special effort to introduce himself to

Edwards and convey her reports looked really good and thanked her for the time

and attention.  (Edwards depo., p. 83:9-15).

When Edwards started as a CCR, Amber Kelley (also known as Amber

Kelley Batie) was moved from hinges on the BC-1 line to being responsible for the

board where downtime was reported on the production line and from which
Edwards would retrieve the needed information for her report.  (Edwards depo., p.
86:8-17).   Edwards observed there was an important need for someone to be cross-
trained in her CCR position in the event she was sick or off work for doctors
appointments.  Edwards asked Harry White if she could cross-train someone for
the position and received permission.  Edwards also identified Amber Kelley as the
person she thought had the requisite skill set to cross-train and her selection was
also approved.  Next Edwards asked if Kelly would be interested in cross-training
for the position.  It was discussed that Edwards would work upstairs in the
computer room for a week compiling the downtime report and then alternate with
Kelley who was recording information on the downtime board on the production
floor.  (Edwards depo., p. 85: 3-12; 87:13-18; 87:19 - 88:6; 94:3-17; Kelley depo.
p. 9, 48).

    **E.**    **Edwards Complains for Swindle to Stop or Move Her Away From
Swindle and Back to Her Former Position.**

    Not only did Edwards complain numerous times to Swindle to stop his
harassment, Edwards also complained to other managers even though she had
never received a handbook or been trained on sexual harassment.  Swindle told
Edwards it would do her no good to complain because Tom Bondy, manager, owed

him.[22]  Swindle bragged to Edwards that no one was going to get him in trouble

because he knew Tom Bondy,[23] the welding manager, that they were drinking

buddies and nobody would fire him because nobody else could run the line like he

could.  (Edwards depo., p. 169:2-6).  Swindle further bragged to Edwards that he

knew too much on Tom Bondy  and nothing would be done to him.  (Edwards

depo., p. 177:18-21).

Edwards told Swindle all she wanted to do was work and for him to stop

harassing her that she was not used to that kind of talk or people acting like that.

Edwards told Swindle that she felt God had put her at the plant for a reason and

that was to help him get right with his family and be a daddy and a husband.

(Edwards depo., p. 191:8-23).

Soon after Edwards expressed her desire to be moved from the work

environment where Swindle was located and initially requested for Swindle to

move her back to her previous job in fenders working for Ulrich, who Edwards

---

[22]  Bondy and Swindle socialized outside of work.  (Swindle depo., pp. 59-60).
Kitchens and Swindle were also close friends and lived together, sharing a townhouse
after Swindle was separated from his wife.  (Swindle depo., pp. 12-13, 48).

[23]  Bondy and Swindle socialized outside of work.  (Swindle depo., pp. 59-60;
134-135).

described as quiet and all about Hyundai's business. Swindle replied that Edwards could come to work on his line on "the floor." (Edwards depo., p. 89:3 - 90:18).

When Edwards approached Harry White about moving away from Swindle and back to her old job in fenders, he asked if she thought she could handle working on the floor and commented that Swindle is king and what Swindle wants, he gets. (Edwards depo., p. 90:19-22).

Edwards informed White that she would just stay in the CCR room, that she would be fine, as long as she could continue to stand up and sit down. White inquired if Edwards was sure that she wanted to stay in the CCR and Edwards replied, "Yes." (Edwards depo., p. 91:10-23; 92:6-21). Edwards had previously complained to Bondy that she might as well go back to the floor because people who were putting down incorrect information on the downtime boards which was effecting her reports and she felt there were lies incorporated in her reports. Bondy told Edwards she would stay in the CCR position and he would get Kelley and Stoddard back working on the downtime boards to get her good information. (Edwards depo., p. 274:10 - 276:15).

Edwards also complained to Billy Kitchens[24] within the first week she was moved to the CCR department about Swindle.  (Edwards depo., p. 127:17-23).  Edwards reported to Billy Kitchens that she did not like Swindle's harassment of her and could he get Swindle to watch his mouth.  (Edwards depo., p. 135:13-23).  Kitchens talked to Swindle[25] and the same day Swindle threatened Edwards, "don't fucking tell my business" to Billy or anyone else.  (PX3, D00180).

Edwards also complained to co-worker Pam Stoddard because Stoddard and Swindle were close friends.  She asked Stoddard to talk to Swindle and ask him to stop.  Stoddard advised Edwards that if she would just act like Swindle's harassment did not bother her, Swindle would eventually stop.  Edwards replied to Stoddard that was the same advice that Swindle provided when she complained to him, but that the harassment was still ongoing.  Stoddard replied that that was just Mike (Swindle)  and "he is crazy" and they just needed to get him away from his

---

[24] Kitchens is a group leader.  This is a position he has held for eight months, having been promoted from team leader.  In 2006, Swindle was living with Billy Kitchens in a roommate situation.  Kitchens described the relationship as being as close as brothers.  (Kitchens depo., pp. 12-13, 48).

[25] Swindle denies Kitchens' statement that Edwards came to him months ago complaining about Swindle and that Kitchens told Swindle to watch his mouth and how he acted around the ladies.  (Swindle depo., pp. 160-162).  Swindle also denied Kitchens' statement that he has been in conversations with Edwards and Swindle where Swindle used the word "fuck."  (Swindle depo., p. 163).

girlfriend and back with his wife. (Edwards depo., p. 124:9-23). On another occasion when Edwards complained to Stoddard about Swindle's harassment, specifically his comment about oral sex and having a man's finger up her butt during sex, Stoddard replied, "Damn girl, it ain't hurting you." (PX3, D00179).

Edwards also complained to Michelle Nelson and Sherry McRae. (Edwards depo., p. 124:12-13; 125:11-12). Sherry McRae was training Edwards on the CCR position as instructed by Culpepper. (Edwards depo., p. 136:1-4). McRae actually warned Edwards about Swindle telling her that she needed to watch Swindle, he runs around and is a bad influence. (Edwards depo., p. 125:11-22).

When Edwards complained to Michelle Nelson, Edwards was told it would do her no good to go any further to management because the rest of management was doing the same thing as Swindle. Edwards replied that she had figured that out because Swindle said they were all drinking buddies and that he could not get fired. Nelson agreed. (Edwards depo., p. 125:23 - 126:7). Nelson also warned Edwards that Swindle had a bad reputation and she should not be alone with him in the computer room where Edwards worked. (Edwards depo., p. 126:15-23). Nelson also apprised Edwards that Swindle would not stop his harassment, he had always acted that way no one in management would do anything about him. (Edwards depo., p. 127:4-16).

Edwards also complained to Culpepper, Group Leader, about Swindle and Culpepper acknowledged that he had observed a lot of Swindle's actions to Edwards. (Edwards depo., p. 147:1-6; 387:6-17). Edwards also complained to Culpepper about a comment that Billy Kitchens had made about her new job, that it was going to be under Kitchens' desk. When Edwards pressed the point and told Kitchens, "go ahead and tell Steve (Culpepper) where you said my new job would be, under your desk," Culpepper laughed and said, "We can't really authorize that Billy."[26] (Edwards depo., p. 148:2-11; 149:20 - 153:20). Culpepper said nothing to chastise nor help Edwards.

On another occasion, Edwards complained to Culpepper when he told her to go to Swindle about a work issue. Edwards expressed her reluctance to go to Swindle and told Culpepper that he knew how Swindle was, she would prefer not to go to him. Culpepper again laughed at Edwards and said that Swindle would tell you what the problem is, but he will put a lot more into it and tell you things you also don't want to hear. (Edwards depo., p. 149:18-23).

---

[26] Kitchens denied that he ever told Edwards that her job would be under his desk even when the audio tape was played of the conversation, Swindle still denied his comment even though he confirmed that it was his and Edwards voice on the tape. (Kitchens depo., pp. 98-103).

On another occasion Edwards and Kelly approached Kitchens about Swindle touching and harassing Edwards. (Kelley depo., p. 18). After the two complained Kelley noticed that no one would talk with she or Edwards or sit with them at lunch. (Kelley depo., p. 40).

### F.    Plaintiff's Interrogation by the Production Manager

The next day after complaining about Swindle to Team Relations, Bondy and Culpepper summoned Edwards for a meeting. (PX3, D00187). Bondy confirmed during depositions the first thing Swindle did when he found out about Edwards' complaint was to go straight to Bondy. (Swindle depo., p. 205; Bondy depo., pp. 98-99; PX3, D00188).

Plaintiff relayed to Bondy that Swindle had told her that Swindle and Bondy were friends and she could not do anything about Swindle harassing her. Nelson testified about this as well. (Nelson depo., pp. 17, 20).

Bondy confirmed that Edwards conveyed very graphic details of how she was being treated by Swindle. (Bondy depo., p. 95).

Swindle denies using "fuck" or "mother fucker" in front of Edwards. (Swindle depo., p. 80:12-17). Since being accused by Ms. Edwards in 2006, he has not received any further training on harassment and discrimination. (Swindle depo., p. 83:12-14). Swindle had no knowledge that it was against the law to

27

sexually harass anyone and testified to such at his deposition. (Swindle depo., p.

346:20 - 347:7). Swindle was told by a coworker that he had heard Edwards had

complained about him sexually harassing and went straight to Tom Bondy to tell

him he was worried about losing his job and did not know what to do. Bondy

replied there was nothing he could do, but sit back and wait to see what team

relations does. (Swindle depo., pp. 108-109). It was after this meeting with

Swindle that Bondy called in Edwards even though he knew she had already gone

to team relations.

### G. Hyundai Did Not Take Prompt Remedial Measures and Did Not Discipline Swindle

Plaintiff has more fully argued this in its brief, but it was only after Plaintiff

was retaliated against and placed on leave that Swindle was suspended two weeks

without pay but returned to the same job with the same hours and pay and has

worked continuous since. He remained a team leader despite Team Relations

recommendations to remove him. (PX4). (Kitchens depo., pp. 77-78).

Team Relations never told Edwards what action was taken and told her she

was not entitled to that information unless she came back to work. (Edwards

depo., p. 263:20 - 264:13). Jones never gave Edwards any reassurance that the

investigation had been completed and action had been taken.   (Edwards depo., p.

265:6-12).

### H.    Six Days after Complaining About Swindle to Team Relations, Plaintiff  is Reassigned from her Computer Desk Job to Slinging a Hammer on one of the Dirtiest Jobs on the BC1 Line

After Edwards complained about Swindle,  Culpepper stopped speaking to

Edwards.  (Kelley depo., p. 40).   Culpepper also approached Kelley about

assuming Edwards position full time.  Culpepper did not convey to Kelley nor

Edwards that Edwards was not doing a good job.  It was only after Edwards

complained that Edwards was moved to another position in production.  (Kelley

depo., pp. 11- 12).  No one but Edwards trained Kelley on how to do the CCR job

and Kelley had no criticism about how Edwards trained her for the job and they

worked well together.  (Kelley depo., pp. 43-44).   Edwards was not moved to

Kelley's job but was instead moved to a weld job considered a very dirty job.

(Kelley depo., pp. 45-46).

In the CCR office, Edwards' desk was 300 feet from Swindle's desk, but

when Edwards was moved to the BC-1 line, she was a mere 30 feet from Swindle

and told the move would make her feel more comfortable.  (Bondy depo., pp. 68,

83-84; Culpepper depo., p. 149:6-12; PX19).

During his deposition, Bondy explained in great detail while reviewing PX26, assuming it was one of Edwards' downtime reports, the problems with the report. But the report was not Edwards' report as she had already been moved to the BC-1 line, the report was from Kelley. (Bondy depo., pp. 55-61; Edwards Aff., ¶ 4).

On August 1, Plaintiff had complained to Team Relations about Swindle and on August 10, Plaintiff was moved to the production floor.[27] (Edwards depo., p. 266:12-21). Edwards was in the CCR room doing downtime when Steve Culpepper called her and told her to come to the production floor that Billy Kitchens had something for her to do. When she arrived on the production floor, Kitchens said he had a new job for her; took her to the line where she had never worked before and gave her a hammer to start hammering car hoods. (Edwards depo., p. 267:14 - 268:12).

---

[27] Culpepper testified it was coincidental only that Edwards was moved six days after she complained about Swindle but Culpepper does not know what he told Edwards when he moved her. (Culpepper depo., p. 130:3-11; PX36).

When Edwards asked Kitchens why she was doing this job,[28] he replied that Culpepper thought it would make her feel better and then he replied, "Just know I didn't have anything to do with it." (Edwards depo., p. 268:1-12). Kitchens repeated that he wanted Edwards to know he had nothing to do with her move down to the production floor. (Edwards depo., p. 268:18-20). Edwards approached Culpepper and asked him why she was being moved and he replied that it was Tom Bondy's decision. (Edwards depo., p. 269:8-18).

Bondy and Swindle were friends and drinking buddies after work. Bondy had also called Edwards to his office asking Edwards what all Swindle had done even though Edwards had already been to Team Relations to complain. (Edwards depo., p. 269:22 - 272:12).

Prior to the move to the production line by Bondy and Culpepper, both men had stopped talking to Edwards after her complaint. (Edwards depo., p. 272:8-12).

---

[28] Swindle was in that area when Edwards went to work on the BC-1 line. (Edwards depo., p. 279:14-18). Edwards was told this would be her permanent job. The line moved every 48 seconds which involved Edwards beating in the gap with a hammer and knocking off the well splatters in that 48 seconds. (Edwards depo., p.283:5-19; 284:10-15). The job was also a dirty job because of the weld splatters get all over you. (Edwards depo., p. 280:8-13; 291:1-6; Kelley depo., pp. 45, 64). The job Edwards was doing involved a gap that had been created by one of the robots on the tailgates. She would take a hammer and beat in the gap. She would also have to take a file, 7-8 inches long and knock off weld splatters. (Edwards depo., p. 281:1 - 282:6).

31

Bondy and Culpepper told Stacye Jones that Edwards had voluntarily come to talk to them.  (Edwards depo., p. 272:20 - 273:4).

Edwards never requested to go work on the BC-1 line in Swindle's area. Rather, she requested to be moved back to moving parts where she would be away from Swindle and his work area.  Swindle had plaintiff moved within 30 feet of his desk, where prior, plaintiff had been located on the floor above the production area. (Edwards depo., p. 194:3-7).

After Plaintiff complained to Team Relations, people stopped talking to her on the line, including the managers.  Group Leader, Steve Culpepper asked that Edwards drop her complaint against Swindle, that he would make Swindle apologize and stay away from her.  (Edwards depo., p. 200:1-22).  When Plaintiff refused, Culpepper stopped talking to Edwards.[29]

Team Member, Amber Kelley told Edwards to tape record her conversations at the plant because Swindle was getting a group of management people together to lie about her and that it was important that she not trust anyone.  (Edwards depo., p. 200:1-5; 201:18 - 202:8).  Kelley also warned Edwards that she had better take

---

[29] Prior to the move to the production line by Bondy and Culpepper, both men had stopped talking to Edwards after her complaint.  (Edwards depo., p. 272:8-12). Bondy and Culpepper told Stacye Jones that Edwards had voluntarily come to talk to them.  (Edwards depo., p. 272:20 - 273:4).

care of herself that they were going to get her out for complaining. (Edwards depo., p. 206:11-19). Kitchens also expressed concern to Edwards that Swindle would take him out with him and apologized to Edwards for his actions and agreed that Swindle should have been gone a long time ago. (Edwards depo., p. 208:9-17; 235:9 - 236:6).

After Edwards was moved to the production line, she was approached by Stacye Jones who asked her who made the decision to move her from the CCR position to the production line. Edwards replied that it was Steve Culpepper and Tom Bondy. Jones provided to Edwards that she had not been informed and Jones promised that they would talk about the move some more. (Edwards depo., p. 277:17 - 278:7).

Jones included in her weekly report that, "The welding team member, Edwards, who made an EEO complaint last week, feels as if Team Members and possibly management, are treating her differently. This Team Member has reported that the Group Leader, Steve Culpepper, would not approve her vacation and personal time for her now, where he would in the past."[30] (Kelley depo., p. 35). Jones reported that she had spoken with the welding manager, Bondy, and

---

[30] Edwards would lose $100 per month is she didn't have perfect attendance so when Culpepper denied her vacation time and she would have to take personal time, then it would cause her to lose her $100 perfect attendance. (Kelley depo., pp. 37-39).

the Group Leader, Culpepper, regarding the actions.  Bondy confirmed to Jones that he intended to move the Team Member from her CCR position to BC-1.  Jones advised Bondy not to do this due to legal ramifications and perceived retaliation.  Further, Culpepper stated that no request for personal or vacation days had been submitted to him.  (PX18 - D00195).

Two days later, Jones confirmed that Edwards had been moved to a different job from the CCR position to the production floor and that this team member had sent her an e-mail which indirectly eluded to retaliation.  The action that Team Relations took regarding this e-mail was redacted by the defendant during the litigation.  (PX18 - D00196; see also PX22).

Edwards was told she was moved from her CCR position to the BC-1 line because it would make her feel more comfortable until things were over.  (PX19; Kitchens depo., p. 28).  Edwards was not told as the Defendant alleges that she was moved because she was not performing well or that she had previously requested to be moved.  No one told Kitchens that Culpepper and Bondy were having to redo any of Edwards reports and he never heard complaints about Edwards' reports.  (Kitchens depo., pp. 24-25).  Rather, Edwards was told the move was based on making her feel more comfortable.  (PX19).

## I.    Plaintiff Goes on Medical Leave

On August 10, Plaintiff was transferred to the production line.  (PX19).  On August 16, Edwards was working the BC-1 line and had experienced a bad night with her neck and shoulder hurting from the hammering and as a result had taken a muscle relaxer on her way to work.  Kitchens approached Edwards to ask how she was doing.  Edwards replied, "Not well."[31]  Kitchens asked if she was sick and if the job was bothering her neck.  Edwards replied that Kitchens knew the job was bothering her neck.  (Edwards depo., p. 291:7-13; Kitchens depo., p. 27).

Edwards conveyed that she had taken medication so that she would be able to do the job.  At this point, Kitchens said that he could turn her in for taking the medication.  (Edwards depo., p. 291:13-23).  Edwards conveyed that she had told medical before about her medication and could take the medication, but just so many hours before her shift but conveyed to Kitchens that she could not do this job and not take her medication.  Kitchens replied again that he could, if he wanted, turn in Edwards.  Edwards replied not to give her any favors since she had had enough favors.  (Edwards depo., p. 292:12-17).

---

[31] This job irritated Plaintiff's neck because of the hammering and using a lot of pressure on the file to knock off the welds.  The job entailed three tasks that all irritated her neck.  (Edwards depo., p. 284:10-15).  However, there were some 13-15 jobs on the line that were less strenuous that Edwards could have performed that would not have irritated her neck.  (Edwards depo., p. 285:13 - 287:12).

Kitchens then called Steve Culpepper on the radio and Culpepper instructed Kitchens to call Stacye Jones. Jones told Edwards to go to medical. (Edwards depo., p. 293:1-5). The medical doctor was angry that Edwards had been moved to the production line, said she should not be on the line with her neck and that he would talk to team relations. (Edwards depo., p. 293:6-23 - 295:2).

The Hyundai doctor told Edwards she would be on involuntary medical leave and that she would have to go to her physician and be released from the doctor before she could come back to work. (Edwards depo., p. 296:3-6). The doctor also asked if Edwards had the short term disability paperwork to which Edwards replied that Jones had already provided her that information. (Edwards depo., p. 296:10-19). Edwards admits she did not apply for FMLA because she was hoping to get back to work and FMLA, as explained to her by Jones is like extended sick leave and Jones had suggested short-term disability. (Edwards depo., p. 301:18 - 302:20).

Jones also told Edwards when she started short-term disability that if the doctor did not release her, her short-term disability application would convert to an application for long-term disability. (Edwards depo., p. 309:18-23). Jones also told Edwards that as long as she was applying for leave, her absence from work would be excused until Jones got back with her. (Edwards depo., p. 203:8-17).

36

During her medical leave, Plaintiff underwent injections for pain blocks, physical therapy, a chiropractor and then pain management.   (Edwards depo., p. 307:1-21).

### J.     Plaintiff's Attempts to Return to Work are Blocked by Hyundai and Plaintiff is Terminated for Complaining of Sexual Harassment

On February 12, 2007, Plaintiff attempted to return to work and went back to the plant reporting to the medical clinic for evaluation.  Edwards was told she would need to get an indication of what her restrictions were from her physician. Plaintiff complied and reported back to work the next day.  (Edwards depo., p. 311:15 - 312:11).  When Plaintiff reported back to work with her restrictions, medical called Steve Culpepper and he reported that he did not have any work for her to do.[32]  (Edwards depo., p. 312:18-19; Culpepper depo., pp. 137-139).

Edwards was requested by medical to call Steve Culpepper even though medical had already talked to Culpepper.  Plaintiff complied.  (Edwards depo., p.

---

[32] On February 12, 2007, Culpepper sent an e-mail to Bondy advising him that Edwards had returned to work and reported to medical which he heard about in the plant and had called to ascertain her condition.  (PX36; Culpepper depo., pp. 133-136).  Culpepper asked Bondy if there was a job she could be placed with her restrictions but doesn't recall ever receiving an answer from Bondy.  (Culpepper depo., p. 138).  He wrote in the e-mail that it was a sensitive subject because he knew Edwards was claiming she had been treated unfairly due to the phone call he had received from her.  (Culpepper depo., p. 139).

319:4 - 320:21).  Plaintiff inquired of Culpepper that she needed to know what

areas she would be going back to work in so she could advise her doctor.[33]

Edwards advised her doctor would release her for the CCR job or the down time

board but Culpepper replied that the down time board was no longer a job[34] and

that she would being back to work on the 505 or 506 line which are considered the

more strenuous jobs in the workplace.  (Edwards depo., p. 286:14-20; 320:7-17;

33:3-8).

The conversations with Culpepper, Plaintiff's group leader, about returning

to work occurred in February 2007.  (Edwards depo., p. 322:1-22; 323:15-23).

Culpepper instructed Edwards that she would have to deal with Jane Ramsey about

returning to work; Ramsey, when contacted by plaintiff told Edwards she would

have to deal with Stacye Jones, which Plaintiff did.  (Edwards depo., p. 323:22 -

324:2).  When Plaintiff contacted Jones, Jones said she would have to get back

with Edwards later about returning to work.  The next thing Plaintiff heard was a

_____

[33] Edwards asked why she was not being allowed to come back to work and
Culpepper explained that he had no job to accommodate her restrictions.  (Culpepper
depo., p. 139:20 - 140:1-5).  Edwards told Culpepper she was being treated unfairly
based on Mike Swindle and her complaints.  (Culpepper depo., p. 140:7-12).

[34] However, Amber Kelley, who was given Edwards' position after Edwards
complained, testified during her deposition that she is currently training two people
to do the CCR position:  Jamal Pollard (male)  and Pamela Stoddard (who Edwards
had previously replaced in the position).  (Kelley depo., p. 67).

38

letter terminating her employment for not calling in.  (Edwards depo., pp. 316-324;

DX23 - D01310).

When Plaintiff attempted to come back to work in February 2007 after her

medical leave, she was denied access and she was escorted to the medical

department through the back door.  The nurse inquired why the security guard was

bringing in a team member through the back door and he told the nurse he was just

doing what he had been told.  The nurse then asked Edwards what was that about --

- coming through the back?   Edwards explained to medical that she had turned in a

team leader for sexual harassment.  The nurse responded that she figured it was

something like that, since  women come in medical upset about the same stuff all

the time and that Edwards was invited to come any time she needed them.

(Edwards depo., p. 348:7 - 349:3).

Further, Edwards physician wrote Hyundai describing Edwards' efforts to

get back to work as:

328:3        ...she has begged to go back to work,
328:4        but I do not see how she can do her
328:5        required duties because of pain with
328:6        lifting and turning.  She has always been
328:7        a worker and very stoic about her pain.
328:8        It has been very hard for her to be idle
328:9        while trying to heal this injury.  She is
328:10       obviously concerned about her long-term
328:11       job security.  I have encouraged her to

328:12      seek disability, but she refuses citing

328:13      her enjoyment of working....

(Edwards depo., p. 328:2-16).

Since being denied return to work, numerous efforts have been made by

Plaintiff and her counsel trying to get Edwards back to work; plaintiff has

identified over 31 jobs that are available.  Hyundai has refused to reinstate

Edwards and stated that the jobs plaintiff has identified are only available to

"external" candidates.  Edwards would be an "internal" candidate and there were

no jobs available for Edwards to apply.  (Pl.'s Evid. Subm. Vol. II, Ex. 2).

Further, Plaintiff applied for unemployment after being terminated and was

opposed by Hyundai.  (PX 23).

### K.      Invasion of Privacy by Mike Swindle

Edwards had several employees approach her asking why she was turning in

Swindle when Swindle had told them they had a "thing" going.  (Edwards depo., p.

334:1-17; 345:6-18).

### III.    <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the Court, by reference to materials on file that there are no genuine issues of material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Clark v. Coats & Clark, Inc.,* 929 F.2d 604 (11th Cir. 1991).

In determining whether the moving party has met its burden, the Court must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or weigh evidence. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. See *Wright & A. Miller,* Federal Practice and Procedure § 2529, p. 299 (2d ed. 1995). That is, the court should give credence to the evidence favoring the non-movant, as well as that "evidence supporting the moving party that is <u>uncontradicted</u> and <u>unimpeached</u>, at least to the extent that the evidence comes from <u>disinterested witnesses</u>." *Id.* at 300. (Emphasis added).

41

## IV.    LEGAL ARGUMENT

### A.    Plaintiff's Claim for Intentional Infliction of Emotional Distress is Not Due to be Dismissed.

In order to prevail on tort-of-outrage or intentional infliction of emotional distress claim, Edwards is required to present substantial evidence indicating that Defendant, Swindle's, conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.  *Thomas v. BSE Indus. Contractors, Inc.,* 624 So. 2d 1041, 1043 (Ala. 1993); see also *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1981).

Courts have recognized the tort of outrage in three areas: (1) wrongful conduct within the context of family burials; (2) an insurance agent's coercing an insured into settling an insurance claim; and (3) egregious sexual harassment. *Stabler v. City of Mobile,* 844 So.2d 555, 560 (Ala. 2002).  Edwards, as depicted above, has shown to this court that Swindle's conduct was severe, extreme and outrageous and cannot be condoned.  No civilized society would condone a supervisor using sexual favors or power to coerce an employee stay employed or using her children as further coercion to give in to his sexual advances.  The evidence also shows that Edwards was caused to suffer severe emotional and

physical harm.  She sought medical attention and medication for stress, loss of sleep and depression as a result of Swindle's actions.  Swindle's conduct was intentional and extreme and was executed with the full knowledge that Edwards could be damaged as a result of his conduct.  (Edwards Aff., ¶ 16).

Edwards, as required under her prima facie case, can show that she suffered special harm as a result of the sexual harassment of Mike Swindle.  Edwards testified as to the extreme emotional harm that she was caused to endure, the loss of her job, and the strain the harassment placed on her family and her marriage. Edwards has proven her claims of intentional infliction of emotional distress. Summary judgment is due to be denied and this case proceed to a jury.

**B.    Plaintiff's Claim of Invasion of Privacy is Not Due to be Dismissed.**

Concerning the elements of the tort of invasion of privacy, our Supreme Court has defined that tort "'as the intentional wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities.'" *Rosen v. Montgomery Surgical Ctr.,* 825 So.2d 735, 737 (Ala. 2001) (quoting *Carter v. Innisfree Hotel, Inc.,* 661 So.2d 1174, 1178 (Ala. 1995)). Recently our supreme court stated:

"The tort of invasion of privacy consists of four limited and distinct wrongs: (1) intruding into the plaintiff's physical solitude or seclusion; (2) giving

43

> publicity to private information about the plaintiff that violates ordinary
> decency; (3) putting the plaintiff in a false, but not necessarily defamatory,
> position in the public eye; or (4) appropriating some element of the
> plaintiff's personality for a commercial use."

*Johnston v. Fuller,* 706 So.2d 700, 701 (Ala.1997).

Each of these categories of invasion of privacy has distinct elements, and each category establishes a separate privacy interest that may be invaded. *Regions Bank v. Plott,* 897 So.2d 239 (Ala. 2004). *S.B. v. Saint James Sch.,* 959 So.2d 72, 90 (Ala. 2006). It is clear from Edwards' complaint, and from the discovery that Edwards sought recovery under the first and third branch of the tort of invasion of privacy: intrusion into her physical solitude or seclusion and placing her in a false position in the public eye.

In *Phillips v. Smalley Maintenance Services, Inc.,* 435 So.2d 705 (Ala.1983), the Court adopted the *Restatement (Second) of Torts* definition of the wrongful-intrusion branch of the invasion-of-privacy tort:

> "One who intentionally intrudes, physically or otherwise, upon the
> solitude or seclusion of another or his private affairs or concerns, is
> subject to liability to the other for invasion of his privacy, if the
> intrusion would be highly offensive to a reasonable person." (internal
> cites omitted).

The commentary to the *Restatement* definition of this tort adds:

"The defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs. Thus there is no liability for the examination of a public record concerning the plaintiff, or of documents that the plaintiff is required to keep and make available for public inspection. Nor is there liability for observing him or even taking his photograph while he is walking on the public highway, since he is not then in seclusion, and his appearance is public and open to the public eye. Even in a public place, however, there may be some matters about the plaintiff, such as his underwear or lack of it, that are not exhibited to the public gaze; and there may still be invasion of privacy when there is intrusion upon these matters."

*Restatement (Second) of Torts* § 652B (1977) cmt. c (emphasis added).

This commentary is consistent with the caselaw of this state. For example, in *Johnson v. Stewart,* 854 So.2d 544, 549 (Ala.2002) (citing *I.C.U. Investigations, Inc. v. Jones,* 780 So.2d 685 (Ala.2000)), our supreme court stated that, "generally, the observation of another person's activities, when that other person is exposed to the public view, is not actionable under the wrongful-intrusion branch of the invasion-of-privacy tort." *See also Key v. Compass Bank, Inc.,* 826 So.2d 159, 165 (Ala.Civ.App.2001) ("Normally, there is no liability for photographing a person in a public place."). Additionally, it should be noted that "'[t]he thing into which there is intrusion or prying must be, and be entitled to be, private.' " *Hogin v. Cottingham,* 533 So.2d 525, 531 (Ala.1988) (W. Page Keeton et al., Prosser and Keeton on the Law of Torts, p. 855 (5th ed.1984) ). Thus, it seems that generally

"surveillance is not an actionable intrusion as long as it is conducted in a reasonable and nonobtrusive manner." 77 C.J.S. *Right of Privacy and Publicity* § 27. *See also Prosser and Keeton on the Law of Torts,* p. 855 (stating that "[o]n the public street, or in any other public place, the plaintiff has no legal right to be alone; and it is no invasion of his privacy to do no more than follow him about and watch him there"). On the other hand, "[i]t is true 'that the "wrongful intrusion" privacy violation can occur in a public place, when the matter intruded upon is of a sufficiently *personal* nature.' " *Johnson,* 854 So.2d at 549 (quoting *Phillips v. Smalley Maint. Servs., Inc.,* 435 So.2d 705, 711 (Ala.1983)) (emphasis added). Indeed, our courts have held that "[o]ne's emotional sanctum is certainly due the same expectations of privacy as one's physical environment." *Phillips,* 435 So.2d at 711.

To summarize, a wrongful intrusion may occur in a public place, so long as the thing into which there is intrusion or prying is entitled to be private. *See Phillips,* supra, and *Hogin,* 533 So.2d at 531 (citing *Prosser and Keeton on the Law of Torts,* p. 855). Assuming that the matter is entitled to be private, then the court will consider two primary factors in determining whether an intrusion is actionable: (1) the means used, and (2) the defendant's purpose for obtaining the information. *See Hogin,* 533 So.2d at 531 (citing *Prosser and Keeton on the Law of*

*Torts,* p. 855), and *Johnson v. Corporate Special Servs., Inc.,* 602 So.2d 385 (Ala.1992); *see also* 77 C.J.S. *Right of Privacy and Publicity* § 27 (2006) (citing *Hogin,* and stating that "[a] primary factor to be considered in determining whether there has been an intrusion is the means used"), and Jenelle Mims Marsh & Charles W. Gamble, *Alabama Law of Damages* § 36:38 (5th ed. 1049-50).

Applying these principles and the description in § 652B of the *Restatement (Second) of Torts* regarding intrusion upon seclusion, Edwards first points out that the wrongful intrusion in this case was alleged, in essence, to have been to Edwards' physical and emotional sanctum. The intrusion, however, was not into a matter of a sufficiently personal nature to rise to the level of a wrongful intrusion into Edwards' privacy. As an example, in contrast, in *Phillips,* 435 So.2d at 711, our supreme court held that the facts of that case supported such a claim when, among other things, the plaintiff in the case had been subjected to intrusive demands, threats, and inquiries into the nature of sex between her and her husband-all occurring two or three times each week while she was at her workplace. In this case no such personal inquiries or demands were made. *Martin v. Patterson,* 975 So.2d 984, 992-994 (Ala.Civ.App. 2007).

Accordingly, Edwards has produced substantial evidence indicating that she has suffered a material harm, capable of being measured in money damages, as a

consequence of Swindle's statements and actions that were or should be of a

personal matter. *See Butler, supra.*

In *Carter v. Innisfree Hotel, Inc.,* 661 So.2d 1174 (Ala.1995), the Alabama

Supreme Court explained how an individual may commit the tort of invasion of

privacy by intruding into another's physical solitude or seclusion-the first branch of

invasion of privacy enumerated in Butler:

> "One may invade another's privacy through either an intrusion upon a
> physical space, such as a trespass, or by an invasion of one's
> *'emotional sanctum';* the law prohibits a wrongful intrusion into
> either of these areas of privacy. *Phillips [v. Smalley Maint. Servs.,
> Inc.,* 435 So.2d 705, 708 (Ala.1983) ]. In defining the invasion of
> privacy tort, the *Phillips* Court quoted comment b to *Restatement
> (Second) of Torts* § 652B (1977):
>
> " 'The invasion may be physical intrusion into a place in which the
> plaintiff has secluded himself, as when the defendant forces his way
> into the plaintiff's room in a hotel or insists over the plaintiff's
> objection in entering his home. It may also be use of the defendant's
> senses, with or without mechanical aids, to oversee or overhear the
> plaintiff's private affairs, as by looking into his upstairs window with
> binoculars or tapping his telephone wires. It may be by some other
> form of investigation or examination into his private concerns....' "

661 So.2d at 1178 (emphasis added). Moreover, in *Butler,* the Alabama Supreme

Court noted what must be established to prove a "false light" claim-the third

branch of invasion of privacy enumerated in Butler:

"Applying *Restatement (Second) of Torts* § 652E (1977) and the following comments, this Court has adopted the following definition for 'false light' invasion of privacy:

" ' "One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

" ' "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

" ' "(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." '

" *Schifano v. Greene County Greyhound Park, Inc.,* 624 So.2d 178, 180 (Ala.1993)

(emphasis omitted) (quoting *Restatement (Second) of Torts* § 652E (1977) ). A

false-light claim does not require that the information made public be private;

instead, the information made public must be *false*. See *Restatement (Second) of*

*Torts* § 652E cmt. a. (1977).

"Additionally, it is integral to a false-light claim that the untrue information

be publicly communicated. Comment a. to § 652E states, 'The rule stated here is,

however, limited to the situation in which the plaintiff is given publicity. On what

constitutes publicity and the publicity of application to a simple disclosure, see §

652D, Comment a., which is applicable to the rule stated here.' " 871 So.2d at 12-

13.

Edwards' claim is Swindle maliciously conveyed to others in her workplace that he and Edwards had "a thing" going on and questioning or having others question why Edwards was reporting Swindle for sexual harassment to the contrary. Edwards had several employees approach her asking why she was turning in Swindle when Swindle had told them they had a "thing" going. (Edwards depo., p. 334:1-17; 345:6-18). Swindle's actions culminated with other managers and team members refusing to talk or eat lunch with the Plaintiff. She was ostracized based on Swindle's false statements to clear his own wrong doing and placing the wrong on Edwards. Swindle intentionally and maliciously intruded into Edwards' *emotional sanctum* by spreading false gossip and rumors regarding Edwards' relationship with Swindle. Defendant's motion for summary judgment is due to be denied.

## V.    <u>CONCLUSION</u>

For all the reasons cited above, Defendant Swindle's motion for partial summary judgment is due to be denied. Edwards' submits that the facts and applicable law set forth herein preclude the granting of Defendant's Motion for Summary Judgment as Edwards has presented to the court genuine issues of material fact.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff moves this

Honorable Court to deny Defendant's Motion for Summary Judgment in its

entirety.

Respectfully submitted,


/s/ Alicia K. Haynes
Alicia K. Haynes
Attorney for Plaintiff

**OF COUNSEL:**

**HAYNES & HAYNES, P.C.**
1600 Woodmere Drive
Birmingham, Alabama   35226
Phone:  (205) 879-0377
Fax:  (205) 879-3572
E-mail:  akhaynes@haynes-haynes.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 2nd day of September 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

J. Tobias Dykes
**CONSTANGY, BROOKS & SMITH, LLC**
One Federal Place, Suite 900
1819 Fifth Avenue North
Birmingham, Alabama  35203

Brian R. Bostick
**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203

/s/ Alicia K. Haynes
OF COUNSEL