# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **TAMMY EDWARDS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:07-cv-908-MHT** |
| **HYUNDAI MOTOR** | ) | |
| **MANUFACTURING ALABAMA, LLC,** | ) | |
| **and MIKE SWINDLE, individually,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT, HYUNDAI MOTOR MANUFACTURING ALABAMA, LLC'S MOTION FOR SUMMARY JUDGMENT

---

Pursuant to this Court's order, Plaintiff provides the following response in opposition to Defendant, Hyundai Motor Manufacturing Alabama, LLC's Motion for Summary Judgment. Plaintiff incorporates herein her response and evidence submitted in opposition to Swindle's motion for summary judgment. Material issues of fact are in dispute which preclude summary judgment as to any of Plaintiff's claims. As grounds therefore, Plaintiff shows unto this Honorable Court the following:

## I.    PLAINTIFF'S INTRODUCTION AND SUMMARY OF THE ARGUMENT

This is an egregious sexual harassment case involving Plaintiff's direct supervisor that culminated into further illegality when Hyundai transferred the Plaintiff six days after her formal complaint of sexual harassment from her computer desk job to a job slinging a hammer on the automotive production line. Hyundai, with prior knowledge that Plaintiff suffered from neck pain and swelling, not only moved her to the physically demanding and dirty job, but moved her closer to her supervisor harasser under the guise that the move would make her feel more comfortable[1] while the sexual harassment investigation was ongoing. The move was made contrary to the clear warning[2] Hyundai's Human Resource office provided to Plaintiff's supervisor not to reassign her due to issues of retaliation and amid Plaintiff's complaint of retaliation.

Within a week of her transfer, Plaintiff was sent to the medical department by the same supervisors who placed her in the physically demanding job when Plaintiff conveyed she was taking medication for her neck pain to help her physically make it through her 12 hour shift. Plaintiff was placed on involuntary

---

[1]  PX19.

[2]  PX18.

medical leave and despite her repeated and ongoing efforts to return to work, Hyundai has not only refused to reinstate Plaintiff, but has terminated her during the pendency of this litigation.

This entire scenario began with the actions of one man, Mike Swindle, the Plaintiff's team leader who from his first introductory conversation forward portrayed an unusual and even perverted obsession with sex. In their initial conversation, Swindle asked Tammy Edwards, the Plaintiff, if she was married and if she ever cheated on her husband. Thereafter, Swindle, with an unfettered license, began making vulgar,[3] lewd,[4] and sexual[5] comments, overtures and even

---

[3] Swindle asked Edwards if she had ever had a man's finger up her butt while having sex. (PX3, D00180).

[4] While asking Edwards if she and her husband ever had oral sex, Swindle boasted that since she had only been with one man, he would lick her ass raw. (PX3, D00180).

[5] When Edwards asked Swindle how many hours she should put down for her time, Swindle replied she could put her pants down. (PX3, D00180). Swindle also misrepresented Edwards hours and told her she owed him.

sexual gestures and simulations with his hands,[6] tongue,[7] and body[8] which caused even his manager to comment "maybe he is not wired right."[9]

Despite Plaintiff's clear and repeated requests to Swindle to stop targeting her for his inappropriate sexual advances[10] and comments,[11] Swindle continued his harassment, even boldly asserting that unless Plaintiff complied, she would not see her daughter cheer at a single football game and boasting it would do her no good to complain because no one ran the plant like he did and he was untouchable

---

[6] Swindle would hug the Plaintiff and ask if she could feel how big he was and say "Can you feel how big I am? Why do you think all the black women want to fuck me?" (Pl.'s Aff., ¶ 15; see also, Doc. 1, ¶ 15). Swindle would also grab his genitals through his pants and shake them at Edwards or rub his genitals in an up and down motion. (PX3, D00179).

[7] Swindle would stare at Plaintiff in a lewd manner looking at her genital area and licking his lips. When Plaintiff threatened to slap Swindle, Swindle laughed and said that would turn him on. (PX3, D00180).

[8] Swindle told Edwards that her problem was she had never been fucked. Swindle then began to thrust his body in his chair while saying, "Fuck me you mother fucker—fuck me, Ralph, like Mike does." (PX3, D00180). Swindle would also "hump" a chain link divider within the plant taunting Edwards this is how he would "fuck" her. Edwards described this humping as Swindle on the fence with his leg hiked up going back and forth and he would go real slow and then speed up real fast and then he would holler out. (Edwards depo., p. 240:1-23).

[9] PX3, D00187.

[10] Amber Kelly reported that Swindle tried to hug Edwards and when Edwards shrugged him away, he said, "When you resist me, it turns me on." (PX3, D00184).

[11] Swindle referred to Edwards as "Fucking Mother Theresa." (PX3, D00184).

4

because he and Bondy (the manager) were drinking buddies.  In fact, when Plaintiff complained to another Team Leader for help, Swindle became angry and told her "Don't fucking go to Billy anymore or anybody about our business." When Edwards would attempt to circumvent Swindle in trying to complete her work, he would sneak up behind her, forcibly jerk her head back by grabbing her hair and warn Edwards, "Don't you fucking dodge me again."[12]

## II.    STATEMENT OF UNDISPUTED FACTS[13]

### A.    Plaintiff's Initial Employment with HMMA Prior to Being Transferred to Swindle's Supervision and His Sexual Harassment

Edwards began employment with Hyundai on January 17, 2006.  (DX2). After accepting the employment offer, Edwards attended orientation, but was not trained on Hyundai's anti-harassment and discrimination policies nor did she receive a handbook.  (DX2-DX6; Edwards depo., p. 38:18-22 - 40:10-19; 41:7-9; 43:1-20).

Defendant provided that Plaintiff received a handbook, was trained on the policies and further, Edwards' sister, informed, her about the sexual harassment

---

[12]  Edwards depo., p. 129:19 - 130:10; 220:3-16.

[13]  When ruling on a motion for summary judgment, the court "must view all evidence and all factual inferences therefrom in the light most favorable to the non-moving party. *Burton v. City of Belle Glade,* 178 F.3d 1175, 1187 (11th Cir. 1999).

training she missed. (Def.'s Brief, p. 6). This position is incorrect as Edwards clearly testified she did not receive the handbook and her sister merely informed Edwards that training would be rescheduled for her, which never happened.[14] (Edwards depo., p. 41:7-9 - 43:1-10).

Edwards' initial assignment was in the body shop in the fender department working with moving parts.[15] (Edwards depo., p. 56:7-11). Edwards was absent from work January 26 and 27 due to an automobile accident. (Edwards depo., p. 48:14-23 - 49:1-5). Upon her return to work, Edwards provided the training center her medical excuse and also provided an excuse and return to work slip to team relations who told Edwards that she would not be allowed to work with the neck brace she was currently wearing and if she wore it inside the plant, she would be sent home. Edwards stated she would just take it off. (Edwards depo., p. 49:9 - 50:12).

On her first night back to work after the automobile accident, Edwards told her Group Leader, Steve Culpepper about the accident and that her doctor had

---

[14] See also PX19 where Edwards requests a handbook when she complained to Jones of retaliation so she would know what to do if she is ever sexually harassed again.

[15] The Hyundai plant works a rotational schedule. Edwards was initially assigned to the second shift for four months and then rotated to the first shift for another four months. (Edwards depo., p. 59:20-64).

requested she be on light duty because of problems with her neck.  Culpepper

accommodated Edwards request[16] and placed her in fenders, a light duty job.[17]

(Edwards depo., p. 52:6-14; 54:21; 55:18-22).

Initially after her accident, Plaintiff's doctor prescribed medications of

Lortabs and muscle relaxers.  (Edwards depo., p. 97:8-23).  Edwards reported to

the Hyundai medical office that she was taking the medications and was told she

would have to take the medications at home when off work and that the

medications could not be taken so many hours before work.  (Edwards depo., p.

99:8-22; 349:17 - 350:2).  The Hyundai physician also confirmed that Edwards had

apprised her team leader of the situation.  (Edwards depo., p. 99:21-22).

Edwards worked in fenders for approximately one month reporting to Keith

Ulrich, Team Leader, and Steve Culpepper, Group Leader.  (Edwards depo., p.

61:17 - 62:4).  The Team Leader[18] had the authority to discipline, make work

---

[16]  Culpepper was made aware of Plaintiff's neck problems in April or May 2006.  (Culpepper depo., p. 150:18 - 151:7).

[17]  In this department, Edwards would place an automobile fender weighing approximately three pounds on a machine, press a button to clamp the fender which was then welded, also by the machine, with Edwards picking up the finished product and placing it on a rack.  (Edwards depo., p. 58:19 - 59:12).

[18]  In 2006, Swindle was a team leader in Body Build and Body Respot.  There are 10 team leaders (5 per shift, i.e, Swindle, Ulrich, Kitchens), 2 group leaders (one per shift, i.e., Culpepper), an assistant manager (Harry White), and a manager (Tom

7

assignments, change job tasks and is also whom Edwards provided her timesheets and informed if she needed to be off work for a doctor's appointment. (Edwards depo., p. 62:20 - 63:16; 65:6-21). Further, a team leader oversees the day to day duties of a small team or area keeping up with the time sheets of those employees, reporting problems or going to as a contact intermediator between production team member and group leader. (Culpepper depo., p. 15). Team Leaders sit at a desk on the front line of the production area with a computer and telephone which is not the same for the hourly team members. The group leaders are located in an office remote from the production line. (Swindle depo., pp. 158-159; Culpepper depo., p. 17:10-13). Team leaders are paid $1.00 more than the hourly workers and are not considered equals with team members. (Culpepper depo., p. 16; Swindle depo., pp. 157-158).

**B.    Edwards is Reassigned to the CCR Position Where Swindle is Introduced to her as "The King" and the Sexual Harassment Begins**

Team leader, Ulrich recommended Edwards for a promotion to the CCR position which involved working from a computer station in an office setting that was on the second floor away from the production line. This position involved keeping up with the downtime when the robots malfunctioned. (Edwards depo., p.

---

Bondy). (Swindle depo., pp. 30-36).

68:7 - 70:10). Edwards replaced Pam Stoddard who was placed back on the production floor to record the downtime on a wet board when a robot went down. This position required recording the causation of the malfunction, how repaired and how long the robot was down. It was from this board or person that Edwards would receive the required information for her downtime reports. (Edwards depo., p. 74:9-12).

While Edwards' office was located upstairs in the computer room away from the production floor, on occasions it would be necessary for Edwards to walk downstairs to the production floor to investigate or obtain additional information needed for her report as well as take pictures to attach to her downtime report. The finished report was then disseminated to the managers and owners of Hyundai. Edwards trained for two days with Sherry McRae who worked the opposite shift performing the same job. (Edwards depo., p. 72:7 - 73:4; 73:15 - 74:5; 74:9-12; 78:13-21; 79:9-12; 79:18 - 80:2).

Long periods of sitting aggravated Edwards neck while performing the CCR job and Edwards asked and obtained permission from Culpepper and Harry White to walk around in the computer room as needed. This request was approved as long as her report was complete by the next morning. Edwards even brought a towel to work with her to put behind her neck and would walk around pulling the

towel to relieve her neck pain.  Compiling the report with attached pictures was

Edwards only job.  (Edwards depo., p. 75:5 - 77:12).

In her new position, Edwards was introduced to Mike Swindle by Harry

White, assistant manager, as "The King" of the body build.  (Edwards depo., p.

71:15-21; 100:6-8).  Months later when Edwards would ask if she could be  moved

away from Swindle and back to her previous job in fenders, White would tell

Edwards that whatever Swindle wants, he gets.   (Edwards depo., p. 90:19-22).

### C.    Edwards' Sexual Harassment by "the King" Becomes Severe and Unbearable as Swindle Brags he is Untouchable Because he is Drinking Buddies with his Manager Tom Bondy

As her new team leader, Edwards reported to Swindle the downtime in his

area.  (Edwards depo., p. 107:67-8).  After Edwards starting reporting to Swindle,

he would come to the computer room and discuss his marital problems, as well as

inquire of Edwards about her marriage.  From the initial conversation Swindle

inquired if Edwards was married and if she ever ran around on her husband.  When

Edwards remarked she was happily married to her high school sweetheart, Swindle

said she was lying and said she had not been with the right person.  Swindle asked

what it would take for Edwards to cheat on her husband.  (PX3, D00193).

Swindle told Edwards that if she would just fuck him one time that she

would go home and blow Ralph's (her husband) head off.  (Edwards depo., p.

10

153:20 - 154:3; Abrams depo., p. 15). Swindle said he did not understand how women could sleep with just one person and that men slept with multiple partners and that Edwards should not believe her husband was monogamous either. Swindle told Edwards to call her husband on his cell phone. When Edwards complied and her husband did not answer, Swindle laughed and said it was because her husband was with another woman. (Edwards Aff., ¶ 16; Edwards depo., p. 109:13-19).

Swindle would harass Edwards by grabbing his genitals and shaking them at Edwards when other men would be around to laugh. On other occasions, Swindle would grab his penis through his pants and stroke it up and down. (PX3, D00179). Edwards described that the more people around, the more Swindle liked harassing her even though she kept asking him to stop. (Edwards depo., p. 128:7-15). Even though Edwards asked Swindle numerous times to stop, he would still grab his crotch and shake his genitals at her every time she saw him. (Edwards depo., p. 120:15-21).

The harassment by Swindle became so bad that Edwards started avoiding Swindle and walking the long way around his work area, but Swindle, undeterred, would appear and cuss Edwards out and tell her not to "fucking dodge" him again. Swindle would grab Plaintiff by the hair when she would try to dodge him and tell

11

her "don't fucking walk by me without speaking." Edwards again asked Swindle to stop shaking his genitals and he replied that he was not hurting her and there was nothing she could do to stop him. (Edwards depo., p. 129:19 - 130:10).

Billy Kitchens, Team Leader, asked Edwards why Swindle was cussing her and Edwards replied that he was such a pervert she could not handle him acting like he did. Kitchens replied that was just Swindle and he understood that he would not bring his wife around Swindle because of how he acted towards women. (Edwards depo., p. 130:18 - 131:5; 146:11-15; Kitchens depo., p. 71). Kitchens confirmed that Swindle comes across brash and the way he talks is wrong. (PX3, p. 2). Kitchens also admitted that Stephanie Samuels, Quality Group Leader, had complained that Swindle's language bothered her and that Swindle was disrespectful to women. (PX3, p. 9-10; Kitchens depo., pp. 34, 42-43; PX3, pp. 2, 9).

Kitchens asked Edwards if she was miserable and she told him that she was. He asked if she wanted to go back on the line and she said, "No." He then asked sarcastically if she wanted to go to Swindle's line and she said, "No," and told Kitchens that Swindle was a pervert. (Edwards depo., p. 193:6-21).

After Edwards complained to Kitchens, Swindle approached Edwards and told her "Don't fucking go to Billy (Kitchens) anymore or anybody about our

12

business." Edwards replied she did not know what he was talking about. Swindle said that Edwards was trying to get him in trouble. (PX3, D00180).

Swindle would graphically describe women in the workplace (Abrams depo., p. 16) and use profanity when he would talk to Edwards about these women. Everything Swindle said was using the word, "fuck" or "mother fucker."[19] (PX30, D00179). Swindle even admitted during his deposition that he used the words "bitch" and "fucking bitch" in the workplace, but testified that "well, bitch" ain't no sexual word to me. (Swindle depo., p. 87:16-20; 90:3-4).

Swindle asked Edwards if she had ever had a man's finger up her butt during sex. (PX3, p. 4). Swindle discussed performing oral sex on Edwards and told her "he would lick her ass raw." Swindle referred to Edwards as "fucking Mother Theresa." (Edwards depo., p. 179:16-22; 211:1-6). Swindle rubbed Edwards leg through her pants and remarked that plaintiff had on new pants, looked "damn good" and if she were his wife he would not have let her out of the house. (Edwards Aff., ¶ 17). Swindle, seeing a picture of Plaintiff's minor daughter on her desk, remarked that she knew Plaintiff's daughter's boyfriend was "tearing that up." (PX3, D00181).

---

[19] On several occasions, the sexual harassment of Plaintiff was witnessed by Steve Culpepper, Group Leader. Another Team Leader, Billy Kitchens, also sexually harassed Plaintiff on the job, and this harassment was also witnessed by Culpepper.

Swindle would discuss different women he had been with sexually in the workplace and those that he would not pursue with Edwards. (Edwards depo., p. 155:16-20). Edwards also observed Swindle sexually harassing other females in front of her and Edwards would tell him to stop. Swindle remarked to Amber Kelley when she was walking down the aisle with a sucker in her mouth that he had something she could suck on and grabbed his genitals and shook it at her. (Edwards depo., p. 156:2-9). Swindle then told Kelley she was "ghetto" and said "you just want to fuck me." (Edwards depo., p. 157:1-2).

Swindle made similar comments to Jennifer, another female coworker in front of Edwards. (Edwards depo., p. 158:13-21). Swindle also discussed sexual situations with Pam Stoddard in front of Edwards when Swindle and Stoddard discussed the various ways they had had sex with different people. (Edwards depo., p. 160:13-15). Team member, Kelley, walked up on the end of this conversation between Edwards, Swindle and Stoddard and heard Edwards complain, you better quit talking to me like that before I report you. Stoddard threatened, "No one is going to fuck with Mike." Kelley inquired of Edwards what they were talking about and Edwards reported that Swindle was talking about

14

performing oral sex on her since she had only been with one man.  (PX3,[20] p. 8 - D00184).

Swindle would hug Edwards against her will and press his body against hers asking if she could feel his erect penis, "Tammy, can you tell how big I am?" "Why do you think the black women want to fuck me?"  (Edwards Aff., ¶ 15).  On one occasion Kelley told Swindle to stop looking at Edwards' butt and in reply Swindle grabbed Edwards and hugged her even though Kelley and Edwards protested that Swindle was to get his hands off Edwards.  (Edwards depo., p. 156:13-20).

Swindle admitted he not only hugged Edwards but grabbed the back of Edwards' hair pulling her toward him and knew when he jerked her head back that Edwards had neck problems.  (Swindle depo., p. 122:9-12; 123:1-5, 280).

Swindle would tell Edwards that if she did not have with him, she would not see Haley, Plaintiff's daughter, cheer at any football games this year.  Swindle would tell Edwards that if she did not kiss or hug him, she could not pass down the

---

[20]  Plaintiff admits this is an accurate summary, but is not everything that Plaintiff discussed with Team Relations that Swindle had done and specifically told Team Relations that Swindle had altered her hours.  Swindle added the hours back in and told Edwards that she owed him.  (Edwards depo., p. 176:14 - 177:6-21).

aisle.  Swindle approached Plaintiff and told her to kiss him so "everyone will think you are fucking me."

Several times Plaintiff would try to do her job by walking the long way around instead of near Swindle's area.  He would forcibly jerk Plaintiff's head by grabbing her ponytail and holding her against her will and tell her, "Don't fucking walk by me without speaking."  (PX3, D00179-D00181; Edwards depo., p. 129:19 - 130:10).

On another occasion, Plaintiff's arms were held behind her back by female team member, Stoddard, a close friend of Swindles so Swindle could kiss Edwards. Stoddard told Swindle to "get her."  Swindle informed Plaintiff there was nothing she could do that would make him stop.  (Edwards depo., p. 204:1-9).  Plaintiff pushed Swindle away from her after he made the comment that nothing could stop him and Swindle laughed and remarked that he liked it when she got rough. Swindle stared at Plaintiff in a lewd manner looking at her genital area and licking his lips.  When Plaintiff threatened to slap Swindle, Swindle laughed and said that would turn him on.  (PX3, D00179-D00181).

On another occasion, Edwards asked Billy Kitchens if he had had a rough day to which Kitchens replied that he had because he, "didn't get any last night." Swindle, who was listening to the conversation then remarked that he knew what

16

was wrong with Edwards, she had never been fucked," to which Swindle began to thrust his body wildly in a chair while saying, "fuck me you mother fucker -- fuck me Ralph like Mike does."  (PX3, p. 4; Edwards depo., p. 162:5 - 163:9; 227:3 - 228:19).

During the investigation, Kelley reported that she had told Swindle not to make suggestive looks at Edwards, "That's a married woman, you shouldn't be looking at her."  Swindle replied, "I can look at her any fucking way I want to, right, Tammy."  Edwards replied, "No."  Swindle then hugged Edwards and when Edwards tried to shrug him away Swindle replied, "when you resist me, it turns me on." Additionally, Swindle hugged Plaintiff seven or eight times, would purposely bump against her with his hands behind his back.  (Edwards depo., p. 216:2-23; 217:1-5; 220:3-22).

Swindle would not only hug Edwards, but would ask Edwards if she could feel how muscular his chest was and that his chest was bigger than her husband's. (Edwards depo., p. 218:8-13).  Edwards described the hugs having to last for a period of time with Edwards having to stand there and then ask Swindle if he was through so she could move.  (Edwards depo., p. 219:21 - 220:2).

Swindle told Edwards that he was an ass man, not a boob man and she could leave her shirt on, he just wanted her bottom half.  Swindle asked Edwards if she

fingered herself.  (PX3, D00181).  Swindle bragged to Edwards about having sex with different women and pulling their hair.  He said he made love to his wife, but he liked to have freaky sex on the side.  Swindle would ask Edwards if she and her husband had oral sex, would brag about having sex with other people and would tell Edwards that he did not use condoms when he had sex.  Swindle stated that he did not get along with Harry White because White's wife wanted him.  (PX3, p. 4; Edwards depo., p. 154:4-14; 195:18 - 198:4).

Edwards would go to the cafeteria to get her breakfast and if she did not ask Swindle if she could bring his breakfast back for him, then he would talk about her in a negative fashion.  When Swindle would ask Edwards to go to the cafeteria and bring back breakfast for he and Jennifer Foster, the female coworker he was having an affair with.[21]  When Edwards remarked that she would need to get Ronald Mitchell breakfast as well, Swindle replied, "You ain't getting that black mother fucker nothing."  (PX3, p. 17; Edwards depo., p. 112:1-23; 251:11 - 252:3).  Swindle invited Edwards to watch him race his motorcycle and when Edwards replied "we might do that," Swindle told Edwards if she was bringing her husband, don't come.  (Edwards depo., p. 113:5-22).

---

[21]  Swindle is married.  (Swindle depo., p. 11).

18

On another occasion, Edwards was walking down the aisle with her clipboard when Swindle approached and started bumping her with his body as she was walking.  Edwards asked Swindle to stop and when she looked up, she saw team member, Cleckler, also her children's baseball coach and a friend from church.  Edwards asked Swindle to stop harassing her and explained that people would think something, to which Swindle replied that he did not give a "fuck." Edwards asked Swindle not to talk like that in front of Mr. Cleckler explaining that he is a good church-going man and would be offended.  Swindle replied in front of Cleckler, "I don't give a fuck who he is or where he goes."  (Edwards depo., p. 119:21 - 120:20).

Kim Abrams reported that Swindle would make comments about women's body parts and looks at women in a sexual way.  Abrams further complained that Swindle has a foul mouth and that she had inquired of him if he was going to apply for the team leader position at the beginning of the year to which he replied he was not going to mess up what he had on that shift because he was having a relationship with one of his team members.  (Abrams depo., pp. 16-17).  Hyundai did nothing about this complaint.

On July 31, 2006, Edwards became upset and was crying over the fact Swindle would not stop his harassment even though she had begged him to quit.

19

(Edwards depo., p. 138:1 - 139:14).  Michelle Nelson and Kim Abrams saw how upset Edwards was and told her that she needed to send Stacye Jones, in team relations, an e-mail to report Swindle.  (Edwards depo., p. 139:15 - 142:13).

Edwards inquired of Jones if she could just be moved to another area away from Swindle, Jones replied that Edwards would not be transferred but the problem would be fixed.  (Edwards depo., p. 142:14 - 144:15).  Six days later, Edwards was transferred and within a week later, Edwards was escorted off Hyundai's plant and her name tag blocked for future access.  Swindle was still at his desk.

**D.    There are No Prior Complaints about Edwards Performance in the CCR position Until She Complains About Swindle and Brings This Lawsuit**

Initially Edwards would ask Steve Culpepper to look over her reports until she was comfortable in her new position.  (Edwards depo., p. 81:19 - 82:5).  No one in management ever discussed with Edwards that there were problems with her reports, in fact, they bragged how well her reports were.  (Edwards depo., p. 82:22 - 83:15).  Tom Bondy, manager, made a special effort to introduce himself to Edwards and convey her reports looked really good and thanked her for the time and attention.  (Edwards depo., p. 83:9-15).

When Edwards started as a CCR, Amber Kelley (also known as Amber Kelley Batie) was moved from hinges on the BC-1 line to being responsible for the

board where downtime was reported on the production line and from which

Edwards would retrieve the needed information for her report. (Edwards depo., p.

86:8-17). Edwards observed there was an important need for someone to be cross-

trained in her CCR position in the event she was sick or off work for doctors

appointments. Edwards asked Harry White if she could cross-train someone for

the position and received permission. Edwards also identified Amber Kelley as the

person she thought had the requisite skill set to cross-train and her selection was

also approved. Next Edwards asked if Kelly would be interested in cross-training

for the position. It was discussed that Edwards would work upstairs in the

computer room for a week compiling the downtime report and then alternate with

Kelley who was recording information on the downtime board on the production

floor. (Edwards depo., p. 85: 3-12; 87:13-18; 87:19 - 88:6; 94:3-17; Kelley depo.

p. 9, 48).

     **E.**    **Edwards Complains for Swindle to Stop or Move Her Away From Swindle and Back to Her Former Position.**

Not only did Edwards complain numerous times to Swindle to stop his

harassment, Edwards also complained to other managers even though she had

never received a handbook or been trained on sexual harassment. Swindle told

Edwards it would do her no good to complain because Tom Bondy, manager, owed

him.[22]  Swindle bragged to Edwards that no one was going to get him in trouble because he knew Tom Bondy,[23] the welding manager, that they were drinking buddies and nobody would fire him because nobody else could run the line like he could.  (Edwards depo., p. 169:2-6).  Swindle further bragged to Edwards that he knew too much on Tom Bondy  and nothing would be done to him.  (Edwards depo., p. 177:18-21).

Edwards told Swindle all she wanted to do was work and for him to stop harassing her that she was not used to that kind of talk or people acting like that. Edwards told Swindle that she felt God had put her at the plant for a reason and that was to help him get right with his family and be a daddy and a husband. (Edwards depo., p. 191:8-23).

Soon after Edwards expressed her desire to be moved from the work environment where Swindle was located and initially requested for Swindle to move her back to her previous job in fenders working for Ulrich, who Edwards

---

[22] Bondy and Swindle socialized outside of work.  (Swindle depo., pp. 59-60). Kitchens and Swindle were also close friends and lived together, sharing a townhouse after Swindle was separated from his wife.  (Swindle depo., pp. 12-13, 48).

[23] Bondy and Swindle socialized outside of work.  (Swindle depo., pp. 59-60; 134-135).

described as quiet and all about Hyundai's business.  Swindle replied that Edwards could come to work on his line on "the floor."  (Edwards depo., p. 89:3 - 90:18).

When Edwards approached Harry White about moving away from Swindle and back to her old job in fenders, he asked if she thought she could handle working on the floor and commented that Swindle is king and what Swindle wants, he gets.  (Edwards depo., p. 90:19-22).

Edwards informed White that she would just stay in the CCR room, that she would be fine, as long as she could continue to stand up and sit down.  White inquired if Edwards was sure that she wanted to stay in the CCR and Edwards replied, "Yes."  (Edwards depo., p. 91:10-23; 92:6-21).  Edwards had previously complained to Bondy that she might as well go back to the floor because people who were putting down incorrect information on the downtime boards which was effecting her reports and she felt there were lies incorporated in her reports.  Bondy told Edwards she would stay in the CCR position and he would get Kelley and Stoddard back working on the downtime boards to get her good information.  (Edwards depo., p. 274:10 - 276:15).

Edwards also complained to Billy Kitchens[24] within the first week she was moved to the CCR department about Swindle.  (Edwards depo., p. 127:17-23).  Edwards reported to Billy Kitchens that she did not like Swindle's harassment of her and could he get Swindle to watch his mouth.  (Edwards depo., p. 135:13-23).  Kitchens talked to Swindle[25] and the same day Swindle threatened Edwards, "don't fucking tell my business" to Billy or anyone else.  (PX3, D00180).

Edwards also complained to co-worker Pam Stoddard because Stoddard and Swindle were close friends.  She asked Stoddard to talk to Swindle and ask him to stop.  Stoddard advised Edwards that if she would just act like Swindle's harassment did not bother her, Swindle would eventually stop.  Edwards replied to Stoddard that was the same advice that Swindle provided when she complained to him, but that the harassment was still ongoing.  Stoddard replied that that was just Mike (Swindle)  and "he is crazy" and they just needed to get him away from his

---

[24] Kitchens is a group leader.  This is a position he has held for eight months, having been promoted from team leader.  In 2006, Swindle was living with Billy Kitchens in a roommate situation.  Kitchens described the relationship as being as close as brothers.  (Kitchens depo., pp. 12-13, 48).

[25] Swindle denies Kitchens' statement that Edwards came to him months ago complaining about Swindle and that Kitchens told Swindle to watch his mouth and how he acted around the ladies.  (Swindle depo., pp. 160-162).  Swindle also denied Kitchens' statement that he has been in conversations with Edwards and Swindle where Swindle used the word "fuck."  (Swindle depo., p. 163).

girlfriend and back with his wife.  (Edwards depo., p. 124:9-23).  On another

occasion when Edwards complained to Stoddard about Swindle's harassment,

specifically his comment about oral sex and having a man's finger up her butt

during sex, Stoddard replied, "Damn girl, it ain't hurting you."  (PX3, D00179).

Edwards also complained to Michelle Nelson and Sherry McRae.  (Edwards

depo., p. 124:12-13; 125:11-12).  Sherry McRae was training Edwards on the CCR

position as instructed by Culpepper.  (Edwards depo., p. 136:1-4). McRae actually

warned Edwards about Swindle telling her that she needed to watch Swindle, he

runs around and is a bad influence.  (Edwards depo., p. 125:11-22).

When Edwards complained to Michelle Nelson,  Edwards was told it would

do her no good to go any further to management because the rest of management

was doing the same thing as Swindle.  Edwards replied that she had figured that

out because Swindle said they were all drinking buddies and that he could not get

fired.  Nelson agreed.  (Edwards depo., p. 125:23 - 126:7).  Nelson also warned

Edwards that Swindle had a bad reputation and she should not be alone with him in

the computer room where Edwards worked.  (Edwards depo., p. 126:15-23).

Nelson also apprised Edwards that Swindle would not stop his harassment,  he had

always acted that way no one in management would do anything about him.

(Edwards depo., p. 127:4-16).

25

Edwards also complained to Culpepper, Group Leader, about Swindle and Culpepper acknowledged that he had observed a lot of Swindle's actions to Edwards.  (Edwards depo., p. 147:1-6; 387:6-17).  Edwards also complained to Culpepper about a comment that Billy Kitchens had made about her new job, that it was going to be under Kitchens' desk.  When Edwards pressed the point and told Kitchens, "go ahead and tell Steve (Culpepper) where you said my new job would be, under your desk," Culpepper laughed and said, "We can't really authorize that Billy."[26]  (Edwards depo., p. 148:2-11; 149:20 - 153:20).  Culpepper said nothing to chastise nor help Edwards.

On another occasion, Edwards complained to Culpepper when he told her to go to Swindle about a work issue.  Edwards expressed her reluctance to go to Swindle and told Culpepper that he knew how Swindle was, she would prefer not to go to him.  Culpepper again laughed at Edwards and said that Swindle would tell you what the problem is, but he will put a lot more into it and tell you things you also don't want to hear.  (Edwards depo., p. 149:18-23).

---

[26]  Kitchens denied that he ever told Edwards that her job would be under his desk even when the audio tape was played of the conversation, Swindle still denied his comment even though he confirmed that it was his and Edwards voice on the tape. (Kitchens depo., pp. 98-103).

On another occasion Edwards and Kelly approached Kitchens about Swindle touching and harassing Edwards.  (Kelley depo., p. 18).  After the two complained Kelley noticed that no one would talk with she or Edwards or sit with them at lunch.  (Kelley depo., p. 40).

**F.    Plaintiff's Interrogation by the Production Manager**

The next day after complaining about Swindle to Team Relations, Bondy and Culpepper summoned Edwards for a meeting.  (PX3, D00187).  Bondy confirmed during depositions the first thing Swindle did when he found out about Edwards' complaint was to go straight to Bondy.  (Swindle depo., p. 205; Bondy depo., pp. 98-99; PX3, D00188).

Plaintiff relayed to Bondy that Swindle had told her that Swindle and Bondy were friends and she could not do anything about Swindle harassing her.  Nelson testified about this as well.  (Nelson depo., pp. 17, 20).

Bondy confirmed that Edwards conveyed very graphic details of how she was being treated by Swindle.  (Bondy depo., p. 95).

Swindle denies using "fuck" or "mother fucker" in front of Edwards. (Swindle depo., p. 80:12-17).  Since being accused by Ms. Edwards in 2006, he has not received any further training on harassment and discrimination.  (Swindle depo., p. 83:12-14).   Swindle had no knowledge that it was against the law to

sexually harass anyone and testified to such at his deposition. (Swindle depo., p. 346:20 - 347:7). Swindle was told by a coworker that he had heard Edwards had complained about him sexually harassing and went straight to Tom Bondy to tell him he was worried about losing his job and did not know what to do. Bondy replied there was nothing he could do, but sit back and wait to see what team relations does. (Swindle depo., pp. 108-109). It was after this meeting with Swindle that Bondy called in Edwards even though he knew she had already gone to team relations.

### G.    Hyundai Did Not Take Prompt Remedial Measures and Did Not Discipline Swindle

Plaintiff has more fully argued this in its brief, but it was only after Plaintiff was retaliated against and placed on leave that Swindle was suspended two weeks without pay but returned to the same job with the same hours and pay and has worked continuous since. He remained a team leader despite Team Relations recommendations to remove him. (PX4). (Kitchens depo., pp. 77-78).

Team Relations never told Edwards what action was taken and told her she was not entitled to that information unless she came back to work. (Edwards depo., p. 263:20 - 264:13). Jones never gave Edwards any reassurance that the

investigation had been completed and action had been taken.   (Edwards depo., p.

265:6-12).

### H.    Six Days after Complaining About Swindle to Team Relations, Plaintiff  is Reassigned from her Computer Desk Job to Slinging a Hammer on one of the Dirtiest Jobs on the BC1 Line

After Edwards complained about Swindle,  Culpepper stopped speaking to

Edwards.  (Kelley depo., p. 40).   Culpepper also approached Kelley about

assuming Edwards position full time.  Culpepper did not convey to Kelley nor

Edwards that Edwards was not doing a good job.  It was only after Edwards

complained that Edwards was moved to another position in production.  (Kelley

depo., pp. 11- 12).  No one but Edwards trained Kelley on how to do the CCR job

and Kelley had no criticism about how Edwards trained her for the job and they

worked well together.  (Kelley depo., pp. 43-44).   Edwards was not moved to

Kelley's job but was instead moved to a weld job considered a very dirty job.

(Kelley depo., pp. 45-46).

In the CCR office, Edwards' desk was 300 feet from Swindle's desk, but

when Edwards was moved to the BC-1 line, she was a mere 30 feet from Swindle

and told the move would make her feel more comfortable.  (Bondy depo., pp. 68,

83-84; Culpepper depo., p. 149:6-12; PX19).

During his deposition, Bondy explained in great detail while reviewing PX26, assuming it was one of Edwards' downtime reports, the problems with the report. But the report was not Edwards' report as she had already been moved to the BC-1 line, the report was from Kelley. (Bondy depo., pp. 55-61; Edwards Aff., ¶ 4).

On August 1, Plaintiff had complained to Team Relations about Swindle and on August 10, Plaintiff was moved to the production floor.[27] (Edwards depo., p. 266:12-21). Edwards was in the CCR room doing downtime when Steve Culpepper called her and told her to come to the production floor that Billy Kitchens had something for her to do. When she arrived on the production floor, Kitchens said he had a new job for her; took her to the line where she had never worked before and gave her a hammer to start hammering car hoods. (Edwards depo., p. 267:14 - 268:12).

_____

[27] Culpepper testified it was coincidental only that Edwards was moved six days after she complained about Swindle but Culpepper does not know what he told Edwards when he moved her. (Culpepper depo., p. 130:3-11; PX36).

When Edwards asked Kitchens why she was doing this job,[28] he replied that Culpepper thought it would make her feel better and then he replied, "Just know I didn't have anything to do with it." (Edwards depo., p. 268:1-12). Kitchens repeated that he wanted Edwards to know he had nothing to do with her move down to the production floor. (Edwards depo., p. 268:18-20). Edwards approached Culpepper and asked him why she was being moved and he replied that it was Tom Bondy's decision. (Edwards depo., p. 269:8-18).

Bondy and Swindle were friends and drinking buddies after work. Bondy had also called Edwards to his office asking Edwards what all Swindle had done even though Edwards had already been to Team Relations to complain. (Edwards depo., p. 269:22 - 272:12).

Prior to the move to the production line by Bondy and Culpepper, both men had stopped talking to Edwards after her complaint. (Edwards depo., p. 272:8-12).

---

[28] Swindle was in that area when Edwards went to work on the BC-1 line. (Edwards depo., p. 279:14-18). Edwards was told this would be her permanent job. The line moved every 48 seconds which involved Edwards beating in the gap with a hammer and knocking off the well splatters in that 48 seconds. (Edwards depo., p.283:5-19; 284:10-15). The job was also a dirty job because of the weld splatters get all over you. (Edwards depo., p. 280:8-13; 291:1-6; Kelley depo., pp. 45, 64). The job Edwards was doing involved a gap that had been created by one of the robots on the tailgates. She would take a hammer and beat in the gap. She would also have to take a file, 7-8 inches long and knock off weld splatters. (Edwards depo., p. 281:1 - 282:6).

Bondy and Culpepper told Stacye Jones that Edwards had voluntarily come to talk to them.  (Edwards depo., p. 272:20 - 273:4).

Edwards never requested to go work on the BC-1 line in Swindle's area. Rather, she requested to be moved back to moving parts where she would be away from Swindle and his work area.  Swindle had plaintiff moved within 30 feet of his desk, where prior, plaintiff had been located on the floor above the production area. (Edwards depo., p. 194:3-7).

After Plaintiff complained to Team Relations, people stopped talking to her on the line, including the managers.  Group Leader, Steve Culpepper asked that Edwards drop her complaint against Swindle, that he would make Swindle apologize and stay away from her.  (Edwards depo., p. 200:1-22).  When Plaintiff refused, Culpepper stopped talking to Edwards.[29]

Team Member, Amber Kelley told Edwards to tape record her conversations at the plant because Swindle was getting a group of management people together to lie about her and that it was important that she not trust anyone.  (Edwards depo., p. 200:1-5; 201:18 - 202:8).  Kelley also warned Edwards that she had better take

---

[29] Prior to the move to the production line by Bondy and Culpepper, both men had stopped talking to Edwards after her complaint.  (Edwards depo., p. 272:8-12). Bondy and Culpepper told Stacye Jones that Edwards had voluntarily come to talk to them.  (Edwards depo., p. 272:20 - 273:4).

care of herself that they were going to get her out for complaining. (Edwards depo., p. 206:11-19). Kitchens also expressed concern to Edwards that Swindle would take him out with him and apologized to Edwards for his actions and agreed that Swindle should have been gone a long time ago. (Edwards depo., p. 208:9-17; 235:9 - 236:6).

After Edwards was moved to the production line, she was approached by Stacye Jones who asked her who made the decision to move her from the CCR position to the production line. Edwards replied that it was Steve Culpepper and Tom Bondy. Jones provided to Edwards that she had not been informed and Jones promised that they would talk about the move some more. (Edwards depo., p. 277:17 - 278:7).

Jones included in her weekly report that, "The welding team member, Edwards, who made an EEO complaint last week, feels as if Team Members and possibly management, are treating her differently. This Team Member has reported that the Group Leader, Steve Culpepper, would not approve her vacation and personal time for her now, where he would in the past."[30] (Kelley depo., p.

_____

[30] Edwards would lose $100 per month is she didn't have perfect attendance so when Culpepper denied her vacation time and she would have to take personal time, then it would cause her to lose her $100 perfect attendance. (Kelley Batie depo., pp. 37-39).

35).  Jones reported that she had spoken with the welding manager, Bondy, and the Group Leader, Culpepper, regarding the actions.  Bondy confirmed to Jones that he intended to move the Team Member from her CCR position to BC-1.  Jones advised Bondy not to do this due to legal ramifications and perceived retaliation.  Further, Culpepper stated that no request for personal or vacation days had been submitted to him.  (PX18 - D00195).

Two days later, Jones confirmed that Edwards had been moved to a different job from the CCR position to the production floor and that this team member had sent her an e-mail which indirectly eluded to retaliation.  The action that Team Relations took regarding this e-mail was redacted by the defendant during the litigation.  (PX18 - D00196; see also PX22).

Edwards was told she was moved from her CCR position to the BC-1 line because it would make her feel more comfortable until things were over.  (PX19; Kitchens depo., p. 28).  Edwards was not told as the Defendant alleges that she was moved because she was not performing well or that she had previously requested to be moved.  No one told Kitchens that Culpepper and Bondy were having to redo any of Edwards reports and he never heard complaints about Edwards' reports.  (Kitchens depo., pp. 24-25).  Rather, Edwards was told the move was based on making her feel more comfortable.  (PX19).

### I.    Plaintiff Goes on Medical Leave

On August 10, Plaintiff was transferred to the production line.  (PX19).  On August 16, Edwards was working the BC-1 line and had experienced a bad night with her neck and shoulder hurting from the hammering and as a result had taken a muscle relaxer on her way to work.  Kitchens approached Edwards to ask how she was doing.  Edwards replied, "Not well."[31]  Kitchens asked if she was sick and if the job was bothering her neck.  Edwards replied that Kitchens knew the job was bothering her neck.  (Edwards depo., p. 291:7-13; Kitchens depo., p. 27).

Edwards conveyed that she had taken medication so that she would be able to do the job.  At this point, Kitchens said that he could turn her in for taking the medication.  (Edwards depo., p. 291:13-23).  Edwards conveyed that she had told medical before about her medication and could take the medication, but just so many hours before her shift but conveyed to Kitchens that she could not do this job and not take her medication.  Kitchens replied again that he could, if he wanted, turn in Edwards.  Edwards replied not to give her any favors since she had had enough favors.  (Edwards depo., p. 292:12-17).

---

[31]  This job irritated Plaintiff's neck because of the hammering and using a lot of pressure on the file to knock off the welds.  The job entailed three tasks that all irritated her neck.  (Edwards depo., p. 284:10-15).  However, there were some 13-15 jobs on the line that were less strenuous that Edwards could have performed that would not have irritated her neck.  (Edwards depo., p. 285:13 - 287:12).

35

Kitchens then called Steve Culpepper on the radio and Culpepper instructed Kitchens to call Stacye Jones. Jones told Edwards to go to medical. (Edwards depo., p. 293:1-5). The medical doctor was angry that Edwards had been moved to the production line, said she should not be on the line with her neck and that he would talk to team relations. (Edwards depo., p. 293:6-23 - 295:2).

The Hyundai doctor told Edwards she would be on involuntary medical leave and that she would have to go to her physician and be released from the doctor before she could come back to work. (Edwards depo., p. 296:3-6). The doctor also asked if Edwards had the short term disability paperwork to which Edwards replied that Jones had already provided her that information. (Edwards depo., p. 296:10-19). Edwards admits she did not apply for FMLA because she was hoping to get back to work and FMLA, as explained to her by Jones is like extended sick leave and Jones had suggested short-term disability. (Edwards depo., p. 301:18 - 302:20).

Jones also told Edwards when she started short-term disability that if the doctor did not release her, her short-term disability application would convert to an application for long-term disability. (Edwards depo., p. 309:18-23). Jones also told Edwards that as long as she was applying for leave, her absence from work would be excused until Jones got back with her. (Edwards depo., p. 203:8-17).

36

During her medical leave, Plaintiff underwent injections for pain blocks, physical therapy, a chiropractor and then pain management.   (Edwards depo., p. 307:1-21).

**J.     Plaintiff's Attempts to Return to Work are Blocked by Hyundai and Plaintiff is Terminated for Complaining of Sexual Harassment**

On February 12, 2007, Plaintiff attempted to return to work and went back to the plant reporting to the medical clinic for evaluation.  Edwards was told she would need to get an indication of what her restrictions were from her physician. Plaintiff complied and reported back to work the next day.  (Edwards depo., p. 311:15 - 312:11).  When Plaintiff reported back to work with her restrictions, medical called Steve Culpepper and he reported that he did not have any work for her to do.[32]  (Edwards depo., p. 312:18-19; Culpepper depo., pp. 137-139).

Edwards was requested by medical to call Steve Culpepper even though medical had already talked to Culpepper.  Plaintiff complied.  (Edwards depo., p.

---

[32] On February 12, 2007, Culpepper sent an e-mail to Bondy advising him that Edwards had returned to work and reported to medical which he heard about in the plant and had called to ascertain her condition.  (PX36; Culpepper depo., pp. 133-136).  Culpepper asked Bondy if there was a job she could be placed with her restrictions but doesn't recall ever receiving an answer from Bondy.  (Culpepper depo., p. 138).  He wrote in the e-mail that it was a sensitive subject because he knew Edwards was claiming she had been treated unfairly due to the phone call he had received from her.  (Culpepper depo., p. 139).

319:4 - 320:21). Plaintiff inquired of Culpepper that she needed to know what areas she would be going back to work in so she could advise her doctor.[33] Edwards advised her doctor would release her for the CCR job or the down time board but Culpepper replied that the down time board was no longer a job[34] and that she would being back to work on the 505 or 506 line which are considered the more strenuous jobs in the workplace. (Edwards depo., p. 286:14-20; 320:7-17; 33:3-8).

The conversations with Culpepper, Plaintiff's group leader, about returning to work occurred in February 2007. (Edwards depo., p. 322:1-22; 323:15-23). Culpepper instructed Edwards that she would have to deal with Jane Ramsey about returning to work; Ramsey, when contacted by plaintiff told Edwards she would have to deal with Stacye Jones, which Plaintiff did. (Edwards depo., p. 323:22 - 324:2). When Plaintiff contacted Jones, Jones said she would have to get back with Edwards later about returning to work. The next thing Plaintiff heard was a

---

[33] Edwards asked why she was not being allowed to come back to work and Culpepper explained that he had no job to accommodate her restrictions. (Culpepper depo., p. 139:20 - 140:1-5). Edwards told Culpepper she was being treated unfairly based on Mike Swindle and her complaints. (Culpepper depo., p. 140:7-12).

[34] However, Amber Kelley, who was given Edwards' position after Edwards complained, testified during her deposition that she is currently training two people to do the CCR position: Jamal Pollard (male) and Pamela Stoddard (who Edwards had previously replaced in the position). (Kelley depo., p. 67).

letter terminating her employment for not calling in.  (Edwards depo., pp. 316-324; DX23 - D01310).

When Plaintiff attempted to come back to work in February 2007 after her medical leave, she was denied access and she was escorted to the medical department through the back door.  The nurse inquired why the security guard was bringing in a team member through the back door and he told the nurse he was just doing what he had been told.  The nurse then asked Edwards what was that about -- - coming through the back?   Edwards explained to medical that she had turned in a team leader for sexual harassment.  The nurse responded that she figured it was something like that, since  women come in medical upset about the same stuff all the time and that Edwards was invited to come any time she needed them. (Edwards depo., p. 348:7 - 349:3).

Further, Edwards physician wrote Hyundai describing Edwards' efforts to get back to work as:

```
328:3       ...she has begged to go back to work,
328:4       but I do not see how she can do her
328:5       required duties because of pain with
328:6       lifting and turning.  She has always been
328:7       a worker and very stoic about her pain.
328:8       It has been very hard for her to be idle
328:9       while trying to heal this injury.  She is
328:10      obviously concerned about her long-term
328:11      job security.  I have encouraged her to
```

39

328:12       seek disability, but she refuses citing
328:13       her enjoyment of working....

(Edwards depo., p. 328:2-16).

Since being denied return to work, numerous efforts have been made by

Plaintiff and her counsel trying to get Edwards back to work; plaintiff has

identified over 31 jobs that are available.  Hyundai has refused to reinstate

Edwards and stated that the jobs plaintiff has identified are only available to

"external" candidates.  Edwards would be an "internal" candidate and there were

no jobs available for Edwards to apply.  (Pl.'s Evid. Subm. Vol. II, Ex. 2).

Further, Plaintiff applied for unemployment after being terminated and was

opposed by Hyundai.  (PX 23).

**K.    Invasion of Privacy by Mike Swindle**

Edwards had several employees approach her asking why she was turning in

Swindle when Swindle had told them they had a "thing" going.  (Edwards depo., p.

334:1-17; 345:6-18).

## III.    <u>ARGUMENT</u>

### A.    **This Egregious Sexual Harassment of the Plaintiff Survives Summary Judgment and Hyundai is Not Entitled to Any Affirmative Defenses**

Sexual harassment in the workplace can alter the terms and conditions of employment in either of two ways. One way is if the employee's refusal to submit to a supervisor's sexual demands resulting in a tangible employment action being taken against her. That conclusion logically has to follow, because tangible employment action is defined in a way that includes a change in the terms and conditions of employment. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 753-54, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998).

As defined by the Supreme Court, a tangible employment action is "a significant hiring, firing, failing to promote,<u> reassignment with significantly different responsibilities,</u> or a decision causing a significant change in benefits." *Id.* at 761, 118 S.Ct. at 2268; *see also, Johnson v. Booker T. Washington Broadcasting Services,* 234 F.3d 501, 512 (11th Cir. 2000) (Emphasis added). An employer is liable under Title VII if it (even unknowingly) permits a supervisor to take a tangible employment action against an employee because she refused to give in to his sexual overtures. That liability exists regardless of whether the employee took advantage of any employer-provided system for reporting harassment. *See id.*

41

at 765, 118 S.Ct. at 2270; *Hulsey v. Pride Restaurants, LLC*, 367 F.3d 1238, 1245 (11th Cir. 2004).

The second way for sexual harassment to violate Title VII is if it is sufficiently severe and pervasive to effectively result in a change (sometimes referred to as a constructive change) in the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned. This is hostile work environment harassment. *See id.* at 754, 118 S.Ct. at 2265. The supervisor does not have to be the harasser for this kind of sexual harassment to occur, although experience has proven that he often will be.

Regardless of who is the harasser, the employer may be able to escape liability for a hostile environment by establishing as an affirmative defense that the employee failed to take prompt advantage of the employer's system for reporting and preventing harassment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 807-08, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998); *Ellerth,* 524 U.S. at 765, 118 S.Ct. at 2270. In that respect hostile work environment harassment is different from tangible employment action harassment.

Edwards contends that Hyundai is liable for Swindle's behavior in two ways because she suffered both types of harassment. She asserts she was harassed and subsequently reassigned for refusing to have sex with Swindle, her supervisor.

42

Within six days of complaining, Plaintiff was moved from her computer desk job to slinging a hammer and a metal file on the production line every 48 seconds in a position that was considered not only one of the most physically demanding positions in the plant, but also one of the dirtiest jobs.[35]

Without doubt, Plaintiff has suffered a tangible employment action for refusing to have sex with Swindle, her supervisor. Edwards, prior to her reassignment, was subjected to ongoing sexual harassment that was sufficiently pervasive and severe to create a hostile work environment. *Hulsey at* 1245.

### B.    Plaintiff's Prima Facie Case of Sexual Harassment

### 1.    Edwards is Harassed by Swindle, her Supervisor, and Hyundai is Directly Liable for Swindle's Sexual Harassment.

Defendant contends it is entitled to summary judgment because Swindle, one of Plaintiff's harassers, was not a supervisor, but a team leader. (Def.'s Brief, p. 41). Defendants have very aptly created a factual dispute on this very contention by the separate Answers filed to Plaintiff's complaint. For instance, in Plaintiff's complaint, she alleges that Swindle was "solely in charge of the Body Build Line," where Plaintiff was required to report downtime and when Swindle was promoted to Team Leader, Edwards was assigned to his team. (Doc. 1, ¶¶ 13-15).

---

[35] Kelley depo., pp. 45-46.

Swindle answered agreeing with Plaintiff's contention that indeed Swindle was in charge of the body build line, that Plaintiff reported down time to Swindle and that Plaintiff was assigned to Swindle's team when he promoted to Team Leader.  (Doc. 8, ¶¶ 13-15).  However, Hyundai answered denying Plaintiff was assigned to Swindle's team but admitted Swindle was promoted to a Team Leader on April 27, 2006, on the Body Build Team A.  (PX1 - Bates No. 463, Doc. 5, ¶¶ 13-15; Swindle depo., p. 49:17-21).

An issue of fact exists since the Plaintiff and Swindle agree that he was her team leader solely in charge of the area Plaintiff was assigned.  Further, another team leader, Billy Kitchens, confirmed that after Edwards came to him "months ago," he told Swindle that since "he was a supervisor now," he could no longer talk ugly in front of the ladies.  (PX3, D00177).

This statement is two-fold, providing notice of Swindle's prior actions to management and that indeed Swindle is deemed a manager of Hyundai in his team leader position.

### 2.    Plaintiff's Hostile Work Environment Claim Survives Summary Judgment

To establish a *prima facie* case of sexual harassment, a Plaintiff must show that: (1) she belongs to a protected group; (2) she has been subjected to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatory abusive working environment; and (5) that a basis for holding the employer liable exists.[36]  *Jones v. City of* Lakeland, 2008 WL 2315872, 5 (11th Cir. June 6, 2008).

To prove sexual harassment in violation of Title VII, a plaintiff may rely on one of two theories.  *Burlington,* 524 U.S. 742, 753-54.  Under the first theory, the plaintiff must prove that the harassment culminated in a "tangible employment action" against her. *Id.* Under the second or "hostile work environment" theory, the plaintiff must prove that she suffered "severe or pervasive conduct." *Id.* at 754, 118 S.Ct. at 2265.

---

[36]  Under the fifth prong, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate ... authority over the employee." *Ellerth,* 524 U.S. at 765. If the harassing supervisor takes a tangible employment action against the victimized employee, the employer will be vicariously liable to the employee without the benefit of a legal defense. *Id.* at 762-63; *see also Frederick v. Sprint/United Mgmt. Co.,* 246 F.3d 1305, 1311 (11th Cir. 2001).

A hostile work environment occurs "when an employer's conduct 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment.' " *Steele v. Offshore Shipbuilding,* 867 F.2d 1311, 1315 (11th Cir.1989) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404-05, 91 L.Ed.2d 49 (1986)). The harassment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher,* 524 U.S. at 787; *Criswell v. Intellirisk Management Corp.,* 2008 WL 2736803, 2 (11th Cir., July 15, 2008).

In analyzing a hostile work environment claim, Courts consider (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with the employee's job performance. *Id.* at 1246.

The Defendant contends in its brief that Edwards' prima facie case fails because many of Plaintiff's complaints had nothing to do with her sex and therefore, Plaintiff cannot show Swindle's sexual harassment of her was sufficiently severe or pervasive. (Def.'s Brief, pp. 32-33). Defendant relies on a 1998 Sixth Circuit unpublished case to support this contention. (See Def.'s Brief,

46

p. 33, citing *Richmond-Hopes v. City of Cleveland*, 1998 WL 808222 (6th Cir. 1998) (unpublished).

Harassing conduct is severe when it causes the employee's workplace to become "permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The conduct of Swindle to the Plaintiff and any reasonable factfinder was severe in that it permeated Edwards' work place with discriminatory intimidation. It is also undisputed that Swindle's conduct was frequent and interfered with Edwards employment during the five months Plaintiff was reporting to Swindle.

Swindle would grab his genitals and shake them at Edwards; Swindle would hump fences simulating sexual acts and tell Plaintiff this was how he would "fuck" her; Swindle would inquire if Plaintiff and her husband had oral sex, had she ever had a man's finger up her butt while having sex; and bragging an invitation to Edwards that he (Swindle) "would lick her ass raw" if he had oral sex with her. Swindle would sit in a chair, thrusting his hips in a sexual simulation of the plaintiff, hollering "Fuck me you motherfucker, fuck me Ralph like Mike does." (PX3, D00180).

Swindle would tell Edwards that she could not pass unless he kissed her or if she hugged him. Plaintiff would not only refuse Swindle's invitations but would

start to walk away from Swindle only to be forcibly jerked by her hair by Swindle and held her against her will. Swindle would then tell Plaintiff, "don't fucking walk by me without speaking." Swindle demanded that Plaintiff kiss him "so everyone will think you are fucking me." On another occasion, a female team member that was Swindle's close friend held Plaintiff's arms behind her back so Swindle could forcibly kiss Plaintiff. Pam told Swindle to "get her" and then told Plaintiff, "nobody is going to fuck with Mike." No one should tolerate nor condone this type of harassment in the workplace.

Even though Edwards verbally complained numerous times to Swindle, Billy Kitchens, team leader, and Steve Culpepper, group leader, the sexual harassment did not stop. Rather, Swindle informed Edwards there was nothing she could do to make him stop and Plaintiff's requests to stop would often perpetuate Swindle to continue or escalate his vulgar conduct. Swindle would laugh and tell Plaintiff he knew his actions aggravated her. Plaintiff would push Swindle from her after these comments or while Swindle would stare at her genital area and lick his lips in a lewd manner. After Plaintiff pushed Swindle from her, Swindle taunted Plaintiff stating that he liked it when she got physical with him. Plaintiff told Swindle if he did not stop, she would slap him in the face. Swindle again laughed at Plaintiff and remarked that would only turn him on.

48

Swindle's actions became so sexually perverse that Plaintiff was unable to do her job. For example, if Plaintiff asked Swindle how many hours to put down on the schedule, Swindle would reply suggestively, "I know what you can put down, your pants."

The United States Supreme Court and the Eleventh Circuit have reiterated that the standard of Title VII is not whether the employer is hostile, but whether the workplace is "permeated" with discrimination. Additionally, "there is 'not simply some magic number of [discriminatory] insults or conduct' that preclude summary judgment, but rather 'it is repeated incidents of ... harassment that continue despite the employee's objections [that] are indicative of a hostile work environment.' " *Mack v. ST Mobile Aerospace Eng'g, Inc.,* 2006 WL 2129661, at * 7 (11th Cir. 2006) (quoting *Miller v. Kentworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002).

Although the Supreme Court and the Eleventh Circuit have not explicitly required an employee to complain to the individual harasser about perceived hostile behavior, the evidence of complaints is relevant in weighing the severity of the environment. In this situation, plaintiff was in tears as she tried to work and of she dodged Swindle, he would jerk her head by grabbing her ponytail even though he knew she had a neck injury. Plaintiff complained not once, but numerous times

for Swindle to stop his perverted and harassing behavior.  Further, plaintiff complained to those that Swindle was close to and other managers to stop Swindle's harassment or move her to another area.  The Defendant instead moved Plaintiff to a physically demanding and dirty job within 30 feet of Swindle's desk. The record is riddled with plaintiff's attempts to cure the sexual harassing environment she was working in.  Defendants motion for summary judgment is due to be denied.

### 3.     HMMA Did Not Take Immediate and Appropriate Corrective Action and is Liable

The Defendant contends even if the conduct is sufficiently severe or pervasive it is still entitled to summary judgement because management took prompt remedial action.  (Def.'s brief, p. 38).  Notably and most incredulous, Swindle testified during his deposition he did not know it was illegal to discriminate or harass someone based on sex and did not know that Hyundai had a policy prohibiting such.  (Swindle depo., p. 346:20 - 347:20).  Swindle is still employed at Hyundai as a Team Leader.  Hyundai cannot argue it has a policy prohibiting discrimination when Swindle has still not been educated even after

traveling from Montgomery to Birmingham with the corporate in-house counsel for depositions.[37] (Swindle depo., p. 64).

At issue is whether Hyundai took any action since Swindle's supervisor testified he continued working the same shift in the same position as he had even though Hyundai contends it transferred Swindle to another shift.[38] Team Relations made the recommendation that Swindle be given a serious misconduct letter and <u>be removed from his team leader status</u>. However, that recommendation was not followed by Swindle's supervisors and he remained a team leader still thinking sex harassment is not illegal. (PX4, D00176; PX7). In fact, Kitchens testified nothing changed for Swindle even though Edwards was without a job. The very action Edwards conveyed to Jones that she was fearful would happen did in fact happen within two weeks.

---

[37] Swindle was trained on the harassment and discrimination policies of Hyundai in January 2004 prior to starting work full-time at Hyundai. (Swindle depo., p. 73:7-22). Swindle's definition of harassment is anything that bothers somebody else. (Swindle depo., p. 74:4-7). Swindle understands that touching can sometimes be harassing depending on the circumstances and doesn't deny that he has used profanity in the workplace including the word, "fuck." (Swindle depo., p. 74:10-13; 74:14 - 76:23). Swindle also admitted using the word "mother fucker" in front of workers and in team leader meetings. (Swindle depo., p. 77:18 - 78:21).

[38] However, during his deposition and after a break with defense counsel, Culpepper changed his testimony and provided that Swindle was assigned an opposite shift after his alleged suspension. (Culpepper depo., p. 164:4 - 165:14).

51

Further at issues is the investigation conducted by Jones. Kitchens and Edwards identified Stephanie Samuels, group leader, who was also harassed by Swindle, but was not interviewed. Culpepper was not interviewed until after the investigation and his statement was never produced during discovery. (Culpepper depo., p. 97). Jones also did not investigate nor talk to Richard Williams who worked in the computer room with Edwards and whom Edwards identified heard many of Swindle's comments. (Edwards depo., p. 255). Team Relations also advised Plaintiff's Supervisor not to move her to another position, but they ignored this directive and reassigned Plaintiff. (PX18, PX22).

If any action was taken against Swindle, it was only after Plaintiff was suspended from work as a result of Defendant's retaliation as Plaintiff was moved to within twenty (20) feet of Swindle's desk while she had been on the second floor, in an office and several hundred feet from him. (Culpepper depo., p. 99:5-23).

### 4. Hyundai Did Not Exercise Reasonable Care to Promptly Prevent and Correct the Harassing Behavior and Blatantly Refused to Follow the Advice of its Own Human Resource Department

Plaintiff told Jones she feared retaliation and desperately needed her job which is why on July 31, 2006, Edwards asked Jones if she could just be moved

without filing a charge of discrimination. Jones, after briefly hearing what Plaintiff was experiencing told Edwards she would have to call her manager.

On August 1, 2006, after Plaintiff had complained to Team Relation, she was approached by Culpepper and told they needed to go talk to Tom Bondy, the weld shop manager. Bondy started the conversation that he had heard rumors that Swindle was bothering her. Plaintiff reluctantly told Bondy about the harassment by Swindle and that it was so severe she wanted to quit. Bondy told Plaintiff she was not going anywhere and asked why she had not told him about the harassment. Plaintiff relayed to Bondy that Swindle had told her that Swindle and Bondy were friends and she could not do anything about Swindle harassing her. (Edwards depo., pp. 270-271).  Jones confirmed that Culpepper and Bondy violated the protocol by approaching her about her complaint.  (Edwards depo., pp. 272-273; see also PX3, D00187-D00188.)

Prior to Plaintiff's complaints about Swindle, Plaintiff had no deficiencies of any kind in her job performance and her performance was deemed exemplary until she complained about Swindle's sexual harassment. In fact there is not a single write-up to support defendant's position that plaintiff's work was deficient. It was also widely known in the plant and among Plaintiff's supervisors that she suffered neck problems and pain due to a recent automobile accident. Plaintiff's neck would

visually swell and Plaintiff often had a towel around her neck while doing her CCR job.  After her complaints.  Hyundai reassigned Edwards from her CCR job, sitting in an office, to the production line where she was made to hammer automobile hoods and file off weld burrs every 48 seconds.  When Plaintiff asked why she was being reassigned, she was told so she would be more comfortable while the investigation was ongoing.  However, this undesirable reassignment six days after her complaint, to a much more physically demanding job was only intended to cause Plaintiff severe physical and emotional pain in retaliation and to physically hurt Edwards so she could not do the job and would quit.

This assignment was in keeping with Swindle's comments to Edwards that it would do her no good to complain that he was not only untouchable, he was drinking buddies with other managers and they would take care of each other. Defendant did not have a policy that it conveyed to the Plaintiff on how to complain, however, the mechanism in place afforded Plaintiff no help, but rather was used to get rid of the Plaintiff for complaining.

### C.    Evidence of Pretext.

A Plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.  *Reeves v. Sanderson*

54

*Plumbing Products, Inc.*, 133, 120 S.Ct. 2097, 147 L.Ed. 105 (2000).  In *St. Mary's Honor Center v. Hicks*, 509 U.S. at 502, 511, 113 S.Ct. 2742, 2750, 125 L.Ed.2d 407 (1993), the Supreme Court specifically stated, that the fact finder's disbelief of the reasons put forward by the Defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the Defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.  *Hicks*, 509 U.S. at 502, 511.

A reasonable jury could conclude based on the direct and circumstantial evidence produced by Plaintiff that the terms and conditions of her employment were altered due to overt sexual harassment and retaliation.  No other reason that Defendant has cited has any credence as articulated in more detail above.  A reasonable jury could conclude there was no evidence that Plaintiff was not adequately performing the CCR position and, therefore, summary judgment is due to denied.

### D.    Plaintiff's FMLA Claim

The FMLA contains two distinct types of provisions. First, it creates a series of substantive rights that eligible employees "shall be entitled" to up to twelve weeks of unpaid leave per year for any one of the following purposes: when the

employee has "a serious health condition that makes [him or her] unable to perform the functions of [his or her] position," 29 U.S.C. § 2612(a)(1)(D); to care for a close family member with such a condition, 29 U.S.C. § 2612(a)(1)(A); or because of the birth, adoption, or placement in foster care of a child, 29 U.S.C. § 2612(a)(1)(A) & (B). See also 29 U.S.C. § 2611(11); 29 C.F.R. §§ 825.100(a), 825.114 (1997) (defining a "serious health condition").

However, following a qualified absence, the employee is entitled to return to the same position or an alternate position with equivalent pay, benefits, and working conditions, and without loss of accrued seniority. 29 U.S.C. § 2614(a)(1); 29 C.F.R. §§ 825.100a) (1997). The FMLA also provides for "intermittent" leave, which allows an employee to take such leave intermittently "when medically necessary," such as to attend appointments with a health care provider for necessary treatment of a serious health condition. 29 U.S.C. § 2612(b); 29 C.F.R. § 825.117 (1997) (defining requirements for intermittent leave). *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 159 (1st Cir. 1998).

Plaintiff was entitled to take FMLA leave for her own health condition. Defendant has violated the FMLA because it did not allow the Plaintiff to return to her previous position or an alternate position. This Court has stated that even though Plaintiff was not an eligible employee under the FMLA the Plaintiff can

prove a violation of FMLA to retaliate under the FMLA. *Walker v. Elmore County Board of Education*, 223 F.Supp.2d 1255, 1261 (M.D. Ala. 2002).

To make out a prima facie case of retaliation under the FMLA, Edwards must show that (1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action. *Randlett v. Shalala*, 118 F.3d 857, 862 (1st Cir.1997).

A reasonable jury could conclude that defendant's reasons for terminating Edwards and not rehiring her or even allowing her to apply for thirty-one different positions, (PX13), was a pretext for discrimination and retaliation in light of the evidence that plaintiff was terminated while on medical leave mandated by the Defendant. There is no dispute that Plaintiff was involuntarily placed on medical leave and despite her efforts, Defendant would not allow her to return to work citing it had no work for her or she had to be an external candidate. Defendant has failed to carry its burden on summary judgment. Plaintiff was retaliated against and terminated in violation of the FMLA and was not returned to the same position or an alternate position with equivalent pay, benefits, and working conditions. Summary judgment is due to be denied.

### E.    Plaintiff's Prima Facie Case of Retaliation.

Plaintiff can establish a prima facie case of retaliation under Title VII by showing the following elements: (1) she participated in a protected activity; (2) she suffered a materially adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision. *Burlington N.E. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L.Ed.2d 345 (2006); *Davis v. Coca Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n. 52 (11th Cir. 2008). The phrase "protected activity" includes formal EEOC complaints and informal complaints filed internally to the employee's supervisors. *Shannon v. Bellsouth Telecomms. Inc.*, 292 F.3d 712, 716 n. 2 (11th Cir. 2002).

In *Burlington*, the Supreme Court stated that the application of Title VII retaliation provision is not limited to an employer's actions that affect terms, conditions or status of employment, or those that occur only at the workplace. The scope of retaliation provision is broader than that of Title VII's substantive discrimination provision. (internal citations omitted).

In its opinion, the Supreme Court stated:

"In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. We speak of material adversity because we believe it is important to separate

significant from trivial harms. Title VII, we have said, does not set forth a general civility code for the American workplace. An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* (citations and quotations omitted).

This court construes "the causal link element broadly so that 'a plaintiff merely has to prove that the protected activity and the ... [adverse] action are not completely unrelated.' " *Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir.2004) (modifications in original) (citation omitted). Furthermore, a causal connection is established if the plaintiff shows that the decision-maker was aware of the protected activity and the protected activity is not wholly unrelated to the adverse action. *Gupta v. Fla. Bd. of Regents,* 212 F.3d 571, 590 (11th Cir.2000). "For purposes of a prima facie case, 'close temporal proximity' may be sufficient to show that the protected activity and the adverse action were not 'wholly unrelated.'" *Id.; Jones v. City of Lakeland*, 2008 WL 2315872, 5 (11th Cir. 2008).

Applying the standard to the facts of this case, there is sufficient evidentiary basis to support Edwards' retaliation claim. It is undisputed that within a mere six days she was moved from her office job to a physically demanding job on the production line slinging a hammer every 48 seconds instead of tapping a keyboard with her fingernails. Employees approached Edwards and asked what she had

done to be moved. (Edward dep. p. 279). This is evidence that a reasonable factfinder can consider that Plaintiff suffered an adverse job action in retaliation for complaining of sexual harassment.

The anti-retaliation provision Title VII seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms by prohibiting employer actions that are likely to deter discrimination victims from complaining to the EEOC, the courts, and employers. *Id., citing Robinson v. Shell Oil Co.*, 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997).

Edwards has shown she participated in activity protected by Title VII in that she complained internally and was reassigned. Plaintiff filed an EEOC charge on September 20, 2006. (PX 6). Thereafter, she was denied access to the plant in December and denied a position in February 2007 after being released from her doctor.

There is a causal connection between Edwards complaints and the Defendant's actions. Defendant's actions were retaliatory and actionable. Edwards has proven a prima facie case of retaliation. Summary judgment is due to be denied.

**F.    The Evidentiary Framework for Plaintiff's Sex Discrimination and Retaliation Claims**

The Defendant contends that Plaintiff does not have direct evidence of harassment or retaliation and that her claims will fail because Plaintiff cannot rebut each and every reason for the stated employment action.

Plaintiff can show that Defendant's conflicting and shifting reasons for Plaintiff's adverse employment action are evidence of pretext and would not have motivated the Defendant to act. Proof that the Defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000).

The defendant is supposedly in the best position to articulate its nondiscriminatory reason for the questionable employment action. *Id.* However, Defendant told Edwards she was moved to make her more comfortable, not as Defendant contends that Plaintiff requested a move because her ass was getting too big or because her performance was lacking. Had those been the real reasons, Defendant was in the best position to articulate those at the time Plaintiff was reassigned. Further Plaintiff was allegedly terminated for not calling in to Hyundai, but Edwards called and unknown to the Defendant recorded those conversation providing further evidence of the untruthfulness of the defendant that

61

a reasonable fact finder could conclude was a cover for the real reason, illegal retaliation. It is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. *Id.*

Specifically, the Supreme Court stated, "the fact finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of a *prima facie* case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reason will permit the trier of fact to infer the ultimate fact of intentional discrimination." *Id.* at 2108.

In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principals of evidence law that the fact finder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." *Id.* at 2108 (internal cites omitted).

### G.    Plaintiff's Assault and Battery Claim

The Defendant contends that Plaintiff cannot prove any of her state law claims because she cannot show that Swindle was a supervisor or that Hyundai is vicariously liable for Swindle.  There is an abundance of evidence that Swindle's actions and language were well known in the plant and no one in management sought to deter him.  Even a female Group Leader had complained about Swindle to no avail.  Further, even after Plaintiff's "formal" complaints, Swindle was still unaware that sexual harassment in the workplace is illegal.  (Swindle depo., p.346:20-347:7).

The Alabama Supreme Court has defined "assault" as:

"an intentional, unlawful offer to touch the person of another in a rude or angry manner under such circumstances as to create, in the mind of the party alleging the assault, a well founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented."

*Allen v. Walker*, 569 So.2d 350, 351 (Ala.1990), quoting *Western Union Telegraph Co. v. Hill*, 25 Ala.App. 540, 542, 150 So. 709, 710, cert. denied, 227 Ala. 469, 150 So. 711 (1933), as quoted in *Holcombe v. Whitaker*, 294 Ala. 430, 435, 318 So.2d 289, 294 (1975).  A successful assault becomes a battery, which consists of the touching of another in a hostile manner. *Surrency v. Harbison*, 489

So.2d 1097, 1104 (Ala.1986), citing *Singer Sewing Machine Co. v. Methvin*, 184 Ala. 554, 561, 63 So. 997, 1000 (1913).

The evidence establishes that the touching at issue in this case was hostile, angry and rude. This court can conclude that the evidence presented by plaintiff, with regard to the instances of touching by Swindle during the relevant periods, are sufficient to create an issue of fact regarding whether Swindle committed an assault and/or a battery. *Ex Parte Atmore Community Hospital,* 719 So.2d 1190, 1194 (Ala. 1998) (finding sufficient evidence of a battery where plaintiff's supervisor "touched her waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg," where there was evidence that the touching was intentional, conducted with sexual overtones, and unwelcome).

There is evidence that Swindle continued touching Edwards after she complained to him and other supervisors about his unwelcome touching.  Clearly, Swindle knew, or should have known, that Edwards did not want Swindle putting his hands on her in any manner.  After Swindle touched Edwards and she complained, Swindle laughed and said there was nothing Edwards could do to deter him.  This is indicative of rudeness and demonstrates the lack of respect that Swindle had for women and particularly Edwards.

If there is a genuine dispute whether the defendant's conduct was intended to "create a reasonable or well-founded apprehension of imminent harm" so as to constitute assault, summary judgment is inappropriate. *Saville v. Houston County Healthcare Authority*, 852 F.Supp. 1512, (M.D.Ala.1994) (quoting *Allen v. Walker*, 569 So.2d 350, 352 (Ala.1990)). Factual issues are in dispute and summary judgment is due to denied.

## I.    Plaintiff's Slander Claim

The elements of Edwards' cause of action for defamation are: 1) a false and defamatory statement concerning the plaintiff; 2) an unprivileged communication of that statement to a third party; 3) fault amounting at least to negligence on the part of the defendant; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement. *McCaig v. Talladega Publ'g Co.*, 544 So.2d 875, 877 (Ala.1989). *Wal-Mart Stores, Inc. v. Smitherman,* 872 So.2d 833, 840 (Ala.2003).

Swindle conveyed to other team members that he and Edwards had a consensual relationship. This was untrue and defamatory. Plaintiff had team members ostracize her and sympathize with Swindle based on these conversations. There is no defense other than Swindle trying to shift his wrong doing after Edwards complained to avoid liability and keep his job. Edwards lost hers as a

result.  Summary judgment is due to be denied.  Swindle defamed Edwards and Hyundai condoned his actions.

### J.     Plaintiff's Outrage Claim

The Defendant does not dispute that Swindle's actions were inappropriate to Edwards, but contends his actions, alone, did not rise to the level of outrage and further that Hyundai cannot be held liable for Swindle's conduct.

In order to prevail on tort-of-outrage or intentional infliction of emotional distress claim, Edwards is required to present substantial evidence indicating that Defendant, Swindle's, conduct (1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.  *Thomas v. BSE Indus. Contractors, Inc.,* 624 So. 2d 1041, 1043 (Ala. 1993); see also *American Road Service Co. v. Inmon*, 394 So. 2d 361 (Ala. 1981).

Courts have recognized the tort of outrage in three areas: (1) wrongful conduct within the context of family burials; (2) an insurance agent's coercing an insured into settling an insurance claim; and (3) egregious sexual harassment. *Stabler v. City of Mobile,* 844 So.2d 555, 560 (Ala. 2002) (Emphasis added). Edwards, as depicted above, has shown to this court that Swindle's conduct was sexually perverse, severe, extreme, outrageous and cannot be condoned.  No

66

civilized society would condone a supervisor using sexual favors or power to advance or stay employed. The evidence also shows that Edwards was caused to suffer severe emotional and physical harm. She sought medical attention for stress, loss of sleep and depression as a result of Swindle's actions.

Swindle's conduct was intentional and extreme and was executed with the full knowledge that Edwards would be damaged as a result of his conduct. Edwards repeatedly asked Swindle to cease his harassment.

Edwards, as required under her prima facie case, can show that she suffered special harm as a result of the sexual harassment of Mike Swindle. Edwards testified as to the extreme emotional harm that she was caused to endure. She cried at work and during her deposition. She was caused to take medication for depression and loss of sleep. She lost weight. Edwards lost her job which caused financial strain and marital problems. (Edwards depo., p. 361). Edwards has proven her claims of intentional infliction of emotional distress. Summary judgment is due to be denied and this case proceed to a jury. Defendant's motion for summary judgment is due to be denied.

### K.    Plaintiff's Negligent Supervision Claim

In *Lane v. Central Bank of Alabama, N.A.,* 425 So.2d 1098, 1100 (Ala.1983), (quoting *Thompson v. Havard,* 285 Ala. 718, 723, 235 So.2d 853

(1970), the Alabama Supreme Court first set out the standard for negligent supervision. This case codifies the employer's duty to investigate the backgrounds of potential employees before hiring and also the employer's duty to train and supervise employees, specifically those employees in a managerial capacity.

In *Big B, Inc. v. Cottingham*, 634 So.2d 999 (Ala. 1993), the defendant was held liable for negligently supervising its store manager where there was sufficient evidence from which the jury could find that had the employer sufficiently investigated the complaints, the manager's attitude towards women and his fitness for employment would have been more seriously re-evaluated and he would not have been allowed to remain where he could mistreat female customers or employees. Once the company has reason to suspect an employee's unfitness, it is under a duty to thoroughly investigate and take such precautions so that the conduct will not occur again. *Id.*

Unfortunately, Swindle proved this claim for Edwards. He testified he had no knowledge of Defendant's sexual harassment policy nor even that sexual harassment was illegal in the workplace. The defendant has utterly and shamefully failed to take this action seriously and train its managers knowing that Plaintiff and other women, after its investigation, have complained about Swindle. (PX3, PX4).

Summary judgment is due to be denied.

IV.    **CONCLUSION**

Plaintiff has proven her *prima facie* case for all of her claims and rebutted

Defendant's allegedly non-discriminatory reasons for her reassignment and

ultimately her termination.  Plaintiff is entitled to a denial of summary judgment on

all her claims in that she has established Defendant's reasons are pretextual and

unworthy of belief.  Even when defendant's witnesses heard their conversation on

Plaintiff's tape, they would still deny the truth.  The Defendant intentionally

sexually harassed Plaintiff and subjected her to further unlawful discrimination and

retaliation.

WHEREFORE, PREMISES CONSIDERED, the Plaintiff moves this

Honorable Court to deny Defendant's Motion for Summary Judgment in its

entirety.

Respectfully submitted,


/s/ Alicia K. Haynes
Alicia K. Haynes
Attorney for Plaintiff

OF COUNSEL:

HAYNES & HAYNES, P.C.
1600 Woodmere Drive
Birmingham, Alabama   35226
Phone:  (205) 879-0377
Fax:  (205) 879-3572
E-mail:  akhaynes@haynes-haynes.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of September 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| J. Tobias Dykes | Brian R. Bostick |
| **CONSTANGY, BROOKS & SMITH, LLC** | **OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.** |
| One Federal Place, Suite 900 | One Federal Place, Suite 1000 |
| 1819 Fifth Avenue North | 1819 Fifth Avenue North |
| Birmingham, Alabama  35203 | Birmingham, Alabama 35203 |


/s/ Alicia K. Haynes
OF COUNSEL