IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| TAMMY EDWARDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:07cv908-MHT |
| | ) | (WO) |
| HYUNDAI MOTOR | ) | |
| MANUFACTURING ALABAMA, | ) | |
| LLC, and MIKE SWINDLE, | ) | |
| individually, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff Tammy Edwards brings federal-law claims against defendant Hyundai Motor Manufacturing Alabama (HMMA) for sexual harassment, gender discrimination, and retaliation, all in violation of Title VII of the Civil Rights Act of 1964 (Title VII), as amended (42 U.S.C. §§ 1981a, 2000e to 2000e-17), and the Family and Medical Leave Act (FMLA) (29 U.S.C. §§ 2601-2654). Edwards also brings state-law claims against defendant Mike Swindle for intentional infliction of emotional distress,

invasion of privacy, assault and battery, and slander. Finally, she brings state-law claims against HMMA for intentional infliction of emotional distress, assault and battery, and negligent supervision. This court has original jurisdiction over the Title VII claims pursuant to 42 U.S.C. § 2000e-5(f)(3) and the FMLA claim pursuant to 29 U.S.C. § 2617(2); this court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

Now pending before the court are the defendants' motions for summary judgment on all claims. Summary judgment will be granted in part and denied in part.

## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). Under Rule 56, the court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## II. BACKGROUND

Edwards began working for HMMA on January 17, 2006. For the first two weeks of her employment, she attended training for new team members. However, she missed the part of the training on HMMA's anti-harassment policies and programs because she was out sick.

Edwards missed two more days of orientation because of a car accident. Although she did not report to the medical clinic after this accident, she did inform Team Relations, part of the human-resources department, of the reason for her absence and the pain she was experiencing

3

as a result of the accident.  Her supervisor placed her on "light duty" assembling fenders.

In March 2006, Edwards was recommended for a position in the Communications and Control Room (CCR), for which she would walk throughout areas of the plant recording down-time information and then enter this information into spreadsheets on a computer.  She was assigned to a new team, Body Build A, where Swindle was Team Leader.

Edwards began having problems with Swindle from the day she moved to his team.  Swindle propositioned her for oral sex; asked her to "fuck" him, and offered to "lick her ass raw," Edwards Dep. at 198; said that one night with him and she would go home and "blow [her husband's] head off," Edwards Dep. at 153-154; asked her whether she had ever had "a man's finger up her butt," Pl.'s Ex. 3 at 180; rubbed her leg and commented on how good she looked in her pants; grabbed his genitals and shook them at her; blocked her way in the hall; bumped against her with his hands behind his back; hugged her; and pulled her hair by

4

grabbing her pony tail.  Edwards made it clear that she did not like Swindle's behavior.  One co-worker in particular, Amber Kelly, witnessed a number of these incidents.

Edwards complained to another Team Leader, Billy Kitchens, about Swindle's behavior, but Kitchens took no action, though he admitted that he knew Swindle's behavior was often objectionable.  Edwards also told her supervisor, Steve Culpepper, that she did not want to go to Swindle with her questions because of the way Swindle treated her.  Culpepper laughed it off but conceded that Swindle will tell you "stuff you don't want to hear." Edwards Dep. at 150-151.[1]

Around May 2006, Edwards told Culpepper that she would like to be reassigned to a job back on the "floor" of the manufacturing plant, in production.  She told Harry White (Culpepper's supervisor) and Tom Bondy (the

---

    1.  Edwards also complained to Culpepper that Kitchens made a joke about her job being underneath his desk, but Culpepper just laughed and made a joke about it.

Production Manager) that she specifically wanted to return to fenders, to work under her first Team Leader, Keith Ulrich, because she did not like the "commotion" in CCR and that "so much sitting" and using the computer hurt her neck.  She did not explain at this time that she also wanted a reassignment, at least in part, to get away from Swindle's offensive behavior.

In June or July of 2006, Edwards requested that HMMA train another employee for a position in CCR, in order to cover her shifts whenever she needed to be absent.  HMMA began this process in July 2006.

Eventually, Swindle's behavior grew so severe that Edwards began taking a longer route as she walked through the plant in order to avoid passing by Swindle. This angered Swindle, who told her to stop "fucking dodging" him.  Edwards Dep. at 129-130.  On at least one occasion, Edwards broke down in tears.

On July 31, 2006, Edwards lodged a formal complaint with HMMA Team Relations.  This was her first contact

6

with anyone in HMMA's Team Relations regarding her sexual-harassment complaint.  She e-mailed Team Relations Representative Stacye Jones and met with Jones that afternoon and again the next day to provide an account of Swindle's offensive behavior.  At this meeting, she again asked to be transferred.

HMMA immediately investigated and confirmed many of Edwards's allegations.  Swindle was placed on two-weeks suspension without pay; reassigned to a different shift in which he would not interact with Edwards; and given a letter of reprimand which would prevent him from being promoted for the next two years.  He was not demoted or fired.

On August 10, 2006, only eleven days after initiating her complaint, Edwards was reassigned to the Weld Team. In this job, she inspected for gaps in tail gates, which she would close by tapping them with a hammer, and she used a small file to shave rough edges off the bodies of cars.  Prior to the reassignment, Jones had advised

Production Manager Bondy not to reassign Edwards because it might be viewed as retaliation.  Bondy reassigned her anyway.

Edwards found her new job to be dirtier and less desirable than her job in CCR or the job she requested in fenders.  Even more, this transfer moved her much closer to Swindle's work station (from about 300 feet away to 30 feet away).

After only a few days in her new position, Edwards reported to Team Relations that she was nauseated from having taken muscle relaxers for neck pain.  She was sent to the medical clinic, where she reported that her neck pain stemmed from a car accident and mentioned that her doctor had been encouraging her not to work so that her neck would heal. The medical clinic sent her home and told her that she needed to get a letter from her doctor explaining her medical conditions.

Edwards did not return for work the next day but applied for and received short-term disability benefits instead.  She did not request FMLA benefits.

On September 26, 2006, Edwards filed a charge with the Equal Employment Opportunity Commission (EEOC), alleging retaliation and discrimination based on sex.

On February 11, 2007, Edwards was informed that her short-term benefits had expired and that her claim had been automatically converted into an application for long-term benefits.  Nevertheless, she reported to work two days later with a statement from her doctor explaining that she could work under the conditions of no prolonged sitting or standing and no lifting.  HMMA sent Edwards home, telling her that there were no positions available that would accommodate these restrictions.

In March 2007, while she was still on long-term medical leave, Edwards exchanged a series of emails with HMMA in which she inquired about her employment status and whether she might return to her previous position or

9

apply for several open positions listed on HMMA's website. HMMA responded that Edwards was still listed as "currently employed" with HMMA and that the positions she inquired about were for "external hires" only; because she was still an employee with HMMA (on long-term medical leave) she could not apply for these particular positions. Ultimately, HMMA informed Edwards that if she wanted to be considered for work she would have to be released from her current-medical restrictions and would have to schedule an appointment with HMMA's on-site medical facility. Edwards did not make such an appointment and did not obtain a release from her restrictions.

On June 14, 2007, HMMA's insurance carrier denied Edwards's application for long-term benefits. Edwards did not return to the plant after receiving this notification. Instead, she appealed the decision but was denied again in January 2008.

On July 11, 2007, Wendy Warner, the Manager of HMMA's Employment Department, determined that Edwards had resigned her position because she had not reported back to management after receiving her denial of long-term benefits.  Warner had no knowledge of Edwards's sexual-harassment complaint or her EEOC charge at the time she made this decision.

### III. FEDERAL-LAW CLAIMS

Edwards brings federal-law claims against HMMA for sexual harassment, gender discrimination, and retaliation in violation of Title VII; she also brings a claim for violation of the FMLA.  The motion for summary judgment will be denied on the sexual-harassment claim and one of her retaliation claims; it will be granted on the remaining retaliation claims and the gender-discrimination and FMLA claims.

11

## A. Sexual Harassment

To establish a sexual-harassment claim Edwards must prove that: (1) she belongs to a protected group; (2) she has been subject to unwelcome sexual harassment; (3) the harassment was based on her sex; (4) the harassment was sufficiently severe to alter the terms and conditions of her employment; and (5) there is a basis for holding the employer liable. Mendoza v. Borden, Inc., 195 F. 3d 1238, 1245 (11th Cir. 1999).

The test for employer liability depends on whether the harasser is a co-worker or a supervisor. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998). If the harasser is a co-worker, the claim is governed by a negligence standard, and the plaintiff must demonstrate that the employer had or should have had notice of the harassment and failed to respond adequately to the problem. Faragher, 524 U.S. at 807. If the harasser is a supervisor, no negligence must be shown and an employer

can be found vicariously liable if: (1) the employee's refusal to comply with the supervisor's sexual demands or overtures resulted in a tangible employment action being taken against her; or (2) the harassment was sufficiently severe or pervasive to alter the conditions of her employment, which is known as a hostile-work-environment claim.  Hulsey v. Pride Restaurants, LLC, 367 F.3d 1238, 1245-46 (11th Cir. 2004).

There is no affirmative defense against a tangible-employment-action claim, Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998); however, an employer may defeat a hostile-work-environment claim with an affirmative defense, if it can show (a) that it "exercised reasonable care to prevent and correct promptly" any sexually harassing behavior, and (b) that the plaintiff employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id.

13

## 1. Was Swindle a Supervisor?

As explained above, a threshold question in this case is whether Swindle was Edwards's supervisor.  This is not a question reducible to neat categorization.  "A supervisor need not necessarily be high in the business structure, nor does he have to have the authority to hire, fire, or promote, in order to be considered an agent whose conduct is binding on an employer."  <u>Sims v. Montgomery County Com'n</u>, 766 F. Supp. 1052, 1069 (M.D. Ala. 1990)(Thompson, J.).  "[I]n determining whether a person acts in either a supervisory or agency capacity, a court must examine 'the circumstances of the particular employment relationship and the job functions performed by the individual.'"  <u>Id</u>. at 1069 (quoting 29 C.F.R. § 1606.8(c)).  "The proper analysis ... calls not for a mechanical application of indefinite and malleable factors ... but rather an inquiry into the reasons that would support a conclusion that harassing behavior ought to be held within the scope of a supervisor's

employment." Faragher, 524 U.S. at 797. Thus, the employee's official categorization within the corporate structure is not dispositive; whether an employee is a supervisor must be a fact-based inquiry considering the actual employment relationship and whether the harassment may have been aided or intensified by a "misuse of supervisory authority." Id. at 807.

Here, there is a genuine question of material fact as to whether Swindle was Edwards's supervisor. Although HMMA asserts that Swindle was a non-exempt, hourly employee not officially empowered to hire, fire or discipline, the evidence suggests that Swindle--as a Team Leader--may have wielded the authority of a supervisor. It is uncontested that he "guided" other team members, handled their time sheets, and was known in the factory as the "king of the body build." Edwards Dep. at 71. He sat at the end of the production row, oversaw the work of an entire "team" of employees, and had the ability to

assign different tasks to different Team Members.[2]
Although Swindle may not have had the authority to
discipline, per se, it appears that he was able to do so,
in effect, by assigning team members to different tasks.

In addition, Edwards has explained that Swindle's
apparent authority and close relationship with management
deterred her from complaining earlier about his conduct.
She felt that he would never be disciplined.  In fact,
she testified that Harry White, an Assistant Manager
above Swindle in the chain of command, once told her she
would be transferred to Swindle's line because "Mike
[Swindle] is the king, and what Mike wants, Mike gets."
Edwards Dep. at 90.  In other words, even if Swindle were
not a supervisor according to the official corporate
structure, there is evidence that he had the authority of
a supervisor and that he may have misused this authority

_____

2. Each shift has five Team Leaders and one Group
Leader.  Each Team Leader oversees the work of an entire
team of employees.  There is no evidence as to how many
employees form an average "team."

16

to harass Edwards.[3]   The evidence, therefore, is sufficient for this factor to go to a jury.


## 2. Did Swindle Create a Hostile-Work Environment?

In order to establish a hostile-work-environment claim, Edwards must show that the harassment was sufficiently severe or pervasive to alter the terms and conditions of her employment.  Walton v. Johnson & Johnson Services, Inc., 347 F.3d 1272, 1279-80 (11th Cir. 2003).  "[C]onduct must be extreme to amount to a change in the terms and conditions of employment." Faragher, 524

_____

3.  Because Edwards has raised a genuine factual question as to whether Swindle was a supervisor for Title VII purposes, it is unnecessary to demonstrate that HMMA knew or should have known of Swindle's harassing behavior. Nevertheless, the court notes that even if Swindle were not deemed a supervisor, Edwards has submitted enough evidence to survive summary judgment on what HMMA knew or should have known concerning Swindle's behavior.  The evidence suggests that it was widely known that Swindle behaved inappropriately, used foul language, and made sexually suggestive comments to female coworkers.  When combined with the fact that Edwards complained to several co-workers, including a supervisor, a reasonable juror could conclude that HMMA should have known that Swindle was sexually harassing Edwards.

17

U.S. at 788.   It "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Id. at 787.   The factors to consider for the objective severity of the harassment include (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.   Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002).   Although there is no "magic number" of insults, "repeated incidents of verbal harassment that continue despite the employee's objections are indicative of a hostile work environment." Id. at 1276 (quoting Shanoff v. Illinois Dept. of Human Servs., 258 F.3d 696, 704 (7th Cir. 2001)) "[N]o single factor is determinative, and either severity or pervasiveness can satisfy the element, if sufficient."

_Reeves v. C.H. Robinson Worldwide, Inc._, 525 F.3d 1139,
1143 (11th Cir. 2008).

A genuine question of material fact exists as to
whether Swindle's conduct created a hostile-work
environment.  Swindle's insults and offensive physical
contacts were repeated, and they continued despite
Edwards's objections. Edwards reports numerous instances
over a four-month period in which Swindle propositioned
her for sex; asked her vulgar questions about her sex
life; and hugged her, touched her, and even pulled her
hair.  Edwards had to alter her route through the
building in order to avoid Swindle and ultimately broke
down in tears before making an official complaint to Team
Relations.  These allegations amount to repeated,
pervasive, and severe conduct, which may have
unreasonably interfered with Edwards's job performance,
creating a hostile-work environment.

### 3. Did HMMA Take Reasonable Care to
### Prevent and Correct the Harassment?

As explained above, an employer may raise an affirmative defense to a hostile-work-environment claim by showing "(a) that [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Mendoza v. Borden, Inc., 195 F. 3d 1238, 1245 (11th Cir. 1999).

An employer may demonstrate that it has taken reasonable care to prevent harassment by showing that it has an "effective and comprehensive anti-sexual harassment policy." Farley v. American Cast Iron Pipe Co., 115 F.3d 1548, 1554 (11th Cir. 1997). "The wide variety of employment settings make it difficult to establish a uniform test for determining whether an employer's anti-harassment policy complaint procedures demonstrate the employer's reasonable care in preventing

20

sexual harassment." <u>Madray v. Publix Supermarkets, Inc.</u>, 208 F.3d 1290, 1298 (11th Cir. 2000).   At minimum, however, "dissemination" of an employer's anti-harassment policy is "fundamental to meeting the requirement for exercising reasonable care in preventing sexual harassment." <u>Id</u>.   In addition, an effective policy must provide avenues for complaint that do not require the plaintiff to bring his or her complaint to the offending supervisor first. <u>Id</u>. at 1298-99.

HMMA's policy did not require Edwards to bring her complaint to Swindle; however, there are material questions about whether HMMA's sexual-harassment policy was thoroughly disseminated.   HMMA asserts that every employee receives information about the sexual-harassment policy in the employee handbook. This information, however, consists of one short paragraph in a 47-page, single spaced handbook, which Edwards never received.

Likewise, although HMMA offers training for new hires on its sexual-harassment policy, Edwards herself was

never trained on the policy; she was absent the day of training, and a training was never rescheduled for her.

Finally, although Edwards complained to Culpepper, a supervisor, it does not appear that HMMA's anti-harassment policy compelled him to investigate Swindle's inappropriate behavior or advise Edwards to take her concerns to Team Relations. It is questionable whether a policy that permits a supervisor to be complacent in the face of sexual harassment can be deemed "effective" or "comprehensive." As such, HMMA has failed to prove the first prong of its affirmative defense.

Summary judgment will be denied on Edwards's sexual-harassment claim.[4]

---

4. Also, this evidence of inaction by HMMA's supervisors undermines HMMA's argument regarding the second prong of the affirmative defense: that it responded promptly and adequately once it became aware of the harassment. A supervisor's knowledge of Swindle's behavior could be imputed to HMMA, and a reasonable juror could conclude that HMMA, therefore, did not respond promptly or adequately when it did nothing with its knowledge, instead waiting for Edwards to file a formal complaint with Team Relations.

## B. Gender Discrimination

Edwards contends that HMMA's decision to fire her and its refusal to rehire her were motivated by gender discrimination. She has no direct evidence that HMMA treated her adversely due to her gender; therefore, her claim must rely on circumstantial evidence.  To prevail on such a claim under Title VII, Edwards must show that (1) she is a member of a protected class; (2) she suffered an adverse-employment action; and (3) other, similarly situated individuals outside her protected class were treated more favorably.  See Maynard v. Board of Regents of Div. Of Universities of Florida Dept. of Educ. ex. rel. University of South Florida, 342 F.3d 1281, 1289 (11th Cir. 2003); see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

Neither party contests the first two prongs of the prima-facie case; Edwards, as a woman, is a member of a protected class, and she suffered an adverse-employment

action when she was terminated and when she was not rehire.   Her claim ultimately fails, however, because she has presented no evidence that similarly situated men were treated more favorably or that otherwise her gender played any role whatsoever in the decisions to terminate her and not rehire her.   The Eleventh Circuit addressed very similar facts in <u>Walton v. Johnson and Johnson Services, Inc.</u>, 347 F.3d 1272, 1283 (11th Cir. 2003), and concluded that, where the plaintiff had failed to return to work at the expiration of her short-term medical leave, and where there was no evidence that the decision to discharge her had anything to do with her gender, she failed to state a claim of gender discrimination under Title VII.   The court arrives at the same conclusion here.

Summary judgment will be granted on Edwards's gender-discrimination claim.

## C. Retaliation

Edwards sets forth three possible retaliatory acts: (1) HMMA's decision to reassign her from CCR to the Weld Team; (2) the termination of her employment after she was denied long-term medical leave; and (3) HMMA's refusal to rehire her after her termination.  To support each of these claims, Edwards must show: (1) she engaged in statutorily protected expression; (2) she suffered an adverse-employment action; and (3) there was a causal relationship between the two events. Thomas v. Cooper Lighting, Inc., 506 F.3d 1361 (11th Cir. 2007).

HMMA concedes that Edwards engaged in statutorily protected expression when she complained of sexual harassment and when she filed her subsequent EEOC charge; the debate surrounds the second two prongs of the standard.

### 1. Edwards's Reassignment

Edwards first claims that her reassignment from CCR to the Weld Team was retaliatory. Because this reassignment took place before she filed her EEOC charge, the claim is based only on her sexual-harassment complaint to HMMA Team Relations.

### i. Was the Reassignment Adverse?

To be adverse, a challenged action must be adverse from the standpoint of a reasonable employee. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-68 (2006). The challenged action need not involve a demotion or a suspension; it simply must be of a kind that might dissuade a reasonable worker from engaging in statutorily protected expression. Id. at 68.

HMMA argues that, because Edwards requested a reassignment, her reassignment from CCR to the Weld Team cannot be adverse. This argument assumes too much. Although a truly voluntary transfer (or reassignment)

26

cannot be considered "adverse," Doe v. Dekalb County, 145
F.3d 1441, 1454 (11th Cir. 1998), there are too many
important factual disputes here.  For example, it is not
clear exactly when Edwards made her request to be
reassigned or what reassignment she actually requested.
It is clear, however, that several months passed after
her initial request to be transferred out of CCR; that
immediately before her reassignment she believed HMMA was
arranging for someone to support her, not replace her;
that she never requested the specific reassignment she
actually received; and, in fact, that she asked not to be
transferred after she became aware that she would be
moved nearer to Swindle.  All of this undermines HMMA's
explanation that it transferred Edwards pursuant to her
request.

In the alternative, HMMA argues that her reassignment
was not 'materially adverse' regardless of whether
Edwards requested it.  This argument also fails.  The new
position on the Weld Team did not involve less pay or

fewer benefits, but there is some evidence that the CCR position involved more responsibility and greater prestige, thus giving Edwards's reassignment the air of a demotion. Even if this were not the case, the move from CCR to the Weld Team placed Edwards much closer to her harasser. A reasonable employee in Edwards's position could certainly view such a reassignment as an adverse-employment action.

### ii. Was There a Causal Relationship between Edwards's Complaint and Her Reassignment?

The Eleventh Circuit has construed "the causal link element broadly, so that 'a plaintiff merely has to prove that the protected activity and the ...[adverse] action are not completely unrelated." Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) (quoting Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998)) "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action. But mere

temporal proximity, without more, must be 'very close.'" Thomas, 506 F.3d at 1363 (quoting Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, (2001)) (internal citations omitted).  The plaintiff must also show that the defendant was aware of the protected activity when taking the adverse-employment action.  See, e.g., Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993); Brungart v. BellSouth Telecommunications, Inc., 231 F.3d 791, 799 (11th Cir. 2000).

Edwards's reassignment clearly meets this standard. HMMA concedes that it was aware of Edwards's complaint before reassigning her.  And the reassignment took place a mere 11 days after she made her complaint. See Mihoubi v. Caribou Coffee Co., Inc., 288 Fed. Appx. 551 (11th Cir. 2008) (finding establishment of prima-facie case where employer was notified of EEOC charge eight days before firing employee); see also Stone v. Geico General Ins. Co., 279 Fed. Appx. 821, 824 (11th Cir. 2008) (finding that a one-month period was sufficient "temporal

proximity to show causation" for prima-facie case);
Donnellon v. Fruehauf Corp., 794 F.2d 598, 601 (11th Cir.
1986) (finding that one-month period between filing EEOC
charge and dismissal "belies any assertion by defendant
that plaintiff failed to prove causation.").


### iii. Has HMMA Presented a Non-retaliatory Reason for the Transfer?

HMMA now has the burden of producing a non-
retaliatory reason for the transfer; it has presented
two: (1) that Edwards requested the transfer and (2) that
her work in the CCR was unsatisfactory.  These reasons
satisfy HMMA's low burden at this stage of the analysis.


### iv. Has Edwards Presented Evidence of Pretext?

The burden of persuasion now lies with Edwards to
provide sufficient evidence to permit a reasonable jury
to conclude that these rationales were merely pretext and
that the real reason for the dismissal was retaliation.
Edwards has met this burden.

HMMA's first explanation, that Edwards requested the transfer, has already been shown to lack credence.  The evidence shows that Edwards did request a transfer but that she did not receive the transfer she originally requested or the one she thought she might receive.  And, although there is some evidence that HMMA began training another person for her position even before Edwards filed her complaint, there is evidence that this person was being trained to fill-in for Edwards not to replace her. In the end, just days after she filed a complaint, HMMA transferred Edwards to a dirtier, less desirable position on the Weld Team only 30 feet away from her harasser; this creates a strong presumption of retaliation. Jones herself advised HMMA not to transfer Edwards, explaining that it could be seen as retaliatory. Based on the evidence, a reasonable jury could certainly agree.

The same holds true for HMMA's argument that Edwards was reassigned because her performance was inadequate. Two managers have alleged this fact, but there is no

evidence to support it and no one informed Edwards, before she complained, that her performance was below par. Considering the weakness of the HMMA's justification and the strength of the presumption of retaliation, a reasonable jury could conclude that HMMA's proffered rationale is mere pretext.

Thus, Edwards has shown a genuine question of fact warranting a trial on her retaliatory-transfer claim. Summary judgment will be denied on this retaliation claim.


## 2. Edwards's Termination

HMMA concedes that Edwards's termination was an adverse-employment action but contends that Edwards has failed to show that her termination was causally related to her in-house sexual-harassment complaint or her EEOC charge. The court agrees.

First, Edwards was terminated 11 months after complaining to Team Relations and ten months after filing

her EEOC charge, so there is no close temporal proximity suggesting causation.  <u>See</u> <u>Davis v. Coca-Cola Bottling Co. Consol.</u>, 516 F.3d 955 (11th Cir. 2008)(finding that eight months did not suffice to show temporal proximity between EEOC charge and dismissal of employee).  More importantly, Edwards has presented no evidence to rebut (a) Warner's statement that Edwards was fired because she failed to report back to work after the termination of her long-term medical leave or (b) Warner's statement that she was not aware of either Edwards's in-house complaint or EEOC charge when making the termination decision.  Therefore, Edwards has failed to demonstrate causality, and her claim for retaliatory termination fails.  Summary judgment will be granted on this retaliation claim.


### 3. HMMA's Refusal to Rehire Edwards

Edwards argues that HMMA's refusal to rehire her was also retaliatory. This claim, however, suffers from a

33

very fundamental deficiency: there is no evidence that Edwards ever actually reapplied for a position with HMMA after she was terminated.

As discussed above, Edwards relies on an email correspondence between her attorney and an attorney for HMMA. This correspondence took place in March 2007. At that time, HMMA told Edwards that, in order to get back to work, she would need to obtain a release from her medical restrictions and she would need to make an appointment with HMMA's on-site medical clinic. She did not take either of these steps. More importantly, however, she did not actually apply for a new position with HMMA after her employment was finally terminated in June 2007. Thus, her retaliatory refusal-to-hire claim clearly fails; the motion for summary judgment will granted as to this claim.

### D. Violation of the Family and Medical Leave Act

The FMLA provides that an eligible employee with "a serious health condition that makes the employee unable to perform the functions of the position" shall be entitled to 12 workweeks of unpaid leave during any one-year period. 29 U.S.C. § 2612(a)(1)(D), 261(c)-(d). To be eligible, an employee must have been employed "(i) for at least 12 months by the employer with respect to whom leave is requested under section 2612 of this title; and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A). Eligibility determinations "must be made as of the date leave commences." 29 C.F.R. § 825.110(d); Walker v. Elmore County Bd. of Educ., 379 F.3d. 1249, 1253 n.10 (11th Cir. 2004).

An employee may bring two types of claims under the FMLA: "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act; and retaliation claims,

in which an employee asserts that his employer
discriminated against him because he engaged in activity
protected by the Act." Strickland v. Water Works & Sewer
Bd. of City of Birmingham, 239 F.3d 1199, 1206 (11th Cir.
2001).

To state a claim of interference, "an employee need
only demonstrate by a preponderance of the evidence that
he was entitled to the benefit denied." Id. at 1206-07.
To state a claim of retaliation, "'an employee must
allege that (1) he engaged in a statutorily protected
activity; (2) he suffered an adverse employment decision;
and (3) the decision was causally related to the
protected activity.'" Walker v. Elmore County Bd. of
Educ., 379 F.3d. 1249, 1252 (11th Cir. 2004) (quoting
Strickland, 239 F.3d at 1207).

Edwards concedes that she was not eligible for FMLA
benefits as of the date her disability leave commenced;
therefore, she does not bring an interference claim.
Instead, she argues that HMMA retaliated against her (for

filing her in-house sexual-harassment complaint and EEOC charge) by denying her right under the FMLA to return to a position with the company.  This claim, however, fails at the most fundamental level; she does not allege (or provide evidence showing) that she ever actually requested leave under the FMLA.  See Cash v. Smith, 231 F.3d 1301, 1307 (11th Cir. 2000) (upholding summary judgment where plaintiff failed to obtain the required medical certification for taking leave under the FMLA and, therefore, never exercised a protected right under the FMLA).

Even if Edwards had requested FMLA benefits, however, she still would not have rights under the statute.  When she began her leave, she was ineligible for FMLA benefits because she had not worked for HMMA for 12 months.  Her ineligibility has not changed.  Therefore, she could only have requested benefits for which she would have been ineligible.  The Eleventh Circuit has clarified that, "There can be no doubt that [a] request--made by an

ineligible employee for leave that would begin when she would still have been ineligible--is not protected by the FMLA." <u>Walker</u>, 379 F.3d. at 1252.  Therefore, Edwards's FMLA claim fails.

Summary judgment will be granted on Edwards's FMLA claim.


### IV. STATE-LAW CLAIMS AGAINST SWINDLE

Edwards also brings state-law claims against Swindle for intentional infliction of emotional distress, invasion of privacy, assault and battery, and slander.


### A. Intentional Infliction of Emotional Distress

To succeed on a claim of intentional infliction of emotional distress, also known as a claim of outrage, <u>see</u> <u>Stewart v. Matthews, Indus., Inc.</u>, 644 So.2d 915, 918 (Ala. 1994), the plaintiff must show (1) that the defendant either intended to inflict emotional distress, or knew or should have known that emotional distress was

likely to result from his conduct; (2) that the defendant's conduct was extreme and outrageous; and (3) that the defendant's conduct caused emotional distress so severe that no reasonable person could be expected to endure it.  Jackson v. Alabama Power Co., 630 So.2d 439, 440 (Ala. 1993).  Extreme and outrageous conduct has been defined as conduct that goes "beyond all possible bounds of decency," and can be regarded as "atrocious and utterly intolerable in a civilized society."  American Road Services, Co. v. Inmon, 394 So.2d 361, 365 (Ala. 1981).

The Alabama Supreme Court has clarified that "outrage is a very limited cause of action that is available only in the most egregious circumstances." Thomas v. BSE Indus. Contractors, Inc., 624 So.2d 1041, 1044 (Ala. 1993).  Both the defendant's conduct and the plaintiff's emotional distress must be extreme; this standard has been applied "'strictly'" by the Alabama Supreme Court. Saville v. Houston County Healthcare Auth., 852 F.Supp.

1512, 1541 (M.D. Ala. 1994) (Thompson, J.) (quoting

Continental Cas. Ins. Co. v. McDonald, 567 So.2d 1208,

1211 (Ala. 1990)).

In Busby v. Truswal Systems Corporation, the Alabama

Supreme Court recognized that egregious sexual harassment

may give rise to an outrage claim.  551 So.2d 322, 324

(Ala. 1989).  There, the defendant, among other things,

invited the plaintiffs to swim in his pool nude; asked if

he could put his hands down the pants of one of the

plaintiffs; bragged about his own sexual abilities;

suggested that he wanted to impregnate one of the

employees; said that he wished the plaintiffs would come

to work braless; acted as if he were going to pinch one

of the plaintiff's breasts with plyers; followed one of

the plaintiffs at night; and put his arm around the

plaintiffs, grabbing their arms and stroking their necks.

The Busby court concluded that this conduct "rose to the

level" of outrage, because it was "'beyond all possible

bounds of decency, ... atrocious and utterly intolerable

in a civilized society.'" _Id_. (quoting <u>American Road Service Co. v. Inmon</u>, 394 So.2d 361 (Ala. 1981)).

Several Alabama district courts have followed the decision in <u>Busby</u>, finding the allegations of sexual harassment sufficiently egregious to support a claim of outrage. In <u>Brewer v. Petroleum Suppliers, Inc.</u>, 946 F. Supp. 926, 936 (N.D. Ala. 1996) (Propst, J.), the court explained that "when the sexual impositions are not merely verbal or economic, but become physical impositions, the harasser is no longer attempting to request sexual favors ... but is instead attempting to force sexual liberties .... At that point, the harasser's conduct goes beyond the simply base and oversteps the tolerable bounds of a civilized society." <u>See also Jeffers v. Russell County Bd. of Educ.</u>, 2008 WL 410621 (M.D. Ala. 2008) (Watkins, J.); <u>Mills v. Wex-Tex Industries, Inc.</u>, 991 F. Supp. 1370 (M.D. Ala. 1997) (DeMent, J.); <u>Brassfield v. Jack McLendon Furniture, Inc.</u> 953 F. Supp. 1438 (M.D. Ala. 1996) (DeMent, J.).

Here, Edwards has alleged that Swindle touched her leg in a suggestive manner; blocked her path in the corridors of the plant; shook his genitals at her; put his hands behind his back and intentionally bumped up against her; pulled her pony tail; asked her very explicit and vulgar questions about her sex life; and repeatedly propositioned her sexually. Edwards has presented evidence that Swindle's actions caused her significant emotional distress; she broke down in tears, lost sleep, and even sought medical help because of depression that may have resulted from Swindle's behavior.

On the whole, these circumstances are similar to those presented in Busby and the district court cases applying that decision. As such, it is for a jury to decide whether Swindle's behavior is outrageous, has caused Edwards to suffer extreme emotional distress, and should not be tolerated in a civilized society. Summary

**42**

judgment will be denied on Edwards's intentional-infliction-of-emotional-distress claim against Swindle.

## B. Invasion of Privacy

A claim for invasion of privacy may consist of "four limited and distinct wrongs: (1) intruding into the plaintiff's physical solitude or seclusion; (2) giving publicity to private information about the plaintiff that violates ordinary decency; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; (4) appropriating some element of the plaintiff's personality for public use." Johnston v. Fuller, 706 So.2d 700, 701 (Ala. 1997).  Edwards bases her claim on the first type of wrong; she alleges that Swindled invaded her "personal and emotional sanctum by physically touching" and "fondling" her.  Pl.'s Compl. at ¶ 68-69.[5]

_____

5.  The motion for summary judgment, perhaps in excess of caution, addresses other invasion-of-privacy claims, such as a false-light claim, that Edwards may

(continued...)

To support an intrusion claim, a plaintiff must show that the defendant "intruded" or "pried" into a private matter in a way that would be objectionable to a reasonable person.  Hogin v. Cottingham, 533 So.2d 525, 531 (Ala. 1988).  "Two primary factors are to considered in determining whether or not an intrusion which effects access to private information is actionable.  The first is the means used. The second is the defendant's purpose for obtaining the information."  Id. (internal citations omitted).

"[E]xtensive egregious inquiries into one's sex life, coupled with intrusive and coercive sexual demands," is an example of intrusion that is sufficient "'to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.'"  Stevenson v. Precision Standard, Inc., 762 So.2d 820, 826 (Ala. 1999) (quoting Phillips v. Smalley Maint. Servs., Inc., 435

(...continued)
have alleged.  But it is clear from the complaint that the plaintiff has not made these claims; therefore, the court will not address them here.

44

So.2d 705, 711 (Ala. 1983)); <u>see also</u> <u>Baldwin v. Blue</u>
<u>Cross/Blue Shield of Ala.</u>, 480 F.3d 1287, 1300 (11th Cir.
2007).

 In this case, Edwards has presented evidence that
Swindle made egregious inquiries into her sex life,
asking her if she had ever had "a man's finger up her
butt," and also made egregious sexual propositions,
offering to "lick her ass raw."  A jury could certainly
see such comments (and others like them) as an intrusion
on private matters in a way that could induce humiliation
or shame in a person of ordinary sensibilities, and
Swindle has offered no legitimate purpose for seeking
this information.  Summary judgment will be denied on
Edwards's invasion-of-privacy claim.


## C. Assault and Battery

 "To succeed on a claim alleging battery, a plaintiff
must establish: (1) that the defendant touched the
plaintiff; (2) that the defendant intended to touch the

**45**

plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." Ex Parte Atmore Community Hosp., 719 So.2d 1190 (Ala. 1998); see also Harper v. Winston County, 892 So.2d 346, 354 (Ala. 2004); Surrency v. Harbison, 489 So.2d 1097, 1104 (Ala. 1986).

In Ex Parte Atmore, the plaintiff survived a motion for summary judgment by presenting evidence that the defendant "touched her waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg ... [and] that each of these touchings was intentional, was conducted with sexual overtones, and was unwelcome." 719 So.2d at 1193. The circumstances are similar here. Swindle admitted that he pulled Edwards's pony tail on several occasions and repeatedly hugged her and bumped against her with his hands behind his back, all against her wishes, eventually causing Edwards to break down in tears. A reasonable juror could conclude that such touching was "harmful" and

offensive." Summary judgment will be denied on Edwards's assault-and-battery claim.

### D. Slander

To establish a slander claim, Edwards must show that (1) the defendant was negligent (2) in publishing (3) a false or defamatory statement (4) concerning the plaintiff (5) which is either actionable per se (without needing to show special harm) or actionable per quod (with proof of special damages). Ex Parte Crawford Broadcasting, 904 So. 2d 221, 225 (Ala. 2004).

Slander per se must impute to the plaintiff an indictable offense involving infamy or moral turpitude. Anderton v. Gentry, 577 So.2d 1261, 1263 (Ala. 1991). Edwards argues that Swindle told others that he had a "thing going" with Edwards, suggesting that they had a sexual relationship and that she, therefore, was engaged in the indictable offense of adultery. In Anderton, however, the Alabama Supreme Court showed reluctance to find slander in such cases, specifically rejecting such

47

a claim where the alleged slander did not specifically describe the circumstances necessary for the offense of adultery, namely, that a married person had relations and <u>cohabitated</u> with another while married.  Swindle's vague statement that he and Edwards had a "thing going" does not address these various elements.  <u>Id</u>.

Likewise, any slander <u>per quod</u> claim must fail because Edwards does not claim "special damages," which are material harms generally limited to "material loss capable of being measured by money." <u>Casey v. McConnell</u>, 975 So.2d 384, 390 (Ala. Civ. App. 2007).  Edwards's states only that Swindle's comments "bothered" her and offended the pride she takes in being faithful to her husband.

Summary judgment will be granted on Edwards's slander claim.

## V. STATE-LAW CLAIMS AGAINST HMMA

Edwards also alleges that, under Alabama state law, HMMA is directly liable for negligent supervision and vicariously liable for Swindle's intentional infliction of emotional distress and assault and battery.

### A. Negligent Supervision[6]

To support a claim of negligent supervision, the plaintiff must demonstrate that (1) the employee committed a tort recognized under Alabama law, Stevenson v. Precision Standard, Inc., 762 So.2d 820, 824 (Ala. 1999),

---

6. Count Five of the complaint alleges "Negligent Hiring, Training, Supervision, and Retention." However, in her response to the motion for summary judgment, Edwards uses the heading "Negligent Supervision Claim," and addresses only the issue of negligent supervision. Pl.'s Resp. M. Summ. J. 67. Therefore, the other potential contentions (negligent hiring and retention) are deemed to have been abandoned. See Brasseler, U.S.A I, L.P. v. Stryker Sales Corp. 182 F.3d 888, 892 (11th Cir. 1999) (affirming the "unremarkable proposition that assertions made in the pleadings[,] ... but not made in opposition to a motion for summary judgment, need not be considered by the district court ... in ruling on the motion for summary judgment"). The court also notes that no evidence or argument has been offered to support these contentions.

(2) the employer had actual notice of this conduct or would have gained such notice if it exercised "due and proper diligence," <u>Armstrong Bus. Servs. v. AmSouth Bank</u>, 817 So.2d 665, 682 (Ala. 2001), and (3) the employer failed to respond to this notice adequately. <u>Id</u>.  "It is proper, when repeated acts of carelessness and incompetency of a certain character are shown on the part of the servant, to leave it to the jury to determine whether they would have come to the master's knowledge had the master exercised ordinary care."  <u>Mardis v. Robbins Tire & Rubber Co.</u>, 669 So.2d 885, 889 (Ala. 1995).

Although "Alabama does not recognize an independent cause of action for sexual harassment," <u>Stevenson</u>, 762 So.2d at 825 n.6, in this case there is evidence that Swindle engaged in repeated behavior amounting to the tort of invasion of privacy.  And this tortious behavior may have been widely known at the plant.  For example, Edwards complained informally to Culpepper, a supervisor, and he recognized that Swindle will often say things that others "do not want to hear."  Kitchens, a Team Leader, witnessed

Swindle's offensive behavior, as did other workers at the plant.  This evidence creates a genuine question whether HMMA either had actual knowledge of Swindle's tortious behavior or would have learned of it by exercising ordinary care, perhaps by following up on Edwards's informal complaints.  Finally, HMMA's failure to act on this information permitted Swindle to continue harassing Edwards until she made her formal complaint, raising a genuine question as to the adequacy of HMMA's response.

## B. Vicarious Liability for Intentional Infliction of Emotional Distress and Assault and Battery

For an employer to be deemed liable for the intentional torts of an employee, the employee must demonstrate that (1) the tortious acts were committed "in the line and scope of the employment," (2) they were committed "in furtherance of the business of the employer," or (3) the employer "participated in, authorized, or ratified the wrongful acts."  Potts v. BE & K Const. Co., 604 So.2d 398, 400 (Ala. 1992); see also

<u>Joyner v. AAA Cooper Transp.</u>, 477 So.2d 364, 365 (Ala.
1985).

To show ratification, in addition to proving that the
offending employee committed a tort, "a complaining
employee must show that the employer (1) had actual
knowledge of the tortious conduct of the offending
employee ...; (2) that based upon this knowledge, the
employer knew, or should have known, that such conduct
constituted sexual harassment and/or a continuing tort;
and (3) that the employer failed to take 'adequate' steps
to remedy the situation." <u>Potts</u>, 604 So.2d at 400. "If
the steps taken to remedy the situation are not reasonably
calculated to halt the harassment, the steps taken by the
employer are not 'adequate.'" <u>Id</u>.

In <u>Busby</u> the Alabama Supreme Court signaled its
reluctance to find vicarious liability for intentional
infliction of emotional distress, explaining that the tort
"should not be the basis for vicarious ... liability
except in the most compelling circumstances," 551 So.2d at
327, because it "carries punitive damages, which should

not ordinarily be imposed against an employer for the personal sexual transgressions of its employees." Id. at 328. The court, therefore, denied the vicarious-liability claim, in part, because the employer did not know "the details or the full extent of [the] conduct" by the offending employee. Id.

The circumstances are similar in this case. There is evidence that other employees, including a supervisor, knew of Swindle's inappropriate behavior at the plant. Nevertheless, Edwards admits that the first time she complained of Swindle's behavior, in any detail, was when she spoke to Team Relations, after which Swindle's offending behavior ceased. As such, there is no evidence that HMMA had actual knowledge (before Edwards complained) that Swindle engaged in behavior amounting to the tort of outrage. The same analysis applies to Edwards's claim for vicarious liability for Swindle's assault and battery. There is no evidence that HMMA actually knew (before Edwards complained) that Swindle had touched Edwards in a rude or offensive way. Finally, all the evidence suggests

53

that HMMA responded adequately after Edwards formally complained, moving quickly to punish Swindle and stop the offending behavior.

Summary judgment will be granted on any theory of vicarious liability against HMMA.

***

Accordingly, it is ORDERED as follows:

(1) Defendant Hyundai Motor Manufacturing Alabama's motion for summary judgment (Doc. No. 21) is denied on (a) plaintiff Tammy Edwards's claims for sexual harassment and retaliation (as to the transfer) under Title VII of the Civil Rights Act of 1964 , as amended (42 U.S.C. §§ 1981a, 2000e to 2000e-17) and (b) her state-law claim for negligent supervision.  These claims will go to trial against defendant Hyundai Motor Manufacturing Alabama.

(2) Defendant Hyundai Motor Manufacturing Alabama's motion for summary judgment (Doc. No. 21) is granted in all other respects.

54

(3) Defendant Mike Swindle's motion for summary judgment (Doc. No. 26) is denied on plaintiff Edwards's state-law claims for intentional infliction of emotional distress, invasion of privacy, and assault and battery. These claims will go to trial against defendant Swindle.

(4) Defendant Swindle's motion for summary judgment (Doc. No. 26) is granted in all other respects.

DONE, this the 27th day of March, 2009.

    /s/ Myron H. Thompson    
UNITED STATES DISTRICT JUDGE