IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| TAMMY EDWARDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:07cv908-MHT |
| | ) | (WO) |
| HYUNDAI MOTOR | ) | |
| MANUFACTURING ALABAMA, | ) | |
| LLC, and MIKE SWINDLE, | ) | |
| individually, | ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER

This case is now before the court on defendant
Hyundai Motor Manufacturing Alabama's (HMMA) motions for
a new trial based on juror misconduct.  The court held a
full evidentiary hearing and oral argument on this matter
on August 25, 2009.  The court now concludes that one of
the jurors did engage in misconduct that denied HMMA's
right to an impartial jury.  Therefore, the motions for
a new trial will be granted.

## RULE 59 STANDARD

HMMA has filed its motion for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure, which provides that, after a jury trial, the court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court."  However, the rule is not as expansive as it might first appear.  The Eleventh Circuit has explained, "'The only grounds for granting a Rule 59 motion are newly-discovered evidence or manifest errors of law or fact.'"  <u>Arthur v. King</u>, 500 F.3d 1335, 1343 (11th Cir. 2007) (quoting <u>In re Kellogg</u>, 197 F.3d 1116, 1119 (11th Cir. 1999)).


## II. BACKGROUND

This lawsuit centered on plaintiff Tammy Edwards sexual-harassment claims against defendants HMMA and Mike Swindle, an employee at the HMMA plant.  The case went to trial in April 2009, and the jury returned a verdict in

2

Edwards's favor, ultimately awarding her $ 6 million in compensatory and punitive damages.  After trial, however, HMMA filled motions for a new trial, arguing that one of the jurors had failed to answer honestly a question asked during voir dire; that this juror was biased; and that HMMA deserved a new trial.  The following are the key dates and facts related to this claim.

April 17, 2009: The court supplied the parties with the juror questionnaire forms for the entire jury pool. A paralegal working for HMMA ran these names through its database, looking for jurors who may have worked for or applied for positions with HMMA.  This search revealed several names, two of which ended up in the jury pool convened for this case.

April 19: HMMA's paralegal sent the names of potential applicants to HMMA's trial attorneys.

April 20:  During voir dire, HMMA asked whether any of the jurors had "applied for work at HMMA at any point in the past and [] didn't get that job?"  Trans. Jury

Selection at 93.  There was no response to that question.
During venire, HMMA raised its concern that one of the
jurors on the list (J-XXX) may actually have applied to
work at Hyundai.  J-XXX was called back for questioning;
she admitted to being nervous but denied ever having
applied for a position at HMMA.  The court did not strike
this juror for cause and HMMA chose not to use one of its
peremptory strikes to remove her.  HMMA then decided not
to question the second juror (J-125) named on its list of
potential applicants.  Jury selection finished that
afternoon; both potential applicants (J-XXX and J-125)
were selected for the petit jury.

That evening HMMA's attorneys received an email from
HMMA's legal department which had a "candidate profile"
attached.  This profile revealed that someone with the
same name and address as J-125 had applied for employment
with HMMA in April 2006 and that this person had received
an interview before she was ultimately denied a position
after failing her final review.  The email from HMMA's

4

legal department speculated that the applicant was denied employment because of information revealed in her background check and concluded that the applicant and J-125 were the same person.

April 21: HMMA's legal department followed up with another email, this time attaching the application and background check.  HMMA's trial attorneys did not pursue this issue at this point or during trial and had no further communication with HMMA on the matter until after trial.

April 30: Trial concluded.

May 1: The jury returned a verdict awarding Edwards approximately $ 5.8 million in compensatory and punitive damages; $ 5.7 million of these damages were apportioned to HMMA.

May 2 – 13: HMMA resumed its investigation of juror J-125.  During this renewed investigation, the attorneys became aware that Alabama Industrial Department Training

(AIDT) conducted pre-employment training programs for Hyundai during the period in which J-125 applied.

May 14: HMMA's attorneys contacted AIDT and received J-125's training profile, which contained her "Production Pre-Employment Assessment," a numerical assessment of her performance at various production work stations and in the classroom.   This information revealed that the applicant began her pre-employment classroom training at HMMA's training center on April 10, 2006, and that she began her workstation training on April 12, 2006.

May 15 and 22: HMMA's attorneys filed the present motions for a new trial, arguing that J-125 had engaged in misconduct during voir dire when she failed to answer honestly after HMMA asked whether any of the potential jurors had applied for a job with Hyundai at any time in the past.[1]

---

    1.  While Swindle also filed a motion for new trial, his motion did not rest on a contention of juror misconduct.

August 24: HMMA received J-125's pre-employment training test scores from AIDT, indicating that she in fact attended four days of classroom and workstation training between April 10 and 14, 2006.

August 25: The court held an evidentiary hearing and oral argument concerning the juror misconduct issue.  The court examined J-125 at length.  She conceded that it was her signature and handwriting on the application for employment, but she stated that she did not remember anything about applying, interviewing, or training at HMMA.  She indicated that she had only been to HMMA's facilities to visit relatives who worked there.

### III. Discussion

#### a. Juror Misconduct

"To obtain a new trial based on juror misconduct during voir dire, a party must: 1) demonstrate that a juror failed to answer honestly a material question on voir dire, and then 2) show that a correct response would

7

have provided a valid basis for a challenge for cause." United States v. Carpa, 271 F.3d 962, 967 (11th Cir. 2001) (restating the test established in McDonough Power Equip. v. Greenwood, 464 U.S. 548 (1984)).

"The first prong ... requires a determination of whether the juror's answers were honest." BankAtlantic v. Blythe Eastman Paine Webber, Inc., 955 F.2d 1467, 1473 (11th Cir. 1992). "[A] juror's mistaken, though honest, response to a question asked during voir dire will not invalidate the result of trial." McDonough, 464 U.S. at 555. "The second prong ... requires a showing of actual bias." BankAtlantic, 955 F.2d at 1473. "A relationship between a juror and defendant, albeit a remote one, can form the basis of a challenge for cause." United State v. Perkins, 748 F.2d 1519 (11th Cir. 1984). Furthermore, "[a] juror's dishonesty is a strong indication of bias." Carpa, 271 F.3d at 967.

"When a prospective juror reveals actual bias, or when bias is implied because the juror has some special

relationship to a party ..., the court must dismiss the prospective juror for cause." <u>United States v. Rhodes</u>, 177 F.3d 963, 965 (11th Cir. 1999). "When the juror demonstrates, however, that she can lay aside any opinion she might hold and render a judgment based solely on the evidence presented in court, then dismissal is not required." <u>Id</u>.

The evidence is conclusive that J-125 is the same person that applied, interviewed, and trained at HMMA. She admitted that it was her signature and handwriting on the application and that the candidate profile contained her information and criminal background. This same signature appears on several forms dated April 10, 2006, which J-125 apparently signed before beginning pre-employment training at HMMA's facilities. When questioned about this information, however, J-125 simply denied any recollection of these events. She did not offer any explanation as to why her handwriting and signature appeared on the application, merely stating

that a lot of things have happened with her family since 2006.

During the evidentiary hearing, J-125's memory did not seem faulty; for example, she quickly recalled the questions she had been asked during voir dire, even offering certain specific details about them.  Nor did she have trouble remembering that she had visited HMMA's facilities several times in the past to visit family members.  Yet she maintains that she has no memory whatsoever of the fact that she applied for employment with HMMA and trained there for several days.  Excluding the possibility of episodic amnesia, this is nearly impossible to believe.  The only reasonable explanation for this phenomenon is that she has consistently failed to answer honestly when she has been asked whether she ever applied to work at HMMA.  Thus, the first prong of the juror misconduct inquiry is satisfied.

The second prong--that this information would have provided a valid challenge for cause--is also satisfied.

"A relationship between a juror and defendant, albeit a remote one, can form the basis of a challenge for cause." United State v. Perkins, 748 F.2d 1519, 1432 (11th Cir. 1984). Edwards has argued that J-125's relationship would not provide a valid challenge for cause because the court, in this same case, declined to dismiss for cause a juror who had two sons working at HMMA. Several key factors distiguish these scenarios. First, J-125's relationship with HMMA is not one step removed and mediated through a relative but direct and extensive. She did not merely visit the factory or hear stories about it from her sons, she spent several days at HMMA's facilities--interviewing, studying in the classrooms, and training on the workstations. This experience would have given her substantial first-hand information about HMMA and its practices and culture, information that would almost certainly influence her analysis of the evidence presented in this case.

In addition, in the case of the juror who had two sons working at HMMA, the juror admitted this relationship and gave the court the opportunity to ask him whether he could be fair and impartial. He stated that he could, and the court found him credible. He therefore demonstrated that he could "lay aside any opinion [he] might hold and render a judgment based solely on the evidence presented in court." Rhodes, 177 F.3d at 965. J-125, on the other hand, still has not admitted her relationship with HMMA and the court has therefore not been able to ask her directly about that relationship and determine whether she might be able set it aside to render a fair judgment.

Third, J-125's experiences are very likely to have engendered bias. HMMA asked her to invest significant amounts of uncompensated time in pre-employment training before denying her a job. This would likely embitter most people. Such is not the case with the juror whose sons worked at HMMA; unless his sons feel strongly about

their jobs, the juror's attitude toward the company is likely to be neutral and easily set aside.      Finally, although bias may not simply be assumed where a juror has been dishonest, "[a] juror's dishonesty is a strong indication of bias."  Carpa, 271 F.3d at 967.  The fact that J-125 was dishonest during voir dire about her relationship with HMMA, and was dishonest again during the evidentiary hearing, is a powerful indication that her attitudes toward HMMA are not neutral.

In conclusion, it is apparent that J-125 failed to answer honestly a question asked during voir dire and that such information, if revealed, would have provided a valid challenge for cause.


### b. Newly Discovered Evidence

As mentioned above, the only grounds for granting a Rule 59 motion are newly discovered evidence or manifest error of law or fact.  "[A] motion for new trial based on juror misconduct is a form of new trial motion for newly

discovered evidence." <u>United States v. Bolinger</u>, 837
F.2d 436, 439 (11th 1988).  "A motion for a new trial
based upon newly discovered evidence must not be based on
evidence or incidents of which appellants had knowledge
prior to return of the jury verdict." <u>United States v.
Calderon</u>, 127 F.3d 1314, 1351 (11th Cir. 1997).
"Moreover, [movants] have the burden of establishing in
their motions that the evidence was in fact newly
discovered and that failure to discover it prior to
verdict was not due to a lack of due diligence.  If
[they] can not make such a showing, their motions should
be denied." <u>Id</u>. (internal citation omitted).

Such a rule "serves to ensure that the trial court is
given every available opportunity to attempt to salvage
the trial by ridding the jury of prejudicial influences."
<u>Bolinger</u>, 837 F.2d at 439.  The rule also prevents
parties from gaming the system.  "[A] defendant cannot
learn of juror misconduct during the trial, gamble on a
favorable verdict by remaining silent, and then complain

in a post-verdict motion that the verdict was prejudicially influenced by that misconduct." United States v. Jones, 597 F.2d 485, 488 n.3 (5th Cir. 1979).[2]

In the case at hand, HMMA's attorneys did not have evidence or knowledge during trial that J-125 intentionally failed to answer a question honestly during voir dire. As explained above, a movant must show dishonesty, not simply a good-faith or honest mistake. During trial, HMMA had evidence and knowledge that J-125 inaccurately answered a question during voir dire, but it had no evidence suggesting that she had been intentionally dishonest. Before the jury returned a verdict that was twice what Edwards had requested and before it was revealed that J-125 spent several uncompensated days training at HMMA's facilities, many innocent and plausible reasons existed for why she might

---

2. In Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

have failed to disclose that information.  In fact, based
on the minimal evidence HMMA had during trial (that J-125
applied  and  interviewed  for  a  position  but  was  not
hired), it would have seemed quite likely that she had a
simple,  good  faith  reason  for  failing  to  mention  her
application  during  voir  dire.    For  example,  she  might
simply  have  forgotten  the  incident  because  she  was
filling  out  many  job  applications  at  the  time  and
interviewing frequently, or she might have misunderstood
the question that was asked, or she may simply have been
daydreaming and failed to hear it--the point being that,
before the true extent of J-125's relationship with HMMA
became  known,  it  would  not  have  seemed  clear  or  even
likely that J-125's failure to disclose her application
was dishonest.  As such, the court cannot say that HMMA
had  evidence  or  knowledge  of  J-125's  intentional
dishonesty prior to the return of the verdict.

    At  the  earliest,  HMMA  had  knowledge  of  J-125's
dishonesty on May 14, 2009, when the full extent of her

relationship with HMMA first came to light.  It is only at this point that HMMA's attorneys realized that she had invested several uncompensated days in training at HMMA before she failed her final review.  This is the information that finally revealed that J-125 could not simply have forgotten her application, but had intentionally failed to answer honestly during voir dire, and was most likely biased against HMMA.  Even then, the full extent of J-125's dishonesty did not finally become clear until the evidentiary hearing on August 25, 2009, when she admitted hearing and understanding the question asked during voir dire but insisted that she had no memory of applying, interviewing, or training at HMMA.

The next question is whether HMMA failed to discover evidence of dishonesty because of a lack of due diligence. Black's Law Dictionary (8th ed. 2004) defines "due diligence" as "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an

obligation." It lists synonyms as "reasonable diligence" or "common diligence." Therefore, the court must ask whether HMMA's attorneys unreasonably failed to discover the evidence of J-125's dishonesty.

In this endeavor, it bears remembering that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland v. Washington, 466 U.S. 668, 689 (1984) (discussing standard for ineffective assistance of counsel). Considering the circumstances and perspective that HMMA's attorneys had at the time, they did not unreasonably fail to discover the evidence of J-125's dishonesty.

First, before the jury was selected, HMMA's attorneys only had a list of names of possible applicants. They actually called one of these individuals, J-XXX, for questioning during venire only to have her deny that she

18

had ever applied to HMMA.   As HMMA's attorneys later
explained to the court during an on-the-record conference
call, this was a chastening experience.   They had
impugned the honesty of that juror, who admitted to being
nervous when called into chambers, and probably alienated
her.   At that point, they had no more information about
J-125 than they had about J-XXX and reasonably decided
not to make the same mistake by questioning J-125 during
venire.

By the time HMMA received additional information
about J-125, suggesting that she had indeed applied with
the company, she had already been selected for the jury.
At that point, questioning her would have been even more
likely to cause alienation.   And there would have been no
reason to do so.   HMMA's attorneys did not yet know the
extent of J-125's relationship with the company, so there
would have been no grounds for asserting the bias
necessary for a valid challenge for cause.   For example,
during oral argument, HMMA's trial attorney noted that he

19

had previously tried cases in the Middle District of Alabama with HMMA applicants on the jury. In those cases, the mere fact that a juror had applied for a job at HMMA did not disqualify that juror from hearing a case against HMMA. Therefore, assuming that J-125 would have given the same answers during trial that she later gave during the evidentiary hearing, questioning her during trial would not only have been fruitless, it would have been detrimental to HMMA's case. As such, HMMA was not unreasonable or indiligent in choosing not to question her; in fact, under the circumstances and according to the evidence HMMA had at the time, it was probably the right decision.

The court must now ask whether HMMA's attorneys lacked due diligence in failing to discover, during trial, the full extent of J-125's relationship with HMMA. Once again, the answer is no. First, and most importantly, HMMA's attorneys had no reason at the time to pursue this issue further. There is no evidence

suggesting that HMMA's trial attorneys should have known that J-125 received extensive pre-employment training at the company.  Nothing in the application or candidate profile they received during trial would have tipped them off to this fact.  And, the evidence of her training was even less accessible than might be assumed because the pre-employment training was not conducted by HMMA itself but by AIDT.[3]  In fact, it appears that HMMA's attorneys did not become aware of the fact that AIDT formerly conducted training for HMMA until well after the jury returned its verdict.  Once they did become aware of this fact, they were able to obtain J-125's records from AIDT very quickly.  The court cannot say, however, that they should have learned about AIDT during trial or should have known that J-125 might have trained with HMMA.  This is particularly true considering that the attorneys then

---

3.  At the evidentiary hearing, HMMA's attorneys explained that AIDT conducted training on HMMA's behalf during the time that HMMA first began operating its plant outside Montgomery, Alabama.  Although conducted by AIDT, the training took place at HMMA for employment with HMMA.

faced the many, more immediate challenges of actually trying a case.

The essential fact revealing J-125's dishonesty and bias in this case is that she spent several unpaid days at the HMMA plant both in classroom and workstation training before she was denied a job for failing her final review.   HMMA's attorneys did not have this evidence during trial and they had no reason to pursue this information any sooner than they did.   Therefore, the court finds that HMMA's failure to discover the evidence of J-125's dishonesty was not due to a lack of due diligence.

The court must candidly add, however, that whether J-125's dishonesty constitutes newly discovered evidence is a close call, for HMMA did have some knowledge that J-125 had applied for a position.   Nonetheless, several factors counsel that the court exercise its discretion to conclude that a new trial is warranted.   First, the court believes that, where the evidence of bias is as

22

substantial as it was in this case (where a juror intentionally misrepresented a material matter to the court), doubts regarding whether the evidence is newly discovered should be resolved in favor of a new trial. Second, the court heard the evidence and personally observed all witnesses, and, while this evidence was sufficient to support a verdict in favor of Edwards, it was not so clearly in favor of either party such that bias could not have played a role; or, to put it another way, this is the type of case in which bias could be critical to the outcome. Third and finally, the "elephant in the room" is that the jury returned a verdict of $ 5.7 million against HMMA. Not only was this award quite substantial, it was twice what Edwards's own attorneys, during closing argument, had appraised the case to be worth. In the face of such reaching by the jury (whether appropriate or not), this court must be sensitive to potential bias, and especially to the substantial bias displayed in this case.

The motions for a new trial based on juror misconduct will be granted.

***

Accordingly, it is the ORDER, JUDGMENT, and DECREE of the court as follows:

(1) Defendant Hyundai Motor Manufacturing Alabama, LLC's alternative motions for new trial (doc. nos. 156 & 166) are granted.

(2) The judgment of the court (doc. no. 150) and the jury verdicts (doc. nos. 144 & 147) are set aside and vacated as to defendant Hyundai Motor Manufacturing Alabama, LLC.

(3) The court will set a date for the jury selection and re-trial of plaintiff Tammy Edwards's claims against defendant Hyundai Motor Manufacturing Alabama, LLC.

DONE, this the 31st day of March, 2010.


                     /s/ Myron H. Thompson
                UNITED STATES DISTRICT JUDGE